**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

IRON MOUNTAIN INCORPORATED; et al.

Plaintiffs,

v.

THOMAS CARR,

Defendant

And

THOMAS CARR,

Counter-Plaintiff

v.

IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; AND CHARLES G. MOORE,

Counter-Defendants

Civil Action No.

05 10890 RCL

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Thomas Carr, Defendant and Counter-Plaintiff in the above-captioned proceedings, by his attorneys, Gary Solomon and Read McCaffrey of Patton Boggs, LLC, herewith answers the Plaintiffs' and Counter-Defendants' Complaint for Declaratory and Injunctive Relief and states:

**Statement of Action**

1. No answer is required to this series of conclusory statements and to the extent that an answer may be deemed required, the contentions and conclusions in Paragraph 1 are DENIED.

2. Defendant and Counter-Plaintiff ADMITS the allegations set forth in Paragraph 2.

3. Defendant and Counter-Plaintiff ADMITS the allegations set forth in Paragraph 3.

4. Defendant and Counter-Plaintiff has insufficient information to either admit or deny these contentions concerning C. Richard Reese.

5. Defendant and Counter-Plaintiff has insufficient information to either admit or deny these contentions concerning John F. Kenny, Jr.

6. Defendant and Counter-Plaintiff has insufficient information to either admit or deny the first sentence in Paragraph 6; because of representations by Mr. Watzke personally to the Defendant and Counter-Plaintiff, the second sentence of Paragraph 6 is ADMITTED.

7. Defendant and Counter-Plaintiff has insufficient information to either admit or deny the first sentence in Paragraph 7; because of representations by Mr. Varn personally to the Defendant and Counter-Plaintiff, the second sentence of Paragraph 7 is ADMITTED.

8. Defendant and Counter-Plaintiff has insufficient information to either admit or deny the first sentence in Paragraph 8; because of representations by Mr. Moore personally to the Defendant and Counter-Plaintiff, the second sentence of Paragraph 8 is ADMITTED.

9. The allegations in Paragraph 9 are ADMITTED.

**Jurisdiction and Venue**

10. The allegations in Paragraph 10 are ADMITTED.

11. The allegations in Paragraph 11 are ADMITTED.

**Background**

12. There are four sentences in Paragraph 12. The Defendant and Counter-Plaintiff has insufficient information to either admit or deny the allegations in sentences one or two, the allegations in sentence 3 are ADMITTED, and the conclusions in sentence 4 require no response.

13. The allegations in Paragraph 13 are DENIED.

14. It is admitted that various communications and dealings as between the Plaintiffs herein and Mr. Carr did occur but the contention that Mr. Carr made claims of relevancy are DENIED.

15. The allegations in Paragraph 15 are DENIED.

16. The allegations in the first sentence of Paragraph 16 are ADMITTED. The allegation in the second sentence of Paragraph 16 is DENIED. The location of said communications is discussed in detail in the Counter-Claim which follows.

17. The allegations in the first sentence of Paragraph 17 are ADMITTED. The allegation in the second sentence of Paragraph 17 is DENIED in that it is incomplete. Mr. Carr and Mr. Neebling attended a meeting on March 26, 2002, as stated, and were promised not only $25 Million in courier business but also sufficient funds to purchase the 51% of a corporation known as Logisteq then owned by Pioneer Capital/J. Peter Pierce.

18. The allegations in Paragraph 18 are ADMITTED.

19. The allegations in Paragraph 19 are DENIED. It is admitted however, that the activities claimed therein occurred on July 16, 2003.

20. The allegations in Paragraph 20 are ADMITTED.

Count I

21. Defendant and Counter-Plaintiff incorporate by reference herein their responses to Paragraphs 1 through 20.

22. The allegations in Paragraph 22 are ADMITTED.

23. The allegations in Paragraph 23 are DENIED.

24. With the filing of the Counter-Claim which follows, the allegations in Paragraph 24 are ADMITTED.

25. No response is required to the legal conclusion set forth in Paragraph 25.

26. The allegations in Paragraph 26 are DENIED.

## DEFENDANT'S AND COUNTER-PLAINTIFF'S AFFIRMATIVE DEFENSES

1. Plaintiffs have failed to aver any basis for their implied contention that this Honorable Court, in these proceedings, would have personal jurisdiction over the Defendant.

2. The relief sought by the Plaintiffs is barred by the doctrine of Unclean Hands.

3. Plaintiffs have failed to state a claim upon which relief can be granted.

4. Plaintiffs have failed to join parties indispensable pursuant to Rule 19.

5. Plaintiffs' claims are barred by estoppel.

6. Plaintiffs' Complaint is frivolous and otherwise violates Rule 11.

7. Defendant and Counter-Plaintiff reserves his right to assert additional defenses as discovery in these proceedings may support.

**COUNTERCLAIM**

Now comes Thomas Carr, Defendant and Counter-Plaintiff in the above captioned proceedings and, pursuant to Rule of Civil Procedure 13 herewith files this Counterclaim against Iron Mountain Incorporated, Iron Mountain Information Management, Inc., (collectively referred to hereafter as "Iron Mountain"), C. Richard Reese, John F. Kenny, Jr., Garry B. Watzke, Larry L. Varn and Charles G. Moore, Plaintiffs and Counter-Defendants and states:

**Facts Common to All Counts**

1. Prior to January 2001, Iron Mountain merged with and/or acquired a competitor known as Pierce Leahy, Inc., the resulting company being known as Iron Mountain.

2. Following the aforementioned transaction, J. Peter Pierce, ("Pierce") was elected to the Board of Directors of Iron Mountain and also was appointed president of the new company.

3. Sometime following the aforementioned merger and/or acquisition, Pierce had a falling out with Iron Mountain and, upon information and belief, was fired as the new company's president, but remained on its Board of Directors.

4. Upon information and belief, Pierce had signed a form of non-compete agreement as part of the aforementioned commercial transaction.

5. On or about January 15, 2001, Thomas Carr, ("Carr") and Pierce entered into an agreement to form a transportation company known as Logisteq, LLC

("Logisteq"), at the conclusion of which transaction, a Pierce controlled entity, Pioneer Capital, L.P., and a Carr controlled entity, Transportation Concepts of New Jersey, Inc. owned Logisteq 51% and 49%, respectively.

6. In the months which followed the formation of Logisteq, Pierce, on his own, formed a company known as Sequedex which, on information and belief, he used surreptitiously to compete with Iron Mountain and in so doing 'posted' significant costs including payroll, etc. expended to operate Sequedex on the books of Logisteq.

7. At a time material to these proceedings, Iron Mountain filed suit against Pierce for, on information and belief, a breach of the merger/acquisiton contract described in Paragraph 1 above, (a violation of the non-compete portion thereof), which action was ultimately placed before an arbiter who ultimately decided the action in favor of Pierce.

8. The proceedings described in the foregoing Paragraph are currently on appeal.

9. One result of the merger/acquisition discussed in Paragraph 1 above was that Logisteq, formerly a tenant of a Pierce Leahy entity, became a tenant of Iron Mountain.

10. On information and belief, because of the activities of Pierce and Sequedex, Iron Mountain sent a letter to Carr signed by Counter-Defendant Watzke that Logisteq and Carr as well as Carr businesses were being evicted from property now owned by Iron Mountain.

11. Mr. Carr protested in writing to Mr. Watzke.

12. Thereafter, Mr. Watzke and other senior executives from Iron Mountain including its CEO, Mr. Ryan, contacted Mr. Carr to arrange a meeting to allegedly discuss the lease.

13. In August 2001 this senior 'entourage' from Iron Mountain came to New Jersey and met with Mr. Carr and revealed at that time, for the first time, their true agenda, which was a discussion of what they believed were unlawful acts being committed by Pierce. That 'entourage' included many of the counter-defendants.

14. At the meeting in August 2001 described above, Iron Mountain, through its senior management and counsel, stated that if Mr. Carr would assist Iron Mountain in confirming what it already suspected and/or knew about the activities of Pierce, and would otherwise assist and support Iron Mountain against Pierce for his violation of the non-compete agreement, that Iron Mountain would compensate Mr. Carr in various ways which they, Iron Mountain, were confident Mr. Carr would find acceptable.

15. On information and belief, if Iron Mountain were to succeed in its claim against Pierce alleging a breach of the non-compete agreement, Iron Mountain would stand to recoup the total purchase price for its acquisition of Pierces' company of $1.2 Billion.

16. Thereafter, in a series of meetings involving the Counter-Defendants, meetings were arranged with Mr. Carr and his counsel Mr. Peslak and his friend James Neebling, principal of Systrans Freight, Inc., (hereinafter "Systrans") several of which occurred on March 19, 2002 in New Jersey, March 26, 2002 in Boston,

April 2, 2002 by telephone conference, April 9, 2002 in New York, July 16, 2003 by telephone conference and September 2003 in New York.

17. During one or more of the aforesaid meetings, both in person and by telephone, wherein the participants included the Counter-Defendants and Mr. Carr, his counsel, Mr. Peslak and his friend Mr. Neebling, in consideration for information being supplied by Mr. Carr and/or confirmations being provided by Mr. Carr, including but not limited to Mr. Carr's cooperation in the aforementioned Iron Mountain/Pierce litigation, the Counter-Defendants promised:

17.1 The funding of Carr's lawsuit against Pierce, of which accumulated fees and disbursements of nearly $200,000, the sum of $50,000 has been paid by Iron Mountain to Carr's attorney, Mr. Peslak;

17.2 The provision of the sum of $5 Million to allow Carr to buy back Pioneer Capital/Pierce's 51% share of Logisteq;

17.3 To hire Carr as a transportation consultant at wages equal to those paid by Logisteq, plus full benefits;

17.4 To ensure the transportation company owned by Mr. Neebling, (which had been capitalized as a start up by Mr. Carr) would receive nearly $50 Million per year in courier business, and

17.5 The payment of $2 Million directly to Mr. Carr as an interim measure to allow him to satisfy certain obligations in the wake of Pierce's wasting of Logisteq.

18. All of the aforementioned contractual obligations and promises which the Counter-Defendants presented to Carr were made with absolutely no intention of fulfilling or otherwise satisfying said obligations.

19. During the July 16, 2003 telephone conference as mentioned above, Counter-Defendant Watzke, when asked by Carr's counsel Arthur Peslak why Iron Mountain and the other Counter-Defendants had not fulfilled their obligations and promises as set forth in Paragraphs 17.1 through 17.5 above, Mr. Watzke stated, in his capacity as general counsel for Iron Mountain, "Once the arbitration (of the lawsuit as between Iron Mountain and Pierce) had been concluded, (the resolution of the appeal), Counter-Defendant Reese would meet with Carr and Mr. Peslak to discuss the fulfillment of Iron Mountain's promises to Carr."

20. Despite repeated requests from Carr and his New Jersey counsel Arthur Peslak as well as his friend James Neebling, for the period beginning in the fall of 2003 through the early months of 2005 the Counter-Defendants remained incapable of or unwilling to fulfill the aforementioned promises, continuing to use as an excuse the pendancy of the Iron Mountain versus Pierce arbitration appeal.

21. In February 2005, undersigned counsel met with Counter-Defendants Watzke and Varn to discuss Mr. Carr's claims that the obligations and promises to him remained unfulfilled.

22. On February 25, 2005 a letter was written to Counter-Defendants Watzke and Varn summarizing the events of the earlier meeting and the claims made therein.

23. On April 7, 2005, as a culmination of some brief interim correspondence, undersigned counsel suggested a meeting with several of the Counter-Defendants to discuss an amicable resolution of the Carr claim.

24. On April 19, 2005, Counter-Defendant Watzke advised that a few more days would be required to respond to my request for a meeting due to the unavailability of Mr. Varn.

25. Thereafter, undersigned counsel received an e-mail from Counter-Defendant Varn stating that he was in trial in Barnstable and would not be able to turn his attentions to responding to our request for a meeting until some time late in the week of May 2.

26. Finally, on May 1, 2005, undersigned counsel again corresponded with Counter-Defendants Watzke and Varn to advise that patience in awaiting a response to a letter dated April 7, 2005 to convene a meeting to amicably resolve Carr's claims was patience which was indeed waning and specific dates for a meeting were then suggested.

27. The response to the foregoing was the filing and delivering of the instant Complaint.

**Count I**

**(Breach of Contract)**

28. Incorporated by reference are all allegations as set forth in Paragraphs 1 through 27 as if repeated herein.

29. The transactions as between Iron Mountain and the other Counter-Defendants and Carr do constitute a binding oral contract supported by adequate consideration.

30. Carr has performed all of his obligations pursuant to the terms and conditions of the aforementioned oral contract.

31. Iron Mountain and the other Counter-Defendants' failure to perform promises and obligations pursuant to the aforementioned oral contract as described above does constitute a breach of said oral contract.

32. As the direct and proximate result of the aforementioned breach by the Counter-defendants, Carr has been damaged.

WHEREFORE, the Counter-Plaintiff Carr demands judgment against the Counter-Defendants in the amount of $20 Million plus interest, attorneys' fees and costs.

**Count II**

**(Fraudulent Misrepresentation)**

33. Incorporated by reference are all allegations as set forth in Paragraphs 1 through 27 as if repeated herein.

34. Iron Mountain and the other Counter-Defendants received from Carr as well as his counsel, Mr. Peslak, and his friend, Mr. Neebling, critical information known to Carr, confirmation of which information was required by the Counter-Defendants in the prosecution of their claims against Pierce.

35. Iron Mountain and the other Counter-Defendants explained to Carr that the consideration for the information and cooperation described in Paragraph 34 above would include the consideration described in Paragraphs 17.1 through 17.5 above.

36. At the time the representations set forth in the foregoing Paragraph were made to Carr, Iron Mountain and the other Counter-Defendants knew that they were false,

knew that they had no intention of fulfilling said obligations and/or promises and knew that Carr would rely on their representations to his detriment.

37. The actions of Iron Mountain and the other Counter-Defendants as described above do constitute a fraudulent misrepresentation.

38. As the direct and proximate result of Iron Mountain's and the other Counter-Defendants' fraudulent misrepresentations, Carr has been damaged.

WHEREFORE, Carr demands judgment for compensatory damages against the Counter-Defendants in the amount of $20 Million, plus interest, attorneys' fees and costs.

May 5, 2005

Respectfully submitted,

By his attorneys,

Gary Solomon

Gary Solomon
BBO #638974
Read K. McCaffrey
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-5243
gsolomon@pattonboggs.com
rmcccaffrey@pattonboggs.com

CERTIFICATE OF SERVICE

I hereby certify that true copies of Defendant and Counter-Plaintiff's Answer, Affirmative Defenses and Counter-Claims were mailed, postage prepaid, this 5th of May, 2005 to counsel for the original plaintiffs herein, Ira K. Gross, Sullivan & Worcester LLP, One Post Office Square, Boston, Massachusetts, 02109.

Read K. McCaffrey



3863096v1