## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; et al. <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS CARR, <br><br> Defendant <br><br> And <br><br> THOMAS CARR, <br><br> Counter-Plaintiff <br><br> v. <br><br> IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; AND CHARLES G. MOORE, <br><br> Counter-Defendants | Civil Action No. <br><br> 05 10890 RCL |

## DEFENDANT'S AND COUNTER-PLAINTIFF'S FIRST AMENDED COUNTER-CLAIM

Thomas Carr, Defendant and Counter-Plaintiff in the above-captioned proceedings herewith Amends the Defendant's and Counter-Plaintiff's Counter-Claim filed previously herein against the Plaintiffs and Counter-Defendants and states:

1

## Facts Common To All Counts

1. Prior to January 2001, Iron Mountain merged with and/or acquired a competitor known as Pierce Leahy, Inc., the resulting company being known as Iron Mountain.

2. Following the aforementioned transaction, J. Peter Pierce, ("Pierce") was elected to the Board of Directors of Iron Mountain and also was appointed president of the new company.

3. Sometime following the aforementioned merger and/or acquisition, Pierce had a falling out with Iron Mountain and, upon information and belief, was fired as the new company's president, but remained on its Board of Directors.

4. Upon information and belief, Pierce had signed a form of non-compete agreement as part of the aforementioned commercial transaction.

5. On or about January 15, 2001, Thomas Carr, ("Carr") and Pierce entered into an agreement to form a transportation company known as Logisteq, LLC ("Logisteq"), at the conclusion of which transaction, a Pierce controlled entity, Pioneer Capital, L.P., and a Carr controlled entity, Transportation Concepts of New Jersey, Inc. owned Logisteq 51% and 49%, respectively.

6. In the months which followed the formation of Logisteq, Pierce, on his own, formed a company known as Sequedex which, on information and belief, he used surreptitiously to compete with Iron Mountain and in so doing 'posted' significant costs including payroll, etc. expended to operate Sequedex on the books of Logisteq.

2

3863096v.3

7. At a time material to these proceedings, Iron Mountain filed suit against Pierce for, on information and belief, a breach of the merger/acquisiton contract described in Paragraph 1 above, (a violation of the non-compete portion thereof), which action was placed before an arbiter who ultimately decided the action in favor of Pierce.

8. The proceedings described in the foregoing Paragraph are currently on appeal.

9. One result of the merger/acquisition discussed in Paragraph 1 above was that Logisteq, formerly a tenant of a Pierce Leahy entity, became a tenant of Iron Mountain.

10. On information and belief, because of the activities of Pierce and Sequedex, Iron Mountain sent a letter to Carr signed by Counter-Defendant Watzke that Logisteq and Carr as well as Carr businesses were being evicted from property now owned by Iron Mountain.

11. Mr. Carr protested in writing to Mr. Watzke.

12. Thereafter, Mr. Watzke and other senior executives from Iron Mountain including its CEO, Mr. Ryan, contacted Mr. Carr to arrange a meeting to allegedly discuss the lease.

13. In August 2001 this senior 'entourage' from Iron Mountain came to New Jersey and met with Mr. Carr and revealed at that time, for the first time, their true agenda, which was a discussion of what they believed were unlawful acts being committed by Pierce. That 'entourage' included many of the counter-defendants.

14. At the meeting in August 2001 described above, Iron Mountain, through its senior management and counsel, stated that if Mr. Carr would assist Iron Mountain in

3

3863'96\3

confirming what it already suspected and/or knew about the activities of Pierce, and would otherwise assist and support Iron Mountain against Pierce for his violation of the non-compete agreement, that Iron Mountain would compensate Mr. Carr in various ways which they, Iron Mountain, were confident Mr. Carr would find acceptable.

15. On information and belief, if Iron Mountain were to succeed in its claim against Pierce alleging a breach of the non-compete agreement, Iron Mountain would stand to recoup the total purchase price for its acquisition of Pierce's company of $1.2 Billion.

16. Thereafter, in a series of meetings involving the Counter-Defendants, meetings were arranged with Mr. Carr and his counsel Mr. Peslak and his friend James Neebling, principal of Systrans Freight, Inc., (hereinafter "Systrans") several of which occurred on March 19, 2002 in New Jersey, March 26, 2002 in Boston, April 2, 2002 by telephone conference, April 9, 2002 in New York, July 16, 2003 by telephone conference and September 2003 in New York.

17. During one or more of the aforesaid meetings, both in person and by telephone, wherein the participants included the Counter-Defendants and Mr. Carr, his counsel, Mr. Peslak and his friend Mr. Neebling, in consideration for information being supplied by Mr. Carr and/or confirmations being provided by Mr. Carr, including but not limited to Mr. Carr's cooperation in the aforementioned Iron Mountain/Pierce litigation, the Counter-Defendants promised:

4

3863096v3

17.1 The funding of Carr's lawsuit against Pierce, of which accumulated fees and disbursements of nearly $200,000, the sum of $50,000 has been paid by Iron Mountain to Carr's attorney, Mr. Peslak;

17.2 The provision of the sum of $5 Million to allow Carr to buy back Pioneer Capital/Pierce's 51% share of Logisteq;

17.3 To hire Carr as a transportation consultant at wages equal to those paid by Logisteq, plus full benefits;

17.4 To ensure the transportation company owned by Mr. Neebling, (which had been capitalized as a start up by Mr. Carr) would receive nearly $50 Million per year in courier business, and

17.5 The payment of $2 Million directly to Mr. Carr as an interim measure to allow him to satisfy certain obligations in the wake of Pierce's wasting of Logisteq.

18. On March 19, 2002, Carr, Neebling and Peslak attended a meeting in Casa Dante, New Jersey with general counsel of Iron Mountain, Garry Watzke. Mr. Watzke, individually and as an agent of Iron Mountain and acting with such authority, stated that, in return for Mr. Carr's cooperation in the Iron Mountain/Pierce litigation, Iron Mountain would fund Mr. Carr's lawsuit against Mr. Pierce and employ Mr. Carr in the event that Mr. Pierce locked him out of Logisteq.

19. On March 26, 2002, Carr and Neebling met with John F. Kenney, Richard Reese and Watzke at Iron Mountain's corporate headquarters in Boston, Massachusetts. Individually as well as acting as an agent of Iron Mountain and with such authority, Reese offered $5 million to Carr to use to buy out Pierce's share of

5

3863096v.3

Logisteq. In addition, at this meeting Reese further promised that Iron Mountain would hire Carr as a transportation consultant and provide $25 million in courier business to Systrans, Inc.

20. On April 2, 2002 Carr and Peslak participated in a conference call to Watzke. During this call, Watzke, individually and acting within the scope of his authority as general counsel, promised that Iron Mountain would pay for Carr's attorneys' fees in his suit against Pierce. During this call, Watzke also promised Carr that Iron Mountain would retain Carr in a consulting position.

21. On April 9, 2002 at a private residence in New York, New York, Carr, Neebling and Peslak met with Larry L. Varn, Richard Reese and John F. Kenney. At this meeting, Varn, individually, as a partner in the Boston firm of Sullivan and Worcester and acting as an agent of Iron Mountain and within the scope of his authority as its attorney, promised that Iron Mountain would wire a $50,000 retainer to Arthur Peslak, Mr. Carr's counsel in disputes involving Pierce. That transaction was completed two days later.

22. On July 16, 2003, Peslak participated in a conference call with Watzke after Carr had called Reese concerning Iron Mountain's failure to fulfill the above promises to Carr. Watzke, individually and acting as an agent of Iron Mountain and within the scope of his authority, told Peslak that Reese had asked him, Watzke, to call Peslak and inform Peslak of the following: 1) Iron Mountain would support Carr; 2) Iron Mountain would pay Peslak's entire bill once the arbitration with Pierce had been concluded, and 3) that once the arbitration with Pierce was concluded,

6

Reese, on behalf of Iron Mountain, would meet with Peslak to discuss the fulfillment of Iron Mountain's promises to Carr.

23. In approximately September 2003, Carr and Neebling attended a meeting with Varn and Charles G. Moore in New York, New York. At this meeting, Varn, indivually, as a partner at the Boston law firm Sullivan and Worcester and acting as an agent of Iron Mountain and within the scope of his authority, promised $2 million dollars for Carr to get more business.

24. All of the aforementioned contractual obligations and promises which the Counter-Defendants presented to Carr were made with absolutely no intention of fulfilling or otherwise satisfying said obligations.

25. During the July 16, 2003 telephone conference as mentioned above, Counter-Defendant Watzke, when asked by Carr's counsel Arthur Peslak why Iron Mountain and the other Counter-Defendants had not fulfilled their obligations and promises as set forth in Paragraphs 17.1 through 17.5 and further described in paragraphs 18 through 23 above, Mr. Watzke stated, individually and in his capacity as general counsel for Iron Mountain, "Once the arbitration (of the lawsuit as between Iron Mountain and Pierce) had been concluded, (the resolution of the appeal), Counter-Defendant Reese would meet with Carr and Mr. Peslak to discuss the fulfillment of Iron Mountain's promises to Carr."

26. Despite repeated requests from Carr and his New Jersey counsel Arthur Peslak as well as his friend James Neebling, for the period beginning in the fall of 2003 through the early months of 2005 the Counter-Defendants remained incapable of

or unwilling to fulfill the aforementioned promises, continuing to use as an excuse the pendancy of the Iron Mountain versus Pierce arbitration appeal.

27. In February 2005, Carr's counsel met with Counter-Defendants Watzke and Varn to discuss Mr. Carr's claims that the obligations and promises to him remained unfulfilled.

28. On February 25, 2005 a letter was written to Counter-Defendants Watzke and Varn summarizing the events of the earlier meeting and the claims made therein.

29. On April 7, 2005, as a culmination of some brief interim correspondence, undersigned counsel suggested a meeting with several of the Counter-Defendants to discuss an amicable resolution of the Carr claim.

30. On April 19, 2005, Counter-Defendant Watzke advised that a few more days would be required to respond to counsel's request for a meeting due to the unavailability of Mr. Varn.

31. Thereafter, undersigned counsel received an e-mail from Counter-Defendant Varn stating that he was in trial in Barnstable and would not be able to turn his attentions to responding to the request for a meeting until some time late in the week of May 2.

32. Finally, on May 1, 2005, counsel again corresponded with Counter-Defendants Watzke and Varn to advise that patience in awaiting a response to a letter dated April 7, 2005 to convene a meeting to amicably resolve Carr's claims was patience which was indeed waning and specific dates for a meeting were then suggested.

33. The response to the foregoing was the filing and delivering of the instant Complaint.

## Count I
### (Breach of Contract)

34. Incorporated by reference are all allegations as set forth in Paragraphs 1 through 33 as if repeated herein.

35. The transactions as between Iron Mountain and the other Counter-Defendants and Carr do constitute a binding oral contract supported by adequate consideration.

36. Carr has performed all of his obligations pursuant to the terms and conditions of the aforementioned oral contract.

37. Iron Mountain and the other Counter-Defendants' failure to perform promises and obligations pursuant to the aforementioned oral contract as described above does constitute a breach of said oral contract.

38. As the direct and proximate result of the aforementioned breach by the Counter-defendants, Carr has been damaged.

WHEREFORE, the Counter-Plaintiff Carr demands judgment against the Counter-Defendants in the amount of $20 Million plus interest, attorneys' fees and costs.

## Count II
### (Fraudulent Misrepresentation)

39. Incorporated by reference are all allegations as set forth in Paragraphs 1 through 33 as if repeated herein.

40. Iron Mountain and the other Counter-Defendants received from Carr as well as his counsel, Mr. Peslak, and his friend, Mr. Neebling, critical information known

to Carr, confirmation of which information was required by the Counter-Defendants in the prosecution of their claims against Pierce.

41. Iron Mountain and the other Counter-Defendants explained to Carr that the consideration for the information and cooperation described herein would include the consideration described in Paragraphs 17.1 through 17.5 and 18 through 23 above.

42. At the time the representations set forth in the foregoing Paragraph were made to Carr, Iron Mountain and the other Counter-Defendants knew that they were false, knew that they had no intention of fulfilling said obligations and/or promises and knew that Carr would rely on their representations to his detriment.

43. The actions of Iron Mountain and the other Counter-Defendants as described above do constitute a fraudulent misrepresentation.

44. As the direct and proximate result of Iron Mountain's and the other Counter-Defendants' fraudulent misrepresentations, Carr has been damaged.

WHEREFORE, Carr demands judgment for compensatory damages against the Counter-Defendants in the amount of $20 Million, plus interest, attorneys' fees and costs.

May 20, 2005

                        Respectfully submitted,

                        By his attorneys,

                        */s/ Kathleen C. Stone*
                        Kathleen C. Stone
                        BBO #481920
                        Looney, Cohen, Reagan & Aisenberg LLP
                        109 State Street
                        Boston, MA 02109
                        617-371-1050


                        Read K. McCaffrey
                        PATTON BOGGS, LLP
                        2550 M Street, NW
                        Washington, DC 20005
                        (202) 457-5243
                        rmcccaffrey@pattonboggs.com