# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED;<br>et al.<br><br>        Plaintiffs,<br><br>    v.<br><br>THOMAS CARR,<br><br>        Defendant<br><br>    And<br><br>THOMAS CARR,<br><br>        Counter-Plaintiff<br><br>    v.<br><br>IRON MOUNTAIN INCORPORATED;<br>IRON MOUNTAIN INFORMATION<br>MANAGEMENT, INC.; C. RICHARD<br>REESE; JOHN F. KENNY, JR.; GARRY<br>B. WATZKE; LARRY L. VARN; AND<br>CHARLES G. MOORE,<br><br>        Counter-Defendants | Civil Action No.<br><br>05 10890 RCL |

## DEFENDANT'S AND COUNTER-PLAINTIFF'S CONSOLIDATED OPPOSITION TO COUNTER-DEFENDANTS' MOTIONS TO DISMISS

Thomas Carr, Defendant and Counter-Plaintiff in the above-captioned proceedings, herewith Opposes Counter-Defendants' Motions to Dismiss and states:

1

## I.    Preliminary Statement

All Counter-Defendants have moved to Dismiss Count II of the First Amended Counter-Claim, including Kenny and Moore.

Simultaneously filed are Motions to Dismiss Counts I and II of the First Amended Counter-Claim, filed by Kenny and Moore.  Therefore, Kenny and Moore's arguments regarding a dismissal of Count II of the First Amended Counter-Claim are repeated in the aforementioned two Motions.

## II.    The Kenny and Moore Motions

Concerning the collective arguments of Kenny and Moore, Carr, through undersigned counsel, acknowledges that the factual allegations regarding these two Plaintiffs and Counter-Defendants were not set forth in the First Amended Counter-Claim.  However, they have been included, specifically in paragraphs 19, 23, 24 and 29 in Carr's proposed Second Amended counter-Claim, attached hereto as Exhibit A.

A Motion for Leave to File said Second Amended Counter-Claim is being filed simultaneously herewith.

## III.    The All Counter-Defendants' Motion to Dismiss Count II

Carr, through undersigned counsel, agrees that additional facts regarding the Counter-Plaintiff's detrimental reliance on the false statements made by the Counter-Defendants are required to bolster the Counter-Claim and therefore said allegations have been more specifically set out in paragraphs 27, 34, 35, 36 and 37 of the proposed Second Amended Counter-Claim, a copy of which is attached hereto as Exhibit A.

As previously stated, a Motion for Leave to File the proposed Second Amended Counter-Claim is being filed at this time.

2

Counter-Defendants' second argument regarding the "promissory" nature of the false representations is addressed in the Memorandum of Reasons and Citations of Authority in Support of His Consolidated Opposition to Counter-Defendants' Motions to Dismiss in support hereof being filed simultaneously herewith, and incorporated herein.

### IV.    Conclusion

Wherefore the Defendant and Counter-Defendant Thomas Carr respectfully urges this Honorable Court to grant the Motion for Leave to File a Second Amended Counter-Claim and otherwise deny Plaintiffs' and Counter-Defendants' Motions to Dismiss.

June 9, 2005

Respectfully submitted,

By his attorneys,

Read K. McCaffrey *(pro hac)*
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-5243
rmcccaffrey@pattonboggs.com

Kathleen C. Stone
BBO #481920
Looney, Cohen, Reagan & Aisenberg LLP
109 State Street
Boston, MA 02109
617-371-1050

3

3870249v1

EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; et al.<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS CARR,<br><br>Defendant<br><br>And<br><br>THOMAS CARR,<br><br>Counter-Plaintiff<br><br>v.<br><br>IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; AND CHARLES G. MOORE,<br><br>Counter-Defendants | Civil Action No.<br><br>05 10890 RCL |

## DEFENDANT'S AND COUNTER-PLAINTIFF'S SECOND AMENDED COUNTER-CLAIM

Thomas Carr, Defendant and Counter-Plaintiff in the above-captioned proceedings herewith Amends the Defendant's and Counter-Plaintiff's First Amended Counter-Claim filed previously herein against the Plaintiffs and Counter-Defendants and states:

1

## Facts Common To All Counts

1.      Prior to January 2001, Iron Mountain Incorporated (Iron Mountain) and Iron Mountain Information Management, Inc. (IMIM), hereinafter referred to as Iron Mountain, merged with and/or acquired a competitor known as Pierce Leahy, Inc., the resulting company being known as Iron Mountain.

2.      Following the aforementioned transaction, J. Peter Pierce, ("Pierce") was elected to the Board of Directors of Iron Mountain and also was appointed president of the new company.

3.      Sometime following the aforementioned merger and/or acquisition, Pierce had a falling out with Iron Mountain and, upon information and belief, was fired as the new company's president, but remained on its Board of Directors.

4.      Upon information and belief, Pierce had signed a form of non-compete agreement as part of the aforementioned commercial transaction.

5.      On or about January 15, 2001, Thomas Carr, ("Carr") and Pierce entered into an agreement to form a transportation company known as Logisteq, LLC ("Logisteq"), at the conclusion of which transaction, a Pierce controlled entity, Pioneer Capital, L.P., and a Carr controlled entity, Transportation Concepts of New Jersey, Inc. owned Logisteq 51% and 49%, respectively.

6.      In the months which followed the formation of Logisteq, Pierce, on his own, formed a company known as Sequedex which, on information and belief, he used surreptitiously to compete with Iron Mountain and in so doing 'posted' significant costs including payroll, etc. expended to operate Sequedex on the books of Logisteq.

3870374v1

7.    At a time material to these proceedings, Iron Mountain filed suit against Pierce for, on information and belief, a breach of the merger/acquisition contract described in Paragraph 1 above, (a violation of the non-compete portion thereof), which action was placed before an arbiter who ultimately decided the action in favor of Pierce.

8.    The proceedings described in the foregoing Paragraph are currently on appeal.

9.    One result of the merger/acquisition discussed in Paragraph 1 above was that Logisteq, became a tenant of Iron Mountain.

10.   On information and belief, because of the activities of Pierce and Sequedex, Iron Mountain sent a letter to Carr signed by Counter-Defendant Watzke that Logisteq and Carr as well as Carr businesses were being evicted from property now owned by Iron Mountain.

11.   Mr. Carr protested in writing to Mr. Watzke.

12.   In August 2001 a senior 'entourage' from Iron Mountain, including its President, General Counsel and Chief Financial Officer, came to New Jersey and met with Mr. Carr and revealed at that time, for the first time, their true agenda, which was a discussion of what they believed were unlawful acts being committed by Pierce.

13.   At the meeting in August 2001 described above, Iron Mountain, through its senior management and counsel, stated that if Mr. Carr would assist Iron Mountain in confirming what it already suspected and/or knew about the activities of Pierce, and would otherwise assist and support Iron Mountain against Pierce for his violation of the non-compete agreement, that Iron Mountain would compensate

Mr. Carr in various ways which they, Iron Mountain, were confident Mr. Carr would find acceptable.

14. On information and belief, if Iron Mountain were to succeed in its claim against Pierce alleging a breach of the non-compete agreement, Iron Mountain would stand to recoup the total purchase price for its acquisition of Pierce's company of $1.2 Billion.

15. Thereafter, in a series of meetings involving the Counter-Defendants, meetings were arranged with Mr. Carr and his counsel Mr. Peslak and his friend James Neebling, principal of Systrans Freight, Inc., (hereinafter "Systrans") several of which occurred on March 19, 2002 in New Jersey, March 26, 2002 in Boston, April 2, 2002 by telephone conference, April 9, 2002 in New York, July 16, 2003 by telephone conference and September 2003 in New York.

16. During one or more of the aforesaid meetings, both in person and by telephone, wherein the participants included the Counter-Defendants and Mr. Carr, his counsel, Mr. Peslak and his friend Mr. Neebling, in consideration for information being supplied by Mr. Carr and/or confirmations being provided by Mr. Carr, including but not limited to Mr. Carr's cooperation in the aforementioned Iron Mountain/Pierce litigation, one or more of the Counter-Defendants promised (as particularized in paragraphs 17-24 and 28-29):

16.1 The funding of Carr's lawsuit against Pierce, of which accumulated fees and disbursements of nearly $200,000, the sum of $50,000 has been paid by Iron Mountain to Carr's attorney, Mr. Peslak;

16.2    The provision of the sum of $5 Million to allow Carr to buy back Pioneer Capital/Pierce's 51% share of Logisteq;

16.3    To hire Carr as a transportation consultant at wages equal to those paid by Logisteq, plus full benefits;

16.4    To ensure the transportation company owned by Mr. Neebling, (which had been capitalized as a start up by Mr. Carr) would receive nearly $50 Million per year in courier business;

16.5    The payment of $2 Million directly to Mr. Carr as an interim measure to allow him to satisfy certain obligations in the wake of Pierce's wasting of Logisteq.

16.6    The provision of assurances to Mr. Carr's creditor, Mr. Paul Schwarz, that Iron Mountain would provide sufficient funds and revenues to Carr to enable Mr. Schwartz to conclude that Mr. Carr was a good candidate to whom a loan of moneys could be made; and

16.7    The provision of assurances that in the event that any negative financial effects befell Mr. Carr, his family or his businesses as a result of his cooperation with Iron Mountain in their disputes with Mr. Pierce, that Iron Mountain would, in essence, indemnify Mr. Carr and his family and businesses against any such negative effects.

17.    Concurrently in the spring of 2002, Iron Mountain began encouraging Carr to file a lawsuit against Pierce on behalf of Systans to coincide with the action that Iron Mountain was planning to also file against Pierce.  With the intent of orchestrating simultaneous lawsuits against Pierce, Iron Mountain actively sought

5

to coerce and facilitate Carr's participation by agreeing to fund Carr's lawsuit, including legal fees and costs, as well as drafting the complaint for Carr to file.

18. On March 19, 2002, Carr, Neebling and Peslak attended a meeting in Casa Dante, New Jersey with the general counsel of Iron Mountain, Garry Watzke. Mr. Watzke, individually and as an agent of Iron Mountain and acting with such authority, stated that, in return for Mr. Carr's cooperation in the Iron Mountain/Pierce litigation, Iron Mountain would fund Mr. Carr's lawsuit against Mr. Pierce and employ Mr. Carr in the event that Mr. Pierce locked him out of Logisteq.

19. On March 26, 2002, Carr and Neebling met with John F. Kenny, Richard Reese and Watzke at Iron Mountain's corporate headquarters in Boston, Massachusetts. Individually as well as acting as an agent of Iron Mountain and with such authority, Reese offered $5 million to Carr to use to buy out Pierce's share of Logisteq. Also, at this meeting Reese further promised that Iron Mountain would hire Carr as a transportation consultant and provide $25 million in courier business to Systrans, Inc. Finally, Counter-Defendant Kenny advised that courier business revenues of $45 Million would be paid to Systrans, Inc. each year for a period of five years in return for the cooperation of Carr and Systrans as described above.

20. On April 2, 2002 Carr and Peslak participated in a conference call to Watzke. During this call, Watzke, individually and acting within the scope of his authority as general counsel, promised that Iron Mountain would pay for Carr's attorneys'

6

fees in his suit against Pierce. During this call, Watzke also promised Carr that Iron Mountain would retain Carr in a consulting position.

21.    On April 9, 2002 at a private residence in New York, New York, Carr, Neebling and Peslak met with Larry L. Varn, Richard Reese and John F. Kenny. At this meeting, Varn, individually, as a partner in the Boston firm of Sullivan and Worcester and acting as an agent of Iron Mountain and within the scope of his authority as its attorney, promised that Iron Mountain would wire a $50,000 retainer to Arthur Peslak, Mr. Carr's counsel in disputes involving Pierce. That transaction was completed two days later.

22.    Carr initially voiced reluctance in joining Iron Mountain's campaign against Pierce and expressed significant concerns about the negative effects of any such action on his business and family.

23.    As consideration for Carr's involvement in Iron Mountain's coordinated efforts against Pierce, Kenny called Carr and promised that, in exchange for his participation, Iron Mountain would fund Carr's lawsuit, including paying all legal fees and costs. In addition, Kenny also promised that in exchange for Carr's participation, Iron Mountain would provide business to Systrans in excess of $45 million dollars, hire Carr as a consultant with the same salary and benefits that he was currently making, and repay any debt that Carr incurred in the process as guarantor of certain obligations.

24.    In addition to expressing these promises to Carr, Kenny also made the same promises to Carr's wife Judy in a separate telephone conversation with her which occurred in April of 2002. Mr. Kenny called Mrs. Carr while she and her family

7

3870374v1

were on vacation in California. In response to her concerns about the negative effects that Carr's involvement with Iron Mountain in its claims against Pierce would have on her family, Kenny specifically affirmed each of the foregoing promises to Mrs. Carr and advised her that any and all negative financial fall out resulting from her husband's filing a complaint against Pierce and/or his other cooperation with Iron Mountain would be taken care of by Iron Mountain.

25.    Carr eventually acquiesced and agreed to participate in Iron Mountain's efforts against Pierce. Upon receiving Carr's acceptance, Iron Mountain had a courier deliver a copy of the drafted complaint to Carr while he was on vacation with his family in California. Carr signed the complaint and Iron Mountain coordinated the filing of the action.

26.    During the ensuing months, Carr and Neebling on behalf of Systrans cooperated completely with the Counter-Defendants, met with witnesses, reviewed and checked out commercial transactions involving Pierce and Pierce-related companies, and turned over documents and other materials to various of the Counter-Defendants. This cooperation involved extensive travel at the request of several of the Counter-Defendants.

27.    In direct and full reliance on the aforementioned promises of consideration, Carr continued to cooperate with the Counter-Defendants, as they had requested and, as a result of his reliance, he lost his businesses and was shackled with debt which several of the Counter-Defendants, as described above, had promised to allay by providing sufficient income to Carr to allow him to comfortably handle the debt.

3870374v1

28.    During a July 16, 2003 telephone conference as mentioned above, Counter-Defendant Watzke, when asked by Carr's counsel Arthur Peslak why Iron Mountain and the other Counter-Defendants had not fulfilled their obligations and promises as set forth in Paragraphs 16.1 through 16.7 and further described in paragraphs 17 through 24, Mr. Watzke stated, individually and in his capacity as general counsel for Iron Mountain, "Once the arbitration (of the lawsuit as between Iron Mountain and Pierce) had been concluded, (the resolution of the appeal), Counter-Defendant Reese would meet with Carr and Mr. Peslak to discuss the fulfillment of Iron Mountain's promises to Carr."

29.    Soon after the events set forth in paragraph 28, Counter-Defendant Moore told Carr, in a telephone conversation, the same assurances which had been conveyed by Watzke to Peslak on July 16, 2003. This was consistent with Moore's role as the prime contact with Mr. Carr as designated by Iron Mountain and the individual Plaintiffs and Counter-Defendants. Mr. Moore would frequently, in conversations with Mr. Carr, restate and otherwise affirm statements of consideration previously made by Mr. Watzke, Mr. Kenny, Mr. Varn, and Mr. Reese.

30.    In approximately September 2003, Carr and Neebling attended a meeting with Varn and Charles G. Moore in New York, New York. At this meeting, Varn, individually, as a partner at the Boston law firm Sullivan and Worcester and acting as an agent of Iron Mountain and within the scope of his authority, promised $2 million dollars for Carr to use to pay off certain debts incurred during the preceding year or two.

9

31.    In addition, Varn called Paul Schwartz, a person to whom Carr owed money, to advise him that Iron Mountain was in the process of setting up a very lucrative business relationship with Carr and that Carr therefore was a good credit risk to whom Mr. Schwartz should loan additional moneys.

32.    All of the aforementioned contractual obligations and promises which the Counter-Defendants presented to Carr were made with absolutely no intention of fulfilling or otherwise satisfying said obligations.

33.    Despite repeated requests from Carr and his New Jersey counsel Arthur Peslak as well as his friend James Neebling, for the period beginning in the fall of 2003 through the early months of 2005 the Counter-Defendants remained incapable of or unwilling to fulfill the aforementioned promises, continuing to use as an excuse the pendancy of the Iron Mountain versus Pierce arbitration appeal.

34.    In hindsight, because there is no arguable relationship between the fulfillment of Iron Mountain's contractual obligations to Mr. Carr and the ultimate termination of Iron Mountain's appeal of the Iron Mountain vs. Pierce arbitration decision, it is now readily apparent that at the time Iron Mountain described the consideration it would pay to Carr in return for Carr's cooperation, including Carr's filing of a lawsuit against Pierce, as coordinated by Iron Mountain, Iron Mountain through the aforementioned officers, agent and outside counsel had absolutely no intention of following through on said considerations and knew that statements regarding said considerations were false, when made.

35.    As a direct result of Carr's cooperation with Iron Mountain including his filing of a complaint against Pierce, orchestrated by Iron Mountain, Pierce wasted the

business of which Carr was a 49% owner and left Carr shackled with debt and a loss of his source of income.

36. Carr however believed that Iron Mountain would make good on his statements of consideration of employment, business and indemnification and when Carr demanded satisfaction from Iron Mountain, he was met with silence and/or denial.

37. As a direct result of his reliance on the false statements of Iron Mountain, Carr has lost his business and his source of personal income and is faced with significant debt.

38. In February 2005, Carr's counsel met with Counter-Defendants Watzke and Varn to discuss Mr. Carr's claims that the obligations and promises to him remained unfulfilled.

39. On February 25, 2005 a letter was written to Counter-Defendants Watzke and Varn summarizing the events of the earlier meeting and the claims made therein.

40. On April 7, 2005, as a culmination of some brief interim correspondence, undersigned counsel suggested a meeting with several of the Counter-Defendants to discuss an amicable resolution of the Carr claim.

41. On April 19, 2005, Counter-Defendant Watzke advised that a few more days would be required to respond to counsel's request for a meeting due to the unavailability of Mr. Varn.

42. Thereafter, undersigned counsel received an e-mail from Counter-Defendant Varn stating that he was in trial in Barnstable and would not be able to turn his attentions to responding to the request for a meeting until some time late in the week of May 2.

11

43.    Finally, on May 1, 2005, counsel again corresponded with Counter-Defendants Watzke and Varn to advise that patience in awaiting a response to a letter dated April 7, 2005 to convene a meeting to amicably resolve Carr's claims was patience which was indeed waning and specific dates for a meeting were then suggested.

44.    The response to the foregoing was the filing and delivering of the instant Complaint.

## Count I

## <u>(Breach of Contract)</u>

45.    Incorporated by reference are all allegations as set forth in Paragraphs 1 through 44 as if repeated herein.

46.    The transactions as between Iron Mountain and the other Counter-Defendants and Carr do constitute a binding oral contract supported by adequate consideration.

47.    Carr has performed all of his obligations pursuant to the terms and conditions of the aforementioned oral contract.

48.    Iron Mountain and the other Counter-Defendants' failure to perform promises and obligations pursuant to the aforementioned oral contract as described above does constitute a breach of said oral contract.

49.    As the direct and proximate result of the aforementioned breach by the Counter-defendants, Carr has been damaged.

WHEREFORE, the Counter-Plaintiff Carr demands judgment against the Counter-Defendants in the amount of $20 Million plus interest, attorneys' fees and costs.

3870374v1

## Count II

### (Against Counter-Defendants Varn, Watzke, Reese, Kenny and Moore)

### (Fraudulent Misrepresentation)

50.     Incorporated by reference are all allegations as set forth in Paragraphs 1 through 44 as if repeated herein.

51.     Iron Mountain and the other Counter-Defendants received from Carr as well as his counsel, Mr. Peslak, and his friend, Mr. Neebling, critical information known to Carr, confirmation of which information was required by the Counter-Defendants in the prosecution of their claims against Pierce as well as Carr's complete cooperation in filing a separate action against Pierce.

52.     The Counter-Defendants explained to Carr that the consideration for the information and cooperation described herein would include the consideration described in Paragraphs 16.1 through 16.7, 17 through 24 and 28 through 30 above.

53.     At the time the representations set forth in the foregoing Paragraph were made to Carr, the Counter-Defendants knew that they were false, knew that they had no intention of fulfilling said obligations and/or promises and knew that Carr would rely on their representations to his detriment.

54.     The actions of Iron Mountain and the other Counter-Defendants as described above do constitute a fraudulent misrepresentation.

55.     That, as more fully explained above, Carr did in fact rely on the aforementioned false statements, not knowing them to be false, to his detriment in that he suffered massive business losses and faced mounting debt all of which, he believed, would

13

be comfortably off-set by the aforementioned representations of considerations. They were not.

56.   As the direct and proximate result of Iron Mountain's and the other Counter-Defendants' fraudulent misrepresentations, Carr has been damaged.

WHEREFORE, Carr demands judgment for compensatory damages against the Counter-Defendants in the amount of $20 Million, plus interest, attorneys' fees and costs.

June 9, 2005

Respectfully submitted,

By his attorneys,

Read K. McCaffrey (pro hac vice)
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-5243
rmcccaffrey@pattonboggs.com

Kathleen C. Stone
BBO #481920
Looney, Cohen, Reagan & Aisenberg LLP
109 State Street
Boston, MA 02109
617-371-1050

14

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; et al. )<br><br>Plaintiffs, )<br><br>v. )<br><br>THOMAS CARR, )<br><br>Defendant )<br><br>And )<br><br>THOMAS CARR, )<br><br>Counter-Plaintiff )<br><br>v. )<br><br>IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; AND CHARLES G. MOORE, )<br><br>Counter-Defendants ) | Civil Action No.<br><br>05 10890 RCL |

## DEFENDANT'S AND COUNTER-PLAINTIFF'S MOTION FOR LEAVE OF COURT TO FILE A SECOND AMENDED COUNTER-CLAIM

Defendant and Counter-Plaintiff Thomas Carr, by his undersigned counsel and pursuant to Rule 15 of the Federal Rules of Civil Procedure, herewith moves this Honorable Court for Leave to Amend the Counter-Claim previously filed herein and states:

1

3870266v1

## I.  Preliminary Statement

Defendant and Counter-Plaintiff Carr filed an Answer and Counter-Claim in these proceedings on or about May 05, 2005.  Thereafter, prior to any responsive pleading being filed by the Counter-Defendants, the Counter-Plaintiff filed a First Amended Counter-Claim on or about May 20, 2005, no leave of Court being required.

The Counter-Defendants have now responded and their response includes motions by two of the Counter-Defendants to dismiss both counts of the First Amended Counter-Claim and a motion by all Defendants to dismiss Count II only, Carr's claim of Fraudulent Misrepresentation.

## II.  Argument

Undersigned counsel respectfully represents that allegations set forth in the proposed Second Amended Counter-Claim (a copy of which is attached hereto as Exhibit A) will moot the averments of pleading deficiencies set froth in the Counter-Defendants' motions described above.

Moreover, as the Court is well aware, the granting of leave to amend is looked upon favorably where the interests of justice will be served as is discussed in the Memorandum of Reasons and Citations of Authority in support thereof.

In the instant proceedings, as more specifically described in the proposed Second Amended Counter-Claim, Mr. Carr and his family were contacted on repeated occasions by the very top management of Iron Mountain, a billion dollar corporation, and their outside counsel, Sullivan and Worcester, insisting on Carr's cooperation in their legal battles with Peter Pierce, a one-time competitor, in return for the payment of moneys and

2

the indemnification of Carr and his family as well as his small transportation company against losses that may result from his cooperation.

Mr. Carr cooperated, and he lost everything. Iron Mountain now refuses to make good on their promises by denying that the promises were ever made.

### III.  Prayer for Relief

Respectfully, justice requires this Honorable Court's granting Mr. Carr's Motion for Leave to File a Second Amended Counter-Claim.

June 9, 2005

Respectfully submitted,

By his attorneys,

Read K. McCaffrey *(pro hac)*
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-5243
rmcccaffrey@pattonboggs.com

Kathleen C. Stone
BBO #481920
Looney, Cohen, Reagan & Aisenberg LLP
109 State Street
Boston, MA 02109
617-371-1050

3

**EXHIBIT A**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| THOMAS CARR, | ) |
| | ) |
| Defendant | ) |
| | ) Civil Action No. |
| And | ) |
| | ) |
| THOMAS CARR, | ) 05 10890 RCL |
| | ) |
| Counter-Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; AND CHARLES G. MOORE, | ) |
| | ) |
| Counter-Defendants | ) |

**DEFENDANT'S AND COUNTER-PLAINTIFF'S SECOND AMENDED
COUNTER-CLAIM**

Thomas Carr, Defendant and Counter-Plaintiff in the above-captioned proceedings herewith Amends the Defendant's and Counter-Plaintiff's First Amended Counter-Claim filed previously herein against the Plaintiffs and Counter-Defendants and states:

1

## Facts Common To All Counts

1.      Prior to January 2001, Iron Mountain Incorporated (Iron Mountain) and Iron
        Mountain Information Management, Inc. (IMIM), hereinafter referred to as Iron
        Mountain, merged with and/or acquired a competitor known as Pierce Leahy,
        Inc., the resulting company being known as Iron Mountain.

2.      Following the aforementioned transaction, J. Peter Pierce, ("Pierce") was elected
        to the Board of Directors of Iron Mountain and also was appointed president of
        the new company.

3.      Sometime following the aforementioned merger and/or acquisition, Pierce had a
        falling out with Iron Mountain and, upon information and belief, was fired as the
        new company's president, but remained on its Board of Directors.

4.      Upon information and belief, Pierce had signed a form of non-compete agreement
        as part of the aforementioned commercial transaction.

5.      On or about January 15, 2001, Thomas Carr, ("Carr") and Pierce entered into an
        agreement to form a transportation company known as Logisteq, LLC
        ("Logisteq"), at the conclusion of which transaction, a Pierce controlled entity,
        Pioneer Capital, L.P., and a Carr controlled entity, Transportation Concepts of
        New Jersey, Inc. owned Logisteq 51% and 49%, respectively.

6.      In the months which followed the formation of Logisteq, Pierce, on his own,
        formed a company known as Sequedex which, on information and belief, he used
        surreptitiously to compete with Iron Mountain and in so doing 'posted' significant
        costs including payroll, etc. expended to operate Sequedex on the books of
        Logisteq.

3870374v1

7.    At a time material to these proceedings, Iron Mountain filed suit against Pierce for, on information and belief, a breach of the merger/acquisition contract described in Paragraph 1 above, (a violation of the non-compete portion thereof), which action was placed before an arbiter who ultimately decided the action in favor of Pierce.

8.    The proceedings described in the foregoing Paragraph are currently on appeal.

9.    One result of the merger/acquisition discussed in Paragraph 1 above was that Logisteq, became a tenant of Iron Mountain.

10.   On information and belief, because of the activities of Pierce and Sequedex, Iron Mountain sent a letter to Carr signed by Counter-Defendant Watzke that Logisteq and Carr as well as Carr businesses were being evicted from property now owned by Iron Mountain.

11.   Mr. Carr protested in writing to Mr. Watzke.

12.   In August 2001 a senior 'entourage' from Iron Mountain, including its President, General Counsel and Chief Financial Officer, came to New Jersey and met with Mr. Carr and revealed at that time, for the first time, their true agenda, which was a discussion of what they believed were unlawful acts being committed by Pierce.

13.   At the meeting in August 2001 described above, Iron Mountain, through its senior management and counsel, stated that if Mr. Carr would assist Iron Mountain in confirming what it already suspected and/or knew about the activities of Pierce, and would otherwise assist and support Iron Mountain against Pierce for his violation of the non-compete agreement, that Iron Mountain would compensate

3

Mr. Carr in various ways which they, Iron Mountain, were confident Mr. Carr would find acceptable.

14.    On information and belief, if Iron Mountain were to succeed in its claim against Pierce alleging a breach of the non-compete agreement, Iron Mountain would stand to recoup the total purchase price for its acquisition of Pierce's company of $1.2 Billion.

15.    Thereafter, in a series of meetings involving the Counter-Defendants, meetings were arranged with Mr. Carr and his counsel Mr. Peslak and his friend James Neebling, principal of Systrans Freight, Inc., (hereinafter "Systrans") several of which occurred on March 19, 2002 in New Jersey, March 26, 2002 in Boston, April 2, 2002 by telephone conference, April 9, 2002 in New York, July 16, 2003 by telephone conference and September 2003 in New York.

16.    During one or more of the aforesaid meetings, both in person and by telephone, wherein the participants included the Counter-Defendants and Mr. Carr, his counsel, Mr. Peslak and his friend Mr. Neebling, in consideration for information being supplied by Mr. Carr and/or confirmations being provided by Mr. Carr, including but not limited to Mr. Carr's cooperation in the aforementioned Iron Mountain/Pierce litigation, one or more of the Counter-Defendants promised (as particularized in paragraphs 17-24 and 28-29):

16.1    The funding of Carr's lawsuit against Pierce, of which accumulated fees and disbursements of nearly $200,000, the sum of $50,000 has been paid by Iron Mountain to Carr's attorney, Mr. Peslak;

4

16.2   The provision of the sum of $5 Million to allow Carr to buy back Pioneer

Capital/Pierce's 51% share of Logisteq;

16.3   To hire Carr as a transportation consultant at wages equal to those paid by

Logisteq, plus full benefits;

16.4   To ensure the transportation company owned by Mr. Neebling, (which had

been capitalized as a start up by Mr. Carr) would receive nearly $50

Million per year in courier business;

16.5   The payment of $2 Million directly to Mr. Carr as an interim measure to

allow him to satisfy certain obligations in the wake of Pierce's wasting of

Logisteq.

16.6   The provision of assurances to Mr. Carr's creditor, Mr. Paul Schwarz, that

Iron Mountain would provide sufficient funds and revenues to Carr to

enable Mr. Schwartz to conclude that Mr. Carr was a good candidate to

whom a loan of moneys could be made; and

16.7   The provision of assurances that in the event that any negative financial

effects befell Mr. Carr, his family or his businesses as a result of his

cooperation with Iron Mountain in their disputes with Mr. Pierce, that Iron

Mountain would, in essence, indemnify Mr. Carr and his family and

businesses against any such negative effects.

17.   Concurrently in the spring of 2002, Iron Mountain began encouraging Carr to file

a lawsuit against Pierce on behalf of Systans to coincide with the action that Iron

Mountain was planning to also file against Pierce.   With the intent of

orchestrating simultaneous lawsuits against Pierce, Iron Mountain actively sought

5

to coerce and facilitate Carr's participation by agreeing to fund Carr's lawsuit, including legal fees and costs, as well as drafting the complaint for Carr to file.

18. On March 19, 2002, Carr, Neebling and Peslak attended a meeting in Casa Dante, New Jersey with the general counsel of Iron Mountain, Garry Watzke. Mr. Watzke, individually and as an agent of Iron Mountain and acting with such authority, stated that, in return for Mr. Carr's cooperation in the Iron Mountain/Pierce litigation, Iron Mountain would fund Mr. Carr's lawsuit against Mr. Pierce and employ Mr. Carr in the event that Mr. Pierce locked him out of Logisteq.

19. On March 26, 2002, Carr and Neebling met with John F. Kenny, Richard Reese and Watzke at Iron Mountain's corporate headquarters in Boston, Massachusetts. Individually as well as acting as an agent of Iron Mountain and with such authority, Reese offered $5 million to Carr to use to buy out Pierce's share of Logisteq. Also, at this meeting Reese further promised that Iron Mountain would hire Carr as a transportation consultant and provide $25 million in courier business to Systrans, Inc. Finally, Counter-Defendant Kenny advised that courier business revenues of $45 Million would be paid to Systrans, Inc. each year for a period of five years in return for the cooperation of Carr and Systrans as described above.

20. On April 2, 2002 Carr and Peslak participated in a conference call to Watzke. During this call, Watzke, individually and acting within the scope of his authority as general counsel, promised that Iron Mountain would pay for Carr's attorneys'

6

3870374v1

fees in his suit against Pierce. During this call, Watzke also promised Carr that Iron Mountain would retain Carr in a consulting position.

21.   On April 9, 2002 at a private residence in New York, New York, Carr, Neebling and Peslak met with Larry L. Varn, Richard Reese and John F. Kenny. At this meeting, Varn, individually, as a partner in the Boston firm of Sullivan and Worcester and acting as an agent of Iron Mountain and within the scope of his authority as its attorney, promised that Iron Mountain would wire a $50,000 retainer to Arthur Peslak, Mr. Carr's counsel in disputes involving Pierce. That transaction was completed two days later.

22.   Carr initially voiced reluctance in joining Iron Mountain's campaign against Pierce and expressed significant concerns about the negative effects of any such action on his business and family.

23.   As consideration for Carr's involvement in Iron Mountain's coordinated efforts against Pierce, Kenny called Carr and promised that, in exchange for his participation, Iron Mountain would fund Carr's lawsuit, including paying all legal fees and costs. In addition, Kenny also promised that in exchange for Carr's participation, Iron Mountain would provide business to Systrans in excess of $45 million dollars, hire Carr as a consultant with the same salary and benefits that he was currently making, and repay any debt that Carr incurred in the process as guarantor of certain obligations.

24.   In addition to expressing these promises to Carr, Kenny also made the same promises to Carr's wife Judy in a separate telephone conversation with her which occurred in April of 2002. Mr. Kenny called Mrs. Carr while she and her family

7

were on vacation in California. In response to her concerns about the negative effects that Carr's involvement with Iron Mountain in its claims against Pierce would have on her family, Kenny specifically affirmed each of the foregoing promises to Mrs. Carr and advised her that any and all negative financial fall out resulting from her husband's filing a complaint against Pierce and/or his other cooperation with Iron Mountain would be taken care of by Iron Mountain.

25. Carr eventually acquiesced and agreed to participate in Iron Mountain's efforts against Pierce. Upon receiving Carr's acceptance, Iron Mountain had a courier deliver a copy of the drafted complaint to Carr while he was on vacation with his family in California. Carr signed the complaint and Iron Mountain coordinated the filing of the action.

26. During the ensuing months, Carr and Neebling on behalf of Systrans cooperated completely with the Counter-Defendants, met with witnesses, reviewed and checked out commercial transactions involving Pierce and Pierce-related companies, and turned over documents and other materials to various of the Counter-Defendants. This cooperation involved extensive travel at the request of several of the Counter-Defendants.

27. In direct and full reliance on the aforementioned promises of consideration, Carr continued to cooperate with the Counter-Defendants, as they had requested and, as a result of his reliance, he lost his businesses and was shackled with debt which several of the Counter-Defendants, as described above, had promised to allay by providing sufficient income to Carr to allow him to comfortably handle the debt.

28.    During a July 16, 2003 telephone conference as mentioned above, Counter-Defendant Watzke, when asked by Carr's counsel Arthur Peslak why Iron Mountain and the other Counter-Defendants had not fulfilled their obligations and promises as set forth in Paragraphs 16.1 through 16.7 and further described in paragraphs 17 through 24, Mr. Watzke stated, individually and in his capacity as general counsel for Iron Mountain, "Once the arbitration (of the lawsuit as between Iron Mountain and Pierce) had been concluded, (the resolution of the appeal), Counter-Defendant Reese would meet with Carr and Mr. Peslak to discuss the fulfillment of Iron Mountain's promises to Carr."

29.    Soon after the events set forth in paragraph 28, Counter-Defendant Moore told Carr, in a telephone conversation, the same assurances which had been conveyed by Watzke to Peslak on July 16, 2003. This was consistent with Moore's role as the prime contact with Mr. Carr as designated by Iron Mountain and the individual Plaintiffs and Counter-Defendants. Mr. Moore would frequently, in conversations with Mr. Carr, restate and otherwise affirm statements of consideration previously made by Mr. Watzke, Mr. Kenny, Mr. Varn, and Mr. Reese.

30.    In approximately September 2003, Carr and Neebling attended a meeting with Varn and Charles G. Moore in New York, New York. At this meeting, Varn, individually, as a partner at the Boston law firm Sullivan and Worcester and acting as an agent of Iron Mountain and within the scope of his authority, promised $2 million dollars for Carr to use to pay off certain debts incurred during the preceding year or two.

9

31.     In addition, Varn called Paul Schwartz, a person to whom Carr owed money, to advise him that Iron Mountain was in the process of setting up a very lucrative business relationship with Carr and that Carr therefore was a good credit risk to whom Mr. Schwartz should loan additional moneys.

32.     All of the aforementioned contractual obligations and promises which the Counter-Defendants presented to Carr were made with absolutely no intention of fulfilling or otherwise satisfying said obligations.

33.     Despite repeated requests from Carr and his New Jersey counsel Arthur Peslak as well as his friend James Neebling, for the period beginning in the fall of 2003 through the early months of 2005 the Counter-Defendants remained incapable of or unwilling to fulfill the aforementioned promises, continuing to use as an excuse the pendancy of the Iron Mountain versus Pierce arbitration appeal.

34.     In hindsight, because there is no arguable relationship between the fulfillment of Iron Mountain's contractual obligations to Mr. Carr and the ultimate termination of Iron Mountain's appeal of the Iron Mountain vs. Pierce arbitration decision, it is now readily apparent that at the time Iron Mountain described the consideration it would pay to Carr in return for Carr's cooperation, including Carr's filing of a lawsuit against Pierce, as coordinated by Iron Mountain, Iron Mountain through the aforementioned officers, agent and outside counsel had absolutely no intention of following through on said considerations and knew that statements regarding said considerations were false, when made.

35.     As a direct result of Carr's cooperation with Iron Mountain including his filing of a complaint against Pierce, orchestrated by Iron Mountain, Pierce wasted the

10

business of which Carr was a 49% owner and left Carr shackled with debt and a loss of his source of income.

36. Carr however believed that Iron Mountain would make good on his statements of consideration of employment, business and indemnification and when Carr demanded satisfaction from Iron Mountain, he was met with silence and/or denial.

37. As a direct result of his reliance on the false statements of Iron Mountain, Carr has lost his business and his source of personal income and is faced with significant debt.

38. In February 2005, Carr's counsel met with Counter-Defendants Watzke and Varn to discuss Mr. Carr's claims that the obligations and promises to him remained unfulfilled.

39. On February 25, 2005 a letter was written to Counter-Defendants Watzke and Varn summarizing the events of the earlier meeting and the claims made therein.

40. On April 7, 2005, as a culmination of some brief interim correspondence, undersigned counsel suggested a meeting with several of the Counter-Defendants to discuss an amicable resolution of the Carr claim.

41. On April 19, 2005, Counter-Defendant Watzke advised that a few more days would be required to respond to counsel's request for a meeting due to the unavailability of Mr. Varn.

42. Thereafter, undersigned counsel received an e-mail from Counter-Defendant Varn stating that he was in trial in Barnstable and would not be able to turn his attentions to responding to the request for a meeting until some time late in the week of May 2.

11

43.   Finally, on May 1, 2005, counsel again corresponded with Counter-Defendants Watzke and Varn to advise that patience in awaiting a response to a letter dated April 7, 2005 to convene a meeting to amicably resolve Carr's claims was patience which was indeed waning and specific dates for a meeting were then suggested.

44.   The response to the foregoing was the filing and delivering of the instant Complaint.

### Count I

### (Breach of Contract)

45.   Incorporated by reference are all allegations as set forth in Paragraphs 1 through 44 as if repeated herein.

46.   The transactions as between Iron Mountain and the other Counter-Defendants and Carr do constitute a binding oral contract supported by adequate consideration.

47.   Carr has performed all of his obligations pursuant to the terms and conditions of the aforementioned oral contract.

48.   Iron Mountain and the other Counter-Defendants' failure to perform promises and obligations pursuant to the aforementioned oral contract as described above does constitute a breach of said oral contract.

49.   As the direct and proximate result of the aforementioned breach by the Counter-defendants, Carr has been damaged.

WHEREFORE, the Counter-Plaintiff Carr demands judgment against the Counter-Defendants in the amount of $20 Million plus interest, attorneys' fees and costs.

3870374v1

## Count II

### (Against Counter-Defendants Varn, Watzke, Reese, Kenny and Moore)

### (Fraudulent Misrepresentation)

50.     Incorporated by reference are all allegations as set forth in Paragraphs 1 through 44 as if repeated herein.

51.     Iron Mountain and the other Counter-Defendants received from Carr as well as his counsel, Mr. Peslak, and his friend, Mr. Neebling, critical information known to Carr, confirmation of which information was required by the Counter-Defendants in the prosecution of their claims against Pierce as well as Carr's complete cooperation in filing a separate action against Pierce.

52.     The Counter-Defendants explained to Carr that the consideration for the information and cooperation described herein would include the consideration described in Paragraphs 16.1 through 16.7, 17 through 24 and 28 through 30 above.

53.     At the time the representations set forth in the foregoing Paragraph were made to Carr, the Counter-Defendants knew that they were false, knew that they had no intention of fulfilling said obligations and/or promises and knew that Carr would rely on their representations to his detriment.

54.     The actions of Iron Mountain and the other Counter-Defendants as described above do constitute a fraudulent misrepresentation.

55.     That, as more fully explained above, Carr did in fact rely on the aforementioned false statements, not knowing them to be false, to his detriment in that he suffered massive business losses and faced mounting debt all of which, he believed, would

be comfortably off-set by the aforementioned representations of considerations. They were not.

56.    As the direct and proximate result of Iron Mountain's and the other Counter-Defendants' fraudulent misrepresentations, Carr has been damaged.

WHEREFORE, Carr demands judgment for compensatory damages against the Counter-Defendants in the amount of $20 Million, plus interest, attorneys' fees and costs.


June 9, 2005

Respectfully submitted,


By his attorneys,


_____

Read K. McCaffrey (pro hac vice)
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-5243
rmcccaffrey@pattonboggs.com


Kathleen C. Stone
BBO #481920
Looney, Cohen, Reagan & Aisenberg LLP
109 State Street
Boston, MA 02109
617-371-1050


14