UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; and CHARLES G. MOORE, <br><br>  Plaintiffs, <br><br> v. <br><br> THOMAS CARR, <br><br>  Defendants. <br><br> and <br><br> THOMAS CARR, <br><br>  Counterclaim-Plaintiff, <br><br> v. <br><br> IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; and CHARLES G. MOORE, <br><br>  Counterclaim-Defendants. | Civil Action No. 05 10890 RCL |

**COUNTERCLAIM-DEFENDANTS'
OPPOSITION TO COUNTERCLAIM-PLAINTIFF'S MOTION
TO AMEND AND TO FILE SECOND AMENDED COUNTERCLAIMS**

Counterclaim-Defendants Iron Mountain Incorporated ("Iron Mountain"), Iron Mountain

Information Management, Inc. ("IMIM"), C. Richard Reese ("Reese"), John F. Kenny, Jr.

("Kenny"), Garry B. Watzke ("Watzke"), Larry L. Varn ("Varn") and Charles G. Moore

{B0419211; 1}

-2-

("Moore" and collectively with the foregoing persons and entities, the "Plaintiffs"), hereby oppose the motion by defendant and Counterclaim-Plaintiff Thomas Carr ("Carr") to amend further and file his proposed Second Amended Counterclaims (the "Second Amended Counterclaims" or "Second Ctrclms."). Despite a third effort, Carr has yet to set forth a counterclaim that states any claim upon which relief can be granted against any of the Counterclaim-Defendants. Accordingly, granting his latest motion to amend would be an exercise in futility.

Carr's claim for an alleged breach of contract is futile because the agreements alleged by him, even assuming that they were made, would violate established public policy and are unenforceable. The breach of contract claim is also unenforceable against Messrs. Reese, Kenny, Watzke, Varn and Moore (collectively, the "Individual Plaintiffs") because Carr fails to allege that they are parties to any alleged agreement. Carr's misrepresentation claim is no more viable than in his prior pleadings because, stripped to the essentials, all of the alleged "representations" are promissory and forward-looking in nature and cannot, as a matter of law, support a fraudulent misrepresentation claim. Additionally, even in this third attempt to state viable claims, Carr has not alleged reasonable reliance on any alleged promise, nor has Carr alleged specific facts, as Fed. R. Civ. P. 9(b) plainly requires, indicating an intent to deceive. Accordingly, the Second Amended Counterclaims (as did the previous attempts) fall short of alleging any legally-cognizable claims and Carr's motion to amend and to file the Second Amended Counterclaims should be denied.

## Background

This story has its genesis in a corporate transaction that occurred over five years ago. In February 2000, Iron Mountain, the world's leader in outsourced records and information

{B0419211; 1}

management services (RIMS), acquired Pierce Leahy Corp ("PLC"), also a leader in the RIMS industry. See Second Ctrclms., ¶ 1. The transaction was structured as a reverse merger (the "Merger") in which Iron Mountain was merged with and into PLC and, immediately thereafter, PLC changed its name to Iron Mountain. Id. Following the Merger, J. Peter Pierce ("Pierce"), the head of PLC prior to the Merger, was elected to the Board of Directors of Iron Mountain. See Second Ctrclms., ¶ 2. Pierce was also appointed President and Chief Operating Officer of Iron Mountain Records Management, Inc. (now known as IMIM). Id. In connection with and as a condition to the Merger, Pierce and PLC (now Iron Mountain) entered into a written employment agreement that contained certain covenants including a covenant not to compete against Iron Mountain directly or indirectly. See Second Ctrclms., ¶ 4.

Pierce remained employed by Iron Mountain until June 30, 2000, at which time his employment was terminated without cause. See Second Ctrclms., ¶ 3. Pierce remained a member of Iron Mountain's Board of Directors, however, until his resignation on December 23, 2002. Id.

In early 2001, Carr and Pierce entered into an agreement to form a transportation company known as Logisteq, LLC ("Logisteq"), based in Freehold, New Jersey, that succeeded to former businesses owned and operated by Carr. See Second Ctrclms., ¶ 5. At the conclusion of the transaction, Pioneer Capital, L.P., which Pierce controls, and Transportation Concepts of NJ, Inc., which Carr controlled, owned 51% and 49%, respectively, of Logisteq. See Second Ctrclms., ¶ 5.[1] Carr alleges that Pierce also formed a company known as Sequedex LLC ("Sequedex"), an IMIM competitor in the RIMS industry, to compete surreptitiously with Iron

---

[1] One of the consequences of the Merger was that Logisteq, whose predecessor in interest (a Carr-controlled entity) had been a tenant of PLC, became a tenant of Iron Mountain at its Freehold, New Jersey, facility.

Mountain and that "in so doing 'posted' significant costs including payroll, etc. expended to operate Sequedex on the books of Logisteq." See Second Ctrclms., ¶ 6.

In late March 2002, Iron Mountain and IMIM filed a complaint against Pierce (the "Pierce Litigation") alleging, *inter alia*, that Pierce, by aiding Sequedex, had violated his written covenants with Iron Mountain and his fiduciary obligations to Iron Mountain and its stockholders. See Second Ctrclms., ¶ 7. The Pierce Litigation was stayed awaiting completion of a then pending arbitration proceeding (the "Pierce Arbitration"). Id.

Carr often claimed (as he does again in the Second Amended Counterclaim) to have evidence of Pierce's contractual and fiduciary breaches and, over a course of several months, regaled Iron Mountain executives and other representatives, including its principal outside counsel in connection with the Pierce Litigation and Pierce Arbitration, with stories regarding this supposed evidence. See Second Ctrclms., ¶¶ 6, 26.

Carr now alleges in the Second Amended Counterclaim that, "in consideration for information being supplied by Mr. Carr and/or confirmations being provided by Mr. Carr," certain Iron Mountain executives or agents made promises of future conduct to Carr and that these promises were not performed. See Second Ctrclms., ¶¶ 16 – 24. Carr does not allege that these promises (which appear to involve a value of tens of millions of dollars), apparently made on behalf of Iron Mountain (NYSE: IRM), were ever evidenced by a written agreement or confirmed by even a single piece of correspondence. For example, the Plaintiffs allegedly made the following oral promises, ostensibly to secure information from Carr regarding Logisteq's and his business partner's (Pierce's) business operations for use in the then-forthcoming Pierce Arbitration:

- Iron Mountain would supply a transportation company owned by Carr's friend, James Neebling ("Neebling"), with $50 million per year in courier business (see Second Ctrclms., ¶¶ 16.4, 19, 23);

- Iron Mountain would provide $5 million for Carr to buy a transportation company in which he owned a 49% share, *i.e.*, Logisteq (see Second Ctrclms., ¶¶ 16.2, 19);

- Iron Mountain would pay Carr $2 million to allow him to satisfy obligations (see Second Ctrclms., ¶¶ 16.5, 23, 30);

- Iron Mountain would fund Carr's lawsuit against Pierce, with the amount totaling over $200,000 (see Second Ctrclms., ¶¶ 16.1, 18, 23);

- Iron Mountain would hire Carr (see Second Ctrclms., ¶¶ 16.3, 19, 23); and

- Iron Mountain would provide assurances to a Mr. Paul Schwartz that Carr was a good candidate to whom money could be loaned (see Second Ctrclms., ¶¶ 16.6, 31).

Carr alleges, albeit only in a conclusory manner (*i.e.*, "in hindsight"), that (all of) the Plaintiffs had no intention of fulfilling these wholly undocumented promises. See Second Ctrclms., ¶¶ 32, 34, 53. As with the previous versions of Carr's counterclaims, these allegations are made with regard to the Plaintiffs as a whole and do not specify the purported intent of any particular entity or individual. Id.

    Carr alleges that as a result of Iron Mountain's alleged failures to satisfy their promises, Carr lost his business and his source of personal income and is faced with significant debt. See Second Ctrclms., ¶ 37. On several occasions, Carr, in person and in writing, as well as through his counsel, accused Iron Mountain and certain of the individual plaintiffs of making and not satisfying various promises. See Second Ctrclms., ¶¶ 25-32. Faced with Carr's unfounded

allegations, the Plaintiffs initiated this action for a binding declaration and judgment that none of them has any legal obligations to Carr.

### Argument

Leave to amend may properly be denied when the proffered claim is futile. See Debreceni v. Bru-Jell Leasing Corp., 710 F. Supp. 15, 18 (D. Mass. 1989). A court should not wait for a separate motion to dismiss to eliminate a futile claim – "[f]or a court to grant a motion to amend, only to turn around and dismiss the claims upon the filing of a properly interposed motion to dismiss, would be a waste of time for both the court and counsel." Bhakta v. Baybank, No. CIV. A. 93-10312-T, 1994 WL 236590, at *5 (D. Mass. 1994), quoting Debreceni, 710 F. Supp. at 19.

A complaint may, and should, be dismissed for failure to state a claim if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). The allegations in the Second Amended Counterclaims are insufficient to sustain any claim for breach of contract or for fraudulent misrepresentation. Additionally, certain elements are not pleaded with the level of particularity required by Fed. R. Civ. P. 9(b). There is no reason for either the Court or any of the parties to waste any additional time or resources on Carr's feeble and futile attempts to state a claim.

### A.    Carr's Alleged Agreements with Iron Mountain are Unenforceable

The Court should not enforce any alleged agreements in the Second Amended Counterclaims because they violate settled public policy. Massachusetts courts have adopted Section 193 of the Second Restatement of Contracts and will not enforce a contract that induces a corporate fiduciary to breach his fiduciary duties. See, e.g., Gellar v. Allied-Lyons PLC, 42 Mass. App. Ct. 120, 123, 674 N.E.2d 1334, 1336-37 (1997) (quoting the Restatement and stating

that "a contract for personal gain which could cause a corporate fiduciary to breach his or her fiduciary duty of loyalty to the corporation is generally held to be unenforceable as against public policy"). The Restatement prohibits enforcement of agreements such as those that Carr is seeking to enforce:

> § 193 Promise Inducing Violation of Fiduciary Duty
>
> A promise by a fiduciary to violate his fiduciary duty or **a promise that tends to induce such a violation is unenforceable on grounds of public policy**.

Restatement (Second) of Contracts § 193 (emphasis added). Carr alleges that Iron Mountain made its alleged promises in consideration for Carr's confirmation or divulgence of information regarding Logisteq and Pierce, which information was necessarily confidential and proprietary. Under the proscription of the Restatement, as adopted by the courts of Massachusetts, these alleged agreements are unenforceable as a matter of law.

The first illustration of an unenforceable promise in the Restatement (Second) of Contracts § 193, mirrors the substance of Carr's allegations. That illustration provides:

> 1. A, in consulting with B, his lawyer, informs B of some facts. Later C promises B $1,000 if B will disclose those facts. B discloses them to C. C's promise is one that tends to induce a violation of B's fiduciary duty to A and is unenforceable on grounds of public policy.

Id. cmt. a, illus. 1. Since Carr owes fiduciary duties to Logisteq and since Carr and Pierce are fiduciaries, Carr had a fiduciary obligation to not disclose confidential information to Iron Mountain or anyone else for his own pecuniary gain. The Restatement's illustration can easily be rewritten with Carr's allegations as follows:

> 1. [Pierce and Logisteq], in consulting with [Carr], his [and its business partner and shareholder, respectively], informs [Carr] of some facts. Later [Iron Mountain] promises [Carr money] if [Carr] will disclose those facts. [Carr] discloses them to [Iron Mountain].

{B0419211; 1}

As in the Restatement's illustration, the Court should deny Carr's attempt to enforce such an agreement.

Carr's alleged pledge of assistance to Iron Mountain for his own pecuniary gain and at the expense of his fiduciary duties to Pierce and Logisteq should not be condoned by the Court. In Geller v. Allied-Lyons PLC, the plaintiff, as Dunkin Donuts's senior vice president for international development, was contracted by Mr. Lipka of DCA, a Dunkin Donuts supplier and a subsidiary of Allied. Lipka asked Geller whether Dunkin Donuts would be interested in being acquired by Allied and stated that Allied would pay Geller a one percent finder's fee if he would help Allied to acquire Dunkin Donuts. Allied eventually purchased Dunkin Donuts, but did not pay Geller the one percent fee that had been promised. Geller sued to enforce the promise. The Court first noted that a fiduciary has duties that cannot be breached while that fiduciary seeks to promote his or her own interest. Geller, 42 Mass. App. Ct. at 123, 674 N.E.2d at 1336. The Court quoted Section 193 of the Restatement (Second) of Contracts and went so far as to state that it would not enforce an agreement that **could** cause such a breach:

> … a contract for personal gain which could cause a corporate fiduciary to breach his or her fiduciary duty of loyalty to the corporation is generally held to be unenforceable as against public policy.

Geller, 42 Mass. App. Ct. at 123, 674 N.E.2d at 1336. As the court in Geller stated, "Massachusetts courts vigorously scrutinize self-interested transactions involving corporate fiduciaries." Geller, 42 Mass. App. Ct. at 123, 674 N.E.2d at 1337. The court in Geller found that by pleading his assistance to Allied in return for a multi-million dollar finder's fee, the plaintiff placed himself in a position in which his contractual obligation to Allied and his own pecuniary interests could have prevented him from acting in Dunkin Donuts' best interest. Geller, 42 Mass. App. Ct. at 123, 674 N.E.2d at 1337. "In creating a **temptation** for the plaintiff

to favor Allied, the finder's fee agreement **could** have induced the plaintiff to facilitate an acquisition that was not in [Dunkin Donut's] best interest, had the events of 1989 unfolded differently." Geller, 42 Mass. App. Ct. at 124, 674 N.E.2d at 1337 (emphasis added). Accordingly, the court in Geller, despite assuming that the promise had been made and that the plaintiff actually performed, refused to enforce the finder's fee agreement.

As in Geller, Carr's alleged agreement with Iron Mountain induced Carr to put his own pecuniary interests ahead of his fiduciary duties to Logisteq and Pierce. Worse for Carr, his agreements not only created the possibility that Logisteq and Pierce might suffer from Carr's breaches, but Carr alleges that his actions actually caused Logisteq to suffer "massive" losses. See Second Ctrclms., ¶¶ 27, 35, 37, 55. Carr's elevation of his own pecuniary interest over his fiduciary duties to Logisteq and Pierce is best exhibited by his allegation that he agreed to work for Iron Mountain as a transportation consultant if his assistance to Iron Mountain were to cause Logisteq to fail. These are not the promises of a fiduciary acting in his companies' best interests, but of a swindler seeking to enhance his own position at the expense of his company and his business partner.

    1.    Carr owed fiduciary duty to Logisteq and Pierce

As an officer of Logisteq, a close corporation, Carr owed it a fiduciary duty. See A.W. Chesterton Co. v. Chesterton, 128 F.3d 1, 5 (1st Cir. 1997). Just as they owed Logisteq a fiduciary duty, Carr and Pierce were fiduciaries and owed duties to each other. See Donahue v. Rodd Electrotype Co., 367 Mass. 578, 587, 328 N.E.2d 505, 512 (1975) ("[j]ust as in a partnership, the relationship among the stockholders must be one of trust, confidence and absolute loyalty…."); see generally 68th Street Apts., Inc. v. Lauricella, 362 A.2d 78, 86 (N.J. Super. Ct. 1976), aff'd, 374 A.2d 1222 (N.J. Super. Ct. 1977) (quoting Donahue and holding that "[b]ecause of the fundamental resemblance of the close corporation to the partnership, the trust

and confidence which are essential to this scale and manner of enterprise, and the inherent danger to minority interests in the close corporation, we hold that stockholders in the close corporation owe one another substantially the same fiduciary duty in the operation of the enterprise that partners owe to one another"). As a fiduciary, Carr was not permitted to act out of avarice, expediency, or self-interest in derogation of his duties to Logisteq and Pierce.

> 2. Carr's disclosure of confidential and proprietary information was a violation of his fiduciary duty

Carr's alleged disclosure of Logisteq's and Pierce's confidential and proprietary business operations to Iron Mountain, (crediting his allegation to that effect for the sake of argument), so that Iron Mountain could prosecute its own litigation against Pierce, would be an unquestioned breach of Carr's fiduciary duties. See Second Ctrclms., ¶ 26. Fiduciaries have an obligation to maintain details of the business in confidence. According to the Second Amended Counterclaims, Pierce's breaches included posting "significant costs including payroll, etc." to the books of Logisteq. See Second Ctrclms., ¶ 6. Carr alleges that he provided "information" "and/or confirmation" regarding Pierce's and Logisteq's business operations to Iron Mountain to show that Pierce was using Logisteq to breach Pierce's contractual obligations to Iron Mountain. See Second Ctrclms., ¶ 26. The alleged disclosure by Carr to Iron Mountain of Logisteq's confidential and proprietary "costs" and "payroll" to Iron Mountain simply violates Carr's fiduciary obligations to Logisteq and Pierce.

> 3. Carr's attempt to take over Logisteq by giving Iron Mountain confidential and proprietary information was a violation of his fiduciary duty

Carr's alleged participation in discussions with Iron Mountain regarding a buy-out of Logisteq, which discussions necessitated a disclosure of Logisteq's confidential and proprietary information (*e.g.*, sufficient information to calculate Logisteq's value), would also constitute a breach of Carr's fiduciary duties of care and loyalty to Logisteq. Carr's alleged discussions with

-10-
{B0419211; 1}

Iron Mountain along these lines, if they were to be found to have occurred, would have made it difficult, if not impossible, for him to act on Logisteq's behalf (as an officer and one of two shareholders) free of his own personal interest.[2] See, e.g., In re Cumberland Farms, 181 B.R. 678, 680 (Bankr. D. Mass. 1995 aff'd in part, rev'd in part, 216 B.R. 690 (D. Mass. 1997), aff'd, 257 B.R. 691 (D. Mass. 2001), aff'd, 284 F.3d 216 (1st Cir. 2002). In Cumberland Farms, defendant Haseotes, a director and the former chief executive officer of Cumberland Farms, attempted to acquire an entire class of claims in the Cumberland Farms bankruptcy. An indenture trustee held security for the benefit of that class of claimants. The trustee had an obligation to act in the interest of that class of claimants and, under the trust indenture, was permitted to follow the direction of holder of 25% of the class of claims as opposed to the post confirmation creditors' committee. Thus, "if Haseotes [had become] the owner of at least 25% of the claims, he would have [had] a significant voice in any action taken on behalf of the holders of those claims." Id. The court in Cumberland Farms found that Haseotes' purchases were accomplished with the interest of both making of a profit and eventually controlling actions on behalf of the class of claimants so that he could terminate the independent board of directors and become once again the chief executive officer of Cumberland Farms. The Court held that this was a breach of Haseotes' fiduciary duties because he placed himself in a position whereby he had a conflict of interest "or, at the very least, a potential conflict of interest." Cumberland Farms, 181 B.R. at 680.

---

[2] Although the Court must, of course, accept as true the well-pleaded allegations of the proposed Second Amended Counterclaim for purposes of ruling on a motion to dismiss or an opposition to a motion for leave to amend, it is Iron Mountain position that, as a matter of fact, it unequivocally disabused Carr very early on in the course of their discussions of any interest in acquiring, or financing the acquisition, of Pierce's interest in Logisteq.

Carr claims, far-fetched though his allegation may be, that he attempted to take control of Logisteq with Iron Mountain's assistance. See Second Ctrclms., ¶ 19. Such an attempt would inexorably create a conflict of interest between Carr on the one hand, and Logisteq and Pierce on the other. For instance, Carr would have no incentive to increase the value of Logisteq, which would increase the amount that would be required to purchase Pierce's interest. Such a motive, *i.e.*, to decrease the value of the company to facilitate its takeover, even if only "possible", conflicts directly with Carr's fiduciary duties both to Logisteq and to his business partner, Pierce.

        4.    <u>Carr's agreement for Systrans to get Iron Mountain's business was a violation of his fiduciary duty</u>

Carr's alleged arrangement of an alleged agreement for Systrans, rather than for Logisteq, to provide services for Iron Mountain would also constitute a breach of his fiduciary duties of care and loyalty to Logisteq. A critical component of Carr's duty of loyalty as a fiduciary is an obligation to bring all corporate opportunities to Logisteq rather than to divert those opportunities for Carr's personal benefit. <u>See</u>, <u>e.g.</u>, <u>Cumberland Farms</u>, 181 B.R. at 680 (finding that Haseotes breached his fiduciary duty because "he should have given Cumberland the prior opportunity to make these purchases"). Despite this settled principle, Carr now alleges that he arranged for Iron Mountain to enter a five year, $45 million, transportation contract with Systrans. <u>See</u> Second Ctrclms., ¶ 19. Even Carr does not allege that he either brought or at least offered this alleged opportunity to Logisteq, or even that he informed Logisteq that he was seeking opportunities for Systrans, as his fiduciary obligations to Logisteq would plainly have required.

According to Carr in the Second Amended Counterclaims, each of these breaches of his fiduciary duty were induced by Iron Mountain's promises. Such promises, according to Massachusetts law, incorporating the Restatement, are unenforceable on their face. Accordingly,

{B0419211; 1}

because Carr's third attempt to state a claim for breach of contract is futile, it should be dismissed, and his latest motion for leave to amend should be denied.

### B. The Individual Plaintiffs Cannot be Liable Under Carr's Breach of Contract Claim

Even if Carr's breach of contract claim were enforceable, as a matter of law it cannot be enforced against any of the Individual Plaintiffs. Unless otherwise agreed, a person making or purporting to make a contract for a disclosed principal does not become a party to the contract. See Porshin v. Snider, 212 N.E.2d 216, 217 (Mass. 1965); Bratcher v. Moriarty, Donoghue & Leja, P.C., 54 Mass. App. Ct. 111, 116, 763 N.E.2d 556, 560-61 (2002). In Bratcher, the plaintiff filed a motion to amend a complaint to add a claim for breach of contract, alleging that the defendant did not fulfill promises to reimburse the plaintiff for certain expenses incurred by him. The court in Bratcher upheld the trial court's denial of the motion to amend the complaint because, since any promises the defendant made were made as an agent for another, the defendant could not be personally liable. Bratcher, 54 Mass. App. Ct. at 116, 763 N.E.2d at 560-61. The Second Amended Counterclaims make clear that any alleged promises were made by Iron Mountain representatives on behalf of Iron Mountain and that any performance would come from Iron Mountain. Accordingly, the Individual Plaintiffs were not parties to any such contracts and should be dismissed from the breach of contract claim.

### C. Carr's Claim of a Five Year Oral Contract is Unenforceable.

The Statute of Frauds bars Carr's claim of an oral five year contract between Iron Mountain and Systrans. An oral contract that is not to be performed within a year is unenforceable under the Statute of Frauds. See Mass. Gen. Laws ch. 259, § 1. Moreover, even if Carr had performed as alleged, any such agreement cannot be enforced. Meng v. Trustees of Boston Univ., 44 Mass. App. Ct. 650, 653, 693 N.E.2d 183, 186 (1998) (holding that

-13-

"performance, even if in full, does not remove a contract from the operation of G.L. c. 259, § 1, Fifth"). Accordingly, any claims regarding any alleged agreements to provide work for Systrans are unenforceable as a matter of law and, hence, futile.

### D. Carr Still Has Not Pleaded the Required Elements for a Fraudulent Misrepresentation Claim

Fraudulent misrepresentation claims are the same as fraud and deceit claims they require the same elements and have the same pleading standards. See, e.g., Blacksmith Invs., LLC v. Cives Steel Co., No. 04-10369-NG, 2005 U.S. Dist. LEXIS 7916, at *5 (D. Mass. Jan. 27, 2005). For a claim of fraudulent misrepresentation to be viable, therefore, there must be specific factual allegations of : (1) a false representation of a material fact, (2) made with the knowledge of its falsity, (3) for the purpose of inducing action thereon, (4) with resulting actual reliance, and (5) the claimant's detriment. See Flomeh-Mawutor v. BankNorth, N.A., 350 F. Supp. 2d 314, 319 (D. Mass. 2004) (dismissing fraud action because the representations were either not false or did not induce detrimental reliance). The allegations in the Second Amended Counterclaim still do not satisfy these required elements. The Second Amended Counterclaims do not contain allegations that Carr reasonably relied on any representations made by Iron Mountain or any of its representatives. Additionally, all of the representations alleged by Carr are promissory and forward-looking in character, and thus cannot support a fraud claim. Accordingly, Carr's motion to amend should be denied and his fraudulent misrepresentation claim should be dismissed.

    1.    Carr Has Not Alleged that he Reasonably Relied to his Detriment, upon any Alleged "Promises" made by any of the Plaintiffs.

Carr's First Amended Counterclaims starkly omitted any allegation that Carr actually relied, in any way, upon any of the Plaintiffs' alleged statements, promises or representations. The Second Amended Counterclaims fare no better because there is no factual allegation detailing what opportunities Carr forwent as a result of any alleged promises. Nor are there

{B0419211; 1}

factual allegations showing that any reliance by Carr was reasonable. See Carroll v. Xerox Corp., 294 F.3d 231, 243 (1st Cir. 2002) ("[t]o state a claim for fraud or misrepresentation, [plaintiff] must allege, *inter alia*, that he reasonably relied upon a representation of the defendant to his detriment"). Upon even a cursory examination, there is no connection between what Carr tries to pass as "reliance" and the promises he alleges he relied upon to his detriment. Carr has failed to identify a single action he took, or forwent, as a result of the Plaintiffs' alleged promises; instead, Carr's "reliance" allegations read more like a list of woes, principally with Pierce, that bear absolutely no relation to the promises that he alleges were made. Stated another way, there is no factual allegation in his pleadings from which the Court could possibly conclude that Carr relied, let alone reasonably, to his detriment as a result of alleged promises from Iron Mountain, as opposed to simply having taken actions that he concluded, reasonably or otherwise, were in his own best interests at the time.

Additionally, the alleged promises are simply too vague to support Carr's general allegations of reasonable reliance. For reliance to be considered reasonable, the representations must be sufficiently specific. See, e.g., Hinchey v. NYNEX Corp., 979 F. Supp. 40, 44 (D. Mass. 1997), aff'd, 144 F.3d 134 (1st Cir. 1998) (denying a fraud claim and stating that "the alleged misrepresentations about his career status were not specific enough so that Hinchey could have reasonably relied on them"). The allegations in the Second Amended Complaint are insufficient. For example, the allegation that Carr would be given a job does not specify the location, salary, reporting structure, etc. As for the alleged contract for Systrans, the Second Amended Complaint is lacking in specifications such as the markets Systrans would serve, the services Systrans would provide, and the rates of those services. Simply, the vague nature of the

-15-

alleged promises cannot support the generalized allegation that Carr's reliance was, in fact, reasonable. Accordingly, the fraudulent misrepresentation claim should not survive.

### 2. The "Representations" Alleged in the Counterclaim are Promises and Therefore are Not Actionable

Each and every one of the alleged misrepresentations set forth in Carr's Counterclaim is promissory only and thus is not actionable as a fraudulent misrepresentation. Generally, "'false statements of opinion, of conditions to exist in the future, or *of matters promissory in nature are not actionable*.'" Blacksmith Invs., LLC, 2005 U.S. Dist. LEXIS 7916, at *17 (dismissing the fraud action due to a failure to allege fraud with particularity), quoting Yerid v. Mason, 341 Mass. 527, 530, 170 N.E.2d 718, 720 (1960) (emphasis added). In Blacksmith Investments, the plaintiff alleged that the defendant made promises to pay a third party (in which payment the plaintiff allegedly had an interest) upon completion of that third party's work. The plaintiff in Blacksmith Investments further alleged that the defendant led the third party to believe that upon completion of its work the third party would be paid. The Court dismissed the fraud-related claims, holding that the claims rested upon promises of future conduct and were therefore not actionable. Blacksmith Invs., LLC, 2005 U.S. Dist. LEXIS 7916, at *5-6.

As in Blacksmith Investments, all of the Plaintiffs' alleged representations, even if believed, are promissory statements. For example, Carr alleges that "Iron Mountain *would fund*… Iron Mountain *would hire*…Iron Mountain *would retain*…Varn…*promised*…" See Ctrclm., ¶¶ 18, 19, 20, 23. These alleged statements are not statements of fact in any sense, but simply alleged oral promises of future performance. Accordingly, since the alleged promises are not actionable under a claim for fraudulent misrepresentation, that claim should be dismissed.

It is not sufficient to argue that Iron Mountain and Carr are not on equal footing or that Iron Mountain had superior knowledge. According to the Second Amended Counterclaims, Carr

is a sophisticated business person having owned outright or in conjunction with Pierce a multi-million dollar transportation and warehouse logistics company.  Additionally, as explained more fully below, Carr does not allege facts showing that the Plaintiffs knew that their alleged promises were false at the time that they were made.  Carr's attempt to turn what is at most a breach of contract claim (unenforceable, though it may be) into a fraud claim is simply without merit.

> E. **The Counterclaim Does Not Satisfy the Particularity Requirements of Rule 9(b)**
>
>> 1. <u>The Second Amended Counterclaims do not sufficiently allege knowledge of the falsity of any promises</u>

The Counterclaims do not set forth the circumstances of the Plaintiffs' knowledge of their representations' alleged falsity with particularity, and Count II should accordingly be dismissed.  Fed. R. Civ. 9(b) unambiguously requires that, "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  The requirement that supporting facts be pleaded applies even when the fraud relates to matters particularly within the knowledge of the opposing party.  See <u>Maldonado v. Dominguez</u>, 137 F.3d 1, 9 (1st Cir. 1998) ("[c]ourts have uniformly held inadequate a complaint's general averment of the defendant's 'knowledge' of material falsity unless the complaint also sets forth specific facts that make it reasonable to believe that defendant knew that a statement was false or misleading"); <u>see generally</u> <u>DiLeo v. Ernst & Young</u>, 901 F.2d 624, 629 (7th Cir. 1990) ("[a]lthough Rule 9(b) does not require 'particularity' with respect to the defendants' mental state, the complaint still must afford a basis for believing that plaintiffs could prove scienter").  Thus, for promissory statements to satisfy the requirements of fraudulent misrepresentation, Carr must allege supporting facts showing that the statements were false when made, as an intention not to perform in the future cannot be established merely by the promise's subsequent non-

-17-

performance. See Blacksmith Invs., 2005 U.S. Dist. LEXIS 7916, at *6. The restriction on promissory statements makes sense. Without this added element, every breach of contract action would simultaneously become an action for fraud.

In this case, the Second Amended Counterclaims, as did the First Amended Counterclaims, merely alleges the circumstances of the Plaintiffs' knowledge of the promises' falsity in the most conclusory fashion – Carr merely alleges that upon "hindsight" it appears that any promises would not be satisfied. See Second Ctrclms., ¶ 34. Carr's "hindsight" is the same as relying on the alleged non-performance of the promises, which was shown to be insufficient in Blacksmith Invs. Under well-established law in the First Circuit (and elsewhere), Carr's conclusory pleading technique is not sufficient in the context of a fraudulent misrepresentation claim. Accordingly, Carr does not have an actionable fraudulent misrepresentation claim.

        2.      The group pleading technique of the Second Amended Counterclaims does not satisfy 9(b)

Finally, Carr's "group pleading" technique regarding the alleged knowledge of all of the Plaintiffs is not sufficient under Fed. R. Civ. P. 9(b). Our Courts have held that if a fraud claim involves multiple defending parties, a claimant usually may not group all claimed wrongdoers together in a single set of allegations; rather, the claimant must make specific and separate allegations against each defendant. See Bio-Vita, Ltd. v. Rausch, 759 F. Supp. 33, 37-38 (D. Mass. 1991) (dismissing the common-law fraud claim due to lack of particularity); see generally 2 Moore's Federal Practice, § 9.03[1][f] (Matthew Bender 3d ed.) ("the claimant must make specific and separate allegations against each defendant."). The Second Amended Counterclaims group the Plaintiffs together and do not allege specific and separate allegations of an intention to deceive or reliance against each of the Plaintiffs. Accordingly, the Second

{B0419211; 1}

Amended Counterclaims do not give sufficient notice of the fraudulent misrepresentation claims against the Plaintiffs.

### Conclusion

For the foregoing reasons, the Plaintiffs respectfully requests that this Court enter an order denying the motion to amend and dismissing Carr's counterclaims with prejudice.

### REQUEST FOR ORAL ARGUMENT

The Plaintiffs believe that oral argument may assist the Court and wish to be heard on these issues.

Respectfully submitted,

**IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; and CHARLES G. MOORE**

By their attorneys,

June 27, 2005

/s/   Samual Miller
Ira K. Gross (BBO #212720)
*igross@sandw.com*
Samual A. Miller (BBO #648568)
*smiller@sandw.com*
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, Massachusetts  02109
(617) 338-2800

{B0419211; 1}