UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; ) <br> IRON MOUNTAIN INFORMATION ) <br> MANAGEMENT, INC.; C. RICHARD ) <br> REESE; JOHN F. KENNY, JR.; ) <br> GARRY B. WATZKE; LARRY L. VARN; ) <br> and CHARLES G. MOORE, ) <br> ) <br>     Plaintiffs and ) <br>     Counterclaim-Defendants, ) <br> ) <br> v. ) <br> ) <br> THOMAS CARR, ) <br> ) <br>     Defendant and ) <br>     Counterclaim-Plaintiff. ) | CIVIL ACTION <br> NO. 05 10890 RCL |

## AFFIDAVIT OF GARRY B. WATZKE

I, GARRY B. WATZKE, first being duly sworn, hereby depose and say:

1.    I am a member in good standing of the bar of the Commonwealth of

Massachusetts. I am one of the named plaintiffs in this action. I am currently a Senior Vice

President of and General Counsel to Iron Mountain Incorporated ("IRM"), the first-named

plaintiff in this action, as well as of its subsidiaries and affiliated entities, including Iron

Mountain Information Management, Inc. ("IMIM" and, together with IRM, "Iron Mountain"),

also a named plaintiff in this action, and have primary responsibility for all of the company's

legal matters, including the retention and supervision of outside counsel. My office is located at

Iron Mountain's corporate headquarters at 745 Atlantic Avenue, Boston, Massachusetts. I make

this affidavit in opposition to the motion by defendant and counterclaim-plaintiff Thomas Carr

("Carr") to disqualify Iron Mountain's long-time principal outside counsel, Sullivan & Worcester

LLP ("S&W"), as its chosen counsel in this action. Except where otherwise indicated, I make this affidavit from facts within my personal knowledge and I believe all matters set forth herein to be true, correct and complete.

2. I received a B.A. degree from the University of Nebraska in 1967 and a Master of Arts Degree from Harvard University in 1968. After two years in the United States Army (1968-1970), I returned to school and received a Juris Doctor degree from Harvard Law School in 1973. On January 1, 2000, I became formally employed by Iron Mountain as Vice President and General Counsel, and I became a Senior Vice President earlier this year.

3. Iron Mountain is the global leader for outsourced records and information management services ("RIMS"), and currently has operations in several hundred locations throughout North America, Latin America, South America and Europe. IRM, the parent corporation, is a Delaware corporation based in Boston whose stock is traded on The New York Stock Exchange ("NYSE") under the symbol "IRM". IMIM, a wholly-owned operating subsidiary of IRM, is a Delaware corporation with a principal place of business located in Collegeville, Pennsylvania.

4. S&W has represented Iron Mountain and its predecessor, Iron Mountain Information Services, Inc., and its affiliates, since at least the mid-1970's. The firm provides a broad range of legal services to Iron Mountain, including representation of and advice to Iron Mountain in corporate matters, acquisitions, tax matters, executive and employee benefits issues, real estate matters, securities and other regulatory compliance matters, and matters involving claims by and against the company, including litigation matters in various jurisdictions. Larry L. Varn ("Varn"), a partner of S&W, has performed a substantial array of litigation, litigation-related and regulatory-related services for the company for many years, including serving as lead

counsel and lead trial counsel in the litigation and arbitration proceedings that Iron Mountain

brought against J. Peter Pierce, Sr. ("Pierce") and which are subject matters of Carr's

counterclaims and proposed second amended counterclaims (the "SAC") in this action. As a

consequence, Varn has close working relationships with and has the confidence of the senior

management of Iron Mountain, including C. Richard Reese ("Reese"), the company's Chairman

and Chief Executive Officer, John F. Kenny, Jr. ("Kenny"), the company's Chief Financial

Officer and a member of its Board of Directors, and myself, all three of whom are plaintiffs in

this declaratory judgment action.

     5.     In late 1999 Iron Mountain entered into a definitive agreement to acquire, via a

reverse merger, Pierce Leahy Corp. ("PLC"), headquartered in King of Prussia, Pennsylvania.

PLC, whose stock was also traded on the NYSE, was also a major RIMS provider that operated

throughout the United States, as well as in certain markets in Canada and Europe. Pierce was the

CEO and principal executive officer of PLC, and he and members of his immediate family were

the largest PLC stockholders.

     6.     The acquisition by Iron Mountain of PLC (the "PLC Acquisition") was

consummated on February 1, 2000. In connection with and as a condition to the transaction,

Pierce entered into an Employment Agreement to serve, on an "at will" basis, as the company's

President and Chief Operating Officer, reporting to Reese, who remained Chairman and CEO.

That employment agreement contained certain restrictive covenants related to non-competition,

non-solicitation and confidentiality of information. Pierce was also elected to a three-year term

on Iron Mountain's Board of Directors. Commencing very shortly after the PLC Acquisition,

however, other Iron Mountain senior management began expressing grave concerns about Pierce

and his ability to perform the functions necessarily expected of him as President and COO. After

consulting with other members of the Board of Directors, the decision was therefore made in June, 2000, by members of the Executive Committee of the Board of Directors of Iron Mountain, other than Pierce, to terminate his employment with the company. That decision was communicated to Pierce later that month. Subsequently, Iron Mountain and Pierce, after negotiations between counsel, entered into a letter agreement, effective as of June 30, 2000, establishing the terms of Pierce's separation from Iron Mountain; pursuant to that letter agreement, Iron Mountain made severance payments to Pierce of approximately $1.5 million. Pierce continued to serve, however, as a member of Iron Mountain's Board of Directors until his resignation on December 23, 2002.

7.     In late October, 2000, Iron Mountain, through Reese, its Chairman and CEO, engaged S&W, and particularly Varn, to undertake a very confidential and discreet investigation into matters involving information that had come to the attention of Iron Mountain's senior management, including Reese, that Pierce might be involved, inappropriately, with a new competitor in the RIMS industry that had been established by former PLC employees who had left Iron Mountain in the summer of 2000 after Pierce was discharged as President and COO. At that time, the new competitor did not have a name known to Iron Mountain; however, it subsequently became known as "Sequedex". At that time, senior management of Iron Mountain had received information from what they regarded as credible sources, that Pierce, directly and through certain of his associates, was surreptitiously financing, supporting and providing advice or assistance to the new competitor, *i.e.*, Sequedex, in violation of the restrictive covenants in his employment agreement with Iron Mountain (which survived the termination of his employment) and his fiduciary obligations to Iron Mountain and its stockholders as a member of the company's Board of Directors. Although I was not directly involved in the investigation into the

- 4 -

matters involving Pierce at that time, I was aware of it and I was also aware that, given the sensitive nature of the matter, involving as it did a sitting director of a publicly-held company, information concerning the investigation was shared within the company on a strictly "need to know" basis and various protocols were instituted to prevent any inadvertent disclosures of the matter.

8.      The investigation into the "Pierce/Sequedex" matter continued into 2001. By the spring of that year the existence of Sequedex, and its entry into the RIMS industry, particularly in the mid-Atlantic states, became a matter of public knowledge, and Sequedex began attempting to lure customers away from Iron Mountain, principally customers with which its known employees had been involved during the time they were employed by PLC. We also learned that several former Iron Mountain employees who had previously been employed by PLC prior to the PLC Acquisition, and who were subject to employment agreements containing non-competition, non-disclosure and other restrictive covenants, had become or were about to become employed by Sequedex in what appeared to be significant financial, sales and management functions and there was evidence suggesting that Sequedex might have acquired Iron Mountain trade secrets and other confidential information related to, among other things, major customers of the company. As a consequence, Iron Mountain initiated a series of actions in New Jersey and Florida for relief in respect of the individual defendants' breaches of those employment agreements and for Sequedex's tortious interference with those agreements. Ultimately those actions, as well as Iron Mountain's disputes with Pierce, were settled by means of two (2) interrelated settlement agreements that were consummated on June 2, 2005, just slightly more than two (2) months ago.

9.     One result of the PLC Acquisition in early 2000 was that Iron Mountain became the owner of a large facility in Freehold, New Jersey (the "Freehold Facility"), that had formerly been an Owens Brockway Glass factory before PLC had acquired and converted it, and expanded it substantially, into a commercial records center. I have visited the Freehold Facility and am generally familiar with it. For some years prior to the PLC Acquisition, PLC had leased a portion of the Freehold Facility to an entity known as Transportation Concepts of New Jersey, Inc., a/k/a TC Transport, a local trucking firm with which Carr was involved. As a consequence of the PLC Acquisition, therefore, TC Transport became a tenant of Iron Mountain.

10.     In early 2001 I began to receive reports with problems with TC Transport at the Freehold Facility. The problems related to, among other things, alleged diesel fuel or gasoline spills by TC Transport; TC Transport trucks crowding out Iron Mountain vehicles at loading docks; TC Transport trucks parking on the shoulders of the road near the Freehold Facility and creating hazardous traffic conditions; and personal difficulties and confrontations between Michael DiIanni ("DiIanni"), a former PLC and, briefly, Iron Mountain employee who had become associated in some fashion with TC Transport on the one hand, and Jim Montague ("Montague"), an Iron Mountain employee at the Freehold facility, on the other. At the same time (February 2001), Iron Mountain determined that it could utilize the space at the Freehold Facility occupied by TC Transport for its own expansion purposes. I had principal responsibility for dealing with these issues, although I did consult from time to time with S&W, including Varn, and also received advice as to New Jersey law from the firm of Wilentz, Goldman & Spitzer P.A. in Woodbridge, New Jersey.

11.     On February 20, 2001, I sent a letter to Carr, who I had never met and with whom I had never spoken, advising him that Iron Mountain was exercising its option under the

- 6 -

warehouse lease to terminate TC Transport's lease at the Freehold Facility effective March 31, 2001. Carr responded with a letter to me, dated February 28, 2001, contending that Iron Mountain, through its former Director of Construction who had passed away the previous winter, had agreed to extend the lease.

12.     The problems with alleged spills, as well as confrontations with DiIanni, continued into March of that year. In particular, I heard a report of a major spill on March 22, 2001. It was disputed whether it came from a TC Transport truck or a trucks operated by a contractor to Iron Mountain that was constructing a new building on the site. There was also a dispute concerning TC Transport's failure to plow the snow on the site, as the lease required it to do. Lastly, I learned of a fistfight between DiIanni and Montague on March 22, 2001, that led to calls to the local police and criminal charges brought by each against the other. Throughout this period I had a number of telephone conversations with Carr, who appeared to be trying to smooth things over and who was endeavoring to obtain Iron Mountain's consent to an extension of the lease.

13.     On April 2, 2001, I sent a letter to Carr indicating that DiIanni and Montague were dropping the criminal charges against each other and confirming that TC Transport would have DiIanni work at locations other than the Freehold Facility. A couple of weeks later Carr wrote to me asking that Iron Mountain include TC Transport's space in some leasehold improvements that were being made by Iron Mountain to the Freehold Facility. I responded to Carr on April 27, 2001, confirming that Iron Mountain wanted TC Transport out of the space, acknowledging that they would not be out by April 30th, and stating that TC would be considered a holdover tenant after that date.

- 7 -

14.    The issues between Iron Mountain and TC Transport continued into May of 2001. I received a letter from DiIanni, dated May 17, 2001, complaining that tea stored by TC Transport in the leased space was experiencing mold problems and asserting that Iron Mountain would be liable. I responded to DiIanni's letter later in the month, denying any liability on the part of Iron Mountain. I also wrote to Carr on May 23, 2001, advising him that TC Transport would be liable for holdover rent. I also had a small handful of telephone conversations with Carr during this period.

15.    In late May or early June, 2001, Pierce wrote to or left a voice mail for Reese asking Iron Mountain to be reasonable with TC Transport in connection with the lease. Pierce also called me directly to push for a resolution on the matter, advising that he was an "investor" in TC Transport. After several internal discussions and consultations, and a further review of Iron Mountain's expansion plans and timetable at the Freehold Facility, Iron Mountain agreed to a one-year extension of the lease so that it would expire July 31, 2002. I had several calls with Carr, and also with Alan McGrath of TC Transport, during this period to work out the details. I sent the new lease extension document to TC Transport in late July, 2001, and it was signed and returned to me about a month later, in late August of that year. I do not believe that I had any contact with Carr or anyone from TC Transport during this period.

16.    On Monday, September 24, 2001, I received an unsolicited call from Carr, with whom I had not spoken since sometime in the early to mid-summer. Carr volunteered that he was "having issues" with Pierce and that he knew of matters in which Iron Mountain would be interested, specifically activities of Pierce that were breaches of Pierce's fiduciary duties to Iron Mountain. Carr sought a meeting with Iron Mountain to discuss the information he claimed to have. Carr also told me on September 24, 2001, that his lawyer wanted him to tell me that he

- 8 -

(Carr) was preparing to file a lawsuit and that Pierce was among the defendants. Carr didn't tell me the gist of his complaint with Pierce; I assumed that he was waiting for a meeting. He also told me that what he had to tell Iron Mountain about DiIanni would "knock me off my chair". I reported the information from Carr to Reese and Varn and had a few additional calls with Carr over the next week. Ultimately, we agreed to Carr's request for a meeting. It was originally scheduled for October 4, 2001, but, at Carr's request, it was rescheduled to later in the month, specifically October 17th.

17.     My first meeting with Carr in fact took place on Wednesday, October 17, 2001, at the Hilton Hotel in East Brunswick, New Jersey. Carr was accompanied by his lawyer, Arthur Peslak ("Peslak"), of Freehold, New Jersey. I was accompanied by Varn, who was in central New Jersey that day on other business, and by Robert "Bob" Miller ("R. Miller"), who was at that time the President of IMIM (then known as Iron Mountain Records Management, Inc.). The meeting, which took place in a sitting area in the hotel's second floor restaurant, lasted a little over two (2) hours. I returned to Boston late that night and, the first thing the following morning, I composed a memorandum to Reese summarizing the meeting. A copy of my memorandum, which I believe to be true and accurate in all material respects, is annexed hereto as Exhibit A. My only other significant recollection is that, towards the end of the October 17th meeting, Varn told Carr and Peslak of reports from Iron Mountain's field organization in the region that TC Transport trucks and trailers, including one or more TC Transport trailers that had been repainted with Sequedex signage, had been observed picking up customers' records from Iron Mountain for transport to Sequedex. We were very careful, however, on the Iron Mountain side not to disclose our independently developed concerns about Pierce's activities. Peslak was

- 9 -

present for the entire meeting on October 17th and at no time did he, in any way, express disagreement with or provide any material qualifications to the statements of fact made by Carr.

18.    Carr continued to call me from time to time over the next few weeks with bits and pieces of additional information. He also called me around Thanksgiving to request a meeting with Reese and Vincent Ryan ("Ryan") of Schooner Capital LLC, who we had mentioned to Carr on October 17th as someone who might be interested in making an investment in the new company, *i.e.*, Logisteq, that, we learned at the October 17th meeting, had been formed as a result of Pierce's investment in the TC Transport. A dinner meeting among Carr, Reese and Ryan was, therefore, arranged for mid-December, 2001. Carr called me on November 28, 2001, to confirm it and to suggest an additional individual, Arturo Soto, who he said could corroborate a substantial amount of the connections between Logisteq and Sequedex, Pierce's involvement with Sequedex, and DiIanni's alleged involvement in union organizing efforts by Teamsters Local 560 earlier that year at the Freehold Facility. Carr reported that DiIanni had caused Soto, formerly a PLC manager at the Freehold Facility, to be hired by Logisteq; that DiIanni had moved Soto to Miami and then fired him; that Soto, after complaining to Pierce and Mike Gold ("Gold") of Sequedex, had been rehired by Logisteq and was then working at Logisteq's Sayreville, New Jersey, facility; and that there had been talk of moving Soto to Connecticut for Sequedex but, at that time, Gold and DiIanni were talking of moving him to Sequedex's operation in Atlanta.

19.    Carr came to Boston to meet and have dinner with Reese and Ryan sometime around the year-end holidays in 2001, or perhaps early 2002. I had only a brief, and inconsequential, conversation with him while he was waiting for Reese and Ryan in a conference room at Iron Mountain's offices in Boston. Shortly thereafter, however, I received a further call

from Carr requesting another meeting. After several calls to arrange such a meeting, I spoke with Carr on January 28, 2002, to set a meeting for January 31, 2002, at Peslak's office in Freehold, New Jersey, which Varn attended. I have reviewed Varn's affidavit, dated August 18, 2005, in connection with this matter (the "Varn Affidavit"), and specifically paragraphs 22 and 23, and confirm that his recollection of the salient events of the January 31, 2002, meeting with Carr and Peslak are the same as my own. In addition, I recall that Carr, at one point during the meeting, asked me if Iron Mountain would provide financing for him to buy out Pierce's interest in Logisteq. I told Carr (as I believe he had been told previously) that Iron Mountain had no interest in Logisteq but that he was free to pursue discussions with Ryan if he wished. As was the case with the meeting on October 17, 2001, Peslak was present for most, if not all, of the discussions. Although Peslak would, from time to time, help focus Carr's attention on particular events, at no time did he express any disagreement with or material qualifications to the statements of historical fact which Carr relayed to Varn and me that day.

20.     Carr continued to call me from time to time during February, 2002, generally describing events that had transpired and the continuing deterioration of his relationship with Pierce. Carr also began increasingly to discuss the prospects for, and a possible "roll up" of other business involved in, the licensed coffee warehousing business, a business in which Logisteq was active. Carr also told me that he was trying, on his own, to get various conversations on tape, including a conversation with an individual who, he said, could confirm an attempted bribe by DiIanni for an Iron Mountain/PLC construction project in Freehold, but that he had limited success. I was not at all familiar with such matters and generally just listened to his reports. I do know, however, that during February, 2002, Varn prepared a draft of an affidavit by Carr based upon the information he had provided to us, principally at the January 31,

- 11 -

2002, meeting at Peslak's office. I provided my input to Varn's draft and I recall seeing a transmission of the draft from Varn to Peslak sometime during the latter half of that month. Varn and I also had a conference call with Carr, which Carr initiated, on February 25, 2002, regarding questions he might pose to Pierce at a forthcoming meeting and to schedule a further meeting, this time involving Kenny, for the following evening, February 26, 2002, in New York, to coincide with a trip that Kenny needed to make to New York for Iron Mountain business.

21.     Kenny, Varn and I met with Carr and his long-time bookkeeper, Tammi Phillips ("Phillips"), for approximately four (4) hours on the evening of February 26, 2002, in Kenny's suite at the Waldorf-Astoria Hotel in New York. I have reviewed paragraphs 25 and 26 of the Varn Affidavit and confirm that my recollections of the material events of the February 26, 2002, meeting are the same as his.

22.     After Kenny's and my return from New York, we spoke with Ryan, who expressed a continuing interest in the possibility of becoming involved in a "roll up" of the licensed coffee warehousing businesses that Carr was espousing. We all agreed, however, and I conveyed to Carr, that any such transaction would be conditioned upon him reaching an accord or settlement with Pierce such that there were no non-competition, fiduciary or other issues between the two of them or involving Logisteq. Carr then proceeded to arrange a meeting, that was scheduled for March 13, 2002, with representatives of RPM and Continental Terminals, both of whom were engaged in the licensed coffee warehousing business in or around the Port of New York and New Jersey and at one or more of the other United States ports (Virginia, Miami and New Orleans) into which exchange coffee is imported into this country.

23.     Kenny and I flew to Newark Airport early on the morning of March 13, 2002. We met Carr at the Newark Airport Marriott. Carr was accompanied by James Neebling

- 12 -

("Neebling"), who Carr introduced as a trusted friend and advisor. This was the first time that I met or spoke with Neebling. The four of us had breakfast together and engaged in a general discussion of the licensed coffee warehousing business, as well as social topics and current events. Shortly thereafter Carr drove us to the Casa Dante Restaurant in Jersey City, New Jersey, where we were joined by Doug Martocci of Continental Terminals and Ray Masucci of RPM. Over a leisurely lunch the six (6) of us engaged in a general discussion of the licensed coffee warehousing business and the possibility, advanced by Carr, of a "roll up" or other combination of Logisteq, Continental Terminals and RPM. This was a very preliminary discussion only and no commitments of any sort, either to Carr or in respect to the coffee warehousing business, were made at that luncheon.

24.    I have reviewed Carr's proposed Second Amended Counterclaim ("SAC") in this action. Nearly all of its material allegations, to the extent I have first-hand knowledge of the underlying events, are false. In particular, paragraph 17 of the proposed SAC Carr alleges that "in the spring of 2002, Iron Mountain began encouraging Carr to file a lawsuit against Pierce on behalf of Systrans [*sic*] to coincide with the action that Iron Mountain was planning to also file against Pierce". This allegation is completely false. At no time did Iron Mountain encourage Carr to file a lawsuit against Pierce or anyone else. In addition, we were always careful not to reveal to Carr that Iron Mountain had plans (which were, in any event, not approved until the Executive Committee of Iron Mountain's Board of Directors met on March 27, 2002) to initiate litigation as a result of what it believed were Pierce's fiduciary and contractual defalcations.

25.    Carr also alleges, in paragraph 18 of the proposed SAC, that "[o]n March 19, 2002, Carr, Neebling and Peslak attended a meeting in Casa Dante, New Jersey [*sic*] with the general counsel of Iron Mountain, Garry Watzke" and that "Watzke, individually and as an agent

- 13 -

of Iron Mountain acting with such authority, stated that, in return for Mr. Carr's cooperation in
the Iron Mountain/Pierce litigation, Iron Mountain would fund Mr. Carr's lawsuit against Mr.
Pierce and employ Mr. Carr in the event that Mr. Pierce locked him out of Logisteq." This
allegation is also completely false. As of March 19, 2002, there was no "Iron Mountain/Pierce
litigation" and we never informed Carr of our confidential internal discussions, or our
confidential discussions with counsel, regarding that matter. Furthermore, although Carr had
previously volunteered to me his intention to bring a lawsuit against Pierce, as of March 19,
2002, conversations on that subject had abated and there was no talk between us, at all, on that
subject in that time frame. Lastly, at no time, either on March 19, 2002 or otherwise, did I state
or undertake, in any way, that Iron Mountain would fund any lawsuit that Carr might ultimately
decide to bring.

26.    At the conclusion of the March 19, 2002, luncheon meeting at Casa Dante, Carr
drove Kenny and me back to Newark Airport, where Kenny boarded a flight to return to Boston.
During the course of that day, however, Carr made various phone calls to arrange for an informal
dinner that evening at the Newark Airport Marriott that would include Soto and also Neebling,
who remained with us during the day. That event convened around 6:30 p.m., when we were
joined by Varn (who was also in New Jersey that day on another matter) and, also, by John
Lehmann ("Lehmann"), who was introduced as the dispatcher for TC Transport/Logisteq. I was
present for the entire conversation at that dinner, and I have reviewed the description of the
discussion contained in paragraphs 27 and 28 of the Varn Affidavit, which is also consistent with
my own memory of the discussions that evening except that I was not present for the one-on-one
conversation between Varn and Soto outside the hotel after the meeting broke up.

- 14 -

27.    Carr and Neebling came to Boston on March 26, 2002, for meetings that afternoon at Iron Mountain's offices. I do not recall who made the arrangements. I was present for the discussions that day, which included Reese (for a portion of the meeting) and Kenny, and which continued to revolve around Carr's proposal for a "roll up" of the licensed coffee warehousing businesses. At that meeting Carr and Neebling delivered a small booklet entitled "Continental USA – Overview" that discussed, in general terms, such a possible "roll up" transaction. Neebling also indicated that his company, known as "Systrans", could also provide transportation services for the prospective venture and, also, for Iron Mountain, although there were no significant or serious discussions on that topic. Carr advised us that, following that meeting, he was leaving on vacation with his family to the west coast.

28.    The material allegations in paragraph 19 of the proposed SAC concerning the meetings at Iron Mountain's offices in Boston on March 26, 2002, are wholly untrue. Specifically, at no time during those meetings did Reese offer $5 million to Carr – or, indeed, any amount – to "use to buy out Pierce's share of Logisteq" or otherwise, and Carr never made any claim to that effect in my presence prior to the eve of filing this case. In fact, Carr was advised on several occasions, both by me and by others representing Iron Mountain, that the company had no interest and would have no interest in Logisteq. In addition, at no time on March 26, 2002 nor, to my knowledge, at any other time, did Reese "[promise] that Iron Mountain would hire Carr as a transportation consultant and provide $25 million in courier business to [Systrans]" or Kenny "[advise] that courier business revenues of $45 Million would be paid to [Systrans] each year for a period of five years in return for the cooperation of Systrans and Carr . . . ." In a nutshell, these allegations of the SAC are flat-out false.

- 15 -

29. On March 28, 2002, Iron Mountain filed, in a New Jersey state court, a complaint against Pierce, Sequedex and others for, among other things, breach of Pierce's restrictive covenants in his employment agreement with Iron Mountain and for breaches of his fiduciary obligations to Iron Mountain and its stockholders (the "Pierce Litigation"). To the best of my knowledge, no one informed Carr, directly or indirectly, in advance that the case against Pierce was being filed and the policy decision was made not to inform him or his counsel, Peslak, or anyone else outside the "need to know" group of senior executives and directors of the company, until after the case was actually on file.

30. Carr alleges, in paragraph 20 of the proposed SAC, that "[o]n April 2, 2002, Carr and Peslak participated in a conference call to [me] [and that I], individually and acting with the scope of [my] authority as general counsel, promised that Iron Mountain would pay for Carr's attorneys' fees in his suit against Pierce" and "that Iron Mountain would retain Carr in a consulting position". These allegations are also completely untrue. Although it is quite possible that I received one or more phone calls from Carr or Peslak that day, as I learned that Pierce, apparently in response to Iron Mountain's suit against him, fired Carr from Logisteq and that Carr was at that point planning a suit against Pierce and others, I never promised him any payments of fees or otherwise in that regard. Similarly, I never promised Carr any "consulting position" with Iron Mountain. In fact, the only discussion to which I was ever a party concerning possible employment of Carr by Iron Mountain took place at the meeting involving Kenny on the evening of February 26, 2002. At one point towards the end of that meeting, Carr asked Kenny if he could get a job at Iron Mountain if he became unemployed as a results of his disputes with Pierce. Kenny replied that Iron Mountain might consider some employment or consulting position for Carr in the transportation area if Pierce were to file Carr. However, to my

- 16 -

knowledge Carr never made any further request, and certainly not to me, to be employed or retained by Iron Mountain. In any event, given what we now know about Carr's veracity and criminal history, he would not qualify for employment by Iron Mountain.

31.    Varn, William Matlack (then an S&W associate and now a partner of the firm) and I met with counsel to Pierce and counsel to Sequedex at S&W's Washington, D.C., offices on April 4, 2002, to make a settlement proposal to them, which we did. Our efforts to resolve the disputes were unsuccessful. Consequently, and consistent with its reporting obligations as a public company, Iron Mountain issued a press release the following morning and made a filing with the SEC announcing the suit. Later that day I was informed that Peslak, on behalf of Carr, had initiated a lawsuit against Pierce and others in a state court in Monmouth County, New Jersey (the "Carr Litigation"), and that a hearing on Carr's applications for emergency interim relief had been scheduled for April 9, 2002.

32.    On the evening of April 8, 2002, I was informed by Varn who was in New Jersey, that Pierce and his associates had filed, in the Carr Litigation, papers disclosing that Carr was under indictment from the United States District Court for the Southern District of New York (the "SDNY Indictment") for "money laundering". This was the first time that I had ever heard that Carr had any problems or issues with law enforcement. I received more details, including a copy of the SDNY Indictment, the following day. The SDNY Indictment, consisting of ten (10) counts, charged Carr and others with bank fraud and wire fraud related to the trafficking and laundering of allegedly stolen checks. Upon informing Reese of this development, he advised me that he and Kenny were going to New York later that day on other business and wanted to meet with Carr face-to-face. Although I assisted in making the arrangements, I did not attend the meeting which, I understand, took place that night at a restaurant named Giambelli's. Over the

- 17 -

next couple of days, however, I did assist with the logistics of a wire transfer from S&W to Peslak of $50,000 which, I was informed, Reese had agreed to advance to ensure that Carr's case against Pierce – which had issues, particularly the use of Logisteq to assist Sequedex, that overlapped with Iron Mountain's claims against Pierce – would be fully developed. Carr called me a few times in this time frame to thank me for Reese's understanding and patience, to protest his innocence of the federal charges against him, and to recite that he "only made one mistake" in doing a favor for individuals he trusted and that this "favor" led to the SDNY Indictment.

33.     In mid-April, 2003, Iron Mountain initiated an arbitration proceeding against Pierce before the Philadelphia office of the American Arbitration Association (the "Pierce Arbitration"). The judge to whom the Pierce Litigation was assigned ultimately stayed that case pending the conclusion of the Pierce Arbitration, which was subsequently transferred from the AAA to ADR Options, Inc., in Philadelphia before Arbitrator Thomas Rutter. The parties agreed that the Pierce Arbitration was governed by the Federal Arbitration Act.

34.     I participated in a telephone call with Peslak on one occasion during July, 2003, although I do not recall the date of the call. I do recall that it occurred on one of the days during which arbitration hearings occurred. I placed the call to Peslak at Varn's request. Varn asked me to call Peslak because Varn had received a voice mail or e-mail from Peslak or Carr, demanding that Iron Mountain meet its obligations to Carr. Because Varn was engaged in the hearing, he asked me to call Peslak, and I did so. Peslak stated that Carr was in difficult financial straits and unable to pay his bills to Peslak because he was unemployed, and Peslak said he felt that Iron Mountain had made commitments to help Carr financially. I believe I acknowledged that it was probably true that Carr was in bad financial shape, but I also told Peslak that Iron Mountain had made no commitments to Carr, either with respect to Carr's litigation against

- 18 -

Logisteq or with respect to supporting Carr's personal life. I told Peslak that while Iron Mountain appreciated Carr's cooperation prior to filing the Complaint in March, 2002, Iron Mountain had not made any promises (other that the commitment made in April, 2002, to contribute $50,000 toward Peslak's fees) and would not now make any promises. However, I told Peslak that at the end of the arbitration and any related proceedings, Iron Mountain would meet with Carr to discuss what, if anything, Iron Mountain could appropriately do to help Carr's circumstances.

35.    The Pierce Arbitration was tried for fifteen (15) days in July and August, and again in November, 2003. I attended every session of the evidentiary hearings in the Pierce Arbitration and, in fact, I was called as a witness by counsel to Pierce, in part concerning the communications I had had with Carr. One of the disputed issues between Iron Mountain and Pierce concerned an audiotape of a Logisteq Advisory Board meeting in early 2002 that Carr, who recorded it on its own with no prompting or encouraging by me, supplied to Varn, Iron Mountain's counsel, sometime in the spring of that year. That audiotape, which became known as "TE-109", contained a damaging admission by Pierce of Logisteq have "subsidizing" Gold's company, *i.e.*, Sequedex. Carr was called as a witness on July 31, 2003, and testified under oath for the limited purposes of authenticating the audiotape and confirming that it was recorded in New Jersey, a so-called "one party consent" state, rather than, as contended by Pierce, in Pennsylvania, which generally prohibits such recordings without the consent of all parties. The arbitrator ultimately concluded, incorrectly in my view in light of other evidence, that TE-109 was recorded in Pennsylvania and thus refused to allow its admission into evidence in the Pierce Arbitration.

36.    Carr was cross-examined vigorously by counsel to Pierce. He testified in material

part, and under oath, as follows on July 31, 2003 (which postdated all of the material events

alleged in the proposed SAC other than an alleged September 2003 meeting in New York in

which I was not involved):

> Q. Now, what promises were given to you by Iron Mountain, if
> any, or their lawyers, for gathering information on their behalf for
> use in this lawsuit?
>
> A. **There was no promises given**. They did tell me that they
> would help me, compensate me for my attorney fees.
>
> Q. Oh, they did?
>
> A. Yes, they did.
>
> Q.    Who told you that?
>
> A.    Garry Watzke.
>
> * * *
>
> A.    For the record, he didn't promise, he said he would help
> compensate me for my attorney fees.
>
> Q.    Okay. And that was [Iron Mountain's General Counsel
> Garry] Watzke, who sits at the end of the table?
>
> A.    Good looking guy down at the end of the table.
>
> Q.    Right. The good looking guy. And did he fulfill that promise
> to you?
>
> A.    Yes, he did.

(Emphasis added).

37.    Closing arguments in the Pierce Arbitration were held on January 9, 2004. On

February 4, 2004, we received the arbitrator's decision denying any relief to Iron Mountain and

awarding Pierce a portion of his attorneys' fees in connection with that case. Although the

decision was a disappointment and, for reasons that Iron Mountain articulated in subsequent

vacatur proceedings in New Jersey, in our view legally defective, it did contain findings of fact both that Carr was a "con man who, inter alia, took Pierce for a large investment in TC Transport ($3,800,000); who took Iron Mountain for $50,000 in fees to support a separate lawsuit against Pierce; [and] who bamboozled Iron Mountain with corrupt 'evidence' from corrupt witnesses, including an ersatz taped recording", and that Carr was "a skillful, persuasive con man". Even Carr's counsel in this case, who came to Boston to meet with Varn, his partner Ira Gross and myself, on February 23, 2005, referred to his client as "damaged goods".

38.    I have reviewed carefully Carr's motion seeking to disqualify S&W as chosen counsel to the plaintiffs, who include Iron Mountain, Reese, Kenny and myself, and the papers which he has filed in support of that motion, and have discussed them with Reese and Kenny. I am also familiar with Rules 1.7 and 1.9 of the Massachusetts Rules of Professional Conduct. I understand that Varn, who is not acting as and will not act as an advocate on behalf of the plaintiffs in connection with this case, may be called to testify as a witness if the Court denies the plaintiffs' motion to dismiss Carr's counterclaims and Carr's motion for leave to file the SAC. I am not aware of any facts, however, indicating the likelihood of any conflict between Varn's anticipated testimony in this matter and that of Iron Mountain or any of the other plaintiffs, including myself. I also do not believe that Samual Miller, an S&W associate who appears to have had a few chance encounters, in each instance in the company of others, with Carr and Neebling, is a "necessary witness" in this case. Further, I am not aware of any evidence or other indicating suggesting that there is any conflict of interest between the plaintiffs and S&W, their chosen counsel, that will materially interfere with S&W's independent professional judgment in its representation of Iron Mountain and the other named plaintiffs, including Iron Mountain, Reese, Kenny and myself, or any other reason why the plaintiffs' choice of counsel should be

- 21 -

disturbed. It is my opinion that Carr has sought to fabricate a hypothetical conflict between S&W and the plaintiffs; however, the hypothetical conflict articulated in his motion papers is, in my view, so remote and removed from reality that Iron Mountain, Reese, Kenny and myself are willing to waive it and thus consent to the continued representation by S&W, Iron Mountain's regular counsel for over 25 years, in this matter. Finally, in my opinion it would work a substantial and costly hardship on Iron Mountain and the other named plaintiffs, if they were required to engage new counsel who are not familiar with Iron Mountain or the history of this matter to represent them in this case.

Signed under the pains and penalties of perjury this  / 8  th day of August, 2005.

GARRY B. WATZKE

COMMONWEALTH OF MASSACHUSETTS )
                                                                      ) ss.
COUNTY OF SUFFOLK                                  )

Then personally appeared before me
this 18th day of August, 2005,
Garry B. Watzke, whom I know personally,
and executed the foregoing affidavit
under oath as his free act and deed.

Doris Taylor Roberson
Notary Public

My commission expires: May 13, 2011

- 22 -

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 18th day of August, 2005, served on counsel listed below, by the method indicated, a true and correct copy of the foregoing **Affidavit of Garry B. Watzke**.

Kathleen C. Stone
Looney, Cohen, Reagan & Aisenberg LLP
109 State Street
2nd Floor
Boston, Massachusetts 02109
(by Hand Delivery)

Read K. McCaffrey, Esq.
Patton Boggs LLP
2550 M Street, NW
Washington, DC 20037
(by FedEx)

Samual A. Miller