# United States District Court
# District of Massachusetts

IRON MOUNTAIN INC., et al.
    Plaintiffs,

V.                                    CIVIL ACTION NO. 05-10890-RCL

THOMAS CARR,
    Defendant,

---

THOMAS CARR,
    Counter-Plaintiff,

V.

IRON MOUNTAIN INC., et al.
    Counter-Defendants.

## *REPORT AND RECOMMENDATION ON COUNTERCLAIM-DEFENDANT CHARLES G. MOORE'S MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS (#9) AND COUNTERCLAIM-DEFENDANT JOHN F. KENNY, JR.'S MOTION TO DISMISS FIRST AMENDED COUNTERCLAIMS (#11)*

COLLINGS, U.S.M.J.

## I. INTRODUCTION

On May 2, 2005, Plaintiffs and Counter-Defendants Iron Mountain Incorporated ("Iron Mountain"), Iron Mountain Information Management, Inc. ("IMIM"), C. Richard Reese ("Reese"), John F. Kenny, Jr. ("Kenny"), Garry B. Watzke ("Watzke"), Larry L. Varn ("Varn") and Charles G. Moore ("Moore")(collectively, the "plaintiffs")[1] sued defendant Thomas Carr ("Carr" or the "defendant") for declaratory judgment and injunctive relief. Specifically, the plaintiffs are seeking a declaratory judgment that they have no agreements with or other legal obligations to Carr and an injunction against Carr to prevent him from prosecuting any actions against the plaintiffs. (*See generally* Complaint for Declaratory and Injunctive Relief #1)

On May 6, 2005, Carr filed an Answer to the Complaint and Counterclaims against the plaintiffs, in which he lodged claims for breach of contract and fraudulent misrepresentation. (Answer, Affirmative Defenses and Counterclaims #3)  Carr then filed a First Amended Counterclaim ("FAC") on

---

[1] For simplicity's sake, the plaintiffs/counter-defendants will be referred to herein simply as the "plaintiffs."

May 20, 2005.

On May 31, 2005, Moore and Kenny filed motions to dismiss with supporting memoranda on the grounds that the FAC failed to state a claim against them. (##9, 10, 11, 12)  On June 13, 2005, Carr moved for leave to file a Second Amended Counterclaim ("SAC"). (#16)  On June 27, 2005, the plaintiffs opposed Carr's motion for leave to file the SAC. (#22)  On October 12, 2005, this Court granted the motion for leave to file the SAC and ordered that "the motion to dismiss the First Amended Counterclaim be...deemed to seek dismissal of the Second Amended Counterclaim."[2]  On October 20, 2005, the plaintiffs filed a Supplemental Filing in Support of Their Motion to Dismiss Second Amended Counterclaims, the gist of which was that the SAC failed to state any claims. (#44)  On November 3, 2005, Carr filed an Opposition to Counter-Defendants' Motion to Dismiss the Second Amended Counterclaims. (#46)

With the issues having been fully briefed, the motions to dismiss are in a posture for resolution.[3] For the reasons discussed below, I shall recommend

---

[2] The SAC was actually docketed on October 26, 2005. (#45)

[3] The plaintiffs also filed a motion to dismiss Carr's fraudulent misrepresentation claim (#14). That motion is addressed in a separate Report and Recommendation of the Court.

that the instant motions to dismiss be allowed as to Count I–breach of contract. As to Count II–the fraudulent misrepresentation claim–that claim shall be addressed in a separate Report and Recommendation since all of the individual plaintiffs have moved to dismiss that count.

## II. RELEVANT FACTS

Prior to January 2001, Iron Mountain and IMIM merged with and/or acquired a competitor known as Pierce Leahy, Inc., the resulting company being known as Iron Mountain. (#45, ¶ 1) Sometime in 2001, J. Peter Pierce ("Pierce") was elected to the Board of Directors of Iron Mountain and also was appointed president of the new company. (#45, ¶ 2) Sometime after the merger/acquisition, Pierce was fired as the company's president but remained on its Board of Directors. (#45, ¶ 3)

On or about January 15, 2001, Carr and Pierce entered into an agreement to form a transportation company known as Logisteq, LLC ("Logisteq"). (#45, ¶ 3) A Pierce-controlled entity, Pioneer Capital LLP, and a Carr-controlled entity, Transportation Concepts of New Jersey, Inc., owned Logisteq 51% and 49% respectively. (#45, ¶ 5) Subsequently, Pierce alone formed a company known as Sequedex which he may have used to compete with Iron Mountain and in

doing so posted significant costs to operate Sequedex on the books of Logisteq. (#45, ¶ 6)

Iron Mountain filed suit against Pierce for breach of a non-compete agreement. (#45, ¶ 7) Ultimately, an arbitrator found in favor of Pierce. (#45, ¶ 7)

One result of the Iron Mountain/Pierce Leahy merger[4] was that Logisteq became a tenant of Iron Mountain. (#45, ¶ 9) At some point, Iron Mountain sent a letter to Carr signed by Watzke stating that Logisteq and Carr as well as certain of Carr's businesses were being evicted from property now owned by Iron Mountain. (#45, ¶ 10) Carr protested in writing to Watzke. (#45, ¶ 11)

In August, 2001, at a meeting between senior management of Iron Mountain and Carr, Iron Mountain told Carr that if Carr would assist Iron Mountain in its action against Pierce for violation of the non-compete agrement, then Iron Mountain would compensate Carr in various ways. (#45, ¶ 13) Thereafter, a series of meetings occurred with the plaintiffs and Carr and his counsel, Arthur Peslak ("Peslak"), and Carr's friend James Neebling ("Neebling"), principal of Systrans Freight, Inc. ("Systrans"); some of these

---

[4] For simplicity's sake, the term "merger" is used since Carr is unclear whether the transaction was actually a merger or an acquisition.

meetings took place on March 19, 2002, March 26, 2002, April 2, 2002, April 9, 2002, July 16, 2003 and September, 2003. (#45, ¶ 15)

In the Spring of 2002, Iron Mountain began encouraging Carr to file a lawsuit against Pierce regarding Logisteq to coincide with the action that Iron Mountain was planning to file against Pierce. (#45, ¶ 17) Iron Mountain drafted the complaint for Carr to file and agreed to fund Carr's lawsuit. (#45, ¶ 17) The draft of the complaint was delivered to Carr while he was on vacation in California; Carr signed the complaint and Iron Mountain coordinated the filing of the action. (#45, ¶ 24)

On March 26, 2002, Carr and Neebling met with Kenny, Reese and Watzke at Iron Mountain in Boston. Reese offered $5 million to Carr so that Carr could buy out Pierce's share of Logisteq. (#45, ¶ 18) Reese also promised that Iron Mountain would hire Carr as a transportation consultant and provide $25 million in courier business to Systrans. (#45, ¶ 18) At this same meeting, Kenny "advised" that $45 million in business would be given to Systrans each year for five years in return for the cooperation of Carr and Systrans. (#45, ¶ 18)

On April 2, 2002, during a conference call, Watzke promised that Iron Mountain would pay for Carr's attorneys' fees in his suit against Pierce. (#45,

¶ 19) Watzke also promised that Iron Mountain would retain Carr in a consulting position. (#45, ¶ 19)

On April 9, 2002, at a private residence in New York City, Varn promised that Iron Mountain would wire a $50,000 retainer to Peslak. (#45, ¶ 20) That transaction was completed two days later. (#45, ¶ 20)

As consideration for Carr's involvement in Iron Mountain's lawsuit against Pierce, Kenny called Carr and promised that, in exchange for Carr's participation, Iron Mountain would fund Carr's lawsuit, including all legal fees and costs and that Iron Mountain would provide business to Systrans in excess of $45 million, hire Carr as a consultant with the same salary and benefits he was currently making, and repay any debt that Carr incurred in the process as guarantor of certain obligations. (#45, ¶ 22)

Kenny made these same promises to Carr's wife, Judy, in a separate telephone conversation that occurred in April, 2002 while the Carr family was in California on vacation. (#45, ¶ 23) Kenny also advised Judy that all negative financial fall out from her husband's filing of a complaint against Pierce and his other cooperation with Iron Mountain would "be taken care of" by Iron Mountain. (#45, ¶ 23)

In reliance on the promises made by the plaintiffs, Carr cooperated with

the plaintiffs as they had requested and, as a result of his reliance, Carr lost his businesses and was shackled with debt. (#45, ¶ 26) Several of the plaintiffs promised to allay such debt by providing sufficient income to Carr to allow him to handle the debt. (#45, ¶ 26)

During a July 16, 2003 telephone conference, Peslak asked Watzke why Iron Mountain and the other plaintiffs had not fulfilled their obligations and promises to Carr. (#45, ¶ 27) Watzke told Peslak that once the arbitration between Iron Mountain and Pierce was over, Reese would meet with Carr and Peslak to discuss the fulfillment of Iron Mountain's promises to Carr. (#45, ¶ 27) Moore subsequently made the same assurances to Carr that had been made by Watzke on July 16, 2003. (#45, ¶ 28)

In September, 2003, Carr and Neebling attended a meeting with Varn and Moore, during which Varn promised $2 million to Carr for Carr to use to pay off certain debts incurred in the previous year or two. (#45, ¶ 29) In addition, Varn called Paul Schwartz ("Schwartz")[5], a person to whom Carr owed money, to advise him that Iron Mountain was in the process of setting up a very lucrative business relationship with Carr and that Carr was therefore a good credit risk

---

[5] The name of this man is spelled different ways in the SAC–"Schwarz" and "Schwartz". Clearly, the references are to the same person and the Court shall use the latter spelling herein.

to whom Schwartz should lend additional money. (#45, ¶ 30)

All of the aforementioned promises were, according to Carr, made with no intention of fulfilling them. (#45, ¶¶ 31, 33) Moreover, the plaintiffs knew that statements regarding the promises were false when made. (#45, ¶ 33) As a direct result of Carr's cooperation with Iron Mountain, Pierce "wasted" Logisteq, and Carr was left shackled with debt and a loss of his source of income. (#45, ¶ 34)

From February to May of 2005, Carr had various communications with Watzke and Varn regarding the promises to Carr that remained unfulfilled. (#45, ¶¶ 37-42) The ultimate response was the lawsuit filed by the plaintiffs against Carr. (#45, ¶ 43)

### III.  STANDARD

The Rule 12(b)(6) pleading standard is familiar: "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the [non-moving party] can prove no set of facts in support of his claims that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957) (footnote omitted). When addressing a motion to dismiss, it is incumbent upon the Court to accept "'the allegations in the complaint as true and mak[e] all

reasonable inferences in favor of plaintiff'". *Doran v. Mass. Turnpike Auth.*, 348 F.3d 315, 318 (1 Cir., 2003), *cert. denied*, 541 U.S. 1031 (2004) citing *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 255 (1 Cir., 1994).  That general proposition notwithstanding, "bald assertions, . . . subjective characterizations, optimistic predications, or problematic suppositions" need not be credited.  *United States v. AVX Corp.*, 962 F.2d 108, 115 (1 Cir., 1992)  (internal quotations omitted); *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 224 (1 Cir.), *cert. denied,* 543 U.S. 820 (2004).

### IV.  ANALYSIS

Both Moore and Kenny have moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the claims against them on the general grounds that the allegations in the SAC fail to state any claim against them. Specifically, Moore and Kenny assert that the breach of contract claim is unenforceable against Moore because there was no contract with Moore and as against Kenny because Carr fails to allege that Kenny was a party to any alleged agreement.  Carr, in turn, responds that the agreements made between Carr and the plaintiffs are enforceable and points out that in the SAC, there are several allegations that Moore and Kenny made promises to Carr. (#46 at 2, 7)

In order for a breach of contract claim to survive a motion to dismiss, a plaintiff must allege that "(1) an agreement was made between the plaintiffs and the defendant supported by valid consideration; (2) the plaintiffs have been ready, willing and able to perform; (3) the defendant's breach has prevented them from performing; and (4) the plaintiffs have suffered damage." *Singarella v. City of Boston*, 342 Mass. 385, 387, 173 N.E.2d 290, 291 (1961) (internal citations omitted). Clearly, Carr has alleged breach, damages and that he was ready, willing and able to perform his part of the bargain. *See, e.g.,* #45 at ¶¶ 24, 26, 32, 34, 36, 47, 48.

The open issue thus is whether Carr has alleged the existence of an agreement between himself and Moore and Kenny and whether such agreement was supported by valid consideration. Moore is only mentioned in two paragraphs of the SAC, ¶¶ 28 and 29. In Paragraph 29, it is simply alleged that Moore attended a meeting with Carr and Neebling. In Paragraph 28, Carr alleges that "Moore told Carr, in a telephone conversation, the same assurances which had been conveyed by Watzke to Peslak on July 16, 2003....Moore would frequently, in conversations with Mr. Carr, restate and otherwise affirm statements of consideration previously made by Mr. Watzke, Mr. Kenny, Mr.

Varn and Mr. Reese." In the referenced July 16, 2003 conversation, Watzke purportedly told Peslak that "[o]nce the arbitration (of the lawsuit as between Iron Mountain and Pierce) had been concluded, (the resolution of the appeal),Counter-Defendant Reese would meet with Carr and Mr. Peslak to discuss the fulfillment of Iron Mountain's promises to Carr." (#45, ¶ 27)

Therefore, the only "agreement" that Carr alleges occurred between himself and Moore is that Moore reaffirmed promises that at the conclusion of the arbitration Reese would meet with Carr and Peslak to discuss "the fulfillment of Iron Mountain's promises to Carr." In short, Moore allegedly reaffirmed promises made by someone else that at some time in the future, another party [ Reese] would meet with Carr to talk about satisfaction of as-yet unfulfilled promises. Such allegations, even viewed in the light most favorable to Carr, simply do not meet the requirements of an agreement such that a contract was formed. As the Supreme Judicial Court explained:

> Although a promise may be sufficiently definite when it contains an option given to the promisor or promisee, yet if an essential element is reserved for the future agreement of both parties, the promise can give rise to no legal obligation until such future agreement. Since either party by the very terms of the promise may refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise.

12

*Lucey v. Hero Int'l Corp.*, 361 Mass. 569, 575, 281 N.E.2d 266, 270 (1972)(quoting Williston, Contracts (3d ed.) § 45)(quotation marks omitted); *see also Gustafson v. Wachusett Regional School Dist.*, 64 Mass. App. Ct. 802, 808, 836 N.E.2d 1097, 1101 (2005)(citing Restatement (Second) of Contracts § 2 comment f (1981))("a mere prediction or anticipation of future events [is] distinguishable from a manifestation of intention to be bound or an enforceable promise or agreement."); *Comets Community Youth Ctr., Inc. v. Town of Natick*, 2000 WL 33171006, * 1 (Mass. Super., Nov. 24, 2000)(citations and quotation marks omitted)("an agreement to enter into a contract which leaves the terms of that contract for future negotiation is too indefinite to be enforced.")

In sum, the agreement between Moore and Carr, as alleged by Carr, amounts to nothing more than a series of promises to meet in the future to discuss other promises that had been made. There are no definite terms and thus no legally enforceable obligation. For that reason, the breach of contract claim should be dismissed as against Moore.

As to Kenny, Carr includes several allegations in the SAC. Specifically, he charges that Kenny:

- "advised that courier business revenues of $45 million would be paid to Systrans, Inc. each year for a period of five years in return for the cooperation of Carr and Systrans...." (#45, ¶ 18)

- "promised that, in exchange for [Carr's] participation, Iron Mountain would fund Carr's lawsuit, including paying all legal fees and costs." (#45, ¶ 22)

- "promised that Iron Mountain would hire Carr as a consultant with the same salary and benefits that he was currently making, and

>repay any debt that Carr incurred in the process as guarantor of certain obligations....Kenny made the same promises to Carr's wife...and advised her that any and all negative financial fall out resulting from her husband's filing a complaint against Pierce and/or his other cooperation with Iron Mountain would be taken care of by Iron Mountain."( #45, ¶¶ 22, 23)

Viewing the allegations in the light most favorable to Carr, there may have been some agreement between Carr and Kenny.  Nevertheless, the breach of contract claim against Kenny still must fail because it is well-established that a person making a contract for a disclosed principal is not himself liable for breach of the contract.  In other words, "[u]nless otherwise agreed, a person making or purporting to make a contract for a disclosed principal does not become a party to the contract." *Bratcher v. Moriarty, Donoghue & Leja, P.C.,* 54 Mass. App. Ct. 111, 116, 763 N.E.2d 556, 560-61 (2002)(citing *Porshin v. Snider*, 349 Mass. 653, 655, 212 N.E.2d 216 (1965)), quoting from Restatement (Second) of Agency § 320, and comment a (1958); *see also Cumberland Farms, Inc. v. Marchese*, 2000 WL 33171003, * 5 (Mass. Super., Mar. 14, 2000)(citations omitted)("one who deals with an agent of a fully disclosed principal may only seek recovery from the principal for any contract-based claims.").

Here, it is obvious that the fully disclosed principal is Iron Mountain and

that Kenny was the so-called agent for Iron Mountain. Carr argues, however, that the SAC reflects that Kenny made the purported promises on behalf of himself, as well as on behalf of Iron Mountain–"[w]hile it is alleged that the delineated promises made by the counter-defendants...were made in their capacities as agents of Iron Mountain, it also alleged that these promises were made by the individuals themselves." (#46 at 7) But, when the SAC is examined, it becomes clear that the allegations are only that Kenny made the alleged promises on behalf of Iron Mountain. *See* #45 at ¶ 18 ("Kenny advised that courier business revenues of $45 million would be paid to Systrans...."); #45 at ¶ 22 ("Kenny...promised that...*Iron Mountain* would fund Carr's lawsuit...[and that] *Iron Mountain* would provide business to Systrans in excess of $45 million dollars...."); #45 at ¶ 23 (Kenny advised Carr's wife "that any and all negative financial fall out resulting from her husband's filing a complaint against Pierce and/or his other cooperation with Iron Mountain *would be taken care of by Iron Mountain*.") (emphasis supplied).

    Thus, viewing the SAC in the most favorable light, it is apparent that Kenny was acting only as an agent for Iron Mountain, a fully disclosed principal, and that as such, he himself did not become a party to any contract. Carr

cannot, therefore, sue Kenny for breach of contract and the contract claim against Kenny should be dismissed.

## V.  CONCLUSION

For the aforementioned reasons, I RECOMMEND that Counterclaim-Defendant Charles G. Moore's Motion to Dismiss First Amended Counterclaims (#9) be ALLOWED as to Count I (breach of contract) and Counterclaim-Defendant John F. Kenny, Jr.'s Motion to Dismiss First Amended Counterclaims be ALLOWED as to Count I (breach of contract).

## VI.  REVIEW BY THE DISTRICT JUDGE

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall

preclude further appellate review.  *See Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *United States v. Vega,* 678 F.2d 376, 378-79 (1 Cir., 1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1 Cir., 1983).  *See also Thomas v. Arn,* 474 U.S. 140 (1985).

*/s/ Robert B. Collings*
ROBERT B. COLLINGS
United States Magistrate Judge

March 13, 2006.