# United States District Court
# District of Massachusetts

IRON MOUNTAIN INC.,
IRON MOUNTAIN INFORMATION
      MANAGEMENT, INC.,
C. RICHARD REESE,
JOHN F. KENNY, JR.,
GARRY B. WATZKE,
LARRY L. VARN,
CHARLES G. MOORE,
         Plaintiffs,

      V.                          CIVIL ACTION NO. 05-10890-RCL

THOMAS CARR,
         Defendant,

------------------------------------------------------------------------------------------------------------

THOMAS CARR,
         Counterclaim-Plaintiff,

      V.

IRON MOUNTAIN INC.,
IRON MOUNTAIN INFORMATION
      MANAGEMENT, INC.,
C. RICHARD REESE,
JOHN F. KENNY, JR.,
GARRY B. WATZKE,
LARRY L. VARN,
CHARLES G. MOORE,
         Counterclaim-Defendants.

# *REPORT AND RECOMMENDATION ON COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIM-PLAINTIFF'S FRAUDULENT MISREPRESENTATION CLAIM (#13) AND MOTION TO DISMISS CONTRACT CLAIMS AGAINST PLAINTIFFS WATZKE, REESE, VARN, IRON MOUNTAIN AND IRON MOUNTAIN INFORMATION MANAGEMENT, INC. AS PRAYED FOR IN THE SUPPLEMENTAL FILING IN SUPPORT OF THEIR MOTION TO DISMISS SECOND AMENDED COUNTERCLAIMS (#44)*

COLLINGS, U.S.M.J.

## I. INTRODUCTION

On May 2, 2005, Plaintiffs and Counter-Defendants Iron Mountain Incorporated ("Iron Mountain"), Iron Mountain Information Management, Inc. ("IMIM"), C. Richard Reese ("Reese"), John F. Kenny, Jr. ("Kenny"), Garry B.

Watzke ("Watzke"), Larry L. Varn ("Varn") and Charles G. Moore ("Moore")(collectively, the "plaintiffs")[1] sued defendant Thomas Carr ("Carr" or the "defendant") for declaratory judgment and injunctive relief. Specifically, the plaintiffs are seeking a declaratory judgment that they have no agreements with or other legal obligations to Carr and an injunction against Carr to prevent him from prosecuting any actions against the plaintiffs. (*See generally* Complaint for Declaratory and Injunctive Relief #1)

On May 6, 2005, Carr filed an Answer to the Complaint and Counterclaims against the plaintiffs, in which he lodged claims for breach of contract and fraudulent misrepresentation. (Answer, Affirmative Defenses and Counterclaims #3) Carr then filed a First Amended Counterclaim ("FAC") on May 20, 2005.

On May 31, 2005, Moore and Kenny filed motions to dismiss with supporting memoranda on the grounds that the FAC failed to state a claim against them. (##9, 10, 11, 12) On June 13, 2005, Carr moved for leave to file a Second Amended Counterclaim ("SAC"). (#16) On June 27, 2005, the

---

[1]

For simplicity's sake, the plaintiffs/counter-defendants will be referred to herein simply as the "plaintiffs." All of the plaintiffs together, excluding Iron Mountain and IMIM, shall be referred to as the "individual plaintiffs."

plaintiffs opposed Carr's motion for leave to file the SAC. (#22) On October 12, 2005, this Court granted the motion for leave to file the SAC and ordered that "the motion to dismiss the First Amended Counterclaim be...deemed to seek dismissal of the Second Amended Counterclaim."[2]

On October 20, 2005, the plaintiffs filed a Supplemental Filing in Support of Their Motion to Dismiss Second Amended Counterclaims (the "Supplemental Filing"), the gist of which was that the SAC failed to state any claims against any of the plaintiffs. (#44) While not technically styled as a motion, the Supplemental Filing moves that the Court dismiss the SAC in its entirety as against all of the plaintiffs. On November 3, 2005, Carr filed an Opposition to Counter-Defendants' Motion to Dismiss the Second Amended Counterclaims. (#46) On March 10, 2006, this Court issued a Report and Recommendation in which it recommended that the breach of contract claims contained in the SAC be dismissed as against Moore and Kenny.

In this Report and Recommendation, the Court shall address the breach of contract claims against Iron Mountain, IMIM, Reese, Watzke and Varn and the fraudulent misrepresentation claims against the individual plaintiffs since

---

[2]

The SAC was actually docketed on October 26, 2005. (#45)

4

the fraud claims have been lodged only against the individual plaintiffs. For the reasons discussed below, the Court shall recommend that the motion to dismiss the breach of contract claim against Watzke be allowed, that the motion to dismiss all of the other breach of contract claims be denied and that the motion to dismiss the fraudulent misrepresentation count be allowed pursuant to Fed. Rule Civ. P. 9(b).

## II. RELEVANT FACTS

Prior to January 2001, Iron Mountain and IMIM merged with and/or acquired a competitor known as Pierce Leahy, Inc., the resulting company being known as Iron Mountain. (#45, ¶ 1) Sometime in 2001, J. Peter Pierce ("Pierce") was elected to the Board of Directors of Iron Mountain and also was appointed president of the new company. (#45, ¶ 2) Sometime after the merger/acquisition, Pierce was fired as the company's president but remained on its Board of Directors. (#45, ¶ 3)

On or about January 15, 2001, Carr and Pierce entered into an agreement to form a transportation company known as Logisteq, LLC ("Logisteq"). (#45, ¶ 5)   A Pierce-controlled entity, Pioneer Capital LLP and a Carr-controlled entity, Transportation Concepts of New Jersey, Inc., owned Logisteq 51% and

49% respectively. (#45, ¶ 5) Subsequently, Pierce alone formed a company known as Sequedex which he may have used to compete with Iron Mountain and in doing so posted significant costs to operate Sequedex on the books of Logisteq. (#45, ¶ 6)

Iron Mountain filed suit against Pierce, according to Carr, for breach of a non-compete agreement. (#45, ¶ 7) Ultimately, an arbitrator found in favor of Pierce. (#45, ¶ 7)

One result of the Iron Mountain/Pierce Leahy merger[3] was that Logisteq became a tenant of Iron Mountain. (#45, ¶ 9) At some point, Iron Mountain sent a letter to Carr signed by Watzke that Logisteq and Carr as well as certain of Carr's businesses were being evicted from property now owned by Iron Mountain. (#45, ¶ 10) Carr protested in writing to Watzke. (#45, ¶ 11)

In August, 2001, at a meeting between senior management of Iron Mountain and Carr, Iron Mountain told Carr that if Carr would assist Iron Mountain in its action against Pierce for violation of the non-compete, then Iron Mountain would compensate Carr in various ways. (#45, ¶ 13) Thereafter, a series of meetings occurred with the plaintiffs and Carr and his counsel, Arthur

---

[3] For simplicity's sake, the term "merger" is used since Carr is unclear whether the transaction was actually a merger or an acquisition.

Peslak ("Peslak"), and Carr's friend James Neebling ("Neebling"), principal of Systrans Freight, Inc. ("Systrans"); some of these meetings occurred on March 19, 2002, March 26, 2002, April 2, 2002, April 9, 2002, July 16, 2003 and September, 2003. (#45, ¶ 15)

In the Spring of 2002, Iron Mountain began encouraging Carr to file a lawsuit against Pierce regarding Logisteq to coincide with the action that Iron Mountain was planning to file against Pierce. (#45, ¶ 17) Iron Mountain drafted the complaint for Carr to file and agreed to fund Carr's lawsuit. (#45, ¶ 17) The draft of the complaint was delivered to Carr while he was on vacation in California; Carr signed the complaint and Iron Mountain coordinated the filing of the action. (#45, ¶ 24)

On March 26, 2002, Carr and Neebling met with Kenny, Reese and Watzke at Iron Mountain in Boston. Reese offered $5 million to Carr so that Carr could buy out Pierce's share of Logisteq. (#45, ¶ 18) Reese also promised that Iron Mountain would hire Carr as a transportation consultant and provide $25 million in courier business to Systrans. (#45, ¶ 18) At this same meeting, Kenny "advised" that $45 million in business would be given to Systrans each year for five years in return for the cooperation of Carr and Systrans. (#45, ¶ 18)

7

On April 2, 2002, during a conference call, Watzke promised that Iron Mountain would pay for Carr's attorneys' fees in his suit against Pierce. (#45, ¶ 19) Watzke also promised that Iron Mountain would retain Carr in a consulting position. (#45, ¶ 19)

On April 9, 2002, at a private residence in New York City, Varn promised that Iron Mountain would wire a $50,000 retainer to Peslak. (#45, ¶ 20) That transaction was completed two days later. (#45, ¶ 20)

As consideration for Carr's involvement in Iron Mountain's lawsuit against Pierce, Kenny called Carr and promised that, in exchange for Carr's participation, Iron Mountain would fund Carr's lawsuit, including all legal fees and costs and that Iron Mountain would provide business to Systrans in excess of $45 million, hire Carr as a consultant with the same salary and benefits he was currently making, and repay any debt that Carr incurred in the process as guarantor of certain obligations. (#45, ¶ 22)

Kenny made these same promises to Carr's wife, Judy, in a separate telephone conversation that occurred in April, 2002 while the Carr family was in California on vacation. (#45, ¶ 23) Kenny also advised Judy that all negative financial fall out from her husband's filing of a complaint against Pierce and his other cooperation with Iron Mountain would "be taken care of" by Iron

Mountain. (#45, ¶ 23)

In reliance on the promises made by the plaintiffs, Carr cooperated with the plaintiffs as they had requested and, as a result of his reliance, Carr lost his businesses and was shackled with debt. (#45, ¶ 26) Several of the plaintiffs promised to allay such debt by providing sufficient income to Carr to allow him to handle the debt. (#45, ¶ 26)

During a July 16, 2003 telephone conference, Peslak asked Watzke why Iron Mountain and the other plaintiffs had not fulfilled their obligations and promises. (#45, ¶ 27) Watzke told Peslak that once the arbitration between Iron Mountain and Pierce was over, Reese would meet with Carr and Peslak to discuss the fulfillment of Iron Mountain's promises to Carr. (#45, ¶ 27) Moore subsequently made the same assurances to Carr that had been made by Watzke on July 16, 2003. (#45, ¶ 28)

In September, 2003, Carr and Neebling attended a meeting with Varn and Moore, during which Varn promised $2 million to Carr for Carr to use to pay off certain debts incurred in the previous year or two. (#45, ¶ 29) In addition, Varn called Paul Schwartz ("Schwartz")[4], a person to whom Carr owed money, to

---

[4] The name of this man is spelled different ways in the SAC–"Schwarz" and "Schwartz". Clearly, the references are to the same person and the Court shall use the latter spelling herein.

advise him that Iron Mountain was in the process of setting up a very lucrative business relationship with Carr and that Carr was therefore a good credit risk to whom Schwartz should lend additional money. (#45, ¶ 30)

All of the aforementioned promises were, according to Carr, made with no intention of fulfilling them. (#45, ¶¶ 31, 33) Moreover, the plaintiffs knew that statements regarding the promises were false when made. (#45, ¶ 33) As a direct result of Carr's cooperation with Iron Mountain, Pierce "wasted" Logisteq, and Carr was left shackled with debt and a loss of his source of income. (#45, ¶ 34)

From February to May of 2005, Carr had various communications with Watzke and Varn regarding the promises to Carr that remained unfulfilled. (#45, ¶¶ 37-42) The ultimate response was the lawsuit filed by the plaintiffs against Carr. (#45, ¶ 43)

### III.  STANDARD

The Rule 12(b)(6) pleading standard is familiar:  "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the [non-moving party] can prove no set of facts in support of his claims that would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957)

(footnote omitted). When addressing a motion to dismiss, it is incumbent upon the Court to accept "'the allegations in the complaint as true and mak[e] all reasonable inferences in favor of plaintiff'". *Doran v. Mass. Turnpike Auth.*, 348 F.3d 315, 318 (1 Cir., 2003), *cert. denied,* 541 U.S. 1031 (2004) citing *Rockwell v. Cape Cod Hosp.*, 26 F.3d 254, 255 (1 Cir., 1994). That general proposition notwithstanding, "bald assertions, . . . subjective characterizations, optimistic predications, or problematic suppositions" need not be credited. *United States v. AVX Corp.*, 962 F.2d 108, 115 (1 Cir., 1992) (internal quotations omitted); *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 224 (1 Cir.), *cert. denied,* 125 S.Ct. 59 (2004).

## IV. ANALYSIS

### A. Breach of Contract Claim

The plaintiffs[5] move to dismiss the breach of contract counterclaim against them on several grounds: (1) the alleged agreements in the SAC violate settled public policy; (2) the individual plaintiffs (as opposed to the corporate plaintiffs) were not parties to any contract; and (3) the Statute of Frauds bars Carr's claim of an oral five year contract between Iron Mountain and Systrans.

---

[5] This excludes Moore and Kenny who, as explained above, filed separate motions to dismiss the contract counterclaims against them.

Carr in turn argues that: (1) the agreements are enforceable; (2) the individual plaintiffs made promises on behalf of themselves to Carr; and (3) the Statute of Frauds is inapplicable.

In order for a breach of contract claim to survive a motion to dismiss, a plaintiff must allege that "(1)  an agreement was made between the plaintiffs and the defendant supported by valid consideration; (2) the plaintiffs have been ready, willing and able to perform; (3) the defendant's breach has prevented them from performing; and (4) the plaintiffs have suffered damage." *Singarella v. City of Boston*, 342 Mass. 385, 387, 173 N.E.2d 290, 291 (1961) (internal citations omitted).  Clearly, Carr has alleged breach, damages and that he was ready, willing and able to perform his part of the bargain. *See, e.g.,* #45 at ¶¶ 24, 26, 32,  34, 36, 47, 48.

The gist of the plaintiffs' public policy argument is that "a contract that induces a corporate fiduciary to breach its fiduciary duties" is unenforceable and that as such the purported agreements between Carr and the plaintiffs cannot be enforced because they required Carr to breach his fiduciary duty to Logisteq. (#44 at 6-7) Specifically, say the plaintiffs, the agreements as set out by Carr in the SAC required that Carr disclose confidential and proprietary information

about Logisteq to Iron Mountain. (#44 at 7) Carr responds that there is no evidence at this point that he was an officer of Logisteq, a requirement if he were to owe Logisteq a fiduciary duty.  Moreover, Carr explains that he had been terminated from Logisteq before most of the promises occurred and thus he did not owe any fiduciary duty to Logisteq given  that he had already been fired. (#46 at 2) Finally, Carr contends that the plaintiffs' partial performance of the purported contract, in the form of a $50,000 payment to Carr's attorney, demonstrates that the "contract" is indeed enforceable. (#45 at 3-4)

The plaintiffs' public policy argument is premature.  At this juncture, the Court is only to examine the SAC to determine whether a contract claim has been put forth.  In order to decide whether the purported agreements between Carr and the plaintiffs violate public policy, some discovery would need to be completed.  For example, from the face of the SAC it is impossible to ascertain whether Carr was employed by Logisteq when the promises were made by the plaintiffs, when Carr was fired from Logisteq, whether Carr was an officer of Logisteq and what kind of fiduciary duties (if any) Carr owed to Logisteq.  Thus, at this point, the Court shall not recommend that the breach of contract counterclaim be dismissed on the grounds that the purported agreements between Carr and the plaintiffs violate public policy.  This is an argument better

addressed at the summary judgment stage.

The plaintiffs' next argument is that the Statute of Frauds bars Carr's claim of an oral five-year contract between Iron Mountain and Systrans pursuant to which Iron Mountain would give Systrans courier business of $45 million each year for a period of five years.  Carr's position is that such an agreement does not come within the Statute of Frauds because it is capable of being performed in one year.

The SAC is not explicit as to the terms of the purported $45 million agreement.  In Paragraph 16.4 of the SAC, it is alleged that Systrans "would receive nearly $50 million per year in courier business"; in Paragraph 18, it is alleged that "business revenues of $45 million would be paid to Systrans, Inc. each year for a period of five years"; and, in Paragraph 22, it is alleged that "Iron Mountain would provide business to Systrans in excess of $45 million dollars...."  Thus, it is not clear that this agreement was for a year or for five years or for some other time period and therefore, it is impossible to determine at this juncture whether such a "contract" would come within the parameters of the Statute of Frauds.  "If the terms of the contract are such that it is *possible* for performance to be completed within the one-year period, even if this is not

14

very likely, the contract is not within the Statute of Frauds." 35 Mass. Prac.,

Consumer Law § 1:19 (2d ed., 2006) (emphasis in original).

Viewing the SAC in the most favorable light, the Court cannot dismiss this

part of the breach of contract claim against Iron Mountain since it is not clear

whether the Statute of Frauds is applicable or not. Such a determination would

be better made at a later stage in the case. In sum, at this point, the breach of

contract claims still stand against Iron Mountain and IMIM. The breach of

contract claims against the individual plaintiffs (excluding Kenny and Moore)

shall be addressed next.

The plaintiffs' position as to the breach of contract counterclaims against

the individual plaintiffs is that the individual plaintiffs were acting as agents for

Iron Mountain, a fully disclosed principal, and as such, the individual plaintiffs

were not parties to any contract and cannot therefore be sued for breach of

contract. Carr's stance is that the individual plaintiffs made the promises on

behalf of themselves, as well as on behalf of Iron Mountain.

It is well-established that a person making a contract for a disclosed

principal is not himself liable for breach of the contract. In other words,

"[u]nless otherwise agreed, a person making or purporting to make a contract

for a disclosed principal does not become a party to the contract." *Bratcher v. Moriarty, Donoghue & Leja, P.C.,* 54 Mass. App. Ct. 111, 116, 763 N.E.2d 556, 560-61 (2002)(citing *Porshin v. Snider*, 349 Mass. 653, 655, 212 N.E.2d 216 (1965)), quoting from Restatement (Second) of Agency § 320, and comment a (1958)); *see also Cumberland Farms, Inc. v. Marchese*, 2000 WL 33171003, * 5 (Mass. Super., Mar. 14, 2000)(citations omitted)("one who deals with an agent of a fully disclosed principal may only seek recovery from the principal for any contract-based claims.").

The SAC must be examined closely to see if the allegations as to each individual plaintiff are that the individual plaintiff was acting only as an agent of Iron Mountain or also was acting individually. Turning to Reese first, the only promises he is alleged to have made to Carr are that he "offered $5 million to Carr to use to buy out Pierce's share of Logisteq" and that he "promised that Iron Mountain would hire Carr as a transportation consultant and provide $25 million in courier business to Systrans, Inc." (#45, ¶ 18) Carr in the SAC asserts that Reese was acting "[i]ndividually as well as acting as agent of Iron Mountain." (#45, ¶ 18) Viewing the allegations in the light most favorable to Carr, he has barely alleged the existence of a contract between Reese

individually and himself–i.e., the payment of $5 million for Carr to buy out Pierce's share of Logisteq. Although unlikely, it is possible that Reese could have been acting individually when he made such a promise. Thus, at this point, the breach of contract claim against Reese should not be dismissed.

Turning now to Watzke, the only allegations are that Watzke "promised that Iron Mountain would pay for Carr's attorneys' fees in his suit against Pierce" and that "Iron Mountain would retain Carr in a consulting position." (#45, ¶ 19) The only other allegation against Watzke is simply that he agreed that Reese would meet with Carr at a later date. (#45, ¶ 27) Thus, even though it is alleged that Watzke was acting individually and as an agent of Iron Mountain, it is obvious from the face of the SAC that the two purported promises he made were made only on behalf of Iron Mountain, a fully disclosed principal. Thus, Watzke was not a party to any contract and cannot be sued for breach thereof. As a result, the breach of contract claim should be dismissed against Watzke.

As for Varn, the allegations in the SAC are that he "promised that Iron Mountain would wire a $50,000 retainer to Arthur Peslak, Mr. Carr's counsel in disputes involving Pierce" and that he "promised $2 million dollars for Carr to use to pay off certain debts incurred during the preceding year or two." (#45,

17

¶¶ 20, 29) Carr contends that Varn was acting "individually, as a partner in the Boston firm of Sullivan and Worcester and acting as an agent of Iron Mountain...." (#45, ¶ 20) Like the claims against Reese, the latter claim against Varn is enough, when viewed in the most favorable light, to state a claim against him individually. It is possible, although unlikely, that Varn could have been making the promise of a $2 million payment on behalf of himself, rather than on behalf of Iron Mountain. Thus, at this juncture, the breach of contract claim should stand against Varn. Therefore, the Court shall recommend that Count I of the SAC be dismissed as against Watzke but not as against Reese and Varn.

### B.  Fraudulent Misrepresentation

The plaintiffs argue that the fraudulent misrepresentation claim against the individual plaintiffs should be dismissed because: (1) Carr has not pleaded the required elements for a fraudulent misrepresentation claim; and (2) the SAC does not satisfy the particularity requirements of Fed. R. Civ. P. 9(b) ("Rule 9(b)"). Not surprisingly, Carr disagrees, asserting that he has successfully and specifically pleaded all of the required elements of fraudulent misrepresentation.

In order to state a claim for fraud[]..., the plaintiff must allege:

> (1) that the statement was knowingly false; (2) that [defendants] made the false statement with the intent to deceive; (3) that the statement was material to the plaintiffs' decision . . . ; (4) that the plaintiffs reasonably relied on the statement; and (5) that the plaintiffs were injured as a result of their reliance.

*Doyle v. Hasbro, Inc.*, 103 F.3d 186, 193 (1 Cir., 1996), quoting *Turner v. Johnson & Johnson*, 809 F.2d 90, 95 (1 Cir., 1986); *see also Johnson v. Brown & Williamson Tobacco Corp.*, 122 F. Supp. 2d 194, 207 (D. Mass., 2000).

The plaintiffs' first argument as to Carr's fraud claim is that Carr has failed adequately to plead reasonable reliance and that Carr has failed to detail any action he took as a result of the plaintiffs' purported promises. Notably, both cases that plaintiffs rely upon to support their argument are summary judgment cases, not motion to dismiss cases. Carr's response is that at the motion to dismiss stage, the Court's inquiry should be limited and that the SAC has satisfactorily alleged reliance, as well as the other elements of fraud.

Looking at the SAC, Carr has alleged reliance. *See* #45, ¶ 26 ("In direct and full reliance on the aforementioned promises of consideration, Carr continued to cooperate with the Counter-Defendants...."); #45, ¶ 36 ("As a direct result of his reliance on the false statements of Iron Mountain, Carr has lost his business...."); #45, ¶ 54 ("Carr did in fact rely on the aforementioned

false statements, not knowing them to be false, to his detriment....").  The issue is thus whether Carr's allegations of reliance are enough to withstand the motion to dismiss.

The plaintiffs argue that Carr does not allege that he took (or forewent) any action in reliance on the plaintiffs' promises.  However,  Carr does purport that he "continued to cooperate" with the plaintiffs and as a result, he "lost his business and was shackled with debt." (#45, ¶ 26) While certainly this allegation is bare-bones, it is enough to withstand the motion to dismiss.  *See, e.g., Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.,* 577 F. Supp. 1281, 1287 (D. Mass., 1983)(allowing motion to dismiss misrepresentation claims because "plaintiff failed to plead adequately the reliance element...."); *Young v. Deloitte & Touche, LLP,* 2004 WL 2341344, *5 (Mass. Super., Sept. 20, 2004)(denying motion to dismiss misrepresentation claim because plaintiff "alleged that the shareholders....'justifiably relied upon Deloitte's false statements and misrepresentations' in taking certain action. This is enough at this stage of the case.").  Thus, the Court shall not recommend that the fraud claim be dismissed on the grounds that Carr failed sufficiently to plead reliance.

The plaintiffs next assert that the so-called representations made by the plaintiffs to Carr are not actionable because they were all promissory in nature. Carr responds that promises relating to future events can be actionable if, like in this case, they were made without intention of performance or if one party has superior knowledge concerning the matters to which the misrepresentations relate.

It is established law that, "only statements of fact, not statements of opinion, future conditions, or matters promissory in nature, are actionable as fraud....A statement that is promissory in nature, however, may be actionable where the defendant misrepresents his actual present intent to perform a future act." *Armstrong v. Rohm and Haas Co., Inc.*, 349 F. Supp.2d 71, 81 n. 4 (D. Mass., 2004)(citations omitted). In the case at bar, Carr alleged that "Iron Mountain through the aforementioned officers, agent and outside counsel had absolutely no intention of following through on said considerations" (#45, ¶ 33) and that the "Counter-Defendants...knew that they had no intention of fulfilling said obligations and/or promises...." (#45, ¶ 52) Thus, it has adequately been alleged that the plaintiffs did not have the intent to perform their future acts, and thus representations that were promissory in nature could be actionable.

This allegation is enough to withstand the motion to dismiss.

Because the Court has determined that the representations, as pled by Carr, are actionable, it need not address Carr's argument regarding the plaintiffs having superior knowledge as to the subject matter of the representations. Consequently, the Court rules that the plaintiffs' are not entitled to dismissal of the fraud claim on the basis that all of the alleged statements were promissory in nature.

Last, the plaintiffs argue that the SAC does not satisfy the particularity requirements of Rule 9(b). In short, say the plaintiffs, Carr has not alleged "supporting facts showing that the statements were false when made, as an intention to perform in the future cannot be established merely by the promise's subsequent non-performance." (#44 at 18)   The plaintiffs also argue that the SAC is faulty because it does not allege separate and specific facts of an intention to deceive or reliance against each of the plaintiffs. (#44 at 18-19) Carr asserts, in response, that "each and every promise by each and every [plaintiff] is set forth with particularity in paragraphs 18, 19, 20, 22, 23, 24, 27, 28, 29, and 30." (#46 at 13)

"The First Circuit strictly applies the particularity requirements of Rule 9(b)....Under the First Circuit test, Rule 9(b) requires specification of the time,

place and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent can be inferred." *Bio-Vita, Ltd. v. Rausch*, 759 F. Supp. 33, 37 (1 Cir., 1991)(citations and internal quotations omitted).  Moreover, it is well-established that, "[i]n a case...where multiple defendants are named, it is incumbent upon the plaintiff to particularize, at least to some extent, the activities for which it attempts to hold each defendant accountable....Each individual defendant is entitled to notice of the particulars of the fraudulent acts it is alleged to have committed." *Prudential Ins. Co. of America v. Turner & Newall, PLC*, 1988 WL 150491, *8 (D. Mass., Dec. 12, 1988).  *See also Goebel v. Schmid Bros., Inc.*, 871 F. Supp. 68, 73 (D. Mass., 1994)(citations omitted)("when multiple defendants are involved in cases arising in this circuit, Rule 9(b) requires that fraud be alleged particularly as to each defendant.").

Thus, it is clear that Carr, in order to withstand the motion to dismiss, must have alleged fraud with particularity as to each individual plaintiff.[6] If he did not do so, then the SAC must be dismissed as to that plaintiff for failure to comply with Rule 9(b). *See Goebel*, 871 F. Supp. at 73, 79 (allowing motion to

---

[6]

As mentioned above, Carr did not bring the fraudulent misrepresentation claims against Iron Mountain or IMIM, just against the individual plaintiffs.

23

dismiss because plaintiffs failed to attribute to defendant "with the requisite particularity, any allegedly fraudulent misrepresentations...."); *Prudential Ins.,* 1988 WL 150491 at *9 (plaintiff referred to defendants collectively and included "no detail as to who made which statement, where and when.").

In reviewing the SAC, it is apparent that Carr has satisfied Rule 9(b) because he has alleged the "time, place and content" of each purportedly fraudulent misrepresentation. *See* #45 at ¶ 18 (Reese), ¶¶ 18, 22 (Kenny), ¶¶ 19, 27 (Watzke), ¶ 28 (Moore), ¶ 29 (Varn)[7]. The plaintiffs argue that the fraud claim should be dismissed under Rule 9(b) because Carr failed to plead reliance and knowledge of falsity as to each plaintiff individually.  However, Rule 9(b) does not require Carr to do so–that rule requires only that a pleading "specify the time, place and content of each alleged false representation." *Bio-Vita*, 759 F. Supp. at 37.  "Malice, intent, knowledge, and other conditions of mind may be averred generally." *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1 Cir., 1997)(quoting Rule 9(b)).  Carr has adequately set forth the time, place and content of each supposedly fraudulent misrepresentation.

As to the plaintiffs' last argument–that dismissal under Rule 9(b) is

---

[7]

This is not to suggest that such allegations could stand up at the summary judgment stage. Especially as to Moore, the allegations of fraud just barely survive Rule 9(b) at this motion to dismiss stage.

appropriate because Carr alleged the knowledge of the falsity of the promises "in the most conclusory fashion," the plaintiffs point out that Carr's only allegation as to knowledge of falsity is that "[i]n hindsight" the plaintiffs "knew that [their] statements....were false." (*See* #45, ¶ 33) The plaintiffs assert that such summary allegations are not enough under Rule 9(b).

Carr does indeed rely on conclusory allegations that the plaintiffs knew their promises were false when made.  And, the rule is that "[a]lthough a plaintiff need not specify the circumstances or the evidence from which fraudulent intent could be inferred, the complaint must provide some factual support for the allegations of fraud." *Reisman v. KPMG Peat Marwick LLP*, 965 F. Supp. 165, 172 (D. Mass., 1997).[8]  Although it is a close call, the Court finds that Carr simply does not offer enough in the way of factual support such that it could reasonably be inferred at the motion to dismiss stage that the plaintiffs knew their statements were false *when made*.

For example, Carr avers that Iron Mountain and its employees told Carr

_____

[8]

In *Reisman*, the court found that complaint did set forth "specific factual allegations which, if proven, would permit a reasonable factfinder to conclude that [defendant] made false representations of material fact with knowledge of their falsity...." 965 F. Supp. at 172.  Thus, although *Reiman* talks in terms of providing factual support for the intent element of fraud, the court goes on to address the knowledge of the falsity of the statements.  Seemingly, the intent and knowledge element are somewhat intertwined.  Here, while Carr did sufficiently allege intent for purposes of surviving the 12(b)(6) motion, he did not, under the requirements of Rule 9(b),  adequately provide factual support for his one allegation that the plaintiffs knew their statements were false when made.

that he would be compensated if he assisted them in their lawsuit against Pierce (#45, ¶ 13), that Iron Mountain had already paid Carr's legal fees in the amount of $50,000 (#45, ¶ 16.1) and that Iron Mountain sought Carr's participation in the lawsuit against Pierce because Iron Mountain wanted Pierce to have to defend simultaneous lawsuits (#45, ¶ 17).  All of this certainly suggests a potential "motive" for all of Iron Mountain's promises–it would promise Carr huge rewards if he, in turn, cooperated with Iron Mountain in its action against Pierce.  However, these allegations are not enough, even viewed in the most favorable light, to support an inference that the promises were false when made.  Perhaps the promises were true when made and it was only after Iron Mountain lost its arbitration with Pierce that Iron Mountain decided to back out of its promises to Carr.  That is, Carr just does not include sufficient allegations in his SAC to support the conclusion or even the inference that the plaintiffs knew that their statements were false when made.

In short, all Carr puts forth is one statement that "in hindsight" it is apparent that the plaintiffs knew their statements were false when made.  In *De Jesus v. Sears, Roebuck and Co.,* 1995 WL 122726, *4 (S.D.N.Y., Mar. 22, 1995), *aff'd,* 87 F.3d 65 (2 Cir., 1996), *cert. denied,* 519 U.S. 1007 (1996), the court

26

dismissed plaintiffs' fraud complaint which contained only one statement that defendant's "agents 'knew' that their statements to plaintiffs were false when made." The *De Jesus* court explained that "[s]uch conclusory allegations are insufficient under Rule 9(b) to convert what may possibly be contract claims into fraud claims." *De Jesus,* 1995 WL 122726, at *4 . Similarly, in the case at bar, Carr has not pled his fraud claim with sufficient particularity. Thus, this Court shall recommend that the fraud count against all of the individual plaintiffs be dismissed pursuant to Rule 9(b).

## V.  CONCLUSION

For the aforementioned reasons, I RECOMMEND that the plaintiffs' motion to dismiss Count I (breach of contract) of Carr's Second Amended Counterclaim (as to all plaintiffs except Moore and Kenney as set forth in pleading #44) be ALLOWED as to plaintiff Watzke and DENIED as to plaintiffs Reese, Varn, Iron Mountain and IMIM. I further RECOMMEND that the Counterclaim-Defendants Motion to Dismiss Counterclaim-Plaintiff's Fraudulent Misrepresentation Claim (#13) contained in Count II of Carr's Second Amended Counterclaim be ALLOWED as to all plaintiffs pursuant to Fed. R. Civ. P. 9(b).

## VI.  REVIEW BY THE DISTRICT JUDGE

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations or report to which objection is made and the basis for such objections.   The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review.  *See Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *United States v. Vega,* 678 F.2d 376, 378-79 (1 Cir., 1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1 Cir., 1983).  *See also Thomas v. Arn,* 474 U.S. 140 (1985).


*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

March 13, 2006.

28