## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; )<br> et al. )<br> )<br> Plaintiffs and, )<br> Counterclaim Defendants )<br> v. )<br> )<br> THOMAS CARR, )<br> )<br> Defendant and )<br> Counterclaim-Plaintiff )<br> )<br> ) | Civil Action No.<br>05 10890 RCL<br><br>Magistrate Judge Collings |

### DEFENDANT THOMAS CARR'S CONSOLIDATED REPLY TO PLAINTIFFS' OPPOSITION TO CARR'S MOTION TO DISQUALIFY AND PLAINTIFFS' OPPOSITION TO CARR'S MOTION TO STRIKE

#### PRELIMINARY STATEMENT

Plaintiffs are intent on maligning Defendant and Counter-Plaintiff Thomas Carr ("Carr") because, they believe, if his credibility is destroyed before the eyes of the Court, only their version of the facts will be seen. Such cynicism drove Plaintiffs to file affidavits attaching nearly 10-inches of mud they allegedly dredged up about Carr, his family, and the personal preferences of people wholly unrelated to this matter. A scorched earth campaign headed by one of Boston's leading law firms and funded with its clients' multi-billion dollar treasury is a daunting force for one man to confront; but Carr has no choice since they sued him.

Neither the motion to disqualify nor Carr's Counterclaim rests solely on his testimony. Ignored in their Opposition to the Motion to Disqualify is the fact that the Declaration accompanying the Motion is signed by Jim Neebling, not Thomas Carr and its veracity is not challenged in any way. The Neebling Declaration, for the Court's reference, is attached hereto as

1

Exhibit 1.   In addition, Carr's New Jersey counsel, Arthur Peslak ("Peslak"), a well-respected attorney with no pecuniary interest at stake in this case, clearly establishes Carr's breach of contract count.   Peslak has sworn that Varn repeatedly promised that all of Carr's legal fees incurred in pursuit of the parties' common litigation goal against Peter Pierce ("Pierce") would be paid.   Peslak confirms that on April 5, 2004 Varn, on behalf of the counter-defendants, breached their promise by only paying part of Peslak's fees, leaving Carr to pay the remainder. Survival of the breach of contract counterclaim means that each counter-defendant possesses a right to sue the others for indemnity or contribution.   Sullivan and Worcester ("S&W") is unable to provide independent advice to its fellow counter-defendants regarding causes of action they own against S&W.

More to the point, Varn and S&W must be disqualified because Carr and Iron Mountain agreed, as early as March 2002, to participate in a common interest agreement regarding their goal to defeat Pierce in their respective actions.   Peslak and Varn have argued to courts in New Jersey and Massachusetts the existence of this agreement and that information shared by Carr and Iron Mountain was privileged and confidential.   Varn and Moore's loathsome affidavits contain some of the confidential information that Carr would never have revealed to them absent the agreement.   The existence of this agreement and Varn's willingness to violate it makes disqualification of Varn and S&W under Rule 1.9 appropriate.

**ARGUMENT**

1.      **Carr's Breach Of Contract Claim Will Survive Preventing Varn or S&W From Rendering Independent Legal Advice To Its Indemnitees.**

New Jersey attorney Arthur Peslak, the only declarant in this matter who does **not** have any pecuniary or other interest at stake in this case, swears that Varn and his client Iron

Mountain breached their promise to pay, *inter alia*, all of Carr's attorney's fees incurred by Carr in exchange for Carr's assistance in the Pierce arbitration by refusing to pay all of his fees. Proposed Second Amended Complaint ("SAC") ¶¶ 16.1, 20, 45, *see also* Declaration of Arthur M. Peslak, attached hereto as Exhibit 2. Peslak's declaration is corroborated by his February 13, 2004 letter to counter-defendant Reese in which Peslak recounts the promises Varn made guaranteeing Peslak that all of Carr's attorney's fees would be paid. See February 13, 2004 letter, attached hereto as Exhibit 3.

Peslak confirms that counter-defendants Varn and Iron Mountain breached their contract with Carr, by paying only $8,177.15 of Peslak's fees on April 5, 2004. Exhibit 2, ¶31. Carr has been injured by counter-defendants' breach of contract in that Carr paid the remaining $17,500 to Peslak to cover the fees the counter-defendants have refused to pay.[1] *Id.* at ¶32.

The Opposition concedes that counsel must be disqualified, under Mass. R. Prof. C. 3.7 or 1.7, if a conflict exists between the counsel and any of his clients. Opposition pp. 9, 15, respectively. *See also*, Opposition, p. 13 ("...the lack of contradiction with Plaintiffs' expected testimony precludes disqualification.") citing *Inverness Med. Switzerland GMBH v. Acon Labs., Inc.*, No. 03-11323-PBS, No. 02-12303-PBS, 2005 WL 1491233, at *7, 9 (D. Mass. Jun. 23,

---

[1] Plaintiffs' Opposition to the motion to compel is nearly breathless in their recitation of Carr's testimony in which Carr said there were no outstanding obligations owed to him by Iron Mountain, Inc. Plaintiffs Memorandum in Opposition to Motion to Disqualify Counsel ("Opposition") pp. 3-4. Setting aside the very narrow and completely misleading slant that plaintiffs place on that quotation, Carr was entirely truthful in his response and stands by it. Prior to Carr's deposition, Varn in the presence of James Neebling, specifically told Carr that while he should tell the truth he should be very careful not to implicate Iron Mountain in making any promises regarding Carr's cooperation. See Affidavit of James Neebling, attached hereto as Exhibit 4. When Carr testified at the arbitration Varn had recently reiterated his promise to Peslak that he would ensure that all of Peslak's fees were paid by Iron Mountain after the arbitration. At the time of Carr's testimony he had no idea that all along the plaintiffs had no intention of paying all of Carr's attorneys fees as they had agreed. Nor could Carr have known at the time of his July 2003 testimony that in 2004 he would pay Peslak $17,500 that Iron Mountain and Varn refused to pay. Exhibit 2, ¶32. Neither Carr nor Peslak would have continued to work on any matter regarding Pierce or Iron Mountain had Varn not made these promises to pay all of Carr's fees.

2005)).  In support, the Opposition cites the comment to Rule 1.7 but misplaces the emphasis on

the quotation.  In view of the Peslak declaration the emphasis should be on the second sentence.

> A possible conflict does not itself preclude the representation.  **The critical questions are the likelihood that a conflict will eventuate** and, if it does, whether it will materially interfere with the lawyer's independent judgment in considering alternatives or foreclose course of action that reasonably should be pursued on behalf of the client.

Mass. R. Prof. C. 1.7, cmt. 4 (emphasis added).

The Opposition premises its entire argument on the following notion: "In the absence of

any prospect that Counsel's testimony will support the existence of such [unsatisfied]

agreements, there cannot be any conflict between Counsel and the Plaintiffs (which destroys

Carr's argument for disqualification)."  *See* Opposition, p. 9.  Unfortunately for Plaintiffs, that

"prospect" exists.  The breach of contract counterclaim is viable because Peslak's declaration

demonstrates that Varn and Iron Mountain acknowledged unsatisfied promises to Carr and in

turn paid Peslak an additional $8,177.15 – breaching their agreement and leaving Carr to pay the

remainder of Peslak's fees.  Any testimony that Varn gives regarding his February 10, 2004,

conversation with Peslak (see, Exhibit 3, p. 1) and the subsequent April 5, 2004 partial payment

of Peslak's fees will be contrary to either Varn's *personal financial interest* as a senior partner of

S&W or to Iron Mountain's interests.

Indeed, Varn's testimony will be directly contrary to the sworn testimony of two counter-

defendants who did not provide affidavits in support of the Opposition.  Counter-defendant

Reese testified in a deposition in the Pierce arbitration that the $50,000 to Carr was a gift and

there were no promises for any future 'gifts'.  Exhibit 5, p. 255.  Counter-defendant Kenny

similarly testified that he had no knowledge of any promises of additional funds to be paid to

Carr or Peslak.  Exhibit 6, p. 135.  Yet, if the testimony of counter-defendants Reese and Kenny

were true, Varn and Iron Mountain would not have paid Peslak an additional $8,177.15 on April 5, 2004. The fact that Iron Mountain paid any of Peslak's fees in 2004 – two years after the initial $50,000 payment – is conclusive evidence of the contract that Carr is attempting to enforce against the counter-defendants, revealing their continued exposure to liability.[2]

The conflict which confronts S&W is more than just the testimony that Varn will give regarding the additional payment to Peslak which is at odds with the sworn testimony of counter-defendants Reese and Kenny and sufficient on its face for disqualification. Opposition, p. 10 quoting *C.W. Keller & Assocs., Inc. v. Cullen*, No. 943493, 1998 WL1181778, at *2 (Mass. Super. Jun. 29, 1998) (disqualification of the attorney-witness is required when "it is shown that counsel's testimony on behalf of the opponent will be prejudicial to counsel's client"). Rather, the conflict is that S&W cannot provide *independent advice* to the counter-defendants regarding their claims against Varn and S&W for Varn's role in making these promises to Peslak and Carr. *Maddocks v. Ricker* Casson, 403 Mass. 592, 597 (1988) (holding that a lawyer could not adequately represent the interests of his clients, the plaintiffs, and himself where he was subject to a claim for contribution even if there had been valid consent). Once the conflict is fixed, as it is here, the courts presume the attorney whose own financial interests are at stake cannot be independent in providing advice.

As noted in Carr's opening papers, the court in *Winter Gardens Condominium Trust v. Winter Gardens Dev. Corp.* found:

> The defendants argue, and I agree, that attorney O'Connor's representation of the plaintiff in this litigation conflicts with his own interests stemming from his dual role as a trustee of the plaintiff and as a unit owner of the Complex. This dual role has a

---

[2] Peslak's declaration provides further support for Carr's other counter-claim, misrepresentation. Varn's desire to try to change the terms of the agreement during the February 10, 2004 telephone call, lend further support to Carr's argument that counter-defendants never intended to fulfill their promises when the made them.

high likelihood of conflicting with his responsibilities that inure to duties of loyalty to the plaintiff as counsel in this matter.

...

This language creates the situation where attorney O'Connor may be personally liable, and may act to shield himself from personal liability in his capacity as a trustee for his possible misfeasance with regard to the septic system, which may cause him to act counter to his duty of loyalty to the plaintiff.

*Winter Gardens Condominium Trust v. Winter Gardens Development Corp.*, No. 023017F, 2005 WL 1132635, * 3-4; (Mass. Super. April 14, 2005); *see also Lange v. Orleans Levee District*, Nos. Civ. A. 97-987, Civ. A. 97-988, 1997 WL 668216 (E.D. La. Oct. 23, 1997) ("Furthermore, there is a substantial likelihood that not only that Klotz's testimony will be prejudicial to plaintiffs, but also that, because Klotz's own conduct and motivation is at issue in this action, 'it may be difficult or impossible for the lawyer to give [his] client detached advice.'") (quoting, Model Rule of Professional Conduct Rule 1.7 cmt (1983)); Rule 1.7, cmt 6 ("If the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for that lawyer to give detached advice.").[3]

### 2. The Common Interest Agreement Between Carr and Iron Mountain Renders All Communications Privileged And Requires the Disqualification of S&W

Massachusetts has long recognized the common interest privilege and has determined that the common interest privilege springs directly from the bedrock principals of the attorney-client privilege. *American Automobile Insurance Co. v. J.P. Noonan Transportation, Inc.*, No. 970325, 2000 WL 33171004, *6 (Mass. Super. Nov. 16, 2000) ("Properly understood, the joint defense or common-interest doctrine is a device designed to prevent waiver of the attorney-client privilege when discrete parties face the same legal claim."). The court in *American Automobile*

---

[3] Aside from the conflict that exists between Varn and the counter-defendants regarding the Carr contract, the Plaintiffs also failed to acknowledge the other actual conflict between Varn and his client Iron Mountain. During the Pierce arbitration, Varn apparently breached a confidentiality agreement involving a third party to the arbitration by providing confidential business documents to Mr. Neebling. Motion for Disqualification, pp. 7. By instructing Neebling to review these confidential documents it appears that Varn has exposed both S&W and Iron Mountain to a lawsuit from the aggrieved third party. *Id.* Plaintiffs do not address this issue at all in their Opposition.

6

went on to explain why courts in Massachusetts have long honored the common interest privilege quoting *Chahoon v. Commonwealth*, 62 Va. (21 Gratt.) 1036, 1043 (1871)

> The parties were jointly indicted for a conspiracy…They might have employed the same counsel, or they might have employed different counsel as they did. But whether they did the one thing or the other, the effect is the same, as to their right of communication to each and all of the counsel, and as to the privilege of such communication…They have a right, all the accused and their counsel, to consult together about the case and the defence (sic), and it follows as a necessary consequence, that <u>all the information, derived by and of the counsel from such consultation, is privileged</u>.

*American Automobile*, 2000 WL 33171004 at *6 (emphasis added)

The court went on to explain how these concepts have been adopted throughout the entire country and the breadth of the privilege that Carr has a right to enjoy. "In addition, when defendants have engaged separate counsel who work together in a common defense, information exchanged between those counsel, or between the clients and the counsel, is privileged to the extent that the exchange is part of an ongoing and joint defense strategy." *American Automobile*, 2000 WL 33171004 at *6 (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 787-88 (3d Cir. 1985) and *United States v. McPartlin*, 595 F.2d 1321, 1336 (7th Cir. 1979)). "In addition, 'communications to an attorney to establish a common defense strategy are privileged even though the attorney represents another client with some adverse interest.'" *Ken's Foods, Inc. v. Ken's Steak House, Inc.*, 213 F.R.D. 89, 93(D. Mass. 2002) (citation omitted).

The court in *American Automobile* summed up the privilege and its basis in the law in the following manner:

> I am of the opinion that the joint defense or common interest components of the attorney-client privilege are necessary to ensure, as a practical matter, that clients receive the fully informed advice the attorney-client privilege is designed to produce. Individuals or entities with joint or common interests simply cannot obtain such advice if their attorneys must proceed in splendid isolation and are prohibited from interacting with others for the purpose of determining whether and to what extent common measures for preservation of common interests are

3932988v1

available, feasible and agreeable to all who may have such interests. I am of the opinion, in sum, that the privilege is fully consistent with the principles upon which the attorney-client privilege rests in Massachusetts and, in fact, is part of Massachusetts common law.

2000 WL 33171004 at *7.

Carr is entitled to the enforcement of the common interest agreement that was first raised in Plaintiffs Varn and Watzke's affidavits in support of the Opposition. *See* Varn Aff. ¶ 32 (Varn helped Peslak draft Carr's complaint against Pierce); Varn Aff. ¶ 37 (Varn attended hearings in the Carr-Pierce litigation); Varn ¶ 39 (April 2002 payment by Iron Mountain of $50,000 to Peslak to support Carr's litigation which could benefit Iron Mountain); Varn Aff. ¶53 (reviewed Pierce related documents with Peslak); *see generally*, Varn Aff. (describing countless meetings with Peslak and Carr to discuss strategy regarding the various Pierce matters); Watzke Aff ¶ 32 (confirming $50,000 payment of Carr's fees was to benefit Iron Mountain's "overlapped" interest in litigation against Pierce.).

Peslak's declaration describes the formation of the common interest agreement and how both he and Varn fought in New Jersey and Massachusetts courts to defend their communications against attacks by Pierce's lawyers. In each instance in which Pierce's attorneys tried to depose either Varn or Peslak, the two lawyers discussed strategies and each time determined to defend the discovery efforts by raising with the court the common interest agreement. On July 24, 2002, Peslak argued to the Honorable Clarkson S. Fisher Jr., P. J. Ch., Superior Court of New Jersey, Monmouth County - Chancery Division that a joint prosecution/common interest agreement did exist between Carr and Iron Mountain and Carr was entitled to the protections of the attorney client relationship. Pierce's lawyers then tried to depose Varn in Massachusetts at which time Peslak and Varn agreed that Varn would argue that he (Varn) could not be deposed by Pierce's counsel due to the common interest privilege between Carr and Iron Mountain.

Carr has successfully fought to maintain the confidentiality of his communications with Varn, but now Varn has violated his obligation to maintain these confidences by using some of those statements in his declaration in support of the Opposition and in an effort to ruin Carr's credibility. *Massachusetts Eye and Ear Infirmary v. OLT Phototherapeutics, Inc.*, *167* F. Supp. 2d 108, 117 (D. Mass. 2001) ("In addition, Standard 503 defines a confidential communication as a communication that is 'not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client.'") quoting Sup.Ct. Standard 503(a)(3)); *In re Spalding Sports Worldwide*, 203 F.3d 800, 806 (Fed. Cir. 2000) ("It is not necessary to expressly request confidential legal assistance when the request is implied."). The gravity of Varn's breach of his obligation is seen in applying the standard Rule 1.9 substantial relationship test that this Court thoroughly reviewed in *ebix.com, Inc. v. McCracken.*, 312 F. Supp. 2d 82 (D. Mass. 2004). Rule 1.9 prevents an attorney from representing a new client against a former client in a matter that is adverse to the former client and substantially related to the issues involving the representation of the former client. *See ebix.com, Inc.*, 312 F. Supp. 2d at 88-89. ("[T]he spirit of Rule 1.9 is that a law firm retains a limited duty of loyalty to a former client--it may not use a former client's confidential information against that client, and should not represent a new client in any matter where the former client reasonably should fear that its earlier confidences will be misused.") (citation omitted).

While Carr did not technically retain Varn to serve as Carr's lawyer, the Massachusetts court in *American Automobile Insurance Co.* explained that Carr still has an absolute right to expect that Varn and Moore would keep confidential information they learned as a result of their participation in common interest agreement. It is the disclosure of Carr's confidential

information provided under a recognized ambit of the attorney-client privilege that is so abhorrent to the legal system and Varn's violation should not be diminished simply because Carr had not directly retained S&W. *American Automobile Insurance Co.*, 2000 WL 33171004 at *8 ("The [common interest] privilege, after all, is an extension of the attorney-client privilege…."); *Massachusetts Eye and Ear Infirmary*, 167 F. Supp. 2d at 116 ("The attorney-client privilege and, therefore, the joint attorney-client privilege, 'springs from the attorney-client relationship.'")(citation omitted); *F.D.I.C. v. Ogden Corp.* 202 F.3d 454, 463 (1st Cir. 2000) ("Courts customarily determine the existence *vel non* of an attorney-client relationship by evaluating whether the putative client's belief that such a relationship existed was objectively reasonable under all the circumstances."); *In re Regents of the University of California*, 101 F.3d 1386, 1390 (Fed. Cir. 1996) (the issue is not who a lawyer believes is his or her client, but whether a lawyer is "acting in a professional relationship with a person.").

It cannot seriously be questioned that the substantial relationship test examined in *ebix.com* is met in this case. *ebix.com, Inc.*, 312 F. Supp. 2d at 89 ("the assessment of whether matters are 'substantially related' must focus on whether the overlap or similarity between the two matters would potentially give rise to such a 'temptation.'. This turns on whether it is 'reasonable to assume that confidential information would have been given to the attorney in the first matter that would be helpful to the adverse client in the second matter'"). (Citations omitted.)

It is a given that the "joint attorney-client relationship remains intact until it is expressly terminated or until circumstances arise that readily imply to *all the joint clients* that the relationship is over." *Massachusetts Eye and Ear Infirmary v. QLT Phototherapeutics, Inc.*, 412

3932988v1

F.3d, 226 (1st Cir. 2005) (quoting *F.D.I.C. v. Ogden Corp.* 202 F.3d 454, 464 (1st Cir. 2000). In

*F.D.I.C. v. Ogden Corp.* the First Circuit stated:

> *Eureka Inv. Corp. v. Chicago Title Ins. Co.,* 743 F.2d 932, 936- 38 (D.C.Cir.1984) does not stand for a different rule. There, the communications at issue were made after the interests of the joint clients diverged and their attorney, aware of the divergence, undertook separate representation of one client, distinct from the joint representation. *See* 743 F.2d at 937. The court's holding addresses whether the content of these communications pertained to the common interest that formed the basis of the joint representation. *See id.* <u>We decline to read *Eureka* as holding that a joint client relationship evaporates whenever one client unilaterally determines that its interests have diverged from those of its co-clients</u>.

202 F.3d at 464  (emphasis added).

As Peslak attests in his declaration, at no time did he act in any way inconsistent with the

common litigation goals of Carr and Iron Mountain.  Exh. 2, ¶ 21.  Indeed, Peslak contends that

all counsel remain bound to maintain the confidences of the clients even though the common

interest agreement was dissolved by early 2005, *Id.*, nor has Carr waived his expectation of

confidentiality.  *Massachusetts Eye and Ear Infirmary,* 412 F.3d at 226.

Carr's counterclaims do not disclose any confidential information gained during the

period of the agreement.  Instead, the counterclaims pertain only to the promises made by Varn,

S&W, and various Iron Mountain entities.  Varn, on the other hand, possesses confidential

information regarding Carr, much of it disclosed in the venomous character attacks Varn leveled

in his affidavit that constitute a breach of the common interest privilege.  Carr never would have

disclosed to Varn the confidential information he did if Carr knew that Varn would use the

information against Carr in a lawsuit brought by Varn and other individuals not privy to the

common interest agreement Carr entered with Iron Mountain. *ebix.com, Inc.,* 312 F.Supp.2d at

89 (quoting *Dee v. Conference Holdings, Inc.,* No. 976608, 1998 WL 1247926, *2 (Mass.Super.

July 14, 1998))  (The substantial relationship test "turns on whether it is 'reasonable to assume

11

that confidential information would have been given to the attorney in the first matter that would be helpful to the adverse client in the second matter.'").  Of course, Carr does not have to prove that Varn or S&W have actually misused confidential information; it is presumed in this case. "A finding of actual use of confidential information is unnecessary if the substantial relationship test is met; under that test, the court will assume an attorney will use confidences obtained from the former client in the subsequent representation." *Id.* (citing *Bays v. Theran,* 418 Mass. 685, 691, 639 N.E.2d 720, 724 (1994)).

This court concluded in *ebix.com* that the attorneys and their law firm would be disqualified if the Rule 1.9 substantial relationship test was met.  312 F. Supp. 2d at 91 ("If any one of these matters is substantially related to claims in this litigation, that would be a basis for disqualification of Levin and Salinger and their firm.")  Carr contends that Varn's participation in the common interest agreement, and that strong presumption given that privilege by Massachusetts courts, as defined in *American Automobile Insurance Co.*, satisfies the first prong of the Rule 1.9 test.  There is little need to explore the actual substantial relationship test since the Proposed Second Amended Complaint plainly pertains directly to the same events that gave rise to the common interest agreement between Carr and Iron Mountain that Varn and S&W are now violating.  Having met both prongs of Rule 1.9, Varn and S&W must be disqualified.

3.  **The Testimony of S&W Attorneys Will Bar S&W From Rendering Any Legal Services To Any Counter-defendants.**

It is disingenuous for plaintiffs to contend that Carr has manufactured a need to call Varn and Miller to testify when the lawsuit was unabashedly brought in the name of their law firm. Opposition, pp. 9, 10, and 18.  S&W does nothing to disabuse the court that this lawsuit is filed on

its behalf to protect the financial interests of itself, its partners, and employees and S&W should not now claim that it will not provide testimony in support of its own claims.

### A. Miller Will Be Called As A Witness For The Counter-Defendants <u>Not</u> Carr.

Both Peslak and Neebling will testify that Miller was present for several conversations during which Varn reiterated various promises to Carr. Aside from Miller, Plaintiffs can only call Varn to rebut this testimony since no one else was present at these meetings establishing Miller's true importance to the counter-defendants.

Once called by the counter-defendants, though, Miller will have to testify about the scores of email, telephone, and other conversations Peslak and Neebling say occurred in which Miller discussed or knew about the promises made to Carr. Neebling Declaration, ¶¶ 15, 17, 20. Conveniently, Miller's Affidavit omits any reference to his participation in these communications or S&W's internal conversations regarding Varn and Iron Mountain's intent to keep their promise to pay all of Carr's attorney fees and why on April 5, 2004 only a portion of Peslak's fees were paid.

### B. S&W Will Be Called As A Witness By The Counter-Defendants, Not Carr.

Because Varn and Moore have sued Carr in their capacities as a partner or agent of S&W, it is inevitable that they will attempt to testify, not as individuals, but on behalf of S&W. This is not speculation, since the Opposition argues this very point. The Opposition argues that testimony by an S&W Rule 30(b)(6) witness regarding issues raised in the opening papers "would be entirely duplicative of the Plaintiffs testimony." Opposition, p. 18. But, Varn cannot provide testimony on behalf of S&W while maintaining his status as an "individual". Plaintiffs' sham is exposed in that Varn has not sued as a true individual but is suing Carr as a principal of S&W. Nevertheless,

13

Plaintiffs argue that S&W should not be disqualified because it will not be testifying – even though it is a party.

### C.    Varn and Miller's Disqualification Is Imputed to S&W.

The Opposition attempts to distinguish the facts of *Winter Gardens Condo. Trust v. Winter Gardens Dev. Corp.*, No. 023017F, 2005 WL 1132635, *3-4 (Mass. Sup. April 14, 2005), from this case but fails to acknowledge the impact on an attorney's law firm when the attorney is disqualified under Rule 3.7. "The prohibition of Rule 3.7, where applicable, applies not only to the attorney who is to be a witness but to other attorneys in his law firm." Mass. R .Prof. C. 3.7, Comment 5; *see* e.g. *Byington v. City of Boston,* 37 Mass. App. Ct. 907, 908 (1994) (discussing former Rule 3.7 and Cannon of Ethics DR 5-101(b)). *See also Winter Gardens Condominium Trust*, 2005 WL 1132635 at *3.

The Massachusetts court in *Winter Gardens* stated that plaintiffs had "not made an adequate showing that the exceptions of Rule 1.7(b) apply, and, that the attorney [ ] can represent them with no adverse effect." *Id.*    As such, the court held "[t]his clearly warrants disqualification of [the plaintiff's attorney's] law firm, Rich May, P.C., from acting as trial counsel in the instant litigation, under Mass. R. Prof Conduct 1.10 and 3.7(b)." *Id.* at *4. Indeed, considering that the law firm's disqualification is imputed when an attorney is disqualified under Rule 3.7, the same must certainly be true when it is the law firm itself that must testify, as will be the case with S&W here.

Far from being unusual, as the Opposition suggest (p. 17), courts in Massachusetts do impute the disqualification of an attorney to the entire firm. *ebix.com, Inc.*, 312 F. Supp. 2d at 91 ("If any one of these matters is substantially related to claims in this litigation, that would be a basis for disqualification of Levin and Salinger and their firm."); *Inverness Medical Switzerland*

14

3932988v·1

*GMBH*, 2005 WL 1491233 at *4 (imputed disqualification of the law firm would only occur if the personally disqualified lawyer did not possess material confidential information), *Bays v. Theran*, 639 N.E.2d 720, 722, 724 (Mass. 1994) (affirming disqualification of law firm where court found that attorney at the firm had represented adverse party and received substantial confidential information from that party while at the firm); *Kevlick v. Goldstein*, 724 F.2d 844, 845-46, 850-51 (1st Cir. 1984) (affirming disqualification of defendants' law firm where attorney at the firm had privileged communications with witnesses relevant to plaintiff's case while at the firm); *Rodriguez v. Montalvo*, 337 F. Supp. 2d 212, 217 (D. Mass. 2004)(holding that confidential information imparted by a party to a paralegal is imputed to the attorney supervisors within a firm, and that the imputation remains with those attorney supervisors when they transfer to a new firm, so that they cannot personally represent a client adverse to that party).

### D.    Varn Cannot Represent Any Party In Any Capacity.

The Opposition grievously mischaracterizes the role Varn and Miller can play in this matter.  Plaintiffs misstates the holding of the Court in *Mutual Life Ins. Co. of New York v. Liberty Mutual Ins. Co.*, 746 F. Supp. 375, 377 (S.D.N.Y. 1990), arguing incorrectly "that the attorney could still assist trial counsel 'informally'" even if they are disqualified under Rule 3.7. Opposition, p. 11.  No representation of the court's holding in *Mutual Life* could be less accurate. Indeed, the court sternly lectured counsel in that case and actually disqualified "counsel for **all purposes**..."  *Id.*  The court went on to explain the rationale for not allowing counsel to "informally" represent a client "behind-the-scenes", as the Opposition argues.

> It may seem trite to remind lawyers that, as such, they are required to exercise independent professional judgment at all stages of a litigation, e.g., to evaluate with a dispassionate eye the validity and non-validity of the positions their client wishes them to take and to render professional advice to their client as to the best

method of achieving the proper result at a minimum legal expense to their client. These judgments can only be made by independent counsel, not by counsel seeking to justify the very expenses she incurred for her client. *Id.*

The Opposition is dismissive of *Mutual Life* because it is from New York, but that court's analysis is helpful in understanding how the purpose served by the underlying disqualification would be undermined if the disqualified lawyer continued to render advice to his client. In this instance Varn's disqualification for all purposes is further necessary because of the presumption that he will continue to divulge confidential information provided by Carr. *ebix.com, Inc.*, 312 F. Supp. 2d at 89.

## Conclusion

This lawsuit is a thinly veiled effort by S&W to sue Carr through its proxies Varn and Moore. Reviewing only Carr's breach of contract counterclaim, there is an undeniable and clear legal conflict of interest where S&W will have to provide advice to the other defendants on whether they should cross-claim against Varn (S&W) for his role in making promises to Peslak and Carr. Indeed, Varn's February 10, 2004 promise is directly contrary to the testimony of counter-defendants Reese and Kenny, creating a testimonial conflict for Varn.

Of more concern is the dismissive manner with which S&W has treated its obligations under the common interest agreement between Carr and Iron Mountain. This court presumes that Varn gained confidential information regarding Carr and will use it for the benefit of his new clients – himself and the other individual plaintiffs. This court should not allow S&W's tactics to erode, however slightly, the bedrock principles of the privileges one has in communicating confidential information to his counsel.

Moreover, the impertinent, scandalous and otherwise immaterial information set forth in the affidavits of Varn and Moore should be stricken from these proceedings for the previously

discussed reasons, but mainly because they contain confidential information provided under the ambit of the common interest privilege.

March 20, 2006

Respectfully submitted,

_____/S/_____
Read K. McCaffrey (*pro hac vice*)
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-5243
rmcccaffrey@pattonboggs.com

17

# EXHIBIT 1

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED;<br>et al.<br><br>                Plaintiffs,<br><br>      v.<br><br>THOMAS CARR,<br><br>                Defendant<br><br>     And<br><br>THOMAS CARR,<br><br>             Counter-Plaintiff<br><br>      v.<br><br>IRON MOUNTAIN INCORPORATED;<br>IRON MOUNTAIN INFORMATION<br>MANAGEMENT, INC.; C. RICHARD<br>REESE; JOHN F. KENNY, JR.; GARRY<br>B. WATZKE; LARRY L. VARN; AND<br>CHARLES G. MOORE,<br><br>            Counter-Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No.<br><br>05 10890 RCL |

## DECLARATION OF JAMES NEEBLING

I, James Neebling, upon personal knowledge and observation, hereby affirm as follows:

1.      I am a resident of the State of New Jersey and am over the age of 18 and if called to testify I would be prepared to testify to the following information based upon my own personal knowledge.

1

2.      I am the principal owner of Systrans Freight Systems, Inc., which was sued by Iron Mountain on May 13, 2005, in this Court in an action styled: *Iron Mountain Information Management Inc. v Systrans Freight Systems, Inc*, Civil Action # 05cv10999 MLW (the "Systrans case"). Like Mr. Carr in this Action, I filed counterclaims against Iron Mountain and I have joined Mr. Carr, both before Your Honor and before Judge Wolf, in moving the Court to consolidate the Systrans case with this matter.

3.      I was present at most if not all of the meetings that are set forth in Carr's counterclaim in this Action as well those counterclaims I filed against Iron Mountain in the Systrans case

4.      In addition, I personally was a party to several communications with the counter-Defendants in this Action pertaining to the promises at issue in this case as well as those same promises that are implicated in the Systrans case.

5.      Specifically, in connection with this case, the counter-defendants sought and received both Carr's and my cooperation in assisting Iron Mountain's litigation team prepare Iron Mountain's lawsuit against Peter Pierce ("Pierce") in exchange for the promises outlined in the respective counterclaims in this and the Systrans case.

6.      Larry Varn ("Varn"), a senior partner at the firm of Sullivan & Worcester, led the litigation efforts against Pierce including the litigation team staffed with lawyers from S&W and the law firm Morgan Lewis.

7.      Also part of Varn's litigation team was a private investigator hired by S&W, Charlie Moore ("Morre"). As explained to me by Varn, Moore was tasked primarily with "digging up as

3878832v1                                        2

much dirt on Pierce as possible" and Varn and Moore specifically sought my assistance in this regard.

8.    In connection with those efforts, Varn approached both Carr and myself soliciting our assistance to aid his litigation team prepare Iron Mountain's case against Pierce.

9.    Beginning in August 2001, Carr and I were first approached by senior executives at Iron Mountain to participate in a series of meetings to discuss what assistance Carr and I could provide Iron Mountain and its litigation team in its legal actions against Pierce. Those executives were: Gary Watzke, general counsel for Iron Mountain; John Kenny, chief financial officer for Iron Mountain; and Iron Mountain's CEO Richard Reese.

10.    As set forth in both Carr's and Systran's respective counterclaims, throughout these meetings the above-named counter-Defendants made a series of promises to both Carr and myself amounting to millions of dollars in cash and contracts for Carr and Systrans.

11.    In addition to the above-referenced meetings, S&W's litigation team initiated or participated in literally hundreds of communications (electronic mail, telephone, and in person meetings) with Carr and myself over the years to which Iron Mountain was not privy.

12.    In particular, Varn expressed to Carr and me that he was concerned that we were having too much direct contact with Gary Watzke and he further directed us instead to use Moore as conduit for communicating with Iron Mountain. Moore and Varn told me that Moore was hired by S&W and not by Iron Mountain.

13.    During these communications with Moore, Moore personally promised both Carr and me that funds would be paid to Carr and that Systrans would receive significant contracts in

exchange for our continued assistance in helping S&W's litigation team prepare Iron Mountain's case.

14. In addition to the meetings described above, Varn also met separately with Carr and me on several occasions in which he reaffirmed that we would be compensated for our efforts in assisting with S&W's investigation of Pierce.

15. Also present at many of these meetings was another S&W attorney, Samuel Miller ("Miller"). Miller was a key participant in S&W's preparation of Iron Mountain's case and would contact me regularly regarding my efforts to advance the investigation of Pierce. Miller's name appears on pleadings S&W filed in support of their representation of Iron Mountain against Pierce. Miller attended at least one dinner in New York that included, at least, Varn, Carr, and myself. It became my understanding over the years that Miller worked closely with Varn and seemed in my judgment to be fully apprised of the communications and promises that that Varn had with Carr and me.

16. In one meeting at a restaurant in New York that included Varn, Carr, myself and Arthur Peslak ("Peslak"), an attorney for Carr, Varn promised to Carr and me that S&W would pay at least $50,000.00 of legal fees to Peslak for legal fees and expenses owed by Carr and me. Peslak, Carr, Varn, and Moore all told me that S&W did in fact pay Peslak $50,000 in partial fulfillment of Varn's promise.

17. During the time in which Carr and I were assisting with S&W's investigation of Pierce, we had complete access to all aspects of the Pierce litigation, including confidential information, and we were routinely asked for our input and advice regarding this information. At no point did Varn, Miller, Moore, attorneys for Morgan Lewis, or anyone from S&W ask me to sign a

4

confidentiality or non-disclosure agreement. I believe that all of those people (Varn, Miller, Moore, attorneys for Morgan Lewis, and S&W) knew that I was being provided with confidential proprietary business information that I would otherwise not be able to access.

18.     For example, Varn sent me Pierce's motion for summary judgment to review. In a separate email, Varn later sent me Iron Mountain's draft opposition to Pierce's motion for summary judgment along with eight attachments. Varn specifically instructed me to review the attachments to Iron Mountain's opposition that included documents produced that were clearly marked confidential and provided by third parties to the dispute. Varn also provided to me other confidential information to which non-parties to the Pierce litigation were not supposed to be privy to. This information contained proprietary business information pertaining to a third party to the suit. Systrans is in the freight and trucking business and the confidential information that Varn told me to review pertained to the confidential financing of another trucking business called, Sequedex. There is no possible way that I would have been privy to Sequedex's efforts to raise capital, the identity of the people from who the company was seeking the capital, without Varn's provision of this information to me.

19.     As I understood it, the purpose in providing these documents to Carr and me was to educate us as to S&W's strategy and theories concerning the Pierce case in furtherance of our continued efforts to assist them in it.

20.     In addition, Varn and Miller contacted Peslak and me concerning a deposition of a significant witness in the Pierce case to ask us for assistance in preparing questions for that deposition. While this may seem strange for two lawyers to contact me, a non-layer and non-party, this was the type of communication that I routinely received from S&W.

I declare under the penalty of perjury 28 USC § 1746 that the foregoing information is true and correct to the best of my recollection.

7/15/05
_____
Date

_____
James Neebling

3878832v1

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

IRON MOUNTAIN INCORPORATED;  )
   et al.  )
  )
  Plaintiffs and,  )
  Counterclaim Defendants  )
  )      Civil Action No.
  )      05CV10890 RCL
      v.  )
  )
THOMAS CARR,  )
  )      Magistrate Judge Collings
  Defendant and  )
  Counterclaim-Plaintiff  )
  )
  )

## DECLARATION OF ARTHUR M. PESLAK

I, Arthur M. Peslak, do hereby swear and affirm under the penalties of perjury that the following is based on my personal knowledge, that I am over the age of 18 and am competent to testify and that if I were called to testify I would do so substantially as follows:

1. I am an attorney in good standing licensed to practice law in the states of New Jersey and New York. I have represented Defendant and Counterclaim Plaintiff Thomas Carr on a number of matters in the past.

2. I have no interest, monetary or otherwise, at stake in this case.

3. In connection with my representation of Carr, on several occasions beginning in 2001 I met with attorneys from the firm of Sullivan & Worcester ("S&W") including Counter-Defendant Larry Varn ("Varn") as well as Iron Mountain's General Counsel Gary Watzke.

4. During these meetings, these S&W attorneys as well as Watzke, on behalf of its client Iron Mountain, made several promises to Defendant and Counter-Plaintiff Thomas Carr ("Carr") and James Neebling ("Neebling"), owner of Systrans Freight Systems, Inc.

5.  Among the promises made to Carr and Neebling was the promise that, in exchange for their agreement to assist S&W and its investigators prepare their case against Peter Pierce, all legal fees Carr would incur in this effort – my bills – would be paid by Iron Mountain.

6.  I informed Varn and Watzke that I would not be able to initiate a lawsuit against Peter Pierce on behalf of Carr without assurance that my fees would be covered.  Varn and Watzke assured me and Carr that all fees Carr incurred in pursuit of Carr's action against Pierce and Carr's support of Iron Mountain's case against Pierce would be paid.  While I presumed they would be paid by Iron Mountain, the initial $50,000 wire transfer came from S&W.

7.  In reliance on Varn's agreement with Carr and at Carr's direction, I began the task of preparing a case for Carr against Pierce in New Jersey state court.  Varn had previously met with Carr on numerous occasions and had sent to me a draft affidavit that he prepared for Mr. Carr.  I used that affidavit to begin my initial draft of Carr's Complaint against Pierce.  I had also spoken with Varn regarding the contents of the suit and the various causes of action.  I shared my thoughts, which were privileged attorney work product, with Varn because I understood that Varn and I were working toward a common goal on behalf of our clients, the defeat of Peter Pierce in actions filed by Carr and Iron Mountain.

8.  I would never have shared with Varn any privileged attorney work product or confidential communications I had with Carr were it not for my understanding that Varn had agreed to keep this information confidential and not disclose it to any third party.  I shared confidential information with Varn with the express understanding that Carr authorized these communications with Varn.  Carr knew and approved of my frequent communications with Varn that included discussions of litigation strategy for both Carr's case and the development of Iron Mountain's case.

9. I had prepared a joint defense agreement and sent a draft to Varn. However, Varn and I discussed the draft agreement and we both agreed there is no requirement in New Jersey for such joint prosecution agreements involving a common interest among parties to be written. Regardless, the law in New Jersey requires counsel to the parties in any such common interest or joint prosecution agreement to maintain the confidences shared by the parties as if they were confidential communications with one's own client.

10. I contacted Varn and asked him to review the draft complaint I wrote for filing on behalf of Carr. As Varn's affidavit admits he made edits to the draft, which I accepted and used when I filed the lawsuit. Although the timing of Mr. Carr's lawsuit was in part related to issues between Carr and Pierce, Varn was pleased that the filing coincided with actions he was taking against Pierce on behalf of Iron Mountain.

11. As a result of several conversations with me, Carr, Varn and Watzke, on April 12, 2002, S&W wired $50,000 to my firm as a retainer for my fees in representing Carr against Pierce. I have no affirmative evidence to suggest whether Iron Mountain paid or reimbursed the $50,000 to S&W. It was clear to me that the reason Varn and Watzke had agreed to fund the lawsuit against Pierce, for Carr's benefit, was because Varn and Watzke believed that I could develop information, strategies, or testimony that would assist their case against Pierce. Another reason is that Varn relied on me to help him prepare for Iron Mountain, Inc's. arbitration against Pierce.

12. The Carr lawsuit against Pierce was on an expedited discovery track since we were seeking a preliminary injunction unlike the Iron Mountain case which was on a normal discovery track. Varn indicated he was, indeed, interested in whatever facts or documents I could get in discovery from Pierce.

13. In furtherance of our common interest, Varn insisted on being involved in every phase of Carr's litigation from reviewing pleadings, to preparing Carr for his deposition testimony to weighing in on settlement of the case. In fact, Varn was insistent that I not begin to prepare Carr for his deposition in a case involving Iron Mountain and Sequedex without Varn being present. I also provided Varn with confidential and privileged documents and work product that I would not have produced to any other person were it not for our joint prosecution agreement, which presumed the maintaining of confidences of our respective clients.

14. In the preparation session for Carr's deposition in the Sequedex case, Varn coached Carr how to answer deposition questions so that Carr would remain strictly truthful to his answers, but would not unnecessarily volunteer information. For example, Varn instructed Carr that if he was asked "did Iron Mountain offer you a job in exchange for your assistance" that Carr was to say "no" because he was offered a consulting position and not a job. While I was uncomfortable with Varn's hair-splitting he was careful to advise Carr to always tell the truth and the advice that Varn was giving was for Carr to carefully listen to the question and answer the only the precise question asked in as narrow a manner as possible.

15. At one point during Carr's deposition in the Sequedex matter, Pierce's son, J. Peter Pierce Jr., approached Carr in the hallway outside of my office and inquired about initiating settlement discussions. I was in my private office and Varn overheard him and ran into my office and told me to get my client away from Pierce, Jr. After the deposition, Varn told Carr, that Carr was not to meet with anyone to discuss settling his dispute with Pierce without Varn being involved. It was agreed that I would write to Pierce's counsel about the incident to inquire whether Pierce had a settlement proposal to offer. Nothing came of my inquiry.

- 4 -

16. Shortly after I filed Carr's suit against Pierce, in early April 2002, Pierce's attorneys learned that Varn and I were working together on our common cases against Pierce. (Varn filed the arbitration action on behalf of Iron Mountain, Inc. on or about April 15, 2002, in Philadelphia. *See*, Varn Aff. p. 17, n.1.) In July 2002, Pierce's counsel sought leave for an out-of-state commission to depose Varn in Carr's New Jersey state court action as well as compel Varn to produce documents I shared with Varn.

17. On or about July 24, 2002, after consulting with Varn, I filed an opposition to Pierce's application with the Honorable Clarkson S. Fisher Jr., P. J. Ch., Superior Court of New Jersey, Monmouth County - Chancery Division, the presiding judge in Carr's action against Pierce. At that time I moved to quash Pierce's efforts to depose Varn. I argued to the court that Varn and I were engaged in a joint prosecution effort against Pierce and that our communications were privileged through the common interest privilege. New Jersey law expressly permits such common interest privileges and I cited the court to *Laporta v. Gloucester County Bd. of Chosen Freeholders*, 340 N.J. Super 254, 263 (App. Div. 2001) ("Generally, when such privileged information is turned over to a non-adversary who has a legitimate interest in the information, such as the GCPO here, there is no waiver unless it can be shown that there was a 'conscious disregard' of the possibility that an adversary would gain access to the material").

18. Judge Fisher did not issue a written opinion but believed that because Pierce's counsel wanted to depose Varn in Massachusetts that he would "issue" the out-of-state commission to a Massachusetts court and it would be for the court in Massachusetts to make any necessary factual findings regarding the application of the privilege to particular documents or questions. I did not appear in the court in Massachusetts regarding the commission to depose Varn but Varn and I did coordinate our defense of this effort and it is my understanding that

- 5 -

Varn and S&W opposed Pierce's efforts to depose Varn by, in part, citing the Massachusetts court to the common interest agreement between Carr and Iron Mountain. . I do know that the Massachusetts court did not execute the commission and Varn was never deposed as part of Carr's case as Pierce's counsel had sought in New Jersey.

19. Having fought and won that battle in July 2002, it is my view that both Varn and I were even more diligent in protecting the confidentiality of our communications from the aggressive discovery tactics of Pierce's attorneys. In fact, Pierce's counsel subpoenaed me in the Iron Mountain/Pierce arbitration in Philadelphia. I successfully had the subpoena quashed by the Superior Court of New Jersey at least in part based upon my argument of the applicability of the New Jersey common interest privilege that I cited to the court.

20. That Varn and others acting in their individual capacities are now suing Carr and are using these confidential communications against Carr is, in my view, a breach of the joint prosecution agreement and a violation of Carr's expectation that Varn would keep all such communications confidential.

21. The common interest privilege in my view continued through the 2003-2004 arbitration and did not cease until early 2005 when it became obvious that Carr and Iron Mountain, Inc. were at odds over Iron Mountain's promises. I have acted consistently with the intent of the Carr-Iron Mountain common interest agreement and have not disclosed or breached the confidences regarding Iron Mountain that I was privy to throughout the duration of the agreement.

22. Leading up to the Iron Mountain, Inc. arbitration, I met or spoke on the phone on several occasions with Varn, attorneys from S&W and Morgan Lewis. Iron Mountain, Inc. had retained Morgan Lewis as its counsel in Philadelphia to assist Varn in trying the arbitration. I

- 6 -

quickly understood and agreed, on behalf of Carr, that Morgan Lewis was part of the joint team and was a recipient of all confidential communications I had shared with Varn. The inclusion of Morgan Lewis as an additional member of the team was neither surprising nor objectionable to me. I freely communicated with attorneys or support staff from Morgan Lewis as I did with Varn. While I had a very minimal role, I was nevertheless privy to many confidential communications regarding the Iron Mountain arbitration strategy. In fact, I was present in Varn's hotel room when the Morgan Lewis attorneys were preparing Varn for his own testimony in the arbitration regarding a trailer of documents that the Pierce attorneys were hiding from Iron Mountain and Carr during discovery.

23. The purpose of my meetings with Varn, S&W and Morgan Lewis was to plan strategy for the case. No meeting with Varn was ever entirely social even if the primary purpose was to meet for dinner or lunch. At absolutely every meeting with Varn, S&W and or attorneys from Morgan Lewis, at some point at least one person would raise the case and discuss client confidential information or trial strategy. I understood that the information I learned was confidential and that I had an ethical obligation to not disclose the information to any person other than my client, Carr.

24. I also helped Varn prepare an affidavit from a third party, Tammi Phillips, which Varn submitted to the arbitrator in the Pierce/Iron Mountain arbitration.

25. Carr was scheduled to be deposed in the Iron Mountain Sequedex matter in May 2003. Prior to the deposition, I told Varn that I had earned the entire $50,000 retainer and had incurred substantially more fees in representing Carr. I told Varn that I could do no further work on behalf of Carr unless Iron Mountain, S&W, or Carr agreed to pay my outstanding fees and agree to pay those that were reasonably foreseeable involving the upcoming arbitration. Indeed,

I told Varn that I could not and would not provide any further assistance to Carr without such an understanding. Varn asked for a copy of all of my bills and I provided them to him and he unambiguously told me that he would get them all paid. A few days later Varn called me to confirm my prior understanding of the agreement between the counter-defendants and Carr, i.e., that Iron Mountain would pay the current outstanding fees and all of the remainder of the fees I incurred on behalf of Carr. Carr and I knew that Carr could not afford to pay the fees and Varn's reiteration of his earlier agreement to pay my fees on behalf of Carr was instrumental to my continuing to provide services to Carr. Varn had one condition, which was that he did not want another large transaction between S&W and me until after the Pierce arbitration which was scheduled to be completed in July 2003. I informed Carr of this conversation and Carr agreed with me that I would continue to represent Carr since Varn had promised that my fees would be paid by Iron Mountain.

26. Varn also asked me to travel to Philadelphia where the arbitration was to convene. Varn reserved a hotel room at the Four Seasons hotel and I expected that Iron Mountain would be paying the bill. Upon arriving in Philadelphia I expected that my time would be spent primarily in preparing Carr for his envisioned testimony. However, Varn had other plans.

27. The first night I arrived Varn instructed me to work with an S&W associate, Beth Jacobson and, I believe, a paralegal from Morgan Lewis on reviewing documents relating to Carr's dealings with Pierce to be used in the arbitration. The next day I continued to review the documents in the office of Morgan Lewis in the presence of Plaintiff Charlie Moore.

28. Carr's testimony that Iron Mountain, Inc. had fulfilled all of its promises is, in my view, correct. Varn had promised to pay all of my fees after the arbitration leading one to reasonably expect that my fees would be paid and that Iron Mountain had satisfied its

obligations. Moreover, a careful reading of the question asks if Iron Mountain, Inc. – the only claimant in the arbitration - had fulfilled all of its promises in the arbitration. The question was narrowly phrased and did not encompass any other Iron Mountain affiliated companies that may have been used by Varn to make promises to Carr and Neebling. While a narrow reading of the question, Carr answered it correctly and truthfully, as Varn had instructed.

29. The arbitration was scheduled to end in July 2003 but did not. More days of testimony were scheduled for November and December. In August 2003, I again inquired of Varn about paying my bills but he asked me to wait until after the completion of testimony later that year. I agreed, albeit reluctantly, because of a telephone conversation with Gary Watzke in July wherein Watzke indicated to me that Richard Reese would meet with Carr and me after the arbitration to discus how Iron Mountain would fulfill all its obligations to Carr.

30. On February 10, 2004, Varn had apparently met with his client to review the result of the arbitration. Late in the evening, Varn called and said that he would have Iron Mountain pay my fees if I could convince Carr to allow Varn to review certain audiotapes that Carr possessed. Varn then said that if Carr would pay $10,000 that he would ensure that Iron Mountain paid the remainder of my fees. Neither of these conditions were part of the original agreement and I objected to Varn's efforts to try to modify the agreement he and Iron Mountain made with Carr.

31. Varn and Iron Mountain breached their agreement to pay my fees by paying only an additional $8,177.50 on April 5, 2004, and refusing to pay the full balance. Varn apparently prevailed upon Iron Mountain to pay the part of my outstanding balance relating to my work, at Varn's request, in connection with the arbitration.

32. After the April 5, 2004 payment, a balance of $17,500 remained on Carr's account. Despite the breach by Varn and Iron Mountain, Carr kept his obligation to me by paying off the

entire balance.  Therefore, I can testify that on multiple occasions Varn promised Carr directly,

and through me, that Iron Mountain would pay <u>all</u> of my fees incurred in representing Carr in

exchange for Carr's cooperation for helping Varn prepare Iron Mountain's cases against Pierce.

Because Varn and Iron Mountain breached their agreement Carr has been damaged by having to

pay nearly $17,500, or the remainder of my fees not paid for by Iron Mountain and Varn as they

had promised.


     I declare the forgoing to be true and correct under the penalty of perjury in accordance

with 18 U.S.C. § 1746.

 

_____September 27, 2005_____      _____

Date                                                      Arthur M. Peslak

- 10 -

# EXHIBIT 3



**Mandel & Peslak LLC**

Attorneys at Law
80 Scenic Drive  Suite 5  Freehold, New Jersey 07728
732-761-1610        fax: 732-761-1611
www.mandelpeslak.com

_Lawrence D. Mandel_
*NJ • NY • PA Bars*

_Arthur M. Peslak_
*NJ • NY Bars*

February 13, 2004

<u>VIA FEDERAL EXPRESS</u>
Richard Reese
Chairman and CEO
Iron Mountain
745 Atlantic Avenue, 7th Floor
Boston, Massachusetts 02111

Dear Mr. Reese:

I am quite disturbed by a recent message given to Jim Neebling by your counsel Mr. Varn and/or his hired investigator Charlie Moore. I understand that Mr. Neebling was told by Mr. Varn and/or Mr. Moore that I was somehow trying to "shake down" someone concerning the payment of my firm's invoices in connection with our representation of Mr. Carr.

The purpose of this letter is to provide you with the facts surrounding my conversations with Mr. Varn during the last year regarding the payment of my firm's fees. Given the recent turn of events, I feel certain that Mr. Varn has not provided you with an accurate picture of my communications with him.

After the initial retainer was fully earned by my firm, I relayed that fact to Mr. Varn and I asked him whether Iron Mountain would continue to fund my client's legal bills. I explained to Mr. Varn that if Iron Mountain was not going to do so, my firm needed to make other arrangements with Mr. Carr in order to continue representing him. If neither Iron Mountain nor Mr. Carr were going to pay our invoices, then it would have been necessary for us to terminate our relationship with Mr. Carr.

Prior to Mr. Carr's deposition in the Sequedex matter, Mr. Varn came to my office. I reiterated by request that he inform me of Iron Mountain's position concerning the payments of Mr. Carr's legal bills. I told Mr. Varn that I would not incur the fees in connection with defending Mr. Carr's deposition unless either Iron Mountain or Mr. Carr provided me with assurances that my bills would be paid. Mr. Varn then asked me for copies of the outstanding invoices and told me he would get them paid. Based on this representation by Mr. Varn, I proceeded to incur further fees in connection with Mr. Carr's deposition.

Richard Reese
February 13, 2004
Page Two

A week or so later, Mr. Varn called me. He told me that he would prefer that Iron Mountain not pay the invoices until after the Pierce arbitration was concluded. I indicated that I did not have a problem waiting until after the arbitration was concluded. Based on these conversations, I neither sought funds from Mr. Carr nor did I stop representing him.

I will also note that I spent two days in Philadelphia in July at Mr. Varn's request during the arbitration. Certainly, it strains credibility to think that I would spend two days away from my other client work as a favor to Mr. Varn.

As you know, the Pierce arbitration began in July and did not conclude at that time. After the July session, I again inquired of Mr. Varn about my firm's invoices. He again asked that I wait until after the November arbitration sessions concluded.

After the arbitration was concluded, Mr. Varn indicated to me that he would have more "flexibility" to have my bills paid. He also indicated that he would raise this matter with you personally prior to Thanksgiving but apparently failed to do so. "Flexibility" or not, our invoices have not been paid.

On Tuesday, February 10, 2004, I received a phone call from Mr. Varn at my house at about 9:00 p.m. I understand that he had met with you, Mr. Kenny and Mr. Watski that afternoon about the results of the Pierce arbitration. I will also note that this was not the first time Mr. Varn called my home after hours. He was slurring his speech and somewhat difficult to understand. However, he made several clear statements to me. First, he told me that I should pressure Mr. Carr to allow him to listen to a tape recording if I wanted Iron Mountain to pay my firm's bills. Second, if I could convince Mr. Carr to pay $10,000 to our firm, he would get Iron Mountain to pay the remainder of the bill. I don't know what your opinion is but from my point of view it is clear who is doing the "shaking down."

I am terribly appalled that this situation has come to this. I continued to represent Mr. Carr and incur fees based on numerous representations by Iron Mountain's agent, Mr. Varn that Iron Mountain would pay our firm's bills. Obviously I was mislead by Mr. Varn. If Mr. Varn had been truthful with me last year, we would not be in this position today. My firm is considering what action to take.

Richard Reese
February 13, 2004
Page Three

        Based on our meetings, I believe that you are an honorable man who lives up to the commitments you make.  I would ask that you reconsider the commitments you made to Mr. Carr and my firm so that this situation does not deteriorate irreparably.

Sincerely,

Arthur M. Peslak

AMP:lb
cc: Gary Watski, Esq. (via Federal Express)

**EXHIBIT 4**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; et al. ) ) ) | |
| Plaintiffs, ) ) ) | |
| v. ) | |
| THOMAS CARR, ) ) ) | |
| Defendant ) ) | |
| And ) ) | Civil Action No. |
| THOMAS CARR, ) ) | 05 10890 RCL |
| Counter-Plaintiff ) ) ) | |
| v. ) ) | |
| IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; AND CHARLES G. MOORE, ) ) ) ) ) ) ) ) | |
| Counter-Defendants ) ) | |

## AFFIDAVIT OF JAMES NEEBLING IN SUPPORT OF THOMAS CARR'S CONSOLIDATED REPLY TO IRON MOUNTAIN'S OPPOSITIONS TO CARR'S MOTIONS FOR DISQUALIFICATION AND TO STRIKE

I, James Neebling, do hereby swear and affirm under the penalties of perjury that I am over the age of eighteen years, that the following is based upon my personal knowledge, that I am competent to so testify, and that the following is both true and correct.

A.    During all times material hereto and currently, I was and continue to be President and CEO of Systrans Freight Systems, Inc.  I have reviewed Defendant's and Counter-Plaintiff's Second Amended Counterclaim and while I am unable to specifically recall the exact dates I do recall all of the events, including the locations and participants, set forth and described in numbered paragraphs 18, 20, 25, 29, and 32 and attest that the details of each are accurately and truthfully set forth therein.

B.    Prior to the commencement of the Iron Mountain/Pierce arbitration proceedings, Larry Varn and Arthur Peslak together attempted to prepare Thomas Carr and me for our depositions and arbitration testimony.  When discussing questions which we might anticipate that may inquire about promises made to Carr, Systrans or me in return for our cooperation in the Iron Mountain/Pierce litigation, Varn, in my presence, specifically told Carr that while he should tell the truth, he should be very careful not to implicate Iron Mountain in making any promises regarding Carr's cooperation or testimony, that he should listen to the questions very carefully and stated that, as a technicality, Iron Mountain's promises of consideration would actually be paid by Iron Mountain's parent corporation Schooner Capital, and so, if Carr were asked about promises made by Iron Mountain, he could safely respond in the negative.

Date: 9/27/05

James Neebling

# EXHIBIT 5

# In The Matter Of:

*Iron Mountain Incorporated  v.*
*J. Peter Pierce*

---

*Richard Reese*
*December 16, 2002*

*ROUGH DRAFT*

---

*Sullivan & Worcester LLP*
*One Post Office Square*
*Boston, MA  02109*
*(617) 338-2800    FAX: (617) 338-2880*

Original File REESE.TXT, 298 Pages
Min-U-Script® File ID: 1729881406

# Word Index included with this Min-U-Script®

Iron Mountain Incorporated v.
J. Peter Pierce

Case 1:05-cv-10890-EDS    Document 52-6    Filed 03/20/2006    Page 3 of 4
ROUGH DRAFT

Richard Reese
December 16, 2002

Page 1

[1]    AMERICAN ARBITRATION ASSOCIATION
[2]    NO. 4 160 00671 02
[3]
[4] IRON MOUNTAIN INCORPORATED,:
     a Pensylvania corporation, :
[5]    Claimant,                    :
     V.                            :
[6] J. PETER PIERCE,               :
       Respondent.                 :
[7]
[8]    December 16, 2002
[9]
[10]    ROUGH  DRAFT
[11]
[12]    Oral deposition of RICHARD REESE,
[13] held in the offices of Cozen O'Connor,
[14] The Atrium, 1900 Market Street,
[15] Philadelphia, Pennsylvania 19103,
[16] commencing at 10:38 a.m. on the above
[17] date, before Teresa M. Beaver, a
[18] Registered Professional Reporter and a
[19] Commissioner in the County of
[20] Philadelphia.
[21]
[22]    ESQUIRE DEPOSITION SERVICES
       1880 John F. Kennedy Boulevard
[23]        15th Floor
       Philadelphia, Pennsylvania 19103
[24]        (215) 988-9191

Page 2

[1] APPEARANCES:
[2]    SULLIVAN & WORCESTER LLP
       BY:  LARRY I. VARN, ESQUIRE
[3]    One Post Office Square
       Boston, Massachusetts 02109
[4]    (617) 338-2965
       Counsel for the Plaintiff
[5]
[6]    COZEN O'CONNOR
       BY:  PATRICK J. O'CONNOR, ESQUIRE
[7]        and
       MELANIE A. MILLER, ESQUIRE
[8]    1900 Market Street
       Philadelphia, Pennsylvania 19103
[9]    (215) 665-2714
       Counsel for the Defendant
[10]
[11]
[12]
[13] ALSO  PRESENT :
[14]    GARRY B. WATZKE
[15]    J. PETER PIERCE
[16]
[17]
[18]
[21]
[22]
[23]
[24]

Page 3

[1]
[2]                INDEX
[3] WITNESS              PAGE NO.
[4]  Richard Reese
[5]    By Mr. O'Connor        5
[6]
[7]
[8]
[9]        EXHIBITS
[10] NO.    DESCRIPTION    PAGE NO.
[11]
[12] R-1    Handwritten Notes   165
[13] R-2    Documents          261
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 4

[1]    DEPOSITION SUPPORT INDEX
[2]
[3]
[4] Direction to Witness Not to Answer
[5] Page Line        Page Line
[6] None
[7]
[8]
[9] Request For Production of Documents
[10] Page Line        Page Line
[11] None
[12]
[13]
[14] Stipulations
[15] Page Line        Page Line
[16]  5  2-8
[17]
[18]
[19] Questions Marked
[20] Page Line        Page Line
[21] None
[22]
[23]
[24]

Richard Reese    Case 1:05-cv-10890-FDS    Document 52-6    Filed 03/20/2006    Page 4 of 4
December 16, 2002      ROUGH DRAFT      Iron Mountain Incorporated   v.
J. Peter Pierce

**Page 253**

[1] Q: Did you ask anyone to
[2] determine whether the lawsuit filed by
[3] Mr. Carr against Mr. Pierce, which your
[4] organization funded to 50,000, was a
[5] valid one or not?
[6] A: I asked my attorney to
[7] investigate the whole — the whole
[8] situation and that would be part of that
[9] investigation.
[10] I did not ask him to give me
[11] an opinion that he had a strong case, a
[12] weak case, a valid case or whatever case.
[13] Q: Do you know if your attorney
[14] or anyone in his firm met with Mr. Carr
[15] or his attorney before the filing of the
[16] suit in connection with the suit filing?
[17] A: I don't know. Don't
[18] remember. Don't recall.
[19] Q: But if he did, you had no
[20] problem with that, I take it?
[21] A: I would have no problem.
[22] Q: And was this part of a plan
[23] that was devised at Iron Mountain to have
[24] lawsuits being filed against

**Page 254**

[1] Mr. Pierce in New Jersey?
[2] A: No.
[3] Q: It just happened? It was
[4] happenstance?
[5] A: We filed our suit
[6] independent of him. The reason we funded
[7] the suit is we felt it was in our best
[8] interest and we didn't fund his suit
[9] until after he filed it. It was in our
[10] best interest to see what he learned.
[11] Q: To do what?
[12] A: See what he learned in his
[13] suit.
[14] Q: The reason you funded the
[15] lawsuit was you had an agreement with
[16] Mr. Carr to tell you what he learned in
[17] his suit against Pierce so that you could
[18] use it in your suit?
[19] A: No, not necessarily. I
[20] don't — to my knowledge, I don't believe
[21] had an agreement that he would tell us
[22] anything but through public records and
[23] other things, information would come out.
[24] Q: Did you have any arrangement

**Page 255**

[1] at all with Mr. Carr in connection with
[2] your funding the 50,000?
[3] A: No.
[4] Q: It was just a gift?
[5] A: Yeah.
[6] Q: And he owed you nothing for
[7] that gift?
[8] A: Correct.
[9] Q: And there was no past
[10] reward, no reward for past services or no
[11] promise for the future?
[12] A: None.
[13] Q: Do you fund litigation
[14] routinely, that is not litigation brought
[15] by Iron Mountain?
[16] A: We don't routinely have this
[17] circumstance so the answer is no.
[18] Q: Are you certain that you
[19] told your board shortly after the funding
[20] occurred that not only did you fund it to
[21] the extent of 50,000, but that you funded
[22] it to a person who had been indicted?
[23] A: I'm certain I told them how
[24] much we funded. I am not certain when I

**Page 256**

[1] told them about a person being indicted
[2] but I'm certain they've learned it. They
[3] learned it.
[4] Q: Have any of the board
[5] members since you advised them of the
[6] funding of the litigation, by Carr,
[7] against Pierce, told you they disagreed
[8] with that strategy?
[9] A: No.
[10] Q: How did the circumstances of
[11] Carr's indictment come up during this
[12] dinner meeting?
[13] A: Our attorney told me, I
[14] believe the day before, or that day of
[15] it.
[16] Q: And your attorney learned of
[17] it in the course of litigation that Carr
[18] had with Pierce?
[19] A: I don't know how he learned
[20] it.
[21] Q: Okay. And when your
[22] attorney told you that, it was you then
[23] who confronted Carr with this indictment
[24] or did Carr bring it up without you

1

1       AMERICAN ARBITRATION ASSOCIATION

2         NO. 4 160 00671 02

3        -    -    -

4 IRON MOUNTAIN INCORPORATED,:

   a Pensylvania corporation, :

5          Claimant,     :

       V.            :

6 J. PETER PIERCE,        :

       Respondent.    :

7        -    -    -

8       December 17, 2002

9        -    -    -

10      Oral deposition of JOHN F. KENNY,

11 JR., held in the offices of Cozen

12 O'Connor, The Atrium, 1900 Market Street,

13 Philadelphia, Pennsylvania 19103,

14 commencing at 10:27 a.m. on the above

15 date, before Teresa M. Beaver, a

16 Registered Professional Reporter and a

17 Commissioner in the County of

18 Philadelphia.

19

20        -    -    -

21

22     ESQUIRE DEPOSITION SERVICES

     1880 John F. Kennedy Boulevard

23         15th Floor

    Philadelphia, Pennsylvania 19103

24       (215) 988-9191

2

1 A P P E A R A N C E S :
2     SULLIVAN & WORCESTER LLP
      BY:  LARRY I. VARN, ESQUIRE
3         and
          BETH LIMON, ESQUIRE (a.m. only)
4     One Post Office Square
      Boston, Massachusetts 02109
5     (617) 338-2965
      Counsel for the Plaintiff
6
7     COZEN O'CONNOR
      BY:  PATRICK J. O'CONNOR, ESQUIRE
8         and
          MELANIE A. MILLER, ESQUIRE
9     1900 Market Street
      Philadelphia, Pennsylvania 19103
10    (215) 665-2714
      Counsel for the Defendant
11
12
13    - - -
14 A L S O   P R E S E N T :
15    J. PETER PIERCE
16    - - -
17
18
19
20
21
22
23
24

4

1         DEPOSITION SUPPORT INDEX
2
3
4  Direction to Witness Not to Answer
5  Page Line          Page Line
6  None
7
8
9  Request For Production of Documents
10 Page Line          Page Line
11 None
12
13
14 Stipulations
15 Page Line          Page Line
16  5    2-8
17
18
19 Questions Marked
20 Page Line          Page Line
21 None
22
23
24

3

1         - - -
2         I N D E X
3  WITNESS                    PAGE NO.
4  John F. Kenny, Jr.
5     By Mr. O'Connor          6
6
7
8
9     - - -
10    E X H I B I T S
11 NO.      DESCRIPTION      PAGE NO.
12
13 R-3   Iron Mountain 1686 to 1689  166
14 R-4   Preliminary Budget      170
15 R-5   Iron Mountain 201-209   187
16    - - -
17
18
19
20
21
22
23
24

1         - - -
2         (It is hereby stipulated and
3  agreed by and between counsel that
4  sealing, filing and certification
5  are waived; and that all
6  objections, except as to the form
7  of questions, be reserved until
8  the time of trial.)
9
10        JOHN F. KENNY, JR., after
11 having been duly sworn, was
12 examined and testified as follows:
13        - - -
14        MR. VARN:  Before we do
15 anything else, something that you
16 raised yesterday provoked us to do
17 a little research last night.  In
18 Iron Mountain Answers to
19 Interrogatory Number 9, Mr. Kenny
20 can confirm this, this was a
21 scribner's error.  The informal
22 board meeting was on March 5, not
23 March 27th.
24        MR. O'CONNOR:  This was a

2  (Pages 2 to 5)

Kenny

134

1    Q.    Have you ever seen the
2 financials of Systran?
3    A.    I've not.
4    Q.    Do you know if they've
5 com -- if they compete with Iron
6 Mountain?
7    A.    I don't know.
8    Q.    Has Schooner Capital ever
9 funded, in any way, Mr. Carr or any of
10 his litigation needs?
11    A.    No.
12    Q.    How do you know that?
13    A.    Excuse me.  Not to my
14 knowledge.
15    Q.    Is the only payment of funds
16 to Mr. Carr or to his attorneys, of which
17 you are aware, the payment of the
18 $50,000?
19    A.    Yes, sir.
20    Q.    Do you know what the
21 arrangement is with respect to that
22 payment?  Do you know what the
23 arrangement was?  What was it for?
24    A.    It was to defray his legal

136

1    A.    The day after the dinner at
2 Giambelli's, Richard Reese discussed it
3 with me.
4    Q.    Were you at the Giambelli
5 dinner?
6    A.    I was.
7    Q.    And that occurred on --
8    A.    I want to say early April;
9 8th, 9th, 10th, something like that.
10    Q.    April 9th?
11    A.    That sounds about right.
12    Q.    Again, did you stay at the
13 Waldorf?
14    A.    I don't recall; but my
15 expense accounts would show.
16    Q.    And who set up the dinner on
17 April 9th?
18    A.    I don't recall.
19    Q.    Who paid for the dinner?
20    A.    I don't recall.
21    Q.    Was this the next time you
22 had seen Carr after the March 26th
23 meeting or had you seen him between the
24 26th of March and April 9th?

135

1 expenses.
2    Q.    Did you see any evidence of
3 what those legal expenses were?
4    A.    I did not.
5    Q.    Do you know whether at the
6 time that payment was made, he had legal
7 expenses of $50,000 or more?
8    A.    I do not.
9    Q.    Was there any support at any
10 time given to you or anyone at Iron
11 Mountain, which justified the payment of
12 that amount?
13    A.    None given to me.  I'm not
14 aware of any given to others at Iron
15 Mountain.
16    Q.    Was there a promise of
17 additional funds to be paid Carr or his
18 lawyers, either in his criminal defense
19 matter or in the civil matter instituted
20 against Pierce?
21    A.    Not to my knowledge.
22    Q.    How were you told of the
23 payment arrangement and the agreement to
24 pay 50,000?

137

1    A.    I believe April 9th was the
2 next meeting, subsequent to March 26th;
3 at which I had seen Tom Carr.
4    Q.    And who was at the dinner
5 meeting?
6    A.    Neebling, Carr, myself,
7 Larry Varn and Carr's attorney, Art
8 Peslak, I believe.
9        MR. VARN:  I'm sorry.  You
10    missed one.
11 BY MR. O'CONNOR:
12    Q.    You missed Reese.
13    A.    And Mr. Reese.  Sorry.
14    Q.    And at the time of that
15 meeting, Carr had filed his lawsuit;
16 correct?
17    A.    I believe so.
18    Q.    As a matter of fact, part of
19 the dinner meeting centered around a
20 hearing in which Mr. Carr and Mr. Peslak
21 were involved that very day with our law
22 firm; correct?
23    A.    I know there had been a
24 hearing.  I don't know if it was the same

35 (Pages 134 to 137)