# United States District Court
# District of Massachusetts

IRON MOUNTAIN INC., et al.
     Plaintiffs,

   V.                            CIVIL ACTION NO. 05-10890-RCL

THOMAS CARR,
     Defendant,

-------------------------------------------------------------------------------------------------------

THOMAS CARR,
     Counter-Plaintiff,

   V.

IRON MOUNTAIN INC., et al.
     Counter-Defendants.

## *MEMORANDUM AND ORDER ON DEFENDANT AND COUNTER-PLAINTIFF THOMAS CARR'S MOTION TO DISQUALIFY PLAINTIFFS' AND COUNTER-DEFENDANTS' COUNSEL (# 24)*

COLLINGS, U.S.M.J.

## I. INTRODUCTION

Plaintiffs Iron Mountain Incorporated ("Iron Mountain"), Iron Mountain Information Management, Inc. ("IMIM"), C. Richard Reese ("Reese"), John F. Kenny, Jr. ("Kenny"), Garry B. Watzke ("Watzke"), Larry L. Varn ("Varn") and Charles G. Moore ("Moore") (collectively, the "plaintiffs") have sued defendant Thomas Carr ("Carr" or the "defendant") for a declaratory judgment and injunctive relief.  Specifically, the plaintiffs are seeking a declaratory judgment that they have no agreements with, or other legal obligations to, Carr and an injunction against Carr to prevent him from prosecuting any actions against the plaintiffs. (*See generally* Complaint for Declaratory and Injunctive Relief #1) Carr filed an Answer to the Complaint and Counterclaims against the plaintiffs in which he lodged claims for breach of contract and fraudulent misrepresentation. (Answer, Affirmative Defenses and Counterclaims #3)

Carr also has moved to disqualify the plaintiffs' counsel, specifically Varn, a partner at Sullivan and Worcester ("S&W") (who is also a plaintiff himself), Samual A. Miller ("Miller"), an associate at S&W, and the law firm of S&W. (Defendant and Counter-Plaintiff Thomas Carr's Motion to Disqualify Plaintiffs'

and Counter-Defendants' Counsel (#24) Varn has not appeared as counsel of record in the instant case, but Miller has. Carr maintains that the attorneys' representation of the plaintiffs runs afoul of Rules 1.7, 1.9 and 3.7 of the Massachusetts Rules of Professional Conduct.

In response to Carr's motion to disqualify, the plaintiffs filed a Memorandum in Opposition to Motion to Disqualify Counsel (#29) and the supporting Affidavits of Charles G. Moore and Larry L. Varn. (## 30, 31) Carr then filed a Reply to Plaintiffs' Opposition to Carr's Motion to Disqualify (with exhibits) (#43). With the issues having been fully briefed by the parties, Carr's motion is now in a posture for resolution. For the reasons discussed below, Carr's motion to disqualify shall be denied.[1]

## II. FACTUAL BACKGROUND AND ADVENT OF THIS LAWSUIT

The facts as recounted in the complaint are fairly straightforward and easy to understand. However, the events leading up to this lawsuit took place over a number of years and what actually occurred during that period is hotly contested by the parties. For purposes of ruling on the instant motion, the Court will summarize the facts and include only those that are necessary for

---

[1] The District Judge to whom this case is assigned has referred the motion to disqualify to the undersigned for final decision pursuant to 28 U.S.C. § 636(b)(1)(A). (Order of Reference #41)

resolution of the disqualification issue.[2]

Toward the end of 2000, Iron Mountain and IMIM began an investigation (the "investigation") of the activities of an Iron Mountain director, one Peter Pierce ("Pierce"), who was also the former president of IMIM. (#1 ¶ 12)  Iron Mountain and IMIM had received information that Pierce was surreptitiously financing, supporting and providing advice to an Iron Mountain competitor in violation of certain restrictive covenants and fiduciary obligations to Iron Mountain and its stockholders. (#1 ¶ 12)    S&W and Varn represented Iron Mountain and IMIM in connection with the  investigation, and Moore, a private investigator, provided services to S&W in connection with the investigation. (#1 ¶ 12) S&W has represented Iron Mountain and its affiliates in a broad range of matters since the 1970's. (#29 at 2)

In the Fall of 2001, Carr contacted Watzke purporting to have information relevant to the investigation. (#1 ¶ 13)  Beginning in the Fall of 2001 and continuing into 2003, the plaintiffs had various communications and dealings with Carr regarding the information that Carr claimed he had which was relevant to the investigation. (#1 ¶ 14) During the course of the investigation,

---

[2] Oftentimes, the facts will be quoted verbatim from the parties' pleadings.

Iron Mountain and IMIM came to believe that Carr had significant credibility issues including the inability to corroborate certain statements and the propensity to embellish and exaggerate. (#1 ¶ 15)

In early 2001, Carr and Pierce entered into an agreement to form a transportation company known as Logisteq, LLC ("Logisteq") which succeeded to former businesses owned and operated by Carr. (#29 at 2)  Carr alleges that Pierce also formed a company known as Sequedex LLC ("Sequedex"), an IMIM competitor, to compete with Iron Mountain and "in so doing 'posted' significant costs...to operate Sequedex on the books of Logisteq." (#29 at 3)(quoting Carr's Second Amended Counterclaim #45 ¶ 6)

In March, 2002, Iron Mountain and IMIM filed a complaint against Pierce (the "Pierce litigation") alleging that Pierce, by aiding Sequedex, had violated his written covenants with Iron Mountain and his fiduciary obligations to Iron Mountain and its stockholders. (#29 at 3) Ultimately, the Pierce litigation wound up in arbitration and in February, 2004, the arbitrator denied any relief to Iron Mountain. (#29 at 4)

Carr maintains that throughout the course of the investigation a series of agreements and promises were made by the plaintiffs to him and to his friend, Jim Neebling ("Neebling"). (#25 at 2) According to Carr, the agreements all

pertained to the plaintiffs gaining Carr and Neebling's support of S&W's litigation efforts on behalf of Iron Mountain. (#25 at 2) Such agreements were apparently made by Varn and S&W without the knowledge or consent of Iron Mountain. (#25 at 2)  Miller was purportedly present at many of the meetings where the agreements were discussed.  (#25 at 11)  The plaintiffs contend, however, that Miller encountered Carr on only four occasions and Neebling on only one occasion, that the conversations between Miller and Carr were social in nature and that Miller did not witness any promises or agreements between any of the plaintiffs and Carr. (#29 at 4-5)

It is not disputed that at some point, S&W paid $50,000 directly to Carr's attorney, Art Peslak ("Peslak"); it is, however, unclear whether the $50,000 was to help defray Carr's legal bills, was a gift or was for some other purpose. (#25 at 2, 13; #43 at 4)  Carr claims that in addition to the $50,000, Varn and Iron Mountain paid Peslak $8,177.15 in April, 2004. (#43 at 4)

The plaintiffs strongly dispute Carr's claim that in Fall of 2003, Varn promised Carr: $2 million in exchange for his cooperation with Iron Mountain against Pierce regarding a covenant not to compete; to fund Carr's lawsuit against Pierce; $5 million to allow Carr to buy back Pierce's share of Logisteq; to hire Carr as a transportation consultation at wages equal to those paid by

Logisteq, plus full benefits; and, that the transportation company, Systrans, owned by Neebling, would receive nearly $50 million per year in courier business. (#3 ¶ 17; #25 at 4)

Carr also claims that Varn violated a confidentiality agreement the parties had in connection with the Pierce lawsuit by wrongfully providing Neebling confidential proprietary information produced by third parties to the Pierce litigation.[3] (#25 at 2) Carr maintains that S&W and Iron Mountain are at risk of being sued as a result of Varn's breach of the confidentiality agreement, and absent Varn's breach, Iron Mountain would not be facing this liability. (#25 at 3)

Carr further alleges that as early as March, 2002, Carr and Iron Mountain agreed to participate in an unwritten common interest agreement regarding their goal to defeat Pierce. (#43 at 2) Carr also maintains, through Peslak, that all counsel remain bound to maintain the confidences of their clients even though the common interest agreement was dissolved in early 2005. (#43 at 10)

---

[3] Specifically, Carr alleges that Varn provided Neebling (without having Neebling sign a non-disclosure agreement) with Sequedex's internal confidential documents regarding how much capital it had raised and that it was seeking more. (#25 at 7)

### III. ANALYSIS

The grounds of this motion lie in the purported conflict of having Varn, Miller and S&W act as counsel to the plaintiffs while at the same time potentially being witnesses in the lawsuit. Carr asserts that such a situation violates Rules 1.7, 1.9 and 3.7 of the Massachusetts Rules of Professional Conduct. Therefore, it is necessary first to set out specifically what those rules provide.

#### Rule 1.7    Conflict of Interest: General Rule

(a)    A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1)    the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2)    each client consents after consultation.

(b)    A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1)    the lawyer reasonably believes the representation will not be adversely affected; and

(2)    the client consents after consultation. When representation of multiple clients in a single matter is

8

undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved.

*Rule 1.9*

(a)     A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation

(b)     A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

    (1)     whose interests are materially adverse to that person; and

    (2)     about whom the lawyer had acquired information...that is material to the matter, unless the former client consults after consultation.

(c)     A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter, unless the former client consults after consultation;

    (1)     use confidential information relating to the representation to the disadvantage of the former client, to the lawyer's advantage, or to the advantage of a third person...; or

    (2)     reveal confidential information relating to the

representation....

*Rule 3.7     Lawyer as Witness*

    (a)    A lawyer shall not act as advocate at trial in which the lawyer is likely to be a necessary witness except where:

        (1)    the testimony relates to an uncontested issue;

        (2)    the testimony relates to the nature and value of legal services rendered in the case; or

        (3)    disqualification of the lawyer would work a substantial hardship on the client.

    (b)    A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

In simplest terms, Carr's argument is that: Varn, a plaintiff but not counsel of record in this matter, may not advise Iron Mountain because he has a "direct and conflicting interest" to that of his co-counter-defendants (#25 at 3, 7); that Varn will be a "significant and material witness on contested issues" (#25 at 4); that Varn may be subject to "claims for indemnity and contribution to the extent that liability for any agreements entered into by him is imputed to other counter-defendants" (#25 at 10-11); that Miller who is counsel of record in this case will be "a material witness" because he was "deeply involved in the

10

underlying Pierce action" (#25 at 11-12); that Miller's "prior representation of Iron Mountain absolutely bars him from representing…any of the other counter-defendants who may have claims against Iron Mountain, or…S&W" (#25 at 14); that S&W must expect "to be called as a material witness at trial precluding the firm–in its entirety–from acting as counsel to any of the plaintiffs" (#25 at 16); and, that S&W must also be disqualified because Varn and Miller's disqualification should be imputed to the whole firm. (#25 at 18)

The plaintiffs counter that "Carr has failed to demonstrate that Varn is an advocate under the advocate-witness rule, or that Miller is a necessary witness" and "has also failed to demonstrate that there is any conflict, impermissible or otherwise, between the Plaintiffs and Counsel." (#29 at 1, 7) Moreover, say the plaintiffs, they are not "aware of any facts indicating the likelihood of any conflict between Varn's anticipated testimony in this matter and that of Iron Mountain or any of the other plaintiffs." (#29 at 7) Finally, the plaintiffs explain that disqualification is unwarranted because they are willing to waive any potential conflict. (#29 at 7)

## A.  The Massachusetts Rules of Professional Conduct

The decision on the instant motion is controlled by the Massachusetts Rules of Professional Conduct which the District of Massachusetts has adopted

per Local Rule 83.6(4)(B) (incorporating by reference "those canons and rules adopted by the Supreme Judicial Court of Massachusetts, embodied in Rules 3:05, 3:07 and 3:08 of said court, ...). As mentioned above, Carr contends that there are three separate rules pursuant to which Varn, Miller and S&W should be disqualified.

### B. <u>The Suspicion Associated with Motions to Disqualify</u>

The SJC has emphasized that "'[d]isqualification, as a prophylactic device for protecting the attorney-client relationship, is a drastic measure which courts should hesitate to impose except when absolutely necessary.'" *Adoption of Erica*, 426 Mass. 55, 58, 686 N.E.2d 967, 970 (Mass., 1997) (quoting *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 721 (7th Cir. 1982)). That court has also warned of the misuse of such motions by parties seeking to harass their opposition. *See Adoption of Erica*, 426 Mass. at 64, 686 N.E.2d at 974 ("We have noted our concern about the high cost to litigants and to the court system occasioned by motions to disqualify attorneys, especially when such motions are used as harassment and dilatory tactics."). Thus, it is clear that disqualification should be allowed only when "absolutely necessary."

### C. <u>Rule 1.7</u>

The gist of Carr's Rule 1.7 argument is that Varn cannot act as an attorney in the instant case because his representation would be materially limited by his own interests. (#25 at 6)   In other words, according to Carr, there is an impermissible conflict of interest between Varn's interests and those of his clients.  As Comment 6 to Rule 1.7 explains, "[i]f the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice."  Carr obviously believes that due to Varn's heavy involvement in the circumstances leading up to this litigation he could not properly advise his clients–the other plaintiffs.

The plaintiffs respond that, "[a]fter consultation with S&W and Watzke...the plaintiffs are not aware of any facts indicating the likelihood of any conflict between Varn's anticipated testimony in this matter and that of Iron Mountain or any of the other plaintiffs" and that "the hypothetical conflict...is, in the Plaintiffs' view, so remote and removed from reality that Iron Mountain is willing to waive it and thus consent to the continued representation by S&W...." (#29 at 7); *see also* #29 at 17 ("any potential conflict has been discussed and waived."); Affidavit of Garry B. Watzke ("Watzke Aff.") ¶ 38 (the conflict is "so remote and removed from reality that Iron Mountain, Reese,

Kenny, and myself [Watzke on behalf of himself and IMIM] are willing to waive it and consent to the continued representation by S&W....").

In short, all of the plaintiffs, except Varn himself, of course, and Moore have consented after consultation to waive the conflict and to representation by Varn and S&W. However, it is not entirely clear that Watzke can waive the conflict on behalf of Reese and Kenny even though both men are officers of Iron Mountain and IMIM. The Court, for purposes of ruling on the disqualification motion, shall assume that Reese and Kenny waive the conflict, as stated in Watzke's affidavit. Nevertheless, Reese and Kenny should submit to the Court their own affidavits setting forth that they have consulted with counsel and that they too agree to waive any conflict.[4]

Carr's position, however, is that the "unique fact pattern of this case" precludes any of the plaintiffs "from being permitted to waive these conflicts." (#25 at 6) Carr relies on several cases to support his contention, but those cases do not lend much credence to his argument. For example, in *Winter Gardens Condominium Trust v. Winter Gardens Dev't Corp.*, 2005 WL 1132635 (Mass.

---

[4]

Moore need not submit an affidavit agreeing to waive the conflict unless the plaintiffs deem it necessary. The representation of Moore by Varn, Miller and S&W is not a basis for the disqualification motion.

Super., April 14, 2005), the court disqualified plaintiff's attorney ("O'Connor")
pursuant to Rules 1.7 and  3.7 on the grounds that O'Connor would be a
"necessary witness at trial because he appears to be one of the few, if not the
only [condominium] unit owner...who installed a disposal system, a fact that
the defendants argue is central to the case, and whose relevance and weight is
highly contested by the plaintiffs." 2005 WL 1132635 at *2.  The *Winter
Gardens* court found that language in the condominium trust document created
"the situation where...O'Connor may be personally liable, and may act to shield
himself from personal liability in his capacity as a trustee...which may cause him
to act counter to his duty of loyalty to the plaintiff." 2005 WL 1132635 at *3.

    The differences between the *Winter Garden* case and the instant case are
striking.  First, in the former case, there was a specific document at issue in the
case subjecting the attorney to personal liability and second, in that case, the
plaintiff had not demonstrated that he had "consented to the conflict after
consultation...." 2005 WL 1132635 at *4.  In the case at bar, the plaintiffs have
specifically consented after consultation to waive the conflict, and there is
nothing more than Carr's conclusory allegations that Varn could be subject to

15

indemnity claims from the other plaintiffs.

Similarly, the other cases cited by Carr explain that there must be a substantial showing that a lawyer who may also be a witness has a conflict of interest, that the lawyer's testimony will be highly prejudicial to his clients or that the lawyer will be unable to offer detached advice. *See, e.g., Lange v. Orleans Levee Dist.*, 1997 WL 668216, * 4 (E.D. La., Oct. 23, 1997)(quoting Model Rule of Professional Conduct Rule 1.7 cmt.[comment number missing] (1983))("there is a *substantial likelihood* not only that [counsel's] testimony will be prejudicial to plaintiffs, but also that because [counsel's] own conduct and motivation is at issue in this action, 'it may be difficult or impossible for the lawyer to give [his] client detached advice.'")(emphasis added); *Inverness Med. Switzerland GMBH v. Acon Labs., Inc.*, 2005 WL 1491233, *8 (D. Mass., 2005)("Generally, Massachusetts courts focus on whether a *substantial conflict* between the lawyer's and client's testimony could emerge.")(emphasis added)(citation omitted).

In *Inverness*, the court ultimately held that the lawyer should not be disqualified because there was "insufficient evidence that [the lawyer's] testimony...would be in substantial conflict with that of witnesses for" the

plaintiff. 2005 WL 1491233 at *12. Likewise, in the case at bar, Carr simply has not made a substantial showing that Varn is motivated by his own interests such that he could not offer detached advice to the other plaintiffs or that Varn's testimony will conflict with that of the other plaintiffs. Carr's allegations are basically unsupported. For example, he asks that the Court disregard any waiver by the plaintiffs on the grounds that he has made "allegations that Varn and S&W made representations regarding agreements that likely subject Iron Mountain to significant financial liability...." (#25 at 8) The Court cannot require disqualification of counsel, a drastic measure, based on the fact that Carr has offered some unsubstantiated allegations.

Thus, given that Varn has represented that he "reasonably believes the representation will not be adversely affected", that the plaintiffs have consented to waiver of the conflict after consultation with counsel, and that Carr has not made a substantial showing that Varn has an impermissible conflict of interest, Rule 1.7 does not bar Varn from acting as counsel to the other plaintiffs in this case. As one court aptly stated, "[s]ince the court cannot conclude that a disinterested lawyer would counsel [plaintiff] not to agree to the representation, the court is inclined to honor [plaintiff's] clear waiver of the conflict of interest." *Horizon Federal Sav. Bank v. Selden Fox & Associates*, 1987 WL 13569, *5 (N.D.

17

Ill., July 1, 1987)(footnote omitted).  Similarly, the Court here is inclined to

honor the plaintiffs' waiver.  Thus, this Court shall not allow the motion to

disqualify pursuant to Rule 1.7.

### D.  Rule 1.9

Carr's argument pursuant to Rule 1.9 is that Miller and Varn both

represented Iron Mountain "in the underlying action against Pierce and [were]

certainly privy to confidential communications and information provided by

Iron Mountain for use in its case" and that there is "simply no manner in which

Miller can purport to represent any of the counter-defendants, who likely have

indemnity and contribution claims against one another...." (#25 at 14) Further,

Carr contends that during the pendency of the case against Pierce, Carr and Iron

Mountain, through their respective counsel, entered into an unwritten common

interest agreement pursuant to which they shared confidential information. *See*

Declaration of Arthur M. Peslak ("Peslak Decl.") ¶ 13, attached as Exh. 2 to #43

("I also provided Varn with confidential and privileged documents and work

product that I would not have produced to any other person were it not for our

joint prosecution agreement, which presumed the maintaining of confidences

of our respective clients.") It is Carr's position that "Varn has violated his

18

obligation to maintain these confidences [provided to him pursuant to the purported common interest agreement] by using some of those statements" in connection with the instant lawsuit. (#43 at 8)

Carr's Rule 1.9 argument, thus, while somewhat attenuated, appears to be that as a result of the common interest agreement, Varn served as Carr's "attorney" and may not now use information he gained while serving as Carr's "counsel" against Carr.[5] Clearly, this is not a situation in which Carr is technically a former client of Varn's since Carr was never actually Varn's client. The question is, thus, whether by virtue of the common interest agreement, Carr should be considered a former client for purposes of Rule 1.9. The substantial relationship test of Rule 1.9 has been explained as follows:

> Under the "substantial relationship" test, a subsequent representation is proscribed "on the sole ground that the later suit, simply because of its substantial relation to the former one, exposes the attorney to an intolerably strong temptation to breach his duty of confidentiality to the former client. The [former] client need never prove that the attorney *actually* misused the confidences to the client's disadvantage. Instead he must prove only the existence of the tempting *situation* by showing (1) that an attorney-client relationship

---

[5]    Carr raised this common interest argument for the first time in his reply brief (#43). Consequently, the Court afforded the plaintiffs an opportunity to respond to such an argument by filing a surreply brief. (*See* Plaintiffs' Surreply to Defendant's Motion to Disqualify Counsel #48).

> existed in the former legal representation, and (2) that
> the former and current representations are both
> adverse and substantially related.

*Bays v. Theran*, 418 Mass. 685, 691, 639 N.E.2d 720, 724 (Mass., 1994) (quoting Note, Developments in the Law: Conflicts of Interest in the Legal Profession, 94 Harv.L.Rev. 1244, 1318 (1981)) (emphasis in original).

Based on the test set forth above, the first issue that must be resolved is whether an attorney-client relationship existed between Varn and Carr. Not surprisingly, the plaintiffs contend that there was no attorney-client relationship between Varn and Carr and that if there ever was such a so-called "common interest" relationship, it has since been terminated. Specifically, the plaintiffs argue that "Varn, Miller and S&W have never represented Carr" and that any such common interest "privilege came to an end upon commencement of litigation between...Carr and the Plaintiffs." (#48 at 5, 10)[6]

Carr himself concedes that "Carr did not technically retain Varn to serve as Carr's lawyer...." (#43 at 9) Thus, there can be little dispute that there was never any formal attorney-client relationship between Varn and Carr. Such a

_____

[6]

Notably, even Peslak admits that any common interest relationship ended in 2005. (*See* Peslak Dec. ¶ 21 ("The common interest privilege in my view continued through the 2003-2004 arbitration and did not cease until early 2005 when it became obvious that Carr and Iron Mountain, Inc. were at odds over Iron Mountain's promises.") Thus, it is clear that the common interest agreement is not even in effect anymore. Nevertheless, the Court shall analyze the situation to determine whether the prior existence of such an agreement requires disqualification of Varn.

conclusion does not, however, end the inquiry. The issue that now needs to be determined is whether the existence of the common interest agreement means that Rule 1.9 applies to the situation and requires disqualification of Varn. The answer is a resounding "no."

The reason is that the common interest privilege "does not apply in subsequent litigation between the joint clients....in that sort of situation, one client's interests in the privilege is counterbalanced by the other's interest in being able to waive it." *In re Grand Jury Subpoena*, 274 F.3d 563, 573 (1 Cir., 2001)(internal citation omitted); *see also F.D.I.C. v. Ogden Corp.*, 202 F.3d 454, 461 (1 Cir., 2000)("when a lawyer represents multiple clients having a common interest, communications between the lawyer and any one (or more) of the clients are privileged as to outsiders but not *inter sese.*")(emphasis in original)(citation omitted); 1 Kenneth S. Broun et al., *McCormick on Evidence* § 91 at 336 (4th ed., 1992)(quoted in *Ogden*, 202 F.3d at 461)("it will often happen that the two original clients will fall out between themselves and become engaged in a controversy in which the communications at their joint consultation with the lawyer may be vitally material. In such a controversy it is clear that the [common interest] privilege is inapplicable.").

Thus, it is obvious here that the common interest privilege does not apply. Carr and Iron Mountain and Varn (along with the other plaintiffs) are clearly adverse and information that may have been turned over in furtherance of a common interest is no longer privileged since Carr and Iron Mountain are now in litigation. In short, any common interest agreement that may have once existed does not apply to the instant case and is not a basis for disqualifying Varn under Rule 1.9.

Because the Court has determined that there was no attorney-client relationship between Varn and Carr, there is no need to move on to the second prong of the "substantial relationship" test – deciding whether the former and current representations are both adverse and substantially related.[7] In short, Carr has not made a showing that Rule 1.9 provides a ground for disqualifying Varn and S&W because he has not proven the existence of a prior attorney-client relationship between himself and Varn such that the substantial relationship test is satisfied. Carr's argument that there was a common interest

---

[7]

For a thorough analysis of the "substantially related" test, *see* this Court's opinion in *ebix.com, Inc. v. McCracken*, 312 F. Supp.2d 82 (D. Mass., 2004). The Court notes, without deciding, that while the parties are clearly adverse, it is quite possible that the two matters at issue in the instant case are not substantially related. In the first matter, Iron Mountain and Carr were both pursuing Pierce regarding competition issues and in the instant matter, the plaintiffs are seeking a declaration that they do not have any monetary or other obligations to Carr arising out of his purported assistance to the plaintiffs in the first matter.

agreement in effect does not change this outcome.

### E. Rule 3.7

Carr asserts that having Miller act as counsel to the plaintiffs violates Rule 3.7 because Miller "is likely to be a necessary witness" given his heavy involvement in the meetings where the various promises were made by Varn to Carr. (#25 at 11-14)  The plaintiffs counter, on the other hand, that Miller is certainly not a necessary witness and that any evidence he could provide would be "entirely duplicative and largely irrelevant to this action." (#29 at 13) The plaintiffs also posit that if Miller has to testify at all (which he may not), the substance of Miller's testimony will not contradict the plaintiffs' expected testimony, and thus, disqualification is precluded. (#29 at 13)

"The party moving for disqualification of a lawyer under Rule 3.7 has the burden of showing that the lawyer 'is likely to be a necessary witness' by demonstrating that the lawyer's testimony is relevant to disputed, material questions of fact and that there is no other evidence available to prove those facts." *Clough v. Richelo*, 274 Ga. App. 129, 132, 616 S.E.2d 888, 891 (Ga. App., 2005) (interpreting Georgia Rule 3.7(a) which is identical to Massachusetts Rule 3.7) (citations omitted).  In *Clough*, the court explained that there was an

insufficient basis automatically to disqualify appellant's counsel because appellee's "claim that he needs [appellant's counsel's] testimony to support his defense is based upon his mere speculation as to what that testimony might entail...." and "[f]urther, until [appellee] deposes [appellant's counsel], [appellee] is unable to show that there is any disputed material fact that can only be proved with [appellant's counsel's] testimony." *Clough*, 274 Ga. App. at 135-36, 616 S.E.2d at 894.

Additionally, in *Inverness Medical,* a case relied upon by Carr, the court denied defendant's motion to disqualify plaintiff's counsel on the grounds that there was "insufficient evidence that [plaintiff's counsel's] testimony...would be in substantial conflict with that of witnesses for" the plaintiff.  2005 WL 1491233 at *12; *see also Bank v. Thermo Jarrell Ash Corp.*, 2002 WL 31188441, *1 (Mass. Super., Aug. 9, 2002) (noting that the Rule 3.7 issue "is not solved...by electing not to call the attorney as a witness, if the client is thereby deprived of evidence that cannot be presented by some other means"); *LeaseAmerica Corp. v. Stewart*, 19 Kan. App.2d 740, 753, 876 P.2d 184, 193 (Kan. App., 1994) (reversing trial court's order disqualifying defendant's counsel because plaintiff failed to show that attorney's "testimony is necessary, that it would be

material to the issues to be resolved, that the evidence could not be obtained elsewhere, or that it would be potentially prejudicial to" the client).

In the case at bar, Carr has not satisfied the heavy burden of demonstrating that Miller should be disqualified under Rule 3.7. Not surprisingly, Carr asserts that Miller will testify that he observed many promises being made by Varn to Carr–a position that supports Carr's version of the facts and a position that obviously would be adverse to that of Iron Mountain and the other plaintiffs. However, Carr offers little to support his contention other than conclusory allegations that Miller is a "necessary witness" because he will, of course, testify that Varn made many promises to Carr.

It is well-established that "[m]ere speculation is not a sufficient basis to disqualify an attorney." *LeaseAmerica*, 19 Kan. App.2d at 753, 876 P.2d at 193. And Carr's allegations about Miller, at this point, appear to be little more than speculative. *See, e.g.,* #25 at 12 ("it is *reasonably expected* that [certain correspondence] will demonstrate Miller's detailed knowledge of the role S&W and Iron Mountain asked Carr and Neebling to play"); #25 at 13 ("*Assuming* Miller testifies that Varn entered the agreement on behalf of Iron Mountain then Miller's testimony would be injurious to his current client Iron

Mountain) (emphasis supplied).

Moreover, Carr has not shown that the testimony that will be elicited from Miller is any different than the testimony of the other plaintiffs. Indeed, to the contrary, the plaintiffs insist that Miller's testimony will be entirely consistent with the testimony of the other plaintiffs. To the extent that Carr himself plans to call Miller as a witness, there are other witnesses who purportedly can offer the same testimony–i.e., Carr himself and Neebling.[8] Thus, Carr has not demonstrated that Miller will offer crucial evidence that cannot be obtained from other sources.[9] That is, Carr has not sustained his burden of proving that Miller is a "necessary witness" under Rule 3.7. *Compare Verizon Yellow Pages Co. v. Sims & Sims, P.C.*, 2003 WL 836087, *3-4 (Mass. Super., Feb. 24, 2003) (holding that defendant's counsel should be disqualified under Rule 3.7 because plaintiff "established a fundamental basis for disqualification" by

---

[8]

Understandably, in a case which is basically a situation of "he said, he said" (i.e., a case that may well hinge on credibility determinations), Carr might benefit from having a witness besides himself and Neebling testify to his version of events. However, Carr simply has not demonstrated that Miller will testify the way that Carr believes he will and has not shown that Miller's testimony will be adverse to that of Miller's clients. Thus, Miller should not be disqualified under Rule 3.7.

[9]

However, the plaintiffs' argument in the instant case that since it is Carr, not the plaintiffs themselves, who will be calling Miller as a witness, there is no basis for disqualifying Miller is unavailing. *See Winter Gardens,* 2005 WL 1132635 at * 3 n. 3 (Mass. Rule 3.7 "has no limiting language regarding *which side* in the litigation deems the advocate as 'necessary' or intends to call him as a witness for purposes of analyzing whether the disqualification is warranted.") (emphasis in original).

26

proving that counsel was a "necessary witness."). In sum, there is no basis

pursuant to Rule 3.7 for disqualifying Miller and no basis pursuant to any of the

other professional responsibility rules for disqualifying Varn or S&W.[10]

---

[10]

    Because the Court has decided that Varn and Miller should not be disqualified, there is no reason to address Carr's argument that S&W also should be disqualified because the conflicts are imputed to the firm.

## IV.  CONCLUSION

For the aforementioned reasons, it is ORDERED that Defendant and Counter-Plaintiff Thomas Carr's Motion to Disqualify Plaintiffs' and Counter-Defendants' Counsel (#24) be, and the same hereby is, DENIED.[11]  The file is herewith RETURNED to the District Judge for further proceedings.

/s/ Robert B. Collings
ROBERT B. COLLINGS
United States Magistrate Judge

March 23, 2006.

---

[11]

This ruling is contingent upon Reese and Kenny filing and serving the affidavits re: waiver referred to on pages 14-15, *supra, on or before the close of business on Monday, April 24, 2006.*

28