UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IRON MOUNTAIN INCORPORATED; ) | | |
| IRON MOUNTAIN INFORMATION ) | | |
| MANAGEMENT, INC.; C. RICHARD ) | | |
| REESE; JOHN F. KENNY, JR.; GARRY ) | | |
| B. WATZKE; LARRY L. VARN; and ) | Civil Action | |
| CHARLES G. MOORE, ) | No. 05 10890 RCL | |

```
                                   )
IRON MOUNTAIN INCORPORATED;        )
IRON MOUNTAIN INFORMATION          )
MANAGEMENT, INC.; C. RICHARD       )
REESE; JOHN F. KENNY, JR.; GARRY   )
B. WATZKE; LARRY L. VARN; and      )        Civil Action
CHARLES G. MOORE,                  )        No. 05 10890 RCL
                                   )
              Plaintiffs,          )
                                   )
       v.                          )
                                   )
THOMAS CARR,                       )
                                   )
              Defendants.          )
                                   )
IRON MOUNTAIN INFORMATION          )
MANAGEMENT, INC.,                  )
                                   )
              Plaintiff,           )
                                   )
       v.                          )        Civil Action No.
                                   )        05 10999 RCL
SYSTRANS FREIGHT SYSTEMS, INC.,    )
                                   )
              Defendant.           )
                                   )
```

**DECLARATION OF IRA K. GROSS**

IRA K. GROSS, hereby declares under penalty of perjury as follows:

1.      I am a member of the Boston, Massachusetts law firm of Sullivan & Worcester LLP, counsel for the Plaintiffs and Counterclaim-Defendants in this case.  I make this declaration from facts within my personal knowledge and I believe all matters set forth herein to be true.

2.      Annexed hereto as Exhibit A is a true and correct copy of Plaintiffs' Complaint for Declaratory and Injunctive Relief.

3.      Annexed hereto as Exhibit B is a true and correct copy of Defendant's and Counter-Plaintiff's Second Amended Counterclaim.

4.      Annexed hereto as Exhibit C are relevant pages and exhibits from the Deposition of Thomas Carr, taken February 27, 2007 and March 15, 2007.

5.      Annexed hereto as Exhibit D are relevant pages and exhibits from the Deposition of Arthur Peslak, Esq., taken March 14, 2007.

6.      Annexed hereto as Exhibit E is a true and correct copy of Defendant and Counter-Plaintiff Thomas Carr's Fourth Amended Initial Disclosures.

7.      Annexed hereto as Exhibit F are relevant pages from the Deposition of C. Richard Reese, taken November 30, 2006.

8.      Annexed hereto as Exhibit G are relevant pages and exhibits from the Deposition of James Neebling, taken February 27, 2007 and March 14, 2007.

9.      Annexed hereto as Exhibit H is a true and correct copy of the Report and Recommendation of Magistrate Judge Collings, dated March 13, 2006.

10.      Annexed hereto as Exhibit I are true and correct copies of Defendant's Supplemental Responses and Verified Second Supplemental Responses to Plaintiffs' First Set of Interrogatories.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 21, 2007.

/s/ Ira K. Gross

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 21, 2007.

/s/ Kevin M. Colmey

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED;<br>IRON MOUNTAIN INFORMATION<br>MANAGEMENT, INC.; C. RICHARD<br>REESE; JOHN F. KENNY, JR.; GARRY<br>B. WATZKE; LARRY L. VARN; and<br>CHARLES G. MOORE,<br><br>    Plaintiffs,<br><br>  v.<br><br>THOMAS CARR,<br><br>    Defendants. | **05  10890 RCL**<br>Civil Action No.<br>RECEIPT # 63913<br>AMOUNT $ 250.00<br>SUMMONS ISSUED___1___<br>LOCAL RULE 4.1___✓___<br>WAIVER FORM ___✓___<br>MCF ISSUED___✓___<br>BY DPTY. CLK.___✓___<br>DATE___5/3/05___<br>MAGISTRATE JUDGE___RCL___ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Iron Mountain Incorporated ("Iron Mountain"), Iron Mountain Information

Management, Inc. ("IMIM"), C. Richard Reese ("Reese"), John F. Kenny, Jr. ("Kenny"),

Garry B. Watzke ("Watzke"), Larry L. Varn ("Varn"), and Charles G. Moore ("Moore" and

collectively with the foregoing persons and entities, the "Plaintiffs"), by their attorneys, Sullivan

& Worcester LLP, as and for their complaint for declaratory and injunctive relief against

defendant Thomas Carr ("Carr"), allege as follows:

Statement of Action

1.   This is an action for a declaratory judgment and injunctive relief. Carr claims,

falsely, that certain of the Plaintiffs made promises to or entered into one or more agreements

with him and that those promises or agreements have not been fulfilled. Plaintiffs deny the

existence of any unperformed promises to, or agreements with, Carr and therefore are entitled to

a binding declaratory judgment and order that they have no agreements with or other legal

obligations to Carr and to a preliminary and permanent injunction against Carr and anyone acting in concert with him from instituting or prosecuting any actions or otherwise continuing to pursue such false claims.

<div align="center">Parties</div>

2.      Iron Mountain (NYSE: IRM) is a Pennsylvania corporation with a principal place of business located at 745 Atlantic Avenue, Boston, Massachusetts. Iron Mountain is the global leader for outsourced records and information management services ("RIMS").

3.      IMIM is a Delaware corporation with a principal place of business located at 1000 Campus Drive, Collegeville, Pennsylvania. IMIM is a wholly-owned subsidiary of Iron Mountain.

4.      Reese is an individual who resides in Boston, Massachusetts. Reese is now, and was at all times material to the matters alleged herein, the Chairman of the Board of Directors and Chief Executive Officer of Iron Mountain and Chief Executive Officer of IMIM.

5.      Kenny is an individual who resides in Hingham, Massachusetts. Kenny is now, and was at all times material to the matters alleged herein, an Executive Vice President and the Chief Financial Officer of Iron Mountain and IMIM.

6.      Watzke is an individual who resides in Marblehead, Massachusetts. Watzke is now, and was at all times material to the matters alleged herein, a Vice President and the General Counsel of Iron Mountain and IMIM.

7.      Varn is an individual who resides in Watertown, Massachusetts. Varn is now, and was at all times material to the matters alleged herein, a partner of Sullivan & Worcester LLP ("S&W"), which regularly represents Iron Mountain and IMIM.

8.      Moore is an individual who resides in Plymouth, Massachusetts. Moore is the principal of C.G.M. Private Detective Group, and was engaged by Varn and S&W, in their

<div align="center">- 2 -</div>

capacity as counsel to Iron Mountain and IMIM, to provide investigatory services regarding various matters referred to herein.

9.     Carr is an individual who, upon information and belief, resides at 152 Chestnut Way, Manalapan, New Jersey.

<u>Jurisdiction and Venue</u>

10.     This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) in that the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the dispute occurred in this judicial district.

<u>Background</u>

12.     Beginning in the fourth quarter of 2000, Iron Mountain and IMIM commenced an investigation of the alleged activities of an Iron Mountain director who was the former president of IMIM and a new competitor in the RIMS industry.  At that time, Iron Mountain and IMIM had received credible information that the Iron Mountain director, directly and through certain of his associates, was surreptitiously financing, supporting, and providing advice to a competitor in violation of certain restrictive covenants and his fiduciary obligations to Iron Mountain and its stockholders. S&W and Varn represented Iron Mountain and IMIM in connection with this investigation, and Moore provided investigatory services to S&W, in connection with this investigation. The investigation culminated in a series of actions.

13.     In the fall of 2001, during the course of Iron Mountain and IMIM's investigation, Carr contacted Watzke purporting to have information relevant to the investigation.

- 3 -

14.     Beginning in the fall of 2001 and spanning through 2002 and 2003, the Plaintiffs had various communications and dealings with Carr regarding the information that Carr claimed to be relevant to Iron Mountain's and IMIM's investigation.

15.     As Iron Mountain and IMIM continued their investigation, they discovered significant credibility issues with respect to Carr including, but not limited to, his inability to corroborate certain statements and his propensity to embellish and exaggerate certain confirmed facts.

16.     Carr, personally and through his recently-retained counsel, has claimed that during the course of the communications and dealings between Plaintiffs and Carr, one or more of the Plaintiffs made promises to or entered into agreements with Carr. Carr claims that many of these communications occurred in Massachusetts or by way of interstate communications wherein one or more of the participants was in Massachusetts.

17.     For example, Carr claims that there was a March 26, 2002 meeting at Iron Mountain's corporate headquarters at 745 Atlantic Avenue, Boston, Massachusetts, among Carr, Kenny, Reese, Watzke, and other individuals not named in this complaint. Carr claims that during this March 26, 2002 meeting Iron Mountain promised "to hire Carr as transportation consultant and to provide $25 Million in courier business to Carr" and another individual.

18.     Carr also claims that on April 2, 2002, he participated in a telephone conference with his attorney and Watzke, whose office is located at Iron Mountain's corporate headquarters in Boston. Carr claims that "Watzke promised that [Iron Mountain] would pay for Carr's attorneys fees in his suit against [Carr's former partner] and [Iron Mountain] would give Carr employment."

- 4 -

19.    Carr further claims that on April 2, 2002, his attorney participated in a telephone conference with Watzke and that "Watzke told [Carr's attorney] that R. Reese had asked him, Watzke, to call [Carr's attorney] and to inform [Carr's attorney] that 1) [Iron Mountain] would support Carr, 2) [Iron Mountain] would pay [Carr's attorney's] entire bill once the [then pending] arbitration . . . had been concluded, and 3) that once the arbitration had been concluded, R. Reese on behalf of [Iron Mountain], would meet with [Carr's attorney] and Carr to discuss the fulfillment of [Iron Mountain's] promises to Carr."

20.    Carr, personally and through his counsel, claims that the Plaintiffs have not fulfilled the promises or agreements set forth above, and others, and that Carr has lost or been deprived millions of dollars as a result.

### Count I:  Declaratory Judgment and Injunctive Relief

21.    The Plaintiffs incorporate by reference herein the allegations in paragraphs 1 through and including 20 as if set forth in full herein.

22.    Carr claims that the Plaintiffs made promises to or entered agreements with Carr and that those promises or agreements have not been fulfilled.

23.    Contrary to Carr's claims, the Plaintiffs have no unfilled promise to, or agreements with, or any other legal obligations to, Carr.

24.    The Plaintiffs and Carr have adverse legal interests and an actual controversy exists and is continuing between Plaintiffs on the one hand, and Carr on the other.

25.    The dispute between the Plaintiffs and Carr is a real and substantial controversy, which is justiciable by this Court pursuant to the Declaratory Judgments Act, 28 U.S.C. § 2201.

26.    By reason of the foregoing, the Plaintiffs are entitled to a conclusive decree declaring their rights and legal obligations as they relate to Carr's claims and to a preliminary and permanent injunction enjoining and restraining Carr and others from from instituting or

- 5 -

{B0400083; 1}

proceeding with any action or suit against any of the Plaintiffs or any other person or entity in any other jurisdiction with respect to or in any way relating to or arising out of any alleged promises by or agreements with any of the Plaintiffs or any person or entity affiliated or associated with any of them.

WHEREFORE, the Plaintiffs respectfully request that this Court:

1.    Declare that the Plaintiffs have no agreements or other legal obligations to Carr;

2.    Enjoin and restrain Carr or any of his agents, servants, employees, or attorneys from instituting or proceeding with any action or suit against any of the Plaintiffs or any other person or entity in any other jurisdiction with respect to or in any way relating to or arising out of any alleged promises by or agreements with any of the Plaintiffs or any person or entity affiliated or associated with any of them; and

3.    Award the Plaintiffs such further relief as the Court deems just, including without limitation reasonable attorneys' fees and disbursements.

IRON MOUNTAIN INCORPORATED;
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.; C. RICHARD
REESE; JOHN F. KENNY, JR.; GARRY
B. WATZKE; LARRY L. VARN; and
CHARLES G. MOORE

By their attorneys,

May 2, 2005

Ira K. Gross (BBO #212720)
igross@sandw.com
Samual A. Miller (BBO #648568)
smiller@sandw.com
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, Massachusetts 02109
(617) 338-2800

- 6 -

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED;<br>et al. )<br><br>Plaintiffs, )<br><br>v. )<br><br>THOMAS CARR, )<br><br>Defendant )<br><br>And )<br><br>THOMAS CARR, )<br><br>Counter-Plaintiff )<br><br>v. )<br><br>IRON MOUNTAIN INCORPORATED;<br>IRON MOUNTAIN INFORMATION<br>MANAGEMENT, INC.; C. RICHARD<br>REESE; JOHN F. KENNY, JR.; GARRY<br>B. WATZKE; LARRY L. VARN; AND<br>CHARLES G. MOORE, )<br><br>Counter-Defendants ) | Civil Action No.<br><br>05 10890 RCL |

## DEFENDANT'S AND COUNTER-PLAINTIFF'S SECOND AMENDED COUNTER-CLAIM

Thomas Carr, Defendant and Counter-Plaintiff in the above-captioned proceedings, having been granted leave by this Honorable Court on October 12, 2005, herewith Amends the Defendant's and Counter-Plaintiff's First Amended Counter-Claim filed previously herein against the Plaintiffs and Counter-Defendants and states:

1

## Facts Common To All Counts

1.  Prior to January 2001, Iron Mountain Incorporated (Iron Mountain) and Iron Mountain Information Management, Inc. (IMIM), hereinafter referred to as Iron Mountain, merged with and/or acquired a competitor known as Pierce Leahy, Inc., the resulting company being known as Iron Mountain.

2.  Following the aforementioned transaction, J. Peter Pierce, ("Pierce") was elected to the Board of Directors of Iron Mountain and also was appointed president of the new company.

3.  Sometime following the aforementioned merger and/or acquisition, Pierce had a falling out with Iron Mountain and, upon information and belief, was fired as the new company's president, but remained on its Board of Directors.

4.  Upon information and belief, Pierce had signed a form of non-compete agreement as part of the aforementioned commercial transaction.

5.  On or about January 15, 2001, Thomas Carr, ("Carr") and Pierce entered into an agreement to form a transportation company known as Logisteq, LLC ("Logisteq"), at the conclusion of which transaction, a Pierce controlled entity, Pioneer Capital, L.P., and a Carr controlled entity, Transportation Concepts of New Jersey, Inc. owned Logisteq 51% and 49%, respectively.

6.  In the months which followed the formation of Logisteq, Pierce, on his own, formed a company known as Sequedex which, on information and belief, he used surreptitiously to compete with Iron Mountain and in so doing 'posted' significant costs including payroll, etc. expended to operate Sequedex on the books of Logisteq.

3870374v1

7.  At a time material to these proceedings, Iron Mountain filed suit against Pierce for, on information and belief, a breach of the merger/acquisition contract described in Paragraph 1 above, (a violation of the non-compete portion thereof), which action was placed before an arbiter who ultimately decided the action in favor of Pierce.

8.  The proceedings described in the foregoing Paragraph are currently on appeal.

9.  One result of the merger/acquisition discussed in Paragraph 1 above was that Logisteq, became a tenant of Iron Mountain.

10. On information and belief, because of the activities of Pierce and Sequedex, Iron Mountain sent a letter to Carr signed by Counter-Defendant Watzke that Logisteq and Carr as well as Carr businesses were being evicted from property now owned by Iron Mountain.

11. Mr. Carr protested in writing to Mr. Watzke.

12. In August 2001 a senior 'entourage' from Iron Mountain, including its President, General Counsel and Chief Financial Officer, came to New Jersey and met with Mr. Carr and revealed at that time, for the first time, their true agenda, which was a discussion of what they believed were unlawful acts being committed by Pierce.

13. At the meeting in August 2001 described above, Iron Mountain, through its senior management and counsel, stated that if Mr. Carr would assist Iron Mountain in confirming what it already suspected and/or knew about the activities of Pierce, and would otherwise assist and support Iron Mountain against Pierce for his violation of the non-compete agreement, that Iron Mountain would compensate

3870374v1

Mr. Carr in various ways which they, Iron Mountain, were confident Mr. Carr would find acceptable.

14. On information and belief, if Iron Mountain were to succeed in its claim against Pierce alleging a breach of the non-compete agreement, Iron Mountain would stand to recoup the total purchase price for its acquisition of Pierce's company of $1.2 Billion.

15. Thereafter, in a series of meetings involving the Counter-Defendants, meetings were arranged with Mr. Carr and his counsel Mr. Peslak and his friend James Neebling, principal of Systrans Freight, Inc., (hereinafter "Systrans") several of which occurred on March 19, 2002 in New Jersey, March 26, 2002 in Boston, April 2, 2002 by telephone conference, April 9, 2002 in New York, July 16, 2003 by telephone conference and September 2003 in New York.

16. During one or more of the aforesaid meetings, both in person and by telephone, wherein the participants included the Counter-Defendants and Mr. Carr, his counsel, Mr. Peslak and his friend Mr. Neebling, in consideration for information being supplied by Mr. Carr and/or confirmations being provided by Mr. Carr, including but not limited to Mr. Carr's cooperation in the aforementioned Iron Mountain/Pierce litigation, one or more of the Counter-Defendants promised (as particularized in paragraphs 17-24 and 28-29):

16.1 The funding of Carr's lawsuit against Pierce, of which accumulated fees and disbursements of nearly $200,000, the sum of $50,000 has been paid by Iron Mountain to Carr's attorney, Mr. Peslak;

3870374v1

16.2    The provision of the sum of $5 Million to allow Carr to buy back Pioneer

Capital/Pierce's 51% share of Logisteq;

16.3    To hire Carr as a transportation consultant at wages equal to those paid by

Logisteq, plus full benefits;

16.4    To ensure the transportation company owned by Mr. Neebling, (which had

been capitalized as a start up by Mr. Carr) would receive nearly $50

Million per year in courier business;

16.5    The payment of $2 Million directly to Mr. Carr as an interim measure to

allow him to satisfy certain obligations in the wake of Pierce's wasting of

Logisteq.

16.6    The provision of assurances to Mr. Carr's creditor, Mr. Paul Schwarz, that

Iron Mountain would provide sufficient funds and revenues to Carr to

enable Mr. Schwartz to conclude that Mr. Carr was a good candidate to

whom a loan of moneys could be made; and

16.7    The provision of assurances that in the event that any negative financial

effects befell Mr. Carr, his family or his businesses as a result of his

cooperation with Iron Mountain in their disputes with Mr. Pierce, that Iron

Mountain would, in essence, indemnify Mr. Carr and his family and

businesses against any such negative effects.

17.    Concurrently in the spring of 2002, Iron Mountain began encouraging Carr to file

a lawsuit against Pierce regarding Logisteq to coincide with the action that Iron

Mountain was planning to also file against Pierce.    With the intent of

orchestrating simultaneous lawsuits against Pierce, Iron Mountain actively sought

5

to coerce and facilitate Carr's participation by agreeing to fund Carr's lawsuit, including legal fees and costs, as well as drafting the complaint for Carr to file.

18.    On March 26, 2002, Carr and Neebling met with John F. Kenny, Richard Reese and Watzke at Iron Mountain's corporate headquarters in Boston, Massachusetts. Individually as well as acting as an agent of Iron Mountain and with such authority, Reese offered $5 million to Carr to use to buy out Pierce's share of Logisteq. Also, at this meeting Reese further promised that Iron Mountain would hire Carr as a transportation consultant and provide $25 million in courier business to Systrans, Inc. Finally, Counter-Defendant Kenny advised that courier business revenues of $45 Million would be paid to Systrans, Inc. each year for a period of five years in return for the cooperation of Carr and Systrans as described above.

19.    On April 2, 2002 Carr and Peslak participated in a conference call to Watzke. During this call, Watzke, individually and acting within the scope of his authority as general counsel, promised that Iron Mountain would pay for Carr's attorneys' fees in his suit against Pierce. During this call, Watzke also promised Carr that Iron Mountain would retain Carr in a consulting position.

20.    On April 9, 2002 at a private residence in New York, New York, Carr, Neebling and Peslak met with Larry L. Varn, Richard Reese and John F. Kenny. At this meeting, Varn, individually, as a partner in the Boston firm of Sullivan and Worcester and acting as an agent of Iron Mountain and within the scope of his authority as its attorney, promised that Iron Mountain would wire a $50,000

3870374v1

retainer to Arthur Peslak, Mr. Carr's counsel in disputes involving Pierce. That transaction was completed two days later.

21.    Carr initially voiced reluctance in joining Iron Mountain's campaign against Pierce and expressed significant concerns about the negative effects of any such action on his business and family.

22.    As consideration for Carr's involvement in Iron Mountain's coordinated efforts against Pierce, Kenny called Carr and promised that, in exchange for his participation, Iron Mountain would fund Carr's lawsuit, including paying all legal fees and costs. In addition, Kenny also promised that in exchange for Carr's participation, Iron Mountain would provide business to Systrans in excess of $45 million dollars, hire Carr as a consultant with the same salary and benefits that he was currently making, and repay any debt that Carr incurred in the process as guarantor of certain obligations.

23.    In addition to expressing these promises to Carr, Kenny also made the same promises to Carr's wife Judy in a separate telephone conversation with her which occurred in April of 2002. Mr. Kenny called Mrs. Carr while she and her family were on vacation in California. In response to her concerns about the negative effects that Carr's involvement with Iron Mountain in its claims against Pierce would have on her family, Kenny specifically affirmed each of the foregoing promises to Mrs. Carr and advised her that any and all negative financial fall out resulting from her husband's filing a complaint against Pierce and/or his other cooperation with Iron Mountain would be taken care of by Iron Mountain.

7

24.  Carr eventually acquiesced and agreed to participate in Iron Mountain's efforts against Pierce.  Upon receiving Carr's acceptance, Iron Mountain had a courier deliver a copy of the drafted complaint to Carr while he was on vacation with his family in California.  Carr signed the complaint and Iron Mountain coordinated the filing of the action.

25.  During the ensuing months, Carr and Neebling on behalf of Systrans cooperated completely with the Counter-Defendants, met with witnesses, reviewed and checked out commercial transactions involving Pierce and Pierce-related companies, and turned over documents and other materials to various of the Counter-Defendants.  This cooperation involved extensive travel at the request of several of the Counter-Defendants.

26.  In direct and full reliance on the aforementioned promises of consideration, Carr continued to cooperate with the Counter-Defendants, as they had requested and, as a result of his reliance, he lost his businesses and was shackled with debt which several of the Counter-Defendants, as described above, had promised to allay by providing sufficient income to Carr to allow him to comfortably handle the debt.

27.  During a July 16, 2003 telephone conference as mentioned above, Counter-Defendant Watzke, when asked by Carr's counsel Arthur Peslak why Iron Mountain and the other Counter-Defendants had not fulfilled their obligations and promises as set forth in Paragraphs 16.1 through 16.7 and further described in paragraphs 17 through 24, Mr. Watzke stated, individually and in his capacity as general counsel for Iron Mountain, "Once the arbitration (of the lawsuit as between Iron Mountain and Pierce) had been concluded, (the resolution of the

appeal), Counter-Defendant Reese would meet with Carr and Mr. Peslak to discuss the fulfillment of Iron Mountain's promises to Carr."

28.   Soon after the events set forth in paragraph 28, Counter-Defendant Moore told Carr, in a telephone conversation, the same assurances which had been conveyed by Watzke to Peslak on July 16, 2003. This was consistent with Moore's role as the prime contact with Mr. Carr as designated by Iron Mountain and the individual Plaintiffs and Counter-Defendants. Mr. Moore would frequently, in conversations with Mr. Carr, restate and otherwise affirm statements of consideration previously made by Mr. Watzke, Mr. Kenny, Mr. Varn, and Mr. Reese.

29.   In approximately September 2003, Carr and Neebling attended a meeting with Varn and Charles G. Moore in New York, New York. At this meeting, Varn, individually, as a partner at the Boston law firm Sullivan and Worcester and acting as an agent of Iron Mountain and within the scope of his authority, promised $2 million dollars for Carr to use to pay off certain debts incurred during the preceding year or two.

30.   In addition, Varn called Paul Schwartz, a person to whom Carr owed money, to advise him that Iron Mountain was in the process of setting up a very lucrative business relationship with Carr and that Carr therefore was a good credit risk to whom Mr. Schwartz should loan additional moneys.

31.   All of the aforementioned contractual obligations and promises which the Counter-Defendants presented to Carr were made with absolutely no intention of fulfilling or otherwise satisfying said obligations.

3870374v1

32.  Despite repeated requests from Carr and his New Jersey counsel Arthur Peslak as well as his friend James Neebling, for the period beginning in the fall of 2003 through the early months of 2005 the Counter-Defendants remained incapable of or unwilling to fulfill the aforementioned promises, continuing to use as an excuse the pendancy of the Iron Mountain versus Pierce arbitration appeal.

33.  In hindsight, because there is no arguable relationship between the fulfillment of Iron Mountain's contractual obligations to Mr. Carr and the ultimate termination of Iron Mountain's appeal of the Iron Mountain vs. Pierce arbitration decision, it is now readily apparent that at the time Iron Mountain described the consideration it would pay to Carr in return for Carr's cooperation, including Carr's filing of a lawsuit against Pierce, as coordinated by Iron Mountain, Iron Mountain through the aforementioned officers, agent and outside counsel had absolutely no intention of following through on said considerations and knew that statements regarding said considerations were false, when made.

34.  As a direct result of Carr's cooperation with Iron Mountain including his filing of a complaint against Pierce, orchestrated by Iron Mountain, Pierce wasted the business of which Carr was a 49% owner and left Carr shackled with debt and a loss of his source of income.

35.  Carr however believed that Iron Mountain would make good on his statements of consideration of employment, business and indemnification and when Carr demanded satisfaction from Iron Mountain, he was met with silence and/or denial.

3870374v1

36.  As a direct result of his reliance on the false statements of Iron Mountain, Carr has lost his business and his source of personal income and is faced with significant debt.

37.  In February 2005, Carr's counsel met with Counter-Defendants Watzke and Varn to discuss Mr. Carr's claims that the obligations and promises to him remained unfulfilled.

38.  On February 25, 2005 a letter was written to Counter-Defendants Watzke and Varn summarizing the events of the earlier meeting and the claims made therein.

39.  On April 7, 2005, as a culmination of some brief interim correspondence, undersigned counsel suggested a meeting with several of the Counter-Defendants to discuss an amicable resolution of the Carr claim.

40.  On April 19, 2005, Counter-Defendant Watzke advised that a few more days would be required to respond to counsel's request for a meeting due to the unavailability of Mr. Varn.

41.  Thereafter, undersigned counsel received an e-mail from Counter-Defendant Varn stating that he was in trial in Barnstable and would not be able to turn his attentions to responding to the request for a meeting until some time late in the week of May 2.

42.  Finally, on May 1, 2005, counsel again corresponded with Counter-Defendants Watzke and Varn to advise that patience in awaiting a response to a letter dated April 7, 2005 to convene a meeting to amicably resolve Carr's claims was patience which was indeed waning and specific dates for a meeting were then suggested.

11

3870374v1

43.     The response to the foregoing was the filing and delivering of the instant Complaint.

## Count I

### (Breach of Contract)

44.     Incorporated by reference are all allegations as set forth in Paragraphs 1 through 43 as if repeated herein.

45.     The transactions as between Iron Mountain and the other Counter-Defendants and Carr do constitute a binding oral contract supported by adequate consideration.

46.     Carr has performed all of his obligations pursuant to the terms and conditions of the aforementioned oral contract.

47.     Iron Mountain and the other Counter-Defendants' failure to perform promises and obligations pursuant to the aforementioned oral contract as described above does constitute a breach of said oral contract.

48.     As the direct and proximate result of the aforementioned breach by the Counter-defendants, Carr has been damaged.

        WHEREFORE, the Counter-Plaintiff Carr demands judgment against the Counter-Defendants in the amount of $20 Million plus interest, attorneys' fees and costs.

## Count II

### (Against Counter-Defendants Varn, Watzke, Reese, Kenny and Moore)

### (Fraudulent Misrepresentation)

49.     Incorporated by reference are all allegations as set forth in Paragraphs 1 through 43 as if repeated herein.

12

3870374v1

50. Iron Mountain and the other Counter-Defendants received from Carr as well as his counsel, Mr. Peslak, and his friend, Mr. Neebling, critical information known to Carr, confirmation of which information was required by the Counter-Defendants in the prosecution of their claims against Pierce as well as Carr's complete cooperation in filing a separate action against Pierce.

51. The Counter-Defendants explained to Carr that the consideration for the information and cooperation described herein would include the consideration described in Paragraphs 16.1 through 16.7, 17 through 24 and 28 through 30 above.

52. At the time the representations set forth in the foregoing Paragraph were made to Carr, the Counter-Defendants knew that they were false, knew that they had no intention of fulfilling said obligations and/or promises and knew that Carr would rely on their representations to his detriment.

53. The actions of Iron Mountain and the other Counter-Defendants as described above do constitute a fraudulent misrepresentation.

54. That, as more fully explained above, Carr did in fact rely on the aforementioned false statements, not knowing them to be false, to his detriment in that he suffered massive business losses and faced mounting debt all of which, he believed, would be comfortably off-set by the aforementioned representations of considerations. They were not.

55. As the direct and proximate result of Iron Mountain's and the other Counter-Defendants' fraudulent misrepresentations, Carr has been damaged.

WHEREFORE, Carr demands judgment for compensatory damages against the

Counter-Defendants in the amount of $20 Million, plus interest, attorneys' fees and costs.


October 26, 2005

Respectfully submitted,


By his attorneys,


Read K. McCaffrey (pro hac vice)
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-5243
rmcccaffrey@pattonboggs.com


Kathleen C. Stone
BBO #481920
Looney, Cohen, Reagan & Aisenberg LLP
109 State Street
Boston, MA 02109
617-371-1050


14

# EXHIBIT C

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------------------x

IRON MOUNTAIN INCORPORATED;

IRON MOUNTAIN INFORMATION

MANAGEMENT, INC.; C. RICHARD

REESE; JOHN F. KENNY, JR.;

GARRY B. WATZKE; LARRY L. VARN;

and CHARLES G. MOORE,

                Plaintiffs and
                Counterclaim Defendants,
                                        Civil Action
        v.                              No. 05 10890 RCL

THOMAS CARR,

                Defendant and
                Counterclaim Plaintiff.
------------------------------------------x

IRON MOUNTAIN INFORMATION

MANAGEMENT, INC.

                Plaintiff,

                                        Civil Action
        v.                              No. 05 10999 RCL

SYSTRANS FREIGHT SYSTEMS, INC.,
                Defendant.
------------------------------------------x
                    February 28, 2007
                    10:05 a.m.
        Deposition of THOMAS CARR, taken by Plaintiff,
pursuant to Notice, at the offices of Patton Boggs,
LLP, One Riverfront Plaza, Newark, New Jersey, before
Denise L. Daniels, a Shorthand Reporter and Notary
Public.

CERTIFIED ORIGINAL
LEGALINK BOSTON

Page 2

```
 1

 2

       A p p e a r a n c e s :

 3

            SULLIVAN & WORCESTER, LLP
 4                 Attorneys for Plaintiffs and
                   Counterclaim Defendants
 5                 One Post Office Square
                   Boston, Massachusetts 02109
 6
            BY:   IRA K. GROSS, ESQ.
 7

 8

 9          PATTON BOGGS, LLP
                   Attorneys for Defendant and
10                 Counterclaim Plaintiff
                   2550 M Street, NW
11                 Washington, D.C. 20005
12          BY:   READ K. McCAFFREY, ESQ.
                   CHRISTOPHER HELLMICH, ESQ.
13                 ILYA SHAPIRO, ESQ.
14

15

16

17

18   Also Present:
19          LARRY L. VARN
            CHARLES G. MOORE
20
                          oOo
21

22

23

24

25
```

Page 3

1

2      T H O M A S      C A R R ,

3              residing at 23 Silver Leaf Way, Manalapan, New

4              Jersey 07726, having been first duly sworn by

5              the Notary Public (Denise L. Daniels), was

6              examined and testified as follows:

7      EXAMINATION BY

8      MR. GROSS:

9              Q.      **Good morning, Mr. Carr.**

10             A.      Good morning, Mr. Gross.

11             Q.      **State your full name for the record,**

12     **please.**

13             A.      Tom Carr.

14             Q.      **What's your address, Mr. Carr?**

15             A.      23 Silver Leaf Way, Manalapan, New Jersey

16     07726.

17             Q.      **How long have you been living there?**

18             A.      Approximately August of '06.

19             Q.      **Where did you live before that?**

20             A.      152 Chestnut Way, Manalplan, New Jersey

21     07726.

22             Q.      **Your current address is a private**

23     **residence that you own?**

24             A.      Yes, it is.

25             Q.      **Are you working?**

Thomas Carr

Page 4

1

2      A.    Yes, I am.

3      Q.    **In what capacity and for whom?**

4      A.    I am the president of Pioneer U.S.A.

5      Q.    **What is that organization?**

6      A.    Pioneer U.S.A. is a warehousing company.

7  I also do consulting to transportation and warehouse

8  companies.

9      Q.    **Do you own Pioneer U.S.A.?**

10      A.    No, I do not.

11      Q.    **Who owns it?**

12      A.    My wife.

13      Q.    **Her name is Judy?**

14      A.    Judith Carr.

15      Q.    **Is she the sole owner?**

16      A.    Yes, she is.

17      Q.    **In what form is that business?**

18      A.    It's an LLC.

19      Q.    **Organized in New Jersey?**

20      A.    Yes.

21      Q.    **Where is its headquarters?**

22      A.    23 Silver Leaf Way, Manalplan, New Jersey

23  07726.

24      Q.    **Mr. Carr, you're claiming in this case**

25  **that Iron Mountain or its representatives made various**

Thomas Carr
02/28/2007

Page 5

1

2  promises to you, correct?

3      A.    Yes.

4      Q.    Are any of those promises documented in

5  writing?

6      A.    No.

7      Q.    Are any of those promises recorded on

8  tape or otherwise memorialized?

9      A.    No.

10      Q.    Did you make any tapes of any

11  conversations or meetings that you had with any Iron

12  Mountain representatives during the time in question?

13      A.    Yes, I did.

14      Q.    What tapes did you make?

15      A.    I have a tape with Charlie Moore.

16      Q.    You have a tape of a conversation that

17  you had with Mr. Moore?

18      A.    Yes, sir.

19      Q.    And that conversation was face-to-face?

20      A.    No.

21      Q.    Over the telephone?

22      A.    Over the telephone.

23      Q.    When did that conversation occur?

24      A.    I believe that was in '04, 2004.

25      Q.    Can you be any more specific about when

Page 18

  1

  2         A.    Yes, it was.

  3         Q.    Did you know who Paradigm was at the time

  4   you cashed the check?

  5         A.    No, I did not.  Walter Culkin told me

  6   that was one of his companies.

  7         Q.    Let me just show you something, Mr. Carr.

  8   This is what I believe is a transcript of your

  9   deposition --

 10         A.    Yes.

 11         Q.    -- in the case that you brought against

 12   Mr. Pierce.

 13         A.    Okay.

 14         Q.    Is that correct?

 15               Why don't you take a look through it and

 16   confirm that for me.

 17         A.    Yes, that is correct.

 18         Q.    This is testimony that you gave under

 19   oath and that you're affirming as correct at this

 20   time, correct?

 21         A.    Yes, correct.

 22               MR. McCAFFREY:  Why don't you identify it

 23         as to the date.

 24               THE WITNESS:  The date is May 30th.  It's

 25         cut off.

Thomas Carr

02/28/2007

Page 19

1

2      Q.    It's May 30, 2002.

3      A.    May 30, 2002.

4            MR. McCAFFREY:  Okay, that's fine.

5            MR. GROSS:  I'm going to ask the reporter

6      to mark that as Carr Exhibit 1.

7            (Whereupon, document dated May 30, 2002

8      marked Carr Exhibit 1 for identification, as of

9      this date.)

10     Q.    Mr. Carr, when was it that anybody from

11  Iron Mountain first promised you anything?

12     A.    It was December 10th, 2001.

13     Q.    Who made what promise to you at that

14  time?

15     A.    Mr. Richard Reese and Mr. Vincent Ryan.

16     Q.    Where were you when the promise was made?

17     A.    I was in the Harvard Club in a private

18  room having dinner.

19     Q.    Was anyone else there?

20     A.    No.

21     Q.    Just you, Mr. Reese and Mr. Ryan?

22     A.    Yes.

23     Q.    What promise or promises were made to you

24  at that time?

25     A.    The promises that were made to me at that

Page 51

1

2          conversation which ended with Mr. Pierce

3          saying, "If you want to buy me out, buy me

4          out."

5                  THE WITNESS:  Correct.

6                  MR. McCAFFREY:  And you already testified

7          to that?

8                  THE WITNESS:  Yes, I did.

9          Q.    But things were not going particularly

10    well between you and Mr. Pierce at that time?

11         A.    No, they were not.

12         Q.    At the time of that conversation in which

13    Mr. Pierce suggested that you buy him out, had you

14    been indicted prior to that time?

15         A.    Yes, I had.

16         Q.    And had you told him?

17         A.    Yes, I had.

18         Q.    When did you tell him about the

19    indictment?

20         A.    The week it happened.

21         Q.    When you told him, did he indicate one

22    way or the other whether he already knew?

23         A.    He did indicate that he already knew.

24         Q.    By the way, what were you indicted for?

25         A.    I was indicted for bank fraud and money

Thomas Carr                                                02/28/2007

Page 52

1

2      laundering.

3              MR. McCAFFREY:  So that we're clear on

4          the record, two indictments?

5              THE WITNESS:  Two indictments, but the

6          same case.  The reason there is two

7          indictments, one check was cashed in the

8          Southern District and another check was cashed

9          in the Eastern District, and it was all under

10         the same group of guys, my next-door neighbor,

11         Walter Culkin.

12         **Q.    Were you indicted in the Eastern District**

13     **at the same time that you were indicted in the**

14     **Southern District?**

15         A.    No.

16         **Q.    You were indicted in the Southern**

17     **District in August of 2001?**

18         A.    August of 2001.

19         **Q.    When were you indicted in the Eastern**

20     **District?**

21         A.    I believe it was months after that.

22         **Q.    And you say it was for the same set of**

23     **acts?**

24         A.    It was the same group of people.

25              MR. McCAFFREY:  What he testified was

**Thomas Carr**

Page 53

1

2      there was a check cashed in the Eastern

3      District and a check cashed in the Southern

4      District.

5          Q.    You eventually pled guilty to parts of

6      both indictments, correct?

7          A.    Yes, sir.

8          Q.    That was when?

9          MR. McCAFFREY:  Which was that, do you

10     recall?

11         THE WITNESS:  I have it.  Do you want me

12     to pull it out?

13         MR. GROSS:  I think I have it as well.

14         MR. McCAFFREY:  Mr. Moore probably has it

15     if you don't.

16         THE WITNESS:  Mr. Moore knows more than

17     me.  He actually enlightened me on everything

18     that went down.

19         MR. McCAFFREY:  Wait for his question.

20         Q.    I'm handing you a document that appears

21     to be the transcript of a plea before the Honorable

22     William D. Wall, the United States Magistrate on

23     September 29, 2004.

24             I'm going to ask you, Mr. Carr, if that

25     is, in fact, a transcript of your plea of guilty to

Thomas Carr                                                02/28/2007

Page 54

2    two counts of these indictments?

3         A.    Yes, it is.  As a matter of fact, it

4    gives my testimony to the Judge in this plea.

5         Q.    **You were under oath when you gave that**

6    **testimony?**

7         A.    Yes, I was.

8         Q.    **Is that testimony true and correct in all**

9    **respects?**

10        A.    Yes, it is.

11             MR. GROSS:  I'm going to ask the reporter

12        to mark this as Carr Exhibit 2.

13             (Whereupon, transcript of plea marked

14        Carr Exhibit 2 for identification, as of this

15        date.)

16             (Mr. McCaffrey stepped out of the

17        proceedings at this point.)

18        Q.    **Mr. Carr, have you been sentenced on**

19    **these convictions?**

20        A.    No, I have not.

21        Q.    **What's the status of your sentencing?**

22        A.    I am presently working with the federal

23    government and have no status on sentencing.

24        Q.    **Was there a sentencing scheduled for**

25    **February, early February?**

Thomas Carr                                                    02/28/2007

Page 55

1

2          A.    Not that I recall.

3          Q.    Who is your counsel in the criminal

4    matters?

5          A.    Michael Bochner.

6          Q.    If I suggested to you that there had been

7    a sentencing scheduled for early February and it had

8    been postponed at the behest of your counsel, that's

9    not consistent with your understanding?

10         A.    I am not sure.

11         Q.    You don't know?

12         A.    No, I don't.

13         Q.    Your understanding is that you have no

14   scheduled sentencing date because of your cooperation

15   with the authorities?

16         A.    As of today, I don't have a date.

17         Q.    Have you ever had a sentencing date?

18         A.    If I did, I was not notified.

19         Q.    So you're unaware of that?

20         A.    Yes.  I'm sure Charlie Moore would know.

21   He speaks with the FBI and the prosecutor on a pretty

22   steady basis.

23         Q.    Well, thanks for that advice.

24         A.    You're welcome.

25         Q.    Did your relationship with Mr. Pierce

Page 113

1

2    to tell us about Mr. Pierce and the employees you have

3    in the company.

4                So I went into explaining the details of

5    the actions of Mr. Pierce with employees in the

6    company and the Logisteq payroll who basically did

7    work for Sequedex.  They had asked Tammy Phillips if

8    we could supply payroll records.  Tammy gave them the

9    information of the payroll company we used.

10                Larry took that information, and Tammy

11   and I agreed that we were very happy to move forward

12   with you people.  And again my concern was that I'm

13   very nervous about the fact that Pierce already

14   threatened to close my company and fire me if I

15   continued to talk with Iron Mountain.

16                And John Kenny immediately turned around

17   and said that if that was to happen, we would

18   immediately offer you a consultant position at the

19   same benefits and wage.  And as a matter of fact,

20   Tammy Kahn turned around and said, "Thanks, what about

21   me?"

22                And he said, "Fine, we would find you a

23   job too."

24                And they told us that, "Listen, Peter is

25   a bad guy, he believes his own lies.  You'll

Page 126

said, "It's a very expensive -- you're going to be up

against some big money guys and it's going to be very

costly to file a suit."  We wanted to make sure that

Iron Mountain or its companies, affiliates, Schooner

Capital, was going to support us a hundred percent.

And what that means is to give us the coffee

businesses, together, merge them, to back me a hundred

percent for attorneys' fees, to hold me harmless of

any economic fallout if Pierce decided to fire me.

    Q.    **Were those last three things that you**

**just mentioned discussed expressly at this meeting?**

    A.    Yes, they were.

    Q.    **That's what you said, "This is what it**

**means to me to be backed a hundred percent, I need all**

**these things"?**

    A.    I said, "I need to have your assurances

that you are going to back me a hundred percent."

Garry Watzke was somewhat on the quiet side and

Mr. Kenny said, "Tom, if Mr. Pierce fires you, we will

give you a consulting job at the same benefits and the

same salary and we will continue to support you."

    And I said, "Thank you."  So that was a

very good comfort level for me.  Art Peslak seemed to

be fine with it, we thought we were in bed with a real

1

2      Q.      Who did the typing?

3      A.      I did.

4              Would you like me to read it?

5      Q.      Well, read it to yourself.

6      A.      Which meeting are you referring to, the

7  26th?

8      Q.      Yes.  All set?

9      A.      Yes.

10     Q.      Having had a chance, Mr. Carr, to review

11 Exhibit 3 with respect to the meeting of March 26,

12 2002, is that an accurate rendition of what went on at

13 the meeting?

14     A.      Yes, Mr. Gross, it is.

15     Q.      Can you recall anything else that went on

16 at the meeting aside from what's written in Exhibit 3?

17     A.      Well, without looking at this paper, on

18 my recollection, I would say that the meeting of the

19 26th was a meeting to come up with Mr. Watzke and

20 Mr. Kenny to confirm or consummate that everything

21 that we have been working on over the last few months

22 is now going to happen.

23              So going into that meeting, Mr. Kenny

24 came in to discuss the transportation problems they

25 were having with Iron Mountain -- I'm going to jump

Thomas Carr

02/28/2007

Page 134

1

2  way back.  The reason they asked me -- the reason

3  Garry Watzke and Mr. Kenny were saying they would

4  probably get me a consulting job is that they were

5  having problems with their transportation, and I

6  believe because of the mergers and acquisitions of so

7  many different companies, there were a lot of

8  facilities in a geographic area where they had trucks

9  passing each other by.

10          For example, your Newark facility might

11  have ABC Courier doing the transportation, and your

12  Jersey City facility might have XYZ, and all these

13  other guys, and they're all passing each other and

14  paying trucks for doing the same work where one

15  company could be doing all the work and save dollars.

16          So it was one of these where you buy a

17  company, you have a traffic manager who has his

18  favorite courier, whether the guy is given ball

19  tickets or he's taking him out to dinner.  This is the

20  guy I want to use, the guy in Jersey City wants to use

21  his guy.  They were trying to consolidate.  I believe

22  he said they had 800 different carriers,

23  transportation carriers doing the business for Iron

24  Mountain and it was just a total mess, and they needed

25  someone with experience to come in with the technology

Page 135

1

2    who can consolidate all these carriers into maybe

3    cutting it in half and saving big, big money and

4    having control of their transportation.

5              So after Jimmy's presentation of what he

6    did with Systrans, and that was perfect for him

7    because that's the exact business he's in, the courier

8    business, that's what U.S. Delivery was, and CD&L, and

9    I was in the truckload business so it was kind of a

10   perfect match.  Tom, we can use right away as a

11   consultant to get involved in the project that they

12   already had people starting to go into.

13        Q.    Who said that?

14        A.    Garry Watzke.  And in Massachusetts they

15   were starting this project right when all this was

16   going on.  So it was -- it wasn't like, gee, let me

17   try to find a position, they needed the help.

18              So John Kenny said to Jim, after the

19   presentation and Jim came up there prepared with a

20   book, Continental, Systrans, U.S.A., just basically

21   giving an outline of how he felt you would structure

22   the roll-up of the coffee.

23              And the need that Iron Mountain had was

24   for someone who can really put this together and he'll

25   save them and organize the structure, the

Thomas Carr

02/28/2007

Page 136

2    infrastructure for the transportation.

3              So it was a wonderful meeting.  After Jim

4    went through his whole spiel of Systrans and working

5    with multiple carriers and mergers and acquisitions,

6    Richard Reese was very, very impressed with Jim, and

7    John Kenny was like, we will hit a home run with this

8    guy.

9              John Kenny had came in and, listen,

10    we have $25 million worth of courier work and that we

11    would like for you to help us, help us with our

12    problem.  So it was terrific.

13              So at that meeting, pretty much Mr. Reese

14    said Tom, Jim, you met the management team, what can I

15    tell you?  We're here, we're sincere, we want you on

16    our team.  He said to me -- Mr. Reese said to me,

17    "Tom," he said, "I'll give you $5 million to buy

18    Mr. Pierce out, we're ready to move forward with

19    this."

20         Q.    One second.

21         A.    Yes.

22         Q.    You said he said he would give you the $5

23    million to buy Mr. Pierce out?

24         A.    Yes.

25         Q.    This was going to be a transfer of 5

Thomas Carr                                    02/28/2007

Page 137

1

2   million to you so you would then own the company

3   outright?

4           A.    I don't know.  I don't know, Jim Neebling

5   said he said it as a loan.  All I know is on my

6   children's life, Mr. Reese in front of John Kenny and

7   in front of Garry Watzke, as clear as we're sitting

8   here today said, "Tom, I will give you $5 million to

9   buy Mr. Pierce out."  Period.

10          Q.    **You understood him to be offering you $5**

11  **million, and then you would be the owner of Logisteq**

12  **outright?**

13          A.    No, no.

14          Q.    **What did you understand him to mean?**

15          A.    What I understood by that is that

16  Schooner Capital would buy Logisteq's 51 percent from

17  Pierce and that they would consolidate along with the

18  Systrans and along with the coffee and merge all of

19  this together and have a very nice company.  And

20  continue to grow and make money.  That's how I took

21  it.

22          Q.    **So just to make sure I got it, when**

23  **Mr. Reese said he would give you $5 million to buy out**

24  **Pierce, you understood that what you just said is what**

25  **he had in mind?  That is, Schooner would buy Pierce's**

Thomas Carr                                                02/28/2007

Page 138

1

2      share, and you would move forward with the coffee

3      roll-up?

4          A.    Yes.  I don't think Mr. Reese is going to

5      say here, Mr. Carr, here's $5 million.  I think

6      Mr. Reese was looking, as he previously told me, to

7      the consolidation of the coffee companies, and

8      Logisteq was obviously going to head this roll-up

9      along with his people and Schooner's people and

10     affiliates.

11         Q.    Do you recall any mention of mezzanine

12     financing in this meeting?

13         A.    Yes, I do.  Mr. Kenny had told us at that

14     meeting that through his connections, and I don't even

15     know what that meant, but he said through his --

16     whether it was Bear Stearns or Goldman Sachs or hedge

17     funds he had told us that he has ways of getting

18     mezzanine, and I don't even know what that word means,

19     but getting mezzanine financing to do the roll-up of

20     these coffee companies.

21         MR. McCAFFREY:  You've sat in the

22         mezzanine, haven't you?  Just kidding.

23         THE WITNESS:  Yes, up on the nose bleed

24         section.

25         A.    I said these guys are looking to give us

Thomas Carr

02/28/2007

Page 139

1

2  $5 million, that's great, I'll pretend I know what it

3  means.  I did question myself.  I thought Schooner was

4  going to be the one giving us money here, but it was

5  all good intent.  We were all together, we were all

6  bonded, we committed to each other.  I was on board, I

7  had made up my mind pretty much at that point after I

8  left that meeting that these guys are the real guys.

9  I'll tell you what really convinced me, the meeting at

10 the Harvard Club, you know, Reese just went into so

11 much negativity about this Pierce, and he didn't have

12 to convince me, I've seen it.  Hey, listen, things

13 happen in life, people don't get along, they break up,

14 you get divorced, shake hands and move on.

15        MR. McCAFFREY:  Let's wait for the next

16     question.

17     Q.    Was Mr. Reese in this meeting the whole

18 time?

19     A.    Yes, he was.

20     Q.    Was Mr. Watzke in the meeting the whole

21 time?

22     A.    No, he wasn't.

23     Q.    Did he come in and out multiple times?

24     A.    Let me think.  I believe for one reason

25 or another, I believe that we had to make -- no.  I

Thomas Carr                                                    02/28/2007

Page 140

1

2   believe Jim and I had to stop at Larry Varn's to meet

3   another attorney at Sullivan & Worcester.  I believe

4   it was like on the circle, and we went to Larry's

5   office and we met with an attorney, I don't recall his

6   name.  And we sat.

7       Q.    That was before you went over to Iron

8   Mountain?

9       A.    Yes.

10      Q.    Now, I'm talking about when you're over

11  at Iron Mountain?

12      A.    Garry Watzke came in first, we sat down,

13  John Kenny, then Richard Reese.  There was also a time

14  that Mr. Watzke took me in to meet a fellow by the

15  name of Tony Hayden -- not Tony Hayden, John Hayden,

16  the VP of real estate.  He introduced me, a very nice

17  man.  I sat with him for five minutes and he spoke

18  with me.  Again, this is a guy I just met, hi, welcome

19  to the team, we're very excited, we hear about the

20  exciting plans of the new business venture, you made

21  the right choice, we're going to move forward.

22  Everything was great.

23          As a matter of fact, Mr. Hayden even

24  called my wife at home to convince her that Tom is

25  making the right decision.  Tom is with a group of

Page 141

professionals and businessmen and making the right

decision to join our team.

Q.      When did he do that?

A.      I believe it was the day after the 26th

meeting.

Q.      How did he know how to get in touch with

your wife?

A.      Because at that point, sitting there, I

was always a little hesitant.  I said "You know, I'm

so excited, but I'm scared.  My wife is a wreck.

Every time I go to talk to her about this, she's like,

'What are you doing, are you sure you're making the

right decision?  We got a lot to lose here.'"

He had, and it sounds like one of these

crazy things, but it is the truth, he said to me,

"Tom, would you like me to call her?"

And I said, "Yeah, as a matter of fact, I

would because I can use all the support I can."

Q.      He just volunteered that in the first

five minutes that you met him?

A.      As crazy as it sounds, it's the truth,

yes.  When we subpoena your records, you'll see that I

called my home.  Just like the records of the

complaint that came to San Diego from Sullivan &

Thomas Carr                                        02/28/2007

Page 142

1

2    Worcester, it will all come out.  The truth will

3    prevail.  I don't know why you guys are doing this to

4    me.  Oh, I do because Larry Varn blames me for losing

5    the case.  It's all my fault.

6         Q.   **We're going to do a lot better if we**

7    **stick to the questions and answers.**

8         A.    I have to vent.  You destroyed my life

9    and family and financially destroyed me.

10        Q.   **When Mr. Reese told you about the $5**

11   **million, who was in the room?**

12        A.    I know for sure Mr. Kenny was, and I'm

13   not positive if Garry was or was not because he was

14   taking calls in and out.  He would be in and out, in

15   and out.  He was in and out two or three different

16   times.  100 percent, Mr. Kenny was in the room along

17   with Mr. Reese, Jim Neebling and myself.  I don't

18   recall if Garry, because Garry had to leave a couple

19   times to pick up calls.

20             I can go on further.

21        Q.   **About what went on at that meeting?**

22        A.    Yes.

23        Q.   **There's more to say?**

24        A.    There's more to say.

25        Q.   **Go ahead.**

Thomas Carr                                          02/28/2007

Page 143

1

2        A.    They were very interested in Jim

3   Neebling's courier company, Systrans, and that he

4   would be able to -- at the time Jim was telling us

5   about some technology that he knows is out there that

6   can merge all these couriers together and it was very

7   impressive to Mr. Kenny and Mr. Reese.

8        Q.    **Did you and Mr. Neebling bring any**

9   **documents describing the coffee roll-up or otherwise**

10  **to this meeting?**

11       A.    Yes, we did.

12       Q.    **Can you briefly describe what it was that**

13  **you brought?**

14       A.    It was a folder about the size of this,

15  which is about an inch thick, and Jimmy basically put

16  a whole business plan together of how we would roll-up

17  the coffee companies and how we would grow through the

18  coffee companies.  Jimmy was involved in the meetings

19  with the coffee people.  Jimmy had a big part of

20  merging these companies along with talking with John

21  Kenny.

22       Q.    **Was that document given to someone at**

23  **Iron Mountain on the 26th?**

24       A.    Yes.

25       Q.    **Who?**

Thomas Carr                                                    02/28/2007

Page 144

1

2          A.     It was given to Mr. Reese, and Mr. Reese

3     handed it off to Mr. Kenny.

4          Q.     **Did Mr. Kenny look at it while you were**

5     **there?**

6          A.     Yes, we went through the whole business

7     plan.

8          Q.     **What was his reaction?**

9          A.     He liked it.  That's when the whole $25

10    million of business came up for the courier work

11    saying, you know, "Jim, we could really use a guy like

12    you to help us put this together."

13         Q.     **What was the financial condition of**

14    **Logisteq in March of 2002?**

15         A.     The financial -- the company did well.

16    The company had significant growth.  It doubled its

17    size in sales, but I'm going to say there was

18    approximately a million dollars of wasted funds in the

19    company due to Sequedex, due to wasting funds of

20    Sequedex.

21         Q.     **Which was Mr. Pierce's responsibility?**

22         A.     Yes.

23         Q.     **And the impact of that was to do what at**

24    **Logisteq?**

25         A.     The company was doing fine.  We had money

Thomas Carr

02/28/2007

Page 145

2  in the bank, and it was doing fine.  It was continuing

3  to grow, and we had hired a significant salesperson by

4  the name of Dominick Balesteri, I believe his last

5  name was.  Dominick was very affluent in the coffee

6  industry, and we started to bring on some very large

7  coffee accounts.  We were expanding our business.

8          As a matter of fact, on the tape that we

9  taped in Freehold on the board meeting, Mr. Huntley

10 goes into saying how well -- we're cash strapped.  And

11 I went on to say we're cash strapped because we're

12 putting all this money up for Sequedex.  We have all

13 this dead weight, we have all these people in the

14 company that we just don't need.

15         Then Peter admits not only on the tape

16 about Sequedex and, "Tom, what can we do to make

17 things better," trying to court me to say listen, I'm

18 the good guy here, told me that things are looking

19 good, things are turning around.  Virginia is starting

20 to fill up and Florida is coming along.  Being in the

21 coffee business for a year-and-a-half, we were doing

22 very well for ourselves and had great potential.

23         I was very excited.  I worked very hard.

24 I left a big company, I had a great position at a very

25 large trucking company, I did a few hundred million.

Thomas Carr                                            02/28/2007

Page 146

1

2      I started my company in 1992, grew the company and

3      really felt now we were taking off and --

4          Q.    Mr. Pierce was in charge, he was the

5      majority owner?

6          A.    Yes.

7          Q.    And he was draining assets off by way of

8      these diverted expenses, wasting as much as a million

9      dollars a year, right?

10         A.    I would say about a million dollars.

11         Q.    And he refused to stop doing that?

12         A.    He refused to stop doing that. He would

13     tell me that there's a picture, a greater picture down

14     the road. And we all knew what that greater picture

15     was, to grow Sequedex and become one.

16         Q.    So, we talked about everything that went

17     on at the March 26th meeting, correct?

18         A.    Yes, we did.

19         Q.    And soon after that, Iron Mountain filed

20     its action against Mr. Pierce, correct?

21         A.    Correct.

22         Q.    And then within several days after that,

23     while you were on the West Coast, you had the

24     conversation with Mr. Watzke, Mr. Kenny and Mr. Peslak

25     that you testified to, correct?

Page 147

1

2          A.    Correct.  We were all on a conference

3    call.

4          Q.    **Then later that same day, Mr. Kenny spoke**

5    **to your wife?**

6          A.    Correct.  Not later, within minutes.

7          Q.    **Well, subsequent.  I just mean after one**

8    **call was over, right?**

9          A.    Yes.

10         Q.    **When was the next time after -- well,**

11   **when did you get back from the West Coast?**

12         A.    The end of the week.  That Monday, I

13   believe.  I believe we stayed Monday through Monday.

14         Q.    **When did you have your next contact with**

15   **anybody from Iron Mountain after you got back?**

16         A.    The next meeting was to be held on April

17   9th at Giambelli's, April 9, 2002.

18         Q.    **Do you recall a meeting at a coffee shop**

19   **in Freehold with Mr. Varn, Mr. Peslak and Mr. Neebling**

20   **that occurred prior to the Giambelli's meeting?**

21         A.    Yes, I do.

22               MR. McCAFFREY:  Did you say yes?

23               THE WITNESS:  Yes.

24         A.    I believe it was the same day.

25         Q.    **So, that was April 9th of 2002?**

Page 148

1

2         A.    Yes.

3         Q.    **What was that meeting about?**

4         A.    Mr. Varn came to me at that meeting and

5    said, "We have a very serious problem."

6                I said, "Okay."

7                He said, "Through Pat O'Connor, we found

8    out that you were indicted in August of '01."

9                And I said, "Yes, I was."

10                And he said, "Well, I need to know what's

11    this about."

12                And I told him that -- I told him what it

13    was about, I was not hiding anything.  One of my best

14    friends who lived next door to me had a wonderful

15    family, four children, our families vacation with each

16    other, we went on ski trips, we went boating.  I

17    believed for years he was a partner at a brokerage

18    firm in the city.

19                And the way this all worked out is that

20    when I bought my company back from U.S. Delivery back

21    in '96, '97, I was looking for investments -- excuse

22    me, investors to come into my company.

23                Well, not knowing, Walter Culkin said to

24    me, "Tom, I could probably find you some guys.  We

25    might be able to take your company and put it into a

Thomas Carr                                    02/28/2007

Page 151

involved.  I put them in my own account.  If I thought

they were stolen checks, I wouldn't put them in my own

account, cashed them and gave the guy the money back."

Q.    Let me ask you for a second.  What did

you think you were doing?  Why do you think he needed

to use you to cash the checks?

MR. McCAFFREY:  You don't have to answer

that, but go ahead and answer it.

A.    I was looking out for myself.  I

needed -- this guy was a really likable guy.  He was a

big Wall Street guy.  He would have big parties at his

house.  And I thought that they were going to help me

take my company public into a public shell and raise

money.  And now I know they were doing that all right,

but they were taking companies public, raising money

and then crashing it and taking all the money.  I did

not know that at the time.  I honestly did not know

that.

And I said, hey, I'm helping my neighbor

out, I'm helping my good friend.  This wasn't a person

I didn't know.  This was one of my best friends, next

door.  If I thought I was doing wrong, I certainly

wouldn't have been cashing checks in my own account,

signing them, cashing them and giving any money.  Or

Thomas Carr                                              02/28/2007

Page 152

1

2    if I thought I was going to go to jail.  I was never

3    arrested or had any previous record.

4              As a matter of fact, I'm very involved as

5    far as different organizations as far as charities and

6    helping sick children, I'm in the newspapers, I'm on

7    the board of directors, I've been the commissioner of

8    Manalpan Sports.  If you want to sit here and try to

9    destroy my credibility, I can show you great things

10   I've done in my life.

11             MR. McCAFFREY:  The question is what did

12        you think you were doing when you were cashing

13        the checks?

14             THE WITNESS:  Helping out my neighbor.

15        Q.    So then there was a dinner the evening of

16   April 9th, 2002 at Giambelli's Restaurant in New York

17   City?

18        A.    Yes.

19        Q.    Who was there?

20        A.    Richard Reese, Larry Varn, Art Peslak,

21   Jimmy Neebling, Tommy Carr.  Was John Kenny there?

22        Q.    You're refreshing your recollection by

23   looking at Neebling 1?

24        A.    I just wasn't sure if John Kenny was

25   there.

Thomas Carr                                        02/28/2007

Page 153

2        Q.     The answer is yes.

3        A.     Yes, he was.  Actually I have a very good

4   memory of most of the events, especially since it

5   drastically affected my life.

6        Q.     So, let's go into what went on at the

7   dinner at Giambelli's.  What was the purpose of that

8   meeting as you understood it before you got there?

9        A.     That meeting was a final consummation

10  that we were going to all unite and lock hands and

11  that Mr. Art Peslak was going to receive a $50,000

12  retainer to start representing me in the case against

13  Pierce.  And we were now all as one, together, united.

14  It became social at first, we all sat down.  I sat

15  next to Mr. Reese.  It started out with just general,

16  you know, hey, do you guys know we're sitting where

17  the Pope had dinner.

18              We talked about -- they were in for some

19  big convention, I believe.  And then after, you know

20  everything went great and then, I guess Mr. Varn must

21  have gave Mr. Reese the nod and Mr. Reese said, "Well,

22  Tom, we have a serious topic to discuss."

23              I said, "Yes, Mr. Reese."

24              He said, "I'm not happy.  I'm not happy

25  about what I found out."

Thomas Carr                                                    02/28/2007

Page 154

1

2              I said, "Okay."

3              He said, "What happened?"

4              I said, "I made a mistake.  I cashed some

5        checks for a friend of mine."

6              And he said to me, "Well," he says, "I'm

7        very disappointed you didn't tell me this." He says

8        that "On the way here, I decided that we're going to

9        move forward, it's a bump in the road, but we're going

10       to move forward, and before we go on, is there

11       anything else in the skeleton of your closet that I

12       should know about?"

13             And I said, "No."

14       Q.    **You were telling me what was said at**

15       **the --**

16             MR. McCAFFREY:  I think he told you,

17             actually.

18       Q.    **Were you finished, was that the end of**

19       **the story as to what happened at Giambelli's that**

20       **night?**

21             MR. McCAFFREY:  The question was what

22             Mr. Reese said.

23       Q.    **I started to say you were telling me what**

24       **had gone on at the meeting as far as what Mr. Reese**

25       **said.  I want you to continue.**

Thomas Carr                                              02/28/2007

Page 155

1

2        A.    After Mr. Reese and I shook hands and we

3    agreed to move forward, he told me that Larry would

4    take care of Art as far as legal fees and everything

5    is going to move forward.  This was a surprise to him,

6    but he made a decision to move forward.  So I thanked

7    him.  I said, "Thank you very much, I appreciate

8    that," and I told him I am going to defend this.

9              MR. McCAFFREY:  What was said, if

10             anything, by anybody else at the meeting other

11             than Mr. Reese?

12             THE WITNESS:  Well, at that moment,

13             everyone just kind of sat there and like didn't

14             know what to expect.  Everybody was kind of on

15             pins and needles thinking where is this going

16             to end up.  We all had a lot invested.  And,

17             you know, for the record, my attorney at the

18             time had told me that you are a nobody in this

19             case, you are basically a chump who cashed some

20             checks and you have nothing to worry about and

21             we're going to defend you.

22             MR. McCAFFREY:  It's 3 o'clock, and what

23             this gentleman would like to know is what

24             anyone else at the meeting may have said to you

25             other than what you just expressed?

**Thomas Carr**                                                      02/28/2007

Page 156

1

2          THE WITNESS:  That's pretty much it.

3     A.    We went on with the meeting.  Then Larry

4  and Art went downstairs and had a conversation.  They

5  asked if they could come and pick up the tapes and Art

6  told me that night along with Jim Neebling -- actually

7  they all left us without paying the check, which Art

8  was pretty pissed off about.

9          He said, "Do you believe this, nobody

10  paid the bill."

11          I said, "Okay, Art, I don't have my

12  Visa."  So Art Peslak paid the bill.  He said, "We're

13  going to move on."

14          Richard wasn't fine.  I spoke with Larry.

15  Art told Jim and I that he had a conversation with

16  Larry Varn downstairs and that Richard told Larry to

17  go ahead and advance Art Peslak the $50,000 retainer

18  through Sullivan & Worcester and that Larry asked Art

19  to set up a meeting within the next week so they could

20  come and pick up the tapes that I recorded from the

21  board meeting.

22     Q.    That's it?

23     A.    Pretty much it.  We all left in good

24  spirits, all shook hands and said have a great

25  weekend.

Thomas Carr

02/28/2007

Page 157

 1

 2              MR. GROSS:  Let's take a break.

 3         (Recess taken at this point.)

 4         Q.    **After the dinner at Giambelli's, what was**

 5    **the next contact that you had with anybody from Iron**

 6    **Mountain or a representative?**

 7         A.    I believe there was a meeting set up

 8    within a couple days after that to go to Art Peslak's

 9    office with Charlie Moore and Larry Varn to secure the

10    tapes that I have from the board meeting of Logisteq

11    in Freehold, New Jersey.

12         Q.    **So this meeting actually took place in**

13    **Mr. Peslak's office?**

14         A.    Yes, it did, Mr. Gross.

15         Q.    **And it related to these tapes that had**

16    **been made?**

17         A.    Yes.

18         Q.    **Were any promises made to you during this**

19    **meeting?**

20         A.    The promises were already made and

21    consummated, so we made the deal.  I was going to be

22    backed and supported and Art Peslak got his retainer

23    and now we had a deal.  We were in bed now, we were

24    moving forward.

25         Q.    **So the answer is no, no promises were**

Thomas Carr

1

2    made at this time?

3        A.      Not at that day.  The promises were made.

4        Q.      I heard what you said.  I'm just asking

5    about this meeting in particular.

6        A.      Okay.  We did listen to the tapes.

7                MR. McCAFFREY:  Wait for his question.

8        Q.      Apart from listening to the tapes, what

9    else did you do, if anything?

10       A.      Larry Varn was very excited to hear

11   Pierce admit that Logisteq had put $300,000 into

12   funding Mike Gold's Sequedex.

13       Q.      What was the next meeting?

14       A.      I don't even see the date for that

15   meeting, what was that?  It was the 11th, I believe.

16       Q.      April 11th.

17       A.      Nothing of substance.

18               MR. McCAFFREY:  His question was when was

19               there a next meeting with anyone from or

20               representing Iron Mountain or an Iron Mountain

21               entity, I guess?  When would that have been?

22       A.      Let me take a look so I can refresh my

23   memory.  I'm showing the next meeting as May 16th,

24   '02.

25       Q.      May 16th?  Who attended that meeting?

Thomas Carr                                              02/28/2007

                                                        Page 159

1

2          A.    I'm showing Varn and myself.

3          Q.    **Just you and Varn?**

4          A.    I believe so.

5          Q.    **I'm sorry, the date was May what?**

6          A.    May 16th, 2002.

7          Q.    **Where did that meeting take place?**

8          A.    It says Freehold, New Jersey.

9          Q.    **Tell me what happened at that meeting, if**

10  **you can recall?**

11         A.    I don't recall that meeting.

12         Q.    **So you're just relying on the fact that**

13  **it's listed in Exhibit 1?**

14         A.    Yes.

15              MR. GROSS:  That's Neebling Exhibit 1.

16         Q.    **When was the next meeting after May 16th**

17  **of 2002?**

18         A.    The next meeting was June 10th at the

19  Waldorf Astoria for dinner.

20         Q.    **Who was there?**

21         A.    Richard Reese, John Kenny, Larry Varn,

22  Tom Carr, Jim Neebling and Art Peslak.

23         Q.    **What was the purpose for that meeting?**

24         A.    That was -- I believe Richard Reese was

25  going to be in town for some function, and it was just

Thomas Carr                                                          02/28/2007

Page 160

2    a get-together social meeting.  Dinner, drinks.

3         Q.    **What was discussed?**

4         A.    We were all very happy about the evidence

5    that we had for the Iron Mountain/Pierce litigation.

6    At that meeting Jim Neebling also spoke with Richard

7    regarding the $25 -- $25,000 business that Jim was

8    getting for his business, Systrans, and at that

9    meeting, both Jim and I were very happily surprised

10   when John Kenny told us the good news, that he had an

11   oracle that showed that the business potential that

12   Systrans would receive was not 25,000, that it was

13   45 -- I'm sorry.  You know what, 25 million.  And that

14   the business that Jim's company could secure was $45

15   million a year in annual sales.

16        Q.    **When you say could secure, you mean that**

17   **he was making a pitch for the business and if he got**

18   **the business, that was the volume of it?**

19        A.    We were committed to business and there

20   really wasn't --

21              MR. McCAFFREY:  You were committed?

22        A.    We were committed from Mr. Reese and John

23   Kenny on the March 26th meeting in the conference

24   room.  It's not like we had to pitch the business.

25   They were really pitching the business to Jim because

Page 161

they were so impressed with Jim's knowledge of the

transportation sector that they needed help, meaning

Iron Mountain.  So at that meeting --

Q.    **Which meeting?**

A.    On the 26th.  We were told we need help,

we have $25 million in transportation business we can

give you.  And don't get me wrong, it was not a

meeting where Richard Reese turned around and said,

"By the way, here's 25 million, let's start, Tom."

As in any big company, you have to have

infrastructure, you have to have a business plan.  We

left there with John Kenny and Richard Reese saying

we'll gather, put the business plan together, let's

sit down and put our heads together and consummate the

deal and let's make it happen.

At the meeting that we had dinner at the

Waldorf Astoria, the great news of the night was that

Mr. Kenny told Jim that Mr. Reese made a mistake, it

was not 25 million, it was $45 million in business.

Now I'm like, Oh, my God, that's wonderful.

Q.    **The 45 million, that was all of Iron**

**Mountain courier business?**

A.    No, I believe he said there was 120,

maybe 140 million in business total, but Iron Mountain

**Thomas Carr**                                              02/28/2007

Page 162

1

2   had their own transportation through their own

3   equipment.  Then the $45 million in business was the

4   business that they outsourced through outside couriers

5   and different transportation companies.  So --

6          **Q.    So 45 million was all their outside**

7   **couriers?**

8          A.    Yes.  And John Kenny had shown us at the

9   table an Oracle of the cycles and the different areas,

10  and the majority of that business was right here in

11  the New York and New Jersey metropolitan area.  Jim

12  and Richard Reese pretty much had a one-on-one because

13  Jim was really pitching this whole plan, how he's

14  going to be able to help Iron Mountain.

15          And Kenny was telling him that they have

16  somebody now working in Massachusetts on this and they

17  want to connect Jimmy with them.  And put it together

18  and would start this business, you know, in an off

19  area pretty much.

20          I believe Jim started in Massachusetts

21  and then went out to the West Coast, like Kansas or

22  Wyoming and started doing test runs on how this

23  business would operate before we actually came into

24  the New York/New Jersey market where the majority of

25  the business consisted of.

**Merrill Legal Solutions**
**(617) 542-0039**

Thomas Carr                                                          02/28/2007

Page 163

1

2          Q.    Do you recall Mr. Reese soliciting a

3    business plan from Mr. Neebling at this June 10, 2002

4    meeting?

5          A.    Reese was not soliciting anything.

6          Q.    So the answer is no?

7          A.    No.

8          Q.    So I assume you don't recall Mr. Reese

9    suggesting to Mr. Neebling if Mr. Neebling gave him

10   such a plan that he would get it into the right hands

11   for consideration?  That's not something that happened

12   at this meeting either?

13         A.    It did happen at the meeting.

14         Q.    It did?

15         A.    Yes.

16         Q.    Mr. Reese said that?

17         A.    Yes, he did.  He said Jim -- that's what

18   I was telling you.  He was going to get him involved

19   with -- again it was their conversation, but I believe

20   the name was Dave Bartley, it might have been someone

21   else, but he was going to connect him to a person to

22   start getting this up and going.

23         Q.    It wasn't your understanding that they

24   had an agreement to give Mr. Neebling or Systrans the

25   business at this point, is it?

Thomas Carr                                                    02/28/2007

Page 164

1

2          A.    My understanding is we had an agreement

3    from the March 26th meeting.

4          Q.    **That Mr. Neebling and Systrans would**

5    **actually get this business?**

6          A.    Absolutely.  Mr. Reese and Mr. Kenny came

7    to us and said, "We need you to help us with our

8    transportation."

9          Q.    **Did they tell Mr. Neebling that he had**

10   **the business on March 26th?**

11         A.    They told Mr. Neebling we have $25

12   million of business that we would like you to look at

13   to operate and help us with the problem we're having.

14         Q.    **Did anybody discuss a contract at that**

15   **point?**

16         A.    I don't recall.

17         Q.    **Do you know whether there was ever a**

18   **contract entered into between Iron Mountain and**

19   **Systrans for a courier business?**

20         A.    Yes, I do know of a contract.

21         Q.    **Anything else at the June 10, 2002**

22   **meetings?**

23         A.    A great dinner, great restaurant, great

24   food, great drinks.  We all celebrated, we were very

25   happy, one big family.  Things were going the way that

Thomas Carr

Page 182

1

2      Q.      Go ahead.

3      A.      So what happened is Jimmy would

4  constantly come to me and ask me for funds to help him

5  fund Systrans based on the promise that we would have

6  $45 million in work and that if I fund the company, he

7  would give me half of the profits, the net profits on

8  the company.  And that's basically how it worked.  And

9  what I did is, approximately over time I had given Jim

10  between -- loans from Paul Schwartz and my own funds

11  in the sum of almost $600,000 to fund Systrans.

12      Q.      How much of it was from your funds as

13  opposed to Mr. Schwartz's funds?

14      A.      One moment.

15      MR. McCAFFREY:  Just do the subtraction.

16      A.      2002, November --

17      MR. McCAFFREY:  How much did Paul loan

18      you?

19      Q.      You want to give me what you lent?

20      A.      I have to add up all the checks I gave

21  him.

22      MR. McCAFFREY:  No, we know from the

23      other day when we did this together it's 600

24      total.  What was Paul's?

25      THE WITNESS:  I have 250 -- I have

Thomas Carr
02/28/2007

Page 183

1

2      $450,000 that came out of my pocket, which was

3      basically my last life's earnings.  I had about

4      600,000 left in my account when I was backing

5      him.  And Paul Schwartz had committed to

6      500,000, and I believe I had signed,

7      personally, for an additional 150,000, 600,000.

8      And out of that, Jimmy was paying my health

9      benefits and I was getting $1,000 a week until

10     the business started coming back.

11     Q.     I'm a little confused.

12            How much actual cash did you lend to

13  Mr. Neebling's business?

14     A.     $450,000.  That's one of the most --

15  that's what really hurts me.

16            MR. McCAFFREY:  Listen.

17            MR. GROSS:  Really.

18     A.     How could Iron Mountain allow me to put

19  that kind of money into an investment.  It's just so

20  wrong.

21     Q.     Just answer my question.

22            Over what period of time did you put that

23  money in?  I don't need the details of each dollar.

24  When did you start and when did you finish?

25     A.     From November 7th, 2002 to -- wait, I'm

Thomas Carr

02/28/2007

Page 185

1

2    him, Mr. Neebling, that you could not be within a

3    hundred miles of Systrans if Systrans was going to do

4    any business with Iron Mountain?

5        A.    Larry Varn had told me one night when we

6    were out having some drinks that we have to be very

7    careful-- actually I can --

8        Q.    Before you do that, see if you can answer

9    my question.

10       A.    No, I didn't talk to Mr. Reese.

11       Q.    No.  Did Mr. Neebling say that Mr. Reese

12   had said that?

13       A.    No, he did not.

14       Q.    Did you ever have a relationship with

15   Systrans that was other than just as a lender?

16       A.    The relationship that I had was a -- that

17   I had lent Systrans a note to fund the company.  And

18   the deal that we worked out is that I would share the

19   profits --

20            MR. McCAFFREY:  The question is did you

21        have a relationship other than that as a

22        lender?

23       A.    No.

24       Q.    The terms of your loan included some

25   share of the profits?

Thomas Carr                                                    02/28/2007

Page 186

1

2          A.    I was to share 50 percent of the profits

3     of Systrans.

4          Q.    **Were you to be paid only out of the**

5     **profits?**

6          A.    Jim Neebling --

7                MR. McCAFFREY:  Just yes or no.

8          A.    He was going to pay me back the money

9     once the business kicked in.

10         Q.    **Did you have a note, did you actually**

11    **make up a note to manifest the loan?**

12         A.    Larry Varn instructed Jim Neebling and I

13    not to have anything in writing that could cause

14    problems between Iron Mountain and the Pierce

15    litigation that Pat O'Connor could go and attack us

16    for.  So we tried to cooperate with Larry Varn.

17         Q.    **There was no writing that evidenced this**

18    **relationship between you and Systrans?**

19         A.    Just checks that I wrote out to --

20               MR. McCAFFREY:  The answer is no.

21         A.    No.

22         Q.    **So your understanding with Mr. Neebling**

23    **was an oral understanding?**

24         A.    Correct.

25         Q.    **And the understanding was you could get**

**Thomas Carr**                                              02/28/2007

Page 200

1

2    not been getting the business we were promised.  So

3    both Jimmy and I, we were very concerned and we were

4    looking for Larry to help us.

5         Q.    Is that how the dinner meeting got set

6    up?

7         A.    Yes.

8         Q.    You called for it?

9         A.    No, Jim Neebling did.

10         Q.    What happened once you got to dinner?

11         A.    Well, to say it bluntly, Larry got sloppy

12    drunk where he couldn't even stand, and he said to me,

13    "Well, you know," he said, "Richard said he didn't

14    promise you anything."

15              I said, "Well, Larry, that's completely

16    false, and you all know that I was promised everything

17    to stand behind you guys, and I did my part.  I helped

18    you for so many years to get you evidence and give you

19    tapes and bring you as many people as I knew who would

20    help you in your fight against Pierce.  And everything

21    that my wife had told me would happen to me is

22    happening.  I'm left in financial ruins.  I have

23    people attacking me for money.  I lost my business, I

24    lost all my money, and I'm not getting the business

25    that I'm supposed to earn through Jim Neebling."

**Thomas Carr**                                              02/28/2007

Page 201

1

2              So Larry said to me, "Well, how much do

3      you do need?  How much would cover your liability?"

4              And I said, "I'm out at least $2

5      million."

6              And he said to me, whether he knows if he

7      said it or not, because half the meetings we had, I

8      don't know if he's a functional alcoholic or a drunk,

9      but he was smashed that night and said, "I'll get you

10     $2 million.  I'm going to talk to Garry Watzke, Tom,

11     and I'm going to figure out a way how I can get you $2

12     million if it's the last thing I do.  We'll have to

13     structure it to keep these bastards down in Philly out

14     of it.  We'll have to structure it through Jim

15     Neebling's company.  I'll talk to Art, I'll talk to

16     Garry and we'll try to work it out."

17             The next day, Garry Watzke called Art

18     Peslak, and Art Peslak's phone records, they had a

19     conversation on how Jim Neebling can structure a deal

20     where Iron Mountain can buy him out, give him the

21     money to get to me and have Jimmy run the company

22     basically as a consultant for Iron Mountain.

23         Q.    Mr. Watzke asked Mr. Peslak to

24     participate in structuring a deal like that?

25         A.    Mr. Watzke asked Art Peslak to figure out

**Thomas Carr**

02/28/2007

Page 202

1

2    how we could formulate a deal to help Tom get some

3    money until after the arbitration, whether that was to

4    buy out Jim's company or put a loan into Jim's company

5    so I can get the funds that I have been putting into

6    Systrans.  I believe there was a term sheet even made

7    up with Art Peslak on some ideas with Garry Watzke and

8    Art, how they can formulate this, but, again, the

9    promises were not fulfilled and nothing happened.

10        **Q.    So to go back to the night before,**

11    **September 9th, at Gallagher's when Mr. Varn told you**

12    **what you say he told you.  Were you at the dinner**

13    **table?**

14        A.    I was at the dinner table.

15        **Q.    Mr. Moore was there as well?**

16        A.    Yes.

17        **Q.    Mr. Miller?**

18        A.    No, Jim Neebling.

19        **Q.    I'm sorry, Mr. Neebling.**

20        A.    It was just us four.  And I think in good

21    intent, I think Larry was sincere, he understood my

22    frustration even though Charlie Moore tried to destroy

23    me afterwards.  But I believe that they understood, I

24    believe they understood I tried to do everything

25    possible to help them.  And at this point their hands

Thomas Carr                                              02/28/2007

Page 203

1      were tied.  Because I guess if they did help me,

2      somehow some way O'Connor would find out about it and,

3      you know, they didn't want to take that chance.

4           Q.    **So you told me everything that went on of**

5      **substance at the September 9, 2003 dinner at**

6      **Gallagher's?**

7           A.    Yes.  Jimmy Neebling also gave his

8      frustration that I've had it.

9           Q.    **I want to ask you a little bit about who**

10     **is Paul Schwartz?**

11          A.    Paul Schwartz is a man who lives in

12     Hewlett Harbor, Long Island and he owns CAC Leasing,

13     and Paul Schwartz is a leasing company that leases

14     equipment to different transportation companies.

15          Q.    **And what's your relationship to**

16     **Mr. Schwartz, if any?**

17          A.    My relationship with Mr. Schwartz is I'm

18     a customer of his.  I took a loan out with him to

19     purchase equipment back in, I believe, 1997, '98.

20          Q.    **Is it any part of your claim in this case**

21     **that relates to your debt with Mr. Schwartz?**

22          A.    Yes.

23          Q.    **Can you explain that, please?**

24          A.    When I signed as a company, Mr. Schwartz

Page 212

1

2          Q.      Were you under oath when you gave that

3    testimony?

4          A.      Yes, I was.

5          Q.      Was all your testimony true and accurate?

6          A.      Yes, it is.

7          MR. GROSS:  I'm going to ask that that

8    document be marked as Carr Exhibit 4.

9          (Whereupon, transcript of testimony of

10   Thomas Carr dated May 28, 2003 marked Carr

11   Exhibit 4 for identification, as of this date.)

12         Q.      Mr. Carr, did you, in fact, give

13   testimony at the arbitration captioned Iron Mountain

14   Incorporated against J. Peter Pierce?

15         A.      Yes, I did.

16         Q.      I'm going to hand you what I believe is a

17   transcript of that testimony and ask you if you can

18   confirm that, in fact, you gave testimony in that

19   arbitration on July 31, 2003?

20         A.      Yes, I did.

21         Q.      And is that document that's before you a

22   transcript of that testimony?

23         A.      Yes, it is.

24         Q.      Did you give that testimony under oath?

25         A.      Yes.

Page 213

1

2          Q.     And was your testimony that day accurate?

3          A.     Yes, it was.

4          Q.     You told the truth?

5          A.     Yes, I did.

6                 MR. GROSS:  I would like to have that

7          marked as Exhibit 5.

8                 (Whereupon, transcript of testimony of

9          Thomas Carr dated July 31, 2003 marked Carr

10         Exhibit 5 for identification, as of this date.)

11         Q.     I'm going to hand you another document,

12  Mr. Carr.  This I believe is a copy of the Southern

13  District of New York indictment against you and

14  others.  Can you look at that and confirm that for me?

15         A.     Yes, it is.

16         Q.     And this is one of the indictments to

17  which you pled guilty in 2004?

18         A.     Yes.

19                MR. GROSS:  I'll have the reporter please

20         mark that as Exhibit 6.

21                (Whereupon, indictment of Thomas Carr

22         marked Carr Exhibit 6 for identification, as of

23         this date.)

24         Q.     I want to spend the next few minutes that

25  we have left today, Mr. Carr, talking about your

Page 220

1

2

3                    C E R T I F I C A T E

                   — — — — — — — — — — —

4

5    STATE OF NEW YORK      )        **CERTIFIED ORIGINAL**
                            )  ss.:  **LEGALINK BOSTON**
6    COUNTY OF NEW YORK     )

7              I, DENISE L. DANIELS, a Shorthand

8    Reporter and Notary Public within and for the

9    State of New York, do hereby certify:

10             That I reported the proceedings in

11   the within entitled matter, and that the

12   within transcript is a true record of such

13   proceedings.

14             I further certify that I am not

15   related, by blood or marriage, to any of

16   the parties in this matter and that I am

17   in no way interested in the outcome of this

18   matter.

19             IN WITNESS WHEREOF, I have hereunto

20   set my hand this _6th_ day of _March_,

21   2007.

22

                   _Denise L. Daniels_

23                 DENISE L. DANIELS

24

25

Page 221

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
-----------------------------------------x
IRON MOUNTAIN INCORPORATED;
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.; C. RICHARD
REESE; JOHN F. KENNY, JR.;
GARRY B. WATZKE; LARRY L. VARN;
and CHARLES G. MOORE,

                 Plaintiffs and
                 Counterclaim Defendants,

                           Civil Action
      v.                  No. 05 10890 RCL

THOMAS CARR,

                 Defendant and
                 Counterclaim Plaintiff.
-----------------------------------------x
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.

                 Plaintiff,

                           Civil Action
      v.                  No. 05 10999 RCL
SYSTRANS FREIGHT SYSTEMS, INC.,
                 Defendant.
-----------------------------------------x
                   March 15, 2007
                   10:10 a.m.
     Continued deposition of THOMAS CARR, taken by
Plaintiff, pursuant to Adjournment, at the offices of
Patton Boggs, LLP, One Riverfront Plaza, Newark, New
Jersey, before Denise L. Daniels, a Shorthand Reporter
and Notary Public.

CERTIFIED ORIGINAL
LEGALINK BOSTON

Thomas Carr, Vol. 2                                03/15/2007

Page 226

1    as to who he worked for?

2         A.    No.  He had a uniform on, but I'm not

3    sure if it was -- I think it was just a local courier,

4    one of Iron Mountain's local couriers had brought it

5    to me, I believe.

6         Q.    Mr. Carr, you were here yesterday for

7    Mr. Peslak's testimony, correct?

8         A.    Yes.

9         Q.    You heard him testify about conversations

10   he had with you regarding this document, Peslak

11   Exhibit 2?

12        A.    Yes.

13        Q.    To your best recollection, did he testify

14   accurately about those conversations?

15        A.    Yes.

16        Q.    I'm handing you another document,

17   Mr. Carr, and I want to ask you whether you can tell

18   me what that is?

19             MR. SHAPIRO:  Do you have another copy of

20        that?

21             MR. GROSS:  Yes.

22        A.    It's the findings of facts for the

23   arbitration between Iron Mountain versus Peter Pierce.

24   The Arbitrator was Thomas B. Rutter, Esquire,

25   Arbitrator.

Thomas Carr, Vol. 2                        03/15/2007

Page 227

1      Q.      Have you had occasion to read this

2   document that's before you before?

3      A.      I'm not sure.

4      Q.      Have you seen it before?

5      A.      Yes, I believe I did.

6      Q.      Under what circumstance?

7      A.      I'm not sure.

8          MR. GROSS:  I'm going to ask that the

9      reporter mark that for identification as Carr

10     Exhibit 7.

11         (Whereupon, findings of facts for

12     arbitration between Iron Mountain versus Peter

13     Pierce marked Carr 7 for identification, as of

14     this date.)

15     Q.      Mr. Carr, are you aware that the

16  Arbitrator referred to you as a con man in this

17  document?

18     A.      Yes, I am.

19     Q.      How did you come to that awareness?

20     A.      I came to that because I read an article

21  that was in the Boston Globe where the Arbitrator said

22  that Tom Carr was a con man, and I was very upset when

23  I read that.

24     Q.      I hand you another document, Mr. Carr,

25  and ask you if you can identify that?

Page 228

1    A.    Yes.  It is an indictment, United States

2    District Court, Eastern District of New York versus

3    Thomas Carr.

4              MR. GROSS:  I'll ask the reporter to mark

5         that as Carr Exhibit 8.

6              (Whereupon, indictment USDC, Eastern

7         District of New York versus Thomas Carr marked

8         Carr Exhibit 8 for identification, as of this

9         date.)

10    Q.    Mr. Carr, this indictment lodges charges

11    against you, among others, correct?

12    A.    Yes.

13    Q.    And you pled guilty to count 2 of this

14    indictment at a subsequent date?

15    A.    Yes, I did.

16    Q.    I'm going to show you another document

17    which appears to be a letter to Judge Spatt of the

18    Eastern District, from the U.S. Attorney's Office

19    dated November 30, 2006 and ask you if you've seen

20    that.

21    A.    No, I have not seen this letter.

22    Q.    Can you tell me what the status is of

23    your sentencing?

24    A.    Yes.  I'm going to be sentenced on April

25    30th, 2007.

Thomas Carr, Vol. 2

03/15/2007

Page 237

1    John Kenny.

2        Q.    Can you place that in time for me?

3        A.    I would say that would be around June of

4    '02.

5        Q.    Did you place a call to Mr. Kenny?

6        A.    Yes, I did.

7        Q.    Did you and Mr. Kenny then have a

8    conversation over the phone?

9        A.    Yes.

10        Q.    Tell me the best you can recall as to

11    what you said to him and what he said in return?

12        A.    I asked John if I could have a job or a

13    consulting position, I need to earn a living.  Now

14    that Logisteq had closed down.  And John had told me

15    he would see what he can do and get back to me.

16        Q.    Is that all he said?

17        A.    Yes.

18        Q.    Is that all you said?

19        A.    Yes.

20        Q.    It was a very short conversation?

21        A.    Very short.

22        Q.    Did you have any further conversations

23    with Mr. Kenny on this subject?

24        A.    No, I didn't.

25        Q.    Did you attempt to speak to Mr. Kenny

Thomas Carr, Vol. 2

03/15/2007

Page 238

1    about this after --

2          A.    I believe within weeks after that, Jim

3    Neebling had told me that he had a conversation with

4    John Kenny and it wasn't a good thing for them to hire

5    me, especially because I had the indictment, that

6    would cause a problem and the fact that O'Connor, the

7    shark he was, had been attacking to try to ruin the

8    credibility of this case.  And Jim told me that

9    instead of giving me a consulting job, that I would

10   get paid through Systrans by securing the work from

11   Iron Mountain.

12         Q.    And did that satisfy you?

13         A.    Yes.

14         Q.    So you didn't pursue a job after that?

15         A.    No.

16         Q.    So another element of your damages that

17   you just described relates to your advancing funds to

18   Systrans?

19         A.    Yes.

20         Q.    What's the amount of that component of

21   your claim?

22         A.    Approximately in the ballpark of about

23   450 is what I put into the Systrans company including

24   Veredex.  And on top of that, I had signed personally

25   for the loans from Paul Schwartz.

Page 245

1    A.    I didn't say anything to Jimmy because I

2  really didn't trust Jimmy at that point.  Because I

3  was calling Jimmy every month asking him for money,

4  asking him, you know, why isn't the business not

5  coming on.

6            And I really didn't have any

7  communication except with Charlie Moore.  And I wasn't

8  sure at that time if Jimmy was just avoiding the fact

9  of the monies I put into the company.  And he was

10  starting to pay me back $1,000 a week, and he started

11  paying me benefits and then he couldn't pay that

12  anymore.

13            And he told me, "I'm really sorry, the

14  business has not come through at Iron Mountain, I'm

15  going to have to stop your health benefits and I'm

16  going to have to stop giving you $1,000 a week to make

17  up for the monies that you put into the company."

18            So we were just desperate at the time.

19  We had all of these commitments, and after the

20  arbitration, I felt Iron Mountain had just walked away

21  and left us out to dry.

22    Q.    You were getting health benefits under

23  the Systrans employee plan?

24    A.    Yes.

25    Q.    You weren't an employee, though?

Page 246

1      A.     No.

2      Q.     So, then to your knowledge -- did

3  Mr. Neebling tell you after this that he had spoken to

4  Mr. Pierce?

5      A.     Yes, he did.

6      Q.     Did he tell you about the substance of

7  his conversation?

8      A.     Yes, he did.

9      Q.     What did he say?

10     A.     He told me he went to Mr. Pierce and he

11 explained to Mr. Pierce how Iron Mountain had -- he

12 understands how he felt because he felt the same way,

13 how Richard Reese terminated him after four months.

14 That Jimmy worked day and night around the clock for

15 Iron Mountain.

16          He told me he told Peter that Iron

17 Mountain should have won the case, but, obviously,

18 somebody got to somebody with this Arbitrator because

19 the proof was just right in front of you.  And he

20 said, "We're really damaged and we want to know if we

21 can work something out with you."

22          So Peter told him, "Yeah, I would like to

23 work something out with you guys, set up a meeting."

24     Q.     So Mr. Neebling told you that, and the

25 meeting was set up?

Page 251

1          that you're referring to there?

2                    THE WITNESS:  It was October 31st, 2004.

3          Q.     Do you recall leaving that message on

4     Mr. Varn's voicemail?

5          A.     Yes.  I think this is a true picture

6     of --

7          Q.     Let me just ask you first so that we get

8     it on the record.

9                 Is that, to the best of your

10    recollection, an accurate rendition of what you left

11    on the voicemail?

12         A.     Yes.

13                    MR. GROSS:  Mark that as Carr Exhibit 9.

14                    (Whereupon, voicemail dated December 8,

15             2004 marked Carr Exhibit 9 for identification,

16             as of this date.)

17                    MR. GROSS:  Just give me a minute.

18                    (There was a pause in the proceedings at

19             this point.)

20         Q.     Mr. Carr, I just handed you a document

21    that appears to be the asset purchase agreement

22    pursuant to which Mr. Pierce bought an interest in

23    your companies, correct?

24         A.     Correct, yes.

25         Q.     Would you take a look at that and confirm

Page 252

1    for me, if you can, that that is, in fact, the

2    agreement?  And I will call your attention to your

3    signature page, which appears at page 25.

4           A.    Okay.

5           Q.    Is this it?

6           A.    Yes.

7                 MR. GROSS:  I ask the reporter to mark

8           that as Exhibit 10, please.

9                 (Whereupon, asset purchase agreement

10          marked Carr Exhibit 10 for identification, as

11          of this date.)

12          Q.    Page 4 of Exhibit 10 in the section

13    numbered 1.2 talks about the purchase price for these

14    assets.

15                Is it the case, Mr. Carr, that you

16    personally received the purchase price set forth in

17    section 1.2-A, that is, $3,869,370 in this

18    transaction?

19          A.    Yes.

20          Q.    Did you receive any amount pursuant to

21    subsection 3 of that section titled "Additional

22    Purchase Price"?

23          A.    No, I never received that.

24          Q.    So the total purchase price that you

25    received for the sale of these assets was the 3.8

Thomas Carr, Vol. 2                              03/15/2007

Page 253

1    million plus?

2           A.    Yes.

3           Q.    Mr. Carr, after the arbitration decision

4    came down, do you recall telephoning Mr. Varn on a

5    Saturday night to tell him that you could prove that

6    the tape at issue in the case was recorded in New

7    Jersey because you had the illegal tape of the

8    Pennsylvania meeting?

9           A.    Yes.

10          MR. GROSS:  I'm finished.  Thanks very

11      much.

12          MR. SHAPIRO:  I have a couple of things I

13      just want to clarify the record about, Tom,

14      your relationship to Systrans.

15   EXAMINATION BY

16   MR. SHAPIRO:

17          Q.    Earlier you testified or two weeks ago,

18   that in response, direct response to Mr. Gross'

19   question that you had no relationship with Systrans

20   beyond that of a lender.  Do you stand by that

21   testimony?

22          A.    Yes.

23          Q.    And today you said that you got some sort

24   of benefits, medical and/or otherwise from Systrans.

25          How long did these benefits continue?

Page 254

1    A.    I believe for about a year.

2    Q.    **Do you remember what time period, when**

3  **they started and when they stopped, about?**

4    A.    No.

5    Q.    **What year are we talking, generally?**

6    A.    I would say 2003.

7    Q.    **Have you seen this document before?**

8          MR. SHAPIRO:  I'm sorry, I don't have any

9    copies?

10   A.    Yes.

11         MR. GROSS:  Just tell me what it is.

12         MR. SHAPIRO:  On the top it says,

13   "Affidavit of Thomas Carr and James Neebling,"

14   and it's actually from your production, Bates

15   number IM 4340.

16   Q.    **What is it in your understanding?**

17   A.    Jim Neebling had called me and told

18   me --

19   Q.    **I don't care how it came about.  What is**

20  **the document?**

21   A.    An affidavit of Thomas Carr and James

22   Neebling.

23   Q.    **Is that your signature there?**

24   A.    Yes.

25   Q.    **What's the date?**

Thomas Carr, Vol. 2                                    03/15/2007

Page 255

1    A.    March 17, '05.

2    Q.    Do you remember signing this?

3    A.    Yes, I do.

4    Q.    It says in part "The undersigned, Thomas

5    Carr, has no interest in Systrans Freight Systems,

6    Inc., ownership or otherwise or any interest in any

7    other entity, ownership or otherwise which is in any

8    way involved with Systrans Freight Systems, Inc."   Is

9    that right?

10   A.    Yes.

11   Q.    Is that statement still correct?

12   A.    Yes.

13   Q.    The next sentence says "The unsigned,

14   Thomas Carr, has no involvement whatsoever in the

15   administration and/or operations of Systrans Freight

16   Systems, Inc."   Do you stand by that statement?

17   A.    Yes.

18         MR. SHAPIRO:  Mark this as Carr 11.

19         (Whereupon, affidavit of Thomas Carr and

20   James Neebling marked Carr Exhibit 11 for

21   identification, as of this date.)

22         MR. SHAPIRO:  That's all I have.

23         MR. GROSS:  I have nothing further.

24         (Time noted:  11:10 a.m.)

25   _____

THOMAS CARR

Page 259

```
 1                 C E R T I F I C A T E
 2
 3
    STATE OF NEW YORK      )
 4                         )   ss.:
    COUNTY OF NEW YORK     )
 5
           I, DENISE L. DANIELS, a Shorthand
 6
    Reporter and Notary Public within and for the
 7
    State of New York, do hereby certify:
 8
           That I reported the proceedings in
 9
    the within entitled matter, and that the
10
    within transcript is a true record of such
11
    proceedings.
12
           I further certify that I am not
13
    related, by blood or marriage, to any of
14
    the parties in this matter and that I am
15
    in no way interested in the outcome of this
16
    matter.
17
           IN WITNESS WHEREOF, I have hereunto
18
    set my hand this _19th_ day of _March_,
19
    2007.
20
21                  _____
                       DENISE L. DANIELS
22
23                         CERTIFIED ORIGINAL
24                         LEGALINK BOSTON
25
```

Thomas C
Vol. 1, May 30, 20

Page 1

[1]     SUPERIOR COURT OF NEW JERSEY

[2]     CHANCERY DIVISION - MONMOUTH COUNTY

[3]         DOCKET NUMBER: MONC 95-02

[4]

[5] THOMAS CARR AND

    TRANSPORTATION CONCEPTS:

[6] OF NEW JERSEY, INC.,              : Deposition of

        Plaintiffs.: THOMAS CARR

[7]     V.                                :

    J. PETER PIERCE,                      :

[8] PIONEER CAPITAL, L.P., :

    PIONEER CAPITAL GENPAR,:

[9] INC. and LOGISTEQ, LLC,:

        Defendants.:

[10]

    J. PETER PIERCE,                      :

[11] PIONEER CAPITAL, L.P., :

    PIONEER CAPITAL GENPAR,:

[12] INC. and LOGISTEQ, LLC,:

        Counterclaimants,:

[13]     V.                               :

    THOMAS CARR,

[14] TRANSPORTATION CONCEPTS:

    OF NEW JERSEY, JAMES

[15] NEEBLING and SYSTRANS

    FREIGHT SYSTEMS, INC., :

[16]     Counterclaim

        Defendants.

[17]

[18]    Transcript of video deposition

    taken by and before Victoria A. Bramnick,

[19] a Shorthand Reporter and Notary Public,

    at the offices of Cozen O'Connor, 457

[20] Haddonfield Road, Cherry Hill, New Jersey

    08002, on Thursday, May 30, 2002,

[21] commencing at 10:14 a.m.

[22]

        ESQUIRE DEPOSITION SERVICES

[23]     90 Woodbridge Center Drive

    Woodbridge, New Jersey 07095

[24]     (732) 283-1060

Page

[1] APPEARANCES:

[2]

        MANDEL & PESLAK

[3]     BY: ARTHUR M. PESLAK, ESQUIRE

        80 Scenic Drive

[4]     Suite 5

        Freehold, New Jersey 07728

[5]     (732) 761-1610

        Counsel for the Plaintiffs

[6]

[7]     COZEN O'CONNOR

        BY: PHILIP G. KIRCHER, ESQUIRE

[8]     JOHN C. BARNOSKI, ESQUIRE

        457 Haddonfield Road

[9]     Cherry Hill, New Jersey 08002

        (856) 910-5000

[10]    Counsel for the Defendants

[11]

[12] ALSO PRESENT:

[12]

[13]    Douglas Huntley

        Alan McGrath

[14]    David Levin, Videographer

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

Page 3

[1]

[2]             INDEX

[3]

[4] Testimony of: THOMAS CARR

[5] By Mr. Kircher. . . . . . . . . 6

[6]

[7]         EXHIBITS

[8]

[9] EXHIBIT NO. DESCRIPTION  PAGE MARKED

[10] Carr-1    Phone Bill     4

[11] Carr-2    Phone Bill     4

[12] Carr-3    Phone Bill     4

[13] Carr-5    Indictment     4

[14] Carr-6    E-mail, 1/29/01   4

[15] Carr-7    Letter, 4/12/02   4

[16] Carr-9    Memo, 4/22/02    4

[17] Carr-10   Memo, 4/26/02    4

[18] Carr-11   Letter, 8/2/00   4

[19] Carr-12   Automobile Lease  4

[20] Carr-13   Letter, 4/23/02   4

[21] Carr-14   Letter, 4/9/02   4

[22] Carr-15   Document      4

[23] Carr-18   Memo, 3/28/01    4

[24] Carr-19   Letter, 4/26/01  4

Cass     EXH  1
FOR IDENT.
IN EVD   DATE 2/28/07
DENISE L. DANIELS

---

Sullivan & Worcester LLP            Min-U-Script®            (3) Page 1 - Page 3

IMP04403

Page 4

[1]
[2]     (Whereupon the documents
[3] were premarked for identification
[4] as Carr Exhibit Numbers 1 through
[5] 3, 5 through 7, 9 through 15, 18
[6] and 19.)
[7]
[8]     THE VIDEOGRAPHER: We are
[9] now on the record. My name is
[10] David Levin. I'm a videographer
[11] employed by Esquire Deposition
[12] Services, 1880 J.F.K. Boulevard,
[13] Philadelphia, PA.
[14]     This is a video deposition
[15] for Superior Court of New Jersey,
[16] Monmouth County, Chancery
[17] Division, Docket Number MONC
[18] 95-02, Civil Action.
[19]     Today's date is May 30,
[20] 2002, and the time is 10:14 a.m.
[21]     This deposition is being
[22] held at 457 Haddonfield Road,
[23] Cherry Hill, New Jersey, in the
[24] matter of Thomas Carr and

Page 5

[1] Transportation Concepts of New
[2] Jersey, Incorporated, versus
[3] J. Peter Pierce, Pioneer Capital,
[4] L.P., Pioneer Capital Genpar, Inc.
[5] and Logisteq, LLC.
[6]     J. Peter Pierce, Pioneer
[7] Capital, L.P., Pioneer Capital
[8] Genpar, Incorporated, and
[9] Logisteq, LLC, versus Thomas Carr,
[10] Transportation Concepts of New
[11] Jersey, James Neebling and
[12] Systrans Freight Systems,
[13] Incorporated.
[14]     This deposition is being
[15] taken on behalf of the defendants.
[16]     All counsel will be noted on
[17] the stenographic record. The
[18] court reporter's name is Vicki
[19] Bramnick, and she will now swear
[20] in the witness.
[21]
[22] THOMAS CARR, after having
[23] been duly sworn, was examined and
[24] testified as follows:

Page 6

[1]
[2]               EXAMINATION
[3]
[4]         BY MR. KIRCHER:
[5]     Q: Mr. Carr, my name is Phil
[6] Kircher. I represent the defendants in
[7] the lawsuit that you and your company
[8] have brought which brings us here today.
[9]     I'm here today with John
[10] Barnoski, who's from our office. Next to
[11] him is Doug Huntley, who's here on behalf
[12] of Pioneer. And then next to him is
[13] Mr. McGrath, who's here on behalf of
[14] Logisteq.
[15]     MR. KIRCHER: Before we get
[16] going with the questioning, let me
[17] just ask your counsel, are there
[18] any stipulations you want to enter
[19] into, Mr. Peslak, with respect to
[20] this deposition?
[21]     MR. PESLAK: Just
[22] Mr. Carr will have a chance to
[23] review the transcript and make any
[24] corrections afterwards before he

Page 7

[1] signs it. And, in addition, since
[2] we don't have a formally signed
[3] protective order, just an
[4] agreement among counsel that the
[5] transcript will remain
[6] confidential for 30 days or until
[7] it's designated confidential
[8] afterwards.
[9]     MR. KIRCHER: That's fine
[10] with me.
[11]     Are you mic'd up, by the
[12] way?
[13]     MR. PESLAK: Yes.
[14]     MR. KIRCHER: You are, okay.
[15]         BY MR. KIRCHER:
[16]     Q: Mr. Carr, let me start out
[17] with a general question. Since September
[18] of last year, September of 2001, have you
[19] met with representatives of Iron Mountain
[20] to discuss matters other than Logisteq's
[21] lease at the Iron Mountain facility?
[22] Have you had any such meetings?
[23]     A: Yes.
[24]     Q: Okay. Approximately, how

Page 8

[1] many? I'm talking about face-to-face.
[2] meetings now.
[3]     A: Approximately, two.
[4]     Q: Okay. Where were those
[5] meetings?
[6]     A: What was the dates you said?
[7]     Q: Since September of 2001.
[8]     A: September 2001. In New
[9] Jersey and in Boston.
[10]     Q: Okay. Where in New Jersey
[11] was the meeting that comes to mind?
[12]     A: In New Jersey at Marlboro,
[13] New Jersey.
[14]     Q: Okay. At any particular
[15] office or facility?
[16]     A: At a restaurant.
[17]     Q: At a restaurant. All right.
[18] We'll come back to those meetings in a
[19] little bit.
[20]     Have you also had occasion
[21] to have telephone calls since September
[22] of 2001 with representatives of Iron
[23] Mountain to discuss matters other than
[24] the Logisteq lease with Iron Mountain?

Page 9

[1]     A: Yes, I have.
[2]     Q: Okay. I brought a bunch of
[3] telephone bills from your Logisteq cell
[4] phone. If I told you that it looks as if
[5] there are 50 or so telephone calls
[6] between you using your company's cell
[7] phone and an Iron Mountain number or
[8] numbers up in Massachusetts, would that
[9] sound about right?
[10]     A: I made numerous calls to
[11] Iron Mountain.
[12]     Q: Okay.
[13]     A: I couldn't recollect exactly
[14] how many.
[15]     Q: Okay. It's more than a half
[16] a dozen or so? It's a bunch?
[17]     A: Oh, I would — yeah. I
[18] would say at least more than a half a
[19] dozen.
[20]     Q: All right. And since
[21] September of 2001, have Iron Mountain
[22] representatives telephoned you as opposed
[23] to you telephoning them —
[24]     A: Yes, they have.

Page 1

[1]     Q: — about matters other than
[2] the Iron Mountain lease?
[3]     A: Yes.
[4]     Q: Okay. We'll go back over
[5] those telephone calls in some detail, but
[6] I just wanted to get a general picture
[7] here.
[8]     A: Sure.
[9]     Q: \Same basic question. Since
[10] September of 2001, have you discussed
[11] with Iron Mountain representatives the
[12] activities of Peter Pierce?
[13]     A: Yes.
[14]     Q: Have you discussed with Iron
[15] Mountain the internal activities of
[16] Logisteq?
[17]     A: Yes.
[18]     MR. PESLAK: Object to the
[19] form of the question.
[20]     MR. KIRCHER: Okay.
[21]                    BY MR. KIRCHER:
[22]     Q: You can answer.
[23]     A: Yes.
[24]     Q: Okay. Have you discussed

Page 11

[1] with Iron Mountain a company known as
[2] Sequedex?
[3]     A: Yes.
[4]     Q: Have you discussed with Iron
[5] Mountain possibly entering into a
[6] business of coffee drayage and
[7] warehousing?
[8]     MR. PESLAK: Object to the
[9] form of the question, but you can
[10] answer. You can answer the
[11] question. I was just objecting to
[12] the form of the question.
[13]     THE WITNESS: Yes.
[14]     MR. KIRCHER: Okay.
[15]                    BY MR. KIRCHER:
[16]     Q: And have you discussed with
[17] Iron Mountain some future association,
[18] business association, between yourself
[19] and Iron Mountain?
[20]     A: Yes.
[21]     Q: And this has all been since
[22] at least September of 2001?
[23]     A: Correct.
[24]     Q: All right.

**Page 12**

[1]  A: Up until today's date.

[2]  Q: Okay.

[3]  A: Yes.

[4]  Q: When's the last time you

[5] spoke to someone from Iron Mountain?

[6]  A: This morning.

[7]  Q: And who was that?

[8]  A: Larry Varn, their attorney.

[9]  Q: Okay. Why did — did you

[10] call him or did he call you?

[11]  A: I called him.

[12]  Q: Why did you call him?

[13]  A: To tell him I have another

[14] tape that I would like to send him.

[15]  Q: Okay. Any other reason why

[16] you called him this morning?

[17]  A: No.

[18]  Q: Now, how do you know Larry

[19] Varn?

[20]  A: I know Larry Varn from Iron

[21] Mountain. He's their counsel, outside

[22] counsel.

[23]  Q: Okay. And how were you

[24] introduced to him?

**Page 13**

[1]  A: Through Iron Mountain.

[2]  Q: And specifically who at Iron

[3] Mountain introduced you to Gary Varn?

[4]  A: Gary Wadzke.

[5]  Q: Okay. Have you gathered

[6] information about Peter Pierce and

[7] Logisteq and given that information to

[8] Larry Varn?

[9]  A: Yes.

[10]  Q: And did you do that knowing

[11] that Mr. Varn represents Iron Mountain in

[12] a lawsuit against Peter Pierce?

[13]  A: Yes, I did.

[14]  Q: Did you understand that you

[15] were gathering that information for

[16] Mr. Varn's use in that lawsuit?

[17]  A: Absolutely.

[18]  Q: Okay. Have you been paid in

[19] any way by Iron Mountain either directly

[20] or indirectly for gathering that

[21] information?

[22]  A: No.

[23]  Q: Has Iron Mountain either

[24] paid or offered to pay the legal expense

**Page 14**

[1] of this present lawsuit that brings us

[2] here today?

[3]  A: Yes.

[4]  Q: Okay. Tell me about that.

[5]  A: I was very concerned about

[6] the legal costs, and they told that they

[7] would assist me in legal costs.

[8]  Q: Okay. And when you say

[9] they, who is they?

[10]  A: Larry Varn and Gary Wadzke.

[11]  Q: You said Larry Varn. Varn

[12] is V-A-R-N, I mean, that's the Larry that

[13] we've been talking about?

[14]  A: V-A-R-N.

[15]  Q: Yeah, that's how it's

[16] spelled.

[17]  A: Okay.

[18]  Q: Okay.

[19]  A: What are you trying to say,

[20] I misannounced (sic) it?

[21]  Q: I thought —

[22]  MR. PESLAK: You said Larry

[23] Varn.

[24]  THE WITNESS: It's Larry

**Page 15**

[1] Varn?

[2]  MR. PESLAK: Varn, yes.

[3]  MR. KIRCHER: Yes.

[4]  THE WITNESS: I'm from

[5] Jersey City.

[6]            BY MR. KIRCHER:

[7]  Q: Okay. How much has Iron

[8] Mountain paid to date to finance, if you

[9] will, this present lawsuit?

[10]  A: I don't have that

[11] information.

[12]  Q: Do you know whether

[13] Mr. Peslak or his firm has submitted

[14] bills to Mr. Varn or to Iron Mountain?

[15]  A: I don't have that

[16] information either.

[17]  Q: Has anyone, either at Larry

[18] Varn's office, including Larry Varn, or

[19] anyone at Iron Mountain, including Gary

[20] Wadzke, told you that they have paid the

[21] legal bills fostered by this case?

[22]  A: No, they have not.

[23]  Q: Who did you strike the

[24] arrangement with to have Iron Mountain

Page 16

[1]  pay the legal bills in this case?

[2]  A: Gary Wadzke.

[3]  Q: Okay. Anyone else that you

[4]  had a discussion with?

[5]  A: No, sir.

[6]  Q: And when was that

[7]  arrangement struck?

[8]  A: I do not have an exact date,

[9]  but I would say it was in the last couple

[10]  of months.

[11]  Q: Okay. Did Mr. Varn or

[12]  Mr. Wadzke or anyone from Iron Mountain

[13]  encourage you to bring this lawsuit?

[14]  A: No.

[15]  MR. PESLAK: Object to the

[16]  form of the question.

[17]  BY MR. KIRCHER:

[18]  Q: This lawsuit was filed —

[19]  and Mr. Peslak maybe can correct me if

[20]  I'm wrong — my recollection is that the

[21]  complaint in this matter, along with TRO

[22]  papers, was filed the first week of April

[23]  of 2002?

[24]  MR. PESLAK: Either that or

Page 17

[1]  the Friday before, the last day of

[2]  March.

[3]  MR. KIRCHER: Okay.

[4]  MR. PESLAK: I'm not sure of

[5]  the exact date.

[6]  MR. KIRCHER: All right.

[7]  MR. PESLAK: Approximately

[8]  correct.

[9]  BY MR. KIRCHER:

[10]  Q: Either the very end of March

[11]  or the very beginning of April this

[12]  lawsuit was filed. Before that happened,

[13]  how long had you been speaking to

[14]  Mr. Varn or Mr. Wadzke or both of them

[15]  about bringing this lawsuit?

[16]  A: I would say approximately

[17]  two months.

[18]  Q: Okay. And what precipitated

[19]  those discussions? What prompted that?

[20]  A: Peter Pierce refused to put

[21]  any additional funds into the company or

[22]  repay the funds that we paid out for

[23]  Sequedex employees.

[24]  Q: Okay.

Page 18

[1]  A: And had told me that if I

[2]  wouldn't put any more money into the

[3]  company that I would be terminated. So I

[4]  realized I was being pushed out of the

[5]  company, and from that point, had to do

[6]  what I had to to save my career and my

[7]  family.

[8]  Q: Okay. And why would that,

[9]  assuming that's all true, why would that

[10]  prompt you to talk to Iron Mountain's

[11]  counsel as opposed to your own counsel?

[12]  A: Iron Mountain was going to

[13]  evict me from our main headquarters in

[14]  Freehold, New Jersey. And that's where

[15]  our shop is and our depot for our tractor

[16]  trailers, and our 70,000 square foot

[17]  warehouse facility.

[18]  Along with that, they were

[19]  going to subpoena me to show all records,

[20]  employment records, and subpoena me in

[21]  front of the Courts to testify against

[22]  everything that was going on with Peter

[23]  Pierce and the Sequedex employees. And I

[24]  wasn't about to get involved in something

Page 19

[1]  that was not the truth.

[2]  Q: Okay.

[3]  A: So I spoke the truth.

[4]  Q: All right. Now, how did you

[5]  come by that information that they were

[6]  going to evict — when you say evict you,

[7]  you mean evict Logisteq?

[8]  A: Evict Logisteq, which I'm 49

[9]  percent owner of. I received a letter

[10]  from Gary Wadzke stating that we were

[11]  being evicted from the premises.

[12]  Q: Okay. Was that a letter

[13]  directed to you or was that a letter

[14]  directed to Logisteq?

[15]  A: I don't recall, but being

[16]  the president of Logisteq at that time, I

[17]  had the dialogue going with Gary Wadzke.

[18]  Q: This — what you're talking

[19]  about now takes us back to the summer of

[20]  2001; is that right?

[21]  A: Correct.

[22]  Q: All right. Let me just

[23]  explore that a little bit with you.

[24]  A: Sure.

IMP04407

Page 20

[1]    Q: When you say Logisteq was
[2] going to be evicted, you're aware, are
[3] you not, that in September of 2001
[4] Logisteq and Iron Mountain entered into
[5] a — essentially, a one-year lease for
[6] the space, plus the parking space?
[7] You're aware of that, aren't you?
[8]    A: Yes, I am.
[9]    Q: All right. Now, when you
[10] say Logisteq was going to be evicted, I
[11] mean, in light of this one-year lease,
[12] what do you mean by that?
[13]    A: In light of the one-year
[14] lease, before that we were going to be
[15] evicted, and that's when I started the
[16] phone calls —
[17]    Q: I see.
[18]    A: — and the dialogue with
[19] Gary Wadzke.
[20]    Q: I see. All right. So it
[21] was before this — assuming I'm correct
[22] that this lease was signed the first week
[23] in September of 2001, before September of
[24] 2001 you began having conversations with

Page 21

[1] Gary Wadzke about the future tenancy of
[2] Logisteq —
[3]    A: Correct.
[4]    Q: — is that fair?
[5]    A: Yes.
[6]    Q: Okay. All right. We'll
[7] come back to that in a while.
[8]    And I take it, just to
[9] finish that off, that that dialogue
[10] between you and Gary Wadzke eventually
[11] grew to include discussions about Iron
[12] Mountain's complaints about Peter Pierce?
[13]    A: The complaints about Peter
[14] Pierce were — the main complaint was
[15] about Michael Dilanni. Because Michael
[16] Dilanni and myself went to see Jim
[17] Monahue at Iron Mountain after the lease,
[18] the new lease occurred.
[19]    Q: Jim Monahue?
[20]    A: Jim Monahue.
[21]    Q: Do you know how to spell
[22] that?
[23]    A: No, I don't.
[24]    Q: Probably someone on my side

Page 22

[1] of the table does.
[2]    Who is Jim Monahue?
[3]    A: Jim Monahue is their
[4] director of maintenance for the Freehold
[5] facility of Iron Mountain.
[6]    Q: Okay.
[7]    A: Jim Monahue and Mike Dilanni
[8] had some animosity for each other. And
[9] Jim would come to our office and give
[10] several complaints about the cleanliness
[11] of their facility and parking the tractor
[12] trailers on the side of the grass —
[13]    Q: Right.
[14]    A: — at the main entrance.
[15] So Mike Dilanni got very
[16] infuriated, asked me to ride up to the
[17] office, basically saying that he's not
[18] going to take this shit from this guy
[19] anymore. Rang the bell of Jim Monahue.
[20] Jim Monahue asked who it was and Mike
[21] Dilanni said, get your ass down here now.
[22] I'm sick of your shit. Jim Monahue
[23] refused to come out. Mike Dilanni then
[24] walked down, picked up a brick, scratched

Page 23

[1] the entire side of Jim Monahue's car and
[2] kicked the car in.
[3]    At that point I said, Mike,
[4] why are you doing this? You're making
[5] more trouble for us. Then Jim Monahue
[6] called up to their headquarters in
[7] Boston, Iron Mountain, told them what had
[8] happened. And Iron Mountain called me to
[9] complain that we will be thrown off the
[10] property for good if we don't stop these
[11] bad actions.
[12]    Q: Okay. Now, let me stop you
[13] there.
[14]    A: Sure.
[15]    Q: Was what you just told me,
[16] Iron Mountain's reaction to what
[17] happened, was that put in some kind of a
[18] letter that was sent to Logisteq?
[19]    A: Yes, it was.
[20]    Q: Do you have a copy of that
[21] letter?
[22]    A: I'm sure I can get one.
[23]    Q: All right. Have you — by
[24] the way, did your counsel in the last

Min-U-Script®                                    Sullivan & Worcester LLP

IMP04408

Page 24

[1] couple weeks ask you to gather up all the
[2] letters and information and documents
[3] that you have relating to Logisteq?
[4]    A: My counsel did, but I
[5] couldn't do that because I've been trying
[6] to get in touch with Logisteq to go down,
[7] and I'm locked out of the office. I was
[8] told by Michael DiIanni two weeks ago if
[9] I go on the premises I'll be arrested.
[10]    Q: Apart from what once were
[11] your offices at Logisteq —
[12]    A: Sure.
[13]    Q: — have you gathered up
[14] every scrap of paper that relates to
[15] Logisteq that you otherwise have —
[16]    A: No.
[17]    Q: — in your garage, in your
[18] house?
[19]    You haven't done that?
[20]    A: No. The only thing I did is
[21] I asked Alan McGrath if I could go down
[22] and take my personal belongings, which
[23] were the pictures of my children. And
[24] Alan followed me in. I took the

Page 25

[1] pictures, put them in a book, and left.
[2] I was not allowed to take any
[3] documentation from my desk or from any
[4] other part of the office.
[5]    Q: Let me get back and make
[6] sure I got an answer to my question.
[7]    A: Sure.
[8]    Q: This letter in which Iron
[9] Mountain complained about, among other
[10] things, the other activities of Mike
[11] DiIanni, was such a letter sent to
[12] Logisteq that you're aware of?
[13]    A: Yes.
[14]    Q: All right. You've seen that
[15] letter?
[16]    A: Yes, I have.
[17]    Q: And who was it addressed to?
[18]    A: It was addressed to me.
[19]    Q: Okay. Did you maintain that
[20] letter in the Logisteq business files?
[21]    A: I gave it to Alan McGrath.
[22]    Q: Okay. So that letter should
[23] be somewhere in Logisteq's files?
[24]    A: Yes.

Page 2

[1]    Q: All right.
[2]    A: We also have additional
[3] information. A few months after that
[4] Mike DiIanni had a brawl with Jim Monahue
[5] and Jim Monahue called the police
[6] department. Five police cars arrived and
[7] they arrested Mike DiIanni. And Iron
[8] Mountain pressed charges against Michael
[9] DiIanni for assaulting Jim Monahue. And
[10] we also have that documentation.
[11]    Q: Okay. I've read about that
[12] in your complaint.
[13]    A: Yes. And it's also public
[14] record. You can look up the date, and
[15] Freehold, Monmouth County Courthouse,
[16] would have the public records showing
[17] that that happened.
[18]    Q: Okay. Now, these phone
[19] calls and meetings, I think you've told
[20] us about two meetings, there may be more,
[21] but the phone calls began roughly in the
[22] late summer of 2001?
[23]    A: I would say so.
[24]    MR. PESLAK: Just so we're

Page 27

[1] clear, you're talking about phone
[2] calls not dealing with the lease?
[3]    MR. KIRCHER: Right.
[4]          BY MR. KIRCHER:
[5]    Q: Phone calls not dealing with
[6] the lease between you and someone from
[7] Iron Mountain or their outside counsel,
[8] Mr. Varn.
[9]    A: Most of the phone calls
[10] between Iron Mountain and myself was
[11] regarding the lease on the building and
[12] trying to keep peace between Pierce Leahy
[13] and Iron Mountain, and trying to stop
[14] this from evolving into a earthquake, if
[15] I may.
[16]    Q: But what I'm focusing on,
[17] Mr. Carr, is, forget the lease for this
[18] second.
[19]    A: Okay.
[20]    Q: A lease was entered into in
[21] September of 2001 for a year. Put that
[22] aside.
[23]    A: Okay.
[24]    Q: I'm focusing on

Page 28

[1] conversations between you and Iron
[2] Mountain or you and Mr. Varn relating to
[3] Peter Pierce or Sequedex or Logisteq's
[4] activities —
[5]    A: Okay.
[6]    Q: — or the coffee business.
[7] Anything other than the lease. Those
[8] phone calls began in the late summer of
[9] 2001?
[10]    A: I don't remember.
[11]    Q: Okay. Were you involved at
[12] all in the negotiation of that September
[13] 2001 lease?
[14]    A: Yes, I was.
[15]    Q: Okay. So you knew at the
[16] time what the deal was, correct?
[17]    A: Correct.
[18]    Q: All right. And once that
[19] lease was entered into, I mean, that
[20] essentially was the end of it? You had
[21] one more year and then you're out?
[22]    A: No, that's not true.
[23]    Q: Okay. Then why did Logisteq
[24] sign that lease then?

Page 29

[1]    A: We signed that lease to have
[2] one more year. And at the time, we were
[3] in negotiations to buy an Anchor Glass
[4] facility in Matawan or Aberdeen, New
[5] Jersey.
[6]    But as far as saying that's
[7] not true, between all the difficulties
[8] that erupted between Michael DiIanni with
[9] Iron Mountain, Michael DiIanni would
[10] purposely go and just try to get these
[11] guys', you know, anger up by going in
[12] there and causing problems and walking
[13] around the back of the building just to
[14] make them upset.
[15]    And as far as drawing the
[16] line, Iron Mountain called me and said,
[17] Listen, lease or no lease, we're going to
[18] have you guys thrown off the property.
[19] We can't continue to disrupt our business
[20] because one of your employees comes on
[21] our property and disrupts our operations.
[22]    Q: Now, let me stop you there.
[23]    A: Sure.
[24]    Q: Are there any letters from

Page 30

[1] Iron Mountain to Logisteq that reflect
[2] what you've just said?
[3]    A: Yes, there is.
[4]    Q: What comes to mind? Do you
[5] have a specific letter in mind?
[6]    A: A letter to mind addressed
[7] to me which Alan McGrath has a copy,
[8] because Alan was involved in the
[9] negotiation, and Alan was pretty much our
[10] controller and vice president.
[11]    The letter from Gary Wadzke
[12] that they would ask us to not allow
[13] Michael DiIanni on the property because
[14] it's a disruption to Iron Mountain
[15] operations. There was an assault on Jim
[16] Monahue. There was damages done to Jim
[17] Monahue's car.
[18]    Q: Are you telling me what's in
[19] the letter or are you just telling me
[20] what —
[21]    A: I'm telling you what's in
[22] the letter.
[23]    Q: Okay.
[24]    A: And we asked that Michael

Page 31

[1] DiIanni does not enter our property.
[2]    Q: Okay. Now, you're aware
[3] that after September 2001 Mike DiIanni
[4] was on the property all the time?
[5]    A: Absolutely.
[6]    Q: Right. He was never thrown
[7] off or evicted by Iron Mountain, was he?
[8]    A: No, because I sat with
[9] Michael DiIanni and I said, Mike, you
[10] need to stop.
[11]    Q: Well, the answer to my
[12] question is no, he was never thrown off
[13] nor evicted, correct?
[14]    A: No, he was thrown off the
[15] property.
[16]    Q: Oh, he was?
[17]    A: Yes.
[18]    Q: When was he thrown off the
[19] property by Iron Mountain?
[20]    A: He was thrown off the
[21] property by the Freehold Police
[22] Department when he assaulted Jim Monahue.
[23]    Q: Okay. I'm talking about
[24] after September of 2001. That was

J. Peter Pierce

Thomas Car...

...71, May 30, 200...

---

Page 32

[1] before. After September of 2001, to your
[2] knowledge, was Mike DiIanni ever evicted
[3] or thrown off the property by Iron
[4] Mountain?
[5]     A: I don't know.
[6]     Q: Okay. Now, it's true, just
[7] to put this in context, Mr. Carr, that it
[8] was in August, some point in August, that
[9] you were indicted by a Federal Grand Jury
[10] in the Southern District of New York,
[11] correct?
[12]     A: This is correct.
[13]     Q: Okay. And that was not made
[14] known immediately by you to the people at
[15] Logisteq, was it?
[16]     A: No. As a matter of fact,
[17] the day I was arrested, immediately
[18] Michael DiIanni went to Peter Pierce and
[19] didn't allow me to call Peter myself and
[20] explain what these charges were about,
[21] and basically involved in a conspiracy
[22] that I am not guilty of.
[23]     MR. PESLAK: I'm just going
[24] to caution you that since this is

---

Page 33

[1] still pending, don't disclose any
[2] of — discuss any of the details
[3] of the underlying case —
[4]     THE WITNESS: Okay.
[5]     MR. PESLAK: — in New York.
[6]     BY MR. KIRCHER:
[7]     Q: Yeah, all I'm trying to —
[8] all I'm trying to get at is the context
[9] of August and September.
[10]     I believe it was in August
[11] that you were indicted. At some point
[12] after that, Logisteq became aware of it.
[13] And then —
[14]     A: In fact, they became aware
[15] of it the same day I was arrested —
[16]     Q: Okay.
[17]     A: — from Mike DiIanni telling
[18] Peter Pierce.
[19]     Q: Fine. And at some point
[20] after that, either in late August or
[21] early September, it was agreed that you
[22] would step down as president of Logisteq
[23] and focus your efforts just on sales, and
[24] Mike DiIanni would take over as the,

---

Page 34

[1] effectively, the chief operating officer?
[2]     A: Well, no, I didn't agree to
[3] that.
[4]     Q: Okay. You didn't agree to
[5] that?
[6]     A: No, sir, I did not.
[7]     Q: Did you protest it?
[8]     A: Yes, I did.
[9]     Q: All right. Did you protest
[10] it in writing?
[11]     A: No, I did not.
[12]     Q: Okay. You protested it to
[13] whom?
[14]     A: I protested it to Peter
[15] Pierce. I said, I will keep my position
[16] as president and continue to increase
[17] sales in the business.
[18]     Q: All right.
[19]     A: And Peter said to me, That's
[20] fine. You can keep the title and your
[21] card, and when you go into meetings you
[22] can present yourself as president of
[23] Logisteq.
[24]     Q: All right. Do you recall

---

Page 35

[1] any kind of a resolution that was — that
[2] came about, a formal resolution within
[3] the company, that as a result of the
[4] indictment you would step down as
[5] president, become what is known as a
[6] principal, and focus your efforts just on
[7] sales? Does that ring a bell?
[8]     A: My focus was always on
[9] sales.
[10]     Q: I understand that. But let
[11] me try my question again. Do you recall
[12] a formal resolution within the company,
[13] within Logisteq, that as a result of your
[14] indictment you would step down as
[15] president, you would be called a
[16] principal, you would focus your efforts
[17] on sales, and Mike DiIanni would
[18] effectively take your position?
[19]     MR. PESLAK: Are you talking
[20] about a written — a writing?
[21]     MR. KIRCHER: I'll leave the
[22] question stand.
[23]     THE WITNESS: A verbal
[24] conversation, yes, I remember

---

Page 36

[1] that.

[2]    MR. KIRCHER: Okay.

[3]              BY MR. KIRCHER:

[4]    Q: And you agreed to that,

[5] didn't you?

[6]    A: No.

[7]    Q: You didn't?

[8]    A: I did not.

[9]    Q: But that happened, didn't

[10] it?

[11]    A: It did happen.

[12]    Q: Okay. So it happened over

[13] your protest?

[14]    A: Correct.

[15]    Q: Now, after that point in

[16] time did you hold yourself out to

[17] outsiders, customers, potential

[18] customers, landlords, anybody, after that

[19] point in time did you hold yourself

[20] as president of Logisteq?

[21]    A: After that point.

[22]    Q: Yes.

[23]    A: I continued to keep my

[24] position as president.

Page 37

[1]    Q: I'm not getting through.

[2] That's my fault. Let me try it this way.

[3] Did you represent to any outsiders after

[4] that point in time that you were

[5] president of Logisteq?

[6]    A: When you say outsiders —

[7]    Q: Yes.

[8]    A: — explain who was an

[9] outsider.

[10]    Q: Anyone who doesn't work for

[11] Logisteq, anyone.

[12]    A: That's a very tricky —

[13] tricky question. If you're saying if

[14] somebody walked up to me and asked my

[15] position, yes, I would say I was

[16] president. I don't understand what

[17] you're getting at.

[18]    Q: Well, that's what I'm

[19] getting at. You would tell people after

[20] that point in time that you were still

[21] president?

[22]    A: I was still president.

[23]    Q: All right. Well, I thought

[24] you just told me that over your protest

Page 38

[1] you were relieved of being president.

[2]    A: Peter Pierce — Peter Pierce

[3] has asked me to step down as president.

[4]    Q: Right.

[5]    A: I told Peter I would not

[6] step down as president. I own 49 percent

[7] of the company. We agreed that I would

[8] be president and continue to run the

[9] company in sales. Peter said to me,

[10] That's fine. You can have your position

[11] as president. You can leave president on

[12] your card, but I would like Mike DiIanni

[13] to step in and be called CEO. I said,

[14] That's fine. Michael DiIanni can be

[15] called CEO, because Michael DiIanni and

[16] Alan McGrath basically ran the company

[17] anyway. I was more involved in the sales

[18] aspect of the company.

[19]    Q: All right.

[20]    A: But I was not going to step

[21] down and become a sales manager or a vice

[22] president. I was not going to do that.

[23]    Q: All right. I just — I want

[24] to make sure I got a clean answer to what

Page 39

[1] I think is a clean question.

[2]    A: Let me give you another

[3] clean answer.

[4]    Q: Well, let me just — let me

[5] try —

[6]    A: I also did not —

[7]    MR. PESLAK: Let him ask the

[8] questions.

[9]    THE WITNESS: Okay.

[10]    MR. PESLAK: He asks the

[11] questions. You answer them.

[12]              BY MR. KIRCHER:

[13]    Q: After September of 2001 and

[14] continuing until at least March of 2002,

[15] did you represent to individuals outside

[16] of Logisteq that you were president?

[17]    A: Yes.

[18]    Q: And it's your understanding

[19] that that was okay with Peter Pierce and

[20] the rest of the people at Logisteq?

[21]    A: Absolutely.

[22]    Q: Okay.

[23]    A: Every meeting I went to with

[24] Alan McGrath or Mike DiIanni, I handed

**Page 40**

[1] out a card saying I'm president.

[2]    Q: Now, while you were at

[3] Logisteq, you were given by the company a

[4] cell phone for use in the company's

[5] business, correct?

[6]    A: Correct.

[7]    Q: And that would be the number

[8] (732) 740-0868, right?

[9]    A: Correct.

[10]    Q: Okay. Do you still have

[11] that phone, by the way?

[12]    A: Yes, I do.

[13]    Q: Do you still use it?

[14]    A: Yes, I do.

[15]    Q: Do you use it for Logisteq

[16] business?

[17]    A: No, I use it for my own

[18] personal phone.

[19]    Q: Well, it's a company phone,

[20] is it not?

[21]    A: No.

[22]    Q: It's not?

[23]    A: It's a company phone that I

[24] use for my personal business just like

**Page 41**

[1] every employee, Mike DiIanni, Alan

[2] McGrath, Peter Pierce, they all use for

[3] their personal.

[4]    Q: All right. Who pays the

[5] bill?

[6]    A: Logisteq.

[7]    Q: When is the last time you

[8] used the phone for Logisteq business?

[9]    A: The last time I used the

[10] phone for Logisteq business, I couldn't

[11] tell you that date.

[12]    Q: Was it before or after April

[13] 10th?

[14]    A: Today's date is April 30th.

[15]    Q: No, no. Today is May 30th.

[16]    A: Okay, May 30th. Okay, just

[17] checking. No, it was after. Yeah, I

[18] continued to use the cell phone. Alan

[19] McGrath asked me to make some calls to

[20] Honeywell, because Honeywell was asking

[21] Alan McGrath for their lease, because

[22] they were in a five-year contract that

[23] they were going to sign. And before they

[24] signed the five-year contract they needed

**Page 42**

[1] to make sure that Logisteq had a lease on

[2] the building for five years. And Alan

[3] couldn't supply them with a lease,

[4] because Peter Pierce would not sign that

[5] lease for the sale of the New Jersey

[6] facility.

[7]    Q: Okay.

[8]    A: Alan McGrath called me,

[9] which I have a copy of the tape — I

[10] taped his messages — asking me to call

[11] Honeywell and try to hold them off while

[12] Peter makes a decision if he's going to

[13] sign the lease or not.

[14]    And, as a matter of fact, a

[15] couple weeks after that Alan had called

[16] me again to appear at a meeting at

[17] Honeywell at three o'clock to discuss

[18] with them the lease on the facility,

[19] which I showed up for the three o'clock

[20] meeting.

[21]    Alan was running late. He

[22] was at Barry Schafferman's office

[23] negotiating the lease with Mr.

[24] Schafferman.

**Page 43**

[1]    Alan had called Honeywell to

[2] see if I was there. I said Alan — told

[3] him I'm here waiting, and Alan couldn't

[4] make it that day. So I've been in

[5] contact with Honeywell on a few occasions

[6] as far as business.

[7]    I also received phone calls

[8] from different coffee companies calling

[9] me on my cell phone that Logisteq has

[10] closed down the operation and is giving

[11] all the coffee to RPM. So I have phone

[12] calls from coffee companies that I

[13] returned their call. And then, of

[14] course, there's personal phone calls.

[15]    Q: Let me try and refocus you,

[16] though. Here's the simple question.

[17]    A: I'm still — okay.

[18]    Q: After April 10th, did you

[19] use your Logisteq cell phone to make

[20] telephone calls for the purpose of

[21] Logisteq business? I think you've said

[22] yes; is that right?

[23]    A: Yes, on request of Alan

[24] McGrath asking me to do so.

Page 44

[1]  Q: Okay.

[2]  A: Because before that we had

[3] an agreement that Peter Pierce was going

[4] to pay me, and I wouldn't contact

[5] customers unless Alan McGrath asked me

[6] to. So, yes, I used the telephone with

[7] Alan McGrath's request to get involved in

[8] some business situations.

[9]  Q: All right. So what you're

[10] telling me is that after April 10th, the

[11] only time you used the cell phone to do

[12] Logisteq business was at the specific

[13] request of Mr. McGrath; is that what

[14] you're telling me?

[15]  A: Correct.

[16]  Q: Okay. Why don't we look at

[17] these telephone bills. Just so you know

[18] the drill here, Mr. Carr —

[19]  A: Sure.

[20]  Q: — is I'm going to show you

[21] a document.

[22]  A: Okay.

[23]  Q: And ask you some questions.

[24] I'm going to give your counsel a copy.

Page 45

[1] We've already — to save some time, we've

[2] already premarked, put a little sticker

[3] on it.

[4]  A: Great.

[5]  Q: So we know later what we're

[6] talking about. It's a wonderful system.

[7]  A: I'm sure you have everything

[8] under control.

[9]  Q: Let me show you what's been

[10] premarked as Carr Exhibit No. 1.

[11]  A: Sure.

[12]  Q: All right. And what this

[13] is, is certain pages from the Verizon

[14] bill —

[15]  A: Yes.

[16]  Q: — telephone company bill

[17] dated October 9, 2001. Do you see that?

[18]  A: Yes, I do.

[19]  Q: Do you see on the first page

[20] right at the top it says, mobile

[21] telephone number detail for Tom. That's

[22] you, right?

[23]  A: That's me.

[24]  Q: And then your number,

Page 46

[1] (732) 740-0868.

[2]  A: Yes, I see that.

[3]  Q: Okay. If I can ask you to

[4] turn over to — do you see at the top on

[5] the right-hand corner there are page

[6] numbers?

[7]  A: Yes, 60 of 142.

[8]  Q: Well, the first of mine says

[9] 58 of 142. Do you see that on the first

[10] page of yours?

[11]  A: Fifty —

[12]  Q: The very first page.

[13]  A: Yes, yes, yes, I do.

[14]  Q: Okay. Let me ask you to

[15] turn over to the page that's numbered 64.

[16]  A: 64?

[17]  Q: Right.

[18]  A: Okay, I have 64 of 142.

[19]  Q: Now, if you look at the way

[20] this bill is formatted, way over in the

[21] left-hand column there is a number

[22] column. Do you see that? It starts at

[23] 168 at the top runs down through 209.

[24] Left column, Mr. Carr.

Page 47

[1]  A: Yes, I'm looking at it.

[2]  Q: Okay. If I can take you

[3] down to Item No. 197.

[4]  A: 197. Yes, I see it.

[5]  Q: Do you see that?

[6]  A: Yes.

[7]  Q: From this bill it appears

[8] that on September 18, 2001 at 2:39 p.m.

[9] you made a call to Boston to a number

[10] (617) 535-4702. Do you see that?

[11]  A: Yes, I do.

[12]  Q: All right. That's Gary

[13] Wadzke's number, isn't it?

[14]  A: I believe so. I'd have to

[15] check the number just to confirm.

[16]  Q: Okay. Do you know why you

[17] were calling — and Gary Wadzke, for the

[18] record, is the general counsel. He's the

[19] chief inside lawyer for Iron Mountain up

[20] in Boston, right?

[21]  A: I know that.

[22]  Q: Okay. Now, why were you

[23] calling Mr. Wadzke on September 18th; do

[24] you remember?

Page 48

[1] A: No, I don't.

[2] Q: Okay. But this would be one

[3] example of a fair number of telephone

[4] calls that you made to Mr. Wadzke?

[5] MR. PESLAK: Object to the

[6] form of the question, but you can

[7] answer.

[8] BY MR. KIRCHER:

[9] Q: Is that right?

[10] A: Yes.

[11] Q: Okay. Let me take you over

[12] to Page 67 of this bill. Are you with

[13] me?

[14] A: Okay.

[15] Q: Are you with me?

[16] A: I'm with you.

[17] Q: And if you go down to Item

[18] No. 326 — I'm sorry, 328.

[19] A: Okay.

[20] Q: Just to speed things along,

[21] this is — do you see it's another

[22] telephone call on September 24th —

[23] A: Yes.

[24] Q: — to the same number in

Page 49

[1] Boston, which would be Mr. Wadzke? Do

[2] you see that?

[3] A: Yes, I do.

[4] Q: And then ditto, same thing

[5] for Item No. 331?

[6] A: What does ditto mean?

[7] Q: Ditto means duplicate.

[8] A: Oh, okay.

[9] Q: Okay. See Item No. 331?

[10] That's a call at seven o'clock, 7:04 p.m.

[11] from you to Mr. Wadzke?

[12] A: Yes, sir, I see that.

[13] Q: Okay. Let me take you over

[14] to page — the last page, Page 73.

[15] A: 73. Okay, I'm on 73.

[16] Q: All right. If you looked

[17] at — if you look at Line Items 556 and

[18] 564, you'd see two more calls that day

[19] which was October 9th at 4:02 p.m. and

[20] 4:45 p.m. —

[21] A: Ditto.

[22] Q: — to Mr. Wadzke, right?

[23] Now, do you remember, have

[24] any general recollection of why you were

Page 50

[1] telephoning Mr. Wadzke in September and

[2] October?

[3] A: I believe I was calling

[4] Mr. Wadzke because every day I was taping

[5] employees from Logisteq, and I believe I

[6] would give him an update on any new

[7] status that was going on with Logisteq.

[8] Q: Okay. So, just so the

[9] record is straight, when you say you were

[10] taping, you were having conversations

[11] with Logisteq employees, but you were —

[12] you had on you somewhere a tape-recorder,

[13] a Dictaphone, or some recording device

[14] and you were recording the conversation?

[15] A: Yes.

[16] Q: Okay. And the person you

[17] were talking to was not aware that the

[18] conversation was being recorded; is that

[19] fair?

[20] A: Depends what conversation

[21] we're talking about.

[22] Q: Well, some of the

[23] conversations, the person you were

[24] talking to was not aware that you were

Page 51

[1] tape-recording it?

[2] A: Yes. And in New Jersey

[3] you're allowed to do that.

[4] Q: Okay.

[5] A: Yes.

[6] Q: I'm not going one way or the

[7] other on that.

[8] A: Oh, no, no, that's fine. I

[9] understand.

[10] Q: And some of the

[11] conversations you actually told the

[12] person, look, I'm tape-recording this; is

[13] that okay?

[14] A: Oh, I've been — I've been

[15] telling them I've been taping them for

[16] months.

[17] Q: Okay.

[18] A: Including Peter Pierce. As

[19] a matter of fact, I showed Peter Pierce

[20] my wire.

[21] Q: All right. But back in

[22] September and October, whose

[23] conversations were you taping?

[24] A: Well, let's see, I've taped

Page 52

[1] conversations from the very beginning.

[2] I've taped a conversation when Mike

[3] DiIanni and myself went to meet with the

[4] local Teamsters at —

[5] Q: Don't tell me about it.

[6] We'll get into the details.

[7] A: Well, you asked —

[8] Q: I just want names.

[9] A: Well, I have to tell you the

[10] story.

[11] Q: No, you don't.

[12] MR. PESLAK: Just answer his

[13] question.

[14]         BY MR. KIRCHER:

[15] Q: Just answer my question.

[16] A: I taped Mike DiIanni.

[17] Q: Who else?

[18] A: I've taped Peter Pierce.

[19] Q: Okay.

[20] A: I've taped Doug Huntley.

[21] I've taped Alan McGrath.

[22] Q: Okay.

[23] A: I've taped Ann Sherello at

[24] RPM.

Page 53

[1] Q: Ann?

[2] A: Sherello.

[3] Q: Okay. At RPM?

[4] A: At RPM.

[5] Q: All right.

[6] A: I've taped Ray Massucci.

[7] I've taped —

[8] MR. KIRCHER: Ray Massucci,

[9] M-A-S-S-U-C-C-I.

[10] THE WITNESS: Yes. He's the

[11] fellow who Peter Pierce gave the

[12] business to.

[13]         BY MR. KIRCHER:

[14] Q: I know — I know who he is.

[15] Go ahead.

[16] A: He was here for 10 hours

[17] with negotiations.

[18] I've taped a number of —

[19] I've taped the police department. I've

[20] taped a sergeant at the Sayreville

[21] facility. God —

[22] MR. KIRCHER: Sayreville,

[23] S-A-Y-R-E-V-I-L-L-E.

[24] THE WITNESS: Yes.

Page 54

[1]         BY MR. KIRCHER:

[2] Q: Who else?

[3] A: As of now, that's the best I

[4] can do.

[5] Q: Okay.

[6] A: But I'm sure — I'm sure

[7] there's more.

[8] Q: Right. And in September and

[9] October you were forwarding some of these

[10] tapes, physically sending the tapes to

[11] Gary Wadzke at Iron Mountain?

[12] A: Absolutely not.

[13] Q: You were telling him about

[14] the taped conversations?

[15] A: Absolutely not.

[16] Q: Well, then I misunderstood

[17] your testimony. I asked you a few

[18] moments ago why were you talking to Gary

[19] Wadzke in September and October, and I

[20] thought you told me —

[21] A: In 2001 I have not told

[22] anything about tapes in September,

[23] October 2001.

[24] Q: I want to go back and look

Page 55

[1] at the record.

[2] A: Okay.

[3] Q: Because I could have sworn

[4] that you —

[5] A: Well, ask your question

[6] again. Let me think about this.

[7] Q: Well — all right, I'll ask

[8] it again.

[9] A: You're making me nervous.

[10] Q: Well, I'm trying not to,

[11] okay?

[12] A: I think you are.

[13] Q: No, really, I'm not.

[14] A: Okay. Well, I'm nervous.

[15] Q: Well, that's okay. It's all

[16] right to be nervous.

[17] A: Because I got all these

[18] people staring at me.

[19] Q: Right. Let me try it again.

[20] A: Okay.

[21] Q: We've seen —

[22] A: Speak slowly.

[23] Q: We've seen some evidence

[24] from Carr Exhibit No. 1 —

Min-U-Script®

Sullivan  & Worcester LLP

IMP04416

Page 56

[1] A: Yes.

[2] Q: — of telephone calls that
[3] you made to Iron Mountain's general
[4] counsel, Gary Wadzke —

[5] A: Yes.

[6] Q: — okay, in September and
[7] October of 2001. Are you with me so far?

[8] A: Yes.

[9] Q: And I asked you a few
[10] moments ago why were you calling Gary
[11] Wadzke. And I thought you told me that
[12] one of the reasons you were calling Gary
[13] Wadzke was in some way to report to him
[14] on these taped conversation. Now, is
[15] that true or not?

[16] A: I don't remember.

[17] Q: All right. Have you ever
[18] sent to Gary Wadzke, or provided to him
[19] in any way, any of the tapes that you've
[20] taken that you just described?

[21] A: Yes, I have.

[22] Q: All right. Have you ever
[23] given to Larry Varn, or someone from his
[24] law firm, any of these tapes?

Page 57

[1] A: Yes, I have.

[2] Q: Okay. Do you have — when
[3] you gave those tapes to those
[4] individuals, did you give them copies or
[5] did you give them your only tape?

[6] A: I gave them the original and
[7] I kept the copy.

[8] Q: Do you still have a copy or
[9] the original of every one of these taped
[10] conversations?

[11] A: Yes, I do.

[12] Q: Where are they?

[13] A: In my home.

[14] Q: Why didn't you give them to
[15] your lawyer within the last couple of
[16] weeks?

[17] A: Well, there's a lot of
[18] things on those tapes that could really
[19] hurt a lot of people.

[20] Q: Let me stop you actually.
[21] In fairness to you —

[22] A: And what I don't want to do
[23] is hurt a lot of people. I was hoping
[24] that maybe we can sit down and settle the

Page 58

[1] case before I really hurt a lot of
[2] people.

[3] Q: Well, I'm sure the people
[4] appreciate that. But —

[5] A: Thank you.

[6] Q: — were you aware that those
[7] tapes had been requested in this
[8] litigation? Did your lawyer tell you
[9] that?

[10] A: I don't remember.

[11] Q: You don't remember whether
[12] he told you that or not?

[13] A: I must have had a very, very
[14] stressful day that day.

[15] Q: But these tapes are in your
[16] home? You could go home now and give
[17] them to Mr. Peslak?

[18] A: Absolutely.

[19] Q: Okay. Are you willing to do
[20] that?

[21] A: Oh, sure.

[22] Q: All right. And what you're
[23] telling me today is, up until this point
[24] in time you didn't know that these tapes

Page 59

[1] had been requested?

[2] A: I don't remember.

[3] Q: You don't remember?

[4] A: I don't remember.

[5] Q: Something like that would
[6] not stick in your mind from the last
[7] couple of weeks?

[8] A: I've been very stressful,
[9] very, very stressful. My life is falling
[10] apart in front of me.

[11] Q: All right.

[12] A: Plus I have an illness. I
[13] have a very, very bad stomach and I need
[14] to go for surgery.

[15] Q: Do you need to take a break
[16] now?

[17] A: No, I'm fine.

[18] Q: Are you on any medicine as
[19] we speak?

[20] A: No, I'm not.

[21] Q: Any time you want to take a
[22] break because you have any physical
[23] discomfort, you just let me know. We can
[24] do that. In fact, we'll take a break

Page 60

[1] every hour.

[2]    A: No, I'm — so far I'm okay.

[3]    Q: All right.

[4]    A: The stress is here, but I'm

[5] okay.

[6]    Q: Which tapes have you

[7] provided to Larry Varn?

[8]    A: Let me think about this.

[9] The tapes I provided with Larry Varn are

[10] the tapes of — Jeff Stern and I had a

[11] conversation. I was trying to get Jeff

[12] Stern to remember the day Mike bribed him

[13] for $300,000 to get the contract to build

[14] the Anchor Glass building restruction

[15] (sic).

[16]    Q: By Mike, you mean Mike

[17] DiIanni?

[18]    A: Yes, Michael DiIanni.

[19]    Q: You never got Mr. Stern to

[20] say that, did you?

[21]    A: No, I did.

[22]    Q: Really?

[23]    A: Yes. As a matter of fact,

[24] you have a copy of the tape.

Page 61

[1]    Q: I've listened to the tape

[2] and I didn't hear him say that.

[3]    A: You have to listen very

[4] closely.

[5]    Q: Okay. Is it your position

[6] that Mike DiIanni actually bribed — you

[7] know what bribery is, don't you?

[8]    A: I was there.

[9]    Q: All right. Is it your

[10] position that Mike DiIanni actually

[11] bribed Jeff Stern?

[12]    A: I was there, sir.

[13]    Q: Can you answer —

[14]    A: Yes, it is. Yes.

[15]    Q: All right. The answer is

[16] yes?

[17]    A: Yes, he did. Yes.

[18]    Q: All right. Go ahead.

[19] That's one tape. Did you give that to

[20] Larry Varn?

[21]    A: Yes, I did.

[22]    Q: What other tapes did you

[23] give to Larry Varn?

[24]    A: The second tape I gave to

Page 62

[1]    Larry Varn I believe was a tape between

[2] Alan McGrath, Mike DiIanni, Peter Pierce,

[3] Doug Huntley and Thomas Carr.

[4]    Q: And what occasion was that

[5] that you taped? What kind of a meeting

[6] was that and when?

[7]    A: Well, you know, I don't

[8] really remember.

[9]    Q: Okay.

[10]    A: But I'll have to think about

[11] that.

[12]    Q: Now, when you start these

[13] tapes, at least the one I listened to

[14] with Jeff Stern —

[15]    A: Yes.

[16]    Q: — you tell us in the

[17] beginning before you actually speak to

[18] the person what day it is and what time

[19] it is?

[20]    A: On some of the tapes.

[21]    Q: Some of the tapes.

[22]    A: Depending how accurate I was

[23] that day.

[24]    Q: Okay. So on some of the

Page 63

[1]    tapes we'll know what day it is because

[2] you tell us?

[3]    A: Unless I made a mistake on

[4] the date.

[5]    Q: Okay. Subject to that,

[6] we'll know what the date is?

[7]    A: Yes.

[8]    Q: All right. You can put that

[9] exhibit down and we'll move to another

[10] one. Let me show you what we've already

[11] marked. This is fairly lengthy. These

[12] are just more telephone bills, Mr. Carr.

[13] There's many, many, many.

[14] As a matter of fact, I told Alan, Listen,

[15] keep the phone on because there's plenty

[16] of calls.

[17]    MR. PESLAK: Did you mark

[18] these all as one exhibit?

[19]    MR. KIRCHER: Yeah, I did.

[20]                 BY MR. KIRCHER:

[21]    Q: Let me just clarify the

[22] record here. What I've handed to you,

[23] Mr. Carr, has been marked as Carr Exhibit

[24] No. 2. There's a little sticker on the

Page 64

[1] front.

[2]     A: There's no sticker on here.

[3] There's a copy of a sticker.

[4]     Q: No, no, that's a real

[5] sticker.

[6]     A: Oh, it's a sticker?

[7]     Q: Yeah.

[8]     A: Okay. Could have fooled me.

[9]     Q: And what this is, is this is

[10] a — it's really a bunch of separate

[11] documents. You'll see that these are the

[12] telephone bills for your cell phone, your

[13] Logistec cell phone —

[14]     A: Sure.

[15]     Q: — for billing dates

[16] December 9, 2001, January 9, 2002,

[17] February 9, 2002, March 9 2002, and April

[18] 9, 2002, okay?

[19]     A: Yes.

[20]     Q: So this is essentially phone

[21] calls you've made from roughly November

[22] through March, okay?

[23]     A: Okay.

[24]     Q: Now, I've just got a few

Page 65

[1] questions about some of these. If you

[2] could —

[3]     A: Be my guest.

[4]     Q: Okay. Thank you. If you

[5] can look at the first one, the December 9

[6] bill.

[7]     A: December 9 bill. Okay.

[8]     Q: And if you'll turn to Page

[9] 79.

[10]     A: 79. Okay, I am on Page 79.

[11]     Q: And if you go down to Item

[12] No. 384.

[13]     A: 384. Yes, sir.

[14]     Q: You see that's another phone

[15] call to Mr. Wadzke up in Boston, right?

[16]     A: Ditto.

[17]     Q: And the date is November 26,

[18] and it's 4:48 p.m.; do you see that?

[19]     A: I believe that is the date.

[20]     Q: Okay.

[21]     A: Yes.

[22]     Q: Do you remember why you

[23] called Mr. Wadzke in late November 2001?

[24]     A: I really don't know.

Page 66

[1]     Q: Okay.

[2]     A: I don't remember exactly.

[3] I'm sure I could —

[4]     Q: All right. Let me ask you

[5] to turn to the next bill, which is the

[6] January bill.

[7]     A: Okay.

[8]     Q: It's the next packet.

[9]     A: The next packet?

[10]     Q: Yeah. There you go.

[11]     A: Okay.

[12]     Q: And in that packet if you

[13] turn to Page 56.

[14]     A: Yes, I'm on 56.

[15]     Q: Do you see that?

[16]     A: Yes, I do.

[17]     Q: All right.

[18]     Item 57 and 58?

[19]     Q: Well, actually, before that,

[20] if you go to 52 and 53 —

[21]     A: Okay.

[22]     Q: — you see Item 52, that's

[23] at call to Mr. Peslak, your counsel,

[24] right?

Page 67

[1]     A: I'm sorry, what item was

[2] that, sir?

[3]     A: 52. Freehold, New Jersey.

[4]     A: 52, 52. Yes. Yes. Yes.

[5]     Q: All right. And that's a

[6] 4:46 p.m., and then right after that at

[7] 4:54 p.m. you made a call to the main

[8] number at Iron Mountain.

[9]     A: Correct.

[10]     Q: Okay. Do you know why you

[11] called Iron Mountain —

[12]     A: Obviously to speak to —

[13]     Q: Just a moment. Just a

[14] moment.

[15]     A: — Mr. Wadzke.

[16]     Q: Do you remember why you

[17] called Iron Mountain on December 10th at

[18] 4:45 p.m.?

[19]     A: Well, I must have called

[20] because I was talking to Mr. Wadzke about

[21] what was going on between myself and

[22] Logisteq and cooperating with them in the

[23] investigation on Peter Pierce violating

[24] his non-compete.

Page 68

[1] Q: Okay. Did you tell — back
[2] in December of — let me just set the
[3] stage here. In December of 2001, you
[4] were then and you are now a 49 percent
[5] shareholder in Logisteq, correct?
[6] A: This is true.
[7] Q: And Peter Pierce — strike
[8] that. Pioneer, then and now, was the 51
[9] percent shareholder in Logisteq, correct?
[10] A: Correct.
[11] Q: Okay. In December of 2001,
[12] whatever your title or position was, you
[13] were still employed full time by
[14] Logisteq?
[15] A: This is true.
[16] Q: All right. And at that time
[17] you were providing information to and
[18] having discussions with Iron Mountain
[19] about the activities of Peter Pierce?
[20] A: Absolutely.
[21] Q: All right. Now, did you
[22] tell Peter Pierce in December you were
[23] having those discussions?
[24] A: Yes, I did.

Page 69

[1] Q: You did?
[2] A: Yes.
[3] Q: Did you tell him that you
[4] were having discussions with Iron
[5] Mountain about whether or not he was
[6] violating his restrictive covenant?
[7] A: Well, I don't remember.
[8] Q: All right. Well, what did
[9] you tell Peter Pierce?
[10] A: I told Peter Pierce that
[11] I've been talking to Iron Mountain, and I
[12] disagree with everything he's doing, and
[13] my interest is in Logisteq, not Sequedex.
[14] And he has to stop putting —
[15] Q: Let me —
[16] A: — Sequedex people on our
[17] books, and he has to stop giving trailers
[18] to Sequedex. And he has to stop trying
[19] to use our buildings for Sequedex,
[20] because I cannot afford to be dragged
[21] into this, and I need to focus on
[22] Logisteq and not Sequedex.
[23] Q: All right. Try and listen
[24] to my question, because I think you

Page 70

[1] answered some other question. Let me try
[2] it again.
[3] What did you tell Peter
[4] Pierce about what you were telling Iron
[5] Mountain?
[6] A: I don't remember.
[7] Q: Okay. Well, did you —
[8] A: Except for what I told you.
[9] Q: Well, that's what I want to
[10] find out. Did you tell Peter Pierce in
[11] December that you were telling Iron
[12] Mountain that he was doing something
[13] wrong that had to do with Sequedex?
[14] A: No, I —
[15] Q: Did you tell Iron — did you
[16] tell Peter Pierce that's what you were
[17] telling Iron Mountain?
[18] A: No. I told Peter Pierce
[19] that Iron Mountain was asking me why we
[20] had Sequedex trailers on our property
[21] when we're already having hard times with
[22] Iron Mountain with Michael DiIanni
[23] causing all these disruptions. And I
[24] told Peter if he does not stop and focus

Page 71

[1] on my company I'm going to have to go and
[2] cooperate, and if they ask me anything,
[3] I'm going to tell the truth.
[4] Q: Okay. That's what you told
[5] Peter Pierce in December?
[6] A: Yes, I did, sir.
[7] Q: Now, was this a very
[8] important thing to you, Mr. Carr, at the
[9] time?
[10] MR. PESLAK: Object to the
[11] form of the question.
[12] BY MR. KIRCHER:
[13] Q: You know what I mean when I
[14] say very important, don't you?
[15] A: No. You got to be a little
[16] more specific.
[17] Q: You don't understand the
[18] English words "very important?"
[19] A: I have a college degree. I
[20] understand English.
[21] Q: Okay. What's your degree?
[22] A: Business.
[23] Q: From where?
[24] A: St. Peter's College.

Page 72

[1]  Q: What year?

[2]  A: 1982.

[3]  Q: Okay. Well, do you ever use

[4] the word important when you speak to

[5] people?

[6]  A: Absolutely.

[7]  Q: Well, then I'll adopt

[8] whatever your understanding of the word

[9] important is. Was this matter involving

[10] Sequedex and Peter Pierce, was that a

[11] matter that was important to you?

[12]  A: Very important to me.

[13]  Q: Okay. And did you document

[14] this concern? Did you sit down and write

[15] a memo to the file or a letter to Peter

[16] Pierce or a letter or a document to

[17] anybody to document that this was your

[18] concern?

[19]  A: Let me think about this. I

[20] don't know — I don't remember if I ever

[21] had something written to Peter, but we

[22] had numerous conversations —

[23]  Q: Well, I understand that's

[24] what you're telling me.

Page 73

[1]  A: — regarding this, verbal

[2] conversations.

[3]  Q: My question is, and I think

[4] you've answered it, is, these

[5] conversations where you raised with Peter

[6] about how upset you were with the

[7] Sequedex stuff, you didn't ever reduce

[8] that to a writing, did you?

[9]  THE WITNESS: Art, was there

[10] one letter I think that I asked

[11] you to write to Peter Pierce? I

[12] think you might have that copy.

[13] There might be a letter.

[14]  MR. KIRCHER: Mr. Peslak

[15] is —

[16]  MR. PESLAK: I'm not the

[17] witness here today.

[18]  THE WITNESS: There may be a

[19] letter addressing that, which I'll

[20] have to ask my attorney to check

[21] his file. And if there is, I'd be

[22] happy to give it to you.

[23]        BY MR. KIRCHER:

[24]  Q: Well, when you say a letter,

Page 74

[1] a letter that was sent or a letter that

[2] was not sent?

[3]  A: A letter that was sent to

[4] Peter Pierce telling him to stop having

[5] the employees of Sequedex being paid

[6] through Logisteq.

[7]  Q: Okay. And when was that

[8] letter sent?

[9]  A: I believe — let me think.

[10] It's not April. It's May. May 30. Let

[11] me just think here. I'm going to say

[12] maybe December of 2000.

[13]  Q: Okay. Will you look for

[14] that letter?

[15]  A: Absolutely.

[16]  Q: Thank you.

[17]  A: You're welcome.

[18]  Q: And if you don't have it,

[19] will you ask your counsel to look for it?

[20]  A: As a matter of fact, I just

[21] asked him.

[22]  Q: Okay. I'll accept that.

[23]  A: Okay.

[24]  Q: Now, picking up on the same

Page 75

[1] phone bills, same page, if you go down to

[2] Item 57 and 58.

[3]  A: 57, 58. Okay.

[4]  Q: Those are two more phone

[5] calls at 5:31 p.m. and 5:45 p.m. on

[6] December 10th to Mr. Wadzke, correct?

[7]  A: Yes.

[8]  Q: All right. So if my count

[9] is correct, on December 10th you had four

[10] separate phone calls to Mr. Wadzke at

[11] Iron Mountain?

[12]  A: That's what the documents

[13] are showing.

[14]  Q: Okay. You have no reason to

[15] doubt this telephone bill, do you?

[16]  A: I believe not.

[17]  Q: Okay. Let me ask you to

[18] turn to the next bill, which is the bill

[19] dated February 9, 2002. Do you got that?

[20] That's the next packet, Mr. Carr.

[21]  A: I'm sorry. The next packet?

[22]  Q: Yeah.

[23]  A: What page?

[24]  Q: In the February 9 bill,

Page 76

[1] let's turn to Page 70.

[2]     A: Page 70. Okay. I'm on

[3] Page 70.

[4]     Q: All right. If you go

[5] down — this whole page appears to be

[6] telephone calls on January 24th, 2002; do

[7] you see that?

[8]     A: Okay.

[9]     Q: All the dates on the left?

[10]     A: Yes.

[11]     Q: All right. And if you start

[12] with Item 386 — actually, 385.

[13]     A: Okay.

[14]     Q: You'll see that the calls no

[15] longer come from the home area, meaning

[16] New Jersey, but now you're making phone

[17] calls, at least the first couple, from

[18] Fairfield, Connecticut. Do you see that?

[19]     A: Yes, I see that.

[20]     Q: Then there's on 389, that is

[21] from the home area.

[22]     A: Okay.

[23]     Q: But then the next several go

[24] Fairfield, Connecticut, New Haven,

Page 77

[1] Connecticut. There's a home area, then

[2] there's Hartford, then there's New

[3] London, and then there's a whole bunch of

[4] Bostons. Do you see that?

[5] - A: Yes, I do.

[6]     Q: All right. You were

[7] traveling that day, right?

[8]     A: Correct.

[9]     Q: In fact, you were driving to

[10] Boston for a meeting with Mr. Wadzke and

[11] others, correct?

[12]     A: Yes. What date was this?

[13] I'm sorry.

[14]     Q: January 24th.

[15]     A: Correct.

[16]     Q: All right. And in fact,

[17] you'll see that the Boston phone calls

[18] start with Item 395 at 12:45 p.m. Do you

[19] see that?

[20]     A: Yes, I do.

[21]     Q: Then they continue until

[22] Item 403, which is 1:16 p.m. Do you see

[23] that?

[24]     A: Yes, I see it.

Page 78

[1]     Q: About six, seven, eight

[2] phone calls. And then there's a — there

[3] seems to be a gap there between 1:16 p.m.

[4] and 4:29 p.m. when no calls were made.

[5] Do you see that?

[6]     A: Yes, I do.

[7]     Q: Is that when you were

[8] meeting with the Iron Mountain

[9] individuals from about 1:00 to 4:00?

[10]     A: I'm sorry, what was the

[11] time, from 1:00 to 4:00?

[12]     Q: Yes.

[13]     A: I believe — I believe so.

[14]     Q: Okay.

[15]     A: I would have to check my

[16] records, but I believe that's what that

[17] was.

[18]     Q: All right. We'll come back

[19] to that meeting in a little bit.

[20]     A: Sure.

[21]     Q: And then at the bottom of

[22] the page it looks like — it looks like

[23] you drove home that night and made some

[24] more phone calls; is that right?

Page 79

[1]     A: Yes, I did.

[2]     Q: In fact, is that what

[3] happened in fact, that you drove home

[4] after the Boston meeting?

[5]     A: Correct.

[6]     Q: Drove home to New Jersey?

[7]     A: Yes.

[8]     Q: All right. We'll talk about

[9] that meeting in a few minutes.

[10]     A: Sure.

[11]     Q: If I can ask you to turn

[12] over to Page 73.

[13]     A: 73. Okay.

[14]     Q: And real quick, Mr. Carr —

[15]     A: Sure.

[16]     Q: If you look at Items 504 and

[17] 531, these are two more phone calls to

[18] Mr. Wadzke of Iron Mountain in Boston.

[19] Do you see that?

[20]     A: Yes, I do.

[21]     Q: And those are on January

[22] 28th?

[23]     A: Yes.

[24]     Q: Now, do you remember what

Page 80

[1] you were talking to Mr. Wadzke about in
[2] January of this year, generally?
[3]     A: Generally? You want a
[4] general answer?
[5]     Q: Yes.
[6]     A: I would have to be talking
[7] to him regarding the situation between
[8] Logisteq and Iron Mountain and Peter
[9] Pierce.
[10]     Q: Okay. Let me shift gears
[11] here just for a second. At any point in
[12] time — let's go back to September of
[13] 2001.
[14]     A: Okay.
[15]     Q: We've seen some phone calls
[16] between you and Mr. Wadzke. When did you
[17] first tell Mr. Wadzke or Mr. Varn that
[18] you were under indictment in the Southern
[19] District of New York?
[20]     A: I didn't.
[21]     Q: To this day, have you ever
[22] told them?
[23]     A: No. As a matter of fact,
[24] you told them.

Page 81

[1]     Q: Okay.
[2]     A: Yes.
[3]     Q: When do you understand that
[4] they first learned that you were under
[5] indictment?
[6]     A: I believe when they received
[7] your information regarding —
[8]     Q: Okay. Did you think maybe
[9] it might be important to them to know
[10] that the information that was being
[11] supplied to them about Mr. Pierce was
[12] being supplied by someone who's under
[13] indictment?
[14]     A: No. I really don't think it
[15] has any relevance at all.
[16]     Q: Okay.
[17]     A: No, I wasn't guilty. I'm
[18] not guilty, and it has nothing to do with
[19] us whatsoever. It was completely
[20] separate from Logisteq.
[21]     Q: Have you ever had any
[22] discussions with Mr. Wadzke or Mr. Varn
[23] about your indictment?
[24]     A: Yes, I have.

Page 82

[1]     Q: Okay. And tell me about
[2] those discussions.
[3]     A: They asked me what was this
[4] indictment, and I told them it was
[5] something I was charged with, which I'm
[6] pleading guilty, and it has nothing
[7] relevant to do with Iron Mountain or
[8] myself.
[9]     Q: All right.
[10]     A: And that's it. I didn't go
[11] on. It was none of their business.
[12]     Q: I want to be fair to you,
[13] Mr. Carr, because I don't want a jumbled
[14] record. What you just said was, is that
[15] you told them that you pleaded guilty.
[16]     A: No.
[17]     Q: Did you mean to say that?
[18]     A: No, no, no, no.
[19]     Q: Okay.
[20]     A: Okay. I take that back. If
[21] I said that I didn't realize it.
[22]     MR. PESLAK: But I think he
[23] did say that.
[24]     MR. KIRCHER: Why don't you

Page 83

[1] read back the answer?
[2]     MR. KIRCHER: I do, too.
[3]     MR. PESLAK: Yeah.
[4]     MR. KIRCHER: In fact, I
[5] know he did.
[6]     THE WITNESS: You're making
[7] me nervous.
[8]     MR. KIRCHER: I don't
[9] mean — look —
[10]     THE WITNESS: Alan's down
[11] there grinning. Doug looks like
[12] he's about to kill me.
[13]     MR. KIRCHER: Why don't we
[14] go off the video. We'll take a
[15] five-minute break. How's that?
[16]     THE WITNESS: Okay.
[17]     THE VIDEOGRAPHER: Stand by.
[18] The time is 11:13. Off the
[19] record.
[20]
[21]     (Recess was taken.)
[22]
[23]     (Whereupon, the pertinent
[24] portion of the record was read.)

**Page 84**

[1] THE VIDEOGRAPHER: Stand by.
[2] The time is 11:22 a.m. We are
[3] back on the record.

[4] BY MR. KIRCHER:
[5] Q: Mr. Carr, before we broke I
[6] asked you some questions about
[7] discussions you had with Mr. Varn about
[8] your indictment, and you gave an answer,
[9] and I think by mistake you used the words
[10] you pleaded guilty. Do you want to
[11] change that or clarify that?
[12] A: Yes. Yes.
[13] Q: Okay.
[14] A: I told him — I told
[15] Mr. Wadzke that I was pleading not
[16] guilty, and it was pretty much my
[17] personal business. And I didn't have
[18] the — I wasn't — I'm not allowed to
[19] speak about the case.
[20] Q: Okay. Now, let me get back
[21] to the topic of tapes.
[22] A: Yes.
[23] Q: Did you tape any of the
[24] discussions that you had with any

**Page 85**

[1] Logisteq individuals while you were
[2] meeting in Pennsylvania?
[3] A: There are so many tapes. I
[4] really don't know, but I can check that
[5] with the tapes.
[6] Q: All right. So sitting here
[7] today, you don't know whether any of
[8] these tapes were taped in Pennsylvania?
[9] A: I don't remember at this
[10] time.
[11] Q: Were any tapes that you made
[12] involving Logisteq or Mr. Pierce or
[13] anything relating to this lawsuit or Iron
[14] Mountain's lawsuit, were any tapes made
[15] in Massachusetts?
[16] A: I really can't remember at
[17] this time.
[18] Q: All right. Sometimes, maybe
[19] not all the time, but sometimes when you
[20] begin one of these tapes —
[21] A: Yes.
[22] Q: — you also mention where
[23] you are, do you not?
[24] A: Yes, I do sometimes.

**Page 86**

[1] Q: So for some of these tapes
[2] we'll know where you are when the tape is
[3] made?
[4] A: Correct.
[5] Q: Okay. Have you taped any
[6] conversations that you've had with
[7] Mr. Varn?
[8] A: No, I have not.
[9] Q: How about any conversations
[10] you've had with Mr. Wadzke?
[11] A: No, I have not.
[12] Q: Is there a reason why you
[13] haven't taped them?
[14] A: No.
[15] Q: Have you made any tapes of
[16] conversations you've had with any Iron
[17] Mountain individual or Iron Mountain
[18] employee or representative?
[19] A: No, I have not.
[20] Q: I think we left off on Page
[21] 73 of the February 9, 2002 bill.
[22] A: 23?
[23] Q: 73.
[24] A: 73, I'm sorry. I'm here.

**Page 87**

[1] Q: And, again, to get through
[2] this quickly — I guess we did this. We
[3] did 504 and 531.
[4] A: Yes.
[5] Q: So let me move on to the
[6] next page, which is Page 78. If you can
[7] turn to Page 78.
[8] A: 78.
[9] Q: Do you have that?
[10] A: Yes, I do.
[11] Q: Now, if you look at Item No.
[12] 733 and 734 —
[13] A: Yes.
[14] Q: — You'll see that you made
[15] phone calls on February 4th at 4:39
[16] p.m. —
[17] A: Yes.
[18] Q: — to an individual in
[19] Sugus, S-U-G-U-S, Massachusetts. Do you
[20] see that?
[21] A: Yes, I do.
[22] Q: Okay. If I told you that
[23] was the cell phone of an individual named
[24] John Heydon, who is the vice president of

Page 88

[1] real estate at Iron Mountain, would that
[2] ring a bell?
[3]    A: Yes. Yes, it would.
[4]    Q: Did you make phone calls to
[5] John Heydon?
[6]    A: Yes, I did.
[7]    Q: Why were you calling him in
[8] February?
[9]    A: Discussing the building.
[10]    Q: Which building?
[11]    A: The building that we're in
[12] in Freehold.
[13]    Q: Okay.
[14]    A: He's in charge of that.
[15]    Q: When you say we, you mean
[16] Logisteq?
[17]    A: Logisteq.
[18]    Q: Okay.
[19]    A: He's in charge of their real
[20] estate group.
[21]    Q: Okay. Can you tell me about
[22] the discussion specifically, if you
[23] remember?
[24]    A: Well, I believe — looking

Page 89

[1] at the time here, I believe the first
[2] time was a voicemail, because it was only
[3] a one-minute call. And a lot of these
[4] calls with Gary Wadzke — it's very
[5] difficult to get through to him. So a
[6] lot of these were just voicemails or
[7] message voicemail that I just hang up and
[8] would try to call him back. So there's a
[9] lot of duplicates. As you would say,
[10] dittos.
[11]    And as far as John Heydon,
[12] John is pretty much in charge of the real
[13] estate with Iron Mountain, and I was
[14] speaking to him regarding future rent of
[15] the building if I was able to stay there
[16] in my facility.
[17]    Q: Future rent by who?
[18]    A: By myself and Logisteq.
[19]    Q: By yourself and Logisteq,
[20] okay.
[21]    A: Yes. Because Peter Pierce
[22] had asked me if I wanted to buy him out.
[23] So I was trying to raise money to see if
[24] I can buy Peter out.

Page 90

[1]    Q: Okay. Let me take you over
[2] to Page 80.
[3]    A: 80.
[4]    Q: Uh-huh. And if you look at
[5] Item 802, that looks like another phone
[6] call to Mr. Wadzke on February 6 at 4:21
[7] p.m. Do you see that?
[8]    A: Yes, sir, I do.
[9]    Q: Okay. Do you remember what
[10] you were talking to Mr. Wadzke about in
[11] February?
[12]    A: I really don't.
[13]    Q: Okay.
[14]    A: Just general regarding Iron
[15] Mountain, Logisteq.
[16]    Q: Sequedex?
[17]    A: Sequedex.
[18]    Q: Peter Pierce?
[19]    A: Peter Pierce.
[20]    Q: Okay. Then if you look at
[21] Item 819, that looks like another phone
[22] call to John Heydon. And —
[23]    A: If you look at it, though,
[24] it's a one-minute — I probably didn't

Page 91

[1] get through to him.
[2]    Q: Okay. All right. You can
[3] put that packet down.
[4]    A: Sure.
[5]    Q: And go to the next one,
[6] which is the bill for March 9th, 2002.
[7]    A: March.
[8]    Q: Do you have that?
[9]    A: I'm sorry, March 9th?
[10]    Q: Yeah.
[11]    A: I have December, January.
[12] Just let me — I'm sorry.
[13]    Q: Got it?
[14]    A: Yep.
[15]    Q: That's the one that starts
[16] with Page 49. And if you can go over
[17] first to Page 59, and if you go down to
[18] Item 354.
[19]    A: 354. Yes.
[20]    Q: Right.
[21]    MR. PESLAK: Which page?
[22]    THE WITNESS: Page 59.
[23]    MR. KIRCHER: Page 59 of
[24] 118. Do you got the right bill?

Page 92

[1]    MR. PESLAK: No.

[2]    THE WITNESS: March.

[3]    MR. PESLAK: Oh, March. I'm

[4] in the wrong — I'm sorry.

[5]    MR. KIRCHER: That's okay.

[6] Are you with us, Art?

[7]    MR. PESLAK: Yeah, I am.

[8] Sorry.

[9]    MR. KIRCHER: Okay.

[10]              BY MR. KIRCHER:

[11]    Q: If you go down to Item —

[12] first Item 353 you'll see that on

[13] February 20th at 1:09 p.m. you had a

[14] 17-minute phone call with Mr. Peslak

[15] here. Do you see that?

[16]    A: Yes.

[17]    Q: And then right after that

[18] you had a 17-minute phone call with

[19] Mr. Wadzke —

[20]    A: Correct.

[21]    Q: — up in Boston?

[22]    A: Yes.

[23]    Q: Do you remember what —

[24] don't tell me about what you said to

Page 93

[1] Mr. Peslak, but what did you say to

[2] Mr. Wadzke?

[3]    A: I wouldn't remember that

[4] conversation, again, just general talk

[5] about the companies.

[6]    Q: Okay. If you go over to

[7] Page 61, Mr. Carr. Again, real quick,

[8] there's another phone call to Mr. Wadzke

[9] at Item 439. And this is February 25th

[10] at 11:20 a.m. Do you see that?

[11]    A: Yes. Yes, I do.

[12]    Q: If I ask you the same

[13] question about what you remember, same

[14] answer?

[15]    A: I'm going to say that was

[16] probably a voicemail and I hung up,

[17] because I see it's only a one-minute —

[18]    Q: Okay.

[19]    A: So, again, it was very

[20] difficult to get through to him, so a lot

[21] of these calls are duplicate calls where

[22] I'm trying to get through to him.

[23]    Q: All right. Let's go over to

[24] Page 63.

Page 94

[1]    A: Sure, 63.

[2]    Q: And down to Item 519, which

[3] is a phone call on February 28 at 10:46

[4] a.m.

[5]    A: Yes.

[6]    Q: That's a seven-minute call

[7] to Mr. Wadzke. Do you see that?

[8]    A: Yes, I do.

[9]    Q: All right. Now, if I told

[10] you that this phone call was made

[11] immediately after you taped the

[12] conversation with Jeff Stern, would that

[13] sound about right, on February 28? And

[14] the reason I say that, in fairness to

[15] you, is, I've listened to that tape, and

[16] on the tape you say, beginning at 9:40

[17] and ending at 10:40 on February 28th.

[18] And in between is the conversation you

[19] had with Jeff Stern.

[20]    A: I'll take your word for it.

[21]    Q: Okay. So this phone — were

[22] you reporting to Mr. Wadzke what had

[23] occurred during the taped conversation

[24] with Mr. Stern?

Page 95

[1]    A: I really don't remember what

[2] that conversation could have been about.

[3]    Q: That certainly makes sense,

[4] though. I mean, you reported to

[5] Mr. Wadzke on that the taped phone con —

[6]    A: It would make sense, if

[7] you're telling me that this —

[8]    Q: — phone conversation?

[9] Go ahead.

[10]    A: It would make sense if

[11] you're telling me that this phone call

[12] happened directly after the conversation

[13] with Jeff Stern, I would say it was

[14] probably regarding the tape.

[15]    Q: Okay. Did you ever tape any

[16] other telephone call — strike that. Did

[17] you ever tape any other conversation that

[18] you had with Mr. Stern other than the

[19] one — the tape of which you've supplied

[20] to us?

[21]    A: No.

[22]    Q: Have you ever spoken to

[23] Mr. Stern —

[24]    A: Yes, I have.

J. Peter Pierce     Thomas Car...

Case 1:05-cv-10890-FDS    Document 81-6     Filed 06/21/2007     Page 25 of 27, May 30, 200...

**Page 96**

[1]   Q: Well, let me finish. Have
[2] you spoken to Mr. Stern since
[3] February 28?
[4]   A: No.
[5]   Q: I want to try and get — I
[6] know I asked you something about this
[7] before, but I want to make sure that I
[8] understand this clearly. Do you believe
[9] that Mr. Stern believes that he was the
[10] object of a bribery attempt by Mike
[11] DiIanni?
[12]   A: He was.
[13]   Q: Well, that's not — listen
[14] to my question.
[15]   MR. PESLAK: Listen to the
[16] question, Tommy.
[17]        BY MR. KIRCHER:
[18]   Q: Listen to my question. I
[19] know what you believe. I want to know
[20] what you think Mr. Stern believes. Do
[21] you think that Mr. Stern thinks that he
[22] was the object of a bribery attempt by
[23] Mike DiIanni?
[24]   A: Absolutely positively.

**Page 97**

[1]   Q: Okay. And you believe that
[2] why, because he told you?
[3]   A: He told me.
[4]   Q: And he told you during that
[5] taped conversation?
[6]   A: No. During the taped
[7] conversation he was very nervous, and I
[8] was really pushing him to get it out.
[9] And obviously, I wouldn't walk in there
[10] and say, by the way, could you tell me if
[11] Mike DiIanni bribed you? He told me once
[12] before. And then I was with Michael and
[13] I said, Jeff, I said, I need you to
[14] testify and tell Peter Pierce — because
[15] I fired Michael DiIanni and I need to
[16] tell Mike — I need to tell Peter Pierce
[17] what really happened, because Peter does
[18] not believe me that Michael DiIanni would
[19] actually take a bribe — would actually
[20] give a bribe for himself after working so
[21] many years with Peter. And it was very
[22] disturbing for Peter Pierce that it
[23] happened. It was the truth. And it was
[24] really a hard thing for Peter to stomach.

**Page 98**

[1]   Q: So, just so I understand it,
[2] Mr. Carr, it's your belief, and I take it
[3] it's your firm belief, that Mike DiIanni
[4] actually bribed Jeff Stern?
[5]   A: Michael DiIanni asked
[6] Mr. Stern for $300,000 cash.
[7]   Q: Uh-huh.
[8]   A: And that $300,000, if he
[9] received it, he would be awarded the
[10] build-out for the Anchor Glass facility.
[11]   Q: Okay. So the bribe flowed
[12] from Mr. Stern to Mr. DiIanni; that's
[13] what you understand?
[14]   A: (Witness indicates.)
[15]   Q: You have to say yes or no
[16] for the record.
[17]   A: Repeat the question.
[18]   Q: Okay. It's your
[19] understanding that Mike DiIanni asked
[20] Mr. Stern to make a $300,000 bribe in
[21] order for Mr. Stern to get some business?
[22]   A: Correct.
[23]   Q: All right. And is it your
[24] understanding that that money actually

**Page 99**

[1] changed hands?
[2]   A: No, it never happened.
[3]   Q: Okay. And what's your
[4] understanding as to why it didn't happen?
[5]   A: What happened is, Mr. Stern
[6] never got the job because the township of
[7] Abberdeen stopped us from going through
[8] with the deal.
[9]   Q: Okay. Do you have an
[10] understanding as to whether Mr. Stern,
[11] regardless of whether the money changed
[12] hands, do you have an understanding as to
[13] whether Mr. Stern agreed to that bribe
[14] arrangement?
[15]   A: No, he did not agree.
[16]   Q: He did not. Okay.
[17] All right. So it's your
[18] position that Mike DiIanni solicited a
[19] bribe but Mr. Stern refused?
[20]   A: Absolutely.
[21]   Q: Okay. And Mr. Stern has
[22] told you that?
[23]   A: Yes.
[24]   Q: All right. Have you told

Page 100

[1] anybody, outside of this deposition and
[2] outside of this lawsuit, have you told
[3] anybody, anybody, someone in your family,
[4] any acquaintance, any stranger, that Mike
[5] DiIanni solicited a bribe?
[6]    A: Yes.
[7]    Q: Who have you told?
[8]    A: Alan McGrath.
[9]    Q: Who else?
[10]    A: Let's see. Alan McGrath,
[11] and I also told Peter Pierce.
[12]    Q: Uh-huh.
[13]    A: Just recently I told Gary
[14] Wadzke.
[15]    Q: Anyone else?
[16]    A: That's all I can remember as
[17] of now.
[18]    Q: All right. And the basis
[19] for your belief that Mike DiIanni did
[20] this is you were there?
[21]    A: Yes.
[22]    Q: Okay. You were there during
[23] the conversation where Mr. DiIanni
[24] solicited the bribe?

Page 101

[1]    A: Correct.
[2]    Q: Okay.
[3]    A: I also have a tape.
[4]    Q: You have a tape of it?
[5]    A: I have a tape with Mike
[6] DiIanni and Alan and myself talking about
[7] it.
[8]    Q: Well, I'm not talking about
[9] that, but —
[10]    A: No, but I have a tape if you
[11] want to hear it.
[12]    Q: Okay. All right. We'll get
[13] to that.
[14]    A: Okay.
[15]    Q: But the conversation where
[16] Mike DiIanni solicited the bribe, do you
[17] have a tape of that?
[18]    A: No, I do not.
[19]    Q: You didn't tape that one?
[20]    A: No. No, I did not.
[21]    Q: All right. Where is the
[22] tape of you and Alan and Mike —
[23]    A: In my home.
[24]    Q: — talking about it?

Page 102

[1]    Q: In your home?
[2]    A: Uh-huh.
[3]    Q: As we sit here today, it's
[4] in your home?
[5]    A: Yes. I did not give those
[6] tapes out.
[7]    Q: To anybody?
[8]    A: No. I was trying to see if
[9] Peter and I can settle before I released
[10] all these additional tapes I had.
[11]    Q: Okay.
[12]    A: Because I don't want it to
[13] get out of control.
[14]    Q: Now, you're not threatening
[15] anybody with these tapes, are you?
[16]    A: No. As a matter of fact,
[17] Mike DiIanni called the FBI and said I
[18] was extorting Peter for money and the FBI
[19] was coming to arrest me. And I said,
[20] Guys, I did not extort anyone. I told —
[21] everyone knows that I was taping them.
[22]    Q: Yeah.
[23]    A: I was just trying to protect
[24] my company. I asked Peter to settle and

Page 103

[1] let's focus on growing our business.
[2]    Q: How do you know Mike DiIanni
[3] spoke to the FBI?
[4]    A: A friend of mine told me.
[5]    Q: Who?
[6]    A: I can't tell you.
[7]    Q: Well, you have to.
[8]    A: I have to?
[9]    Q: Yeah.
[10]    A: Okay.
[11]    MR. PESLAK: You have to
[12] answer the question.
[13]    MR. KIRCHER: Yeah.
[14]    THE WITNESS: Okay. I need
[15] to think —
[16]    MR. PESLAK: It's under a
[17] confidentiality order.
[18]          BY MR. KIRCHER:
[19]    Q: You have to think about it
[20] because you don't want to answer, or you
[21] have to remember the name?
[22]    A: I have to remember who that
[23] person was. I have a lapse in memory. I
[24] can't remember the name.

Page 104

[1]    Q: Well, are you purposely not
[2] giving me the name, Mr. Carr, because
[3] it's a very serious matter? You're under
[4] oath, and if you know the name, you have
[5] to give it to me.
[6]       So who was the person who
[7] told you that Mike DiIanni called the
[8] FBI? And if I have to go to a judge to
[9] make you answer, I will.
[10]    A: I — I — you know what, I
[11] don't remember who told me.
[12]    Q: Okay. So you can't prove
[13] anything with respect to this —
[14]    A: No, I cannot prove.
[15]    Q: All right. Well, without
[16] recalling the identity of this person,
[17] what did that person tell you?
[18]    A: That Mike DiIanni is going
[19] to do everything in his power to bring
[20] you down and hurt your family. And I've
[21] been receiving letters at my home, very,
[22] very nasty letters, telling my wife that
[23] I have girlfriends, and I'm leaving her,
[24] and I'm plotting to hurt her, and just

Page 105

[1] these terrible letters coming to my home.
[2]    Q: Anonymous letters?
[3]    A: Yes, that are making my wife
[4] very upset.
[5]    Q: What's that got to do with
[6] Mike DiIanni? You think they're coming
[7] from him?
[8]    A: Yes, I do.
[9]    Q: Okay. Do you have these
[10] letters?
[11]    A: Yes, I do.
[12]    Q: Where, in your home?
[13]    A: In my home. I believe I do,
[14] unless my wife —
[15]    Q: Now, I started out asking
[16] you what did this person whose name you
[17] can't remember tell you about Mike
[18] DiIanni and the FBI, and somehow you got
[19] onto these letters.
[20]    A: Well, I'll tell you what
[21] I'll do, I'll call the FBI and I'll find
[22] out how they heard I was extorting Peter,
[23] and maybe I can get information from the
[24] FBI directly.

Page 106

[1]    Q: All right. I'll accept that
[2] offer.
[3]    A: Okay.
[4]    Q: Thank you.
[5]    A: But as of today, I have no
[6] proof that Mike DiIanni did that.
[7]       I do have proof that someone
[8] called the FBI again the second time and
[9] said I went in with gangsters and
[10] mobsters into the Sayreville facility and
[11] threatened people with a gun that I was
[12] going to kill them, I was going to ruin
[13] all their coffee, but I have that whole
[14] tape in there showing I — I had to show
[15] the FBI that that was not true. And
[16] there was a sergeant in there at the
[17] time.
[18]       So again, someone called the
[19] FBI. And I've also received many
[20] complaints from my customers that Mike
[21] DiIanni is calling them slandering my
[22] name, saying I'm a womanizer and I never
[23] worked and that I'm indicted and I'm
[24] involved with the Mafia, so I'm getting

Page 107

[1] slandered terribly by Mike DiIanni. So
[2] that's why I would think that it's Mike
[3] DiIanni, because I have witnesses telling
[4] me. As late as two days ago I received a
[5] call from a company by the name of Grief
[6] Corporation.
[7]    Q: Can you spell that for us?
[8]    A: G-R-I-E-F. And the fellow's
[9] name is Bill, told me that Mike DiIanni
[10] put my indictment in front of him and
[11] said that he's a mob — involved in the
[12] Mafia and he's no good and he's a
[13] womanizer and he never worked and he's
[14] just drawing the company down. And
[15] that's why Peter's no longer having him
[16] in the company.
[17]       So what I'm being told is
[18] that my customers don't ever want to deal
[19] with me again because of Mike DiIanni
[20] calling up all my customers and ruining
[21] my reputation.
[22]    Q: When you say my customers,
[23] who is the my?
[24]    A: My customers are customers

Page 108

[1] I've had over the years that I had
[2] credibility with and reports with who
[3] have trusted in me for many years,
[4] customers like Loreal who I brought Mike
[5] Gold to and gave them the business for
[6] Sequedex. Customers such as Nestle.
[7]     Q: Have you had discussions
[8] with those kinds of customers in the last
[9] month or so?
[10]     A: Yeah. You have my phone
[11] records. They've been calling me.
[12]     Q: Well, let me get a straight
[13] answer to the question. Have you had
[14] discussions —
[15]     A: Yes.
[16]     Q: — whether it's by telephone
[17] or otherwise — let me finish. Have you
[18] had discussions with those kinds of
[19] customers over the last several months?
[20]     A: Yes.
[21]     Q: Okay. And was that for the
[22] purpose of trying to save them for some
[23] future business of yours?
[24]     A: No.

Page 109

[1]     Q: What was the purpose of
[2] those discussions?
[3]     A: The purpose of the
[4] discussions were I had customers calling
[5] me asking me what's going on with our
[6] business. They're being told by RPM that
[7] Logisteq had closed down operations and
[8] now all of their certified coffee and
[9] commercial coffee has to be out of the
[10] warehouse within 60 days at their cost.
[11]     Then I had my bank, who I
[12] personally signed a $100,000 letter of
[13] credit for a bond, calling me to tell me
[14] that my customers pulled the bond.
[15]     Q: Pulled?
[16]     A: Pulled the bond.
[17]     Q: Right.
[18]     A: Because they're being told
[19] they have to move and leave the premises
[20] because Peter did not sign the lease and
[21] he had given the coffee business to RPM.
[22] So I've been getting many complaints,
[23] very disturbing complaints, people who
[24] know me calling my home.

Page 110

[1]     Q: Okay. Well, let me refocus
[2] you. Other than these complaints —
[3]     A: Yes.
[4]     Q: — have you had discussions
[5] with those customers about future
[6] business?
[7]     A: No.
[8]     Q: In any form?
[9]     A: No.
[10]     Q: Let's get back to the phone
[11] bills —
[12]     A: Sure.
[13]     Q: — and see if we can
[14] complete this. If I told you there were
[15] three more calls to Gary Wadzke on
[16] March 1st — I'm going to try and rush
[17] through this a little bit.
[18]     A: That's fine.
[19]     Q: — will you accept that?
[20] Three more calls to Gary Wadzke on March
[21] 1st.
[22]     A: I'll accept on the record
[23] that any of these calls to Gary Wadzke on
[24] my phone bill were made by me.

Page 111

[1]     Q: Okay.
[2]     A: Okay.
[3]     Q: All right. Another phone
[4] call to Gary Wadzke by you on March 4th;
[5] will you accept that?
[6]     A: Yes, I will.
[7]     Q: Okay. Another phone call to
[8] Gary Wadzke on March 5th; will you accept
[9] that?
[10]     A: Yes.
[11]     Q: Okay. If you look at the
[12] last packet in this exhibit, which is the
[13] April 9th bill — do you have that one?
[14]     A: Yes, I do.
[15]     Q: Okay. And in that packet if
[16] you turn to Page 50 —
[17]     A: Okay.
[18]     Q: — will you accept that
[19] there is a phone call on March 14th to
[20] Mr. Wadzke at Iron Mountain? It's at
[21] 4:10 p.m. Do you see that?
[22]     A: Yes, I — what number is
[23] that? I'm sorry.
[24]     Q: Item 145.

Min-U-Script®

IMP04430

Page 112

[1] A: Yes, I see that.

[2] Q: Okay. And then if you go

[3] over to that next page, Page 51 at

[4] Item 219, you'll see there is another

[5] phone call to Mr. Wadzke.

[6] A: Yes, I see that.

[7] Q: All right. And moving on to

[8] Page 53, Item 297 and 300. This is

[9] March 18.

[10] A: Yes.

[11] Q: Two more calls to

[12] Mr. Wadzke. Do you see that?

[13] A: Yes, I do.

[14] Q: Then if you go down to

[15] Item 313 on March 18th at 4:41 there's a

[16] call that you made to a number on Staten

[17] Island. Do you see that?

[18] A: Yes, I do.

[19] Q: That's Mr. Massucci of RPM;

[20] isn't it?

[21] A: Correct.

[22] Q: Okay. And if you go down to

[23] Item 339 you'll see another phone call on

[24] March 19th to Mr. Massucci's number?

Page 113

[1] A: Yes.

[2] Q: Now, you were calling —

[3] actually, if you go over to the next

[4] page, Page 54, you'll see on March 19th

[5] at Item 344 and 345, two more calls to

[6] Mr. Massucci, one to his business and one

[7] to his mobile phone?

[8] A: Correct.

[9] Q: And then at Item 349 there

[10] is a phone call at 11:38 on March 19th to

[11] Jersey City, and that's to a restaurant,

[12] correct, Casadante?

[13] A: I'm sorry, what item?

[14] Q: 349.

[15] A: Okay. 349?

[16] Q: Yeah.

[17] A: Yes, I see it.

[18] Q: Okay. Now, what you were

[19] doing, among other things, on March 19th,

[20] was you were setting up a lunch meeting

[21] that included Mr. Massucci, correct?

[22] A: Correct.

[23] Q: It included Mr. Martosi of

[24] Continental?

Page 114

[1] A: Correct.

[2] Q: And it also included some

[3] Iron Mountain folks?

[4] A: Yes.

[5] Q: And the Iron Mountain

[6] folks — and actually, that lunch meeting

[7] occurred, didn't it?

[8] A: Yes, it did.

[9] Q: March 19th at the — is it

[10] Casadante?

[11] A: Casadante.

[12] Q: Okay.

[13] A: It's a restaurant.

[14] Q: And who were the Iron

[15] Mountain folks at that lunch?

[16] A: Gary Wadzke and John Kenny.

[17] Q: Right. And Gary Wadzke, as

[18] we know, is the general counsel of Iron

[19] Mountain, correct?

[20] A: Yes, correct.

[21] Q: And Mr. Kenny is the chief

[22] financial officer of Iron Mountain?

[23] A: Yes, he is.

[24] Q: Okay. And so you and

Page 115

[1] Mr. Kenny and Mr. Wadzke of Iron

[2] Mountain, and then Mr. Martosi of

[3] Continental, who is in the coffee

[4] business, right?

[5] A: Correct.

[6] Q: And actually is a competitor

[7] of Logisteq?

[8] A: Yes. So is RPM.

[9] Q: Right. On March 19th, while

[10] you were still employed by Logisteq and

[11] on its payroll, you were meeting with two

[12] of Logisteq's competitors and

[13] representatives of Iron Mountain; is that

[14] right?

[15] A: Yes, it is.

[16] Q: How long did that luncheon

[17] go?

[18] A: About three-and-a-half

[19] hours.

[20] Q: Okay. And the principal

[21] topic of that luncheon was to discuss a

[22] future business venture involving coffee

[23] and Iron Mountain?

[24] A: Correct.

Page 116

[1]  Q: And possibly Mr. Martosi's
[2] company and Mr. —
[3]  A: Can I just back up on that?
[4]  Q: Sure.
[5]  A: I made a mistake. You said
[6] coffee venture in Iron Mountain?
[7]  Q: Yes.
[8]  A: No, not Iron Mountain.
[9]  Q: Right. A coffee venture?
[10]  A: Coffee venture with Schooner
[11] Capital. Schooner Capital.
[12]  Q: S-C-U-N-A, Scuna?
[13]  A: You have a college degree?
[14]  Q: I do.
[15]  A: Do you know how to spell
[16] Schooner?
[17]  Q: Schooner, like the ship?
[18]  A: Yes.
[19]  Q: It's your North Jersey
[20] accent. I'm sorry.
[21]  A: Okay.
[22]  Q: I've got a Philadelphia
[23] accent, so —
[24]  A: Okay.

Page 117

[1]  Q: Schooner Capital. Now, who
[2] and what is Schooner Capital?
[3]  A: Schooner Capital is a
[4] venture capital company.
[5]  Q: And the head of Schooner is
[6] who?
[7]  A: Vin Ryan.
[8]  Q: Fin Ryan.
[9]  A: Vin.
[10]  Q: Vin Ryan.
[11]  A: Okay. Geez. Vincent Ryan.
[12]  Q: Right. Was a representative
[13] of Schooner at this meeting, this
[14] luncheon meeting?
[15]  A: Actually, no.
[16]  Q: Okay. But one of the topics
[17] of this luncheon meeting was a coffee
[18] venture involving —
[19]  A: Actually, the topic of this
[20] meeting was to raise money so that I can
[21] buy my 51 percent of the company away
[22] from Peter, and to then see if we can
[23] merge all the coffee companies together
[24] to become one, and whether that was going

Page 118

[1] to be Continental or RPM to raise the
[2] money and then to see if we can raise
[3] money through Schooner Capital. That's
[4] what that meeting was about.
[5]  Q: Okay. Now, so one of the
[6] topics was to, in some form, combine
[7] Logisteq's business with the business of
[8] others?
[9]  A: Yes.
[10]  Q: And as the 49 percent
[11] shareholder that day, did you tell your
[12] 51 percent brother shareholder that you
[13] were having such a meeting?
[14]  A: As a matter of fact —
[15]  Q: Can you answer my question?
[16]  A: No.
[17]  Q: What was Iron Mountain's
[18] role, as you saw it, to be in this future
[19] combining venture?
[20]  A: Iron Mountain would have no
[21] role in this future rollup. This should
[22] be strictly a Schooner Capital
[23] investment. And I had asked John Kenny
[24] if he could help us organize investors to

Page 119

[1] come and raise money to buy Peter's 51
[2] percent out and then to raise additional
[3] monies to buy Continental and RPM so we
[4] could merge the companies since Peter
[5] would no longer put money into Logisteq.
[6]  Q: Okay. Now, at this meeting,
[7] did you share with the assembled group
[8] any information about Logisteq?
[9]  A: No.
[10]  Q: None at all?
[11]  A: No.
[12]  Q: Did they share any
[13] information with you about their
[14] business?
[15]  A: Yes.
[16]  Q: Okay. So this was sort of a
[17] one-way street where you learned about
[18] Continental and RPM, but you didn't share
[19] any Logisteq information?
[20]  A: No. And the reason is that
[21] we've spoken to — Mike DiIanni and
[22] myself had spoken to Continental and RPM
[23] many times prior to this meeting. We had
[24] the same intent with Peter Pierce to do a

IMP04432

Page 120

[1] rollup.

[2] Q: Right.

[3] A: And to buy some of the major
[4] competitors of Logisteq to bring us all
[5] together and maybe some day build the
[6] company to take it public.

[7] So Peter had met with Ray
[8] Massucci from RPM to discuss and
[9] negotiate buying his company, but at that
[10] time negotiations stopped.

[11] Q: Since March 19th have you
[12] had any conversations with Mr. Martosi?

[13] A: Yes, I have.

[14] Q: About what was discussed at
[15] this luncheon meeting?

[16] A: Yes.

[17] Q: And what's the — what were
[18] the results of those — how many
[19] discussions, more than one?

[20] A: Yes, we had more than one.

[21] Q: Okay. Did you share any of
[22] those discussions with anyone at
[23] Logisteq?

[24] A: I believe I spoke to Alan

Page 121

[1] McGrath about me meeting with
[2] Continental, because at the time we had a
[3] large account called Coffee America who
[4] wanted Logisteq to put a blending
[5] facility in, which would be around the
[6] area of about three-quarters of a million
[7] dollars. And I had told him that I was
[8] talking with Continental, that they had
[9] have a blending facility and it would be
[10] a great idea if Peter would merge all
[11] these companies together and we'd control
[12] the coffee market. And I had also told
[13] Peter and asked Peter if he would have
[14] any interest in doing that, and he said
[15] no, I would not at this time.

[16] Q: Let me go back to something
[17] I asked you earlier, because I'm a little
[18] confused. If one of the purposes of this
[19] lunch meeting was to discuss some future
[20] combining of businesses that would
[21] include the Logisteq business — do I
[22] have that right so far?

[23] A: Correct.

[24] Q: — how would you expect

Page 122

[1] sophisticated business people on the
[2] other side to make a decision about a
[3] business that would include Logisteq if
[4] no information was shared with them about
[5] Logisteq? That's why I'm confused.

[6] A: There's nothing to be
[7] confused about. They know about my
[8] company and they know that Logisteq is
[9] one of the leaders in the coffee industry
[10] and is a competitive edge against them
[11] and a real threat to their business.

[12] Q: All right.

[13] A: So being a leader in the
[14] industry, it was kind of a privilege that
[15] we were going to them and asking them if
[16] they had interest in merging with us.

[17] Q: All right. And it's your
[18] position, Mr. Carr, that you shared no
[19] information about Logisteq with any of
[20] the gentlemen at this meeting, this
[21] luncheon meeting?

[22] A: The information I shared is
[23] that I'm trying to buy Peter Pierce out
[24] of his 51 percent. Pretty much that's

Page 123

[1] about it.

[2] Q: All right. But you shared
[3] no information about existing leases,
[4] existing customers, existing contracts,
[5] existing financial information; you
[6] shared none of the information with them?

[7] A: No, I wouldn't do that,
[8] because they're a competitor. By me
[9] sharing any information as far as
[10] competitors, I would be giving them the
[11] leading edge. So, no, I would not share
[12] that information.

[13] Q: Okay. And did you ponder —
[14] strike that. Did you at least consider
[15] informing the majority shareholder ahead
[16] of time or after the fact about this
[17] meeting?

[18] A: Yes, I did.

[19] Q: Okay. And you decided not
[20] to do that, correct?

[21] A: I'm sorry, I decided what?

[22] Q: You decided not to tell —
[23] let me do it this way. Let me break it
[24] down.

[1] A: Oh, Peter Pierce knew I had

[2] the meeting.

[3] Q: Before the fact?

[4] A: Before the fact, yes.

[5] Q: You told Peter Pierce that

[6] this meeting —

[7] A: I told Peter that I am

[8] trying to raise money to buy his 51

[9] percent out. I told him that I am trying

[10] to raise money to put the blending

[11] facility in if I couldn't buy

[12] Continental. And I asked Peter if he

[13] would be interested in buying these

[14] companies and forgetting about

[15] Telespectrum and forgetting Sequedex,

[16] focus on growing this company by buying

[17] out other coffee companies and we become

[18] a very strong company, and the company

[19] was really heading in the right

[20] direction.

[21] Q: Let me see if I can get an

[22] answer —

[23] A: And he told me he has no

[24] interest at that time.

[1] Q: Let me see if I can get an

[2] answer to my question.

[3] A: Sure.

[4] Q: Before March 19th, before

[5] this luncheon meeting at Casadante —

[6] A: Yes.

[7] Q: — did you tell Peter Pierce

[8] or anyone else at Logisteq that you were

[9] about to have a meeting with Doug Martosi

[10] of Continental, Ray Massucci of RMP and

[11] two representatives of Iron Mountain?

[12] A: Yes, I did.

[13] Q: Okay. Did you — how did

[14] you tell him, in person, by telephone?

[15] A: By telephone.

[16] Q: All right. Did you tell

[17] anyone else?

[18] A: No, only Peter.

[19] Q: And Peter's reaction to you

[20] telling him that was, who cares?

[21] A: No. He said he had no

[22] interest in — I asked Peter. I said,

[23] Peter, I'm going to be meeting with

[24] Continental and RPM regarding our

[1] contract coming up to build a blending

[2] facility, and I feel it would be a wise

[3] move if we really wanted to grow this

[4] company to buy these two players and we'd

[5] pretty much dominate the market.

[6]    And I told him I'm going to

[7] set up a meeting with them to raise

[8] money. If you don't have any interest in

[9] doing a merger, I will try to talk to

[10] them and do a deal and raise my own money

[11] to buy you out. And he said that's fine.

[12]    As a matter of fact, I told

[13] Alan McGrath also. We went to a

[14] convention, and I had told Alan at the

[15] convention — I had met him at the bar

[16] and Doug Martosi was there, and I told

[17] Alan that I know Doug through a family

[18] member and that Doug has a brand-new

[19] blending facility. I am going to be

[20] talking to him about doing a deal with us

[21] on the blending if Peter did not want to

[22] raise the money, because to walk away —

[23] that was 40 to 60 million pounds of

[24] coffee a year that we could have had in

[1] our facility.

[2]    And the company was being

[3] ran very well by Alan McGrath and going

[4] in the right direction. The numbers were

[5] getting better. And I pretty much told

[6] him if Peter is not going to put any more

[7] money into the company, I'm going to do

[8] my best to raise the money on my own,

[9] whether it's doing a merger through

[10] investors, private investors, to bring

[11] the companies together. So Alan McGrath

[12] was well aware of that.

[13] Q: All right. And this meeting

[14] was the coffee trade show in Florida —

[15] A: Yes.

[16] Q: — on March 9th?

[17] A: As a matter of fact, to add

[18] to that, I even told Alan that I wouldn't

[19] do this unless I knew Alan was going to

[20] remain in the company.

[21] Q: Okay.

[22] A: Because I was very fond of

[23] the way Alan ran the operation, and I was

[24] very impressed with the way Alan McGrath

Page 128

[1] dealt with employees. He's very
[2] professional.
[3]    Q: Right. In fact, you're so
[4] impressed with Alan McGrath that as
[5] recently as the last two days you've
[6] offered him a job, right?
[7]    A: Yes, as a matter of fact, I
[8] have.
[9]    Q: Okay. So in the last two
[10] days you've solicited the employment of
[11] the president of Logisteq?
[12]    A: No, Logisteq was closed
[13] down. I have tape.
[14]    Q: No, no, no. Logisteq is not
[15] closed down. Logisteq exists. And you
[16] recognize that Alan McGrath is
[17] essentially the chief executive officer,
[18] and in the last two days you've solicited
[19] his employment, correct?
[20]    A: No, that's not correct.
[21] Alan McGrath told me he would be out of
[22] work for the summer. And I asked Alan
[23] McGrath, I said, If you need a job, I'm
[24] really sorry to see you hurt in the

Page 129

[1] middle of this mess because you've never
[2] done anything wrong. And basically this
[3] divorce is between Peter and I and a lot
[4] of people are getting hurt.
[5]    So people who are out of
[6] jobs I will try to help place in other
[7] positions because of my credibility with
[8] many large Fortune 500 companies, that I
[9] would do my best to help Alan find a
[10] position since he's been a very big help
[11] during the last year and a half with me.
[12]    Q: All right. Let me see if
[13] I — let me see if I understand this.
[14]    A: Yes.
[15]    Q: Is it your position — let
[16] me ask it this way. In the last couple
[17] of days, did you solicit Alan McGrath to
[18] be an employee or did he come to you and
[19] solicit a position with you? Who
[20] initiated this?
[21]    A: Well, I really don't
[22] remember who initiated it. I know
[23] Alan — I know Alan was saying that — I
[24] asked Alan — I had actually asked Alan

Page 130

[1] who is remaining. And he said to me, he
[2] says, We're closing the company. He
[3] says, There's nothing I can do about it.
[4] I have that on tape as a matter of fact.
[5] I can play you that tape, too.
[6]    Q: Oh, you have that? Where's
[7] that tape, at home?
[8]    A: Yes, it is.
[9]    Q: Okay.
[10]    A: I'll bring that to you. I
[11] have Alan on tape saying I talked to
[12] Peter. Peter is closing the company.
[13] The only two people we have left in the
[14] office besides myself is Dawn Kelly and
[15] Sharon Culkin, and they are here to
[16] collect all the receivables. And we
[17] probably have about two to three weeks
[18] left before we collect the receivables
[19] and close the doors for good.
[20]    Q: Okay. Well, let me go back
[21] to my question. Here's what I'm trying
[22] to get at, Mr. Carr.
[23]    A: Yes.
[24]    Q: In the last couple of

Page 131

[1] days — and I'm trying to ask this so you
[2] can give me a yes or a no.
[3]    A: Okay.
[4]    Q: In the last couple of days,
[5] have you solicited the employment of Alan
[6] McGrath; yes or no?
[7]    A: I'm going to say no to
[8] soliciting. I did not solicit him.
[9]    Q: Well, did you ask him if he
[10] was interested in being an employee?
[11]    A: An employee?
[12]    Q: Yeah.
[13]    A: I asked Alan McGrath if he
[14] was going to be out of work, I would help
[15] him find a job.
[16]    Q: With who?
[17]    A: Oh, I have many contacts.
[18]    Q: Oh, just anybody, or did you
[19] have a particular company in mind?
[20]    A: No, I have a few different
[21] companies in mind.
[22]    Q: Okay. So if Alan McGrath
[23] says that two days ago you solicited his
[24] employment by Iron Mountain, that would

Page 132

[1] be a lie; is that your position?

[2]    A: From me?

[3]    Q: Yes. Let me try it again.

[4]    A: Okay. Try it again.

[5]    Q: Did you tell Alan McGrath —

[6] did you offer to Alan McGrath in the last

[7] two days that you could get him

[8] employment with Iron Mountain?

[9]    A: No.

[10]    Q: Did you have any discussion

[11] with Alan McGrath in the last two days

[12] about his being employed by Iron

[13] Mountain?

[14]    A: No.

[15]    Q: Did you have any discussion

[16] with him about Iron Mountain at all in

[17] the last two days?

[18]    A: I don't remember.

[19]    Q: So let me get an answer to

[20] my question. If Alan McGrath says that

[21] within the last two days you offered him

[22] employment by Iron Mountain, that would

[23] be a lie?

[24]    A: No, I'm not going to say

Page 133

[1] it's a lie. I just don't remember.

[2]    Q: Let me go back to the phone

[3] bill and see if I can save some time

[4] here. On Page 54 there are a number of

[5] phone calls on March 20th, the day after

[6] this luncheon meeting —

[7]    A: Okay.

[8]    Q: — by you to both Ray

[9] Massucci and Doug Martosi.

[10]    A: Yes.

[11]    Q: You agree with that?

[12]    A: Yes.

[13]    Q: Okay. Was that sort of a

[14] follow-up to the meeting?

[15]    A: Yes.

[16]    Q: Okay. Then another phone

[17] call, this is on Page 55 at Item 431,

[18] 10-minute phone call to Ray Massucci.

[19] Same topic?

[20]    A: Yes, same topic.

[21]    Q: Okay. And then on

[22] November — strike that. Then on March

[23] 22nd several more phone calls to Ray

[24] Massucci?

Page 134

[1]    A: Correct.

[2]    Q: Same topic?

[3]    A: Yes.

[4]    Q: All right. Then right after

[5] the phone call at 12:43, this is Item 482

[6] on Page 56, right after a phone call to

[7] Mr. Massucci there's a phone call to Gary

[8] Wadzke. Does that sound familiar?

[9]    A: No, but if you say it's in

[10] the bill, I agree.

[11]    Q: Well, it's here. It's Item

[12] 482 —

[13]    A: Okay.

[14]    Q: — and 483. Were you

[15] reporting to Mr. Wadzke about your

[16] conversations with Mr. Massucci?

[17]    A: No, I was not.

[18]    Q: Over on Page 57 at Item 496

[19] there's a phone call to a Boston number,

[20] 338-2965. That's Mr. Varn's phone. You

[21] had a telephone call with Mr. Varn on

[22] March 22nd. Does that ring a bell?

[23]    A: If the document is there,

[24] yes.

Page 135

[1]    Q: Okay. And then there's a

[2] call to a — this is Line Item 497. It's

[3] to area code (617) 763-1620. Do you know

[4] whose phone number that is in Boston?

[5]    A: No, I do not. I'm taking

[6] your word for it.

[7]    Q: Well, it's here. I mean,

[8] your counsel is following along.

[9]    Then on Item 506 there is a

[10] phone call to Boston, and I believe this

[11] is on March 22nd at 4:51. I believe it's

[12] Mr. Kenny, his phone number. Have you

[13] made any phone calls to Mr. Kenny, maybe

[14] following up on this luncheon meeting?

[15]    A: Maybe. Maybe, if it was

[16] there. It could have been.

[17]    Q: Okay. Then if you'll follow

[18] along with me, Mr. Carr, turn over to

[19] Page 59 of the April 9 bill. Are you

[20] with me?

[21]    A: Yes, I am.

[22]    Q: If you look at Items 603

[23] through 628, you'll see that all the

[24] phone calls you made in those items were

J. Peter Pierce

Thomas Car...

Case 1:05-cv-10890-FDS    Document 81-7    Filed 06/21/2007    Page 8 of 30    Vol...

Vol. 1, May 30, 2007

Page 136

[1] from Boston, Massachusetts. Do you see
[2] that?
[3]   A: Yes.
[4]   Q: You were up in Boston on
[5] March 26th, correct?
[6]   A: Yes, sir.
[7]   Q: Were you up there to have a
[8] meeting with Iron Mountain folks?
[9]   A: Yes, I was.
[10]   Q: All right. Tell me about
[11] that meeting.
[12]   A: That meeting — you know
[13] what, let me just get my grip here. What
[14] day was this?
[15]   Q: The bill says that it's
[16] March 26th.
[17]   A: March 26?
[18]   Q: Right.
[19]   A: I believe the meeting wasn't
[20] with Iron Mountain. I believe that
[21] meeting was Schooner Capital with Vincent
[22] Ryan trying to raise money so I can buy
[23] Peter Pierce out of my 51 percent, and to
[24] discuss doing an investment that they

Page 137

[1] were interested in buying some coffee
[2] companies and merging them together.
[3]   Q: Okay. So you were in Boston
[4] for a meeting with Mr. Ryan of Schooner?
[5]   A: Yes.
[6]   Q: All right. Who else was at
[7] that meeting?
[8]   MR. PESLAK: Phil, I think
[9] the guy's running out of tape.
[10]   MR. KIRCHER: Okay. Let's
[11] take a break. We'll stop right
[12] there.
[13]   THE VIDEOGRAPHER: Ten
[14] minutes.
[15]   MR. KIRCHER: Ten minutes.
[16] All right. We'll go 10 minutes
[17] and then we'll break for lunch.
[18]           BY MR. KIRCHER:
[19]   Q: Who else was at the meeting
[20] that you had with Mr. Ryan of Schooner?
[21]   A: On the 26th I believe it was
[22] just myself and Vin Ryan.
[23]   Q: Okay.
[24]   A: But I had a few meetings up

Page 138

[1] there, so I'd have to actually check back
[2] in documents.
[3]   Q: Okay. While you were in
[4] Boston —
[5]   A: Yes.
[6]   Q: — and the reason I ask this
[7] is, the lawsuit that Iron Mountain filed
[8] against Peter Pierce and Mr. Huntley and
[9] Pioneer, you're aware that there's such a
[10] lawsuit, aren't you?
[11]   A: Yes, I am.
[12]   Q: In fact, that's — I think
[13] you told me earlier you were gathering
[14] information —
[15]   A: Absolutely.
[16]   Q: — for that lawsuit?
[17] I believe that lawsuit was
[18] filed on March 28th.
[19]   A: Okay.
[20]   Q: And my question to you is,
[21] were you up in Boston meeting with Iron
[22] Mountain's lawyers as they were putting
[23] the final touches on that lawsuit?
[24]   A: No, absolutely not. I was

Page 139

[1] meeting — that day I was meeting
[2] specifically with Vin Ryan.
[3]   Q: And while you were in Boston
[4] on the 26th you didn't have any
[5] discussions or conversations with Iron
[6] Mountain or its lawyers?
[7]   A: No.
[8]   Q: Okay. Then it looks as if
[9] you took a West Coast trip starting
[10] with — at least starting with Las Vegas,
[11] which isn't West Coast, but if you look
[12] at the phone bill —
[13]   A: Yes.
[14]   Q: — for the next couple
[15] pages, it looks like you were in Las
[16] Vegas for a couple days, then Los
[17] Angeles —
[18]   A: Correct.
[19]   Q: — then San Diego?
[20]   A: Yes.
[21]   Q: Then Los Angeles again?
[22]   A: Correct.
[23]   Q: Finally coming home, it
[24] looks like, about April 4th?

**Page 140**

[1]   A: That's true.

[2]   Q: Okay. Was that a pleasure

[3] trip, business trip?

[4]   A: That was vacation.

[5]   Q: Vacation?

[6]   A: Yes.

[7]   Q: Okay. Did you pay for that

[8] vacation?

[9]   A: Yes, I did.

[10]   Q: Did Iron Mountain in any way

[11] fund that vacation?

[12]   A: No, they did not.

[13]   Q: Okay. Was that a vacation

[14] with your family?

[15]   A: Yes, it was.

[16]   Q: While you were in San Diego

[17] on the 2nd of April — this is Item 718

[18] on Page 61 — it looks like you made a

[19] phone call to Gary Wadzke for 13 minutes.

[20]   A: Yes.

[21]   Q: Why would you call Gary

[22] Wadzke from San Diego?

[23]   A: I don't remember.

[24]   Q: Now, shortly after you filed

**Page 141**

[1] your lawsuit there was a — and

[2] Mr. Peslak can correct me if I jumble

[3] this — within a few days after you filed

[4] your lawsuit there was a scheduled

[5] hearing before Judge Fisher in Freehold

[6] on an application for immediate relief

[7] that you were seeking. Does that ring a

[8] bell?

[9]   A: Yes, it does.

[10]   Q: Okay. And I know Mr. Peslak

[11] was there that day, because I saw him.

[12] Were you there that day in the court?

[13]   A: Yes, I was.

[14]   Q: Okay.

[15]   A: I saw you there.

[16]   Q: I saw you there, too, but I

[17] didn't know who you were.

[18]   A: Okay.

[19]   Q: But now I do.

[20]   A: Lucky you.

[21]   Q: Right. And Mr. Varn was

[22] there?

[23]   A: Yes, he was.

[24]   Q: Okay. Was he there because

**Page 142**

[1] you asked him to be there?

[2]   A: No, actually, I didn't ask

[3] him to be there. I was surprised he was

[4] there.

[5]   Q: Okay. You had met Mr. Varn

[6] by that time, by April —

[7]   A: Yes, I have.

[8]   Q: Okay. Now, the day of that

[9] hearing was April 9th.

[10]   A: Correct.

[11]   Q: I don't want to know what

[12] discussions you had with your lawyer, but

[13] after that hearing that day, did you

[14] become aware of any restrictions on what

[15] you could do or not do with respect to

[16] Logisteq?

[17]   A: Yes.

[18]   Q: Okay. Did you gain an

[19] understanding that in return for

[20] continuing to be paid, until there was a

[21] further hearing in July, that in return

[22] for that, did you become aware that you

[23] had agreed to do and not do certain

[24] things with respect to Logisteq's

**Page 143**

[1] business?

[2]   A: Yes.

[3]   Q: Okay. What was your

[4] understanding of what you could do or not

[5] do so long as you were getting paid?

[6]   A: My understanding was to have

[7] as little communication with my customers

[8] as possible. And if there was a problem

[9] with my customers, direct them to Alan

[10] McGrath.

[11]   Q: Okay. Now, that very day

[12] from this phone bill, that very day at

[13] 3:51 p.m. on April 9th, there's a

[14] telephone from you to Honeywell.

[15]   A: Okay.

[16]   Q: Can you tell me why you were

[17] talking to Honeywell the very day you

[18] agreed not to do that?

[19]   A: The very day I agreed?

[20]   Q: Yes.

[21]   A: I don't remember.

[22]   Q: By the way, that's Line Item

[23] 965.

[24]       All right — well, we're not

Page 144

[1] done with the phone bills.

[2]     Why don't we take a break at

[3] this point? We'll go off the video and

[4] then we'll discuss, you know, lunch

[5] arrangements and all that stuff.

[6]     THE VIDEOGRAPHER: This

[7] concludes tape one of this

[8] videotape deposition. The time is

[9] 12:12 p.m. We are off the record.

[10]

[11]     (Lunch recess was taken.)

[12]

[13]     THE VIDEOGRAPHER: This

[14] begins tape two of this videotape

[15] deposition. The time is 1:16 p.m.

[16] We are on the record.

[17]     MR. KIRCHER: We're back

[18] after a lunch break.

[19]     BY MR. KIRCHER:

[20]     Q: Mr. Carr, let me go back to

[21] this March 19th meeting at the restaurant

[22] that involved Mr. Martosi and

[23] Mr. Massucci, the two fellows from Iron

[24] Mountain and yourself. Was Jim Neebling

Page 145

[1] at that luncheon?

[2]     A: Yes, he was.

[3]     Q: Okay. All right. So we

[4] have you, Jim Neebling, two individuals

[5] from Iron Mountain, Mr. Massucci,

[6] Mr. Martosi. Was there anyone else at

[7] that luncheon meeting that we're leaving

[8] out?

[9]     A: No, I believe that's it.

[10]     Q: Okay. And Mr. Neebling was

[11] there because what?

[12]     A: Jim Neebling, um, he's been

[13] also working with Logisteq, and he's been

[14] working with Alan McGrath prior to this

[15] trying to see if he can get involved with

[16] our company doing some work. He was also

[17] trying to help us find some customers to

[18] fill up Miami. He has a small business

[19] in Miami and Bayhead, New Jersey. So

[20] what Jimmy was going to do is actually

[21] try to be part of this group, and if we

[22] were able to get investors, to merge his

[23] company in with our companies.

[24]     Q: Okay. And his company is

Page 146

[1] called Sys —

[2]     A: Systrans.

[3]     Q: S-Y-S-T-R-A-N-S?

[4]     A: Yes.

[5]     Q: Okay. Mr. Neebling owns

[6] that company as far as you know?

[7]     A: Yes, he does.

[8]     Q: All right. We'll talk about

[9] Mr. Neebling and Systrans later. Let me

[10] just finish off the phone bills.

[11]     A: Sure.

[12]     Q: And we've marked the next

[13] exhibit as Carr Exhibit No. 3, and I'll

[14] hand that to you, Mr. Carr, and give your

[15] counsel a copy. This is the phone bill

[16] from Verizon for your cell phone, your

[17] Logisteq cell phone, dated May 9, 2002.

[18] And if you'll — if you'll turn over with

[19] me to Page 49, the second page.

[20]     A: Yes.

[21]     Q: The Item No. 12 indicates

[22] that on April 10 at 2:28 p.m. you made a

[23] phone call to a (732) 577-7850 number,

[24] which, as far as we know, is Honeywell.

Page 147

[1]     A: Yes, it is.

[2]     Q: Okay. And Honeywell is or

[3] was, at least at the time, was a customer

[4] of Logisteq?

[5]     A: Correct.

[6]     Q: If you turn over to the next

[7] page, Page 50 of this phone bill, Item

[8] No. 38 indicates that you called

[9] Honeywell again on April 11?

[10]     A: Yes.

[11]     Q: Okay.

[12]     A: Just for the record, on the

[13] first one, Item 12 —

[14]     Q: Uh-huh.

[15]     A: — I believe I called and

[16] returned a call and got a voicemail and

[17] we were kind of playing phone tag.

[18]     Q: Okay. Well, did you

[19] report when you got — well, strike that.

[20] Are you saying that you think you were

[21] called by Honeywell and you were just

[22] returning the call?

[23]     A: Yes.

[24]     Q: All right. Did you — when

Page 148

[1] you got that call from Honeywell, did you
[2] alert someone at Logisteq that a customer
[3] had called you?
[4]   A: Yes, I did.
[5]   Q: Right that moment?
[6]   A: Yes, I did. Oh, at that
[7] moment?
[8]   Q: Yes.
[9]   A: No, I'm sorry. Not at that
[10] moment.
[11]   Q: Before you called back, did
[12] you call Alan McGrath or someone at
[13] Logisteq and say, I just got a call from
[14] a customer, what do you want me to do?
[15] Did you do that?
[16]   A: I had called Alan McGrath
[17] and I believe I got Alan's voicemail, but
[18] I'm not sure if it was the moment
[19] thereafter or that night. But Alan and I
[20] spoke quite frequently during the week.
[21]   Q: Okay. If you go over to
[22] Page 55 of this particular phone bill,
[23] Item No. 295 indicates on April 22nd at
[24] 12:22 p.m. you made a phone call to

Page 149

[1] Honeywell. Do you see that?
[2]   A: Yes, I do.
[3]   Q: And then Item 299, same day,
[4] at 12:52 —
[5]   A: Yes.
[6]   Q: — you made a phone call to
[7] Honeywell?
[8]   A: Correct.
[9]   Q: Later on that day, same day,
[10] April 22 at 4:20 p.m., it looks like you
[11] made a phone call to Mr. Wadzke at Iron
[12] Mountain. Do you see that?
[13]   A: Yes, I do.
[14]   Q: And Item 323, again, on the
[15] same day, April 22nd at 4:42 p.m. at
[16] (609) 275-0400, that's the phone of
[17] Mr. Schafferman who is the lawyer for the
[18] Sayreville landlord?
[19]   A: Yes, that's correct.
[20]   Q: Okay. You made a call to
[21] him?
[22]   A: Yes, I did.
[23]   Q: Item No. 350 on the next
[24] page, Page 56, April 23rd —

Page 150

[1]   A: By the way, that was — I
[2] didn't get through to him on that day. I
[3] got his voicemail.
[4]   Q: Okay. But you called him?
[5]   A: Yes, I did call him.
[6]   Q: And you knew Mr. Schafferman
[7] was the lawyer for the landlord in
[8] Sayreville?
[9]   A: Yes.
[10]   Q: Okay. Next page, Page 56,
[11] Item 350, it looks like a 14-minute phone
[12] call to Gary Wadzke on April 23.
[13]   A: Correct.
[14]   Q: Do you see that?
[15]   A: Yes, I do.
[16]   Q: And then if you go over to
[17] the next page, Page 57, Item 396 on April
[18] 24th, 2002 at 3:12 p.m., that (908)
[19] number is the mobile phone of John
[20] Lehmann?
[21]   A: Yes, it is.
[22]   Q: L-E-H-M-A-N-N?
[23]   A: Yes.
[24]   Q: Correct?

Page 151

[1]   A: Yep.
[2]   Q: Mr. Lehmann was someone who
[3] had, at one time, worked for Logisteq?
[4]   A: Yes, he was.
[5]   Q: The next item, Item 397,
[6] April 24th at 3:15 p.m.
[7]   A: Yes.
[8]   Q: That number in Point
[9] Pleasant, New Jersey, is a Jim Neebling
[10] Systran number?
[11]   A: Correct.
[12]   Q: Okay. So you called him on
[13] April 24th?
[14]   A: Yes, I did.
[15]   Q: And then the next item, Item
[16] No. 328, again, on April 24th at 3:19
[17] p.m.
[18]   MR. PESLAK: 4:28.
[19]   MR. KIRCHER: I'm sorry.
[20] I'm on Item 398.
[21]   MR. PESLAK: I think you
[22] said 328.
[23]   MR. KIRCHER: Okay. Then
[24] let me start over.

IMP04440

Page 152

BY MR. KIRCHER:

[2]    Q: Item 398 on April 24th at

3:19 p.m. that's a phone call to Asbury

[4] Park to Tammy —

[5]    A: Yes.

[6]    Q: — who at the time was a

[7] Logisteq employee; is that right?

[8]    A: Yes. She's out on maternity

[9] leave.

[10]    Q: Okay. Turn over to Page 59,

[11] Item 508 on April 30 at 3:55 p.m. That's

[12] a phone call to Honeywell again, correct?

[13]    A: Yes, it is.

[14]    Q: And in fact you were talking

[15] to a woman whose name is Gabrielle?

[16]    A: Gabrielle Daly.

[17]    Q: Okay. All right. You can

[18] put that exhibit aside. Let me just make

[19] sure I got the meetings that we've talked

[20] about straight. I think you indicated

[21] from the phone records that you made a

[22] trip to Boston and had a meeting with

[23] Iron Mountain people on January 24th of

[24] this year?

Page 153

[1]    A: Correct.

[2]    Q: Is that right?

[3]    A: Yes.

[4]    Q: Okay. And I may have asked

[5] you this, but did you tape any portion of

[6] that meeting with Iron Mountain?

[7]    A: No, I did not.

[8]    Q: Okay. Did you — I don't

[9] know what your habits are, but did you

[10] make any notes of that meeting?

[11]    A: No, I did not.

[12]    Q: Do you ever make notes at

[13] meetings? Is that your habit or —

[14]    A: No, I'm really — I'm not a

[15] note taker.

[16]    Q: Okay. And you're telling me

[17] you have no notes from that meeting; is

[18] that right?

[19]    A: That's correct.

[20]    Q: Okay. You didn't creat any

[21] memos or send a memo to the file or

[22] anything of that sort, did you?

[23]    A: No, I did not.

[24]    Q: All right. Do you keep a

Page 154

[1] daily — I call them Day Planners,

[2] schedule books — do you keep one of

[3] those?

[4]    A: No, I do not.

[5]    Q: You don't have a little

[6] book —

[7]    A: Nope.

[8]    Q: — of — how do you keep

[9] track of your meetings?

[10]    A: I'm unemployed.

[11]    Q: Well, how did you keep track

[12] of your meetings before?

[13]    A: A Day Planner.

[14]    Q: All right. Where's that?

[15]    A: Home.

[16]    Q: Home?

[17]    A: Yes.

[18]    Q: Did you offer that up to

[19] Mr. Peslak?

[20]    A: No, I did not.

[21]    Q: Okay. Can you get that for

[22] us?

[23]    A: Yes, I can.

[24]    Q: All right. And how do you

Page 155

[1] use that Day Planner? What do you use it

[2] for?

[3]    A: Well, while I was employed

[4] with Logisteq, if I had my meetings, I

[5] would put my appointments by date.

[6]    Q: Right. Did you carry that

[7] around with you like in your briefcase or

[8] with you in some way?

[9]    A: In my briefcase.

[10]    Q: Okay. So that it wasn't

[11] something that you just kept in your

[12] office, you actually took it with you

[13] wherever you went?

[14]    A: Yes, I did.

[15]    Q: So if you were on the road,

[16] for instance, you could make appointments

[17] and keep track of them?

[18]    A: Yes.

[19]    Q: All right. Do you otherwise

[20] keep any sort of a daily, I hate to use

[21] the word diary, but a daily log or diary

[22] of what your activities are?

[23]    A: No.

[24]    Q: No other written records of

Page 156

[1] appointments, meetings, other than this
[2] Day Planner?
[3]    A: Correct.
[4]    Q: While at Logisteq, were you
[5] a computer user? Did you have a desktop
[6] or laptop?
[7]    A: No, I did not.
[8]    Q: Okay. So I take it you
[9] don't use a computer or any other
[10] electronic — you don't have a personal
[11] digital device —
[12]    A: No.
[13]    Q: — or a Palm —
[14]    A: No Palm, no computer.
[15]    Q: — or anything that —
[16] okay.
[17]    And never did while you were
[18] at Logisteq?
[19]    A: Correct.
[20]    Q: Let me go back to meetings.
[21] We talked somewhat about this March 19th
[22] meeting over lunch at Casadante.
[23]    A: Yes.
[24]    Q: Did you make any electronic

Page 157

[1] or tape-recording of any of the
[2] discussions at that meeting?
[3]    A: No, I did not.
[4]    Q: Okay. Did you make any
[5] notes or create any documents?
[6]    A: No.
[7]    Q: How would you, I mean, if
[8] this was a business meeting to explore
[9] future possibilities, how would you
[10] remember what was discussed, all in your
[11] head?
[12]    A: No, they were basically
[13] preliminary meetings to see if there was
[14] interest —
[15]    Q: Right.
[16]    A: — in these groups coming
[17] together.
[18]    Q: Okay.
[19]    A: And I was trying to raise
[20] money and put this deal together.
[21]    Q: Right.
[22]    A: So basically there was
[23] really no notes to take. It was more a
[24] casual talk —

Page 158

[1]    Q: All right.
[2]    A: — a get-to-know-each-other
[3] type of meeting.
[4]    Q: All right. And nothing came
[5] of that, I take it?
[6]    A: No.
[7]    Q: Then, because I saw the time
[8] records about Boston, I asked you whether
[9] there was a meeting on March 26th in
[10] Boston with Iron Mountain people, and I
[11] think you told me no, that that was a
[12] meeting with Schooner?
[13]    A: Schooner Capital.
[14]    Q: Okay. And you're aware that
[15] Schooner is owned or controlled by former
[16] Iron Mountain people?
[17]    A: Yes, I do.
[18]    Q: Mr. Ryan at one time was a
[19] large investor in Iron Mountain?
[20]    A: I'm fully aware of that.
[21]    Q: Okay. Do you know that
[22] Mr. Reese is a principal in Schooner
[23] Capital, Mr. Reese, the CEO of Iron
[24] Mountain?

Page 159

[1]    A: I don't know who Mr. Reese
[2] is.
[3]    Q: You never met him?
[4] Richard Reese?
[5]    A: No.
[6]    Q: Have you ever met him?
[7]    A: Did I ever meet — I
[8] don't — what does Richard look like?
[9]    Q: Got me. Sitting here today,
[10] you don't know whether you've met him or
[11] not?
[12]    A: I might have met him once.
[13]    Q: And where was that?
[14]    A: In the Boston office. I've
[15] met with John Kenny. I've met with Gary
[16] Wadzke. I've met with Vin Ryan.
[17]    Q: But maybe you just said
[18] hello to Mr. Reese but nothing —
[19]    A: Maybe.
[20]    Q: — is that where you were
[21] going with this?
[22]    A: Yes.
[23]    Q: Okay. You don't recall any
[24] substantive discussions with Mr. Reese?

Page 160

[1] A: No, I don't.

[2] Q: Did you talk to — did you

[3] provide information to Iron Mountain or

[4] its lawyers about the activities of

[5] Arturo Soto? Arturo is A-R-T-U-R-O, and

[6] Soto is S-O-T-O. I know you know him.

[7] Did you provide any information to Iron

[8] Mountain or its lawyers about the

[9] activities of Arturo Soto while he was

[10] employed by Logisteq?

[11] A: Yes, I did.

[12] Q: Okay. And did you tell Iron

[13] Mountain lawyers in so many words that

[14] you thought Arturo Soto was performing

[15] work to benefit Sequedex?

[16] A: No. I told them that he was

[17] offered a job by Sequedex to work in

[18] their Atlanta facility and their

[19] Connecticut facility, and there was an

[20] opportunity maybe in Miami.

[21] Q: Okay. But I want to get an

[22] answer to my question. At any time did

[23] you inform Iron Mountain or its counsel

[24] that you believed Arturo Soto, while

Page 161

[1] employed by Logisteq, was actually

[2] working for Sequedex? Did you ever tell

[3] Iron Mountain that?

[4] A: I don't believe so.

[5] Q: Okay. Same question, exact

[6] same question, different person, and

[7] that's Ettle Rickets. Did you ever tell

[8] Iron Mountain or its lawyers that you

[9] believe that Ettle Rickets was, while

[10] employed by Logisteq, performing work to

[11] benefit Sequedex?

[12] A: Yes, I did.

[13] Q: Okay. Same question with

[14] respect to, I think it's Sandra Cole?

[15] A: Sandra Cole, yes.

[16] Q: All right.

[17] A: I told them that.

[18] Q: Okay. Is there any other

[19] person who was employed by Logisteq —

[20] A: Mark Haslon.

[21] Q: All right. Mark Haslon,

[22] H-A-S-L-O-N?

[23] A: Mark Haslon.

[24] Q: So you provided information

Page 162

[1] to Iron Mountain or its lawyers that Mark

[2] Haslon, while employed by Logisteq, was

[3] actually performing work to benefit

[4] Sequedex?

[5] A: They were.

[6] Q: I know, but you have to

[7] answer —

[8] A: Yes, I did.

[9] Q: Yes, you did. All right.

[10] Anyone else that you made that —

[11] provided that information about to Iron

[12] Mountain?

[13] A: No. Michael DiIanni and

[14] Alan McGrath was involved on a minimal

[15] amount also helping out Sequedex.

[16] Michael and I looked at different

[17] buildings for Sequedex. Michael DiIanni

[18] and myself and Mark and Sandra, Ettle and

[19] Mike Gold went to one of my customers to

[20] secure the business for Sequedex.

[21] Q: Which customer was that?

[22] A: That was Loreal, Ralph

[23] Folkes.

[24] Q: Loreal, the cosmetic

Page 163

[1] company?

[2] A: Cosmetic — yes.

[3] MR. KIRCHER: Let me go —

[4] Can you read back his last

[5] answer, please? I'm sorry.

[6] (Whereupon, the pertinent

[7] portion of the record was read.)

[8] BY MR. KIRCHER:

[9] Q: Now, what you mean is that

[10] these people went to one of the

[11] customers, Loreal, to secure business

[12] from Sequedex? What information do you

[13] have about that?

[14] A: The information during our

[15] conversation from day one in the very

[16] beginning when Peter Pierce had asked me

[17] to get involved with Sequedex and to see

[18] if any of my customers would be

[19] interested in doing business with

[20] Sequedex, and I told him I would try my

[21] best to secure some accounts for

[22] Sequedex. And in my office, Mark Haslon,

[23] Ettle, Sandra Cole worked in our office

[24] until they opened up the Cranbury

Page 164

[1] facility. And I would give Mark leads to
[2] go see people, and I gave him three or
[3] four different customers of mine who are,
[4] to this day, still using Sequedex. And I
[5] went on the calls with them.
[6]     So one of our bigger
[7] accounts was Loreal Cosmetics. And I set
[8] up an appointment and the Sequedex group,
[9] including myself and Mike Dilanni, went
[10] to a meeting with Loreal and Ralph Folkes
[11] to give them the business which is —
[12]    Q: Ralph?
[13]    A: Ralph Folkes, F-O-L-K-E-S.
[14]    Q: Is that a Loreal person?
[15]    A: He's a director of
[16] warehousing with Loreal. And to this day
[17] I believe it's a daily pickup. They go
[18] there every day and pick up boxes of
[19] archives for Sequedex.
[20]    Q: Right. And your testimony,
[21] I take it, Mr. Carr, is that, in general,
[22] in the beginning, as you say, Mr. Pierce
[23] asked you to help Sequedex get new
[24] customers that might include existing

Page 165

[1] customers of Logisteq?
[2]    A: This is correct.
[3]    Q: Okay. How did he tell you
[4] that, in a meeting or on the phone or —
[5]    A: In a meeting when Peter and
[6] I sat down at the La Mirage Diner.
[7]    Q: La Mirage?
[8]    A: La Mirage Diner —
[9]    Q: Okay.
[10]    A: — in Freehold with Mike
[11] Dilanni and I and Jimmy Neebling. Peter
[12] was explaining that he, Mark Haslon and
[13] Ettle and Sandra would be working in the
[14] Logisteq's office because they have
[15] noncompetes with Iron Mountain. They
[16] would be actually being paid — they
[17] would be paid by us. That they would be
[18] working for Sequedex, Mike Gold, but
[19] until they opened up the facility they
[20] would need to work out of our office.
[21] And Peter would fund the monies that I'm
[22] paying out of my company to pay the
[23] salaries for Mike Gold — I'm sorry.
[24] Take that back. Not Mike Gold. Mark

Page 166

[1] Haslon, Ettle and Sandra.
[2]    Then prior to our closing,
[3] Peter had given me an advance of $250,000
[4] before we even closed on the company to
[5] fund those salaries.
[6]    Q: Now, when you say he gave
[7] you —
[8]    A: He gave TC Transport —
[9]    Q: Right.
[10]    A: — the money.
[11]    Q: Right.
[12]    A: The monies to support their
[13] salaries.
[14]    Q: And eventually the assets of
[15] TC were purchased by Logisteq?
[16]    A: Correct.
[17]    Q: For which Pioneer paid close
[18] to $4 million?
[19]    A: Yes.
[20]    Q: Okay. Now, I was going to
[21] get to this later, but let me get to it
[22] now. It's true, is it not, Mr. Carr,
[23] that you, you being TC Concepts —
[24]    A: Yes.

Page 167

[1]    Q: — you hired Arturo Soto in
[2] the fall of 2000, correct?
[3]    A: No, that is not true.
[4]    Q: Well, who employed Arturo
[5] Soto in the fall of 2000?
[6]    A: In the fall of 2000, Michael
[7] Dilanni asked —
[8]    Q: Can you answer my question
[9] first? Who employed Arturo Soto in the
[10] fall of 2000?
[11]    A: Okay. No —
[12]    Q: If you don't know, just tell
[13] me.
[14]    A: No, I do know. I want to
[15] back up. I, Thomas Carr, employed Arturo
[16] Soto with the request of Peter Pierce and
[17] Michael Dilanni.
[18]    Q: I appreciate the additional
[19] information, but let me get a clean
[20] answer to a clean question.
[21]    Who paid the wage check to
[22] Arturo Soto in the fall of 2000, which
[23] company?
[24]    A: TC Transport.

[1] Q: Your company, right?

[2] A: Yes, correct.

[3] Q: And you, Tommy Carr, signed

[4] that check, right?

[5] A: Correct.

[6] Q: You didn't have any problem

[7] doing that, did you?

[8] A: No.

[9] Q: Same thing for Ettle

[10] Rickets. You, TC Concepts —

[11] A: Yes.

[12] Q: — employed that person and

[13] you signed that person's paycheck?

[14] A: Yes, I did.

[15] Q: Same thing with Sandra Cole?

[16] A: Correct.

[17] Q: And same thing with Mark

[18] Haslon, right?

[19] A: Yes.

[20] Q: Now, at the time, in the

[21] fall of 2000, did you create any document

[22] whereby you protested this arrangement

[23] that you just described, that even though

[24] they're being paid by TC Concepts,

[1] they're actually working for someone

[2] else? Do you have a scrap of paper from

[3] the fall of 2000 —

[4] A: Oh, I didn't protest it.

[5] Q: Well, let me finish my

[6] question.

[7] A: Sure.

[8] Q: Do you have a scrap of paper

[9] to substantiate that?

[10] A: No, I do not.

[11] Q: All right. Now, you knew

[12] that Mike Gold had no restrictive

[13] covenant. Do you know what a restrictive

[14] covenant is?

[15] A: Yes, I do.

[16] Q: In fact, you have one, don't

[17] you?

[18] A: Yes, I do.

[19] Q: That forbids you from

[20] competing with Logisteq?

[21] A: Correct.

[22] Q: You knew that Mike Gold

[23] didn't have a restricted covenant?

[24] A: Yes. Peter told me when he

[1] was asking Mike to open up Sequedex.

[2] Q: Right. So he was free to

[3] compete with anybody he wanted to, Iron

[4] Mountain, anybody?

[5] A: Correct.

[6] Q: You understood that, right?

[7] A: Absolutely.

[8] Q: And you understood that his

[9] business was a business that might be a

[10] business attractive to some of Logisteq's

[11] clients? You knew that, didn't you?

[12] There could be some cross-fertilization

[13] there, if you will?

[14] A: Absolutely.

[15] Q: Okay. A lot of businesses

[16] have a need for archiving their records?

[17] A: Sure.

[18] Q: There's nothing wrong with

[19] that, is there?

[20] A: No, there's not.

[21] Q: All right. In fact, if I

[22] understand things correctly, your

[23] first — strike that. Back in the mid

[24] '90s, your company actually did work in

[1] connection with Pierce Leahy, that's how

[2] you met these people or some of them?

[3] A: We actually did work with

[4] Pierce Leahy since 1996, and after the

[5] acquisition of Iron Mountain, continued

[6] to do work for Iron Mountain.

[7] Q: Right. And the work you did

[8] was?

[9] A: Trucking.

[10] Q: Trucking?

[11] A: Yes, delivering from point A

[12] to point B.

[13] Q: On a contract basis or on a

[14] tariff basis or —

[15] A: No, pretty much on a tariff

[16] basis, on an on-need basis.

[17] Q: Now, I diverted for a few

[18] minutes. Let me get back to meetings.

[19] A: Sure.

[20] Q: Do you recall meeting —

[21] after you filed your complaint in this

[22] case, which was the end of March, the

[23] beginning of April of this year, after

[24] that point in time, do you recall a

Page 172

[1] meeting the first half of April that
[2] included you, Jim Neebling, John Lehmann,
[3] Arturo Soto, and Iron Mountain attorneys?
[4]   A: Yes, I do.
[5]   Q: Okay. When did that meeting
[6] take place? Can you place that for me?
[7]   A: I can't place the date, but
[8] if you give me an idea, I can —
[9]   Q: First half of April?
[10]   A: Yes.
[11]   Q: Is that about right?
[12]   A: Yes.
[13]   Q: Okay. What was the purpose
[14] of that meeting?
[15]   A: The purpose of that meeting
[16] was to try to get Arturo to sign an
[17] affidavit against Sequedex and Peter
[18] Pierce and Mike DiIanni to tell a story
[19] about the truth of what really happened.
[20]   Q: All right. And he refused
[21] to do that, didn't he?
[22]   A: Yes, he did.
[23]   Q: And at that meeting, he took
[24] you aside and objected to your lying and

Page 173

[1] making up things at that meeting, didn't
[2] he?
[3]   A: No, he did not.
[4]   Q: All right. So if he said
[5] that, if he told us that, that he took
[6] you aside and said, Tommy, stop the
[7] lying, I'm not going to agree to any of
[8] this —
[9]   A: Okay.
[10]   Q: — he would be lying; is
[11] that what you're telling me?
[12]   A: No, that didn't happen at
[13] all.
[14]   Q: Okay.
[15]   A: Do you want to know what did
[16] happen?
[17]   Q: No. I want an answer to my
[18] question. If I told you that Arturo Soto
[19] has said that he took you aside at that
[20] meeting and said, Stop it. Stop making
[21] this stuff up. Stop lying. None of this
[22] happened, your point — your position is
[23] that's a lie?
[24]   A: Oh, that's an absolute lie.

Page 174

[1]   A: Sure.
[2]   Q: Okay. Did you ever ask Mike
[3] DiIanni not to fire John Lehmann or let
[4] him go from Logisteq?
[5]   A: Oh, many of times.
[6]   Q: Okay. And did you ever tell
[7] people that he shouldn't be let go
[8] because, quote, he could bury you, end
[9] quote?
[10]   A: Yes, I did. I said, he can
[11] bury us with the company because he knows
[12] everything about the company and he knows
[13] all the customer base, that he could
[14] easily open up and take our business.
[15]   Q: Right. And Mr. Lehmann is
[16] also indicted in the same indictment that
[17] you're indicted in?
[18]   A: Yes, he is.
[19]   Q: Okay. Why was Lehmann at
[20] this meeting in April? Why was he there?
[21]   A: John Lehmann?
[22]   Q: Yes.
[23]   A: I believe John Lehmann was
[24] going to go to work for Systrans at the

Page 175

[1] time, and Jim Neebling, who was at the
[2] meeting because he was one of the
[3] companies that we were trying to roll up
[4] with the coffee companies —
[5]   Q: Right.
[6]   A: So that's why John Lehmann
[7] was there.
[8]   Q: What else happened at this
[9] April meeting at which Arturo Soto
[10] declined to sign an affidavit?
[11]   A: Well, they didn't actually
[12] ask him to sign an affidavit. They had
[13] met for a cup of coffee at the hotel in
[14] Newark and they asked Arturo if they
[15] could please hear the truth about what
[16] was going on with Peter Pierce and Mike
[17] DiIanni as far as Mike DiIanni asking
[18] Arturo to come join Logisteq if he would
[19] go back and tell all the Spanish people
[20] in Iron Mountain to vote for the union.
[21] And if Arturo did that, Peter and Mike
[22] DiIanni would hire him on with Logisteq
[23] and give him a good position, and he
[24] would grow with Logisteq and Sequedex as

Page 176

[1] the two companies had a wonderful
[2] opportunity to grow.
[3] And Arturo at the time said,
[4] listen, I don't want to get involved in
[5] this. I'm afraid of Michael DiIanni.
[6] And I'm afraid of being torn into the
[7] middle of this, because I'm not going to
[8] have the monies or the willpower to fight
[9] after I went through my divorce of —
[10] with my two children and now I have a new
[11] wife on the way.
[12] Q: Okay.
[13] A: So he refused to speak. He
[14] didn't want to get involved.
[15] Q: All right. So he gave no
[16] affidavit, no written statement to the
[17] Iron Mountain attorneys —
[18] A: He —
[19] Q: — as far as you know?
[20] A: He absolutely did not say
[21] anything to the attorneys. His quote, I
[22] am here as an employee of Iron Mountain;
[23] if you hired me to testify, then I'll
[24] leave now.

Page 177

[1] Q: Okay. And what did the Iron
[2] Mountain lawyers say?
[3] A: That's fine.
[4] Q: Who were the Iron Mountain
[5] lawyers, by the way?
[6] A: Larry Varn and Gary Wadzke.
[7] Q: Okay.
[8] A: And then Gary Wadzke said,
[9] no, we hired you because we had a
[10] position opened, and we hired you for
[11] your credibility and past work ethics,
[12] and we are not going to pressure you to
[13] tell us anything you don't want to tell
[14] us. And then that was the end of the
[15] meeting.
[16] Q: You're aware that before
[17] this meeting in mid April, whenever it
[18] was in April, you're aware that before
[19] this meeting Iron Mountain had already
[20] publicly filed a complaint that made
[21] allegations about Arturo Soto and what he
[22] did at Logisteq; you're aware of that,
[23] aren't you?
[24] A: No, actually, I'm not.

Page 178

[1] Q: Oh, all right.
[2] A: I wasn't aware of that.
[3] Q: What else —
[4] MR. PESLAK: The question
[5] is, was he aware of the complaint
[6] or was he aware of the specific
[7] allegations in the complaint?
[8] MR. KIRCHER: Let me try it
[9] again. I'm not sure where I —
[10] what I said, but let me try it
[11] again.
[12]
[13] BY MR. KIRCHER:
[13] Q: Are you aware, sitting here
[14] today, that before this meeting with
[15] Arturo Soto in the middle of April, Iron
[16] Mountain had already filed a complaint
[17] making allegations about what Arturo Soto
[18] did or did not do at Logisteq?
[19] A: I was not aware of that.
[20] Q: Okay. What else — do you
[21] know what else Iron Mountain's lawyers
[22] did to attempt to confirm or verify what
[23] he did at Logisteq, he being Arturo Soto?
[24] A: They just asked him, and he

Page 179

[1] said I have nothing to say.
[2] Q: Okay.
[3] A: And they were fine with
[4] that.
[5] Q: Did you ever attend meetings
[6] with any representatives of Iron Mountain
[7] at their East Brunswick, New Jersey,
[8] facility?
[9] A: No, I have not.
[10] Q: Okay. Do you recall
[11] mentioning that you did to Alan McGrath?
[12] A: No, I did not.
[13] Q: Since April 1st of this
[14] year, what other telephone numbers have
[15] you used in your daily life other than
[16] the Logisteq cell phone? What other
[17] numbers do you use, so we can get those
[18] phone bills?
[19] A: The only phone number I use
[20] is my cell phone during the day.
[21] Q: Which cell phone?
[22] A: (732) 740-0868, the Logisteq
[23] phone —
[24] Q: That's that we've got the

Page 180

[1] bills for?

[2] A: Yes. And my home phone

[3] number, which is (732) 446 —

[4] Q: Right.

[5] A: — 2528.

[6] Q: 2528?

[7] A: Yes.

[8] Q: And you don't — you haven't

[9] used any other phone numbers to contact

[10] Iron Mountain or anybody in the last two

[11] months?

[12] A: I don't have any other

[13] phones.

[14] Q: Okay.

[15] A: No. Obviously, I knew you

[16] guys were going to pull all the records.

[17] I'm still using the phone. I even told

[18] that to Alan. I asked his permission, am

[19] I allowed to use the phone? Are they

[20] going to shut it off? And he said no,

[21] you're allowed to use the phone. So I

[22] continue to use the phone until this day.

[23] Q: Okay. When you travel —

[24] A: Yes.

Page 181

[1] Q: — do you have — do you use

[2] credit cards? Do you have credit cards?

[3] A: Yes, I do.

[4] Q: Okay. Tell me the credit

[5] cards that you've used in the last four

[6] months. Just give me the names of the

[7] companies.

[8] A: In the last four months.

[9] Visa.

[10] Q: Is that a credit card or a

[11] debit card?

[12] A: No, they're all credit

[13] cards.

[14] Q: Okay. Visa.

[15] A: Visa.

[16] Q: And which bank do you have

[17] that through?

[18] A: First Washington.

[19] Q: Is that in New Jersey?

[20] A: Yes. Why did you make that

[21] face?

[22] Q: Washington's in D.C. Is

[23] this a Washington, New Jersey?

[24] A: Oh, really. Yes.

Page 182

[1] Q: I thought it was. All

[2] right. First Washington. What other

[3] credit credits?

[4] A: Capital One.

[5] Q: Okay.

[6] A: And that's it.

[7] Q: Okay. You haven't used any

[8] other credit card in the last four

[9] months?

[10] A: No, only the two. I only

[11] have three, so —

[12] Q: Do you — when you travel,

[13] do you use a travel agency or a travel

[14] bureau or a travel —

[15] A: I use a travel agency.

[16] Q: Okay. What's the name of

[17] it?

[18] A: Travel Network.

[19] Q: And where are they located?

[20] A: They're located in

[21] Manalapan, New Jersey. And they're at

[22] Yorktown Plaza.

[23] Q: Okay.

[24] A: And the phone number is

Page 183

[1] 973-2800. And that's (732) area code.

[2] Q: Okay.

[3] A: And the person I deal with

[4] there is Fran, F-R-A-N.

[5] Q: Thank you.

[6] A: You're welcome.

[7] Q: Other than paying or

[8] offering to pay for the legal bills in

[9] this case, has Iron Mountain offered

[10] or — has Iron Mountain given you or

[11] offered to give you anything in return

[12] for providing information to them?

[13] A: They're too smart for that.

[14] Absolutely not.

[15] Q: Okay.

[16] A: They did not offer me any

[17] perks, any money, anything.

[18] Q: Have they dangled in front

[19] of you future employment or a future

[20] business association?

[21] A: None whatsoever. They just

[22] asked me to speak the truth. And being

[23] in the trouble I'm in now with this

[24] indictment, I don't want to get into any

Page 184

[1] more difficult problems, so I offered
[2] them the truth.
[3]    Q: Okay.
[4]    A: And that's all it was is the
[5] truth.
[6]    Q: All right. Have you
[7] signed — do you know what an affidavit
[8] is?
[9]    A: Yes, I do.
[10]    Q: Have you signed an affidavit
[11] at the request of Iron Mountain?
[12]    A: No, I did not.
[13]    Q: Have they asked you — did
[14] they present you with an affidavit to
[15] sign?
[16]    A: No, they have not.
[17]    Q: Have you ever seen a draft
[18] of an affidavit that Iron Mountain had
[19] something to do with?
[20]    A: I have never seen a draft
[21] from Iron Mountain.
[22]    Q: All right. Did you ever
[23] tell anybody that Iron Mountain had asked
[24] you to sign an affidavit?

Page 185

[1]    A: Yes, I did.
[2]    Q: Who did you tell that?
[3]    A: I told Alan McGrath.
[4]    Q: Was that a lie?
[5]    A: Yes, it was.
[6]    Q: Why did you lie to Alan
[7] McGrath?
[8]    A: Because I was trying to get
[9] some common sense into Peter to try to
[10] convince him to let's make this company
[11] work and stop all the nonsense and forget
[12] the ego. And I was hoping that Peter
[13] would come to his senses and focus on
[14] building this company, and we could have
[15] had a real nice company, and trust me
[16] when I told him that Mike DiIanni is not
[17] a good person and has been stealing from
[18] him for years, but Peter obviously took
[19] Mike DiIanni's word over mine.
[20]    Q: Other than verbal
[21] information that you have shared with
[22] Iron Mountain, which we've talked about,
[23] have you provided any documents to Iron
[24] Mountain since last September?

Page 186

[1]    A: The only documents I
[2] supplied to Iron Mountain were two tapes.
[3]    Q: Okay. And that was the Jeff
[4] Stern tape?
[5]    A: The Jeff Stern tape.
[6]    Q: And what was the other tape?
[7]    A: The other tape included Doug
[8] Huntley, Alan McGrath, Mike DiIanni and
[9] Thomas Carr.
[10]    Q: Was that a tape of some
[11] advisory meeting within Logisteq?
[12]    A: Because I taped so many
[13] tapes, I really can't remember at this
[14] moment what —
[15]    Q: You left out Peter Pierce.
[16] Did you mean to leave out Peter Pierce or
[17] was he —
[18]    A: Oh, I'm sorry. I thought I
[19] said Peter Pierce.
[20]    Q: Oh, did you? You may have.
[21]    A: Okay.
[22]    Q: But whatever — the tape —
[23] the second tape that you provided to Iron
[24] Mountain includes a discussion among you,

Page 187

[1] Peter Pierce, Mike DiIanni, Alan McGrath,
[2] Doug Huntley?
[3]    A: This is true.
[4]    Q: Okay. Anyone else? Do I
[5] have the whole cast?
[6]    A: You have the whole cast,
[7] yes.
[8]    Q: Okay. So you have not
[9] provided any written documents, just two
[10] tapes, and you've had discussions?
[11]    A: As of today?
[12]    Q: As of today.
[13]    A: The only two documents I
[14] provided to Iron Mountain were those two
[15] tapes, nothing more.
[16]    Q: Okay.
[17]    A: I have many documents to
[18] offer them, but I have not as of today.
[19]    Q: Okay.
[20]    A: Including more tapes.
[21]    Q: And — okay.
[22]    MR. KIRCHER: Okay? Do you
[23] need a break?
[24]    THE COURT REPORTER:

Page 188

[1] (Indicates.)

[2] THE WITNESS: Do you need

[3] some water? There's water.

[4] BY MR. KIRCHER:

[5] Q: The Iron Mountain

[6] representatives that you've spoken to

[7] since last September, let me just go

[8] through a list.

[9] A: Sure.

[10] Q: They include Gary Wadzke,

[11] the general counsel of Iron Mountain,

[12] correct?

[13] A: Yes.

[14] Q: John Kenny, the chief

[15] financial officer of Iron Mountain?

[16] A: Correct.

[17] Q: You may have spoken to

[18] Richard Reese, but not substantially?

[19] A: I don't recall ever meeting

[20] Richard Reese.

[21] Q: Okay. You've spoken to John

[22] Heydon, the vice president for real

[23] estate operations?

[24] A: I've spoken to John Heydon a

Page 189

[1] couple of times.

[2] Q: Does the name Bob Miller —

[3] have you spoken to a guy named Bob Miller

[4] at Iron Mountain?

[5] A: Bob Miller?

[6] Q: Yes. Does that ring a bell?

[7] A: Can I ask a question off the

[8] record for a minute?

[9] THE WITNESS: Is that the

[10] guy that we met, Alan, the guy who

[11] always comes to our office?

[12] BY MR. KIRCHER:

[13] Q: You have to do it on your

[14] own. If you don't remember, that's fine.

[15] A: I don't remember. I know

[16] there's a fellow, a Frank Miller —

[17] Frank.

[18] MR. McGRATH: Frank Mullin.

[19] THE WITNESS: Oh, Frank

[20] Mullin. That's not the same

[21] person.

[22] BY MR. KIRCHER:

[23] Q: Okay.

[24] A: No, I don't remember him.

Page 190

[1] Q: You've spoken to Larry Varn,

[2] who is an outside lawyer for Iron

[3] Mountain?

[4] A: Yes.

[5] Q: He often comes along with a

[6] sidekick whose name is Matt. Have you

[7] talked to a lawyer named Matt at Larry

[8] Varn's firm?

[9] A: No, I haven't.

[10] Q: All right. Am I leaving out

[11] anyone that you remember from Iron

[12] Mountain that you've spoken to?

[13] A: No, I believe that's

[14] everyone.

[15] Q: Okay. Let me talk a little

[16] bit with you, Mr. Carr, about this issue

[17] of employment with Logisteq. Before the

[18] Logisteq acquisition of the assets of

[19] your companies, which is dated sometime

[20] in January of 2001 when that happened.

[21] A: Correct.

[22] Q: Right before that moment in

[23] time you had no written employment

[24] contract with any of your companies,

Page 191

[1] correct?

[2] A: No, I have not.

[3] Q: Okay. And after the

[4] Logisteq acquisition of the assets of

[5] your companies, you had no written

[6] employment agreement, correct?

[7] A: I wanted to have a written

[8] employment contract, but Peter Pierce

[9] made me feel very comfortable telling me

[10] that without Tommy Carr there's no

[11] business. So there's no need for an

[12] employment contract, because as long as

[13] the company is here, you'll maintain to

[14] run the company. So, in fact, no, there

[15] was no employment contract.

[16] Q: All right. And you're aware

[17] that — and we can go through it if you

[18] want — you're aware that in the asset

[19] purchase agreement, that memorializes

[20] that transaction in January of 2001?

[21] A: Yes, I am aware of that.

[22] Q: You're aware that in that

[23] agreement you make representations that

[24] you have no agreement and that this asset

Page 192

[1] purchase agreement creates no employment
[2] agreement; you're aware of that, aren't
[3] you?
[4]   A: I put a lot of trust in
[5] Peter Pierce and I took his word —
[6]   Q: Can I get an answer to my
[7] question? I don't want — I don't want
[8] the side-show. I want an answer to my
[9] question.
[10]   A: I need to tell you —
[11]   Q: Well, you can hold that to
[12] yourself. I just want to get through
[13] this.
[14]     Let me break this up.
[15] You're aware that in the —
[16]   A: I'm aware, yes.
[17]   Q: You're aware that in the
[18] asset purchase agreement, the written
[19] agreement that memorializes the
[20] acquisition of your company's assets,
[21] that you represented, (A), that you have
[22] no employment agreement, and (B), that
[23] this agreement creates no employment
[24] agreement?

Page 193

[1]   A: I understand that, yes.
[2]   Q: Okay. And you read that
[3] agreement before you signed it, didn't
[4] you?
[5]   A: Yes, I did.
[6]   Q: That Mr. Peslak, your
[7] lawyer, participated in the drafting of
[8] that agreement, correct?
[9]   A: This is true. Correct.
[10]   Q: You had free and open access
[11] to Mr. Peslak to understand, as best you
[12] could, what this agreement meant,
[13] correct?
[14]   A: Yes, I did.
[15]   Q: All right. You knew that
[16] going into this transaction you would
[17] come out of it with no employment
[18] agreement, right?
[19]   A: Yes.
[20]   Q: Okay. Now, we went over
[21] this a couple minutes ago. You're also
[22] aware that that asset purchase agreement
[23] created a restrictive covenant benefiting
[24] Logisteq, a restricted covenant on your

Page 194

[1] future activities; you're aware of that,
[2] aren't you?
[3]   A: Yes, I am.
[4]   Q: And you knew that when you
[5] signed it?
[6]   A: Yes, I did.
[7]   Q: Right. And you understood
[8] that what that meant was that from the
[9] date of the closing of that transaction,
[10] for a period of time defined in the
[11] agreement, you could not go out and
[12] compete with Logisteq?
[13]   A: I understood that.
[14]   Q: Let me just — let's just
[15] mark this as — well, it has been marked.
[16] This is Carr Exhibit 5. I've skipped
[17] over 4.
[18]   A: Thank you.
[19]   MR. KIRCHER: I don't have
[20] another copy, Art, but this is the
[21] indictment, which a copy has
[22] been — I think we supplied one to
[23] you.
[24]   MR. PESLAK: Yes. You can

Page 195

[1] share it with Mr. Carr if you
[2] want.
[3]
[4]         BY MR. KIRCHER:
[5]   Q: Let me just — I don't plan
[6] to spend much time on this.
[7]   A: That's good.
[8]   Q: In August of 2001 — let me
[9] just set the time line here.
[10]   The acquisition of the
[11] assets of your companies was at some
[12] point in the first half of January of
[13] 2001. I forget when the closing was,
[14] January 15th or 16th, something like
[15] that, but it was January of 2001 that
[16] this deal was done, right?
[17]   A: Correct.
[18]   Q: And you understood going
[19] into that deal that you would come out as
[20] a minority shareholder; in other words,
[21] you would own less than 50 percent of the
[22] company?
[23]   A: I understood that.
[24]   Q: Right. And you've been
[25] around the block enough, Mr. Carr, to

IMP04451

**Page 196**

[1] understand that in terms of control, it's
[2] better to be the majority shareholder
[3] than the minority shareholder, correct?
[4]    A: Yes, I do.
[5]    Q: You knew you were giving up
[6] control of your companies to Pioneer?
[7]    A: Yes, I did.
[8]    Q: Okay. And you knew, through
[9] the operating agreement, that on major
[10] matters you could be outvoted?
[11]    A: Yes, I did.
[12]    Q: Whatever Pioneer wanted to
[13] do, it could do, correct?
[14]    A: Yes. Correct.
[15]    Q: And your major focus during
[16] the first six, seven months after January
[17] of 2001, as the chief executive officer,
[18] your major focus was sales, essentially
[19] to bring in new business?
[20]    A: Sales and negotiating the
[21] building that Peter was purchasing for
[22] Sequedex and Logisteq.
[23]    Q: Okay.
[24]    A: Which was the Iron Mountain

**Page 197**

[1] facility. And I was also involved in
[2] real estate in Miami and Virginia.
[3]    Q: Okay. But a major focus of
[4] your —
[5]    A: Absolutely —
[6]    Q: Was sales?
[7]    A: — a major focus was sales.
[8]    Q: All right. A major focus of
[9] that sales activity was coffee, the
[10] coffee business?
[11]    A: Yes, coffee and other
[12] commodities, including general freight.
[13]    Q: Okay. Now, in August you
[14] learned that you had been indicted?
[15]    A: Yes.
[16]    Q: Correct?
[17]    A: Correct.
[18]    Q: You've indicated earlier
[19] that Mike DiIanni beat you to the punch
[20] in terms of getting to Peter Pierce to
[21] tell him about the indictment; is that
[22] what you meant to tell me earlier?
[23]    A: Yes.
[24]    Q: Right. I take it then if

**Page 198**

[1] Mike DiIanni's position is that you came
[2] to him and said, don't tell Peter about
[3] this, your position would be that he's
[4] just flat out lying; is that right?
[5]    A: I'm sorry, you're going to
[6] have to repeat the question.
[7]    Q: Okay. I'm sorry.
[8]    A: That's okay.
[9]    Q: You've taken the position
[10] that you intended to tell Peter Pierce
[11] about the indictment, but that Mike
[12] DiIanni beat you to that; he got to Peter
[13] before you did?
[14]    A: Yes.
[15]    Q: Okay. If Mike DiIanni said,
[16] that's not true, Tommy came to me and
[17] said I've been indicted, but don't tell
[18] Peter about this, that would be a lie?
[19]    A: Absolutely.
[20]    Q: Okay. Either way, Peter and
[21] the rest of Logisteq found out about this
[22] indictment some time in August, September
[23] time period?
[24]    A: The same time I was arrested

**Page 199**

[1] Peter found out from Mike DiIanni.
[2]    Q: Okay. Now, did you provide
[3] a copy of the indictment to Peter Pierce?
[4]    A: Yes, I did.
[5]    Q: All right. And I assume he
[6] read it?
[7]    A: Yes, he did.
[8]    Q: All right. And after he
[9] read it, he asked you to step down as the
[10] chief executive officer of the company?
[11]    A: No. After he read it, Mike
[12] DiIanni, Peter Pierce and Thomas Carr was
[13] at Frank Feds, a restaurant, and we sat
[14] down and read the indictment, and Peter
[15] told me that this changes the whole deal
[16] between you and I. And you have two
[17] choices, either you buy me out or I buy
[18] you out.
[19]    Q: This was in August of 2001?
[20]    A: This was the same — the
[21] same — the day I received this.
[22]    Q: Okay.
[23]    A: And I brought it to Peter
[24] and showed him. We had the meeting with

Page 200

[1] Michael DiIanni and myself and Peter.
[2] Peter read it. He said, this changes the
[3] deal. You have two choices, your two
[4] choices are either you buy me out or I
[5] buy you out.
[6]     Q: Okay. What did you say in
[7] response to that?
[8]     A: I said I'll try my best to
[9] buy you out.
[10]     Q: Okay. Did that position
[11] ever change?
[12]     A: No, it did not.
[13]     Q: So as far as you're
[14] concerned, the position that Peter Pierce
[15] announced in August of 2001, the day you
[16] were indicted, that position was the same
[17] position all the way through until March,
[18] April?
[19]     A: Correct.
[20]     Q: Okay.
[21]     A: I would have to find
[22] investors to raise money to buy Peter
[23] Pierce's 51 percent.
[24]     Q: Right. And so the notion

Page 201

[1] that what was discussed was that you
[2] would step down as president, you would
[3] be described to the outside world as a
[4] principal in the company, and that you
[5] would focus your efforts on sales until
[6] this indictment stuff was cleared up, as
[7] far as you're concerned that's just not
[8] true?
[9]     A: No. What was — what
[10] actually happened, the truth of the
[11] matter is that Peter and Mike DiIanni and
[12] myself met with Alan McGrath at the
[13] meeting. And Peter said, I need to ask
[14] you to step down. You can no longer be
[15] president of Logisteq. And I am making
[16] Mike DiIanni now CEO of Logisteq, and I'm
[17] putting you in a sales position until you
[18] find funding to buy my 51 percent out.
[19]     Q: Okay.
[20]     A: I disagreed with that. I
[21] said, Peter, I said, that's not right
[22] that you're doing this. This is not true
[23] what happened here. I am pleading not
[24] guilty. And I want to continue to run as

Page 202

[1] president, and my customers will know me
[2] as president. And Peter then said,
[3] that's fine, if you want to continue to
[4] hand out your cards as president, that's
[5] fine.
[6]     Then Mike DiIanni and Alan
[7] McGrath wrote up a interoffice memo
[8] stating that — the minutes of the
[9] meeting, exactly what occurred at the
[10] meeting, and that Thomas Carr was going
[11] to step down to be in a sales position.
[12] I never agreed to that. I never signed
[13] that.
[14]     Mike DiIanni immediately
[15] went out and made business cards up as
[16] CEO, told everybody in the company I have
[17] no control, called a meeting, said I am
[18] now in power. You don't listen to Tommy
[19] Carr. You don't answer to Tommy Carr,
[20] you answer to me. And Alan McGrath is my
[21] assistant.
[22]     Q: Okay.
[23]     A: Period at the end.
[24]     Q: All right. So if the

Page 203

[1] internal records of Logisteq suggest that
[2] it was resolved that you would step down
[3] as president, you would have a sales
[4] function until this indictment thing was
[5] cleared up, that Mike DiIanni would be
[6] president, if the internal records of
[7] Logisteq reflect that, they're just
[8] wrong?
[9]     A: The internal records do not
[10] reflect that. A memo from Alan McGrath
[11] or Mike DiIanni — I have a copy of it.
[12] Art has it in the file — of the minutes
[13] of the meeting reflects that.
[14]     Q: Okay.
[15]     A: There's so signature from
[16] Peter Pierce saying that. And Peter
[17] Pierce agreed that I can go on and hand
[18] out cards as president. Mike DiIanni was
[19] very upset about that, called a meeting
[20] in my office without Peter Pierce, and
[21] told everybody in my office that I am no
[22] longer president, I have no authority in
[23] the company. I'm not allowed to check —
[24] to sign checks.

**Page 204**

[1] And Mike DiIanni then went
[2] to the bank, to Commerce Bank, took my
[3] name off the bank account. I had no
[4] authority to sign checks. I had no
[5] authority to make decisions. And then I
[6] fought that decision. I called up Peter
[7] and I said, Peter, this is not right.
[8] And until maybe a month and
[9] a half to two months ago, finally, Peter
[10] told Mike to resign and then made Alan
[11] McGrath the president and asked me if I
[12] would change my title to principal and
[13] owner —
[14] THE WITNESS: What was it,
[15] Alan?
[16] Okay. To change my card
[17] from saying president. That Peter
[18] was going to be the CEO. Alan
[19] McGrath would now be president.
[20] And I would be principal and
[21] owner. I have a copy of the
[22] business card in my car. I can
[23] give it to you. On those lines.
[24] And that's the truth, exactly, to

**Page 205**

[1] my knowledge.
[2] BY MR. KIRCHER:
[3] Q: All right. Did you create
[4] any documents in September or October or
[5] November setting out your view of what
[6] happened, describing what happened as you
[7] saw it?
[8] A: Over the years as a director
[9] working for some large trucking
[10] corporations I had to be very computer
[11] literate. And since I opened up my own
[12] company in 1991, I've more or less been
[13] an entrepreneur and more or less got away
[14] from the computer work, because I
[15] basically went out and did sales and had
[16] my people do all the computer work and
[17] structure in the company. So I've
[18] somewhat gotten away from computers. And
[19] I didn't keep many memos. And I had a
[20] secretary, Tammy Phillips, who, if we had
[21] to do an interoffice memo, I'd have
[22] her — I would dictate it to her. She
[23] would write it up and then send it on its
[24] way. I really never sent any memos back.

**Page 206**

[1] It was pretty much always verbal
[2] communication between Peter and myself.
[3] Q: So the answer to my question
[4] is no?
[5] A: No.
[6] Q: So I take it after September
[7] of 2001 you, in fact, among other things,
[8] handed out business cards to outsiders
[9] that described you as president of
[10] Logisteq?
[11] A: Yes.
[12] Q: Okay. Were you ever scolded
[13] about that by Peter or anyone else?
[14] A: Yes, as a matter of fact, I
[15] was.
[16] One of my sales
[17] representatives, Dominic Mariano, who is
[18] known for being a true leader in the
[19] coffee industry over the last 20 years,
[20] Dominic and I had a meeting in Canada to
[21] go up there and try to secure a major
[22] business account. Prior to going into
[23] the meeting, Dominic told me that Mike
[24] DiIanni told him not to let Tommy Carr

**Page 207**

[1] hand out any cards, and gave Dominic a
[2] stack of his cards that said Michael
[3] DiIanni, CEO, and gave strict
[4] instructions at that meeting, I want you
[5] to stand up, introduce yourself as
[6] Dominic Mariano, sales account executive,
[7] and hand out one of my cards to each
[8] person in that meeting and make sure that
[9] they understand that Michael DiIanni is
[10] the CEO of that company and do not let
[11] Tommy hand out his business cards. I was
[12] very taken back, very upset. It was very
[13] unprofessional. And this is the type of
[14] guy that I dealt with working with
[15] Michael DiIanni.
[16] Q: Okay. Let me get back to
[17] the question now. You were scolded about
[18] handing out your card that described you
[19] as president?
[20] A: Yes, from Michael DiIanni.
[21] Q: All right. As part of the
[22] bail conditions for your indictment, your
[23] travel was restricted; is that correct?
[24] A: No, it was not.

Page 208

[1]    Q: All right. Were there any
[2] travel restrictions —
[3]    A: In the beginning on the
[4] first —
[5]    Q: Let me finish. Let me
[6] finish. Did the court, as part of the
[7] bail situation, place any travel
[8] restrictions on you whatsoever?
[9]    A: At first they did, but my
[10] attorney called him up my probation
[11] officer and explained that I need to
[12] travel for business, and he said that's
[13] fine. As long as I call in and let them
[14] know where I'm going, that's not a
[15] problem.
[16]    Q: All right. So —
[17]    A: So the answer is no. As
[18] long as I call in I can travel.
[19]    Q: What's the name of that
[20] probation officer?
[21]    A: I don't know.
[22]    Q: You don't know the name of
[23] your probation —
[24]    A: I don't report to her.

Page 209

[1]    Q: It's not probation, by the
[2] way. It's pretrial services.
[3]    A: Yeah, I don't report to
[4] pretrial.
[5]    Q: Who do you report to?
[6]    A: I don't.
[7]    Q: You don't?
[8]    A: No. I just make a phone
[9] call to the office once a week.
[10]    Q: Well, let me — let me
[11] just — let me just suggest to you that
[12] if someone took a look at the public
[13] record about your indictment — and this
[14] is a public indictment —
[15]    A: Sure.
[16]    Q: — and I have the docket
[17] statement here. The docket statement,
[18] the public statement, sets forth fairly
[19] severe travel restrictions. In other
[20] words, you got to stay in New Jersey
[21] unless you go to the Southern District of
[22] New York, plus they gave you five days
[23] for the Bahamas.
[24]    A: Right. No, I understand

Page 210

[1] that.
[2]    Q: You understand that?
[3]    A: Yes.
[4]    Q: Okay. And what you're
[5] telling me is that you got a verbal
[6] approval from a pretrial services person
[7] to travel anywhere you want?
[8]    A: My attorney did.
[9]    Q: Okay. Your attorney did on
[10] your behalf?
[11]    A: Correct.
[12]    Q: Do you have any evidence of
[13] that?
[14]    A: No, I do not.
[15]    Q: Did you alert anyone at
[16] Logisteq about your travel restrictions?
[17] Did you go to Peter Pierce or Pioneer or
[18] Doug Huntley and say, look, the judge in
[19] the case has ordered me to stay in New
[20] Jersey unless I go to New York City for
[21] this case? Did you tell them that?
[22]    A: No, I did not, because
[23] during that week I called my attorney and
[24] explained to him that in order to run my

Page 211

[1] business I need to travel. And my
[2] attorney then called the prosecutor to
[3] get that lifted.
[4]    Q: All right.
[5]    A: And what they asked is, when
[6] I do travel, that I make a phone call to
[7] my attorney and my attorney calls the
[8] pretrial, and that's the arrangements we
[9] made. So in any way at all that has not
[10] harmed Logisteq whatsoever.
[11]    Q: I thought I started to ask
[12] this. Maybe I asked completely —
[13]    A: Okay.
[14]    Q: — but to your knowledge, do
[15] you have any written evidence of that
[16] arrangement, a letter from pretrial
[17] services?
[18]    A: No, I do not. No.
[19]    Q: You just hear from your
[20] attorney and that's it?
[21]    A: Yes.
[22]    Q: So, for instance, when you
[23] go to Boston or Canada, you call your
[24] attorney and then your attorney calls

Page 212

[1] pretrial services?

[2]    A: Correct.

[3]    Q: And they don't care where

[4] you go?

[5]    A: Well, I've been traveling

[6] all over the world and they don't care.

[7] I've been calling in to my attorney. As

[8] long as I call in.

[9]    MR. KIRCHER: Why don't we

[10] take a five-minute break? We've

[11] been going at it for about an

[12] hour, okay?

[13]    THE WITNESS: Okay.

[14]    THE VIDEOGRAPHER: The time

[15] is 2:14. Off the record.

[16]

[17]    (Recess was taken.)

[18]

[19]    THE VIDEOGRAPHER: The time

[20] is 2:26. Back on the record.

[21]            BY MR. KIRCHER:

[22]    Q: Let me start in on a new

[23] topic, Mr. Carr, and that is the time

[24] period between, let's say, September of

Page 213

[1] 2000 and January of 2001 when the asset

[2] purchase agreement was closed on.

[3]    I assume, and you tell me if

[4] I'm wrong, I assume that during that time

[5] period there was a certain amount of

[6] activity trying to forecast what business

[7] would look like in the coming year or

[8] two. Does that sound familiar?

[9]    A: Yes.

[10]    Q: Okay. And in fact, I think

[11] right after the asset purchase agreement

[12] a formal official budget for Logisteq was

[13] adopted?

[14]    A: Correct.

[15]    Q: A budget in the sense of

[16] here's what we think's going to happen in

[17] 2001 and here's what we have to do?

[18]    A: That's correct.

[19]    Q: Okay. And I'm trying to cut

[20] through this in wide — with a wide —

[21] with a sharp knife here.

[22]    Would you agree with me that

[23] in rough numbers the sales forecast for

[24] the year 2001 that everyone agreed upon,

Page 214

[1] everybody within Logisteq, and which made

[2] its way into the formal budget, was

[3] somewhere between 17 and $18 million?

[4]    A: I want to say between 15 and

[5] $18 million.

[6]    Q: Okay. And that figure would

[7] represent at least a doubling, if not a

[8] tripling, of the revenues from your

[9] businesses from the year before?

[10]    A: I believe my business year

[11] end was about seven to $8 million in

[12] sales prior to the sale to Peter.

[13]    Q: Okay. So using your

[14] figures, not that I agree with them, but

[15] using your figures, the new forecast

[16] would represent at least a doubling —

[17]    A: Yes.

[18]    Q: — of revenues?

[19]    A: Correct.

[20]    Q: Maybe more?

[21]    A: Yes.

[22]    Q: And as I understand it, and

[23] you correct me if I'm wrong, the bulk of

[24] that new business would be from

Page 215

[1] anticipated sales with regard to the

[2] drayage, D-R-A-Y-A-G-E, and warehousing

[3] of coffee? That would be a substantial

[4] new part of this new business?

[5]    A: That business would consist

[6] of Anchor Glass and coffee.

[7]    Q: Okay. And what business

[8] would Anchor Glass be giving to Logisteq?

[9]    A: Anchor Glass was somewhat

[10] committal to about $5 million in business

[11] if we were to purchase their building and

[12] take over their existing operation that

[13] they had in Aberdeen, New Jersey.

[14]    Q: Okay. And that business —

[15] well, I mean, for that amount of money,

[16] what would Logisteq be doing for Anchor

[17] Glass?

[18]    A: Anchor Glass was a union

[19] shop, and they were looking to outsource

[20] their business and cut their expenses.

[21] They had their building for sale, which

[22] was somewhat a white elephant because it

[23] was a lot of cleanup. Peter and I

[24] negotiated to buy the Anchor Glass

Page 216

[1] building, and in the negotiations would
[2] take over their present operation in
[3] Abderdeen, New Jersey, which consisted of
[4] approximately, I'm going to say ballpark,
[5] 300,000 square feet of glass. And we
[6] would then take in-bound loads and
[7] warehouse them and then ship out-bound
[8] loads to their customers.
[9]    Q: Okay.
[10]    A: And we would be a
[11] third-party logistics company for Anchor
[12] Glass.
[13]    Q: Okay. Let me do this.
[14] We've premarked as Exhibit No. 6 the
[15] document that I've just handed to you.
[16] And I'm giving your counsel a copy. And
[17] for the record, Mr. Carr, what this
[18] appears to be, the first page is a
[19] January 29, 2001 E-mail from — do you
[20] see on the from line it says Dhun?
[21] That's Doug Huntley?
[22]    A: Yes.
[23]    Q: Who's the gentleman sitting
[24] next to me?

Page 217

[1]    A: Yes.
[2]    Q: And it's addressed to Alan
[3] McGrath, who is sitting next to him?
[4]    A: Yes.
[5]    Q: And also to you —
[6]    A: Correct.
[7]    Q: — as CEO, to Mike DiIanni
[8] as COO, and to Alan McGrath as vice
[9] president?
[10]    A: Yes.
[11]    Q: Do you see that?
[12]    A: Yes, I do.
[13]    Q: Okay. And without reading
[14] the whole thing, what Mr. Huntley was
[15] attaching was a Logisteq budget. And it
[16] says: This is now the official budget
[17] you should load into your accounting
[18] system and so on and so forth. Do you
[19] see that?
[20]    A: Yes, I do.
[21]    Q: Okay. Then if you go past
[22] the next E-mail you'll come to a
[23] spreadsheet that's dated at the bottom of
[24] January 25, 2001.

Page 218

[1]    A: Yes.
[2]    Q: And it's titled, Logisteq,
[3] LLC, Budget Revision Analysis. Do you
[4] see that?
[5]    A: Yes, I do.
[6]    Q: All right. And if you look
[7] at the first line item it says, 2001
[8] company total revenue, then there's the
[9] number 17,181,110 under the final column,
[10] right?
[11]    A: Yes.
[12]    Q: So the official budget in
[13] January of 2001 for revenue for the year
[14] 2001 was slightly over $17 million?
[15]    A: (Indicates.)
[16]    Q: You have to say yes or no.
[17]    A: Yes.
[18]    Q: Okay.
[19]    A: I'm sorry.
[20]    Q: That's okay.
[21] And then what follows
[22] underneath that is a breakdown. It's
[23] headed 2001 EBIT, capital E-B-I-T.
[24] That's earnings before interest and tax?

Page 219

[1]    A: Yes.
[2]    Q: 2001 EBIT summary by profit
[3] (cost) center. Do you see that?
[4]    A: Yes.
[5]    Q: And then it ticks off a
[6] number of items. Do I have that right?
[7]    A: Okay.
[8]    Q: And if you go over to — if
[9] you go over two pages, Mr. Carr, you'll
[10] come to another spreadsheet entitled
[11] Consolidated Income Statement. Do you
[12] see that?
[13]    A: Yes, I'm looking.
[14]    Q: And that sets forth certain
[15] figures for the years 1998, 1999, and
[16] then by quarter, the year 2000. Do you
[17] see that?
[18]    A: Yes, I do.
[19]    Q: And then by quarter the
[20] prediction for the year 2001 and 2002.
[21] Do you see that?
[22]    A: Yes.
[23]    Q: If you look — and this is
[24] what I was getting at. If you look at

**Page 220**

[1] the revenue line and go to the year 2000,
[2] that would show a figure of $5,353,453.
[3] Do you see that?
[4] A: Yes, I do.
[5] Q: Okay. So would you agree
[6] with me that if the revenue in the year
[7] 2000 was 5.35 million, and the budget for
[8] 2001 was 17.18 million, that the budget
[9] was almost — well, it was more than
[10] three times the revenue of the last year
[11] before it?
[12] A: Yes, I agree.
[13] Q: Okay. And a large measure
[14] of that budgeted 17.1 was your prediction
[15] that you could secure that amount of new
[16] business, correct?
[17] A: Correct.
[18] Q: All right. Now, as of — as
[19] of, let's say, February 1st, 2002 — I'm
[20] skipping around here a little bit.
[21] A: Sure.
[22] Q: But I want to put things in
[23] a little bit of context. As of February
[24] 2001, in terms of the capital

**Page 221**

[1] contributions by the two shareholders,
[2] Pioneer as the 51 percent shareholder,
[3] and TC Concepts as the 49 percent
[4] shareholder, by February of 2002 Pioneer
[5] had contributed capital of almost a
[6] million and a half dollars?
[7] A: Correct.
[8] MR. PESLAK: Object to the
[9] form of the question.
[10] MR. KIRCHER: Okay. Well,
[11] what's the nature of the
[12] objection? Maybe I can cure it.
[13] MR. PESLAK: I don't think
[14] they contributed — made capital
[15] contributions after the initial
[16] asset purchase agreement was done.
[17] THE WITNESS: They were
[18] notes.
[19] MR. KIRCHER: Yeah, I think
[20] there were. But I'll let the
[21] question stand.
[22] THE WITNESS: Sure.
[23]                    BY MR. KIRCHER:
[24] Q: I think you answered it yes.

**Page 222**

[1] A: Well, they were notes.
[2] Q: Well, in whatever form —
[3] A: Okay, yes.
[4] Q: — they had contributed —
[5] they were on the hook in terms of capital
[6] for about a million and a half?
[7] A: Yes.
[8] Q: And you, as of February
[9] 2002, the number — when I say you, I
[10] mean TC Concepts, the capital
[11] contribution was about 250,000?
[12] A: 300,000.
[13] Q: 300,000. Why is 250 not
[14] correct?
[15] A: I'd have to go through the
[16] financials, but I have a note for
[17] 300,000. Plus there's a discrepancy. I
[18] was supposed to get, I believe,
[19] $4,080,000 for the company, and I
[20] actually — I believe I walked away with
[21] $3,700,000. I was told that my taxes
[22] would be paid for, and I never received
[23] that money, additional money.
[24] Q: Taxes paid for by whom?

**Page 223**

[1] A: By Peter Pierce.
[2] Q: By him personally?
[3] A: No, by Pioneer Capital. But
[4] Doug and I and Peter were going through
[5] that and we were going to work that out.
[6] Q: Well, put that aside. What
[7] I'm trying to figure is, by February of
[8] 2002 —
[9] A: 300,000.
[10] Q: — was TC Concepts' capital
[11] contribution?
[12] A: $300,000.
[13] Q: Right. And in contrast, the
[14] capital contribution of Pioneer was about
[15] a million and a half?
[16] A: Yes.
[17] Q: Five times as much?
[18] A: Well, a lot of that was for
[19] Sequedex, to fund Sequedex.
[20] Q: I'm not asking you about —
[21] A: But I'm telling you.
[22] Q: Well, I'm not asking.
[23] A: Okay. Well, I told you.
[24] Q: This is a

**Page 224**

[1] question-and-answer session.

[2]   A: Okay.

[3]   Q: Without you describing what

[4] you think it is, the capital contribution

[5] of Pioneer was five — at least five

[6] times what yours was, correct?

[7]   A: No.

[8]   Q: No?

[9]   A: No.

[10]   Q: Why is that not a truth?

[11]   A: Because the monies did not

[12] go for Logisteq. The monies went to

[13] cover employees and buildings for

[14] Sequedex.

[15]   Q: What buildings for Sequedex?

[16]   A: Miami. We have a building

[17] in Miami that we were starting up in —

[18] with Mike Gold. I met with people from

[19] Sequedex in Miami.

[20]   Q: Who is the tenant on that

[21] building?

[22]   A: The tenant is Logisteq.

[23]   Q: Okay. What other buildings?

[24]   A: The other building was going

**Page 225**

[1] to be the Anchor Glass building, which

[2] was going to be the home headquarters for

[3] Sequedex.

[4]   Q: Right. That was never

[5] purchased, though, right?

[6]   A: No, but we put a lot of

[7] money into the building.

[8]   Q: But it was never purchased?

[9]   A: Correct.

[10]   Q: All right.

[11]   A: So I could knock out

[12] probably about — if you back out all the

[13] money wasted that went through Sequedex,

[14] we're about even as far as contributions

[15] into the company.

[16]   Q: Well, without — without you

[17] ascribing —

[18]   A: That's a very important note

[19]     on —

[20]   Q: Without you ascribing what

[21] you think the money went to —

[22]   A: Well, I know. I have — I

[23] have —

[24]   Q: Without you ascribing what

**Page 226**

[1] you think the money went to —

[2]   A: Yes.

[3]   Q: — which is disputed —

[4]   A: Yes.

[5]   Q: — the money in, regardless

[6] of how it was used, Pioneer put in five

[7] times as much money as you?

[8]   A: I don't know. I'm not

[9] subject to any of the financial

[10] information. I was locked out of the

[11] office, so I can't tell you that or not.

[12]   Q: Well, as of the last time

[13] you looked, it was five times as much?

[14]   A: I don't know.

[15]   Q: You don't know?

[16]   A: No, I don't know.

[17]   Q: Okay.

[18]   MR. HUNTLEY: Is there a

[19] letter?

[20]   THE WITNESS: Oh, I'm sorry.

[21] I need to add one more thing.

[22]   Besides the 300,000

[23] contribution I made, I also put an

[24] additional hundred thousand

**Page 227**

[1] contribution for a bond. So I

[2] have $400,000 into the company.

[3]   BY MR. KIRCHER:

[4]   Q: And what's the bond for?

[5]   A: The bond is for the coffee

[6] exchange.

[7]   Q: For the license?

[8]   A: Yes.

[9]   Q: And when you say for the

[10] bond, what do you mean? You dug into

[11] your pocket and pulled out a hundred

[12] thousand dollars?

[13]   A: I dug into my pocket and

[14] pulled out a hundred thousand dollars and

[15] put it up for the bond.

[16]   Q: Okay. How is that

[17] reflected on the books of Logisteq?

[18]   A: Alan McGrath would know that

[19] better than I would.

[20]   Q: Well, I'm asking you as the

[21] former president — when did you do that,

[22] by the way?

[23]   A: Approximately, last June.

[24]   Q: June of 2001?

Page 228

[1]  A: Yes.

[2]  Q: Okay. In June of 2001 you

[3] were the president of Logisteq?

[4]  A: Yes, I was.

[5]  Q: I assume you would know how

[6] that was treated internally

[7] accounting-wise?

[8]  A: Yes. It was — it was —

[9]  Q: How was it treated?

[10]  A: It should have went on the

[11] books as a note to me.

[12]  Q: Well, forget should have.

[13] How was it treated internally

[14] accounting-wise?

[15]  A: I don't know.

[16]  Q: You don't know?

[17]  A: No, I do not.

[18]  Q: You dug into your own

[19] pocket, pulled out a hundred thousand

[20] dollars, gave it to the company, and you

[21] didn't attempt to find out how it was

[22] treated accounting-wise?

[23]  A: No, I did not.

[24]  Q: Is that how you ran your

Page 229

[1] company?

[2]  A: No, I did not. Mike DiIanni

[3] and Alan McGrath were in control of the

[4] books at the time.

[5]  Q: Well, you're the president.

[6] You had a right to go see the books. Did

[7] you ask to see the books to see —

[8]  A: I had — I had —

[9]  Q: — how that money of yours

[10] was treated?

[11]  A: I had a very difficult time

[12] dealing with Mike DiIanni. He would

[13] never give me information that I asked

[14] for.

[15]  Q: So you're telling me that in

[16] June of 2001 when you were the president

[17] of this company you asked to see the

[18] books of your own company that you were

[19] president of and half owner, almost half

[20] owner, and you were refused —

[21]  A: No.

[22]  Q: Is that what you're saying?

[23]  A: No. I'm not saying that.

[24]  Q: So you don't know how that

Page 230

[1] was treated accounting-wise?

[2]  A: That's what I said.

[3]  Q: Okay.

[4]  A: I do not know.

[5]  Q: Now, at some point in the

[6] early part of 2002 did Pioneer, as the

[7] majority shareholder, ask you to put

[8] $900,000 into the company?

[9]  A: Yes, they did.

[10]  Q: And you refused?

[11]  A: I refused because I had an

[12] E-mail saying that they were terminating

[13] me from the company.

[14]  Q: Okay.

[15]  A: And that Mike DiIanni was

[16] coming back to work.

[17]  Q: Right. And one of your

[18] responses to this $900,000 contribution

[19] was you asked for an employment

[20] agreement?

[21]  A: Yes, I did.

[22]  Q: Because you didn't have one?

[23]  A: Yes, I did.

[24]  Q: Yes, you did?

Page 231

[1]  A: I did ask for an employment

[2] agreement.

[3]  Q: That's because you didn't

[4] have one, right?

[5]  A: Correct.

[6]  Q: Okay. And ultimately, you

[7] didn't put any money — after that

[8] request was made you put no money into

[9] the company?

[10]  A: After I was given a fax —

[11] I'm sorry, after I was given an E-mail

[12] stating that Peter Pierce would terminate

[13] me I decided not to put $900,000 into the

[14] company at his request.

[15]  Q: Okay.

[16]  A: But to find investors to buy

[17] Peter's 51 percent out.

[18]  Q: Right. It's true, is it

[19] not, Mr. Carr, that what Mr. Pierce, on

[20] behalf of Pioneer, said was, we've

[21] already put in a million and a half.

[22] You've put in whatever you've put in. If

[23] you don't put money into this company

[24] we're going to take the company and run

Page 232

[1] it without you; that's what he said?

[2]     A: Yes, that is true.

[3]     Q: Okay. Now, would you agree

[4] with me as a businessman and an

[5] entrepreneur, Mr. Carr, would you agree

[6] with me, with the general principle, that

[7] if you forecast that your revenue is

[8] going to more than triple, that you would

[9] expect the infrastructure of that company

[10] to also get bigger to support that kind

[11] of business activity? Would you

[12] generally agree with that?

[13]     A: Absolutely.

[14]     Q: Okay. So with a forecast

[15] of — we're going to have three times as

[16] much income next year, came as no

[17] surprise to you that plans were made to

[18] hire additional people, correct?

[19]     A: Correct.

[20]     Q: In fact, you participated in

[21] the hiring of additional people, correct?

[22]     A: I participated in the hiring

[23] of one additional person, but also

[24] requested to Peter that we're

Page 233

[1] overstaffed. It's been months now. The

[2] main reason that we didn't make our

[3] projections is we didn't find a building

[4] to store the coffee in, and we were

[5] trying to negotiate the Anchor Glass

[6] building, which fell apart.

[7]     So along with losing all the

[8] coffee that was projected, we also lost

[9] all the business from Anchor Glass. And

[10] then on top of that, the coffee market,

[11] which is public record on Wall Street,

[12] has completely hit rock bottom.

[13]     Q: Okay. Well, put aside the

[14] coffee business hitting rock bottom.

[15]     A: Yes.

[16]     Q: Is it your position that —

[17] let me go back a step. You're aware, are

[18] you not, that instead of hitting this

[19] 17.1 million, what the company actually

[20] did in 2001 was about $8.5 million of

[21] revenue?

[22]     A: Correct.

[23]     Q: So the company did not meet

[24] even 50 percent of its budget, correct?

Page 234

[1]     A: True.

[2]     Q: Now, is that your fault or

[3] is it their fault, or is it some

[4] combination thereof? Or is it no one's

[5] fault? Whose fault is that?

[6]     A: It's no one's fault.

[7]     Q: It's no one's fault?

[8]     A: Right.

[9]     Q: It's not your fault?

[10]     A: No, it's not my fault.

[11]     Q: In any event, it's no one's

[12] fault, but the company didn't do very

[13] well, did it?

[14]     A: No, it did not.

[15]     Q: In fact, it lost more than a

[16] million and a half dollars, correct?

[17]     A: Yes.

[18]     Q: And that's not good, is it?

[19]     A: Well, there's a — you asked

[20] me a question, is it anybody's fault —

[21]     Q: Right.

[22]     A: — that we didn't meet the

[23] revenue?

[24]     Q: Right.

Page 235

[1]     A: There's a fault, yes. It's

[2] the fault of not getting the buildings on

[3] time, which I have to sit here and say we

[4] all worked very diligently on. But as

[5] far as is it the fault of losing money?

[6]     Q: Right.

[7]     A: The fault of losing money is

[8] because Peter had all kinds of hidden

[9] money going through the company.

[10]     Q: What do you mean, "hidden

[11] money?"

[12]     A: He was paying employees who

[13] worked for Sequedex and we were paying

[14] that money.

[15]     Q: And which —

[16]     A: He had an additional amount

[17] of people in the company that should have

[18] not worked for the company.

[19]     Q: Name the people who should

[20] not have been employed that were

[21] receiving hidden money. List them.

[22]     A: Mark Haslon.

[23]     Q: Okay. And how much was he

[24] paid in 2001?

**Page 236**

[1]   A: I'm going to say $80,000.

[2]   Q: Okay. And he did absolutely

[3] no work for Logisteq, none?

[4]   A: No, he worked for a couple

[5] of weeks in the office for Logisteq. He

[6] helped to create a Web page for us.

[7]   Q: So what percentage of his

[8] time was for Logisteq and what percentage

[9] was for Sequedex?

[10]   A: I would say about 5 percent

[11] of his time was for Logisteq and 95

[12] percent of his time was for Sequedex.

[13]   Q: Okay. Who's the next name

[14] on the list?

[15]   A: Sandra Cole.

[16]   Q: And how much was she paid in

[17] 19 — 2001?

[18]   A: I don't know the exact

[19] records, but I'm going to say 70,000.

[20]   Q: Right. And what percentage

[21] of her time was Logisteq and what

[22] percentage was Sequedex?

[23]   A: Five percent Logisteq, 95

[24] percent Sequedex.

**Page 237**

[1]   Q: Okay. Who's next?

[2]   A: Ettle.

[3]   Q: Right. And what was she

[4] paid in 2001?

[5]   A: Don't quote me, but I'm

[6] going to say 75,000.

[7]   Q: Right. And what percentage

[8] of her time is Logisteq and what

[9] percentage is Sequedex?

[10]   A: Ninety-five and 5 percent.

[11]   Q: All right. Who's next?

[12]   A: Michael DiIanni.

[13]   Q: Okay.

[14]   A: $125,000 salary.

[15]   Q: Okay.

[16]   A: Full benefits and a company

[17] car.

[18]   Q: And how do you break down

[19] his percentage?

[20]   A: Total useless.

[21]   Q: No, no.

[22]   A: He didn't spend any time —

[23]   Q: Well, whether it was useless

[24] or not, what time is Sequedex and what

**Page 238**

[1] time is — is —

[2]   A: Spent very little time at

[3] Logisteq. Really didn't do much.

[4] Bullied himself around. And spent a lot

[5] of time working with Mike Gold at

[6] Sequedex.

[7]   Q: Okay. Who's next?

[8]   A: I have people in Miami,

[9] which I would have to get their names.

[10]   Q: You don't know their names?

[11]   A: No, because they're

[12] employees that Mike DiIanni hired,

[13] because Mike DiIanni had a deal

[14] underneath the table. He purchased the

[15] fellow's house for his daughter and he

[16] owed him money. So he said, listen, go

[17] down to Miami, buy a house down there,

[18] I'll put you as a manager running the

[19] company. And he allowed him to hire his

[20] friend, and his friend's friends, and his

[21] son.

[22]      So while we had an empty

[23] building in Miami, we had approximately

[24] 15 people on the payroll. And I told

**Page 239**

[1] Mike, Why do we have all these people in

[2] Miami? And he says, Don't worry about

[3] it. I'm CEO. I got my own deal. I'll

[4] take care of it. I said, Well, Mike, I

[5] am worried about it, because we're

[6] showing a lot of loss with the company.

[7] He said, Well, just stay out of it. I

[8] got it under control.

[9]      Then as far as Sayreville,

[10] we just laid off a manager. Alan McGrath

[11] and Mike DiIanni hired a guy by the name

[12] of JR to become a manager. I told Alan

[13] McGrath and Mike DiIanni to their faces,

[14] I do not condone this. I disagree with

[15] it. I do not want this guy hired for

[16] 50,000 a year. We're way, way

[17] overstaffed. I'm looking to cut people.

[18] And he said — Alan said, well, I need an

[19] assistant. And they did it without my

[20] say-so.

[21]   Q: Let me do it this way. From

[22] January of 2001 until you were indicted,

[23] you were president of the company,

[24] correct? You were indicted in August of

Page 240

[1] 2001?

[2] A: Correct.

[3] Q: So that's the first

[4] two-thirds of the year. By that time, by

[5] August of 2001, the company was way

[6] behind budget revenue-wise?

[7] A: Yes, it was.

[8] Q: Okay. And it was losing

[9] money?

[10] A: Yes, it was.

[11] Q: Under your watch?

[12] A: Correct.

[13] Q: All right. And so I guess

[14] what you're saying here, and you correct

[15] me if I'm wrong, Mr. Carr, is that

[16] although you pleaded with these other

[17] people to get rid of — you pleaded with

[18] Peter Pierce to get rid of these extra

[19] people who were secretly working for

[20] Sequedex?

[21] A: Correct.

[22] Q: They didn't let you do that,

[23] and so it's their fault that the company

[24] was in trouble; is that your position?

Page 241

[1] A: My position is Peter Pierce

[2] and I met on the amount of people working

[3] in the company, and Peter told me that he

[4] understands the first year will not make

[5] money, and maybe the second year will not

[6] make money. He said, we are basically

[7] starting start-up companies. He said to

[8] me that I will go as far as three years

[9] without making money because I am

[10] building my own company, Sequedex, and

[11] there's going to be a lot of losses until

[12] we get our foundation off the ground.

[13] Q: Mr. Carr —

[14] A: He then told —

[15] Q: Go ahead, I'm sorry.

[16] A: He then told me that he will

[17] keep these people on the payroll, and we

[18] will try our best for the next year to

[19] get as much coffee as we can and continue

[20] to grow the company.

[21] During that time we had no

[22] building to operate in except for the

[23] Freehold facility, which we were being

[24] evicted after one year, and the

Page 242

[1] Sayreville location, which we were only

[2] on a month-to-month lease. That was not

[3] sufficient for our needs.

[4] So at that point I sat back

[5] and let Peter dominate and run the

[6] company along with Mike DiIanni.

[7] Q: You just mentioned that

[8] Mr. Pierce said that during the first

[9] year he was willing to lose money.

[10] You're aware that the budget shows

[11] earnings of almost a million dollars,

[12] correct?

[13] A: Absolutely.

[14] Q: So the official budget that

[15] you approved and Peter approved doesn't

[16] talk about any loss; it talks about

[17] making a million dollars, correct?

[18] A: Yes, it does.

[19] Q: Okay. And you're aware that

[20] the selling, general, and administrative

[21] expense of Logisteq in the budget for the

[22] year 2001 is about the same as what it

[23] was for TC Concepts in 1999 and 2000; are

[24] you aware of that?

Page 243

[1] A: No, I'm not.

[2] Q: That would surprise you?

[3] A: Absolutely.

[4] Q: Okay.

[5] A: Sure.

[6] Q: Now —

[7] A: That couldn't be.

[8] Q: — this protest about too

[9] many people and that's why we're losing

[10] money, did you document that at all

[11] before August of 2001?

[12] A: Oh, Doug Huntley is aware of

[13] it. Alan McGrath's aware of it.

[14] Q: I didn't ask you that.

[15] A: No, I did not.

[16] Q: You did think it was

[17] important to document that you were

[18] asking that costs be slashed but —

[19] A: No, because I trusted Peter

[20] Pierce, and what Peter said pretty much

[21] went. So I understand I made a mistake

[22] by trusting Peter Pierce now, but Peter

[23] was okay with that. And since — the

[24] fact that we didn't meet our revenues

**Page 244**

[1] were not my fault. They were because we
[2] did not get the Anchor Glass building.
[3] We did not get those revenues from Anchor
[4] Glass, which were somewhere between four
[5] and five million. And we missed out on
[6] the coffee harvest because we didn't have
[7] a building to put the coffee in. And
[8] Peter —
[9]    Q: You hired —
[10]    A: — was well aware of that.
[11]    Q: You hired Alan McGrath?
[12]    A: I was asked to hire Alan
[13] McGrath by Peter Pierce and Mike DiIanni.
[14]    Q: You agreed to hire Alan
[15] McGrath?
[16]    A: Yes, I agreed to hire them.
[17]    Q: You agreed to hire Arturo
[18] Soto?
[19]    A: I was asked to hire them
[20] from Mike DiIanni and Peter Pierce.
[21]    Q: And you agreed to it?
[22]    A: Yes, I did agree to it.
[23]    Q: You agreed to hire Sandra
[24] Cole?

**Page 245**

[1]    A: I agreed to hire Sandra
[2] Cole.
[3]    Q: You agreed to hire Mark
[4] Haslon?
[5]    A: I agreed to hire Mark
[6] Haslon.
[7]    Q: You agreed to hire Ettle
[8] Rickets?
[9]    A: I agreed to hire these
[10] people on the promise that Peter Pierce
[11] would front the money for their salaries.
[12]    Q: All right. And you have no
[13] written document that would support that
[14] promise, do you?
[15]    A: Peter would not put that in
[16] writing.
[17]    Q: Yes or no, do you have a
[18] written document that evidences that
[19] promise?
[20]    A: No, I only have verbal
[21] promises.
[22]    Q: Right. You agreed to hire
[23] Sharon Culkin?
[24]    A: Yes, I agreed to hire Sharon

**Page 246**

[1] Culkin.
[2]    Q: You agreed to hire her
[3] husband, Walter Culkin, correct?
[4]    A: No. As a matter of fact, I
[5] terminated her husband, Walter Culkin.
[6]    Q: Well, if he was terminated
[7] he had to be hired in the first instance.
[8] You agreed to hire him?
[9]    A: Yes.
[10]    Q: All right. Those are
[11] neighbors of yours?
[12]    A: Yes, they are.
[13]    Q: Next-door neighbors?
[14]    A: Next-door neighbors.
[15]    Q: So you put next-door
[16] neighbors on the Logisteq payroll?
[17]    A: Yes, I did.
[18]    Q: You agreed to hire Walter
[19] Hughes?
[20]    A: Yes, I did.
[21]    Q: And you agreed to hire Lee
[22] Koppel?
[23]    A: Yes, I did.
[24]    Q: All right. And while those

**Page 247**

[1] people were employees, and before August
[2] of 2001, you signed their paychecks?
[3]    A: Yes, I did.
[4]    Q: What is your business
[5] relationship with Jim Neebling?
[6]    A: My business relationship
[7] with Jim Neebling is in 1995 Jimmy and I
[8] sold our companies to U.S. Delivery.
[9]    Q: U.S. Delivery?
[10]    A: U.S. Delivery.
[11]    Q: Okay. And since 1995 to the
[12] present day, what is your business
[13] relationship with Jim Neebling?
[14]    A: We have continued to do work
[15] together over the years. Jimmy has also
[16] done work for Peter Pierce. And Jimmy
[17] Neebling had come to meet with Peter
[18] Pierce and Doug Huntley and Alan McGrath
[19] and Mike DiIanni to try to sell his
[20] company to Pioneer Capital.
[21]    Q: And his company is Systrans?
[22]    A: Yes.
[23]    Q: In the last five or six
[24] months, let's say since — let's say

**Page 248**

[1] since the beginning of this year, 2001,

[2] have you worked on behalf of Systrans?

[3]     A: No, I have not.

[4]     Q: Have you done anything to

[5] benefit Systrans?

[6]     A: I have sat down with Jim

[7] Neebling and Peter Pierce to try to

[8] negotiate buying the company along with

[9] merging Systrans, Logisteq, RPM and

[10] Continental into one roll up of

[11] companies.

[12]     Q: Do you know an individual

[13] whose name is Bill Canley?

[14]     A: Yes, I do.

[15]     Q: Who is Bill Canley?

[16]     A: Bill Canley was a friend and

[17] manager for my company since day one.

[18]     Q: Since?

[19]     A: Since the day I opened my

[20] company.

[21]     Q: Okay. What is he now?

[22]     A: He is a dispatcher for

[23] Systrans.

[24]     Q: Did he ever work at

**Page 249**

[1] Logisteq?

[2]     A: Yes, he did.

[3]     Q: Okay. Do you know why he

[4] would tell us that presently he reports

[5] to you at Systrans?

[6]     A: I don't know why he would do

[7] that. I don't have a job.

[8]     Q: Well, let's assume he did.

[9]     A: Okay.

[10]     Q: Is there any basis to that?

[11]     A: No, not at all.

[12]     Q: Okay. So he's just making

[13] that up?

[14]     A: I don't think he would say

[15] something like that.

[16]     Q: Well, let's assume he did.

[17] What I'm asking you is, is there any —

[18]     A: Oh, if he said that it's an

[19] absolute lie.

[20]     Q: Okay. And you're telling me

[21] now on a sworn record that you've

[22] never — forget being employed by, but

[23] you've never worked for or in some way

[24] advanced the cause in the last five or

**Page 250**

[1] six months of Systrans; is that what

[2] you're telling me?

[3]     A: No, it is not.

[4]     Q: Well, I thought that's what

[5] you told me before.

[6]     A: No. I just told you —

[7]     Q: Well —

[8]     A: — I helped Systrans try to

[9] join our rollup with the RPM,

[10] Continental, and Logisteq.

[11]     Q: Okay. Have you helped Jim

[12] Neebling in the last four or five months

[13] get new customers for Systrans?

[14]     A: Get new customers?

[15]     Q: Yes.

[16]     A: No, I have not.

[17]     Q: You haven't spoken to any

[18] customers of Logisteq or potential

[19] customers out there with a view towards

[20] making them Systrans' customers?

[21]     A: No.

[22]     Q: Have you talked to any

[23] landlords or prospective landlords on

[24] behalf of Systrans?

**Page 251**

[1]     A: No.

[2]     Q: Have you done any

[3] negotiating for Systrans?

[4]     A: None whatsoever.

[5]     Q: Did you ever have any

[6] conversations in the last three months

[7] with Jim Martin at Cargo?

[8]     A: Jim Martin at Cargo?

[9]     Q: Do you know who that is?

[10]     A: Yes, I do.

[11]     Q: Did you discuss with him

[12] diverting drayage business from Logisteq

[13] to Systrans?

[14]     A: No.

[15]     Q: So if he said that, that

[16] would not be true?

[17]     A: Oh, absolutely.

[18]     Q: What telephone number do you

[19] use when you call Jim Neebling?

[20]     A: (732) 740-0868.

[21]     Q: You don't use your other —

[22]     A: And —

[23]     Q: — telephone?

[24]     A: Yes.

---

**Page 252**

[1]  Q: Okay.

[2]  A: And (732) 446-2528.

[3]  Q: And when you call Jim

[4] Neebling, what number do you call?

[5]  A: (732) 239-5195.

[6]  Q: What's that? Is that his

[7] office number?

[8]  A: That is his cell phone

[9] number.

[10]  Q: That's his cell?

[11]  A: Yes.

[12]  Q: Do you use any other number?

[13]  A: No. No, I believe that's

[14] it. Maybe once or twice I called his

[15] Bayhead office.

[16]  Q: Okay.

[17]  THE WITNESS: Bayhead

[18] office.

[19]  Once or twice I've used his

[20] Bayhead office and phone number.

[21]  BY MR. KIRCHER:

[22]  Q: Let me show what we have

[23] previously marked as Exhibit No. 7.

[24]  A: Thank you.

---

**Page 253**

[1]  Q: And for the record, Exhibit

[2] 7 is a copy of an April 12, 2002 letter

[3] addressed to Jim Neebling at Systrans

[4] Freight Systems, Inc. from Mr. Peslak

[5] with a copy to me. Is that correct?

[6]  A: Yes.

[7]  Q: Did you and Mr. Neebling

[8] prepare this letter for Mr. Peslak to

[9] sign?

[10]  A: I prepared that letter along

[11] with Art Peslak to send to Jim Neebling

[12] because Jim was taking advantage of the

[13] divorce between Peter Pierce and myself.

[14]  Q: All right. That's not my

[15] question. Did you — did you and

[16] Mr. Neebling participate in the drafting

[17] of this letter, the preparation of this

[18] letter —

[19]  A: No.

[20]  Q: — for Mr. Peslak to sign?

[21]  A: No.

[22]  Q: All right. So if — do you

[23] know Art Crooker?

[24]  A: Art Crooker. Yes, I do.

---

**Page 254**

[1]  Q: Does he work at Systrans?

[2]  A: Yes, he does.

[3]  Q: Okay. So if he said that he

[4] was present when you and Jim Neebling

[5] dictated this letter to Mr. Peslak,

[6] that's a lie?

[7]  A: Oh, absolutely.

[8]  Q: Okay.

[9]  A: Unless maybe Mike DiIanni's

[10] paying him off. That could be happening.

[11] You know how Mike —

[12]  Q: So it would be Mr. DiIanni's

[13] fault if he's lying?

[14]  A: Well, you know how Mike

[15] DiIanni is.

[16]  Q: Well, I'm certainly learning

[17] how you feel about him, Mr. Carr.

[18]  A: Very controlling.

[19]  Q: Right.

[20]  A: Very controlling person.

[21] Mike would stoop that low.

[22]  Q: Now, this letter which

[23] you — you'll admit that at least you

[24] prepared this letter for Mr. Peslak to

---

**Page 255**

[1] sign?

[2]  A: Art and I prepared that

[3] together.

[4]  Q: Okay.

[5]  A: I went to Art Peslak and

[6] complained. I said as much as Jimmy and

[7] I are friends, he's taking advantage of

[8] the matter. He's capitalizing on my

[9] downside here.

[10]  Q: Now, the first sentence

[11] says, it says, Dear Jim, Mr. Carr has —

[12] and this is from Mr. Peslak to Mr.

[13] Neebling. Dear Jim, Mr. Carr has

[14] informed me that you have used

[15] information gained from your personal

[16] friendship with Mr. Carr as well as your

[17] dealings with other Logisteq personnel to

[18] attempt to divert business from Logisteq.

[19]  Did I read that correctly?

[20]  A: Yes, you did.

[21]  Q: Okay. What information that

[22] Mr. Neebling gained from you as a result

[23] of the personal friendship was

[24] Mr. Neebling using to divert Logisteq

---

Page 256

[1] business?

[2]    A: Going back a few months ago

[3] when we — as Logisteq prepared the lease

[4] to be signed with the Sayreville Group,

[5] LLC, Peter Pierce, after I terminated

[6] Mike DiIanni, decided not to sign the

[7] lease on the Sayreville facility. At

[8] that time Jim Neebling and I were working

[9] together with Logisteq and Alan McGrath

[10] to try to get customers for the empty

[11] facility in Miami.

[12]    When I received the letter

[13] from Peter Pierce saying that they were

[14] not signing the lease on the facility

[15] building, I was very concerned. And

[16] Jimmy and I were at lunch that day and I

[17] told Jimmy, I said, I'm really upset.

[18] Here we are trying to fill up a building

[19] in Miami. We're filling up a building in

[20] Sayreville and now Peter's not signing

[21] the lease. So he said to me, well, why

[22] isn't Peter signing the lease? He says,

[23] well, I think he's very upset because I

[24] asked him to tell Mike he no longer has a

Page 257

[1] job at Logisteq.

[2]    So by knowing that

[3] information, he now decided he would

[4] capitalize on this and go after the

[5] business with Walter Hughes, who Walter

[6] and Jim have an agreement with each

[7] other.

[8]    Walter Hughes is an outside

[9] contractor or an outside consultant who

[10] brings accounts to many different

[11] warehouses. He has a contract with

[12] Logisteq and he also has a contract with

[13] Systrans.

[14]    So at the time when Walter

[15] Hughes found out that there was no lease

[16] on the building, he then went to Jim

[17] Neebling and offered work to Jim

[18] Neebling. I then told Jim Neebling, I

[19] said, Jimmy, you know what, we work

[20] together. I don't think it's ethical

[21] what you're doing, and I'm certainly not

[22] going to sit here and let you capitalize

[23] on my business. He then said, Well, why

[24] don't we talk to Peter and talk to Peter

Page 258

[1] about maybe making a global solution to

[2] sit down and work out a plan here.

[3]    So at that time, that's when

[4] I asked Art Peslak to notify Jimmy in

[5] writing that we're not accepting what's

[6] going on with him going to the landlord

[7] and trying to lease space for Walter

[8] Hughes and him.

[9]    Then from that point I even

[10] called Alan McGrath and I said, Alan, I

[11] want to let you know what's happening.

[12] As much as Jimmy and I are friends and we

[13] talk every day, Jimmy also went through

[14] some bad times. He's going through a

[15] divorce. He has a sick child. And he's

[16] trying to capitalize on my loss. I need

[17] you to call up Wakefern, and I need you

[18] to call up Snapple to make sure they know

[19] that Logisteq is in good shape and secure

[20] in that business. And this is at the

[21] same time when Jimmy Neebling was working

[22] the deal out with Walter Hughes to take

[23] this business away from us. So Alan —

[24]    Q: I'm sorry, who did you make

Page 259

[1] the statement about, you better call up

[2] Wakefern and —

[3]    A: To Alan McGrath.

[4]    Q: Okay.

[5]    A: I called up Alan. I said,

[6] Listen, I know we're going through some

[7] hard times right now with Peter and I,

[8] but you know how Jimmy Neebling is, he

[9] acts like your best friend, but Jimmy

[10] does what's good for Jimmy. Jimmy's

[11] going to capitalize on anything he can to

[12] make as much money as he can for himself.

[13] He's a very greedy guy.

[14]    And he also had a contract

[15] with Walter Hughes, which everybody at

[16] Logisteq is well aware of. Alan has been

[17] dealing with Jimmy over the last six,

[18] seven months to also do some business

[19] with him. Peter's been dealing with

[20] Jimmy. Mike DiIanni lent Jim Neebling

[21] $50,000, which I have a contract and I

[22] can supply you with that information,

[23] because Peter was going to buy Jimmy's

[24] company and Mike DiIanni offered money to

Page 260

[1] him and said if this deal goes through to
[2] make sure I get a part of your business.
[3]    And then from that point on,
[4] Alan went ahead and called Wakefern and
[5] called Snapple and he'll — if he's a
[6] truthful man, he can sit there and verify
[7] everything I'm saying is the truth.
[8]    Q: Let me kind of refocus you.
[9] I appreciate all that information.
[10]    A: You're welcome.
[11]    Q: The question was, what
[12] information did you share with
[13] Mr. Neebling that he used —
[14]    A: I told you that information.
[15]    Q: Okay. So it was the
[16] information about Sayreville —
[17]    A: Information about the
[18] Sayreville lease that Peter did not sign.
[19]    Q: Okay.
[20]    A: And I was very upset about
[21] that.
[22]    Q: Okay. And in fact, was
[23] business diverted from Logisteq as a
[24] result of Mr. Neebling using that

Page 261

[1] information?
[2]    A: Yes.
[3]    Q: Okay.
[4]    A: Yes.
[5]    Q: So if I read this letter
[6] correctly and your answer, information
[7] that you provided to Mr. Neebling enabled
[8] him to divert business from Logisteq; yes
[9] or no?
[10]    A: No.
[11]    Q: No?
[12]    A: No.
[13]    Q: Well, I thought you just
[14] answered that yes.
[15]    A: I did — well, let me
[16] explain. There's always a sentence
[17] behind the answer.
[18]    Peter Pierce had all the
[19] time to make his decision over four or
[20] five months to sign that lease. He knew
[21] that Honeywell had a contract ready to be
[22] signed for a five-year contract, and part
[23] of the requirements for that contract was
[24] for Logisteq to have a lease on the

Page 262

[1] amount of time on the contract. Peter
[2] would not sign that contract.
[3]    Jimmy Neebling, knowing this
[4] information through Walter Hughes —
[5] because Walter would ask Alan day-to-day
[6] do we have a lease, because Wakefern and
[7] Snapple needed to see a lease — took
[8] advantage of this.
[9]    So I want to say no, it
[10] wasn't from me. I want to say, yes,
[11] Jimmy knew — Jimmy knew that there was
[12] no lease on the building, but he did not
[13] find that out —
[14]    Q: Well, let me —
[15]    A: Okay.
[16]    Q: Excuse me for interrupting.
[17] I just want to understand this letter
[18] which you've already told me you and
[19] Mr. Peslak prepared.
[20]    A: Okay.
[21]    Q: Okay. And I'm focusing on
[22] that first sentence.
[23]    A: Yes.
[24]    Q: Mr. Carr has informed me

Page 263

[1] that you, Jim Neebling, have used
[2] information gained from your personal
[3] friendship with Mr. Carr as well as your
[4] dealings with other Logisteq personnel to
[5] attempt to divert business from Logisteq.
[6]    Now, is what I just read a
[7] true statement?
[8]    A: Let me think about it and
[9] say it probably is.
[10]    Q: Well, I don't —
[11]    A: Yes, yes, yes, yes.
[12]    Q: I just want to know whether
[13] that sentence is —
[14]    A: Yes, that is a true
[15] sentence.
[16]    Q: Okay. So if that is a true
[17] statement, Mr. Carr —
[18]    A: Yes.
[19]    Q: — then would you agree with
[20] me that, at least in part, information
[21] that Mr. Neebling got from you as a
[22] result of your personal friendship
[23] resulted in the diversion of business
[24] from Logisteq?

Page 264

[1]  A: Yes.

[2]  Q: Okay.

[3]  A: It makes sense, yes.

[4]  Q: All right. And in fact,

[5] this letter's coming up somewhere later

[6] on, either you or Mr. Peslak — I think

[7] it's you — describe what Mr. Neebling is

[8] doing to Logisteq as wreaking havoc?

[9]  A: Yes.

[10]  Q: You made that statement

[11] later on in April, right?

[12]  A: Correct.

[13]  Q: Okay. All right. Now, this

[14] letter was sent on April 12th, and two

[15] weeks later you presented to Peter Pierce

[16] an offer by Mr. Neebling and Systrans to

[17] buy the whole Logisteq assets?

[18]  A: Correct.

[19]  Q: Okay. I take it by then you

[20] mended your fences with Mr. Neebling such

[21] that despite this letter you were acting

[22] on his behalf a couple of weeks later?

[23]  A: Correct.

[24]  Q: Okay. That April 12th

Page 265

[1] letter, that really wasn't intended to

[2] soften up Mr. Pierce so you could get a

[3] better deal, was it?

[4]  A: Repeat the question.

[5]  Q: Yes. This letter, copy of

[6] which was sent to me as Mr. Pierce's —

[7] you knew I would show this letter to

[8] Mr. Pierce, didn't you?

[9]  A: Did I know it?

[10]  Q: Yes.

[11]  A: I would assume so, yes.

[12]  Q: Okay. So the question I

[13] have for you is, did you send this letter

[14] with a copy to me for the purpose of

[15] trying to soften Peter Pierce up in the

[16] ongoing back and forth about you buying

[17] him or him buying you?

[18]  A: Yes.

[19]  Q: You did?

[20]  A: Yes.

[21]  Q: Okay. This has been — this

[22] exhibit has previously been marked as

[23] Carr Exhibit 9. And this is the, for the

[24] record, the April 22, 2002 — it's a memo

Page 266

[1] on the letterhead of Systrans,

[2] Mr. Neebling's company, and it's to you

[3] from Mr. Neebling. Do you see that?

[4]  A: Yes, I'm reading that.

[5]  Q: Okay. When you have a

[6] chance to finish reading it, let me know.

[7]  A: Okay, I'm finished.

[8]  Q: Now, in this memo to you

[9] from Jim Neebling, Mr. Neebling makes a

[10] written offer on behalf of Systrans

[11] Freight Systems, Inc. to acquire the

[12] assets of TC Transport/Logisteq, correct?

[13]  A: Correct.

[14]  Q: All right. And this offer

[15] was conveyed to Pioneer by your

[16] presenting this document to Mr. Pierce at

[17] a dinner meeting of some sort; is that

[18] right?

[19]  A: That's true.

[20]  Q: Okay. Why wasn't

[21] Mr. Neebling there to make his own

[22] presentation to the Logisteq owners? Why

[23] do —

[24]  A: He was.

Page 267

[1]  Q: He was?

[2]  A: He was. We meet a few days

[3] after, Jimmy Neebling, Alan McGrath, and

[4] Peter and I.

[5]  Q: All right. But when this

[6] was first presented to Pioneer,

[7] Mr. Neebling wasn't there, right?

[8]  A: I don't remember that. I

[9] really don't.

[10]  Q: Well, this is less than two

[11] months ago or less than a — it's less

[12] than two months ago.

[13]  A: The meeting I had with Peter

[14] Pierce, Jim Neebling was there with Alan

[15] McGrath. Alan's right next to you if you

[16] want to ask him.

[17]  Q: All right. Well, let me see

[18] if I can straighten out the record.

[19]  A: Sure.

[20]  Q: When this piece of paper,

[21] Exhibit No. 9, was first given to

[22] Pioneer, who was it given to and by whom?

[23]  A: I don't remember.

[24]  Q: You don't know?

Page 268

[1] A: No, I don't.

[2] Q: Can I suggest to you that

[3] you gave this to Peter at a meeting just

[4] between you and Peter?

[5] A: Okay, you can suggest that.

[6] Q: Do you accept that?

[7] A: I don't remember that.

[8] Q: You don't remember that?

[9] A: No.

[10] Q: What do you remember?

[11] A: I remember meeting with Alan

[12] McGrath, myself, Peter and Jimmy.

[13] Q: Okay.

[14] A: Sitting at a table

[15] discussing buying 51 percent of

[16] Peter's —

[17] Q: Well —

[18] A: — shares.

[19] Q: — this isn't buying 51

[20] percent; this is an offer to pay the

[21] whole shooting match.

[22] A: Right.

[23] Q: Right. Okay. Now, in that

[24] first paragraph Mr. Neebling says to you:

Page 269

[1] As the situation gets worse by the day

[2] between yourself and Peter Pierce, the

[3] customers and employees are looking for

[4] security. Did I read that correctly?

[5] A: You're asking me if you read

[6] it correctly?

[7] Q: Yes.

[8] A: Did you read it correctly?

[9] Q: That's what I'm asking you.

[10] I was hoping you were —

[11] A: How do I know if you read it

[12] correctly?

[13] Q: I was hoping you were

[14] following.

[15] A: I read it. I read it

[16] correctly.

[17] Q: Okay. Sometimes witnesses

[18] don't like you to read stuff. They'll

[19] disagree with it.

[20] A: Okay.

[21] Q: But let's just say I read it

[22] correctly, all right?

[23] A: Sure. I'll assume.

[24] Q: My question to you is, how

Page 270

[1] would Jim Neebling know what Logisteq's

[2] employees are looking for?

[3] A: Because he works with Walter

[4] Hughes, who is a consultant for Logisteq,

[5] and he knows day by day what's going on.

[6] Q: So Walter Hughes was

[7] informing Mr. Neebling —

[8] A: Oh, absolutely.

[9] Q: — about Logisteq employees?

[10] A: Day by day, hour by hour.

[11] Q: All right. How would

[12] Mr. Neebling know about what Logisteq's

[13] customers are looking for?

[14] A: By Mr. Hughes.

[15] Q: Through Mr. Hughes?

[16] A: Absolutely.

[17] Q: So Mr. Hughes was the deep

[18] throat for all this information?

[19] A: Mr. Hughes is at the

[20] warehouse, the office. He's on the road.

[21] He sees customers.

[22] Q: Okay.

[23] A: Sure.

[24] Q: And he's under no

Page 271

[1] constraints to maintain the confidence of

[2] his customers?

[3] A: He has a contract with

[4] Logisteq and Systrans.

[5] Q: All right. What happens if

[6] there's an opportunity that comes up

[7] that's good for both of them, what does

[8] Mr. Hughes do?

[9] MR. PESLAK: Object to the

[10] form of the question.

[11] BY MR. KIRCHER:

[12] Q: If you know.

[13] A: He does what's better for

[14] him.

[15] Q: Okay.

[16] A: And for an example, if

[17] Mr. Hughes has a customer who will come

[18] to him only with a company that has a

[19] lease on a warehouse, obviously

[20] Mr. Hughes is going to select that

[21] company who has a lease rather than a

[22] company that does not have a lease.

[23] Q: Did you help Mr. Neebling

[24] prepare this memo?

Page 272

[1]  A: No, I did not.

[2]  Q: You had nothing to do with

[3]  it?

[4]  A: Absolutely not.

[5]  Q: Did you provide any

[6]  information to Mr. Neebling that's

[7]  contained in the memo?

[8]  A: No, I did not.

[9]  Q: Did you have any discussions

[10]  with Mr. Neebling about this kind of an

[11]  acquisition before you saw this memo?

[12]  A: Yes, I did.

[13]  Q: Okay. And tell me about

[14]  that discussion.

[15]  A: Mr. Neebling told me that he

[16]  was trying to raise some investment money

[17]  himself, and he would like to make an

[18]  offer to Peter directly —

[19]  Q: All right. Did you

[20]  immediately —

[21]  A: — and that he would like to

[22]  have a meeting with Peter. And from that

[23]  point on I called Peter and asked Peter

[24]  to come to the Mom's Peppermill Diner in

Page 273

[1]  Hightstown, New Jersey. And we sat down

[2]  with Alan McGrath, Jim Neebling, Peter

[3]  Pierce and myself to discuss the future

[4]  plans of Logisteq.

[5]  Q: How long before this memo

[6]  did you have that discussion with

[7]  Mr. Neebling?

[8]  A: I don't remember.

[9]  Q: Well, was it weeks, months,

[10]  days, hours? You can't ballpark it for

[11]  me?

[12]  A: I don't remember.

[13]  Q: When he first told you that

[14]  he was contemplating an offer to purchase

[15]  the assets of Logisteq, did you

[16]  immediately convey that to Logisteq or

[17]  Pioneer?

[18]  A: I really don't remember.

[19]  Q: Now, you were aware — you

[20]  were still employed on April 22nd, right;

[21]  you were still getting your paycheck?

[22]  A: On April 22nd?

[23]  Q: Yes. I think —

[24]  A: I'm not sure, but if you say

Page 274

[1]  so —

[2]  Q: I think you were, because I

[3]  think the letter about you're not

[4]  employed anymore was May 1st.

[5]  A: Okay.

[6]  Q: So let's assume that's

[7]  correct.

[8]  A: Okay.

[9]  Q: You were aware on April 22nd

[10]  of the constraints that were part of the

[11]  deal; we talked about that before?

[12]  A: Correct.

[13]  Q: Okay. What information did

[14]  Mr. Neebling have about Logisteq's

[15]  accounts payable and loans?

[16]  A: None whatsoever as far as

[17]  my —

[18]  Q: Why would he say in point

[19]  four, all accounts payable and loans

[20]  current as of closing without knowing

[21]  what those accounts payable and loans

[22]  were?

[23]  A: I don't know. You would

[24]  have to ask Jim Neebling.

Page 275

[1]  Q: Did you share any of that

[2]  information with Mr. Neebling?

[3]  A: No, I did not.

[4]  Q: How did he know about the

[5]  Miami lease? Who told him about that?

[6]  A: What about the Miami lease?

[7]  Q: Well, he mentions in point

[8]  five, lease in Miami, 100,000 — it's

[9]  100,000 square feet (100K space) to not

[10]  be included. How would he know about

[11]  that?

[12]  A: He's been working with Alan

[13]  McGrath for the past six months with

[14]  customers on a consulting deal, so that's

[15]  how he knows about that, from Alan

[16]  McGrath.

[17]  Q: He says in his last

[18]  paragraph: This offer will not slow our

[19]  efforts to secure customers to Systrans.

[20]  Then it goes on.

[21]  Despite the April 12th

[22]  letter from Mr. Peslak to him to

[23]  basically lay off, he didn't lay off, he

[24]  was continuing to attempt to secure and

IMP04471

Page 276

[1] divert Logisteq business?

[2]    A: Yes, he did.

[3]    Q: Okay. And he was successful

[4] in doing that, correct?

[5]    A: Yes, he was.

[6]    Q: And this was the person that

[7] you then presented to Mr. Pierce as a

[8] possible suitor, as a possible purchaser

[9] of the Logisteq business?

[10]    A: Correct.

[11]    Q: Someone who was already

[12] basically stealing it?

[13]    A: Yes.

[14]    MR. KIRCHER: Do you want to

[15] take a break? Let's take your

[16] break now.

[17]    THE VIDEOGRAPHER: This

[18] concludes tape two of this

[19] videotape deposition. The time is

[20] 3:20. We are off the record.

[21]

[22]    (Recess was taken.)

[23]

[24]    THE VIDEOGRAPHER: This

Page 277

[1] begins tape three of this

[2] videotape deposition, and the time

[3] is 3:34. We are on the record.

[4]            BY MR. KIRCHER:

[5]    Q: Mr. Carr, we were talking

[6] about Jim Neebling and his business,

[7] Systrans. Has Mr. Neebling ever promised

[8] you anything or committed to anything to

[9] you in connection with this possible

[10] acquisition of the Logisteq business?

[11]    A: No, he has not.

[12]    Q: So there's nothing — there

[13] was nothing in it for you in presenting

[14] his offer to — basically to Pioneer and

[15] Logisteq?

[16]    A: I'm sorry, I misunderstood

[17] the question.

[18]    Q: Yeah, here's what I'm trying

[19] to ask, and I'm not being artful. You

[20] were along with Mr. Neebling — from your

[21] testimony, you were along with

[22] Mr. Neebling when his offer to acquire

[23] the assets of Logisteq was presented. In

[24] fact, his memo is directed to you. Do I

Page 278

[1] have that right so far?

[2]    A: Correct.

[3]    Q: All right. And my question

[4] to you is, if that — did Mr. Neebling

[5] make any commitment to you or promise you

[6] anything or offer you anything for

[7] supporting him or helping him in any way

[8] with this proposed acquisition?

[9]    A: Yes, he did.

[10]    Q: What did he — what promise

[11] or offer did he make to you?

[12]    A: I would get half of the

[13] money that he was willing to pay for the

[14] whole company.

[15]    Q: Okay. You would get half

[16] the money?

[17]    A: Well, 49 percent of it.

[18]    Q: All right. Did he offer you

[19] anything else? Would you have any role

[20] in the future business of Systrans?

[21]    A: Yes, I would.

[22]    Q: And what offer or promise

[23] did he make to you?

[24]    A: I would do sales for him.

Page 279

[1]    Q: Okay. You would be employed

[2] and do sales for Systrans?

[3]    A: (Indicates.)

[4]    Q: On top of getting 49 percent

[5] of the purchase price?

[6]    A: Only if he was able to buy

[7] the company from Peter.

[8]    Q: Okay. So if that

[9] acquisition had occurred, it would have

[10] been in your interest to help Systrans

[11] secure Logisteq customers, would it not?

[12]    A: Yes, it would.

[13]    Q: Let me switch gears here for

[14] a second and go back to telephones.

[15] Apparently, I was not complete enough in

[16] my prior questioning.

[17]    I asked you questions about

[18] whatever phones you've used in the past

[19] couple months. And when I asked you

[20] that, I meant phones not only in your

[21] name where you pay the bill, but anyone

[22] else's phone, like Jim Neebling's phone

[23] or anyone else's phone that you may have

[24] used to conduct business, use on a daily

Page 280

[1] basis, that sort of thing.

[2]   A: The only phone I used was my

[3] own phone at home and the phone that I

[4] have through Logisteq.

[5]   Q: Okay. Did you ever tell

[6] anyone that you had a new cell phone, a

[7] different cell phone from the Logisteq

[8] cell phone?

[9]   A: No, because I don't have a

[10] new cell phone.

[11]   Q: Okay. You don't have a cell

[12] phone with you or on you now?

[13]   A: Yes, I do.

[14]   Q: You have the Logisteq one?

[15]   A: I have the Logisteq one.

[16]   Q: Okay. Have you ever — I

[17] understand that Systrans has a place of

[18] business both in Bayhead and Sayreville;

[19] is that right?

[20]   A: Correct.

[21]   Q: Have you ever — strike

[22] that. In the last — since April 9th.

[23] Have you been on the premises of

[24] Systrans' business?

Page 281

[1]   A: No, I have not.

[2]   Q: Neither in Bayhead nor in

[3] Sayreville?

[4]   A: No.

[5]   Q: Let's take it from the first

[6] of March forward. During that time

[7] period have you been on Systrans'

[8] business premises?

[9]   A: No, I have not.

[10]   Q: Did you ever have any

[11] discussions with Iron Mountain about Iron

[12] Mountain purchasing the Anchor Glass

[13] building? Let me stop there.

[14]   A: No, I have not.

[15]   Q: Did you ever have any

[16] discussions with Iron Mountain about Iron

[17] Mountain providing business space to your

[18] company at some time in the future?

[19]   A: Yes, I have.

[20]   Q: Tell me about those

[21] discussions.

[22]   A: I was actually asking Iron

[23] Mountain if I can raise the money to buy

[24] the 51 percent of Peter's part of the

Page 282

[1] company, if I can continue to operate out

[2] of the Freehold facility since Mike

[3] DiIanni would no longer be apart of the

[4] operation.

[5]   Q: Okay. Apart from that, have

[6] you had any other discussions about a

[7] business run by you being a tenant in a

[8] building owned by Iron Mountain?

[9]   A: No.

[10]   Q: Let me show you what was

[11] previously marked as Exhibit 10.

[12]   A: Thank you.

[13]   Q: And for the record,

[14] Exhibit 10 is an April 26, 2002 memo from

[15] Thomas Carr to J. Peter Pierce and signed

[16] by Mr. Carr. Is that correct, Mr. Carr?

[17]   A: I'm sorry, I was reading

[18] this while you were talking.

[19]   Q: That's okay. It's an April

[20] 26, 2002 memo from you to Peter Pierce?

[21]   A: Yes.

[22]   Q: Okay. Go ahead and read it.

[23]   A: Thank you.

[24]   Q: Have you had a chance to

Page 283

[1] read it?

[2]   A: Yes, I did.

[3]   Q: Okay. Much of this memo has

[4] to do with the history of the attempt to

[5] have Mr. Pierce or have you buy out

[6] Pioneer's interest in Logisteq?

[7]   A: Yes.

[8]   Q: All right. My focus is on

[9] the last sentence of this April 26th

[10] memo, Mr. Carr, and there you say after

[11] above that making a new proposal, you

[12] say: Obviously, I would need your

[13] agreement today since Jim Neebling has

[14] already been wreaking havoc with our

[15] customer base. Did I read that

[16] correctly?

[17]   A: Yes, you did.

[18]   Q: Okay. And is that a true

[19] statement?

[20]   A: Yes, it is.

[21]   Q: Right. And when you say our

[22] customer base, you mean Logisteq's

[23] customer base?

[24]   A: Yes.

Page 284

[1] Q: Now, you know an individual
[2] whose name is Anthony DiAngeli, correct?
[3] A: Yes, I do.
[4] Q: All right. He's also a
[5] defendant in the indictment that we've
[6] talked about previously?
[7] A: Yes, he is.
[8] Q: And he is sometimes referred
[9] to as Tony D?
[10] A: Yes.
[11] Q: He has a company, the name
[12] of which is ATS?
[13] A: Yes.
[14] Q: And that is short for All
[15] Transportation Services, correct?
[16] A: Correct.
[17] Q: And, if you know, what does
[18] that company do?
[19] A: That company does LTL
[20] trucking, small deliveries, and
[21] warehousing.
[22] Q: LTL is less than trailer
[23] load?
[24] A: Yes.

Page 285

[1] Q: Okay. And would they
[2] compete in any way with Logisteq?
[3] A: No, not really.
[4] Q: No. Would they compete in
[5] any way with Systrans?
[6] A: Well, actually, they could
[7] compete with us, because they're also in
[8] the warehousing business, but we were
[9] just trying to rent out the second and
[10] third.
[11] Q: Okay.
[12] A: And they were a tenant at
[13] the time.
[14] Q: All right.
[15] A: I was doing my best to fill
[16] up the entire building.
[17] Q: All right. We'll get to
[18] that in a second.
[19] A: Okay.
[20] Q: I was just trying to find
[21] out a little bit about ATS. That company
[22] still in business so far as you know?
[23] A: I don't know. I haven't —
[24] Q: All right. Now, with

Page 286

[1] respect to Mr. DiAngeli —
[2] A: Yes.
[3] Q: — I want to ask you some
[4] questions about a Mercedes-Benz
[5] automobile lease.
[6] A: Sure.
[7] Q: In the summer of 2000 before
[8] Logisteq was even created, TC Concepts,
[9] one of your companies, entered into a
[10] three-year, 36-month automobile lease
[11] with Mercedes-Benz for the lease of a
[12] Mercedes-Benz; is that correct?
[13] A: Yes, it is.
[14] Q: All right. And we can look
[15] at it if you want, but you're aware that
[16] that written lease had a no-assignment
[17] clause; you're aware of that?
[18] A: I wasn't aware of that.
[19] Q: You're now aware of it?
[20] A: You just told me, yes.
[21] Q: Okay. Let me show you what
[22] was previously marked as Carr Exhibit
[23] No. 11.
[24] MR. KIRCHER: I don't have

Page 287

[1] an extra copy of this, Mr. Peslak,
[2] but you can share it with your
[3] client.
[4] BY MR. KIRCHER:
[5] Q: Let me simply ask you, when
[6] you get a chance to look at this, Mr.
[7] Carr —
[8] A: Sure.
[9] Q: — whether this is the lease
[10] that I just described?
[11] A: Yes, it is.
[12] Q: Okay. And for the record,
[13] this actually is a document that came
[14] either from your files or Mr. Peslak's
[15] files, because it's a document that was
[16] produced to us by you folks. This
[17] document appears to be dated August 2,
[18] 2000. It's a 36-month lease. And if you
[19] turn to the third page of the document
[20] with the No. 00411, do you have that
[21] third page? You'll see —
[22] A: Yes.
[23] Q: — as part of the preprinted
[24] agreement in Section 15 on the left-hand

Page 288

[1] side, at the end of 15 it says: I will
[2] not assign or sublease any interest in
[3] the vehicle or this lease. I will keep
[4] the vehicle and the lease free from all
[5] liens. Do you see that?
[6]    A: Yes, I do.
[7]    Q: Okay. Now, are you telling
[8] me that until this very moment you
[9] weren't aware of that no-assignment
[10] provision?
[11]    A: No. Actually, Mike DiIanni
[12] wanted an agreement that we would no
[13] longer have company vehicles. And Mike
[14] DiIanni agreed to give the car to
[15] Michael — to Anthony DiAngelis, I
[16] believe his name is.
[17]    Q: DiAngeli?
[18]    A: Yes, DiAngeli. And the rent
[19] every month was going to be paid along
[20] with the car payment. Michael DiIanni
[21] was well aware of the agreement. After a
[22] couple of delinquent payments from
[23] Mr. DiAngeli, Mr. DiIanni asked for the
[24] car back. Mr. DiAngeli told Michael

Page 289

[1] DiIanni, I am not giving the car back,
[2] because I have an agreement here that
[3] Thomas Carr signed that I can take over
[4] the lease payments on the car and cover
[5] the insurance.
[6]    So from that day on, there's
[7] been a battle back and forth, but I
[8] basically told Alan McGrath to go get the
[9] car. It's not a problem with me once I
[10] found out that the car was not allowed to
[11] be given up as a lease.
[12]    But all the employees who
[13] had company cars were told to give the
[14] cars back, but the problem is that I have
[15] personal guarantees on these cars.
[16]    Q: All right. Let me explore
[17] that with you a little bit.
[18]    A: Sure.
[19]    Q: Let me suggest to you,
[20] Mr. Carr, that actually what happened is
[21] that you made a decision some time late
[22] last year or early this year that you
[23] wanted to assign this lease to
[24] Mr. DiAngeli. You went to Mr. DiIanni to

Page 290

[1] ask permission for that and he refused
[2] because of this no-assignment
[3] provision —
[4]    A: That's untrue.
[5]    Q: Wait a minute.
[6]    A: Okay.
[7]    Q: — and then, without
[8] notifying anyone at Logisteq, you and
[9] Mr. DiAngeli nevertheless entered into an
[10] automobile lease.
[11]    A: That's not true.
[12]    Q: Okay.
[13]    A: Mr. Michael DiIanni was
[14] fully aware of the obligations, and
[15] Mr. DiIanni gave full authorization for
[16] Mr. DiAngeli to take over the lease. And
[17] if anybody got affected by that, I did.
[18] I went from an $500 Mercedes sedan to a
[19] Mercedes truck, and from that day on, had
[20] made all the payments on my own and have
[21] never asked for a car payment from
[22] Logisteq since.
[23]    Q: Let me show you what's been
[24] marked as Carr No. 12. Do you recognize

Page 291

[1] this document?
[2]    A: Yes. This is a document I
[3] signed.
[4]    Q: And for the record, Exhibit
[5] No. 12 is a two-page document entitled
[6] Automobile Lease, contains 15 paragraphs,
[7] and it appears to be signed by
[8] Mr. DiAngeli as president of All
[9] Transportation Services, Inc., and then
[10] signed by Thomas Carr, president of
[11] Logisteq. Do you see that?
[12]    A: Yes, I see that.
[13]    Q: And the date of those
[14] signatures appear to be January 11th of
[15] 2002, correct? Do you see that?
[16]    A: Yes.
[17]    Q: All right. If you go back
[18] to the first page, the date of this lease
[19] appears to be, in the first sentence it
[20] says: This lease of a Mercedes-Benz made
[21] as of December 1, 2001. Do you see that?
[22]    A: Yes.
[23]    Q: Okay. Now, you did this
[24] after you were told not to do it and you

**Page 292**

[1] did it without notifying anybody at
[2] Logisteq, correct?
[3]    A: No. That's not true.
[4]    Q: Okay.
[5]    A: Mike DiIanni understood
[6] exactly what was going on there.
[7]    Q: Okay. Do you have any proof
[8] documenting — proof of that?
[9]    A: Sure. Got proof right here.
[10] I have a lease to Tony DiAngeli with my
[11] signature on it.
[12]    Q: No, no. What I'm saying is,
[13] do you have any proof that you provided a
[14] copy or otherwise made Mike DiIanni aware
[15] that you had done this? Do you have any
[16] documentary proof of that?
[17]    A: No, why would I?
[18]    Q: Well, that's not the
[19] question. And I think you've answered.
[20] You don't have any documentary proof?
[21]    A: No.
[22]    Q: Okay.
[23]    A: I was the president of the
[24] company. I signed for the lease.

**Page 293**

[1]    As a matter of fact, I know
[2] for a fact that the car's delinquent now.
[3] Mercedes-Benz called me because I'm
[4] personally signed on these automobiles.
[5] And Logisteq has not been making payment,
[6] even though Tony DiAngeli has been making
[7] payments to Logisteq. So I'm very
[8] concerned about that.
[9]    MR. KIRCHER: I'm going to
[10] move to strike that as not
[11] responsive to any question.
[12]    BY MR. KIRCHER:
[13]    Q: Let me show you what's been
[14] marked as Exhibit 13. And for the
[15] record, this is a copy of what appears to
[16] be a letter dated April 23, 2002 from a
[17] company called Chase. I assume it's part
[18] of the Chase Manhattan family of
[19] companies.
[20]    A: Yes.
[21]    Q: And it's addressed to Thomas
[22] Carr with an address of All
[23] Transportation Service, 891 — it looks
[24] like 8 19th Route 33, Freehold, New

**Page 294**

[1] Jersey. It looks like a form letter. It
[2] says, Dear Applicant, Thank you for your
[3] recent application for vehicle financing.
[4]    Now, do you know why Chase
[5] would be sending you a letter at ATS?
[6]    A: Sure. What happened is,
[7] there was a Jeep that was on Logisteq's
[8] name also.
[9]    Q: I'm sorry?
[10]    A: There was a Jeep in the name
[11] of Logisteq, and I was the cosigner on
[12] it. And that jeep was driven by
[13] Christina DiAngeli who was an employee at
[14] Logisteq at the time. Michael DiIanni
[15] told me I need to get it out of my name
[16] and put it in Christina's name. So at
[17] the time, Tony DiAngeli, who was
[18] Christina's wife — husband, applied to
[19] Chase Bank with me as a cosigner to get
[20] it out of Logisteq's name, and we were
[21] refused credit. That's what that is.
[22]    Q: You say in your answer that
[23] Mike DiIanni told you that you had to get
[24] it out of Logisteq's name?

**Page 295**

[1]    A: Mike DiIanni wanted all
[2] company cars out of Logisteq's name.
[3] There was approximately five vehicles.
[4] So Alan McGrath was working on that.
[5] Alan McGrath was trying his best to get
[6] all the cars going back to the dealer
[7] of — the leases were going to expire —
[8] to send the cars back. And whatever cars
[9] we had a longer lease on, they wanted the
[10] cars out of the company name and in the
[11] person's name directly.
[12]    Q: All right. Now, let me just
[13] stop —
[14]    A: And Logisteq was no longer
[15] going to make payments for any company
[16] cars.
[17]    Q: Right. When did — when,
[18] with respect to this automobile, this
[19] Jeep, did Mr. DiIanni make that statement
[20] to you?
[21]    A: I don't remember.
[22]    Q: You don't remember?
[23]    A: No.
[24]    Q: The reason I ask is, as of

Page 296

[1] April 2002, Mr. DiIanni had been gone
[2] some seven or eight weeks?
[3]    A: No, Michael DiIanni's still
[4] working. He works for Logisteq. I just
[5] called him the other day. He's at
[6] Sayreville. He's operating every day on
[7] a daily — a day-to-day basis.
[8]    Q: Let me repeat the question.
[9]    A: Sure.
[10]    Q: In relation to the date of
[11] this letter, April 23, 2002, when did
[12] Mr. DiIanni tell you that you had to
[13] change the Jeep from Logisteq to your own
[14] name?
[15]    A: Oh, gosh, way before this
[16] letter.
[17]    Q: All right. Why did they
[18] send this letter to you at ATS?
[19]    A: Maybe Mr. DiAngeli was
[20] trying to put the Mercedes-Benz in his
[21] name, because that's what happened with
[22] Alan, so honestly I don't know. I'd have
[23] to call them and ask.
[24]    Q: You don't know why Chase was

Page 297

[1] writing to you at ATS about a Jeep?
[2]    A: No, I don't. No. I can
[3] find out by calling them. It's simple
[4] enough.
[5]    Q: Now, your son has a leased
[6] car in Florida; is that true?
[7]    A: Yes, it is.
[8]    Q: To your knowledge, as we sit
[9] here today, does he still have that car
[10] in Florida?
[11]    A: Yes, he does.
[12]    Q: I take it he's not using it
[13] on behalf of Logisteq?
[14]    A: No, he's not.
[15]    Q: Never has?
[16]    A: He has when he worked for
[17] Logisteq.
[18]    Q: When did he work for
[19] Logisteq?
[20]    A: He worked there from the
[21] very beginning of — up until, I'd say,
[22] January of 2001 —
[23]    Q: Okay.
[24]    A: — part time while he was in

Page 298

[1] school.
[2]    Q: And what kind of a car is
[3] that?
[4]    A: A Camaro, Chevrolet Camaro.
[5]    Q: And what is the — what is
[6] your understanding of the terms of that
[7] lease? When does that lease end?
[8]    A: That is — that is a car
[9] that I personally purchased myself for
[10] the downpayment and signed, but I needed
[11] the company's name. So when I bought the
[12] car, it was before the acquisition with
[13] Peter Pierce. And the terms of that car
[14] I believe is 60 months, and it's a note.
[15]    Q: Okay. But who's on the hook
[16] for the — who initially is on the hook
[17] for the monthly lease payment? Who pays
[18] that?
[19]    A: I'm on the hook for all of
[20] the monthly payments on all of the
[21] vehicles, because I co-signed for every
[22] vehicle in the company.
[23]    Q: That's not what I mean,
[24] though. I mean, as things were running

Page 299

[1] normally, who would be making the monthly
[2] payment, Logisteq?
[3]    A: Logisteq up until about, I
[4] want to say, four or five months ago.
[5]    Q: Okay. When's the last time
[6] you made a payment on the Camaro?
[7]    A: As a matter of fact, last
[8] week.
[9]    Q: Last week?
[10]    A: Yes.
[11]    Q: Is that current? Is the
[12] lease current?
[13]    A: Yes, it's current.
[14]    Q: How many payments have you
[15] made?
[16]    A: I've made the last four
[17] payments on the lease. I can show you
[18] proof that it's current.
[19]    As a matter of fact, I went
[20] in and asked Alan if I could have the
[21] payment book so I could continue to make
[22] those payments. And I also have the car
[23] insured.
[24]    Q: A couple of weeks ago

Page 300

[1] Mr. Schwartz's company, CAC, repossessed
[2] some trailers from Logisteq in Freehold.
[3]    A: Okay.
[4]    Q: Did you know that was going
[5] to happen ahead of time?
[6]    A: Yes, I did as a matter of
[7] fact. Yes.
[8]    Q: Okay. Did you alert
[9] Logisteq to that fact?
[10]    A: No. Actually, I didn't,
[11] because I believe Alan McGrath and Paul
[12] Schwartz had a dialogue going, and
[13] approximately seven months behind on
[14] payments with that note, and Alan McGrath
[15] made a commitment to Paul that he was
[16] going to make the payment. And then
[17] supposedly Paul called me and said that
[18] Jimmy Neebling called me and said that
[19] the equipment is being sold. He heard
[20] through one of the mechanics. And I
[21] said, Alan, you have to call — I said,
[22] Paul, you have to call Alan McGrath.
[23] I — I — all I know is customers are
[24] calling me saying they closed down the

Page 301

[1] operation.
[2]    So you would have to ask
[3] Alan McGrath. He's down at the end of
[4] the table about as far as the
[5] conversation with the repossession from
[6] Paul Schwartz.
[7]    Q: Did you do anything to
[8] prevent Mr. Schwartz's company from
[9] repossessing those trailers?
[10]    A: Yes, I did. I called
[11] Mr. Schwartz and I said before you
[12] repossess anything, would you please give
[13] Alan McGrath a courtesy call and see if
[14] they're going to make payments on that
[15] before you start pulling equipment out?
[16] And Mr. Schwartz said, yes, I will give
[17] him the courtesy. He said, I gave him
[18] the courtesy for the last three months.
[19] They've been promising me payments. And,
[20] quite frankly, he says, you know, we — I
[21] don't know who to trust anymore. Alan's
[22] been very stand up, and he has a lot of
[23] respect for Alan, but no payments ever
[24] reached the office.

Page 302

[1]    So he called me back and he
[2] said he spoke to Alan McGrath. He wanted
[3] a payment, and if he didn't get the
[4] payment, he said he's going to pick up
[5] the equipment, and Alan gave him the
[6] permission to go pick up the equipment.
[7]    Q: So it's your understanding
[8] that Mr. Schwartz announced this and Alan
[9] McGrath said fine, if I don't make the
[10] payment, you can pick them up?
[11]    A: I believe that's what was
[12] said.
[13]    Q: And that's why this
[14] repossession was done in the middle of
[15] the night?
[16]    A: In the middle of the night?
[17]    Q: Early morning?
[18]    A: Oh, I don't know anything
[19] about that.
[20]    Q: Well, I thought you were
[21] there. Were you there?
[22]    A: Was I where?
[23]    Q: At Logisteq's place of
[24] business where the trailers were

Page 303

[1] repossessed?
[2]    A: Absolutely not.
[3]    Q: Were you there later that
[4] day?
[5]    A: During the day, yes, I was.
[6]    Q: Okay.
[7]    A: I was called from one of the
[8] employees at Logisteq and I was told —
[9]    Q: Which employee?
[10]    A: Two employees, as a matter
[11] of fact. One was George Pavasky (ph).
[12]    Q: George Pavasky?
[13]    A: Yes. He's in charge of
[14] maintenance. And he told me that Mike
[15] Dilanni said call the police and tell
[16] them that the garage was broken into and
[17] you heard that Tommy Carr was down here.
[18] So I called up George and he said, well,
[19] he says, you know, I don't want to get
[20] involved in the middle of this. He says,
[21] I was told by Mike to call the police and
[22] report that there was $30,000 of tools
[23] missing. And the police are on their way
[24] down.

Page 304

[1] And then Sharon Culkin
[2] called me from the office and said,
[3] Tommy, you better get down here. Mike
[4] DiIanni's on the phone saying there was a
[5] theft of trucks stolen and all kinds of
[6] equipment. So before Mike was up to his
[7] bad tricks again and trying to get me
[8] arrested with the FBI, immediately I got
[9] in my car, left the house, driven down to
[10] the office. And as soon as I pulled up
[11] on the property, Mike DiIanni's there and
[12] he tells the officer, Officer, arrest
[13] this man. He's restricted against being
[14] on the property. I said, wow, excuse me,
[15] I am not — I have no restriction on
[16] being on the property. I'm here because
[17] I was told that Mike DiIanni is trying to
[18] accuse me of breaking into a garage.
[19] So Mike tried to have me
[20] arrested. And then George Pavasky came
[21] too, and I said, George, I want you to
[22] speak the truth. I want you to tell me
[23] now what Mike DiIanni said. He says,
[24] Mike DiIanni told me to call the police

Page 305

[1] and say that you heard Tommy Carr was
[2] down here and broke into the garage. And
[3] he told the police officer that.
[4] Q: You heard him tell the
[5] police officer that?
[6] A: Oh, yeah, we all did.
[7] Q: Okay.
[8] A: And then the police officer
[9] was going to arrest Mike DiIanni and
[10] George for making a false statement. And
[11] then, as good hearted as I am, I got in
[12] the middle of it and I said, please,
[13] Officer, I volunteer my time with the
[14] local community. I'm a board of director
[15] on the school — on the board of
[16] education. I'm a commissioner for the
[17] town sports. And I donate a thousand
[18] dollars a year to the police fund for
[19] Freehold Township. Please just let it
[20] go. It's a civil thing going on here.
[21] Just everything's going to be okay. I'll
[22] leave. Don't arrest these guys. So they
[23] left. And then after they left, Mike
[24] DiIanni and I had some words, and I left.

Page 306

[1] Q: Okay. Were you there with
[2] other people? Was Neebling there?
[3] A: I don't know if Jimmy
[4] Neebling was there or not. I don't
[5] remember. I was too heated up worrying
[6] about myself getting arrested.
[7] Q: You don't remember whether
[8] any other people were there with you or
[9] not?\
[10] A: One of my — one of my
[11] friends was there, Brian Finley.
[12] Q: Okay.
[13] A: Okay.
[14] Q: He's the guy who repossessed
[15] the tractors that day?
[16] A: No. Brian Finley is —
[17] Brian Finley's a friend of mine for years
[18] who had four tractors or five tractors a
[19] couple years in my company as an
[20] investment. And then Brian decided he
[21] wouldn't want to continue to operate
[22] them, but he would rent them on a month
[23] to month to Logistec as long as they were
[24] paying the bill.

Page 307

[1] Q: Right. Well, I didn't mean
[2] to misinterpret.
[3] A: So it was just —
[4] Q: When I say repossess, he
[5] took — he took possession again of his
[6] tractors?
[7] A: So anyhow it was a
[8] coincidence that Associates, the bank,
[9] made a phone call to his house saying
[10] that the trucks are delinquent and went
[11] down the office to talk to Dawn about
[12] payment. And I was there and Brian
[13] pulled up. And I explained to Brian, I
[14] said, Brian, I said, they're closing
[15] down. So he said, Well, I want my trucks
[16] if they're not going to pay. And I says,
[17] Well, you better go in and talk to Alan
[18] McGrath.
[19] And he went in and he spoke
[20] with Dawn Kelly, and Dawn said we have no
[21] money to make any payments. And then
[22] Brian, I believe, went to Alan and said,
[23] Alan, I'm taking my trucks back if you
[24] can't pay for them.

Page 308

[1] Q: How did he take — did he
[2] have keys? I mean, how do you take back
[3] tractors?
[4] A: I believe Alan gave him the
[5] keys. And I'm sure if he owns four
[6] vehicles he would have duplicate keys.
[7] Q: I'm just asking. I don't
[8] know about these things.
[9] A: Well, come on, it's common
[10] sense.
[11] Q: So it's just a coincidence
[12] that on the same day you're there
[13] Mr. Schwartz repossesses trailers and
[14] Brian Finley takes back his tractors?
[15] A: No, it's not a coincidence
[16] that Mr. Schwartz was repossessing. That
[17] was planned. Alan and Paul worked that
[18] out, Paul Schwartz. They had a mutual
[19] agreement that Paul was coming in to take
[20] the equipment.
[21]     It was a coincidence that I
[22] showed up and Brian Finley showed up, but
[23] it wasn't a coincidence that George
[24] Pavasky called me and told me that Mike

Page 309

[1] DiIanni wants him to call the Freehold
[2] Police Department to press charges
[3] against me for stealing things when
[4] indeed nothing was missing. George told
[5] the truth. Thank God. He's a good man.
[6] Q: So the reason — the
[7] original reason you were there that day
[8] is because this George fellow called you?
[9] A: George and Sharon Gulkin
[10] called me.
[11] Q: Okay. Did you and
[12] Mr. Finley or you and anyone else attempt
[13] to block Alan McGrath from leaving with
[14] Mr. DiIanni that day?
[15] A: Well, that day, let's see.
[16] Let me recall.
[17] Q: It's a pretty simple
[18] question. You can explain later. Can I
[19] get a yes or no at the beginning?
[20] A: No.
[21] Q: No, you did not make some
[22] attempt with your car to block Alan
[23] McGrath from leaving?
[24] A: No.

Page 310

[1] Q: Okay. Why didn't
[2] Mr. Schwartz finance your purchase of the
[3] business?
[4] A: I'm sorry? Why didn't he?
[5] Q: Yeah.
[6] A: Well, I was willing to put
[7] my house up, and Jimmy Neebling was going
[8] to try to get his wife to put up his
[9] house as collateral. And because him and
[10] his wife are going through hard times and
[11] are talking about separating, she didn't
[12] do that. So whether he was pulling my
[13] leg or not, he said, I'm sorry, I can't
[14] get the house up.
[15]     And Paul, with the little
[16] bit of collateral he had from my home,
[17] wasn't willing to take that much of a
[18] risk by putting $2 million up.
[19] Q: After taxes how much did you
[20] walk away with when you sold your 49
[21] percent interest in your companies?
[22] A: Okay. I'm going to have to
[23] figure this out.
[24] Q: Just ballpark.

Page 311

[1] A: Let me just think real
[2] quick. I walked away —
[3] Q: How about before taxes? I
[4] can figure out the taxes.
[5] A: Well, three point — 3.7,
[6] 3.8, another 300,000, so now I'm down to
[7] 3.5. Another 1.5 in taxes. I'm down to
[8] two. Walked away — then I had a lot of
[9] personal debt. Walked away with about $2
[10] million. And then after paying my other
[11] liabilities and debts and mortgages on my
[12] homes, I — pretty much I finished up
[13] with about $600,000.
[14] Q: I covered this very quickly
[15] hours ago, but I want to make sure we're
[16] on the same wavelength. Since you were
[17] at the hearing that was supposed to take
[18] place on April 9th — and there was no
[19] hearing because the lawyers worked out a
[20] deal with Judge Fisher in chambers — I
[21] want to make sure that I know that that
[22] day you became aware that the deal was
[23] you continue to get paid, you get your
[24] benefits so long as you don't do anything

IMP04480

Page 312

[1] on behalf of Logisteq in terms of
[2] contacting customers and so on and so
[3] forth?
[4]    A: I'm going to back up because
[5] in my last statement I said I was aware,
[6] but I definitely was not aware that day,
[7] because right after we made the decision,
[8] I had to run, so I left and I didn't talk
[9] to Art Peslak until the next day when Art
[10] explained to me what the conditions were.
[11] So it was actually the day after when I
[12] knew what the conditions were.
[13]    Q: Now —
[14]    A: And to my understanding, I
[15] believed I was to stay away from the
[16] office and my customers, but if my
[17] customers called me, to let Alan know
[18] what the situation was and to notify Alan
[19] McGrath.
[20]    Q: Well, let me ask you this,
[21] Mr. Carr.
[22]    A: Sure.
[23]    Q: I wrote to Mr. Peslak on
[24] April 9th and spelled out in pretty

Page 313

[1] specific terms what the deal was. Did
[2] Mr. Peslak share that letter with you so
[3] you could see it for yourself?
[4]    A: No, I didn't see the letter.
[5]    Q: All right. I understand
[6] that Mr. McGrath wrote a letter to you
[7] that spelled out in very specific terms
[8] what you could or could not do. Do you
[9] remember getting a letter from Alan
[10] McGrath along those lines?
[11]    A: Yes, I do.
[12]    Q: Let me just mark — well,
[13] they're already marked. Let me just put
[14] them on the record.
[15]    First is Carr-14, which is
[16] the letter I sent to Mr. Peslak. And if
[17] you look at Paragraph 2, did you ever see
[18] this letter?
[19]    A: No, I did not.
[20]    Q: Okay. And then let me show
[21] you what we've marked as Carr-15.
[22]    Now, this is not a signed
[23] letter, but looking at Carr-15 —
[24]    MR. PESLAK: Do you have a

Page 314

[1] copy of that, Phil?
[2]    MR. KIRCHER: Oh, yeah, I'm
[3] sorry.
[4]            BY MR. KIRCHER:
[5]    Q: Looking at Carr-15, is this
[6] the letter that you got from Alan McGrath
[7] telling you what you could or could not
[8] do?
[9]    A: No, this is not the letter I
[10] received.
[11]    Q: Okay. We'll get to that.
[12]    A: Okay.
[13]    Q: You did get a letter from
[14] Alan McGrath?
[15]    A: Was it a certified letter?
[16]    Q: I don't think so.
[17]    THE WITNESS: Did you send
[18] it certified?
[19]    MR. McGRATH: Courier.
[20]    THE WITNESS: Courier.
[21] Let me just read it real
[22] quick.
[23]    No, I don't remember ever
[24] seeing this letter.

Page 315

[1]            BY MR. KIRCHER:
[2]    Q: Well, do you remember
[3] getting a letter from Alan McGrath —
[4]    A: Yes, I did.
[5]    Q: — by courier that purported
[6] to explain what you could or could not do
[7] as a result of this deal that was struck
[8] on April 9th?
[9]    A: Yes, I do.
[10]    Q: Okay. And you read that?
[11]    A: I did.
[12]    Q: Now, we know that from the
[13] April 22nd memo from Mr. Neebling to you,
[14] you had discussions and a written offer
[15] regarding the negotiations of a sale of
[16] Logisteq, correct?
[17]    A: Correct.
[18]    Q: All right. We know that you
[19] had at least four telephone calls after
[20] April 9th —
[21]    A: Okay.
[22]    Q: — with someone at
[23] Honeywell?
[24]    A: Oh, which Alan McGrath knew

Page 316

[1] about.

[2]    Q: Well, can you just answer my

[3] question yes or no?

[4]    A: Yes.

[5]    Q: Okay. Our records show that

[6] you had calls to Honeywell on the 10th of

[7] April, the 11th, the 22nd and the 30th.

[8] Does that sound right?

[9]    A: I don't know. I'd have to

[10] look at the records.

[11]    Q: All right. If that's in the

[12] records, you wouldn't dispute that?

[13]    A: No, I wouldn't.

[14]    Q: We know from the telephone

[15] records that you had a number of phone

[16] calls to Mr. Massucci at RMP after April

[17] 9th?

[18]    A: Yes, I have.

[19]    Q: We know that you talked to

[20] Mr. Schafferman, the Sayreville

[21] landlord's lawyer, after April 9th,

[22] correct?

[23]    A: Yes.

[24]    Q: Did you call Vera at Coffee

Page 317

[1] America after April 9th?

[2]    A: After April 9th, I don't

[3] remember.

[4]    Q: Did you call Marjorie

[5] Sapata — Sapeta at Nestle after April

[6] 9th?

[7]    A: Yes, I did.

[8]    Q: Did you call David Martinez

[9] at Atlantic after April 9th?

[10]    A: Yes.

[11]    Q: Let me go back to Marjorie

[12] Sapeta (ph)?

[13]    A: Sure.

[14]    Q: Was that call after April

[15] 9th but before May 1st?

[16]    A: I called anybody who called

[17] me to question what was going on with

[18] Logisteq, so I'd have to check the dates

[19] with my phone records.

[20]    Q: All right. So the answer

[21] is, you don't know?

[22]    A: The answer is, I'll check my

[23] records and give you a yes or no.

[24]    Q: Yes, but I want an answer to

Page 318

[1] my question. The question is, did you

[2] call Marjorie Sapeta between April 9th

[3] and May 1?

[4]    A: I don't know.

[5]    Q: Thank you. Same question

[6] with respect to David Martinez at

[7] Atlantic, you don't know?

[8]    A: Well, the problem with David

[9] Martinez is, he rents from me.

[10]    Q: Rents what?

[11]    A: He own — he rents my home.

[12] And his children are on my baseball team

[13] and I coach, so we have a friendship,

[14] so —

[15]    Q: Did you talk to David

[16] Martinez about business?

[17]    A: No.

[18]    Q: No.

[19]    A: Friendship and rental and

[20] we're in the middle of holding a mortgage

[21] on his home, so we spoke quite

[22] frequently. And I have all the

[23] documents. As a matter of fact, we just

[24] closed on my house a few weeks ago, which

Page 319

[1] Art Peslak was the attorney.

[2]    Q: By the way, I asked you

[3] before about offering Alan McGrath a job

[4] at Iron Mountain. Did you mention to him

[5] a salary of $125,000 a year?

[6]    A: 125,000?

[7]    Q: Yeah.

[8]    A: Yeah, I asked him, I said,

[9] that's what you're making now.

[10]    Q: Right.

[11]    A: Right.

[12]    Q: So part of the discussion

[13] that you recently had with Alan McGrath

[14] was employment at Iron Mountain for

[15] $125,000 a year?

[16]    A: At Iron Mountain?

[17]    Q: Yes.

[18]    A: No, absolutely not.

[19]    Q: Well —

[20]    A: Iron Mountain? How could I

[21] get a — I don't work for Iron Mountain.

[22] How could I get him a job at Iron

[23] Mountain? Come on, guys. Geez, this is

[24] nonsense, unfound.

Page 320

[1]    Q: But you did have a
[2] discussion with him about employment
[3] generally at $125,000 a year?
[4]    A: No. I told Alan McGrath I
[5] felt very bad for him because he has a
[6] family and he has no job, and I would
[7] help him find a job with all the contacts
[8] I have. That's what I told Alan McGrath.
[9]    Q: Did you offer Sharon Culkin
[10] a job?
[11]    A: Did I? I told Sharon Culkin
[12] I would help her find a job. I told
[13] Tammy Phillips I'd help her get a job.
[14]    Q: Did you do that after
[15] April 9th?
[16]    A: I did that after Peter
[17] closed the company.
[18]    Q: Well, is that a yes, you did
[19] it after April 9th?
[20]    A: Hold on one second. I did
[21] that after Peter closed the company. I
[22] don't know what date that is. I can
[23] check on one of my tapes. If you can
[24] give me 10 minutes, I'll run down to my

Page 321

[1] car.
[2]    Q: And what date do you
[3] associate or what event do you associate
[4] with Peter, quote, closing the company,
[5] end quote?
[6]    A: Well, I got a tape from Ann
[7] Sherello on May 14th, and I called there
[8] looking for JR and Alan, and she said
[9] they're no longer employed here, that
[10] Logisteq went out of business and now we
[11] own the operation and we're taking it
[12] over and we have 60 days to move our
[13] coffee. So that was May 14th.
[14]    Then I called up Alan and
[15] taped Alan on a conversation saying,
[16] Alan, what is going on? All my customers
[17] are calling me telling me that Peter
[18] closed the company. And Alan said, Well,
[19] Tom, I'm really sorry, but there's
[20] nothing I can do. Peter closed the
[21] company. I have no control of it. So
[22] that was May 14th.
[23]    And I believe on Friday,
[24] that Friday prior to May 14th, I had

Page 322

[1] probably 10 or 15 calls from many of my
[2] customers telling me that Logisteq
[3] employees called and said as of today we
[4] are closed (sic) down operations. We
[5] cannot take any more pickups or
[6] deliveries.
[7]    But I would have to check
[8] with the tapes I have at my house just to
[9] make sure my memory corrects me.
[10]    Q: Right. And you're going to
[11] produce those tapes to your lawyer,
[12] because we've asked for them?
[13]    A: Well, what tape? Do you
[14] want the tape where Peter —
[15]    Q: I want every tape —
[16]    A: — Pierce and Mike DiIanni
[17] went to unionize Iron Mountain, or do you
[18] want the tape where Mike DiIanni —
[19]    Q: Yes.
[20]    A: — was bribing —
[21]    Q: Yes.
[22]    A: — Jeff Stern for 300,000 —
[23]    Q: Yes.
[24]    A: — or do you want the tape

Page 323

[1] that Mike —
[2]    MR. PESLAK: I think he's
[3] asking for all the tapes.
[4]    THE WITNESS: Oh, all of the
[5] tapes.
[6]    BY MR. KIRCHER:
[7]    Q: I want all the tapes.
[8]    A: All the tapes. There's
[9] about 20 of them. I don't know. I got
[10] to count them. Hours and hours of tapes.
[11]    Q: Twenty or 30, we'd like all
[12] of them. You're going to produce them
[13] for your lawyer?
[14]    A: It's going to be a long time
[15] to listen to them.
[16]    Q: Can I get an answer to my
[17] question, Mr. Carr?
[18]    A: Yes, sir.
[19]    Q: All right.
[20]    A: Do you have the tape, by the
[21] way, of when Mike DiIanni and Peter
[22] Pierce — where Peter tells me that it
[23] was $300,000 that he put into the company
[24] for Sequedex employees? I don't — did I

**Page 324**

[1] give you that, Phil?

[2]    Q: We only received one tape,

[3] and that was the tape from February 28th

[4] from 9:50 to 10:40 with a somewhat

[5] bizarre conversation with Jeff Stern.

[6] That's all we have.

[7]    A: You don't have the one where

[8] Mike DiIanni — where Peter Pierce admits

[9] putting money —

[10]    Q: From my process of

[11] deduction, no.

[12]    THE WITNESS: I thought you

[13] said you sent them that one.

[14]                BY MR. KIRCHER:

[15]    Q: At least I don't think we

[16] did.

[17]    MR. BARNOSKI: We have two

[18] tapes, but the second one is —

[19]    MR. HUNTLEY: A dupe of the

[20] first.

[21]    THE WITNESS: See, they

[22] didn't get the second tape.

[23] Because I have a tape where Peter

[24] blatantly admits —

**Page 325**

[1]    MR. PESLAK: Okay. Tom,

[2] just stop it. Let him ask his

[3] questions, okay?

[4]    THE WITNESS: The truth

[5] always prevails. Remember that

[6] as David in the Gospel. Alan

[7] should know all about that. The

[8] truth will come out.

[9]    MR. PESLAK: Stop it.

[10]                BY MR. KIRCHER:

[11]    Q: You made some mention of

[12] Sequedex's trucks being parked in the —

[13] at the Iron Mountain facility in

[14] Freehold.

[15]    A: How foolish was that?

[16]    Q: Let me see if I can get

[17] yeses and nos. Do you remember

[18] mentioning that earlier today?

[19]    A: Yes, I did.

[20]    Q: Thanks.

[21]    A: You're welcome.

[22]    Q: And did you ever become

[23] aware of an arrangement between Sequedex

[24] and Logisteq whereby Sequedex would pay

**Page 326**

[1] Logisteq $200 a month for Logisteq to put

[2] on two of their trucks Sequedex insignia?

[3]    A: Yes. As a matter of fact, I

[4] blatantly remember there was a bogus

[5] agreement between Mike DiIanni and Jeff

[6] Stern — not Jeff Stern. God, I got Jeff

[7] Stern on my — Mike DiIanni and Mike Gold

[8] that they'll make up a bogus agreement to

[9] say that they're renting the trailers and

[10] paying us an advertisement fee, when —

[11] and the reality is that we were basically

[12] just giving them trailers to haul their

[13] own freight and helping them build

[14] Sequedex's company.

[15]    Q: So it's your position that

[16] the trailers were given by Logisteq to

[17] Sequedex in every sense of that word

[18] given, just here, they're yours, you

[19] don't owe us anything?

[20]    A: No, there was an agreement,

[21] an agreement where they make us — there

[22] was an agreement so Sequedex would pay us

[23] $200 a month for these trailers.

[24]    So when Iron Mountain came

**Page 327**

[1] back to us and said how dare you to park

[2] Sequedex trailers on our property, that

[3] we were just renting them to Sequedex and

[4] advertising for them.

[5]    Q: Well, let me — I want a —

[6]    A: Yes, I am aware of the

[7] agreement. Yes. Yes.

[8]    Q: Okay. You say it's a bogus

[9] agreement. Are you aware that that bogus

[10] agreement was signed by Alan McGrath?

[11]    A: Yes.

[12]    Q: Okay. And in your judgment

[13] it's still a bogus agreement?

[14]    A: Well, it's a bogus agreement

[15] because it was obviously — why am I

[16] doing this to myself?

[17]    Q: Why is it bogus? What's

[18] bogus about it?

[19]    A: Let's say this. It was

[20] bogus because it was untrue.

[21]    Q: What was untrue?

[22]    A: Okay. It was untrue that we

[23] were advertising — I'm sorry, you know

[24] what, let me back up. I made a mistake.

Page 328

[1] It wasn't a bogus agreement.

[2]    Sequedex and Logisteq agreed

[3] to put a Sequedex decal on a Logisteq

[4] trailer.

[5]    Q: Okay.

[6]    A: And allow Sequedex to use

[7] these trailers for their transportation.

[8]    Q: Well, that's what I want to

[9] separate out, Mr. Carr.

[10]    A: This is true.

[11]    Q: I want to separate two

[12] things. One is, trailers that are leased

[13] or owned by Logisteq. Are you with me so

[14] far?

[15]    A: I'm with you.

[16]    Q: And that are used by

[17] Logisteq in its business but happen to

[18] have a Sequedex decal on their body for

[19] which Sequedex pays $100 a month on two

[20] trailers —

[21]    A: And who did that, the Holy

[22] Ghost?

[23]    Q: Let me just stop right

[24] there. Okay. Do you understand what I

Page 329

[1] just said?

[2]    A: Yes, I do.

[3]    Q: Okay. Are you aware of that

[4] arrangement?

[5]    A: Yes, I am.

[6]    Q: Okay. The second part of

[7] that is, is the using, Sequedex using

[8] these trailers. Are you aware that from

[9] time to time Sequedex hired, retained,

[10] whatever word you want to use, Logisteq

[11] to haul for Sequedex at arm's length

[12] market rates? Are you aware of that?

[13]    A: Yes, I am.

[14]    Q: Okay. Nothing wrong with

[15] that, is there? It's business.

[16]    A: If you say so.

[17]    Q: I'm not saying so, I'm

[18] asking you. If Sequedex was willing to

[19] pay Logisteq's rates —

[20]    A: It's only right to help

[21] Peter Pierce's company, Sequedex. Yes,

[22] there's nothing wrong with that.

[23]    MR. KIRCHER: We'll move to

[24] strike that.

Page 330

[1]    BY MR. KIRCHER:

[2]    Q: Let me get the question out.

[3] There's nothing wrong with Logisteq

[4] accepting business from Sequedex at arm's

[5] length market rates?

[6]    A: Absolutely not.

[7]    Q: Okay.

[8]    A: We're in business to make

[9] money.

[10]    Q: And the color of that money

[11] is still green, right?

[12]    A: Right.

[13]    Q: And assuming that the market

[14] rate for putting a decal on the side of a

[15] trailer is $100 a month, nothing wrong

[16] with Logisteq accepting that business

[17] either, right?

[18]    A: Absolutely, not.

[19]    Q: Okay. Is part of the

[20] information that you passed along —

[21] strike that. We've been over that.

[22]    A: Yeah, we don't want that

[23] one.

[24]    Q: Let's mark — this one has

Page 331

[1] been marked as Carr No. 18. And for the

[2] record, Mr. Carr, this appears to be a

[3] March 28, 2001 memo from Doug Huntley to

[4] you; is that correct?

[5]    A: Yes, it is.

[6]    Q: Okay. Do you recall this

[7] particular document?

[8]    A: Yes, I do.

[9]    Q: All right. And March 28,

[10] 2001 was about two or three months into

[11] the new arrangement where Logisteq was

[12] owned 51 percent by Pioneer and 49

[13] percent by you, correct?

[14]    A: Yes, correct.

[15]    Q: All right. In the first

[16] paragraph Mr. Huntley announces to you

[17] that he is attaching a promissory note

[18] that Logisteq owes you for the $90,000

[19] you put into the company to date. Do

[20] you see that?

[21]    A: Yes.

[22]    Q: And a similar note on the

[23] 250 from the Leo Trust. The Leo Trust is

[24] a trust associated with Peter Pierce?

**Page 332**

[1] A: So I can collect that money?

[2] Q: Well, can you answer my

[3] question? You recognize that the Leo

[4] Trust is a trust that is in some way

[5] related or affiliated to —

[6] A: Indirectly it's related to

[7] Peter Pierce's son, I believe.

[8] Q: Well, his father and his

[9] brother are named Leo. I don't know

[10] which one it is.

[11] A: I'm not sure.

[12] Q: But my only question is —

[13] I'm not trying to belabor this — is —

[14] A: No, that's fine, I'm

[15] listening.

[16] Q: Okay. Now, did you write

[17] back, at least on the first paragraph

[18] about the 90,000 for the promissory note

[19] to you, you didn't disagree with that,

[20] did you?

[21] A: No.

[22] Q: Okay. If you go down to —

[23] well, strike that. One of the things

[24] that Logisteq had to do in the beginning

**Page 333**

[1] was to arrange for some long-term bank

[2] refinancing like any other company needs

[3] to have, correct?

[4] A: Yes.

[5] Q: And the idea was to have

[6] some kind of long-term financing through

[7] Commerce Bank, right?

[8] A: No. Actually, in the

[9] beginning Peter told me that he was going

[10] to back the company and I would never

[11] have to sign personally on any notes or

[12] collateralize anything with the company.

[13] And that's one of the benefits of selling

[14] 51 percent of my company, is that I would

[15] be off the personal guarantees.

[16] Q: Right. And where in the

[17] asset purchase agreement does that

[18] appear?

[19] A: You got me again. It wasn't

[20] in the agreement.

[21] Q: So that promise never made

[22] it through, did it?

[23] A: Nope. I learned a lesson,

[24] make sure — you can't listen to

**Page 334**

[1] somebody's word.

[2] Q: Let me go back — right.

[3] Let me go back to my question. And that

[4] is that as of March of 2001, one of the

[5] things Logisteq was doing while you were

[6] its president —

[7] A: Yes.

[8] Q: — was trying to arrange for

[9] long-term financing with Commerce Bank?

[10] A: Yes, this is true.

[11] Q: And that's who that Roger

[12] Bomgardner, the name in the second

[13] paragraph, he was from Commerce Bank,

[14] right?

[15] A: Roger Bomgardner, correct.

[16] Q: Now, Doug Huntley reports to

[17] you in the third paragraph, one of the

[18] points they, meaning Commerce Bank, were

[19] firm on was that there be $1 million of

[20] equity. And then there's a little

[21] handwritten note, subordinated note, into

[22] the company from the principals. They

[23] are okay with 750,000 (Peter entities),

[24] and 250,000 from you, as this is

**Page 335**

[1] something we need to represent to them,

[2] you should be prepared to wire in another

[3] 160,000 before the closing of the bank

[4] line (250,000 minus 90,000).

[5] Did I read that correctly?

[6] A: Yes, sir.

[7] Q: Okay. So to sort of sum up

[8] here, Doug was reporting to you that what

[9] the bank is looking for is some more

[10] capital from the owners. And with

[11] respect to you, it would be an additional

[12] 160. That's what he was reporting to

[13] you?

[14] A: Sure.

[15] Q: And you put that in, didn't

[16] you?

[17] A: Yes, I did.

[18] Q: And the Peter side of it,

[19] the Pioneer side, they put in the 750?

[20] A: Correct.

[21] Q: Okay. Now, eventually you

[22] did sign personal guarantees with respect

[23] to Logisteq's business, didn't you?

[24] A: Yes, I did.

Page 336

[1] Q: All right. You had the
[2] right to refuse to do that, didn't you?
[3] A: Yes, I did.
[4] Q: No one dragged your arm
[5] across those pieces of paper, did they?
[6] A: No. Again, I listened to
[7] the verbal promises.
[8] Q: Well, if the promise was
[9] you'd never have to sign a personal
[10] guarantee, you signed it anyway, and you
[11] had —
[12] A: I was a very foolish person.
[13] Q: Well, whether you were
[14] foolish or not is not my question. My
[15] question is —
[16] A: I believed in Peter Pierce.
[17] Q: The question is, you did
[18] that and you knew what you were doing at
[19] the time, right?
[20] A: Yes, I did.
[21] Q: All right.
[22] A: Big mistake.
[23] Q: Let me show you what's been
[24] previously marked as Exhibit 19.

Page 337

[1] A: Thank you. And for the —
[2] MR. KIRCHER: I don't have
[3] another copy of this, Art.
[4] MR. PESLAK: What letter is
[5] it?
[6] MR. KIRCHER: It's April 26,
[7] 2001.
[8] MR. PESLAK: To whom?
[9] MR. KIRCHER: It's from you
[10] to John Velasquez, New York Board
[11] of Trade. It's probably this
[12] coffee thing.
[13]        BY MR. KIRCHER:
[14] Q: For the record, this is an
[15] April 26, 2001 letter from Mr. Peslak to
[16] Mr. Velasquez of the New York Board of
[17] Trade. It says CSCE. Is that some kind
[18] of coffee exchange?
[19] A: Yes. That's the —
[20] Q: Coffee and cocoa?
[21] A: Coffee and cocoa exchange.
[22] Q: Okay.
[23] A: And sugar.
[24] Q: And I assume that you knew

Page 338

[1] Mr. Velasquez?
[2] A: Yes, I did.
[3] Q: All right. Did you provide
[4] the information in this letter from
[5] Mr. Peslak to send on to Mr. Velasquez?
[6] A: No.
[7] THE WITNESS: Art, can I see
[8] that for one second? Let me just
[9] read it real quick.
[10] No, I believe that was Alan
[11] McGrath and Tammy Phillips. We
[12] needed to have our commercial
[13] exchange license, and it was in
[14] Transportation Concepts at the
[15] time.
[16]        BY MR. KIRCHER:
[17] Q: Right.
[18] A: And we needed to turn it
[19] into Logistics since that was the new
[20] name of the company.
[21] Q: All right. Well, here's
[22] what I'm after, Mr. Carr.
[23] A: Sure.
[24] Q: The letter says we represent

Page 339

[1] Logisteq Transportation Warehousing
[2] Corporation (Logisteq).
[3] A: Okay.
[4] Q: I'm not aware of any such
[5] company, are you?
[6] A: No, I'm not. It's just — I
[7] think it's — no, that's a misprint.
[8] That's all it is.
[9] Q: That's a misprint?
[10] A: Yes, just a misprint.
[11] Q: Then it says: Effective
[12] March 1, 2001 Transportation Concepts has
[13] joined Logisteq. The following is the
[14] new division, Transportation Concept of
[15] New Jersey.
[16] A: What are you trying to get
[17] at? Tell me what you're trying to get
[18] at. I don't understand your motive here.
[19] Q: See, that's the joy of being
[20] a lawyer. I don't have to tell you what
[21] I'm trying to get at.
[22] A: Okay. Well, I'll tell you
[23] what this is.
[24] Q: Let me ask the question,

**Page 340**

[1] because I'm not sure if a question is
[2] pending.
[3]    A: Okay.
[4]    Q: My question is, was there
[5] ever any division created or formed
[6] within Logisteq called Transportation
[7] Concept of New Jersey?
[8]    A: Oh, absolutely not, no.
[9]    Q: Okay.
[10]    A: That's very petty. All this
[11] is is, I could tell you, is that — and
[12] Alan McGrath can verify this — is that
[13] Art not knowing Logisteq, okay, LLC,
[14] we're a transportation warehousing
[15] company. So he sent the letter to just
[16] let them know that Logisteq is now the
[17] new name. So that's — you can —
[18] that's — you can check that out very
[19] simple. That's not even a concern.
[20] Without notifying them about the new
[21] name, we would have never been able to
[22] store coffee.
[23]    Q: Mr. Carr, in this case each
[24] side, your side and our side, has asked

**Page 341**

[1] the other side to produce documents.
[2] It's normal in civil litigation. You ask
[3] the other side to give me X, Y and Z
[4] documents.
[5]    A: I know all about it. We
[6] just asked RMP for the document between
[7] Peter and him giving the business away.
[8] I understand that.
[9]    Q: There you go. Okay. Well,
[10] that's a subpoena. This is between the
[11] parties, but it really doesn't make any
[12] difference.
[13]    We asked, in a formal way,
[14] in a written way —
[15]    A: Yes.
[16]    Q: — for a bunch of documents
[17] from you. And one of the things we asked
[18] you for were documents evidencing
[19] communications or meetings between
[20] Mr. Carr and Mr. Pierce, or between
[21] Mr. Carr and Mr. DiIanni, during which
[22] Sequedex was discussed. Okay. The
[23] response that your lawyer gave was that
[24] we have produced or will produce those

**Page 342**

[1] documents.
[2]    Now, we went through every
[3] single page of what has been produced to
[4] us and there are no such documents. And
[5] my question to you is, are you aware,
[6] sitting here today, of any documents
[7] evidencing communications or meetings
[8] between Mr. Carr and Mr. Pierce and
[9] between Mr. Carr and Mr. DiIanni during
[10] which Sequedex was discussed?
[11]    A: Yes, I am.
[12]    Q: Well, where are those? We
[13] don't have them.
[14]    A: I gave them to Art.
[15]    MR. PESLAK: I think it was
[16] the magical duplicate tape —
[17]    THE WITNESS: Yes.
[18]    MR. PESLAK: — that was
[19] supposed to be at this other
[20] meeting that —
[21]    MR. KIRCHER: Well, that's
[22] not a document. That's a tape.
[23]         BY MR. KIRCHER:
[24]    Q: I'm talking about documents,

**Page 343**

[1] pieces of paper. Do you have any of
[2] those?
[3]    A: No, I can't help.
[4]    Q: All right. So the only
[5] thing you have is a tape that we don't
[6] have yet?
[7]    A: I'll send you all my tapes.
[8]    Q: Okay. Now, one thing that
[9] has surfaced, and I'm confused about
[10] this, there's been some mention about
[11] transcriptions. I'll ask the witness
[12] this.
[13]    MR. KIRCHER: If you can
[14] answer it, Mr. Peslak, that's
[15] fine.
[16]         BY MR. KIRCHER:
[17]    Q: Are those tapes being
[18] transcribed? In other words, is someone
[19] listening to them the way this young lady
[20] is listening to us and transcribing them?
[21]    MR. PESLAK: I haven't had
[22] them transcribed.
[23]    MR. KIRCHER: Okay.
[24]    MR. PESLAK: Well, I think

Page 344

[1] the confusion with that other tape
[2] was, the copies came in when I was
[3] away.
[4]     MR. KIRCHER: Okay.
[5]     MR. PESLAK: And my
[6] secretary just sent them on to
[7] you, and I haven't — I've got the
[8] copy of the other tape in my
[9] office —
[10]     MR. KIRCHER: Okay.
[11]     MR. PESLAK: — which we can
[12] have properly copied —
[13]     MR. KIRCHER: All right.
[14] I'm —
[15]     MR. PESLAK: — and
[16] furnished to you.
[17]     MR. KIRCHER: For
[18] purposes —
[19]     MR. PESLAK: But we haven't
[20] transcribed it.
[21]                    BY MR. KIRCHER:
[22]     Q: For purpose of the next
[23] couple of questions, I'm talking about
[24] paper documents —

Page 345

[1]     A: Sure.
[2]     Q: — as opposed to audio
[3] tapes, cassettes, whatever.
[4]     A: Okay.
[5]     Q: We asked for documentation
[6] regarding communications or meetings
[7] between Mr. Carr and Mr. DiIanni and
[8] between Mr. Pierce, Mr. DiIanni, Mr. Carr
[9] and Mr. Carr's late father's friend at
[10] Local 560 regarding certain alleged
[11] Teamster activity.
[12]     We asked for any documents
[13] you might have about that. You said that
[14] you would provide them or have provided
[15] them, but we haven't seen any. Are there
[16] any of those documents?
[17]     A: No, only tapes.
[18]     Q: Only tapes.
[19]     A: Except for the fact — as a
[20] matter of fact, when Peter and Mike
[21] DiIanni met with the Local 560, they did
[22] give them a whole package with all the
[23] locations, all the employees, what the
[24] employees are making, the salaries, their

Page 346

[1] positions.
[2]     Q: I'm going to interrupt you
[3] and move to strike.
[4]     A: No.
[5]     Q: That's not responsive to my
[6] question.
[7]     A: But I'm saying I could
[8] ask — I could try to get those documents
[9] from 560.
[10]     Q: All I'm interested in is
[11] what you have now, and I think your
[12] answer is you don't have anything?
[13]     A: Not now I don't.
[14]     Q: All right.
[15]     A: But I can get them.
[16]     Q: Next, I think we've been
[17] through this. You don't have any
[18] documents that would evidence the fact
[19] that you have an employment agreement?
[20] We've been over that. You don't have any
[21] written employment agreement?
[22]     A: Again, just the trust of
[23] Peter's word.
[24]     Q: Right.

Page 347

[1]     A: He's such a good man.
[2]     Q: Right. Did you ask
[3] Mr. Peslak to put that promise in the
[4] asset purchase agreement?
[5]     A: No. I'm a very trusting
[6] person.
[7]     Q: This is sort of related to
[8] what I just asked, but do you have any
[9] documents, not tapes, but documents
[10] involving your alleged intervention with
[11] the Teamsters on behalf of Mr. Pierce?
[12]     A: We will subpoena Local 560
[13] and get all the documents that you need.
[14]     Q: I'm sure you will. I'll be
[15] interested in that. That's kind of fun.
[16]     A: Okay.
[17]     Q: But my question is right
[18] here, right now, do you or TC Concepts
[19] have any such documents?
[20]     A: I don't have them with me
[21] here, but I can get them for you very
[22] quickly.
[23]     Q: What's the name of the —
[24] your late father's friend at Local 560

**Page 348**

[1] that you've mentioned?

[2] A: My father has many, many

[3] friends.

[4] Q: Well, the one that's

[5] mentioned in the Iron Mountain complaint

[6] and I think even your complaint, who's

[7] that fellow? What's his name?

[8] A: Kevin Fagan.

[9] Q: How do you spell Fagan?

[10] A: F-A-G-A-N.

[11] Q: Where is he as we sit here

[12] today?

[13] A: I believe he's at Local 641.

[14] Q: Which is where?

[15] A: In Secaucus, New Jersey.

[16] Q: Secaucus, okay.

[17] A: And also Jimmy Hoffa.

[18] Q: And also Jimmy Hoffa?

[19] A: Yes.

[20] Q: The one that's alive or the

[21] one that's no longer with us?

[22] A: Both.

[23] Q: Both. What do they have to

[24] do with this?

**Page 349**

[1] A: My father was very good

[2] friends with Jimmy Hoffa.

[3] Q: Oh, okay. But do they know

[4] anything about Peter Pierce and all that

[5] stuff?

[6] A: Yes, they did.

[7] Q: Okay. Well, we can't talk

[8] to senior. What does junior know?

[9] A: Well, he knows that we tried

[10] to unionize Iron Mountain with the

[11] request of Peter Pierce and Mike Dilanni,

[12] because of Peter Pierce's harsh stepdown

[13] from president of Iron Mountain.

[14] And at the same time — the

[15] same time, they tried to unionize Iron

[16] Mountain, Peter was dumping a lot of the

[17] stock knowing that the stock might be

[18] affected. So they tried to organize

[19] Philadelphia and New Jersey.

[20] Q: They being?

[21] A: The Teamster unions. All

[22] the different locals. I can get a list

[23] of them for you.

[24] Q: Right.

**Page 350**

[1] A: Mike Dilanni probably has

[2] them, too, if you need them.

[3] Q: I mean, the Teamsters don't

[4] need Peter Pierce to identify a good

[5] target for union organization, do they?

[6] A: Oh, absolutely not, but when

[7] Peter Pierce and Mike Dilanni goes and

[8] gives him all the documentation they need

[9] and Pierce tells them to go and do it,

[10] it's a homerun.

[11] Q: And what is — what is the

[12] evidence that you have that Peter Pierce

[13] was involved in that?

[14] A: I taped it.

[15] Q: You taped it. Okay.

[16] A: I have the tape.

[17] Q: So it's on one of your

[18] tapes?

[19] A: Yes, it is.

[20] Q: Which you're going to give

[21] to Mr. Peslak?

[22] A: I was trying to hold back,

[23] but I will give it to you if you'd like

[24] to hear it.

**Page 351**

[1] Q: All right. And these are

[2] tapes of Peter speaking with union

[3] people?

[4] A: I'll give you the tapes.

[5] Q: I know, but I'm fascinated.

[6] Do you actually hear Peter's voice on the

[7] tape?

[8] A: I don't remember.

[9] Q: Or is it just you trying to

[10] convince some union guy to accept your —

[11] A: Oh, I don't need to convince

[12] any union guys.

[13] Q: Well, let me finish the

[14] question. If Peter Pierce's voice isn't

[15] on the tape, is what we're going to hear

[16] what we've heard before, and that is, you

[17] trying to convince somebody —

[18] A: No, we have witnesses that

[19] Peter was there along with Michael

[20] Dilanni.

[21] Q: Who are they? Who are those

[22] witnesses?

[23] A: Oh, I believe there was four

[24] or five different people.

Min-U-Script®

Sullivan & Worcester LLP

IMP04490

Page 352

[1]  Q: What are their names?

[2]  A: Well, James Neebling was

[3] there.

[4]  Q: Oh, okay.

[5]  A: Coincidence.

[6]  Q: Yeah, what a coincidence.

[7] Your friend, James Neebling. Who else?

[8]  A: Tom McGinley, the vice

[9] president of the Teamster unions. He was

[10] there.

[11]  Q: Okay.

[12]  A: Michael DiIanni was there.

[13] Let me see. And, you know what, we had

[14] actually a few different meetings. As a

[15] matter of fact, the Teamster unions, they

[16] actually used our office in Freehold as a

[17] depot when they were unionizing Freehold,

[18] so they actually —

[19]  Q: So when you say our depot,

[20] who is the our?

[21]  A: They used our office,

[22] Logisteq, as a depot when it came down to

[23] picket the lines and to try to unionize

[24] Iron Mountain. So I'll try my best to

Page 353

[1] recollect to get as much information I

[2] need there along with Mike DiIanni. And

[3] there was three or four different locals

[4] that had meetings with Mike DiIanni after

[5] that with Mike DiIanni giving them the

[6] okay that Peter Pierce condoned this to

[7] unionize all of Iron Mountain. So I can

[8] get you all those names of people to

[9] testify and sign affidavits.

[10]  Q: All right.

[11]  A: Okay.

[12]  MR. KIRCHER: Let me make a

[13] suggestion. I was about to go

[14] traipsing through the — I

[15] shouldn't say that. I was to go

[16] through, in a very analytical way,

[17] the verified first amended

[18] complaint, as well as Mr. Carr's

[19] certification, which is going to

[20] take some time.

[21]  MR. PESLAK: Right.

[22]  MR. KIRCHER: It's about

[23] 4:45. We're not going to finish

[24] today.

Page 354

[1]  MR. PESLAK: Right.

[2]  MR. KIRCHER: So I'm willing

[3] to let you go out enjoy the

[4] sunshine and come back another

[5] day.

[6]  THE WITNESS: There's no sun

[7] left.

[8]  MR. KIRCHER: Oh, yes, there

[9] is.

[10]  THE WITNESS: And I'm not

[11] going to enjoy the day because I

[12] did not have a nice day here

[13] today.

[14]  MR. KIRCHER: You think this

[15] is fun for me? I'm just kidding.

[16]  THE WITNESS: If Peter has

[17] any sense he'll sit down and

[18] settle this.

[19]  MR. KIRCHER: So why don't

[20] we adjourn now with the

[21] understanding that we will resume

[22] at some time in future.

[23]  MR. PESLAK: Right.

[24]  MR. KIRCHER: Okay.

Page 355

[1]  MR. PESLAK: We'll have to

[2] talk about scheduling your folks

[3] as well, so —

[4]  MR. KIRCHER: All right.

[5]  THE VIDEOGRAPHER: That

[6] concludes this videotape

[7] deposition for today. The time is

[8] 4:42 p.m. We are off the record.

[9]  (Witness excused.)

[10]  (Deposition adjourned at

[11] approximately 4:42 p.m.)

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

IMP04491

Page 356

[1]                    CERTIFICATE

[2] I, VICTORIA A. BRAMNICK, a

[3] Notary Public and Shorthand Reporter of

[4] the State of New Jersey, do hereby

[5] certify that prior to the commencement of

[6] the examination, THOMAS CARR, was duly

[7] sworn by me to testify to the truth, the

[8] whole truth and nothing but the truth.

[9]         I DO FURTHER CERTIFY that

[10] the foregoing is a true and accurate

[11] transcript of the testimony as taken

[12] stenographically by and before me at the

[13] time, place and on the date hereinbefore

[14] set forth, to the best of my ability.

[15]         I DO FURTHER CERTIFY that I

[16] am neither a relative nor employee nor

[17] attorney nor counsel of any of the

[18] parties to this action, and that I am

[19] neither a relative nor employee of such

[20] attorney or counsel, and that I am not

[21] financially interested in the action.

[22]

[23] Victoria A. Bramnick

[24] Dated: June 3, 2002

Page 358

[1]        ACKNOWLEDGMENT OF DEPONENT

[2]     I, _____, do hereby

[3] certify that I have read the foregoing

[4] pages, _____ and that the same is a

[5] correct transcription of the answers

[6] given by me to the questions therein

[7] propounded, except for the corrections or

[8] changes in form or substance, if any,

[9] noted in the attached Errata Sheet.

[10]

[11] DATE            SIGNATURE

[12]

[13] Subscribed and sworn to before me this

[14] _____ day of _____,

[15] 200_.

[16] My commission expires: _____

[17]

[18]

[19]

[20] Notary Public

[21]

[22]

[23]

[24]

Page 357

[1]

[2]        ERRATA

[3]

[4] PAGE   LINE   CHANGE

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

Page 359

[1]

[2]        LAWYER'S NOTES

[3]

[4] PAGE    LINE

[5]

[6]

[7]

[8]

[9]

[10]

[11]

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

J. Peter Pierce

Vol. 1, May 30, 2007

Page 360

[1]          LAWYER'S NOTES
[2] PAGE  LINE
[3]
[4]
[5]
[6]
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

IMP04493

**Lawyer's Notes**

IMP04494

## $

**$1 million** 334:19
**$100** 328:19; 330:15
**$100,000** 109:12
**$125,000** 237:14; 319:5, 15; 320:3
**$17 million** 218:14
**$18 million** 214:3, 5
**$2 million** 310:18; 311:9
**$200** 326:1, 23
**$250,000** 166:3
**$3,700,000** 222:21
**$30,000** 303:22
**$300,000** 60:13; 98:6, 8, 20; 223:12; 323:23
**$4 million** 166:18
**$4,080,000** 222:19
**$400,000** 227:2
**$5 million** 215:10
**$5,353,453** 220:2
**$50,000** 259:21
**$600,000** 311:13
**$8 million** 214:11
**$8.5 million** 233:20
**$80,000** 236:1
**$90,000** 331:18
**$900,000** 230:8, 18; 231:13

## 0

**00411** 287:20

## 1

**1** 4:4; 45:10; 55:24; 291:21; 318:3; 339:12
**1.5** 311:7
**10** 53:16; 137:16; 146:22; 282:11, 14; 320:24; 322:1
**10-minute** 133:18
**100,000** 275:8, 9
**100K** 275:9
**10:14** 4:20
**10:40** 94:17; 324:4
**10:46** 94:3
**10th** 41:13; 43:18; 44:10; 67:17; 75:6, 9; 316:6
**11** 147:9; 286:23
**118** 91:24
**11:13** 83:18
**11:20** 93:10
**11:22** 84:2
**11:38** 113:10
**11th** 291:14; 316:7
**12** 146:21; 147:13; 253:2; 290:24; 291:5
**125,000** 319:6
**12:12** 144:9

**12:22** 148:24
**12:43** 134:5
**12:45** 77:18
**12:52** 149:4
**12th** 264:14, 24; 275:21
**13** 140:19; 293:14
**14-minute** 150:11
**142** 46:7, 9, 18
**145** 111:24
**14th** 111:19; 321:7, 13, 22, 24
**15** 4:5; 214:4; 238:24; 287:24; 288:1; 291:6; 322:1
**15th** 195:13
**160** 335:12
**160,000** 335:3
**168** 46:23
**16th** 195:13
**17** 214:3
**17,181,110** 218:9
**17-minute** 92:14, 18
**17.1** 220:14; 233:19
**17.18** 220:8
**18** 4:5; 47:8; 112:9; 331:1
**1880** 4:12
**18th** 47:23; 112:15
**19** 4:6; 236:17; 336:24
**197** 47:3, 4
**1982** 72:2
**1991** 205:12
**1995** 247:7, 11
**1996** 171:4
**1998** 219:15
**1999** 219:15; 242:23
**19th** 112:24; 113:4, 10, 19; 114:9; 115:9; 120:11; 125:4; 144:21; 156:21; 293:24
**1:00** 78:9, 11
**1:09** 92:13
**1:16** 77:22; 78:3; 144:15
**1st** 110:16, 21; 179:13; 220:19; 274:4; 317:15

## 2

**2** 63:24; 287:17; 313:17
**20** 206:19; 323:9
**2000** 74:12; 167:2, 5, 6, 10, 22; 168:21; 169:3; 213:1; 219:16; 220:1, 7; 242:23; 286:7; 287:18
**2001** 7:18; 8:7, 8, 22; 9:21; 10:10; 11:22; 19:20; 20:3, 23, 24; 26:22; 27:21; 28:9, 13; 31:3, 24; 32:1; 39:13; 45:17; 47:8; 54:21, 23; 56:7; 64:16; 65:23; 68:3, 11; 80:13; 190:20; 191:20; 195:7, 12, 14; 196:17; 199:19; 200:15; 206:7; 213:1, 17, 24;

**216:19; 217:24; 218:7, 13, 14, 23; 219:2, 20; 220:8, 24; 227:24; 228:2; 229:16; 233:20; 235:24; 236:17; 237:4; 239:22; 240:1, 5; 242:22; 243:11; 247:2; 248:1; 291:21; 297:22; 331:3, 10; 334:4; 337:7, 15; 339:12
**2002** 4:20; 16:23; 39:14; 64:16, 17, 17, 18; 75:19; 76:6; 86:21; 91:6; 146:17; 150:18; 219:20; 220:19; 221:4; 222:9; 223:8; 230:6; 253:2; 265:24; 282:14, 20; 291:15; 293:16; 296:1, 11; 356:24
**209** 46:23
**20th** 92:13; 133:5
**219** 112:4
**22** 149:10; 265:24
**22nd** 133:23; 134:22; 135:11; 148:23; 149:15; 273:20, 22; 274:9; 315:13; 316:7
**23** 86:22; 150:12; 293:16; 296:11
**239-5195** 252:5
**23rd** 149:24
**24th** 48:22; 76:6; 77:14; 150:18; 151:6, 13, 16; 152:2, 23
**25** 217:24
**250** 222:13; 331:23
**250,000** 222:11; 334:24; 335:4
**2528** 180:5, 6
**25th** 93:9
**26** 65:17; 136:17; 282:14, 20; 337:6, 15
**26th** 136:5, 16; 137:21; 139:4; 158:9; 283:9
**275-0400** 149:16
**28** 94:3, 13; 96:3; 331:3, 9
**28th** 79:22; 94:17; 138:18; 324:3
**29** 216:19
**295** 148:23
**297** 112:8
**299** 149:3
**2:14** 212:15
**2:26** 212:20
**2:28** 146:22
**2:39** 47:8
**2nd** 140:17

## 3

**3** 4:5; 146:13; 356:24
**3.5** 311:7
**3.7** 311:5
**3.8** 311:6
**30** 4:19; 7:6; 74:10; 152:11; 323:11

**300** 112:8
**300,000** 216:5; 222:12, 13, 17; 223:9; 226:22; 311:6; 322:22
**30th** 41:14, 15, 16; 316:7
**313** 112:15
**323** 149:14
**326** 48:18
**328** 48:18; 151:16, 22
**33** 293:24
**331** 49:5, 9
**338-2965** 134:20
**339** 112:23
**344** 113:5
**345** 113:5
**349** 113:9, 14, 15
**350** 149:23; 150:11
**353** 92:12
**354** 91:18, 19
**36-month** 286:10; 287:18
**38** 147:8
**384** 65:12, 13
**385** 76:12
**386** 76:12
**389** 76:20
**395** 77:18
**396** 150:17
**397** 151:5
**398** 151:20; 152:2
**3:12** 150:18
**3:15** 151:6
**3:19** 151:16; 152:3
**3:20** 276:20
**3:34** 277:3
**3:51** 143:13
**3:55** 152:11

## 4

**4** 194:17
**40** 126:23
**403** 77:22
**431** 133:17
**439** 93:9
**446** 180:3
**446-2528** 252:2
**457** 4:22
**482** 134:5, 12
**483** 134:14
**49** 19:8; 38:6; 68:4; 91:16; 118:10; 146:19; 221:3; 278:17; 279:4; 310:20; 331:12
**496** 134:18
**497** 135:23
**4:00** 78:9, 11
**4:02** 49:19
**4:10** 111:21
**4:20** 149:10
**4:21** 90:6
**4:28** 151:18

**4:29** 78:4
**4:39** 87:15
**4:41** 112:15
**4:42** 149:15; 355:8, 11
**4:45** 49:20; 67:18; 353:23
**4:46** 67:6
**4:48** 65:18
**4:51** 135:11
**4:54** 67:7
**4th** 87:15; 111:4; 139:24

## 5

**5** 4:5; 194:16; 236:10; 237:10
**5.35** 220:7
**50** 9:5; 111:16; 147:7; 195:20; 233:24
**50,000** 239:16
**500** 129:8
**504** 79:16; 87:3
**506** 135:9
**508** 152:11
**51** 68:8; 112:3; 117:21; 118:12; 119:1; 122:24; 124:8; 136:23; 200:23; 201:18; 221:2; 231:17; 268:15, 19; 281:24; 331:12; 333:14
**519** 94:2
**52** 66:20, 22; 67:3, 4, 4
**53** 66:20; 112:8
**531** 79:17; 87:3
**535-4702** 47:10
**54** 113:4; 133:4
**55** 133:17; 148:22
**556** 49:17
**56** 66:13, 14; 134:6; 149:24; 150:10
**560** 345:10, 21; 346:9; 347:12, 24
**564** 49:18
**57** 66:18; 75:2, 3; 134:18; 150:17
**577-7850** 146:23
**58** 46:9; 66:18; 75:2, 3
**59** 91:17, 22, 23; 135:19; 152:10
**5:31** 75:5
**5:45** 75:5
**5th** 111:8

## 6

**6** 90:6; 216:14
**60** 46:7; 109:10; 126:23; 298:14; 321:12
**603** 135:22
**609** 149:16
**61** 93:7; 140:18
**617** 47:10; 135:3
**628** 135:23

**63** 93:24; 94:1
**64** 46:15, 16, 18
**641** 348:13
**67** 48:12

# 7

**7** 4:5; 252:23; 253:2
**70** 76:1, 2, 3
**70,000** 18:16; 236:19
**718** 140:17
**73** 49:14, 15, 15; 79:12, 13; 86:21, 23, 24
**732** 40:8; 46:1; 146:23; 179:22; 180:3; 183:1; 251:20; 252:2, 5
**733** 87:12
**734** 87:12
**740-0868** 40:8; 46:1; 179:22; 251:20
**75,000** 237:6
**750** 335:19
**750,000** 334:23
**763-1620** 135:3
**78** 87:6, 7, 8
**79** 65:9, 10, 10
**7:04** 49:10

# 8

**8** 293:24
**80** 90:2, 3
**802** 90:5
**819** 90:21
**891** 293:23

# 9

**9** 4:5; 45:17; 64:16, 16, 17, 17, 18; 65:5, 7; 75:19, 24; 86:21; 135:19; 146:17; 265:23; 267:21
**90,000** 332:18; 335:4
**908** 150:18
**90s** 170:24
**95** 236:11, 23
**95-02** 4:18
**965** 143:23
**973-2800** 183:1
**9:40** 94:16
**9:50** 324:4
9th 49:19; 91:6, 9; 111:13; 127:16; 142:9; 143:13; 280:22; 311:18; 312:24; 315:8, 20; 316:17, 21; 317:1, 2, 6, 9, 15; 318:2; 320:15, 19

# A

A-R-T-U-R-O 160:5

add 127:17; 226:21

**a.m** 4:20; 84:2; 93:10; 94:4
Aberdeen 99:7; 216:3
Aberdeen 29:4; 215:13
ability 356:14
able 89:15; 145:22; 279:6; 340:21
above 283:11
absolute 173:24; 249:19
Absolutely 13:17; 31:5; 39:21; 54:12, 15; 58:18; 68:20; 72:6; 74:15; 96:24; 99:20; 138:15, 24; 170:7, 14; 176:20; 183:14; 197:5; 198:19; 232:13; 236:2; 242:13; 243:3; 251:17; 254:7; 270:8, 16; 272:4; 303:2; 319:18; 330:6, 18; 340:8; 350:6
accent 116:20, 23
accept 74:22; 106:1; 110:19, 22; 111:5, 8, 18; 268:6; 351:10
accepting 258:5; 330:4, 16
access 193:10
account 121:3; 204:3; 206:22; 207:6
accounting 217:17
accounting-wise 228:7, 14, 22; 230:1
accounts 163:21; 164:7; 257:10; 274:15, 19, 21
accurate 62:22; 356:10
accuse 304:18
acquaintance 100:4
acquire 266:11; 277:22
acquisition 171:5; 190:18; 191:4; 192:20; 195:9; 272:11; 277:10; 278:8; 279:9; 298:12
across 336:5
acting 264:21
Action 4:18; 356:18, 21
actions 23:11
activities 10:12, 15; 25:10; 28:4; 68:19; 155:22; 160:4, 9; 194:1
activity 197:9; 213:6; 232:11; 345:11
acts 259:9
actually 51:11; 57:20; 61:6, 10; 62:17; 66:19; 76:12; 97:19, 19; 98:4, 24; 113:3; 114:6; 115:6; 117:15, 19; 129:24; 138:1; 142:2; 145:20; 155:12; 161:1; 162:3; 165:16; 169:1; 170:24; 171:3; 175:11; 177:24; 201:10; 222:20; 233:19; 281:22; 285:6; 287:13; 288:11; 289:20; 300:10; 312:11; 333:8; 351:6; 352:14, 16, 18

addition 7:1
additional 17:21; 26:2; 102:10; 119:2; 167:18; 222:23; 226:24; 232:18, 21, 23; 235:16; 335:11
address 293:22
addressed 25:17, 18; 30:6; 217:2; 253:3; 293:21
addressing 73:19
adjourn 354:20
adjourned 355:10
administrative 242:20
admit 254:23
admits 324:8, 24
adopt 72:7
adopted 213:13
advance 166:3
advanced 249:24
advantage 253:12; 255:7; 262:8
advertisement 326:10
advertising 327:4, 23
advisory 186:11
affected 290:17; 349:18
affidavit 172:17; 175:10, 12; 176:16; 184:7, 10, 14, 18, 24
affidavits 353:9
affiliated 332:5
afford 69:20
afraid 176:5, 6
afterwards 6:24; 7:8
again 35:11; 42:16; 55:6, 8, 19; 70:2; 87:1; 93:4, 7, 19; 106:8, 18; 107:19; 132:3, 4; 139:21; 147:9; 149:14; 151:16; 152:12; 178:9, 11; 304:7; 307:5; 333:19; 336:6; 346:22
against 13:12; 18:21; 26:8; 122:10; 138:8; 172:17; 304:13; 309:3
agency 182:13, 15
ago 24:8; 54:18; 56:10; 107:4; 131:23; 193:21; 204:9; 256:2; 267:11, 12; 299:4, 24; 311:15; 318:24
agree 34:2, 4; 99:15; 133:11; 134:10; 173:7; 213:22; 214:14; 220:5, 12; 232:3, 5, 12; 244:22; 263:19
agreed 33:21; 36:4; 38:7; 99:13; 142:23; 143:18, 19; 202:12; 203:17; 213:24; 244:14, 16, 17, 21, 23; 245:1, 3, 5, 7, 9, 22, 24; 246:2, 8, 18, 21; 288:14; 328:2
agreement 7:4; 44:3; 191:6, 19, 23, 24; 192:1, 2, 18, 19, 22, 23, 24; 193:3, 8, 12, 18, 22; 194:11; 196:9; 213:2, 11; 221:16; 230:20; 231:2; 257:6; 283:13; 287:24; 288:12,

21; 289:2; 308:19; 326:5, 8, 20, 21, 22; 327:7, 9, 10, 13, 14; 328:1; 333:17, 20; 346:19, 21; 347:4
ahead 53:15; 61:18; 95:9; 123:15; 241:15; 260:4; 282:22; 300:5
Alan 24:21, 24; 25:21; 30:7, 8, 9; 38:16; 39:24; 41:1, 18, 21; 42:2, 8, 15, 21; 43:1, 2, 3, 23; 44:5, 7; 52:21; 62:2; 63:14; 100:8, 10; 101:6, 22; 120:24; 126:13, 14, 17; 127:3, 11, 18, 19, 23, 24; 128:4, 16, 21, 22; 129:9, 17, 23, 23, 24, 24; 130:11; 131:5, 13, 22; 132:5, 6, 11, 20; 143:9; 145:14; 148:12, 16, 19; 162:14; 179:11; 180:18; 185:3, 6; 186:8; 187:1; 189:10; 201:12; 202:6, 20; 203:10; 204:10, 15, 18; 217:2, 8; 227:18; 229:3; 239:10, 12, 18; 243:13; 244:11, 12, 14; 247:18; 256:9; 258:10, 10, 23; 259:3, 5, 16; 260:4; 262:5; 267:3, 14; 268:11; 273:2; 275:12, 15; 289:8; 295:4, 5; 296:22; 299:20; 300:11, 14, 21, 22; 301:3, 13, 23; 302:2, 5, 8; 307:17, 22, 23; 308:4, 17; 309:13, 22; 312:17, 18; 313:9; 314:6, 14; 315:3, 24; 319:3, 13; 320:4, 8; 321:8, 14, 15, 16, 18; 325:6; 327:10; 338:10; 340:12
Alan's 83:10; 148:17; 267:15; 301:21
alert 148:2; 210:15; 300:8
alive 348:20
allegations 177:21; 178:7, 17
alleged 345:10; 347:10
allow 30:12; 32:19; 328:6
allowed 25:2; 51:3; 84:18; 180:19, 21; 203:23; 238:19; 289:10
almost 220:9; 221:5; 229:19; 242:11
along 16:21; 18:18; 48:20; 135:8, 18; 190:5; 233:7; 242:6; 248:8; 253:10; 277:20, 21; 288:19; 313:10; 330:20; 351:19; 353:2
although 240:16
always 35:8; 189:11; 206:1; 261:16; 325:5
amended 353:17
America 121:3; 317:1
among 7:4; 25:9; 113:19; 186:24; 206:7
amount 162:15; 213:5; 215:15; 220:15; 235:16; 241:2; 262:1

Analysis 218:3
analytical 353:16
Anchor 29:3; 60:14; 98:10; 215:6, 8, 9, 16, 18, 24; 216:11; 225:1; 233:5, 9; 244:2, 3; 281:12
Angeles 139:17, 21
anger 29:11
animosity 22:8
Ann 52:23; 53:1; 321:6
announced 200:15; 302:8
announces 331:16
Anonymous 105:2
answered 70:1; 73:4; 221:24; 261:14; 292:19
Anthony 284:2; 288:15
anticipated 215:1
anymore 22:19; 274:4; 301:21
Apart 24:10; 59:10; 233:6; 282:3, 5
Apparently 279:15
appear 42:16; 291:14; 333:18
appears 47:7; 76:5; 216:18; 287:17; 291:7, 19; 293:15; 331:2
Applicant 294:2
application 141:6; 294:3
applied 294:18
appointment 164:8
appointments 155:5, 16; 156:1
appreciate 58:4; 167:18; 260:9
approval 210:6
approved 242:15, 15
Approximately 7:24; 8:3; 17:7, 16; 216:4; 227:23; 238:23; 295:3; 300:13; 355:11
April 16:22; 17:11; 41:12, 14; 43:18; 44:10; 64:17; 74:10; 111:13; 135:19; 139:24; 140:17; 142:6, 9; 143:13; 146:22; 147:9; 148:23; 149:10, 15, 24; 150:12, 17; 151:6, 13, 16; 152:2, 11; 171:23; 172:1, 9; 174:20; 175:9; 177:17, 18; 178:15; 179:13; 200:18; 253:2; 264:11, 14, 24; 265:24; 273:20, 22; 274:9; 275:21; 280:22; 282:14, 19; 283:9; 293:16; 296:1, 11; 311:18; 312:24; 315:8, 13, 20; 316:7, 16, 21; 317:1, 2, 5, 9, 14; 318:2; 320:15, 19; 337:6, 15
archives 164:19
archiving 170:16
area 76:15, 21; 77:1; 121:6; 135:3; 183:1
arm 336:4

arm's 228:4; 330:2

around 29:13; 121:5; 155:7; 195:24; 220:20; 238:4

arrange 333:1; 334:8

arrangement 15:24; 16:7; 99:14; 168:22; 211:16; 325:23; 329:4; 331:11

arrangements 144:5; 211:8

arrest 102:19; 304:12; 305:9, 22

arrested 24:9; 26:7; 32:17; 33:15; 198:24; 304:8, 20; 306:6

arrived 26:6

Art 73:9; 92:6; 194:20; 203:12; 253:11, 23, 24; 255:2, 5; 258:4; 312:9, 9; 319:1; 337:3; 338:7; 340:13; 342:14

artful 277:19

Arturo 160:5, 5, 9, 14, 24; 167:1, 4, 9, 15, 22; 172:3, 16; 173:18; 175:9, 14, 18, 21; 176:3; 177:21; 178:15, 17, 23; 244:17

Asbury 152:3

ascribing 225:17, 20, 24

aside 27:22; 152:18; 172:24; 173:6, 19; 223:6; 233:13

aspect 38:18

ass 22:21

assault 30:15

assaulted 31:22

assaulting 26:9

assembled 119:7

asset 191:18, 24; 192:18; 193:22; 213:1, 11; 221:16; 333:17; 347:4

assets 166:14; 190:18; 191:4; 192:20; 195:10; 264:17; 266:12; 273:15; 277:23

assign 288:2; 289:23

assist 14:7

assistant 202:21; 239:19

associate 321:3, 3

associated 331:24

Associates 307:8

association 11:17, 18; 183:20

assume 199:5; 213:3, 4; 228:5; 249:8, 16; 265:11; 269:23; 274:6; 293:17; 337:24

assuming 18:9; 20:21; 330:13

Atlanta 160:18

Atlantic 317:9; 318:7

ATS 284:12; 285:21; 294:5; 296:18; 297:1

attaching 217:15; 331:17

attempt 96:10, 22; 178:22; 228:21; 255:18; 263:5; 275:24; 283:4; 309:12, 22

attend 179:5

attorney 12:8; 73:20; 208:10; 210:8, 9, 23; 211:2, 7, 7, 20, 24, 24; 212:7; 319:1; 356:17, 20

attorneys 172:3; 176:17, 21

attractive 170:10

audio 345:2

August 32:8, 8; 33:9, 10, 20; 195:7; 197:13; 198:22; 199:19; 200:15; 239:24; 240:5; 243:11; 247:1; 287:17

authority 203:22; 204:4, 5

authorization 290:15

automobile 286:5, 10; 290:10; 291:6; 295:18

automobiles 293:4

awarded 98:9

aware 20:2, 7; 25:12; 31:2; 33:12, 14; 50:17, 24; 58:6; 127:12; 138:9; 142:14, 22; 158:14, 20; 177:16, 18, 22; 178:2, 5, 6, 13, 19; 191:16, 18, 21, 22; 192:2, 15, 16, 17; 193:22; 194:1; 233:17; 242:10, 19, 24; 243:12, 13; 244:10; 259:16; 273:19; 274:9; 286:15, 17, 18, 19; 288:9, 21; 290:14; 292:14; 311:22; 312:5, 6; 325:23; 327:6, 9; 329:3, 8, 12; 339:4; 342:5

away 117:21; 126:22; 205:13, 18; 222:20; 258:23; 310:20; 311:2, 8, 9; 312:15; 341:7; 344:3

**B**

B 171:12; 192:22

back 8:18; 10:4; 19:19; 21:7; 25:5; 29:13; 51:21; 54:24; 68:1; 78:18; 80:12; 82:20; 83:1; 84:3, 20; 89:8; 110:10; 116:3; 121:16; 130:20; 133:2; 138:1; 144:17, 20; 148:11; 156:20; 163:4; 165:24; 167:15; 170:23; 171:18; 175:19; 205:24; 207:12, 16; 212:20; 225:12; 230:16; 233:17; 242:4; 256:2; 265:16; 279:14; 288:24; 289:1, 7, 14; 291:17; 295:6, 8; 302:1; 307:23; 308:2, 14; 312:4; 317:11; 327:1, 24; 332:17; 333:10; 334:2, 3; 350:22; 354:4

bad 23:11; 59:13; 258:14; 304:7; 320:5

Bahamas 209:23

bail 207:22; 208:7

ballpark 216:4; 273:10; 310:24

bank 109:11; 181:16; 204:2, 2, 3; 294:19; 307:8; 333:1, 7; 334:9, 13, 18; 335:3, 9

bar 126:15

Barnoski 6:10; 324:17

Barry 42:22

base 174:13; 283:15, 22; 23

baseball 318:12

basic 10:9

basically 22:17; 32:21; 38:16; 129:2; 157:12, 22; 205:15; 241:6; 275:23; 276:12; 277:14; 289:8; 326:11

basis 100:18; 171:13, 14, 16, 16; 249:10; 280:1; 296:7

battle 289:7

Bayhead 145:19; 252:15, 17, 20; 280:18; 281:2

beat 197:19; 198:12

became 33:12, 14; 311:22

become 35:5; 38:21; 117:24; 124:17; 142:14, 22; 239:12; 325:22

began 20:24; 26:21; 28:8

begin 85:20

beginning 17:11; 52:1; 62:17; 94:16; 163:16; 164:22; 171:23; 208:3; 248:1; 297:21; 309:19; 332:24; 333:9

begins 144:14; 277:1

behalf 5:15; 6:11, 13; 210:10; 231:20; 248:2; 250:24; 264:22; 266:10; 297:13; 312:1; 347:11

behind 240:6; 261:17; 300:13

belabor 332:13

belief 98:2, 3; 100:19

believes 96:9, 20

bell 22:19; 35:7; 88:2; 134:22; 141:8; 189:6

belongings 24:22

benefit 160:15; 161:11; 162:3; 248:5

benefiting 193:23

benefits 237:16; 311:24; 333:13

besides 130:14; 226:22

best 54:3; 127:8; 129:9; 163:21; 193:11; 200:8; 241:18; 259:9; 285:15; 295:5; 352:24; 356:14

better 127:5; 196:2;

227:19; 259:1; 265:3; 271:13; 304:3; 307:17

big 129:10; 336:22

bigger 164:6; 232:10

bill 41:5; 45:14, 16; 46:20; 47:7; 48:12; 65:6, 7; 66:5, 6; 75:15, 18, 18, 24; 86:21; 91:6, 24; 107:9; 110:24; 111:13; 133:3; 134:10; 135:19; 136:15; 139:12; 143:12; 146:15; 147:7; 148:22; 248:13, 15, 16; 279:21; 306:24

billing 64:15

bills 9:3; 15:14, 21; 16:1; 44:17; 63:12; 64:12; 75:1; 110:11; 144:1; 146:10; 179:18; 180:1; 183:8

bit 8:19; 19:23; 78:19; 110:17; 190:16; 220:20, 23; 285:21; 289:17; 310:16

bizarre 324:5

blatantly 324:24; 326:4

blending 121:4, 9; 124:10; 126:1, 19, 21

block 195:24; 309:13, 22

board 305:14, 15; 337:10, 16

Bob 189:2, 3, 5

body 328:18

bogus 326:4, 8; 327:8, 9, 13, 14, 17, 18, 20; 328:1

Bomgardner 334:12, 15

bond 109:13, 14, 16; 227:1, 4, 5, 10, 15

book 25:1; 154:6; 299:21

books 69:17; 154:2; 227:17; 228:11; 229:4, 6, 7, 18

Boston 8:9; 23:7; 47:9, 20; 49:1; 65:15; 77:10, 17; 79:4, 18; 92:21; 134:19; 135:4, 10; 136:1, 4; 137:3; 138:4, 21; 139:3; 152:22; 158:8, 10; 159:14; 211:23

Bostons 77:4

both 17:14; 133:8; 271:7; 280:18; 348:22, 23

bottom 78:21; 217:23; 233:12, 14

bought 298:11

Boulevard 4:12

boxes 164:18

Bramnick 5:19; 356:2, 23

brand-new 126:18

brawl 26:4

break 59:15, 22, 24; 83:15; 123:23; 137:11, 17; 144:2, 18; 187:23; 192:14; 212:10; 237:18; 276:15, 16

breakdown 218:22

breaking 304:18

Brian 306:11, 16, 17, 20;

307:12, 13, 14, 22; 308:14, 22

bribe 97:19, 20; 98:11, 20; 99:13, 19; 100:5, 24; 101:16

bribed 60:12; 61:6, 11; 97:11; 98:4

bribery 61:7; 96:10, 22

bribing 322:20

brick 82:24

briefcase 155:7, 9

bring 16:13; 104:19; 120:4; 127:10; 130:10; 196:19

bringing 17:15

brings 6:8; 14:1; 257:10

broke 84:5; 305:2

broken 303:16

brother 118:12; 332:9

brought 6:8; 9:2; 108:4; 199:23

Brunswick 179:7

budget 213:12, 15; 214:2; 217:15, 16; 218:3, 12; 220:7, 8; 233:24; 240:6; 242:10, 14, 21

budgeted 220:14

build 60:13; 120:5; 126:1; 326:13

build-out 98:10

building 27:11; 29:13; 42:2; 60:14; 88:9, 10, 11; 89:15; 185:14; 196:21; 215:11, 21; 216:1; 224:16, 21, 24; 225:1, 7; 233:3, 6; 238:23; 241:10, 22; 244:2, 7; 256:15, 18, 19; 257:16; 262:12; 281:13; 282:8; 285:16

buildings 69:19; 162:17; 224:13, 15, 23; 235:2

bulk 214:23

Bullied 238:4

bunch 9:2, 16; 64:10; 77:3; 341:16

bureau 182:14

bury 124:8, 8

business 11:6, 18; 25:20; 28:6; 29:19; 34:17; 40:5, 16, 24; 41:8, 10; 43:6, 21; 44:8, 12; 53:12; 71:22; 82:11; 84:17; 98:21; 103:1; 108:5, 23; 109:6, 21; 110:6; 113:6; 115:4, 22; 118:7, 7; 119:14; 121:21; 122:1, 3, 11; 140:3; 143:1; 145:18; 157:8; 162:20; 163:11, 19; 164:11; 170:9, 9, 10; 174:14; 183:20; 191:11; 196:19; 197:10; 202:15; 204:22; 206:8, 22; 207:11; 208:12; 211:1; 213:6; 214:10, 24; 215:4, 5, 7, 10, 14, 20; 220:16; 232:11; 233:9, 14; 247:4, 6, 12; 251:12; 255:18; 256:1;

257:5, 23; 258:20, 23; 259:18; 260:2, 23; 261:8; 263:5, 23; 276:1, 9; 277:6, 10; 278:20; 279:24; 280:18, 24; 281:8, 17; 282:7; 285:8, 22; 302:24; 310:3; 318:16; 321:10; 328:17; 329:15; 330:4, 8, 16; 335:23; 341:7

**businesses** 121:20; 170:15; 214:9

**businessman** 232:4

**buy** 29:3; 89:22, 24; 117:21; 119:1, 3; 120:3; 122:23; 124:8, 11; 126:4, 11; 136:22; 199:17, 17; 200:4, 5, 9, 22; 201:18; 215:24; 23:1:16; 238:17; 259:23; 264:17; 279:6; 281:23; 283:5

**buying** 120:9; 124:13, 16; 137:1; 248:8; 265:16, 17; 268:15, 19

# C

**CAC** 300:1

**call** 12:10, 10, 12; 32:19; 42:10; 43:13; 47:9; 48:22; 49:10; 65:15; 66:23; 67:7; 89:3, 8; 90:6, 22; 92:14, 18; 93:8; 94:3, 6, 10; 95:11, 16; 105:21; 107:5; 111:4, 7, 19; 112:5, 16, 23; 113:10; 133:17, 18; 134:5, 6, 7, 19, 21; 135:2, 10; 140:19, 21; 146:23; 147:16, 22; 148:1, 12, 13, 24; 149:6, 11, 20; 150:5, 12; 152:3, 12; 154:1; 208:13, 18; 209:9; 211:6, 23; 212:8; 251:19; 252:3, 4; 258:17, 18; 259:1; 296:23; 300:21, 22; 301:13; 303:15, 21; 304:24; 307:9; 309:1; 316:24; 317:4, 8, 14; 318:2

**called** 12:11, 16; 23:6, 8; 26:5; 29:16; 35:15; 38:13, 15; 42:8, 15; 43:1; 65:23; 67:11, 17, 19; 102:17; 104:7; 106:8, 18; 121:3; 146:1; 147:8, 15, 21; 148:3, 11, 16; 150:4; 151:12; 202:17; 203:19; 204:6; 208:10; 210:23; 211:2; 252:14; 258:10; 259:5; 260:4, 5; 272:23; 293:3, 17; 296:5; 300:17, 18; 301:10; 302:1; 303:7, 18; 304:2; 308:24; 309:8, 10; 312:17; 317:16, 16; 321:7, 14; 322:3; 340:6

**calling** 43:8; 47:17, 23; 50:3; 56:10, 12; 88:7; 106:21; 107:20; 108:11; 109:4, 13, 24; 113:2; 212:7; 297:3; 300:24; 321:17

**calls** 8:21; 9:5, 10; 10:5; 20:16; 26:19, 21; 27:2, 5, 9; 28:8; 41:19; 43:7, 12, 14, 20; 48:4; 49:18; 56:2; 63:16; 64:21; 75:5, 10; 76:6, 14, 17; 77:17; 78:2, 4, 24; 79:17; 80:15; 87:15; 88:4; 89:4; 93:21, 21; 110:15, 20, 23; 112:11; 113:5; 133:5, 23; 135:13, 24; 164:5; 211:7, 24; 315:19; 316:6, 16; 322:1

**Camaro** 298:4, 4; 299:6

**came** 35:2; 158:4; 198:1, 16; 232:16; 287:13; 304:20; 326:24; 344:2; 352:22

**can** 10:22; 11:9, 10; 16:19; 23:22; 26:14; 34:20, 22; 38:10, 11, 14; 46:3; 47:2; 48:6; 54:4; 57:24; 59:23; 61:13; 63:8; 65:5; 79:11; 85:4; 87:6; 88:21; 89:24; 91:2, 16; 100:16; 102:9; 105:23; 107:7; 110:13; 116:3; 117:20, 22; 118:2, 15; 124:21; 125:1; 130:3, 5; 131:2; 133:3; 136:22; 141:2; 143:16; 145:15; 152:17; 154:21, 23; 163:4; 167:8; 172:6, 8; 174:10; 179:17; 189:7; 191:17; 192:6, 11; 194:24; 201:14; 203:17; 204:22; 208:18; 221:12; 241:19; 259:11, 12, 22; 260:6; 267:18; 268:2, 5; 281:23; 282:1; 286:14; 287:2; 289:3; 297:2; 299:17; 302:10; 309:18, 18; 311:4; 316:2; 320:22, 23; 321:20; 323:16; 325:16; 332:1, 2; 338:7; 340:12, 17, 18; 343:13; 344:11; 346:15; 347:21; 349:22; 353:7

**Canada** 206:20; 211:23

**Canley** 248:13, 15, 16

**Capital** 5:3, 4, 7, 7; 116:11, 11; 117:1, 2, 3, 4; 118:3, 22; 136:21; 158:13, 23; 182:4; 218:23; 220:24; 221:5, 14; 222:5, 10; 223:3, 10, 14; 224:4; 247:20; 335:10

**capitalize** 257:4, 22; 258:16; 259:11

**capitalizing** 255:8

**car** 23:1, 2; 30:17; 204:22; 237:17; 288:14, 20, 24; 289:1, 4, 9, 10; 290:21; 297:6, 9; 298:2, 8, 12, 13; 299:22; 304:9; 309:22; 321:1

**car's** 293:2

**card** 34:21; 38:12; 40:1; 181:10, 11; 182:8; 204:16, 22; 207:18

**cards** 181:2, 2, 5, 13;

**care** 212:3, 6; 239:4

**career** 18:6

**cares** 125:20

**Cargo** 251:7, 8

**Carr** 4:4, 24; 5:9, 22; 6:5, 22; 7:16; 27:17; 32:7; 44:18; 45:10; 46:24; 55:24; 62:3; 63:12, 23, 23; 71:8; 75:20; 79:14; 82:13; 84:5; 93:7; 98:2; 104:2; 122:18; 130:22; 135:18; 144:20; 146:13, 14; 164:21; 166:22; 167:15; 168:3; 186:9; 190:16; 191:10; 194:10; 195:1, 24; 199:12; 202:10, 19, 19; 206:24; 212:23; 216:17; 219:9; 231:19; 232:5; 240:15; 241:13; 254:17; 255:11, 13, 16; 262:24; 263:3, 17; 265:23; 277:5; 282:15, 16; 283:10; 286:22; 287:7; 289:3, 20; 290:24; 291:10; 293:22; 303:17; 305:1; 312:21; 323:17; 328:9; 331:1, 2; 338:22; 340:23; 341:20, 21; 342:8, 9; 345:7, 8; 356:6

**Carr's** 345:9; 353:18

**Carr-14** 313:15

**Carr-15** 313:21, 23; 314:5

**carry** 155:6

**cars** 26:6; 289:13, 14, 15; 295:2, 6, 8, 8, 10, 16

**Casadante** 113:12; 114:10, 11; 125:5; 156:22

**case** 15:21; 16:1; 33:3; 58:1; 84:19; 171:22; 183:9; 210:19, 21; 340:23

**cash** 98:6

**cassettes** 345:3

**cast** 187:5, 6

**casual** 157:24

**cause** 249:24

**causing** 29:12; 70:23

**caution** 32:24

**cell** 9:3, 6; 40:4; 41:18; 43:9, 19; 44:11; 64:12, 13; 87:23; 146:16, 17; 179:16, 20, 21; 252:8, 10; 280:6, 7, 8, 10, 11

**center** 219:3

**CEO** 38:13, 15; 158:23; 201:16; 202:16; 204:18; 207:3, 10; 217:7; 239:3

**certain** 45:13; 142:23; 213:5; 219:14; 345:10

**certainly** 95:3; 254:16; 257:21

**CERTIFICATE** 356:1

**certification** 353:19

**certified** 109:8; 314:15, 18

**certify** 356:5, 9, 15

**chambers** 311:20

**chance** 6:22; 266:6; 282:24; 287:6

**Chancery** 4:16

**change** 84:11; 200:11; 204:12, 16; 296:13

**changed** 99:1, 11

**changes** 199:15; 200:2

**charge** 88:14, 19; 89:12; 303:13

**charged** 82:5

**charges** 26:8; 32:20; 309:2

**Chase** 293:17, 18; 294:4, 19; 296:24

**check** 47:15; 73:20; 78:15; 85:4; 138:1; 167:21; 168:4; 203:23; 317:18, 22; 320:23; 322:7; 340:18

**checking** 41:17

**checks** 203:24; 204:4

**Cherry** 4:23

**Chevrolet** 298:4

**chief** 34:1; 47:19; 114:21; 128:17; 188:14; 196:17; 199:10

**child** 258:15

**children** 24:23; 176:10; 318:12

**choices** 199:17; 200:3, 4

**Christina** 294:13

**Christina's** 294:16, 18

**City** 15:5; 113:11; 210:20

**Civil** 4:18; 305:20; 341:2

**clarify** 63:21; 84:11

**clause** 286:17

**clean** 38:24; 39:1, 3; 167:19, 20

**cleanliness** 22:10

**cleanup** 215:23

**clear** 27:1

**cleared** 201:6; 203:5

**clearly** 96:8

**client** 287:3

**clients** 170:11

**close** 130:19; 166:17

**closed** 43:10; 109:7; 128:12, 15; 166:4; 213:2; 300:24; 318:24; 320:17, 21; 321:18, 20; 322:4

**closely** 61:4

**closing** 130:2, 12; 166:2; 194:9; 195:12; 274:20; 307:14; 321:4; 335:3

**co-signed** 298:21

**coach** 318:13

**Coast** 139:9, 11

**cocoa** 337:20, 21

**code** 135:3; 183:1

**coffee** 11:6; 28:6; 43:8, 11, 12; 106:13; 109:8, 9,

**certify** 356:5, 9, 15

**21;** 115:3, 22; 116:6, 9, 10; 117:17, 23; 121:3, 12; 122:9; 124:17; 126:24; 127:14; 137:1; 175:4, 13; 197:9, 10, 11; 206:19; 215:3, 6; 227:5; 233:4, 8, 10, 14; 241:19; 244:6, 7; 316:24; 321:13; 337:12, 18, 20, 21; 340:22

**coincidence** 307:8; 308:11, 15, 21, 23; 352:5, 6

**Cole** 161:14, 15; 163:23; 168:15; 236:15; 244:24; 245:2

**collateral** 310:9, 16

**collateralize** 333:12

**collect** 130:16, 18; 332:1

**college** 71:19, 24; 116:13

**color** 330:10

**column** 46:21, 22, 24; 218:9

**combination** 234:4

**combine** 118:6

**combining** 118:19; 121:20

**comfortable** 191:9

**coming** 102:19; 105:1, 6; 126:1; 139:23; 157:16; 213:7; 230:16; 264:5; 308:19

**commencement** 356:5

**Commerce** 204:2; 333:7; 334:9, 13, 18

**commercial** 109:9; 338:12

**commissioner** 305:16

**commitment** 278:5; 300:15

**committal** 215:10

**committed** 277:8

**commodities** 197:12

**common** 185:9; 308:9

**communication** 143:7; 206:2

**communications** 341:19; 342:7; 345:6

**community** 305:14

**companies** 43:8, 12; 93:5; 117:23; 119:4; 121:11; 124:14, 17; 127:11; 129:8; 131:21; 137:2; 145:23; 175:3, 4; 176:1; 181:7; 190:19, 24; 191:5; 195:10; 196:6; 241:7; 247:8; 248:11; 286:9; 293:19; 310:21

**company** 6:7; 11:1; 17:21; 18:3, 5; 35:3, 12; 38:7, 9, 16, 18; 40:3, 19, 23; 45:16; 71:1; 102:24; 107:5, 14, 16; 116:2; 117:4, 21; 120:6, 9; 122:8; 124:16, 18, 18; 126:4; 127:2, 7, 20; 130:2, 12; 131:19; 145:16, 23, 24;

146:6; 165:2, 6, 22;
166:4; 167:23; 168:1;
170:24; 174:11, 12;
185:10, 14, 15; 191:13, 14;
195:21; 199:10; 201:4;
202:16; 203:23; 205:12,
17; 207:10; 216:11; 218:8;
222:19; 225:15; 227:2;
228:20; 229:1, 17, 18;
230:8, 13; 231:9, 14, 23,
24; 232:9; 233:19, 23;
234:12; 235:9, 17, 18;
237:16; 238:19; 239:6, 23;
240:5, 23; 241:3, 10, 20;
242:6; 247:20, 21; 248:8,
17, 20; 259:24; 266:2;
271:18, 21, 22; 278:14;
279:7; 281:18; 282:1;
284:11, 18, 19; 285:21;
288:13; 289:13; 292:24;
293:17; 295:2, 10, 15;
298:22; 300:1; 301:8;
306:19; 320:17, 21; 321:4,
18, 21; 323:23; 326:14;
329:21; 331:19; 333:2, 10,
12, 14; 334:22; 338:20;
339:5; 340:15
company's 9:6; 40:4;
192:20; 298:11
compete 170:3; 194:12;
285:2, 4, 7
competing 169:20
competitive 122:10
competitor 115:6; 123:8
competitors 115:12;
120:4; 123:10
complain 23:9
complained 25:9; 255:6
complaint 16:21; 21:14;
26:12; 171:21; 177:20;
178:5, 7, 16; 348:5, 6;
353:18
complaints 21:12, 13;
22:10; 106:20; 109:22, 23;
110:2
complete 110:14; 279:15
completely 81:19;
211:12; 233:12
computer 156:5, 9, 14;
205:10, 14, 16
computers 205:18
con 95:5
Concept 339:14; 340:7
Concepts 5:1, 10;
166:23; 168:10, 24; 221:3;
222:10; 223:10; 242:23;
286:8; 338:14; 339:12;
347:18
concern 72:14, 18;
340:19
concerned 14:5; 200:14;
201:7; 256:15; 293:8
concludes 144:7;
276:18; 355:6
conditions 207:22;
312:10, 12
condone 239:14

condoned 353:6
conduct 279:24
confidence 271:1
confidential 7:6, 7
confidentiality 103:17
confirm 47:15; 178:22
confused 121:18; 122:5,
7; 343:9
confusion 344:1
Connecticut 76:18, 24;
77:1; 160:19
connection 171:1; 277:9
consider 123:14
consist 215:5
consisted 216:3
Consolidated 219:11
conspiracy 32:21
constraints 271:1;
274:10
consultant 257:9; 270:4
consulting 275:14
contact 43:5; 44:4; 180:9
contacting 312:2
contacts 131:17; 320:7
contained 272:7
contains 291:6
contemplating 273:14
context 32:7; 33:8;
220:23
Continental 113:24;
115:3; 118:1; 119:3, 18,
22; 121:2, 8; 124:12;
125:10, 24; 248:10;
250:10
continue 29:19; 34:16;
38:8; 77:21; 180:22;
201:24; 202:3; 241:19;
282:1; 299:21; 306:21;
311:23
continued 36:23; 41:18;
171:5; 247:14
continuing 39:14;
142:20; 275:24
contract 41:22, 24;
60:13; 126:1; 171:13;
190:24; 191:8, 12, 15;
257:11, 12; 259:14, 21;
261:21, 22, 23; 262:1, 2;
271:3
contractor 257:9
contracts 123:4
contrast 223:13
contributed 221:5, 14;
222:4
contribution 222:11;
223:11, 14; 224:4; 226:23;
227:1; 230:18
contributions 221:1, 15;
225:14
control 45:8; 102:13;
121:11; 196:1, 6; 202:17;
229:3; 239:8; 321:21
controlled 118:15
controller 30:10

controlling 254:18, 20
convention 126:14, 15
conversation 35:24;
50:14, 18, 20; 52:2; 56:14;
60:11; 93:4; 94:12, 18, 23;
95:2, 8, 12, 17; 97:5, 7;
100:23; 101:15; 163:15;
301:5; 321:15; 324:5
conversations 20:24;
28:1; 50:10, 23; 51:11, 23;
52:1; 54:14; 57:10; 72:22;
73:2, 5; 86:6, 9, 16;
120:12; 134:16; 139:5;
251:6
convey 273:16
conveyed 266:15
convince 185:10;
351:10, 11, 17
COO 217:8
cooperate 71:2
cooperating 67:22
copied 344:12
copies 57:4; 344:2
copy 23:20; 30:7; 42:9;
44:24; 57:7, 8; 60:24; 64:3;
73:12; 146:15; 194:20, 21;
199:3; 203:11; 204:21;
216:16; 253:2, 5; 265:5,
14; 287:1; 292:14; 293:15;
314:1; 337:3; 344:8
corner 46:5
Corporation 107:6;
339:2
corporations 205:10
corrections 6:24
correctly 170:22; 255:19;
261:6; 269:4, 6, 8, 12, 16,
22; 283:16; 335:5
corrects 322:9
cosigner 294:11, 19
cosmetic 162:24; 163:2
Cosmetics 164:7
cost 109:10; 219:3
costs 14:6, 7; 243:18
counsel 5:16; 6:17; 7:4;
12:21, 22; 18:11, 11;
23:24; 24:4; 27:7; 44:24;
47:18; 56:4; 66:23; 74:19;
114:18; 135:8; 146:15;
160:23; 188:11; 216:16;
356:17, 20
count 75:8; 323:10
County 4:16; 26:15
couple 6:19; 24:1; 42:15;
57:15; 59:7; 76:17;
129:16; 130:24; 131:4;
139:14, 16; 189:1; 193:21;
236:4; 264:22; 279:19;
288:22; 299:24; 306:19;
344:23
Courier 314:19, 20;
315:5
course 43:14
Court 4:15; 5:18; 141:12;
187:24; 208:6
courtesy 301:13, 17, 18

Courthouse 26:15
Courts 18:21
covenant 69:6; 169:13,
14, 23; 193:23, 24
cover 224:13; 289:4
covered 311:14
Cranbury 163:24
creat 153:20
create 157:5; 168:21;
205:3; 236:6
created 193:23; 286:8;
340:5
creates 192:1, 23
credibility 108:2; 129:7;
177:11
credit 109:13; 181:2, 2, 4,
10, 12; 182:3, 8; 294:21
credits 182:3
Crooker 253:23, 24
cross-fertilization
170:12
CSCE 337:17
Culkin 130:15; 245:23;
246:1, 3, 5; 304:1; 309:9;
320:9, 11
cup 175:13
cure 221:12
current 274:20; 299:11,
12, 13, 18
customer 147:3; 148:2,
14; 162:21; 174:13;
271:17; 283:15, 22, 23
customers 36:17, 18;
44:5; 106:20; 107:18, 20,
22, 24, 24; 108:4, 6, 8, 19;
109:4, 14; 110:5; 123:4;
143:7, 9; 145:17; 162:19;
163:11, 18; 164:3, 24;
165:1; 202:1; 216:8;
250:13, 14, 18, 20;
256:10; 269:3; 270:13, 21;
271:2; 275:14, 19; 279:11;
300:23; 312:2, 16, 17;
321:16; 322:2
cut 213:19; 215:20;
239:17

**D**

D 284:9
D-R-A-Y-A-G-E 215:2
D.C 181:22
daily 154:1; 155:20, 21;
164:17; 179:15; 279:24;
296:7
Daly 152:16
damages 30:16
dangled 183:18
dare 327:1
date 4:19; 12:1; 15:8;
16:8; 17:5; 26:14; 41:11,
14; 63:4, 6; 65:17, 19;
77:12; 155:5; 172:7;
194:9; 291:13, 18; 296:10;
320:22; 321:2; 331:19;

356:13
dated 45:17; 75:19;
146:17; 190:19; 217:23;
287:17; 293:16; 356:24
dates 8:6; 64:15; 76:9;
317:18
daughter 238:15
David 4:10; 317:8; 318:6,
8, 15; 325:6
Dawn 130:14; 307:11, 20,
20
day 17:1; 32:17; 33:15;
43:4; 49:18; 50:4; 58:14,
14; 60:12; 62:18, 23; 63:1;
77:7; 80:21; 118:11;
120:5; 133:5; 136:14;
139:1; 141:11, 12; 142:8,
13; 143:11, 12, 17, 19;
149:3, 9, 9, 15; 150:2;
154:1, 13; 155:1; 156:2;
163:15; 164:4, 16, 18;
179:20; 180:22; 199:21;
200:15; 247:12; 248:17,
19; 256:16; 258:13; 269:1;
270:5, 5, 10, 10; 289:6;
290:19; 296:5, 6; 303:4, 5;
306:15; 308:12; 309:7, 14,
15; 311:22; 312:6, 9, 11;
354:5, 11, 12
day-to-day 262:5; 296:7
days 7:6; 107:4; 109:10;
128:5, 10, 18; 129:17;
131:1, 4, 23; 132:7, 11, 17,
21; 139:16; 141:3; 209:22;
267:2; 273:10; 321:12
deal 28:16; 99:8; 107:18;
126:10, 20; 157:20; 183:3;
195:15, 18; 199:15; 200:3;
238:13; 239:3; 258:22;
260:1; 265:3; 274:11;
275:14; 311:20, 22; 313:1;
315:7
dealer 295:6
dealing 27:2, 5; 229:12;
259:17, 19
dealings 255:17; 263:4
dealt 128:1; 207:14
Dear 255:11, 13; 294:2
debit 181:11
debt 311:9
debts 311:11
decal 328:3, 18; 330:14
December 64:16; 65:5, 7;
67:17; 68:2, 3, 11, 22;
70:11; 71:5; 74:12; 75:6, 9;
91:11; 291:21
decided 123:19, 21, 22;
231:13; 256:6; 257:3;
306:20
decision 42:12; 122:2;
204:6; 261:19; 289:21;
312:7
decisions 204:5
declined 175:10
deduction 324:11
deep 270:17
defendant 284:5

**defendants** 5:15; 6:6
**defined** 194:10
**definitely** 312:6
**degree** 71:19, 21; 116:13
**delinquent** 288:22;
293:2; 307:10
**deliveries** 284:20; 322:6
**delivering** 171:11
**Delivery** 247:8, 9, 10
**department** 26:6; 31:22;
53:19; 309:2
**Depending** 62:22
**Depends** 50:20
**Deposition** 4:11, 14, 21;
5:14; 6:20; 100:1; 144:8,
15; 276:19; 277:2; 355:7,
10
**depot** 18:15; 352:17, 19,
22
**describe** 264:7
**described** 56:20; 168:23;
201:3; 206:9; 207:18;
287:10
**describing** 205:6; 224:3
**designated** 7:7
**desk** 25:3
**desktop** 156:5
**despite** 264:21; 275:21
**detail** 10:5; 45:21
**details** 33:2; 52:6
**device** 50:13; 156:11
**Dhun** 216:20
**dialogue** 19:17; 20:18;
21:9; 300:12
**DiAngeli** 284:2; 286:1;
288:17, 18, 23, 24; 289:24;
290:9, 16; 291:8; 292:10;
293:6; 294:13, 17; 296:19
**DiAngelis** 288:15
**diary** 155:21, 21
**Dictaphone** 50:13
**dictate** 205:22
**dictated** 254:5
**Diego** 139:19; 140:16, 22
**difference** 341:12
**different** 43:8; 131:20;
161:6; 162:16; 164:3;
257:10; 280:7; 349:22;
351:24; 352:14; 353:3
**difficult** 89:5; 93:20;
184:1; 229:11
**difficulties** 29:7
**digital** 156:11
**Dilanni** 21:15, 16; 22:7,
15, 21, 23; 24:8; 25:11;
26:4, 7, 9; 29:8, 9; 30:13;
31:1, 3, 9; 32:2, 18; 33:17,
24; 35:17; 38:12, 14, 15;
39:24; 41:1; 52:3, 16;
60:17, 18; 61:6, 10; 62:2;
70:22; 96:11, 23; 97:11,
15, 18; 98:3, 5, 12, 19;
99:18; 100:5, 19, 23;
101:6, 16; 102:17; 103:2;
104:7, 18; 105:6, 18;

106:6, 21; 107:1, 3, 9, 19;
119:21; 162:13, 17; 164:9;
165:11; 167:7, 17; 172:18;
174:3; 175:17, 17, 22;
176:5; 185:16; 186:8;
187:1; 197:19; 198:12, 15;
199:1, 12; 200:1; 201:11,
16; 202:6, 14; 203:5, 11,
18; 204:1; 206:24; 207:3,
9, 15, 20; 217:7; 229:2, 12;
230:15; 237:12; 238:12,
13; 239:11, 13; 242:6;
244:13, 20; 247:19;
254:15; 256:6; 259:20, 24;
282:3; 288:11, 14, 20, 23;
289:1, 24; 290:13, 15;
292:5, 14; 294:14, 23;
295:1, 19; 296:1, 12;
303:15; 304:17, 23, 24;
305:9, 24; 309:1, 14;
322:16, 18; 323:21; 324:8;
326:5, 7; 341:21; 342:9;
345:7, 8, 21; 349:11;
350:1, 7; 351:20; 352:12;
353:2, 4, 5
**Dilanni's** 185:19; 198:1;
254:9, 12; 296:3; 304:4, 11
**diligently** 284:4
**Diner** 165:6, 8; 272:24
**dinner** 266:17
**direct** 143:9
**directed** 19:13, 14;
277:24
**direction** 124:20; 127:4
**directly** 13:19; 95:12;
105:24; 272:18; 295:11
**director** 22:4; 164:15;
205:8; 305:14
**disagree** 69:12; 239:14;
269:19; 332:19
**disagreed** 201:20
**disclose** 33:1
**discomfort** 59:23
**discrepancy** 222:17
**discuss** 7:20; 8:23; 33:2;
42:17; 115:21; 120:8;
121:19; 136:24; 144:4;
251:11; 273:3
**discussed** 10:10, 14, 24;
11:4, 16; 120:14; 157:10;
201:1; 341:22; 342:10
**Discussing** 88:9; 268:15
**discussion** 16:4; 88:22;
132:10, 15; 186:24;
272:14; 273:6; 319:12;
320:2
**discussions** 17:19;
21:11; 68:18, 23; 69:4;
81:22; 82:2; 84:7, 24;
108:7, 14, 18; 109:2, 4;
110:4; 120:19, 22; 139:5;
142:12; 157:2; 159:24;
187:10; 272:9; 281:11, 16,
21; 282:6; 315:14
**dispatcher** 248:22
**dispute** 316:12
**disputed** 226:3

**disrupt** 29:19
**disruption** 30:14
**disruptions** 70:23
**disrupts** 29:21
**District** 32:10; 80:19;
209:21
**disturbing** 97:22; 109:23
**ditto** 49:4, 6, 7, 21; 65:16
**dittos** 89:10
**diversion** 263:23
**divert** 255:18, 24; 261:8;
263:5; 276:1
**diverted** 171:17; 260:23
**diverting** 251:12
**Division** 4:17; 339:14;
340:5
**divorce** 129:3; 176:9;
253:13; 258:15
**Docket** 4:17; 209:16, 17
**document** 44:21; 72:13,
16, 17; 134:23; 168:21;
216:15; 243:10, 17;
245:13, 18; 266:16;
287:13, 15, 17, 19; 291:1,
2, 5; 331:7; 341:6; 342:22
**documentary** 292:16, 20
**documentation** 25:3;
26:10; 345:5; 350:8
**documenting** 292:8
**documents** 4:2; 24:2;
64:11; 75:12; 138:2;
157:5; 185:23; 186:1;
187:9, 13, 17; 205:4;
318:23; 341:1, 4, 16, 18;
342:1, 4, 6, 24; 344:24;
345:12, 16; 346:8, 18;
347:9, 9, 13, 19
**dollars** 121:7; 221:6;
227:12, 14; 228:20;
234:16; 242:11, 17;
305:18
**dominate** 126:5; 242:5
**Dominic** 206:17, 20, 23;
207:1, 6
**donate** 305:17
**done** 24:19; 30:16; 129:2;
144:1; 195:15; 221:16;
247:16; 248:4; 251:2;
292:15; 302:14
**doors** 133:10
**doubling** 214:7, 16
**doubt** 75:15
**Doug** 6:11; 52:20; 62:3;
83:11; 125:9; 126:16, 17,
18; 133:9; 186:7; 187:2;
210:18; 216:21; 223:4;
243:12; 247:18; 331:3;
334:16; 335:8
**down** 22:21, 24; 24:6, 21;
33:22; 35:4, 14; 38:3, 6,
21; 43:10; 46:23; 47:3;
48:17; 57:24; 63:9; 65:11;
72:14; 75:1; 76:5; 83:10;
91:3, 17; 92:11; 94:2;
104:20; 107:14; 109:7;
112:14, 22; 123:24;

128:13, 15; 165:6; 199:9,
14; 201:2, 14; 202:11;
203:2; 237:18; 238:17, 17;
248:6; 258:2; 273:1;
300:24; 301:3; 303:17, 24;
304:3, 9; 305:2; 307:11,
15; 311:6, 7; 320:24;
322:4; 332:22; 352:22;
354:17
**downpayment** 298:10
**downside** 255:9
**dozen** 9:16, 19
**draft** 184:17, 20
**drafting** 193:7; 253:16
**dragged** 69:20; 336:4
**drawing** 29:15; 107:14
**drayage** 11:6; 215:2;
251:12
**drill** 44:18
**driven** 294:12; 304:9
**driving** 77:9
**drove** 78:23; 79:3, 6
**dug** 227:10, 13; 228:18
**duly** 5:23; 356:6
**dumping** 349:16
**dupe** 324:19
**duplicate** 49:7; 93:21;
308:6; 342:16
**duplicates** 89:9
**during** 94:23; 97:4, 6;
100:22; 129:11; 148:20;
163:14; 179:20; 196:15;
210:23; 213:4; 241:21;
242:8; 281:6; 303:5;
341:21; 342:9

## E

**E-B-I-T** 218:23
**E-mail** 216:19; 217:22;
230:12; 231:11
**earlier** 121:17; 138:13;
197:18, 22; 325:18
**early** 33:21; 230:6;
289:22; 302:17
**earnings** 218:24; 242:11
**earthquake** 27:14
**easily** 174:14
**East** 179:7
**EBIT** 218:23; 219:2
**edge** 122:10; 123:11
**education** 305:16
**Effective** 339:11
**effectively** 34:1; 35:18
**efforts** 33:23; 35:6, 16;
201:5; 275:19
**ego** 185:12
**eight** 78:1; 296:2
**either** 13:19, 23; 15:16,
17; 16:24; 17:10; 33:20;
198:20; 199:17; 200:4;
264:6; 287:14; 330:17
**electronic** 156:10, 24

**elephant** 215:22
**else** 16:3; 52:17; 54:2;
100:9, 15; 125:8, 17;
137:6, 19; 145:6; 162:10;
169:2; 175:8; 178:3, 20,
21; 187:4; 206:13; 278:19;
309:12; 352:7
**else's** 279:22, 23
**employed** 4:11; 68:13;
115:10; 132:12; 155:3;
160:10; 161:1, 10, 19;
162:2; 167:4, 9, 15;
168:12; 235:20; 249:22;
273:20; 274:4; 279:1;
321:9
**employee** 41:1; 86:18;
129:18; 131:10, 11; 152:7;
176:22; 294:13; 303:9;
356:16, 19
**employees** 17:23; 18:23;
29:20; 50:5, 11; 74:5;
128:1; 224:13; 235:12;
238:12; 247:1; 269:3;
270:2, 9; 289:12; 303:8,
10; 322:3; 323:24; 345:23,
24
**employment** 18:20;
128:10, 19; 131:5, 24;
132:8, 22; 183:19; 190:17,
23; 191:6, 8, 12, 15; 192:1,
22, 23; 193:17; 230:19;
231:1; 319:14; 320:2;
346:19, 21
**empty** 238:22; 256:10
**enabled** 261:7
**encourage** 16:13
**end** 17:10; 28:20; 171:22;
174:8; 177:14; 202:23;
214:11; 288:1; 298:7;
301:3; 321:5
**ending** 94:17
**English** 71:18, 20
**enjoy** 354:3, 11
**enough** 195:24; 279:15;
297:4
**enter** 6:18; 31:1
**entered** 20:4; 27:20;
28:19; 286:9; 290:9
**entering** 11:5
**entire** 23:1; 285:16
**entities** 334:23
**entitled** 219:10; 291:5
**entrance** 22:14
**entrepreneur** 205:13;
232:5
**equipment** 300:19;
301:15; 302:5, 6; 304:6;
308:20
**equity** 334:20
**erupted** 29:8
**Esquire** 4:11
**essentially** 20:5; 28:20;
64:20; 128:17; 196:18
**estate** 88:1, 20; 89:13;
188:23; 197:2
**ethical** 257:20

# F

**Ettle** 161:7, 9; 162:18; 163:23; 165:13; 166:1; 168:9; 237:2; 245:7
**even** 127:18; 166:4; 168:23; 180:17; 225:14; 233:24; 258:9; 286:8; 293:6; 340:19; 348:6
**event** 234:11; 321:3
**eventually** 21:10; 166:14; 335:21
**everybody** 202:16; 203:21; 214:1; 259:15
**everyone** 102:21; 190:14; 213:24
**everything's** 305:21
**evict** 18:13; 19:6, 6, 7, 8
**evicted** 19:11; 20:2, 10, 15; 31:7, 13; 32:2; 241:24
**evidence** 55:23; 210:12; 211:15; 346:18; 350:12
**evidences** 245:18
**evidencing** 341:18; 342:7
**evolving** 27:14
**exact** 16:8; 17:5; 161:5; 236:18
**exactly** 9:13; 66:2; 202:9; 204:24; 292:6
**EXAMINATION** 6:2; 356:6
**examined** 5:23
**example** 48:3; 271:16
**Except** 70:8; 241:22; 345:19
**exchange** 227:6; 337:18, 21; 338:13
**Excuse** 262:16; 304:14
**excused** 355:9
**executive** 128:17; 196:17; 199:10; 207:6
**Exhibit** 4:4; 45:10; 55:24; 63:9, 18, 23; 111:12; 146:13, 13; 152:18; 194:16; 216:14; 252:23; 253:1; 265:22, 23; 267:21; 282:11, 14; 286:22; 291:4; 293:14; 336:24
**existing** 123:3, 4, 4, 5; 164:24; 215:12
**exists** 128:15
**expect** 121:24; 232:9
**expense** 13:24; 242:21
**expenses** 215:20
**expire** 295:7
**explain** 32:20; 37:8; 261:16; 309:18; 315:6
**explained** 208:11; 210:24; 307:13; 312:10
**explaining** 165:12
**explore** 19:23; 157:8; 289:16
**extort** 102:20
**extorting** 102:18; 105:22
**extra** 240:18; 287:1

---

**F-A-G-A-N** 348:10
**F-O-L-K-E-S** 164:13
**F-R-A-N** 183:4
**face** 181:21
**face-to-face** 8:1
**faces** 239:13
**facility** 7:21; 8:15; 18:17; 22:5, 11; 29:4; 42:6, 18; 53:21; 89:16; 98:10; 106:10; 121:5, 9; 124:11; 126:2, 19; 127:1; 160:18, 19; 164:1; 165:19; 179:8; 197:1; 241:23; 256:7, 11, 14; 282:2; 325:13
**fact** 32:16; 33:14; 42:14; 51:19; 59:24; 60:23; 63:14; 74:20; 77:9, 16; 79:2, 3; 80:23; 83:4; 102:16; 118:14; 123:16; 124:3, 4; 126:12; 127:17; 128:3, 7; 130:4; 138:12; 152:14; 169:16; 170:21; 191:14; 206:7, 14; 213:10; 232:20; 234:15; 243:24; 246:4; 260:22; 264:4; 277:24; 293:1, 2; 299:7, 19; 300:7, 9; 303:11; 318:23; 326:3; 345:19, 20; 346:18; 352:15
**Fagan** 348:6
**fair** 21:4; 48:3; 50:19; 82:12
**Fairfield** 76:18, 24
**fairly** 63:11; 209:18
**fairness** 57:21; 94:14
**fall** 167:2, 5, 6, 10, 22; 168:21; 169:3
**falling** 59:9
**false** 305:10
**familiar** 134:8; 213:8
**family** 18:7; 100:3; 104:20; 126:17; 140:14; 293:18; 320:6
**far** 29:6, 15; 43:6; 56:7; 60:2; 89:11; 121:22; 123:9; 146:6, 24; 175:17; 176:19; 200:13; 201:7; 225:14; 235:5; 239:9; 241:8; 274:16; 278:1; 285:22; 301:4; 328:14
**fascinated** 351:5
**father** 332:8; 348:2; 349:1
**father's** 345:9; 347:24
**fault** 37:2; 234:2, 3, 5, 5, 6, 7, 9, 10, 12, 20; 235:1, 2, 5, 7; 240:23; 244:1; 254:13
**fax** 231:10
**FBI** 102:17, 18; 103:3; 104:8; 105:18, 21, 24; 106:8, 15, 19; 304:8
**February** 64:17; 75:19, 24; 86:21; 87:15; 88:8;

---

50:6, 11; 92:13; 93:9; 94:3, 13, 17; 96:3; 220:19, 23; 221:4; 222:8; 223:7; 324:3
**Federal** 32:9
**Feds** 199:13
**fee** 326:10
**feel** 126:2; 191:9; 254:17
**feet** 216:5; 275:9
**fell** 233:6
**fellow** 53:11; 189:16; 309:8; 348:7
**fellow's** 107:8; 238:15
**fellows** 144:23
**felt** 320:5
**fences** 264:20
**few** 26:3; 43:5; 54:17; 56:9; 64:24; 79:9; 131:20; 137:24; 141:3; 171:17; 256:2; 267:2; 318:24; 352:14
**Fifty** 46:11
**fight** 176:8
**figure** 214:6; 220:2; 223:7; 310:23; 311:4
**figures** 214:14, 15; 219:15
**.file** 72:15; 73:21; 153:21; 203:12
**filed** 16:18, 22; 17:12; 138:7, 18; 140:24; 141:3; 171:21; 177:20; 178:16
**files** 25:20, 23; 287:14, 15
**fill** 145:18; 256:18; 285:15
**filling** 256:19
**Fin** 117:8
**final** 138:23; 218:9
**Finally** 139:23; 204:9
**finance** 15:8; 310:2
**financial** 114:22; 123:5; 188:15; 226:9
**financially** 356:21
**financials** 222:16
**financing** 294:3; 333:6; 334:9
**find** 70:10; 105:21; 129:9; 131:15; 145:17; 200:21; 201:18; 228:21; 231:16; 233:3; 262:13; 285:20; 297:3; 320:7, 12
**fine** 7:9; 33:19; 34:20; 38:10, 14; 51:8; 59:17; 110:18; 126:11; 177:3; 179:3; 189:14; 202:3, 5; 208:13; 302:9; 332:14; 343:15
**finish** 21:9; 96:1; 108:17; 146:10; 169:5; 208:5, 6; 266:6; 351:13; 353:23
**finished** 266:7; 311:12
**Finley** 306:11, 16; 308:14, 22; 309:12
**Finley's** 306:17
**fire** 174:3
**fired** 97:15

---

**firm** 15:13; 56:24; 98:3; 190:8; 334:19
**first** 16:22; 20:22; 45:19; 46:8, 9, 12; 65:5; 76:17; 80:17; 81:4; 89:1; 91:17; 92:12; 147:13; 167:9; 170:23; 172:1, 9; 181:18; 182:2; 195:11; 196:16; 208:4, 9; 216:18; 218:7; 240:3; 241:4; 242:8; 246:7; 255:10; 262:22; 267:6, 21; 268:24; 273:13; 281:5; 291:18, 19; 313:15; 324:20; 331:15; 332:17; 353:17
**Fisher** 141:5; 311:20
**Five** 26:6; 42:2; 209:22; 223:17; 224:5, 5; 226:6, 13; 236:23; 244:5; 247:23; 249:24; 250:12; 261:20; 275:8; 295:3; 299:4; 306:18; 351:24
**five-minute** 83:15; 212:10
**five-year** 41:22, 24; 261:22
**flat** 198:4
**Florida** 127:14; 297:6, 10
**flowed** 98:11
**focus** 33:23; 35:6, 8, 16; 69:21; 70:24; 103:1; 124:16; 185:13; 196:15, 18; 197:3, 7, 8; 201:5; 283:8
**focusing** 27:16, 24; 262:21
**Folkes** 162:23; 164:10, 13
**folks** 114:3, 6, 15; 136:8; 287:16; 355:2
**follow** 135:17
**follow-up** 133:14
**followed** 24:24
**following** 135:8, 14; 269:14; 339:13
**follows** 5:24; 218:21
**fond** 127:22
**fooled** 64:8
**foolish** 325:15; 336:12, 14
**foot** 18:16
**forbids** 169:19
**forecast** 213:6, 23; 214:15; 232:7, 14
**foregoing** 356:10
**forget** 27:17; 185:11; 195:12; 228:12; 249:22
**forgetting** 124:14, 15
**form** 10:19; 11:9, 12; 16:16; 48:6; 71:11; 110:8; 118:6; 221:9; 222:2; 271:10; 294:1
**formal** 35:2, 12; 213:12; 214:2; 341:13
**formally** 7:2
**formatted** 46:20

---

**formed** 340:5
**former** 158:15; 227:21
**forth** 209:18; 217:18; 219:14; 265:16; 289:7; 312:3; 356:14
**Fortune** 129:8
**forward** 281:6
**forwarding** 54:9
**fostered** 15:21
**fought** 204:6
**found** 198:21; 199:1; 257:15; 289:10
**foundation** 241:12
**four** 75:9; 164:3; 181:5, 8; 182:8; 244:4; 250:12; 261:19; 274:19; 299:4, 16; 306:18; 308:5; 315:19; 351:23; 353:3
**Fran** 183:4
**Frank** 189:16, 17, 18, 19; 199:13
**frankly** 301:20
**free** 170:2; 193:10; 288:4
**Freehold** 14:4; 22:4; 26:15; 31:21; 67:3; 88:12; 141:5; 165:10; 241:23; 282:2; 293:24; 300:2; 305:19; 309:1; 325:14; 352:16, 17
**Freight** 5:12; 197:12; 253:4; 266:11; 326:13
**frequently** 148:20; 318:22
**Friday** 17:1; 321:23, 24
**friend** 103:4; 238:20; 248:16; 259:9; 306:17; 345:9; 347:24; 352:7
**friend's** 238:20
**friends** 238:20; 255:7; 258:12; 306:11; 348:3; 349:2
**friendship** 255:16, 23; 263:3, 22; 318:13, 19
**front** 18:21; 59:10; 64:1; 107:10; 183:18; 245:11
**full** 68:13; 237:16; 290:15
**fully** 158:20; 290:14
**fun** 347:15; 354:15
**function** 203:4
**fund** 140:11; 165:21; 166:5; 223:19; 305:18
**funding** 201:18
**funds** 17:21, 22
**furnished** 344:16
**further** 142:21; 356:9, 15
**future** 11:17; 21:1; 89:14, 17; 108:23; 110:5; 115:22; 118:18, 21; 121:19; 157:9; 183:19, 19; 194:1; 273:3; 278:20; 281:18; 354:22

---

# G

**G-R-I-E-F** 107:8

**Gabrielle** 152:15, 16

**gain** 142:18

**gained** 255:15, 22; 263:2

**gangsters** 106:9

**gap** 78:3

**garage** 24:17; 303:16; 304:18; 305:2

**Gary** 13:3, 4; 14:10; 15:19; 16:2; 19:10, 17; 20:19; 21:1, 10; 30:11; 47:12, 17; 54:11, 18; 56:4, 10, 12, 18; 89:4; 100:13; 110:15, 20, 23; 111:4, 8; 114:16, 17; 134:7; 140:19, 21; 150:12; 159:15; 177:6, 8; 188:10

**gather** 24:1

**gathered** 13:5; 24:13

**gathering** 13:15, 20; 138:13

**gave** 25:21; 53:11; 57:3, 6; 61:24; 84:8; 108:5; 164:2; 166:6, 8; 176:15; 207:1, 3; 209:22; 228:20; 268:3; 290:15; 301:17; 302:5; 308:4; 341:23; 342:14

**gears** 80:10; 279:13

**Geez** 117:11; 319:23

**general** 7:17; 10:6; 47:18; 49:24; 56:3; 80:4; 90:14; 93:4; 114:18; 164:21; 188:11; 197:12; 232:6; 242:20

**generally** 80:2, 3; 232:12; 320:3

**Genpar** 5:4, 8

**gentleman** 216:23

**gentlemen** 122:20

**George** 303:11, 12, 18; 304:20, 21; 305:10; 308:23; 309:4, 8, 9

**get-to-know-each-other** 158:2

**gets** 269:1

**Ghost** 328:22

**girlfriends** 104:23

**given** 13:7; 40:3; 56:23; 109:21; 166:3; 183:10; 231:10, 11; 267:21, 22; 289:11; 326:16, 18

**gives** 350:8

**giving** 43:10; 69:17; 104:2; 123:10; 196:5; 215:8; 216:16; 289:1; 326:12; 341:7; 353:5

**Glass** 29:3; 60:14; 98:10; 215:6, 8, 9, 17, 18, 24; 216:5, 12; 225:1; 233:5, 9; 244:2, 4; 281:12

**global** 258:1

**God** 53:21; 309:5; 326:6

**goes** 260:1; 275:20; 350:7

**Gold** 108:5; 162:19; 165:18, 23, 24; 169:12, 12;

**Gabrielle - initiated (8)**

224:18; 238:5; 326:7

**good** 23:10; 107:12; 130:19; 175:23; 185:17; 195:6; 234:18; 258:19; 259:10; 271:7; 305:11; 309:5; 347:1; 349:1; 350:4

**gosh** 296:15

**Gospel** 325:6

**Grand** 32:9

**grass** 22:12

**Great** 45:4; 121:10

**greedy** 259:13

**green** 330:11

**grew** 21:11

**Grief** 107:5

**grinning** 83:11

**grip** 136:13

**ground** 241:12

**group** 88:20; 119:7; 145:21; 164:8; 256:4

**groups** 157:1

**grow** 126:3; 175:24; 176:2; 241:20

**growing** 103:1; 124:16

**guarantee** 336:10

**guarantees** 289:15; 333:15; 335:22

**guess** 87:2; 240:13

**guest** 65:3

**guilty** 32:22; 81:17, 18; 82:6, 15; 84:10, 16; 201:24

**gun** 106:11

**guy** 22:18; 189:3, 10, 10; 207:14; 239:11, 15; 259:13; 306:14; 351:10

**guy's** 137:9

**guys** 29:11, 18; 102:20; 180:16; 305:22; 319:23; 351:12

# H

**H-A-S-L-O-N** 161:22

**habit** 153:13

**habits** 153:9

**Haddonfield** 4:22

**half** 9:15, 18; 129:11; 172:1, 9; 195:11; 204:9; 221:6; 222:6; 223:15; 229:19, 19; 231:21; 234:16; 278:12, 15

**hand** 146:14; 202:4; 203:17; 207:1, 7, 11

**handed** 39:24; 63:22; 206:8; 216:15

**handing** 207:18

**hands** 99:1, 12

**handwritten** 334:21

**hang** 89:7

**happen** 36:11; 99:4; 173:12, 16; 213:16; 300:5; 328:17

**happened** 17:12; 23:8,

17; 26:17; 36:9, 12; 79:3; 95:12; 97:17, 23; 99:2, 5; 172:19; 173:22; 175:8; 190:20; 201:10, 23; 205:6, 6; 289:20; 294:6; 296:21

**happening** 254:10; 258:11

**happens** 271:5

**happy** 73:22

**hard** 70:21; 97:24; 259:7; 310:10

**harmed** 211:10

**harsh** 349:12

**Hartford** 77:2

**harvest** 244:6

**Haslon** 161:20, 21, 23; 162:2; 163:22; 165:12; 166:1; 168:18; 235:22; 245:4, 6

**hate** 155:20

**haul** 326:12; 329:11

**Haven** 76:24

**havoc** 264:8; 283:14

**head** 117:5; 157:11

**headed** 218:23

**heading** 124:19

**headquarters** 18:13; 23:6; 225:2

**hear** 61:2; 101:11; 175:15; 211:19; 350:24; 351:6, 15

**heard** 105:22; 300:19; 303:17; 305:1, 4; 351:16

**hearing** 141:5; 142:9, 13, 21; 311:17, 19

**hearted** 305:11

**heated** 306:5

**held** 4:22

**hello** 159:18

**help** 118:24; 129:6, 9, 10; 131:14; 145:17; 164:23; 271:23; 279:10; 320:7, 12, 13; 329:20; 343:3

**helped** 236:6; 250:8, 11

**helping** 162:15; 278:7; 326:13

**Here's** 43:16; 130:21; 213:16, 17; 277:18; 338:21

**hereby** 356:4

**hereinbefore** 356:13

**Heydon** 87:24; 88:5; 89:11; 90:22; 188:22, 24

**hidden** 235:8, 10, 21

**Hightstown** 273:1

**Hill** 4:23

**himself** 97:20; 238:4; 259:12; 272:17

**hire** 175:22; 232:18; 238:19; 244:12, 14, 16, 17, 19, 23; 245:1, 3, 5, 7, 9, 22, 24; 246:2, 8, 18, 21

**hired** 167:1; 176:23; 177:9, 10; 238:12; 239:11, 15; 244:9, 11; 246:7; 329:9

**hiring** 232:21, 22

**history** 283:4

**hit** 233:12

**hitting** 233:14, 18

**Hoffa** 348:17, 18; 349:2

**hold** 36:16, 19; 42:11; 192:11; 320:20; 350:22

**holding** 318:20

**Holy** 328:21

**home** 57:13; 58:16, 16; 76:15, 21; 77:1; 78:23; 79:3, 6; 101:23; 102:1, 4; 104:21; 105:1, 12, 13; 109:24; 130:7; 139:23; 154:15, 16; 180:2; 225:2; 280:3; 310:16; 318:11, 21

**homerun** 350:10

**homes** 311:12

**honestly** 296:22

**Honeywell** 41:20, 20; 42:11, 17; 43:1, 5; 143:14, 17; 146:24; 147:2, 9, 21; 148:1; 149:1, 7; 152:12; 261:21; 315:23; 316:6

**hook** 222:5; 298:15, 16, 19

**hoping** 57:23; 185:12; 269:10, 13

**hotel** 175:13

**hour** 60:1; 212:12; 270:10, 10

**hours** 53:16; 115:19; 273:10; 311:15; 323:10, 10

**house** 24:18; 238:15, 17; 304:9; 307:9; 310:7, 9, 14; 318:24; 322:8

**How's** 83:15

**Hughes** 246:19; 257:5, 8, 15; 258:8, 22; 259:15; 262:4; 270:4, 6, 14, 15, 17, 19; 271:8, 17, 20

**hundred** 226:24; 227:11, 14; 228:19

**hung** 93:16

**Huntley** 6:11; 52:20; 62:3; 138:8; 186:8; 187:2; 210:18; 216:21; 217:14; 226:18; 243:12; 247:18; 324:19; 331:3, 16; 334:16

**hurt** 57:19, 23; 58:1; 104:20, 24; 128:24; 129:4

**husband** 246:3, 5; 294:18

# I

**idea** 121:10; 172:8; 333:5

**identification** 4:3

**identify** 350:4

**identity** 104:16

**illness** 59:12

**immediate** 141:6

**immediately** 32:14, 17; 94:11; 202:14; 272:20;

273:16; 304:8

**important** 71:8, 14, 18; 72:4, 9, 11, 12; 81:9; 225:18; 243:17

**impressed** 127:24; 128:4

**in-bound** 216:6

**Inc** 5:4; 253:4; 266:11; 291:9

**include** 21:11; 121:21; 122:3; 164:24; 188:10

**included** 113:21, 23; 114:2; 172:2; 186:7; 275:10

**includes** 186:24

**including** 15:18, 19; 51:18; 164:9; 187:20; 197:12

**income** 219:11; 232:16

**incorporated** 5:2, 8, 13

**increase** 34:16

**indeed** 309:4

**indicated** 152:20; 197:18

**indicates** 98:14; 146:21; 147:8; 148:23; 188:1; 218:15; 279:3

**indicted** 32:9; 33:11; 106:23; 174:16, 17; 197:14; 198:17; 200:16; 239:22, 24

**indictment** 35:4, 14; 80:18; 81:5, 13, 23; 82:4; 84:8; 107:10; 174:16; 183:24; 194:21; 197:21; 198:11, 22; 199:3, 14; 201:6; 203:4; 207:22; 209:13, 14; 284:5

**indirectly** 13:20; 332:6

**individual** 86:17; 87:18, 23; 248:12; 284:1

**individuals** 39:15; 57:4; 78:9; 85:1; 145:4

**industry** 122:9, 14; 206:19

**inform** 160:23

**information** 13:6, 7, 15, 21; 15:11, 16; 19:5; 24:2; 26:3; 68:17; 81:7, 10; 105:23; 119:8, 13, 19; 122:4, 19, 22; 123:3, 5, 6, 9, 12; 138:14; 160:3, 7; 161:24; 162:11; 163:12, 14; 167:19; 183:12; 185:21; 226:10; 229:13; 255:15, 21; 257:3; 259:22; 260:9, 12, 14, 16, 17; 261:1, 6; 262:4; 263:2, 20; 270:18; 272:6; 274:13; 275:2; 330:20; 338:4; 353:1

**informed** 255:14; 262:24

**informing** 123:15; 270:7

**infrastructure** 232:9

**infuriated** 22:16

**initial** 221:15

**initially** 298:16

**initiated** 129:20, 22

**inside** 47:19

**insignia** 326:2

**instance** 155:16; 211:22; 246:7

**instead** 233:18

**instructions** 289:5

**insurance** 289:5

**insured** 299:23

**intended** 198:10; 265:1

**intent** 119:24

**interest** 69:13; 121:14; 122:16; 124:24; 125:22; 126:8; 157:14; 218:24; 279:10; 283:6; 288:2; 310:21

**interested** 124:13; 131:10; 137:1; 163:19; 346:10; 347:15; 356:21

**internal** 10:15; 203:1, 6, 9

**internally** 228:6, 13

**interoffice** 202:7; 205:21

**interrupt** 346:2

**interrupting** 262:16

**intervention** 347:10

**into** 6:19; 11:5; 17:21; 18:2; 20:4; 27:14, 20; 28:19; 34:21; 52:6; 69:21; 106:10; 119:5; 127:7; 176:6; 183:24; 185:9; 193:16; 195:18; 206:22; 214:2; 217:17; 225:7, 15; 227:2, 10, 13; 228:18; 230:8; 231:8, 13, 23; 248:10; 286:9; 290:9; 303:16; 304:18; 305:2; 323:23; 331:10, 19; 334:21; 338:19

**introduce** 207:5

**introduced** 12:24; 13:3

**investigation** 67:23

**investment** 118:23; 136:24; 272:16; 306:20

**investor** 158:19

**investors** 118:24; 127:10, 10; 145:22; 200:22; 231:16

**involved** 18:24; 28:11; 30:8; 32:21; 38:17; 44:7; 106:24; 107:11; 144:22; 145:15; 162:14; 163:17; 176:4, 14; 197:1; 303:20; 350:13

**involving** 72:9; 85:12; 115:22; 117:18; 347:10

**iron** 7:19, 21; 8:22, 24; 9:7, 11, 21; 10:2, 11, 14; 11:1, 4, 17, 19; 12:5, 20; 13:1, 2, 11, 19, 23; 15:7, 14, 19, 24; 16:12; 18:16; 12; 20:4; 21:11, 17; 22:5; 23:7, 8, 16; 25:8; 26:7; 27:7, 10, 13; 28:1; 29:9, 16; 30:1, 14; 31:7, 19; 32:3; 47:19; 54:11; 56:3; 67:8, 11, 17; 68:18; 69:4, 11; 70:4, 11, 15, 17, 19, 22; 75:11; 78:8; 79:18;

80:8; 82:7; 85:13; 86:16, 17; 88:1; 89:13; 90:14; 111:20; 114:3, 5, 14, 18, 22; 115:11, 13, 23; 116:6, 8; 118:17, 20; 125:11; 131:24; 132:8, 12, 16, 22; 136:8, 20; 138:7, 21; 139:5; 140:10; 144:23; 145:5; 149:11; 152:23; 153:6; 158:10, 16, 19, 23; 160:3, 7, 12, 23; 161:3, 8; 162:1, 11; 165:15; 170:3; 171:5, 6; 172:3; 175:20; 176:17, 22; 177:1, 4, 19; 178:15, 21; 179:6; 180:10; 183:9, 10; 184:11, 18, 21, 23; 185:22, 23; 186:2, 23; 187:14; 188:5, 11, 15; 189:4; 190:2, 11; 196:24; 281:11, 11, 16, 16, 22; 282:8; 319:4, 14, 16, 20, 21, 22; 322:17; 325:13; 326:24; 348:5; 349:10, 13, 15; 352:24; 353:7

**Island** 112:17

**issue** 190:16

**Item** 47:3; 48:17; 49:5, 9; 65:11; 66:18, 22; 67:1; 75:2; 76:12; 77:18, 22; 87:11; 90:5, 21; 91:18; 92:11, 12; 93:9; 94:2; 111:24; 112:4, 8, 15, 23; 113:5, 9, 13; 133:17; 134:5, 11, 18; 135:2, 9; 140:17; 143:22; 146:21; 147:7, 13; 148:23; 149:3, 14, 23; 150:11, 17; 151:5, 5, 15, 15, 20; 152:2, 11; 218:7

**Items** 49:17; 79:16; 135:22, 24; 219:6

# J

**J** 5:3, 6; 282:15

**J.F.K** 4:12

**James** 5:11; 352:2, 7

**January** 64:16; 66:6; 76:6; 77:14; 79:21; 80:2; 91:11; 152:23; 190:20; 191:20; 195:11, 13, 14; 196:16; 213:1; 216:19; 217:24; 218:13; 239:22; 291:14; 297:22

**Jeep** 294:7, 10, 12; 295:19; 296:13; 297:1

**Jeff** 60:10, 11; 61:11; 62:14; 94:12, 19; 95:13; 97:13; 98:4; 186:3, 5; 322:22; 324:5; 326:5, 6, 6

**Jersey** 4:15, 23; 5:2, 11; 8:9, 10, 12, 13; 15:5; 18:14; 29:5; 42:5; 51:2; 67:3; 76:16; 79:6; 113:11; 116:19; 145:19; 151:9; 179:7; 181:19, 23; 182:21; 209:20; 210:20; 215:13; 216:3; 273:1; 294:1;

339:15; 340:7; 348:15; 349:19; 356:4

**Jim** 21:16, 19, 20; 22:2, 3, 7, 9, 19, 20, 22; 23:1, 5; 26:4, 5, 9; 30:15, 16; 31:22; 144:24; 145:4, 12; 151:9; 172:2; 175:1; 247:5, 7, 13; 248:6; 250:11; 251:7, 8, 19; 252:3; 253:3, 11, 12; 254:4; 255:11, 13; 256:8; 257:6, 16, 17, 18; 259:20; 263:1; 266:9; 267:14; 270:1; 273:2; 274:24; 277:6; 279:22; 283:13

**Jimmy** 145:20; 165:11; 247:7, 15, 16; 255:6; 256:16, 17; 257:19; 258:4, 12, 13, 21; 259:8, 9, 10, 17, 20; 262:3, 11, 11; 267:3; 268:12; 300:18; 306:3; 310:7; 348:17, 18; 349:2

**Jimmy's** 259:10, 23

**job** 99:6; 128:6, 23; 131:15; 160:17; 249:7; 257:1; 319:3, 22; 320:6, 7, 10, 12, 13

**jobs** 129:6

**John** 6:9; 87:24; 88:5; 89:11, 12; 90:22; 114:16; 118:23; 150:19; 159:15; 172:2; 174:3, 21, 23; 175:6; 188:14, 21, 24; 337:10

**join** 175:18; 250:9

**joined** 339:13

**joy** 339:19

**JR** 239:12; 321:8

**judge** 104:8; 141:5; 210:18; 311:20

**judgment** 327:12

**July** 142:21

**jumble** 141:2

**jumbled** 82:13

**June** 227:23, 24; 228:2; 229:16; 356:24

**junior** 349:8

**Jury** 32:9

# K

**keep** 27:12; 34:15, 20; 36:23; 63:15; 153:24; 154:2, 8, 11; 155:17, 20; 205:19; 241:17; 288:3

**Kelly** 130:14; 307:20

**Kenny** 114:16, 21; 115:1; 118:23; 135:12, 13; 159:15; 188:14

**kept** 57:7; 155:11

**Kevin** 348:8

**keys** 308:2, 5, 6

**kicked** 23:2

**kidding** 354:15

**kill** 83:12; 106:12

**kind** 23:17; 35:1; 62:5; 122:14; 147:17; 232:10; 260:8; 272:10; 298:2; 333:6; 337:17; 347:15

**kinds** 108:8, 18; 235:8; 304:5

**KIRCHER** 6:4, 6, 15; 7:9, 14, 15; 10:20, 21; 11:14, 15; 15:3, 6; 16:17; 17:3, 6, 9; 27:3, 4; 33:6; 35:21; 36:2, 3; 39:12; 48:8; 52:14; 53:8, 13, 22; 54:1; 63:19, 20; 71:12; 73:14, 23; 82:24; 83:2, 4, 8, 13; 84:4; 91:23; 92:5, 9, 10; 96:17; 103:13, 18; 137:10, 15, 18; 144:17, 19; 151:19, 23; 152:1; 163:3, 8; 178:8, 12; 187:22; 188:4; 189:12, 22; 194:19; 195:3; 205:2; 212:9, 21; 221:10, 19, 23; 227:3; 252:21; 271:11; 276:14; 277:4; 286:24; 287:4; 293:9, 12; 314:2, 4; 315:1; 323:6; 324:14; 325:10; 329:23; 330:1; 337:2, 6, 9, 13; 338:16; 342:21, 23; 343:13, 16, 23; 344:4, 10, 13, 17, 21; 353:12, 22; 354:2, 8, 14, 19, 24; 355:4

**knew** 28:15; 124:1; 127:19; 150:6; 169:11, 22; 170:11; 180:15; 193:15; 194:4; 196:5, 8; 261:20; 262:11, 11; 265:7; 312:12; 315:24; 336:18; 337:24

**knife** 213:21

**knock** 225:11

**knowing** 13:10; 257:2; 262:3; 274:20; 340:13; 349:17

**knowledge** 32:2; 205:1; 211:14; 297:8

**known** 11:1; 32:14; 35:5; 206:18

**knows** 102:21; 174:11, 12; 270:5; 275:15; 349:9

**Koppel** 246:22

# L

**L-E-H-M-A-N-N** 150:22

**L.P** 5:4, 7

**La** 165:6, 7, 8

**lady** 343:19

**laid** 239:10

**landlord** 149:18; 150:7; 258:6

**landlord's** 316:21

**landlords** 36:18; 250:23, 23

**lapse** 103:23

**laptop** 156:6

**large** 121:3; 129:8;

158:19; 205:9; 220:13

**Larry** 12:8, 18, 20; 13:8; 14:10, 11, 12, 22, 24; 15:17, 18; 56:23; 60:7, 9; 61:20, 23; 62:1; 177:6; 190:1, 7

**Las** 139:10, 15

**last** 7:18; 12:4; 16:9; 17:1; 23:24; 41:7, 9; 49:14; 57:15; 59:6; 108:8, 19; 111:12; 128:5, 9, 18; 129:11, 16; 130:24; 131:4; 136:2, 11, 17, 21; 163:4; 180:10; 181:5, 8; 182:8; 185:24; 188:7; 206:19; 220:10; 226:12; 227:23; 247:23; 249:24; 250:12; 251:6; 259:17; 275:17; 280:22; 283:9; 289:22; 299:5, 7, 9, 16; 301:18; 312:5

**late** 26:22; 28:8; 33:20; 42:21; 65:23; 107:4; 289:21; 345:9; 347:24

**later** 45:5; 146:9; 149:9; 166:21; 264:5, 11, 15, 22; 303:3; 309:18

**law** 56:24

**lawsuit** 6:7; 13:12, 16; 14:1; 15:9; 16:13, 18; 17:12, 15; 85:13, 14; 100:2; 138:7, 10, 16, 17, 23; 141:1, 4

**lawyer** 47:19; 57:15; 58:8; 142:12; 149:17; 150:7; 190:2, 7; 193:7; 316:21; 322:11; 323:13; 339:20; 341:23

**lawyers** 138:22; 139:6; 160:4, 8, 13; 161:8; 162:1; 177:2, 5; 178:21; 311:19

**lay** 275:23, 23

**leader** 122:13; 206:18

**leaders** 122:9

**leading** 123:11

**leads** 164:1

**Leahy** 27:12; 171:1, 4

**learned** 81:4; 119:17; 197:14; 333:23

**learning** 254:16

**lease** 7:21; 8:24; 10:2; 20:5, 11, 14, 22; 21:17, 18; 27:2, 6, 11, 17, 20; 28:7, 13, 19, 24; 29:1, 17, 17; 41:21; 42:1, 3, 5, 13, 18, 23; 109:20; 242:2; 256:3, 7, 14, 21, 22; 257:15; 258:7; 260:18; 261:20, 24; 262:6, 7, 12; 271:19, 21, 22; 275:5, 6, 8; 286:5, 10, 11, 16; 287:9, 18; 288:3, 4; 289:4, 11, 23; 290:10, 16; 291:6, 18, 20; 292:10, 24; 295:9; 298:7, 7, 17; 299:12, 17

**leased** 297:5; 328:12

**leases** 123:3; 295:7

least 9:18; 11:22; 39:14;
62:15; 76:17; 123:14;
139:10; 147:3; 214:7, 16;
224:5; 254:23; 263:20;
315:19; 324:15; 332:17
leave 35:21; 38:11;
109:19; 152:9; 176:24;
186:16; 305:22
leaving 104:23; 145:7;
190:10; 309:13, 23
Lee 246:21
left 25:1; 46:24; 76:9;
86:20; 130:13, 18; 186:15;
304:9; 305:23, 23, 24;
312:8; 354:7
leg 310:13
legal 13:24; 14:6, 7;
15:21; 16:1; 183:8
Lehmann 150:20; 151:2;
172:2; 174:3, 15, 19, 21,
23; 175:6
length 329:11; 330:5
lengthy 63:11
lent 259:20
Leo 331:23, 23; 332:3, 9
less 195:20; 205:12, 13;
267:10, 11, 11; 284:22
lesson 333:23
letter 19:9, 12, 13; 23:18,
21; 25:8, 11, 15, 20, 22;
30:5, 6, 11, 19, 22; 72:15,
16; 73:10, 13, 19, 24; 74:1,
1, 3, 8, 14; 109:12; 221:16;
226:19; 253:2, 8, 10, 17,
18; 254:5, 22, 24; 256:12;
261:5; 262:17; 264:14, 21;
265:1, 5, 7, 13; 274:3;
275:22; 293:16; 294:1, 5;
296:11, 16, 18; 313:2, 4, 6,
9, 16, 18, 23; 314:6, 9, 13,
15, 24; 315:3; 337:4, 15;
338:4, 24; 340:15
letter's 264:5
letterhead 266:1
letters 24:2; 29:24;
104:21, 22; 105:1, 2, 10,
19
Levin 4:10
liabilities 311:11
license 227:7; 338:13
lie 132:1, 23; 133:1;
173:23, 24; 185:4, 6;
198:18; 249:19; 254:6
liens 288:5
life 59:9; 179:15
lifted 211:3
light 20:11, 13
line 29:16; 49:17; 135:2;
143:22; 195:8; 216:20;
218:7; 220:1; 335:4
lines 204:23; 313:10;
352:23
list 188:8; 235:21; 236:14;
349:22
Listen 29:17; 61:3; 63:14;

69:23; 96:13, 15, 18;
176:4; 202:18; 238:16;
259:6; 323:15; 333:24
listened 61:1; 62:13;
94:15; 336:6
listening 332:15; 343:19,
20
literate 205:11
litigation 58:8; 341:2
little 8:19; 19:23; 45:2;
63:24; 71:15; 78:19;
110:17; 121:17; 143:7;
154:5; 190:15; 220:20, 23;
238:2; 285:21; 289:17;
310:15; 334:20
LLC 5:5, 9; 218:3; 256:5;
340:13
load 217:17; 284:23
loads 216:6, 8
loans 274:15, 19, 21
local 52:4; 305:14;
345:10, 21; 347:12, 24;
348:13
locals 349:22; 353:3
located 182:19, 20
location 242:1
locations 345:23
locked 24:7; 226:10
log 155:21
Logisteq 5:5, 9; 6:14;
8:24; 9:3; 13:7; 19:7, 8, 14,
16; 20:1, 4, 10; 21:2;
23:18; 24:3, 6, 11, 15;
25:12, 20; 28:23; 30:1;
32:15; 33:12, 22; 34:23;
35:13; 36:20; 37:5, 11;
39:16, 20; 40:3, 15; 41:6,
8, 10; 42:1; 43:9, 19, 21;
44:12; 50:5, 7, 11; 67:22;
68:5, 9, 14; 69:13, 22;
74:6; 80:8; 81:20; 85:1, 12;
88:16, 17; 89:18, 19;
90:15; 109:7; 115:7, 10;
119:5, 8, 19; 120:4, 23;
121:4, 21; 122:3, 5, 8, 19;
125:8; 128:11, 12, 14, 15;
142:16; 145:13; 146:17;
147:4; 148:2, 13; 151:3;
152:7; 155:4; 156:4, 18;
160:10; 161:1, 10; 162:2;
165:1; 166:15; 169:20;
174:4; 175:18, 22, 24;
177:22; 178:18, 23;
179:16, 22; 186:11;
190:17, 18; 191:4; 193:24;
194:12; 196:22; 198:21;
201:15, 16; 203:1, 7;
206:10; 210:16; 211:10;
213:12; 214:1; 215:8, 16;
217:15; 218:2; 224:12, 22;
227:17; 228:3; 236:3, 5, 8,
11, 21, 23; 237:8; 238:3;
242:21; 246:16; 248:9;
249:1; 250:10, 18; 251:12;
255:17, 18, 24; 256:3, 9;
257:1, 12; 258:19; 259:16;
260:23; 261:8, 24; 263:4,
5, 24; 264:8, 17; 266:22;

270:4, 9; 271:4; 273:4, 15,
16; 276:1, 9; 277:10, 15,
23; 279:11; 280:4, 7, 14,
15; 283:6; 285:2; 286:8;
290:8, 22; 291:11; 292:2;
293:5, 7; 294:11, 14;
295:14; 296:4, 13; 297:13,
17, 19; 299:2, 3; 300:2, 9;
303:8; 306:23; 312:1;
315:16; 317:18; 321:10;
322:2; 325:24; 326:1, 1,
16; 328:2, 3, 13, 17;
329:10; 330:3, 16; 331:11,
18; 332:24; 334:5; 339:1,
2, 13; 340:6, 13, 16;
352:22
Logisteq's 7:20; 25:23;
28:3; 115:12; 118:7;
142:24; 165:14; 170:10;
270:1, 12; 274:14; 283:22;
294:7, 20, 24; 295:2;
302:23; 329:19; 335:23
Logistic 64:13
logistics 216:11; 338:19
London 77:3
long 17:13; 115:16;
143:5; 191:12; 208:13, 18;
212:8; 273:5; 306:23;
311:24; 323:14
long-term 333:1, 6; 334:9
longer 76:15; 107:15;
119:5; 201:14; 203:22;
256:24; 282:3; 288:13;
295:9, 14; 321:9; 348:21
look 26:14; 44:16; 46:19;
49:17; 51:12; 54:24; 65:5;
74:13, 19; 79:16; 83:9;
87:11; 90:4, 20, 23;
111:11; 135:22; 139:11;
159:8; 209:12; 210:18;
213:7; 218:6; 219:23, 24;
286:14; 287:6; 313:17;
316:10
looked 49:16; 162:16;
226:13
looking 47:1; 88:24;
215:19; 219:13; 239:17;
269:3; 270:2, 13; 313:23;
314:5; 321:8; 335:9
looks 9:4; 78:22, 22;
83:11; 90:5, 21; 139:8, 15,
24; 140:18; 149:10;
150:11; 293:23; 294:1
Logisteq 10:16; 161:19
Loreal 108:4; 162:22, 24;
163:11; 164:7, 10, 14, 16
Los 139:16, 21
lose 242:9
losing 233:7; 235:5, 7;
240:8; 243:9
loss 239:6; 242:16;
258:16
losses 241:11
lost 233:8; 234:15
lot 57:17, 19, 23; 58:1;
89:3, 6, 9; 93:20; 129:3;
170:15; 192:4; 215:23;
223:18; 225:6; 238:4;

239:6; 241:11; 301:22;
311:8; 349:16
low 254:21
LTL 284:19, 22
Lucky 141:20
lunch 113:20; 114:6, 15;
121:19; 137:17; 144:4, 11,
18; 156:22; 256:16
luncheon 115:16, 21;
117:14, 17; 120:15;
122:21; 125:5; 133:6;
135:14; 145:1, 7
lying 172:24; 173:7, 10,
21; 198:4; 254:13

## M

M-A-S-S-U-C-C-I 53:9
Mafia 106:24; 107:12
magical 342:16
main 18:13; 21:14; 22:14;
67:7; 233:2
maintain 25:19; 191:13;
271:1
maintenance 22:4;
303:14
major 120:3; 196:9, 15,
18; 197:3, 7, 8; 206:21
majority 123:15; 196:2;
230:7
makes 42:12; 95:3;
264:3; 266:9
making 34:4; 55:9; 76:16;
83:6; 105:3; 173:1, 20;
178:17; 201:15; 241:9;
242:17; 249:12; 250:20;
258:1; 283:11; 293:5, 6;
299:1; 305:10; 319:9;
345:24
man 260:6; 304:13;
309:5; 347:1
manager 38:21; 238:18;
239:10, 12; 248:17
Manalapan 182:21
Manhattan 293:18
many 8:1; 9:14; 63:13,
13, 13; 85:3; 97:21;
106:19; 108:3; 109:22;
119:23; 120:18; 129:8;
131:17; 160:13; 174:5;
186:12; 187:17; 205:19;
243:9; 257:10; 299:14;
322:1; 348:2, 2
March 17:2, 10; 39:14;
64:17, 22; 91:6, 7, 9; 92:2,
3; 110:16, 20; 111:4, 8, 19;
112:9, 15, 24; 113:4, 10,
19; 114:9; 115:9; 120:11;
125:4; 127:16; 133:5, 22;
134:22; 135:11; 136:5, 16,
17; 138:18; 144:21;
156:21; 158:9; 171:22;
200:17; 281:6; 331:3, 9;
334:4; 339:12
Mariano 206:17; 207:6
Marjorie 317:4, 11; 318:2

mark 63:17; 161:20, 21,
23; 162:1, 18; 163:22;
164:1; 165:12, 24; 168:17;
194:15; 235:22; 245:3, 5;
313:12; 330:24
marked 63:11, 23;
146:12; 194:15; 252:23;
265:22; 282:11; 286:22;
290:24; 293:14; 313:13,
21; 331:1; 336:24
market 121:12; 126:5;
233:10; 329:12; 330:5, 13
Marlboro 8:12
Martin 251:7, 8
Martinez 317:8; 318:6, 9,
16
Martosi 113:23; 115:2;
120:12; 125:9; 126:16;
133:9; 144:22; 145:6
Martosi's 116:1
Massachusetts 9:8;
85:15; 87:19; 136:1
Massucci 53:6, 8;
112:19; 113:6, 21; 120:8;
125:10; 133:9, 18, 24;
134:7, 16; 144:23; 145:5;
316:16
Massucci's 112:24
Matawan 29:4
match 268:21
maternity 152:8
Matt 190:6, 7
matter 4:14; 16:21;
32:16; 42:14; 51:19;
60:23; 63:14; 72:9, 11;
74:20; 80:23; 102:16;
104:3; 118:14; 126:12;
127:17; 128:7; 130:4;
201:11; 206:14; 246:4;
255:8; 293:1; 299:7, 19;
300:6; 303:10; 318:23;
326:3; 345:20; 352:15
matters 7:20; 8:23; 10:1;
196:10
May 4:19; 26:20; 27:15;
41:15, 16; 73:18; 74:10,
10; 146:17; 153:4; 186:20;
188:17; 274:4; 279:23;
317:15; 318:3; 321:7, 13,
22, 24
maybe 16:19; 57:24;
74:12; 81:8; 85:18;
105:23; 120:5; 135:13, 15,
15; 159:17, 19; 160:20;
204:8; 211:12; 214:20;
221:12; 241:5; 252:14;
254:9; 258:1; 296:19
McGinley 352:8
McGrath 6:13; 24:21;
25:21; 30:7; 38:16; 39:24;
41:2, 19, 21; 42:8; 43:24;
44:5, 13; 52:21; 62:2;
100:8, 10; 121:1; 126:13;
127:3, 11, 24; 128:4, 16,
21, 23; 129:17; 131:6, 13,
22; 132:5, 6, 11, 20;
143:10; 145:14; 148:12,
16; 162:14; 179:11; 185:3,

7; 186:8; 189:18;
201:12; 202:7, 20; 203:10;
204:11, 19; 217:3, 8;
227:18; 229:3; 239:10, 13;
244:11, 13, 15; 247:18;
256:9; 258:10; 259:3;
267:3, 15; 268:12; 273:2;
275:13, 16; 289:8; 295:4,
5; 300:11, 14, 22; 301:3,
13; 302:2, 9; 307:18;
309:13, 23; 312:19; 313:6,
10; 314:6, 14, 19; 315:3,
24; 319:3, 13; 320:4, 8;
327:10; 338:11; 340:12

**McGrath's** 44:7; 243:13

**mean** 14:12; 19:7; 20:11,
12; 28:19; 49:6; 60:16;
71:13; 82:17; 83:9; 88:15;
95:4; 135:7; 157:7; 163:9;
186:16; 215:15; 222:10;
227:10; 235:10; 283:22;
298:23, 24; 307:1; 308:2;
350:3

**meaning** 76:15; 334:18

**means** 49:7

**meant** 193:12; 194:8;
197:22; 279:20

**measure** 220:13

**mechanics** 300:20

**medicine** 59:18

**meet** 52:3; 159:7; 233:23;
234:22; 243:24; 247:17;
267:2

**meeting** 8:11; 39:23;
42:16, 20; 62:5; 77:10;
78:8, 19; 79:4, 9; 85:2;
113:20; 114:6; 115:11;
117:13, 14, 17, 20; 118:4,
13; 119:6, 23; 120:15;
121:1, 19; 122:20, 21;
123:17; 124:2, 6; 125:5, 9,
23; 126:7; 127:13; 133:6,
14; 135:14; 136:8, 11, 12,
19, 21; 137:4, 7, 19;
138:21; 139:1, 1; 144:21;
145:7; 152:22; 153:6, 10,
17; 156:22; 157:2, 8;
158:3, 9, 12; 164:10;
165:4, 5; 171:20; 172:1, 5,
14, 15, 23; 173:1, 20;
174:20; 175:2, 9; 177:15,
17, 19; 178:14; 186:11;
188:19; 199:24; 201:13;
202:9, 10, 17; 203:13, 19;
206:20, 23; 207:4, 8;
266:17; 267:13; 268:3, 11;
272:22; 342:20

**meetings** 7:22; 8:2, 5, 18;
26:19, 20; 34:21; 137:24;
152:19; 153:13; 154:9, 12;
155:4; 156:1, 20; 157:13;
171:18; 179:5; 341:19;
342:7; 345:6; 352:14;
353:4

**member** 126:18

**memo** 72:15; 153:21;
202:7; 203:10; 205:21;
265:24; 266:8; 271:24;
272:7, 11; 273:5; 277:24;

282:14, 20; 283:3, 10;
315:13; 331:3

**memorializes** 191:19;
192:19

**memory** 103:23; 322:9

**memos** 153:21; 205:19,
24

**mended** 264:20

**mention** 85:22; 319:4;
325:11; 343:10

**mentioned** 242:7; 348:1,
5

**mentioning** 179:11;
325:18

**mentions** 275:7

**Mercedes** 290:18, 19

**Mercedes-Benz** 286:4,
11, 12; 291:20; 293:3;
296:20

**merge** 117:23; 119:4;
121:10; 145:22

**merger** 126:9; 127:9

**merging** 122:16; 137:2;
248:9

**mess** 129:1

**message** 89:7

**messages** 42:10

**met** 7:19; 120:7; 126:15;
142:5; 159:3, 6, 10, 12, 15,
15, 16; 171:2; 175:13;
189:10; 201:12; 224:18;
241:2; 345:21

**Miami** 145:18, 19;
160:20; 197:2; 224:16, 17,
19; 238:8, 17, 23; 239:2;
256:11, 19; 275:5, 6, 8

**mic'd** 7:11

**Michael** 21:15, 15; 24:8;
26:8; 29:8, 9; 30:13, 24;
31:9; 32:18; 38:14, 15;
60:18; 70:22; 97:12, 15,
18; 98:5; 162:13, 16, 17;
167:6, 17; 176:5; 200:1;
207:2, 9, 15, 20; 237:12;
288:15, 20, 24; 290:13;
294:14; 296:3; 351:19;
352:12

**mid** 170:23; 177:17

**middle** 129:1; 176:7;
178:15; 302:14, 16;
303:20; 305:12; 318:20

**might** 73:12, 13; 81:9;
159:12; 164:24; 170:9;
345:13; 349:17

**Mike** 22:7, 15, 20, 23;
23:3; 25:10; 26:4, 7; 31:3,
9; 32:2; 33:17, 24; 35:17;
38:12; 39:24; 41:1; 52:2,
16; 60:12, 16, 16; 61:6, 10;
62:2; 96:10, 23; 97:11, 16;
98:3, 19; 99:18; 100:4, 19;
101:5, 16, 22; 102:17;
103:2; 104:7, 18; 105:6,
17; 106:6, 20; 107:1, 2, 9,
19; 108:4; 119:21; 162:19;
164:9; 165:10, 18, 23, 24;
169:12, 22; 170:1; 172:18;

174:2; 175:16, 17, 21;
185:16, 19; 186:8; 187:1;
197:19; 198:1, 11, 15;
199:1, 11; 201:11, 16;
202:6, 14; 203:5, 11, 18;
204:1, 10; 206:23; 217:7;
224:18; 229:2, 12; 230:15;
238:5, 12, 13; 239:1, 4, 11,
13; 242:6; 244:13, 20;
247:19; 254:9, 11, 14, 21;
256:6, 24; 259:20, 24;
282:2; 288:11, 13; 292:5,
14; 294:23; 295:1; 303:14,
21; 304:3, 6, 11, 17, 19,
23, 24; 305:9, 23; 308:24;
322:16, 18; 323:1, 21;
324:8; 326:5, 7, 7; 345:20;
349:11; 350:1, 7; 353:2, 4,
5

**Miller** 189:2, 3, 5, 16

**million** 121:6; 126:23;
220:7, 8; 221:6; 222:6;
223:15; 231:21; 233:19;
234:16; 242:11, 17; 244:5

**mind** 8:11; 30:4, 5, 6;
59:6; 131:19, 21

**mine** 46:8; 103:4; 164:3;
185:19; 306:17

**minimal** 162:14

**minority** 195:19; 196:3

**minus** 335:4

**minute** 189:8; 290:5

**minutes** 79:9; 137:14, 15,
16; 140:19; 171:18;
193:21; 202:8; 203:12;
320:24

**Mirage** 165:6, 7, 8

**misannounced** 14:20

**misinterpret** 307:2

**misprint** 339:7, 9, 10

**missed** 244:5

**missing** 303:23; 309:4

**mistake** 63:3; 84:9;
116:5; 243:21; 327:24;
336:22

**misunderstood** 54:16;
277:16

**mob** 107:11

**mobile** 45:20; 113:7;
150:19

**mobsters** 106:10

**Mom's** 272:24

**moment** 67:13, 14;
148:5, 7, 10, 18; 186:14;
190:22; 288:8

**moments** 54:18; 56:10

**Monahue** 21:17, 19, 20;
22:2, 3, 7, 19, 20, 22; 23:5;
26:4, 5, 9; 30:16; 31:22

**Monahue's** 23:1; 30:17

**MONC** 4:17

**money** 18:2; 89:23;
98:24; 99:11; 102:18;
117:20; 118:2, 3; 119:1, 5;
124:8, 10; 126:8, 10, 22;
127:7, 8; 136:22; 157:20;

166:10; 183:17; 200:22;
215:15; 222:23, 23; 225:7,
13, 21; 226:1, 5, 7; 229:9;
231:7, 8, 23; 235:5, 7, 9,
11, 14, 21; 238:16; 240:9;
241:5, 6, 9; 242:9; 243:10;
245:11; 259:12, 24;
272:16; 278:13, 16;
281:23; 307:21; 324:9;
330:9, 10; 332:1

**monies** 119:3; 165:21;
166:12; 176:8; 224:11, 12

**Monmouth** 4:16; 26:15

**month** 108:9; 204:8;
288:19; 306:22, 23; 326:1,
23; 328:19; 330:15

**month-to-month** 242:2

**monthly** 298:17, 20;
299:1

**months** 16:10; 17:17;
26:3; 51:16; 108:19;
180:11; 181:6, 8; 182:9;
196:16; 204:9; 233:1;
247:24; 250:1, 12; 251:6;
256:2; 259:18; 261:20;
267:11, 12; 273:9; 275:13;
279:19; 298:14; 299:4;
300:13; 301:18; 331:10

**more** 9:15, 18; 18:2; 23:5;
26:20; 28:21; 29:2; 38:17;
49:18; 54:7; 63:12; 71:16;
75:4; 78:24; 79:17;
110:15, 20; 112:11; 113:5;
120:19, 20; 127:6; 133:23;
157:23; 184:1; 187:15, 20;
205:12, 13; 214:20; 220:9;
226:21; 232:8; 234:15;
322:5; 335:9

**morning** 12:6, 16; 302:17

**mortgage** 318:20

**mortgages** 311:11

**Most** 27:9

**motive** 339:18

**Mountain** 7:19, 21; 8:23,
24; 9:7, 11, 21; 10:2, 11,
15; 11:1, 5, 17, 19; 12:5,
21; 13:1, 3, 11, 19, 23;
15:8, 14, 19, 24; 16:12;
18:12; 20:4; 21:17; 22:5;
23:7, 8; 25:9; 26:8; 27:7,
10, 13; 28:2; 29:9, 16;
30:1, 14; 31:7, 19; 32:4;
47:19; 54:11; 67:8, 11, 17;
68:18; 69:5, 11; 70:5, 12,
17, 19, 22; 75:11; 78:8;
79:18; 80:8; 82:7; 86:17,
17; 88:1; 89:13; 90:15;
111:20; 114:3, 5, 15, 19,
22; 115:2, 13, 23; 116:6, 8;
118:20; 125:11; 131:24;
132:8, 13, 16, 22; 136:8,
20; 138:7; 139:6; 140:10;
144:24; 145:5; 149:12;
152:23; 153:6; 158:10, 16,
19, 24; 160:3, 8, 13, 23;
161:3, 8; 162:1, 12;
165:15; 170:4; 171:5, 6;
172:3; 175:20; 176:17, 22;
177:2, 4, 19; 178:16;

179:6; 180:10; 183:9, 10;
184:11, 18, 21, 23; 185:22,
24; 186:2, 24; 187:14;
188:5, 11, 15; 189:4;
190:3, 12; 196:24; 281:11,
12, 16, 17, 23; 282:8;
319:4, 14, 16, 20, 21, 23;
322:17; 325:13; 326:24;
348:5; 349:10, 13, 16;
352:24; 353:7

**Mountain's** 18:10; 21:12;
335:14; 36:3; 85:14;
118:17; 138:22; 178:21

**move** 63:9; 87:5; 109:19;
126:3; 293:10; 321:12;
329:23; 346:3

**moving** 112:7

**much** 15:7; 30:9; 84:16;
89:12; 122:24; 126:5;
127:5; 171:15; 195:5;
206:1; 223:17; 226:7, 13;
232:16; 235:23; 236:16;
238:3; 241:19; 243:20;
255:6; 258:12; 259:12;
283:3; 310:17, 19; 311:12;
353:1

**Mullin** 189:18, 20

**must** 58:13; 67:19

**mutual** 308:18

**myself** 21:16; 27:10;
32:19; 52:3; 67:21; 82:8;
89:18; 101:6; 119:22;
130:14; 137:22; 162:18;
164:9; 200:1; 201:12;
206:2; 253:13; 268:12;
273:3; 298:9; 306:6;
327:16

# N

**name** 4:9; 5:18; 6:5;
103:21, 24; 104:2, 4;
105:16; 106:22; 107:5, 9;
152:15; 182:16; 189:2;
190:6; 204:3; 208:19, 22;
235:19; 236:13; 239:11;
248:13; 279:21; 284:2, 11;
288:16; 294:8, 10, 15, 16,
20, 24; 295:2, 10, 11;
296:14, 21; 298:11;
334:12; 338:20; 340:17,
21; 347:23; 348:7

**named** 87:23; 189:3;
190:7; 332:9

**names** 52:8; 181:6;
238:9, 10; 352:1; 353:8

**nasty** 104:22

**nature** 221:11

**Neebling** 5:11; 144:24;
145:4, 10, 12; 146:5, 9;
151:9; 165:11; 172:2;
175:1; 247:5, 7, 13, 17;
248:7; 250:12; 251:19;
252:4; 253:3, 7, 11, 16;
254:4; 255:13, 22, 24;
256:8; 257:17, 18, 18;
258:21; 259:8, 20; 260:13,
24; 261:7; 262:3; 263:1,

21; 264:7, 16, 20; 266:3, 9,
9, 21; 267:3, 7, 14; 268:24;
270:1, 7, 12; 271:23;
272:6, 10, 15; 273:2, 7;
274:14, 24; 275:2; 277:6,
7, 20, 22; 278:4; 283:13;
300:18; 306:2, 4; 310:7;
315:13; 352:2, 7
**Neebling's** 266:2; 279:22
**need** 31:10; 59:13, 15;
69:21; 97:13, 15, 16;
103:14; 128:23; 165:20;
170:16; 187:23; 188:2;
191:11; 192:10; 201:13;
208:11; 211:1; 226:21;
239:18; 258:16, 17;
283:12; 294:15; 335:1;
347:13; 350:2, 4, 8;
351:11; 353:2
**needed** 41:24; 262:7;
298:10; 338:12, 18
**needs** 242:3; 333:2
**negotiate** 120:9; 233:5;
248:8
**negotiated** 215:24
**negotiating** 42:23;
196:20; 251:3
**negotiation** 28:12; 30:9
**negotiations** 29:3;
53:17; 120:10; 216:1;
315:15
**neighbors** 246:11, 13,
14, 16
**Neither** 281:2; 356:16, 19
**nervous** 55:9, 14, 16;
83:7; 97:7
**Nestle** 108:6; 317:5
**Network** 182:18
**nevertheless** 290:9
**New** 4:15, 23; 5:1, 10; 8:8,
10, 12, 13; 18:14; 21:18;
29:4; 32:10; 33:5; 42:5;
50:6; 51:2; 67:3; 76:16, 24;
77:2; 79:6; 80:19; 145:19;
151:9; 164:23; 176:10;
179:7; 181:19, 23; 182:21;
196:19; 209:20, 22;
210:19, 20; 212:22;
214:15, 24; 215:4, 4, 13;
216:3; 220:15; 250:13, 14;
273:1; 280:6, 10; 283:11;
293:24; 331:11; 337:10,
16; 338:19; 339:14, 15;
340:7, 17, 20; 348:15;
349:19; 356:4
**Newark** 175:14
**Next** 6:10, 12; 66:5, 8, 9;
75:18, 20, 21; 76:23; 87:6;
91:5; 112:3; 113:3;
139:14; 146:12; 147:6;
149:23; 150:10, 17; 151:5,
15; 216:24; 217:3, 22;
232:16; 236:13; 237:1, 11;
238:7; 241:18; 267:15;
312:9; 344:22; 346:16
**Next-door** 246:13, 14, 15
**nice** 185:15; 354:12

**night** 78:23; 148:19;
302:15, 16
**Ninety-five** 237:10
**no-assignment** 286:16;
288:9; 290:2
**non-compete** 67:24
**noncompetes** 165:15
**none** 82:11; 119:10;
123:6; 173:21; 183:21;
236:3; 251:4; 274:16
**nonsense** 185:11;
319:24
**Nope** 154:7; 333:23
**nor** 31:13; 281:2; 356:16,
16, 17, 19
**normal** 341:2
**normally** 299:1
**North** 116:19
**nos** 325:17
**Notary** 356:3
**note** 153:15; 222:16;
225:18; 228:11; 298:14;
300:14; 331:17, 22;
332:18; 334:21, 21
**noted** 5:16
**notes** 153:10, 12, 17;
157:5, 23; 221:18; 222:1;
333:11
**notify** 258:4; 312:18
**notifying** 290:8; 292:1;
302:10
**notion** 200:24
**November** 64:21; 65:17,
23; 133:22; 205:5
**Number** 4:17; 9:7; 40:7;
45:21, 24; 46:21; 47:9, 13,
15; 48:3, 24; 53:18; 67:8;
111:22; 112:16, 24; 133:4;
134:19; 135:4, 12; 146:23;
150:19; 151:8, 10; 179:19;
180:3; 182:24; 218:9;
219:6; 222:9; 251:18;
252:4, 7, 9, 12, 20; 316:15
**numbered** 46:15
**Numbers** 4:4; 9:8; 46:6;
127:4; 179:11, 17; 180:9;
213:23
**numerous** 9:10; 72:22

## O

**o'clock** 42:17, 19; 49:10
**oath** 104:4
**Object** 10:18; 11:8;
16:15; 48:5; 71:10; 96:10,
22; 221:8; 271:9
**objected** 172:24
**objecting** 11:11
**objection** 221:12
**obligations** 290:14
**Obviously** 67:12; 97:9;
180:15; 185:18; 271:19;
283:12; 327:15
**occasion** 8:20; 62:4

**occasions** 43:5
**occurred** 21:18; 94:23;
114:7; 202:9; 279:9
**October** 45:17; 49:19;
50:2; 51:22; 54:9, 19, 23;
56:7; 205:4
**off** 21:9; 23:9; 29:18; 31:7,
12, 14, 18, 20; 32:3; 42:11;
83:14, 18; 86:20; 144:3, 9;
146:10; 180:20; 189:7;
204:3; 212:15; 219:5;
239:10; 241:12; 254:10;
275:23, 23; 276:20;
333:15; 355:8
**offer** 106:2; 132:6;
154:18; 183:16; 187:18;
264:16; 266:10, 14;
268:20; 272:18; 273:14;
275:18; 277:14, 22; 278:6,
11, 18, 22; 315:14; 320:9
**offered** 13:24; 128:6;
132:21; 160:17; 183:9, 11;
184:1; 257:17; 259:24
**offering** 183:8; 319:3
**office** 6:10; 8:15; 15:18;
22:9, 17; 24:7; 25:4; 42:22;
130:14; 155:12; 159:14;
163:22, 23; 165:14, 20;
189:11; 203:20, 21; 209:9;
226:11; 236:5; 252:7, 15,
18, 20; 270:20; 301:24;
304:2, 10; 307:11; 312:16;
344:9; 352:16, 21
**officer** 34:1; 114:22;
128:17; 188:15; 196:17;
199:10; 208:11, 20;
304:12, 12; 305:3, 5, 8, 13
**offices** 24:11
**official** 213:12; 217:16;
218:12; 242:14
**often** 190:5
**on-need** 171:16
**once** 24:10; 28:18; 97:11;
159:12; 209:9; 252:14, 19;
289:9
**one** 23:22; 28:21; 29:2,
20; 48:2; 51:6; 56:12; 57:9;
61:19; 62:13; 63:10, 18;
65:5; 73:10; 85:20; 91:5,
15; 95:19; 101:19; 111:13;
113:6, 6; 117:16, 24;
118:5; 120:19, 20; 121:18;
122:9; 144:7; 147:13;
151:3; 154:2; 158:18;
162:19; 163:10, 15; 164:6;
169:16; 175:2; 182:4;
194:22; 206:16; 207:7;
226:21; 230:17, 22; 231:4;
232:23; 241:24; 248:10,
17; 280:14, 15; 286:9;
300:20; 303:7, 11; 306:10,
10; 320:20, 23; 324:2, 7,
13, 18; 328:12; 330:23, 24;
332:10, 23; 333:13; 334:4,
17; 336:4; 338:8; 341:17;
343:8; 348:4, 20, 21;
350:17
**one's** 234:4, 6, 7, 11

**one-minute** 89:3; 90:24;
93:17
**one-way** 119:17
**one-year** 20:5, 11, 13
**ongoing** 265:16
**only** 24:20; 44:11; 57:5;
89:2; 93:17; 125:18;
130:13; 179:19; 182:10,
10; 186:1; 187:13; 242:1;
245:20; 271:18; 279:6, 20;
280:2; 324:2; 329:20;
332:12; 343:4; 345:17, 18
**onto** 105:19
**open** 170:1; 174:14;
193:10
**opened** 163:24; 165:19;
177:10; 205:11; 248:19
**operate** 241:22; 282:1;
306:21
**operating** 34:1; 196:9;
296:6
**operation** 43:10; 127:23;
215:12; 216:2; 282:4;
301:1; 321:11
**operations** 29:21; 30:15;
109:7; 188:23; 322:4
**opportunity** 160:20;
176:2; 271:6
**opposed** 9:22; 18:11;
345:2
**order** 7:3; 98:21; 103:17;
210:24
**ordered** 210:19
**organization** 350:5
**organize** 118:24; 349:18
**original** 57:6, 9; 309:7
**others** 77:11; 118:8
**otherwise** 24:15; 108:17;
155:19; 292:14
**out** 7:16; 17:22; 18:4;
22:23; 24:7; 28:21; 36:16,
19; 40:1; 70:10; 89:22, 24;
97:8; 102:6, 13; 105:15,
22; 109:9; 119:2; 122:23;
124:9, 17; 126:11; 128:21;
129:5; 131:14; 136:23;
137:9; 145:8; 152:8;
162:15; 165:20, 22;
186:15, 16; 190:10;
193:17; 194:11; 195:18;
198:4, 21; 199:1, 17, 18;
200:4, 5, 9; 201:18; 202:4,
15; 203:18; 205:5, 15;
206:8; 207:1, 7, 11, 18;
223:5; 225:11, 12; 226:10;
227:11, 14; 228:19, 21;
231:17; 239:7; 244:5;
250:19; 257:15; 258:2, 22;
262:13; 267:18; 282:1;
283:5; 285:9, 21; 289:10;
294:15, 20, 24; 295:2, 10;
297:3; 301:15; 308:18;
310:23; 311:4, 19; 312:24;
313:7; 321:10; 325:8;
329:8; 330:2; 340:18;
354:3
**out-bound** 216:7

**outside** 12:21; 27:7;
39:15; 100:1, 2; 190:2;
201:3; 257:8, 9
**outsider** 37:9
**outsiders** 36:17; 37:3, 6;
206:8
**outsource** 215:19
**outvoted** 196:10
**over** 10:4; 33:24; 36:12;
37:24; 46:4, 15, 20; 48:11;
49:13; 79:12; 90:1; 91:16;
93:6, 23; 108:1, 19; 112:3;
113:3; 134:18; 135:18;
146:18; 147:6; 148:21;
150:16; 151:24; 152:10;
156:22; 185:19; 193:20;
194:17; 205:8; 206:19;
212:6; 215:12; 216:2;
218:14; 219:8, 9; 247:15;
259:17; 261:19; 289:3;
290:16; 321:12; 330:21;
346:20
**overstaffed** 233:1;
239:17
**owe** 326:19
**owed** 238:16
**owes** 331:18
**own** 18:11; 38:6; 40:17;
126:10; 127:8; 189:14;
195:20; 205:11; 228:18;
229:18; 239:3; 241:10;
266:21; 280:3; 290:20;
296:13; 318:11; 321:11;
326:13
**owned** 158:15; 282:8;
328:13; 331:12
**owner** 19:9; 204:13, 21;
229:19, 20
**owners** 266:22; 335:10
**owns** 146:5; 308:5

## P

**p.m** 47:8; 49:10, 19, 20;
65:18; 67:6, 7, 18; 75:5, 5;
77:18, 22; 78:3, 4; 87:16;
90:7; 92:13; 111:21;
143:13; 144:9, 15; 146:22;
148:24; 149:10, 15;
150:18; 151:6, 17; 152:3,
11; 355:8, 11
**PA** 4:13
**package** 345:22
**packet** 66:8, 9, 12; 75:20,
21; 91:3; 111:12, 15
**page** 45:19; 46:5, 10, 12,
15; 48:12; 49:14, 14, 14;
65:8, 10; 66:13; 75:1, 23;
76:1, 2, 3, 5; 78:22; 79:12;
86:20; 87:6, 6, 7; 90:2;
91:16, 17, 21, 22, 23; 93:7,
24; 111:16; 112:3, 3, 8;
113:4, 4; 133:4, 17; 134:6,
18; 135:19; 140:18;
146:19, 19; 147:7, 7;
148:22; 149:24, 24;
150:10, 10, 17, 17; 152:10;

**pages** 45:13; 139:15; 219:9

**paid** 13:18, 24; 15:8, 20; 17:22; 74:5; 142:20; 143:5; 165:16, 17; 166:17; 167:21; 168:24; 222:22, 24; 235:24; 236:16; 237:4; 288:19; 311:23

**Palm** 156:13, 14

**paper** 24:14; 169:2, 8; 267:20; 336:5; 343:1; 344:24

**papers** 16:22

**paragraph** 268:24; 275:18; 313:17; 331:16; 332:17; 334:13, 17

**paragraphs** 291:6

**Park** 152:4; 327:1

**parked** 325:12

**parking** 20:6; 22:11

**part** 25:4; 145:21; 207:21; 208:6; 215:4; 230:6; 260:2; 261:22; 263:20; 274:10; 281:24; 287:23; 293:17; 297:24; 319:12; 329:6; 330:19

**participate** 253:16

**participated** 193:7; 232:20, 22

**particular** 8:14; 131:19; 148:22; 331:7

**parties** 341:11; 356:18

**passed** 30:20

**past** 177:11; 217:21; 275:13; 279:18

**Paul** 300:11, 15, 17, 22; 301:6; 308:17, 18, 19; 310:15

**Pavasky** 303:11, 12; 304:20; 308:24

**pay** 13:24; 16:1; 44:4; 140:7; 165:22; 183:8; 268:20; 278:13; 279:21; 307:16, 24; 325:24; 326:22; 329:19

**payable** 274:15, 19, 21

**paycheck** 168:13; 273:21

**paychecks** 247:2

**paying** 165:22; 183:7; 235:12, 13; 254:10; 306:24; 311:10; 326:10

**payment** 288:20; 290:21; 293:5; 298:17; 299:2, 6, 21; 300:16; 302:3, 4, 10; 307:12

**payments** 288:22; 289:4; 290:20; 293:7; 295:15; 298:20; 299:14, 17, 22; 300:14; 301:14, 19, 23; 307:21

**payroll** 115:11; 238:24; 241:17; 246:16

**pays** 41:4; 298:17;

**peace** 27:12

**pending** 33:1; 340:2

**Pennsylvania** 85:2, 8

**people** 32:14; 37:19; 39:20; 55:18; 57:19, 23; 58:2, 3; 69:16; 72:5; 106:11; 109:23; 122:1; 129:4, 5; 130:13; 152:23; 158:10, 16; 163:10; 164:2; 171:2; 174:7; 175:19; 205:16; 224:18; 232:18, 21; 235:17, 19; 238:8, 24; 239:1, 17; 240:17, 19; 241:2, 17; 243:9; 245:10; 247:1; 306:2, 8; 351:3, 24; 353:8

**Peppermill** 272:24

**percent** 19:9; 38:6; 68:4, 9; 117:21; 118:10, 12; 119:2; 122:24; 124:9; 136:23; 195:20; 200:23; 201:18; 221:2, 3; 231:17; 233:24; 236:10, 12, 23, 24; 237:10; 268:15, 20; 278:17; 279:4; 281:24; 310:21; 331:12, 13; 333:14

**percentage** 236:7, 8, 20, 22; 237:7, 9, 19

**performing** 160:14; 161:10; 162:3

**period** 194:10; 198:23; 202:23; 212:24; 213:5; 281:7

**perks** 183:17

**permission** 180:18; 290:1; 302:6

**person** 50:16, 23; 51:12; 62:18; 103:23; 104:6, 16, 17; 105:16; 125:14; 161:6, 19; 164:14; 168:12; 183:3; 185:17; 189:21; 207:8; 210:6; 232:23; 254:20; 276:6; 336:12; 347:6

**person's** 168:13; 295:11

**personal** 24:22; 40:18, 24; 41:3; 43:14; 84:17; 156:10; 255:15, 23; 263:2, 22; 289:15; 311:9; 333:15; 335:22; 336:9

**personally** 109:12; 223:2; 293:4; 298:9; 333:11

**personnel** 255:17; 263:4

**perspective** 250:23

**pertinent** 83:23; 163:6

**Peslak** 6:19, 21; 7:13; 10:18; 11:8; 14:22; 15:2, 13; 16:15, 19, 24; 17:4, 7; 26:24; 32:23; 33:5; 35:19; 39:7, 10; 48:5; 52:12; 58:17; 63:17; 66:23; 71:10; 73:14, 16; 82:22; 83:3; 91:21; 92:1, 3, 7, 14; 93:1; 96:15; 103:11, 16; 137:8; 141:2, 10; 151:18, 21; 154:19; 178:4; 193:6,

194:4; 221:8, 13; 253:4, 8, 11, 20; 254:5, 24; 255:5, 12; 258:4; 262:19; 264:6; 271:9; 275:22; 287:1; 312:9, 23; 313:2, 16, 24; 319:1; 323:2; 325:1, 9; 337:4, 8, 15; 338:5; 342:15, 18; 343:14, 21, 24; 344:5, 11, 15, 19; 347:3; 350:21; 353:21; 354:1, 23; 355:1

**Peslak's** 287:14

**Peter** 5:3, 6; 10:12; 13:6, 12; 17:20; 18:22; 21:12, 13; 28:3; 32:18, 19; 33:18; 34:14, 19; 38:2, 2, 5, 9; 39:19; 41:2; 42:4, 12; 44:3; 62:9; 67:23; 68:7, 19, 22; 69:9, 10; 70:3, 10, 16, 18, 24; 71:5; 72:10, 15, 21; 73:5, 11; 74:4; 80:8; 89:21, 24; 90:18, 19; 97:14, 16, 17, 21, 22, 24; 100:11; 102:9, 18, 24; 105:22; 109:20; 117:22; 119:4, 24; 120:7; 121:10, 13, 13; 122:23; 124:1, 5, 7, 12; 125:7, 18, 22, 23; 126:21; 127:6; 129:3; 130:12, 12; 136:23; 138:8; 163:16; 165:5, 11, 21; 166:3; 167:16; 169:24; 172:17; 175:16, 21; 185:9, 12, 18; 186:15, 16, 19; 187:1; 191:8; 192:5; 196:21; 197:20; 198:2, 10, 12, 18, 20; 199:1, 3, 12, 14, 23; 200:1, 2, 14, 22; 201:11, 13, 21; 202:2; 203:16, 16, 20; 204:6, 7, 9, 17; 206:2, 13; 210:17; 214:12; 215:23; 223:1, 4; 231:12; 232:24; 235:8; 240:18; 241:1, 3; 242:5, 15; 243:19, 20, 22, 22; 244:8, 13, 20; 245:10, 15; 247:16, 17; 248:7; 253:13; 256:5, 13, 22; 257:24, 24; 259:7, 23; 260:18; 261:18; 262:1; 264:15; 265:15; 267:4, 13; 268:3, 4, 12; 269:2; 272:18, 22, 23, 23; 273:2; 279:7; 282:15, 20; 298:13; 320:16, 21; 321:4, 17, 20; 322:14; 323:21, 22; 324:8, 23; 329:21; 331:24; 332:7; 333:9; 334:23; 335:18; 336:16; 341:7; 345:20; 349:4, 11, 12, 16; 350:4, 7, 12; 351:2, 14, 19; 353:6; 354:16

**Peter's** 71:24; 107:15; 119:1; 125:19; 231:17; 256:20; 259:19; 268:16; 281:24; 346:23; 351:6

**petty** 340:10

**ph** 303:11; 317:12

**Phil** 6:5; 137:8; 314:1; 324:1

**Philadelphia** 4:13; 116:22; 349:19

**Phillips** 205:20; 320:13; 338:11

**phone** 9:4, 7; 20:16; 26:18, 21; 27:1, 5, 9; 28:8; 40:4, 11, 18, 19, 23; 41:8, 10, 18; 43:7, 9, 11, 14, 19; 44:11; 63:15; 64:12, 13, 20; 65:14; 75:1, 4, 10; 76:16; 77:17; 78:2, 24; 79:17; 80:15; 87:15, 23; 88:4; 90:5, 21; 92:14, 18; 93:8; 94:3, 10, 21; 95:5, 8, 11; 108:10; 110:10, 24; 111:3, 7, 19; 112:5, 23; 113:7, 10; 133:2, 5, 16, 18, 23; 134:5, 6, 7, 19, 20; 135:4, 10, 12, 13, 24; 139:12; 140:19; 143:12; 144:1; 146:10, 15, 16, 17, 23; 147:7, 17; 148:22, 24; 149:6, 11, 16; 150:11, 19; 152:3, 12, 21; 165:4; 179:16, 18, 19, 20, 21, 23; 180:2, 9, 17, 19, 20, 21; 182:24; 209:8; 211:6; 252:8, 20; 279:22, 22, 23; 280:2, 3, 3, 6, 7, 8, 10, 12; 304:4; 307:9; 316:15; 317:19

**phones** 180:13; 279:18, 20

**physical** 59:22

**physically** 54:10

**pick** 164:18; 302:4, 6, 10

**picked** 22:24

**picket** 352:23

**picking** 74:24

**pickup** 164:17

**pickups** 322:5

**picture** 10:6

**pictures** 24:23; 25:1

**piece** 267:20

**pieces** 336:5; 343:1

**Pierce** 5:3, 6; 10:12; 13:6, 12; 17:20; 18:23; 21:12, 14; 27:12; 28:3; 32:18; 33:18; 34:15; 38:2, 2; 39:19; 41:2; 42:4; 44:3; 51:18, 19; 52:18; 53:11; 62:2; 67:23; 68:7, 19, 22; 69:9, 10; 70:4, 10, 16, 18; 71:5; 72:10, 16; 73:11; 74:4; 80:9; 81:11; 85:12; 89:21; 90:18, 19; 97:14, 16, 22; 100:11; 119:24; 122:23; 124:1, 5; 125:7; 136:23; 138:8; 163:16; 164:22; 167:16; 171:1, 4; 172:18; 175:16; 186:15, 16, 19; 187:1; 191:8; 192:5; 197:20; 198:10; 199:3, 12; 200:14; 203:16, 17, 20; 210:17; 223:1; 231:12, 19; 240:18; 241:1; 242:8; 243:20, 22; 244:13, 20; 245:10; 247:16, 18;

**Pierce's** 200:23; 265:6; 329:21; 332:7; 349:12; 351:14

**Pioneer** 5:3, 4, 6, 7; 6:12; 68:8; 138:9; 166:17; 196:6, 12; 210:17; 221:2, 4; 223:3, 14; 224:5; 226:6; 230:6; 231:20; 247:20; 266:15; 267:6, 22; 273:17; 277:14; 331:12; 335:19

**Pioneer's** 283:6

**place** 129:6; 172:6, 6, 7; 208:7; 280:17; 302:23; 311:18; 356:13

**plan** 195:4; 258:2

**planned** 308:17

**Planner** 154:13; 155:1; 156:2

**Planners** 154:1

**plans** 232:17; 273:4

**play** 130:5

**players** 126:4

**playing** 147:17

**Plaza** 182:22

**pleaded** 82:15; 84:10; 240:16, 17

**pleading** 82:6; 84:15; 201:23

**Pleasant** 151:9

**please** 163:5; 175:15; 301:12; 305:12, 19

**pleasure** 140:2

**plenty** 63:15

**plotting** 104:24

**plus** 20:6; 59:12; 209:22; 222:17

**pocket** 227:11, 13; 228:19

**point** 18:5; 23:3; 32:8; 33:11, 19; 36:15, 19, 21; 37:4, 20; 58:23; 80:11; 144:3; 151:8; 171:11, 12, 24; 173:22; 195:11; 230:5; 242:4; 258:9; 260:3; 272:23; 274:18; 275:7; 311:5

**points** 334:18

**police** 26:5, 6; 31:21; 53:19; 303:15, 21, 23; 304:24; 305:3, 5, 8, 18; 309:2

**ponder** 123:13

**portion** 83:24; 153:5; 163:7

**position** 34:15; 35:18; 36:24; 37:15; 38:10; 61:5, 10; 68:12; 99:18; 122:18;

129:10, 15, 19; 132:1;
173:22; 175:23; 177:10;
198:1, 3, 9; 200:10, 14, 16,
17; 201:17; 202:11;
233:16; 240:24; 241:1;
326:15
**positions** 129:7; 346:1
**positively** 96:24
**possession** 307:5
**possibilities** 157:9
**possible** 143:8; 276:8, 8;
277:9
**possibly** 11:5; 116:1
**potential** 36:17; 250:18
**pounds** 126:23
**power** 104:19; 202:18
**precipitated** 17:18
**prediction** 219:20;
220:14
**preliminary** 157:13
**premarked** 4:3; 45:2, 10;
216:14
**premises** 19:11; 24:9;
109:19; 280:23; 281:8
**preparation** 253:17
**prepare** 253:8; 271:24
**prepared** 253:10;
254:24; 255:2; 256:3;
262:19; 335:2
**preprinted** 287:23
**present** 14:1; 15:9;
34:22; 184:14; 216:2;
247:12; 254:4
**presentation** 266:22
**presented** 264:15;
267:6; 276:7; 277:23
**presenting** 266:16;
277:13
**presently** 249:4
**president** 19:16; 30:10;
33:22; 34:16, 22; 35:5, 15;
36:20, 24; 37:5, 16, 21, 22;
38:1, 3, 6, 8, 11, 11, 22;
39:16; 40:1; 87:24;
128:11; 188:22; 201:2, 15;
202:1, 2, 4; 203:3, 6, 18,
22; 204:11, 17, 19; 206:9;
207:19; 217:9; 227:21;
228:3; 229:5, 16, 19;
239:23; 291:8, 10; 292:23;
334:6; 349:13; 352:9
**press** 309:2
**pressed** 26:8
**pressure** 177:12
**pretrial** 209:2, 4; 210:6;
211:8, 16; 212:1
**pretty** 30:9; 84:16; 89:12;
122:24; 126:5; 127:5;
171:15; 206:1; 243:20;
309:17; 311:12; 312:24
**prevails** 325:5
**prevent** 301:8
**previously** 252:23;
265:22; 282:11; 284:6;
286:22; 336:24

**price** 279:5
**principal** 35:6, 16;
115:20; 158:22; 201:4;
204:12, 20
**principals** 334:22
**principle** 232:6
**prior** 119:23; 145:14;
166:2; 206:22; 214:12;
279:16; 321:24; 356:5
**private** 127:10
**privilege** 122:14
**Probably** 21:24; 90:24;
93:16; 95:14; 130:17;
225:12; 263:9; 322:1;
337:11; 350:1
**probation** 208:10, 20, 23;
209:1
**problem** 143:8; 168:6;
208:15; 289:9, 14; 318:8
**problems** 29:12; 184:1
**process** 324:10
**produce** 322:11; 323:12;
341:1, 24
**produced** 287:16;
341:24; 342:3
**professional** 128:2
**profit** 219:2
**projected** 233:8
**projections** 233:3
**promise** 245:10, 14, 19;
278:5, 10, 22; 333:21;
336:8; 347:3
**promised** 277:7
**promises** 245:21; 336:7
**promising** 301:19
**promissory** 331:17;
332:18
**prompt** 18:10
**prompted** 17:19
**proof** 106:6, 7; 292:7, 8,
9, 13, 16, 20; 299:18
**properly** 344:12
**property** 23:10; 29:18,
21; 30:13; 31:1, 4, 15, 19,
21; 32:3; 70:20; 304:11,
14, 16; 327:2
**proposal** 283:11
**proposed** 278:8
**prosecutor** 211:2
**protect** 102:23
**protective** 7:3
**protest** 34:7, 9; 36:13;
37:24; 169:4; 243:8
**protested** 34:12, 14;
168:22
**prove** 104:12, 14
**provide** 160:3, 7; 199:2;
272:5; 338:3; 345:14
**provided** 56:18; 60:7, 9;
161:24; 162:11; 185:23;
186:23; 187:9, 14; 261:7;
292:13; 345:14
**providing** 68:17; 183:12;
281:17

**provision** 288:10; 290:3
**public** 26:13, 16; 120:6;
209:12, 14, 18; 233:11;
356:3
**publicly** 177:20
**pull** 180:16
**pulled** 109:14, 15, 16;
227:11, 14; 228:19;
304:10; 307:13
**pulling** 301:15; 310:12
**punch** 197:19
**purchase** 191:19; 192:1,
18; 193:22; 213:2, 11;
215:11; 221:16; 273:14;
279:5; 310:2; 333:17;
347:4
**purchased** 166:15;
225:5, 8; 238:14; 298:9
**purchaser** 276:8
**purchasing** 196:21;
281:12
**purported** 315:5
**purpose** 43:20; 108:22;
109:1, 3; 172:13, 15;
265:14; 344:22
**purposely** 29:10; 104:1
**purposes** 121:18;
344:18
**pushed** 18:4
**pushing** 97:8
**put** 17:20; 18:2; 23:17;
25:1; 27:21; 32:7; 45:2;
63:8; 91:3; 107:10; 119:5;
121:4; 124:10; 127:6;
152:18; 155:5; 157:20;
192:4; 220:22; 223:6;
225:6; 226:6, 23; 227:15;
230:7; 231:7, 8, 13, 21, 22,
22, 23; 233:13; 238:18;
244:7; 245:15; 246:15;
294:16; 296:20; 310:6, 8;
313:13; 323:23; 326:1;
328:3; 331:19; 335:15, 19;
347:3
**putting** 69:14; 138:22;
201:17; 310:18; 324:9;
330:14

## Q

**quarter** 219:16, 19
**question-and-answer**
224:1
**quick** 79:14; 93:7; 311:2;
314:22; 338:9
**quickly** 87:2; 311:14;
347:22
**quite** 148:20; 301:20;
318:21
**quote** 174:8, 9; 176:21;
237:5; 321:4, 5

## R

**raise** 89:23; 117:20;
118:1, 2; 119:1, 2; 124:8,
10; 126:7, 10, 22; 127:8;
136:22; 157:19; 200:22;
272:16; 281:23
**raised** 73:5
**Ralph** 162:22; 164:10,
12, 13
**ran** 38:16; 127:3, 23;
228:24
**Rang** 22:19
**rate** 330:14
**rates** 329:12, 19; 330:5
**rather** 271:21
**Ray** 53:6, 8; 120:7;
125:10; 133:8, 18, 23
**reached** 301:24
**reaction** 23:16; 125:19
**read** 26:11; 83:1, 24;
163:4, 7; 193:2; 199:6, 9,
11, 14; 200:2; 255:19;
261:5; 263:6; 269:4, 5, 8,
11, 15, 15, 18, 21; 282:22;
283:1, 15; 314:21; 315:10;
335:5; 338:9
**reading** 217:13; 266:4, 6;
282:17
**ready** 261:21
**real** 64:4; 79:14; 88:1, 19;
89:12; 93:7; 122:11;
185:15; 188:22; 197:2;
311:1; 314:21; 338:9
**reality** 326:11
**realize** 82:21
**realized** 18:4
**really** 55:13; 57:18; 58:1;
60:22; 62:8; 64:10; 65:24;
81:14; 85:4, 16; 90:12;
95:1; 97:8, 17, 24; 124:19;
126:3; 128:24; 129:21;
153:14; 157:23; 172:19;
181:24; 186:13; 205:24;
238:3; 256:17; 265:1;
267:9; 273:18; 285:3;
321:19; 341:11
**reason** 12:15; 75:14;
86:12; 94:14; 119:20;
138:6; 233:2; 295:24;
309:6, 7
**reasons** 56:12
**recall** 19:15; 34:24;
35:11; 159:23; 171:20, 24;
179:10; 188:19; 309:16;
331:6
**recalling** 104:16
**receivables** 130:16, 18
**received** 19:9; 43:7; 81:6;
98:9; 106:19; 107:4;
199:21; 222:22; 256:12;
314:10; 324:2
**receiving** 104:21; 235:21
**recent** 294:3
**recently** 100:13; 128:5;

319:13
**Recess** 83:21; 144:11;
212:17; 276:22
**recognize** 128:16;
290:24; 332:3
**recollect** 9:13; 353:1
**recollection** 16:20;
49:24
**record** 4:9; 5:17; 26:14;
47:18; 50:9; 55:1; 63:22;
82:14; 83:19, 24; 84:3;
98:16; 110:22; 144:9, 16;
147:12; 163:7; 189:8;
209:13; 212:15, 20;
216:17; 233:11; 249:21;
253:1; 265:24; 267:18;
276:20; 277:3; 282:13;
287:12; 291:4; 293:15;
313:14; 331:2; 337:14;
355:8
**recorded** 50:18
**recording** 50:13, 14
**records** 18:19, 20; 26:16;
78:16; 108:11; 152:21;
155:24; 158:8; 170:16;
180:16; 203:1, 6, 9;
236:19; 316:5, 10, 12, 15;
317:19, 23
**reduce** 73:7
**Reese** 158:22, 23; 159:1,
4, 18, 24; 188:18, 20
**referred** 284:8
**refinancing** 333:2
**reflect** 30:1; 203:7, 10
**reflected** 227:17
**reflects** 203:13
**refocus** 43:15; 110:1;
260:8
**refuse** 336:2
**refused** 17:20; 22:23;
99:19; 172:20; 176:13;
229:20; 230:10, 11; 290:1;
294:21
**regard** 215:1
**regarding** 27:11; 73:1;
80:7; 81:7; 89:14; 90:14;
95:14; 125:24; 315:15;
345:6, 10
**regardless** 99:11; 226:5
**related** 332:5, 6; 347:7
**relates** 24:14
**relating** 24:3; 28:2; 85:13
**relation** 296:10
**relationship** 247:5, 6, 13
**relative** 356:16, 19
**released** 102:9
**relevance** 81:15
**relevant** 82:7
**relief** 141:6
**relieved** 38:1
**remain** 7:5; 127:20
**remaining** 130:1
**remember** 28:10; 35:24;
47:24; 49:23; 56:16;
58:10, 11; 59:2, 3, 4;

60:12; 63:15, 22; 65:24;
67:16; 69:7; 70:6; 72:20;
79:24; 85:9, 16; 88:23;
90:9; 92:23; 93:3, 13; 95:1;
100:16; 103:21, 22, 24;
104:11; 105:17; 129:22;
132:18; 133:1; 140:23;
143:21; 157:10; 186:13;
189:14, 15, 24; 190:11;
267:8, 23; 268:7, 8, 10, 11;
273:8, 12, 18; 295:21, 22;
306:5, 7; 313:9; 314:23;
315:2; 317:3; 325:5, 17;
326:4; 351:8
rent 89:14, 17; 285:9;
288:18; 306:22
rental 318:19
renting 326:9; 327:3
rents 318:9, 10, 11
repay 17:22
Repeat 98:17; 198:6;
265:4; 296:8
report 56:13; 147:19;
208:24; 209:3, 5; 303:22
reported 95:4
REPORTER 187:24;
356:3
reporter's 5:18
reporting 94:22; 134:15;
335:8, 12
reports 108:2; 249:4;
334:16
repossess 301:12; 307:4
repossessed 300:1;
303:1; 306:14
repossesses 308:13
repossessing 301:9;
308:16
repossession 301:5;
302:14
represent 6:6; 37:3;
39:15; 214:7, 16; 335:1;
338:24
representations 191:23
representative 86:18;
117:12
representatives 7:19;
8:22; 9:22; 10:11; 115:13;
125:11; 179:6; 188:6;
206:17
represented 192:21
represents 13:11
reputation 107:21
request 43:23; 44:7, 13;
167:16; 184:11; 231:8, 14;
349:11
requested 58:7; 59:1;
232:24
requirements 261:23
resign 204:10
resolution 35:1, 2, 12
resolved 203:2
respect 6:19; 104:13;
142:15, 24; 161:14; 286:1;
295:18; 301:23; 318:6;
335:11, 22

response 200:7; 341:23
responses 230:18
responsive 293:11;
346:5
rest 39:20; 198:21
restaurant 8:16, 17;
113:11; 114:13; 144:21;
199:13
restricted 169:23;
193:24; 207:23; 304:13
restriction 304:15
restrictions 142:14;
208:2, 8; 209:19; 210:16
restrictive 69:6; 169:12,
13; 193:23
restruction 60:14
result 35:3, 13; 255:22;
260:24; 263:22; 315:7
resulted 263:23
results 120:18
resume 354:21
retained 329:9
return 142:19, 21; 183:11
returned 43:13; 147:16
returning 147:22
revenue 218:8, 13;
220:1, 6, 10; 232:7;
233:21; 234:23
revenue-wise 240:6
revenues 214:8, 18;
243:24; 244:3
review 6:23
Revision 218:3
Richard 159:4, 8; 188:18,
20
Rickets 161:7, 9; 168:10;
245:8
rid 240:17, 18
ride 22:16
right 8:17; 9:9, 20; 11:24;
17:6; 19:4, 20, 22; 20:9,
20; 21:6; 22:13; 23:23;
25:14; 26:1; 27:3; 28:18;
31:6; 34:9, 18, 24; 37:23;
38:4, 19, 23; 40:8; 41:4;
43:22; 44:9; 45:12, 20, 22;
46:17; 47:12, 20; 48:9;
49:16, 22; 51:21; 53:5;
54:8; 55:7, 16, 19; 56:17,
22; 58:22; 59:11; 60:3;
61:9, 15, 18; 63:8; 65:15;
66:4, 17, 24; 67:5, 6;
68:16, 21; 69:8, 23; 75:8;
76:4, 11; 77:6, 7, 16;
78:18, 24; 79:8; 82:9; 85:6,
18; 91:2, 20, 24; 92:17;
93:23; 94:9, 13; 98:23;
99:17, 24; 100:18; 101:12,
21; 104:15; 106:1; 109:17;
111:3; 112:7; 114:17;
115:4, 9, 14; 116:9;
117:12; 120:2; 121:22;
122:12, 17; 123:2; 124:19;
125:16; 127:4, 13; 128:3,
6; 129:12; 134:4, 4, 6;
136:10, 18; 137:6, 11, 16;

141:21; 143:24; 145:3;
146:8; 147:24; 148:5;
152:7, 17; 153:2, 18, 24;
154:14, 24; 155:6, 19;
157:15, 21; 158:1, 4;
161:16, 21; 162:9; 164:20;
166:9, 11; 168:1, 4, 18;
169:11; 170:2, 6, 21;
171:7; 172:11, 20; 173:4;
174:15; 175:5; 176:15;
178:1; 180:4; 182:2;
184:6, 22; 190:10, 22;
191:16; 193:15, 18; 194:7;
195:15, 23; 197:8, 24;
198:4; 199:5, 8; 200:24;
201:21; 202:24; 204:7;
205:3; 207:21; 208:1, 16;
209:24; 211:4; 213:11;
218:6, 10; 219:6; 220:18;
223:13; 225:4, 5, 10;
229:6; 230:17; 231:4, 18;
234:8, 21, 24; 235:6;
236:20; 237:3, 7, 11;
240:13; 245:12, 22;
246:10, 24; 253:14, 22;
254:19; 259:7; 264:4, 11,
13; 266:14, 18; 267:5, 7,
15, 17; 268:22, 23; 269:22;
270:11; 271:5; 272:19;
273:20; 278:1, 3, 18;
280:19; 283:8, 21; 284:4;
285:14, 17, 24; 286:14;
289:16; 291:17; 292:9;
295:12, 17; 296:17; 307:1;
312:7; 313:5; 315:18;
316:8, 11; 317:20; 319:10,
11; 322:10; 323:19;
328:23; 329:20; 330:11,
12, 17; 331:9, 15; 333:7,
16; 334:2, 14; 336:1, 2, 19,
21; 338:3, 17, 21; 343:4;
344:13; 346:14, 24; 347:2,
17, 18; 349:24; 351:1;
353:10, 21; 354:1, 23;
355:4
right-hand 46:5
ring 35:7; 88:2; 134:22;
141:7; 189:6
risk 310:18
RMP 125:10; 316:16;
341:6
Road 4:22; 155:15;
270:20
rock 233:12, 14
Roger 334:11, 15
role 118:18, 21; 278:19
roll 175:3; 248:10
rollup 118:21; 120:1;
250:9
rough 213:23
roughly 26:21; 64:21
Route 293:24
RPM 43:11; 52:24; 53:3,
4; 109:6, 21; 112:19;
115:8; 118:1; 119:3, 18,
22; 120:8; 125:24; 248:9;
250:9
ruin 106:12

ruining 107:20
run 38:8; 191:14; 201:24;
210:24; 231:24; 242:5;
282:7; 312:8; 320:24
running 42:21; 137:9;
238:18; 298:24
runs 46:23
rush 110:16
Ryan 117:7, 8, 10, 11;
136:22; 137:4, 20, 22;
139:2; 158:18; 159:16

## S

S-A-Y-R-E-V-I-L-L-E
53:23
S-C-U-N-A 116:12
S-O-T-O 160:6
S-U-G-U-S 87:19
S-Y-S-T-R-A-N-S 146:3
S500 290:18
salaries 165:23; 166:5,
13; 245:11; 345:24
salary 237:14; 319:5
sale 42:5; 214:12; 215:21;
315:15
sales 33:23; 34:17; 35:7,
9, 17; 38:9, 17, 21; 196:18,
20; 197:6, 7, 9; 201:5, 17;
202:11; 203:3; 205:15;
206:16; 207:6; 213:23;
214:12; 215:1; 278:24;
292:10
Same 10:9; 33:15; 48:24;
49:4; 74:24; 75:1; 93:12,
13; 119:24; 133:19, 20;
134:2; 149:3, 9, 15; 161:5,
6, 13; 168:9, 15, 17;
174:16; 189:20; 198:24;
199:20, 21; 200:16;
242:22; 258:21; 308:12;
311:16; 318:5; 349:14, 23
San 139:19; 140:16, 22
Sandra 161:14, 15;
162:18; 163:23; 165:13;
166:1; 168:15; 236:15;
244:23; 245:1
Sapata 317:5
Sapata 317:5, 12; 318:2
sat 31:8; 165:6; 199:13;
242:4; 248:6; 273:1
save 18:6; 45:1; 108:22;
133:3
saw 118:18; 141:11, 15,
16; 158:7; 205:7; 272:11
say-so 239:20
saying 22:17; 29:6;
37:13; 40:1; 106:22;
129:23; 130:11; 147:20;
203:16; 204:17; 229:22,
23; 230:12; 240:14;
256:13; 260:7; 292:12;
300:24; 304:4; 307:9;
321:15; 329:17; 346:7
Sayreville 53:20, 22;
106:10; 149:18; 150:8;

239:9; 242:1; 256:4, 7, 20;
260:16, 18; 280:18; 281:3;
296:6; 316:20
Schafferman 42:24;
149:17; 150:6; 316:20
Schafferman's 42:22
schedule 154:2
scheduled 141:4
scheduling 355:2
school 298:1; 305:15
Schooner 116:10, 11,
16, 17; 117:1, 2, 3, 5, 13;
118:3, 22; 136:21; 137:4,
20; 158:12, 13, 15, 22
Schwartz 300:12; 301:6,
11, 16; 302:8; 308:13, 16,
18; 310:2
Schwartz's 300:1; 301:8
scolded 206:12; 207:17
scrap 24:14; 169:2, 8
scratched 22:24
Scuna 116:12
Secaucus 348:15, 16
second 27:18; 61:24;
80:11; 106:8; 146:19;
186:23; 241:5; 279:14;
285:9, 18; 320:20; 324:18,
22; 329:6; 334:12; 338:8
secretary 205:20; 344:6
secretly 240:19
Section 287:24
secure 162:20; 163:11,
21; 206:21; 220:15;
258:19; 275:19, 24;
279:11
security 269:4
sedan 290:18
seeing 314:24
seeking 141:7
seems 78:3
sees 270:21
select 271:20
sell 247:19
selling 242:20; 333:13
send 12:14; 153:21;
205:23; 253:11; 265:13;
295:8; 296:18; 314:17;
338:5; 343:7
sending 54:10; 294:5
senior 349:8
sense 95:3, 6, 10; 185:9;
213:15; 264:3; 308:10;
326:17; 354:17
senses 185:13
sent 23:18; 25:11; 56:18;
74:1, 2, 3, 8; 205:24;
264:14; 265:6; 313:16;
324:13; 340:15; 344:6
sentence 255:10;
261:16; 262:22; 263:13,
15; 283:9; 291:19
separate 64:10; 75:10;
81:20; 328:9, 11
separating 310:11

**September** 7:17, 18:17, 8, 21; 9:21; 10:10; 11:22; 20:3, 23, 23; 27:21; 28:12; 31:3, 24; 32:1; 33:9, 21; 39:13; 47:8, 23; 48:22; 50:1; 51:22; 54:8, 19, 22; 56:6; 80:12; 185:24; 188:7; 198:22; 205:4; 206:6; 212:24

**Sequedex** 11:2; 17:23; 18:23; 28:3; 69:13, 16, 18, 19, 22; 70:13, 20; 72:10; 73:7; 74:5; 90:16, 17; 108:6; 124:15; 160:15, 17; 161:2, 11; 162:4, 15, 17, 20; 163:12, 17, 20, 22; 164:4, 8, 19, 23; 165:18; 170:1; 172:17; 175:24; 196:22; 223:19, 19; 224:14, 15, 19; 225:3, 13; 235:13; 236:9, 12, 22, 24; 237:9, 24; 238:6; 240:20; 241:10; 323:24; 325:23, 24; 326:2, 17, 22; 327:2, 3; 328:2, 3, 6, 18, 19; 329:7, 9, 11, 18, 21; 330:4; 341:22; 342:10

**Sequedex's** 325:12; 326:14

**sergeant** 53:20; 106:16

**serious** 104:3

**Service** 293:23

**Services** 4:12; 209:2; 210:6; 211:17; 212:1; 284:15; 291:9

**session** 224:1

**set** 68:2; 126:7; 164:7; 195:8; 356:14

**sets** 209:18; 219:14

**setting** 113:20; 205:5

**settle** 57:24; 102:9, 24; 354:18

**seven** 49:10; 78:1; 196:16; 214:11; 259:18; 296:2; 300:13

**seven-minute** 94:6

**several** 22:10; 76:23; 108:19; 133:23

**severe** 209:19

**shape** 258:19

**share** 119:7, 12, 18; 120:21; 123:11; 195:1; 260:12; 275:1; 287:2; 313:2

**shared** 122:4, 18, 22; 123:2, 6; 185:21

**shareholder** 68:5, 9; 118:11, 12; 123:15; 195:19; 196:2, 3; 221:2, 4; 230:7

**shareholders** 221:1

**shares** 268:18

**sharing** 123:9

**Sharon** 130:15; 245:23, 24; 304:1; 309:9; 320:9, 11

**sharp** 213:21

**Sherello** 52:23; 53:2;
321:7

**shift** 80:10

**ship** 116:17; 216:7

**shit** 22:18, 22

**shooting** 268:21

**shop** 18:15; 215:19

**short** 284:14

**Shorthand** 356:3

**shortly** 140:24

**show** 18:19; 44:20; 45:9; 63:10; 106:14; 127:14; 220:2; 252:22; 265:7; 282:10; 286:21; 290:23; 293:13; 299:17; 313:20; 316:5; 336:23

**showed** 42:19; 51:19; 199:24; 308:22, 22

**showing** 26:16; 75:13; 106:14; 239:6

**shows** 242:10

**shut** 180:20

**sic** 14:20; 60:15; 322:4

**sick** 22:22; 258:15

**side** 21:24; 22:12; 23:1; 122:2; 288:1; 330:14; 335:18, 19; 340:24, 24, 24; 341:1, 3

**side-show** 192:8

**sidekick** 190:6

**sign** 28:24; 41:23; 42:4, 13; 109:20; 172:16; 175:10, 12; 184:15, 24; 203:24; 204:4; 253:9, 20; 255:1; 256:6; 260:18; 261:20; 262:2; 333:11; 335:22; 336:9; 353:9

**signature** 203:15; 292:11

**signatures** 291:14

**signed** 7:2; 20:22; 29:1; 41:24; 109:12; 168:3, 13; 184:7, 10; 193:3; 194:5; 202:12; 247:2; 256:4; 261:22; 282:15; 289:3; 291:3, 7, 10; 292:24; 293:4; 298:10; 313:22; 327:10; 336:10

**signing** 256:14, 20, 22

**signs** 7:1

**similar** 331:22

**simple** 43:16; 297:3; 309:17; 340:19

**simply** 287:5

**single** 342:3

**sit** 57:24; 72:14; 102:3; 235:3; 257:22; 258:2; 260:6; 297:8; 348:11; 354:17

**sitting** 85:6; 159:9; 178:13; 216:23; 217:3; 268:14; 342:6

**situation** 80:7; 208:7; 269:1; 312:18

**situations** 44:8

**six** 78:1; 196:16; 247:23; 250:1; 259:17; 275:13

**skipped** 194:16

**skipping** 220:20

**slandered** 107:1

**slandering** 106:21

**slashed** 243:18

**slightly** 218:14

**slow** 275:18

**slowly** 55:22

**small** 145:18; 284:20

**smart** 183:13

**Snapple** 258:18; 260:5; 262:7

**soften** 265:2, 15

**sold** 247:8; 300:19; 310:20

**solicit** 129:17, 19; 131:8

**solicited** 99:18; 100:5, 24; 101:16; 128:10, 18; 131:5, 23

**soliciting** 131:8

**solution** 258:1

**somebody** 37:14; 351:17

**somebody's** 334:1

**somehow** 105:18

**someone** 12:5; 21:24; 27:6; 56:23; 81:12; 100:3; 106:7, 18; 148:2, 12; 151:2; 169:1; 209:12; 276:11; 315:22; 343:18

**sometime** 190:19

**Sometimes** 85:18, 19, 24; 269:17; 284:8

**somewhat** 156:21; 205:18; 215:9, 22; 324:4

**somewhere** 25:23; 50:12; 214:3; 244:4; 264:5

**son** 238:21; 297:5; 332:7

**soon** 304:10

**sophisticated** 122:1

**sorry** 48:18; 67:1; 75:21; 77:13; 78:10; 86:24; 91:9, 12; 92:4, 8; 111:23; 113:13; 116:20; 123:21; 128:24; 148:9; 151:19; 163:5; 165:23; 186:18; 198:5, 7; 218:19; 226:20; 231:11; 241:15; 258:24; 277:16; 282:17; 294:9; 310:4, 13; 314:3; 321:19; 327:23

**sort** 119:16; 133:13; 153:22; 155:20; 266:17; 280:1; 335:7; 347:7

**Soto** 160:5, 6, 9, 14, 24; 167:1, 5, 9, 16, 22; 172:3; 173:18; 175:9; 177:21; 178:15, 17, 23; 244:18

**sound** 9:9; 94:13; 134:8; 213:8; 316:8

**Southern** 32:10; 80:18; 209:21

**space** 20:6, 6; 258:7; 275:9; 281:17

**Spanish** 175:19

**Speak** 55:22; 59:19;
62:17; 67:12; 72:4; 84:19; 176:13; 183:22; 304:22

**speaking** 17:13; 89:14; 351:2

**specific** 30:5; 44:12; 71:16; 178:6; 313:1, 7

**specifically** 13:2; 88:22; 139:2

**speed** 48:20

**spell** 21:21; 107:7; 116:15; 348:9

**spelled** 14:16; 312:24; 313:7

**spend** 195:5; 237:22

**Spent** 238:2, 4

**spoke** 12:5; 19:3; 103:3; 120:24; 148:20; 302:2; 307:19; 318:21

**spoken** 95:22; 96:2; 119:21, 22; 188:6, 17, 21, 24; 189:3; 190:1, 12; 250:17

**sports** 305:17

**spreadsheet** 217:23; 219:10

**square** 18:16; 216:5; 275:9

**St** 71:24

**stack** 207:2

**stage** 68:3

**stand** 35:22; 83:17; 84:1; 207:5; 221:21; 301:22

**staring** 55:18

**start** 7:16; 62:12; 76:11; 77:18; 151:24; 212:22; 301:15

**start-up** 241:7

**started** 20:15; 105:15; 211:11

**starting** 139:9, 10; 224:17; 241:7

**starts** 46:22; 91:15

**State** 356:4

**statement** 176:16; 209:17, 17, 18; 219:11; 259:1; 263:7, 17; 264:10; 283:19; 295:19; 305:10; 312:5

**Staten** 112:16

**stating** 19:10; 202:8; 231:12

**status** 50:7

**stay** 89:15; 209:20; 210:19; 239:7; 312:15

**stealing** 185:17; 276:12; 309:3

**stenographic** 5:17

**stenographically** 356:12

**step** 33:22; 35:4, 14; 38:3, 6, 13, 20; 199:9; 201:2, 14; 202:11; 203:2; 233:17

**stepdown** 349:12

**Stern** 60:10, 12, 19; 61:11; 62:14; 94:12, 19,
24; 95:13, 18, 23; 96:2, 9, 20, 21; 98:4, 6, 12, 20, 21; 99:5, 10, 13, 19, 21; 186:4, 5; 322:22; 324:5; 326:6, 6, 7

**stick** 59:6

**sticker** 45:2; 63:24; 64:2, 3, 5, 6

**still** 33:1; 37:20, 22; 40:10, 13; 43:17; 57:8; 68:13; 115:10; 164:4; 180:17; 273:20, 21; 285:22; 296:3; 297:9; 327:13; 330:11

**stipulations** 6:18

**stock** 349:17, 11

**stolen** 304:5

**stomach** 59:13; 97:24

**stoop** 254:21

**stop** 23:10, 12; 27:13; 29:22; 31:10; 57:20; 69:14, 17, 18; 70:24; 74:4; 137:11; 173:6, 20, 20, 21; 185:11; 281:13; 295:13; 325:2, 9; 328:23

**stopped** 99:7; 120:10

**store** 233:4; 340:22

**story** 52:10; 172:18

**straight** 50:9; 108:12; 152:20

**straighten** 267:18

**stranger** 100:4

**street** 119:17; 233:11

**stress** 60:4

**stressful** 58:14; 59:8, 9

**strict** 207:3

**strictly** 118:22

**strike** 15:23; 68:7; 95:16; 123:14; 133:22; 147:19; 170:23; 280:21; 293:10; 329:24; 330:21; 332:23; 346:3

**strong** 124:18

**struck** 16:7; 315:7

**structure** 205:17

**stuff** 73:7; 144:5; 173:21; 201:6; 269:18; 349:5

**Subject** 63:5; 226:9

**sublease** 288:2

**submitted** 15:13

**subordinated** 334:21

**subpoena** 18:19, 20; 341:10; 347:12

**substantial** 215:3

**substantially** 188:18

**substantiate** 169:9

**substantive** 159:24

**successful** 276:3

**sufficient** 242:3

**sugar** 337:23

**suggest** 203:1; 209:11; 268:2, 5; 289:19

**suggestion** 353:13

**Sugus** 87:19

IMP04510

**suitor** 276:8

**sum** 335:7

**summary** 219:2

**summer** 19:19; 26:22; 28:8; 128:22; 286:7

**sun** 354:6

**sunshine** 354:4

**Superior** 4:15

**supplied** 81:11, 12; 95:19; 186:2; 194:22

**supply** 42:3; 259:22

**support** 166:12; 232:10; 245:13

**supporting** 278:7

**supposed** 222:18; 311:17; 342:19

**supposedly** 300:17

**Sure** 10:8; 17:4; 19:24; 23:14, 22; 24:12; 25:6, 7; 29:23; 38:24; 42:1; 44:19; 45:7, 11; 54:6, 6; 58:3, 21; 64:14; 66:3; 78:20; 79:10, 15; 91:4; 94:1; 96:7; 110:12; 116:4; 125:3; 146:11; 148:18; 152:19; 169:7; 170:17; 171:19; 174:1; 178:9; 188:9; 207:8; 209:15; 220:21; 221:22; 243:5; 258:18; 260:2; 267:19; 269:23; 270:23; 273:24; 286:6; 287:8; 289:18; 292:9; 294:6; 296:9; 308:5; 311:15, 21; 312:22; 317:13; 322:9; 332:11; 333:24; 335:14; 338:23; 340:1; 345:1; 347:14

**surfaced** 343:9

**surgery** 59:14

**surprise** 232:17; 243:2

**surprised** 142:3

**swear** 5:19

**switch** 279:13

**sworn** 5:23; 55:3; 249:21; 356:7

**Sys** 146:1

**system** 45:6; 217:18

**Systems** 5:12; 253:4; 266:11

**Systran** 151:10

**Systrans** 5:12; 146:2, 9; 174:24; 247:21; 248:2, 5, 9, 23; 249:5; 250:1, 8, 13, 20, 24; 251:3, 13; 253:3; 254:1; 257:13; 264:16; 266:1, 10; 271:4; 275:19; 277:7; 278:20; 279:2, 10; 280:17, 24; 281:7; 285:5

## T

**table** 22:1; 238:14; 268:14; 301:4

**tag** 147:17

**taker** 153:15

**talk** 18:10; 79:8; 93:4; 126:9; 146:8; 157:24; 160:2; 190:15; 242:16; 257:24, 24; 258:13; 307:11, 17; 312:8; 318:15; 349:7; 355:2

**talked** 130:11; 152:19; 156:21; 185:22; 190:7; 250:22; 274:11; 284:6; 316:19

**talking** 8:1; 14:13; 19:18; 27:1; 31:23; 35:19; 45:6; 50:17, 21, 24; 54:18; 67:20; 69:11; 80:1, 6; 90:10; 101:6, 8, 24; 121:8; 126:20; 143:17; 152:14; 277:5; 282:18; 310:11; 342:24; 344:23

**talks** 242:16

**Tammy** 152:4; 205:20; 320:13; 338:11

**tape** 12:14; 42:9; 57:5; 60:24; 61:1, 19, 24; 62:1; 84:23; 86:2; 94:15, 16; 95:14, 15, 17, 19; 101:3, 4, 5, 10, 17, 19, 22; 106:14; 128:13; 130:4, 5, 7, 11; 137:9; 144:7, 14; 153:5; 186:4, 5, 6, 7, 10, 22, 23; 276:18; 277:1; 321:6; 322:13, 14, 15, 18, 24; 323:20; 324:2, 3, 22, 23; 342:16, 22; 343:5; 344:1, 8; 350:16; 351:7, 15

**tape-recorder** 50:12

**tape-recording** 51:1, 12; 157:1

**taped** 42:10; 51:24; 52:2, 16, 18, 20, 21, 23; 53:6, 7, 18, 19, 20; 54:14; 56:14; 57:9; 62:5; 85:8; 86:5, 13; 94:11, 23; 95:5; 97:5, 6; 186:12; 321:15; 350:14, 15

**tapes** 54:10, 10, 22; 56:19, 24; 57:3, 18; 58:7, 15, 24; 60:6, 9, 10; 61:22; 62:13, 20, 21; 63:1; 84:21; 85:3, 5, 8, 11, 14, 20; 86:1, 15; 102:6, 10, 15; 186:2, 13; 187:10, 15, 20; 320:23; 322:8, 11; 323:3, 5, 7, 8, 10; 324:18; 343:7, 17; 345:3, 17, 18; 347:9; 350:18; 351:2, 4

**taping** 50:4, 10; 51:15, 23; 102:21

**target** 350:5

**tariff** 171:14, 15

**tax** 218:24

**taxes** 222:21, 24; 310:19; 311:3, 4, 7

**TC** 166:8, 15, 23; 167:24; 168:10, 24; 221:3; 222:10; 223:10; 242:23; 266:12; 286:8; 347:18

**team** 318:12

**Teamster** 345:11;

**Teamsters** 52:4; 347:11; 350:3

**telephone** 8:21; 9:3, 5; 10:5; 43:20; 44:6, 17; 45:16, 21; 48:3, 22; 56:2; 63:12; 64:12; 75:15; 76:6; 95:16; 108:16; 125:14, 15; 134:21; 143:14; 179:14; 251:18, 23; 315:19; 316:14

**telephoned** 9:22

**telephones** 279:14

**telephoning** 9:23; 50:1

**Telespectrum** 124:15

**telling** 30:18, 19, 21; 33:17; 44:10, 14; 51:15; 54:13; 58:23; 70:4, 11, 17; 72:24; 74:4; 95:7, 11; 104:22; 107:3; 125:20; 153:16; 173:11; 191:9; 210:5; 223:21; 229:15; 249:20; 250:2; 288:7; 314:7; 321:17; 322:2

**tells** 304:12; 323:22;

**Ten** 137:13, 15

**tenancy** 21:1

**tenant** 224:20, 22; 282:7; 285:12

**terminate** 231:12

**terminated** 18:3; 246:5, 6; 256:5

**terminating** 230:12

**terms** 196:1; 197:20; 220:24; 222:5; 298:6, 13; 312:1; 313:1, 7

**terrible** 105:1

**terribly** 107:1

**testified** 5:24

**testify** 18:21; 97:14; 176:23; 353:9; 356:7

**testimony** 54:17; 164:20; 277:21; 356:11

**Thanks** 325:20

**theft** 304:5

**thereafter** 148:19

**thereof** 234:4

**think's** 213:16

**third** 285:10; 287:19, 21; 334:17

**third-party** 216:11

**Thomas** 4:24; 5:9, 22; 62:3; 167:15; 186:9; 199:12; 202:10; 282:15; 289:3; 291:10; 293:21; 356:6

**though** 43:16; 90:23; 95:4; 168:23; 225:5; 293:6; 298:24

**thought** 14:21; 37:23; 54:20; 56:11; 160:14; 182:1; 186:18; 211:11; 250:4; 261:13; 302:20; 324:12

**thousand** 226:24;

349:21; 352:9, 15

227:12, 14; 228:19; 305:17

**threat** 122:11

**threatened** 106:11

**threatening** 102:14

**three** 42:17, 19; 110:15, 20; 130:17; 164:2; 182:11; 220:10; 232:15; 241:8; 251:6; 277:1; 301:18; 311:5; 331:10; 353:3

**three-and-a-half** 115:18

**three-quarters** 121:6

**three-year** 286:10

**throat** 270:18

**thrown** 23:9; 29:18; 31:6, 12, 14, 18, 20; 32:3

**ticks** 219:5

**times** 70:21; 119:23; 174:5; 189:1; 220:10; 223:17; 224:6; 226:7, 13; 232:15; 258:14; 259:7; 310:10

**title** 34:20; 68:12; 204:12

**titled** 218:2

**today** 6:8, 9; 14:2; 41:15; 58:23; 73:17; 85:7; 102:3; 106:5; 159:9; 178:14; 187:11, 12, 18; 283:13; 297:9; 322:3; 325:18; 342:6; 348:12; 353:24; 354:13; 355:7

**Today's** 4:19; 12:1; 41:14

**together** 117:23; 120:5; 121:11; 127:11; 137:2; 157:17, 20; 247:15; 255:3; 256:9; 257:20

**told** 9:4; 14:6; 15:20; 18:1; 23:7, 15; 24:8; 26:19; 37:24; 38:5; 43:2; 51:11; 54:20, 21; 56:11; 58:12; 63:14; 69:10; 70:8, 18, 24; 71:4; 80:22, 24; 82:4, 15; 84:14, 14; 87:22; 94:9; 97:2, 3, 4, 11; 99:22, 24; 100:2, 7, 11, 13; 102:20; 103:4; 104:7, 11; 107:9, 17; 109:6, 18; 110:14; 121:7, 12; 124:5, 7, 9, 23; 126:6, 12, 14, 16; 127:5, 18; 128:21; 138:13; 158:11; 160:16; 161:17; 163:20; 169:24; 173:5, 18; 180:17; 185:3, 16; 199:15; 202:16; 203:21; 204:10; 206:23, 24; 222:21; 223:23; 238:24; 239:12; 241:3, 14, 16; 250:5, 6; 256:17; 257:18; 260:14; 262:18; 272:15; 273:13; 275:5; 286:20; 288:24; 289:8, 13; 291:24; 294:15, 23; 303:8, 14, 21; 304:17, 24; 305:3; 308:24; 309:4; 320:4, 8, 11, 12; 333:9

**Tom** 45:21; 321:19; 325:1; 352:8

**Tommy** 96:16; 168:3; 173:6; 191:10; 198:16;

202:18, 19; 206:24; 207:11; 303:17; 304:3; 305:1

**Tony** 284:9; 292:10; 293:6; 294:17

**took** 24:24; 139:9; 155:12; 172:23; 173:5, 19; 185:18; 192:5; 204:2; 209:12; 262:7; 307:5, 5

**tools** 303:22

**top** 45:20; 46:4, 23; 233:10; 279:4

**topic** 84:21; 115:21; 117:19; 133:19, 20; 134:2; 212:23

**topics** 117:16; 118:6

**torn** 176:6

**total** 218:8; 237:20

**touch** 24:6

**touches** 138:23

**towards** 250:19

**town** 305:17

**township** 99:6; 305:19

**track** 154:9, 11; 155:17

**tractor** 18:15; 22:11

**tractors** 306:15, 18, 18; 307:6; 308:3, 14

**trade** 127:14; 337:11, 17

**trailer** 284:22; 328:4; 330:15

**trailers** 18:16; 22:12; 69:17; 70:20; 300:2; 301:9; 302:24; 308:13; 326:9, 12, 16, 23; 327:2; 328:7, 12, 20; 329:8

**traipsing** 353:14

**transaction** 191:20; 193:16; 194:9

**transcribed** 343:18, 22; 344:20

**transcribing** 343:20

**transcript** 6:23; 7:5; 356:11

**transcriptions** 343:11

**Transport** 166:8; 167:24

**Transport/Logisteq** 266:12

**Transportation** 5:1, 10; 284:15; 291:9; 293:23; 328:7; 338:14; 339:1, 12, 14; 340:6, 14

**travel** 180:23; 182:12, 13, 13, 14, 15, 18; 207:23; 208:2, 7, 12, 18; 209:19; 210:7, 16; 211:1, 6

**traveling** 77:7; 212:5

**treated** 228:6, 9, 13, 22; 229:10; 230:1

**tricks** 304:7

**tricky** 37:12, 13

**tried** 304:19; 349:9, 15, 18

**trip** 139:9; 140:3, 3; 152:22

**triple** 232:8

**tripling** 214:8

**TRO** 16:21

**trouble** 23:5; 183:23; 240:24

**truck** 290:19

**Trucking** 171:9, 10; 205:9; 284:20

**trucks** 304:5; 307:10, 15, 23; 325:12; 326:2

**true** 18:9; 28:22; 29:7; 32:6; 56:15; 68:6, 15; 106:15; 140:1; 166:22; 167:3; 187:3; 193:9; 198:16; 201:8, 22; 206:18; 231:18; 232:2; 234:1; 251:16; 263:7, 14, 16; 266:19; 283:18; 290:11; 292:3; 297:6; 328:10; 334:10; 356:10

**trust** 185:15; 192:4; 301:21; 331:23, 23, 24; 332:4, 4; 346:22

**trusted** 108:3; 243:19

**trusting** 243:22; 347:5

**truth** 19:1, 3; 71:3; 97:23; 172:19; 175:15; 183:22; 184:2, 5; 201:10; 204:24; 224:10; 260:7; 304:22; 309:5; 325:4, 8; 356:7, 8, 8

**truthful** 260:6

**try** 29:10; 35:11; 37:2; 39:5; 42:11; 43:15; 55:19; 69:23; 70:1; 89:8; 96:5; 110:16; 126:9; 129:6; 132:3, 4; 145:21; 163:20; 172:16; 178:8, 10; 185:9; 200:8; 206:21; 241:18; 247:19; 248:7; 250:8; 256:10; 310:8; 346:8; 352:23, 24

**trying** 14:19; 24:5; 27:12, 13; 33:7, 8; 55:10; 60:11; 69:18; 89:23; 93:22; 102:8, 23; 108:22; 122:23; 124:8, 9; 130:21; 131:1; 136:22; 145:15, 17; 157:19; 175:3; 185:8; 213:6, 19; 223:7; 233:5; 256:18; 258:7, 16; 265:15; 272:16; 277:18; 285:9, 20; 295:5; 296:20; 304:7, 17; 332:13; 334:8; 339:16, 17, 21; 350:22; 351:9, 17

**turn** 46:4, 15; 65:8; 66:5, 13; 75:18; 76:1; 79:11; 87:7; 111:16; 135:18; 146:18; 147:6; 152:10; 287:19; 338:18

**Twenty** 323:11

**twice** 252:14, 19

**two** 8:3; 17:17; 24:8; 26:20; 49:18; 75:4; 79:17; 107:4; 112:11; 113:5; 115:11; 125:11; 126:4; 128:5, 9, 18; 130:13, 17; 131:23; 132:7, 11, 17, 21; 144:14, 23; 145:4; 176:1, 10; 180:10; 182:10; 186:2;

**tripling 214:8** 135:3, 9; 14:9; 99:16; 200:3, 3; 204:9; 213:8; 219:9; 221:1; 264:14; 267:10, 12; 276:18; 303:10; 311:8; 324:17; 326:2; 328:11, 19; 331:10

**two-page** 291:5

**two-thirds** 240:4

**type** 158:3; 207:13

## U

**U.S** 247:8, 9, 10

**ultimately** 231:6

**um** 145:12

**under** 45:8; 80:18; 81:4, 12; 103:16; 104:3; 218:9; 239:8; 240:11; 270:24

**underlying** 33:3

**underneath** 218:22; 238:14

**understands** 241:4

**understood** 170:6, 8; 194:7, 13; 195:17, 22; 292:5

**unemployed** 154:10

**unfound** 319:24

**union** 175:20; 215:18; 350:5; 351:2, 10, 12

**unionize** 322:17; 349:10, 15; 352:23; 353:7

**unionizing** 352:17

**unions** 349:21; 352:9, 15

**unless** 44:5; 63:3; 105:14; 127:19; 209:21; 210:20; 254:9

**unprofessional** 207:13

**untrue** 290:4; 327:20, 21, 22

**up** 7:11; 9:8; 12:1; 22:16, 24; 23:6; 24:1, 13; 26:14; 29:11; 37:14; 42:19; 47:19; 58:23; 65:15; 74:24; 89:7; 92:21; 93:16; 107:20; 113:20; 116:3; 126:1, 7; 135:14; 136:4, 7; 137:24; 138:21; 145:18; 154:18; 163:24; 164:8, 18; 165:19; 167:15; 170:1; 173:1, 21; 174:14; 175:3; 192:14; 196:5; 201:6; 202:7, 15; 203:5; 204:6; 205:11, 23; 206:21; 207:5; 208:10; 224:17; 227:15; 248:10; 249:13; 256:18, 19; 258:17, 18; 259:1, 5; 264:5; 265:2, 15; 271:6; 285:16; 289:11; 297:21; 299:3; 301:22; 302:4, 6, 10; 303:18; 304:6, 10; 306:5; 307:13; 308:22, 22; 310:7, 8, 14, 18; 311:12; 312:14; 321:14; 326:8; 327:24; 335:7

**update** 50:6

**upon** 213:24

**upset** 29:14; 73:6; 105:4; 203:19; 207:12; 256:17, 23; 260:20

**use** 13:16; 40:4, 13, 15, 17, 24; 41:2, 18; 43:19; 69:19; 72:3; 155:1, 1, 20; 156:9; 179:17, 19; 180:19, 21, 22; 181:1; 182:13, 15; 251:19, 21; 252:12; 279:24; 328:6; 329:10

**used** 41:8, 9; 44:6, 11; 84:9; 179:15; 180:9; 181:5; 182:7; 226:6; 252:19; 255:14; 260:13; 263:1; 279:18, 24; 280:2; 328:16; 352:16, 21

**useless** 237:20, 23

**user** 156:5

**using** 9:6; 164:4; 180:17; 214:13, 15; 255:24; 260:24; 297:12; 329:7, 7

## V

**V-A-R-N** 14:12, 14

**vacation** 140:4, 5, 8, 11, 13

**Varn** 12:8, 19, 20; 13:3, 8, 11; 14:10, 11, 11, 23; 15:1, 2, 14, 18; 16:11; 17:14; 27:8; 28:2; 56:23; 60:7, 9; 61:20, 23; 62:1; 80:17; 81:22; 84:7; 86:7; 134:21; 141:21; 142:5; 177:6; 190:1

**Varn's** 13:16; 15:18; 134:20; 190:8

**Vegas** 139:10, 16

**vehicle** 288:3, 4; 294:3; 298:22

**vehicles** 288:13; 295:3; 298:21; 308:6

**Velasquez** 337:10, 16; 338:1, 5

**venture** 115:22; 116:6, 9, 10; 117:4, 18; 118:19

**Vera** 316:24

**verbal** 35:23; 73:1; 185:20; 206:1; 210:5; 245:20; 336:7

**verified** 353:17

**verify** 178:22; 260:6; 340:12

**Verizon** 45:13; 146:16

**versus** 5:2, 9

**vice** 30:10; 38:21; 87:24; 188:22; 217:8; 352:8

**Vicki** 5:18

**VICTORIA** 356:2, 23

**video** 4:14; 83:14; 144:3

**VIDEOGRAPHER** 4:8, 10; 83:17; 84:1; 137:13; 144:6, 13; 212:14, 19; 276:17, 24; 355:5

**videotape** 144:8, 14; 276:19; 277:2; 355:6

**view** 205:5; 250:19

**Vin** 7:7, 9, 10; 137:22; 139:2; 159:16

**Vincent** 117:11; 136:21

**violating** 67:23; 69:6

**Virginia** 197:2

**Visa** 181:9, 14, 15

**voice** 351:6, 14

**voicemail** 89:2, 7; 93:16; 147:16; 148:17; 150:3

**voicemails** 89:6

**volunteer** 305:13

**vote** 175:20

## W

**Wadzke** 13:4; 14:10; 15:20; 16:2, 12; 17:14; 19:10, 17; 20:19; 21:1, 10; 30:11; 47:17, 23; 48:4; 49:1, 11, 22; 50:1, 4; 54:11, 19; 56:4, 11, 13, 18; 65:15, 23; 67:15, 20; 75:6, 10; 77:10; 79:18; 80:1, 16, 17; 81:22; 84:15; 86:10; 89:4; 90:6, 10; 92:19; 93:2, 8; 94:7, 22; 95:5; 100:14; 110:15, 20, 23; 111:4, 8, 20; 112:5, 12; 114:16, 17; 115:1; 134:8, 15; 140:19, 22; 149:11; 150:12; 159:16; 177:6, 8; 188:10

**Wadzke's** 47:13

**wage** 167:21

**Wait** 290:5

**waiting** 43:3

**Wakefern** 258:17; 259:2; 260:4; 262:6

**walk** 97:9; 126:22; 310:20

**walked** 22:24; 37:14; 222:20; 311:2, 8, 9

**walking** 29:12

**Wall** 233:11

**Walter** 246:3, 5, 18; 257:5, 5, 8, 14; 258:7, 22; 259:15; 262:4, 5; 270:3, 6

**wants** 309:1

**warehouse** 18:17; 109:10; 216:7; 270:20; 271:19

**warehouses** 257:11

**warehousing** 11:7; 164:16; 215:2; 284:21; 285:8; 339:1; 340:14

**Washington** 181:18, 23; 182:2

**Washington's** 181:22

**wasted** 225:13

**watch** 240:11

**water** 188:3, 3

**wavelength** 311:16

**way** 7:12; 13:19; 23:24; 37:2; 40:11; 46:19, 20; 51:6; 56:13, 19; 97:10; 123:23; 127:23, 24;

129:15; 140:10; 143:22; 150:1; 155:8; 176:11; 177:5; 198:20; 200:17; 205:24; 209:2; 211:9; 214:2; 227:22; 239:16, 16, 21; 240:5; 249:23; 278:7; 285:2, 5; 296:15; 303:23; 319:2; 323:21; 332:4; 341:13, 14; 343:19; 353:16

**Web** 236:6

**week** 16:22; 20:22; 148:20; 209:9; 210:23; 299:8, 9

**weeks** 24:1, 8; 42:15; 57:16; 59:7; 130:17; 236:5; 264:15, 22; 273:9; 296:2; 299:24; 318:24

**welcome** 74:17; 183:6; 260:10; 325:21

**weren't** 288:9

**West** 139:9, 11

**what's** 30:18, 21; 45:9; 71:21; 99:3; 105:5; 109:5; 120:17; 182:16; 208:19; 221:11; 227:4; 252:6; 258:5, 11; 259:10; 270:5; 271:13; 290:23; 293:13; 327:17; 336:23; 347:23; 348:7

**whatsoever** 81:19; 183:21; 208:8; 211:10; 251:4; 274:16

**When's** 12:4; 299:5

**whenever** 177:17

**Where's** 130:6; 154:14

**whereby** 168:22; 325:24

**Whereupon** 4:2; 83:23; 163:6

**wherever** 155:13

**Whey** 107:22

**white** 215:22

**who's** 6:10, 11, 13; 81:12; 216:23; 236:13; 237:1, 11; 238:7; 298:15; 348:6

**whole** 76:5; 77:3; 106:13; 187:5, 6; 199:15; 217:14; 264:17; 268:21; 278:14; 345:22; 356:8

**whose** 51:22; 105:16; 135:4; 152:15; 190:6; 234:5; 248:13; 284:2

**wide** 213:20, 20

**wife** 104:22; 105:3, 14; 176:11; 294:18; 310:8, 10

**willing** 58:19; 242:9; 278:13; 310:6, 17; 329:18; 354:2

**willpower** 176:8

**wire** 51:20; 335:2

**wise** 126:2

**within** 35:2, 12, 13; 57:15; 109:10; 132:21; 141:3; 186:11; 214:1; 340:6

**without** 104:15; 191:10; 203:20; 217:13; 224:3;

**225:16; 226, 24; 232:1;**
**239:19; 241:9; 274:20;**
**290:7; 292:1; 340:20**

**witness** 5:20; 11:13;
14:24; 15:4; 33:4; 35:23;
39:9; 53:10, 24; 73:9, 17,
18; 83:6, 10, 16; 91:22;
92:2; 98:14; 103:14;
188:2; 189:9, 19; 204:14;
212:13; 221:17, 22;
226:20; 252:17; 314:17,
20; 323:4; 324:12, 21;
325:4; 338:7; 342:17;
343:11; 354:6, 10, 16;
355:9

**witnesses** 107:3; 269:17;
351:18, 22

**woman** 152:15

**womanizer** 106:22;
107:13

**wonderful** 45:6; 176:1

**word** 72:4, 8; 94:20;
135:6; 155:21; 185:19;
192:5; 326:17; 329:10;
334:1; 346:23

**words** 71:18; 84:9;
160:13; 195:19; 209:20;
305:24; 343:18

**work** 37:10; 128:22;
131:14; 145:16; 160:15,
17; 161:10; 162:3; 165:20;
170:24; 171:3, 6, 7;
174:24; 177:11; 185:11;
205:14, 16; 223:5; 230:16;
236:3; 247:14, 16; 248:24;
254:1; 257:17, 19; 258:2;
297:18; 319:21

**worked** 106:23; 107:13;
151:3; 163:23; 235:4, 13,
18; 236:4; 248:2; 249:23;
297:16, 20; 308:17;
311:19

**working** 97:20; 145:13,
14; 161:2; 165:13, 18;
169:1; 205:9; 207:14;
238:5; 240:19; 241:2;
256:8; 258:21; 275:12;
295:4; 296:4

**works** 270:3; 296:4

**world** 201:3; 212:6

**worried** 239:5

**worry** 239:2

**worrying** 306:5

**worse** 269:1

**wow** 304:14

**wreaking** 264:8; 283:14

**write** 72:14; 73:11;
205:23; 332:16

**writing** 34:10; 35:20;
73:8; 245:16; 258:5; 297:1

**written** 35:20; 72:21;
155:24; 176:16; 187:9;
190:23; 191:5, 7; 192:18;
211:15; 245:13, 18;
266:10; 286:16; 315:14;
341:14; 346:21

**wrong** 16:20; 70:13; 92:4;

**129:2; 170:18; 203:8;**
**213:4; 214:23; 240:15;**
**329:14, 22; 330:3, 15**

**wrote** 202:7; 312:23;
313:6

# X

**X** 341:3

# Y

**Y** 341:3

**year** 7:18; 27:21; 28:21;
29:2; 72:1; 80:2; 126:24;
129:11; 152:24; 171:23;
179:14; 213:7, 24; 214:9,
10; 218:13; 219:16, 20;
220:1, 6, 10; 232:16;
239:16; 240:4; 241:4, 5,
18, 24; 242:9, 22; 248:1;
289:22, 22; 305:18; 319:5,
15; 320:3

**years** 42:2; 97:21; 108:1,
3; 185:18; 205:8; 206:19;
219:15; 241:8; 247:15;
306:17, 19

**Yep** 91:14; 151:1

**yeses** 325:17

**York** 32:10; 33:5; 80:19;
209:22; 210:20; 337:10,
16

**Yorktown** 182:22

**young** 343:19

# Z

**Z** 341:3

**Lawyer's Notes**

IMP04514

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,
.    Case No. 2:02-cr-01112-ADS-2
.    2:02-cr-01112-ADS-3,
            Plaintiff,                .    2:03-cr-01103
.
versus                               .
.    Long Island Courthouse
.    100 Federal Plaza
THOMAS CARR and                       .    Central Islip, NY 11722
JOHN LEHMAN, JR.,
.
            Defendants.               .    September 29, 2004
. . . . . . . . . . . . . . . . ..    11:57 A.M.


TRANSCRIPT OF PLEA
BEFORE HONORABLE WILLIAM D. WALL
UNITED STATES MAGISTRATE

APPEARANCES:

For the U.S.A.:            United States Attorney's Office
                          By:  BURTON T. RYAN, ESQ.
                          610 Federal Plaza
                          Central Islip, New York 11722

For Thomas Carr:          Bachner & Herskovits, P.C.
                          By:  MICHAEL F. BACHNER, ESQ.
                          26 Broadway, Suite 2310
                          New York, New York 10004

For John Lehman, Jr.:     RICHARD D. HALEY, ESQ.
                          300 Rabro Drive
                          Hauppauge, New York 11788


Audio Operator:           Thomas Talbott

Proceedings recorded by electronic sound recording, transcript
           Produced by transcription service.

## TRANSCRIPTS PLUS
435 Riverview Circle, New Hope, Pennsylvania 18938
E-Mail CourtTranscripts@AOL.COM

215-862-1115  (FAX) 215-862-6639

Cass    EXH 2
FOR IDENT
IN EVD    DATE 2/28/07
DENISE L. DANIELS

IMP04515

2

1          MR. TALBOTT:  CR-1112 and CR-03-1103, United States

2   of America versus Thomas Carr and John Lehman.

3          Counsel, state your appearances for the record.

4          MR. RYAN:  For the Government, Your Honor, Burton

5   Ryan.

6          THE COURT:  Mr. Ryan.

7          MR. BACHNER:  Good afternoon, Your Honor.  Or still

8   good morning.  Michael Bachner on behalf of Thomas Carr.

9          MR. HALEY:  Richard -- Richard D. Haley on behalf of

10  John Lehman.

11         THE COURT:  Okay.  Good morning, folks.

12         MULTIPLE SPEAKERS:  Good morning.

13         THE COURT:  Judge Spatt has referred this matter to

14  me for a plea allocution.  Mr. Bachner and Mr. Haley, do your

15  clients respectively consent to my jurisdiction for that

16  purpose?

17         MR. BACHNER:  Yes, Your Honor.

18         MR. HALEY:  Yes, sir.

19         THE COURT:  And do either of you have any -- see any

20  reason why we can't take the two pleas together at the same

21  time?

22         MR. BACHNER:  No, Your Honor.

23         MR. HALEY:  I have no objection.

24         THE COURT:  Very well.  Okay, Mr. Carr --

25         MR. CARR:  Yes, sir.

IMP04516

3

1         THE COURT:  -- and Mr. Lehman, before accepting your

2   plea, there are a number of questions I must ask each of you to

3   assure there it is a valid plea.  If you do not understand any

4   of my questions, please -- please say so and I'll reword the

5   question.  Do you understand?

6         MULTIPLE SPEAKERS:  Yes.

7         THE COURT:  Tom, would you please swear the

8   defendants.

9         MR. TALBOTT:  Mr. Carr, Mr. Lehman, if you would

10  please stand, raise your right hand.

11               THOMAS CARR, SWORN

12             JOHN LEHMAN, JR., SWORN

13        MR. TALBOTT:  Please be seated and speak into the

14  microphones and just state your name for the record.

15        MR. CARR:  Thomas Carr.

16        MR. LEHMAN:  John Lehman.

17        THE COURT:  Okay.  Mr. Lehman, you're going to have

18  to pull that mike closer to you so we can get a decent

19  recording of the proceeding, okay?  Thank you.

20        MR. LEHMAN:  John Lehman.

21        THE COURT:  Thank you.  Okay.  Mr. Carr, what

22  schooling or education have you completed?

23        MR. CARR:  St. Peters College, four-year degree.

24        THE COURT:  Okay.  Have you had any difficulty in

25  communicating with Mr. Bachner?

4

1              MR. CARR:  No, I have not.

2              THE COURT:  Are you presently or recently been under

3   the care of a physician or psychiatrist?

4              MR. CARR:  No, Judge.

5              THE COURT:  In the past 24 hours have you taken any

6   narcotic drugs, medicine or pills or drunk any alcoholic

7   beverages?

8              MR. CARR:  No, I did not.

9              THE COURT:  Have you ever been hospitalized or

10  treated for narcotic addiction?

11             MR. CARR:  No, sir.

12             THE COURT:  And is your mind clear and do you

13  understand the proceedings here today?

14             MR. CARR:  Yes, sir.

15             THE COURT:  Mr. Bachner, have you discussed this

16  matter with Mr. Carr?  And are you satisfied that he

17  understands the rights that he'll be waiving by pleading

18  guilty?

19             MR. BACHNER:  Yes, Your Honor.

20             THE COURT:  And is he capable of understanding these

21  proceedings?

22             MR. BACHNER:  Yes, Your Honor.

23             THE COURT:  Do you have any doubt as to his

24  competence to plead?

25             MR. BACHNER:  None, Your Honor.

5

1          THE COURT:  And have you advised him of the maximum

2    sentence and the operation of the sentencing guidelines?

3          MR. BACHNER:  I have, Your Honor.

4          THE COURT:  Thank you.

5          MR. BACHNER:  You're welcome.

6          THE COURT:  Mr. Lehman, what schooling have you

7    completed?

8          MR. LEHMAN:  I have some college without a degree.

9          THE COURT:  And you've been able to communicate with

10   Mr. Haley, and understand these proceedings?

11         MR. LEHMAN:  Yes, sir.

12         THE COURT:  Okay.  Are you presently or recently been

13   under the care of a physician or psychiatrist?

14         MR. LEHMAN:  No, Judge.

15         THE COURT:  In the past 24 hours have you taken any

16   narcotic drugs, medicine or pills or drunk any alcoholic

17   beverages?

18         MR. LEHMAN:  No, sir.

19         THE COURT:  Have you ever been hospitalized or

20   treated for narcotic addiction?

21         MR. LEHMAN:  No.

22         THE COURT:  Is your mind clear and do you understand

23   the nature of these proceedings?

24         MR. LEHMAN:  Yes, sir.

25         THE COURT:  Mr. Haley, have you discussed this matter

6

1    with your client?

2            MR. HALEY:  Yes, sir.

3            THE COURT:  And are you satisfied that he understands

4    the rights he'll be waiving by pleading guilty?

5            MR. HALEY:  I am, Your Honor.

6            THE COURT:  And that he's capable of understanding

7    these proceedings?

8            MR. HALEY:  Yes, sir.

9            THE COURT:  And do you have any doubt as to his

10   competence to proceed?

11           MR. HALEY:  No, sir.

12           THE COURT:  And have you advised him of the maximum

13   sentence and fine that can be imposed and discussed with him

14   the operation of the sentencing guidelines?

15           MR. HALEY:  I have, Your Honor.

16           THE COURT:  Thank you.

17           All right.  Mr. Carr, have you received a copy of the

18   indictment and had an opportunity to discuss this matter with

19   Mr. Bachner?

20           MR. CARR:  Yes, Judge.

21           THE COURT:  And are you satisfied to have him

22   represent you here today?

23           MR. CARR:  Yes, Judge.

24           THE COURT:  And, Mr. Lehman, have you received a copy

25   of the indictment and discuss it with Mr. Haley and are you

IMP04520

7

1  satisfied to have him represent you here today?

2            MR. LEHMAN:  Yes, sir.

3            THE COURT:  All right.  Gentlemen, the first and most

4  important thing you must each understand is that you do not

5  have to plead guilty, even if you are guilty.  Under our system

6  of law, the prosecutor has the burden of proving the guilt of a

7  defendant beyond a reasonable doubt.  And if the prosecutor is

8  unable to meet his burden of proof, the jury has a duty to find

9  the defendant not guilty, even if he is guilty.  Do you

10 understand?

11           MR. LEHMAN:  Yes.

12           THE COURT:  Mr. Carr, do you understand?

13           MR. CARR:  Yes.  Yes, Judge.

14           THE COURT:  So, that it sometimes happens in American

15 courtrooms the jury has returned a verdict of not guilty, even

16 though everybody in the courtroom knew that the defendant was

17 guilty.  What the jury was saying in those cases is not that

18 the defendant was innocent, but rather that the Prosecutor had

19 failed to meet his burden of proving that the defendant was

20 guilty.  Do you understand?

21           MR. CARR:  Yes, Judge.

22           MR. LEHMAN:  Yes.

23           THE COURT:  So, that is why I say even if you are

24 guilty, you have a choice.  You may plead guilty, as you

25 apparently wish to do.  Or you may say to the Government prove

8

1  it, meet your burden of proving my guilt beyond a reasonable

2  doubt.  And the way you exercise that option is by saying not

3  guilty when I ask you how to you plead.  Do you understand?

4          MR. CARR:  Yes.

5          MR. LEHMAN:  Yes.

6          THE COURT:  If you persist in your plea of not

7  guilty, under the Constitution and laws of the United States,

8  you are entitled to a speedy and public trial by a jury with

9  the assistance of counsel on the charges contained in each of

10  the indictments.  Do you understand?

11          MR. CARR:  Yes, Judge.

12          MR. LEHMAN:  Yes.

13          THE COURT:  At the trial, you would be presumed

14  innocent and the Government would have to overcome that

15  presumption and prove you guilty by competent evidence and

16  beyond a reasonable doubt, you would not have to prove that you

17  are innocent.  If the Government were to fail, the jury would

18  have the duty to find you not guilty.  Do you understand?

19          MR. CARR:  Yes, Judge.

20          MR. LEHMAN:  Yes.

21          THE COURT:  By pleading guilty, you are relieving the

22  Government of the burden of proving that you are guilty and you

23  are admitting your guilt.  Do you understand?

24          MR. CARR:  Yes, Judge.

25          MR. LEHMAN:  Yes.

1          THE COURT:  In the course of the trial, the witnesses

2   for the Government would come to court and testify in your

3   presence and your counsel would have the right to cross examine

4   the witnesses for the Government, to object to evidence offered

5   by the Government and to offer evidence on your behalf.  Do you

6   understand?

7          MR. CARR:  Yes.

8          MR. LEHMAN:  Yes.

9          THE COURT:  At a trial, while you would have the

10  right to testify if you chose to do so, you could not be

11  required to testify.  Under the Constitution of the United

12  States a defendant in a criminal case cannot be forced to take

13  the witness stand at a trial and say anything that could be

14  used to show that he is guilty of the crime with which he is

15  charged.

16          If you decide not to testify, the Court would

17  instruct the jury that they could not hold that against you.

18  Do you understand?

19          MR. CARR:  Yes.

20          MR. LEHMAN:  Yes.

21          THE COURT:  If you plead guilty, I will have to ask

22  you questions about what you did in order to satisfy myself

23  that you were guilty of the charge to which you seek to plead

24  guilty, and you will have to answer my questions and

25  acknowledge your guilt.  Thus, you will be giving up the right

10

1    that I have just described, that is the right not to say

2    anything that would show that you are guilty of the crime with

3    which you are charged.  Do you understand?

4              MR. CARR:  Yes, sir.

5              MR. LEHMAN:  Yes.

6              THE COURT:  If you plead guilty, and I recommend that

7    Judge Spatt accept your plea, you will be giving up your

8    Constitutional Right to a trial and the other rights I have

9    just discussed.  There will be no further trial of any kind and

10   no right to an appeal.  Judge Spatt will simply enter a

11   judgment of guilty on the basis of your guilty pleas.  Do you

12   understand?

13             MR. CARR:  Yes.

14             MR. LEHMAN:  Yes.

15             THE COURT:  Are you willing to give up your right to

16   a trial and the other rights I have just discussed?

17             MR. CARR:  Yes, Judge.

18             MR. LEHMAN:  Yes.

19             THE COURT:  I have been presented with two

20   cooperation agreements, one on behalf of each defendant.  Mr.

21   Carr, I've marked yours as Court Exhibit 2.  Have you reviewed

22   the cooperation agreement with Mr. Bachner and are you

23   satisfied that it accurately reflects the agreement that you

24   have reached with the Government.

25             MR. CARR:  Yes, Judge.

11

1          THE COURT:  And do you understand the cooperation

2    agreement?

3          MR. CARR:  Yes, I do.

4          THE COURT:  And you signed the last page?

5          MR. CARR:  Yes, I did.

6          THE COURT:  Okay.  Mr. Lehman, I've marked your

7    cooperation agreement as Court Exhibit 1.  Have you reviewed

8    the cooperation agreement with Mr. Haley and are you satisfied

9    that it accurately reflects the agreement that you have reached

10   with the Government.

11         MR. LEHMAN:  Yes.

12         THE COURT:  And do you understand the cooperation

13   agreement?

14         MR. LEHMAN:  Yes, I do.

15         THE COURT:  Other than any promises contained in the

16   cooperation agreements, has anyone made any other promises to

17   you that have caused you to plead guilty?  Mr. Carr?

18         MR. CARR:  No, sir.

19         THE COURT:  Mr. Lehman?

20         MR. LEHMAN:  No, sir.

21         THE COURT:  Has anyone made any promises to you as to

22   what your sentence will be?  Mr. Carr?

23         MR. CARR:  No, Judge.

24         THE COURT:  Mr. Lehman?

25         MR. LEHMAN:  No, Judge.

IMP04525

12

1          THE COURT:  Okay.  I now want to discuss with you the

2    sentencing scheme that is applicable here.  It's my

3    understanding that you each intend to plead guilty to Count 2

4    of Indictment 02-CR-1112, charging a conspiracy to launder

5    money.  And Count 2 of Indictment 03-CR-1103, charging a bank

6    fraud violation of 18 U.S.C. 1344.

7          Those two counts carry the following statutory

8    penalties and they're both the same for each of you.

9          Money laundering, there's a maximum term of

10   imprisonment of 20 years.  There is no minimum term of

11   imprisonment.  There's a maximum supervised release term of

12   three years to follow any term of imprisonment.  A maximum fine

13   of $500,000 or twice the value of the funds involved, whichever

14   is greater.  Restitution in the amount of approximately

15   $696,000.  And a $100 special assessment and criminal

16   forfeiture.

17         The bank fraud count carries a maximum term of

18   imprisonment of 30 years.  There is no minimum term of

19   imprisonment.  A maximum supervised release term of five years

20   to follow any term of imprisonment.  A maximum fine of

21   $1,000,000 or twice the gross gain or loss, whichever is

22   greater.  Restitution in the amount of approximately $1.6

23   million.  A $100 special assessment and criminal forfeiture.

24         Mr. Carr, do you understand that those are the

25   maximum penalties?

13

1          MR. CARR:  Yes, I do, Judge.

2          THE COURT:  And, Mr. Lehman, do you?

3          MR. LEHMAN:  Yes, sir.

4          THE COURT:  Okay.  There are presently in effect

5   sentencing guidelines.  They are really rules of law that limit

6   the District Court's discretion in imposing a sentence.  The

7   guidelines limit how high a sentence can be imposed and how low

8   a sentence can be imposed.  Moreover, there may be factors

9   present that would allow Judge Spatt to depart from the

10  guidelines upwardly or downwardly.

11         Until sentencing when the Court receives a pre-

12  sentence report and the Court hears from you, your lawyer and

13  the Government, you cannot know with certainty what the

14  guidelines will be or whether there will be grounds to depart

15  from them, do you understand?

16         MR. CARR:  Yes.

17         MR. LEHMAN:  Yes.

18         THE COURT:  Now, the Government in the cooperation

19  agreement has prepared their estimate of the appropriate

20  guidelines.  And it's my understanding that you each have

21  agreed that your sentence is to be governed by the sentencing

22  guidelines and that you waive any right to have facts that

23  determine the offense level under the guidelines alleged in an

24  indictment found by a jury beyond a reasonable doubt, is that

25  correct?

14

1          MR. CARR:  Yes, Judge.

2          MR. LEHMAN:  Yes.

3          THE COURT:  Further, that you each waive any

4  constitutional challenge to the validity of the guidelines, is

5  that correct?

6          MR. CARR:  Yes.

7          MR. LEHMAN:  I'm sorry?

8          THE COURT:  That you waive any constitutional

9  challenge to validity of the guidelines?

10          MR. LEHMAN:  Yes.

11          THE COURT:  You're not disputing their

12  constitutionality, is that correct?

13          MR. LEHMAN:  Yes.

14          THE COURT:  And further, that you each agree that

15  facts to determine the offense level will be found by the Court

16  at sentencing by a preponderance of the evidence and that the

17  Court may consider any reliable evidence, including hearsay.

18  Do you understand that, as well, Mr. Carr?

19          MR. CARR:  Yes.  Judge, my attorney did have a

20  question?

21          MR. BACHNER:  Judge, just so the record is clear,

22  there was no estimate made as to the guidelines.

23          THE COURT:  I see that.  Okay.  Thank you.

24          MR. BACHNER:  You're welcome.

25          THE COURT:  Do you each understand those waivers?

15

1          MR. CARR:  Yes.

2          THE COURT:  Mr. Lehman?

3          MR. LEHMAN:  Yes.

4          THE COURT:  Okay.  Before we proceed any farther, do

5    either of you have any questions that you would like to ask me

6    about this charge, the indictment, your rights, the guidelines

7    or anything?

8          MR. CARR:  No, Judge.

9          THE COURT:  Mr. Carr?

10         MR. CARR:  No, Judge.

11         THE COURT:  Mr. Lehman?

12         MR. LEHMAN:  No.

13         THE COURT:  Okay.  Are you each ready to plead?

14         MR. CARR:  Yes.

15         THE COURT:  Okay.  Mr. Bachner or Mr. Haley, do you

16   know any reason why each of your defendants should not plead

17   guilty?

18         MR. BACHNER:  No, Your Honor.

19         MR. HALEY:  No, sir.

20         THE COURT:  Are you aware of any legal defenses to

21   the charge, Mr. Bachner?

22         MR. BACHNER:  No, Your Honor.

23         THE COURT:  Mr. Haley?

24         MR. HALEY:  No, Your Honor.

25         THE COURT:  Okay.  Mr. Carr, what is your plea to

16

1  Count 2 of Indictment 02-CR-1112, charging you with a
2  conspiracy to launder money?
3          MR. CARR:  Guilty, Judge Wall.
4          THE COURT:  And, Mr. Carr, what is your plea to Count
5  2 of Indictment 03-CR-1103, charging a bank fraud?
6          MR. CARR:  Also guilty, Judge.
7          THE COURT:  Are you making this plea of guilty
8  voluntarily and of your own free will?
9          MR. CARR:  Yes, I am.
10         THE COURT:  Has anyone threatened or forced you to
11 plead guilty?
12         MR. CARR:  No, they haven't.
13         THE COURT:  And, once again, has anyone promise you
14 what your sentence will be?
15         MR. CARR:  No, sir.
16         THE COURT:  Mr. Lehman, what is your plea to Count 2
17 of Indictment 02-CR-1112, charging you with a conspiracy to
18 launder money?
19         MR. LEHMAN:  Guilty.
20         THE COURT:  And what is your plea to Count 2 of
21 Indictment 03-CR-1103, charging a bank fraud?
22         MR. LEHMAN:  Also guilty.
23         THE COURT:  Are you making this plea of guilty
24 voluntarily and of your own free will?
25         MR. LEHMAN:  Yes, sir.

17

1          THE COURT:  Has anyone threatened or forced you to

2    plead guilty?

3          MR. LEHMAN:  No, sir.

4          THE COURT:  Has anyone promise you what your sentence

5    will be?

6          MR. LEHMAN:  No, sir.

7          THE COURT:  Okay.  Mr. Carr, as to Count 2 of

8    Indictment CR-02-1112, conspiracy to launder money, did you, in

9    fact, from July 26th, 1997 and continuing through October 31st,

10   1997 in the Eastern District of New York, together with others,

11   knowingly and intentionally conspire to conduct financial

12   transactions affecting interstate commerce, specifically the

13   transfer of approximately $695,965, which transactions involved

14   the proceeds of specified unlawful activity, that is wire fraud

15   and bank fraud.

16         MR. CARR:  Yes, Judge.

17         THE COURT:  Tell me, sir, in your own words what it

18   is that you did that makes you guilty of that charge?

19         MR. CARR:  From July, 1997 through about October,

20   1997, I was told by Barry Schwartz that certain funds held in

21   Liechtenstein belonged to Schwartz and his partner who had

22   recently died.  Schwartz told me that he needed to move the

23   funds into the U.S. so that his partner's wife would be unable

24   to claim a potential source of the money -- share, I'm sorry.

25   I agreed with others to have transferred the money into an

IMP04531

18

1  account.  I then cashed several checks drawn on that account

2  and gave the money to another person who I knew would deliver

3  the money to Schwartz at his Long Island home.  I knew my

4  behavior was wrong.

5          THE COURT:  Does that satisfy the Government, Mr.

6  Ryan?

7          MR. RYAN:  That does, Your Honor.

8          THE COURT:  Mr. Carr, as to Count 2 of Indictment CR-

9  03-1103, charging bank fraud, did you, from November, 2000, up

10 to and including December, 2000 in the Southern District of New

11 York, together with others, knowingly execute and attempt to

12 execute a scheme, an artifice to defraud a financial

13 institution?

14         MR. CARR:  Yes, Judge.

15         THE COURT:  Tell me what you did in connection with

16 that count that makes you guilty of bank fraud.

17         MR. CARR:  From about November, 2000 until about

18 December, 2000, I agreed with others to cash a check in the

19 amount of $51,000 at a Fleet Bank in New Jersey, believing that

20 the check was stolen.  I knew my behavior was illegal.

21         THE COURT:  Does that satisfy the Government, Mr.

22 Ryan?

23         MR. RYAN:  Yes, Judge.  I believe the evidence will

24 show that the money was ultimately -- the check and/or the

25 money eventually ended up in Manhattan in the Southern

IMP04532

19

1  District.

2          THE COURT:  Very well.  All right.  Mr. Lehman, as to

3  Count 2 of Indictment CR-02-1112, did you, from July 26th, 1997

4  through October 31st, 1997 in the Eastern District of New York,

5  together with others, knowingly and intentionally conspire to

6  conduct financial transactions affecting interstate commerce,

7  specifically the transfer of approximately $695,965, involved

8  the proceeds of specified unlawful activity, specifically wire

9  fraud and bank fraud.

10          MR. LEHMAN:  Yes, sir.

11          THE COURT:  Tell me, sir, in your own words what it

12  is that you did that makes you guilty of that charge?

13          MR. LEHMAN:  In approximately July of 1997, I allowed

14  --

15          THE COURT:  You have to speak up, sir, please.

16          MR. LEHMAN:  In approximately July of 1997, I allowed

17  two wire transfers to come into my company's bank account.  I

18  then wrote checks out to others so the funds could be removed

19  and ultimately sent to Mr. Barry Schwartz.  And, this, sir, I

20  do know that it was illegal.

21          THE COURT:  And you did that in the Eastern District

22  of New York?

23          MR. LEHMAN:  Yes, sir.

24          THE COURT:  Mr. Ryan?

25          MR. RYAN:  That's sufficient, Judge.

20

1    THE COURT:  ..d, Mr. Lehman, as to Count 2 of

2  Indictment CR-03-110?, you pled guilty to Count 2, charging

3  bank fraud.  Did yo:, .:om November, 2000 to December of 2000

4  in the Southern District of New York, together with others,

5  execute and attempt :o execute a scheme, an artifice to defraud

6  a financial institution and to obtain monies, funds, credits,

7  assets, securities an: other property owned by and under the

8  custody and control .: : financial institution by means of

9  false and fraudulent pretenses, representations and promises?

10    MR. LEHMAN:  Yes, Your Honor.

11    THE COURT:  ell me specifically, sir, in your own

12  words, what it is that you did that makes you guilty of that

13  count?

14    MR. LEHMAN·  I received a check which I knew to be

15  stolen from $51,000 Peter Vionis (phonetic) and deposited it

16  into my checking ac.. .:.  I then wrote checks against those

17  deposited funds to remove the money from the bank.

18    THE COURT:  ..nd was that in the Southern District of

19  New York?

20    MR. LEHMAN:  Yes, sir, it is.

21    THE COURT:  ..r. Ryan?

22    MR. RYAN:  ..'re satisfied.  Thank you, Judge.

23    THE COURT:  ..ery well.  Based on the information

24  that's been given to me, I find that the defendants are acting

25  voluntarily, that each fully understands his rights and the

IMP04534

21

1  consequences of his plea and that there is the factual basis

2  for the plea.

3          I, therefore, will recommend that Judge Spatt accept

4  the plea of guilty -- two pleas of guilty Count 2 of each

5  indictment, that is 02-CR-1112 and 03-CR-1103.  Dates for

6  sentences are as follows:

7          Mr. Carr, your sentencing will be before Judge Spatt

8  on January 7th, 2005 at 9 A.M.

9          And, Mr. Lehman, your sentencing will be January 7th,

10 2005 before Judge Spatt at 9:30 A.M.

11         Anything further on behalf of the Government?

12         MR. RYAN:  Judge, Mr. Lunger, from the Civil

13 Division, who is present here, will submit the consent order of

14 forfeiture to Judge Spatt.

15         THE COURT:  Very well.  Okay.  Thank you.  Anything

16 else, Mr. Bachner?

17         MR. BACHNER:  No, thank you, Your Honor.

18         THE COURT:  Mr. Haley?

19         MR. HALEY:  No, sir.

20         THE COURT:  Okay.  Thank you, gentlemen.

21         MR. HALEY:  Thank you, Judge.

22         MR. BACHNER:  Thank you very much, Judge.

23              (Proceedings Adjourn at 12:18 P.M.)

24

25

22

1

2                    C E R T I F I C A T I O N

3

4         I, Karen Hartmann, certify that the foregoing is a

5   correct transcript to the best of my ability, from the

6   electronic sound recording of the proceedings in the above-

7   entitled matter.

8

9    /s/ Karen Hartmann                    Date:  October 22, 2004

10   TRANSCRIPTS PLUS

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

IMP04536

Responses to meetings: Tom Carr, Jim Neebling

The following are comments relating to our meetings with various Iron Mountain and related parties:

1. Meeting March 19, 2002:  The meeting was a "get to know you" meeting.  Kenny CFO, and Watzke joined Tom, Myself, Doug Martocci, and Art Peslak for lunch. The meeting was to convince Tom to join the Iron Mountain effort against PJP. As CFO Kenny explained that Iron Mountain was a "roll-up" of the records storage industry.   Kenny was very personal and spoke about boating, his kids, his wife, his mother, his Catholic church in Long Island.  Gary stayed the course of explaining "how wrong JPP was" and Kenny played the personal role to court Tom to go the course with I.M..  Kenny made specific promises to Tom that Iron Mountain would make it worth Tom's effort by hiring him as a consultant, giving him warehouse space if needed, helping him legally, and participating in a "roll-up" in the coffee storage business. Kenny went on to setup a meeting in Boston with Vin Ryan, and other experienced executives to formulate a coffee company. Kenny had numerous meetings, circulating documents, and doing financial analysis with representatives of RPM and Continental Terminals (the two largest coffee storage companies) both who attended the meeting with Reese, Varn, Watzke, Carr, Masucci, Kenny, and other senior executives.

2. Meeting March 26, 2002 with Reese, Watzke, Kenny, Neebling and Carr in the I.M. conference room: All three wanted us to join I.M in there case against Pierce. They felt we would be an asset for I.M. with the knowledge we had.  I.M needed to assure us that the benefits we would have for turning against Pierce would be greater then the risk of Pierce's retaliation.  We had explained to the group that Pierce would have vengeance, once he knew I, decided to join Reese and his entourage.   At that meeting, Reese had offered me five million dollars to buy Pierce out but, we both knew that Pierce would only do that if I promised not to talk with anyone from I.M.  Then Reese stated that I.M. would give us all their transportation, so that we would earn off the forty-five million in business.  Reese then told us that he and Vin Ryan would continue to pursue the consolidation of the three coffee companies that I was trying to have Pierce purchase.  Both you and I left Boston that night feeling so sure of ourselves, knowing that the three top officers of I.M just assured us millions of dollars in business and committed to back us 100% if we would help them with information regarding Pierce.

3. Early/Summer 2002: Reese had set up a meeting with you and I along with the owner's of the two largest coffee companies, Vin Ryan and the whole I.M. group. We had a prodigious dinner meeting and again leaving Boston with assurances from the I.M. group that they were very excited about moving forward with the merger of these two large companies leaving you and I to believe that my coffee business together with the purchase of my two largest competitors was now



1.    4863010

EXH 3
FOR IDENT
IN EVD    DATE 2/28/07
DENISE L. DANIELS

coming to fruition. These guys had painted a wonderful picture for our future and clearly promised us a better life if we joined their fight against Pierce.

4. Sept. 9, 2003 Meeting: One of the last meetings both Jim and I had with Varn and Moore was at Gallagher's steak house in N.Y.C. I was very upset with Varn and I.M., for not coming through on their promises to me and demanded some answers. Varn had told Jim and I that Watzke would work out some kind of arrangement with Peslak to send two-million dollar's, into Systrans, and Jim would pass the money to me for debt that I incurred from Pierce closing Logisteq. Varn asked Jim to be creative on thinking how I.M. would be able to pass this money onto Tom, without Pat O' Connor and Pierce attacking. Jim suggested that I.M. buy Systrans and Tom would get his money and Jim would run the company. Varn liked the idea and then had Watzke call Peslak to see how I.M. could structure the deal. Again! the deal never happened and we were asked to be patient and were promised the world after the arbitration.

#97

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION
MIDDLESEX COUNTY
DOCKET NO. C-192

*File
IMRS-83
Mathewson Melnick
and Hosler Depo
Transcript*

IRON MOUNTAIN RECORDS MANAGEMENT,  *
INC., a Delaware corporation,
                    Plaintiff,      *    CIVIL_ACTION

        vs.                         *
                                         Deposition of:
                                         THOMAS CARR
                                    *    May 28, 2003

FRED A. MATHEWSON, JR. and
SEQUEDEX LLC, a Pennsylvania        *
limited liability company,

                    Defendants.     *

- - - - - - - - - - - - - - - - - -
SEQUEDEX LLC, a Pennsylvania
limited liability company,          *

                    Third-Party Plaintiff/
                    Defendant,      *
                v.
IRON MOUNTAIN INCORPORATED, a       *
Pennsylvania corporation,

                    Third-Party    *
                    Defendant.
- - - - - - - - - - - - - - - - - - - - -
SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION
MIDDLESEX COUNTY
DOCKET NO. C-41-02

IRON MOUNTAIN RECORDS MANAGEMENT,  *
INC., a Delaware corporation,
                    Plaintiff,      *
                v.                   *
JEFFREY S. MELNICK and SEQUEDEX     *

SCHULMAN, WIEGMANN & ASSOCIATES
CERTIFIED SHORTHAND REPORTERS
216 STELTON ROAD, SUITE C-1
PISCATAWAY, NEW JERSEY
1 - 732 - 752 - 7800

*Cass FOR IDENT IN EVD  EXH 4  DATE 2/28/07  DENISE L. DANIELS*

IMP04537



4

```
 1    A P P E A R A N C E S :
 2
 3      SULLIVAN & WORCESTER, LLP.
 4        Attorneys for Iron Mountain
 5        One Post Office Square
 6        Boston, MA  02109
 7      BY:  LARRY L. VARN, ESQ.
 8
 9      SPECTOR, GADON & ROSEN, P.C.
10        Attorneys for the Sequedex LLC, Fred A.
11        Mathewson, Jr., Jeffrey S. Melnick and
12        Mark E. Haslon
13        1635 Market Street
14        Philadelphia, PA  19103
15      BY:  ALAN B. EPSTEIN, ESQ.
16      BY:  PETER R. ROSENZWEIG, ESQ.
17
18      MANDEL & PESLAK, LLC
19        Attorneys for Thomas Carr
20        80 Scenic Drive, Suite 5
21        Freehold, New Jersey  07728
22      BY:  ARTHUR M. PESLAK, ESQ.
23
24
25
```

5

```
 1              I_N_D_E_X
                ------
 2
 3  WITNESS      DIRECT  CROSS  REDIRECT  RECROSS
 4
 5  THOMAS CARR
 6
 7  By:  Mr. Epstein    6
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

T R A N S C R I P T of the stenographic

notes of the proceedings in the above-entitled

matter, as taken by and before SUSAN M. OLIVERI, a

Certified Shorthand Reporter and Notary Public of

the State of New Jersey, held at the offices of

MANDEL & PESLAK, LLC., 80 Scenic Drive, Suite 5,

Freehold, New Jersey  07728, on Wednesday, May 28,

2003, commencing at approximately 10 o'clock in the

forenoon pursuant to notice.

6

1  T H O M A S   C A R R, residing at 35 Denise Court,
2  Manalapan, New Jersey 07726, is duly sworn by
3  a Notary Public of the State of New Jersey and
4  testifies under oath as follows:
5
6  DIRECT EXAMINATION BY MR. EPSTEIN:
7      Q    Mr. Carr, would you please state your
8  full name for the record.
9  A    Thomas Carr.
10     Q    And, Mr. Carr, prior to coming here
11  today, what did you do to prepare for this
12  deposition?
13  A    I met with Larry Varn and Art Peslak yesterday
14  to review my memory.
15     Q    Where did you meet with Mr. Varn and
16  Mr. Peslak in preparation for this deposition?
17  A    Here in Peslak's office in Howell, New Jersey.
18     Q    And when did you meet; how long did you
19  meet?
20  A    Approximately two and a half hours.
21     Q    As you sit here today, Mr. Carr, are
22  you represented by Arthur Peslak and the firm of
23  Mandel and Peslak?
24  A    Yes, I am.
25     Q    Have you been in the past or are you

7

1  presently represented directly by the firm of
2  Sullivan and Worcester?
3  A    No, I have not.
4      Q    Would you keep your voice up, please.
5  What did you discuss with Mr. Varn and Mr.
6  Peslak?
7  A    Mr. Varn and Mr. Peslak asked me to review the
8  entire scene over the two years, two and a half
9  years and told me to pretty much answer the
10  questions yes and no and honestly and speak nothing
11  but the truth.
12     Q    It took about four minutes to explain
13  that in your first introduction. For the remainder
14  of that two and a half hours, what did you talk
15  about?
16         MR. PESLAK: I object to the form of
17  the question. It's argumentative.
18     Q    Did you do all of the talking?
19  A    No, we were all speaking, but I talked about
20  the last two and a half years of my life.
21     Q    What did Mr. Peslak or Mr. Varn say to
22  you during that two and half hour period?
23  A    I pretty much dominated the conversation
24  during the two and a half hours and did most of the
25  speaking reviewing the past of what's been going on

8

1  with the group of Sequedex and Logisteq.
2      Q    What else did you talk about in
3  specific about Sequedex and Logisteq?
4  A    We talked about specific dates, we talked
5  about meeting places, we spoke about people who I
6  met with and had conversations with, and also if I
7  had any additional documents.
8      Q    And what did you advise him of about
9  additional documents?
10  A    At this time I have no additional documents.
11     Q    Did you come with any documents to this
12  deposition as requested in the subpoena?
13  A    No.
14     Q    With regard to your conversations with
15  Mr. Varn and Mr. Peslak, did they provide you with
16  any materials which to review in preparation for
17  this deposition?
18         MR. PESLAK: Are you talking about
19  yesterday?
20  A    No, they have not.
21     Q    Yesterday, did they show you any
22  documents or any depositions or any pleadings from
23  any case?
24  A    No, they did not.
25     Q    Prior to yesterday were you provided

9

1  with any documentation, depositions or pleadings to
2  review in connection with this deposition?
3  A    Yes.
4      Q    What?
5  A    Peter Pierce's deposition.
6      Q    Which Peter Pierce?
7  A    Peter Pierce, Sr.
8      Q    What else?
9  A    And that was it.
10         MR. VARN: I am still having trouble
11  hearing. Off the record
12         (Whereupon, a discussion is held off
13         the record.)
14     Q    In preparation for this deposition, did
15  you review any of the transcripts or tapes that you
16  made?
17  A    No, I did not.
18     Q    Did you review any other depositions
19  other than Peter Pierce's?
20  A    No, sir.
21     Q    Did you review any of the pleadings in
22  any of the cases involving the matters relating to
23  as you've described it, Sequedex or Logisteq?
24  A    No, sir.
25     Q    Did you bring with you today or do you

10

1  have any documents relating to Sequedex?
2  A   No, I do not.
3     Q    Have you ever had any documents
4  relating to Sequedex at any time during any relevant
5  period?
6        MR. PESLAK:  Object to the form of the
7  question. It's ambiguous.
8  A   Yes, I have.
9     Q    What documents have you had with regard
10  to Sequedex?
11       MR. PESLAK:  Object to the form of the
12  question. It's ambiguous.
13  A   The time of my employment with Logisteq, I was
14  involved with numerous meetings regarding Sequedex,
15  Logisteq, Anchor Glass building and the Miami
16  building that we were reviewing plans to decide
17  where Sequedex would warehouse their record storage.
18     Q    Did you personally at any time, other
19  than Logisteq having documents, did you personally
20  have documents relating to Sequedex?
21  A   No, I did not.
22       MR. VARN:  Objection as to form.
23     Q    Did you personally have any documents
24  relating to Michael Gold, the former president of
25  Sequedex --

11

1  A   No.
2     Q    -- or the present president of
3  Sequedex?
4  A   No, sir.
5     Q    How about with regard to Fred
6  Mathewson?
7  A   No, sir.
8     Q    Jeffrey Melnick?
9  A   No.
10     Q    Mark Haslon, did you ever have any
11  documents personally from Mark Haslon?
12  A   Yes.
13       MR. PESLAK:  Object to the form of the
14  question. Slow down let us interpose objections
15  before you answer.
16  A   I'm sorry.
17     Q    What documents?
18  A   I have a document from Mark Haslon to Arturo
19  Soto asking him to come to work for Sequedex prior
20  to me leaving the company.
21     Q    Where was Mr. Haslon at the time that
22  he made this offer?
23  A   He was at my office in Freehold, New Jersey.
24     Q    And what was the document that you had?
25  A   The document I had was a copy of that letter

12

1  from Mr. Haslon to Arturo Soto asking him to join
2  Sequedex in the form of an employment.
3     Q    And what did you do with that document?
4  A   I gave that document back to Arturo Soto.
5     Q    Did you keep a copy of that document?
6  A   No, I did not.
7     Q    Have you seen a copy of that document
8  since the time that you last had it in your hands?
9  A   No, I have not.
10     Q    Were there any copies made of the
11  document that remained either at Logisteq or
12  anywhere else?
13  A   To my knowledge I'm not aware of that, any.
14     Q    You ever have any other documents
15  relating to Mark Haslon at any time?
16       MR. VARN:  Objection as to form.
17  A   Yes, I have.
18     Q    What?
19  A   I had a document from Mark Haslon to Mr. Jeff
20  Stern regarding the build out of the building,
21  asking how much additional monies it would be to add
22  special arrangements in the office space and the
23  warehouse.
24     Q    Which warehouse?
25  A   Anchor Glass building Cliffwood Beach, New

13

1  Jersey.
2     Q    And who is Jeff Stern at the time?
3  A   Jeff Stern is a contractor who was going to
4  give us a proposal on doing the build out on the
5  Anchor Glass building.
6     Q    And what was that proposal about?
7  A   That proposal was to pretty much do the same
8  construction as they did to Freehold, New Jersey.
9     It was an old glass building. They were going
10  to remove all the ovens, and they were going to
11  break through the second floor on the hot end of the
12  building, and they were going to rack the building
13  from the floor to the ceiling which was
14  approximately 60 feet.
15     Q    When you say "they," who do you mean?
16  A   PJR Construction, Freehold, New Jersey.
17     Q    And who were they going to do that for?
18  A   They were going to do that for Peter Pierce
19  and Tony Hayden, two owners of the real estate
20  project.
21     Q    And what was the name of the real
22  estate project?
23  A   I believe it was going under Pioneer Capital
24  and Hayden Real Estate.
25     Q    And who is Mr. Haslon working for at

14

1  the time?
2  A   Logisteq.
3      Q   Do you have any documents in your
4  possession presently involving Iron Mountain?
5  A   No, I do not.
6      Q   Do you -- have you brought with you
7  today your calendar for the last two years?
8  A   No, I did not.
9      Q   You have a calendar, do you not, sir?
10 A   Yes, I do.
11     Q   Is there any reason you didn't bring it
12 with you?
13 A   I was not asked to bring it.
14     Q   Does the calendar denote any meetings
15 with anybody from Iron Mountain?
16 A   I'm not sure at this time.  I would have to
17 look at my calendar.
18     Q   Did the calendar generally record your
19 meetings --
20 A   Yes.
21     Q   -- with people?
22 A   Yes, it did.
23     Q   And during that two and a half year
24 period did you meet with Iron Mountain?
25 A   Absolutely.

15

1      Q   During your last deposition you were
2  asked about that calendar, were you not?
3  A   Yes, I was.
4      Q   Did you have any discussions with Mr.
5  Varn about that calendar?
6  A   No, I did not.
7      Q   Did you have any discussions with Mr.
8  Peslak about that calendar?
9  A   No, I did not.
10     Q   Did anybody ask you to bring that
11 calendar with you today --
12 A   No, sir.
13     Q   -- as to determine whether or not it
14 involved any meetings with any of the individuals
15 cited in your subpoena?
16 A   No.
17     Q   Was anybody else present during your
18 two and a half hour preparation for this deposition
19 with Mr. Varn and Mr. Peslak?
20 A   No, sir.
21     Q   Did you meet with anyone else in
22 connection with this deposition?
23 A   No, I did not.
24     Q   What is your date of birth, sir?
25 A   February 22, 1960.

16

1      Q   And where were you born?
2  A   Jersey City, New Jersey.
3      Q   Where were you raised?
4  A   Jersey City.
5      Q   Where did you go to school, high
6  school?
7  A   High school, I went to St. Al's High.
8      Q   Saint?
9  A   Allouisha High School.
10     Q   Where is that?
11 A   That is Westside Avenue, in Jersey City.
12     Q   Did you go to school after high school?
13 A   Yes, I did.
14     Q   Where?
15 A   St. Peter's College, Kennedy Boulevard, Jersey
16 City.
17     Q   Did you graduate from St. Peter's?
18 A   Yes, I did.
19     Q   What was your area of concentration in
20 college?
21 A   Business.
22     Q   Business administration?
23 A   Correct.
24     Q   What was your degree?
25 A   Business.

17

1      Q   Was it a BA, a BS?
2  A   BS, yes.
3      Q   And what year did you graduate from St.
4  Peter's college?
5  A   1982.
6      Q   Where did you go to work in 1982?
7  A   1982, I went to work for Roadway Express.
8  They were on Second Street in South Kearny, New
9  Jersey.
10     Q   And what was your business with Roadway
11 Express?
12 A   Dispatcher.
13     Q   How long did you work for Roadway
14 Express?
15 A   I would say approximately three years.
16     Q   Were you a dispatcher for the entire
17 three years?
18 A   No, I was not.
19     Q   What did you move onto?
20 A   I became a warehouse manager.
21     Q   Was that your last position with
22 Roadway?
23 A   Yes, it was.
24     Q   After your three years stint with
25 Roadway Express, where did you go?

IMP04541

**18**

1    A    I left and I went to Red Star Express.
2    They are based on Delancey Street, in Newark, New
3    Jersey.
4        Q    What did you do for Red Star?
5    A    Operations manager.
6        Q    How long were you with Red Star
7    Express' operation?
8    A    Red Star built a new terminal in Lakewood, New
9    Jersey, and I then left Newark and went to Lakewood,
10   New Jersey as an operations manager, and I resigned
11   from Red Star Express in 1988.
12       Q    Were you still the operations manager?
13   A    Yes, I was.
14       Q    In Lakewood?
15   A    And that's on Swathmore Avenue.
16       Q    What happened then, where did you go
17   work?
18   A    I left. I had a better offer in a company by
19   the name of APA Transport. They are located on 88th
20   Street, in North Bergen, New Jersey.
21       Q    You were there from 1988 until when?
22   A    Until 1992.
23       Q    And what was your position with APA
24   Transport?
25   A    Account manager.

**19**

1    Q    How long did you remain account manager
2    during that four years period, the whole time?
3    A    Full period of employment.
4        Q    After leaving APA Transport, where did
5    you go?
6    A    I left APA Transport to enter into my own
7    business.
8        Q    What was that business?
9    A    TC Transport Corporation.
10       Q    And where was that located?
11   A    Nine Union Hill Road, Englishtown, New Jersey.
12   07726.
13       Q    That was a corporate entity?
14   A    Yes, it was a S corporation.
15       Q    Who owned the stock?
16   A    Thomas Carr.
17       Q    What type of transport did TC Transport
18   Corporation provide?
19   A    We were a local regional truck load carrier.
20       Q    How long did you remain the owner of TC
21   Transport Corporation?
22   A    Until 1994.
23       Q    What happened in 1994?
24   A    I was acquired by a New York Stock Exchange
25   Company by the name of U.S. Delivery based out of

**20**

1    Houston, Texas.
2        Q    Did you remain as an employee of US
3    Delivery or TC Transport?
4    A    As US Delivery.
5        Q    And what was your position with US
6    Delivery?
7    A    I was the president of the local truck load
8    division.
9        Q    Did you remain in the same location?
10   A    No, we did not.
11       Q    Where did you move to?
12   A    We relocated to 400 Broadway, Freehold, New
13   Jersey, 07728.
14       Q    And you remained with US Delivery from
15   1994 until when?
16   A    Until 1996, two years.
17       Q    What happened in 1996?
18   A    1996 the stock crashed from 50 to $6 a share,
19   and I purchased back my company from US Delivery.
20       Q    Was that a negotiated process, or was
21   it something that was provided for in the original
22   sale agreement?
23   A    It was a negotiated process.
24       Q    How much stock did you buy back from US
25   Delivery to purchase TC Transport Corporation?

**21**

1    A    100 percent.
2        Q    How many shares of stock at $6 a share?
3    A    $6 a share, there was.
4        MR. PESLAK: I think he's asking you
5    whether you bought stock to buy the company back,
6    which you didn't do.
7    A    No, I didn't.
8        Q    How did you buy the company?
9    A    I'm sorry, I bought the company back cash.
10       Q    How much was that?
11   A    That was $650,000.
12       Q    Had TC Transport ceased existing during
13   that period of time?
14   A    No.
15       Q    It always stayed alive?
16   A    Yes.
17       Q    Why?
18   A    It was a subsidiary of US Delivery.
19       Q    So it was a wholly owned subsidiary?
20   A    It was a wholly owned sub, yes.
21       Q    So you were paid technically by TC
22   Transport Corporation as its --
23   A    Yes.
24       MR. PESLAK: Are you asking whether his
25   salary came from TC Transport?

22

1    Q    Yes.
2    A    Yes, it did.
3    Q    How long did you continue to run TC
4  Transport after 1996?
5    A    Until 2001, January of 2001.
6    Q    What happened then?
7    A    Pioneer Capital and Peter Pierce acquired 51
8  percent of my company.
9    Q    Who was your attorney for purposes of
10  the repurchase of Capital from US Delivery?
11    A    Art Peslak.
12    Q    And who was your attorney for purposes
13  of the sale to Pioneer Capital at 51 percent?
14    A    Art Peslak.
15    Q    Pioneer Capital is an incorporated
16  entity, is it not?
17    A    Yes, it is.
18    Q    Are you saying that Mr. Pierce
19  individually purchased your company, or did he as a
20  shareholder in Pioneer Capital participate in that
21  purchase?
22    A    He as a share holder as a participant in
23  Pioneer Capital purchased my company.
24    Q    Who else were shareholders in Pioneer
25  Capital to your knowledge?

23

1    A    I don't really know that answer.
2    Q    Prior to 2001, did you know Mr. Pierce?
3    A    Yes, I did.
4    Q    In what context?
5    A    I met Mr. Pierce in 1996.
6    Q    In what context?
7    A    Mr. Pierce was the owner of the Freehold
8  facility for Pierce Layhey, and at a time before
9  they went public, they were having some union issues
10  with their employees.
11    Mike DiIanni then approached me knowing that
12  my father was involved in the Teamsters unions, and
13  had asked if I could be of any assistance in guiding
14  them what to do.
15    Q    Who was Mr. DiIanni employed by?
16    A    Sequedex -- I'm sorry strike that.  Pierce
17  Layhey.
18    Q    Don't strike that.
19    A    Pierce Layhey.
20    Q    How did you know Mr. DiIanni?
21    A    I knew Mr. DiIanni from renting space from the
22  Pierce Layhey facility in Freehold.
23    Q    You rented space at Pierce Layhey?
24    A    Yes, sir.
25    Q    For TC --

24

1    A    Transport.
2    Q    -- Transport.  Is that where TC
3  Transport moved to in 1996?
4    A    Yes, it is.
5    Q    So you and Mr. DiIanni were working in
6  the same building?
7    A    Yes, sir.
8    Q    And at that time the Teamsters were
9  engaged in some kind of organizing activity?
10    A    That's correct.
11    Q    And what activity were they engaged in
12  in 1996 that Mr. DiIanni approached you?
13    A    Supposedly a few of their courier drivers and
14  their warehouse laborers came together to form the
15  union.
16    Q    When you rented space from Pierce
17  Layhey did you do so from Michael DiIanni or through
18  Michael DiIanni or did you do so through Mr. Pierce;
19  who was it that you dealt with?
20    A    Through Michael DiIanni.
21    Q    Did you have any dealings with Mr.
22  Pierce prior to this unionization issue?
23    A    No, I had not.
24    Q    Mr. DiIanni approached you and asked
25  you for an introduction to the Teamsters?

25

1    A    No, he asked if I could advise him what he can
2  do and if I can be of any help.
3    Q    What did you tell Mr. DiIanni?
4    A    I told him I will try to get involved, that my
5  father had some very good friends of his leading the
6  Teamsters Union and from that point I called a
7  friend of mine who was a Teamster delegate and asked
8  for a favor.
9    Q    What was that favor?
10    A    That favor was to hold back from trying to
11  unionize Pierce Layhey until they went public.
12    Q    Okay.  And did that favor get granted
13  because of your connections with your father?
14    A    The union couldn't make any promises, but he
15  told me he would try his best.
16    Q    And who was that individual?
17    A    That individual was a Kevin Faygen.
18    Q    Is there anything illegal or improper
19  about what you had asked Mr. Faygen to do?
20    MR. PESLAK:  Objection.
21    A    No, sir.
22    Q    When did you meet Mr. Pierce after this
23  union problem was resolved?
24    A    Mr. Pierce thanked me for helping him and also
25  thanked me for filling space up in the building

26

1    while their company was growing.
2        Q    Was that in person?
3    A    Yes, it was.
4        Q    And was that at the Freehold facility?
5    A    Yes, it was.
6        Q    How many times did you meet Mr. Pierce
7    to get thanked in this fashion, just the once?
8    A    Once.
9        Q    After 1996?
10   A    Yes.
11       Q    Did you have any further contact with
12   Mr. Pierce?
13   A    Once.
14       Q    When?
15   A    Peter Pierce came down with Tony Hayden and a
16   few other gentlemen to take a tour through the
17   Freehold facility to show them all the improvements
18   that were being made, and Peter Pierce thanked me
19   very much for keeping the facility clean and
20   improving my part of the office in the warehouse.
21       Q    Who was Mr. Hayden?
22   A    Mr. Hayden I believe is a representative of
23   Hayden Real Estate, who represents Peter in his real
24   estate transactions.
25       Q    Any other times other than this thanks

27

1    for keeping the building clean and neat?
2    A    No, sir.
3        Q    After you met Mr. Pierce that time --
4    by the way, what year was that, do you know?
5        MR. PESLAK:  Which one?
6        Q    Second meeting?
7    A    1996.
8        Q    So both meetings were in 1996?
9    A    Yes.
10       Q    Any meetings from 1996 to 2000 with Mr.
11   Pierce?
12   A    Yes.
13       MR. VARN:  Objection as to form.
14       Q    Any other meetings?
15   A    Yes.
16       Q    When?
17   A    July of 2000.
18       Q    That was the next meeting after the one
19   he did the tour with Tony Hayden, correct?
20   A    Yes, Al.
21       Q    Let's keep it a little more formal.
22   We're not that friendly yet.
23       MR. PESLAK:  Objection, let's stop the
24   colloquy here.
25   A    I am trying to show respect.

28

1        Q    In July 2000 what meeting do you have
2    with Mr. Pierce?
3    A    In July 2000 I had a meeting with Peter
4    Pierce, Mike DiIanni and I in the La Mirage Diner in
5    Freehold, New Jersey.
6        Q    Who initiated the meeting?
7    A    Michael DiIanni.
8        Q    For what purpose?
9    A    To discuss a real estate transaction.
10       Q    What real estate transaction?
11   A    Interest in the Anchor Glass building in
12   Cliffwood Beach, New Jersey.
13       Q    Had you had discussions with Mr.
14   DiIanni about entering into that enterprise with him
15   or Mr. Pierce --
16       MR. VARN:  Objection to form.
17       Q    -- prior to the meeting?
18   A    Yes, I did.
19       MR. VARN:  Objection to form.
20       Q    What discussions did you have with Mr.
21   DiIanni with regard to the purchase of the Anchor
22   Glass building?
23   A    I explained to Mike DiIanni that I am looking
24   for investigators to buy the Anchor Glass building
25   with me, and I would pay a return of 12 percent on

29

1    their money, and I would try my best to fill the
2    building up with freight and commodities and coffee.
3        Q    So you were looking to purchase this
4    and Peter Pierce was a potential investor?
5    A    This is correct.
6        Q    Do you have any documentation regarding
7    that meeting at the La Mirage Diner in Freehold?
8    A    No.
9        Q    What transpired at the meeting?
10   A    We had breakfast, Peter Mike and I, we had a
11   very friendly conversation.  I asked Peter if he
12   would be interested in purchasing the building with
13   me.
14   I had a very good relationship with Anchor
15   Glass, and that they would sell me the building
16   probably at $7 a square foot.  Along with
17   selling me the building, they are looking for an
18   outside source to take over their logistics in the
19   building.  They were also unionized.  They were
20   trying to get away from the union.
21       Q    Anchor Glass?
22   A    Yes.  So I explained to Peter how I would like
23   for him and his investigators to come in and
24   purchase the building, and I would do my best
25   filling the warehouse and giving him a nice return

IMP04544

30

1  to his money.
2      Q     What did Mr. Pierce advise you at that
3  meeting about this investment?
4  A    Mr. Pierce at that time had told me he was
5  interested.
6      Q     What happened as a result of that
7  meeting?
8  A    He told me Mike DiIanni would come to my
9  office and pick up a financial package and give him
10  a week or two to review it and he will get back to
11  me.
12     Q     What happened as a result of that?
13  A    We set up a second meeting.
14     Q     When?
15  A    Two weeks later.
16     Q     Where?
17  A    Same place, La Mirage Diner.
18     Q     Who was there?
19  A    Michael DiIanni, Peter Pierce, Tony Hayden
20  another gentleman with gray hair in the 60s.  I
21  can't recall who that would be, and Tom Carr.
22     Q     Who was the gentleman with the gray
23  hair in the 60s with?
24  A    Himself.
25     Q     I mean, was he an associated with Mr.

31

1  Pierce?
2  A    Yes.
3      Q     Was he associated with Mr. Hayden?
4  A    He came with Mr. Hayden and Mr. Pierce.
5      Q     Do you know whether or not he was
6  associated in business with Mr. Hayden or Mr. Pierce
7  or both?
8  A    I believe, I believe he was an investor with
9  Mr. Hayden, from insurance company.
10     Q     As a result of the second meeting what
11  occurred?
12  A    They asked me many questions regarding the
13  building, and they asked me many questions regarding
14  TC Transport.
15     Q     As a result of your meeting with them
16  and being asked these questions, what occurred?
17  A    The result of that meeting I answered all of
18  their questions, very professionally and --
19     Q     Mr. Carr, would you please listen to my
20  question because, otherwise, we're going to be here
21  for a very long time, and we may need more than
22  today, and I want to avoid that if we can.  If you
23  listen to my question and just answer the question,
24  I would appreciate it.
25     MR. VARN:  Objection.

32

1      MR. PESLAK:  Objection.
2      Q     The question is as a result of that
3  meeting and what was said in that meeting, what
4  occurred?
5  A    The result of the meeting is that Peter Pierce
6  and Tony Hayden had interest in going forward with
7  investing in the building and also had interest in
8  investing in TC Transport.
9      Q     Was an investment made in the building
10  by Mr. Pierce, Mr. Hayden or the companies that they
11  represented?
12  A    Yes.
13     Q     Who purchased the Anchor Glass
14  building?
15     MR. VARN:  Objection as to form.
16     Q     Who or what entity purchased that
17  building?
18     MR. VARN:  Objection as to form.
19  A    I don't know, but I would think it was either
20  Pioneer Capital and Hayden Real Estate, I believe it
21  was a joint venture.
22     Q     Did you have any share in the purchase
23  of that building?
24  A    Yes.
25     Q     What share did you have in the purchase

33

1  of that building?
2  A    I was told I would own 25 percent of that
3  building.
4      Q     Who told you that?
5  A    Peter Pierce.
6      Q     Was there any writing regarding your
7  ownership of that building?
8  A    In one of Peter's depositions I believe he
9  admitted that, but I'm not sure.
10     Q     I am asking you whether or not you
11  received any writing at the time that Mr. Pierce
12  made this representation from him as to the
13  ownership?
14  A    No.
15     Q     Did you ever sign any documents or
16  receive any documents from Mr. Pierce or Mr. Hayden
17  or anybody who represented them that you had any
18  ownership share in that building?
19  A    No, I did not.
20     Q     When Mr. Pierce said that you would own
21  25 percent of the building, did he explain to you
22  what conditions or what investment it would take for
23  you to do so?
24  A    No, he did not.
25     Q     Do you know the purchase price for the

34

1  Anchor Glass building?
2  A   I believe it was $8 million.
3      Q   When was the Anchor Glass building
4  purchased?
5  A   It was never purchased.
6      Q   Nobody ever purchased it?
7  A   No, sir.
8      Q   As a result of your meetings with Mr.
9  Pierce, what occurred with regard to Anchor Glass,
10  if anything?
11      MR. PESLAK:  Objection.
12      Q   You told me before that it was
13  purchased by some joint venture --
14      MR. VARN:  Objection.
15      MR. PESLAK:  Objection.
16      Q   -- now you are saying it wasn't
17  purchased.
18      MR. VARN:  Objection, you're the one
19  that said it was purchased.  You asked him if an
20  investment was made and you jumped to the conclusion
21  that it was purchased.
22      Q   Was an investment made?
23  A   Yes.
24      Q   What investment?
25  A   Investment was made by Pioneer Capital to put

35

1  improvements into the building with PJR
2  Construction.
3      Q   What improvement did they put in the
4  building?
5  A   The improvements they put in the building was
6  insulation, painting, cleaning, preparing doors and
7  patching the roof.
8      Q   Okay.  Did they do that as a tenant of
9  Anchor Glass?
10  A   Yes, they did.
11      Q   Was Pioneer Capital a tenant of Anchor
12  Glass or some other entity?
13  A   No, it was some other entity.
14      Q   What other entity?
15  A   Logisteq.
16      Q   And when did Logisteq, when did
17  Logisteq make these improvements?
18  A   I believe early 2001.
19      Q   Now, when you say Pioneer Capital put
20  improvements in the building, who paid for those
21  improvements to your knowledge?
22  A   Logisteq I believe paid a $20,000 deposit to
23  PJR Construction and Pioneer I believe was billed
24  for the additional amount of $20,000.
25      Q   Do you have any documentation regarding

36

1  who paid for the improvements in the building,
2  Anchor Glass building?
3  A   No, I do not.
4      Q   At any time did Pioneer have offices at
5  the Anchor Glass building?
6  A   No, they did not.
7      Q   Do you know whether or not Logisteq
8  paid back to Pioneer Capital any monies for the
9  monies put up for these improvements?
10  A   No, they did not.
11      Q   You know they did not or --
12  A   They did not pay back Pioneer Capital.
13      Q   And do you know whether or not Pioneer
14  Capital had any note or other type of document
15  indicating a debt owed by Logisteq to Pioneer?
16  A   I believe they had.
17      Q   Do you know what the particulars of
18  that note are?
19  A   I believe that would be the security deposits
20  that Pioneer Capital put up.
21      Q   The first meeting that you have told us
22  about was in July of 2000?
23  A   Yes.
24      Q   And the second one was approximately
25  two weeks later?

37

1  A   Yes.
2      Q   Did anything occur between the dates of
3  those first meetings and the time that Logisteq
4  actually did these improvements in early 2001?
5      MR. VARN:  Objection.
6      MR. PESLAK:  Objection to the form.
7  Are you asking did anything happen?
8      Q   Did anything occur with regard to the
9  Anchor Glass building?
10  A   There were many occurrences.
11      Q   Like what?
12  A   Well, let's start back in August.  Ask me
13  exactly what you're trying to get out of me so -- I
14  don't understand the question.
15      Q   I am not trying to get anything out of
16  you, Mr. Carr.  I am just trying to ask you
17  questions.
18  A   Well, ask.
19      Q   I'm trying to understand what happened
20  with regard to the Anchor Glass facility.
21      Let's start in August of 2000.
22      MR. PESLAK:  He said he doesn't
23  understand your questioning.  You are asking vague
24  and ambiguous questions.  Why don't you ask
25  definitive questions, did he go to meetings, did

38

1 something happened at the building?
2 A  I will give --
3     MR. EPSTEIN:  Thank you for your.
4 Speech?
5     MR. PESLAK:  You're welcome.  Let's
6 focus in the deposition on something that's relevant
7 to this case.  He is in Middlesex County.
8 A  In August of 2000 Mr. Peter Pierce --
9     MR. EPSTEIN:  Mr. Peslak, you have a
10 right to object to matters relating to your client,
11 and when I ask him a question, as his personal
12 attorney you have a right to object.
13     As to the cases in Middlesex County, you have
14 no standing in those cases.
15     MR. PESLAK:  I will object whenever I
16 want.  Okay.  I am his attorney.  I am representing
17 him in the Monmouth County action.  You're a
18 defendant.
19     MR. EPSTEIN:  And you can be polite and
20 stop poking your finger at people.
21     MR. PESLAK:  You can be polite and
22 stopping making rude comments to my client as well.
23     MR. EPSTEIN:  I didn't make any rude
24 comments.
25     MR. PESLAK:  You did, too.

39

1     MR. EPSTEIN:  Not once.
2     Q  Mr. Carr, would you please tell me what
3 happened in August of 2000 with regard --
4 A  In August of 2000 Peter Pierce, Tony Hayden
5 and Mike DiIanni, Tom Carr booked tickets to fly to
6 Tampa, Florida to have a meeting with Anchor Glass
7 to negotiate the purchase of the building.
8     Q  Did you have any other meetings with
9 Anchor Glass --
10 A  Yes.
11     Q  -- to negotiate the purchase of the
12 building?
13 A  Yes, I did.
14     Q  Where?
15 A  I believe three in Florida, and three in
16 Cliffwood Beach and one in St. Louis with
17 Anheuser-Busch.
18     Q  Was Mr. Pierce at each of these?
19 A  No, he was not.
20     Q  How many meetings was Mr. Pierce
21 involved in?
22 A  He was involved in two of the meetings I was
23 involved with.
24     Q  Where, Florida or Cliffwood Beach or
25 Anheuser Beach?

40

1 A  Florida and Cliffwood Beach.
2     Q  So he was at one Florida meeting and
3 one Cliffwood Beach meeting?
4 A  Yes.
5     Q  How about Mr. Hayden, how many meetings
6 was he at?
7 A  Mr. Hayden was at the Florida meeting.  He was
8 at the Anchor Glass/Cliffwood Beach meeting also.
9     Q  As a result of those seven meetings,
10 what happened to the negotiations?
11 A  Negotiations went fine.  Peter and Tony Hayden
12 worked out a deal with Anchor Glass.  We were going
13 to secure four to $5 million in business to take
14 over their logistics, and we made an agreement to
15 allow us to move coffee into the building starting
16 2001.
17     Q  You made an agreement.  Was that a
18 written agreement?
19 A  Yes, it was.
20     Q  And that agreement was with?
21 A  That was with Transportation Concepts of New
22 Jersey and Anchor Glass.
23     Q  Who was Transportation Concepts?
24 A  That is my, that is Peter and his company,
25 which at the time we were changing it to Logisteq.

41

1     Q  Let's stick with Transportation
2 Concepts.
3 A  Yes.
4     Q  You said earlier that you ran TC
5 Transport from 1996 to 2001?
6 A  Yes.
7     Q  When did Transportation Concepts come
8 into play?
9 A  Actually, TC Transport was the logo name, but
10 the real name of the business was Transportation
11 Concepts of New Jersey when I bought it back from US
12 Delivery in 1996.
13     Q  Okay.  The agreement between
14 Transportation Concepts of New Jersey and Anchor
15 Glass --
16 A  Yes.
17     Q  -- to store coffee, was that a rental
18 agreement?
19 A  Yes, it was.
20     Q  And was it a rental agreement for a
21 particular amount of space in that building?
22 A  I believe it was 100,000 square feet.
23     Q  When was that agreement entered into,
24 what date?
25 A  Early 2001.

42

1    Q    At the time that that agreement was
2  entered into, who owned Transportation Concepts of
3  New Jersey?
4    A    Peter Pierce owned 51 percent and Tom Carr
5  owned 49 percent.
6    Q    When did Mr. Pierce -- did he buy it
7  personally or was it through a company?
8    A    It was through a company.
9    Q    What company?
10  A    Pioneer Capital.
11    Q    When did Pioneer Capital become 51
12  percent owner of Transportation Concepts of New
13  Jersey?
14    A    January 3, 2001.
15    Q    You said early 2001. Can you place
16  that in conjunction with the sale of the business,
17  part of your business went to Pioneer Capital, how
18  soon after that; was it two months, three months,
19  one months?
20        MR. VARN:  Objection, as to form.  How
21  soon was what after, Alan?
22        MR. EPSTEIN:  The agreement with
23  Anchor.
24        MR. VARN:  Okay.
25  A    Approximately first to second quarter of 2001.

43

1    Q    And what was your position with
2  Transportation Concepts of New Jersey at the time
3  that this agreement was made?
4    A    President.
5    Q    Now, following the agreement to take
6  100,000 square feet of space as a renter from Anchor
7  Glass --
8    A    Yes.
9    Q    -- were any of the meetings that you
10  described in Florida, Cliffwood Beach or in St.
11  Louis still taking place?
12  A    Yes.
13    Q    How many of those meeting had taken
14  place after you secured this rental in the first or
15  second quarter?
16  A    After I secured the rental in the first or
17  second quarter, I was pretty much out of the
18  negotiations of the building, and it was then in the
19  hands of Peter Pierce and Tony Hayden.
20    Q    As result of the negotiations what
21  happened to the purchase of the building, if you
22  know?
23  A    We agreed to a purchase price. Anchor Glass
24  agreed to give us their contract for running their
25  warehouse and transportation, and the Township of

44

1  Aberdeen started poking their nose into it and gave
2  Anchor Glass a very hard time regarding the sale to
3  Peter Pierce and Tony Hayden.
4    Q    In what way?
5    A    I believe a few years prior to the negotiation
6  Anchor Glass had an abatement of taxes, and there
7  was a lawsuit involved between Anchor Glass and
8  Aberdeen Township. So there is a lot of animosity
9  between the two.
10    And when they were told that Peter Pierce was
11  coming into purchase the building, the town wanted
12  to know what kind of use would be permitted and
13  wanted to know why Anchor Glass didn't make them
14  aware of this transaction.
15    Q    As a result of the intercession of the
16  Township of Aberdeen, did the purchase of the or the
17  negotiated purchase of this building fail?
18  A    It failed at one point.
19    Q    When?
20  A    It failed when the township would not allow
21  uses for the building, and they put restrictions on
22  time limits. I believe they wanted us to operate
23  from seven to seven, and I believe that they wanted
24  Peter Pierce to lock into one use in the building
25  and, obviously, that wouldn't make sense to purchase

45

1  a building for only one use if you were going to
2  have a resale.
3    So Pete and Tony said it would be impossible
4  to get investors to invest in the building based on
5  those restrictions. So they killed the deal.
6    Q    When you said "they killed the deal,"
7  they didn't go through with the purchase of Anchor
8  Glass facility because of that?
9    A    This is correct.
10    Q    And you were a witness to these events
11  in terms of what the Aberdeen Township officials had
12  done to restrict the use of the building?
13  A    I was told by Mike DiIanni, who attended the
14  meeting.
15    Q    Do you have any reason to believe that
16  what Mr. DiIanni or Mr. Pierce advised you about
17  this purchase was not true?
18  A    No, because then what I did is I called the
19  township myself, and I spoke to the two of the
20  township officials and went there personally and
21  tried to reason with them to see why they were
22  giving us such a hard time when we as a company
23  would do nothing but help the town.
24    We offered them to give property back as a
25  ballpark, and we offered to put $6 million in

IMP04548

46

1    improvements into the building, and at that point
2    they said there is no further discussion, unless
3    you, unless you abide by our restrictions we're not
4    going to budge.
5        Q    So you were a personal witness to the
6    fact that Aberdeen put up road blocks to this sale?
7    A    Yes.
8        Q    And as a result, the sale did not take
9    place?
10   A    Yes.
11       Q    Let's go back to January of 2001.
12   Where was your company TC Transportation
13   Concepts of New Jersey operating out of?
14   A    We were operating out of 819 Route 33 in
15   Freehold, New Jersey. That was our corporate office
16   and our warehouse was located at the Iron Mountain
17   facility which is 811 Route 33 Freehold, New Jersey.
18       Q    So your office and warehouse were close
19   by but not together?
20   A    Yes.
21       Q    How long had you been operating out of
22   Iron Mountain's facility?
23   A    Since 1996.
24       Q    Was Iron Mountain a customer of
25   Transportation Concepts of New Jersey?

47

1    A    Yes, they were.
2        Q    Did they remain a customer after Mr.
3    Pierce purchased 51 percent share of Transportation
4    Concepts?
5    A    Yes, they did.
6        Q    In the year 2001, did you have
7    discussions with Iron Mountain regarding your lease
8    on the facility?
9    A    Yes, I did.
10       Q    And what discussions did you have with
11   Iron Mountain in sometime early or mid 2001?
12   A    Discussion it was to confirm that I had a
13   lease with, a two year -- two, five year options.
14       Q    The lease that you had was originally
15   what term, in 1996 when you signed with Iron
16   Mountain?
17   A    Originally I believe two, five year options.
18       Q    Well, when you say "options," you mean
19   you had a five-year lease with additional --
20   A    Yes.
21       Q    -- additional 10 years?
22   A    With additional 10 years. Five year with two,
23   five-year options.
24       Q    And were the price of those leases with
25   Iron Mountain spelled out in your original lease?

48

1        MR. VARN:  Objection as to form. We
2    all know the original lease was with Pierce Layhey
3    because Iron Mountain didn't have a thing to do with
4    Freehold until 2000 so.
5        Q    Iron Mountain or its predecessor?
6    A    Yes.
7        Q    And the five-year options were
8    available to you as a tenant -- when I say "you," I
9    mean TC Concepts --
10   A    Yes, sir.
11       Q    -- what happened in the year 2000
12   regarding the lease?
13       MR. VARN:  2000 or 2001?
14       Q    2001, I am sorry.
15   A    2001. The lease was questioned. We didn't
16   have a lease with Iron Mountain, and I asked for a
17   lease to continue the two-year option of five years.
18       Q    You said you didn't have a lease with
19   Iron Mountain; what do you mean by that?
20   A    The lease I had was with Pierce Layhey.
21       Q    Pierce Layhey owned the building?
22   A    Yes. I assumed when Pierce Layhey sold the
23   building to Iron Mountain that the lease would stay
24   in effect.
25       Q    Okay. And in fact was there a clause

49

1    in the lease that did not allow that?
2    A    I can't answer that. I would need to look at
3    the lease. I haven't read the lease.
4        Q    What brought you to renegotiate this
5    process or get involved in negotiating with Iron
6    Mountain after Iron Mountain had purchased Pierce
7    Layhey in 2000?
8    A    In 2000 Iron Mountain came to Tom Carr, a
9    fellow by the name of Jim Johnson.
10       Q    That was in 2000?
11   A    Yes, it was.
12       Q    Okay.
13   A    And in a meeting with Tom Carr, Jim Johnson
14   and Mike DiIanni they asked me if I would be willing
15   to give up the offices in the building for security
16   and safety reasons.
17       Q    And when you said the "offices," the
18   offices of TC Concepts?
19   A    The offices of TC Transport inside the Iron
20   Mountain facility. They asked if I would relocate
21   because of their security and safety reasons.
22       Q    Just your offices as opposed to your
23   warehousing?
24   A    Yes.
25       Q    And did you do that?

IMP04549

50

1  A  Yes, I did.
2     Q    Were you, was Transportation Concepts
3  compensated --
4  A  Yes, they were.
5     Q    -- for this move?
6     And after you moved your offices, what further
7  happened with regard to relationship with this
8  building?
9  A  Well, I believe that's when things started
10  falling apart between Mike DiIanni and Iron
11  Mountain. There was a lot of animosity between a
12  few of the Iron Mountain people and a few of the
13  Pierce Layhey people.
14     Q    I am asking you in connection with -- I
15  am not getting into personalities. I'm asking what
16  happened next with regard to the lease by the
17  corporation Transportation Concepts as it involved
18  the warehousing facility in Freehold at the Iron
19  Mountain warehousing facility?
20  A  I believe that Iron Mountain had sent me a
21  letter to vacate the premises.
22     Q    When?
23  A  I'm going to say September of 2001.
24        MR. VARN: When did they vacate or when
25  did they get the letter?

51

1     Q    I didn't ask about a letter. I asked
2  what happened next after 2000 and your move from the
3  Iron Mountain facility. Did you meet with Iron
4  Mountain regarding anything to do with the Iron
5  Mountain facility in Freehold?
6        MR. VARN: Excuse me, was not the
7  preceding question a one word question "when"?
8        (Whereupon, the requested portion is
9     read back by the court reporter as follows:
10     "QUESTION: When?")
11     Q    When was the next time you had any
12  dealings with Iron Mountain regarding the lease?
13  When I say "you," as the representative of
14  Transportation Concepts, did you have any dealings
15  with Iron Mountain Mountain regarding your lease at
16  the Iron Mountain facility?
17  A  At the Iron Mountain facility when Jim Johnson
18  and Mike DiIanni and Carr discussed their relocation
19  of the office, I asked Jim Johnson would he please
20  allow me to remain in the warehouse.
21     At that time he said he would do his best to
22  work up a lease, and as long as Iron Mountain does
23  not need that space, I don't think there would be a
24  problem with TC Transport staying in that space.
25     From that point, Jim Johnson got very ill and

52

1  passed on, and months went by and I really didn't
2  have any other conversations with Iron Mountain. I
3  was just hoping I would be able to stay there on the
4  lease that I had prior with Pierce Layhey.
5     Q    When did your lease with Pierce Layhey
6  end, the first five-year period?
7  A  My lease ended I believe five years from 1996
8  would bring us into 2002.
9     Q    When in 1996 did you first sign the
10  lease?
11        MR. PESLAK: Five years from 1996 is
12  2002?
13  A  Well, I signed it in '96 to 2001.
14     Q    When in 1996 did you sign the lease?
15  A  I don't remember.
16     Q    When you say "I," you mean TC
17  Transportation Concepts of New Jersey; correct?
18  A  Yes.
19     Q    Okay. When did Transportation Concepts
20  next have any discussions with Iron Mountain after
21  this initial meeting with Mr. Johnson about the
22  lease of the Freehold warehouse facility?
23  A  I would have to say August, September of 2001.
24     Q    Who did you have conversations with?
25  A  Gary Watzke.

53

1     Q    You said that you had to say it was
2  August or September of 2001, why is it that you are
3  placing it in August or September of 2001? Is that
4  your recollection, or is there a particular
5  triggering event that makes you recall that?
6  A  Well, I believe I received a letter from Gary
7  Watzke, telling me we have to relocate within 90
8  days, and I believe that was sent to me in August of
9  2001, but if you gave me a chance to go back to my
10  records, I could give you that exact date.
11     Q    These are records that you still have?
12  A  Well, I would know the date, yes.
13     Q    Are these records that you still have,
14  sir?
15  A  No, they are not. My attorney would have
16  them.
17     Q    Are these records relating to your
18  business and Iron Mountain?
19  A  No, sir.
20     Q    What do they relate to?
21  A  My attorney Art Peslak would have the date of
22  that first letter because he sent a subpoena asking
23  for all the records. So I would think my attorney
24  would know the dates.
25     Q    So you do have documents either in your

54

1 control or your attorney's control regarding Iron
2 Mountain; am I correct?
3 A    I don't know, I'd have to ask my attorney.
4      Q    Mr. Carr, I'm asking you today. You're
5 the one that's under oath now. You said I'd have to
6 look at my records as to the date of that letter.
7      Do you have or does your attorney have because
8 you turned it over to him a copy of that letter
9 dated August or September of 2001 giving you 90 days
10 to vacate the premises?
11 A    I believe he does.
12     Q    Okay. Why didn't you bring that with
13 you today?
14 A    I wasn't asked to.
15     Q    Did you personally receive a copy of
16 the Notice of Deposition for taking your deposition
17 today?
18 A    Yes, I did.
19     Q    Okay. And in that did you notice that
20 there were documents requested from, that you had
21 concerning Sequedex, Michael Gold, Fred Mathewson,
22 Jeffrey Melnick, Mark Haslon and Iron Mountain?
23 A    Yes.
24     Q    Okay. And did you bring with you
25 today, in response to this subpoena which asked you

55

1 to bring these documents any documents relating to
2 Iron Mountain?
3 A    No, I did not.
4      Q    Why?
5 A    I don't have any.
6      Q    Who has them?
7 A    What documents are you asking for, sir?
8      Q    I'm asking for any documents that
9 relate to Iron Mountain?
10 A    I believe --
11     MR. PESLAK: First of all, Mr.
12 Rosenzweig called me yesterday, and I said if there
13 were any documents responsive to the subpoena, they
14 were produced in the Monmouth County action,
15 whatever Mr. Carr had given to me was produced in
16 Monmouth County and you were free to use them in
17 this case.
18 A    I believe at this point all of the documents
19 for Logisteq is in a trailer sitting somewhere in
20 Freehold cartage, Freehold, New Jersey.
21     Q    I am not asking about documents that
22 you don't control. I'm asking about documents that
23 you have. Do you have any documents that you know
24 of regarding Iron Mountain --
25 A    No.

56

1      Q    -- that have not been produced in this
2 litigation or in any litigation?
3 A    No, I do not.
4      Q    Now, after you received that letter
5 giving you 90 days to vacate, that letter was signed
6 by Mr. Watzke?
7 A    Yes, he was.
8      Q    Prior to August, September, when you
9 received that letter from Mr. Watzke, was he writing
10 on behalf of Iron Mountain?
11 A    Yes, he was.
12     Q    And Iron Mountain at that point was the
13 owner of the facility in which your business was
14 housed; correct?
15 A    Correct.
16     Q    When I say "your business," I mean the
17 business that you owned 49 percent of?
18 A    Correct.
19     Q    The other 51 percent was owned by
20 Pioneer Capital?
21 A    Correct.
22     Q    By the way, when you signed these
23 agreements with Pioneer Capital to sell 51 percent
24 of your business, did they have voting stock, that
25 is do they have a controlling interest in the

57

1 business?
2 A    Yes, they did.
3      Q    And you understood that when you
4 entered into that business that they had a
5 controlling interest in the business?
6 A    Yes, I did.
7      Q    At the time that you received this
8 letter from Mr. Watzke had you ever met with Mr.
9 Watzke prior to the date that he sent that letter?
10 A    No, I had not.
11     MR. VARN: Do you have any coffee? Off
12 the record.
13     (Whereupon, a discussion is held off
14 the record.)
15     MR. EPSTEIN: Let's take a break.
16     (Whereupon, a recess was taken.)
17     Q    Prior to the receipt of the letter I
18 asked you whether or not you had previously met Gary
19 Watzke. Had you ever received any telephone
20 communications or written communications from Mr.
21 Watzke prior to September of 2001, or August,
22 September of 2001?
23     MR. PESLAK: Prior to his receipt of
24 the letter you are asking?
25     Q    Prior to your receipt of the letter

58

1  that you described gave you 90 days to vacate the
2  building and it was from Gary Watzke in August or
3  September of 2001, had you ever had any
4  communication with Mr. Watzke either by telephone or
5  through correspondence?
6  A    No, I had not.
7      Q    Did you ever discuss with Mr. Watzke at
8  any time the fact that you had sold a controlling
9  interest of your business to Peter Pierce, Sr.?
10          MR. VARN:  Are you saying any time, you
11  mean up until that point or any time?
12      Q    Up to the time that you received that
13  letter in September, had you ever advised Mr. Watzke
14  in any form whether it be in person, over the
15  telephone or by letter of some, by some
16  correspondence, that you had sold a controlling
17  interest in Transportation Concepts to Peter Pierce?
18  A    No.
19      Q    When you received this letter in August
20  or September of 2001, was Transportation Concepts of
21  New Jersey still operating under that name?
22  A    No, they were not.
23      Q    What name were they using?
24  A    Logisteq.
25      Q    When did they start using Logisteq, the

59

1  company name?
2  A    I don't know the exact date. I would say the
3  time frame would be February of 2001.
4      Q    And was Logisteq a new corporation or
5  was it merely a fictitious name?
6  A    It was a new corporation.
7      Q    Was the ownership of Logisteq in
8  February or sometime around February 2001 any
9  different than the ownership of Transportation
10  Concepts of New Jersey, that is 51 percent to
11  Pioneer Capital and 49 percent to Thomas Carr?
12  A    That's correct, 51 percent to Peter Pierce, 49
13  percent to Tom Carr.
14      Q    Okay. Did Mr. Pierce own the shares,
15  or was it Pioneer Capital that owned the shares --
16          MR. PESLAK:  Objection. Asked and
17  answered?
18      Q    -- in Logisteq?
19  A    I do not remember.
20      Q    Were there any other stockholders for
21  either your share of the stock or that which was
22  held by either Pioneer or Mr. Pierce?
23  A    I believe Peter out of his generosity gave
24  some B shares to Kathleen Kelly, Michael DiIanni and
25  Al McGrafth, but I'm not exactly sure what kind of

60

1  arrangement he made with them.
2      Q    When did that happen?
3  A    I believe within the first month of January
4  2001.
5      Q    That's when it was still Transportation
6  Concepts?
7  A    Yes.
8      Q    When the company changed from
9  Transportation Concepts and switched over to
10  Logisteq as a company, did those individuals become
11  shareholders in Logisteq?
12  A    To my knowledge I believe they received B
13  shares in the company.
14      Q    As we sit here today, do you have any
15  documentation to establish that it was Mr. Pierce
16  who owned the shares as opposed to Pioneer Capital,
17  a company in which he had an investment?
18  A    No, I do not.
19      Q    Do you personally know in February of
20  2001, what percentage of Pioneer Capital was owned
21  by Peter Pierce, Sr.?
22  A    No, I do not.
23      Q    Do you have any idea of who owned the
24  stock of Pioneer Capital in February of 2001 when
25  Logisteq came into being?

61

1  A    To the best of my knowledge, I believed Peter
2  Pierce owned the stock of Pioneer Capital.
3      Q    All of it?
4  A    I don't believe he owned all of it. I believe
5  that there was some shares in his sons' names.
6      Q    Do you have any documentation to
7  establish that either now or did you then?
8  A    No, I did not, or I do not have any documents
9  now.
10      Q    Where did your belief come from?
11  A    My belief came from we were in a meeting one
12  day, Paoli and I met with Peter, Jr. and Peter
13  Pierce, Sr. and Doug Huntley, Mike DiIanni, Alan
14  McGrafth, and he introduced me to Peter, Jr. saying
15  he just came back from Europe, and he's going to be
16  involved somewhat in Pioneer Capital.
17      Q    Okay.
18  A    But he didn't say to what extent.
19      Q    He just said he was going to be
20  involved with Pioneer Capital?
21  A    Yes.
22      Q    But he didn't say he was going to own
23  any portion or interest in it?
24  A    I don't believe he did.
25      Q    But when Mr. Pierce spoke to you about

62

1 these things, he spoke to you about Pioneer Capital
2 as being the only entity as opposed to him
3 personally, didn't he?
4 A   Yes, he did.
5     Q    At any time did you ever ask Mr. Pierce
6 any questions about Pioneer Capital that he refused
7 to answer or not give you answers to?
8 A   No, I have not.
9     Q    After the business became Logisteq in
10 February of 2001 and prior to receiving the letter
11 from Gary Watzke in August of 2001, did you ever
12 have any further dealings with Iron Mountain
13 regarding the lease?
14 A   Yes.
15     Q    With whom?
16 A   With Gary Watzke.
17     Q    And what dealings did you have between
18 February of 2001 and August of 2001?
19 A   With Gary Watzke?
20     Q    Yes.
21 A   Well, I am not exactly sure about a date that
22 letter came to me. I'm, I'm saying from the best of
23 my memory it might have been August. It might have
24 been September, but at this point it might have been
25 earlier from that.

63

1     When I received the letter, I called Gary
2 Watzke and tried to negotiate a lease with him to
3 allow us to stay on the property.
4     Q    When you say "us," at that time, did
5 you disclose that you were now operating as Logisteq
6 as opposed to Transportation Concepts of New Jersey?
7 A   Yes, I did. I made Gary Watzke aware that
8 Peter Pierce from Pioneer Capital invested in my
9 company, and now is an owner of 51 percent of
10 Logisteq.
11     Q    What did Mr. Watzke say when you made
12 this disclosure?
13 A   Mr. Watzke, Mr. Watzke told me at that point
14 he would get back to me within a couple of weeks
15 when he spoke with his counterparts.
16     Q    What do you mean by his counterparts?
17 A   I don't know; that's what he said to me.
18     Q    Okay. And did he get back to you in a
19 couple of weeks?
20 A   Yes, he did.
21     Q    Did he say anything else about Mr.
22 Pierce's involvement with your business?
23 A   None whatsoever.
24     Q    Did you have conversations with anyone
25 else other than Gary Watzke at Iron Mountain from

64

1 the period February 2001 through September 2001?
2 A   No, at that point my main contact was only
3 Gary Watzke.
4     Q    You said my "main contact"?
5 A   My only contact.
6     Q    Your only contact --
7 A   -- was Gary Watzke.
8     Q    Did Mr. Watzke ask you any questions
9 about Pioneer Capital, Peter Pierce or any other
10 investors in Logisteq?
11 A   None whatsoever.
12     Q    When did you next have any dealings
13 with Mr. Watzke after that time when he told you he
14 would get back to you in a few weeks?
15 A   Two weeks after I spoke to him.
16     Q    And what happened then?
17 A   Gary Watzke called me, apologized that we had
18 to relocate, understood what a hassle it was going
19 to be to move out, but at that time it wasn't his
20 problem, he was working for Iron Mountain, and they
21 needed the space. So his decision was final. We
22 had to relocate.
23     Q    Okay. So he told you that the reason
24 that Iron Mountain was asking you to relocate was
25 because Iron Mountain needed the space in their

65

1 warehousing facility?
2 A   Correct.
3     Q    Was there any other reason given by Mr.
4 Watzke at the time that you had these discussions
5 with him as to your relocation?
6 A   No, there was not.
7     Q    Did you have any discussions at all
8 about your business or Mr. Pierce or anyone else at
9 Logisteq?
10 A   None whatsoever.
11     Q    Was anyone else involved in the
12 conversations between you and Mr. Watzke regarding
13 this relocation?
14 A   Peter Pierce.
15     Q    Was he on the phone with you?
16 A   No, he was not.
17     Q    Did, was he there in person when --
18 A   No, he was not.
19     Q    Well, how was involved in the
20 discussions with Mr. Watzke, did he have his own
21 discussions with Mr. Watzke?
22 A   I called Peter Pierce as soon as I received
23 the letter, and Peter told me when you get the
24 response from Gary Watzke, give me a call and let me
25 know what happened.

66

1    When Gary called me and told me that we
2    absolutely have to move, I called Peter.  Peter said
3    he would try his best to get through to someone at
4    Iron Mountain to see if we could remain on the
5    property for a certain amount of time.
6        Q    Did he say who?
7        A    Yes, Gary Watzke.
8        Q    Do you know whether or not, personally
9    know whether or not Mr. Pierce did call Gary Watzke
10   in regard to the Logisteq lease?
11       A    Yes, I do.
12       Q    How do you know that?
13       A    Peter Pierce called me, told me he had a
14   conversation with Gary Watzke, that they needed the
15   space, they wanted us to vacate, they would give us
16   ample time.
17       Then Peter told me he was going to call
18   Richard Reese directly and have a conversation with
19   Richard, he had a board meeting coming up, and to
20   just hang in there and as soon as he gets back he
21   will update me.
22       Q    So he told you that he spoke to Watzke
23   and Watzke said that you had to vacate?
24       A    Yes.
25       Q    And that he was then going to talk to

67

1    Mr. Reese at the board meeting?
2        A    Yes, sir.
3        Q    When was that board meeting supposed to
4    take place; do you remember when this all these
5    conversations took place, was this in August,
6    September, October?
7        A    Do not remember.
8        Q    Could it have been earlier than that?
9        A    It could have been.
10       Q    Could it have been as early as May when
11   these events started taking place?
12       A    It could have been, but I believed it was
13   summer.  So unless it was a very warm May, maybe.
14   I'm thinking back.  I remember it was warm.  So it
15   could have been anywhere from May to August.  I
16   would say but not exactly sure.
17       Q    What did you next hear about Logisteq
18   remaining on premises at the Iron Mountain facility?
19       A    I was very happy to hear that Peter had a
20   successful meeting with Richard Reese.  That Richard
21   agreed to allow us --
22       Q    Wait a minute.  We're jumping ahead of
23   ourselves.  Did you have another conversations with
24   Mr. Pierce about his conversations with Mr. Reese?
25       A    Yes, I did.

68

1        Q    What did Mr. Pierce tell you about his
2    conversation with Mr. Reese?
3        A    That's what I was just answering.  Peter came
4    to me, and I was very happy to hear he had a
5    successful meeting with Mr. Richard Reese, that we
6    would be able to continue to operate out of the
7    Freehold facility for an additional year, and
8    Richard Reese was kind enough to give us
9    compensation for our nuisance to move.
10       He allowed us to remain in the building for
11   one year with no additional rent, I'm sorry with no
12   rent.
13       Q    So after the conversation with Mr.
14   Pierce where he said that Watzke said there was no
15   deal, he came back to you, said he had a meeting
16   with Richard Reese and that Richard Reese allowed,
17   would allow Logisteq to remain in the Iron Mountain
18   building at zero rental --
19       A    For one year.
20       Q    -- for one year?
21       A    Yes.
22       MR. PESLAK:  Does he have any
23   connection in any of the cases against Sequedex?
24       MR. VARN:  Not that I have been able to
25   ascertain.

69

1        MR. PIERCE:  Who are you referring to?
2        MR. EPSTEIN:  This whole line of
3    questioning --
4        MR. EPSTEIN:  Don't ask him questions.
5        Q    Did Mr. Pierce advise you as to why Mr.
6    Reese had agreed to allow Logisteq to remain at a
7    zero rental for a period of one year?
8        A    Mr. Reese told -- I'm sorry, Mr. Pierce had
9    told me that he had a conversation after the board
10   meeting with Richard Reese, and Richard allowed him
11   one year understanding what a difficult time it
12   would be right now for us to relocate because we
13   already had a problem with space, we were trying to
14   renegotiate on a building that we couldn't cut a
15   deal with.
16       Q    But why the free rental?
17       A    Well, originally I had a lease with Pierce
18   Layhey showing that I would have five years and two
19   five-year options.
20       Now all of a sudden I'm being told that we
21   have to relocate.  So it was getting a little nasty
22   between Gary Watzke, and I, I basically threatened
23   them that I would hold them up in court if they
24   tried to evict me, that I have a business here,
25   we're completely full, three months is not ample

70

1   time for us to go out and secure warehouse space.
2       So at that point I also said I had a
3   three-year -- I'm sorry, I have a lease with a five
4   year and two, five-year options here, and Jim
5   Johnson pretty much verbally agreed that he would
6   help me continue to stay in the building.
7       And since the death of Jim Johnson, I guess
8   that delayed a lot of the negotiations on the lease,
9   and Iron Mountain never got back to me. So Iron
10  Mountain I believed in their minds understood that
11  this would be a big inconvenience, and I think as
12  far as Richard Reese was concerned I think he was
13  showing goodwill to Peter that he would work with us
14  and give us a year rent for free.
15      Q    How much were you paying in rent at the
16  time that you heard from Mr. Pierce that Iron
17  Mountain was going to give you a years free rent?
18  A    Logisteq at the time was paying $2 and five
19  cents per square foot.
20      Q    And how many square feet did you have?
21  A    That was on 100,000 square feet.
22      Q    So am I correct in saying that you were
23  paying in excess of $200,000 a year --
24  A    Yes.
25      Q    -- for the space that you rented?

71

1   A    (Indicating.)
2       Q    Did you find it unusual that Iron
3   Mountain was willing to give you or not you but
4   Logisteq a $200,000 present for the following year?
5       MR. VARN:  Objection as to form.
6   A    I didn't give it much thought.
7       Q    Did Iron Mountain ask Logisteq to sign
8   any special releases or agreements with regard to
9   this one-year free lease?
10  A    Yes, they did.
11      Q    And what agreements did Logisteq sign?
12  A    Logisteq signed an, I believe a very short
13  boilerplate lease showing that we would remain in
14  the building for one year and to compensate us for
15  the move, they would not collect rent for that year.
16      Q    When did that agreement come into
17  being?
18  A    To the best of my knowledge, I believe it was
19  sometime during the summer of 2001, and to make it
20  very broad, I'm going to say it could have been
21  anywhere between May and August of 2001.
22      Q    Now, at that time were you still
23  employed as the president of Logisteq?
24  A    Yes, I was employed as president of Logisteq.
25      Q    And did you sign the agreements on

72

1   behalf of Logisteq --
2   A    No, I did not.
3       Q    -- for this extension?  Who did?
4   A    Alan McGrafth.
5       Q    And what was Mr. McGrafth's function
6   with Logisteq?
7   A    Mr. McGrafth's function with Logisteq was
8   basically a C of O position.  He was responsible for
9   all the financial interest in the business and his
10  title was at the time vice-president.
11      Q    And did Mr. McGrafth sign that document
12  with your approval as the president?
13  A    Yes, he did.
14      Q    When you signed, when I say "you," I
15  mean when Logisteq signed this new lease with Iron
16  Mountain in the summer, sometime around the summer
17  of 2001 --
18  A    Sure.
19      Q    -- did you have any discussions with
20  Mr. Pierce regarding the sale of your portion of
21  Logisteq to Pioneer Capital?
22  A    No, I did not.
23      Q    Did you have any conversations with Mr.
24  Pierce regarding the sale of your portion of
25  Logisteq in any circumstance whether it be Pioneer

73

1   Capital or otherwise?
2   A    To be quite frank, I don't understand the
3   question.  You nee to re --
4       Q    Did you have any conversations with Mr.
5   Pierce regarding the purchase of your share of the
6   business?
7   A    What year are we talking now?
8       Q    In the summer of 2001?
9   A    Yes, we did.
10      Q    When did you first start having
11  conversations about selling your share of the
12  business to Mr. Pierce or any other person or
13  entity?
14  A    I believe it was August of 2001.
15      Q    What conversations did you have with
16  Mr. Pierce in August of 2001 regarding the sale of
17  your shares in Logisteq?
18  A    In August of 2001, I was indicted for
19  conspiracy on bank fraud.  I actually cashed one
20  check for --.
21      MR. PESLAK:  Don't go into the details
22  of that.  No, don't go into the details of that.
23  It's still pending.
24      MR. EPSTEIN:  I am going to go into the
25  details of that.

74

1     MR. PESLAK: I am going to direct him
2 not to answer the question on the details of his
3 indictment. I can tell you right now --
4     MR. EPSTEIN: I am not going into the
5 factual details. I certainly have a right to
6 explore the circumstances of the indictment and what
7 is public knowledge.
8     Q     In the context of your business --
9 A     Yes, sir.
10     Q     -- not the whys or wherefores --
11 A     Sure.
12     Q     -- did there come a time in August of
13 2001 where you discussed sale of your business with
14 Mr. Pierce?
15 A     Yes, sir I did.
16     Q     When I say the sale of your business,
17 the sale of your shares --
18 A     Sure.
19     Q     -- in Logisteq to Mr. Pierce or any
20 other entity?
21 A     Yes, I did.
22     Q     What triggered those discussions?
23 A     In August of 2001, I had an indictment and
24 Michael DiIanni told Peter Pierce that I was
25 indicted, and Mike DiIanni and Peter asked me to

75

1 attend a meeting the next day at a restaurant called
2 Frankie Fed's in Freehold, New Jersey.
3     Q     Frankie Fed's?
4 A     Frankie Fed's, F-E-D-S.
5     Q     Okay.
6 A     Peter, who was a real gentleman at the time,
7 was very concerned and was very upset that this
8 happened, and I didn't make him aware of this.
9     Q     When were you first indicted, when was
10 it, in August?
11 A     I don't know the exact date, sir.
12     Q     When did you first learn that you were
13 under any investigation regarding federal crimes?
14 A     The first day I learned that I was in any
15 investigation for federal crime was the day the FBI
16 came to my house and arrested me.
17     Q     When was that?
18 A     That was in August of 2001.
19     Q     Had the indictment against you already
20 been returned at the time that they came and
21 arrested you?
22     MR. PESLAK: If you know what that
23 means.
24 A     I don't understand the question.
25     Q     Were you already charged with the

76

1 crimes set forth in the indictment at the time that
2 they arrested you, or were you arrested prior to the
3 time the indictment came down?
4 A     No, I was already charged and arrested that
5 day.
6     Q     You had no idea that there were any
7 charges against you prior to that time?
8 A     No, I did not.
9     Q     When you got arrested in August of 2001
10 by the FBI, how long were you in custody?
11 A     For five years -- five hours.
12     Q     And had you had any pre-warning about
13 the FBI coming to your house and arresting you?
14 A     No, I had not had any pre-warning.
15     Q     After they arrested you in -- where
16 were you living at the time, by the way?
17 A     35 Denise Court, Manalapan.
18     Q     Same place that you're living now?
19 A     Yes, sir.
20     Q     After they arrested you, where did they
21 take you?
22 A     They took me to the FBI headquarters in
23 Southern Manhattan.
24     Q     And then what happened?
25 A     They questioned me, they asked me if I would

77

1 cooperate with them, if I would cooperate with them
2 now, it would be much easier on my case.
3     Q     And what happened as a result of your
4 conversations, what further happened that day; were
5 you taken into court; were you released; what
6 happened?
7 A     I sat down with the agents, I explained to
8 them that I had cashed --
9     MR. PESLAK: Don't go into the details.
10     Q     I don't want to go into details because
11 your lawyer has directed you not to answer the
12 details, I asked you physically what happened to you
13 after being arrested by the FBI. You were taken to
14 their head quarters in Manhattan, and you said you
15 were released five hours later?
16 A     Yes, from that point I cooperated with them,
17 gave them all the information they needed to know.
18 We went in front of a judge and I was set bail.
19     Q     Okay. That was a judge in the Southern
20 District of New York, in Manhattan?
21 A     Yes, Judge McKenna.
22     Q     What what were you charged with?
23 A     Bank fraud conspiracy.
24     Q     Were there persons charged with you in
25 connection with this arrest?

IMP04556

78

1  A    Yes.
2    Q    Who was charged with you?
3  A    I believe there was eight other people, all
4  arrested the same day.
5    Q    Do you know the names of those eight
6  other people?
7  A    John Lehmann, Tony DiAngli, Peter Loiness, and
8  the other fellows I don't know.
9    Q    Did you all appear before the judge at
10  the same time?
11  A    Yes, we did.
12    Q    Judge McKenna released you on bail.
13  What was the amount of the bail that you were
14  required to post?
15  A    I believe the amount of the bail was $250,000.
16    Q    Cash or bond?
17  A    Bond.
18    Q    And was it a full bond or a 10 percent
19  bond?
20  A    10 percent bond.
21    Q    Who posted the bail for you?
22  A    My attorney, Michael Chazen.
23    Q    He's in New York?
24  A    He's in New Jersey.
25    Q    Michael Chazen?

79

1  A    C-H-A-Z-E-N.  He's --
2    Q    Where is he?
3  A    He's in Freehold, New Jersey, on Route 9.
4    Q    When did Mr. Chazen learn of your
5  arrest?
6  A    Immediately.  My wife called his office and
7  told him the FBI came to arrest me.
8    Q    Now, in addition to posting a $250,000
9  10 percent bond --
10  A    Yes.
11    Q    -- for your release, did the judge set
12  parameters as to release in terms of any
13  restrictions?
14  A    Yes, he did.
15    Q    What were the restrictions set at the
16  time?
17  A    The restrictions set was I could travel only
18  within the area of New Jersey and to Southern
19  District of New York, and I would be allowed to have
20  one week vacation.
21    Q    Do you remember the date that you were
22  actually indicted, the date in August?
23  A    No, I do not.
24    Q    Did Judge McKenna or any other judge in
25  the Southern District of New York ever relieve you

80

1  of your responsibility with regard to those travel
2  restrictions?
3  A    Yes, they did.
4    Q    When?
5  A    I believe within the first two weeks I
6  obtained an attorney Michael Bachner, New York City,
7  and I explained to Mr. Bachner that these
8  restrictions would be catastrophic for my job, and
9  that I travel all over the country and some parts of
10  the world.
11    So he spoke with the prosecutor, the
12  prosecutor asked for release on the job and he gave
13  me a, they gave me an allowance, well, they gave me
14  permission to travel for work only, and if I had to
15  go on a vacation, I'd have to call in and tell them
16  where I'm going on vacation.
17    Q    Did you get an actual document that
18  provided you with the boundaries or the restrictions
19  that were then in place after Mr. Bachner, that's
20  B-O-C-H-N-E-R?
21  A    B-A-C-H-N-E-R, first name is Michael, and he's
22  on Broadway in New York City.
23    Q    Okay.  Now, with regard to these
24  restrictions, did you receive them in writing?
25  A    I personally did not receive them.  I believe

81

1  my attorney did.
2    Q    Did you ever get a copy of the
3  indictment that was issued against you?
4  A    Yes, I did.
5    Q    Did you get a copy of, at any time did
6  you get a copy of these written restrictions, these
7  new written restrictions that were issued?
8  A    No, I did not.  I did receive a copy of the
9  indictment.
10    Q    Since the time that you have been
11  indicted in August of 2001 --
12  A    Yes.
13    Q    -- has there been any pretrial
14  proceedings?
15  A    Yes.
16    Q    Under the caption of that indictment?
17  A    Yes, sir.
18    Q    What proceedings?
19  A    We had hearings every three months at the
20  Federal Court.
21    Q    What was the purpose of those hearings?
22  A    Just a brief.
23    Q    Status hearings?
24  A    Status hearings.
25    Q    And who held those hearings?

IMP04557

82

1  A    Judge McKenna.
2      Q    Other than the status hearings every
3  three months, have any other proceedings taken
4  place?
5  A    No, sir.
6      Q    As we sit hear today, do you remain
7  under indictment for the charges brought against you
8  in that case?
9  A    Yes, I do.
10     Q    Do all other remaining persons indicted
11  with you remain under indictment in that case?
12  A    Yes, they do.
13     Q    Has there been any trial date set for
14  the matter?
15  A    No, sir, but there is a date set for June 2
16  for another brief,
17     Q    When you say a "brief," what do you
18  mean?
19     MR. PESLAK: He's asking what is your
20  understanding of what's going to happen.
21  A    The same thing he just said.
22     Q    Status hearing?
23  A    Yes.
24     Q    At the last status conference, what did
25  the prosecutor and/or the defense counsel say as to

83

1  the status the of the matter?
2  A    The problem is because there are so many
3  attorneys involved it's very difficult for everybody
4  to have the date, so that's why it's prolonging, and
5  the next hearing would be June 2nd and we'd hear
6  from them.
7      Q    Okay. What you are saying is that they
8  are trying to set a trial date?
9  A    Yes, they are. We should have a trial date
10  within, very shortly.
11     MR. EPSTEIN: Off the record.
12     (Whereupon, a recess is taken.)
13     Q    Let's go back to the meeting that you
14  had with Peter Pierce and Mike DiIanni.
15  A    Yes.
16     Q    You said that Mike DiIanni told Peter
17  Pierce about your indictment. How did Mike DiIanni
18  find out about it?
19  A    I told Mike DiIanni.
20     Q    Mike DiIanni was what, as it related to
21  the corporation known as Logisteq?
22  A    Mike DiIanni was hired on as the CEO of
23  Logisteq.
24     Q    So he was your boss?
25  A    I am going to say we were about the same

84

1  level.
2      Q    It's August of 2001, your compensated
3  by Logisteq. What is your rate of compensation for
4  Logisteq?
5  A    I'm sorry, I'm compensated by Logisteq?
6      Q    With respect, you were employed by
7  Logisteq --
8  A    You mean my salary?
9      Q    Yes.
10  A    200, I believe it was 200, it was either 200
11  or $250,000 a year.
12     Q    Were there any additional payments to
13  you by way of benefits or --
14  A    Yes.
15     Q    And what were they perks, benefits?
16  A    I had full health insurance, and I had a
17  company automobile, and I had an expense account.
18     Q    How much was the expense account?
19  A    Well, basically the expense account was just
20  to take customers out to dinners and lunch, so we
21  would write that off in the company. So that didn't
22  actually go as my compensation.
23     MR. PESLAK: I'd like to note for the
24  record that I think this deposition is going way off
25  line from the Middlesex County cases, and it's also

85

1  all very interesting information but we're certainly
2  not bringing Mr. Carr back for another day of this
3  since it is clear from the letter in plain view on
4  the table that there was correspondence with Mr.
5  Barnowski from Cozzen about Mr. Carr's deposition.
6      MR. EPSTEIN: From Mr. Barnowski did
7  you say?
8      MR. PESLAK: I said correspondence with
9  Mr. Barnowski.
10     MR. EPSTEIN: No, you said from.
11     MR. PESLAK: No, I said with.
12     MR. EPSTEIN: And the fact is that
13  there is communications to Mr. Barnowski in this
14  matter, and it does relate to the earlier Carr
15  deposition, which was taken in connection with the
16  Cozzen and O'Connor firm and not this one --
17     MR. PESLAK: That's fine, and what I am
18  saying is if you want to bring Mr. Carr back for
19  another day of this, we will submit this to Judge
20  Hamlin before Mr. Carr comes back.
21     MR. EPSTEIN: This relates to Mr.
22  Carr's credibility in this case as it relates to my
23  client Sequedex.
24     MR. PESLAK: You can make all the
25  speeches you want, I am telling you for the record

86

1  if you don't finish what you do here today, you're
2  going have to go back to Judge Hamlin to get him
3  back in this case.
4       MR. EPSTEIN: I will be more than happy
5  to do that.
6       MR. PESLAK: And I will be more than
7  happy to present this transcript. We spent a half
8  an hour on the proceedings as to what happened at
9  the Southern District of New York courthouse the day
10 he was arrested. That's real relevant to his
11 credibility, Mr. Epstein.
12      MR. EPSTEIN: It is, sir, and I thank
13 you for confirming that.
14      Q    Would you please tell me in addition to
15 these benefits did you receive any bonuses as the
16 president of Logisteq in 2001?
17 A    No, I did not.
18      Q    What happened at the meeting between
19 Mr. DiIanni and Mr. Pierce in August of 2001?
20 A    The meeting with Mr. DiIanni and Peter Pierce
21 and I, we sat down at lunch, Peter told me he was
22 very disappointed, very upset over the indictment.
23 Wanted to know why I didn't call him directly.
24      And I explained to him that it's much worse
25 than it really is, that I am fighting this, I am not

87

1  convicted, and it will not affect the business
2  whatsoever.
3       I said I am cooperating with the FBI, and
4  Peter then told me, well, Tom, we have two
5  operations here, and I asked him what the two
6  options were, and he says I don't feel comfortable
7  with the situation. I would like you to buy me out
8  or I will buy you out.
9       And I said, well, I'm sorry you feel that way,
10 I didn't want this to affect our relationship. I am
11 working very diligently on growing the business. We
12 see a lot of light at the end of the tunnel and
13 would still like to perform my duties as president.
14 And that was pretty much the meeting.
15      Q    Did Mr. Pierce ascribe his request to
16 be either bought out or to have you buy him out to
17 anything else but the indictment that was brought
18 against you?
19 A    I believe Peter Pierce used the indictment as
20 an excuse to make those offerings for me to buy him
21 out or for me to buy me out.
22      Q    Prior to your indictment and this
23 meeting, had Mr. Pierce suggested to you that he
24 either purchase the entire business or you purchase
25 the entire business?

88

1  A    No, he has not.
2       Q    After he said that at the meeting, what
3  occurred with regard to the purchase of the business
4  by you or by him, anything?
5  A    No, we were going to digest it for a week or
6  two and then regroup.
7       Q    Who suggested that?
8  A    Peter.
9       Q    What happened then?
10 A    I went back to work.
11      Q    Did you continue to be paid by Logisteq
12 as long as you remained an employee of that company?
13 A    Yes, I did.
14      Q    After you went back to work in August
15 of 2001, did you have any further conversations with
16 Mr. Pierce about either selling to him the, your
17 shares or your purchasing Mr. Pierce's shares.
18      MR. VARN: Objection as to form. I
19 understand that you're referring to conversations to
20 the month of August of 2001. If you meant it
21 broader, please clarify.
22      Q    I meant after the conversations in
23 August of 2001.
24 A    Yes, we did.
25      Q    Did you have any further conversations

89

1  from Mr. Pierce about the purchase either way --
2  A    Yes, we did.
3       Q    -- of the business? When?
4  A    Two weeks after the first meeting.
5       Q    So two weeks later you had a second
6  meeting?
7  A    Yes, we did.
8       Q    Where?
9  A    Freehold, New Jersey.
10      Q    Where?
11 A    At our office.
12      Q    Who was present?
13 A    Peter Pierce, Tom Carr, and Mike DiIanni.
14      Q    What happened at that meeting?
15 A    At that meeting, I asked Peter to buy me out,
16 and Peter said to me at that time I thought about it
17 and I'm not willing to buy you out.
18      So at that point I asked him, well, would you
19 hold a note for me and let me pay you over time? He
20 said no, I really can't do that. I will give you
21 sometime to try to find financing.
22      And I told him I'm really sorry about this,
23 that I would try my best to raise the money and buy
24 him out.
25      Q    Was that the entire gist of the

90

1  meeting?
2  A    No, it was not.
3      Q    What else occurred at that meeting?
4  A    After we discussed who's going to buy who out,
5  I asked him for time to give me enough, ample time
6  to raise this money.
7      It's, at that time I had to pay taxes and
8  pretty much the money I received from him was gone.
9  So on top of that, he asked me to step down as
10  president, and he was going to now make Mike DiIanni
11  fully in charge of the company, and I would have a
12  sales role in the company.
13      Q    And you would have a what in the
14  company?
15  A    A sales role.
16      Q    Was there any diminished compensation
17  in that sales role contemplated?
18  A    No, sir.
19      Q    You would get the same amount of money?
20  A    Yes, sir.
21      Q    Anything else occur at that meeting
22  other than his statement that you should find
23  financing to buy him out and that in the interim you
24  would take on a sales role in the company?
25  A    Yes, I disagreed with that position, and I

91

1  told him I would remain president. I thought it was
2  bad for business to change my title as a
3  salesperson, and he told me you can keep your
4  present cards that say president but please just
5  focus on sales.
6      Q    So he allowed you to keep your title?
7  A    Yes.
8      Q    Anything else happen at that meeting?
9  A    No.
10      Q    At the conclusion of the meeting or
11  after the conclusion of that meeting, did you have
12  any further meetings with Peter Pierce regarding the
13  purchase of his share or Pioneer's share of the
14  business?
15  A    Yes, I did.
16      Q    When?
17  A    I had numerous meetings with Peter Pierce. Of
18  course, we were basically negotiating on how much he
19  would want for his half of the company.
20      Q    Were these all face-to-face meetings?
21  A    Yes, they were. No, wait.
22      Q    Where did the next one take place?
23  A    I'm sorry, they aren't weren't all
24  face-to-face. I had some face-to-face and some
25  phone conversations with Peter.

92

1      Q    When did the next meeting take place
2  after meeting number two in the offices of Freehold
3  when he asked you to step back from your role as
4  president and take on the sales function?
5  A    The next meeting took place on the telephone.
6  I was in Freehold, New Jersey at Logisteq and Peter
7  Pierce was at Pioneer in Paoli, and I called Peter
8  to tell him I'm having a difficult time in the short
9  span to raise the money and would he be willing to
10  hold a note. He basically told me to make him an
11  offer and he would digest it.
12      Q    That was meeting number three over the
13  telephone?
14  A    Yes.
15      Q    Was there a meeting number four?
16  A    Yes, there was.
17      Q    And when did that occur?
18  A    That occurred approximately two months later.
19      Q    Do you remember what month that was in?
20  A    No, I did not.
21      Q    Was it before or after September of
22  2001?
23  A    It was after.
24      Q    Was it before or after November of
25  2001?

93

1  A    After.
2      Q    Was it before or after the end of the
3  year 2001?
4  A    I would say it was February of 2002.
5      Q    Okay. Where did that meeting take
6  place?
7  A    That meeting took place in Freehold, New
8  Jersey.
9      Q    Where in Freehold?
10  A    In Logisteq office.
11      Q    Who is was there?
12  A    Peter Pierce and Tom Carr.
13      Q    Just the two of you?
14  A    Yes.
15      Q    And what did you discuss at that
16  meeting?
17  A    Peter was actually coming back from Manhattan,
18  and he stopped by to say hello to everyone, and we
19  sat down, and I told him that I am pretty close to
20  securing financing, that I have a fellow by the name
21  of Paul Schwarcz, who is willing to put some money
22  up, but he wants all kind of collateral guarantees,
23  personal guarantees, and he would like to do a due
24  diligence and have a financial package sent to him.
25      And then at that point he would tell me how

94

1  much he's willing to lend as a note to me, and at
2  that point Peter and I would discuss how much money
3  Peter is willing to hold as a note.
4       Q    What was Peter asking for Pioneer's
5  share of Logisteq?
6  A    $5 million.
7       Q    $5 million for his share of it?
8  A    Correct.
9       Q    Okay.  What else did you discuss at
10  that meeting in February of 2002?
11  A    That was it.
12       Q    Was there a fifth meeting?
13  A    Yes, there was.
14       Q    What was the fifth meeting?
15  A    Fifth meeting was at the Mom's Peppermill
16  Diner in East Windsor, New Jersey.
17       Q    That's right outside of Princeton;
18  correct?
19  A    East Windsor.
20       Q    Okay.  East Windsor, I'm sorry.
21  A    That's okay.
22       Q    What highway or --
23  A    That's on Route 33, in East Windsor, New
24  Jersey.
25       Q    Okay.  And who was that at that

95

1  meeting?
2  A    Peter Pierce, Tom Carr, Alan McGrafth and Jim
3  Neebling, N-E-E-B-L-I-N-G.
4       Q    When did that take place?
5  A    That took place in say March of 2002.
6       Q    What happened at that meeting?
7  A    Peter refused to hold any money.  He said he
8  needed the 5 million in full, and at that point Jim
9  Neebling came and tried to help negotiate with Peter
10  for Paul Schwarcz and asked Peter if he would be
11  willing to hold a million dollars note and
12  we made an offer on the company.
13       At that point Peter Pierce told Jimmy and I
14  if we don't come up with the money in one week, he's
15  going to bankrupt the company and close it down.
16       And then from that point I asked Peter if you
17  were going to bankrupt the company and close it
18  down, why wouldn't you just buy me out and you guys
19  can run the company and grow it.
20       Q    What did he say?
21  A    He said no.  He has no interest in buying my
22  49 percent.
23       Q    At the time that Mr. Pierce told you
24  those things in March of 2002, --
25  A    Yes.

96

1       Q    -- were you being paid by Logisteq?
2  A    Yes, I was.
3       Q    And in connection with the operations
4  of Logisteq were you aware of what their financial
5  condition was at the time he expressed to you that
6  unless the company were purchased in one week that
7  he would to use your phrase bankrupt the company?
8  A    Yes, I was aware.
9       Q    What was the financial condition of the
10  company in terms of its ability to meet its daily
11  obligations?
12       MR. PESLAK:  Objection to the form of
13  the question as vague and ambiguous.
14  A    It was poor.
15       Q    The company was not meeting its
16  obligations, was it?
17  A    No, it was not.
18       Q    Is Mr. Neebling an attorney?
19  A    No, he is not.
20       Q    And you said he was there representing
21  the interest of Paul Schwarcz?
22  A    Correct.
23       Q    Who is Mr. Schwarcz?
24  A    Paul Schwarcz is an acquaintance of mine for
25  many years.  He helped finance my trucks in 1992.

97

1  He owns a small leasing and financing company.
2       Q    So when you say "Mr. Schwarcz," you
3  mean his company was willing to make this
4  investment, not Mr. Schwarcz personally?
5  A    This is Paul Schwarcz personally.
6       Q    So personally he was going to come in
7  and loan you $4 million to purchase this company?
8  A    Mr. Schwarcz saw the very strong potential of
9  the growth of Logisteq, and he would have purchased
10  Peter Pierce's 51 percent, but it would have to be
11  the right deal that made sense to him.
12       Q    Was there anything placed in writing to
13  Mr. Pierce as to what Mr. Schwarcz was offering
14  either directly or through Mr. Neebling?
15  A    Yes, sir.
16       Q    And what form did that writing take?
17  A    That form was in writing, letter from Paul
18  Schwarcz and from Jim Neebling.  There was two
19  letters, and they were both given to Peter Pierce,
20  and they were both given to Art Peslak because Art
21  Peslak was involved in the negotiation as my
22  attorney.
23       Q    Those letters, were they formal offer
24  letter, where there were just discussions in terms
25  of what --

98

1  A    They were a formal offer letter.
2  Q    Both of them?
3  A    Yes.
4  Q    Were happened next, was there a sixth
5  meeting?
6  A    No, there was not.
7  Q    Did you have any further discussions
8  either in person or over the telephone with Mr.
9  Pierce about Logisteq?
10  A    No, I did not, but Mr. Pierce told my attorney
11  if he did not have the money raised within a week,
12  he was closing the company.
13  Q    I thought he told you that at that
14  meeting?
15  A    He did, he told me that, and then he spoke to
16  my attorney. As a matter of fact we have an E-mail
17  on that.
18  Q    Okay. And he said he was closing the
19  company down or that he was going to pursue
20  bankruptcy proceedings?
21  A    He told me at the meeting at the Peppermill
22  that he was going to bankrupt the company, but he
23  told Art Peslak that he was closing the company
24  down, that he would give me until Friday to raise
25  the money.

99

1  Q    Did Mr. Pierce take any further action
2  in the year 2000 to finance or refinance the
3  operations of Logisteq in any way that you know of?
4      MR. PESLAK: 2000?
5  Q    2002, I'm sorry?
6  A    No, he did not.
7  Q    In the context of Logisteq, did Mr.
8  Pierce or any of the officers of Logisteq take
9  action to pursue a insolvency proceedings in any
10  court after March of 2002?
11  A    No, they did not.
12  Q    There's never been any proceedings with
13  regard to Logisteq that you know of in the context
14  of any Federal Court, bankruptcy or otherwise?
15  A    No.
16      MR. PESLAK: He's asking whether they
17  filed bankruptcy for Logisteq, Tomorrow.
18  A    He said during March and April.
19  Q    I said after March.
20      MR. PESLAK: After that. I'm sorry, I
21  misunderstood.
22  Q    After 2002, your meeting, your number
23  five meeting at the Mom's Peppermill Diner, was
24  there any action taken for Logisteq to claim
25  protection under the bankruptcy laws?

100

1  A    Yes, sir.
2  Q    And when did that action take place?
3  A    I believe, I believe that was in 2003, early
4  2003.
5  Q    Following your meeting in March of
6  2002, you said that there were letters that went
7  from Mr. Schwarcz and Mr. Neebling to Mr. Pierce?
8  A    Yes, sir.
9  Q    Did you continue to be paid by Logisteq
10  following the forwarding of those letters?
11  A    Yes, I was.
12  Q    When was it that you stopped being paid
13  by Logisteq if at all?
14  A    I was stopped, I would say April of 2002, when
15  the company deceased.
16  Q    April 2002, Logisteq stopped doing
17  business?
18  A    Yes, deceased, stopped operations.
19      MR. VARN: We have gone past the time
20  we all agreed. Can we break? Pretty quick --
21      MR. EPSTEIN: Do it right now.
22      MR. VARN: I must say that I am
23  seriously contemplating over lunch making a call to
24  Judge Hamlin because it's abundantly clear to me
25  except for a stray handful of questions at the

101

1  beginning of this case that none of these lines of
2  inquiry have anything to do with the issues to be
3  tried before Judge Messina in the Middlesex County
4  case.
5      MR. EPSTEIN: And I disagree.
6      MR. VARN: Let me finish. I didn't
7  interrupt.
8      MR. EPSTEIN: I didn't know you weren't
9  finished. You stopped at end of sentence.
10      MR. VARN: I will let you know when
11  I've stopped. And it was never contemplated I can
12  tell you --
13      MR. EPSTEIN: I am going to object here
14  because I don't think this has to be on the record.
15      MR. VARN: Nothing today changes any
16  contemplation that Mr. Carr is not going to be
17  called as a witness in the Middlesex County cases.
18  So all of these ostensibly credible
19  justifications are pretty hollow for me and
20  basically canards. Pretty obviously going on is
21  your ongoing representation of Mr. Pierce's
22  interests in these matters. So I am going to
23  contemplate making that call. I thought I would
24  give you advance notification.
25      MR. EPSTEIN: Phone is right there, Mr.

102

1  Varn. I invite you to call Judge Hamlin. Whether
2  Mr. Carr gets called in the Middlesex cases is not
3  your decision. Could very well be our decision.
4      Very serious allegations have been made by Mr.
5  Carr against Sequedex, allegations that you have
6  used consistently in connection with the claims of
7  Iron Mountain against Sequedex.
8      There is no indication that he is not a
9  witness. Certainly he has been listed as a
10 potential witness throughout this matter, and I have
11 every right to both find out what he knows about all
12 of these issues relating to Mr. Pierce, Iron
13 Mountain, the motivations of Iron Mountain in
14 bringing these actions initially, the motivations of
15 Iron Mountain in relationship to Mr. Carr and the
16 motivations of Iron Mountain in context of Sequedex.
17     Every one of these questions goes to issues
18 that relate to all of the players and all of the
19 issues and each, in each one of these cases that
20 Iron Mountain has brought against us, and they
21 relate not only to those actions but also our
22 counterclaims, where Mr. Carr may play a very
23 important part in helping establish that. I think
24 that we need to explore these issues both as to his
25 background and credibility I have not done anything

103

1  here to protract the proceedings other than to make
2  this speech to counter your speech on the record.
3      MR. VARN: Why don't we agree to
4  disagree, but the transcript will speak for itself.
5      I can tell you from my, from Ironmountain's
6  point of view that should you not complete today, we
7  will resist spending any more time and money on this
8  exercise in these cases, which as far as I can tell
9  none of this examination has anything yet other than
10 a stray few questions at the beginning to do with
11 the issues to be tried before Judge Messina in
12 Brunswick.
13     MR. EPSTEIN: That is not your
14 determination.
15     MR. VARN: It is not, it is the judge's
16 determination. I am giving you fair warning where
17 we're going. So you're not surprised.
18     MR. EPSTEIN: Thank you for your
19 threat.
20     (Whereupon, a luncheon recess is taken
21 at 12:50 p.m.)
22     L U N C H E O N  R E C E S S
23     (Whereupon, the deposition is resumed
24 at 1:40 p.m.)
25 BY MR. EPSTEIN:

104

1  Q    After August 2002, who was in charge of
2  the day-to-day operations of the company Logisteq?
3  A    Michael DiIanni and Alan McGrafth.
4  Q    Did you have any overview or say in the
5  operations of the company during that period after
6  August 2002?
7      MR. PESLAK: Object to the form of the
8  question.
9  A    No.
10 Q    I'm sorry, 2001?
11 A    Oh.
12 Q    I correct my question. As to August
13 2001, you sat down with Mr. Pierce and you took on
14 the sales function?
15 A    Yes.
16 Q    You were no longer operating as the
17 chief operating office of Logisteq; is that correct?
18 A    Correct.
19 Q    Prior to that time you were operating
20 as the chief operating officer of Logisteq; is that
21 correct?
22 A    No, it's not correct.
23 Q    When did you cease operating as the or
24 functioning as the chief operating officer of
25 Logisteq?

105

1  A    I was never running as the chief operating
2  officer, I was running as president. Michael
3  DiIanni was running as the chief operating officer
4  since the acquisition.
5  Q    During the period of time from the time
6  of the acquisition by Pioneer Capital of 51 percent
7  of the share of the stock, were you kept abreast as
8  to the financial condition of Logisteq?
9  A    Yes.
10 Q    And in April of 2002, when the company
11 ceased operations, were you aware of its financial
12 condition?
13 A    Yes.
14 Q    Was the company at that time
15 financially capable of keeping its doors open?
16 A    Absolutely.
17     MR. PESLAK: Object to the form of
18 question, asked and answered.
19 Q    It was?
20 A    Yes, it was.
21 Q    It had sufficient Capital in the bank
22 to maintain its operations?
23 A    Yes.
24 Q    And from what source do you make that
25 statement?

IMP04563

106

1          MR. PESLAK: Object to the form of the
2    question.
3    A    We're talking to Al McGrafth and Mike DiIanni,
4    as Mike DiIanni says in his deposition that Art was
5    telling me about the end of the road, the light at
6    the end of the tunnel, all the coffee was starting
7    to come in, we were working at a profit. We just
8    secured Snapple, we just secured Wakefern, we
9    secured some very heavy volume accounts. So we were
10   finally coming to where we had that growth spur.
11        Q    Okay. Now I am going to ask you again
12   in terms of the amount of money in the bank, not
13   prospects, but the amount of money actually in the
14   bank at the time that the operation ceased in April
15   of 2002, was there sufficient monies available to
16   meet the cash flow needs of Logisteq?
17   A    Yes.
18        Q    On what basis do you make that
19   statement?
20   A    On looking at the financial and speaking with
21   Al McGrafth, who was in charge of the financial part
22   of the company.
23        Q    Okay. Al McGrafth told you in April of
24   2002, that there was sufficient monies in the
25   treasury of Logisteq and/or coming in through cash

107

1    flow to meet current obligations?
2    A    Absolutely.
3        Q    In context of this, did you take any
4    steps after 2002 when you were no longer an employee
5    of Logisteq to secure any of the business that had
6    been with Logisteq?
7    A    No, I did not.
8          MR. PESLAK: In the context of what?
9        Q    In the context of those circumstances?
10   A    No, matter of fact --
11        MR. PESLAK: Objecting to the form of
12   the question. It's vague and ambiguous. I do know
13   what circumstances you are talking about.
14        Q    Did you try to continue the the
15   business in April of 2002?
16   A    Yes, I did with Peter Pierce and Logisteq, I
17   would never want to close the business down, I
18   worked 12 hard years to continue it.
19        Q    That's not what I asked. After the
20   business ceased operations in 2002, did you try to
21   continue to work with the clients and the customers
22   of Logisteq to continue that trucking business and
23   that storage warehouse business?
24   A    No, I did not.
25        Q    Prior to August -- April of 2002, did

108

1    you take any steps to secure financing for Logisteq
2    and for your purchase of Logisteq other than going
3    to Mr. Schwarcz?
4    A    Yes I did.
5        Q    What other actions did you take to
6    secure financing for your purchase of the Pioneer
7    Capital share of Logisteq?
8    A    I went to private investors.
9        Q    When did you first go to any private
10   investors?
11   A    I would say September of 2002.
12        Q    What private investors did you go to in
13   September of 2002 or one?
14   A    2002.
15        Q    Okay. How about back after Mr.
16   Pierce --
17   A    Wait a minute, I'm sorry. Back that up.
18   September 2001 --
19        Q    Okay. September 2001 what private
20   investors did you go to?
21   A    I went to Schooner Capital. I went to Elliot
22   Bauer and Associates LLC. I went to Friendship
23   Realty, Inc. and Ventures. I went to CAC Leasing.
24        Q    Is that Mr. Schwarcz' company?
25   A    Yes, it is. I went to New England Motor

109

1    Freight, a person by the name of Jon Shevell. I
2    went to Peslak and Mandel to ask if they would have
3    any investors.
4        Q    Okay. Anybody else?
5    A    And I went to family members. And as of now,
6    that's all I can recall.
7        Q    In September of 2002, how many meetings
8    did you have with Elliot Bauer.
9          MR. VARN: Objection to form. You mean
10   2001?
11        Q    2001, in connection with the purchase
12   of the Pioneer Capital share of the business?
13   A    One meeting.
14        Q    Who did you meet with?
15   A    Elliot Bauer.
16        Q    How about Friendship Realty, who did
17   you meet with there?
18   A    Ben Kirsch. K-I-R-S-C-H.
19        Q    And where is Friendship Realty located?
20   A    In Howell, New Jersey.
21        Q    Howell?
22   A    Yes.
23        Q    How many meetings did you have with Mr.
24   Kirsch?
25   A    One.

110

1    Q    New England Motor Freight, what was the
2 gentleman's name Jon?
3    A    Jon Shevell, S-H-E-V-E-L-L.
4    Q    How many meetings with Mr. Shevell?
5    A    One meeting.
6    Q    Where is he located?
7    A    New England Motor Freight, Elizabeth, New
8 Jersey.
9    Q    Schooner Capital?
10   A    Yes.
11   Q    Where are they located?
12   A    They are located in Boston, Massachusetts,
13 Atlantic Avenue.
14   Q    How did you come to meet with Elliot
15 Bauer; how did you have that connection?
16   A    I went to my bank first, Washington State
17 Bank, and the president of the bank Abe Oppotute,
18 told me that there is no way in the world that they
19 would invest in trucking companies, but he had a
20 private investor who may be able to do something if
21 there was enough collateral and he introduced me to
22 Elliot Bauer.
23   Q    How about Friendship Realty, how did
24 you get there?
25   A    I got there from Elliot Bauer.  He told me he

111

1 was a big investor, multi, multi-millionaire.  He
2 buys projects.
3    Q    How about New England Motor Freight?
4    A    New England Motor Freight tried to purchase my
5 company back in 1994.  So I went to them on my own,
6 made a phone call to Jon Shevell, set up a meeting
7 with Jon and his logistics president for the truck
8 load division.
9    Q    And you had one meeting with him?
10   A    Yes.
11   Q    I assume that all three of those were
12 not interested in making an investment?
13   A    They had interest, but not for that kind of
14 money, not for $5 million.
15   Q    How about Schooner Capital, how did you
16 get in touch with Schooner Capital?
17   A    Picked up the phone, dialed their number.
18   Q    They are up in Boston, how do you know
19 to pick up a phone and dial their number?
20   A    Spoke to Gary Watzke --
21   Q    Gary Watzke --
22   A    -- of Iron Mountain.
23   Q    -- of Iron Mountain --
24   A    Yes.
25   Q    -- suggested Schooner Capital?

112

1    A    Yes.
2    Q    Did he give you the number of Schooner
3 Capital?
4    A    Yes, he did.
5    Q    Did he give you the name of the
6 individual at Schooner Capital with whom he
7 suggested you meet?
8    A    Yes, Vin Ryan.
9    Q    Had you had any meetings with Mr.
10 Watzke or Mr. Ryan or anyone else at Schooner
11 Capital or Iron Mountain prior to your being
12 directed there by Gary Watzke, face-to-face
13 meetings?
14   A    I'm sorry, what were the dates?
15   Q    In September of 2001, did you have a
16 face-to-face meeting with anybody from Iron Mountain
17 or Schooner Capital or Gary Watzke from Iron
18 Mountain or Schooner Capital in connection with any
19 of these matters prior to the time that you picked
20 up the phone and called Mr. Ryan?
21   A    Yes, I did.
22   Q    What meeting did you have prior to your
23 picking up the phone and calling Schooner Capital to
24 look for money?
25   A    Well, after the many terrible things that were

113

1 told to me about Iron Mountain, I had a little bit
2 of animosity towards myself and believed they were a
3 bunch of creeps for what they did to Peter that they
4 buy your company and a five months later they
5 terminate you.
6       So I wasn't too happy about that, and Peter
7 Pierce and Mike DiIanni were giving me a lot of
8 money to buy my company and join their team, I felt
9 Peter was a very highly respected man --
10   Q    I am going to cut you off, only to the
11 extent I have a question, and my question was in
12 September of 2001.  You said you picked up the phone
13 and called Schooner Capital, Vin Ryan at the
14 suggestion of Gary Watzke, and I asked you whether
15 or not you had a face-to-face meeting with Mr.
16 Watzke prior to your doing that and you said yes;
17 correct?
18   A    I had a meeting after the letter.
19   Q    I didn't ask about a letter, sir.  Mr.
20 Carr, please focus on my question.
21      In September of 2001, you advised me that you
22 approached Schooner Capital and Vin Ryan at the
23 suggestion of Gary Watzke to secure funding to
24 purchase Mr. -- Pioneer Capital's share of Logisteq;
25 correct?

114

1    A    Yes, sir correct.
2    Q    Okay. And I asked you prior to that
3  action of picking up the phone and calling up
4  Schooner Capital whether or not you had any
5  face-to-face meeting with Gary Watzke and you said
6  yes; is that correct?
7    A    Yes, that's correct.
8    Q    When did that face-to-face meeting take
9  place with Gary Watzke in relationship to your
10  meeting with Mr. Pierce about your indictment, how
11  soon after that?
12    A    I would say it was before October. So I'd say
13  sometime in September.
14    Q    So the first meeting with Gary was
15  sometime in September of 2001?
16    A    I'm not sure. It may have been sooner, but I
17  could find out the facts and let you know.
18    Q    Mr. Watzke --
19    A    Yes.
20    Q    -- to help you refresh your
21  recollection has claimed that the first meeting he
22  had he had with you was in October of --
23    A    In New Jersey, okay.
24    Q    -- in October of 2001?
25    A    Okay.

115

1    Q    Does that refresh your recollection as
2  to when your first meeting took place?
3    A    Thank you. Yes, it does.
4    Q    Okay. And where did that meeting take
5  place?
6    A    That meeting took place at the Hilton Hotel,
7  in East Brunswick, on Route 18.
8    Q    Who was present at that meeting?
9    A    I believe it was Tom Carr, Art Peslak, Gary
10  Watzke, Bob Miller, and I think Larry Varn.
11    Q    Who initiated that meeting?
12    A    I did.
13    Q    How did you initiate a meeting with
14  those individuals particularly Gary Watzke, Bob
15  Miller and Larry Varn?
16    A    Picked up the phone.
17    Q    Who did you call?
18    A    Gary Watzke.
19    Q    When you called up Mr. Watzke, had you
20  already talked to to initiate this meeting, had you
21  already talked to Mr. Pierce regarding his reaction
22  to your indictment?
23    A    No.
24    Q    You had not?
25    A    No.

116

1    Q    You initiated this meeting prior to
2  August of 2001?
3    A    I had a dialog going with Gary Watzke pretty
4  much all summer since the letter he sent us that we
5  were being evicted I kept in touch with Gary Watzke.
6    Q    I didn't ask you that, sir.
7        MR. PESLAK:  I think he wants you to
8  focus on after you meet with Peter and before you
9  talked to Gary the first time to set up this
10  meeting.
11    Q    In August of 2001, you met with Peter
12  after Mike DiIanni and you told him that you had
13  been indicted, and at that meeting it was resolved
14  that you would remain as the titular president of
15  Logisteq, but that you would undertake a sales
16  function; correct?
17        MR. VARN:  Objection as to form.
18    A    This is correct.
19    Q    After that meeting, I asked whether or
20  not you had a face-to-face meeting with Mr. Watzke,
21  and you told me that the first face-to-face meeting
22  that you had with Mr. Watzke was on or about October
23  17, 2001; correct, in East Brunswick at the Hilton
24  Hotel?
25    A    Yes, sir, correct.

117

1    Q    And I asked you how was that meeting
2  set up, who's initiative was it that set up that
3  meeting and you said mine?
4    A    Correct.
5    Q    And you said I picked up the phone?
6    A    This is true.
7    Q    What triggered your picking up the
8  phone and asking Gary Watzke to meet with you in
9  East Brunswick at the Hilton Hotel.
10    A    I felt that they would have enough money to
11  finance my part of the 49 percent of the company.
12    Q    Okay. So you were looking to Iron
13  Mountain and specifically your contact at Iron
14  Mountain Gary Watzke to finance your purchase of the
15  company?
16    A    Yes.
17    Q    Now, when you made this appointment to
18  see Mr. Watzke about this, you brought along your
19  attorney; correct --
20    A    Yes, I did.
21    Q    -- to this meeting? Were you aware
22  that Mr. Miller was going to be there?
23    A    No, I was not.
24    Q    Were you aware that attorney Larry Varn
25  who sits at this table was going to be there?

118

1    A    Yes, I was.
2    Q    Who told you Larry Varn was going to be
3    present at this meeting?
4    A    Gary Watzke.
5    Q    And what did Gary Watzke tell you about
6    Larry Varn being present at this meeting?
7    A    He told me that Larry Varn represents Iron
8    Mountain as their counsel.
9    Q    Did you think that his representation
10   would be involving the purchase of or the financing
11   of the purchase for the remainder of Logisteq?
12   A    Absolutely, it was with Pierce Layhey.
13   Q    What do you mean it was with Pierce
14   Layhey?
15   A    Larry Varn had involvement in negotiations in
16   in closing on Pierce Layhey.
17   Q    Did you know that at the time?
18   A    Yes, I did.
19   Q    Had you ever met Larry Varn?
20   A    No, I hadn't.
21   Q    How did you know that Mr. Varn was
22   involved in the closings regarding Pierce Layhey?
23   A    Gary Watzke advised me that Mr. Varn has a big
24   say to what deals they go through and what deals
25   they don't acquire.

119

1    Q    Okay.  When you got to East Brunswick
2    at this meeting, this first meeting with Gary Watzke
3    that was the first time that you had meet Gary
4    Watzke face-to-face; correct?
5    A    Correct.
6    Q    You had never met him before?
7    A    No, I had not.
8    Q    And you hadn't met Larry Varn before
9    that time?
10   A    No, sir.
11   Q    Had you met with Bob Miller prior to
12   that time?
13   A    No, I had not.
14   Q    Had Mr. Peslak had any conversations
15   with any of those individuals to your knowledge?
16   A    No, he did not.
17   Q    When you went to this meeting, did you
18   bring with you any documentation?
19   A    No, I did not.
20   Q    At this meeting at the Hilton Hotel in
21   East Brunswick, when you got introduced to Mr.
22   Miller, what were you told his function was with
23   Iron Mountain?
24   A    I was told that Mr., Bob Miller is the
25   president of Iron Mountain.

120

1    Q    Now, when you went to this meeting at
2    the Hilton, what did you talk about with these
3    individuals?
4    A    Basically a summary of the time in my business
5    from July 2000 to present, what kind of activities
6    were going on, and that I was unhappy, and I was
7    looking for financing to buy my partner out, and I
8    had a wonderful opportunity for an investment
9    company to come in and merge three major coffee
10   companies together and basically have a monopoly in
11   the coffee market.
12        MR. EPSTEIN:  I have to get this.  Off
13   the record.
14        (Whereupon, a discussion is held off
15   the record.)
16        Q    How long did the meeting at the Hilton
17   Hotel take with all of the people that you have
18   identified?
19   A    Approximately two hours.
20   Q    Did you take any notes at that meeting?
21   A    No, I did not.
22   Q    Did you advise the people at that
23   meeting that, of your status with regard to the
24   company, that is that Mr. Pierce had asked you to
25   step back because of your indictment?

121

1    A    I never told anybody from Iron Mountain or
2    their outside counsel anything about any indictment.
3    Q    At that meeting?
4    A    Nor any other meeting.  It was a complete
5    surprise to Iron Mountain.
6    Q    Well, eventually they found out, didn't
7    they?
8    A    Well, I was hoping the case would be resolved
9    by then.
10   Q    Eventually they found out?
11   A    Yes, they did.  I believe from Cozzen and
12   O'Connor.
13   Q    Regardless of how they found out, they
14   found out?
15   A    Yes, they did.
16   Q    But at that meeting, and I would like
17   to take it one step at a time --
18   A    Sure.
19   Q    At that particular meeting, is it true
20   that they weren't aware of the indictment?
21   A    That is true.
22   Q    Now, when you left the meeting, I'm
23   sorry.  Before you left the meeting and during that
24   meeting, did you have any discussions with any of
25   the individuals at that meeting regarding pending

122

1  litigation with or against Sequedex?
2  A   None whatsoever.
3      Q   Did you have any discussions regarding
4  any litigation with or against Peter Pierce?
5  A   No, I did not.
6      Q   When was the next time that you had any
7  meeting with any individual from Iron Mountain or
8  any of the people who were involved in that first
9  meeting at the Hilton Hotel?
10 A   Within the short time period I was invited to
11 come up to Boston and I drove up to Schooner Capital
12 in Boston.
13     Q   Okay. Do you know how short of a time
14 period after the middle of October it was that you
15 went up to Schooner Capital; was it a week, two
16 weeks, two months, a year?
17 A   I am going to say within a two-month period.
18     Q   Okay. Some of the people who have
19 testified in this case have identified that meeting
20 in Boston on or about December 10, 19 -- I'm sorry,
21 2001.
22     MR. VARN: Objection. I don't believe
23 there's been any cases in these cases about that
24 meeting at all. There certainly has even been in
25 other cases.

123

1      Q   Some of the people who have been
2  deposed, and I didn't say which case, but some of
3  the people in connection with these meetings who
4  have been deposed have testified that the meeting
5  took place sometime in, sometime in the day of
6  December 10, does that accord with your
7  recollection?
8  A   Yes, that's about the time frame.
9      Q   In connection with these matters, how
10 did it come about that you went to Boston on
11 December 10 to meet with Schooner Capital?
12 A   Gary Watzke told me that Iron Mountain
13 themselves would really have no interest in
14 purchasing Logisteq or doing a roll up of coffee
15 companies, but they did tell me that Vin Ryan of
16 Schooner Capital would look at this investment and
17 talk to me about it.
18     Q   When did Gary Watzke state that Iron
19 Mountain would have no interest in providing you
20 with financing?
21 A   During the meeting at the Hilton.
22     Q   Who called you or did you call them in
23 terms of setting up this meeting at Schooner?
24 A   I called and asked for Vin Ryan, received his
25 secretary on the phone.

124

1      Q   And when did you do that?
2  A   Within a week of meeting with Gary Watzke at
3  the Hilton.
4      Q   And what happened as a result of your
5  call one week after?
6  A   Secretary told me he's very busy, he's
7  traveling and I left a message that Gary Watzke told
8  me to give him a call to set up an appointment with
9  him and would he please call me back to set up a
10 day.
11     Q   Okay. Did he?
12 A   Yes, he did.
13     Q   When?
14 A   Oh, gosh probably about two weeks after that,
15 and, actually, it wasn't Vin Ryan. It was his
16 secretary who called me to schedule the appointment.
17     Q   Did she schedule the appointment for
18 12/10?
19 A   Yes.
20     Q   At that meeting in Boston where did it
21 take place?
22 A   It took place at Schooner Capital, Atlantic
23 Avenue, Boston Massachusetts.
24     Q   And who was present?
25 A   Jon Kenny, Tom Carr, Vin Ryan, and Vin Ryan's

125

1  president of Schooner Capital, she's a young woman,
2  and I forgot her name.
3      Q   What did you talk about?
4  A   Talked about purchasing the 51 percent of
5  Logisteq and negotiating the deal to purchase three
6  huge coffee companies and merging them all into one.
7      Q   What else did you talk about that day?
8  A   That day, Jon Kenny asked me to summarize what
9  I've told Gary Watzke and Larry Varn at the Hilton.
10     Q   Told them about what?
11 A   The shenanigans that were taking place in
12 Freehold, New Jersey.
13     Q   Well, earlier you told me that you only
14 were talking about the subject of the business.
15 What shenanigans did you tell Larry Varn and Gary
16 Watzke about at the Hilton meeting in October?
17     MR. VARN: Objection as to form,
18 to the preface.
19 A   Okay. Now, I must ask you this. When I go to
20 elaborate, you cut me short, and you want me to
21 answer one word answer.
22     Q   I didn't cut you short at all, sir.
23 Only if you didn't answer my question.
24 A   Okay.
25     Q   If you answer my question, I won't cut

126

1  you short.
2  A    Well, I need to elaborate on this.
3    Q    What shenanigans did you tell, I don't
4  want any background on it. I just want to know what
5  you related to Mr. Varn and to Mr. Watzke that you
6  believed were shenanigans occurring in Freehold?
7  A    I believed that Mike DiIanni and Michael Gold
8  and Peter were involved with Sequedex and that Mike
9  DiIanni was Peters right-hand man and doing nothing
10  but making problems for Peter, and, unfortunately,
11  Peter took Michael's side and believed Mike DiIanni
12  instead of me.
13    Q    Okay. Now, Peter Pierce, Mike Gold and
14  Mike DiIanni were involved in Sequedex?
15  A    This is true.
16    Q    Okay. Did you have -- when you say
17  "involved with," in what way were you indicating
18  they were involved with Sequedex? Mr. Gold was
19  employed by Sequedex, was he not?
20  A    Yes, he was.
21    Q    Okay. And Mr. DiIanni was employed by
22  Logisteq; is that correct?
23  A    Yes.
24    Q    Mr. Pierce was not employed by either
25  one of those entities; is that correct?

127

1  A    I believe so.
2    Q    In what way was Mike DiIanni involved
3  with Sequedex that, as you related it to Larry Varn
4  and Gary Watzke in that first meeting on October 17,
5  2001?
6  A    I told Gary Watzke and Larry Varn that Mike
7  DiIanni had met with me in July and told me that he
8  was very upset and angry at the Iron Mountain people
9  because they really scammed Peter at -- it should
10  have been Sequedex, I'm sorry, it should have been
11  Pierce Layhey, who should have really purchased Iron
12  Mountain, but Peter believed in Iron Mountain and
13  believed in Richard Reese and on a handshake was
14  told he would be the president of Iron Mountain.
15    After learning everything they can possibly
16  learn about Pierce Layhey, they then terminated
17  Peter, they demoted half of the Pierce Layhey
18  employment, employees and took salaries away from
19  some of the Pierce Layhey employees.
20    Q    This is all information that Mike
21  DiIanni told you?
22  A    Yes, correct.
23    Q    Okay.
24    MR. VARN: Objection. Do you want to
25  let him finish the last question.

128

1    MR. EPSTEIN: No. He never answered my
2  last question. I just wanted to clarify something.
3  Please stop telling me to how to take this
4  deposition, Mr. Varn. I'm doing a very good job.
5    Q    Mr. Carr, with regard to --
6    MR. EPSTEIN: Aside from being
7  sophomoric and unprofessional, that is rude.
8    Q    Mr. Carr, with regard to the
9  information that was information Mike DiIanni told
10  you?
11  A    Right.
12    Q    My question was --
13  A    Yes.
14    Q    -- what shenanigans did you advise Mr.
15  Varn and Mr. Watzke about when you met with them in
16  October of 2001?
17    MR. VARN: Objection.
18  A    I'm telling you, but I need to get to the
19  point. This is everything I'm telling him which I'm
20  telling you. So after telling him that Mike DiIanni
21  explained that to me, and that they were very upset
22  with what went on between Iron Mountain and Pierce
23  Layhey, Mike DiIanni then did many different things
24  to upset Iron Mountain, and one of those things were
25  when he and this fellow by the name of Jim Montague

129

1  had some words and after that Iron Mountain called
2  me, sent me a letter saying that Mike DiIanni would
3  not be allowed on the property.
4    And from that time on, I gave that letter to
5  Al McGrafth and I met with Peter, than I says,
6  Peter, whatever is going on here, you need to
7  somewhat control Mike, because his anger is really
8  blown up into a bombshell, and I explained that Mike
9  DiIanni was involved with Sequedex as far as finding
10  buildings for them, setting up racking, having
11  people on our payroll and many more things. If you
12  want me to continue, I will.
13    Q    Well, let's start with the finding
14  buildings.
15  A    Yes.
16    Q    Did you tell Mr. Varn and Mr. Watzke
17  what buildings Mike DiIanni in September of 2001 had
18  found for Sequedex?
19  A    Yes, I did.
20    Q    What buildings did you tell them that
21  he had found for Sequedex?
22  A    I told Larry Varn and Gary Watzke that Mike
23  DiIanni and I, Mike DiIanni and I and Peter Pierce
24  went to the Anchor Glass building, and the reason
25  that building was so attractive is, number one, the

130

1  price of the building and, number two, that Sequedex
2  needed to find a building of that size to grow into
3  for record storage.
4      Then we met with Mike Gold, Peter Pierce, Tom
5  Carr, Mike DiIanni, Tony Hayden, Mike Gold and
6  Matthew Aiello, who is the coffee manager in Miami,
7  and we looked at the Uptons building, which was
8  going to be shared between Logisteq and Sequedex.
9      Q    Okay. Now, Logisteq was looking for
10 new quarters, were they not?
11 A    Yes, sir, they were.
12     Q    And at the time do you know whether or
13 not Sequedex was looking for quarters in the
14 Freehold area?
15 A    Yes, they were.
16     Q    And Mike Gold during those excursions
17 was representing Sequedex, was he not?
18 A    Yes, he was.
19     Q    Continue on. What other buildings
20 aside from those two did Mike DiIanni aid in finding
21 for Sequedex?
22 A    The third building he aided to find for
23 Sequedex was the building on 1900 Route, State
24 Highway 9, in Miami, which was 100,000 square feet.
25 And that building was going to be used for both

131

1  Logisteq with coffee and a start-up operation with
2  Sequedex.
3      Q    Again, did Mr. DiIanni work with Mr.
4  Gold in context of finding space that the two
5  companies could share?
6  A    Yes, he did.
7      Q    And was Mr. Gold present during those
8  processes, that is what was he present to
9  investigate these matters on behalf of Sequedex?
10 A    Yes, he was.
11     Q    What other buildings did you relate to
12 Mr. Varn were explored by Mike DiIanni in
13 conjunction with Mr. Gold at Sequedex?
14 A    No other buildings.
15     Q    At the time that they were making that
16 exploration was Sequedex doing business at all with
17 Logisteq?
18         MR. PESLAK:  Object to the form of the
19 question.
20 A    No, they were not.
21     Q    There was no business between Mr. Gold
22 and Mr. -- and Logisteq of any type?
23 A    They weren't open yet. They didn't open until
24 I believe January of 2001.
25     Q    Okay. I thought you were talking about

132

1  2001?
2  A    We're talking about 2000 -- no, we're talking
3  about 2000.
4      Q    Okay. So all of this exploration in
5  terms of these matters were at a time when Mr. Gold
6  representing Sequedex was looking for warehousing
7  facilities --
8  A    Correct.
9      Q    -- in the area?
10 A    Yes.
11     Q    Do you know whether or not there was
12 any discussions between Mr. Gold and Mr. DiIanni
13 regarding working with Sequedex, working with
14 Logisteq after it opened its doors?
15 A    Yes, there was.
16     Q    There was. And Mr. DiIanni was
17 representing Logisteq in this regard?
18 A    Yes.
19     Q    And Mr. Gold was representing Sequedex?
20 A    Correct.
21     Q    Were there ever in the future after
22 those initial meetings in 2000, was there a
23 formalization, that is, was there in fact a
24 relationship between Sequedex and Logisteq in terms
25 of doing business with each other?

133

1  A    Yes.
2         MR. PESLAK:  Object to the form of the
3  question.
4      Q    Now, what other buildings do you recall
5  other than those three in 2000?
6  A    That was it.
7      Q    Okay. Now, you also said something
8  about sharing an employee, was that in the year
9  2000?
10 A    Yes, it was.
11         MR. VARN:  Objection to form.
12     Q    What employees in the year 2000 did
13 Sequedex and Logisteq share?
14 A    We shared Mark Haslon.
15     Q    Do you know when Mr. Haslon came to
16 work for either Logisteq or Sequedex?
17 A    I am going to say in the area of September
18 2000 maybe October 2000.
19     Q    Came to work for which company?
20 A    Logisteq, TC Transport.
21     Q    And what did Mr. Haslon do at Logisteq?
22 A    When Mr. Haslon was hired by Mike DiIanni in
23 September of 2000, Mr. Haslon came into help us
24 create a Web page, also he put together a brochure
25 for us, and he tried to implement some new ideas in

134

1  the warehouse.
2      Q    What was Mr. Haslon's background in the
3  warehousing and/or box storage business?
4      A   Mr. Haslon's background was I believe a
5  facilities manager, an operations manager at Pierce
6  Layhey/Iron Mountain.
7      Q    Okay. So he was somebody that Mr.
8  DiIanni was aware of or new prior to the time that
9  you hired him at Logisteq?
10     A    Yes.
11     Q    Okay. And did he in fact help create a
12  new Web page?
13     A    Yes, he did.
14     Q    And did he in fact help do the things
15  that you spoke of, including some of the logistics
16  and some of the work on operations?
17     A    Yes, he did. He was very professional.
18     Q    With regard to Mr. Haslon, were there
19  other individuals who came to work for Logisteq
20  during the year 2000 that you referred to when you
21  spoke to Mr. Varn and Mr. Watzke at that first
22  meeting at the Hilton Hotel?
23     A    Yes.
24     Q    Who?
25     A    Sandra Cole,

135

1      Q    Who was Sandra Cole?
2      A    Sandra Cole was an X Iron Mountain Pierce
3  Layhey employee.
4      Q    Okay. And what did she do at Logisteq?
5      A    Sandra, at Logisteq what she did for Logisteq
6  was basically set up files and try to implement a
7  handbook for the company.
8      Q    Was she a full-time employee or a
9  consultant at first at Logisteq?
10     A    She was a full-time employee.
11     Q    Okay. And how long did she work at
12  Logisteq?
13     A    I believe Sandra Cole I would say started
14  somewhere in the time length of September, October
15  and had left to go to Sequedex full-time in I would
16  say September of 2001 or maybe earlier.
17     Q    What other employees were at Logisteq
18  that you spoke to Mr. Varn or Mr. Watzke about?
19     A    Ettel.
20     Q    By the way did Sandra Cole set up files
21  for Logisteq?
22     A    Yes, she did.
23     Q    And did she implement the handbook that
24  you spoke of?
25     A    Yes, she did.

136

1      Q    Ms. Cole had background in customer
2  relations and general operations of warehousing type
3  businesses, did she not?
4      A    Yes, she did.
5      Q    Who else came to work at Logisteq?
6      A    Ettel.
7      Q    Yes. That's E-T-T-E-L --
8      A    Yes.
9      Q    -- Ricketts?
10     A    Yes.
11     Q    What did Ms. Ricketts do at Logisteq?
12     A    Ms. Ricketts and Sandra helped coordinate a
13  better system of filing and tried to add some
14  infrastructure to the company.
15     Along with that, they set up a collections
16  department to help get our receivables in a 30-day
17  pay period.
18     Q    And during that period of time did she
19  actually perform those duties that she was a board
20  with Logisteq?
21         MR. VARN: Objection as to form. I
22  don't know what that period of time refers to.
23     Q    From the time when did she come aboard?
24     A    I am going to say about the same time Mark and
25  Sandra came.

137

1      Q    When did she leave?
2      A    Possible, approximately the same time.
3      Q    She stayed on until approximately 9/01?
4      A    I am going to say a little earlier, maybe
5  mid-summer.
6      Q    July or August?
7      A    Yes.
8      Q    Of '01?
9      A    Yes.
10     Q    During that period of time, from the
11  time that she came aboard in approximately October
12  until she left in approximately July or August of
13  '01, did she perform the jobs that you have just
14  described for Logisteq?
15     A    Yes, she did.
16     Q    And did she do that at Logisteq, did
17  actually do that work at Logisteq's headquarters?
18     A    She did at Logisteq's headquarters.
19     Q    How about Sandra Cole, did she actually
20  work at the headquarters of Logisteq?
21     A    Yes, she did.
22     Q    How about Mr. Haslon, did he work at
23  the headquarters of Logisteq?
24     A    Yes, he did.
25     Q    Anybody else?

138

1    A   Yes.
2    Q   Who?
3    A   There was Alan McGrafth.
4    Q   He had been a former Iron Mountain
5  Pierce Layhey employee?
6    A   Yes.
7    Q   What was Mr. McGrafth's job at
8  Logisteq?
9    A   Mr. Alan McGrafth was an asset for Logisteq..
10  He was very creative and very smart, a financial
11  person.  He put together a financial program and
12  basically set up infrastructure in the company and
13  he ran day-to-day operations.
14    Q   When did he come aboard?
15    A   He came along I believe August of 2000.
16    Q   How long did they stay aboard with
17  Logisteq?
18    A   Until the end of the closing of the company.
19    Q   Until April of 2002?
20    A   Yes.
21    Q   And during that period of time, did he
22  perform his functions for Logisteq as an employee?
23    A   All of the employees I just named had
24  performed their duties at Logisteq along with
25  helping out duties for Sequedex.

139

1    Q   Now, during that same period of time --
2    A   Yes.
3    Q   -- and after Sequedex was up and
4  running, Sequedex was a client or customer of
5  Logisteq, was it not?
6    A   It was not a client until they moved into
7  Cranbury.  I believe that was January of 2001.
8    Q   Okay.  So after this period from
9  October 2000, January 2001 but after January 2001,
10  Logisteq serviced Sequedex?
11    A   This is true.
12    Q   And Sequedex paid to Logisteq monies
13  for those services?
14    A   Yes I, believe we billed Sequedex for those
15  services.
16    Q   Do you have any reason to believe that
17  those billings weren't at true market rate?
18    A   They weren't at true market rate, no.
19    Q   How do you know that?
20    A   Because I am the one who made the rates up.
21    Q   Okay.  And when you made the rates up,
22  why did you give it to them for less than market
23  rate, if that's the case?
24    A   I didn't.  I asked for a fee of $350 per truck
25  loads, and I believe Mike DiIanni said we're going

140

1  to do it for $200 a truck load.  So I just okayed
2  it.
3    Q   Do you know whether or not there was
4  any negotiation regarding Sequedex and Logisteq
5  regarding the rate charged to Sequedex with Mr.
6  DiIanni?
7    A   Michael DiIanni and his tribe had constant
8  involvement with Sequedex.  So, yes, I would believe
9  that they had negotiations on what to charge.
10    Q   Do you know what it was that Sequedex
11  demonstrated it could get for those same services or
12  secure those same services for out in the open
13  marketplace; were you directly involved in those
14  negotiations with Sequedex?
15    A   No, I was not.  Mike DiIanni handled that.
16    Q   Okay.  Now, after Sequedex came into
17  the fold of being a customer of Logisteq --
18    A   Yes.
19    Q   -- what services did you see Sandra
20  Cole perform for Sequedex?
21    A   Sandra Cole -- can we talk about Sandra, Mark
22  and Ettel together, as one group or are we
23  talking --
24    Q   No.
25    A   -- one individual.

141

1    Q   I wanted to know what Sandra Cole, that
2  you personally observed Sandra Cole do for Sequedex?
3    A   I observed Sandra Cole in any conference room
4  working on a brochure and a marketing material to
5  sell for Sequedex, and then had asked me to
6  introduce my customers to her and Mark Haslon to
7  secure accounts for Sequedex.
8    Q   At that time Sequedex was a client of
9  yours, correct, customer of yours?
10    A   Correct.
11    Q   At that time, during that time period,
12  from October 2000 -- I'm sorry, January 2001, until
13  they left, did Sequedex remain a customer of
14  Logisteq throughout?
15    A   Yes, they did.
16    Q   Was Iron Mountain a customer of
17  Logisteq during that same period of time, 2001, that
18  is January through October of 2001?
19    A   Yes, yes, they were.
20    Q   What did you see Ettel Ricketts do for
21  Sequedex?  By the way, was there anything else that
22  Sandra Cole did other than work on a brochure or ask
23  your help to get customers for Sequedex?
24    A   She had actually gone to appointments with me
25  with Mark Haslon to notify the customers, say she

142

1  was a representative of Sequedex, that she's here to
2  secure them business and could give them a very good
3  service at a very competitive price.
4      Q    Which customers did she accompany you
5  to, to say those things that she was a direct
6  representative of Sequedex?
7  A   L'oreal Cosmetics.
8      Q    Where?
9  A   In Dayton, New Jersey.
10     Q    Who did you talk to there?
11 A   Ralph Folks.
12     Q    And who else?
13 A   Michael Chazen, an attorney.
14     Q    Where?
15 A   Freehold, New Jersey.
16     Q    Okay. Who else?
17 A   Howard Mazure.
18     Q    Where?
19 A   Freehold, New Jersey.
20     Q    What is his business?
21 A   He's an attorney also.
22     Q    Who else?
23 A   Honeywell.
24     Q    Where?
25 A   Freehold, New Jersey.

143

1      Q    Who did you talk to?
2  A   I spoke to a Gabriel Daily.
3      Q    Did you talk to, who did Sandra Cole
4  represent herself to be a representative of Sequedex
5  to, all these three people?
6  A   Yes.
7      Q    Okay. Now, at Honeywell, Gabriel --
8  A   Daily.
9      Q    Okay. Who else?
10 A   That's all I can think of. I did give her a
11 list of my current customer list though, so she
12 could make sales calls on.
13     Q    Did you personally observe her making
14 any sales calls on individuals as a representative
15 of Sequedex during the period January 2001 to
16 October 2001?
17 A   Yes, I did. I was there. I was with her.
18     Q    Who other than these four?
19 A   Those four people.
20     Q    Okay. Anybody else?
21 A   I don't recall.
22     Q    Okay. With regard to Ettel Ricketts --
23 by the way, does Sandra Cole do anything else other
24 than those things that you just told us, work on a
25 brochure, ask you to get help for customers and went

144

1  on appointments as a representative of Sequedex?
2  A   No, but many times I was in the office, and we
3  received calls from Sequedex to Sandra, Mark and
4  Ettel, and then they would leave at different times
5  to say, listen, I'm going over to Cranbury to
6  Sequedex, if there is any messages, give me a call
7  over there.
8      Q    Okay. Did individuals from Logisteq
9  ever visit the facility at Cranbury, its customer
10 Sequedex, did you?
11 A   Yes, I did.
12     Q    And did you do that as a representative
13 of Logisteq?
14 A   Yes, I did.
15     Q    You weren't working for Sequedex when
16 you went to visit your customer Sequedex, were you?
17 A   No, I was not.
18     Q    Were you personally with Sandra Cole at
19 Cranbury at any time?
20 A   Yes.
21     Q    When?
22 A   Once. I am going to say July of 2001.
23     Q    And what context were you with Sandra
24 Cole at Sequedex?
25 A   Mike DiIanni had asked me to go to lunch with

145

1  him and then go over to visit Mike Gold at Sequedex
2  in Cranbury, and when Mike and I arrived Mark
3  Haslon, Sandra and Mike Gold were in the office
4  talking.
5      Q    They were just talking?
6  A   Yes.
7      Q    These are people that had previously
8  worked together at Iron Mountain?
9  A   Yes.
10     Q    And this was lunchtime?
11 A   Yes, it was.
12     Q    Any other time you saw Sandra Cole at
13 Sequedex?
14 A   No.
15     Q    Ettel Ricketts --
16 A   Yes.
17     Q    Is that the full extent of things you
18 saw with Sandra Cole do for Sequedex?
19 A   Yes.
20     Q    Ettel Ricketts, what did you see her do
21 for Sequedex while she was an employee of Logisteq?
22 A   Well, she was an employee of Logisteq, she was
23 setting up new policies, and she was working with a
24 fellow by the name of Price an IT fellow, to set up
25 their computer system.

146

1      And since it wasn't until I believe after
2   January of 2001, that Mike Gold had no place to go
3   because the negotiations on the Anchor Glass
4   building weren't going in the right direction. So
5   he had to get a temporary location.
6      So they would sit in our conference table, in
7   our conference room table with Mark Haslon and Ettel
8   and Price and Mike DiIanni and I and Alan, and we
9   would all be discussing the future growth of
10  Sequedex and marketing plans and different
11  customers.
12     Q     You sat in on it, too; is that correct?
13  A     Yes, I did correct.
14     Q     And this was Mike Gold's sharing with
15  you his future as the head of Sequedex?
16  A     No, I did not --
17        MR. VARN:  Objection.
18  A     I did not say that.
19     Q     Okay.  Mike Gold was there sharing with
20  you information as to Sequedex?
21  A     No.
22     Q     He wasn't?
23  A     No.
24     Q     Mike Gold wasn't there?
25  A     Mike Gold was not at that meeting.

147

1      Q     So it was just everybody else you said,
2   Sandra Cole?
3   A     Mike DiIanni.
4      Q     Mike DiIanni?
5   A     Tom Carr, Alan McGrath, Sandra, Ettel and
6   Mark Haslon and Price, who was their IT guy.
7      Q     Okay.  And how many meetings did you
8   have at Logisteq with those individuals talking
9   about Sequedex?
10  A     Numerous meetings.
11     Q     How much is numerous, more than 10?
12  A     10, 20.
13     Q     And you had 20 meetings, how long did
14  those meetings last?
15  A     Anywhere from 10 minutes to an hour and a
16  half.
17     Q     Over what period of time?
18  A     From a period of October 2000 to, I would say,
19  up until about May of 2001.
20     But the real involvement was October,
21  November, December, January, that was when I was
22  heavily involved in meetings.
23     Q     So you say that there were
24  approximately 10 to 20 meetings between October and
25  January, between those individuals that lasted

148

1   anywhere from 10 minutes to two and a half hours
2   where they spoke about Sequedex; correct?
3   A     Yes, correct.
4      Q     During that period of time, were they
5   also carrying out their duties for Logisteq?
6   A     Yes, they were.
7      Q     And during that period of time, do you
8   know whether or not they were meeting with Michael
9   Gold; was he at those meetings?
10  A     The only meeting Mike Gold was at, Mike Gold
11  showed up at Freehold twice and sat down with the
12  group and spoke, which I have all the witnesses in
13  my office to verify that.  Mike Gold met with me in
14  Miami to discuss the set up of the Miami facility.
15     Q     Okay.
16  A     And Mike Gold met with me and Mark Haslon and
17  Peter Pierce at the Anchor Glass facility when the
18  construction team came in to do a layout of the
19  head, corporate offices for Sequedex.
20     Q     Okay.  And he was going to be one of
21  the tenants in that facility; correct?
22  A     This is correct.
23     Q     And that's why he was meeting with you,
24  he was looking for space to put his business?
25  A     Yes.

149

1        MR. VARN:  Objection.
2      Q     With regard to that, did you ever see
3   Mike Gold or any other officer of Sequedex at
4   Logisteq headquarters meeting with these
5   individuals?
6        MR. VARN:  Objection.
7   A     I only saw Mike Gold come to Freehold twice to
8   meet with those people, yes.
9      Q     Did you ever see any other officers of
10  Sequedex that you know of come to Logisteq and talk
11  with those four people?
12  A     Besides Peter Pierce, I've never seen any of
13  the other fellows who were involved with Mike Gold.
14     Q     Did you ever see Fred Mathewson at the
15  Logisteq facility?
16  A     No, I did not.
17     Q     Did you ever see Jeffrey Melnick at the
18  Logisteq facility?
19  A     No, I did not.
20     Q     Now, during the time, and I didn't ask
21  you about this, about Sandra Cole; during the time
22  that she was at these meetings with Ettel Ricketts,
23  the rest of the day -- the rest of the time that she
24  was employed at Logisteq, she did her job for
25  Logisteq correct?

150

1  A   This is true.
2      Q   Do you know whether or not from your
3  own personal knowledge whether any of those
4  individuals had ever been compensated by Sequedex
5  during that same period of time October 2000 to
6  October 2001?
7  A   No, they would be -- I don't know that, but
8  they were being paid by Logisteq payroll.
9      Q   Do you know whether or not they were
10 ever paid by anybody at Sequedex on any basis --
11 A   No, I have --
12     Q   -- whether it be contract or a payroll
13 or anything else?
14 A   If they were, I have no knowledge of that.
15     Q   Do you have any knowledge as to whether
16 or not Mr. Haslon was ever paid for any actions that
17 he might have done by Sequedex during that same
18 period of time?
19 A   I would, again, I would not have that
20 knowledge.
21     Q   And how about this fellow Price, is
22 that Price Brennan?
23 A   Yes, it is.
24     Q   Was he being paid by Logisteq to do
25 something with their computer?

151

1  A   No, he was not, he was being paid for doing a
2  project for Sequedex, but I do not know by whom.
3      Q   Okay. And why was he at Logisteq at
4  the time?
5  A   At the time, Mike Gold didn't have an office
6  set up yet, and they were using our office as their
7  office, and everything, meetings with the Sequedex
8  people and then when Cranbury finally opened a few
9  months later, everybody relocated.
10     Q   Was it Mr. Brennan who was having
11 meetings with these various people at various times?
12 A   No, actually each meeting was different.  It
13 was depending on which meeting.  Mark Haslon usually
14 would head up the meetings.
15     Q   Were you present at these meetings?
16 A   Yes, I was.
17     Q   Did you ever object to these meetings?
18 A   No, I did not.
19     Q   Did you ever say anything to anybody
20 about the propriety of having a meeting about a
21 situation on Logisteq property?
22 A   No, because I was part of the group.  I was
23 well informed and, well, a part of what was going
24 on, and I had no objection to it at that time.
25     Q   Did you have any discussions with any

152

1  of these individuals that it was inappropriate to
2  help your customer Sequedex in any way, in any
3  fashion?
4  A   No, I did not.
5      Q   In terms of Logisteq --
6  A   Yes.
7      Q   -- that is logistical meetings with
8  customers --
9  A   Yes, sir.
10     Q   -- as an executive of a trucking
11 company, do you often have meetings involving the
12 logistical needs of customers?
13 A   Yes, I do.
14     Q   Did you have such meetings with Iron
15 Mountain from time to time, for example?
16 A   Yes.
17     Q   Did you go to their place of business
18 and have those meetings with them as to how they can
19 best improve their operations?
20 A   Yes, I did.
21     Q   And did just you participate in those
22 meetings, or did other people from Logisteq also
23 participate?
24 A   Other people from Logisteq also participated.
25     Q   So you would go to other customers and

153

1  deal with them as to their other logistical problems
2  in terms of moving things from one place to another?
3  A   Yes, I would.
4      Q   And that would include their
5  warehousing needs as well, wouldn't it?
6  A   Yes, it would.
7      Q   And you would make suggestions as an
8  employee of Logisteq as to how they can best improve
9  those things?
10 A   Yes.
11     Q   Would those meetings sometimes be short
12 meetings?
13 A   Depending on the customer and depending on the
14 needs, it could be a 15-minute meeting; it could be
15 a three-hour meeting.
16     Q   And that would happen, that happened
17 throughout your career as a trucking executive and a
18 person administrator?
19 A   Yes, it has.
20     Q   Now, were there any other persons who
21 had previously been involved with Pierce Layhey who
22 were now involved with Logisteq who had any
23 involvement with Sequedex during this same period of
24 time?
25 A   Yes.

154

1    Q    Who?
2    A    Can you excuse me one second, I wrote them
3    down and gave them --
4         MR. PESLAK:  No, no, just testify.
5    A    Okay.  I forgot the names, in Florida in
6    August of 2000 we had a sales meeting.
7    Q    August of 2000?
8    A    Yes.
9    Q    Okay.
10   A    In August of 2000.
11   Q    This is before Sequedex even existed?
12   A    Yes, sir.
13   Q    Okay.  You had a sales meeting for?
14   A    We had a sales meeting.
15   Q    With Logisteq?
16   A    For Newco.
17   Q    What is Newco?
18   A    Newco was going to be a record storage
19   company.
20   Q    What record storage company?
21   A    The records storage company Peter Pierce and
22   Mike Gold were going to open.
23   Q    Okay.  Who had a meeting in 2000 in
24   Florida?
25   A    Michael DiIanni.

155

1    Q    Right?
2    A    Peter Pierce, Mike Gold, Matthew Aiello, Tom
3    Carr, and there was three salesmen from Iron
4    Mountain who were at the hotel, and I had their
5    names written down.  I would just have to give them
6    to you when I get them.
7    Q    They were presently then working for
8    Iron Mountain?
9    A    Correct, and they were going to be joining the
10   Newco record company.
11   Q    What Hotel did you meet at?
12   A    I believe it was the Ramada at Newark.  I'm
13   sorry.  The Ramada at Miami Airport.  It was right
14   outside Miami Airport.
15   Q    And were you staying at that Ramada
16   Inn?
17   A    No, I was not.
18   Q    Where were you staying?
19   A    I was staying with Arturo Soto, at his
20   apartment in Miami.
21   Q    Do you know where the other individuals
22   were staying?
23   A    No, I do not.
24   Q    What were you doing in Miami with
25   Arturo Soto?

156

1    A    Arturo Soto was going to be the manager for
2    the record storage company in Miami, along with
3    helping Logisteq in the coffee business.
4         So Arturo was transferred from New Jersey to
5    Miami to help set up Newco, which was going to be a
6    record archive business in Miami.
7    Q    Did they, Newco ever get off the
8    ground?
9    A    Yes, it did.
10   Q    When?
11   A    I believe January 2001.
12   Q    You are saying that Newco was Sequedex?
13   A    Yes, sir.
14   Q    Did anybody call it Sequedex?
15   A    Not at, not in August.  There was no name at
16   that time.
17   Q    Now, at the time that you met at the
18   Miami Ramada Inn --
19   A    Yes.
20   Q    -- all of those people were present at
21   the meeting?
22   A    Yes, they were.
23   Q    Where were those individuals staying;
24   they weren't all staying with Mr. Soto, were they?
25   A    No, they weren't.

157

1    Q    Where was Mike DiIanni staying?
2    A    Mike DiIanni was flying home with me back to
3    New Jersey.
4    Q    Okay.  Where had Mike DiIanni been
5    staying?
6    A    I believe he stayed with Arturo one night.
7    Q    Oh, so he came down there, stayed with
8    Arturo one night and was flying back?
9    A    That's correct.
10   Q    How about Peter Pierce?
11   A    Peter Pierce was also flying back with Tony
12   Hayden.
13   Q    So Tony Hayden was at the meeting, too?
14   A    Tony Hayden was not at that meeting.
15   Q    Peter Pierce was coming from where?
16   A    Looking at the Upton's building in Miami.
17   Q    Okay.  So you were looking at a coffee
18   storage building in Miami?
19   A    No, sir.  We were looking at an empty building
20   for future use for coffee and record storage.
21   Q    And this was in August of 2000?
22   A    Yes, sir.
23   Q    How about Mat Aiello, where was he
24   staying?
25   A    He was staying with Arturo Soto.

158

1    Q    Did you all fly down together?
2    A    No, we did not.
3    Q    You were all down there independently
4    of each other?
5    A    Correct.
6    Q    Was there another purpose to your being
7    there that you were all there at the same time?
8    A    Yes, were we were looking at a building.
9    Q    The Upton building?
10   A    Correct.
11   Q    And you were determining whether or not
12   it was a proper facility for this dual purpose?
13   A    It was a perfect facility because the building
14   had racking and Mike Gold and Peter were very exited
15   because it was multiple offices that they said would
16   be a good marketing tool to have a call center.
17        And I remember Mike Gold saying to Arturo and
18   I that this racking may be usable for record
19   storage. We will have to see it if it can be
20   converted. I, he also liked the building because it
21   had a mezzanine and high ceilings.
22   Q    Now, at that time who was taking the
23   responsibilities for discussing these matters, Mike
24   Gold, as to the racking and the storage facilities?
25   A    Mike Gold and Peter Pierce.

159

1    Q    And what did Mr. Pierce tell you was
2    his involvement with Newco if at all?
3        MR. VARN: Objection as to form.
4    Q    Did he tell you or state in your
5    presence what his involvement was with this new
6    company?
7    A    Yes, he did.
8        MR. VARN: Rather than objecting to
9    form, you mean at that time or any old time?
10   Q    In August of 2000, did Mr. Pierce tell
11   you what is his involvement was with this new
12   company called Newco?
13   A    Yes, he did.
14   Q    What did he tell you his involvement
15   was?
16   A    At the time after negotiating with Peter,
17   Tammy Philips, my office manager and financial
18   person, and I met with Peter and Tony Hayden.
19   Q    In August of 2000 while you were down
20   in Miami, did Peter Pierce tell you what his
21   involvement was with Newco? I don't want to hear
22   about Ms. Philips or what she knew. I want to know
23   what you knew.
24        MR. VARN: Objection.
25   A    I am trying to give you an answer and you keep

160

1    interrupting me.
2    Q    I am not interrupting. I would like an
3    answer to my question.
4        MR. PESLAK: He was answering your
5    question, if you let him finish.
6    Q    Please, just tell me in August of 2000
7    what discussion did you have with Peter Pierce that
8    lead you to believe that Mr. Pierce had any
9    involvement with Newco?
10   A    May I speak?
11   Q    You can answer that question.
12   A    Without being interrupted?
13   Q    You can answer that question.
14   A    Back in August of 2000, Tammy Philips and I
15   had a meeting with Peter Pierce and Tony Hayden.
16   Q    Where?
17   A    At Hayden Real Estate --
18   Q    Okay.
19   A    -- in Pennsylvania. Peter Pierce, Tammy and I
20   sat down to discuss the price of the deal.
21   Q    What deal?
22   A    Logisteq, which was TC Transport at the time.
23   Q    Okay.
24   A    Peter told me that he had multiple companies
25   coming into play, and if I join his team we would be

161

1    very successful. He's getting back into the records
2    business. Mike Gold is going to front up the
3    project, and we would be very, very successful and
4    very strong.
5        That is the main reason that we went to Anchor
6    Glass because Peter needed a large building that I
7    could fill up until their record storage company
8    grew.
9    Q    He told you Mike Gold was going to
10   front up a record storage business, and he was
11   looking for facilities for that record storage
12   business; is that correct?
13   A    Absolutely truthful.
14   Q    Okay.
15   A    Correct.
16   Q    Do you have any evidence other than
17   that statement that you just related by Mr. Pierce
18   that in fact Mr. Pierce had any direct involvement
19   with any business called Newco or with Sequedex?
20        MR. VARN: Objection.
21        MR. PESLAK: You asked him if there
22   were any documents?
23   Q    Evidence of any type.
24   A    The evidence I have is a witness, Tammy
25   Philips, who was with me, first of all.

162

1    Secondly, it's very evident and obvious that I
2 would allow all these people into my company and
3 being paid by Logisteq while their primary work was
4 with Sequedex.
5    Q    Was Mr. Gold being paid by your
6 company?
7         MR. VARN:  Objection.
8    Q    Was Mr. Gold being paid by your
9 company?
10   A    Mr. Gold had no compete.  No, he was not being
11 paid by my company.
12   Q    Was Mike DiIanni being paid by your
13 company?
14   A    Mike DiIanni was not being paid until January
15 of '01 because he would cut a deal with Peter.  So
16 it wouldn't show up on any records because Mike had
17 to show up on my office on a daily basis.
18   Q    In August of 2000 was Mike DiIanni
19 being paid by your company, that was not something
20 that Mr. Pierce --
21   A    Yes, he was.
22   Q    He was being paid by your company in
23 August of 2000?
24   A    Yes, he was.
25   Q    How was Mike DiIanni being paid by

163

1 company?
2    A    He was being paid monthly by having a company
3 car, a Lexus, that I agreed to go out and buy for
4 him in the name of TC Transport, and Mike DiIanni
5 paid personally for it, and I paid for that monthly
6 for those services.
7    Q    Now, we were talking about the meeting
8 in August 2000 in Miami, Florida, is this something
9 you told Mr. Varn and Mr. Watzke about during your
10 meeting of 10/17 when Mr. Miller, Mr. Varn, Mr.
11 Watzke and you were present at the Hilton Hotel; did
12 you tell him about this?
13   A    For the record, it wasn't the Hilton Hotel.
14 It was the Marriott Hotel in Miami.  I just
15 remembered that.
16   Q    I am not talking about the Marriott.
17 You said it was the Ramada at the Miami Airport.
18   A    It was actually the Marriott.
19        MR. PESLAK:  Could you -- he is asking
20 about the meeting in East Brunswick.
21   A    I'm sorry.
22   Q    I said did you tell Varn and Watzke
23 about this meeting in August of 2000?
24   A    No, I did not.
25   Q    Did you ever tell anybody about this

164

1 meeting prior to today?
2    A    No -- yes.
3    Q    Who?
4    A    I told Richie Reese.
5    Q    When?
6    A    I would say February of, February/March of
7 2002.
8    Q    Did you tell anybody else about this
9 meeting other than Richard Reese?
10   A    Yes, I did.
11   Q    Who?
12   A    Gary Watzke.
13   Q    When did you tell Gary Watzke about
14 this meeting in August of 2000?
15   A    Same time I told Richard Reese.
16   Q    Anybody else?
17   A    Larry Varn.
18   Q    Was Mr. Varn present at the same time?
19   A    Yes, he was.
20   Q    Let's go back to the first meeting when
21 you were telling them about the shenanigans?
22   A    Sure.
23   Q    You said in October of 2001, you had a
24 meeting with Gary Watzke and Larry Varn --
25   A    Yes.

165

1    Q    -- and Bob Miller and your lawyer Art
2 Peslak, and that was at the Hilton Hotel in East
3 Brunswick?
4    A    Correct.
5    Q    And at that meeting you told them about
6 shenanigans, and you told them all about the things,
7 about Sandra Cole and Ettel Ricketts, Mark Haslon
8 that you related to us today?
9    A    Correct.
10   Q    And you told it to them in
11 approximately the same detail?
12   A    Yes, a little less.  I didn't elaborate as
13 much.
14   Q    Did you tell them anything more in
15 October 2000 -- I mean, 2001 at that meeting?
16   A    No, I didn't.
17   Q    At that meeting at the Hilton regarding
18 the shenanigans relating to Logisteq?
19   A    Yes, I did.
20   Q    What else did you tell them?
21   A    I told them how Mike DiIanni was causing a lot
22 of problems for Jim Montague, who was their
23 facilities manager.
24   Q    Anything else?
25   A    No.

166

1    Q    There were no other shenanigans that
2  you were telling these two individuals about?
3    A    There was so many shenanigans, but I didn't
4  let it all out at the first meeting. I just gave
5  them a brief, on questions and answers, and I did
6  not give them all of the information that I had on
7  the company.
8    Q    At your meeting with Schooner
9  Capital --
10   A    Yes.
11   Q    -- where Jon Kenny, Tom Carr, Vin Ryan
12 and this young woman president of Schooner was
13 present, did you let them know or anybody there know
14 at that time of any of these actions that were
15 taking place at Logisteq?
16   A    No, I did not.
17   Q    You were trying to sell those people on
18 Logisteq; correct?
19   A    This is true.
20   Q    And why was it when you were talking to
21 them in October of 2000 did you think that telling
22 them about shenanigans would be helpful in getting
23 Logisteq purchased by Iron Mountain?
24      MR. VARN: Objection form.
25   A    Well --

167

1    Q    What was your reasoning?
2    A    It had nothing to do -- I never -- you're
3  putting words in my mouth. I never thought it would
4  be, it would enhance the deal.
5       What actually, the real reason is that after
6  receiving a letter of complaint for Mike DiIanni
7  being on the property after he was arrested by
8  Freehold Township Police Department, he was
9  continuing to harass Iron Mountain people, and I got
10 a call from Gary Watzke saying if this continues to
11 happen, you will not get a year, you will be out of
12 here in 30 days.
13      So when they addressed this to me about Mike
14 DiIanni, I was basically just answering to a
15 response of, yeah, well, this is, this is a bunch of
16 shenanigans with this guy. I don't know why he has
17 so much anger and it needs to stop.
18      Certainly, I did not think that if I told them
19 these these things that were going on between
20 Sequedex and Logisteq and Iron Mountain that that
21 was going to in any way influence Iron Mountain
22 Mountain to buy my company.
23   Q    Now, at that time isn't it true, sir,
24 that you were aware that actions had been taken by
25 Iron Mountain against Sequedex --

168

1    A    I --
2    Q    -- isn't that true?
3    A    I had no knowledge of that whatsoever.
4    Q    When did you first learn that there
5  were any actions vis-a-vis Iron Mountain and
6  Sequedex, when was the first time?
7    A    I believe I found that out April of 2002.
8    Q    So you had no knowledge that there was
9  any litigation pending whatsoever between either
10 Iron Mountain and Sequedex or Iron Mountain and any
11 Sequedex employees; is that correct?
12   A    Iron Mountain never spoke to me about any
13 litigation that was going on between Sequedex,
14 Pierce Layhey or Iron Mountain, yes, that's correct.
15   Q    Did anybody from Sequedex, your
16 customer, ever speak to you about any litigation
17 that was ongoing between those companies?
18   A    No, they have not.
19   Q    Nobody ever told you about that in
20 either 2001 or 2002?
21   A    No.
22   Q    And you didn't hear anything about
23 it --
24   A    No, I have not.
25   Q    -- independently?

169

1    A    No.
2    Q    Okay. So the first time you told
3  anybody about this meeting in 2000 was when you met
4  with Richard Reese, Gary Watzke and Larry Varn.
5  Where did you meet with those individuals in
6  February of 2002?
7       MR. PESLAK: Objection, asked and
8  answered?
9    A    You left one person out, Jon Kenny.
10   Q    Where did you meet with them?
11   A    We met at Iron Mountain in Boston,
12 Massachusetts.
13   Q    Is this the third meeting that you have
14 had with anybody from either Iron Mountain or
15 Schooner?
16   A    Yes, it is.
17   Q    Do you know the date in February that
18 you met?
19   A    No, I don't.
20   Q    Now, in addition to those individuals
21 Richard Reese, Gary Watzke, you said was present?
22   A    Correct.
23   Q    Larry Varn and Jon Kenny was there.
24 Anybody else there besides you?
25   A    No.

170

1    Q    You're sure of that?
2    A    To the best of my recollection, yes.
3    Q    Were you accompanied by anyone to that
4    meeting?
5    A    I don't believe so.
6    Q    Was Mr. Peslak or anybody else there on
7    your behalf?
8    A    No, took it upon myself.
9    Q    How did you get to the offices at Iron
10   Mountain at that time?
11   A    I drove.
12   Q    Prior to that number three in person
13   meeting, did you have any discussions with Mr.
14   Watzke or anybody else at Iron Mountain, by
15   telephone, by E-mail or other methodology?
16   A    We had a dialog going on, yes.
17   Q    With whom?
18   A    With Gary Watzke.
19   Q    Okay. Anybody else at Iron Mountain?
20   A    No, sir.
21   Q    What else did you talk about in the
22   number three meeting other than the Newco Miami
23   meeting?
24   A    Number three meeting was pretty much my guts
25   poured out to them. My life was in turmoil. I was

171

1    being pushed out of the company. I had absolutely
2    no luck with investors coming to me with money, and
3    I basically asked these guys to please help me save
4    the company.
5    Q    What else?
6    A    Ask a question.
7    Q    What else did you talk about; you
8    talked about the Miami meeting?
9    A    Yes.
10   Q    You were begging them for money?
11   A    Yes.
12   Q    What else?
13   A    That's really it. I just gave them a summary
14   of pretty much all the underworld that was going on
15   through Pioneer and Logisteq and Sequedex, and I can
16   tell you in detail, if that's what your looking for.
17   Q    Now, you said number two meeting was at
18   Schooner Capital; correct?
19   A    This is true.
20   Q    Was there any additional meetings while
21   you were up in Boston other than Schooner Capital;
22   did you go to a restaurant or a club?
23   A    Yes, I did.
24   Q    Where?
25   A    I went to an a restaurant in Boston with

172

1    Richard Reese, Jon Kenny, Vin Ryan, Ray Masucci --
2    Q    Now I am talking about in December of
3    2001.
4    A    Oh, I'm sorry, no.
5    Q    You were up at Schooner Capital with
6    Jon Kenny, you, Vin Ryan and the president of
7    Schooner?
8    A    Yes.
9    Q    Did you meet with anybody else while
10   you were up in Boston at that meeting to have that
11   meeting at the Schooner Capital?
12   A    No, I did not.
13   Q    Did you meet with Mr. Reese or Mr. Ryan
14   at a place other than at Schooner Capital?
15   A    Yes, but at a different date.
16   Q    That was a different date entirely?
17   A    Correct.
18   Q    That wasn't in December of 2001;
19   correct?
20   A    Yes, actually, I, I didn't even realize who
21   Richard Reese was, and then it came back to me, yes,
22   I did meet with him.
23   Q    Because earlier you said you never met
24   with Richard Reese, didn't you?
25   A    No, no, no, I said I never met with a Richard

173

1    Reese in the initial meetings at the Hilton Hotel at
2    the first meeting.
3    Q    Is that what you recall your testimony
4    to be?
5    A    If that wasn't my testimony, then I said it
6    incorrectly and let me rephrase it.
7    Q    Now I'm asking you again in February of
8    2002, you had a meeting at Iron Mountain?
9    A    Yes.
10   Q    And that was with Larry Varn, with Mr.
11   Kenny, Mr. Watzke, with Richard Reese and you?
12   A    This is correct.
13       MR. PESLAK: Objection, asked and
14   answered three times already.
15   Q    Was there anything else at that third
16   meeting that you discussed?
17   A    No.
18   Q    When was the next meeting you had with
19   anyone from Iron Mountain or related to Iron
20   Mountain?
21   A    I believe two weeks after that I had one more
22   meeting in Boston.
23   Q    In February?
24   A    No, I believe now we're getting into March.
25   Q    So the number four meeting that you

174

1  recall was in March?
2  A   Yes.
3      Q    And who initiated that meeting?
4  A   I did.
5      Q    By the way, you said that there was
6  another meeting up in Boston, was that before or
7  after the December 10 meeting?
8  A   That was the one I'm talking about now.  This
9  is the last meeting I had up in Boston.
10      Q    In March?
11  A   Yes, in March.
12      Q    Was there any meeting in December other
13  than the one at Schooner Capital?
14  A   I don't remember off the top of my head, no.
15      Q    Do you recall any meeting at the
16  Harvard Club?
17  A   Yes, I do.
18      Q    When did that take place?
19  A   That's the meeting I am going to tell you
20  about now.
21      Q    Okay.
22  A   But I may be mixed up on dates.  So if I, if
23  you need to find out the facts, I can actually go
24  back and recollect and find exact dates.  Some dates
25  may not be for the record exact.  They were during a

175

1  broad period of time.
2      Q    I wasn't there, and I am just trying to
3  establish when it was.
4  A   I understand.
5      Q    Because you have told us about several
6  different meetings at different times --
7  A   Yes.
8      Q    -- and --
9  A   To the best of my knowledge, I am trying to
10  keep them in sequence, but, again, we're talking a
11  year, you know, to two years.  So I don't know the
12  exact dates, but if you really need them, I will
13  supply them with you.
14      Q    How are you going to supply them to me?
15  How are you going to do that?
16  A   I will do some research.
17      Q    How are you going to do the research;
18  where are you going to look?
19  A   That's up to me to find out.
20      Q    No, it's up to me to explore with you
21  right now where are you going to look to the find
22  out the dates that those meetings took place.  Do
23  you have a calendar, sir?
24  A   Well, let me think.  How will I know?
25      Q    Yes.

176

1  A   I will make a phone call to Iron Mountain, and
2  I will ask the individuals that I have met with if
3  they can remember the dates we met then.  I will
4  come back to you and give you the dates that I think
5  are correct.
6      Q    Good.  I think we ought to convene this
7  deposition until he can come back to me where the
8  dates are correct because if we're going to go
9  through this whole exercise, and I am going to be
10  told that these dates aren't correct because he
11  can't remember them, I think we ought to convene
12  today and come back again.
13  A   I am giving you the time frame.  I am not
14  going from year to year; I am telling you within
15  months of each other.
16      Q    Well, sir --
17  A   I am pretty close to the months.  I am not
18  talking if I gave you a date of February, I am not
19  going to go back and say, no, it was last July.
20      I am saying within that time period it might
21  have been the end of January, it could be the
22  beginning of January.
23      Q    Mr. Carr, I am going go to be very
24  explicit.  I am asking you questions, and I am
25  giving you refreshment as to what other people have

177

1  recalled and what you previously recalled at your
2  deposition --
3  A   Okay.
4      Q    -- and you're telling me now that this
5  isn't true, and you are saying that with a little
6  bit of research that you could come to this
7  deposition prepared to tell me the dates.
8      With a little bit of research, could you give
9  me an absolute list of all the meetings that you
10  were at at the various locations?
11      MR. PESLAK:  Objection.  Look every
12  witness has recollection problems, okay.  And you
13  can proceed here today with this deposition, and you
14  know this is just a silly colloquy now you're having
15  with Mr. Carr.
16      THE WITNESS: No, I would like to
17  speak --
18      MR. PESLAK:  He's harassing you right
19  now.
20      MR. EPSTEIN:  I am not harassing anyone
21  and I refuse to accept that.
22      THE WITNESS:  I don't feel I am being
23  harassed.
24      MR. EPSTEIN:  Thank you, Mr. Carr.
25      THE WITNESS:  I understand that you're

IMP04581

178

1  trying to get the exact time periods. I will do my
2  best by calling Iron Mountain and finding out
3  exactly those dates and then I can give you those
4  dates in the meanwhile.
5      MR. PESLAK: Better way to proceed is
6  he just show you the depositions for the dates he's
7  reading out, and if that refreshes your
8  recollection --
9      THE WITNESS: No one here told me
10  dates.
11      MR. VARN: Now I object. Let's get
12  back to Q and A, what a deposition is all about.
13      MR. PESLAK: There's no question.
14      Q    Mr. Carr, in March 2002, you said that
15  you had a meeting at Iron Mountain, a number three
16  meeting in February of 2002. I asked you whether or
17  not you had a meeting in Boston at the Harvard Club
18  with any individuals from Iron Mountain or from
19  Schooner Capital --
20  A    Yes.
21      Q    -- at any time in December?
22  A    Yes, I did.
23      Q    Okay. With whom?
24  A    I believe that was Richard Reese, Vin Ryan,
25  Jon Kenny, and Ray Masucci. I just don't remember

179

1  the name of the restaurant I went to.
2      Q    This, to your recollection, and please
3  let me try to put this in sequence --
4  A    Sure.
5      Q    -- because I don't want there to be any
6  confusion. You said the very first meeting you had
7  was in the Hilton Hotel, in East Brunswick?
8  A    Yes.
9      Q    There is no question in your mind about
10  that?
11  A    No question in my mind.
12      Q    And then you said you were at a meeting
13  where Richard Reese was, where, at the Schooner
14  Capital in December of 2001. This was approximately
15  two months after your first meeting at Schooner
16  Capital with Jon Kenny, you, Vin Ryan and the
17  president of Schooner Capital, four of you --
18  A    Yes.
19      Q    -- correct?
20  A    Yes.
21      Q    And you had that meeting because Watzke
22  said that Richard Reese wasn't interested in making
23  an investment and that he referred you to Schooner
24  Capital?
25  A    This is correct.

180

1      Q    So that was meeting number two, and I'm
2  asking you between that first meeting in East
3  Brunswick and meeting number two at Schooner
4  Capital, did you have any meetings in December in
5  Boston?
6  A    I had two more meetings. I just cannot
7  recollect the time and the name of the restaurant
8  but, yes, I did have two more meetings.
9      Q    In Boston?
10  A    Yes.
11      Q    So there was a total of three meetings
12  in Boston you're saying?
13  A    (Indicating.)
14      Q    And do you remember whether or not one
15  of those meetings was another meeting in Boston at a
16  restaurant?
17  A    Yes, it was at a restaurant.
18      Q    Do you remember who was present at that
19  meeting at the restaurant?
20  A    Yes.
21      Q    Who?
22  A    Jon Kenny, Richard Reese, Vin Ryan, Gary
23  Watzke, Tom Carr and Ray Masucci, to the best of my
24  knowledge.
25      Q    Wasn't that, it was Mr. Martocci there?

181

1  A    No, that was a meeting in Jersey City that was
2  another meeting we had.
3      Q    So Mr. Masucci --
4  A    Yes.
5      Q    -- was with you in Boston?
6  A    Yes, he was.
7      Q    And you're not sure what month that
8  was?
9  A    It was early 2002. Ray Masucci.
10      Q    That's Ray Masucci?
11  A    Yes, was in Boston with me.
12      Q    So Ray was in Boston with you. Who
13  else was there? Jon Kenny you said?
14  A    Jon Kenny Vin Ryan, Jon Kenny, Richard Reese
15  Gary Watzke, Ray Masucci and Ray Masucci's
16  accountant, his name was Joe.
17      Q    And that was early in 2002?
18  A    Yes.
19      Q    Was that before or after the Iron
20  Mountain meeting in February of 2002 where you
21  discussed the Newco Miami meeting?
22  A    That was before.
23      Q    So it was sometime in either January or
24  February?
25  A    Yes.

182

```
1      Q      How did you get to Boston?
2      A   I drove.
3      Q      With whom?
4      A   Myself.
5      Q      Where did you stay?
6      A   I drove home that night.
7      Q      And you met at a restaurant but you
8  don't remember the name?
9      A   No, I don't.
10     Q      What did you talk about at that meeting
11 in early 2002, January or February?
12     A   That meeting was primarily a listening meeting
13 for Ray Masucci to explain his entire business and
14 the coffee business.
15         Vin Ryan and Jon Kenny asked many questions of
16 Ray Masucci and Ray Masucci's accountant, and Ray
17 Masucci basically explained everything about his
18 business, where the future is going in coffee and
19 discussed a purchase from Vin Ryan at Schooner
20 Capital.
21     Q      Anything else discussed during that
22 particular meeting?
23     A   That meeting was strictly a business meeting
24 to purchase RPM and purchase Continental Coffee
25 Companies.
```

183

```
1      Q      Was there anything else discussed at
2  that meeting, yes or no?
3      A   There, no, there was not.
4      Q      Okay. Now, during the months of
5  January or February, were there any other meetings
6  in any location to discuss these matters?
7      A   Yes, there was.
8      Q      By the way, was Mr. Neebling present
9  during that meeting?
10     A   I don't remember.
11     Q      So you are not sure about that?
12     A   No.
13     Q      And you are sure that that was January
14 and February, as opposed to March?
15     A   I am not sure, but I'm giving you my best
16 answer at this time.
17     Q      Was it in the afternoon or the evening
18 that meeting?
19     A   It was in the evening.
20     Q      Approximately, how long did it take?
21     A   I would say two and a half hours.
22     Q      Were there any meetings other than that
23 meeting in either January or February of that year
24 at any other location?
25     A   No.
```

184

```
1      Q      Specifically, was there a meeting in
2  New York in February of 2002?
3      A   I apologize, yes, there was a meeting in New
4  York.
5      Q      Where?
6      A   That meeting took place at the Astoria Waldorf
7  Hotel at a restaurant called The Bear and The Bull.
8      Q      Who was that meeting with?
9      A   That meeting was with Jimmy Neebling, Tom
10 Carr, Jon Kenny, Larry Varn, and Richard Resse and
11 Gary Watzke.
12     Q      So Neebling, --
13     A   James Neebling.
14     Q      Okay.
15     A   Tom Carr, Larry Varn.
16     Q      You said Richard Reese?
17     A   Richard Reese.
18     Q      Okay.
19     A   Gary Watzke and Jon Kenny.
20     Q      And what was that meeting about in
21 February of 2000 at The Bull and The Bear at the
22 Astoria Waldorf?
23     A   That meeting was a follow-up meeting to the
24 discussion of buying out Logisteq, buying the coffee
25 companies, and there was also a meeting with Jim
```

185

```
1  Neebling to do a consulting project for Iron
2  Mountain.
3      Q      Do you remember if that meeting was
4  before or after the meeting in Boston at the unknown
5  restaurant?
6      A   That was after the meeting in Boston.
7      Q      Was anything else discussed at that
8  meeting in February of 2002?
9      A   No.
10         MR. VARN: Excuse me. Where have you
11 ID'd that one at?
12         MR. EPSTEIN: Astoria Waldorf Hotel at
13 The Bull and the Bear.
14         MR. VARN: I'm sorry.
15     Q      Now, was there a meeting after that
16 meeting in February of 2002 in New York?
17     A   No, there was not.
18     Q      Any other meetings --
19     A   Yes.
20     Q      -- that took place?
21     A   Yes, another meeting.
22     Q      When?
23     A   I believe March of 2002.
24     Q      Okay. And where was that?
25     A   That was at a restaurant called Costa Dante in
```

186

1  Jersey City, New Jersey.
2      Q    Who was at that meeting?
3  A    That was I believe Gary Watzke, Jon Kenny, Ray
4  Masucci from RPM Coffee, Doug Martocci from
5  Continental Coffee, and Tom Carr.
6      Q .  How long did that meeting take place?
7  A    Approximately four and a half hours.
8  It was a very long meeting.
9      Q    And the entire four and a half hours
10  was at this restaurant the Costa Dante?
11  A    Yes, it was.
12      Q    Now, at the meeting of early 2002 in
13  Boston at the restaurant you don't remember the name
14  or at the meeting at the Astoria Waldorf or at this
15  latest meeting at Costa Dante --
16  A    Yes.
17      Q    -- did you talk to Gary Watzke or Larry
18  Varn about any of the alleged shenanigans or any of
19  the dealings between Sequedex and Logisteq?
20  A    No, I did not.
21      Q    You had no conversations during those
22  meetings about those matters?
23  A    I had potential sellers at those meetings and
24  didn't want to involve anybody in the shenanigans.
25      Q    Am I correct in stating then that --

187

1  A    Yes, you are.
2      Q    -- you did not talk about the
3  shenanigans at any of those meetings?
4  A    Yes, sir, you're correct.
5      Q    During those meetings, did you reveal
6  to either Mr. Varn or Mr. Watzke or discuss with
7  them any taping that you were doing of individuals?
8  A    Yes, I did.
9      Q    Did you reveal those tapings to anyone
10  else in those meetings that you were taping people?
11  A    No, I did not.
12      Q .  Just those two?
13  A    Larry Varn and Gary Watzke.
14      Q    Those are the only people that you
15  revealed that you were engaged in taping people's
16  conversations?
17  A    I'm sorry, the whole group I engaged in
18  telling them.
19      Q    Okay. So you you told everybody who
20  were at those three meetings?
21  A    No, I told the last meeting I had in Boston
22  was Jon Kenny, Gary Watzke, Richard Reese, Larry
23  Varn and I.
24      Q    When was that?
25  A    I believe that that wasn't the one at the

188

1  restaurant.  That was the one in the office.
2      Q    Wait a minute.
3  A    Okay.
4      Q    The last meeting we're up to number six
5  meeting?
6  A    Yes.
7      Q    Because I have down and, please correct
8  me if I am wrong, --
9  A    Sure.
10      Q    -- I'm trying to keep it straight, is
11  the last meeting we have is the one at the Costa
12  Dante in Jersey City?
13  A    Yes.
14      Q    That was preceded by the one in the
15  Astoria Waldorf Hotel, in New York City, and the one
16  before that was in Boston.  It was at a restaurant
17  you don't remember the name of?
18  A    Okay.
19      Q    Was that --
20  A    That's the one.
21      Q    -- where you told everybody you were
22  taping people?
23  A    That's the meeting, but it was at the office
24  of Iron Mountain.  I did not tell them that at the
25  restaurant because we were meeting --

189

1      Q    You met them both places?
2  A    Yes.
3      Q    Well, you also told us about an earlier
4  meeting in Boston at the Schooner Capital?
5  A    Correct.
6      Q    That wasn't it?
7  A    No, that wasn't it.
8      Q    Okay.
9  A    It was the night we met at Iron Mountain, and
10  then we were meeting the potential seller at the
11  restaurant.
12      Q    Okay. That's, but wait a minute, you
13  have one in again at Iron Mountain, where you Larry
14  Varn, Jon Kenny, Gary Watzke, Richard Reese, and you
15  all met and you spoke about the Newco Miami meeting,
16  and you poured out your guts and were trying to get
17  them to help you save the company?
18  A    Correct.
19      Q    Then you said that there was a fourth
20  meeting, a different meeting in Boston; is that the
21  same meeting?
22  A    That's the same meeting, yes.
23      Q    So, actually, what I had marked as
24  three and four were three?
25  A    Right.

190

1    Q    One together?
2    A    And then the meeting after that.
3         MR. VARN: No, wait. Let's get back to
4    Q and A or we're going to have a transcript that's
5    going to look like scrambled.
6    Q    Then there was a meeting at the Astoria
7    Waldorf after that?
8    A    Yes.
9    Q    Where did you tell anybody about the
10   taping that you were doing at these meetings?
11   A    At Iron Mountain.
12   Q    Who did you tell?
13   A    I told a group which was everyone I named at
14   that meeting.
15   Q    So you told everybody at Iron Mountain.
16   Was anybody different at the restaurant then there
17   was at Iron Mountain?
18   A    Yes, Ray Masucci.
19   Q    Okay. Ray and his accountant Joe?
20   A    Correct.
21   Q    But everybody was else was pretty much
22   the same?
23   A    Yes.
24   Q    So you told Larry Varn, Jon Kenny, Gary
25   Watzke, Richard Reese, all about the fact that you

191

1    were engaged in taping people?
2    A    Yes.
3    Q    What was the purpose of your taping
4    people?
5    A    My purpose of taping people was I felt that I
6    didn't have the trust of Peter Pierce, because of
7    the indictment, and I could not convince Peter
8    Pierce after I met with him at a restaurant in
9    Freehold for about three and a half hours I'd say
10   around December of 2001, and I tried in every way I
11   can to convince Peter that due to poor lack of
12   judgment on his behalf, Mike DiIanni was not a
13   friend, Mike DiIanni felt he deserved a lot more and
14   always asked for more, and that he's a disturbance
15   to the company.
16        I said to Peter, please, trust me that this
17   company is really going in the right direction, and
18   I understand you need to have a body in there
19   watching your investment but make that person Alan
20   McGrath. I have no signature say on the checks, I
21   have basically no say in the company; get rid of
22   Mike DiIanni, let Peter McGrath run it, and let's
23   continue to grow Logisteq.
24        Peter at that time told me that's not the way
25   I operate, we'll have a meeting with Mike DiIanni,

192

1    and we will discuss it in person.
2    Q    Okay. Now, can you please answer my
3    question who decided you should tape anybody?
4    A    I did.
5    Q    Did you tell anybody prior to the
6    meeting in Boston that you had in fact taped
7    anybody?
8    A    No.
9    Q    Did you inform anybody as to your
10   intention to tape people during meetings?
11   A    No.
12   Q    When did you tape people during
13   meetings, what meetings did you tape people?
14   A    Oh, I don't remember off the top of my head.
15   Q    You can't remember any of the times
16   that you made any tapes?
17   A    Not at this point. If I knew that was going
18   to be a question, we have the tapes. I can go back
19   and listen to all the tapes and try and give you an
20   answer, but I really don't --
21   Q    Well, did you tape a Mr. Jeff Stern?
22   A    Yes, I did.
23   Q    Where did you tape Jeff Stern?
24   A    That tape was done in Jeff Stern's office at
25   PJR Construction, Freehold, New Jersey.

193

1    Q    And why were you taping Jeff Stern?
2    A    I was taping Jeff Stern because Mike DiIanni
3    wanted $300,000 in order to give Jeff the $6 million
4    job and to try to prove to Peter that this guy was a
5    phony baloney and had been stealing from day one.
6         I was hoping to tape Jeff and get him to say
7    so on tape, and as hard as I tried to, I realized a
8    few months after that, oh my God, Jeff is not going
9    to admit to that because Jeff went to Peter to try
10   to make Peter invest in him, so he can split up with
11   is his partner and start his own company.
12        So it seems like every way I tried, I was
13   defeated.
14   Q    Okay. So you taped Jeff Stern. How
15   long of a conversation did you have with Jeff Stern
16   that you taped?
17   A    I would say approximately a half hour.
18   Q    And during that taping of Jeff, he
19   didn't admit anything that you thought was
20   incriminating; is that correct?
21   A    No, he was -- basically did not, but if -- I
22   would like to listen to the tape once more and make
23   sure.
24   Q    Who has the tapes of those meetings?
25   A    Cozzen, O'Connor, Larry Varn and Art Peslak.

194

1    Q    When did you give Mr. Peslak the tapes?
2  A   I gave Mr. Peslak the tapes first, I gave him
3  two tapes when we decided to put a suit against
4  Pioneer and then I was hoping --
5    Q   When was that?
6  A   That was April 2002.
7        MR. VARN:  Objection.
8    Q   When did you give Mr. Varn the tapes?
9  A   I gave Mr. Varn --
10    Q   Before or after that?
11  A   The tapes, after.
12    Q   After April of 2002?
13  A   (Indicating.)
14    Q   But you told him that you were taping
15  as early as March --
16  A   Yes.
17    Q   -- of 2002?
18  A   That's correct.
19    Q   You were taping in January of 2002, and
20  specifically you went to tape Mike DiIanni?
21  A   Yes, sir.
22    Q   Okay.  And where did that occur?
23  A   I believe it was Freehold, New Jersey.
24    Q   Okay.  And how long on January 26 or
25  thereabouts did you tape Mike DiIanni?

195

1  A   What is January 26?
2    Q   The day you taped Mike DiIanni at
3  Freehold, New Jersey?
4  A   I am not sure of that date, but if you are
5  telling me that's the day, I will go from your word.
6    Q   It's the day that you said it was.
7  A   Okay.  Approximately 20 minutes.
8    Q   And what was the purpose of taping Mike
9  DiIanni on that particular day?
10  A   Well, I knew I needed to do something to
11  protect myself because it would basically be Peter
12  and Tom Carr verbally saying, accusing of each other
13  of things, and I knew Peter was a very wealthy man,
14  and the last thing I wanted to do was get into World
15  War III, and the reason I didn't hand over anymore
16  tapes is that I told Peter that I had been taping
17  everyone, and I would really like to find a
18  resolution because I don't want to be tied up in
19  lawsuits, I don't want to be incriminated by all of
20  these attorneys and go for another three years
21  appealing and everything else.
22      So I was hoping that Peter would sit down,
23  come to his senses and try to work out a deal with
24  me, and Al, let Alan McGrafth run the company, and
25  the next thing I'm getting a subpoena for a

196

1  deposition at Cozzen, O'Connor, and what happened at
2  that deposition is they asked me how many tapes I
3  have.
4      And I told them I have many tapes, and they
5  said how many tapes did you give to Iron Mountain
6  and how many tapes did you give to Art Peslak, and I
7  said I gave two tapes, and then they said well we
8  want all the other tapes.
9      So I couldn't understand it because if they
10  didn't open their big mouth and would have settled
11  with Peter those tapes never would have showed up,
12  but they demanded those tapes, and I really didn't
13  want to hand them over.  I just wanted to just find
14  a solution to make a happy ending, and I even told
15  Peter that.  I said Peter, please, let's not fight
16  this out in court.  Let's just try to work it out.
17        MR. VARN:  Excuse me, Miss, could I
18  have the question that was asked.
19        MR. EPSTEIN:  I have no idea what I
20  asked.
21      (Whereupon, the requested portion is
22  read back by the court reporter as follows:
23      "QUESTION: And what was the purpose of
24  taping Mike DiIanni on that particular day?")
25        MR. PESLAK:  Try to stay focused.

197

1  A   That was the answer, however elaborate it was,
2  the truth, I mean I didn't want to --
3        MR. PESLAK:  No question.
4  A   I didn't want to be involved in this.
5        MR. PESLAK:  No question, just shut up.
6    Q   Do you remember having an additional
7  conversation with Mike DiIanni and Alan McGrafth
8  were present as well as a John Lehmann, a Bill and a
9  Cary?
10        MR. PESLAK:  You asked him whether he
11  taped or had the conversation?
12    Q   Yes, had he had taped a conversation
13  with those individuals approximately two or three
14  days after your taping of Mike DiIanni?
15  A   No, I don't remember that tape.
16    Q   Do you remember having a further
17  conversation with Tom, a Tom F?
18  A   I don't know who that to be.  I am not aware
19  of a Tom F.  Give me a little background about who
20  he is.
21    Q   I don't know, I'm asking you.
22  A   No, it doesn't ring a bell to me at all.
23    Q   Do you remember having a conversation
24  with Arturo Soto in Bacillus Restaurant, in
25  Freehold?

198

1    A    Yes, I do.
2    Q    Why did you tape Arturo Soto in
3    Bacillus Restaurant in Freehold?
4    A    I wanted Arturo to speak the truth.  I wanted
5    Arturo to admit that he was approached by Mike and
6    Peter to help unionize Iron Mountain by telling the
7    Spanish speaking people to vote for the union, and
8    that Arturo would be promised a job with a higher
9    paying opportunity and would have a wonderful future
10   in the records business.
11       And I asked him to sign an affidavit saying
12   that, so I would have more strength in my case.
13       Q    And what did he say?
14   A    He said no, I'm afraid of Mike DiIanni.
15       Q    Okay.  Now, that tape was March 1st.
16   Did you have a case pending on March 1st, 2002,
17   against anyone?
18   A    No.
19       Q    Were you planning a case against anyone
20   on March 1st, 2002?
21   A    No.
22       Q    Well, you said you wanted to have more
23   strength in your case.  What case did you mean?
24   A    I wanted to have all the evidence I could
25   possibly secure before I was pushed and locked out

199

1    of my office because I knew once I was locked out,
2    it would be very difficult for me to go back and
3    tape any of these people.  So I was building a case
4    for me in case we couldn't resolve this issue.
5        Q    You're building a case?
6    A    I was building a case for myself, hoping that
7    I would not have to use this.
8        Q    Now, during that conversation did you
9    discuss with Mr. Soto the question of unionization?
10   A    Yes, I did.
11       Q    And do you recall what Mr. Soto's
12   response was to your inquiries in that regard?
13   A    He didn't want to get involved.
14       Q    And he didn't agree with your
15   statements that you were making on that tape that in
16   fact he had been involved with any form of action
17   towards unionization of Iron Mountain, did he?
18       MR. VARN: Objection.
19   A    He was afraid for his life.
20       Q    I am asking you yes or no, did he admit
21   that?
22   A    No, he did not.
23       Q    Okay.  Thank you.  Was there anything
24   on that tape that stated that he was afraid for his
25   life?

200

1    A    No.  No.
2        Q    Do you recall having a conversation, a
3    tape where you had a conversation taped with Alan?
4        MR. PESLAK: Alan who?
5        Q    Alan who?
6    A    Alan McGrath, yes.
7        Q    Okay.  And where did that conversation
8    take place?
9    A    Freehold, New Jersey.
10       Q    And what was the purpose of taping Alan
11   McGrafth?
12   A    Alan McGrafth knew about the $300,000 bribe
13   that Mike asked Jeff Stern and, basically, Mike
14   DiIanni told Jeff is listen, if I bought you the
15   job, you'd have to pay me a commission anyway, and
16   I'm giving you all of this work.
17       So Alan McGrafth and Mike were very close, and
18   I was trying to get Alan to testify that this
19   happened.
20       Q    During that conversation, weren't you
21   aware that there were litigation between Iron
22   Mountain and Peter Pierce and Sequedex?
23   A    No, I was not.  I had no idea.
24       Q    You had no idea that there were people
25   called Peter's attorneys or other people's attorneys

201

1    during that conversation to your recollection?
2    A    The only recollection I have of Peter's
3    attorney was that one time Mike DiIanni had made a
4    phone call to Peter asking him about the Sequedex,
5    the decals on the trucks in the yard, if that's
6    going to cause a problem, and I believe it came back
7    that Peter had to check with Cozzen, O'Connor and
8    Peter gave Mike the go ahead to do it.  That's all I
9    remember.
10       Q    Weren't you having a conversation with
11   Alan McGrafth all about Peter's lawyers, a Mr.
12   Barnowski?
13   A    No, sir, I don't even know that name.
14       Q    You don't remember having a
15   conversation with Mr. McGrafth about a Mr. Barnowski
16   in March of 2002?
17   A    Never mentioned that name.
18       Q    And do you recall having a conversation
19   with Mr. McGrafth where you were talking about RPM?
20   A    Yes, I do.
21       Q    And what was that about?
22   A    We were trying to do a roll up, Peter and I
23   from the beginning of January, we were sitting with
24   Ray Masucci and we were considering buying the
25   coffee company.  I was trying to convince Peter to

202

1  acquire Continental and RPM, and we'd pretty much be
2  the largest player in the country for importing
3  coffee and having an exchange license warehouse,
4  when Peter said he had no interest, and then he told
5  me I'd have to buy him out because he had no
6  interest in buying me out.
7      I then went on the roll to try and get
8  investors to raise the money to buy my company. So
9  knowing that TC Transport was a pretty small company
10 in revenue size, I figured it would be a more
11 attractive deal if I would add on Continental and
12 RPM.
13     So I went on my search with a three-company
14 roll up and tried to get investors to get involved.
15     Q    Okay. Now, in connection with your
16 conversation with Alan McGrafth in March of 2002,
17 did you talk to him about your case and getting an
18 injunction through the judge; do you recall having
19 that conversation with Mr. McGrafth?
20 A   Is this after Peter closed the company or
21 before he closed the company?
22     Q    Before.
23 A   No, I don't remember that. An injunction for
24 what?
25     Q    Do you recall having a conversation

203

1  with Al McGrafth where you talked and said I am
2  going in tomorrow and waiting for the judge to give
3  me an injunction to go in and run my 49 percent; do
4  you remember that?
5  A   Oh, yes, sir, I do.
6      Q    And that was before --
7  A   I believe that's when Peter fired me.
8      Q    Was that when Peter fired you?
9  A   That would have been the day.
10     Q    Okay. So this conversation with Mr.
11 McGrafth didn't take place in March; is that what
12 you're saying?
13 A   No, I know when Peter fired me, I was very
14 upset. I said, gosh, Peter is doing to me exactly
15 what Richard Reese did to him, and this is
16 unfounded. So I tried my best to get an injunction
17 to put a stop.
18     Q    And that's your recollection that your
19 conversation on that regard was after you were
20 fired?
21 A   Yes, sir. What other reason would there be,
22 if I wasn't fired, what would I have to get an
23 injunction for?
24     MR. PESLAK: Tom, there is no question
25 pending.

204

1  A   Injunction to do what?
2      Q    Now, you were talking to Mr. McGrafth
3  about a cancellation notice, from May 3rd. Do you
4  know what you were talking about?
5  A   No, I don't.
6      Q    Do you remember having a conversation
7  with a Tom Finley and a female person that you
8  taped?
9  A   No, I don't know a Tom Finley.
10     Q    Do you remember calling up a Tom Finley
11 and talking to a female in his office, asking for
12 Tom Finley.
13     MR. PESLAK: Object to the form of the
14 question.
15 A   I never heard the name Tom Finley.
16     Q    Do you recall asking Mr. Finely what
17 his address is up there?
18 A   Up where?
19     Q    And he said "707 Summit, Union City"?
20 A   Should I correct him?
21     Q    Is there a Tom that you know that said
22 707 Summit in Union City?
23 A   Yes, there is.
24     Q    Who?
25 A   Tom McGinney.

205

1      Q    McGinney?
2  A   McGinney.
3      Q    And who is Mr. McGinney?
4  A   It's the vice-president of the Teamsters Union
5  Local 560.
6      Q    Where?
7  A   Union City, New Jersey, Summit Avenue.
8      Q    Did Mr. McGinney know that you were
9  taping him or taping his office?
10 A   No, he did not.
11     Q    By the way, have you ever seen
12 transcriptions of the tapes that you put together?
13 A   No, I have not.
14     Q    Did you have a further conversation in
15 May of 2002 with Tom McGinney?
16 A   Yes, I did.
17     Q    Did Mr. McGinney know that you were
18 taping him at that time?
19 A   No, he did not.
20     Q    Did you do that in person or was that
21 over the telephone?
22 A   I did that over the telephone.
23     Q    And what was the purpose of your taping
24 the conversation with Mr. McGinney?
25 A   Again, I needed all the evidence I could

206

1  possibly come up with to prove my case. I knew it
2  would be a very expensive case to fight.
3      So back in July of 2000, Peter Pierce and Mike
4  DiIanni had asked for Tom McGinney to come and
5  unionize Iron Mountain, and Mike DiIanni had given
6  Tom McGinney all the documents which would show all
7  the salaries of the Iron Mountain employees and
8  locations.
9      So I asked Tom on the telephone would he
10  please remember that, and he did remember it, and he
11  said, yes, I remember when Mike DiIanni and Peter
12  Pierce met with me and we unionized Iron Mountain or
13  tried to.
14     Q    He said that, to your recollection,
15  that's what he said on the tape?
16  A  Oh, yeah, I remember that tape --
17     Q    Okay.
18  A  -- specifically and --
19     Q    And did he specifically recognize who
20  Peter Pierce was?
21  A  No, he did say Peter Pierce, Peter Pierce and
22  I said you don't remember Peter? He's an older
23  looking guy. He said, yes, that's right. I
24  remember Peter. He didn't say much because Peter
25  didn't talk at all during that meeting.

207

1          MR. PESLAK:  Mr. Epstein, how long do
2  you have today.
3          MR. PESLAK:  I have to pick up my
4  daughter.
5          MR. EPSTEIN:  When do you want to stop?
6          MR. PESLAK:  A convenient point in the
7  next half hour.  I have to pick up my daughter this
8  evening.
9          MR. EPSTEIN:  A half hour is fine.
10  We're not going to stop there. We're just going to
11  stop there for the day.
12          MR. PESLAK:  I understand that.
13          MR. EPSTEIN:  You can do whatever you
14  want to stop us from going forward, but I will stop
15  at your request.  I understand that picking up
16  daughter is important.
17          MR. VARN:  If we're going to go in a
18  half hour, can we get a short break.
19          MR. EPSTEIN:  Off the record.
20          (Whereupon, a discussion is held off
21  the record.)
22     Q    I am not going to go over those things
23  that I was just going over.  I am going to change
24  direction because of the time restraints that we
25  have --

208

1  A    Yes.
2      Q    -- at the present time and ask whether
3  or not Jim Neebling was involved in either of the
4  Boston meetings, that is either the one at Iron
5  Mountain or the one at the Harvard Club or the other
6  restaurant in Boston that you don't remember with
7  you and Mr. Kenny and Ray Masucci and Richard Reese
8  and Gary Watzke?
9  A  I believe he was.
10     Q    Why was Mr. Neebling present in Boston
11  at that time?
12  A  Mr. Neebling also had a small company by the
13  name of Systrans, and Mr. Neebling since July of
14  2000 has been working with Peter and I and Alan
15  McGrafth and Mike DiIanni to try to go out and buy
16  some other companies.
17      We looked at a company by the name of CD&L,
18  which is a publicly held company in the New York
19  Stock Exchange, president Vincent Brenner, and what
20  happened is Jimmy being in the courier world and
21  working for the New York Stock Exchange company with
22  US Delivery had these relationships.
23      So we he brought some companies to the table.
24  He also was trying to get Peter to invest in some
25  project that Jimmy was doing and --

209

1      Q    Which Peter?
2  A  Peter Pierce.  And when Peter refused to do
3  so, it didn't work out. He then went to Schooner to
4  try to have Schooner invest in some of these
5  projects that he was doing along with the coffee.
6  He wanted to know if we can do one big merger and
7  roll in the coffee companies with Tom's company and
8  his company.
9      Q    Okay.  His company was a courier
10  service; correct?
11  A  No, his company back in 1994 was a courier
12  service before he sold to US Delivery.  His new
13  company is a warehouse and trucking company that he
14  formed down in Florida.
15     Q    And that's called Systrans?
16  A    Yes.
17     Q    What type of trucking company is that?
18  A  He does multiple types of trucking.  I believe
19  he does LTL, he does courier work, he does full
20  truck loads, he does consulting and full logistics.
21  He does warehousing.  That's really it, he does.
22     Q    What relationship do you have with Mr.
23  Neebling's company Systrans.
24          MR. PESLAK:  Objection to form.
25  A  I have no relationship whatsoever with Jimmy

210

1    Neebling's company called Systrans.
2        Q    Okay. Why did you bring Mr. Neebling
3    along with you to Boston or invite him along with
4    you to Boston to discuss his company Systrans with
5    the people up at Iron Mountain?
6    A    Jim Neebling was working at Logisteq at the
7    time on a consultant basis trying to find customers
8    for us in Florida.
9        Q    When?
10   A    March, January, April of 2002.
11       Q    He was being paid by Logisteq?
12   A    He had, he has a written agreement by Logisteq
13   to go out --
14       Q    Who signed that agreement?
15   A    Al McGrafth.
16       Q    Okay.
17   A    Okay. And Jimmy had his business based out of
18   Florida. Jimmy had military accounts that were
19   would come in and need warehousing.
20       So at the time we had available space in Miami
21   and Jimmy was doing some work with us trying to get
22   some space filled up for his accounts in Miami.
23       Q    What space did you have in Miami in
24   March of 2002?
25   A    We had two buildings. We had one building

211

1    which was 42,000 square feet, and we had another
2    building that was approximately 100,000 square feet.
3        Q    Now, at the time that you invited Jimmy
4    to come up to Boston, did you advise anybody at
5    Logisteq that you were inviting their consultant to
6    come to Boston to take away the business from
7    Logisteq?
8    A    Actually, I did not invite Jimmy Neebling.
9    Jim Neebling basically invited himself. He's a very
10   domineering and aggressive, very smart person, and
11   he said to me Tom, he says let me go up with you and
12   see if I can cut a deal and explain to these guys
13   that if we merge one big company, it would be very
14   very --
15       Q    But he wouldn't have known about these
16   meetings up in Boston in March of 2002 unless you
17   had invited him; correct?
18   A    Correct.
19       Q    Okay. And when he came up there,
20   you're the one that introduced him to the people at
21   Iron Mountain; correct?
22   A    Yes, I did.
23       Q    And isn't it true that at some point he
24   made a power point presentation to the people at
25   Iron Mountain regarding his courier service and how

212

1    to utilize them in their business; correct?
2    A    Yes, that's correct.
3        Q    And you were present during that
4    process?
5    A    I'm not -- I don't remember if I was there or
6    not, but I do know he made a presentation.
7        Q    In that context, did you ever have any
8    discussions with Iron Mountain or any of the Iron
9    Mountain people about Mr. Neebling and the
10   advantages of doing business with Mr. Neebling?
11   A    Yes, I did.
12       Q    Okay. With whom?
13   A    With Gary Watzke.
14       Q    What did you say to Mr. Watzke about
15   Mr. Neebling and his business?
16   A    I told Mr. Watzke that Jim Neebling was a very
17   smart guy and had the knowledge for the technology
18   and courier world, and he would be an asset for
19   their company to hire on as a consultant to help
20   them integrate their current courier transportation
21   needs.
22       Q    And at the same time you were talking
23   about, to Mr. Neebling about putting his company
24   together with the other coffee business and other
25   matters, so as to sell the whole, the whole --

213

1    including purchasing the 51 percent by Iron
2    Mountain, was it kind of a package deal?
3        MR. VARN:  Excuse me. Could I have
4    that one read back.
5        Q    I'm sorry, I am going to try it again.
6        Were you talking to Iron Mountain at the same
7    time Mr. Neebling was talking to Iron Mountain at
8    the same time that the coffee people were talking to
9    Iron Mountain; was it all about the same time?
10   A    All about the same time, correct.
11       Q    And you were all talking at the same
12   general meetings kind of having Iron Mountain think
13   about making it a total purchase, your 51 percent,
14   their coffee business, Mr. Neebling's courier
15   business; correct?
16   A    Yes, that's correct.
17       Q    And you brought Ray Masucci and Mr.
18   Martocci to the table, as well as Mr. Neebling;
19   correct?
20   A    Not with Mr. Neebling, no, it was separate
21   meetings.
22       Q    They were separate meetings, but you
23   brought them to the table with Iron Mountain?
24   A    Yes, I did.
25       Q    Did you believe that this would enhance

214

1  your chances of putting together a deal with Iron
2  Mountain?
3      A   I believed it was a wonderful opportunity for
4  an investor looking to invest in companies, yes, I
5  did.
6      Q   We also talked about Jeff Stern?
7      A   Yes, sir.
8      Q   He is in the construction business?
9      A   Yes, he is.
10     Q   Do you have any present dealings with
11  Mr. Stern?
12     A   Yes, I do.
13     Q   And what dealings do you have with Mr.
14  Stern?
15     A   I contracted land with him, 16 acres to build
16  an approximate 120,000 square foot building for me.
17     Q   When?
18     A   I would say in the last six months.
19     Q   And is that contract ongoing at the
20  present time?
21     A   Yes, it is.
22     Q   What is the purpose of that building?
23     A   That would be a fitness sports complex.
24     Q   Where is that?
25     A   Vanderberg Road, Marlboro, New Jersey.

215

1      Q   And where is Marlboro, New Jersey?
2      A   Next to Freehold, New Jersey.
3      Q   And who are your partners in that
4  sports complex?
5      A   Richard Conte and Brett Pasell.
6      Q   Have you advised Mr. Stern that he was
7  the subject of a tape recording --
8      A   Yes, I did.
9      Q   -- made by you?
10     A   Yes.
11     Q   And has he seen or heard that tape
12  recording?
13     A   I don't know.
14     Q   Has he been advised the tape recording
15  will be used in litigation?
16     A   Yes.
17     Q   And has he been advised as to how that
18  tape recording will be used in any litigation?
19     A   I don't know about that.
20     Q   In connection with your tape
21  recordings --
22     A   Yes.
23     Q   -- you took tape recordings here in
24  Freehold?
25     A   Correct.

216

1      Q   Where else did you take these tape
2  recordings?
3      A   Gosh, basically just the Freehold office,
4  maybe outside in the parking lot, PJR Construction,
5  in a conference room at Logisteq, at Basil le's
6  Restaurant in Freehold.
7      Q   Did you tape record anything at
8  Sequedex?
9      A   No, I have not.
10     Q   Did you tape record anything in your
11  Massachusetts meetings in Boston?
12     A   No, I did not.
13     Q   Did you tape record anything in any
14  meetings in Pennsylvania?
15     A   No, I did not.
16     Q   Have you provided to your attorneys and
17  in turn to Mr. O'Connor at Cozzen and O'Connor all
18  of the tapes that you made of any individual
19  anywhere?
20     A   Yes, he demanded that I do that, and my
21  attorney said I would have to give all the tapes up
22  against my will.
23     Q   Why against your will?
24     A   Because I was hoping to resolve this whole
25  case with Peter.

217

1      Q   With regard to when you say "against
2  your will" because it was demand as part of the
3  discovery in this case?
4      A   Yes, correct.
5          MR. VARN:  Not in this case.
6      A   Not in this case, in the --
7      Q   In the case --
8      A   -- in Monmouth.
9      Q   -- in the case in Monmouth County?
10     A   Yes, sir.
11         MR. VARN:  I feel like I just sat
12  through a Monmouth County deposition, the case I am
13  not interested in.
14         MR. PESLAK:  Me too.
15     Q   Does Mr. Varn have any interest in the
16  Monmouth County case; does he have any involvement
17  in that case?
18     A   I can't answer that.
19     Q   Monmouth County case is pending here
20  and was brought by you against Peter Pierce and
21  Sequedex; is that correct?
22     A   Yes, sir.
23     Q   And Logisteq?
24     A   Yes.
25     Q   And Logisteq and you brought a

218

```
 1   derivative action on behalf of Logisteq against
 2   Sequedex in turn, did you not?
 3   A   Yes, I did.
 4       Q   And how did that case get paid for; how
 5   did your lawyer get paid in that case?
 6   A   Well, I knew it was going to be a lot of money
 7   to do this and --
 8       Q   I am asking you a question, sir.  I am
 9   not asking you for the justifications.  I am asking
10   you who paid your lawyer in that case, that Monmouth
11   County case?
12   A   My attorney's fees were subsidized by Iron
13   Mountain.  They gave my attorney $50,000.
14       Q   Okay.  And did that money, did that
15   check to your lawyer come from Mr. Varn and Mr.
16   Varn's office?
17   A   I don't know.
18       Q   Weren't you advised, sir, that the
19   check from, from Iron Mountain was paid through Mr.
20   Varn and his office?
21   A   I believe the money was coming through Iron
22   Mountain.  Whether the Iron Mountain was paying
23   Larry Varn's counsel, I am not sure, but I was very
24   upset because I thought they would pay for my entire
25   bill, and at this point, I am not getting paid
```

219

```
 1   anymore money for my attorney.
 2       So I really hate to continue these hours of
 3   fees being racked up with my personal expense that
 4   now I am unemployed.
 5       Q   Okay.  The fees are coming because of
 6   your private case --
 7   A   Yes.
 8       Q   -- in Monmouth County --
 9   A   Yes, sir.
10       Q   -- that you brought?
11   A   Correct.
12       Q   You know you have the right to drop
13   that case?
14   A   Yes.
15       Q   And, therefore, have no more fees?
16   A   I would personally love to resolve this case
17   and come to a happy and fair resolution among us
18   all, and I think everybody would like to see the
19   same thing happen.
20       Q   Well, Sequedex has no liability except
21   through Logisteq, and Logisteq is presently in
22   bankruptcy.  So I think that's going to be a very
23   difficult thing, but you can drop all the claims all
24   by yourself and not have any anything to worry
25   about.  Have you considered that?
```

220

```
 1   A   Yeah, I have considered, but I do have damages
 2   pending.
 3       MR. PESLAK:  There are no questions
 4   pending.  That was just a speech by Mr. Epstein.
 5       Q   So you are aware -- by the way, who did
 6   you have discussions with about the payment of the
 7   $50,000 in fees paid to your lawyer in that case?
 8   A   Gary Watzke.
 9       Q   Did you have any conversations at all
10   with Mr. Varn --
11   A   No, not -- no.
12       Q   -- about those fees?
13   A   I was very upset because Gary Watzke told
14   me --
15       MR. PESLAK:  The question is, did you
16   have discussions with Larry Varn?
17   A   No.
18       Q   Did you have any discussions at all
19   with Larry Varn --
20   A   No, I did not.
21       Q   -- about those fees?
22   A   No.
23       Q   None?
24   A   None.
25       Q   Now, in connection with the Monmouth
```

221

```
 1   County case has Mr. Varn been present throughout the
 2   process of the court hearings in the Monmouth County
 3   case?
 4   A   No, he has not.
 5       Q   You haven't seen him in the court
 6   proceedings at all?
 7   A   I seen him the very first time when I was
 8   fired from Logisteq for the hearing, Larry Varn
 9   showed up.
10       Q   Well, wait a minute, in April of 2002,
11   you're claiming that that is when you were fired
12   from Logisteq; is that correct?
13   A   Yes, correct.
14       Q   Is that when Logisteq stopped all
15   operations?
16   A   Yes, it is.
17       Q   Okay.  So nobody was working for
18   Logisteq at that point; correct?
19   A   No, I was fired prior to them closing the
20   company.
21       Q   Okay.  Prior to.  When were you fired
22   from Logisteq?
23   A   Oh God, I believe March.
24       Q   Okay.  Did you get a letter saying you
25   were fired?
```

222

1    A    Yes, I did.
2        Q    And that you weren't going to receive
3    anymore monies from Logisteq?
4    A    Correct.
5        Q    What was the basis for that?
6    A    The basis was Peter wanted me to put $950,000
7    into the company to cash flow it.
8        Q    Okay.
9    A    And I told him I would try to consider that,
10   but I am trying to raise money now to buy my 51
11   percent, and now you're telling me I need $950,000,
12   I can't even raise the money to buy you out, and he
13   said, well, if you do not put $950,000, I am going
14   to have to terminate you, and I actually have an
15   E-mail based on that.
16       Q    Okay.  So your statement is that the
17   E-mail was the one that fired you, not the closing
18   of the company?
19   A    Peter Pierce had terminated me, sir.
20       Q    And did you bring your action with
21   regard to your discharge prior to the time that the
22   company ceased its business or after?
23   A    Before.
24       Q    How soon before was it that you brought
25   your action?

223

1    A    I'm going to say approximately three weeks.
2        Q    And after you brought your action, the
3    company ceased doing business?
4    A    Yes, sir.
5        Q    Nobody was paid by Logisteq after that;
6    correct?
7    A    After they closed the company?
8        MR. PESLAK:  To the accident you have
9    knowledge of that.
10   A    No, I'm sorry, people with paid.  As a matter
11   of fact, I was told that Mike DiIanni and Al
12   McGrafth got a $25,000 bonus, and they were being
13   paid after the company actually closed down.
14       Q    Who told you that?
15   A    I believe Art Peslak did.  It was in the, it
16   was in the subpoena documented from Cozzen and
17   O'Connor.
18       Q    Was there any business being done by
19   the company after it closed down in April of 2002?
20   A    Only business was administrative, collecting
21   the receivables.
22       Q    Okay.  Who did that?
23   A    Alan McGrafth, Mike DiIanni and Sharon Cokkin,
24   Dawn, Kelly.
25       Q    Okay.  Getting back to Systrans.

224

1    A    Yes, sir.
2        Q    How many meetings was Mr. Neebling
3    involved in that you were present?
4    A    Present with who, sir?
5        Q    Anybody from Iron Mountain or Schooner?
6    A    Yes, I believe two.
7        Q    Just two?
8    A    Yes.
9        Q    And during those meetings, did you have
10   any conversations directly with Mr. Neebling
11   involving this global business idea of putting
12   together these various businesses and selling them
13   to Iron Mountain?
14   A    Yes, we have been talking about it, for six
15   months we have been trying to raise money.
16       Q    Have you placed anything in writing to
17   Mr. Neebling or he to you about this suggestion that
18   you put these businesses together and sell them
19   globally?
20   A    No.
21       Q    Everything has been oral?
22   A    Yes.
23       Q    Who else did you go to -- and this is
24   where we're going to end up gentlemen because I know
25   you have to go -- who else did you go to other than

225

1    Iron Mountain and Schooner with Mr. Neebling to sell
2    these businesses globally?
3    A    We believed we had a deal with Iron Mountain.
4    So we stayed with them.  We believed we were going
5    through a due diligence, and in my heart, I believed
6    that there would be a deal struck.
7        Q    Did you go to anybody else to try to
8    sell these businesses globally other than Iron
9    Mountain or Schooner with Mr. Neebling and with Mr.
10   Martocci and Mr. Masucci?
11   A    I went to other people.  The names I named you
12   before, but that was not with Jim Neebling.  That
13   was myself.
14       Q    I am asking you with these individuals?
15   A    No.  No.
16       Q    Did you ever go to anybody else from,
17   besides Iron Mountain?
18   A    Schooner, Schooner Capital.
19       Q    And who gave you the impression that
20   you had a deal with Iron Mountain?
21   A    Vin Ryan told me.
22       Q    Schooner Capital?
23   A    Yes, Schooner Capital, he was very interested
24   in the coffee business because it was somewhat like
25   the record storage.  He liked the fact that the

IMP04593

226

1 coffee just sits in the warehouse and you fill them
2 up, and I believe that he was going to go forward
3 with this, and I believe that I was going to have a
4 nice-sized company and continue and grow the coffee,
5 and we had have a global settlement and kind of a
6 bombshell was dropped on me when they found out I
7 was indicted. They didn't want anything to do with
8 me.
9     Q    When they found out that you were
10 indicted, that's when it all fell apart?
11 A    Yes.
12    Q    Including the idea of this global
13 company with Mr. Neebling and Messers Masucci and
14 Martocci?
15 A    Yes, sir.
16    Q    Thank you.
17    MR. EPSTEIN: I have no further
18 questions today. I am certainly not done, and I am
19 going to ask for a second deposition, and you
20 gentlemen can take whatever action you deem
21 appropriate.
22    I don't think I have wasted time today. I
23 don't think I have been redundant. I know that you
24 don't think these things are relevant, but you think
25 everything you ask is always relevant and everything

227

1 I ask is always irrelevant. So I don't know if
2 that's the test.
3     MR. VARN: I don't think I've ever said
4 anything like that.
5     MR. EPSTEIN: I think that there has
6 been a clear inference taken by me in most of your
7 remarks, and I am saying this somewhat tongue in
8 check, and I am saying this -- go off the record.
9     MR. VARN: No, leave it on the record.
10     MR. EPSTEIN: I am saying it only
11 because you said earlier you would like to go to
12 Hamlin suggesting that I was engaging in irrelevant
13 behavior. I don't think that that is true. I have
14 approximately a half a day more of Mr. Carr's
15 deposition, and I will contact you to schedule it.
16     If you together feel otherwise, you will let
17 me know, and we will take whatever action
18 appropriate to talk to Judge Hamlin.
19     MR. VARN: I assume we will deem to be
20 appropriate on behalf of our clients. I don't know
21 what I may have said other than what I said on the
22 record before lunch, I have been
23 uncharacteristically indulgent and quiet today, I
24 thought.
25     MR. EPSTEIN: I have to agree with

228

1 that. I mean, I really do have to agree with that
2 Larry, and I appreciate it.
3     MR. VARN: But the other thing that has
4 happened since the entirety of this day was consumed
5 by yourself, obviously, so far at least I have not
6 been afforded my right of cross-examination.
7     MR. EPSTEIN: I certainly agree that
8 that is correct, and I would like to continue it,
9 and, again, I will contact you and we can compare
10 schedules and/or inclinations. Thank you.
11     (Whereupon, the witness is
12 excused.)
13     (Whereupon, the deposition is
14 concluded at 4:30 p.m.)
15
16
17
18
19
20
21
22
23
24
25

229

1
2        C E R T I F I C A T E
       - - - - - - - - - -
3
4
5     I, SUSAN M. OLIVERI, a Certified Shorthand
6 Reporter and Notary Public of the State of New
7 Jersey, certify that the foregoing is a true and
8 accurate transcript of the deposition of said
9 witness who was first duly sworn by me, on the date
10 and place herein before set forth.
11     I FURTHER CERTIFY that I am neither
12 attorney, nor counsel for, nor related to or
13 employed by, any of the parties to the action in
14 which this deposition was taken, and further that I
15 am not a relative or employee of any attorney or
16 counsel employed in this action, nor am I
17 financially interested in this case.
18
19
20     _____
      SUSAN M. OLIVERI, C.S.R.
21     LICENSE NO. XI01914
22
23
24
25

Page 920

[1]                    IRON MOUNTAIN :
[2] INCORPORATED, a
[3] Pennsylvania Corporation,:
[4]                              Claimant :
[5] and :
[6] J. PETER PIERCE, :
[7]                         Respondent :
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

[1]
[2]                    ROUGHDRAFT
[3]
[4]   Case: Iron Mountain vs. J. P. Pierce
[5]
[6]   Date: 7/31/03
[7]
[8] This Draft is an unedited, uncertified
[9] translation of the proceedings for attorneys'
[10] information only.
[11]   Because it is unedited, this transcription will
[12] contain writing conflicts, misstrokes or
[13] untranslated words or phrases which will be
[14] corrected upon editing procedures accomplished only
[15] by the Official Reporter.
[16]   — Thomas Carr, CARR, sworn —.
[17]        BY MR. O'CONNOR:
[18]   Q: Mr. Carr, you spoke with James Neebling before
[19] coming in here today?
[20]   A: No, I have not.
[21]   Q: Never spoken to him — speak to him about his
[22] testimony?
[23]   A: No.
[24]   Q: Who have you spoken to in preparation for this
[25] hearing?

Page 923

[1]
[2]   A: Art Peslak.
[3]   Q: Anyone else?
[4]   A: No, sir.
[5]   Q: Is Mr. Peslak here?
[6]   A: Yes, he is.
[7]   Q: Is he your attorney?
[8]   A: Yes, he is.
[9]   Q: So you did not speak with Mr. Varn prior to
[10] coming in here today?
[11]   A: No, I did not.
[12]   THE ARBITRATOR: Do you want Mr.
[13] Peslak in the room, sir?
[14]   THE WITNESS: Would be fine. Sure.
[15]   MS. DAVIS: Yes.
[16]   THE ARBITRATOR: Do you want to get
[17] him?
[18]   MS. DAVIS: Yes.
[19]   THE ARBITRATOR: Mr. Peslak, good
[20] morning, sir. Mr. Carr has just answered
[21] a question by saying you're here, and
[22] you're his attorney. Therefore, I asked
[23] whether he wished to have you in the room,
[24] and he said that he did. Therefore, I
[25] invite you to be here and to perform such

Page 924

[1]
[2] role as his attorney as you think is
[3] appropriate under the circumstances.
[4]   MR. PESLAK: Thank you.
[5]        BY MR. O'CONNOR:
[6]   Q: Mr. Carr, you've not spoken with any other
[7] attorney that's seated across the table from me
[8] other than Mr. Peslak, is that your sworn testimony?
[9]   A: Yes, it is.
[10]   Q: The issue before us today, Mr. Carr, is
[11] whether you ever taped anyone in Pennsylvania
[12] without their consent. Did you tape anyone in
[13] Pennsylvania in connection with securing alleged
[14] evidence for Iron Mountain?
[15]   A: No, I did not.
[16]   Q: Please refer to your deposition, May 30th, 02,
[17] page 85?
[18]   THE ARBITRATOR: Mr. Peslak, do you
[19] want a copy of the transcript?
[20]        BY MR. O'CONNOR:
[21]   Q: It really starts on page 84, and the question
[22] was, line 23?
[23]   "Question: Did you tape any of the
[24] discussions that you had with any Logisteq
[25] individuals while you were meeting in

Page 925

[1]
[2]    Pennsylvania?
[3]    "Answer: There are so many tapes I
[4] really don't know, but I can check that
[5] with the tapes.
[6]    "Question: All right. So sitting here
[7] today, you don't know whether any of these
[8] tapes were taped in Pennsylvania?
[9]    "Answer: I don't remember at this
[10] time.
[11]    "Question: Were any tapes that you
[12] made involving Logisteq or Mr. Pierce or
[13] anything relating to this lawsuit or Iron
[14] Mountain's lawsuits, were any tapes made
[15] in Massachusetts?
[16]    "Answer: I can't remember.
[17] Is that truthful testimony.
[18]    THE WITNESS: Yes, it is, at the time
[19] it was.
[20]        BY MR. O'CONNOR:
[21]    Q: At the time it was. And what have you done
[22] since that sworn testimony to confirm that no tapes
[23] occurred in Pennsylvania?
[24]    A: I looked at dates in my appointment book and I
[25] listened to the tapes carefully to put them in

Page 926

[1]
[2] sequence.
[3]    Q: I see. Now, you're aware, I take it, that
[4] taping someone in Pennsylvania without their consent
[5] is illegal?
[6]    A: Yes, I'm aware of that.
[7]    Q: And were you so aware for some time?
[8]    A: Yes, I was.
[9]    Q: So if you took a tape of anyone without their
[10] consent in Pennsylvania, you knew it was improper
[11] and illegal?
[12]    MR. VARN: Objection.
[13]    THE ARBITRATOR: Basis.
[14]    MR. VARN: It's not improper and/or
[15] illegal under any and all possible
[16] circumstances.
[17]    THE ARBITRATOR: That's true.
[18] Objection sustained.
[19]        BY MR. O'CONNOR:
[20]    Q: Did you receive any advice from your lawyer or
[21] Iron Mountain's lawyer as to where you could tape
[22] and where you could not?
[23]    A: Yes, I did.
[24]    Q: From whom?
[25]    A: Mr. Michael Chazen and Garry Watzke of Iron

Page 927

[1]
[2]    Mountain.
[3]    Q: Garry Watzke?
[4]    A: Yes, sir.
[5]    THE ARBITRATOR: Would you speak just
[6] a little more loudly, please.
[7]    THE WITNESS: Sure.
[8]        BY MR. O'CONNOR:
[9]    Q: Did they tell you that that you could tape in
[10] Pennsylvania?
[11]    A: They told me I could not tape in Pennsylvania
[12] and do not do so.
[13]    Q: And when did you begin taping people in
[14] connection with this case?
[15]    MR. VARN: Objection.
[16]    THE ARBITRATOR: Basis.
[17]    MR. VARN: Assumes a fact not in
[18] evidence, when he said in relation to this
[19] case. There's a whole bunch of cases and
[20] business dealings.
[21]    THE ARBITRATOR: Well, let me shift it
[22] just a little bit: When did you begin
[23] taping conversations, business meetings,
[24] telephone calls, anything of the sort in
[25] connection with your dispute or disputes

Page 928

[1]
[2] with Mr. Peter Pierce.
[3]    THE WITNESS: To the best of my
[4] knowledge, I believe December 2001.
[5]        BY MR. O'CONNOR:
[6]    Q: Now, have you produced for anyone in this
[7] case, including Mr. Peslak or any of the Iron
[8] Mountain lawyers any tapes that you took in
[9] September 01?
[10]    A: Yes, I have.
[11]    Q: I ask for them to be produced because they
[12] were never produced or identified, September 01?
[13]    MR. VARN: Where did September come
[14] from? He just said December.
[15]    MR. O'CONNOR:
[16]    THE ARBITRATOR: Did you make any
[17] tapes in connection with your disputes
[18] with Mr. Pierce in September of 2001.
[19]    THE WITNESS: No, what I said is I
[20] believe to the best of my knowledge I
[21] started in December 2001.
[22]    THE ARBITRATOR: That's what I thought
[23] I heard.
[24]    MR. O'CONNOR: Well, I have no tapes
[25] from December 2001. They have never been

IMP04375

Iron Mountain Incorporated  v.
J. Peter Pierce (AAA)

Case 1:06-cv-10890-FDS    Document 81-14    Filed 06/21/2007    Page 4 of 38

DRAFT

TRIAL DAY 4 JULY 31, 2003, DRAFT
Vol. 1, July 31, 2003

**Page 929**

[1]
[2] identified and they have never been
[3] produced.
[4]    THE ARBITRATOR: Do we have a question
[5] for the witness.
[6]            BY MR. O'CONNOR:
[7]    Q: Who did you give those tapes to, the December
[8] 2001?
[9]    A: All tapes I have given to Mr. Art Peslak after
[10] Mr. Kircher asked me to hand over all tapes I had.
[11]    Q: So they were all original tapes that you had
[12] given to Mr. Peslak?
[13]    A: Yes, sir, at the request of Peter Pierce's
[14] attorney.
[15]    Q: So if you testified under oath that you gave
[16] original tapes to Mr. Varn and Mr. Watzke, that
[17] would be incorrect?
[18]    A: Let me rephrase the answer: I had given all
[19] tapes to my attorney, Art Peslak, what he did with
[20] the tapes, you would have to ask him.
[21]    Q: My question was very simple: Did you ever
[22] give original tapes that you took that were in your
[23] possession to Mr. Varn and Mr. Watzke?
[24]    A: No, I did not. I gave them to Art Peslak.
[25]    Q: So if you testified under oath that you did,

**Page 930**

[1]
[2] that would be incorrect?
[3]    A: It might have been a mistake.
[4]    Q: Might have been a mistake. I see?
[5]    A: Correct.
[6]    Q: And where is the taping equipment that you
[7] used in connection with taping persons in this case?
[8]    A: It's the same one I showed Mr. Pierce when I
[9] was taping him. This, here.
[10]    Q: And show the — show the Judge how you would
[11] tape people —
[12]    THE ARBITRATOR: Let's state for the
[13] record what it is that we have just seen.
[14] Do you want to just describe it, so I have
[15] something on the record.
[16]    THE WITNESS: This is a microcassette
[17] player by GE fast play back. At the time
[18] of taping conversations, I would plug the
[19] mic in the tape recorder, put the
[20] microcassette in, put this in my pocket
[21] and attach the clip to the inside of my
[22] jacket, which I showed Mr. Peter Pierce
[23] before all the litigation started and told
[24] him I was taping him at the time.
[25]            BY MR. O'CONNOR:

**Page 931**

[1]
[2]    Q: Would it be observed to anyone with respect to
[3] the equipment and the mic that you used that you
[4] were using it, or did you hide it?
[5]    A: I hid it.
[6]    Q: Okay?
[7]    THE ARBITRATOR: Let me be sure the
[8] record is clear. The witness has
[9] demonstrated that the microrecorder that I
[10] was using, which has been described, would
[11] be placed in the inside of his left-hand
[12] side of his jacket and that the
[13] microphone, itself, would be clipped to
[14] the inside but lead edge on the left side
[15] of the jacket.
[16]    Mr. O'Connor — that is right.
[17]    A: Yes, sir.
[18]            BY MR. O'CONNOR:
[19]    Q: How long have you had that equipment that's in
[20] front of you?
[21]    A: I received this from an employee who was
[22] taping Mike DiIanni at the time for conspiracy and
[23] he had begin me this tape and told me it would be a
[24] good idea to tape Mike with all the chaos that's
[25] been going on between Iron Mountain, pierce and

**Page 932**

[1]
[2]    Logisteq.
[3]    Q: Can I have an answer to my question?
[4]    A: Yes, sir. I had this since December of 2001.
[5]    Q: Who Dave gave it to you?
[6]    A: Joey DiPasquale.
[7]    Q: Where does Joey DiPasquale live?
[8]    A: 71 Longwood Drive, Manalapan New Jersey,
[9] 07726.
[10]    Q: Does he still live there?
[11]    A: Yes, he does.
[12]    Q: So you didn't buy this equipment?
[13]    A: No, I did not.
[14]    Q: And it was a gift to you from Joey DiPasquale?
[15]    A: It was not a gift, it was lent to me.
[16]    Q: And you still have it?
[17]    A: Yes, I do.
[18]    Q: He hasn't asked for it back?
[19]    A: He has.
[20]    Q: And did you refuse to give it to him?
[21]    A: Yes, I did. I told him I would need it for
[22] evidence.
[23]    Q: Okay. So the taping that you performed in
[24] connection with this tape in this case, did you do
[25] it on your own or did you do it at the request of

TRIAL DAY 4, JULY 31, 2003, DRAFT
Vol. 1, July 31, 2003
DRAFT
Iron Mountain Incorporated v.
J. Peter Pierce (AAA)
Case 1:05-cv-00596-DS    Document 51-14    Filed 06/21/2007    Page 5 of 28

Page 933

[1]
[2]    Iron Mountain?
[3]    MR. VARN: Objection.
[4]    THE ARBITRATOR: Basis.
[5]    MR. VARN: Assumes facts not in
[6] evidence when he says in connection with
[7] this case.
[8]    THE ARBITRATOR: Well, I don't know.
[9]    MR. O'CONNOR: I will rephrase the
[10] question.
[11]    THE ARBITRATOR: We're talking, Mr.
[12] Carr — well maybe I better not say
[13] anything.
[14]    Yeah, the question is going to be
[15] rephrased. Go ahead, Mr. O'Connor.
[16]    A: I did it all on my own, to answer the
[17] question.
[18]        BY MR. O'CONNOR:
[19]    Q: Mr. Carr, when you would tape people while you
[20] were employed at Transport in Logisteq did you have
[21] a specific purpose as to who you wanted to tape?
[22] Did you have a game plan?
[23]    A: Yes, I did.
[24]    Q: And the game plan was what?
[25]    A: Game plan was to have the tape in my

Page 934

[1]
[2] possession to try to prove to Peter what was going
[3] on internally because Peter was very busy with
[4] operations and different things going on, and I
[5] thought I would sit with Peter and let him listen to
[6] the tape, and for myself, in case I was squeezed out
[7] of the company.
[8]    Q: So you believed that Peter Pierce was unaware
[9] of what was going on in Logisteq and you wanted to
[10] tape certain things for his eyes and ears so he
[11] would believe you, is that your testimony?
[12]    A: No, it is not. I believe Peter Pierce was
[13] well aware of what was going on with Logisteq, he
[14] was a 51% shareholder.
[15]    I don't believe that he was aware of
[16] the immature actions of Mike DiIanni.
[17]    Q: And you wanted to tape people to demonstrate
[18] that Mike DiIanni was immature and doing immature
[19] actions, is that your testimony?
[20]    A: Yes.
[21]    Q: Is that the sole purpose of your taping?
[22]    A: No, sir.
[23]    MR. VARN: Objection.
[24]    THE ARBITRATOR: The objection is
[25] well-founded which is to say the witness

Page 935

[1]
[2] said also he was taping to protect himself
[3] in the event there was an attempt to
[4] squeeze him out.
[5]    THE WITNESS: Yes, sir. Correct.
[6]        BY MR. O'CONNOR:
[7]    Q: Of whom was your first taping?
[8]    A: I really don't remember my first taping.
[9]    Q: You don't. You don't know where?
[10]    A: I believe — I believe it was Mike DiIanni and
[11] Alan McGrath in the Freehold office. If that's not
[12] correct, it was Jeff Stern. So it was one or the
[13] other.
[14]    Q: But it would have been December 2001?
[15]    A: Late December, early January.
[16]    Q: Well, I thought I heard you testify five
[17] minutes ago that your first taping was December
[18] 2001?
[19]    A: You did hear me say that.
[20]    Q: Is that wrong?
[21]    A: I believe it was December, but I'm not
[22] absolutely positive of the dates.
[23]    Q: I see. Did you ever tape any Iron Mountain
[24] employees?
[25]    A: No, I did not.

Page 936

[1]
[2]    Q: You don't know — you never met Richard Reese,
[3] right?
[4]    A: Yes, I did.
[5]    Q: You testified under oath you never met him?
[6]    MR. VARN: Objection. Improper
[7] confrontation, improper impeachment.
[8]    MR. O'CONNOR: Page 159.
[9]    THE WITNESS: I don't have to look, I
[10] remember what I said. I said Richard
[11] Reese, who is that. Mr. Kircher said he
[12] is the CEO of Iron Mountain. I said, yes,
[13] I did meet him, I shook his hand and said
[14] Hello, and after that I had many different
[15] meetings with Richard.
[16]        BY MR. O'CONNOR:
[17]    Q: Go to page 159 of your deposition.
[18]    A: Yes, I see —
[19]    THE ARBITRATOR: Hold on.
[20]    MR. VARN: It would appear to me,
[21] since depositions are being used that were
[22] not conducted under the auspices of this
[23] case, that the position previously
[24] asserted about depositions in other cases
[25] has been waived?

Iron Mountain Incorporated v.
J. Peter Pierce (AAA)

Case 1:05-cv-10890-FDS   Document 81-14   Filed 06/21/2007   Page 8 of 58

DRAFT
TRIAL DAY 4 JULY 31, 2003, DRAFT
Vol. 1, July 31, 2003

Page 937

[1]
[2]    THE ARBITRATOR: I don't know that
[3]  there's a waiver. Maybe I will let Mr.
[4]  O'Connor speak to that, if he wishes; but
[5]  I think it's always been my view that
[6]  testimony taken under oath in any case,
[7]  whether it's this case or some case in
[8]  southern California can be used to impeach
[9]  the witness if it is thought to be
[10]  contradictory.
[11]    MR. O'CONNOR: That's true. It's a
[12]  different issue.
[13]    THE ARBITRATOR: Go ahead.
[14]    Do you have the page in front of you,
[15]  Mr. Carr.
[16]    A: Yes, where I said I've met — have you ever
[17]  met him? "I might have met him once."
[18]  That's what I said, yes.
[19]        BY MR. O'CONNOR:
[20]    Q: No, here's what you said. Question line 21,
[21]  let me read it for Mr.
[22]    A: Sure.
[23]    Q: Do you know that Mr. Reese is a principal in
[24]  Schooner Capital, Mr. Reese the CEO of Iron
[25]  Mountain?

Page 938

[1]
[2]    "Answer: I don't know who Mr. Reese
[3]  is.
[4]    "Question: You never met him, Richard
[5]  Reese?
[6]    "Answer: No."
[7]  That's your testimony. Is that
[8]  truthful.
[9]    THE WITNESS: No — I was very nervous
[10]  at the time, there was cameras on me,
[11]  everybody was staring at me, trying to
[12]  intimidate me, so I wasn't sure, that's
[13]  why I said I have met him once much that's
[14]  my answer.
[15]        BY MR. O'CONNOR:
[16]    Q: Is this testimony untruthful?
[17]    A: It was truthful at the time, yes.
[18]    Q: But it's not truthful now?
[19]    A: I have met Mr. Reese at that time and then
[20]  have met him many times afterwards.
[21]    Q: So this is untruthful testimony in your
[22]  deposition under oath?
[23]    A: No, sir, it is not — it's truthful.
[24]    Q: The testimony I just read to you is truthful?
[25]    A: Yes, sir.

Page 939

[1]
[2]    Q: Okay. Are you nervous now?
[3]    A: Yes, sir, I am.
[4]    Q: Does that affect your ability to tell the
[5]  truth?
[6]    A: Absolutely not.
[7]    Q: Okay. Did you ever let Iron Mountain know you
[8]  were taping?
[9]    A: Yes, I did.
[10]    Q: Who did you advise?
[11]    A: Garry Watzke.
[12]    Q: Anybody else?
[13]    A: No, sir.
[14]    Q: Do you know Garry Watzke?
[15]    A: Yes, I do.
[16]    Q: Do you know him well?
[17]    A: No, I do not know him well.
[18]    Q: How many times have you met him?
[19]    A: I would say any time from six to ten times.
[20]    Q: Did Iron Mountain tell you that you shouldn't
[21]  tape people without their permission?
[22]    A: No, they did not.
[23]    Q: So they agreed that you should tape?
[24]    MR. VARN: Objection.
[25]    THE WITNESS: They —

Page 940

[1]
[2]    THE ARBITRATOR: Wait a minute.
[3]  There's a middle ground. What did Iron
[4]  Mountain, through the person of Mr. Watzke
[5]  tell you about taping, if anything.
[6]    THE WITNESS: Garry Watzke told me be
[7]  careful, do not tape in Pennsylvania, it's
[8]  against the law, for my own good.
[9]        BY MR. O'CONNOR:
[10]    Q: Would you give Mr. Watzke updates when you
[11]  would tape people?
[12]    A: Occasionally.
[13]    Q: Well, did you — every time you did a tape, is
[14]  it not a fact that you would call Mr. Watzke after
[15]  you had taped employees from Logisteq and give him
[16]  an update on what you found out for him?
[17]    A: No, that is not a fact.
[18]    Q: It's not. That would be false?
[19]    A: Yes, that would be false.
[20]    Q: Go to your deposition again, on page 50?
[21]    A: Okay.
[22]    Q: And we will read into the record what you
[23]  testified under oath?
[24]    A: Sure.
[25]    Q: In your dep?

TRIAL DAY 4 JULY 31, 2003, DRAFT
Vol. 1, July 31, 2003

Case 1:05-cv-10890-FDS    Document 81-14    Filed 06/19/2008    Page 1 of 2

DRAFT

Iron Mountain Incorporated v.
J. Peter Pierce (AAA)

Page 941

[2] MS. DAVIS: Is it the same one?

[3] MR. O'CONNOR: Yeah.

[4] Q: Really starts at the bottom of page 49, do you

[5] have that?

[6] A: Yes.

[7] Q: The question to you was: "Now do you

[8] remember, have any general recollection of why you

[9] were telephoning Mr. Watzke September and October?

[10] "Answer: I believe I was calling Mr.

[11] Watzke because everyday I was taping

[12] employees from Logisteq I believe I would

[13] give him an update on any new status that

[14] was going on with Logisteq.

[15] "Question: Okay. So just so the

[16] record is straight, when you say you were

[17] taping, you were having conversations with

[18] a Logisteq employees but you were — you

[19] had on you somewhere a tape recorder, a

[20] dictaphone or something recording device

[21] and you were recording the conversation?

[22] "Answer: Yes."

[23] Does that refresh your recollection.

[24] THE WITNESS: Yes, it does.

[25] Q: So were you, in fact, updating Watzke every

Page 942

[2] time you were taping people?

[3] A: I can't say every time. You're saying every

[4] time. I don't remember every time, but, yes, I did

[5] update him.

[6] Q: And when you would do the tape and update Mr.

[7] Watzke about what you found out on the tape, would

[8] you give him a copy of the tape?

[9] A: No, I would not.

[10] Q: Did anyone suggest to you who you should tape

[11] and what information you should attempt to receive?

[12] A: No one.

[13] Q: Before the taping that occurred in December of

[14] 2001, were you ever in the habit of taping people?

[15] A: No, I was not.

[16] Q: Is this the first time, December 2001 and

[17] thereafter that you began taping people?

[18] A: No, it is not.

[19] Q: So you have taped people in other situations?

[20] A: Yes, I have.

[21] Q: Other than matters involving this case?

[22] A: Correct.

[23] Q: And was that before or after?

[24] A: That was before.

[25] Q: Have you taped people after the last tape you

Page 943

[2] took in connection with this case?

[3] A: Yes, I have.

[4] Q: Anyone in connection with this case?

[5] A: No, sir.

[6] THE ARBITRATOR: Are you taping this

[7] proceeding.

[8] THE WITNESS: No, I am not.

[9] Q: You understood that when you were taping

[10] people, that you were gathering information from Mr.

[11] Varn for use in this lawsuit, did you not?

[12] A: No, sir, I did not.

[13] Q: Page 13 of your dep?

[14] A: Okay.

[15] Q: Turn to it, please.

[16] Let me read for you, because this was

[17] taken in May of 02?

[18] A: Yes.

[19] Q: "Question: Okay. Have you gathered

[20] information about Peter Pierce and Logisteq and

[21] given that information to Larry Varn?

[22] "Answer: Yes.

[23] Is that truthful.

[24] A: Yes, it is.

[25] Q: So that's truthful?

Page 944

[2] A: Yes.

[3] Q: "Question: And did you know that knowing

[4] that Mr. Varn represents Iron Mountain in a lawsuit

[5] against Peter Pierce?

[6] "Answer: Yes, I did.

[7] Is that truthful.

[8] A: Yes, it is.

[9] Q: "Question: Did you understand that you were

[10] gathering that information for Mr. Varn's

[11] use in that lawsuit?

[12] "Answer: Absolutely.

[13] Is that truthful.

[14] A: Yes, it is.

[15] Q: So you wish to change the sworn testimony you

[16] have given here?

[17] A: No, I would like to add to it.

[18] Q: Go ahead, add to it?

[19] A: I would like to add to, I was doing it for

[20] myself. I was taping for myself to protect Tom

[21] Carr.

[22] Q: So when you answered "Absolutely" to your

[23] understanding that you were gathering information

[24] for Mr. Varn's use, is that false?

[25] A: No, that's true.

Iron Mountain Incorporated v.
J. Peter Pierce (A.L.X.)    Case 1:05-cv-10890-FDS    Document 81-14    Filed 06/21/2007    Page 1 of 31

DRAFT
TRIAL DAY 4 JULY 31, 2003, DRAFT
Vol. 1, July 31, 2003

Page 945

[1]
[2]    Q: Oh, that's true?
[3]    A: Yes.
[4]    Q: Now, what promises were given to you by Iron
[5] Mountain, if any, or their lawyers, for gathering
[6] information on their behalf for use in this lawsuit?
[7]    A: There was no promises given. They did tell me
[8] that they would help me, compensate me for my
[9] attorney fees.
[10]    Q: Oh, they did?
[11]    A: Yes, they did.
[12]    Q: Who told you that?
[13]    A: Garry Watzke.
[14]    Q: At what point in time did he tell you that?
[15]    A: I'm not sure what point in time it was.
[16]    Q: You're not sure?
[17]    A: That's what I said, sir.
[18]    Q: Was it prior to you filing a lawsuit?
[19]    A: Yes, it was.
[20]    Q: Okay. Was it in the year 2001?
[21]    A: Could have been the late end of 2001, early
[22] 2002.
[23]    Q: And when did you file your lawsuit against Mr.
[24] Pierce?
[25]    A: I believe it was April of 2002.

Page 946

[1]
[2]    Q: So it was several months before you filed your
[3] lawsuit?
[4]    A: Correct.
[5]    Q: That — let me finish, please; that a promise
[6] was made by Garry Watzke to you that they would fund
[7] a lawsuit?
[8]    A: For the record, he didn't promise, he said he
[9] would help compensate me for my attorney fees.
[10]    Q: Okay. And that was Watzke, who sits at the
[11] end of the table?
[12]    A: Good looking guy down at the end of the table.
[13]    Q: Right. The good looking guy.
[14]    And did he fulfill that promise to
[15] you?
[16]    A: Yes, he did.
[17]    Q: And was that promise fulfilled at a dinner in
[18] New York?
[19]    A: I'm not sure if it was at the dinner or it was
[20] at the meeting in Boston.
[21]    Q: I see. And what was said to you that
[22] indicated to you that the promise would be
[23] fulfilled?
[24]    A: That my attorney would ask for a 50
[25] thousand-dollar detainer and this could be well into

Page 947

[1]
[2] the one or two hundred thousand mark if it goes to
[3] trial; and at the time Garry said that we would
[4] compensate you and help you with the container —
[5]    Q: Retainer?
[6]    A: I'm sorry, retainer.
[7]    Q: And did your lawyer, in fact, sends you a
[8] bill, a retainer for 50 thousand?
[9]    A: My attorney sends me bills every month, yes.
[10]    Q: In connection with this case, did he send you
[11] a retainer for 50 thousand?
[12]    A: I believe he did.
[13]    MR. VARN: Objection.
[14]    MR. O'CONNOR: Okay. We're going to
[15] ask you to produce all the bills from Mr.
[16] Peslak that led to the funding of this 50
[17] thousand.
[18]    THE WITNESS: Fine.
[19]    MR. O'CONNOR: Do you have those.
[20]    THE WITNESS: I believe I can find
[21] them.
[22]    BY MR. O'CONNOR:
[23]    Q: How much have you paid Mr. Peslak?
[24]    A: I have paid Mr. Peslak approximately 10
[25] thousand dollars.

Page 948

[1]
[2]    Q: Out of your pocket?
[3]    A: Yes, out of my pocket.
[4]    Q: And that's it?
[5]    A: Yes.
[6]    Q: Did Sullivan and Worcester help you in the
[7] preparation of your legal papers?
[8]    A: No, they did not.
[9]    Q: Did they do Memorandum of Law for you?
[10]    A: No, they did not.
[11]    Q: Are you certain?
[12]    A: Yes.
[13]    Q: When did you retain Mr. Peslak in connection
[14] with your lawsuit against Mr. Pierce?
[15]    A: Mr. Peslak has been my attorney since 1994 and
[16] all through the process of having the dispute with
[17] Peter, I've been consulting him on which direction I
[18] should go, and he told me to try to work it out with
[19] Peter.
[20]    Q: When did you retain Mr. Peslak in connection
[21] with your case against Peter Pierce?
[22]    A: April 2002.
[23]    Q: Are you certain of that?
[24]    A: I'm not sure of the question. If you're
[25] asking that's when I started the lawsuit —

TRIAL DAY 4 JULY 31, 2003  DRAFT Case 1:05-cv-10990-FDS  Document PRAFT14  Filed 06/20/2008 Iron Mountain Page incorporated v.

Vol. 1, July 31, 2003

J. Peter Pierce (AAA)

Page 949

[1]
[2] Q: No, I didn't ask that question?
[3] A: You see I really can't give you a date because
[4] I would use Art Peslak as an in-house attorney for
[5] me, and we have been talking ever since the
[6] acquisition, January 2001. So we were talking back
[7] and forth. Going back, I had Art Peslak draw up a
[8] letter to Mr. Pierce prior to 2002 requesting that
[9] we have a meeting and on, on, and on.
[10] Q: Excuse me, you didn't finish?
[11] A: I'm finished.
[12] Q: Where is that letter?
[13] A: I believe Art Peslak has a copy. I believe I
[14] may have a copy with me.
[15] Q: Yeah?
[16] A: Art, do you have a copy of that letter with
[17] you?
[18] THE ARBITRATOR: You can't get help.
[19] THE WITNESS: Okay. I'm sorry, just
[20] bear with me a second.
[21]
[22] THE ARBITRATOR: Unless, of course,
[23] your attorney volunteers to help you and
[24] I'm not saying he should. .
[25] BY MR. O'CONNOR:

Page 950

[1]
[2] Q: Mr. Carr, you can look for it at maybe a
[3] break?
[4] A: Okay. That's fine.
[5] Q: Okay?
[6] A: Sure.
[7] Q: How much is — but Larry Varn also promised
[8] you that you would be assisted with your legal
[9] costs, too, isn't that correct?
[10] A: No, I don't — I don't remember Larry, I
[11] remember Garry Watzke telling me.
[12] Q: Go to your deposition again on page 14?
[13] A: Okay. Starts at line 13.
[14] "Question: Has Iron Mountain either
[15] paid or offered to pay the legal expense
[16] of this presents lawsuit that brings us
[17] here today?" That's referring to the Carr
[18] versus Pierce lawsuit?
[19] "Answer: Yes.
[20] "Question: Okay. Tell me about that?
[21] "Answer: I was very concerned about
[22] the legal cost and they told that they
[23] would assist me in legal costs.
[24] "Question: Okay and when you say
[25] "They" who is they?

Page 951

[1]
[2] "Answer: Larry Varn and Garry Watzke."
[3] THE WITNESS: Okay.
[4] BY MR. O'CONNOR:
[5] Q: Is that truthful?
[6] A: Yes, it is.
[7] Q: So now you remember Mr. Varn also promised the
[8] payment of legal expense?
[9] A: Maybe Mr. Varn was with Mr. Watzke at the time
[10] telling me, yes, he might have told me that.
[11] Q: Have you read these depositions before you
[12] came here?
[13] A: No, I did not.
[14] Q: How much has been paid to date?
[15] THE ARBITRATOR: By whom to whom? .
[16] BY MR. O'CONNOR:
[17] Q: Iron Mountain or Larry Varn or Sullivan and
[18] Worcester to you or to your attorney?
[19] A: No money has been paid to me, and I believe 50
[20] thousand dollars was paid to Art Peslak.
[21] Q: Did there Peslak indicate that to you?
[22] A: Yes, he did.
[23] Q: Is that shown on a credit to any bills he sent
[24] to you?
[25] A: Yes, it is.

Page 952

[1]
[2] Q: And you have those bills and you will produce
[3] them?
[4] A: Yes, I will.
[5] MR. PESLAK: Subject to my review of
[6] them.
[7] THE ARBITRATOR: Indicating for the
[8] record, that was Mr. Peslak being Mr.
[9] Carr's counsel and saying that he reserves
[10] the right to review any document which is
[11] requested of Mr. Carr before it's produced
[12] and if he has an issue, he will bring it
[13] to our attention before it's produced.
[14] Fair, Mr. Peslak.
[15] MR. PESLAK: That's correct.
[16] BY MR. O'CONNOR:
[17] Q: Do you have your day planner with you, Mr.
[18] Carr?
[19] A: Yes, I do.
[20] Q: Would you produce it?
[21] A: Which year?
[22] Q: The year we're talking about, 2002?
[23] A: 2002.
[24] Q: If you have 2001 we will take that, too?
[25] A: 2001. Would you like 2000, also?

Iron Mountain Incorporated v.
J. Peter Pierce (AAA)

Case 1:05-cv-10890-FDS    Document 81-14    Filed 06/21/2007    Page 1 of 2

DRAFT

TRIAL DAY 1, JULY 31, 2003, DRAFT
Vol. 1, July 31, 2003

---

Page 953

[1]
[2]   Q: We will take 2000, too.
[3]   MR. O'CONNOR: Could we mark these as
[4] Pierce exhibits.
[5]   MR. VARN: Shouldn't we send these out
[6] to be copied.
[7]   MR. O'CONNOR: We will. We will. But
[8] I need a record: 2000 will be 177; 2001
[9] will be 178, and 2002 will be 179.
[10]   BY MR. O'CONNOR:
[11]   Q: Did you make any changes to these day planners
[12] within the last year, any additions or deletions?
[13]   A: No, I have not.
[14]   Q: Is this day planner in your hand?
[15]   A: Yes, it is.
[16]   Q: January 29th is ripped out of your day
[17] planner. Where is it, 2002?
[18]   MR. VARN: Can I see the exhibit —
[19]   MR. O'CONNOR: What's missing is, this
[20] is just for the record, January 29th,
[21] January 30th, January 31st, February 1,
[22] February 2.
[23]   THE ARBITRATOR: Of.
[24]   MR. O'CONNOR: 2002.
[25]   THE ARBITRATOR: Show it to Mr. Varn.

Page 954

[1]
[2]   Mr. Peslak, do you want to sit down
[3] here closer by your client? I mean, we
[4] will have to move a chair or something,
[5] but.
[6]   MR. PESLAK: I think Mr. O'Connor
[7] isn't moving the page. This is the whole
[8] week.
[9]   MR. O'CONNOR: Maybe I missed it.
[10]   THE ARBITRATOR: Off the record.
[11]   THE ARBITRATOR: Now, on the record,
[12] the question has been put that the pages
[13] representing the dates of January 29, 30,
[14] 31, February 1 at least were, quote,
[15] ripped out, unquote, of your 2002 daytimer
[16] daily journal.
[17]   Now, are those pages missing, Mr.
[18] Peslak and Mr. Varn?
[19]   MR. VARN: No, they're right here.
[20] Each two pages is a week.
[21]   MR. O'CONNOR: Oh, I see, the heading
[22] is January 28th, but there is 3 dates.
[23]   Okay. .
[24]   BY MR. O'CONNOR:
[25]   Q: And these entries that you made here for

Page 955

[1]
[2]   January 29th appear to be in blue ink for certain
[3] entries and the journal mostly — well, is in black
[4] ink.
[5]   Let me show you January 29th?
[6]   MR. VARN: May I see it first?
[7]   THE ARBITRATOR: Yes.
[8]   THE ARBITRATOR: All right. You've
[9] seen it, Mr. Varn, let's put it in front
[10] of the witness.
[11]   MR. VARN: May I have the question.
[12]   MR. VARN: Objection.
[13]   THE ARBITRATOR: And the question is.
[14]   BY MR. O'CONNOR:
[15]   Q: Did you make any entries in that journal in
[16] blue ink recently?
[17]   A: No, I have not, but the entire page of January
[18] 29th is all in black ink, for the record, there is
[19] no blue ink on January 29th.
[20]   Q: Maybe I'm going blind?
[21]   A: You are. It's all black. January 29th.
[22]   Q: You're right, it's January 30th it's in blue.
[23]   Read into the record every entry for
[24] January 29th in your calendar and the time?
[25]   THE ARBITRATOR: Give the time and the

Page 956

[1]
[2] information entered, please.
[3]   MR. VARN: Excuse me, would it be
[4] possible to get a Xerox of those pages.
[5]   MR. O'CONNOR: You're going to listen
[6] to it.
[7]   THE ARBITRATOR: Hold on. Don't
[8] answer yet, Mr. Carr.
[9]   THE ARBITRATOR: Are these the only
[10] dates.
[11]   MR. O'CONNOR: January 7th and January
[12] 29th. (Discussion off the record.)
[13]   MR. O'CONNOR: I could move on while
[14] we're waiting for that.
[15]   THE ARBITRATOR: Of course. .
[16]   BY MR. O'CONNOR:
[17]   Q: In connection with these entries that we're
[18] going to go over on the 7th and 29th, I take it that
[19] you have been totally truthful with your attorney,
[20] Mr. Peslak, with respect to the activities that you
[21] performed on January 29th?
[22]   A: Yes, I have.
[23]   MR. PESLAK: I just want to caution
[24] the witness, don't reveal any
[25] communications you may have had with me.

**Page 957**

[1]
[2]   MR. O'CONNOR: I didn't ask that.
[3]   THE ARBITRATOR: Or said in non-lawyer
[4] language, Mr. Carr, do not tell us what
[5] you said to your attorney or what your
[6] attorney said to you unless you first
[7] consult with him, because you're entitled
[8] to exercise the attorney/client privilege
[9] and I would only want you to waive that
[10] privilege by answering a question
[11] concerning what you said or he said after
[12] you have consulted with him to see if
[13] that's an appropriate decision for you to
[14] make.
[15]   THE WITNESS: I understand.
[16]        BY MR. O'CONNOR:
[17]   Q: But it's fair to state you never gave false
[18] information to your attorney about the events that
[19] occurred in January 2002, correct?
[20]   A: That's correct.
[21]   Q: And is it fair to state that you gave your
[22] attorney information about your attendance at
[23] certain board — a certain board meeting for
[24] Logisteq?
[25]   A: This is correct.

**Page 958**

[1]
[2]   Q: And the information you gave your attorney
[3] about your attendance at a certain board meeting at
[4] Logisteq would have been truthful?
[5]   A: Yes, it would.
[6]   Q: Okay. And I take it it is your sworn
[7] testimony, Mr. Carr, that you did, indeed, tape a
[8] Logisteq board meeting where Mr. Pierce, DiIanni,
[9] McGrath, Huntley, and yourself were present?
[10]   A: This is correct.
[11]   Q: And when did you so tape that board meeting?
[12]   A: I believe it was January 2002.
[13]   Q: What day?
[14]   A: I'm not sure of the exact dates.
[15]   Q: Was it early January or was it late January?
[16]   A: I believe I taped for the entire month of
[17] January.
[18]   Q: My question is a very simple one, sir: Did
[19] you tape a Logisteq board meeting in January 2002?
[20]   A: Yes, I did.
[21]   Q: Was there only one such board meeting?
[22]   A: Yes, there was.
[23]   Q: Okay. Now, can you tell us whether the tape
[24] of that board meeting occurred in early January or
[25] late January?

**Page 959**

[1]
[2]   A: Early January.
[3]   Q: You believe it was early January?
[4]   A: Yes.
[5]   Q: Do you recall the date?
[6]   A: No, I do not recall the date.
[7]   Q: Would your calendar for January or the
[8] specific dates of the 7th or 29th refresh your
[9] recollection?
[10]   A: I will take a look.
[11]   THE ARBITRATOR: The question pending
[12] before the witness, I believe, is whether
[13] you can decide, having looked at your
[14] daytimer what the date was of this
[15] Logisteq board meeting, which you taped.
[16] Are you able to do so, sir.
[17]   THE WITNESS: I believe it was the
[18] week of January 7th.
[19]        BY MR. O'CONNOR:
[20]   Q: Now, is there any reference during the week of
[21] January 7th to a board meeting?
[22]   A: The only reference I see here is I have a
[23] meeting with Peters at 11:00 a.m. on Monday, January
[24] 7th. That's the only date I have circled in on this
[25] page for that week and — let me see.

**Page 960**

[1]
[2]   Q: There seems — do you see January 29th?
[3]   A: January 29th? Yes, I do.
[4]   Q: Do you see any reference to a board meeting
[5] there?
[6]   A: Oh, yes, board meeting on Tuesday, January
[7] 29th at 10:00 a.m. in Paoli, Pennsylvania.
[8]   Q: Oh, you see that?
[9]   A: Yes, I do.
[10]   Q: So does that refresh your recollection that
[11] you attended a board meeting on January 29th in
[12] Paoli, Pennsylvania?
[13]   A: Yes, it does.
[14]   Q: Okay. And the taping that you did was at that
[15] board meeting?
[16]   A: No, it was not.
[17]   Q: So let me see if I have this right.
[18]     You attended a board meeting at
[19] January 29th, 2002 in Paoli, you have a reference
[20] here at 10:00, correct?
[21]   A: Yes.
[22]   Q: 10 o'clock. And it's your sworn testimony you
[23] did not tape that board meeting?
[24]   A: No, I did not. Not in Pennsylvania.
[25]   Q: No, that's not my question?

Iron Mountain Incorporated v.
J. Peter Pierce (AAA)

Case 1:05-cv-10890-FDS    Document 81-14    Filed 06/21/2007    Page 13 of 18

DRAFT
TRIAL DAY 4, JULY 31, 2003, DRAFT
Vol. 1, July 31, 2003

Page 961

[1]
[2]    THE ARBITRATOR: He said no, he did
[3] not.
[4]              BY MR. O'CONNOR:
[5]    Q: How long did that board meeting last in
[6] Pennsylvania?
[7]    A: I really don't remember.
[8]    Q: Well, you have a reference here to a Pepsi
[9] lunch at 11:30. Did you leave the board meeting to
[10] go to a Pepsi lunch?
[11]    A: No, I had to cancel that lunch. That was a
[12] special meeting on Tuesday, the 29th. I was set up
[13] for a lunch with Pepsi Cola. I then had set up a
[14] meeting with Peter for Tuesday, the 29th.
[15]    Q: Who attended the board meeting in Paoli on
[16] January 29th?
[17]    A: I believe it was Tom Carr, Peter Pierce, Alan
[18] McGrath and Doug Huntley.
[19]    Q: How about Mike DiIanni?
[20]    A: I don't think he was there.
[21]    Q: And can you tell us how long the board meeting
[22] lasted?
[23]    A: I really don't know. Approximately three
[24] hours, two hours.
[25]    Q: What was discussed at the board meeting?

Page 962

[1]
[2]    A: I believe it was a meeting about the
[3] termination of Mike DiIanni on the 29th.
[4]    Q: What about the budget of Logisteq. Was that
[5] being discussed at that board meeting?
[6]    A: I don't believe it was on the 29th.
[7]    Q: What else was discussed other than this, your,
[8] quote, termination of Mike DiIanni?
[9]    A: Yes.
[10]    Q: What else was discussed?
[11]    A: About how we were going to continue the
[12] company and improve the working habits and relations
[13] with the employees.
[14]    Q: Were personnel cuts discussed at that meeting?
[15]    A: Yes, Mike DiIanni.
[16]    Q: Was financial information presented at that
[17] meeting?
[18]    A: I believe not. No.
[19]    Q: Was there any discussion of employees who were
[20] on Logisteq's payroll that were doing work for other
[21] companies at that meeting?
[22]    A: No, I believe we had a meeting prior to that
[23] about the Sequedex employees on Logisteq.
[24]    Q: So your answer is no to that question?
[25]    A: Yes, it is.

Page 963

[1]
[2]    Q: Why is it that you did not tape that meeting?
[3]    A: I knew that I would not be able to tape in
[4] Pennsylvania, plus I didn't feel comfortable taping
[5] out of my own area, my own office.
[6]    Q: So, although you attended a 3-hour board
[7] meeting on January 29th where in you believe the
[8] potential termination of DiIanni was discussed, some
[9] personnel issues?
[10]    A: Yes.
[11]    Q: What else do you recall in the 3-hour meeting?
[12]    A: I believe Peter and I were talking on basis of
[13] how we were going to move the company forward.
[14]    Q: Okay. The so-called tape in question, you're
[15] familiar with the tape that we're here about, it's a
[16] tape of what we claim to be a board meeting?
[17]    A: Okay, yes, I am.
[18]    Q: Are you aware of the tape?
[19]    A: Yes.
[20]    Q: Did you listen to the tape before you came
[21] here?
[22]    A: Yes, I did.
[23]    Q: Okay. And was it your habit when you would
[24] tape — did anyone train you how to tape correctly,
[25] what you would have to say before you would begin

Page 964

[1]
[2] the taping to identify it by date and time and where
[3] you were and where you were going? Did you have any
[4] training, no?
[5]    A: No, I had no training.
[6]    MR. VARN: Objection.
[7]    THE ARBITRATOR: What's the basis of
[8] the objection? Do you withdraw the
[9] objection.
[10]    MR. VARN: Train how to tape
[11] correctly. Of I don't know there is such
[12] a —
[13]    MR. O'CONNOR: That is your objection.
[14]    THE ARBITRATOR: I will overrule the
[15] objection.
[16]              BY MR. O'CONNOR:
[17]    Q: Did anyone tell you how to tape and what you
[18] should say on a tape to identify it to make it
[19] authentic?
[20]    A: No. No one had told me.
[21]    Q: Did you have a habit when you would tape
[22] people — I take it you never taped with their
[23] permission, you just taped without their permission,
[24] correct?
[25]    A: This is correct.

Page 965

[1]
[2]    Q: You always did it surreptitiously or in a
[3] hidden way, correct?
[4]    A: Yes, but I made everyone aware that I had been
[5] taping them.
[6]    Q: So you would never tell people you were taping
[7] them at the time, but you say, you know, I've taped
[8] you before?
[9]    A: Yes, correct.
[10]    Q: But you never would say, you're now on tape?
[11]    A: No, I never told them —
[12]    Q: You never did that; and you never showed your
[13] tape to them?
[14]    A: No, I showed my tape recorder once to Peter.
[15]    Q: Yeah, I know you said that, we're going to get
[16] to that?
[17]    A: In a meeting.
[18]    Q: So when do you believe and where do you
[19] believe the tape in question that we're here about,
[20] where do you believe that was taken?
[21]    A: I don't believe I know — all the tapes are
[22] taped in Freehold, New Jersey.
[23]    Q: No, the tape in question?
[24]    A: Freehold, New Jersey it was taped.
[25]    Q: And was it a board meeting?

Page 966

[1]
[2]    A: It was a meeting yes, it was a board meeting.
[3]    Q: And was it in January?
[4]    A: Yes, it was in January.
[5]    Q: And was it January 7th?
[6]    A: I really can't say the exact date, I can just
[7] tell you the sequence of the tape. If you listen to
[8] the tape, it would explain — self-explanatory and
[9] you would understand why they were in sequence and
[10] where they were taking place.
[11]    Q: From your calendar, can you tell me when you
[12] took the tape of the board meeting in New Jersey?
[13]    A: I'm going to say either the first or second
[14] week of January 2002.
[15]    Q: And what references are you looking at to
[16] support that sworn testimony?
[17]    A: I'm not looking at any references. I'm
[18] remembering the meeting that Peter and I had on
[19] December — I'm going to say the last week of
[20] December, Peter and I had had a 3-hour lunch meeting
[21] to discuss what was happening internally in the
[22] company, and Peter said we would follow up within a
[23] week or two and have a board meeting in Freehold to
[24] discuss everything that's going on, and cuts and
[25] talking about Mike DiIanni, and we did so.

Page 967

[1]
[2]    And then I believe a week or so after
[3] that I went to Canada, Toronto, and when I came
[4] back, I asked Mike DiIanni to leave, to terminate
[5] Mike DiIanni.
[6]    Q: So — oh, okay.
[7]    So you believe the tape in question
[8] also dealt with the termination of Mike DiIanni?
[9]    A: Yes, it did.
[10]    Q: Okay. And that's the tape we're talking
[11] about?
[12]    A: Yes.
[13]    Q: And that tape was taken after your trip to
[14] Canada?
[15]    A: No.
[16]    Q: Oh, I thought that's what you said?
[17]    A: No, that tape was taken before my trip to
[18] Canada.
[19]    (Whereupon, the Court Reporter read the
[20] record as requested.)
[21]
[22]          BY MR. O'CONNOR:
[23]    Q: Does that refresh your recollection?
[24]    A: Yes.
[25]    THE ARBITRATOR: Consistent, it

Page 968

[1]
[2] sounded like to me. He said his sequence
[3] was a meeting with Mr. Pierce the ends of
[4] December; the board meeting in Freehold,
[5] New Jersey, in the early part of January,
[6] he went to Canada, when he came back from
[7] Canada is when he terminated Mr. DiIanni;
[8] did I get that right?
[9]    THE WITNESS: Yes, sir.
[10]          BY MR. O'CONNOR:
[11]    Q: Was DiIanni terminated in January?
[12]    A: Yes, he was.
[13]    Q: By whom?
[14]    A: By myself, Thomas car.
[15]    Q: And did he, in fact, leave?
[16]    A: Yes, he did.
[17]    Q: And who was present when the termination of
[18] DiIanni occurred?
[19]    A: Tammi Phillips, Alan McGrath, the whole office
[20] staff.
[21]    Q: And was that as a result of a board meeting in
[22] Freehold that you were authorized to do that?
[23]    A: No, it was not.
[24]    Q: Were you authorized to do that?
[25]    A: No, I was not.

Iron Mountain Incorporated v.
J. Peter Pierce (AAA)
Case 1:05-cv-10890-FDS    Document 81-14    Filed 06/21/2007    Page 14 of 28
DRAFT
TRIAL DAY 4 JULY 31, 2003, DRAFT
Vol. 1, July 31, 2003

---

Page 969

[1]
[2]   Q: So why did you do it?
[3]   A: Because he didn't belong in the company and he
[4] was causing too much trouble.
[5]   Q: I'm trying to get focused on, in sequence.
[6] You are saying it was before your trip to Canada
[7] that you attended a board meeting in Freehold of
[8] Logisteq, correct?
[9]   A: Yes, sir.
[10]   Q: And that was the meeting you taped?
[11]   A: Correct.
[12]   Q: And how long was that meeting?
[13]   A: I would say about an hour.
[14]   Q: An hour board meeting?
[15]   A: Yes, maybe an hour to two hours, tops.
[16]   Q: And is there a reference to that board meeting
[17] in your calendar?
[18]   A: Yes, there is.
[19]   Q: Where is that?
[20]   A: January 7th, 11:00 a.m., Peter Pierce.
[21]   Q: Does that refer to a board meeting?
[22]   A: Yes, it does.
[23]   Q: Where? I'm reading it, I'm missing it. It
[24] says Peter Pierce 11 a.m.?
[25]   A: Peter and I spoke he said he would be coming

Page 970

[1]
[2] down with Doug Huntley and we would be having a
[3] meeting. That's the meeting I taped in New Jersey.
[4]   Q: Who was present at that January 7th board
[5] meeting that you taped?
[6]   A: I believe Mike DiIanni, Alan McGrath, Doug
[7] Huntley, Peter Pierce and Tom Carr.
[8]   Q: So you believe the reference on January 7th at
[9] 11 o'clock, "Peter Pierce, 11:00 a.m." with a
[10] telephone number is a board meeting on January 7th
[11] at which everyone attended that you referenced in
[12] your testimony?
[13]   A: I'm not positive it was January 7th. I know
[14] it was a meeting that Peter told me he would come
[15] down within a week or two after our 3-hour lunch. I
[16] have it down here on January 7th, but I'm not
[17] positive that was the day.
[18]   Q: And what was discussed at this one-hour board
[19] meeting on January 7th, if that is the day?
[20]   A: During a meeting with Peter and I in Freehold
[21] for three hours I discussed all of the unacceptable
[22] acts of Mike DiIanni and I do not condone what's
[23] been going on, and I would not continue on unless
[24] Mike DiIanni is let go, I would continue to focus on
[25] Logisteq.

Page 971

[1]
[2]   Peter then told me he would like to
[3] confront everyone together and have a meeting, we'll
[4] call an emergency meeting within the next week or
[5] so, and that's what we did.
[6]   Q: Let's stick with the board meeting on January
[7] 7th. You said you had a conversation with Peter.
[8] Was Mike DiIanni there?
[9]   A: At the meeting — yes, as a matter of fact,
[10] the week and a half — the last week in December
[11] Peter and I met for three hours, he said we would
[12] all get together within a week or two and that was,
[13] yes, Doug Huntley, Peter, myself, Mike and Alan.
[14]   Q: And it was an official board meeting?
[15]   A: If you want to call it that. We had the board
[16] meeting, but really we spoke about the plan of the
[17] company. Peter asked me if I had my wish, what
[18] would I do to change the company and pretty much
[19] that's what I told him, I said at the time — as a
[20] matter of fact, I remember something specifically on
[21] the tape, on that day —
[22]   Q: Well, I'm not asking you about the tape now?
[23]   A: On that day, I remember telling Peter, I said,
[24] Mike, you're not going to like me after this, you're
[25] not going to be my friend, but I told Peter I think

Page 972

[1]
[2] that we should terminate Mike DiIanni. And I
[3] remember on the 25th of January, I had a big blowout
[4] with Mike DiIanni because I fired him because of his
[5] acts.
[6]   So we weren't talking at all; so
[7] that's for a fact. If we had a big blowout, how
[8] could I say Mike, you're not going to be my friend
[9] if it was after the 25th. That's something that I
[10] just realized, too.
[11]   Plus on the tape, Peter says on the
[12] tape.
[13]   MR. O'CONNOR: I object to this, Your
[14] Honor, this is not responsive.
[15]   THE ARBITRATOR: Yeah.
[16]   MR. O'CONNOR: It's totally
[17] unresponsive.
[18]   THE WITNESS: No, it isn't, it's
[19] proving the dates, because can I say one
[20] thing.
[21]   THE ARBITRATOR: But I don't want to
[22] hear what's on the tape just yet, if I
[23] ever do.
[24]   The point is that based upon what you
[25] hear on the tape, you're able to tell me

Page 973

[1]
[2] that the meeting which is tape recorded
[3] occurred earlier in January than January
[4] 25th.
[5]    A: There are many statements on there proofing
[6] it.
[7]    THE ARBITRATOR: Which fix that date
[8] for you.
[9]    THE WITNESS: Yes.
[10]    THE ARBITRATOR: Okay. .
[11]           BY MR. O'CONNOR:
[12]    Q: Well, are you saying that on January 7th the
[13] meeting lasted an hour?
[14]    A: What I'm saying is I believe it was the first
[15] week or two in January. I'm not telling you
[16] positively that it was January 7th, but I will tell
[17] you it was a couple of weeks after Peter and I met
[18] and on the tape Peter says —
[19]    MR. O'CONNOR: Again, I object, Your
[20] Honor, not responsive.
[21]    THE ARBITRATOR: Yeah, you can't tell
[22] me what is actually said on the tape. Of
[23] we're deciding — we're trying to find out
[24] now whether I ever get to listen to it; so
[25] what you can say, I at a time, is that

Page 974

[1]
[2] based upon what is on the tape as you've
[3] heard it, it confirms in your mind that
[4] the meeting which took place in Freehold,
[5] which was taped was before January 25th.
[6]    THE WITNESS: Absolutely.
[7]    THE ARBITRATOR: And you think your
[8] best estimate is January 7th, although you
[9] can't be exactly sure about that date.
[10]    THE WITNESS: Yes.
[11]           BY MR. O'CONNOR:
[12]    Q: Dell me what you can recall as fully as you
[13] can recall it which occurred at that board meeting
[14] which you can't place, you think it's January 7th in
[15] the first two weeks?
[16]    MR. VARN: Objection.
[17]    THE ARBITRATOR: Basis.
[18]    MR. VARN: Well, I wasn't allowed to
[19] make similar inquiry of Mr. McGrath
[20] yesterday as to what people said or
[21] responded to, what other people said.
[22]    THE ARBITRATOR: But the evidentiary
[23] situation was different yesterday. As I
[24] pointed out when I sustained Mr. Kircher's
[25] objection, it was that if Mr. Pierce

Page 975

[1]
[2] responded there might be some evidential
[3] use for that, and if Mr. Pierce did not
[4] respond, there might be a different
[5] evidential inference to be drawn.
[6]    But here Mr. Pierce's lawyer is asking
[7] the witness what was said, and I take it
[8] by doing so he waives my hearing what Mr.
[9] Pierce said or did not say.
[10]    MR. VARN: Withdraw my objection.
[11]    MR. O'CONNOR: No, I didn't ask
[12] specifically what people said; I said what
[13] was discussed, what general items were
[14] discussed.
[15]    THE ARBITRATOR: Oh, I didn't hear the
[16] phrase "General items," because when you
[17] asked what was discussed, that suggested
[18] to me not subject matters, but what was
[19] said.
[20]           BY MR. O'CONNOR:
[21]    Q: What were the general subject matters of
[22] discussion at the first board meeting in January?
[23]    A: At the first meeting, as Peter told me about a
[24] week and a half ago, we had a 3-hour lunch, we would
[25] start a new slate.

Page 976

[1]
[2]    And I was very concerned because we
[3] needed cash flow in the company, and I had asked
[4] Peter to reimburse the monies that he put into the
[5] company for the Sequedex employees, and Peter told
[6] me that it was approximately 300 thousand dollars
[7] that he put in for the company —
[8]    MR. O'CONNOR: I object to this
[9] testimony.
[10]    THE WITNESS: Well, you just asked
[11] me —
[12]    THE ARBITRATOR: The subject matter.
[13]    MR. O'CONNOR: I said the general
[14] subject matter, sir.
[15]    THE ARBITRATOR: Mr. O'Connor.
[16]    THE WITNESS: I don't understand the
[17] question.
[18]    THE COURT: What you are supposed to
[19] do is to tell me subject matters, not what
[20] was said.
[21]    So, for example, in this instance, one
[22] of the subject matters was reimbursement
[23] to Logisteq or Logisteq for employees on
[24] Logisteq's payroll but who were, in fact,
[25] doing work for Sequedex.

Iron Mountain Incorporated v.
J. Peter Pierce (AAA)
Case 1:05-cv-10890-FDS    Document 81-14    Filed 06/21/2007    Page 16 of 28
DRAFT
TRIAL DAY 4 JULY 31, 2003, DRAFT
Vol. 1, July 31, 2003

Page 977

[1]
[2]    Fair.
[3]    A: Thank you. You said it exactly.
[4]    THE ARBITRATOR: Thank you.
[5]            BY MR. O'CONNOR:
[6]    Q: What else was discussed?
[7]    A: We discussed the unionizing of Iron Mountain
[8] with Arturo and Mike DiIanni.
[9]    We discussed the Sequedex employees on
[10] the payroll at Logisteq which Peter said he would
[11] end; we discussed the termination of Mike DiIanni,
[12] and we discussed a layoff of management and would
[13] try to get some 35 thousand-dollar management in the
[14] company.
[15]    Q: And that took place within an hour or three
[16] hours?
[17]    A: We also discussed the termination of one of
[18] our managers, Joseph DiPasquale.
[19]    Q: How long did that meeting take place?
[20]    A: Like I said before, approximately an hour,
[21] probably no more than two hours, but I would say
[22] about one hour.
[23]    Q: Were there any discussions of the budget at
[24] that meeting?
[25]    A: Yes, there was.

Page 978

[1]
[2]    Q: So that's something you missed?
[3]    A: You keep on interrupting me. I was going to
[4] say that.
[5]    Q: Oh, I'm sorry. Go ahead.
[6]    A: There was discussions about the budget.
[7]    Q: Yes. What were the discussions about the
[8] budget?
[9]    A: The discussions were that the cash flow was
[10] tight and I wanted the monies that we had put into
[11] the company for Sequedex back into the company and
[12] that's why we're cash flow tight; and Doug Huntley
[13] said that we were not I can making money because the
[14] coffee was very slow that year and with 9/11 the
[15] whole economy had slowed down and we were discussing
[16] laying off the truckers and just hiring on the
[17] operators.
[18]    Q: How long did the discussion about the budget
[19] last?
[20]    A: Oh, gosh, I don't know how long. It was bits
[21] and pieces, we would talk a little bit about it, we
[22] would go back. It was really basically, you know, a
[23] clean slate, as Peter quoted, a week and a half ago
[24] at our 3-hour lunch.
[25]    Q: It's a simple question about the budget?

Page 979

[1]
[2]    THE ARBITRATOR: No, the question is
[3] how long did it last, and you don't know.
[4]    THE WITNESS: I don't know.
[5]            BY MR. O'CONNOR:
[6]    Q: Were any papers presented at this board
[7] meeting that you taped about the budget, any
[8] submissions?
[9]    A: No, sir.
[10]    Q: So there was no agenda about the budget, no
[11] proposed budget discussed at this taped meeting in
[12] Freehold?
[13]    A: The proposed budget was we were going to cut
[14] employees and try to hire some 35 thousand-dollar
[15] managers.
[16]    Q: That wasn't my question. I'm sorry?
[17]    A: That's all right.
[18]    Q: The question was, were there any documents
[19] submitted at this taped meeting in Freehold about
[20] the budget?
[21]    A: If there were, I didn't receive them.
[22]    Q: How about at the Paoli meeting? Were there
[23] any documents submitted about the budget at the
[24] Paoli meeting, which you recall?
[25]    A: If there were, I didn't receive any, no.

Page 980

[1]
[2]    Q: And it's your sworn testimony that there were
[3] then two official board meetings of Logisteq in
[4] January 2002, one during the first week that
[5] occurred in Freehold and one that you remember in
[6] Paoli?
[7]    A: Yes, there were two meetings where the Board
[8] of Directors got together. Yes.
[9]    Q: And it's your testimony that Huntley and
[10] DiIanni and yourself and Peter Pierce and McGrath
[11] were present at this first board meeting sometime
[12] during the first two weeks of January in Freehold?
[13]    A: This is correct. Yes.
[14]    Q: Now, you had a habit of calling Mr. Watzke
[15] when you taped, do you recall that testimony?
[16]    A: On some tapes I might have called, on others
[17] maybe I have not called; but, yes, I believe I did.
[18]    Q: You had a habit of calling Watzke when you did
[19] a tape, correct?
[20]    A: I just answered the question.
[21]    Q: All right. Now, there are no calls to Mr.
[22] Watzke on January 7th from your phone records, which
[23] we will introduce.
[24]    Are you aware of that?
[25]    A: No, I'm not.

Page 981

[1]
[2] Q: I would like to mark for the record Carr's
[3] phone records, 180.
[4] Let me show that to Mr. Carr?
[5] MR. VARN: Mr. Rutter, may I note for
[6] the record that this phone record appears
[7] to commence on January 10, 2002.
[8] THE ARBITRATOR: Mr. O'Connor.
[9] MR. PESLAK: It would have to be a
[10] bill dated January 9th, because it was
[11] dated every 9th, the 9th of the month.
[12]
[13] (Whereupon, a brief recess was taken
[14] at this time.)
[15] THE ARBITRATOR: On the record. Mr.
[16] Carr you've had placed before you
[17] respondent's exhibits 180 and 181. Mr.
[18] O'Connor? .
[19] BY MR. O'CONNOR:
[20] Q: Yes, two simple questions: On January 7th,
[21] according to your phone record, there is no call to
[22] Mr. Watzke in Boston; is there? Or any calls
[23] whatsoever. That's 180, sir?
[24] A: 180.
[25] Q: Yeah, that's the January. 71 of 32?

Page 982

[1]
[2] A: The phone number calls I see the number to Art
[3] Peslak before the meeting and after the meeting; so
[4] it may have been Art Peslak that I called, informed
[5] him that I taped.
[6] Q: What are you referring to on that exhibit?
[7] A: 006 on January 7th at 10:56 a.m. I made a
[8] phone call to 732-761-1610. That's Art Peslak.
[9] Q: That's Peslak?
[10] A: Yes.
[11] Q: That's at 10:55 a.m.?
[12] A: Yes.
[13] Q: You are saying you believe you called Peslak
[14] and told him you were about to tape?
[15] MR. PESLAK: That I'm going to object
[16] to.
[17] MR. O'CONNOR: I think that's what he
[18] said.
[19] THE ARBITRATOR: No, he said he may
[20] have called Mr. Peslak.
[21] THE WITNESS: I said I made a call to
[22] Mr. Peslak prior to the meeting.
[23] BY MR. O'CONNOR:
[24] Q: What was that about?
[25] A: I don't recall, sir.

Page 983

[1]
[2] And I called Mr. Peslak in the
[3] afternoon, also, that's 007 at 4:48; I also
[4] called —
[5] Q: Slow down a minute. That's 4:48. Okay. And
[6] do you know what that's about defendant?
[7] MR. PESLAK:
[8] THE WITNESS: Object.
[9] THE ARBITRATOR: Mr. Carr, let me
[10] remind you, you do not have to answer any
[11] questions without having first consulted
[12] with your attorney about anything which he
[13] said to you or you said to him, based upon
[14] his legal advice to you.
[15] BY MR. O'CONNOR:
[16] Q: There were no calls to Mr. Watzke or any calls
[17] to Boston that day, right?
[18] A: I don't believe so. I see a 917 area code,
[19] I'm not sure where that's at; but I don't see any
[20] phone calls to Iron Mountain, no, I do not.
[21] Q: The 917. Where is that, sir, what time? It
[22] says home area?
[23] A: 8:23 a.m.
[24] MR. VARN: Objection. The home area
[25] indicates called from, not called to.

Page 984

[1]
[2] THE ARBITRATOR: Okay.
[3] Q: Let me ask you this: When you would be taping
[4] people?
[5] A: Yes.
[6] Q: You indicated your testimony was you would let
[7] Watzke know when you taped someone and and you would
[8] give him an update, correct?
[9] MR. VARN: Objection.
[10] THE ARBITRATOR: Testimony is
[11] sometimes he did, sometimes he didn't.
[12] MR. O'CONNOR: All right.
[13] Q: Is that correct?
[14] A: Yes.
[15] Q: Did you do that with respect to Mr. Peslak?
[16] MR. PESLAK: Objection.
[17] MR. O'CONNOR: What's the basis.
[18] THE WITNESS: That's attorney
[19] privilege.
[20] THE ARBITRATOR: Yeah, now, if you
[21] want to meet and talk about it, outside
[22] the room, we can do it.
[23] MR. PESLAK: No, we're not waiving
[24] privilege.
[25] THE ARBITRATOR: Then the privilege is

---

Page 985

[1]
[2] enforced.
[3]    MR. O'CONNOR: How is that privileged,
[4] Your Honor.
[5]    THE ARBITRATOR: It would be a
[6] communication to an attorney ostensibly
[7] seeking legal advice and, therefore, falls
[8] within the attorney/client privilege.
[9]    MR. O'CONNOR: All right. .
[10]    BY MR. O'CONNOR:
[11]    Q: Go to respondent's exhibit 181 and turn to
[12] January 29th, which is page 73. And on there,
[13] there's a phone call at 3 o'clock p.m. to
[14] 617-535-4702 in Boston.
[15]    Do you see that?
[16] A: Yes, I do.
[17] Q: Is that Mr. Watzke?
[18] A: I believe so.
[19] Q: And this is the date of the board meeting in
[20] Paoli?
[21] A: This is the day that we had board members in a
[22] meeting in Paoli, yes.
[23] Q: And that phone call was placed at the
[24] conclusion of the board meeting?
[25] A: I believe so, yes.

---

Page 986

[1]
[2]    Q: And what was that phone call about, if you can
[3] recall?
[4] A: I don't recall.
[5] Q: Now, so I understand, you believe the board
[6] meeting in New Jersey which you taped was about Mike
[7] DiIanni, right?
[8] A: Correct.
[9] Q: And at that board meeting, you either
[10] threatened to discharge DiIanni — you had words,
[11] right?
[12] A: No, I did not. I didn't threaten. Peter
[13] asked me if I had my way of running the company,
[14] what would I do; and I told Mike DiIanni, Mike, you
[15] may not be my friend after this, but I would have to
[16] let you go.
[17] Q: But did you tell Mr. Pierce at that board
[18] meeting that — or Mr. DiIanni about the bribes for
[19] the construction work? Was that the board meeting?
[20] A: No.
[21] Q: When did you discuss at any board meeting the
[22] so-called bribes for construction work?
[23] A: I don't think I did.
[24] Q: All right. When you— you met with Mr. Varn
[25] on several occasions, did you not?

---

Page 987

[1]
[2] A: Yes, I did.
[3] Q: And did Mr. Varn make inquiry about what you
[4] did and what you learned in January 2002?
[5] A: I believe I offered it to Mr. Varn.
[6] Q: Did you tell Mr. Varn about this board meeting
[7] in Freehold, New Jersey, in early January 2002?
[8] A: It was — I didn't say there was a board
[9] meeting in January 2nd.
[10] Q: No, I said early January, sir. We will say
[11] the first two weeks of January?
[12] A: I'm not sure.
[13] Q: Did you tell Mr. Varn about a board meeting
[14] that occurred in the end of January 2002?
[15] A: I'm not sure if I did or not.
[16] Q: Well, Mr. Varn indicated in sworn answers to
[17] interrogatories about contacts he had with you, and
[18] I want to read into the record what he responded in
[19] sworn answers to interrogatories on page 16 of
[20] supplemental answers to interrogatories, see if this
[21] refreshes your recollection?
[22] A: Thank you.
[23] Q: "Carr reported that in late January — late
[24] January 2002 after he returned from a business trip
[25] he had a heated conversation with DiIanni. Carr

---

Page 988

[1]
[2] reported that he threatened to discharge DiIanni
[3] from Logisteq, to which he replied, 'You're full of
[4] shit.' Carr reported that he also explained to
[5] DiIanni that Carr had been told that DiIanni had
[6] taken or solicited bribes for construction work.'
[7] Carr reported DiIanni became very heated, said you
[8] want to live, if you dare tell Peter (Pierce) you
[9] won't need to talk again; DiIanni only left Logisteq
[10] premises when Carr threatened to call the police.
[11]    Now, that discussion was after the
[12] Canadian trip; correct?
[13] A: It does bring back my memory, yes, this was
[14] after the 20 — I believe it was the week of the
[15] 25th.
[16] Q: And where was that discussion?
[17] A: In Freehold, New Jersey.
[18] Q: Was that also a board meeting?
[19] A: No, it was not.
[20] Q: And Carr reported that shortly after his
[21] meeting with DiIanni he called Pierce and that
[22] Pierce apologized for not having returned prior
[23] calls which Carr made to him. Carr reported that
[24] when he told Pierce that he, Carr, had fired
[25] DiIanni, Pierce replied well, Tommy, we need to talk

---

Page 989

[1]
[2] about it."?
[3]     A: This is correct.
[4]     Q: So that sequence is correct?
[5]     A: Yes, it is.
[6]     Q: And all of that clearly occurred after the
[7] Canadian trip?
[8]     A: Yes, it did.
[9]     Q: And you correctly reported the sequence to Mr.
[10] Varn?
[11]     A: Yes, I did.
[12]     Q: Okay. And that's important?
[13]     A: Yes.
[14]     Q: You wouldn't lie about that?
[15]     A: I don't lie about anything.
[16]     Q: Okay. Then it goes on to say, "Carr
[17] reported — that's you "After that a meeting was
[18] subsequently convened at Logisteq's offices in
[19] Freehold involving Pierce, DiIanni, Douglas Huntley,
[20] Pierce's financial assistant and Alan McGrath." —
[21]     MR. VARN: Objection.
[22]     THE ARBITRATOR: Basis.
[23]     MR. VARN: He didn't go —
[24]     MR. O'CONNOR: I'm still reading, sir.
[25] I'm still going.

Page 990

[1]
[2]     MR. VARN: He skipped over.
[3]     THE ARBITRATOR: He elided it?
[4]     MR. O'CONNOR: We will put the entire
[5] thing in the record, in sequence.
[6]          BY MR. O'CONNOR:
[7]     Q: Mr. Carr, you met with Mr. Varn, correct?
[8] Many times?
[9]     A: Yes.
[10]     Q: And you gave Mr. Varn a lot of information,
[11] including what you did, when you did it in January
[12] 2002, correct?
[13]     A: Yes, sir.
[14]     Q: Okay. Now, we will go through this very
[15] slowly at his request, because you were right, I did
[16] skip a little piece.
[17]     I'm going to start with "Carr reported
[18] in late January" because the other refers to 2001.
[19]     MR. VARN: Tell me where you are.
[20]     MR. O'CONNOR: "Carr reported that in
[21] late January 2002." Right here.
[22]     Okay. Of.
[23]          BY MR. O'CONNOR:
[24]     Q: The previous reference is to 2001. So we're
[25] not going to go into that.

Page 991

[1]
[2]     January 2002 is the important date;
[3] correct? Do you have that, Mr. Carr?
[4]     A: I'm listening.
[5]     Q: Okay. Now, you're Mr. Carr reporting to Mr.
[6] Varn who under oath states the following: "Carr
[7] reported that in late January 2002 after he returned
[8] from a business trip he had a heated conversation
[9] with DiIanni. Carr reported that he threatened to
[10] discharge DiIanni from Logisteq to which he replied,
[11] you are full of shit. Carr reported that he also
[12] explained to DiIanni that Carr had been told that
[13] DiIanni had taken or solicited bribes for
[14] construction work. Carr reported DiIanni became
[15] very heated, said, do you want to live? If you dare
[16] tell Peter (Pierce) you won't need to talk again.
[17] DiIanni only left Logisteq premises when Carr
[18] threatened to call the local police."
[19]     Now, that's the first discussion with Varn, is
[20] that accurate?
[21]     A: Yes, it is.
[22]     Q: Okay. And did that discussion about DiIanni
[23] and the heated conversation occur after your
[24] Canadian trip?
[25]     A: Yes, it did.

Page 992

[1]
[2]     Q: And when was your Canadian trip?
[3]     A: The week of the 17th.
[4]     Q: Of January?
[5]     A: January 17th, 2002.
[6]     Q: Now, in sequence, "Carr reported — so we know
[7] this is after January 17th, this first meeting?
[8]     A: Correct.
[9]     Q: "Carr reported that shortly after his meeting
[10] with DiIanni he called Pierce and that Pierce
[11] apologized for not having returned prior calls which
[12] Carr had made to him.
[13]     Carr reported that when he told Pierce
[14] that he, Carr had fired DiIanni, Pierce replied,
[15] well, Tommy, we need to talk about it. Carr
[16] reported that he repeated to Pierce that he felt he
[17] had been lied to, deceived and cheated by Pierce and
[18] DiIanni. Carr reported that he and Pierce concluded
[19] the conversation by agreeing to meet several days
[20] later. Before that meeting could take place,
[21] however, Carr reported that DiIanni returned to the
[22] Logisteq office. When Carr confronted DiIanni,
[23] DiIanni told him, you can't fire me, me and Peter
[24] are like blood; and Carr called Pierce, Pierce told
[25] Carr to calm down and proposed a by out of DiIanni

Iron Mountain Incorporated   v.     **DRAFT**          **TRIAL DAY 4 JULY 31, 2003, DRAFT**
J. Peter Pierce (AAA)                                              **Vol. 1, July 31, 2003**

Case 1:05-cv-10890-FDS     Document 81-14     Filed 06/21/2007     Page 20 of 28

Page 993

[1]
[2] to be discuss add day or two later." Do you have
[3] that?
[4]   A: Yes, I do.
[5]   Q: And did that, in fact, occur?
[6]   A: Yes, it did.
[7]   Q: And did that occur after the heated exchange
[8] with DiIanni?
[9]   A: Yes, it did.
[10]   Q: So now we're in January 20th, thereabouts?
[11]   A: 29th.
[12]   Q: You think we're at the 29th at that time?
[13]   A: When the meeting occurred?
[14]   Q: No, I'm not there yet; I just asked you
[15] about—
[16]   A: Okay, yes, so far, you're right to track.
[17]   Q: That's after DiIanni, after your Canadian
[18] trip, so we're clearly in the end of January,
[19] January 20th?
[20]   A: Yes.
[21]   Q: Then third item, all in sequence?
[22]   A: Actually, I believe I fired Mike DiIanni on
[23] the 25th.
[24]   Q: Now, let's stay — this is in sequence, you
[25] are back from Canada, you had the heated exchange

Page 994

[1]
[2] with DiIanni, then after that, you called Peter, you
[3] go back and forth, now the their, this is in
[4] sequence. "Carr reported that a meeting was
[5] subsequently convened at Logisteq's offices in
[6] Freehold involving Pierce, DiIanni, Doug Huntley,
[7] Pierce's financial assistant and Alan McGrath.
[8]     Carr reported that the meeting lasted
[9] approximately an hour. Carr reported during that
[10] meeting, during the meeting, Pierce stated he would
[11] soon be walking away from Telespectrum in order to
[12] focus on Sequedex and Logisteq. Carr also reported
[13] that Pierce admitted on several occasions to having
[14] had Logisteq support Sequedex."
[15]     Do you have that meeting in mind?
[16]   A: I believe I do.
[17]   Q: When was that —
[18]   THE ARBITRATOR: Well, before you do
[19] that: Is that an accurate recitation of
[20] the events as they occurred.
[21]   THE WITNESS: Yes.
[22]   THE ARBITRATOR: The last piece that
[23] he just read.
[24]   THE WITNESS: Yes.
[25]     BY MR. O'CONNOR:

Page 995

[1]
[2]   Q: When did that meeting occur in Freehold, with
[3] all those gentlemen present?
[4]   A: No, I don't believe that was Freehold. I
[5] believe we had an emergency meeting on the 29th
[6] because I fired Peter Pierce — I'm sorry, I fired
[7] Mike DiIanni on the 25th, and then Peter said we
[8] would have a meeting discussing his termination.
[9]     And that's why I drove out to
[10] Pennsylvania to meet with Peter and I believe Alan
[11] and Doug Huntley.
[12]   Q: So if Mr. Varn in sworn answers to
[13] interrogatories said that you reported to him that
[14] that meeting occurred in Freehold, in the sequence
[15] we described it, that would be false?
[16]   A: I believe that Peter was going to come to
[17] Freehold that day.
[18]   Q: What day, sir?
[19]   A: I believe the week after and got tied up with
[20] a problem he— he had problems with Telespectrum,
[21] and then had asked if we could come out and discuss
[22] it on the 29th and a week wasn't — four days wasn't
[23] going to make a difference, and I said that's fine.
[24]   Q: Well, the meeting that I referenced only —
[25]   THE ARBITRATOR: Let's nail it down. .

Page 996

[1]
[2]     BY THE ARBITRATOR:
[3]   Q: If it says in those answers to interrogatories
[4] that that meeting occurred in Freehold, that would
[5] be an error, yes?
[6]   MR. VARN: I even have to object to
[7] your question, because the language was
[8] the meeting was convened at Freehold,
[9] which I wrote it, it was Ford-looking in
[10] my mind.
[11]   THE WITNESS: It could have been
[12] Freehold, because we had a meeting right
[13] after —
[14]   THE ARBITRATOR: Depends on what is,
[15] is.
[16]   MR. VARN: No, depends upon my mastery
[17] or lack thereof of English and the tenses
[18] pertinent thereto.
[19]   THE WITNESS: Now it's coming back, I
[20] fired Mike DiIanni on January 25th was a
[21] Friday, Peter then called and spoke to me
[22] about it, he said we need to call a
[23] meeting right away; Saturday went by,
[24] Sunday went by, Monday I met with Peter in
[25] Pennsylvania; we let the weekend to cool

**Page 997**

[1]
[2] off and then we had a special meeting on
[3] Monday, the 29th; and I believe that
[4] meeting was — I believe that was — I'm
[5] not sure who was there; I believe it was
[6] Alan McGrath, Peter Pierce, Tom Carr and
[7] Doug Huntley, because we were discussing
[8] the terrible actions of Mike DiIanni.
[9]     THE ARBITRATOR: Okay.
[10]     THE WITNESS: And it's all in
[11] sequence, and I came back from Canada —
[12] let me get my bearings straight here —
[13] yes, that's how it happened. I fired him
[14] on the 25th.
[15]     THE ARBITRATOR: And who called the
[16] meeting, Mr. Pierce or you.
[17]     THE WITNESS: I called Peter and said,
[18] Peter, I had enough, he said, all right,
[19] let's have another meeting we will sit
[20] down and discuss it.
[21]     THE ARBITRATOR: So Mr. Pierce was the
[22] one who called the meeting.
[23]     THE WITNESS: Yes.
[24]     THE ARBITRATOR: And where was he when
[25] he called the meeting and spoke to you, in

**Page 998**

[1]
[2]     Pennsylvania.
[3]     THE WITNESS: In Pennsylvania.
[4]             BY MR. O'CONNOR:
[5]     Q: Is that the 3-hour board meeting that you
[6] referenced earlier, or was it not a Board meeting?
[7]     A: Any meeting that there's a Board of Directors,
[8] I called a board meeting; so, yes, it was a board
[9] meeting, it was Board of Directors.
[10]     Q: And it was 3 hours?
[11]     A: Yes — it might have been longer than 3 hours,
[12] because I think we might have even went to lunch
[13] that day, I think we went to Wendy's.
[14]     Q: I want to know if there was ever a one-hour
[15] meeting in Freehold in late January with Pierce,
[16] DiIanni, Huntley and McGrath and you, as reflected
[17] in these answers, did that ever happen?
[18]     A: A one-hour meeting — no, no, it did not
[19] happen — no, it couldn't have happened. Because
[20] let's — you know what, the book speaks for itself,
[21] I fired him on the 25th, because I have a tape
[22] firing him.
[23]     Q: Right?
[24]     A: And then Monday we met. So how could a
[25] meeting occur on a Saturday or Sunday.

**Page 999**

[1]
[2]     Q: I agree.
[3]     So when these answers are filed and
[4] says that you reported that there was a meeting in
[5] Freehold for an hour in late January, they would
[6] have been false. Did you lie to Mr. Varn?
[7]     A: Could have been a mistake on Mr. Varn's part
[8] or my part.
[9]     Q: Or your part, it could have been a mistake?
[10]     A: Well, obviously it was a mistake.
[11]     Q: This (Indicating.) Is a mistake?
[12]     A: No, not the entire.
[13]     Q: But this part of the story, the Freehold
[14] meeting?
[15]     A: Well, I'm looking at the calendar.
[16]     Q: Right?
[17]     A: Be point in the book don't lie.
[18]     Q: Right, exactly?
[19]     THE ARBITRATOR: Having in mind that
[20] it does not say the meeting was held in
[21] Freehold, it says the meeting was
[22] convened.
[23]     MR. O'CONNOR: And lasted one hour.
[24]     THE ARBITRATOR: Watch the verb.
[25]     MR. VARN: Having in mine, too, that I

**Page 1000**

[1]
[2] had to scramble pretty fast pursuant to
[3] your order to do that.
[4]     THE COURT: Mr. Varn, I'm not being
[5] critical of anybody. I'm just observing
[6] the English languages and the nuance
[7] thereof.
[8]             BY MR. O'CONNOR:
[9]     Q: So?
[10]     A: As a matter of fact, for the record, may I say
[11] something.
[12]     THE ARBITRATOR: You may add, sure.
[13]     THE WITNESS: I have a tape of January
[14] 25th when I actually terminated Mike .
[15] DiIanni, I was taping that.
[16]             BY MR. O'CONNOR:
[17]     Q: But it's your sworn testimony that on January
[18] 29th, 02, there was no meeting whatsoever in
[19] Freehold, New Jersey, that that meeting was in
[20] Paoli, Pennsylvania?
[21]     A: I believe it was in Pennsylvania. I have
[22] right here, 10 o'clock, Paoli, Pennsylvania. So,
[23] yes, I believe that was Pennsylvania.
[24]     Q: Is that your sworn testimony?
[25]     A: Yes, it is. It was Pennsylvania.

---

Page 1001

[1]
[2]    Q: And when you would — as I asked you earlier,
[3] when you would meet with Mr. Peslak about your
[4] meetings you always gave him truthful information.
[5] I don't want to know what the information was?
[6]    A: Yeah, attorney privilege — yes, truthful
[7] information.
[8]    Q: But you never lied to your attorney, Mr.
[9] Peslak?
[10]    A: I might have lied about my girlfriend once or
[11] twice.
[12]    Q: Whatever, but you never lied about critical
[13] dates, etcetera?
[14]    A: No, absolutely not.
[15]    Q: Let me mark for the record, your amended
[16] complaint?
[17]    A: Yes, sir.
[18]    Q: Mr. Carr, filed by Mr. Peslak, who sits to
[19] your right. That's defendant's exhibit 162?
[20]    A: Thank you.
[21]    Q: Are you familiar with this complaint?
[22]    A: Yes, something that was — took a lot of
[23] stress and gray hairs out of my life.
[24]    Q: I believe that. Do you see the verification
[25] at the end of the complaint, which is May 2nd, 2002?

Page 1002

[1]
[2]    A: What number are you looking at.
[3]    Q: 29?
[4]    MR. PESLAK: Last page.
[5]    BY MR. O'CONNOR:
[6]    Q: Page 29. It's all numbered?
[7]    MR. VARN: Point of order, I think we
[8] have some ambiguity on what's numbered
[9] what. Can we have just a second, please.
[10]    MR. VARN: Can we make it the next
[11] number, because 162 is a different
[12] document. I just want to correct it now.
[13]    THE ARBITRATOR: Sure.
[14]    MR. VARN: So it will be 182?
[15]    MR. O'CONNOR: We will call it 182. .
[16]    BY MR. O'CONNOR:
[17]    Q: Mr. Carr, in page 29, you stated, "I've read
[18] the foregoing verified complaint, I certify that all
[19] the allegations contained there in are true and
[20] correct; I understand if any of the foregoing
[21] statements made by me are willfully false, I am
[22] subject to punishment."
[23]    Do you see that?
[24]    A: Yes, I do.
[25]    Q: I want to refer you to paragraph 65 of that

Page 1003

[1]
[2] compl___nt?
[3]    ___ ___at page is that on?
[4]    ___ ___n page 19?
[5]    ___ ___. Okay. Read into the record what you
[6] ve___ ___ under oath in this complaint.
[7]    ___ ___ you want me to read the whole page?
[8]    ___ No, paragraph 65?
[9]    A: 65 "On Tuesday, January 29th, 2002, a meeting
[10] was held at Logisteq's offices in Freehold
[11] involving Pierce, DiIanni, Doug Huntley, Pierce's
[12] financial assistant and another Pierce employee,
[13] Alan McGrath.
[14]    The meeting lasted approximately an
[15] hour. A significant portion of that meeting was
[16] de___ed to Carr's demand that Sequedex personnel be
[17] re___ed from Logisteq's payroll and that Sequedex be
[18] re___ed to repay the costs which Logisteq had
[19] inc___ed on its behalf. Although Pierce refused to
[20] take any action to force Sequedex to repay the
[21] adv___ces, he did agree that Sequedex personnel costs
[22] w___ __o longer be charged to Logisteq (costs) is
[23] that truthful.
[24]    ___ ___ee the problem is, I was on vacation in San
[25] Di___o; I went through a very, very stressful time.

Page 1004

[1]
[2]    Q: Could I have an answer, please?
[3]    THE ARBITRATOR: You can just say yes
[4] or ___, and then make any explanation.
[5]    THE WITNESS: No, that's not truthful.
[6]    THE ARBITRATOR: Now, your
[7] expla___tion, Mr. Carr, is.
[8]    THE WITNESS: I was contemplating a
[9] co___ __int against Peter hoping that we
[10] could work it out before we went to this
[11] extreme. We had a vacation planned in San
[12] Di___o with my wife and the kids. It was a
[13] very stressful week because I was
[14] ter___ated from Logisteq and was not
[15] all___ed to go in and get any of my
[16] records. I didn't have my tapes with me,
[17] I didn't have any of my records with me,
[18] and I __as very confused at the time and I
[19] was very hesitant to even go ahead and
[20] si___ __is complaint knowing that it would
[21] just go into world war three and create a
[22] lo___ __rm battle between three companies.
[23]    ___ was Fed Ex'd to me on vacation.
[24] I ___ __rough it quickly and signed it.
[25] I ___ have confused some of the meetings

---

TRIAL DAY 4 JULY 35, 2003 0080 FDS     Document 61-14     Filed 06/21/2007     Page 23 of 28

**TRIAL DAY 4, JULY 31, 2003, DRAFT**     **DRAFT**     Iron Mountain Incorporated    v.

Vol. 1, July 31, 2003                                                   J. Peter Pierce (AAA)

Page 1005

[1]
[2] until I really got into researching the
[3] tapes, looking at my appointment book,
[4] listening to the tapes carefully in
[5] sequence, then it all came back to me.
[6]      Even to this day there's some
[7] confusion on dates and who was at the
[8] meeting that I could tell you for the
[9] records, the tapes will tell it all.
[10]      THE ARBITRATOR: Okay. Mr. O'Connor.
[11]         BY MR. O'CONNOR:
[12]      Q: There's one problem with what you just said,
[13] this is an amended complaint filed in May?
[14]      A: Okay.
[15]      Q: Not the complaint that was Fed Ex'd to you.
[16] So can you give us an explanation, when you got the
[17] amended complaint in May?
[18]      A: Very simply, I made a mistake. People make
[19] mistakes everyday.
[20]      Q: It had nothing to do with San Diego, then,
[21] this was an amended complaint?
[22]      A: It was a very stressful period, very
[23] stressful, as it is now in my life.
[24]      Q: I'm sure?
[25]      A: You should be sure.

Page 1006

[1]
[2]      Q: Let me ask you this: Did you ever explain to
[3] Mr. Peslak that in the amended complaint in May that
[4] you made a mistake?
[5]      MR. PESLAK: Objection.
[6]      THE ARBITRATOR: Yes, I will enforce
[7] the privilege.
[8]         BY MR. O'CONNOR:
[9]      Q: Did you ever file another amended complaint
[10] against Mr. Pierce or is this the last complaint you
[11] filed, to your knowledge?
[12]      A: May I ask my attorney? Because I don't know
[13] the answer.
[14]      THE ARBITRATOR: If you don't know,
[15] just say I don't know.
[16]      THE WITNESS: I don't know.
[17]      Q: May I see the cassette, please?
[18]      THE ARBITRATOR: Do you want the
[19] cassette or the recorder.
[20]      MR. O'CONNOR: I want the cassette
[21] that's contained within the recorder.
[22]      THE WITNESS: Oh, I don't have the
[23] tape. Which tape are we talking about?
[24]      THE ARBITRATOR: You mean exhibit 109?
[25]      MR. O'CONNOR: No, I want the tape

Page 1007

[1]
[2] that was in that recorder.
[3]      MS. DAVIS: 109.
[4]      MR. O'CONNOR: That's not 109.
[5]      THE WITNESS: What tape are you asking
[6] for.
[7]      MR. O'CONNOR: I want to know where
[8] the tape that was in that recorder that
[9] you used to tape this Logisteq board
[10] meeting, where is it.
[11]      THE WITNESS: I gave it to Mr. Peslak.
[12]         BY MR. O'CONNOR:
[13]      Q: And what is the size of the cassette?
[14]      A: Microcassette.
[15]      Q: It's a microcassette?
[16]      A: I have a blank one with me, if you want to see
[17] it.
[18]      MR. O'CONNOR: Yeah, I would like to
[19] see one and I would like to mark it as an
[20] exhibit.
[21]      THE WITNESS: Sure.
[22]      MR. O'CONNOR: Because I want to make
[23] sure what the original tape looks like.
[24]      MR. PESLAK: Better yet, here it is.
[25] That's it.

Page 1008

[1]
[2]      THE ARBITRATOR: The record may
[3] indicate that Mr. Peslak has placed before
[4] Mr. O'Connor a microcassette tape in a
[5] plastic container for which tapes at which
[6] Mr. Peslak has said "Here it is,".
[7]         BY MR. O'CONNOR:
[8]      Q: I show you what your attorney just threw on
[9] the table. We will mark it 183.
[10]      I show you this exhibit and ask you if
[11] that's the original tape?
[12]      A: Of what tape, though? I don't understand,
[13] there was multiple tapes.
[14]      MR. O'CONNOR: How many tapes.
[15]      THE ARBITRATOR: Mr. O'Connor, Mr.
[16] Peslak has said, "Here it is," and I take
[17] it he means that's the original of the
[18] tape which has become exhibit 109, and as
[19] you know, I have a bad habit of when a
[20] lawyer tells me something, I accept it as
[21] being true unless and until I find that I
[22] cannot accept his word, and in this case
[23] Mr. Peslak has neither said nor done
[24] anything to make me doubt his integrity or
[25] credibility.

Iron Mountain Incorporated FDS    Document 87-4    Filed 06/21/2007    Page 24 of 28
J. Peter Pierce (AAA)

Iron Mountain Incorporated FDS    Document 8    DRAFT    Filed 06/21/2007    TRIAL DAY 4 JULY 31, 2003, DRAFT    Page 24 of 28
Vol. 1, July 31, 2003

**Page 1009**

[1]

[2]    Therefore, I take it that the tape is

[3] now identified as Pierce exhibit 183 and a

[4] copy is Iron Mountain-109.

[5]    Next question.

[6]    **BY MR. O'CONNOR:**

[7]    Q: My question is, is that the original tape that

[8] you taped without the permission of Mr. Pierce and

[9] others at a board meeting which you claim occurred

[10] between the first two weeks of January 2002?

[11]    A: I believe it is. I didn't listen to it, but I

[12] believe it is. Yes.

[13]    Q: And that's the size —

[14]    A: From what I have written down here, also, yes.

[15]    Q: Is it your habit when you did these tapes on

[16] those cassettes to write down the date and time of

[17] the tape?

[18]    A: No.

[19]    Q: It's not?

[20]    A: No.

[21]    Q: Does Mr. Peslak have the other original tapes?

[22]    A: I gave all the tapes to Mr. Peslak. I don't

[23] know if you have them or not.

[24]    Q: Did you on tapes that you were making?

[25]    A: Yes.

**Page 1010**

[1]

[2]    Q: For whatever reason always announce before you

[3] began taping the specific date and time of the tape?

[4]    A: No, not always.

[5]    Q: Are you saying if we looked at other tapes

[6] that you took they would not have a recitation of

[7] the date and time?

[8]    A: I said not always. Depending on if I was

[9] running late, if I walked in, the situation. You

[10] know, it's not easy to tape a bunch of board

[11] members.

[12]    Q: I know that. Is it clear on that tape, if you

[13] can recall, whether you announced the date and time

[14] of the tape?

[15]    THE ARBITRATOR: When you say that

[16] tape, you mean 183.

[17]    **BY MR. O'CONNOR:**

[18]    Q: 183?

[19]    THE COURT: Does 183 have a header

[20] telling us the date and time of which the

[21] recording is being made.

[22]    THE WITNESS: I still don't understand

[23] which tape this is, the board meeting.

[24]    THE ARBITRATOR: Assuming it is the

[25] tape of the Logisteq board meeting in

**Page 1011**

[1]

[2] early January, about which you have

[3] testified, does it have on it as a header,

[4] the date and time at which the reporting

[5] is being made?

[6]    THE WITNESS: I don't think it does,

[7] but I'm not positive. It may.

[8]    **BY MR. O'CONNOR:**

[9]    Q: How soon after you made the tape of the

[10] Logisteq board meeting in January 2002 did you give

[11] it to Mr. Peslak?

[12]    A: Well, I held the tapes back because I figured

[13] that we could all talk this out and come to a

[14] settlement; Peter's attorney, Mr. Kircher who is

[15] sitting next to demanded I give up all the tapes,

[16] and that's when I did.

[17]    Q: Had you given up the tape of the secret — the

[18] secret tape of the Logisteq board meeting before Mr.

[19] Kircher demanded that you give up all the tapes?

[20]    A: No, I did not.

[21]    Q: So Mr. Peslak did not have the original of

[22] that tape until after your deposition in May of 02,

[23] is that your testimony?

[24]    A: No, it is not.

[25]    Q: When did Mr. Peslak get the tape of the secret

**Page 1012**

[1]

[2] board meeting, — the secret tape of the board

[3] meeting?

[4]    A: I don't know. I don't remember, but I know I

[5] told him not to hand over any of these tapes until I

[6] tell him it's okay that we're going forward.

[7]    We were hoping to resolve this; but,

[8] again, Peter's attorneys demanded that we get all

[9] these tapes.

[10]    Q: Right. Now, prior to Mr. Pierce's attorney,

[11] Mr. Kircher, demanding that all the tapes be

[12] produced in discovery, is it your testimony that you

[13] gave up two of those tapes to Mr. Varn and Mr.

[14] Watzke?

[15]    A: I believe I gave Art Peslak two tapes. Which

[16] two tapes I'm not sure right at this moment.

[17]    THE ARBITRATOR: Well, the originals

[18] or copies of the originals.

[19]    THE WITNESS: No, I gave Mr. Peslak

[20] all original tapes.

[21]    THE ARBITRATOR: And the two tapes

[22] that Mr. O'Connor just asked, about which

[23] ended up in Mr. Varn's and/or Mr. Watzke's

[24] hands, were they original tapes or copies

[25] of tapes?

Page 1013

[1]
[2]    THE WITNESS: I don't know, Mr. Peslak
[3] took care of that. I wouldn't have that
[4] answer.
[5]    THE ARBITRATOR: All right.
[6]        BY MR. O'CONNOR:
[7]    Q: Did you keep a copy of any tapes you gave Mr.
[8] Peslak?
[9]    A: No, I did not.
[10]    Q: So when you would turn over the original, you
[11] had nothing?
[12]    A: Correct.
[13]    Q: Did you keep a record of when you turned the
[14] tapes over to Mr. Peslak?
[15]    A: No, I did not.
[16]    Q: Did Mr. Peslak transcribe the tapes for you?
[17]    A: I'm not sure he did or not.
[18]    Q: Did you ever see a transcript of the tapes you
[19] turned over to Mr. Peslak?
[20]    A: No, I did not.
[21]    Q: Did you ever listen to the tape before you
[22] turned it over to Mr. Peslak?
[23]    A: Yes, I did.
[24]    Q: Okay. What is the length of that tape?
[25]    A: I really don't know. I don't know if it tells

Page 1014

[1]
[2] you on here. No, it doesn't tell you how long —
[3] oh, actually, 60 minutes.
[4]    Q: Each side?
[5]    A: I believe so.
[6]    THE ARBITRATOR: Is it recorded on
[7] both sides.
[8]    THE WITNESS: Yes, 60 minutes on each
[9] side, correct.
[10]    THE ARBITRATOR: And is it recorded on
[11] both sides.
[12]    THE WITNESS: Yes, it is.
[13]    THE ARBITRATOR: Tell me how you
[14] switch sides on the tape while you're in a
[15] meeting recording a meeting.
[16]    THE WITNESS: I would never — I
[17] really have no habit or way of doing
[18] things. All I do is, whatever tapes I
[19] had, you know, I would put a tape in,
[20] rewind it and record. I had no method.
[21]    THE ARBITRATOR: No, but in this
[22] meeting, if it's on both sides, how did
[23] you in the midst of the meeting after one
[24] hour turn the tape over so as to record on
[25] the second side.

Page 1015

[1]
[2]    MR. VARN: Can I object to your
[3] question, as assuming a fact not in
[4] evidence.
[5]    THE ARBITRATOR: The witness has said
[6] it's recorded on both sides.
[7]    MR. VARN: But he didn't say the both
[8] sides were the same meeting.
[9]    THE WITNESS: No, they are not the
[10] same meeting.
[11]    THE ARBITRATOR: So there are
[12] different meetings on each side.
[13]    THE WITNESS: Each side would have a
[14] different meeting, yes.
[15]    THE ARBITRATOR: You are right.
[16]        BY MR. O'CONNOR:
[17]    Q: So if the meeting was 3 hours, would the tape
[18] run out?
[19]    A: Yes.
[20]    Q: And did it run out on this occasion, when you
[21] were taping Peter and others?
[22]    A: I don't remember. I would have to play it and
[23] listen to it again.
[24]    Q: Would it beep when it would run out?
[25]    A: No, it would just stop. That's it.

Page 1016

[1]
[2]    Q: No indication that you were—
[3]    A: Not self voice activated, you just turn it on
[4] and it runs until it runs out.
[5]    Q: And when it runs out it doesn't make a noise?
[6]    A: Just shuts off.
[7]    Q: And the meeting that you taped that you claim
[8] was taped in New Jersey, did you run out of tape
[9] then, do you know? Did the meeting last beyond the
[10] tape capacity?
[11]    A: No, I believe the meeting in New Jersey was a
[12] very quick meeting. I believe it was only 45
[13] minutes, an hour. It couldn't have been more than
[14] an hour, two hours. I think it was a very quick, to
[15] the point, maybe an hour at most, and I believe I
[16] have that whole meeting on this side of the tape.
[17]    THE ARBITRATOR: When did you turn the
[18] tape on, after the meeting had begun, or
[19] before you walked in the meeting room, or
[20] tell me about that.
[21]    THE WITNESS: Actually, I was in the
[22] meeting room and I believe Peter walked in
[23] and I was kind of — it was unexpected and
[24] I didn't have the tape on, so I actually
[25] had to walk out, click it on, and walk

Page 1017

[1]

[2] right back into the conference room.

[3]   THE ARBITRATOR: Having turned it on,

[4] did you tape the on/off switch so it

[5] wouldn't inadvertently go off?

[6]   THE WITNESS: It goes off

[7] automatically.

[8]   THE ARBITRATOR: No, did you tape it

[9] to make sure you wouldn't bump it — do

[10] anything to make sure it would stay on?

[11]   THE WITNESS: No, there is no way.

[12] You just got to be careful; it's a pretty

[13] hard button to actually click. So you

[14] would have to do it with a force of a

[15] hand.

[16]   BY MR. O'CONNOR:

[17]   Q: Did you keep a log of all the tapes and when

[18] you took them?

[19]   A: No, I did not.

[20]   Q: Did Mr. Peslak, to your knowledge?

[21]   A: I don't believe he did.

[22]   Q: Did you give any tapes directly to Mr. Varn or

[23] Mr. Watzke?

[24]   A: No, I did not.

[25]   Q: So if they got tapes, it came from Mr. Peslak?

Page 1018

[1]

[2]   A: Yes.

[3]   Q: Did you ever attend a meeting where you

[4] replayed the tape you took in front of Mr. Watzke or

[5] Mr. Varn, the meeting we're talking about?

[6]   A: No, I don't believe I ever played them in

[7] front of Mr. Varn and Mr. Watzke.

[8]   Q: Did you ever play them in front of your

[9] attorney, Mr. Peslak?

[10]   MR. VARN: Objection.

[11]   THE ARBITRATOR: Basis.

[12]   MR. VARN: Is he saying — is he

[13] saying play them as the whole group or is

[14] he talking about this particular tape.

[15]   MR. PESLAK: I'm going to object on

[16] attorney work product and trial strategy.

[17]   THE ARBITRATOR: Well, likewise, I

[18] would assume that he played the tape, if

[19] he did, in order to receive legal advice

[20] from you, and, therefore, I will sustain

[21] the—

[22]   THE WITNESS: Obviously, they don't

[23] want you to hear the tape.

[24]   BY MR. O'CONNOR:

[25]   Q: It's a simple question: Did you ever play the

Page 1019

[1]

[2] tape in question, the tape of this board meeting,

[3] did you ever play it for Varn, Watzke and Peslak?

[4]   THE COURT: For Peslak, I will sustain

[5] the privilege unless you can establish

[6] that it was played in his presence and the

[7] presence of others who — or another who

[8] was not Mr. Carr's attorney.

[9]   MR. O'CONNOR: All right.

[10]   BY MR. O'CONNOR:

[11]   Q: Is Mr. Varn your attorney?

[12]   A: No, he's not — I don't remember, guys, I

[13] don't remember if I played it for Mr. Varn or not.

[14]   Q: Is Mr. Watzke your attorney?

[15]   A: No, he's not.

[16]   Q: All right. So the question is, did you ever

[17] play the tape in front of Mr. Watzke, Mr. Varn and

[18] Mr. Peslak?

[19]   THE ARBITRATOR: As a group?

[20]   MR. O'CONNOR: As a group.

[21]   THE WITNESS: I don't remember. I

[22] can't remember. I've been through so much

[23] in the last two years.

[24]   MR. O'CONNOR: Let me confer just a

[25] minute, please.

Page 1020

[1]

[2]

[3]   MR. O'CONNOR:

[4]   Q: Mr. Carr you testified, I believe this you

[5] never sent to Garry Watzke or Larry Varn any of the

[6] tapes; right?

[7]   A: I believe — I believe I gave them to Art

[8] Peslak.

[9]   Q: Right?

[10]   A: If I made a mistake and sent them to Garry and

[11] Larry, I don't remember. I believe I sent them

[12] directly to my attorney. But it's been very, very —

[13]   Q: Stressful?

[14]   A: Yeah, let me — and I will tell you why. My

[15] daughter has a brain tumor, she has been in

[16] Philadelphia Children's Hospital, they cut half her

[17] eye out; this is the third time this year my son

[18] broke a bone, he has a bone disease, brittle bone

[19] disease, he has to go in for surgery, he has

[20] internal bleeding, that they can't do surgery on the

[21] bones.

[22]   So I'm very, very stressed. I can't

[23] remember everything. Okay? And I never wanted any

[24] of this to happen. I asked many a meetings with

[25] your counterpart, Mr. Kircher, to have Peter come in

Page 1021

[2] and try to settle this like men and gentlemen.
[3] MR. O'CONNOR: Your Honor, with all
[4] due respect.
[5] THE WITNESS: For some reasons you
[6] guys continue to drag this on.
[7] BY MR. O'CONNOR:
[8] Q: Pleads, I asked you a simple question?
[9] THE ARBITRATOR: No, the witness has
[10] said if he sent it to Mr. Varn or Mr.
[11] Watzke, he has no memory of having done
[12] so, it is his testimony and his belief
[13] that he turned the originals of all tapes
[14] over to his own attorney.
[15] BY MR. O'CONNOR:
[16] Q: So when you testified under oath at page 56
[17] and 57 on May 30th, 2002 that, question?
[18] MR. VARN: Can we get there.
[19] MS. DAVIS: What page.
[20] MR. O'CONNOR: 56 and 57.
[21] "Question: All right, have you ever
[22] sent to Garry Watzke or provided to him in
[23] any way any of the tapes that you have
[24] taken that you have just described?
[25] "Answer: Yes, I have."

Page 1022

[2] THE WITNESS: Yes, I have, through Art
[3] Peslak. Not directly.
[4] BY MR. O'CONNOR:
[5] Q: ?
[6] "Question: All right, have you ever
[7] begin to Larry Varn or someone from his
[8] law firm any of these tapes?
[9] "Answer: Yes, I have."
[10] THE WITNESS: Correct, I have, through
[11] my attorney. I would never just hand over
[12] a tape. I tried very long and hard to try
[13] to settle this, not to cause this
[14] nightmare.
[15] BY MR. O'CONNOR:
[16] Q: ?
[17] "Question: Okay, do you have, when you
[18] gave those tapes to those individuals,
[19] meaning Varn and Watzke, did you give them
[20] copies or did you give them your only
[21] tape?
[22] "Answer: I gave them the original."
[23] THE WITNESS: Correct.
[24] Q: That's correct?
[25] A: I believe that's — my attorney sent them the

Page 1023

[2] originals.
[3] Q: "Answer: I gave them the original and I kept
[4] a copy?
[5] A: They were transcripted onto a larger tape to
[6] knock all the non-human noises out.
[7] Q: How do you know that?
[8] A: Art Peslak told me.
[9] Q: And I asked — you were asked, do you still
[10] have a copy or the original of every one of these
[11] taped conversations? Your answer was: You didn't
[12] keep any, right?
[13] A: Art Peslak has all the copies.
[14] Q: Your answer under oath was "Yes, I do.
[15] "Question: Where are they?
[16] "Answer: In my home."
[17] Is that accurate.
[18] A: At the time. I gave them to Art Peslak.
[19] MR. O'CONNOR: I have no further
[20] questions.
[21] THE ARBITRATOR: Mr. Varn, any
[22] questions of the witness.
[23] MR. VARN: Can we have just a moment?
[24] THE ARBITRATOR: Of course. Sure.
[25] MR. O'CONNOR: I need to move into

Page 1024

[2] evidence 177, the 2000 day planner we're
[3] going to copy; 178, the 2001 day planner;
[4] 179, the 2002 day planner; 180, the
[5] January 9th, 02, the date of the phone
[6] bills; 181, the 2/9/02 phone bills; 182,
[7] the amended complaint, Carr versus Pierce,
[8] and 183, the cassette.
[9] THE ARBITRATOR: Any objection, Mr.
[10] Varn.
[11] MR. VARN: None as to 180, 181, 182
[12] and 183. I've not had an opportunity to
[13] review the entirety of the day planners,
[14] so I don't know if I have an objection,
[15] but if we could have an opportunity at
[16] some point to —
[17] THE ARBITRATOR: Mr. Varn, 180 through
[18] 183 are admitted into evidence, 170
[19] through 179, the ruling is reserved until
[20] you've had an opportunity to examine the
[21] documents. All right? You may have your
[22] minute or two, sir.
[23]
[24] (Whereupon, a brief recess was taken
[25] at this time.) (After a recess.).

---

Page 1025

[1]
[2]                    BY MR. VARN:
[3]     Q: Judge, I have no questions of this witness,
[4] but I have a request?
[5]     THE ARBITRATOR: Which is I am the
[6] request is that.
[7]     MR. VARN: The request is that you
[8] take custody of the apparatus, that we
[9] mark it as claimant's trial exhibit 157,
[10] that you also take custody of the original
[11] tape that is our, respondent's or
[12] Pierce-183; that you keep them solely in
[13] your possession in a secure place such
[14] that, if, as I shrewdly suspect there are
[15] forensic issues, that from this moment in
[16] time forward, the possibility of issues of
[17] custody and movement, etcetera, etcetera,
[18] is reduced to zero.
[19]     THE ARBITRATOR: While you were out of
[20] the room, I had a brief conversation with
[21] Mr. Carr's attorney and made the
[22] suggestion that I would keep the tape in
[23] my care, custody and control until its
[24] involvement in this arbitration was
[25] settled. And having then made that

Page 1026

[1]
[2] suggestion, I very immediately thought if
[3] I do that, and I am prepared to do it, it
[4] may prevent — present chain of custody
[5] issues if Mr. Peslak tries to use this
[6] tape at some other time in some other
[7] proceeding and he and I were going to try
[8] to figure out between us how we could
[9] solve that.
[10]     Also, I had not considered keeping the
[11] microcassette recorder, so let me ask Mr.
[12] Carr.
[13]     A: You can keep it.
[14]     THE ARBITRATOR: Thank you. Then the
[15] microcassette recorder will be marked as
[16] claimant's exhibit 157. Offer it into
[17] evidence?
[18]     MR. VARN: I so offer.
[19]     THE ARBITRATOR: Any objection.
[20]     MR. O'CONNOR: Yes, I want
[21] authentication from the witness on that.
[22]     THE ARBITRATOR: What kind of
[23] authentication, do you mean.
[24]     MR. O'CONNOR: I want him to identify
[25] that, in fact, that is the exact tape —

Page 1027

[1]
[2]     THE ARBITRATOR: No, we're not talking
[3] about the tape. We're talking about the
[4] machine.
[5]     MR. O'CONNOR: Oh, the machine. I
[6] don't care about the machine.
[7]     THE ARBITRATOR: All right. CT-157 is
[8] received.
[9]     Now, off the record.
[10]     (Discussion off the record.)
[11]     THE ARBITRATOR: For the record, and I
[12] will keep in my care, custody and control
[13] Pierce exhibit 183, which is identified
[14] for us as the original of the tape of the
[15] Logisteq board meeting prepared by Mr.
[16] Carr and a copy of which has been marked
[17] as claimant's exhibit 109.
[18]     And I do so, specifically, so that in
[19] the event there needs to be proof of
[20] custody, chain of custody of this tape at
[21] some other time for some other reason, I
[22] can and will execute an affidavit as to my
[23] continued possession and control of the
[24] tape at all times.
[25]     MR. O'CONNOR: Mr. Rutter, I don't

Page 1028

[1]
[2] believe the witness identified that as the
[3] original tape.
[4]     THE ARBITRATOR: The lawyer did.
[5]     MR. O'CONNOR: The lawyer can did not
[6] testify in this case. He threw the
[7] cassette at me.
[8]     MR. VARN: The witness did, we checked
[9] the feed.
[10]     THE WITNESS: It is the tape.
[11]     THE ARBITRATOR: Say it again.
[12]     THE WITNESS: It is the original tape.
[13] I looked at it.
[14]     THE ARBITRATOR: Anything else, Mr.
[15] Varn.
[16]     MR. VARN: Nothing with this witness.
[17]     THE ARBITRATOR: Mr. O'Connor,
[18] anything else for Mr. Carr.
[19]     MR. O'CONNOR: No, thank you.
[20]     THE ARBITRATOR: Sir, you are free to
[21] go about your business. I hope your son
[22] does okay.
[23]     THE WITNESS: Thank you.
[24]     (Discussion off the record.)
[25]     THE ARBITRATOR: Mr. O'Connor, who is

---

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA

- v. -

PETER G. LIOUNIS,
    a/k/a "Lefty,"
THOMAS CARR,
JOHN M. LEHMANN,
ARTHUR S. BATTAGLINO,
FRANK PAUL ADAMITA,
ANTHONY D'ANGELI,
    a/k/a "Tony D,"
EDWARD J. MISHAN,
JOHN THOMAS KELLY, and
MIKHAIL SHTEYMAN,

                    Defendants.

- - - - - - - - - - - - - - - -x

INDICTMENT

01 Cr.

01 CRIM. 784
CR 03 1103

A TRUE COPY
J. MICHAEL McMAHON, CLERK

BY _____
        CLERK

SPATT, J.
WALL, M.J.

## COUNT ONE

## CONSPIRACY

The Grand Jury charges:

1.    From at least in or about July 2000 up to
and including at least in or about March 2001, in the Southern
District of New York and elsewhere, while PETER G. LIOUNIS, a/k/a
"Lefty," the defendant, was on release pursuant to an order of
the United States District Court for the Southern District of New
York, dated October 5, 1999, issued pursuant to Title 18, United
States Code, Section 3142(c), PETER G. LIOUNIS, a/k/a "Lefty,"
THOMAS CARR, JOHN M. LEHMANN, and ARTHUR S. BATTAGLINO, the
defendants, and others known and unknown, unlawfully, willfully,
and knowingly did combine, conspire, confederate, and agree


EXH 6
FOR IDENT
IN EVD    DATE 2/28/07
DENISE L. DANIELS

together and with each other to commit offenses against the
United States, to wit, wire fraud, in violation of Title 18,
United States Code, Section 1343, and bank fraud, in violation of
Title 18, United States Code, Section 1344.

### Objects of the Conspiracy

2.    It was a part and object of the conspiracy
that PETER G. LIOUNIS, a/k/a "Lefty," THOMAS CARR, JOHN M.
LEHMANN, and ARTHUR S. BATTAGLINO, the defendants, and others
known and unknown, unlawfully, willfully, and knowingly, having
devised and intended to devise a scheme and artifice to defraud,
and for obtaining money and property by means of false and
fraudulent pretenses, representations, and promises, would and
did transmit and cause to be transmitted by means of wire
communication in interstate commerce writings, signs, signals,
pictures, and sounds for the purpose of executing such scheme and
artifice, in violation of Title 18, United States Code, Section
1343.

3.    It was a further part and object of the conspiracy
that PETER G. LIOUNIS, a/k/a "Lefty," THOMAS CARR, JOHN M.
LEHMANN, and ARTHUR S. BATTAGLINO, the defendants, and others
known and unknown, unlawfully, willfully, and knowingly would and
did execute and attempt to execute a scheme and artifice to
defraud a financial institution and to obtain moneys, funds,
credits, assets, securities, and other property owned by and

2

IMP04342

under the custody and control of a financial institution by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344.

### Overt Acts in Furtherance of the Conspiracy

4.    In furtherance of the conspiracy and to effect the illegal objects thereof, PETER G. LIOUNIS, a/k/a "Lefty," THOMAS CARR, JOHN M. LEHMANN, and ARTHUR S. BATTAGLINO, the defendants, and others known and unknown, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    In or about November 2000, a co-conspirator not named as a defendant herein stole a check in the amount of $51,000 from U.S. Clearing in Manhattan.

b.    In or about November 2000, PETER G. LIOUNIS, a/k/a "Lefty," the defendant, received a stolen check in the amount of $51,000.

c.    In or about December 2000, a co-conspirator not named as a defendant herein stole a check in the amount of $18,103 from Mutual of America Foundation in Manhattan.

d.    In or about December 2000, JOHN M. LEHMANN, the defendant, deposited a stolen check in the amount of $18,103.

3

IMP04343

e.   In or about December 2000 or January 2001, a co-conspirator not named as a defendant herein stole a check in the amount of $107,399.04 from Mutual of America Life Insurance Company in Manhattan.

f.   In or about December 2000 or January 2001, THOMAS CARR, the defendant, received a stolen check in the amount of $107,399.04.

g.   In or about March 2001, ARTHUR S. BATTAGLINO caused $50,000 to be wired from a brokerage account at Auerbach Pollack & Richardson to his bank account at Fleet Bank.

(Title 18; United States Code, Section 371 and 3147(1).)

COUNT TWO

BANK FRAUD

The Grand Jury further charges:

5.   From at least in or about November 2000 up to and including at least in or about December 2000, in the Southern District of New York and elsewhere, while PETER G. LIOUNIS, a/k/a "Lefty," the defendant, was on release pursuant to an order of the United States District Court for the Southern District of New York, dated October 5, 1999, issued pursuant to Title 18, United States Code, Section 3142(c), PETER G. LIOUNIS, a/k/a "Lefty," THOMAS CARR, and JOHN M. LEHMANN, the defendants, together with others known and unknown, unlawfully, willfully, and knowingly executed and attempted to execute a scheme and artifice to

4

IMP04344

defraud a financial institution and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution by means of false and fraudulent pretenses, representations, and promises, to wit, PETER G. LIOUNIS, a/k/a "Lefty," THOMAS CARR, and JOHN M. LEHMANN, the defendants, and others participated in a scheme to negotiate a stolen check dated November 15, 2000, drawn on an account at Fleet Bank, in the amount of $51,000.

(Title 18, United States Code, Sections 1344, 2, and 3147(1).)

COUNT THREE

BANK FRAUD

The Grand Jury further charges:

6.    In or about December 2000, in the Southern District of New York and elsewhere, while PETER G. LIOUNIS, a/k/a "Lefty," the defendant, was on release pursuant to an order of the United States District Court for the Southern District of New York, dated October 5, 1999, issued pursuant to Title 18, United States Code, Section 3142(c), PETER G. LIOUNIS, a/k/a "Lefty," and JOHN M. LEHMANN, the defendants, together with others known and unknown, unlawfully, willfully, and knowingly executed and attempted to execute a scheme and artifice to defraud a financial institution and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution by means of false and

5

IMP04345

fraudulent pretenses, representations, and promises, to wit,
PETER G. LIOUNIS, a/k/a "Lefty," and JOHN M. LEHMANN, the
defendants, and others participated in a scheme to negotiate
stolen checks dated December 12, 2000, drawn on accounts at Chase
Manhattan Bank, in the amounts of $18,103 and $90,008.79.

(Title 18, United States Code, Sections 1344, 2, and 3147(1).)

## COUNT FOUR

## BANK FRAUD

The Grand Jury further charges:

7.    From at least in or about December 2000 up to and
including at least in or about January 2001, in the Southern
District of New York and elsewhere, JOHN M. LEHMANN, the
defendant, together with others known and unknown, unlawfully,
willfully, and knowingly executed and attempted to execute a
scheme and artifice to defraud a financial institution and to
obtain moneys, funds, credits, assets, securities, and other
property owned by and under the custody and control of a
financial institution by means of false and fraudulent pretenses,
representations, and promises, to wit, JOHN M. LEHMANN, the
defendant, and others participated in a scheme to negotiate
stolen checks dated December 26, 2000 and December 29, 2000,
drawn on accounts at Chase Manhattan Bank, in the amounts of
$28,670.49 and $10,000.

(Title 18, United States Code, Sections 1344 and 2.)

6

IMP04346



## COUNT FIVE

### BANK FRAUD

The Grand Jury further charges:

8.  From in or about December 2000 up to and including at least in or about January 2001, in the Southern District of New York and elsewhere, while PETER G. LIOUNIS, a/k/a "Lefty," the defendant, was on release pursuant to an order of the United States District Court for the Southern District of New York, dated October 5, 1999, issued pursuant to Title 18, United States Code, Section 3142(c), PETER G. LIOUNIS, a/k/a "Lefty," THOMAS CARR, JOHN M. LEHMANN, and ARTHUR S. BATTAGLINO, the defendants, together with others known and unknown, unlawfully, willfully, and knowingly executed and attempted to execute a scheme and artifice to defraud a financial institution and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution by means of false and fraudulent pretenses, representations, and promises, to wit, PETER G. LIOUNIS, a/k/a "Lefty," THOMAS CARR, JOHN M. LEHMANN, and ARTHUR S. BATTAGLINO, the defendants, and others participated in a scheme to negotiate a stolen check dated December 29, 2000, drawn on an account at Chase Manhattan Bank, in the amount of $107,399.04.

(Title 18, United States Code, Sections 1344, 2, and 3147(1).)

7

IMP04347



## COUNT SIX

### WIRE FRAUD

The Grand Jury further charges:

9. In or about October 2000, in the Southern District of New York and elsewhere, while PETER G. LIOUNIS, a/k/a "Lefty," the defendant, was on release pursuant to an order of the United States District Court for the Southern District of New York, dated October 5, 1999, issued pursuant to Title 18, United States Code, Section 3142(c), PETER G. LIOUNIS, a/k/a "Lefty," and ARTHUR S. BATTAGLINO, the defendants, together with others known and unknown, unlawfully, willfully, and knowingly, having devised and intended to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, and thereby affected a financial institution, to wit, PETER G. LIOUNIS, a/k/a "Lefty," and ARTHUR S. BATTAGLINO, the defendants, and others participated in a scheme to have $50,000 transferred by wire from a brokerage account at Auerbach Pollack & Richardson to a bank account at Fleet Bank, without the authorization or knowledge of the brokerage account holder.

(Title 18, United States Code, Sections 1343, 2, and 3147(1).)

8

IMP04348



## COUNT SEVEN

### WIRE FRAUD

The Grand Jury further charges:

10.  In or about March 2001, in the Southern District of New York and elsewhere, while PETER G. LIOUNIS, a/k/a "Lefty," the defendant, was on release pursuant to an order of the United States District Court for the Southern District of New York, dated October 5, 1999, issued pursuant to Title 18, United States Code, Section 3142(c), PETER G. LIOUNIS and ANTHONY D'ANGELI, a/k/a "Tony D," the defendants, together with others known and unknown, unlawfully, willfully, and knowingly, having devised and intended to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, and thereby affected a financial institution, to wit, PETER G. LIOUNIS and ANTHONY D'ANGELI, a/k/a "Tony D," the defendants, and others participated in a scheme to have $550,000 transferred by wire from a brokerage account at Auerbach Pollack & Richardson to a bank account at First Union Bank, without the authorization or knowledge of the brokerage account holder.

(Title 18, United States Code, Sections 1343, 2, and 3147(1).)

9

IMP04349



## COUNT EIGHT

### WIRE FRAUD

The Grand Jury further charges:

11.   From at least in or about September 2000 up to and including at least in or about October 2000, in the Southern District of New York and elsewhere, while PETER G. LIOUNIS, a/k/a "Lefty," the defendant, was on release pursuant to an order of the United States District Court for the Southern District of New York, dated October 5, 1999, issued pursuant to Title 18, United States Code, Section 3142(c), PETER G. LIOUNIS, a/k/a "Lefty," FRANK PAUL ADAMITA, EDWARD J. MISHAN, JOHN THOMAS KELLY, and MIKHAIL SHTEYMAN, the defendants, together with others known and unknown, unlawfully, willfully, and knowingly, having devised and intended to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire communication in interstate and foreign commerce writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, and thereby affected a financial institution, to wit, PETER G. LIOUNIS, a/k/a "Lefty," FRANK PAUL ADAMITA, EDWARD J. MISHAN, JOHN THOMAS KELLY, and MIKHAIL SHTEYMAN, the defendants, and others participated in a scheme to have $280,000 transferred by wire from a brokerage account at Merrill Lynch to a bank account

10

IMP04350

at Citibank without the authorization or knowledge of the
brokerage account holder.

(Title 18, United States Code, Sections 1343, 2, and 3147(1).)

## COUNT NINE

### BANK FRAUD

The Grand Jury further charges:

12. In or about November 2000, in the Southern
District of New York and elsewhere, FRANK PAUL ADAMITA, the
defendant, together with others known and unknown, unlawfully,
willfully, and knowingly executed and attempted to execute a
scheme and artifice to defraud a financial institution and to
obtain moneys, funds, credits, assets, securities, and other
property owned by and under the custody and control of a
financial institution by means of false and fraudulent pretenses,
representations, and promises, to wit, FRANK PAUL ADAMITA, the
defendant, and others participated in a scheme to negotiate a
stolen check dated November 7, 2000, drawn on an account at Fleet
Bank, in the amount of $70,677.

(Title 18, United States Code, Sections 1344 and 2.)

11

IMP04351

## COUNT TEN

### BANK FRAUD

The Grand Jury further charges:

13.   From in or about April 2001 up to and including at least in or about May 2001, in the Southern District of New York and elsewhere, FRANK PAUL ADAMITA, the defendant, together with others known and unknown, unlawfully, willfully, and knowingly executed and attempted to execute a scheme and artifice to defraud a financial institution and to obtain moneys, funds, credits, assets, securities, and other property owned by and under the custody and control of a financial institution by means of false and fraudulent pretenses, representations, and promises, to wit, FRANK PAUL ADAMITA, the defendant, and others participated in a scheme to negotiate a stolen check dated April 11, 2001, drawn on an account at Chase Manhattan Bank, in the amount of $250,701.

(Title 18, United States Code, Sections 1344 and 2.)


_____
FOREPERSON

_____
MARY JO WHITE
United States Attorney

12

IMP04352

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

PETER G. LIOUNIS,
   a/k/a "Lefty,"
THOMAS CARR,
JOHN M. LEHMANN,
ARTHUR S. BATTAGLINO,
FRANK PAUL ADAMITA,
ANTHONY D'ANGELI,
   a/k/a "Tony D,"
EDWARD J. MISHAN,
JOHN THOMAS KELLY, and
MIKHAIL SHTEYMAN,

Defendants.

## INDICTMENT

01 Cr.

Title 18, United States Code,
Sections 371, 1343, 1344, 2, and
3147(1)

MARY JO WHITE
United States Attorney.

A TRUE BILL

Foreperson.

IRON MOUNTAIN INCORPORATED   :

        Claimant        :

                   :

v.                     :

                   :

J. PETER PIERCE          :

                   :

        Respondent      :

                   :

**IN ARBITRATION**

(Thomas B. Rutter, Esquire)
Arbitrator

**FINDINGS OF FACT,
CONCLUSIONS OF LAW AND AWARD**

**FINDINGS OF FACT**

## I.   GENERAL BACKGROUND

### A.   THE PARTIES

1.   Claimant, Iron Mountain Incorporated ("IRM"), is a Pennsylvania corporation with a principal place of business located in Boston, Massachusetts. Claimant's Trial Exhibit ("CTE") 3 (Iron Mountain 2002 Annual Report, Form 10-K). Iron Mountain Information Management, Inc. ("IMIM", collectively with IRM, "Iron Mountain"), is a wholly owned subsidiary of IRM, with a principal place of business located in Collegeville, Pennsylvania. Id. Iron Mountain went public in February of 1996, and its common stock is currently traded on the New York Stock Exchange under the symbol "IRM". Day 1, Charles Richard Reese ("Reese") Trial Testimony

EXH 7
FOR IDENT
IN EVD   DATE 3/15/07
DENISE L. DANIELS

at 140:20-24;[1] CTE 3 at p.16 of Form 10-K[2].

2. Iron Management is the world leader in professional records and information management services ("RIMS"). Day 1, Reese at 138:5 – 139:6, 217:23 – 218:6. Iron Mountain is an international, full-service provider of RIMS, storing and servicing all types of information media, including paper, micrographics and computer data, both physically in records centers and digitally. Day 1, Reese at 138:5 – 139:6. Iron Mountain operates over 46 million square feet of commercial space in approximately eighty (80) cities in the United States, as well as in Canada, Mexico, South America and Europe. Day 1, Reese at 138:5 – 139:6. Iron Mountain's revenue for 2003 is estimated to be approximately $1.4 billion. Day 1, Reese at 139:9-10.

3. Pierce Leahy Corp. ("PLC") was a major RIMS provider founded in 1969. Day 2, J. Peter Pierce ("Pierce") at 390:8-23; Day 1, Reese at 143:25 – 144:12. Prior to 2000, PLC operated throughout the United States, as well as in certain markets in Canada and Europe. Day 2, Pierce at 391: 20-23; Day 1, Reese at 143:25 -144:12.

4. PLC was headed by Respondent Pierce, who had served as a member of its Board of Directors since the early 1970s, as its President since 1984, and as its Chief Executive Officer since approximately 1995. Day 2, Pierce at 390:8 –

---

[1]  Testimony from the fifteen (15) days of arbitration hearings, starting on July 28, 2003, are identified as "Day ___, [Witness] at [Page:Line]."

[2]  Exhibits are identified as CLT (claimant) or Respondent (Pierce), Exhibit, Number.

391:18; Day 6, Pierce at 1432:13-19.

B.    **THE COMPETITIVE ENVIRONMENT**

5.    The RIMS industry is a competitive industry with relatively low barriers

to entry.  Day 5, Douglas Huntley ("Huntley") at 1314:3 – 1325:5.

6.    In the United States, Iron Mountain currently has more than 3,000

competitors in the RIMS industry.  Day 1, Reese at 142:2-6.  Iron

Mountain's competitors vary by geographic region and include, in the

New York City to Philadelphia corridor, CitiStorage, GRM Information

Management Services, Diversified Record Management Corporation and

Recall, a division of Brambles Industries Ltd., a global company with

operations in Australia, North America, Europe, and Asia.  Day 1, Reese at

141:5 – 142:6, 217:23 – 218:15. In New York alone, there are approximately

100 RIMS providers.  Day 1, Reese at 141:5 – 142:6.

7.    In 1999, prior to the merger transaction with Iron Mountain (the

"Merger"), PLC was Iron Mountain's largest competitor and the second

largest national RIMS provider, with total revenues of approximately $350

million in that year.  Day 2, Pierce at 391:10-23.

C.    **THE MERGER**

8.    In the fall of 1999, Iron Mountain and PLC began negotiations for a

possible merger.  Day 1, Reese at 147:5-18.  Iron Mountain's Chief

Financial Officer (CFO), John J. Kenny, Jr. ("Kenny"), and PLC's CFO,

Huntley, met with the Department of Justice regarding the possible

merger. Day 1, Reese at 147:17 – 148:9; Day 5, Huntley at 1314:3 – 1325:5. The merger was not opposed by the federal authorities, who raised no anti-competitive concerns. Day 1, Reese at 147:19 – 148:9; Day 5, Huntley at 1313:14 – 1326:5.

9.    At the time of the merger, Pierce and his immediate family were the largest Pierce Leahy stockholders. Day 1, Reese at 154:17-19.

10.    On February 1, 2000, Iron Mountain was merged with and into PLC. Day 1, Reese at 153:4-12. The Merger involved a stock swap of approximately one share of PLC for 1.1 shares of the new entity. Day 1, Reese at 153:4-12. Immediately thereafter, PLC changed its name to Iron Mountain. Day 1, Reese at 153:4-12. The merger was valued at approximately $1.1 billion. Day 1, Reese at 153:4-12.

**D.    THE PIERCE EMPLOYMENT AGREEMENT**

11.    In connection with, and as a condition of the merger, Pierce and PLC (now Iron Mountain), for good and valuable consideration, entered into a written Employment Agreement dated as of February 1, 2000 (the "Pierce Employment Agreement"). Day 2, Pierce at 392:14-16; Day 1, Reese at 160:18 – 161:14; CTE 1 (Pierce Employment Agreement).

12.    The Pierce Employment Agreement was negotiated at arms' length with the assistance of both Pierce's and Iron Mountain's lawyers. Day 2, Pierce at 392:6-16, 395:25-396:10, 402:6-8; Day 6, Pierce at 1469:18-22; Day 1, Reese at 160:18-161:12.

4

13.    In accordance with the Pierce Employment Agreement, Iron Mountain hired Pierce On an "at will" basis, as its President and as its Chief Operating Officer (the most senior officer of IMIM, Iron Mountain's paper records management operations) and agreed to pay him a salary of $325,000 per year plus bonuses, stock options and fringe benefits. Day 1, Reese 162:19 – 163:22; Day 2, Pierce at 392:23-393:11. During his Iron Mountain employment, Pierce was in charge of overseeing all operational management for IMIM in the Americas, including the United States, Canada, Mexico and Central and South America. Day 1, Reese at 162:19 – 163:22; Day 2, Pierce at 392:23-393:11.[3]

---

[3] The specific terms relevant to Pierce's duties and compensation were as follows:

        1.    <u>Employment</u>. Employer [Pierce-Leahy/Iron Mountain] hereby agrees to employ Executive [Pierce] and Executive hereby accepts employment by Employer for the period and upon the terms and conditions specified in this Agreement.

        2.    <u>Office and Duties</u>

           (a)    Executive shall serve Employer generally as (i) President of Employer and (ii) President, Chief Operating Officer and the most senior officer of Employer's paper records management operations operating in the Americas (*i.e.* North America, South America and Central America). Executive shall have the duties, authority and responsibilities consistent with the duties, authority and responsibilities typically performed by persons serving in such capacities of businesses of similar size. In such capacities, Executive shall report directly to C. Richard Reese ("Reese").

(b)    Executive shall serve as a member of the Board of Directors of Employer unless he is not elected by the shareholders of Employer.

\* \* \* \* \*

3.    <u>Term</u>. The term of employment ("Term of Employment") of Executive pursuant to this Agreement shall be four (4) years, commencing on the date the Merger is effective (as determined pursuant to the Agreement and Plan of Merger by and among Iron Mountain and Employer dated as of October 20, 1999). Unless either party elects to terminate this Agreement at the end of the initial or any renewal term by giving the other party written notice of such election at least ninety (90) days before the expiration of the then current term, the Term of Employment shall be deemed to have been renewed for an additional term of one (1) year commencing on the day after the expiration of the then current term.

4.    <u>Compensation</u>

(a)    For all of the service rendered by Executive to Employer, Executive shall receive: (i) Base Compensation at the gross annual rate (without regard to authorized or legally required deductions and withholdings) of Three Hundred Twenty-Five Thousand Dollars ($325,000), payable in substantially equal installments in accordance with Employer's regular payroll practices in effect from time to time and (ii) bonus(es) in such amounts as are determined from time to time by Employer's Board of Directors (or any committee thereof), provided Executive shall have the same opportunity to participate in Employer's bonus plans and arrangements as Reese.

\* \* \* \* \*

(c)    Executive shall receive stock options in the same number and under the same terms as Reese receives such options. "Stock options" for the purposes of this paragraph shall be defined broadly and shall include by way of example stock appreciation rights, restricted stock awards and other incentive equity based compensation arrangements.

5.    <u>Fringe Benefits</u>

14.    Pierce also entered into certain restrictive convenants, as set forth in the

Pierce Employment Agreement, related to non-competition, non-

solicitation and confidentiality of information as follows:

13.    <u>Confidentiality, Non-Competition and Non-</u>
<u>Solicitation.</u>

(a)    Except with the prior written consent of
Employer, during Executive's active
employment with Employer and for a
period of one (1) year after the
termination of Executive's employment
with Employer, but in no event less than
(5) years after the date hereof (the
"Restricted Period"). Executive agrees
that he shall not disclose or make
available, directly or indirectly, to
others or use for his or others' benefit
confidential information, whether or
not reduced to written or other
recorded form, related to Employer and
its subsidiaries, including the names of
customers, the contact persons at
customers, pricing, the software
programs utilized by Employer and its
subsidiaries in the operation of its
business and all other information
material to the operation, management,
marketing or financing of Employer and
its subsidiaries which is not known or
generally available to the public or
competitors in the records management
or records storage industries.

As an inducement to Executive to enter into this
Agreement, and in consideration of Executive's
covenants under this Agreement, Executive shall be
entitled to the benefits set forth below during the Term
of Employment.

\* \* \* \* \*

(b)    Executive agrees that during the Restricted Period, he shall not directly or indirectly own, manage, engage in, participate in, provide advice to, be employed by, have a financial interest in, or solicit or attempt to obtain business from any customer of Employer or any of its subsidiaries on behalf of, any enterprise which provides records management or records storage and related services to business facilities (including, without limitation, the management, handling, storage, filing, processing and retrieval of medical records used by hospitals, private practitioners, and other medical institutions) located in the geographic areas in which Executive oversees operations at the time of the termination of his employment (the "Restricted Area"). Section 13(b) shall not prohibit Executive from owning equity securities of Employer or acquiring up to five percent (5%) of any class of securities registered pursuant to the Securities Exchange Act of 1934, as amended, of any corporation which may engage in the records management storage services in direct competition with the business of Employer and its subsidiaries within the Restricted Area.

(c)    Executive agrees that during the Restricted Period, Executive shall not on his own behalf or on behalf of any other person under his control or on behalf of others, directly or indirectly solicit for employment (including as an independent contractor), or endeavor to entice away, any of the officers,

employees or independent contractors of Employer and its subsidiaries who perform services for Employer and its subsidiaries. For the avoidance of doubt, Employer acknowledges that his Section 13(c) shall not prohibit Executive from employing, on his own behalf or on behalf of any other person under his control or on behalf of others, a former officer, employee or independent contractor of Employer and its subsidiaries who has ceased to perform services for Employer and its subsidiaries without enticement by Executive and who seeks employment (including as an independent contractor) by Executive without solicitation by Executive.

\* \* \* \* \*

(e)     Executive acknowledges that confidential information in his possession related to the Employer and its subsidiaries has particular value, the loss of confidentiality of which by communication to unauthorized persons cannot be reasonably or adequately compensated for by damages alone. Moreover, Executive agrees that any breach of paragraphs (a) (b) and (c) of this Section 13 would give rise to damages which would be difficult to calculate. Therefore, the parties hereby agree that in the event of a breach of any of the terms and conditions of this Section 13, the Employer shall be entitled to equitable relief by way of an injunction. This Section 13 shall not be construed as a limitation upon the Employer's remedies for such breach.

9

>    (f)    The restrictions contained in this Section
>           13 shall be broadly construed by any
>           court having jurisdiction of the matter in
>           order to protect the Employer to the
>           maximum degree possible.

Day 1, Reese at 157:18 – 159:13; CTE 1.

15.    Pierce had

>    A layman's understanding of what the Agreement
>    was about, yes, I did. As a matter of fact, I [Pierce]
>    told Mr. Reese very specifically while we were
>    negotiating the Employment Agreement . . . that you
>    could make this restrictive covenant for a hundred
>    years.

Day 6, Pierce at 1469:4-17, 1469:23-1470:4.  This testimony by Pierce is

consistent with his written representation as set forth in the Employment

Agreement:

>    13(d).  Executive knowledges that he has
>            carefully read all the terms herein stated
>            and agrees that the same are necessary
>            for the reasonable and proper protection
>            of Employer; and that each and every
>            covenant is reasonable with respect to
>            such matter, length of time, and the
>            geographical area described; and that
>            irrespective of all other conditions, the
>            covenants and restrictions hereinabove
>            provided shall be operative during the
>            full      period    and    throughout    the
>            geographical area described. * * *

16.    When Pierce commenced his employment with Iron Mountain, he was

appointed to a three-year term on the Board of Directors of Iron Mountain

("Board of Directors") and elected to the Executive Committee of the

Board of Directors. Day 2, Pierce at 395:11-24; Day 1, Reese at 155:17 – 156:5.

D.    **TERMINATION OF PIERCE AS AN IRON MOUNTAIN EMPLOYEE**

17.    In his capacity as the Chairman of the Board and Chief Executive Officer of Iron Mountain, Reese terminated Pierce's employment with Iron Mountain on June 23, 2000. Day 1, Reese at 137:13 – 138:2, 140:25 – 141:4, 230:16; Day 2, Pierce at 399:7-18, Day 6, Pierce at 1438:2-13.

18.    Richard Reese fired Pierce without notice. This happened only a few weeks after Pierce had been voted president of Iron Mountain's largest division by the Iron Mountain Board.

19.    There were no discussions at any formal Iron Mountain Board meeting with respect to Pierce's job performance or alleged improper conduct prior to the time that Reese fired Pierce. (R.395). However, there were informal discussions between Reese and other members of Iron Mountain's Board of Directors.

20.    On or about 12 September 2000, Iron Mountain and Pierce entered into a letter agreement, effective as of 30 June 2000 establishing terms for Pierce's separation from Iron Mountain (the "Pierce Termination Agreement"). Day 1, Reese at 164:24 – 165:3; Day 6, Pierce at 1438:2 – 7, CTE 2 (Pierce Termination Agreement). The Pierce Termination Agreement was negotiated at arm's length by lawyers on both sides. Day 6, Pierce at 1482:19 – 1483:15; Day 1.

21.    Pursuant to the Pierce Termination Agreement, the parties confirmed that

Pierce's employment as President and Chief Operating Officer of Iron

Mountain was terminated as of 30 June 2000 without cause (as "cause" is

defined in the Pierce Employment Agreement).    CTE 2 (Pierce

Termination Agreement); Day 6, Pierce at 1438:2 – 7; Day 1, Reese at

164:24 – 165:7.

22.    The Pierce Termination Agreement also provided, in relevant part:

> 7.    You, [Pierce], your heirs, successors, and
> assigns, hereby knowingly and voluntarily
> remise, release and forever discharge the
> Company, its current and former officers,
> directors, agents, representatives and
> employees, parent companies, affiliates and
> subsidiaries (collectively, the "Parties"), from
> any and all debts, demands, actions, causes of
> actions [sic], accounts, covenants, contracts,
> agreements, claims, damages, omissions,
> promises, and any and all claims and
> liabilities whatsoever, of every name and
> nature, known or unknown, both in law and
> equity ("Claims"), which you now have or
> ever had against the Parties.  This General
> Release of Claims shall apply to any Claim of
> any type, including, without limitation, any
> and all Claims of any type that you may have
> arising under the common law, under Title VII
> of the Civil Rights Act of 1964, as amended, the
> Age Discrimination in Employment Act of
> 1967, as amended, the Older Workers Benefit
> Protection Act, the Americans With Disabilities
> Act, the Family and Medical Leave Act, and
> any other Federal, state or local statutes,
> regulations, ordinances or common law
> creating employment-related causes of action,
> and shall further apply, without limitation, to
> any and all Claims in connection with, related
> to or arising out of your employment, or the

termination of your employment, with the Parties. You also hereby waive any Claim for reinstatement, severance pay, attorney's fees, or costs. You agree that you will not hereafter pursue any individual Claim against the Parties (as defined in this General Release) by filing a claim, complaint or charge with any federal state or local court, any arbitration panel or any administrative agency, for or on account of anything that that [sic] is the subject of the General Release; provided, however, that nothing in this General Release shall prevent you from seeking to enforce your rights under this Agreement.

\* \* \* \* \*

9.    This Agreement constitutes the entire agreement and understanding between you and Company and supersedes all other agreements between you and Company as to the subject matter covered hereby, except as specifically provided otherwise in this Agreement. Except as expressly amended in paragraphs 2 and 3 of this Agreement (relating to the termination of your employment and the payments and benefits provided for in your Employment Agreement in the event of your termination), your and the Company's obligations under your Employment Agreement shall remain in full force and effect.

\* \* \*

23.    In addition, pursuant to the Piece Termination Agreement, Iron Mountain agreed to, and did, pay (a) a severance to Pierce at the annual rate of $325,000 for the period 1 July through December 31, 2000, less required withholdings; (b) a lump sum to Pierce on January 2, 2001, of $1,002,083, less required withholdings, and (c) a lump sum to Pierce on January 2,

2001, of $125,000, less required withholdings. CTE 1 (Pierce Employment Agreement); CTE 2 (Pierce Termination Agreement); Day 1, Reese at 165:14 – 166:2. The amounts paid to Pierce in accordance with the Termination Agreement exceeded that which was provided for in Employment Agreement of 1 February 2000. Id. That is, Pierce received fresh consideration for his promises under the Termination Agreement.

24.    Iron Mountain has made all of the payments and has otherwise fully performed all of its obligations under the Pierce Termination Agreement, except as otherwise identified herein. Day 1, Reese at 165:8 – 11. Pierce continued to be a member of the Board of Directors after his termination as an Iron Mountain employee until December 23, 2002, at which time Pierce resigned as a director. Day 1, Reese at 207:25 – 209:5, 254:2-14; Day 2, Pierce at 476:7-10; CTE 4 (Iron Mountain Proxy Statement at 8).

E.    **THE SCOPE OF THIS ARBITRATION**

25.    It is the contractual terms of the Pierce Employment and Termination Agreements, and the factual questions as to breach thereof, <u>vel</u> <u>non</u>, by Pierce, which constitute the subject matter of this Arbitration.

26.    In addition, the scope of Pierce's duties as a member of the Board of Directors of Iron Mountain, and his breach (if any) of those fiduciary duties are the subject matter of this Arbitration so far as they relate to Sequedex, the Iron Mountain competitor.

14

27.   Iron Mountain does not contend in this arbitration that Pierce violated any
      provision of his Employment Agreement prior to 3 June 2000.  See, e.g.,
      Iron Mountain's Response to Pierce's Proposed Findings of Fact and
      Conclusions of Law, at pp. 5, 6.

28.   Except for purposes of evidentiary rulings on the relevant exception(s) to
      the hearsay rule, the questions whether (a) there was a conspiracy as
      alleged by Iron Mountain, (b) the identity of the members of the alleged
      conspiracy and (c) Pierce's alleged membership in the alleged conspiracy
      are <u>not</u> before this Arbitrator.

F.   **OTHER RELEVANT ENTITIES**

      (1)    Sequedex

29.   Sequedex LLC ("<u>Sequedex</u>") was formally established as a Pennsylvania
      limited liability company in October 2000.    CTE 28 (Sequedex
      Incorporation Documents).

30.   Sequedex was established to engage in, and did engage in, the RIMS
      business of storing active and inactive paper records, retrieving records
      for clients on an as-needed basis, transporting records to and from clients,
      providing professional services, and offering "complementary business
      lines."  Day 9, James Michael Gold ("Gold") at 2215:14-21; Day 1, Reese at
      173:6-21; CTE 33 (Sequedex Powerpoint Presentation).   In its early
      business plan, Sequedex stated that it was a "newly formed records

management company with a strategy of being a high service provider to manage hardcopy information for customers." CTE 142.

31.     Iron Mountain also provides archival storage of active and inactive paper records, retrieval of records for clients on an as-needed basis, transportation of records to and from clients (storage and retrieval), shredding and document destruction services, as well as disaster recovery programs for computer operations for "all types of information media." Day 1, Reese at 138:5-24.

32.     Sequedex was therefore a competitor of Iron Mountain in the RIMS industry.

33.     Several former senior and executive employees of PLC, who had joined Iron Mountain at the time of the merger, left the employ of Iron Mountain to work for Sequedex.  Day 1, Reese at 167:2 – 169:19.  Gold, former executive vice-resident of field operations in the mid-Atlantic region, who resigned from Iron Mountain in July 2000, shortly after Pierce was terminated, was the initial founder and President of Sequedex.  Day 9, Gold at 2210:9-10, 2217:11-13, 2238:21 – 2239:7; CTE 28 (Sequedex Incorporation Documents).  In addition, Peter Hamilton ("Hamilton"), a former PLC/Iron Mountain senior account manager; Fred A. Mathewson ("Mathewson"), a former senior financial manger; W. Price Brannon ("Brannon"), a former senior information technology ("IT") executive who had been PLC's Chief Information Officer ("CIO"); Gary Tobiczyk

("Tobiczyk"), a former senior sales representative; and Jeff Melnick ("Melnick"), also a former senior sales representative, went to work for Sequedex. Day 1, Reese at 170:3 – 172:15, 156:9-25; Day 9, Gold at 2251:3-18, 2231:12 – 2233:18, 2254:16 – 2255:14; Day 6, Pierce at 1457:7 – 1464:17.

34.  By August or September 2000, Pierce was aware that Sequedex was being established to engage in a RIMS business operating between New York and Philadelphia. Day 6, Pierce at 1447:16 – 1448:5, 1450:19-23, 1456:6-7, 1464:18-25; Day 9, Gold at 2250:15-22. Pierce was also aware that several people were leaving or had left Iron Mountain to join the new Sequedex organization as a result of the "fallout that was going on inside the Iron Mountain organization as a result of my [Pierce's] termination", i.e., the departure of many former Pierce Leahy employees from Iron Mountain followed and, partially at least, was a result of the termination of Pierce. Pierce was still a member of the Iron Mountain Board of Directors at that time. Day 6, Pierce at 1453:5-11.

35.  Pierce did not notify the Iron Mountain Board of Directors or any Iron Mountain executive that he knew that Sequedex was being formed and was going to compete with Iron Mountain; in fact, he testified that "it did not enter my mind" to make this disclosure. Day 6, Pierce at 1455:5 – 1456:16, 1567:22 – 1568:5, 1577:8 – 1579:23, 1607:2-7; Day 7, Pierce at 1697:4 – 1700:15, 1704:22 – 1705:10; Day 2, Pierce at 476:7 – 478:19.

**(2) Pioneer Capital**

36.    Pierce formed Pioneer Capital, L.P. ("Pioneer"), a private investment company, in September of 2000 to manage the investment portfolio of the Pierce family, including himself. Day 6, Pierce at 1442:6-16. Pioneer was a wealth management vehicle for Pierce and two related Pierce family trusts. Day 3, Huntley at 828:25 – 829:10; Day 5, Huntley at 1293:23 – 1294:2. Pierce was and is the controlling founder, President and Chief Executive Officer of Pioneer Capital. Day 3, Huntley at 833:4-6.

37.    Pierce established the headquarters for Pioneer Capital in Paoli, Pennsylvania. Day 3, Huntley at 835:16-18.

**(3) Telespectrum**

38.    Telespectrum Worldwide, Inc. ("Telespectrum"), based in King of Prussia Pennsylvania, approached Pierce in approximately late October 2000, with a potential employment opportunity. Negotiations with respect thereto continued through November of 2000. Day 6, Pierce at 1554:24 – 1555:12; Day 5, Kurt Dinkelacker ("Dinkelacker") at 1366:15 – 1367:5.

39.    From January of 2001 until on or about May 3, 2002, Pierce served as the CEO and Chairman of Telespectrum. Day 6, Pierce at 1443:6-14, 1599:11 – 1600:6; Day 5, Dinkelacker at 1367:6-13; Day 1, Reese at 264:25 – 265:3.

**(4) TC/Logisteq**

40.    In early 2001, Pierce created Logisteq LLC ("Logisteq"), a New Jersey limited liability company, that succeeded to the assets and business of

Transportation Concepts of New Jersey, Inc. and certain affiliated entities ("<u>TC</u>" or "<u>TC Transport</u>").     Day 2, Pierce at 424:4 – 426:21.  Tom Carr ("<u>Carr</u>") was the 100% owner of TC.  Day 3, McGrath at 622:23 – 623:4. Pierce's investment of $3.8 million in TC resulted in Pierce's owning 51% of the new entity  (Logisteq); Carr held a 49% interest.  Day 5, Huntley at 1354:16-20;  Day 6, Pierce at 1580:18-25.  Prior to the Pierce transaction, TC had been in the business of warehousing or storing commodities (coffee) and in the trucking business.  Day 4, Tammi Phillips ("<u>Phillips</u>") Trial Testimony at 1139:9 – 1140:7; Day 3, Alan McGrath ("<u>McGrath</u>") Trial Testimony at 795:12-14.  Pierce was the CEO of Logisteq.  Day 3, McGrath at 676:24 – 677:11.  From and after January 2001, Pierce, Carr, Huntley, McGrath and Michael DiIanni ("<u>DiIanni</u>"), the two owners and three senior officers of Logisteq, made up the advisory board of the company. Day 3, McGrath at 864:20 – 865:2; Day 4, Huntley at 1068:5-10.

41.     In order to fund TC Transport prior to the creation of Logisteq and Pierce's acquisition of a 51% controlling interest therein, Pierce borrowed $758,522.09 of his son Matthew's money to make loans to TC Transport.[4] Day 6, Pierce at 1478:17 – 1480:17.

42.     Pierce borrowed the money from Matthew because Matthew enjoyed cash liquidity at the time and Pierce did not.  Day 6, Pierce at 1479:12-14.  Pierce

19

subsequently repaid Matthew in full, with interest. Day 2, Pierce at 422:17 – 424:3; Day 6, Pierce at 1479:7-11.

**(5) Anchor Glass**

43.    The Anchor Glass facility ("Anchor Glass") was a large facility in Aberdeen Township, New Jersey formerly used as a glass manufacturing plant. Day 3, Huntley at 855:16-22; Day 6, Pierce at 1503:3-11. The Anchor Glass facility consisted of approximately 731,244 ft² of commercial warehouse space and ancillary office space on more than fifty-one (51) acres, adjacent to the Garden State Parkway. CTE 37 (Anchor Glass Brochure).

**(6) Hartford Windsor**

44.    Hartford Windsor Associates L.P. ("H-W") is a limited partnership formed in November 2001 consisting of Pierce, J. Anthony Hayden ("Hayden"), Frank Seidman ("Seidman"), John Greenwald ("Greenwald"), and Hartford General, LLC. CTE 67; Day 2, Pierce at 448:9 – 449:5, 449:16-23; Day 7, Hayden at 1822:16 – 1823:25, 1860:12-14.

45.    H-W is a single purpose entity organized to acquire an approximately 79,039 ft² warehousing and distribution facility located a 4 Craftsman Road, East Windsor, Connecticut, for the exclusive use by Sequedex as a tenant for its RIMS business with the Travelers Insurance Company (the

---

⁴    Matthew Pierce ("Matthew"), Pierce's 23 year old son who was at the time living in Colorado and working as a custom home builder, had sold 128,049 shares of Iron Mountain stock at $35.00 per share for a net price of $4,471,321.68.

"Hartford Property"). CTE 49; Day 10, Seidman at 2517:23 – 2518:3, 2518:25 – 2519:13. Pierce and Hayden discussed formation of the partnership and the real estate acquisition/investment in the late summer or early fall of 2001, shortly after Sequedex entered into a RIMS contract with Travelers. Day 2, Pierce at 448:9 - 449:5.

## II.   ACTIVITIES ALLEGED BY IRON MOUNTAIN TO CONSTITUTE VIOLATION BY PIERCE OF HIS RESTRICTIVE COVENANTS

### A.   FORMATION OF SEQUEDEX

46.   By August or September 2000, Gold and Pierce had discussed the new venture, Sequedex, and the fact that Hamilton was going to join the venture. Day 6, Pierce at 1448:21-25, 1458. By his own admission, Pierce attended a scheduled meeting with Gold at Pioneer's offices in Paoli, Pennsylvania, on September 28, 2000 at which Gold informed Pierce he was going to form his own records management company, i.e., Sequedex. Day 6, Pierce at 1528:17-25.

47.   Sequedex LLC ("Sequedex") was formally established as a Pennsylvania limited liability company in October 2000. CTE 28 (Sequedex Incorporation Documents).

48.   Several former senior and executive employees of PLC, who had joined Iron Mountain at the time of the merger, left the employ of Iron Mountain

to work for Sequedex.  Day 1, Reese at 167:2 – 169:19.  Gold, former executive vice-resident of field operations in the mid-Atlantic region, who resigned from Iron Mountain in July 2000, shortly after Pierce was terminated, was the initial founder and President of Sequedex.  Day 9, Gold at 2210:9-10, 2217:11-13, 2238:21 – 2239:7; CTE 28 (Sequedex Incorporation Documents).  In addition, Peter Hamilton ("Hamilton"), a former PLC/Iron Mountain senior account manager; Fred A. Mathewson ("Mathewson"), a former senior financial manger; W. Price Brannon ("Brannon"), a former senior information technology ("IT") executive who had been PLC's Chief Information Officer ("CIO"); Gary Tobiczyk ("Tobiczyk"), a former senior sales representative; and Jeff Melnick ("Melnick"), also a former senior sales representative, went to work for Sequedex.  Day 1, Reese at 170:3 – 172:15, 156:9-25; Day 9, Gold at 2251:3-18, 2231:12 – 2233:18, 2254:16 – 2255:14; Day 6, Pierce at 1457:7 – 1464:17.

49.   There is no credible evidence that Pierce directly or indirectly recruited any of the individuals named in the foregoing paragraphs to join Sequedex, either during or after their connection (if any) with Iron Mountain.

50.   Also in or about September of 2000, Huntley was engaged by Gold to provide consulting services for his new "archive company, records management company", i.e., Sequedex.  Day 3, Huntley at 835:11 – 837:4. Huntley agreed to such a consulting arrangement.  Day 3, Huntley at

827:22 – 828:23.  **There is no credible evidence that Pierce recruited Huntley for Sequedex.**

51.  In the autumn of 2000, Huntley created several financial models for Sequedex.  Day 9, Gold at 2250:6-16; Day 3, Huntley at 837:7 – 839:9; CTE 141 (Huntley consulting services list).  Huntley also prepared a business plan for Sequedex, as well as providing strategic planning advice; advice on human resources requirements in the finance and administrative areas of the new company; introductions to and guidance in banking, accounting and tax services; comments and recommendations on the underlying Sequedex operating agreement; and participated in meetings with investment bankers and a "potential funding source".  Day 3, Huntley at 849:7 – 850:4; CTE 141 (Huntley memorandum), CTE 142 (Sequedex Business Plan).  The Sequedex business plan stated that the Sequedex management team would be "largely drawn from ex – Pierce Leahy employees, employees who have worked in the business."  Day 3, Huntley at 852:9-16; CTE 142 (Sequedex Business Plan).

52.  The financial model for Sequedex, then referred to as "NEWCO", included as part of its management team the following persons: Gold, Hamilton, Brannon, Mathewson, Mark Haslon ("Haslon"), Jack O'Donnell ("O'Donnell"), Sandra Cole ("Cole") and Ettle Ricketts, also known as Ettle Hunte, ("Ricketts").  The Sequedex financial model also included an initial equity interest of 10% each for Gold and Hamilton, and earnings

23

incentives whereby Haslon could earn up to 5% in equity over 5 years and others could earn up to a 3% equity interest over 3 years. CTE 34.

53.    There is no credible evidence that Pierce directly or indirectly recruited any of the individuals named in the foregoing paragraphs to join Sequedex, either during or after their connection (if any) with Iron Mountain. supra.

54.    Sequedex projected up to four warehouses in New Jersey providing more than 2 million cubic feet of record's storage space, three of which warehouses were projected to be operational and profitable by the third quarter of 2003. CTE 31. The projections also predicted that Sequedex's revenues would increase from essentially zero to more than $6.4 million by 2005. CTE 31. Sequedex further projected that net income in its fifth year of operation would be about $2.6 million. CTE 31.

55.    On a number of occasions, particularly in the fall 20000, Pierce allowed Gold and other former PLC employees to use an available unused conference room at Pioneer to conduct meetings with both potential investors and potential employees.  Day 3, Huntley at 836:3-7; Day 6, Pierce at 1449:24 – 1450:6, Day 6, Pierce at 1516:6 – 1517:3.

56.    There is no credible evidence that Pierce was aware of, let alone directly

or indirectly participated in, any of these business plans or projections

or meetings.[5]

57.    In October of 2000, Brandon telephoned David Woosley ("Woosley"), an

IT consultant and independent contractor to PLC/Iron Mountain with

respect to the PROGRESS® database management system utilized by both

PLC and Iron Mountain.  Brannon told Woosley that he and Gold "were

going to start a records management business" and invited Woosley to

meet with them to discuss possible IT consulting services that Woosley

might provide to the new venture.  Day 5, Woosley at 1384:17 – 1385:7.

58.    In October of 2000, that meeting (among Gold, Brannon and Woosley)

occurred at the Pioneer offices in Paoli.  Day 6, Pierce at 1466:11-14; Day 5,

Woosley at 1385:5-9; Day 14, Brannon at 3450:24 – 3451:7.   During the

course of the meeting, Gold told Woosley that they were starting a new

records management company that would be called Sequedex, an

acronym developed from "sequential indexing"; that Sequedex would be

operating by the beginning of 2001; that they hoped to have records

management operations in several major U. S. cities, including Denver,

Philadelphia, New York and Miami; that they wanted to create a system

that would provide the most advanced records management technology

---

[5]  Compare the projections in ¶54, supra, with Pierce's predictions  to his son, Peter, Jr., i.e., that Gold's
new company would only "pick up crumbs" in the RIMS business, given Iron Mountain's market
dominance.

25

available; and that Sequedex "hoped to target the large clients of Iron Mountain." Day 5, Woosley at 1387:2 – 1389:7.

59.    It is alleged that during that meeting at Pioneer's offices, Pierce appeared and thus engaged in the Sequedex meeting at which Gold and Brannon were endeavoring to recruit Woosley for IT services for Sequedex. Day 5, Woosley at 1399:5-17; Day 14, Brannon at 3453:1-3. Woosley testified that Pierce said "Hi", exchanged pleasantries and "humorously said, 'I don't see you, if you don't see me'." Day 5, Woosley at 1392:9-17. According to Woosley, Pierce's presence "lent a lot of credibility to the meeting." Day 5, Woosley at 1392:18-24. Brannon did not recall Pierce's having made such a statement. CTE 6. Pierce denies making any such statement.

60.    This Arbitrator finds that the Woosley testimony as to this alleged statement by Pierce is not credible. Such conduct is inconsistent with the person Pierce has demonstrated himself to be throughout the credible evidence adduced during this arbitration. Woosley, on the other hand, had a demonstrated raison d'etre for his testimony; i.e., renewal of a lucrative consulting contract with Iron Mountain (a renewal which, in fact, occurred).

61.    Pierce knew that Tobiczyk, who resided in Florida, was meeting with Gold in Pennsylvania to discuss employment at Sequedex. Day 6, Pierce at 1533:9 – 1534:24. Tobiczyk met with Pierce at Pierce's office in Paoli

during the same trip to the Delaware Valley from Florida. Day 6, Pierce at 1534:16-19.

62.    There is no credible evidence that Pierce played any role in recruiting Tobiczyk for Sequedex. Indeed, even if Pierce had done so, such would <u>not</u> be a breach of either the Employment or the Termination Agreement since Tobiczyk had already left the employ of Iron Mountain by the time of the Paoli meeting with Pierce.

B.    **PIERCE'S ALLEGED INDIRECT OWNERSHIP OF SEQUEDEX THROUGH PETER PIERCE, JR. AND PIERCE'S ALLEGED PARTICIPATION IN SEQUEDEX VIA INVESTMENTS IN SEQUEDEX BY HIS FAMILY AND CLOSE FRIENDS**

63.    Pierce has acknowledged that, during September of 2000, Gold asked Pierce if Pierce "would have any problem if [Gold] contacted any family members – Pierce family members – to help him raise capital for this venture [Sequedex]." Day 6, Pierce at 1448:21-25. Pierce responded that he "didn't see where that was problematic."[6] Day 6, Pierce at 1448:21 1449:3.

64.    By the fall of 2000, Pierce's sister, Mary E. Pierce ("<u>Mary</u>" or "<u>Molly</u>"), was contacted by Gold. Day 14, Molly at 3847:16 – 3488:19. By Thanksgiving 2000, Molly was willing to invest $1.5 million in Sequedex. Day 14, Molly at 3512:21-24, 3513:11-21.

---

[6] Pierce's restrictive covenants were, of course, personal to him; they did <u>not</u> bind his relatives, friends or co-workers. See ¶14, supra.

65.   On December 28, 2000, someone signed a Sequedex Subscription
      Agreement to purchase 900 Sequedex units at a cost of $1,500,000 on
      Molly's behalf.   Day 10, Seidman at 2504:21-23; CTE 31; Molly at 3517:1 –
      3518:20.   On January 5, 2001, Molly signed the signature page of the
      Sequedex Subscription Agreement for those 900 units at a cost of
      $1,500,000.   Day 14, Molly at 3517:7-18; <u>RTE</u> 205.

66.   Also in the early fall of 2000, Pierce's son, Peter Pierce, Jr., was contacted
      by Gold regarding an investment in Sequedex.   Day 8, Pierce, Jr. at
      2021:12-24.   On December 28, 2000, Pierce, Jr. signed a Sequedex
      Subscription Agreement to purchase 1,800 Sequedex units for a total
      investment of $3,000,000.   CTE 31; Day 10, Seidman at 2504:21-23.   Day 9,
      Gold at 2350:16 – 2351:3.   In December 2000, one-half of that amount, $1.5
      million, was wired to Sequedex by Peter Pierce, Jr.   CTE 12.   He
      subsequently paid the balance.

67.   As of the fall of 2000, Peter Pierce Jr. was only three years out of college;
      had never before made a comparable investment in a new venture (Day 8,
      Pierce, Jr. at 1997:23 – 1998:2, 2037:12 – 2040:2-15, 2042:21 – 2043:19,
      2044:17 – 2045:2, 2052:11-17); and testified that he was investing the lion's
      share of his then net worth in Gold's start-up company, based on his
      "belief" in Gold, his "knowledge" of the RIMS business and his
      confidence in his personal ability to succeed financially without regard to
      the success or failure of Gold's new business.   He was, of course, also

28

employed in London at the time with an investment-banking firm, acting as a venture capitalist for it.

68.    Assuming Pierce knew before he resigned from the Iron Mountain Board of Directors in December that his son and sister were going to provide 90% of the initial capital for competitor Sequedex (an assumption not established in this record), Pierce did not disclose this knowledge to the Board of Directors or senior management of Iron Mountain during his directorship. Day 6, Pierce at 1567:22 – 1568:5.

69.    There is no credible evidence that Pierce directly or indirectly caused, or even encouraged, his sister Molly or his son, Peter Jr., to invest in Sequedex. Indeed, he and they all testified to the exact opposite. And, contrary to the innuendo advanced by Iron Mountain, there is no evidence that Pierce had (or has) any agreement, tacit or otherwise, to indemnify either of them, in whole or in part, from their losses (which are entire) arising out of the Sequedex investment.[7]

70.    Nor does Gold's/Sequedex' business transactions with various business associates of Peter Pierce  - - e.g., Hayden, the realtor; Seidman, the venture capitalist; Hamilton, the RIMS account representative— evidence Pierce's direct or indirect involvement in Sequedex. Obviously, all of

---

[7]    Similarly, Pierce's borrowing of approximately $758,000 from his son, Matthew, for use in connection with a bridge loan to TC Transport (see ¶¶ 41-42, supra) is not evidence of an investment by anyone in Sequedex since (a) the Matthew – Peter Pierce transaction was a genuine loan (which has been repaid with interest) and (b) TC Transport/Logisteq is not Sequedex.

29

these men were business acquaintances (initially through Pierce and Pierce Leahy, to be sure). What then, is more natural than for them to come together when Gold is <u>lawfully</u> trying to put together a new company to engage in a business (the RIMS business) they have experienced success in? And, of course, none of them was under any prohibition - -legal, moral or contractual- - from starting a business to compete with Iron Mountain.

71.  **Finally, they were simply not credible to the extent that certain statements allegedly were made by certain individuals to the effect that Pierce was involved in Sequedex' start-up were not "puffing"  - -see, <u>e.g.</u>, DiAnni, Goldman, Hamilton- -. For example, the variegated testimony of witnesses about visits to Florida- -  <u>e.g.</u> Aiello, Soto- -  and other fortuitous meanderings- -  <u>e.g.</u> Vumballo; Brana- - is simply not credible so far as it relates to alleged remarks concerning Pierce.**

72.  Simply put, the fingerprints of Tom Carr – a con man who, <u>inter alia</u>, took Pierce for a large investment in TC Transport ($3,800,000); who took Iron Mountain for $50,000 in fees to support a separate lawsuit against Pierce; who bamboozled Iron Mountain with corrupt "evidence" from corrupt witness, including an ersatz taped recording – are pervasive throughout these witnesses and their testimony.

73.  It is true that Pierce visited the March 2001 grand opening of Sequedex Cranbury, New Jersey, facility in March 2001 on his way back from an

unrelated business meeting in New York. Pierce walked around the facility and, according to Hamilton, looked at some of the storage racking that was there and said that, "the place looked great . . .[it] had everything other than the boxes."[8]  Day 12, Hamilton at 3014:11-24.

74.  Likewise, it is true that Pierce's name was on a list of possible investors who were to be invited by Hayden, Pierce's best friend and longtime real estate broker, to a meeting at the Philadelphia Country Club on May 3, 2001 where investment in Sequedex was to be pitched.  CTE 30 and 64. However, the evidence is clear that Pierce was not in fact invited to - -and did not in fact- - attend the meeting.[9]

75.  The telephone records relied upon so heavily by Iron Mountain prove both too little and too much and, hence, prove nothing.  Compare Iron Mountains' Proposed Findings of Fact at pp. 29 – 37 with Pierce's Proposed Findings of Fact at pp. 47 – 51.  This is especially true as regards the allegation that Pierce disclosed to Gold an Iron Mountain – Chicago Allstate business opportunity, about which he learned about at an Iron Mountain Board meeting.  There is no factual or logical nexus between the

---

[8]  Hamilton used the pronoun "we", not "it".  However, the "we" clearly refers to Sequedex and is clearly not an admission by Pierce that he was directly or indirectly involved with the Sequedex start-up. The plural pronoun "we", coming from Hamilton's mouth, clearly refers to Hamilton, Gold, etc. – the Sequedex start-up group.

[9]  Quaere:  if Pierce was the Wizard of Oz behind the Sequedex curtain, why would he be on a list of prospective investors in May 2001?)

Boston events and the hearsay "evidence" of a Sequedex, Chicago/Allstate contact, except for the fortuitous circumstance of chronology.

76.     Iron Mountain also points to "evidence" that certain employees were allegedly "parked" at Logisteq (Carr's trucking and coffee warehousing company) until Sequedex put them on its payroll. Regrettably for Iron Mountain there is no evidence that Pierce knew of these "facts" (or, even of these employees), especially since he was then working 24/7 on the Telespectrum project. In any event, to the extent these employees - - Haslon, Cole, Ricketts- - were "parked" (if they were), this looks more like a Carr-Gold arrangement (after all, Gold is burning through his $5,000,000 seed capital at an extraordinary rate) than a Pierce (Logisteq) – Pierce (Sequedex) arrangement.

77.     In short, while very capable lawyering  - -aided and abetted by a skillful, persuasive con man (Tom Carr)- -  gave rise to suspicions about Pierce worthy of further inquiry, at the end of the day the "evidence" described above does <u>not</u>, separately or together, rise to the level the of fair <u>preponderance</u> of the evidence necessary to prove a breach by Pierce of his fiduciary duties or a breach by Pierce of his Employment or Termination Agreements.[10]

---

[10] Obviously, if the evidence does not amount to a "fair preponderance"; it is not "clear and convincing". Hence, there is no need to resolve the legal issue as to standard of proof argued by the parties to this arbitration.

C.    THE ANCHOR GLASS AFFAIR

78.    In the summer of 2000, Pierce learned from DiIanni that Carr was attempting to fund a business plan to raise capital and relocate his business, TC Transport, into a single facility, the Anchor Glass facility, in Aberdeen Township, New Jersey. Day 6 Pierce at 1487:2-12.

79.    On or about July 27, 2000, less than a month after having left the employ of Iron Mountain, Pierce met with Carr at Hayden's office in Conshohocken to discuss Carr's plan. Day 6, Pierce at 1485:11 – 1487:25; 1488:2-12, 1494:25 – 1495:5; CTE 108 (Pierce Electronic Calendar).

80.    Hayden, Pierce's real estate "advisor/expert," as well as Pierce's partner on several real estate deals, assisted Pierce and provided him with advice regarding a possible deal with Carr and Carr's company, TC Transport, involving the Anchor Glass facility. Day 6, Pierce at 1495:5-17, 1496:7-8.

81.    Hayden coordinated the Anchor Glass partnership, which included Pierce, Carr, Gold, Huntley and himself. Day 6, Pierce at 1531:11-14, 1497:19 – 1498:4; Day 3, Huntley at 861:20-24. Pierce, Gold and DiLanni were all key contacts on the Anchor Glass facility project CTE 39 (deal information sheet). Day 3, Huntley at 861:20-24. Hayden consistently gave updated status reports to Pierce, Carr, Gold and Huntley as to the Anchor Glass facility deal. There can be no doubt of Pierce's participation in attempting to obtain the Anchor Glass warehouse space; in fact, the investment group which was to purchase Anchor Glass was to include

33

Pioneer Capital.  CTE 98 (Pierce's Answers to Interrogatories at Response

No. 4).  Day 6, Pierce at 1531:11-14, 1497:19 – 1498:4;  Day 3, Huntley at

861:10 – 862:7; CTE 69.

82.    Pierce was aware during the time he was involved in the Anchor Glass

partnership that Gold and Hayden were working together to raise capital

and secure real estate for Sequedex.  Day 6, Pierce at 1541:4-11, 1668:14-17;

CTE 36; CTE 118.

83.    Pierce understood that a partnership would be formed to purchase the

Anchor Glass facility, to rent a portion of the facility to Sequedex, and to

lease a portion of the facility to TC/Logisteq.  Day 6, Pierce at 1575:6-25.

Sequedex intended to use a section of the Anchor Glass building as

warehouse space as well as office space, with a total of approximately

100,000 ft² CTE 58 and 69.  As of September 29, 2000, Pierce had attended

various meetings regarding the purchase of the Anchor Glass facility.

CTE 55.

84.    During October of 2000, McGrath, then vice president of operations for TC

Transport, coordinated efforts with contractors for improvements to the

Anchor Glass facility.  Day 3, McGrath at 799:23 – 800:25.  One of the

contractors, Canyon Group in Red Bank, New Jersey, invoiced Pierce,

through McGrath and Dilanni, $39,000 for work being done in preparation

for "the move-in of the space and preparing the office space and drawings

of the space."    Day 6, Pierce at 1572:19 – 1573:17;   CTE 83.   This

34

preparation included designing office space for Sequedex. CTE 40 (Plan for Anchor Glass office space). As of October 16, 2000, the would-be purchasers of the Anchor Glass facility, including Pierce, were prepared to spend in excess of $8 million in improvements to the building. CTE 56.

85. In the fourth quarter of 2000, Huntley worked with Hayden on behalf of Pierce and Pioneer in connection with the Anchor Glass project, as well as regarding Pierce's loans to, and forthcoming equity investment in, TC/Logisteq. Hayden was "spearheading" the real estate component of the project and Huntley was responsible for the "overall TC Transportation due diligence." He was also responsible for coordinating, facilitating and advising about Pioneer's investment in Logisteq. Day 3, Huntley at 831:14 – 835:6, 855:11 – 862:6; Day 6, Pierce at 1496:15 – 1498:8; CTE 68 (Independent Contractor Consulting Agreement). In fact, Pioneer entered into an Independent Contractor Consulting Agreement with Huntley on October 23, 2000, for services related to the Anchor Glass facility. Day 3, Huntley at 827:18 – 828:18, 1292:6-9; CTE 68 (Independent Contractor Consulting Agreement between Pioneer Capital and Huntley).

86. Pierce signed the Independent Contractor Consulting Agreement on behalf of Pioneer. During this same time period, Huntley provided consulting services to Sequedex and also maintained a working relationship with Sequedex. Day 5, Huntley at 1308:3 – 1309:1, 1341:10-21; CTE 96 (Pierce's Answers to Interrogatories at Response No. 4).

35

87. Hayden, in furtherance of the Anchor Glass project, sent a letter dated November 29, 2000 to Jeffrey A. Leonard ("Leonard"), a lawyer at Cozen O'Connor, proposing that Sequedex rent a portion of the Anchor Glass building known as Warehouse IV and receive "Year 1 rent free"; that "Sequedex will have the ongoing right to expand into the TC Transport space by giving TC Transport (3) months notice on the space needed"; and that "Mike Gold has requested that this lease be prepared as soon as possible in order for him to bring to potential clients. . . to verify that he indeed has a building for their files." CTE 38 (Letter dated November 29, 2000). Pierce received and read this letter, and copies were also sent to Huntley and Gold. Day 6, Pierce at 1574:21 – 1571:5

88. On November 29, 2000, approximately six (6) weeks before Pierce and Pioneer acquired control of TC/Logisteq, Hayden wrote to James Maguire at the Philadelphia Insurance Company regarding the Anchor Glass property. Day 6, Pierce at 1570:2-14; CTE 58 (Letter dated November 29, 2000).

89. Hayden wrote the following to Mr. Maguire:

> As discussed, Peter Pierce and Hayden Real Estate are pursuing the acquisition of the [Anchor Glass] property. As you can see it totals approximately 711,000 square feet which will be initially leased as follows:

| | | |
|---|---|---|
| Anchor Glass | 5 years | 135,000 square feet |
| T.C. Transport | 10 years | 477,000 square feet |

36

| Sequedex | 15 years | 99,000 square feet |

\* \* \*

> \* \* \* Our plan is to buy the building for $11,2000,000 and put in approximately $6 million for capital improvements such as a new roof, demolition of the furnaces, new flooring and overall general improvements. \* \* \* Our desire is to close as soon as possible.

CTE 58 (emphasis added); Day 6, Pierce at 1570:15 – 1571:14.

90.     On December 12, 2000, still approximately one (1) month before Pierce and Pioneer acquired an interest in TC/Logisteq, Huntley, on behalf of Pierce and Pioneer, wrote to Mr. Holck, the President of Commerce Bank Pennsylvania, with a copy to Pierce.  Day 5, Huntley at 1327:9 – 1328:4; CTE 71 (Letter dated December 12, 2000); Day 6, Pierce at 1558:22 – 1589:15; CTE 71.  The letter stated that Huntley was inquiring as to Commerce Bank's interest in participating in the purchase of the Anchor Glass facility.  CTE 71 (Letter dated December 12, 2000); Day 3, Huntley at 857:6-23, 859:2-13; Day 5, Huntley at 1328:15-17; Day 3, McGrath at 802:18 – 803:13; Day 6, Pierce at 1589:13 – 1590:3.

91.     Commencing in late 2000, and continuing through 2001, officials of Aberdeen Township (the New Jersey situs of the Anchor Glass facility) had numerous conversations with,and correspondence from,various individuals who were affiliated with the putative Anchor Glass

37

partnership concerning potential restrictions on the use of the facility, including issues regarding the volume of truck traffic that would arise out of use of that facility for a records management business.  Day 6, Pierce at 1637:25 – 1638:19; Day 5, Huntley at 1336:13 – 1340:13; CTE 72.

92.    Pierce, along with others, including Huntley, attended at least two (2) meetings with officials of Aberdeen Township during the summer of 2001 regarding the potential purchase and use of the Anchor Glass facility.  Day 6, Pierce at 1675:13-15, 1684:7-9; Day 5, Huntley at 1335:23 – 1336:12; 1344:18-23; CTE 72; RTE 185 and 186.

93.    In both of those meetings, Pierce initially stated that he intended to use the Anchor Glass Facility for general warehousing and storage of coffee and other commodities.  Day 6, Pierce at 1677:20 – 1678:9; Day 5, Huntley at 1344:18 – 1345:23.  However, Pierce also stated that he "was looking at records – that – that we would look to use some of the warehouse as a records management facility."  Day 5, Huntley at 1344:24 – 1345:20.

94.    Ultimately, largely because of issues with Aberdeen Township and inability to get necessary zoning and municipal operating permits, the Anchor Glass acquisition was abandoned. Neither Pierce (in any capacity), nor Sequedex (in any capacity), nor any of the other individuals or entities named above, acquired any interest of any kind in the Anchor Glass facility.  Indeed, it would appear that the real estate partnership intended to purchase the facility was never formed.

95.    Pierce did not inform either the Board of Directors or senior management at Iron Mountain that he was to be a potential major investor in Anchor Glass real estate in which Sequedex, a competitor, would potentially be able to store more than 1 million cubic feet of records.  Day 6, Pierce at 1578:18 – 1579:23.

96.    Given that the Anchor Glass real estate partnership was apparently never formed, and given the definite fact that the Anchor Glass facility was never acquired by Pierce, either directly or indirectly, there is no factual basis for a finding that Pierce's action vis-à-vis the Anchor Glass facility was a violation of any of his restrictive covenants.  This finding is especially appropriate in as much as Sequedex was, at best, the tail of the tenant dog.  See, e.g., ¶89, supra, as regards the square footages of the respective tenancies, including Pierce's own company, TC Transport.

C.    THE HARTFORD-WINDSOR INCIDENT

97.    In late 2000 or early 2001, Hamilton and Haslon, on behalf of Sequedex, began negotiations with the Travelers Insurance Group (a PLC/Iron Mountain customer since 1993) for a records management contract in the Hartford, Connecticut area.  Day 10, Kenwood at 2457:17 – 2458:8, 2465:18 – 246614; CTE 161.

98.    On March 6, 2001, Allegiance Health Care Corp. ("Allegiance"), then the owner of the Hartford Property, and Sequedex entered into a letter of

intent whereby Allegiance would sell Sequedex (or its assignee) the
Hartford Property (defined as the property located at 4 Craftsman Road,
East Windsor, Connecticut). CTE 44.

99.    Sequedex did not have sufficient financial resources to purchase the
Hartford Property. Day 7, Greenwald at 1880:12-20. Thus, the foregoing
letter of intent was "not for Sequedex to actually buy the property." Day
7, Greenwald at 1875:8-12.

> The intent was not at any time for Sequedex to
> purchase a building up in this area or anywhere. It
> was to lease it. Mike Gold and Sequedex needed a
> building quickly in the market to fulfill his contract
> and we didn't have time to form a partnership and go
> through that process, so in order to tie up the building
> quickly, we needed to enter into a deal where
> Sequedex could control the property, and that's why
> we took the language "or assignee" in it, to assign it
> to a partnership. Day 7, Greenwald at 1875:16 –
> 1876:2.

100.   As early as March 2001, Greenwald and Hayden knew that if the
Sequedex transaction was to be consummated, the funds for the purchase
would have to come from "a partnership to be formed of investors that
Tony [Hayden] and I were going to put together." Day 7, Greenwald
1877:7-12.

101.   Prior to signing the Purchase and Sale Agreement for the Hartford
property with Allegiance, on 16 August 2001, Sequedex signed a contract
with the Travelers Group (with an effective date of July 1, 2001,) whereby

Sequedex would provide records management services to Travelers. CTE 45. Day 10, Seidman at 2499:3-20. Travelers agreed to store 500,000 cubic feet of records which would provide minimum annual revenue to Sequedex of $600,000. CTE 45; Day 10, Seidman at 2499:3-11. Exhibit C to the Sequedex – Travelers contract lists the Hartford Property as the approved storage facility, even though Sequedex did not yet own or lease it. CTE 45.

102. Hence, as of July 1, 2001, Sequedex had a RIMS contract with Travelers and Sequedex needed a facility in the Hartford area if it were to perform under the Travelers' contract. Day 12, Hamilton at 3052:19 – 3053:1.

103. As of August 16, 2001, Allegiance and Sequedex entered into the Purchase and Sale Agreement for the purchase by Sequedex of the Hartford Property for $2,400,000, which Agreement was executed by both the seller (Allegiance) and the buyer (Sequedex). CTE 47.

104. As of September 25, 2001, according to Greenwald, "Peter Pierce is going to be the general partner [and the partnership] may buy the building for cash . . .due diligence ends the end of October; we hope for closing in early November." RTE 201 at CW0461 (Duffy phone log).

105. Greenwald, on behalf of Hayden Real Estate and Sequedex, wrote a memorandum on October 25, 2001 (the "Greenwald Memorandum") to Pierce, Hayden and Seidman regarding completion of due diligence on the Hartford Property. CTE 60, 61 and 62. The Greenwald Memorandum

41

advises that $2.75 million is needed for a closing scheduled for November 5, 2001. CTE 60, 61 and 62.

106. Pierce was to invest, and did invest, $2,250,000 in cash (82% of the funds necessary) in the form of bridge loan funds, to close on the acquisition of the Hartford Property until the H-W Partnership could be formed and funded. [11] The remaining 18% was provided by Hayden and Seidman. CTE 60, 61 and 62; RTE 201 at CW0463.

107. On October 30, 2001, an e-mail from Ms. Kelly, Pierce's secretary, instructed Rita (sic), "[p]er your conversation with Doug [Huntley] today", to wire $00,000 out of the "J. Peter Pierce Sr. account" to an account at Founders Bank in the name of H-W. CTE 115.

108. A subsequent e-ail from Ms. Kelly to Rita, dated November 9, 2001, instructed her to wire the additional $2,150,000 from Pierce's account to the same H-W account at Founders Bank. CTE 114.

109. At the time of the money transfers, Pierce knew that Iron Mountain had an existing contract with Travelers for records management services, which contract dated back to 1993 and was one that Pierce himself had negotiated. Day 7, Pierce at 1696:11 – 1697:9.

---

[11] H-W, a limited partnership consisting of Pierce, Hayden, Seidman, Greenwald and Hartford General, LLC, was a special purchase entity formed in November of 2001 for the sole purpose of acquiring and owning the Hartford Property. Day 10, Greenwald at 2517:23-25. Each partner personally guaranteed the investment. CTE 67. The filings of H-W that are available to the general public do not disclose the names of the H-W partners, including Pierce. See also ¶¶44-45, supra.

110.    At the time Pierce moved forward with the investment, he knew that the
        Hartford Property was intended to be leased to Sequedex as a sole tenant.
        Day 7, Pierce at 1704:11-15. Pierce knew that, as a result of H-W's leasing
        property to Sequedex, some or all of the Travelers' records might move
        from Iron Mountain. Sequedex needed warehouse space in the Hartford
        area quickly as it had already obtained the records management business
        from Travelers. Day 7, Greenwald at 1876:18 – 1877:2, 1878:25 – 1882:12.

111.    On or about November 14, 2001, after Pierce had transferred $2,250,000 to
        H-W, Sequedex and H-W entered into an assignment and assumption of
        the sale and purchase agreement whereby Sequedex assigned to H-W all
        of Sequedex's right, title and interest in the Hartford Property. CTE 48.
        Day 7, Pierce at 1707:10-24, 1708:22 – 1709:17; Day 7, Hayden at 1819:14 –
        1822:24.

112.    On November 14, 2001, Allegiance conveyed the Hartford Property to H-
        W. CTE.48

113.    On November 15, 2001, Sequedex entered into a lease agreement with H-
        W for all of the Hartford Property. CTE 49; Day 7, Hayden at 1823; 11-24;
        Day 7, Greenwald at 1886:18 – 1887:5.

114.    Sequedex was the sole tenant for all 79,039 ft$^2$ of the Hartford Property,
        pursuant to a 15-year lease and was not required to front a security
        deposit or provide other credit support or security. Day 7, Hayden at
        1825:5-16; CTE 153 and 154; Day 7, Greenwald at 1887:6 – 1890:6.

43

115.   The credible evidence is that H-W did not require security from Sequedex
(other than a security interest in the stream of Travelers' payments)
because of the perceived reliability of the Sequedex – Travelers contract.
While this confidence was misplaced (since Iron Mountain held on to the
Travelers' business by using various lawful competitive methods (e.g.,
pricing adjustments)),[12] this knowledge - -surely known to investor Pierce-
- does raise close questions as to violations vel non by Pierce of his
restrictive covenants. See Conclusion of Law ¶11, infra.

116.   As of August 21, 2002, Sequedex fell into arrears in its obligations to pay
rent plus real estate taxes and insurance on the Hartford lease as far back
as April 2002. CTE 50. "Sequedex hasn't paid rent in three months"
according to Greenwald as of July 8, 2002. RTE at CWO0464.

D.   **MISCELLANEOUS**

117.   There is no credible evidence that Pierce acted:     (1) to disclose
confidential information;     (2) to solicit customers away from Iron
Mountain;[13]   (3)  to solicit Iron Mountain employees (see ¶¶ 49 and 50,

---

[12] The evidence in this arbitration clearly supports the conclusion that Iron Mountain knew every
competitive step being taken by Sequedex to obtain the Travelers' RIMS business or to obtain a
storage/distributions facility as quickly as each step was taken (indeed, in some instances, contemplated).
Hence, while entrapment may be too strong a conclusion as regards Pierce, it is also very clear that Iron
Mountain's price adjustments vis-à-vis customer Travelers (and perhaps all customers) are the result of
lawful competitive pressures (Sequedex qua Gold, et al. was plainly lawful), not the result of some
unlawful conspiratorial activity by anyone.

[13]   Except as regards Telespectrum, the company of which he became CEO in November 2001.  Such
"diversion" cannot, in equity, be deemed a violation of Pierce's restrictive covenants.

44

<u>supra</u>); or (4) otherwise to engage in conduct which, directly or indirectly, violated any of his restrictive covenants.

III.    <u>IRON MOUNTAIN'S ALLEGED DAMAGES</u>

118.    Iron Mountain's Jerry Cole may be qualified to opine on Iron Mountain's alleged damages if Iron Mountain were otherwise entitled to recover damages. However, (a) Iron Mountain is not entitled to recover any compensatory damages in this case and (b), as set forth in this Arbitrator's comments at Day 10, pp. 2674 – 2684 and at Day 11, pp. 2709 – 2879, <u>passim</u>, both the methodology and factual predicates employed Mr. Cole do not satisfy the evidentiary standards for legally acceptable expert proof of monetary damages in the Commonwealth of Pennsylvania. Cf. <u>Grady v. Frito-Lay</u>, _____ Pa., __, ____ A.2d _____, 2003 WL 23100025, P.A., Dec. 31, 2003.

IV.    <u>PIERCE'S CLAIM TO ATTORNEY'S FEES AND COSTS</u>

119.    Respondent Pierce claims entitlement to reimbursement of attorney's fees and costs in connection with this proceeding under § 7.2 of the Amended and Restated By-Laws of Iron Mountain Incorporated. In pertinent part those by-laws are as follows:

Section 7.2.   *Indemnification and Insurance*

(a)   Indemnification of Directors and Officers.

45

(i)    Each Indemnitee (as defined below) shall be indemnified and held harmless by the Corporation for all actions taken by him or her and for all failures to take action (regardless of the date of any such action or failure to take action) to the fullest extent permitted by Pennsylvania law against all expense, liability and loss (including without limitation attorneys fees, judgments, fines, taxes, penalties, and amounts paid or to be paid in settlement) reasonably incurred by or imposed upon the Indemnitee in connection with any Proceeding (as defined below). No indemnification pursuant to this Section shall be made, however, in any case where the act or failure to act giving rise to the claim for indemnification is determined by a court to have constituted willful misconduct or recklessness.

\* \* \* \* \*

(ii)    (iv)    For purposes of this Article, (A) "Indemnitee" shall mean each Director or officer of the Corporation (including, without limitation, the Chairman Emeritus) who was or is a party to, or is threatened to be made a party to, or is otherwise involved in, any Proceeding, by reason of the fact that he or she is or was a representative of the Corporation or is or was serving in any capacity at the request or for the benefit of the Corporation as a representative of another corporation or any partnership, joint venture, trust, employee benefit plan, or other enterprise; and (B) "Proceeding" shall mean any threatened, pending or completed action, suit or proceeding (including without limitation an action, suit or

46

proceeding by or in the right of the
Corporation), whether civil, criminal,
administrative, investigative or through
arbitration.

\* \* \* \* \*

(c)    *Non-Exclusivity of Rights.*    The rights to
indemnification . . . provided in this Article shall
not be exclusive of any other rights that any person
may have or hereafter acquire under any statute,
provision of the Articles or Bylaws, agreement, vote
of shareholders or Directors, or otherwise.[14]

120.    Pierce also claims indemnification with respect to his attorney's fees and

costs in this Arbitration pursuant to Paragraph 14 of his Employment

Agreement, as preserved by his Termination Agreement.  In pertinent part

that paragraph 14 provides as follows:

14.    <u>Indemnification</u>

(a)    Employer shall indemnify Executive to
the fullest extent permitted by Pennsylvania
law in effect on the date hereof against all
costs,   expenses,   liabilities   and   losses
(including, without limitation, attorneys' fees,
judgments, fines, penalties, ERISA excise taxes,
penalties and amounts paid in settlement)
reasonably incurred by Executive in connection
with a Proceeding.  For the purposes of this
Section 14, a "Proceeding" shall mean any
action,   suit   or   proceeding,   whether   civil,
criminal,   administrative   or   investigative,   in

---

[14]  Paragraph 7.2(a)(ii) also provides that attorney's fees and costs are to be advanced by the corporation
in advance of the final disposition of the proceeding to the fullest extent permitted by Pennsylvania law.
Following certain disputes between the parties to this Arbitration concerning enforcement of that
advance payment provision, this Arbitrator has ordered  - and Iron Mountain has complied with the
Order- -  that there be created a separate escrow fund containing funds which are available for
satisfaction of the indemnification obligation.

47

which Executive is made, or is threatened to be made, a party to, or a witness in, such action, suit or proceeding by reason of the fact that he is or was an officer, director or employee of Employer or is or was serving as an officer, director, member, employee, trustee or agent of any other entity at the request of Employer.[15]

121. This Arbitrator finds as a fact that Respondent Pierce has incurred attorneys' fees, litigation costs and litigation expenses in connection with, and as a result of, this Arbitration.

122. Further, this Arbitrator finds as a fact that this Arbitration falls within the definition of a "Proceeding" as identified in paragraph 14(a) of his Employment Agreement and as defined in Paragraph 7.2(a)(iv) of the By-Laws.

123. Further, this Arbitrator finds that the conduct giving rise to the instant claims for indemnification did not - -and does not- - constitute "willful misconduct or recklessness".

124. However, as regards the By-Laws only, this Arbitrator finds that Mr. Pierce does not fall within the definition of "Indemnitee" within the meaning of Paragraph of 7.2(a)(iv) since his being a party to this arbitration proceeding is not by reason of the fact that he was acting as a

---

[15] Paragraph 14, like Paragraph 7.2, provides for advance payment by the Employer to the Executive of these attorneys' fees and costs. That claim has been resolved in the same manner as the claim arising out of the By-Laws. See footnote 14, supra.

48

representative of the corporation or was serving in any capacity at the request of or for the benefit of the corporation.

125. As already noted, the Pierce Termination Agreement also provides a broad general release of certain defined claims by Pierce subject, however, to the proviso that "nothing in this General Release shall prevent you [Pierce] from seeking to enforce your rights under this [Termination and Employment] Agreement."

49

## CONCLUSIONS OF LAW

1.  There was no conspiracy of which Pierce is or was a part.

2.  _Ergo_, all of the hearsay testimony conditionally admitted into evidence pursuant to the co-conspirator exception to the hearsay rule is hereby stricken from the record.

3.  Pierce **did not** <u>directly</u> disclose or make available to others, or use for his or others' benefit, confidential information related to Iron Mountain or any of its subsidiaries.

4.  Pierce **did not** <u>indirectly</u> disclose or make available to others, or use for his or others' benefit, confidential information related to Iron Mountain or any of its subsidiaries.

5.  Pierce **did not** <u>directly</u> own, manage, engage in, participate in, provide advice to, be employed by, have a financial interest in, or solicit or attempt to obtain business from any customer of Iron Mountain[16] or any of its subsidiaries on behalf of any enterprise (including Sequedex) which provided or provides records management or records storage or related services to any business facility.

6.  Pierce **did not** <u>indirectly</u> own, manage, engage in, participate in, provide advice to, be employed by, have a financial interest in, or solicit or attempt to obtain business from any customer of Iron Mountain or any of its

subsidiaries on behalf of any enterprise (including Sequedex) which provided or provides records management or records storage or related services to any business facility.

7.    Pierce did not <u>directly</u> solicit for employment or endeavor to entice away any of the officers, employees or independent contractors of Iron Mountain or any of its subsidiaries.

8.    Pierce did not <u>indirectly</u> solicit for employment or endeavor to entice away any of the officers, employees or independent contractors of Iron Mountain or any of its subsidiaries.

9.    To the contrary, the fair preponderance of the evidence establishes that the former Iron Mountain/Pierce-Leahy employees who participated in the formation, funding and attempted operation of Sequedex did so independently of Mr. Pierce, based upon their acquaintanceships <u>inter sese</u> and their individual opinions as to the business opportunity presented by the intended operation of Sequedex.

10.    Respondent Pierce invested no funds in Sequedex and did not participate directly or indirectly in the capitalization of Sequedex. To the contrary, the investments in Sequedex made by Pierce's sister, Molly, and his son, Peter Pierce, Jr., were made by them from their own funds and based upon their independently arrived at judgments concerning the investment. Indeed, the established evidence is that Peter Pierce, Jr. made

---

[16]    See fn. 13. <u>supra</u>.

his investment in Sequedex notwithstanding advice and opinions expressed with respect to the likelihood of Sequedex' success by his father, Peter Pierce, Sr.

11. While Pierce's failed endeavors with respect to acquisition of the New Jersey Anchor Glass facility for use, in part, by Sequedex (as well as Pierce's own commodity storage and transportation company) and Pierce's partnership participation in the acquisition of the East Windsor warehouse for use by Sequedex' as a tenant for storage of Travelers' business records may, arguably, come close to a violation of the spirit of Pierce's Employment and Termination Agreement's restrictive covenants, this Arbitrator concludes that such landlord activities do not constitute a relationship in or with tenant Sequedex such as to constitute a violation of § 13(b) of the Employment Agreement.

12. While it might have been preferable, from the perspective of ethical business practices, for Pierce to have disclosed his knowledge of the business activities of competitor Sequedex to Iron Mountain when he, Pierce, was still a member of the Iron Mountain Board of Directors, this Arbitrator can find no legal basis for imposing a legal duty of disclosure on Pierce. Hence, it is concluded that Pierce did not breach his fiduciary duties to Iron Mountain as a member of the Iron Mountain Board of Directors.

52

13.   Furthermore, even were this Arbitrator to conclude - -as he does not- - that Pierce either breached his fiduciary duties as an Iron Mountain Board Member or breached Paragraph 13 of his Employment Agreement, Iron Mountain has failed to prove any damages (except the self-inflicted costs of this and related litigation) as a result of any wrongful act by Pierce. See this Arbitrator's comments at Day 10, pp. 2674 – 2684 and at Day 11, pp. 2709 – 2879, passim.

14.   Paragraph 7 of the Pierce Termination Agreement, which provides a broad valid general release by Pierce of certain defined claims does not preclude Pierce's recovery of attorney's fees and costs as set forth in Paragraph 14 of his Employment Agreement because, first, the claims released by that Paragraph 7 are only claims which Pierce had, or ever had, as of the date of the Termination Agreement (12 September 2000) and, second, because Paragraph 7 specifically permits Paragraph 14 type claims.

53

IRON MOUNTAIN INCORPORATED    :

          Claimant               :

                                   :

v.                                 :

                                 :

J. PETER PIERCE              :

                                 :

          Respondent          :

                                 :

**IN ARBITRATION**

(Thomas B. Rutter, Esquire)
Arbitrator

## AWARD

For the reasons expressed in the accompanying Findings of Fact and Conclusions of Law, be it, and it hereby is

ORDERED that Claimant's demand for damages is **DENIED**; and it is further

ORDERED that Claimant's demand for injunctive relief is **REFUSED**; and it is further

ORDERED that Respondent's claim for attorney's fees and costs is **GRANTED** as follows: to the extent that Respondent claims reimbursement of, or indemnification by Claimant for, attorney's fees or costs, Respondent shall, on or before 1 March 2004, submit a verified bill of costs for such attorney's fees and costs to this Arbitrator and to counsel for Claimant. Within thirty (30) days of the date on which such bill of costs is served on counsel for Claimant, Claimant shall submit its objections, if any, to such verified bill of costs to this Arbitrator and to counsel for Respondent. Within fifteen (15) days of the date on which such objections, if any, are served on counsel for Respondent, Respondent shall submit its reply to such objections to this Arbitrator and on counsel for Claimant, whereupon this Arbitrator shall determine whether evidentiary proceedings or oral argument, or both, shall be had with respect to the bill of costs. Such bill of costs shall, of course, be limited to those costs, expenses, liabilities and losses reasonably incurred by Pierce in connection with this Arbitration only.

DATED:      February 4, 2004

                                   Thomas B. Rutter, Esquire
                                   Arbitrator

55

CR 02 1112411

FILED
RECEIVED
U.S. DISTRICT COURT, E.D.N.Y.
IN CLERK'S OFFICE
LONG ISLAND COURTHOUSE

★ SEP 2 4 2002 ★
ENTERED
★ 9/25/02 ★ DTR

JAC:BTR:br
F.#2002RO1893
Schwartz.Ind

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - -X

UNITED STATES OF AMERICA

- against -

BARRY SCHWARTZ,
THOMAS CARR, and
JOHN LEHMAN,

            Defendants.

- - - - - - - - - - - - -X

SPATT, J.
INDICTMENT
WALL, M..

Cr. No. _____
(T. 18, U.S.C., §§ 371,
982, 1956(h), and
3551 et seq.)

THE GRAND JURY CHARGES:

                    Introduction

        At all times relevant to this Indictment, unless

otherwise stated:

        1.  The defendant BARRY SCHWARTZ, a resident of

Huntington, New York, was a co-owner of Barrett-Day Securities, a

stock brokerage firm located in New York, New York.

        2.  The defendant THOMAS CARR, a resident of Manalapan,

New Jersey, was the President of Logisteq Trucking Company and

the employer of the defendant JOHN LEHMAN.

        3.  The defendant JOHN LEHMAN, was a resident of

Manalapan, New Jersey, and the owner of a defunct corporation,

Rogers Trucking, Inc.

EXH 8
FOR IDENT
IN EVD    DATE 3/15/07
DENISE L. DANIELS

IMP04354

2

4.   Verwaltungs-und-Privat Bank AG, is a bank located in Vaduz, Liechtenstein.  The defendant BARRY SCHWARTZ and John Doe, an individual known to the Grand Jury, and a partner of the defendant BARRY SCHWARTZ in Barrett-Day Securities maintained accounts with Verwaltungs-und-Privat Bank AG.

5.   Amboy National Bank ("Amboy Bank") was a financial institution located at 3590 U.S. Highway 9, Old Bridge, New Jersey, whose accounts were insured by the Federal Deposit Insurance Corporation.

<u>COUNT ONE</u>
(Conspiracy To Commit Wire and Bank Fraud)

6.   The allegations contained in paragraphs 1 through 5 are realleged and incorporated herein.

7.   On or about and between July 26, 1997 through October 31, 1997, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants BARRY SCHWARTZ, THOMAS CARR, and JOHN LEHMAN, together with others, knowingly and intentionally conspired to devise a scheme and artifice to defraud, and obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and (1) for the purpose of executing such scheme and artifice, transmitted and caused to be transmitted by means of wire communication in interstate and

IMP04355

3

foreign commerce, writings, signs and signals, to wit: wire
transfers of approximately $696,000; and (2) to defraud the Amboy
Bank and to obtain monies, funds and credits, under the custody
and control of the Amboy Bank, in violation of Title 18, United
Stated Code, Sections 1343 and 1344.

<u>Means and Methods of the Conspiracy</u>

8.  It was a part of the conspiracy that the defendant
BARRY SCHWARTZ learned of the death of his partner in Barrett-Day
Securities, John Doe, in July 1997.

9.  It was a further part of the conspiracy that the
defendant BARRY SCHWARTZ knew that his partner maintained a
numbered bank account at Verwaltungs-und-Privat Bank AG in Vaduz,
Liechtenstein containing the proceeds of various stock sales.

10.  It was a further part of the conspiracy that the
defendant BARRY SCHWARTZ arranged to forge the signature of John
Doe's widow, and directed Verwaltungs-und-Privat Bank AG to
transfer approximately $696,000 to a bank account under the
control of the defendant JOHN LEHMAN at Amboy Bank in Old Bridge,
New Jersey.

11.  It was a further part of the conspiracy that the
defendant BARRY SCHWARTZ arranged for the defendant THOMAS CARR
to withdraw the monies in various nominee names from the account
controlled by the defendant JOHN LEHMAN at Amboy Bank and have

IMP04356

4

the currency delivered to the defendant BARRY SCHWARTZ on Long
Island, New York.

13.  In furtherance of the conspiracy and to effect the
objectives thereof, within the Eastern District of New York and
elsewhere, the defendants BARRY SCHWARTZ, THOMAS CARR and JOHN
LEHMAN, together with others, did commit and cause to be
committed the following:

Overt Acts

a.  On or about July 27, 1997, the defendant BARRY
SCHWARTZ learned of the death of his partner in Barrett-Day
Securities John Doe.

b.  On or about August 2, 1997, the widow of John Doe
telephoned the defendant BARRY SCHWARTZ to request his assistance
in obtaining  monies in a bank account maintained by John Doe at
the Verwaltungs-und-Privat Bank AG.

c.  On or about August 2, 1997, the defendant BARRY
SCHWARTZ telephoned a coconspirator to discuss obtaining control
of the monies contained in the bank account maintained by John
Doe at the Verwaltungs-und-Privat Bank AG.

d.  In or about August 1997, the defendant BARRY
SCHWARTZ drove from Long Island to New Jersey to meet with the
defendants THOMAS CARR and JOHN LEHMAN to arrange a bank account

IMP04357

DEC 02 2003 16:47 FR                    TO 16173382880      P.06

5

to receive wire transfers from John Doe's Verwaltungs-und-Privat Bank AG account.

e.   On or about August 29, 1997, the defendant JOHN LEHMAN reopened a previously closed Rogers Trucking bank account, No. 06148342, at Amboy Bank, Old Bridge, New Jersey.

f.   On or about August 31, 1997, the defendant BARRY SCHWARTZ arranged to fax instructions under the forged signature of the widow of John Doe to Verwaltungs-und-Privat Bank AG requesting the wire transfer of $500,000 to the Rogers Trucking account at Amboy Bank.

g.   On or about September 7, 1997, the Verwaltungs-und-Privat Bank AG wire transferred $500,000 to the Rogers Trucking account at Amboy Bank.

h.   On or about September 9, 1997 the defendant JOHN LEHMAN drew check number 1108 in the amount of $75,000 on the Rogers Trucking account in the name of a nominee.

i.   On or about September 10, 1997 the defendant JOHN LEHMAN cashed check number 1125 in the amount of $9,500 on the Rogers Trucking account in the name of a nominee.

j.   On or about September 10, 1997 the defendant THOMAS CARR requested that the defendant JOHN LEHMAN draw check no. 1127 on Rogers Trucking in the name of National Expeditors for $50,000.

IMP04358

6

k.  On or about September 10, 1997 the defendant THOMAS CARR cashed check no. 1128 made out to Thomas Carr in the amount of $100,000.

l.  On or about September 11, 1997 the defendant JOHN LEHMAN drew check no. 1124 on the Rogers Trucking account made out to a nominee in the amount of $100,000.

m.  On or about September 12, 1997 the defendant JOHN LEHMAN drew check no. 1122 on the Rogers Trucking account made out to a nominee in the amount of $100,000.

n.  On or about September 17, 1997, the defendant BARRY SCHWARTZ arranged for additional instructions to Verwaltungs-und-Privat Bank AG requesting the wire transfer of $200,000 from John Doe's account to the Rogers Trucking account at Amboy Bank.

o.  On or about September 19, 1997 the defendant JOHN LEHMAN cashed check no. 1211 on the Rogers Trucking account made out to himself in the amount of $6859.39

p.  On or about September 19, 1997, the Verwaltungs-und-Privat Bank AG wire transferred $196,002.75 to the Rogers Trucking account at Amboy Bank.

q.  On or about September 24, 1997 the defendant THOMAS CARR had a nominee cash check no. 1213 drawn on the Rogers Trucking account in the amount of $75,000.

7

r.  On or about September 24, 1997 the defendant THOMAS CARR cashed check no. 1214 drawn on the Rogers Trucking account in the amount of $5,000.

s.  On or about September 25, 1997 the defendant THOMAS CARR had a nominee cash certified check no. 1212 drawn on the Rogers Trucking account in the amount of $100,000.

t.  On or about September 26, 1997 the defendant THOMAS CARR had a nominee cash check no. 1215 drawn on the Rogers Trucking account in the amount of $9,000.

u.  On or about September 26, 1997 the defendant THOMAS CARR had a nominee cash check no. 1216 drawn on the Rogers Trucking account in the amount of $680.60.

v.  In or about September, 1997, the defendant THOMAS Carr delivered cash to a coconspirator who drove to Long Island, New York and delivered the money to the defendant BARRY SCHWARTZ.

w.  In or about October 1997, the defendant THOMAS CARR delivered cash collected from the cashed Rogers Trucking account checks to a coconspirator who drove to Long Island, New York and delivered the money to the defendant BARRY SCHWARTZ.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

IMP04360

8

<u>COUNT TWO</u>
(Conspiracy to Launder Money)

14.  The allegations contained in paragraphs one
through five and eight through thirteen are realleged and
incorporated herein.

15.  From July 26, 1997 and continuing through October
31, 1997, both dates being approximate and inclusive, within the
Eastern District of New York and elsewhere, the defendants BARRY
SCHWARTZ, THOMAS CARR and JOHN LEHMAN, together with others, did
knowingly and intentionally conspire to conduct financial
transactions affecting interstate commerce, to wit: the transfer
of approximately $695,965 in United States currency, which
transactions involved the proceeds of a specified unlawful
activity, to wit: wire fraud and bank fraud in violation of Title
18, United States Code, Sections 1343 and 1344 and, knowing that
the property involved in said financial transactions, to wit:
approximately $695,965 in United States currency, represented the
proceeds of some form of unlawful activity, with the intent to
promote the carrying on of said specified unlawful activity, and
knowing that the transactions were designed in whole and in part
to disguise the nature, source, ownership and control of the
proceeds of said specified unlawful activity, in violation of

TO 16173382880      P.10

9

Title 18, United States Code, Sections 1956(a)(1)(A)(i) and
1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(h) and
3551 et seq.)

### Forfeiture Allegation for Count Two

16.  The allegations contained in paragraphs one
through  five and eight through thirteen are realleged and
incorporated herein.

17.  As a result of the offense set forth in Count Two
of this Indictment, the defendants BARRY SCHWARTZ, THOMAS CARR,
and JOHN LEHMAN shall forfeit to the United States, pursuant to
Title 18, United States Code, Section 982(a)(1), all right, title
and interest in any and all property, real and personal, involved
in such offense, and all property traceable to such property,
including, but not limited to, the following: (1) all money and
other property that was the subject of each financial transaction
that the defendants BARRY SCHWARTZ, THOMAS CARR, and JOHN LEHMAN
conducted in violation of Section 1956(h) of Title 18, United
States Code; (2) all commissions, fees and other property
obtained as a result of that violation; and (3) all property used
in any manner or part to commit and to facilitate the commission
of that violation.  The property subject to forfeiture to the

IMP04362

10

United States includes, but is not limited to, the amount of approximately $695,965.

18.   If more than one defendant is convicted of such offense, the defendants so convicted are jointly and severally liable for the forfeiture obligations alleged above.

19.   If, by any act or omission of the defendants BARRY SCHWARTZ, THOMAS CARR, and JOHN LEHMAN, the property described in paragraph 17, or any portion thereof:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property, which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), to seek forfeiture of any

IMP04363

11

other property of the defendant up to the value of the property

described in subparagraphs 32(a) through 32(e) above.

      (Title 18, United States Code, Section 982)

                                A TRUE BILL

                                FOREPERSON

ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

BY:
   ACTING UNITED STATES ATTORNEY
    PURSUANT TO 28 C.F.R. O.131

IMP04364

DEC 02 2003 16:49 FR                    TO 16173382880        P.13

# UNITED STATES DISTRICT COURT

EASTERN _ _ _ _ District of _ _ _ _ NEW YORK

_ _ _ _ Criminal _ _ _ _ Division

## THE UNITED STATES OF AMERICA

vs.

BARRY SCHWARTZ,
THOMAS CARR, and
JOHN LEEMAN,

Defendants.

# INDICTMENT

T. 18, U.S.C., Sections 371, 982, 1956(h),
and 3551 et seq.

*a true bill.*

*Chas A. Capello*

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ Foreman

*Filed in open court this* _ _ _ _ _ _ _ _ *day,*

*of* _ _ _ _ _ _ _ _ _ _ _ _ _ _ A.D. _ _ _ _ _ _ _

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ Clerk

*Bail, $* _ _ _ _ _ _ _ _ _ _ _

IMP04365

** TOTAL PAGE.13 **

ASSET PURCHASE AGREEMENT

BY AND AMONG

TRANSPORTATION CONCEPTS OF NEW JERSEY, INC.
a New Jersey corporation,

TC TRANSPORT & WAREHOUSING, INC.
a New Jersey corporation,

TC TRANSPORT & LEASING, INC.
a New Jersey corporation,

THOMAS CARR
Principal

AND

LOGISTEQ, LLC
a Pennsylvania corporation

as of January 1, 2001

PHILA1\1336337\7 107515.000

EXH _____
FOR IDENT
IN EVD    DATE 3/15/07
DENISE L. DANIELS

IMP01387

# TABLE OF CONTENTS

**ARTICLE I** ........................................................................................................ 3
Section 1.1  Purchase and Sale of Assets ..................................................... 3
Section 1.2  Purchase Price ........................................................................... 4
Section 1.3  Assumption of Liabilities .......................................................... 4
Section 1.4  Date, Time and Place of Closing. ............................................. 4
**ARTICLE II** ....................................................................................................... 4
Section 2.1  Status .......................................................................................... 5
Section 2.2  Corporate Authority; Effective Agreement ............................... 5
Section 2.3  Customer Contracts ................................................................... 5
Section 2.4  Liabilities ................................................................................... 5
Section 2.5  Real Estate ................................................................................. 6
Section 2.6  Personal Property ...................................................................... 6
Section 2.7  Trade Names, Trademarks and Service Marks .......................... 7
Section 2.8  Taxes .......................................................................................... 7
Section 2.9  Legal Matters ............................................................................. 7
Section 2.10  Contracts, Leases, Agreements and Other Commitments ....... 8
Section 2.11  Employees and Employment Contracts ................................... 8
Section 2.12  Consents ................................................................................... 9
Section 2.13  No Other Assets. ...................................................................... 9
Section 2.14  Financial Statements ................................................................ 9
Section 2.15  Suppliers; Conflicts of Interest. .............................................. 9
Section 2.16  No Material Change .................................................................. 9
Section 2.17  Actions Since Balance Sheet Date ......................................... 10
Section 2.18  Permits and Licenses ............................................................. 10
Section 2.19  Compliance with Laws .......................................................... 10
Section 2.20  Environmental Matters .......................................................... 10
Section 2.21  Statements and Other Documents Not Misleading ............... 11
Section 2.22  Survival of Representations and Warranties .......................... 11
**ARTICLE III** ................................................................................................... 12
Section 3.1  Company Status ....................................................................... 12
Section 3.2  Company Authority .................................................................. 12
Section 3.3  Survival of Representations and Warranties ............................ 12
**ARTICLE IV** ................................................................................................... 12
Section 4.1  Conduct of Business Pending Closing ..................................... 12
**ARTICLE V** ..................................................................................................... 13
Section 5.1  Access to Information .............................................................. 13
Section 5.2  Non-Competition ...................................................................... 14
Section 5.3  Cooperation .............................................................................. 14
Section 5.4  Bulk Sales Laws ....................................................................... 15
Section 5.5  Employment of Employees ...................................................... 15
Section 5.6  Consents ................................................................................... 15
Section 5.7  Press Release ............................................................................ 15
Section 5.8  Change of Name ....................................................................... 15
**ARTICLE VI** ................................................................................................... 16

PHILA1\1336337\7 107515.000

IMP01388

Section 6.1  No Material Adverse Change ................................................................................ 16
Section 6.2  Representations and Warranties ........................................................................... 16
Section 6.3  Performance of Agreements ................................................................................ 16
Section 6.4  Opinion of Counsel .............................................................................................. 16
Section 6.5  No Actions, Etc. ................................................................................................... 16
Section 6.6  Consents; Lease Estoppels; Subordination and Non-Disturbance Agreements ....... 16
Section 6.7  Environmental Audit ............................................................................................ 17
Section 6.9  Deliveries ............................................................................................................. 17
**ARTICLE VII** ........................................................................................................................... 17
Section 7.1  Representations and Warranties ........................................................................... 17
Section 7.2  Performance of Agreements ................................................................................ 17
Section 7.3  No Actions, Etc. ................................................................................................... 17
Section 7.4  Deliveries ............................................................................................................. 18
**ARTICLE VIII** .......................................................................................................................... 18
Section 8.1  Seller's and Principal's Deliveries ...................................................................... 18
Section 8.2  Purchaser's Deliveries ......................................................................................... 19
**ARTICLE IX** ............................................................................................................................. 19
Section 9.1  Indemnifications ................................................................................................... 19
(b)   Indemnification by Purchaser ........................................................................................... 20
**ARTICLE X** .............................................................................................................................. 21
Section 10.1  Termination ........................................................................................................ 21
Section 10.2  Status of Agreement after Termination ............................................................. 22
**ARTICLE XI** ............................................................................................................................. 22
Section 11.1  Notices ............................................................................................................... 22
Section 11.2  Broker's Commission ......................................................................................... 23
Section 11.3  Headings ............................................................................................................ 23
Section 11.4  Entire Agreement ............................................................................................... 23
Section 11.5  Severability ........................................................................................................ 23
Section 11.6  Counterpart Execution ....................................................................................... 23
Section 11.7  Governing Law .................................................................................................. 23
Section 11.8  Waiver ................................................................................................................ 24
Section 11.9  Further Assurances ............................................................................................ 24
Section 11.10 Assignability; Binding Effect .......................................................................... 24

IMP01389

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is entered into as of this 1st day of January, 2001, by and among Logisteq, LLC, a New Jersey limited liability company with its principal offices at 209 W. Lancaster Avenue, Suite 101, Paoli, PA  19301 ("Purchaser"), and TRANSPORTATION CONCEPTS OF NEW JERSEY, INC., a New Jersey corporation, TC TRANSPORT & WAREHOUSING, INC., a New Jersey corporation, and TC TRANSPORT & LEASING, INC., a New Jersey corporation, all with their principal offices at 811 Rte. 33, Freehold, NJ  07726 (collectively, "Seller") and THOMAS CARR, an individual ("Principal").

## W I T N E S S E T H:

Seller owns and operates a transportation and logistics business (the "Business"). Principal owns all of the outstanding capital stock of each Seller.  Seller desires to sell and Purchaser desires to purchase 51% undivided interest of the assets of each Seller upon the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the foregoing premises and of the mutual agreements and covenants hereinafter set forth, the parties hereto, intending to be legally bound hereby, agree as follows:

## ARTICLE I

## PURCHASE AND SALE OF ASSETS

Section 1.1    Purchase and Sale of Assets.

(a) Purchased Assets.  Subject to the terms of this Agreement, on the Closing Date (as defined below) Seller will sell, assign, convey, transfer and deliver to Purchaser, and Purchaser will purchase and acquire from Seller, effective as of January 1, 2001, a 51% undivided interest in all of Seller's assets of any description and wherever situated, tangible and intangible (the "Acquired Assets").

The Acquired Assets consist of a 51% undivided interest in the following assets (the "Assets"):

(i) all of Seller's rights to all service marks, trade names, trademarks, copyrights, patents, trade secrets, processes and methods, whether or not patentable, to the extent owned or used  by Seller and relating to the Business;

(ii) all books and records maintained by Seller through the Closing Date and pertaining to the Business, including, without limitation, product manuals, operating manuals, and records relating to customer and trade accounts and lists and similar operating data, whether in electronic, computer, paper or other form, other than books and records which Seller is required by law to retain;

PHILA1\1336337\7 107515.000                    - 3 -

IMP01390

    (iii)   all machinery, equipment, and fixtures;

    (iv)   all trucks, trailers, forklifts and other vehicles:

    (v)   all furniture, supplies, inventory items and other personal property;

    (vi)   all federal, state and local permits, authorizations, franchises and licenses, to the extent such permits are transferable; and

    (vii)   all other assets of Seller.

Section 1.2    <u>Purchase Price</u>.

    (a)   <u>Purchase Price</u>. The consideration to be paid to Seller for the Acquired Assets shall be $3,869,370 (the "Purchase Price"), which Purchaser shall pay to Seller at the Closing (as defined below), as follows: to an account designated by Seller, by wire transfer of funds.

    (b)   <u>Allocation of Purchase Price</u>. The Purchase Price shall be allocated in accordance with <u>Schedule 1.2(b)</u> which Schedule shall be provided by Purchaser to Seller at Closing. Neither Purchaser nor Seller shall take any position with any taxing authority which is inconsistent with such allocation.

    (c)   <u>Additional Purchase Price</u>. To the extent that Seller satisfies all of its existing outstanding payroll tax claims (including all interest and penalties) for less than $413,000, Purchaser shall pay to Seller, as additional purchase price, 51% of the difference between the amount actually paid to fully satisfy such claims and $413,000.

Section 1.3    <u>Assumption of Liabilities</u>.

    On the Closing Date, Purchaser shall assume and agree to undertake to pay, perform and discharge as and when due, 51% of all debts, obligations and liabilities of Seller, whether such liabilities are actual or contingent, known or unknown, liquidated or unliquidated. Notwithstanding the foregoing Purchaser shall be entitled to indemnification from Seller and Principal as set forth in Section 9.1 hereof.

Section 1.4    <u>Date, Time and Place of Closing, Effective Date</u>.

    The transactions provided for by this Agreement shall be consummated (the "Closing") at 10:00 a.m., local time, on or before January 15, 2001, at the offices of Cozen and O'Connor 1900 Market Street, Philadelphia, PA, or at such other place and time as Seller and Purchaser shall mutually agree; provided, however, that at the request of Purchaser, the Closing may be delayed until not later than January 30, 2001. The date and time of Closing is hereinafter sometimes called the "Closing Date." The transaction shall be effective as of January 1, 2001.

## ARTICLE II

## REPRESENTATIONS AND WARRANTIES OF SELLER

PHILA1\1336337\7 107515.000        - 4 -

IMP01391

As a material inducement to Purchaser to enter into this Agreement and purchase the Assets, Seller and Principal hereby jointly and severally represent and warrant to Purchaser that:

Section 2.1    Status.

Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of New Jersey. Seller has the full power and authority to own its properties and to carry on the business as presently conducted by it. Seller is duly qualified to do business and is in good standing in all other jurisdictions where the conduct of its business so requires, a list of which is attached hereto as Schedule 2.1. Seller has the power and authority to own the Assets and to carry on the Business as now being conducted.

Section 2.2    Corporate Authority; Effective Agreement.

The Board of Directors and shareholders of Seller have duly authorized and approved the execution and delivery of this Agreement and any and all agreements, documents or instruments to be executed and/or delivered in connection herewith (collectively, the "Purchase Documents") and the performance of the transactions provided for herein and therein. No other action by Seller or any of its shareholders or the Principal is required in connection with the foregoing. This Agreement has been duly executed and delivered by Seller and Principal and constitutes the legal, valid and binding obligations of Seller and Principal, enforceable against each of them in accordance with its terms. The Purchase Documents will constitute the valid and binding obligations of Seller and Principal, as applicable, enforceable against each of them in accordance with their respective terms. The execution, delivery and performance of this Agreement by Seller and Principal and the consummation of the transactions provided for herein do not and will not: (a) conflict with, violate or result in the breach of any of the terms or conditions of, or constitute a default under (i) Seller's Articles of Incorporation or By-laws or any contract, agreement, commitment, indenture, mortgage, pledge, note, bond, license, permit or other instrument or obligation to which Seller or Principal is a party or by which Seller or Principal or any of their respective assets or properties are bound or affected, or (ii) any law, regulation, ordinance or decree to which Seller or any Principal or any of their respective assets or properties are bound or subject, or (b) result in the creation or imposition of any lien, security interest, charge, encumbrance, restriction or right, including rights of termination or cancellation, in or with respect to, or otherwise adversely affect, Seller, Principal, the Assets or the Business.

Section 2.3    Customer Contracts.

Seller has no written contracts with its customers other than those set forth on Schedule 2.3 attached hereto, copies of which have been previously delivered to Purchaser. Neither party to such contract is in default under any such contract, and no event has occurred which, but for the lapse of time or the giving of notice would constitute a default thereunder.

Section 2.4    Liabilities.

Seller has no liabilities (including, but not limited to, accounts payable) except as and to the extent reflected in (a) the Financial Statements (as defined in Section 2.14) or (b) as set forth on Schedule 2.4 attached hereto.

IMP01392

Section 2.5    <u>Real Estate</u>.

Seller has no interest in any real estate except that Seller leases, as tenant, the premises described on <u>Schedule 2.5</u> attached hereto (such leased property, collectively the "Premises"). True, complete and correct copies of the lease agreements pertaining to the leased Premises are attached to <u>Schedule 2.5</u> (individually a "Lease" and collectively the "Leases"). Seller has paid all amounts due and is not in default under any of the Leases, and there exists no condition or event which, with the passage of time, the giving of notice or both, will constitute a default under or breach of any of the Leases. Seller knows of no pending or proposed eminent domain proceeding or assessment for public improvements with respect to any of the Premises which could adversely affect the use, operation or value of the Business or the Assets. Seller has received no notice from any insurance carrier or landlord for any of the Premises notifying Seller of the need to undertake any repairs, alterations or construction or to take any action with respect to any of the Premises. Except as described on <u>Schedule 2.5</u>, each of the Premises and all of the buildings, fixtures and improvements owned or leased by Seller, and all heating and air conditioning equipment, plumbing, electrical and other mechanical facilities which are part of, or located on or in, such buildings or improvements are in good operating condition and repair, and do not require any repairs other than normal routine maintenance to maintain them in good operating condition and repair. All taxes currently due and payable with respect to the Premises have been paid, and there is no abatement in effect with respect to all or any portion of the real estate taxes. All contractors, subcontractors and other persons or entities furnishing work, labor, materials or supplies for any development or construction work done at the Premises have been paid in full and there are no claims against Seller or the Premises in connection therewith.

Section 2.6    <u>Personal Property</u>.

Schedule 2.6 attached hereto is a list of all personal property in which a 51% undivided interest is being sold, assigned, conveyed, transferred and delivered to Purchaser pursuant to this Agreement ("Personal Property"), including, without limitation, all equipment (telecommunications and computer equipment included), fixtures and furnishings, storage racking, vehicles, and inventory items, such as folding cartons, containers and other storage materials. The Personal Property also includes lists of all customers of Seller and the books and records (whether electronically maintained or otherwise) which will provide Purchaser with the ability to generate such lists, as well as all business addresses, post office boxes, telephone, telex and telecopier numbers and marketing and administrative data. Also included among the Personal Property is the computerized records management and billing system currently utilized by Seller. Seller has good and marketable title to the Personal Property. All of the Personal Property is in good operating condition and repair and does not require any repairs other than normal routine maintenance to maintain the Personal Property in good operating condition and repair.

IMP01393

Section 2.7    Trade Names, Trademarks and Service Marks.

The corporate name of Seller and the trade names, trademarks, service marks and copyrights listed on Schedule 2.7 are the only names, trademarks, service marks and copyrights which are used by Seller. Seller is the sole and exclusive owner of its trade names, trademarks, service marks and copyrights and has the sole and exclusive right to use the trade names, trademarks, service marks and copyrights. No claim has been asserted against Seller that its corporate name or any of its trade names, trademarks, service marks or copyrights conflict with the trade names, trademarks, service marks, copyrights, corporate names or other proprietary rights of others, and Seller has no knowledge of any basis for any such claim or conflict. Seller does not own any patents, and has no patent applications pending and, to the Seller's knowledge, Seller is not engaged in any activity which infringes upon any patent, patent application, trademark, trade name, service mark, copyright or proprietary right of any other party.

Section 2.8    Taxes.

Except as set forth on Scheduler 2.8. Seller has timely filed and will timely file all federal, state and local tax returns required by law to be filed by Seller and has timely paid and will timely pay and make adequate provision for the payment of all taxes (and related interest and penalties) required to be paid in respect of such returns for all taxable periods up to and including the Closing Date, including, but not limited to real estate, sales, use, social security, payroll, unemployment compensation and personal property taxes. No waivers or extensions of statutes of limitations relating to filing of tax returns have ever been granted to Seller, and no consents or elections have been filed by Seller with the Internal Revenue Service. Seller will have paid or made adequate provision for the payment of all federal and state income and any other taxes payable by Seller with respect to the transactions covered by this Agreement, including sales, transfer and similar types of taxes. All rights to (i) any and all refunds which relate to Seller's ownership, use, operation or possession of the Assets or the Business up to and including the Closing Date, and (ii) any other amounts received by Purchaser with regard to any federal, state or local taxes for the period up to and including the date of the Closing shall belong to Seller.

Section 2.9    Legal Matters.

Except as set forth on Schedule 2.9, Seller is not a party to or, to Seller's best knowledge, threatened with, any suit, action, arbitration or other legal or administrative proceeding or governmental inquiry or investigation by which Seller, the Assets or the Business would be adversely affected. There are no judgments, orders, decrees or awards before any court, department, commission, board, instrumentality or arbitrator which affects the Assets, Seller or the Business.

IMP01394

Section 2.10    Contracts, Leases, Agreements and Other Commitments.

Seller is not a party to or bound by any written, oral or implied contract, agreement, lease, power of attorney, guaranty, surety agreement, or other commitment except for the following (collectively, the "Corporation Agreements"):

(a)    the Leases described on Schedule 2.5 and the contracts listed on Schedule 2.3;

(b)    agreements involving a maximum possible liability or obligation on the part of Seller of less than $5,000 each and less than $15,000 in the aggregate; and

(c)    the agreements listed on Schedule 2.10(c) attached hereto.

True, correct and complete copies of all of the Corporation Agreements, including all amendments thereto, have been delivered to Purchaser. All of the Corporation Agreements are valid, binding and enforceable against the respective parties thereto in accordance with their respective terms. Except as shown on Schedule 2.10, Seller and all other parties to all of the Corporation Agreements have performed all of the obligations required to be performed under the Corporation Agreements, and neither Seller nor any other party is in default or in arrears under the terms thereof, and no condition exists or event has occurred which, with the giving of notice or lapse of time or both, would constitute a default under such Corporation Agreements. The consummation of the transactions provided for in this Agreement will not result in an impairment or termination of any of Seller's rights under any Corporation Agreement and do not require the consent of or notice to any party other than Seller, except as set forth on Schedule 2.12. None of the terms or provisions of any Corporation Agreement materially adversely affects the Assets or Business of Seller. Schedule 2.10(d) also contains a listing of all outstanding written and oral proposals, bids, offers, guaranties, advances or credit granted which, if accepted, could impose any debts, obligations or liabilities upon Purchaser after the Closing Date.

Section 2.11    Employees and Employment Contracts

(a) Employees. Schedule 2.11(a) is a complete and accurate list as of December 1, 2000 of all employees of Seller and their positions and salaries. Seller shall deliver at the Closing Schedule 2.11(a) revised to reflect changes therein up to the date of the Closing.

(b) Union Representation; Compliance With Employment Law. Seller is not a party to any union agreement or collective bargaining agreement, or to any written or oral employment agreement with any of its employees, and is in compliance with all laws respecting employment and employment practices, terms and conditions of employment and wages and hours. Seller is not aware of any union organizing activity involving its employees or the Business. There is no complaint filed or threatened to be filed against Seller before any federal, state or local governmental or quasi-governmental agency or authority alleging violation of law (federal, state or local) relating to employment practices or discrimination in employment.

PHILA1\1336337\7 107515.000                     - 8 -

IMP01 395

(c) <u>Employee Benefit Plans</u>.  Except as set forth on <u>Schedule 2.11(c)</u>, no present or former employee of Seller shall be entitled to any retirement pay or retirement benefits of any kind.  Seller does not now maintain or make contributions to and has not, at any time in the past, maintained or made contributions to (i) any employee benefit plan which is subject to the minimum funding requirements of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), or (ii) any multi-employer plan subject to the terms of the Multi-Employer Pension Amendment Act of 1980.  There has been no material claim made against Seller's medical insurance plan.

Section 2.12    <u>Consents</u>.

Except as set forth on <u>Schedule 2.12</u>, no notices, consents, approvals, licenses, permits or waivers are required to execute and deliver this Agreement and to consummate the transactions provided for herein, including the transfer of the Assets to Purchaser hereby.

Section 2.13    <u>No Other Assets</u>.

The Assets constitute all of the assets, property, rights and privileges which are used by Seller in the operation of the Business or are required for the operation of the Business.

Section 2.14    <u>Financial Statements</u>.

<u>Schedule 2.14</u> contains balance sheets-of Seller at December 31, 1999 and September 30, 2000, and statements of earnings and cash flows of Seller for the fiscal year ended December 31, 1999 and the nine months ended September 30, 2000.  Such statements have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods reported upon and present fairly and accurately the financial position of Seller for the periods reported upon.  The balance sheet at September 30, 2000 and the statement of earnings for the nine month period ended September 30, 2000 are sometimes herein called the "Financial Statements."

Section 2.15    <u>Suppliers; Conflicts of Interest</u>.

(a) <u>Suppliers</u>.  Seller has not been notified of, nor to its knowledge, has there been any circumstance that would result in a termination or cancellation of any agreement between Seller and any of its suppliers, distributors or customers.

(b) <u>Conflicts of Interest</u>.  No partner, shareholder, director, officer or employee of Seller or any relative or affiliate of any of the foregoing: (i) has any pecuniary interest in any supplier or customer of Seller or in any other business with which Seller conducts business or with which Seller is in competition; (ii) has any interest in any property or assets used by Seller, including the Assets; or (iii) has any contractual or other claim, express or implied, of any kind whatsoever against Seller in connection with the Business or Assets.

Section 2.16    <u>No Material Change</u>

Since September 30, 2000, there has been no material adverse change in the business, assets or financial condition of Seller or the Business, except as the same may be caused by

PHILA1\1336337\7 107515.000                    - 9 -

IMP01396

transactions in the ordinary course of business which are not prohibited by this Agreement and which are described on Schedule 2.16.

Section 2.17    Actions Since Balance Sheet Date.

Except as set forth on Schedule 2.17, since September 30, 2000, Seller:

(a)    has not taken any action outside of the ordinary course of business;

(b)    has not borrowed any money or become contingently liable for any obligation or liability of others;

(c)    has paid all of its debts and obligations as they became due;

(d)    has not incurred any debt, liability or obligation of any nature to any party except for obligations arising in the ordinary course of business; and

(e)    has used its best efforts to preserve its business organization intact, to keep available the services of its employees, and to preserve its relationships with its customers, suppliers and others with whom it deals.

Section 2.18    Permits and Licenses.

Seller holds all franchises, licenses, permits, consents, approvals, waivers and other authorizations (collectively, the "Permits") which are necessary for the operation of the Business, including without limitation, all Permits issued by federal, state or local governments and governmental agencies.  Schedule 2.18 attached hereto sets forth a complete list of all Permits held by Seller.  Seller is not in default, nor has Seller received any notice of any claim of default, with respect to any of the Permits or of any notice of any other claim or proceeding or threatened proceeding relating to any of the Permits.  All of the Permits are in full force and effect.  The transactions provided for in this Agreement will not result in the cancellation or termination of any of the Permits, and no consent from or notice to any federal, state or local government or governmental agency is required to transfer any Permit to the Purchaser.

Section 2.19    Compliance with Laws.

Seller is in compliance with all requirements of law, federal, state and local, and all requirements of all governmental bodies or agencies having jurisdiction over it, the operations of the Business, or the use of its Assets or any of its Premises.  Seller has not received any notice, not previously complied with, from any federal, state or municipal authority or any insurance or inspection body, that any of its properties, facilities, equipment or business procedures or practices fails to comply with any applicable law, ordinance, regulation, building or zoning law, or requirement of any public authority or body.  There are no regulations or legislation pending before any federal, state, local or foreign governmental body or legislature which, if adopted, would have a materially adverse effect on the Business or the Assets.

Section 2.20    Environmental Matters.

IMP01397

Except as disclosed on Schedule 2.20(a), Hazardous Substances (hereinafter defined) have not been used by Seller at the Premises (collectively, "Seller's Facilities") during Seller's occupancy thereof. Except as disclosed on Schedule 2.20(b), Seller has no actual knowledge of such use by another person or entity during or prior to Seller's occupancy thereof in any manner which: (i) violates federal, state or local laws, ordinances or regulations governing the use, storage, treatment, disposal of any element, compound, mixture, solution or substance, defined as a hazardous substance in the Comprehensive Environmental Response Compensation and Liability Act, 42 U.S.C. Section 9601, et seq. ("CERCLA"), or other applicable federal, state or local law, ordinance or regulation, including, without limitation, any applicable federal, state or local laws governing hazardous or toxic waste, substance, oil or material (collectively, "Hazardous Substances"); or (ii) requires "removal" or "remediation" as those terms are defined in CERCLA. Except as set forth on Schedule 2.20(c), Seller is in compliance in all material respects with all applicable federal, state and local environmental laws and regulations, including, but not limited to, the Clean Air Act, 42 U.S.C. Section 7401, et seq.; the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 U.S.C. Section 1251, et seq.; the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq.; CERCLA, as amended by the Superfund Amendments and Reauthorization Act ("SARA"); the Hazard Communication Standard, 29 CFR Section 1910.1200; and the Toxic Substances Control Act, 15 U.S.C. Section 2601, et seq. Except as set forth on Schedule 2.20(d), no notice from any governmental body has ever been served upon Seller, its agents or employees and Seller has no knowledge of any notice served upon any occupant, owner or prior owner of any of the Premises claiming any violation of any of the aforesaid environmental laws on or in connection with the Premises or with respect to the Business, or requiring or calling attention to the need for any clean up, removal, remediation, repair, construction, alteration, demolition, renovation or installation in or in connection with the Premises in order to comply with any federal, state or local law, regulation, ordinance or order concerning the environmental state, condition or quality of the Premises. Neither Seller, its agents or employees, nor, to the actual knowledge of Seller, any occupant, owner or prior owner or occupant of any of the Premises has ever been informed of any threatened or proposed serving of any such violation or corrective work order on or in connection with any of the Premises or with respect to the Business.

Section 2.21    Statements and Other Documents Not Misleading.

Neither this Agreement, including all Exhibits and Schedules, nor any other financial statements, documents or instruments delivered by Seller to Purchaser in connection with this Agreement and the transactions contemplated by this Agreement, contains or will contain any untrue statement of any material fact or omits or will omit to state any material fact required to be stated to make such statement, document or instrument not misleading.

Section 2.22    Survival of Representations and Warranties.

The representations, warranties and agreements of Seller set forth in this Agreement or in any Exhibit or Schedule attached hereto are made as of the date of this Agreement and shall be true, correct, complete and accurate on and as of the Closing Date and at all times between the date of this Agreement and the Closing Date. The representations and warranties of Seller set forth in this Agreement or in any Exhibit or Schedule attached hereto shall survive the Closing Date and shall terminate on the third anniversary of the Closing Date; provided, however, that

PHILA1\1336337\7 107515.000                - 11 -

IMP01398

the representations and warranties of Seller pertaining to tax matters and brokers shall survive the Closing Date and shall terminate on the later to occur of (a) the third anniversary of the Closing Date and (b) the date upon which the applicable statute of limitations expires.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that:

Section 3.1    Company Status.

Purchaser is a limited liability company duly organized and validly existing under the laws of the State of New Jersey and has full power and authority to own its properties and to carry on the business presently conducted by it.

Section 3.2    Company Authority.

Purchaser has duly authorized and approved the execution and delivery of this Agreement and the performance of the transactions provided for herein. No other company action is required in connection herewith. This Agreement constitutes a legal, valid and binding obligation of Purchaser and is enforceable against Purchaser in accordance with its terms.

Section 3.3    Survival of Representations and Warranties.

The representations, warranties and agreements of Purchaser as set forth in this Agreement or in any Exhibit attached hereto are made as of the date of this Agreement and shall be true, correct and accurate on and as of the Closing Date and at all times between the date of this Agreement and the Closing Date. The representations and warranties of Purchaser set forth in this Agreement shall survive the Closing Date and shall terminate on the third anniversary of the Closing Date.

## ARTICLE IV

## CONDUCT OF BUSINESS PENDING CLOSING

Section 4.1    Conduct of Business Pending Closing.

Seller agrees that between the date hereof and the Closing Date, Seller shall:

(a)    not take or permit any action or omit to take any action which would cause any of the representations and warranties of Seller contained in this Agreement or in any Schedule or Exhibit to become untrue;

(b)    conduct its business in a good and diligent manner in the ordinary and usual course of its business;

PHILA1\1336337\7 107515.000                    - 12 -

IMP01399

(c)     not enter into any contract, agreement, commitment or other arrangement with any party, other than contracts in the ordinary course of its business, and not amend, modify or terminate any Corporation Agreement, without the prior written consent of Purchaser;

(d)     use its best efforts to preserve its business organization intact, to keep available the service of its employees and to preserve its relationships with customers, suppliers and others with whom it deals;

(e)     not pay any bonuses or make any other payments to any officers, directors or executive employees of Seller;

(f)     not reveal to any party, other than Purchaser or its authorized representatives ("Agents"), any of the business procedures and practices followed by it in the conduct of the Business;

(g)     maintain in full force and effect all insurance currently maintained by Seller;

(h)     keep the Premises and all of its equipment and tangible personal property in good operating repair and perform all necessary repairs and maintenance;

(i)     comply with all provisions of any Corporation Agreement applicable to it as well as with all applicable laws, rules and regulations;

(j)     not dispose of any Assets except in the ordinary course of business, or terminate any Lease or Corporation Agreement; and

(k)     not declare or pay any dividends, or redeem any stock, or make any other payment or distribution to shareholders;

(l)     not engage in any transaction with respect to the Business which involves the expenditure or commitment of more than $10,000 without the prior written consent of the Purchaser; and

(m)     inform Purchaser of any material adverse change in the business, assets, results of operations, financial condition or prospects of the Company.

## ARTICLE V

## FURTHER COVENANTS AND AGREEMENTS

Section 5.1     Access to Information.

Seller shall give to Purchaser and its agents access to all of the properties and Assets of Seller and all of Seller's documents, books and records relating to its current and past operations and to the Business, and shall permit Purchaser and its agents to make copies thereof, and Seller shall permit Purchaser to interview Seller's employees during reasonable business hours and upon reasonable prior notice. Without limiting the generality of the foregoing, upon the request

IMP01400

of Purchaser, Seller shall, prior to Closing, provide Purchaser or its agents access to Seller's books and records for the purpose of enabling Purchaser (or its agents) to audit such books and records and prepare audited financial statements of the Company if Purchaser determines it requires such statements in connection with any federal or state securities laws.

Section 5.2     Non-Competition.

To induce Purchaser to enter into this Agreement and purchase the Assets, Seller and Principal (by execution of this Agreement) each agree as an independent covenant that for a period of five years following the Closing Date, neither Seller, Principal, nor any entity owned, controlling or controlled, directly or indirectly, by them or any of them, (a) shall engage in any business operation substantially similar to the Business as the same is conducted on the Closing Date, either as an owner, consultant, manager, associate, employee, partner, agent, principal or otherwise, within 250 miles of any location at which Seller conducts any portion of the Business as of the Closing Date or (b) shall solicit, induce, encourage or attempt to influence any client, customer, employee, consultant, independent contractor or supplier of Seller to cease to do business (or reduce the amount of business) or terminate his or her employment with Seller prior to Closing or with Purchaser or its affiliates after Closing. Seller and Principal acknowledge that the restrictions contained in this Section 5.2 are reasonable and necessary to protect the legitimate interests of Purchaser, and that any violation of this Section 5.2 will result in irreparable injury to Purchaser and that money damages would not provide an adequate remedy to Purchaser, and, therefore, Purchaser shall be entitled to preliminary and permanent injunctive relief in any court of competent jurisdiction and to an equitable accounting of all earnings, profits and other benefits arising from such violation, which rights shall be cumulative and in addition to any other rights or remedies to which the Purchaser may be entitled. If any portion of the covenants or agreements contained in this Section 5.2 or the application thereof is held to be invalid or unenforceable, then the other portions of such covenants or agreements or the application thereof shall not be affected and shall be given full force and effect without regard to the invalid or unenforceable portions. If any covenant or agreement herein is held to be unenforceable because of the area covered, the duration thereof, or the scope thereof, then the court making such determination shall have the power to reduce the area and/or duration and/or limit the scope thereof, and the covenant or agreement shall then be enforceable in its reduced form.

Section 5.3     Cooperation.

(a)     General.  Purchaser and Seller agree to execute and deliver all other instruments and take all such other actions as either party may reasonably request from time to time, before or after Closing and without payment of further consideration, to effectuate the transactions provided herein and to confer to Purchaser the benefits intended by such transactions. The parties shall cooperate fully with each other and with their respective counsel and accountants in connection with any steps required to be taken as part of their respective obligations under this Agreement. Without limiting anything herein to the contrary, Seller shall make available to Purchaser, solely for the purposes of permitting Purchaser to respond to inquiries regarding the Assets, the activities of the Business and the employees of Seller not employed by Purchaser, representatives of Seller's electronic data processing, personnel and quality assurance functions.

IMP01401

(b)    Access to Information.  Purchaser agrees that following Closing it shall provide to Seller (on a confidential basis) information relating to the Assets and/or the Business which Seller reasonably requires to prepare any tax returns, information returns or reports required to be filed by Seller with governmental agencies.  Such information shall be provided in the form in which such information has customarily been maintained by Seller.  Seller shall similarly provide to Purchaser (on a confidential basis) information relating to the Assets or the Business which Purchaser reasonably requires, including access to any books or records of Seller retained by the Seller.

Section 5.4    Bulk Sales Laws.

Seller and Principal acknowledge that any applicable provisions of any tax clearance or bulk sales laws pertaining to the transactions contemplated by this Agreement are not being complied with and that Seller and Principal, jointly and severally, agree to indemnify and hold harmless Purchaser from and against any and all liability, cost or expense (including court costs and attorney fees) arising out of or relating to any such tax clearance or bulk sales law.

Section 5.5    Employment of Employees.

Upon the Closing, Purchaser shall employ all of the employees of Seller, upon the same compensation, benefits and seniority as such employees were receiving from Seller at the time of the Closing.  Notwithstanding the foregoing, nothing in this Agreement is intended to confer upon any employee of Seller any rights or remedies, including, without limitation, any rights of continued employment of any nature or kind whatsoever.

Section 5.6    Consents.

Seller will use its best efforts to obtain all necessary third party or governmental consents necessary to consummate the transactions provided for in this Agreement.

Section 5.7    Press Release.

Neither Seller nor Principal shall issue any press release or public statement regarding the transactions contemplated by this Agreement without the prior written consent of Purchaser.

Section 5.8    Change of Name.

Seller hereby covenants that as promptly as practicable following the Closing Date, Seller shall cause to be prepared and filed with the appropriate agency such documents as are required to change Seller's name to a name which is different from, and not confusingly similar to, the trade names and trademarks comprising a portion of the Assets being purchased hereunder.

IMP01402

# ARTICLE VI

## CONDITIONS TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any or all of which Purchaser may waive:

Section 6.1    No Material Adverse Change.

During the period from the date hereof to the Closing Date there shall not have been any material adverse change in the business, Assets, results of operations, financial condition or prospects of the Business.

Section 6.2    Representations and Warranties.

Each of the representations and warranties of Seller set forth in this Agreement and any Exhibit or Schedule hereto shall be true and correct on and as of the Closing Date as if made on and as of the Closing Date.

Section 6.3    Performance of Agreements.

Seller shall have performed and complied with all of its covenants and agreements contained in this Agreement which are required to be performed or complied with on or prior to the Closing Date.

Section 6.4    Opinion of Counsel.

Purchaser shall have received an opinion from Seller's counsel, dated as of the Closing Date, in form and content reasonably acceptable to Purchaser.

Section 6.5    No Actions, Etc.

No action, suit, proceeding or investigation by or before any court, administrative agency or other governmental authority shall have been instituted or threatened, the effect of which would restrain, prohibit or invalidate the transactions contemplated by this Agreement or affect the right of Purchaser to own or control, after the Closing, the Assets or to operate the Business or have a material adverse effect on the Business.

Section 6.6    Consents; Lease Estoppels; Subordination and Non-Disturbance Agreements.

All consents of all third parties required to consummate the transactions provided for in this Agreement, including without limitation the consents set forth on Schedule 2.12, other than the consents of the landlords of the Premises, shall have been obtained.

IMP01403

Section 6.7    Environmental Audit.

Seller shall use its best efforts to deliver to Purchaser Phase I environmental audits or assessments ("Environmental Audits") respecting the Premises located in Sayersville, New Jersey, and the property known as TC2, which had previously been conducted at such Premises, the results of which shall be acceptable in all respects to Purchaser. The parties agree a Phase I environmental audit will not be delivered for the premises known as the Freehold property.

Section 6.8    Due Diligence.

The parties have executed this Agreement without Purchaser having completed his due diligence investigation of Seller. Purchaser shall have completed its due diligence investigation relating to Seller, its current and past operations and the Business and the results of such investigation shall be satisfactory to Purchaser in its sole discretion.

Section 6.9    Deliveries.

All documents required to be delivered by Seller at or prior to Closing shall have been delivered to Purchaser at Closing.

## ARTICLE VII

## CONDITIONS TO OBLIGATIONS OF SELLER

The obligations of Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or prior to the Closing Date, of each of the following conditions, any or all of which Seller may waive:

Section 7.1    Representations and Warranties.

Each of the representations and warranties of Purchaser set forth in this Agreement and any Exhibit hereto shall be true and correct on and as of the Closing Date as if made on and as of the Closing Date.

Section 7.2    Performance of Agreements.

Purchaser shall have performed and complied with all of its covenants and agreements contained in this Agreement which are required to be performed or complied with on or prior to the Closing Date.

Section 7.3    No Actions, Etc.

No action, suit, proceeding or investigation by or before any court, administrative agency or other governmental authority shall have been instituted or threatened, the effect of which would restrain, prohibit or invalidate the transactions contemplated by this Agreement.

IMP01404

Section 7.4    Deliveries.

All documents required to be delivered by Purchaser at or prior to Closing shall have been delivered to Seller at Closing.

## ARTICLE VIII

## CLOSING

Section 8.1    Seller's and Principal's Deliveries.

At the Closing, Seller and Principal shall deliver to Purchaser:

(a)    in a form satisfactory to Purchaser's counsel or as set forth in this Agreement, such bills of sale, certificates of title for vehicles, endorsements of transfer, conveyances, assignments and subleases and other documents and agreements as shall vest in Purchaser title to the Acquired Assets in accordance with the terms hereof;

(b)    a certificate signed by a duly authorized officer of Seller, dated the Closing Date, confirming: (i) the truth and correctness of all of the representations and warranties of Seller contained in this Agreement as of the Closing Date and as of all times between the date hereof and the Closing Date; (ii) that all agreements and covenants of Seller required to have been performed or complied with have been performed or complied with; and (iii) that all necessary approval by Seller and its shareholders have been taken to authorize the consummation of the transactions contemplated by the Agreement;

(c)    certificates signed by the Principal dated the Closing Date, confirming: (i) the truth and correctness of all of the representations and warranties of the Principal contained in this Agreement as of the Closing Date and as of all times between the date hereof and the Closing Date; (ii) that all agreements and covenants of Principal required to have been performed or complied with have been performed or complied with; and (iii) that all necessary approvals by Principal have been taken to authorize the consummation of the transactions contemplated by the Agreement; and

(d)    the original copy of each written Corporation Agreement;

(e)    a "good standing" certificate for Seller issued by the State of New Jersey;

(f)    keys to all premises and to all automobiles and vehicles included in the Assets;

(g)    electronic and paper copies of all client and inventory records of Seller;

(h)    the opinion of Seller's counsel to which reference is made in Section 6.4 hereof;

(i)    copies of certificates of occupancy for each of the Premises; and

IMP01405

(j)        such other documents or instruments as Purchaser shall reasonably request to further evidence consummation of the transactions contemplated by this Agreement.

Section 8.2    <u>Purchaser's Deliveries</u>.

At the Closing, Purchaser shall deliver or cause to be delivered to Seller:

(a)        the Purchase Price in the form and manner provided for in Section 1.2 hereof; and

(b)        a certificate signed by a duly authorized officer of Purchaser, dated the Closing Date, confirming: (i) the truth and correctness of all of the representations and warranties of Purchaser contained in this Agreement as of the Closing Date and as of all times between the date hereof and the Closing Date; (ii) that all agreements and covenants of Purchaser required to have been performed or complied with have been performed or complied with; and (iii) that all necessary corporate action by the Board of Directors of Purchaser has been taken to authorize the consummation of the transactions contemplated by the Agreement.

Section 8.3    <u>Parties to Bear Own Expenses</u>.

Whether or not the transactions contemplated by this Agreement are consummated and except as otherwise provided for herein, Purchaser and Principal shall each bear their respective expenses relating to or arising out of this Agreement, including, but not limited to, fees for attorneys, accountants and other advisors.

## ARTICLE IX

## INDEMNIFICATION

Section 9.1    <u>Indemnifications</u>.

(a)        <u>Indemnification by the Seller and Principal</u>.  Seller and Principal hereby jointly and severally agree to indemnify, defend and hold harmless Purchaser and its directors, officers, agents and employees from and against any and all losses, damages, liabilities and expenses, including, without limitation, legal fees and court costs, to which any of them may become subject as the result of:

(i)        any and all loss or damage resulting from any misrepresentation, breach of warranty, or any non-fulfillment of any warranty, representation, covenant or agreement on the part of Seller or Principal contained in this Agreement;

(ii)       any and all loss or damage resulting from any error contained in any statement, report, certificate or other document or instrument delivered to Purchaser pursuant to this Agreement or contained in any Exhibits or Schedules;

(iii)      any and all loss or damage resulting to Purchaser by reason of any claim, debt, liability or obligation pertaining to any taxes (and related interest and penalties)

IMP01406

owed by Seller, including without limitations any taxes relating to the Business for periods ending on or prior to the Closing Date; and

(iv)     any and all acts, suits, proceedings, demands, assessments, judgments, reasonable attorneys' fees, costs and expenses incident to any of the foregoing.

(b)     <u>Indemnification by Purchaser</u>.  Purchaser hereby agrees to indemnify, defend and hold harmless Seller and its officers, agents and employees, from and against any and all losses, damages, liabilities and expenses, including, without limitation, legal fees and court costs, which any of them may become subject to as the result of:

(i)     any and all loss or damage resulting from any misrepresentation, breach of warranty, or any non-fulfillment of any warranty, representation, covenant or agreement on the part of Purchaser contained in this Agreement;

(ii)     any and all loss or damage resulting to Seller by reason of any claim, debt, liability or obligation expressly assumed by Purchaser hereunder; and

(iii)     any and all acts, suits, proceedings, demands, assessments, judgments, reasonable attorneys' fees, costs and expenses incident to any of the foregoing.

(c)     <u>Procedures for Establishment of Indemnification</u>.

(i)     In the event that any claim shall be asserted by any party which, if sustained, would result in a right of a party to indemnification hereunder (a "Loss"), the person entitled to indemnification hereunder (the "Indemnitee"), within a reasonable time after learning of such claim, shall notify the person obligated to provide indemnification hereunder with respect to such claim (the "Indemnitor"), and shall extend to the Indemnitor a reasonable opportunity to defend against such claim, at the Indemnitor's sole expense and through legal counsel reasonably acceptable to the Indemnitee, provided that the Indemnitor proceeds in good faith, expeditiously and diligently.  No determination shall be made pursuant to subparagraph (ii) below while such defense is still being made until the earlier of (A) the resolution of said claim by the Indemnitor with the claimant, or (B) the termination of the defense by the Indemnitor against such claim or the failure of the Indemnitor to prosecute such defense in good faith and in an expeditious and diligent manner.  The Indemnitee shall be entitled to rely upon the opinion of its counsel as to the occurrence of either of said events.  The Indemnitee shall, at its option and expense, have the right to participate in any defense undertaken by the Indemnitor with legal counsel of its own selection.  No settlement or compromise of any claim which may result in a Loss may be made by the Indemnitor without the prior written consent of the Indemnitee unless (A) prior to such settlement or compromise the Indemnitor acknowledges in writing its obligation to pay in full the amount of the settlement or compromise and all associated expenses and (B) the Indemnitee is furnished with security reasonably satisfactory to the Indemnitee that the Indemnitor will in fact pay such amount and expenses.

(ii)     In the event that an Indemnitee asserts the existence of any Loss, the Indemnitee shall give written notice to the Indemnitor of the nature and amount of the Loss asserted.  If the Indemnitor, within a period of 15 days after the giving of the Indemnitee's notice, shall not give written notice to the Indemnitee announcing its intention to contest such

IMP01407

assertion of the Indemnitee (such notice by the Indemnitor being hereinafter called the "contest notice"), such assertion of the Indemnitee shall be deemed accepted and the amount of the Loss shall be deemed established. In the event, however, that a contest notice is given to the Indemnitee within said 15-day period, then the contested assertion of a Loss shall be settled by arbitration to be held in Philadelphia, Pennsylvania in accordance with the rules of the American Arbitration Association then obtaining. The determination of the arbitrator(s) shall be delivered in writing to the Indemnitor and the Indemnitee and shall be final, binding and conclusive upon all of the parties hereto, and the amount of the Loss, if any, determined to exist, shall be deemed established. Notwithstanding anything herein contained to the contrary, each party shall pay its own attorney's fees, costs and expenses incident to any arbitration proceeding brought under this subparagraph 9(c)(ii).

(iii)    The Indemnitee and the Indemnitor may agree in writing, at any time, as to the existence and amount of a Loss, and, upon the execution of such agreement, such Loss shall be deemed established.

(iv)    Payments of any Loss shall be paid to the person entitled thereto within ten business days following the establishment of the Loss.

(v)    Seller's and Principal's aggregate obligation under this Article IX, together with their aggregate obligation under Article IX of the Limited Liability Operating Agreement of Purchaser, shall be $2,000,000.

## ARTICLE X

## TERMINATION OF AGREEMENT

Section 10.1    Termination.

This Agreement may be terminated, and the transaction contemplated hereby may be abandoned, by written notice promptly given to the other parties hereto, at any time prior to the Closing Date:

(a)    by mutual written consent of the Purchaser and Seller; or

(b)    by either Purchaser on the one hand or Seller and Principal on the other hand if there shall have been a material breach of any representation, warranty, covenant or agreement on the part of the other set forth in this Agreement; or

(c)    by either Purchaser or Seller if any permanent injunction or other order of a court or competent authority or government agency which prevents the consummation of the transaction shall have become final and not appealable; or

(d)    by either Purchaser or Seller if the transaction shall not have been consummated on or before January 30, 2001; or

(e)    by Seller if any of the conditions specified in Article VII have not been met or waived by Seller at any such time as such conditions can no longer be satisfied; or

IMP01408

(f)       by Purchaser if any of the conditions specified in Article VI have not been met or waived by Purchaser at any such time as such conditions can no longer be satisfied.

Section 10.2    Status of Agreement after Termination.

Upon any termination of this Agreement pursuant to Section 10.1, this Agreement shall be void and have no effect, without any liability on the part of any party hereto or any shareholders, directors or officers thereof; provided, however, such termination shall not affect the liability of any party for the breach of any provision of this Agreement.

## ARTICLE XI

## GENERAL

Section 11.1    Notices.

All notices and other communications hereunder shall be in writing and shall be sent by certified mail, postage prepaid, return receipt requested; by an overnight express courier service that provides written confirmation of delivery; or by facsimile with confirmation, addressed as follows:

| | |
|---|---|
| If to Seller and Principal: | Thomas Carr<br>Transportation Concepts of New Jersey, Inc.<br>811 Rte. 33<br>Freehold, NJ  07726<br>Fax: |
| With a copy to: | Arthur M. Peslak, Esquire<br>Mandel & Peslak<br>80 Scenic Drive, Suite 5<br>Freehold, NJ  07728 |
| If to Purchaser: | Logisteq, LLC<br>209 W. Lancaster Avenue<br>Suite 101<br>Paoli, PA 19301<br>Attn:  J. Peter Pierce<br>Fax: |
| With a copy to: | Barry H. Kitain, Esquire<br>Cozen and O'Connor<br>1900 Market Street<br>Philadelphia, PA 19103<br>Fax:  215-665-2013 |

IMP01409

Any party may change its address for receiving notice by giving notice of a new address in the manner provided herein. Any notice so given, shall be deemed to be delivered on the second business day after the same is deposited in the United States Mail, on the next business day if sent by overnight courier, or on the same business day if sent by facsimile before the close of business, or the next business day, if sent by facsimile after the close of business.

Section 11.2   Broker's Commission.

Each party agrees to indemnify and hold harmless the other party from and against any and all liability, loss, damage, cost or expense (including court costs and attorney fees) arising out of or relating to any claim that such party entered into any brokerage agreement or similar arrangement, whether oral or written.

Section 11.3   Headings.

The descriptive article, section and paragraph headings set forth herein are inserted for convenience of reference only, do not constitute a part of this Agreement and shall not control or affect the meaning or construction of any provision of the within Agreement.

Section 11.4   Entire Agreement.

This Agreement, together with Exhibits and Schedules attached hereto, constitutes the entire agreement between the parties pertaining to this subject matter and supersedes all prior or contemporaneous agreements and understandings of the parties relating to the same. This Agreement may be amended only in writing signed by both parties.

Section 11.5   Severability.

If any term or provision of this Agreement or any application thereof shall be invalid or unenforceable, the remainder of this Agreement and any other application of such term or provision shall not be affected thereby.

Section 11.6   Counterpart Execution.

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Any counterpart signature page delivered by facsimile transmission shall be deemed to be and have the same force and effect as an originally executed signature page. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

Section 11.7   Governing Law.

This Agreement shall be governed by and construed in accordance with the internal laws of New Jersey without reference to choice of law principles thereof.

PHILA1\1336337\7 107515.000                    - 23 -

IMP01410

Section 11.8    <u>Waiver</u>.

Any of the terms or conditions of this Agreement may be waived at any time by the party entitled to the benefit thereof, but only by written notice signed by the party waiving such terms or conditions.

Section 11.9    <u>Further Assurances</u>.

Both parties will take such reasonable steps as are necessary to consummate the transactions contemplated herein.

Section 11.10    <u>Assignability; Binding Effect</u>.

This Agreement may not be assigned by either party without the prior written consent of the other party.  This Agreement shall be binding upon the parties hereto, and their successors and permitted assigns.

PHILA1\1336337\7 107515.000                    - 24 -

IMP01411

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the day and year first above written.

TRANSPORTATION CONCEPTS OF NEW JERSEY, INC.

By: _____
    Name:
    Title:

TC TRANSPORT & WAREHOUSING, INC.

By: _____
    Name:
    Title:

TC TRANSPORT & LEASING, INC.

By: _____
    Name:
    Title:

_____
THOMAS CARR

LOGISTEQ, LLC,


By: _____
    Name:
    Title:

IMP01412

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement on the day and year first above written.

TRANSPORTATION CONCEPTS OF NEW JERSEY, INC.

By:_____
    Name:
    Title:

TC TRANSPORT & WAREHOUSING, INC.

By:_____
    Name:
    Title:

TC TRANSPORT & LEASING, INC.

By:_____
    Name:
    Title:

_____
THOMAS CARR

LOGISTEQ, LLC,

By:_____
    Name: J Peter Pierce
    Title: President

PHILA1\1336337\7 107515.000

- 25 -

IMP01413

## LIST OF SCHEDULES

| | |
|---|---|
| Schedule 1.1(b) | Purchase Price Allocations |
| Schedule 2.1 | Foreign Qualifications |
| Schedule 2.3 | Customer Contracts |
| Schedule 2.4 | Liabilities |
| Schedule 2.5 | Real Estate |
| Schedule 2.6 | Personal Property |
| Schedule 2.7 | Trade Names, Etc. |
| Schedule 2.8 | Taxes |
| Schedule 2.9 | Legal Matters |
| Schedule 2.10 | Defaults under Corporation Agreements |
| Schedule 2.10(c) | Corporation Agreements |
| Schedule 2.11(a) | Employees |
| Schedule 2.11(c) | Employee Benefits Plan |
| Schedule 2.12 | Consents |
| Schedule 2.14 | Financial Statements |
| Schedule 2.15(b) | Conflicts of Interest |
| Schedule 2.16 | Material Adverse Changes |
| Schedule 2.17 | Actions Since Balance Sheet Date |
| Schedule 2.18 | Permits and Licenses |
| Schedule 2.20 | Environmental Matters |

IMP01414

## Schedule 1.1(b)

### PURCHASE PRICE ALLOCATION

Book value for all non-transportation assets

Book value plus $250,000 for all transportation assets

Balance to goodwill

IMP01415

## SCHEDULE 2.1

## FOREIGN QUALIFICATIONS

Seller is not qualified to do business in any jurisdiction but New Jersey

IMP01416

# SCHEDULE 2.4

# LIABILITIES

See Schedules 2.5, 2.9, 2.10 (d), 2.14, 2.17

Potential claim of $72,681.00 by Jean-Phillipe concerning an over turned trailer that has not been paid by the Seller's insurance carrier.

IMP01417

## SCHEDULE 2.5

### REAL ESTATE LEASES

1)    February 22, 1998    Parking Lease

2)    May 1, 1999    Freehold Warehouse Lease

3)    August 2000    Office Lease with Indian Road Associates, LLC

4)    November 1999    Warehouse Lease with Sayreville, LLC

5)    August 1999    Warehouse Lease between Shore Office Group II, LLC and
                      Anthony Maiorino

6)    October 2000    Miami Warehouse Sublease with Corporate Express of the
                      South, Inc.

7)    Extension Agreement with Iron Mountain

## SCHEDULE 2.6

## PERSONAL PROPERTY

See attached lists of Office Equipment/Furniture and Shop Equipment.

See attached Vehicle Titles.

IMP01419

## SCHEDULE OF OFFICE EQUIPMENT/FURNITURE

### DISPATCH

4 HIGH SWIVEL CHAIRS
2 LOW SWIVEL CHAIRS
1 TWO DRAWER METAL FILE CABINET
1 KEY CABINET
1 WALLBOARD
2 ROUND WALL CLOCKS
5 LUCENT TELEPHONES
3 PC'S W/MONITORS
1 OKIDATA PRINTER
1 OKIFAX FAX MACHINE
1 CANNON COPIER
1 13" TV ON SWIVEL WALL MOUNT
1 PANASONIC AG 6040 TIME LAPSE RECORDER
2 ULTRAK SECURITY CAMERAS

### OPEN OFFICE AREA

2 THREE DRAWER WOODEN FILE CABINETS
2 TWO DRAWER WOODEN FILE CABINETS
2 BOOKSHELVES
1 TOSHIBA COPIER
1 OKIFAX FAX MACHINE
1 ROUND WALL CLOCK

### TAMMI'S OFFICE

3 LEATHER ARM CHAIRS
1 LEATHER CAPTAINS CHAIR
1 L-SHAPE CHERRYWOOD DESK
1 TWO PIECE CHERRYWOOD CREDENZA
1 TWO DRAWER CHERRYWOOD FILE CABINET
1 BRASS COAT RACK
1 LUCENT PHONE
1 PC W/MONITOR & MODEM
1 HP LASER JET PRINTER
1 13" TV ON SWIVEL WALL MOUNT

### A/R OFFICE

2 L-SHAPE WOODEN DESKS
1 DESK
2 SWIVEL CHAIRS
1 CHAIR
1 BOOKCASE
2 PC'S W/MONITORS
1 OKIDATA PRINTER W/STAND
1 PITNEY BOWES POSTAGE MACHINE W/SCALE
2 LUCENT PHONES
1 BROTHER GX8250 TYPEWRITER
1 ROUND WALL CLOCK

## SCHEDULE OF OFFICE EQUIPMENT/FURNITURE

### STORAGE ROOM

1 LUCENT VOICE MAIL SYSTEM
1 PC SERVER
1 PIONEER STEREO SYSTEM
1 FIVE DRAWER METAL FILE CABINET
1 DSS SYSTEM
2 THREE DRAWER FILING CABINETS
1 TWO DRAWER METAL FILE CABINET

### TOM'S OFFICE

2 LEATHER ARM CHAIRS
1 LEATHER CAPTAINS CHAIR
1 CHERRYWOOD DESK
1 TWO PIECE CHERRYWOOD CREDENZA
1 LUCENT PHONE
2 ULTRAK SECURITY MONITORS
1 TWO DRAWER METAL FILE CABINET

### CONFERENCE ROOM

1 CONFERENCE TABLE
1 LEATHER CAPTAINS CHAIR
9 LEATHER ARM CHAIRS
1 BOOKCASE
1 TWO PIECE CREDENZA
1 BRASS COAT RACK
1 GLOBE W/STAND
2 LUCENT PHONES

### JOANNE'S OFFICE

1 WOODEN DESK
1 CAPTAINS CHAIR
2 CHAIRS
1 TWO SHELF BOOKCASE
1 TWO DRAWER FILE CABINET
1 PC W/MONITOR
1 LUCENT PHONE

### LOUNGE

1 LEATHER COUCH
1 LEATHER CHAIR & OTTOMAN
1 SIX SHELVE BOOKCASE
2 END TABLES
1 COCKTAIL TABLE
1 ENTERTAINMENT CENTER
1 25" TV
1 LUCENT PHONE

IMP01421

## SCHEDULE OF OFFICE EQUIPMENT/FURNITURE

### KITCHEN

1 REFRIGERATOR
1 KITCHEN TABLE W/CHAIRS
1 MICROWAVE
1 COFFEE MAKER
1 ROUND WALL CLOCK

* ASSORTED PAINTINGS, PLANTS, ETC

IMP01422

## SCHEDULE OF SHOP EQUIPMENT

7 FUEL CANS
4 AIR HOSES
2 CHARGERS
1 GREASE GUN
4 JACK STANDS
1 20 TON AIR JACK
1 20 TON HYDROLIC JACK
1 BATTERY TESTER & CHARGER
1 GENERATOR
1 PORTABLE AIR COMPRESSOR
1 AIR COMPRESSOR
1 BENCH CUTTING SAW
1 SKILL SAW
1 TIRE GUN
1 AIR GUN
2 CREEPERS
1 HAND TRUCK
2 LADDERS
1 BEAD SETTER
1 WHEEL DOLLIE
1 SET OF IMPACT SOCKETS
1 HOIST
1 PARTS WASHER
4 TRAILER LADDERS
2 SLEDGE HAMMERS
3 SMALL ASSORTED HAMMERS
1 OIL TANK PUMP
1 AIR DRILL
1 AIR RIVIT GUN
1 GRINDER
5 CLAMPS
1 AIR CHISEL
1 AIR ALLUMINUM CUTTER
1 WRATCHET SET
6 WORK BENCHES
2 VICES
4 PROPANE SHOP HEATERS
3 TIRE BREAKER BASES
1 3.5 TON FLOOR JACK
1 AUTO OIL
1 AUTO GREASE
1 LIGHT TESTER
1 WELDER
1 FAN
1 TORCH
1 55 GALLON BARREL W/STAND
ASSORTED NUTS & BOLTS
ASSORTED SMALL TOOLS
1 PRESS
2 MANUAL HAND PUMPS
3 OIL DRAIN CANS
2 CARTS

## <u>SCHEDULE OF SHOP EQUIPMENT</u>

3 TOWING CHAINS
2 DROP LIGHTS
3 FILTER WRENCHES
1 HAND GREASE GUN
6 EXTENSION CORDS

4 GARBAGE CANS
1 DESK
1 FILE CABINET
4 CHAIRS
1 CLOCK
1 MEDICINE CABINET
1 CLOTHING RACK

IMP01424

## <u>SCHEDULE 2.7</u>

The following are the trade names used by Seller:

1)    TC Transport

2)    Transportation Concepts of New Jersey, Inc.

3)    TC Transport & Leasing, Inc.

4)    TC Transport & Warehousing, Inc.

Registered Trademarks or Service marks:    NONE

Copyrights:    NONE

IMP01425

## SCHEDULE 2.8

## TAXES

1) Previously disclosed payroll tax liability for 1999 with estimated penalties and interest totaling $413,000.

## SCHEDULE 2.9

## LEGAL MATTERS

1)  Peter Jordan v. TC Transport & Warehousing, Inc.  Superior Court of New Jersey, Special Civil Part, Monmouth County, Docket No. DC-8242-00 Consent Settlement order attached.

2)  American Intermodal Services, Inc. v. Transportation Concepts of N.J., Inc. Supreme Court of New York, Putnum County, Index 780/2000 Default Judgment of $67,422.00 fraudulently applied for by plaintiff.  Plaintiff offered to settle for $5,000.00.  Motion to vacate default and/or enforce settlement agreement will be filed in due course.

3)  Victor Cherres et al. v. Richard Ramos, et al, Superior Court of New York, County of Queens, Index No. 22118/95.  Still Pending. Covered by Insurance.

4)  Accident matter involving Seller's truck causing damage to a Sears store. Covered by Seller's Insurance.

IMP01427

KARR & SALBER
681 South Broadway
Suite 1
P.O. Box 346
Pennsville, NJ 08070
(856) 935-8500
By: Gary M. Salber, Esquire
Attorney for: Peter Jordan t/a Transport Tire Center

| | |
|---|---|
| PETER JORDAN t/a TRANSPORT TIRE CENTER, | SUPERIOR COURT OF NEW JERSEY LAW DIVISION-SPECIAL CIVIL PART MONMOUTH COUNTY DOCKET NO.: DC-8242-00 |
| Plaintiff, | |
| vs. | Civil Action |
| TC TRANSPORT & WAREHOUSING, INC., | CONSENT ORDER |
| Defendant. | |

THIS MATTER having been brought before the Court on a Complaint filed by Peter Jordan, t/a Transport Tire Center through his attorney, Gary M. Salber, Esquire, of Karr & Salber, and an Answer having been filed by TC Transport & Warehousing, Inc., through their attorney, Arthur M. Peslak, Esquire of Mandel & Peslak, and the parties having conferred and resolved their differences, it is on this _____ day of December, 2000, ORDERED that:

1.   The amount owed by the defendant to the plaintiff as of December 1, 2000, is $4130.44.

2.   Defendant shall make payments directly to plaintiff in the amount of $500.00 per week until the balance is satisfied.

3.    In the event the foregoing payments are not made, plaintiff may move for enforcement following 10 days notice to defendant's attorney in which event defendant shall be responsible for the reasonable attorney's fees of plaintiff.

_____  J.S.C.

Consented to as to form and entry.

Dated: 12/4/2000

MANDEL & PESLAK

By: _____
Attorney for Defendant

KARR & SALBER

_____
Gary M. Salber
Attorney for Plaintiff

Dated: 12/6/00

IMP01429

## SCHEDULE 2.10

## DEFAULTS UNDER CORPORATION AGREEMENTS

Great American Insurance Company's failure to pay claim referred to on Schedule 2.4

IMP01430

## SCHEDULE 2.10(d)

## CORPORATION AGREEMENTS

1)  Promissory Note in the amount of $444,000.00 dated November 2000 to Financial Credit, Inc.

2)  Automobile Lease with Mercedes-Benz Credit Corporation. Lease No. 01-400-5168-02-49001.

3)  Automobile Lease with Chase for 2001 Lexus GS300.

4)  February 5, 1997 Security Agreement/Conditional Sale Contract between TC Transport & Leasing, Inc. and Delaware Valley Trailers.

5)  January 16, 1997 Security Agreement/Conditional Sale Contract between TC Transport & Leasing, Inc. and Pine Trailer Sales, Inc.

6)  March 5, 1997 Security Agreement/Conditional Sale Contract between TC Transport Leasing, Inc. and Pine Trailer Sales, Inc.

7)  March 16, 2000 Lease Agreement between Grief Corporation and CAC-PS. Agreement with LN7203.

8)  November 11, 1998 Lease Agreement between Transportation Concepts of N.j> and CAC-PS. Agreement No. LN7133.

9)  Promissory Note in the amount of $72,000.00 dated April 4, 2000 to Financial Federal Credit, Inc.

10) Ford Motor Credit Co. Loan dated September 4, 1998.

11) Equipment Lease No. 4094361-001 with Barclay Brand Corporation.

12) Lease Agreement with Watkins Leasing Company, L-6983 dated February 25, 1999.

13) Zurich-American Insurance Group Policy covering the period July 29, 2000 to July 29, 2000 to July 29, 2001.

14) Star Insurance Company Worker's Compensation and Employee's Liability Policy covering the period August 4, 2000 to August 4, 2001.

15) Promissory Note and Security Agreement in the amount of $758,522.09 dated December 14, 2000 between TC Transportation, Inc. and Matthew Pierce.

16)    Lease Number 7244 with CAC-PS.

17)    Security Agreement with Associates Commercial Corp. Acct Number 138690.

18)    Forklift Lease Agreement with First Federal Leasing dated December 2000.

## SCHEDULE 2.11(a)

## EMPLOYEES

See attached List as of 12-1-00

IMP01433

| | |
|---|---|
| **TC TRANSPORT** | |
| **PAY TERMS AS OF 12/1/2000** | |

**DRIVERS**

| | | | |
|---|---|---|---|
| ACKERMAN | | $ 180.00 | DAILY-FOR NESTLE SHUTTLE |
| AMUSAN | | $ 13.00 | HOURLY |
| BROCKWAY | | $ 13.00 | HOURLY |
| BUCKLES | | $ 13.00 | HOURLY |
| BUTLER | | $ 156.00 | DAILY-FOR COSMAIR SHUTTLE |
| CANADA | | $ 13.00 | HOURLY |
| CLARK | | $ 14.00 | HOURLY |
| CLAYTON, L | | $ 13.75 | HOURLY |
| CONKLIN | | $ 13.00 | HOURLY |
| FOLLENVAIDER | | $ 13.00 | HOURLY    OR $650 PER WK IF IN WHSE |
| HOWE | | $ 13.00 | HOURLY |
| HYER | | $ 13.00 | HOURLY |
| JAIYELA | | $ 13.00 | HOURLY |
| KIRCHENDOERFFER | (contract) | $ 13.00 | HOURLY |
| PECH | (contract) | $ 14.50 | HOURLY |
| RAMOS | (contract) | $ 14.00 | HOURLY |
| RODRIGUEZ, R | | $ 14.00 | HOURLY |
| SKON | | $ 13.00 | HOURLY |
| SWAN | | $ 13.00 | HOURLY |
| TURTURRO | | $ 14.00 | HOURLY |
| WENDELL | | $ 13.00 | HOURLY |
| ZELINSKY | (contract) | $ 14.00 | HOURLY |

IN ADDITON TC TRANSPORT PAYS THE EMPLOYEE PORTION OF DRIVER HEALTH BENEFITS
WHICH IS $234.46 MONTHLY.            EXCLUDING ACKERMAN (WE PAY FULL BENEFITS)

**TC OFFICE**

| | | | |
|---|---|---|---|
| BALOGH | | $ 675.00 | WEEKLY |
| CARR | | $ 1,500.00 | WEEKLY |
| CROOKER | | $ 1,000.00 | WEEKLY |
| KELLEY | | $ 20.00 | HOURLY |
| PHILLIPS | | $ 700.00 | WEEKLY |
| POTESTIVO | (contract) | $ 300.00 | WEEKLY |
| VERNOOY | | $ 11.00 | HOURLY |

**TC3**

| | | | |
|---|---|---|---|
| BATTAGLINO, ART | | $ 450.00 | WEEKLY |
| CARRION, ANGEL | (contract) | $ 20.00 | PER CONTAINER |
| COLON, BERNALDIN | (contract) | $ 20.00 | PER CONTAINER |
| D'ANGELI, CRISTINA | (contract) | $ 500.00 | WEEKLY |
| HOPKINS, FRANK | | $ 1,153.84 | WEEKLY |

IMP01434

| TC TRANSPORT |
| --- |
| PAY TERMS AS OF 12/1/2000 |

| | | | | |
| --- | --- | --- | --- | --- |
| DEPASQUALE, JOE | (contract) | $ 1,000.00 | WEEKLY | |
| LEHMANN, JOHN | | $ 1,500.00 | WEEKLY | |
| AIELLO, MATT | | $ 1,000.00 | WEEKLY | |
| MCGRATH, ALAN | | $ 1,326.92 | WEEKLY | PLUS $350 MONTHLY CAR ALLOWANCE |
| GIBBS, NESTOR | | $ 16.00 | HOURLY | |
| PEREZ | | $ 400.00 | WEEKLY | |
| SOTO, ARTURO | | $ 1,115.38 | WEEKLY | PLUS $300 MONTHLY CAR ALLOWANCE |
| D'ANGELI, TONY | | $ 600.00 | WEEKLY | |
| SOMMA, VINNY | | $ 1,057.69 | WEEKLY | |
| VUMBACO, JOE | (contract) | $ 10.00 | HOURLY | |
| TORRES, JUAN | | $ 13.00 | HOURLY | |

**SHOP**

| | | | | |
| --- | --- | --- | --- | --- |
| BALLSCHMEIDER | | $ 750.00 | WEEKLY | |
| PREVOSTI | (contract) | $ 750.00 | WEEKLY | |

**WHSE**

| | | | | |
| --- | --- | --- | --- | --- |
| R CLARK | | $ 650.00 | WEEKLY | |
| GARRETT | (contract) | $ 500.00 | WEEKLY | |

**GUARDS**

| | | | | |
| --- | --- | --- | --- | --- |
| BOYER, MARK | | $ 8.00 | HOURLY | |
| URBAN, ED | (contract) | $ 8.00 | HOURLY | |
| PRZYBYLKO, TOM | (contract) | $ 9.00 | HOURLY | |
| MISC GUARDS | (contract) | $ 7.00 | HOURLY | |
| MAIORINO, TONY | (contract) | $ 10.00 | HOURLY | |

IMP01435

## SCHEDULE 2.11(c)

## EMPLOYEE BENEFIT PLANS

1) The Company provides health insurance for its employees.
2) The Company pays the premiums for Thomas Carr's Life Insurance Policy.

**SCHEDULE 2.12**

**CONSENTS**

None

## SCHEDULE 2.14

## FINANCIAL STATEMENT

1)    Financial Statement December 31, 1999.

2)    Balance Sheet September 30, 2000.

3)    Statement of Earnings and Expenses (Profit & Loss) January 2000 to September 2000.

4)    Cash Flow Report September 30, 2000.

IMP01438

Mar-17-05  04:49pm   From-PATTON BOGGS LLP                    20245763154440        T-174  P.03/03  F-931

## AFFIDAVIT OF THOMAS CARR AND JAMES NEEBLING

We, Thomas Carr and James Neebling, hereby individually swear and affirm under the penalties of perjury that the following information is based on our individual personal knowledge, that we are each competent to so testify, and that the following information is both true and correct.

Each of us is over the age of eighteen years.

Systrans Freight Systems, Inc. was formed by the undersigned James Neebling in anticipation of a commercial relationship with Iron Mountain.  Systrans Freight Systems, Inc. is owned one hundred percent (100%) by James Neebling.

The undersigned Thomas Carr has no interest in Systrans Freight Systems, Inc., ownership or otherwise, or any interest in any other entity, ownership or otherwise, which is in any way involved with Systrans Freight Systems, Inc.

The undersigned Thomas Carr has no involvement whatsoever in the administration and/or operations of Systrans Freight Systems, Inc.

DATE: 3-17-05

_____
Witness

_____
Thomas Carr

DATE: _____

_____
Witness

_____
James Neebling

EXH
FOR IDENT
IN EVD   DATE
DENISE L. DANIELS

03/17/2005 THU 15:10 [TX/RX NO 6986] @002

IMP04340

# EXHIBIT D

Arthur M. Peslak

03/14/2007

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
-----------------------------------------x
IRON MOUNTAIN INCORPORATED;
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.; C. RICHARD
REESE; JOHN F. KENNY, JR.;
GARRY B. WATZKE; LARRY L. VARN;
and CHARLES G. MOORE,

                Plaintiffs and
                Counterclaim Defendants,

                                Civil Action
          v.                    No. 05 10890 RCL

THOMAS CARR,

                Defendant and
                Counterclaim Plaintiff.
-----------------------------------------x
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.

                Plaintiff,

                                Civil Action
          v.                    No. 05 10999 RCL
SYSTRANS FREIGHT SYSTEMS, INC.,
                Defendant.
-----------------------------------------x
                    March 14, 2007
                    10:05 a.m.
        Deposition of ARTHUR M. PESLAK, taken by
Plaintiff, pursuant to Subpoena, at the offices of
Patton Boggs, LLP, One Riverfront Plaza, Newark, New
Jersey, before Denise L. Daniels, a Shorthand Reporter
and Notary Public.

CERTIFIED ORIGINAL
LEGALINK BOSTON

Arthur M. Peslak                                    03/14/2007

Page 2

1

        A p p e a r a n c e s:

2

            SULLIVAN & WORCESTER, LLP
3                   Attorneys for Plaintiffs and
                    Counterclaim Defendants
4                   One Post Office Square
                    Boston, Massachusetts 02109
5

            BY:    IRA K. GROSS, ESQ.
6

7

8           PATTON BOGGS, LLP
                    Attorneys for Defendant and
9                   Counterclaim Plaintiff
                    2550 M Street, NW
10                  Washington, D.C. 20005
11          BY:    ILYA SHAPIRO, ESQ.
                    EDWARD D. GEHRES, III, ESQ.
12

13

14

15

16   Also Present:
17          LARRY L. VARN
            CHARLES G. MOORE
18          THOMAS CARR
19                          oOo
20

21

22

23

24

25

Arthur M. Peslak                                    03/14/2007

Page 3

1    A R T H U R     M.     P E S L A K ,

2          residing at 1 Kings Way, Freehold, New

3          Jersey 07728, having been first duly sworn by

4          the Notary Public (Denise L. Daniels), was

5          examined and testified as follows:

6    EXAMINATION BY

7    MR. GROSS:

8          Q.    Good morning.  Will you state your full

9    name for the record, please?

10         A.    Arthur Matthew Peslak.

11         Q.    **Mr. Peslak, are you an attorney?**

12         A.    Yes.

13         Q.    **Where do you practice?**

14         A.    My office is in Freehold, New Jersey.

15         Q.    **How long have you been an attorney?**

16         A.    I was first admitted in 1989.

17         Q.    **In New Jersey?**

18         A.    New Jersey and New York and the United

19   States Patent Office.  I'm a registered patent

20   attorney.

21         Q.    **Mr. Peslak, you received a subpoena to**

22   **attend this deposition today, did you not?**

23         A.    Yes.

24         Q.    **I hand you a document and ask if you can**

25   **confirm if that's the subpoena or a copy of the**

Arthur M. Peslak                                      03/14/2007

Page 4

1   subpoena that was served on you?

2        A.    Yes.

3             MR. GROSS:  Mark that as Peslak 1,

4        please.

5             (Whereupon, subpoena marked Peslak

6        Exhibit 1 for identification, as of this date.)

7        Q.    Mr. Peslak, the subpoena commands you to

8   produce all documents relating to any promises made to

9   Thomas Carr by Iron Mountain Incorporated, C. Richard

10  Reese or Larry L. Varn.  Have you done that?

11       A.    I think with the documents you have this

12  morning, plus my time records and my chronology, which

13  was previously produced, I think you have it.  That's

14  the tally of documents relating to any promises.

15       Q.    And the documents that were supplied by

16  you earlier were forwarded to me by counsel for

17  Mr. Carr, is that your understanding?

18       A.    I understand that the chronology and my

19  time records for the matter I had given to Patton

20  Boggs, and they produced them to you.

21            (Mr. Carr entered the proceedings at this

22       point.

23       Q.    Mr. Peslak, when did you first come to

24  represent Mr. Thomas Carr?

25       A.    Mid-'90s time frame, '94, '95, something

Arthur M. Peslak

03/14/2007

Page 5

1   like that.

2        Q.    Just briefly, in what connection?

3        A.    I believe it was when he originally sold

4   his business to U.S. Delivery.

5        Q.    Did you also represent Mr. Carr when he

6   sold a portion of TC Transport to J. Peter Pierce?

7        A.    Yes.

8        Q.    When was that sale consummated, if you

9   recall?

10       A.    Late 2000, early 2001.

11       Q.    Do you recall the basic parameters of the

12   deal?

13       A.    You mean the price?

14       Q.    Well, that would be one of them.

15       A.    Yes.

16       Q.    And what was the price?

17       A.    $3.8 million for 49 percent of the

18   company.  Excuse me, 51 percent of the company.

19       Q.    Mr. Carr retaining the other 49 percent,

20   correct?

21       A.    Yes.

22       Q.    Do you know how the price was set?

23       A.    I wasn't part of the negotiations, but I

24   do have an understanding from subsequent developments

25   how Pierce approximately arrived at the price.

Arthur M. Peslak

03/14/2007

Page 6

1       Q.      Can you tell me how he did?

2               MR. SHAPIRO:  To the extent you know.

3       A.      It's my understanding from a document

4    that was produced by Pierce during discovery and a

5    subsequent litigation that Doug Huntley had valued the

6    company based upon projections that Tommy had made as

7    to the revenue that could be accrued to the company if

8    they garnered certain coffee warehousing business.  It

9    was not based on prior revenues of TC Transport.

10      Q.      There was a valuation prepared by someone

11   working for Mr. Pierce?

12      A.      That's my understanding, yes.

13      Q.      This is all based on your understanding

14   derived from the document that you just described?

15      A.      I did not get involved in this until the

16   price was set, at which point the lawyers got involved

17   to do the contract, but the price was already set.

18   There was some review of the document subsequently.

19      Q.      Your understanding is that Mr. who --

20      A.      Doug Huntley.

21      Q.      Mr. Huntley valued TC Transport based on

22   some prospective business in the coffee area?

23      A.      I believe so.

24      Q.      And the valuation of the business in toto

25   was what?

Arthur M. Peslak                                          03/14/2007

Page 7

1      A.    I assume if you divide 3.8 million by

2  .49, you'll get the total valuation.

3      Q.    **To your knowledge, there was no premium**

4  **for the majority controlling interest that was figured**

5  **into this?**

6      A.    I don't know.

7      Q.    **Mr. Peslak, what was the nature of your**

8  **representation of Mr. Carr following the sale to**

9  **Mr. Pierce?**

10      A.    At what point in time?

11      Q.    **Well, what was the next service, type of**

12  **service that you performed, legal service that you**

13  **performed for him?**

14          MR. SHAPIRO:  To the extent that this is

15          privileged, then I'll instruct you not to

16          answer.

17      A.    I really don't know what the next thing

18  was.  There were probably some cleanup matters on some

19  sort of nuisance lawsuits that were against TC

20  Transport, not necessarily Logisteq, and at various

21  times after the acquisition, Tommy would call me and

22  ask me questions or tell me things that were going on

23  and ask my opinion of them.

24      Q.    **Did there come a time when you prepared a**

25  **complaint on Mr. Carr's behalf against Mr. Pierce?**

Arthur M. Peslak                                          03/14/2007

Page 8

1      A.    Yes.

2      Q.    When did you begin work that led to the

3  filing of that complaint?

4      A.    You mean when did I sit down and put

5  pencil to paper?

6      Q.    Well, when did you start to do any work,

7  whether it was putting pencil to paper to actually

8  draft the complaint or not that led to the filing of

9  the complaint?

10      A.    I'm not sure how to answer that.  I mean

11  I started to draft the complaint, you know, within a

12  week or two of when it was filed.

13      Q.    Had you had discussions with Mr. Carr

14  about filing a complaint before that?

15      A.    Probably.

16      Q.    Did Mr. Carr complain to you about his

17  relationship with Mr. Pierce prior to that time?

18      A.    Sure.

19      Q.    When did he start doing that?

20      A.    The first time Tommy came to me with any

21  dissatisfaction was probably after the first

22  quarter -- sometime after the first quarter of the

23  year 2001.

24      Q.    So sometime after March 31, 2001 is what

25  you're saying?

Arthur M. Peslak                                      03/14/2007

Page 9

1       A.      Right.

2       Q.      **What complaint did he make to you about**

3  **Mr. Pierce?**

4       A.      I don't think it was about Pierce per se,

5  but he came to me and said that the financials for the

6  first quarter of the company weren't very good, and

7  one of the things he mentioned was that there were

8  these employees for Pierce's other company.  I don't

9  know if it was called Sequedex at that time or not,

10  that the archiving company was on the Logisteq

11  payroll, and that was one of the reasons that the

12  company was losing money, that these people were on

13  the payroll, and they weren't doing anything for

14  Logisteq.

15      Q.      **Did Mr. Carr ask you to perform any legal**

16  **services in connection with that complaint?**

17      A.      Well, he asked me what I thought about

18  it.

19      Q.      **And, in fact, when the complaint was**

20  **ultimately filed, it did contain allegations that**

21  **related to that complaint -- that gripe of Mr. Carr,**

22  **correct?**

23      A.      I believe so.  I haven't looked at the

24  complaint in a while, but I believe so.

25      Q.      **Let me hand you a document that appears**

Arthur M. Peslak                                        03/14/2007

Page 65

1  this business effort in Systrans.

2       Q.    Support him how, through the business

3  effort?  What was the proposal?

4       A.    These guys had thrown around numbers of

5  25 million or $45 million in courier business every

6  year, and from that, Tom would get some sort of

7  distribution, salary, whatever.

8       Q.    You said Mr. Neebling actually made a

9  proposal that included that component at this Waldorf

10 Astoria meeting?

11      A.    I don't know exactly what he discussed

12 with Richard Reese because they were sitting down at

13 one end of the table and I was sitting at the other

14 end with Larry and Kenny, but Jim told me that's part

15 of what he discussed with Richard Reese that night.

16      Q.    So you didn't hear that firsthand while

17 it was occurring?

18      A.    No.

19      Q.    And what we're talking about at the

20 Waldorf Astoria occurred on June 10, 2002?

21      A.    If that's what's on my -- it's on my

22 thing, yeah, June 10th.

23      Q.    Let's backtrack a little bit to the

24 chronology reflected in Exhibit 4.  We haven't

25 discussed yet the April 9, 2002 meeting.  Can you tell

Arthur M. Peslak                                              03/14/2007

Page 66

1    me who attended that meeting and what transpired?

2          A.    You're talking about the one in New York?

3          Q.    I'm talking about -- yes, I'm talking

4    about the one in New York at Giambelli's?

5          A.    That was Richard Reese, John Kenny, Larry

6    Varn, Jim Neebling, Tom Carr and myself.

7          Q.    Tell me as best you can recall what was

8    said by whom during that meeting?

9          A.    We got there and we had general chitchat.

10   Tommy and Richard Reese were sitting down at the end

11   of the table sort of by themselves.  Jim, John Kenny,

12   Larry and myself were sort of at the other end of the

13   table, and we were engaging in some discussion of what

14   had happened in court that day.  That was the day we

15   went to court on the return date for my order to show

16   cause, as well as some general business sort of

17   discussions.

18              The conversation between Richard and Tom

19   was largely private.  I didn't hear what was going on.

20   At a certain point in time, Larry asked me to step

21   outside and Larry said to me, "Richard is going to

22   authorize us to send you the $50,000 that you

23   requested."

24              He said, "Don't spend it all in one

25   place, and when it's used up, there would be more if

Arthur M. Peslak                                    03/14/2007

Page 67

1    you need it."

2            And I said to Larry -- I had e-mailed a

3    proposed sort of guarantee agreement to Garry, and I

4    faxed it to Larry earlier that afternoon for at least

5    Schooner Capital to guarantee the payment of my firm's

6    fees in the case, and I said, "The agreement has to

7    get signed."

8            Larry said, "We really don't want any

9    written agreements, but I can tell you Iron Mountain

10   is going to pay you -- Iron Mountain, despite the

11   bottom shelf finding out Tommy is indicted, Richard

12   has decided he's going take back Tommy and we're going

13   to pay your fees in the case.  So don't worry about

14   it."

15       Q.    And you eventually did receive the

16   $50,000 payment, correct?

17       A.    Right.  There was a wire transfer into my

18   firm's trust account a couple days later.

19       Q.    Your understanding based on your

20   conversation with Mr. Varn was that Iron Mountain

21   would pay your fees going forward representing

22   Mr. Carr in the case against Mr. Pierce?

23       A.    That's correct.

24       Q.    And how much beyond the $50,000 has there

25   been in the way of accrued fees in that matter?

Arthur M. Peslak                                        03/14/2007

Page 68

1          A.    I think the total amount was 75/$80,000,

2     something like that.

3          Q.    **When you say the total, you mean**

4     **including the 50?**

5          A.    Total fees billed on the case.

6          Q.    **Is 75 to $80,000?**

7          A.    Yes.

8          Q.    **And how much of that remains unpaid?**

9          A.    None of it.

10         Q.    **Mr. Carr paid the balance after the**

11    **$50,000 was applied?**

12         A.    The 50,000 was applied.  There was a

13    subsequent payment from Iron Mountain of a couple of

14    thousand dollars.  I don't have the numbers offhand on

15    top of my head.  I think Tommy paid another 15 to

16    $20,000 to our firm.  These are ballpark figures.

17         Q.    **So, as far as what you say Mr. Varn told**

18    **you Iron Mountain would undertake in the way of**

19    **payment of your fees, those fees have all been paid at**

20    **this point?**

21         A.    Someone paid them, right.

22         Q.    **Yes, I understand, but they're all paid?**

23         A.    Right.

24         Q.    **Have you told me everything that you can**

25    **recall about the April 9th dinner meeting at**

Arthur M. Peslak

03/14/2007

Page 85

1          (Whereupon, e-mail from Mr. Neebling

2      marked Peslak Exhibit 6 for identification, as

3      of this date.)

4      Q.    **With respect to that litigation that you**

5  **filed on behalf of Mr. Carr against Mr. Pierce, you**

6  **testified about what happened at the initial return**

7  **date.  What happened after that in that case?**

8      A.    I started doing some discovery.  You want

9  the whole life history of the litigation?

10     Q.    **Give me a brief summary, and we'll see**

11 **what we're interested in.**

12     A.    I started doing some documentary and

13 discovery.  Tommy's deposition occurred sometime in

14 May.  After Pierce closed Logisteq, I believe I filed

15 a motion asking Judge Fisher to appoint a special

16 fiscal agent on behalf of Tom's interest, which he

17 declined to do.

18          After the company was closed and he

19 denied that motion, there was little point in the

20 preliminary injunction motion, and we withdrew that

21 application.  We continued to engage in the sort of

22 hide and seek game with Cozen & O'Connor over

23 documents and discovery over a couple of months.  We

24 filed bankruptcy, which was in the state court

25 proceeding, and ultimately the case was -- I believe

Arthur M. Peslak                                    03/14/2007

Page 86

1   everybody took a stipulation of dismissal without

2   prejudice.

3           Q.    Was there ever any consideration or

4   relief derived by Carr or TC of New Jersey, Inc. in

5   this case, in the claims of the case?

6           A.    Did he get any money?

7           Q.    Yes, anything?

8           A.    No.

9           Q.    Were there any settlement discussions

10  with Mr. Pierce?

11          A.    Yes.

12          Q.    The amount didn't generate any

13  constructive result?

14          A.    No.

15          Q.    When Mr. Carr was deposed in May of 2003,

16  was it --

17          A.    2002.

18          Q.    2002.  To your knowledge, did he

19  truthfully answer the questions that were asked of him

20  at the deposition?

21              MR. SHAPIRO:  Objection.  It's not clear

22          which deposition.

23          Q.    The deposition you just talked about is

24  the one I'm asking about.  He was deposed in your

25  case, right?

Arthur M. Peslak                                              03/14/2007

Page 87

1        A.    Yes.  I think there was one statement

2  where he said he hadn't met Richard Reese, but other

3  than that, nothing else stands out in my mind.

4        Q.    In fact, Mr. Peslak, Mr. Carr had met

5  Richard Reese on one or more occasions prior to his

6  giving deposition testimony, hadn't he?

7        A.    Yes.

8        Q.    Did Mr. Carr ever tell you why he said he

9  met Mr. Reese, in the deposition?

10       A.    He said he was very nervous and thought

11  he was going to create issues for Iron Mountain.

12       Q.    Create issues if he told the truth about

13  knowing Mr. Reese?

14       A.    Create issues for Iron Mountain if he

15  said he had met with Richard Reese.

16       Q.    You testified a few moments ago that you

17  had some subsequent discussions, I believe, with

18  Mr. Varn about -- that touched on the issue of

19  Mr. Carr's potential employment by Iron Mountain, is

20  that true?

21       A.    I don't know what you're referring to.

22       Q.    I asked you about whether that was the

23  last time --

24       A.    Oh, I'm sorry.

25       Q.    The employment of Mr. Carr by Iron

ARTHUR M. PESLAK

Page 105

```
 1                 C E R T I F I C A T E

 2
 3
    STATE OF NEW YORK      )
 4                         )  ss.:
    COUNTY OF NEW YORK     )
 5
 6           I, DENISE L. DANIELS, a Shorthand

 7     Reporter and Notary Public within and for the

 8     State of New York, do hereby certify:

 9           That I reported the proceedings in

10     the within entitled matter, and that the

11     within transcript is a true record of such

12     proceedings.

13           I further certify that I am not

14     related, by blood or marriage, to any of

15     the parties in this matter and that I am

16     in no way interested in the outcome of this

17     matter.

18           IN WITNESS WHEREOF, I have hereunto

19     set my hand this 19th day of March          ,

20     2007.

21                         _____
                                  DENISE L. DANIELS
22
23     CERTIFIED ORIGINAL
24     LEGALINK BOSTON
25
```



Arthur M. Peslak, Esq.
Lawrence D. Mandel, Esq.
Mandel & Peslak, LLC
80 Scenic Drive
Suite 5
Freehold, NJ 07728
Attorneys for Plaintiff
(732) 761-1610

## SUPERIOR COURT OF NEW JERSEY
## CHANCERY DIVISION – GENERAL EQUITY
## MONMOUTH COUNTY

————————————————————X

Thomas Carr and
Transportation Concepts of New Jersey, Inc.

        Plaintiffs

v.

J. Peter Pierce, Pioneer Capital, L.P.,
Pioneer Capital Genpar, Inc. and
Logisteq, LLC

        Defendants.

————————————————————X

Docket No. MCN C. 95-02

## VERIFIED COMPLAINT AND DEMAND FOR TRIAL BY JURY

## THE PARTIES

1.    Transportation Concepts of New Jersey, Inc. ("TC") is a New Jersey

Corporation with its principal place of business located 811 Route 33,

Freehold, New Jersey 07788.



2.    Thomas Carr ("Carr") is an individual residing at 33 Denise Court, Manalapan, New Jersey.

3.    Defendant, J. Peter Pierce ("Pierce"), is an individual who, upon information and belief, resides at 269 Hilldale Road, Villanova, Pennsylvania.

4.    Defendant Pioneer Capital, L.P. ("Pioneer") is, upon information and belief, a Pennsylvania limited partnership with its principal place of business located at 209 West Lancaster Avenue, Paoli, Pennsylvania.

5.    Defendant Pioneer Capital Genpar, Inc. ("Pioneer Genpar"), is, upon information and belief, a Pennsylvania corporation, and is the General Partner of Pioneer Capital, L.P. with it principal place of business located at 209 West Lancaster Avenue, Paoli, Pennsylvania. Pierce is the President, CEO, Secretary and Treasurer of Pioneer Genpar, and thus controls both Pioneer Genpar and, also, controls Pioneer.

6.    Defendant Logisteq, LLC ("Logisteq") is a New Jersey limited liability company with its principal place of business located at 811 Route 33, Freehold, New Jersey.

## THE RELATIONSHIP BETWEEN THE PARTIES

7.    Defendant Logisteq was formed by Pierce and Pioneer for the purpose of acquiring the assets of plaintiff TC. TC is a trucking and warehousing company owned by Carr that he founded on or about 1996.

2

IMP00709

8. On or about January 15, 2001, TC transferred a 51% undivided interest of its assets to Logisteq for a payment of $3,869,370 plus an additional purchase price dependent on the resolution of certain TC tax liabilities.

9. Defendant Pioneer contributed the $3,869,370 to Logisteq to fund the purchase of TC's assets in exchange for a 51% equity interest in Logisteq.

10. TC then contributed the remaining 49% undivided interest in its assets to Logisteq in exchange for a 49% equity interest in Logisteq.

11. As of this date, TC still owns 49% of Logisteq and Pioneer still owns 51%.

## THE BUSINESS OF TC PRIOR TO THE ACQUISITION

12. Carr is the President and founder of Plaintiff TC and its predecessor and affiliated companies (collectively "the TC businesses"). Carr founded a series of companies in the early 1990's that were in the business of trucking, transportation, warehousing, leasing and other related activities.

13. Logisteq is effectively the successor entity to the TC businesses.

14. In approximately 1991, Carr was employed by Roadway Express. Rhone-Poulenc, a customer of Roadway Express for which Mr. Carr had principal responsibility, was facing the possibility of a union strike. Roadway Express was also unionized and its drivers would not cross the picket lines. Rhone-Poulenc suggested that Mr. Carr organize a new non-union company for local hauling purposes. Mr. Carr accepted the idea and proceeded to start the first of the TC businesses, known as TC Transport of New Jersey, Inc.

3

15. The first TC business grew to annual revenues to approximately $3 million after about three years. However, its profit margins were slim and the company was constantly starved for cash to finance its expansion. As a consequence, in 1994 Mr. Carr sold the company to U.S. Delivery for approximately $1.2 million, half in cash and half in stock of U.S. Delivery.

16. US Delivery was a public company that was in the process of attempting to "roll-up" local trucking businesses in the United States. After the acquisition by US Delivery, Mr. Carr was employed by U.S. Delivery in Freehold, New Jersey. After about a year and a half, U.S. Delivery's stock, which had risen from $16 per share at the time of the acquisition to as high as $47 per share, crashed to $6 per share. US Delivery was then acquired by another public company Corporate Express. Corporate Express then began to divest itself of some of the companies acquired by US Delivery. As a result, in approximately 1996, Carr negotiated a repurchase of the company assets that had been sold to U.S. Delivery in 1994.

17. The new company started by Carr in 1996 eventually evolved into Plaintiff TC.

18. The first few years after repurchasing the trucking company from U.S. Delivery were very difficult. Although sales grew from $3 million to more than $7 million, TC was only marginally profitable and had

4

significant cash shortages. Because of its growth, however, it needed larger facilities and more parking for its warehousing operation and trucks.

19.     In 1996, one of TC's customers, Owens-Brockway in Freehold, sold its property, a former glass factory, to Pierce Leahy Corp. ("PLC"). At the time, Defendant Pierce was the President and Chief Executive Officer of, and effectively controlled PLC. PLC was in the business of archiving and storing business records in warehouses.

20.     Owens-Brockway had allowed TC to park its trucks and trailers on the property in Freehold. TC continued to grow and so did its need for additional warehousing space.

21.     When Carr learned that PLC was buying the Owens-Brockway property in Freehold, Carr spoke with Michael DiIanni, a regional facilities manager for PLC, to see if TC could lease some space in the property. PLC agreed to lease TC approximately 300,000 ft.² of warehouse space on terms favorable to TC. TC subsequently invested approximately $300,000 in improvements to the property, partly in offices and partly in cleaning up the warehouse space.

22.     Later on in 1996, PLC was confronted with a union election campaign sponsored by Local 560 of the Teamsters.

23.     Carr was raised in Jersey City, New Jersey. Carr's late father was an active member of Local 560 of the International Brotherhood of Teamsters (the "Teamsters"), based in Union City, New Jersey. Carr thus literally grew up in the trucking business.

5

24.     Knowing that Carr was friendly with Teamster's officials, Michael
Dilanni, then an employee of PLC, approached Carr and explained that if
the union election campaign were to be successful, it could have a very
negative effect, and perhaps even prevent, PLC's plan for a public stock
offering. A very good friend of Mr. Carr's late father had recently been
appointed President of Local 560 upon the termination of its government
receivership. At Dilanni's request, Mr. Carr approached his father's
friend about the PLC situation. At Mr. Carr's request, the Teamsters
terminated their election activity at PLC.

25.     On several occasions, both Dilanni and Defendant Pierce expressed their
great gratitude to Mr. Carr for his assistance in resolving their problems
with the Teamsters. As a result, PLC granted TC a five-year lease on
approximately 300,000 ft. at the former Owens-Brockway facility in
Freehold. The lease also contained an additional five year option for TC
to remain in the space. TC continued to invest money into the property,
including rebuilding the garage, installing new flooring in the warehouse
areas, removing former railroad tracks, improving the offices, and
restoring portions of the warehouse.

26.     As a result of the various interactions, Dilanni and Carr became somewhat
friendly. In addition, Defendant Pierce also approached Carr and,
reconfirmed his gratitude for help in resolving PLC's issues with the
Teamsters, told Carr he would always be available, and that Carr should
not hesitate to contact him, if Carr ever needed a favor or any help.

6

27.    TC continued to grow during the following years, particularly a portion of the business devoted to storing coffee for Nestlé on a long-term basis. At the same time, PLC continued to grow and to utilize more and more of the Freehold facility for its own records storage requirements. Thus, TC's ability to expand at its Freehold facility was significantly constrained. As a result TC leased some additional space at a large – more than 1 million ft.$^2$ - facility owned by Anchor Glass in Aberdeen Township, New Jersey.

28.    In early 2000, PLC was acquired by another large public company, Iron Mountain, Incorporated ("Iron Mountain"), whose stock is traded on the New York Stock Exchange. Iron Mountain is also in the business of storing business records. As part of the acquisition, Defendant Pierce, upon information and belief, was given a highly paid executive position at Iron Mountain, was elected to the Board of Directors of Iron Mountain and both personally and via his family, received a large amount of Iron Mountain stock worth several tens of millions of dollars in connection with the acquisition of PLC.

29.    In the spring of 2000, Iron Mountain informed TC that it was not willing to lease additional space to TC in Freehold and wanted TC to vacate the Freehold facility at the end of the initial five-year lease term.

30.    Nestlé's representatives had previously suggested that it would support TC in developing licensed coffee exchange warehouses in the four United States ports that import coffee. The four ports are the Port of New York and New Jersey (all licensed coffee warehouses in that area must be

7

IMP00714

located within 25 miles of the Statue of Liberty), Virginia, Miami and New Orleans. Nestle wanted to reduce its dependence on a coffee storage company that charged Nestlé excessively high rates for storage and other services.

31. TC was very comfortable with the business of warehousing coffee, which involves long-term storage of coffee beans plus ancillary services for which the warehouseman can charge at good margins. Based on the promise of business from Nestle, TC obtained a license from the Commodities Exchange to operate a licensed coffee exchange warehouse at the former Anchor Glass facility in Aberdeen Township, New Jersey. TC needed a significant capital infusion to acquire warehouses in the four key coffee markets but was unable to obtain conventional bank financing.

32. In 2000, Carr learned that Anchor Glass wanted to sell the Aberdeen Township facility which he believed would be ideal for the expansion of TC's coffee warehousing and transportation businesses in the area of the Port of New York and New Jersey. TC made an offer to purchase the property for $8.5 million and was led to believe that Anchor Glass would be willing to lease back a large portion of the warehouse.

33. In light of defendant Pierce's expressions of gratitude for Mr. Carr's assistance to PLC with its union problems, Mr. Carr approached Michael DiIanni sometime during the summer of 2000. Mr. Carr inquired as to whether Defendant Pierce would be in a position to put together a group of

8

investors to buy the Anchor Glass property in Aberdeen Township and lease it back to TC.

34.    At or around June 30, 2000, Pierce was either fired or resigned from his position at Iron Mountain. Upon information and belief, Pierce was subject to post-employment restrictive covenants with Iron Mountain that precluded him from directly or indirectly competing with Iron Mountain in the records management and storage business for a period of five years.

35.    Around this time, Carr met with Pierce, DiIanni, and Tony Hayden, who was introduced as Pierce's real estate broker, for lunch to discuss TC's proposal to acquire the Anchor Glass facility. At that meeting, Carr showed Pierce, DiIanni and Hayden a formula for repayment and a forecast for the business. During the meeting, Pierce stated in substance that the coffee warehousing business "sounds a lot like the archives business". Pierce requested a few years of financial statements for TC, which were provided a few days later.

36.    Approximately two or three weeks later, Pierce and his principal financial advisor Douglas Huntley met with Mr. Carr. At that meeting, Pierce stated that, rather than simply put together an investor group to purchase the Anchor Glass property, he was interested in buying 51% of TC. Pierce also indicated that an additional investor group would be established to purchase the Anchor Glass property. Pierce indicated that Carr would own a 25% interest in the Anchor Glass property as an investment without cost since Carr brought the deal to Pierce's attention. Pierce stated that he

9

IMP00716

was very impressed with Carr's track record at TC and wanted Carr to remain involved to grow the business. Pierce and Huntley stated that they valued TC at $8.2 million. Pierce proposed to pay approximately $4 million for a 51% interest in TC Transport. Pierce also assured Carr that he would be employed as President of Logisteq at an annual salary of $200,000 plus fringe benefits.

37.    In light of his prior experience with US Delivery, Carr was very reluctant to sell a majority stake in TC, which he had founded and built from scratch. Ultimately, however, Carr concluded that TC needed a significant infusion of cash if it were to continue to grow to reduce its need for expensive factoring of receivables which was costing TC more than $600,000 annually. In addition, if TC were to expand its coffee warehousing business, it needed to purchase or lease a large facility, such as the Anchor Glass property, which TC could not finance through conventional means. Later, Pierce increased his offer from $4.0 million to $4.1 million for a 51% interest in the company.

38.    As a result of TC's inability to expand its business in Freehold, it leased approximately 150,000 ft² in a building at 4000 Bordentown Road in Sayreville to store coffee beans, and over time has expanded its occupancy of the building to approximately 700,000 ft².

39.    In approximately August, 2000, DiIanni came to see Carr to try to persuade him to accept Pierce's offer to acquire a 51% interest in TC and to purchase the Anchor Glass property in Aberdeen Township. DiIanni

10

IMP00717

proceeded to lavish praise on Pierce, telling Carr that all he does is "help people". DiIanni also stated that Pierce "really got f----d" by Iron Mountain after the acquisition and that PLC should have bought Iron Mountain, rather than the other way around. DiIanni referred to Iron Mountain as "evil". Carr was somewhat receptive to his opinions, as he had recently been told by the late Jim Johnson of Iron Mountain that it wanted the space back which TC leased at the Freehold facility.

40.   During that same meeting, DiIanni told Carr that "we [*i.e.*, the former senior management at PLC] are all getting together." DiIanni told Carr that he, Pierce and others were forming an archives and records management company called Sequedex and that "we will take all of their [*i.e.*, Iron Mountain's] major accounts back from them in all the major cities."

41.   Sequedex is another company in which Defendant Pioneer or Defendant Pierce, upon information and belief, has a controlling interest. Thus, Defendant Pierce, upon information and belief, controls Sequedex either directly or through his position as President of Pioneer Genpar.

42.   In the same meeting, DiIanni told Carr that Pierce had a "major favor" to ask of him. DiIanni asked Carr if he would arrange to "bring the union [*i.e.*, the Teamsters] back and unionize Iron Mountain" so that it would have to raise its prices for records storage services to its customers. DiIanni explained that he and Pierce had a plan to unionize Iron Mountain first at Freehold, then at other locations in New Jersey and Pennsylvania

11

and ultimately across the entire country. Carr then arranged a meeting with Pierce, DiIanni, and his late father's friend at Local 560 of the Teamsters to facilitate Pierce's attempt to unionize Iron Mountain in Freehold and elsewhere. At that meeting, Pierce provided Local 560 with substantial, individually identifiable employee information about Iron Mountain.

43. During the late summer of 2000, Pierce continued to express to Carr an interest in acquiring the Anchor Glass facility in Aberdeen Township. During the course of a meeting between Carr and Pierce, Pierce complained bitterly that "I was screwed by Iron Mountain – they put a knife in my back!" Pierce continued by stating that "I am starting Sequedex" and that "we'll get Aberdeen [*i.e.*, the Anchor Glass facility] and start there."

44. Carr continued to be reluctant to accept Pierce's offer to acquire 51% of TC and its related companies. However, given TC's cash needs and its especially acute need to acquire additional warehouse space for coffee storage, in approximately November 2000, Carr accepted Pierce's offer. A closing was scheduled and took place on or about January 15, 2001.

45. Another inducement offered by Pierce to Carr to convince Carr to agree to the transaction was that Pierce told Carr that Carr would never be required to personally guarantee Logisteq's debts. The issue of personal guarantees was important to Carr since, as TC's sole shareholder, he previously was

12

required to personally guarantee substantially all of TC's financial obligations.

46.  In agreeing to the transaction, Carr's expectations were that he would continue to be President of Logisteq in order to protect TC's 49% ownership interest in Logisteq.   Pierce agreed with Carr's expectations by offering him the Presidency and maintaining Carr's salary and benefit package after the closing.

47.  Carr would not have agreed to maintaining a 49% ownership interest, valued at approximately $4 million by Pierce, unless Pierce allowed him to control the day-to-day operations of Logisteq as President.

48.  Shortly after the closing, Pierce told Carr that DiIanni, who had quit his job with Iron Mountain the previous autumn, would become an executive officer of Logisteq.  Carr was surprised, but at that point did not have any negative feelings toward DiIanni.  As the months progressed, Carr observed various actions on DiIanni's part, some including violence and threats of violence towards Iron Mountain personnel in Freehold and others.  In addition, it appeared that DiIanni was spending as much, if not more, of his time providing transportation services and other assistance to Sequedex than he was for Logisteq.

49.  In the fall of 2001, Pierce used his majority position to force DiIanni onto Carr as the Chief Executive Officer of Logisteq, telling Carr that "you should let us run the operation and you run sales.". After that point, DiIanni began to run the day-to-day operations of Logisteq and entirely

13

usurp Carr's authority by, including but not limited, to telling Logisteq's employees that they were to follow his directions not Carr's.

50.    In addition, during calendar year 2001, Pierce used his control position at Logisteq to cause it to hire approximately 10 to 12 individuals, at an annual salary cost in excess of $500,000. These employees performed most if not all of their work for Sequedex and performed few if any services for Logisteq. These Sequedex employees on Logisteq's payroll included Sandra Cole, Arturo Sanchez, and Ettle Rickets. Carr was told that Logisteq needed to hire some of these employees, who had worked at Iron Mountain, because they had non-compete agreements which prohibited them from working for Sequedex directly. Pierce also caused Logisteq to perform hauling services for Sequedex at little or no charge. Pierce did loan funds to Logisteq to cover some of these expenses. However, Logisteq is required to repay Pierce under the terms of the Notes.

51.    On several occasions, Carr verbally complained to Pierce about the expenses which Logisteq was being required to incur for Sequedex's hidden employees. Pierce consistently replied that Carr should "be patient" because there is a "bigger picture" than just Logisteq and even promised that Carr would be granted an ownership interest in Sequedex. Pierce told Carr that the "bigger picture" was to foster the growth of Sequedex. As a result, three or four Logisteq trailers were repainted with the Sequedex name and given to Sequedex with no benefit or payment to

14

IMP00721

Logisteq.  At several meetings attended by Carr, Michael Gold, the CEO of Sequedex, along with Pierce and DiIanni, spoke directly of a plan to combine Logisteq with Sequedex as soon as Pierce could do so without violating his non-compete obligations to Iron Mountain.  These same individuals explained that their ultimate goal was to overtake Iron Mountain and "bring Iron Mountain down" within ten (10) years.

52.    During 2001, Logisteq continued to attempt to acquire the Anchor Glass property in Aberdeen Township.  A purchase and sale agreement was signed.  However, in order to close the purchase several environmental and water quality issues needed to be resolved.  In addition, it was going to be necessary to invest substantial sums in improvements in order to convert it into a licensed coffee warehouse.  Pierce put DiIanni in charge of acquiring the Anchor Glass property.

53.    Carr introduced DiIanni and Pierce to Jeff Stern, a local contractor.  Stern told Carr that DiIanni required a $300,000 kickback to him personally if Stern was going to receive the contract for improvements to the Anchor Glass property.  Unfortunately, the purchase could not be completed after DiIanni provoked an argument with a local fire inspector which resulted in the Aberdeen Township authorities closing the entire property.

54.    DiIanni's actions cost Logisteq several million dollars in revenue since Logisteq would have taken over Anchor Glass' warehouse operations if the purchase had been consummated.

15

IMP00722

55. In July 2001, Logisteq acquired a leased warehouse in Miami supposedly for coffee storage. The lease was in Logisteq's name and personally guaranteed jointly by both Pierce and Carr. Pierce told Carr that the Miami warehouse would actually be used for Sequedex' records storage operations in Miami. However, Iron Mountain initiated suit in Florida against Sequedex and one of its employee who was bound by a restrictive covenant agreement which effectively postponed Sequedex's records storage operation in Florida. Without the Sequedex operation in Florida, the building remained empty for several months, at a substantial cost to Logisteq, since the prime season for importing coffee beans into the United States runs from February through June and that period had already passed when the Miami lease was signed.

56. As a result of the inability to acquire the Anchor Glass property, the problems with the warehouse space in Miami and the Sequedex employees on Logisteq's payroll, Logisteq lost nearly $1 million in 2001 even though revenues had increased to approximately $10 million.

57. By the fall of 2001, Pierce was very concerned about Sequedex' growth as he related to Carr that its plans for expansion into Denver and Miami were "on hold" and its plans to open a records centers in Connecticut had been significantly delayed. Pierce assured Carr, however, that he would benefit in time as "Sequedex will become a very big company" and "Logisteq will also become a very big company."

16

58. During 2001, Logisteq was short of cash again, due largely to the increased expenses it had incurred to assist Sequedex and the costs it paid to acquire real estate in Miami and to attempt to acquire the Anchor Glass property. Pierce proposed that Logisteq obtain a $3 million line of credit from Commerce Bank. Despite Pierce's prior promise to Carr that he "would never have to sign personally for anything", Pierce required Carr to guarantee 49% of Logisteq's debt to Commerce Bank. Pierce also insisted that Carr loan an additional $250,000 to Logisteq, as did Pierce.

59. By late 2001, many long-time Logisteq employees who had worked for TC prior to Pierce's acquisition had become very disillusioned with DiIanni's management of the day to day operations of Logisteq. Two key employees threatened to quit if DiIanni wasn't removed. In addition, in late 2001, a woman who worked in Logisteq's office threatened to assert a sexual harassment claim as a result of rude and crude remarks which DiIanni directed to her.

60. DiIanni was also charged with assault after a physical confrontation with an Iron Mountain employee in Freehold who DiIanni shoved. That matter resulted in charges being filed against DiIanni in Freehold Township Municipal Court.

61. On Friday, January 25, 2002, upon returning from a business trip to Canada, Carr had a heated conversation with DiIanni. Carr threatened to discharge DiIanni from Logisteq, to which DiIanni replied "you're full of s--t!" Carr explained to him that he had been told that DiIanni had been

17

soliciting bribes. DiIanni, becoming very h___ __ __ told Carr, "Do you want
to live? If you dare tell Peter [Pierce], you won't need to talk again."
DiIanni only left Logisteq's premises when C___ threatened to call the
local police.

62.    Shortly after that meeting, Carr called Pierce. ___ _n Carr told Pierce that
he had fired DiIanni, Pierce replied, "well, Tommy, we need to talk about
it." Carr told Pierce that he felt that he had b___ __'d to, deceived and
cheated by him and DiIanni. Carr and Pierce ___ _uded the conversation
by agreeing to meet the following Tuesday, J___ __/ 29, 2002.

63.    On Monday, January 28, 2002, DiIanni retur___ __ he Logisteq office like
nothing had happened the prior Friday. When ___ ___-site manager called
Carr to report that DiIanni had returned, Carr ___urned to the office.
DiIanni told Carr that he had no authority to fire him, stating "you can't
fire me. Me and Peter are like blood."

64.    Carr became angry and immediately called Pie___ __o told Carr to "calm
down." When Carr asked why DiIanni was bac___ __ Logisteq's premises,
Pierce responded that "we need to talk about a b___-_ut of Mike
[DiIanni]." Carr informed Pierce that DiIanni l___ __en stealing from him
for years and relayed what Jeff Stern had told h___ __out DiIanni soliciting
bribes. Pierce had no reaction.

65.    On Tuesday, January 29, 2002, a meeting was l___ __ Logisteq's offices in
Freehold involving Pierce, DiIanni, Douglas He___ __ (Pierce's financial
assistant) and another Pierce employee Alan M___ __h. The meeting lasted

18

approximately an hour. A significant portion of that meeting was devoted to Carr's demand that Sequedex personnel be removed from Logisteq's payroll and that Sequedex be required to repay the costs which Logisteq had incurred on its behalf. Although Pierce refused to take any action to force Sequedex to repay the advances, he did agree that Sequedex personnel costs would no longer be charged to Logisteq.

66.   During the course of the January 29, 2002, meeting, Pierce said that he would soon be walking away from Telespectrum Worldwide, Inc, another company in which Pierce is involved, in order to "focus on Sequedex and Logisteq." He indicated that he would be willing to exercise an option to buy the property in Sayreville where Logisteq already leased approximately 750,000 ft² for $20 million.

67.   In March 2002, Pierce came to Carr and demanded that Carr make a capital contribution to Logisteq of $900,000 in order to meet Logisteq's cash flow requirements for 2002.

68.   Pierce indicated that if Carr did not make this capital contribution that Pierce would terminate Carr's employment with Logisteq.

69.   Rather than make such a large capital contribution and remain partners with Pierce whom he no longer trusted, Carr attempted to negotiate the purchase of Pierce's 51% interest in Logisteq. However, Pierce's asking price has been unreasonable in light of Logisteq's current financial situation and the fact that Pierce, for the benefit of Sequedex, has caused Logisteq to pay out several hundred thousand dollars in cash for no

19

corresponding benefit to Logisteq. Pierce demanded that Carr pay Pierce $4.2 million dollars in cash plus remove Pierce as personal guarantor of all Logisteq debt prior to closing. Pierce also demanded that Carr agree to retain one of Pierce's long time employees, Alan McGrath, as President of Logisteq after closing.

70. On April 2, 2002, Pierce sent an e-mail to Carr's attorney stating that he will terminate Carr's employment effective April 8, 2002 allegedly because of the financial problems at Logisteq. A true copy of Pierce's April 2, 2002 e-mail is attached hereto as Exhibit 1.

71. Despite the financial problems to which Pierce refers, without Carr's prior knowledge and around the time Pierce was demanding that Carr provide $900,000 to Logisteq, Pierce raised the salary of Alan McGrath from $80,000 to $100,000 per year.

72. Pierce's April 2, 2002 e-mail does not address: (a) how Carr's 49% interest in Logisteq will be protected after Carr's employment is terminated, (b) what Pierce will do about the Logisteq debt personally guaranteed by Carr, (c) how Logisteq will repay the $250,000 loaned by Carr during 2001 or (d) what Pierce intends to do about the Logisteq funds that were paid out for the benefit of Sequedex. In fact, Pierce makes no acknowledgement of the fact that Carr and TC own 49% of Logisteq. Rather, Pierce proceeds on the erroneous assumption that Carr is merely at at-will employee whom Pierce can fire and be done with.

20

IMP00727

## COUNT I

## APPOINTMENT OF A CUSTODIAL RECEIVER FOR LOGISTEQ, LLC

73. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 to 72 above as if more fully set forth herein.

74. Since the formation of Logisteq by Pierce in January 2001, Pierce has abused Logisteq, Carr and TC by using Logisteq as part of his scheme to gain revenge against Iron Mountain, avoid his non-compete agreement and breach his fiduciary obligations. Pierce has abused Logisteq's personnel, money and assets to one end, i.e., to support Sequedex.

75. As a result of Pierce's actions, Logisteq has lost money to the detriment of Carr and TC. Despite requests by Carr, Pierce has refused to take action to recover the funds and assets diverted from Logisteq to the benefit of Sequedex.

76. Pierce has oppressed TC and Carr by using his majority control position in TC to cause Logisteq to lose money to support Sequedex, forced Carr out as President of Logisteq and put DiIanni in his place, forced Carr to personally guarantee certain of Logisteq's financial obligations, and is now threatening to terminate Carr's employment entirely.

77. Due to Pierce's oppression of Carr and TC, the diversion of Logisteq's assets to benefit Sequedex, TC and Carr have been financially damaged. Further, TC and Carr are being threatened with irreparable harm to their

21

interest in Logisteq by Pierce's threats to freeze Carr out by terminating his employment, a step that will further operate to harm Logisteq.

78. Without judicial intervention, TC and Carr's 49% interest in Logisteq is threatened with destruction by defendants since Carr will have no access nor input into the operations of Logisteq.

WHEREFORE, Carr and TC demand judgment on this Count and the appointment of a Custodial Receiver for Logisteq, pendente lite, a preliminary injunction precluding defendants from terminating Carr's employment with Logisteq and such other relief as the Court deems equitable and proper.

## COUNT II

### UNJUST ENRICHMENT

79. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 to 78 as if more fully set forth herein.

80. Defendants have been unjustly enriched by the diversion of Logisteq's funds and assets to Sequedex to the detriment of Carr and TC.

81. As a result of Defendant's unjust enrichment, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand judgment on this Count against defendants for damages, punitive damages, an accounting, reasonable costs and attorney fees and for such other relief as the Court deems equitable and proper.

22

IMP00729

## COUNT III

## BREACH OF FIDUCIARY DUTY

82. Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1 to 81 as if more fully set forth herein.

83. By abusing his majority position in Logisteq to further his revenge scheme against Iron Mountain, Pierce and the other Defendants have oppressed Plaintiffs and breached their fiduciary obligations to Logisteq and to Plaintiffs.

84. Defendants have abused Logisteq as part of their plan to avoid Pierce's non-competition agreement with and fiduciary obligations to Iron Mountain by using Sequedex and Logisteq as corporate shells to further Pierce's illegal activities.

85. Defendants' actions have been unfair, oppressive, and unlawful to TC and Carr by destroying TC's and Carr's legitimate expectations when Carr agreed to Pierce's proposal to purchase 51% of Logisteq.

86. Defendants' actions have been unfair, oppressive, and unlawful to TC and Carr in that Logisteq has been losing money as a result of Pierce's diversion of Logisteq's assets and money to support his related company Sequedex in its illegal activities.

87. Defendants' are threatening to terminate Carr's employment with Logisteq which, without judicial intervention, would result in a complete freeze-out of Carr and TC from the affairs of Logisteq to the irreparable harm of Plaintiffs and Logisteq.

04/04/2002 THU 14:01  [TX/RX NO 6651]  ☒024

IMP00730

WHEREFORE, Plaintiffs demand judgment on this Count against Defendants for damages, punitive damages, an accounting, attorney fees and costs and an order directing defendants to sell their membership interest in Logisteq to Plaintiffs at fair value at a date deemed equitable by the Court plus any adjustments to the fair value deemed equitable by the Court plus such further relief as the Court deems equitable and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand trial by jury on all issues so triable.

### CERTIFICATION PURSUANT TO RULE 4:5-1

Pursuant to New Jersey Court Rule 4:5-1, it is stated that the matter in controversy is not the subject of any other action pending in any other court or of a pending arbitration proceeding to the best of our knowledge or belief. Also, to the best of our belief, no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this pleading, we know of no other parties that should be joined in the above action. In addition, we recognize the continuing obligation of each party to file and serve on all parties and the court an amended certification if there is a change in the facts stated in the original certification.

### DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:5-1(c), Arthur M. Peslak is designated as trial counsel for the Plaintiffs in this matter.

April 3, 2002

**Mandel & Peslak, LLC**
**Attorneys for Plaintiffs**

BY: _____

24

IMP00731

## VERIFICATION

I, Thomas Carr, being of full age states:

1)  I am a named Plaintiff in this matter and the President of Co-Plaintiff

   Transportation Concepts of New Jersey, Inc.

2)  I have read the foregoing Verified Complaint, and I hereby certify that all

   allegations contained therein are true and correct.

3)  I understand that if any of the foregoing statements made by me are willfully

   false, I am subject to punishment.


BY:  _Thomas Carr_


Dated: April 3, 2002

04/04/2002  14:17    7327611611                    MANUEL & PESCA, PC

**EXHIBIT 1**

IMP00733

04/04/2002  14:30   7327611611                      MANUEL & FELGA /12

Subj:      **Logisteq**
Date:      4/2/02 9:39:34 AM Eastern Standard Time
From:      ppierce@telespectrum.com
To:        APeslak@aol.com
CC:        dhun001@aol.com, mcgrathalan@aol.com

To Tom Carr (c/o Art Peslak):

Not having heard back from you regarding our final offer for you to buy back
my 51% interest in Logisteq, I'm assuming it was unacceptable.

Given the company's current need for additional cash I am preparing to take
the following and immediate actions:

-     Effective Monday, April 8, 2002 due to the company's
desperate cash requirements we are forced to lay you off
-     Pioneer Capital will continue to fund the company's short
term cash needs

Tom, this is consistent with our discussions over the last several weeks. We
have a business to run and a major investment to protect and we are taking
the necessary steps to do that.

In closing if you are interested in buying back the business on an all cash
basis our offer still stands.  Meaning our current offer plus any additional
investment that we make in the company.

Please don't bother wasting our time with any offers other than all cash at
closing.

Regards,

Peter Pierce

J. Peter Pierce
Chairman & CEO
TeleSpectrum Worldwide
443 South Gulph Rd.
King of Prussia, PA  19406
Tel: 610-878-7650
Fax: 610-878-7475


<!DOCTYPE HTML PUBLIC "-//W3C//DTD HTML 3.2//EN">

<HEAD>
<META HTTP-EQUIV="Content-Type" CONTENT="text/html; charset=iso-8859-1">
<META NAME="Generator" CONTENT="MS Exchange Server version 5.5.2654.89">
<TITLE>Logisteq</TITLE>
</HEAD>


To Tom Carr (c/o Art Peslak):

04/04/2002 THU 14:14  [TX/RX NO 6653]  ☑002

IMP00734

Not having heard back from you regarding our final offer for you to buy back my 51% interest in Logisteq, I'm assuming it was unacceptable.

Given the company's current need for additional cash I am preparing to take the following and immediate actions:

         -         Effective Monday, April 8, 2002 due to the company's desperate cash requirements we are forced to lay you off

         -         Pioneer Capital will continue to fund the company's short term cash needs

Tom, this is consistent with our discussions over the last several weeks. We have a business to run and a major investment to protect and we are taking the necessary steps to do that.

In closing if you are interested in buying back the business on an all cash basis our offer still stands.  Meaning our current offer plus any additional investment that we make in the company.

Please don't bother wasting our time with any offers other than all cash at closing.

Regards,


Peter Pierce


J. Peter Pierce

Chairman &amp; CEO
TeleSpectrum Worldwide
443 South Gulph Rd.
King of Prussia, PA  19406
Tel: 610-878-7650
Fax: 610-878-7475

--------------- Headers ---------------
Return-Path: <ppierce@telespectrum.com>
Received: from  rly-xh05.mail.aol.com (rly-xh05.mail.aol.com [172.20.115.234]) by air-xh04.mail.aol.com (v84.10) with ESMTP id MAILINXH44-0402093934; Tue, 02 Apr 2002 09:39:34 -0500
Received: from  KOPMAIL01.tlsp.com ([64.212.154.200]) by rly-xh05.mail.aol.com (v84.10) with ESMTP id MAILRELAYINXH56-0402093857; Tue, 02 Apr 2002 09:38:57 -0500
Received: by kopmail01.tlsp.com with Internet Mail Service (5.5.2653.19)
      id <HYMXZVXL>; Tue, 2 Apr 2002 09:37:40 -0500
Message-ID: <C73E2EEF7A4B44429FE07746AB094F0B04F42574@kopmail01.tlsp.com>
From: ppierce@telespectrum.com
To: APeslak@aol.com
Cc: dhun001@aol.com, mcgrathalan@aol.com

Subject: Logisteq
Date: Tue, 2 Apr 2002 09:37:32 -0500
MIME-Version: 1.0
X-Mailer: Internet Mail Service (5.5.2653.19)
Content-Type: multipart/alternative;
     boundary="----_=_NextPart_001_01C1DA53.EC624B10"

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED;<br>et al.<br><br>Plaintiffs and,<br>Counter-Defendants<br>v.<br><br>THOMAS CARR,<br><br>Defendant and<br>Counter-Plaintiff | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 05 10890 RCL |

**DEFENDANT AND COUNTER-PLAINTIFF THOMAS CARR'S**
**FOURTH AMENDED INITIAL DISCLOSURES**

Defendant and Counter-Plaintiff Thomas Carr ("Carr"), by and through undersigned counsel and pursuant to Rule 26(a) of the federal Rules of Civil Procedure and Local Rule 26.2, hereby provides the following initial disclosures. These disclosures are made without waiving any rights and/or objections as to competency, relevancy, materiality, privilege, confidentiality and/or admissibility as evidence in this or any related proceeding.

**Rule 26(a)(1)(A) Disclosures**

Carr identifies the following entities and individuals likely to have discoverable information that Carr may use to support his claim or defenses relating to, but not limited to the contractual relationship between Carr and the Plaintiffs and Counterclaim Defendants as well as the communications amongst the parties and various third parties.

1)     Iron Mountain Incorporated

4873985

Iron Mountain Incorporated, through its corporate representatives and/or one or more

of the witnesses listed in paragraphs three through seven below, will testify

concerning the promises and contractual obligations made to Carr in exchange for

Carr's assistance with and participation in efforts against Pierce.  In addition, Iron

Mountain Incorporated will testify to Carr's fulfillment of his obligations under the

agreements and its own breach of the parties' oral agreement.

2)      Iron Mountain Information Management, Inc.

Iron Mountain Information Management, Inc., through its corporate representatives

and/or one or more of the witnesses listed in the paragraphs three through seven

below, will testify concerning the promises and contractual obligations made to Carr

in exchange for Carr's assistance with and participation in efforts against Pierce.  In

addition, Iron Mountain Information Management, Inc. will testify to Carr's

fulfillment of his obligations under the agreements and its own breach of the parties'

oral agreement.

3)      C. Richard Reese

As described more fully in paragraphs 18 and 20 of Counter-Plaintiff's Second

Amended Counterclaim ("SAC"), C. Richard Reese will testify concerning the

promises and contractual obligations made to Carr in exchange for Carr's assistance

with and participation in efforts against Pierce.  In addition, Reese will testify to

Carr's fulfillment of his obligations under the agreements and its own breach of the

parties' oral agreement.

4)      John F. Kenny, Jr.

As described more fully in paragraphs 18, 20, 22, and 23 of the SAC, John F. Kenny Jr. will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Iron Mountain Incorporated will testify to Carr's fulfillment of his obligations under the agreements and its own breach of the parties' oral agreement.

5)     Gary Watzke

As described more fully in paragraphs 18, 19, and 27 of the SAC, Gary Watzke will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Watzke will testify to Carr's fulfillment of his obligations under the agreements and its own breach of the parties' oral agreement.

6)     Larry L. Varn

As described more fully in paragraphs 20, 29, and 30 of the SAC, Larry L. Varne will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Varn will testify to Carr's fulfillment of his obligations under the agreements and its own breach of the parties' oral agreement.

7)     Charles G. Moore

As described more fully in paragraphs 28 and 29 of the SAC, Charles Moore will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Moore will testify to Carr's fulfillment of his obligations under the agreements and its own breach of the parties' oral agreement.

8)    James Neebling
      571 West Lake Avenue; Suite 5
      Bayhead, NJ 08742
      (732) 295-9914

James Neebling will testify concerning the promises and contractual obligations made

to Carr in exchange for Carr's assistance with and participation in efforts against

Pierce.  In particular, Neebling will testify concerning promises made to Carr

concerning Neebling's company, Systrans, Inc.  In addition, Neebling will testify to

Carr's fulfillment of his obligations under the parties' oral agreements and Iron

Mountain's breach of those agreements.  Specifically, he will testify how he and Carr

helped develop Iron Mountain's case against Pierce.  Finally, as he stated at his

deposition in this case (started February 27, finished March 14, 2007), Neebling will

corroborate Carr's allegations, specifically with regard to contractual obligations the

Counter-Defendants undertook at particular meetings and the investments that Carr

made in Systrans (which Carr lost when Iron Mountain breached its agreements).

9)    Arthur Peslak
      80 Scenic Drive, Suite 5
      Freehold, NJ  07728
      (732) 761-1610

As described more fully in paragraphs 19, 20, and 27 of the SAC, Arthur Peslak will

testify concerning the promises and contractual obligations made to Carr in exchange

for Carr's assistance with and participation in efforts against Pierce.  In particular,

Peslak will testify concerning Carr's lawsuit against Peter Pierce and the promises of

Counter-Defendants to fund that lawsuit.  In addition, Peslak will testify to Carr's

fulfillment of his obligations under the agreements and its own breach of the parties'

oral agreement.  He will also testify as to Varn's preparation of Carr to testify at the

Iron Mountain-Pierce arbitration.  Finally, as he stated at his March 14, 2007

4873985                              4

deposition in this case, Peslak will corroborate Carr's allegations with regard to contractual obligations the Counterclaim Defendants undertook at certain meetings and during certain telephone calls.

10)    Judy Carr
        152 Chestnut Way
        Manalapan, NJ 07726
        (732) 617-5925

Judy Carr will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In particular, Mrs. Carr will testify concerning the events described more fully in paragraph 23 of the SAC. Specifically—and as she testified at her March 8, 2007 deposition in this case—she will testify of phone calls made to her by Kenny and John Hayden (identified below) to assure her that Iron Mountain would compensate her husband financially for his efforts in their case against Pierce. In addition, Mrs. Carr will testify to Carr's fulfillment of his obligation under the agreements and the Counter-Defendants' breaches of the parties' oral agreements.

11)    Paul Schwartz
        976 Wateredge Place
        Hewlett, NY  11557-2612
        (516) 374-6530

Paul Schwartz will testify concerning Counterclaim Defendants' assurances that Carr was a good candidate to receive a financial loan from Schwartz because of money and revenue promised to Carr by the Counter-Defendants. More specifically—and as he stated at his March 8, 2007 deposition in this case—Schwartz will testify that, in March 2003, after Carr had requested a $500,000 loan to capitalize the Systrans venture with Neebling, Varn called Schwartz to confirm that Iron Mountain would

provide Systrans with tens of millions of dollars of business ($45 million per year).
This phone call followed on a previous negotiation with Carr about Carr's request for
an extension of time to repay an earlier $500,000 loan that Schwartz had made to
Logisteq on Carr's personal guarantee. Schwartz will testify that he agreed to this
extension only after performing due diligence on Carr's statement that Iron Mountain
would be hiring him as a consultant and had agreed to invest in certain coffee
distributorships with Carr. Schwartz will testify that he would never have made the
new loan—or extended the term of the older one—if he had not received assurances
from Iron Mountain. Finally, Schwartz will testify that he stopped receiving
assurances from the Counter-Defendants once Iron Mountain lost its arbitration
against Pierce.

12)    Michael Chazen
       4400 Route 9 South, Ste. 1000
       Freehold, NJ 07728
       (732) 303-0808

Michael Chazen will testify concerning the promises and contractual obligations
made to Carr in exchange for Carr's assistance with and participation in efforts
against Pierce. Chazen will testify about the arbitration against Pierce and Carr's
assistance to IM in that regard. In addition, Chazen will testify to Carr's fulfillment
of his obligations under the agreements and the Counter-Defendants' breaches of the
parties' oral agreements. He will also testify that he would not have agreed to
testify—without a subpoena—in the Pierce arbitration if Larry Varn had not made
certain assurances to him. Specifically, Chazen will testify that Varn, by e-mail and
over the phone, assured him that Carr would be "taken care of," and that Varn's

assurances only confirmed what Carr has been telling him about IM's agreement to pay off Carr's debts and hire Carr.

13)  Vincent Brana
     c/o Velocity Express
     80 Wesley St.
     So. Hackensack, NJ 07606
     (201) 487-7443

Vincent Brana will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Brana will testify to agreements that he personally entered into with the Counter-Defendants, which were similar to those entered into by Carr. Brana will also testify to Carr's fulfillment of his obligations under the agreements and the Counter-Defendants' breaches of the parties' oral agreements. More specifically, Brana will testify that he had many meetings, dinners, and phone conversations with Varn over a period of about six months in 2002. He will testify that Varn repeatedly and continually promised that Brana would be receiving up to $15 million of business per year from Iron Mountain (as a subcontractor for Carr and Neebling)—that Iron Mountain would specifically direct its business to Brana's company. Finally, Brana will testify that he stopped receiving entreaties and assurances from the Counter-Defendants once Iron Mountain lost its arbitration against Pierce.

14)  Tammy Phillips-Kahn
     12 Alden Terrace
     Howell, NJ 07731-1531
     (908) 692-5179

Tammy Phillips-Kahn will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in

4873985                                    7

efforts against Pierce. In particular Phillips-Kahn will testify concerning the February

2002 meeting at the Waldorf-Astoria hotel in New York between Carr and the

Counter-Defendants, which is described more fully in the SAC. She will testify that

Watzke, Kenny, and Varn assured her and Carr that they would have jobs if Pierce

closed Logisteq and fired them. She will also testify that, around the time of Varn's

preparation of her for testifying at the Pierce arbitration, Varn assured her that if she

and Carr helped IM in its case against Pierce, IM would help them. Finally, Phillips-

Kahn will testify to Carr's fulfillment of his obligations under the parties' oral

agreements and the Counter-Defendants' breaches of those oral agreements.

15)    Arturo Soto
       2 Charlestown Ct.
       Maulvin, S.C. 29662
       (732) 642-5190

Arturo Soto will testify concerning the promises and contractual obligations made to

Carr in exchange for Carr's assistance with and participation in efforts against Pierce.

In addition, Soto will testify about agreements that he entered into with Counter-

Defendants, which were similar to those entered into by Carr—assistance with the

Pierce case in exchange for financial and employment assistance—and that IM

similarly breached these agreements after the Pierce arbitration. Soto will also testify

to Carr's fulfillment of his obligations under the agreements and the Counter-

Defendants' breaches of the parties' oral agreements.

16)    John Hayden
       Address to be provided

John Hayden will testify concerning the promises and contractual obligations made to

Carr in exchange for Carr's assistance with and participation in efforts against Pierce.

In particular, Hayden will testify concerning certain meetings and communications described more fully in the SAC, as well as a telephone conversation about which Judy Carr testified at her deposition. In addition, Hayden will testify to Carr's fulfillment of his obligations under the agreements and the Counter-Defendants' breaches of the parties' oral agreements.

17)   Vincent Ryan
      Address to be provided

Vincent Ryan, Charman of Schooner Capital LLC, will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Ryan will testify to Carr's fulfillment of his obligations under the parties' agreements and the Counter-Defendants' breaches of those agreements.

18)   Samual Miller, Esq.
      Sullivan & Worcester LLP
      One Post Office Square
      Boston, MA  020109
      (617) 338-2800

Samuel Miller, Esq. will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In particular, Miller will testify concerning certain meetings between Carr and the Counter-Defendants described more fully in the SAC, which he attended. In addition, Miller will testify to Carr's fulfillment of his obligations under the agreements and the Counter-Defendants' breaches of the parties oral agreements.

19)   Bob Miller

Bob Miller is the President of Counter-Defendant Iron Mountain Incorporated and will testify concerning the promises and contractual obligations made to Carr in

exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Bob Miller will testify to Carr's fulfillment of his obligations under the agreements and its own breach of the parties' oral agreement.

20)    Patrick O'Hare
       Address to be provided

Patrick O'Hare will testify as to meetings between Carr, Larry Varn and Charles Moore in Miami concerning the business of Iron Mountain in Florida.

21)    Walter Hughes
       Address to be provided

Walter Hughes will testify concerning meetings between Carr, Varn and Charles Moore to discuss the business of Iron Mountain as it related to former employees of Logisteq.

22)    William Hettler
       Address to be provided

William Hettler will testify concerning meetings between himself, Carr, Varn and Charles Moore about Hettler's participation in Iron Mountain's efforts against Peter Pierce including an affidavit Hettler executed for Iron Mountain relating to Hettler's sale of property to Peter Pierce and Logisteq for record storage.

23)    Ron Shapss
       Address to be provided

Ron Shapss will testify about meetings between himself, Varn and Charles Moore that were arranged by Carr and James Neebling at the request of Iron Mountain to develop and perfect its claims against Peter Pierce.

24)    Jeff Stern
       Address to be provided

Jeff Stern will testify about meetings between himself, Varn and Charles Moore that were arranged by Carr and James Neebling at the request of Iron Mountain to develop and perfect its claims against Peter Pierce.

25)    Ron Lieberman
       Address to be provided

Ron Lieberman will testify about meetings between himself, Varn and Charles Moore that were arranged by Carr and Jim Neebling at the request of Iron Mountain to develop and perfect its claims against Peter Pierce.

**Rule 26(a)(1)(B) Disclosure:**

Carr will make available for inspection and/or copying all non-privileged or protected documents that are in its possession, custody or control and that Carr may use to support its claims or defenses.  Documents and physical evidence categories include, but are not limited to the following:

1)  Correspondence and communications between the parties;

2)  Correspondence and communications between the parties and third-parties concerning matters pertaining to this action;

3)  Correspondence between Counter-Defendant Larry Varn and James Neebling including, but not limited to, the following:

- email dated January 20, 2003
- email dated March 4, 2003
- email dated March 10, 2003
- email dated March 31, 2003
- email dated April 2, 2003
- emails dated April 14, 2003
- email dated May 4, 2003
- email dated May 19, 2003
- email dated June 10, 2003
- emails dated June 20, 2003

- emails dated June 24, 2003
- emails dated June 26, 2003
- email dated June 30, 2003
- emails dated July 1, 2003
- emails dated July 2, 2003
- email dated July 9, 2003
- emails dated July 11, 2003
- emails dated July 25, 2003
- emails dated July 29, 2003
- email dated August 14, 2003
- email dated September 8, 2003
- email dated September 10, 2003
- emails dated September 25, 2003
- email dated November 2, 2003
- email dated November 14, 2003
- email dated November 2, 2004
- email dated March 4, 2005
- email dated March 5, 2005
- email dated March 6, 2005

4)  Correspondence between Arthur Peslak and Richard Reese, including but not

    limited to, the following:

- letter from Peslak to Reese dated February 13, 2004

5)  Documents concerning the parties' promises and oral agreements;

6)  Documents concerning Carr's fulfillment of his obligations under the parties

    agreement;

7)  Documents concerning Peter Pierce and Logisteq, LLC.

8)  Documents related to Iron Mountain's legal action against Pierce including

    pleadings, drafts of pleadings, and depositions, including but not limited to the

    following:

- Deposition of John F. Kenny in Iron Mountain v. Pierce, American Arbitration
  Association, No. 4 160 00671 02
- Deposition of C. Richard Reese in Iron Mountain v. Pierce, American Arbitration
  Association, No. 4 160 00671 02

9) Documents concerning Systrans, Inc.

10) Documents relating to Paul Schwartz;

11) Documents related to legal actions involving Iron Mountain, IMIM and Peter
Pierce; and

12) Documents related to legal actions involving Carr and Peter Pierce;

Carr's identification of documents, physical evidence and tangible things under
Rule 26(a)(1)(B) is preliminary in nature. In addition, relevant documents, physical
evidence and tangible things may be found in the custody and control of the defendants in
this proceeding, various third parties identified under Rule 26(a)(1)(A) and other persons
and/or organizations to be identified during discovery.

**Rule 26(a)(1)(C) Disclosure:**

Carr's preliminary computation of damages consists of the following:

1) $250,000 paid and remaining due in legal costs and fees to Arthur Peslak in
connection with Carr's lawsuit against Peter Pierce;

2) $2 million promised to Carr to alleviate personal debts and other financial
burdens;

3) $1,250,000 in lost wages and benefits Carr would have received as a consultant
for Iron Mountain and IMIM (calculated as yearly wages of $250,000 for 5
years);

4) Lost profits from the Counter-Defendants' breach of their oral contract with Carr
and Jim Neebling to provide business in the amount of $45 million gross revenues
to Systrans Freight Systems, Inc. (in which Carr invested and was due as return on
investment 50% of total expected net profits). Conservatively, net profits from the

Systrans transportation services brokerage business would equal 7% of gross revenues or approximately $3MM per year, for five years equals $15MM one half of which is $7.5MM. For the original promise of $25MM in gross revenues annually for 5 years, the calculation would result in Carr receiving $4.3MM.

5)  $600,000, the investment in Systrans Freight Systems, Inc. that Carr lost as a result of the Counter-Defendants' breach. Obviously, this is duplicative partially of #4 above and would be part of the damage claim only if #4 was not awarded.

**Rule 26(a)(1)(D) Disclosure:**

The disclosures required by this Rule are not applicable in this case.

Dated March 22 2007

Respectfully submitted,

Read K. McCaffrey (pro hac vice)
Ilya Shapiro (pro hac vice)
rmccaffrey@pattonboggs.com
ishapiro@pattonboggs.com
Patton Boggs LLP
2550 M Street, NW
Washington, DC  20037
Telephone: (202) 457-6000

Counsel for Defendant and
Counter-Plaintiff

4873985                                   14

Certificate of Service

I certify that on this 22nd day of March, 2007, I caused to be served on the counsel

identified by e-mail and first class mail this **Defendant and Counter-Plaintiff Thomas**

**Carr's Fourth Amended Initial Disclosures.**

> Ira K. Gross (BO #12720)
> Kevin Colmey (pro hac vice)
> SULLIVAN & WORCESTER LLP
> One Post Office Square
> Boston, MA 02109
> (617) 338-2800
>
> (by first class mail)
>
> _____
> Ilya Shapiro

# EXHIBIT F

1
2

                              Volume:    I
                                Pages:    1 to 69
                                Exhibits:  6 to 15

3

4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

5

                        CIVIL ACTION NO. 05-10890 RCL

6

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

IRON MOUNTAIN, INCORPORATED, et al.,

7

                 Plaintiffs and
                 Counter-Defendants,

8

9

     vs.

THOMAS CARR,

10

                 Defendant and
                 Counter-Plaintiff.

11

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

12

13

14

          DEPOSITION OF CHARLES R. REESE, a witness

15

called on behalf of the Defendant and Counter-Plaintiff,
taken pursuant to the applicable provisions of the
Federal Rules of Civil Procedure before Cynthia A.

16

Powers, Shorthand Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the law offices of

17

Sullivan & Worcester LLP, One Post Office Square,
Boston, Massachusetts, on Thursday, November 30, 2006,

18

commencing at 1:58 p.m.

19

20

21

                 \* \* \* \* \*

22

23

              KACZYNSKI REPORTING
          72 CHANDLER STREET, SUITE 3

24

         BOSTON, MASSACHUSETTS 02116
            (617) 426-6060

2

```
 1    APPEARANCES:

 2           SULLIVAN & WORCESTER LLP
              Ira K. Gross, Esquire
 3            One Post Office Square
              Boston, Massachusetts 02109
 4            (617) 338-2823
              Representing Iron Mountain, et al.
 5
              PATTON BOGGS LLP
 6            Read K. McCaffrey, Esquire
              Ilya Shapiro, Esquire
 7            2550 M Street, NW
              Washington, D.C. 20037-1350
 8            (202) 457-6000
              Representing Thomas Carr
 9
      ALSO PRESENT:
10
              Thomas Carr
11            James Neebling
              Larry L. Varn
12

13

14

15

16

17

18

19

20

21

22

23

24
```

3

1                        I N D E X
     Examination by:    Direct    Cross    Redirect    Recross
2      Mr. McCaffrey       4

3

4

5

6

7

8

9

10                      E X H I B I T S
     Exhibit                                                Page
11
       6              Defendant's Notice of Deposition        9
12                    Duces Tecum

13     7              List of Iron Mountain-Carr             10
                      Meetings Attended by Reese
14
       8              Memorandum dated October 18, 2001      12
15
       9              Transcript dated July 28, 2003         17
16
       10             Defendant's/Counter-Plaintiff's        23
17                    Second Amended Counter-Claim

18     11             Defendant and Counter-Plaintiff        35
                      Thomas Carr's Second Amended
19                    Initial Disclosures

20     12             Letter dated February 13, 2004         37

21     13             Declaration of Arthur M. Peslak        40

22     14             Transcript of Reese deposition         43
                      on 12/16/02
23
       15             Master List of Iron Mountain-          62
24                    Carr Meetings

4

1               P R O C E E D I N G S

2               CHARLES R. REESE,

3

4          having been satisfactorily identified

5           and duly sworn by the Notary Public,

6          was examined and testified as follows:

7

8               DIRECT EXAMINATION

9    BY MR. McCAFFREY:

10          Q.    Would you state your full name and

11   address for the record?

12          A.    Charles Richard Reese, 100 Belvidere

13   Street, Boston, Mass.

14          MR. GROSS:  Excuse me one second, Read.

15   Do we have the same stipulation that we had at

16   Mr. Varn's deposition?

17          MR. McCAFFREY:  I think that would be

18   fine.  By the way, Ira, I forget what the answer to this

19   is, are we marking these exhibits consecutively or for

20   each of the depositions; in other words, would that be

21   Reese 1?

22          (Discussion held off the record)

23   BY MR. McCAFFREY:

24          Q.    Without giving me too much detail, give

27

1    times from the very first time I met him to give us

2    information and often times did over and over.  We told

3    him in the first meeting, we told him in the other

4    meetings, and including this one, that we will listen,

5    but there is no payment for that information and, you

6    know, there are no promises.

7           Q.    Did the information -- a bit redundant,

8    I'm sorry.  Did the information include the names of

9    potential witnesses?

10           MR. GROSS:  Objection.  You can answer.

11           A.    Possibly.

12           Q.    Okay.

13           A.    Possibly.

14           Q.    Possibly, all right.  Take a look at

15    paragraph --

16           A.    But not on that date, if you're

17    specifically talking about that date.

18           Q.    And I am, and I understand your answer.

19           A.    Then I don't think so.

20           Q.    All right, that's more than fair, okay.

21    Paragraph twenty, bottom of page six:  On April 9, 2002

22    at a private residence in New York -- and let me

23    parenthetically state we now know this was a restaurant

24    in New York, Giambelli's, or a name close to that.

28

1          A.     Right.

2          Q.     Carr, Neebling, and Peslak met with Larry

3     Varn, Richard Reese and John Kenny.  At this meeting

4     Varn promised that Iron Mountain would wire a fifty

5     thousand dollar retainer to Arthur Peslak,

6     Mr. Carr's counsel in disputes involving Pierce.  That

7     transaction was completed two days later.

8              What is your recollection, if any, of

9     that event on April 9, 2002?

10         A.     Meeting happened, not necessarily on the

11    date, but in April of 2002 at Giambelli's, the

12    restaurant.  The attendees, correct.  I don't believe as

13    worded in the next sentence is precisely correct; that

14    is, Mr. Varn did not, let's see how you use it, promise

15    that Iron Mountain would wire a fifty thousand dollar

16    check.  I told the group that we would put forth fifty

17    thousand dollars to help them develop evidence and

18    Mr. Varn and Mr. Peslak worked out or were told to work

19    out the mechanics and did so.

20         Q.     Okay.  Go back to what has been marked as

21    Exhibit 9.  Let me direct your attention to page 198

22    which is in the upper left-hand corner of the quad,

23    specifically at line eight.  Are you there?

24         A.     Yes.

29

1      Q.    And if it doesn't say what I'm about to

2   read, then tell me.  Well, I decided that even though

3   you have to deal with what you find, that it was in the

4   best interest of our shareholders that we would give

5   Mr. Carr's attorney, a civil attorney, fifty thousand

6   dollars to aid in their investigation because we felt

7   that what we would learn that would come forth through

8   that would be of value to us to protect our

9   shareholders.

10              Can you tell me either now or at the time

11   you were making that statement under oath what you felt

12   you might learn from your, my term, support of

13   Mr. Carr's attorney's efforts?

14              MR. GROSS:  Objection.

15      A.    As I said earlier, Tommy had told us a

16   variety of things none of which we could corroborate

17   with factual or documentary evidence, therefore, wasn't

18   doing us any good.

19              It was my understanding at the time that

20   the nature of his lawsuit was such that he would wind up

21   with subpoena power and therefore to get possible access

22   to documents and information that we probably could not

23   get access to because of the nature of our lawsuit.

24      Q.    Let me direct your attention back to

30

1    Exhibit 10 and specifically to paragraph number

2    twenty-two which is found on page seven.

3                As consideration for Carr's involvement

4    in Iron Mountain's coordinated efforts against Pierce,

5    Kenny called Carr and promised that, in exchange for his

6    participation, Iron Mountain would fund Carr's lawsuit,

7    including paying all legal fees and costs.  In addition,

8    Kenny also promised that, in exchange for Carr's

9    participation, Iron Mountain would provide business to

10   Systrans in excess of forty-five million dollars, hire

11   Carr as a consultant with the same salary and benefits

12   that he was currently making, and repay any debt that

13   Carr incurred in the process as guarantor of certain

14   obligations.

15               My question to you is whether or not you

16   had ever had any conversations with Mr. Kenny about, and

17   we'll start with this, about the payment of legal fees

18   and costs to fund Carr's lawsuit against Pierce?

19          A.    Only those related to the fifty thousand

20   dollars that we promised and delivered after the April

21   meeting and a discussion that that was all we're going

22   to do.

23          Q.    The discussion of that is all we were

24   going to do, was that in response to somebody's desire

44

1    was an Italian restaurant, learned Tommy Carr had been

2    indicted.  That's what that phrase is.  And the last one

3    says scolded him.

4                Now, I wasn't at your deposition in 2002,

5    and from what I'm reading there, I'm assuming you at the

6    time were looking at some kind of a chart or document;

7    am I correct?

8         A.    Some note, a one- or two-page scribbled

9    note of mine.

10        Q.    Of yours?

11        A.    Yes.

12        Q.    Were they produced as an exhibit, if you

13   remember?  Not produced as an exhibit, I'm sorry.  I

14   misspoke.  Were they offered up as an exhibit to this

15   deposition that's Exhibit 14?

16        A.    It's a technical question I can't give an

17   answer to.  I don't know.

18        Q.    Okay.

19        A.    I used them in the deposition.

20        Q.    I understand.

21        A.    Whatever that means.

22        Q.    That's fine.  And getting on down then to

23   line seventeen, question:  March 28th?  Answer:  Filed

24   suit on Peter.  Question:  It says --  And the answer:

45

1    Filed and then the arrow says suit on Peter and then the

2    dash gave fifty thousand dollars.  And that gave fifty

3    thousand dollars is really part of the April 9th.  Do

4    you see how there's three bullets indented?  At the

5    April 9th meeting is when we decided to fund or help

6    Tommy Carr with his suit.  That's what that means.

7                Question, that decision to, using your

8    words, fund or help Tommy Carr with his suit, unquote,

9    was made after you had learned of Mr. Carr's indictment?

10        A.    I would say more precisely it was

11   reaffirmed in my mind after, but I decided going into

12   the meeting that we would probably help him, but I did

13   not know of his indictment until right before the

14   meeting, the so-called Giambelli dinner.

15        Q.    I don't want to mince words with you

16   because we've been doing pretty well today in that

17   regard.  Question is:  When you made that decision to

18   fund or help Tommy Carr with his suit, a decision was

19   made -- well, strike that.

20                Is it correct that what you've told me is

21   the decision to help fund or help Tommy Carr with his

22   suit had been made before the meeting commenced, you

23   learned of the indictment, and you didn't change your

24   decision?

46

1          A.     Correct.

2          Q.     Now, have you ever been made aware of the

3     contention that through the good offices of Iron

4     Mountain the Carr complaint against Peter Pierce was

5     shipped to Mr. Carr while he was on vacation in

6     California by courier or some equivalent means, signed

7     by Mr. Carr, and then returned to the east coast and

8     filed?  Are you aware of the contention that Iron

9     Mountain arranged for that event to occur?

10         A.     No.  I may have read it in your

11    complaint.  If it's in there, I've read it.  I don't

12    remember it, so.

13         Q.     Did you have anything to do with those

14    arrangements being made?

15         A.     No.

16         Q.     What involvement, if any, was either

17    contemplated or actually occurred regarding the

18    involvement of Vin Ryan/Schooner in any of the Carr

19    events?

20                MR. GROSS:  Objection.

21         Q.     You can answer.

22                MR. GROSS:  Go ahead.

23         Q.     Only when he tells you you can't answer.

24         A.     Okay.  Make sure I get your question.

# EXHIBIT G

James E. Neebling

02/27/2007

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
----------------------------------------x
IRON MOUNTAIN INCORPORATED;
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.; C. RICHARD          **CERTIFIED ORIGINAL**
REESE; JOHN F. KENNY, JR.;            **LEGALINK BOSTON**
GARRY B. WATZKE; LARRY L. VARN;
and CHARLES G. MOORE,

           Plaintiffs and
           Counterclaim Defendants,

                     Civil Action
     v.                No. 05 10890 RCL

THOMAS CARR,

           Defendant and
           Counterclaim Plaintiff.
----------------------------------------x
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.

           Plaintiff,

                     Civil Action
     v.                No. 05 10999 RCL
SYSTRANS FREIGHT SYSTEMS, INC.,
           Defendant.
----------------------------------------x
              February 27, 2007
              10:15 a.m.
      Deposition of JAMES E. NEEBLING, taken by
Plaintiff, pursuant to Notice, at the offices of
Patton Boggs, LLP, One Riverfront Plaza, Newark, New
Jersey, before Denise L. Daniels, a Shorthand Reporter
and Notary Public.

James E. Neebling
02/27/2007

Page 2

```
 1

 2

        A p p e a r a n c e s :

 3

              SULLIVAN & WORCESTER, LLP

 4                    Attorneys for Plaintiffs and
                      Counterclaim Defendants

 5                    One Post Office Square
                      Boston, Massachusetts 02109

 6

              BY:   IRA K. GROSS, ESQ.

 7

 8

 9            PATTON BOGGS, LLP
                      Attorneys for Defendant and

10                    Counterclaim Plaintiff
                      2550 M Street, NW

11                    Washington, D.C. 20005

12            BY:   READ K. McCAFFREY, ESQ.
                      ILYA SHAPIRO, ESQ.

13

14

15

16   Also Present:

17        THOMAS CARR
          LARRY L. VARN

18
                            oOo

19

20

21

22

23

24

25
```

Page 3

1

2      J A M E S   E.   N E E B L I N G,

3              residing at 20 Marigold Lane, Marlboro,

4              New Jersey 07746, having been first duly

5              sworn by the Notary Public (Denise L.

6              Daniels), was examined and testified as

7              follows:

8      EXAMINATION BY

9      MR. GROSS:

10             Q.     Good morning, Mr. Neebling.  Would you

11     state your name for the record, please?

12             A.     James E. Neebling.

13             Q.     Where do you live, Mr. Neebling?

14             A.     20 Marigold Lane, Marlboro, New Jersey

15     07746.

16             Q.     Are you employed currently?

17             A.     Yes.

18             Q.     By whom?

19             A.     I work with Land Star Freight Systems.

20             Q.     What's the business of Land Star Freight

21     Systems?

22             A.     Land Star is a truckload carrier.

23             Q.     Where is its headquarters?

24             A.     Jacksonville, Florida.

25             Q.     Do you work out of that headquarters or

Page 98

1

2    It was just something that he wanted to make sure that

3    we were legally correct in our ability to now take

4    them from Logisteq.

5         Q.    **After May 9th, what was the next contact**

6    **with Iron Mountain?**

7         A.    It would have been a dinner meeting at

8    the Waldorf Astoria.  Right down the street from my

9    house.  No, I'm only kidding.

10        Q.    **That was in June?**

11        A.    That was June 10th, '02.

12        Q.    **Who was there?**

13        A.    Reese, Kenny, Varn, Carr, Neebling,

14   Peslak.  And to just clarify something from the past,

15   that may be when they were going to CNBC.  That might

16   be the day when they had to meet with analysts.  We

17   met at the Bull and the Bear.  The CFO, CEO, Varn, two

18   guys from Freehold, and I had basically sat down and

19   wanted to solicit them to do business with Systrans or

20   contemplate a deal.

21             At that point Kenny had said to me, and I

22   specifically remember this, that, "Oh, I had checked

23   with the Oracle" -- I guess Oracle was our accounting

24   system -- "and it wasn't 25 million, it was 120

25   million, but 80 million on our Oracle accounting was

James E. Neebling
02/27/2007

Page 99

1

2      for internal trucks."  So it netted out to be like a

3      40-plus million dollars opportunity.

4          Q.      Forty million for external couriers?

5          A.      External couriers, correct.

6          Q.      What else transpired?

7          A.      Well, I mean that meeting was a meeting

8      where we -- you know, it was very -- from 30,000 feet,

9      it was a very social, pretty impressive place to eat

10     dinner.  We didn't have a proposal.  Kenny was getting

11     back to me with the size of the opportunity.  I went a

12     little further with Richard explaining what I thought

13     we could do, and then we were setting up a meeting to

14     be up in Boston at a future date for me to come in

15     with something formal.

16         Q.      Up to this point, insofar as Systrans and

17     you were concerned, you were discussing with Iron

18     Mountain the possibility you might do courier business

19     for them in the future?

20         A.      Up to this point, it was just a

21     discussion, correct.

22         Q.      Did you make any kind of pitch at this

23     meeting at all?

24         A.      The one thing we had at the meeting was

25     the fact that we had known Peter's intention not to

James E. Neebling                                                02/27/2007

Page 100

1

2  let the company be bought back by Tom.

3            Now, our coffee opportunity was still in

4  the works, but we weren't buying back Logisteq.  We

5  were just looking to do the coffee roll-up with RPM

6  and Continental, and we thought we could go after the

7  business to get the business from Logisteq.  Because

8  there was no opportunity to buy Logisteq back from

9  Pierce, there was still the potential for a coffee

10 "roll-up," but that -- our destiny was lying in the

11 hands of two successful guys that will make money, the

12 owners of the other two companies.  We put a little

13 more emphasis on the courier opportunity.  Iron

14 Mountain was spending the money anyway with other

15 vendors.

16            And number 2, we were still without

17 income or the ability to have something to generate an

18 income.  Tom was losing by sticking with Iron

19 Mountain.  It wasn't a sales presentation with power,

20 but it wasn't a loosey-goosey conversation.  My

21 objective of the meeting was just to get an

22 appointment in Boston with them.  We agreed we would

23 communicate and set up something.

24       Q.     And have you told me everything that you

25 can recall now about that June 10th meeting?

Page 101

1

2      A.    The one at the Waldorf?

3      Q.    Yes.

4      A.    I'm going to say -- my objective was

5   look, we're meeting with these guys again, they're

6   pretty high level.  This is a pretty exclusive place

7   for dinner, a lot of deals get done there, it's got a

8   lot of history.  My only objective is I want to pin

9   Reese down to a meeting, get my day in court in Boston

10  so I can make my presentation.  I think we left with

11  that accomplished.

12     Q.    Did you set a date?

13     A.    I don't think we set a date.  I think he

14  left it open.  I had to go back and put something

15  together, and my recollection, it's probably in my

16  timeline when we did meet, but we were going to have

17  other meetings on the coffee so we would firm it up as

18  it developed.

19     Q.    After June 10, 2002, what was the next

20  contact that you had with Iron Mountain or its

21  representatives?

22     A.    That would have been sometime around --

23  my records say summer.  It was probably around July

24  1st, I'm going to say, 2002.  And that's when we were

25  doing the big presentation, embracing session with all

Page 110

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
-----------------------------------------x
IRON MOUNTAIN INCORPORATED;
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.; C. RICHARD
REESE; JOHN F. KENNY, JR.;
GARRY B. WATZKE; LARRY L. VARN;
and CHARLES G. MOORE,

        Plaintiffs and
        Counterclaim Defendants,

                Civil Action
     v.           No. 05 10890 RCL

THOMAS CARR,

        Defendant and
        Counterclaim Plaintiff.
-----------------------------------------x
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.

        Plaintiff,

                Civil Action
     v.           No. 05 10999 RCL
SYSTRANS FREIGHT SYSTEMS, INC.,
        Defendant.
-----------------------------------------x
              March 14, 2007
              2:30 p.m.
     Continued deposition of JAMES E. NEEBLING,
taken by Plaintiff, pursuant to Adjournment, at the
offices of Patton Boggs, LLP, One Riverfront Plaza,
Newark, New Jersey, before Denise L. Daniels, a
Shorthand Reporter and Notary Public.

CERTIFIED ORIGINAL
LEGALINK BOSTON

James E. Neebling, Vol. 2                           03/14/2007

Page 118

Q.    Tell me the first time.

A.    I've told you in my past testimony.  I
have to go back through my notes here.

      Kenny told me, Reese told me, Walter
Kadell told me, Rob Reynolds told me.  We had a
presentation in Manhattan.  We had to buy software
conducive to running a business that was the size of a
$45 million operation.  They brought their operations
people in to make sure that our software could handle
the number of transactions.  Obviously they didn't
bring their people into the Flatotel in Manhattan for
an all-day presentation on the software if we were
going to do $30,000 a week in business.  I could run
it off of paper index cards.  So that's my answer.

Q.    Let me go back to some of your prior
testimony.

      Last time you were talking about a
meeting that occurred on June 10, 2002.  This was at
the Bull and Bear?

A.    Uh-huh.

      MR. SHAPIRO:  Do you have a page, Ira?

      MR. GROSS:  I'm going to be on page 99.

Q.    This is the meeting when your testimony
indicates that Mr. Kenny clarified the level of
outside courier volume that Iron Mountain did, and it

Page 119

1    indicated based on the Oracle system that it was 45,

2    correct?

3         A.    Yes.

4         Q.    So, you described that meeting as from

5    30,000 feet.  We didn't have a proposal, Kenny was

6    getting back to me with the size of the opportunity.

7    I went a little further with Richard explaining what I

8    thought we could do, and then we were setting up a

9    meeting to be up in Boston at a future date for me to

10   come in with something formal.

11             And my question was:  "Up to this point,

12   insofar as Systrans and you were concerned, you were

13   discussing with Iron Mountain the possibility you

14   might do courier business for them in the future.

15             "Answer:  Up to this point it was just a

16   discussion.

17             "Question:  Correct.

18             "Answer:  Correct."

19             I understood that to mean no commitment

20   had been made to you as of June 10, 2002; is that

21   correct?

22        A.    That's correct.

23        Q.    Now, I want to get to the point when you

24   say the commitment was actually made to you, and

25   presumably it was sometime after June 10, 2002?

James E. Neebling, Vol. 2                                    03/14/2007

Page 120

1        A.    I assume that's correct.

2        Q.    **When was it?**

3        A.    My life went into full-time setting up

4    their courier work, getting their technology, flying

5    to Canada and running all over with them.  They told

6    me to do this test, I lived in Maryland for a

7    month-and-a-half.  Came back with the results and told

8    them they had a problem beyond proportion for a public

9    company.  Here's the results.  I didn't have this the

10   last time.  If you'd like a copy, you're free to have

11   a copy.

12       Q.    **You handed me --**

13       A.    A test market in the Virginia, Baltimore,

14   Maryland market.  When they saw those results, they

15   realized there was a serious problem.  Not only were

16   they going to give us business to try to help us where

17   we were helping them, but we were performing a service

18   that made sense to their business.

19            MR. GROSS:  I'm going to ask the reporter

20       to mark this as Neebling Exhibit 4.

21            (Whereupon, document re test market in

22       Virginia, Baltimore, Maryland market marked

23       Neebling Exhibit 4 for identification, as of

24       this date.)

25       Q.    **Mr. Neebling, when you did the work**

Page 152

1  Let Bob feel that he's doing his thing.  But, you

2  know, I would respect that only to a certain point

3  and, you know this went up to Boston.

4             MR. SHAPIRO:  Can we take a five-minute

5        break?

6             MR. GROSS:  Absolutely.

7             (Recess taken at this point.)

8        Q.    Mr. Neebling, did Mr. Carr ever have any

9  equity interest in Systrans Freight Systems?

10       A.    The only thing he had was an escrow

11 agreement to secure his debt.  It was always the

12 intention of everyone at Iron Mountain, including

13 myself to make sure that Cozen & O'Connor and the

14 Pierce camp did not in any way feel that Tom was

15 involved.

16       Q.    So?

17       A.    He didn't have equity technically, but

18 everyone knew that he was involved with the company.

19 The company was put there to basically help him offset

20 his loss.  I mean they didn't know me from Adam.  I

21 didn't just walk down Atlantic and run into them.  I

22 was there because of Tom, Tom was their main guy, and

23 I set this thing up to service them but it was

24 basically to benefit myself and Tom.

25            MR. SHAPIRO:  Jim, you're giving sort of

Page 153

1    a Tom Carr answer here.  Ira asked simply

2    whether Tom had an equity interest in Systrans

3    or not?

4         A.    The answer is no.

5         Q.    I'm going to hand you a document

6    Mr. Neebling.  This appears to be an e-mail that you

7    sent Garry Watzke with a copy to Larry Varn dated

8    January 5, 2004.  Can you confirm that you actually

9    did send that?

10        A.    Yes.

11             MR. GROSS:  I ask the reporter to mark

12        that as Exhibit 7.

13             (Whereupon, e-mail from Mr. Neebling to

14        Garry Watzke with copy to Larry Varn dated

15        January 5, 2004 marked Neebling Exhibit 7 for

16        identification, as of this date.)

17        Q.    What prompted you to send this?

18        A.    What prompted me to send this was the

19   fact that I continually wanted business in the New

20   Jersey, New York marketplace.  Mike Holland was the

21   man in charge of this region.  Mike Holland also had

22   the Freehold facility under his watch, his control.

23   What would happen was we were given warehouse space

24   there to use, rent, we paid rent, we didn't pay rent,

25   we were given time, there was no rent.

James E. Neebling, Vol. 2                                    03/14/2007

Page 166

1    September 9, 2003 for dinner?

2         A.    Can I look look at my chart?  I remember

3    going to Gallagher's, that's my place.

4               Okay, got it.

5         Q.    When was it?

6         A.    September 9, '03.

7         Q.    You had dinner at Gallagher's with whom?

8         A.    Tom Carr, Charlie Moore, Larry Varn.

9         Q.    And as best as you can recall, what

10   conversations occurred at that dinner?

11        A.    Well, this was the dinner where Tom was

12   at his wit's end, and Larry asked him specifically

13   what is it that can get you, you know, out of harm's

14   way.

15              And you know, they went through a whole

16   list of issues, Commerce Bank and different items that

17   went wrong in this whole thing.  And that's where this

18   whole $2 million promise came in or a bridge deal or

19   some sort of financing that would allow Tom to get

20   some relief.

21        Q.    I want to hear your best recollection

22   about what actually was said about that, if you can.

23        A.    That's my best recollection.

24        Q.    Mr. Varn said what?

25        A.    I would say that it went, "Tom, what's it

Page 167

1    going to take for you to, you know, be okay," along

2    those lines.  I don't want to speculate, but it was a

3    meeting that was very significant in this relationship

4    because Tom was at his breaking point of financial

5    disaster, losing everything.

6         Q.    **Mr. Varn asked what would it take for you**

7    **to be okay?**

8         A.    They went through a list of issues,

9    Commerce Bank, Paul Schwartz.  They promised him a

10   consulting contract that never came.  They promised

11   that he would be able to pay his kids' tuition -- not

12   that they would pay their tuition, but Tom would be

13   able to pay their tuition.

14             There were a list of items that were a

15   byproduct of the situation between Iron Mountain and

16   Pierce and Tom.  And these issues wouldn't have been

17   there if we were able to do the business that Tom

18   could have earned money from the courier contract.

19   But it just never came.  So Tom was sitting there

20   getting more and more pressure from his family and

21   financial creditors.

22        Q.    **So the total of this came up to $2**

23   **million, that is what Mr. Carr expressed?**

24        A.    I think they did their quick math in

25   their head and listed items out.  I remember the

Page 168

1    Commerce Bank thing was 300-something thousand, and

2    there's issues involved with various creditors, Ford

3    Motor credit people, so they came up with this number.

4        **Q.    Once they came up with the number, which**

5    **was 2 million, what, if anything, did Mr. Varn say**

6    **about it?**

7        A.    It was an issue that was obviously not

8    Larry's decision in any way shape or form.  There were

9    times when I would speak to Larry in the sense that,

10   "Listen, we can work something through Systrans to get

11   Tom paid."  We were always working so that O'Connor

12   wasn't onto us.  I mean that's the problem.  We were

13   always working under the radar.  We were trying to

14   keep out of harm's way because we were trying to win

15   that location.

16       **Q.    Focus on the question right now, which is**

17   **what did Mr. Varn say about the 2 million?**

18       A.    That's to the extent of what I know, what

19   I just answered you.

20       **Q.    Did you hear Mr. Varn promise to get**

21   **Mr. Carr $2 million?**

22       A.    I've been around with these guys long

23   enough, and if you're going to ask me did he say, "I

24   promise to give you $2 million," no, but we have been

25   running with these guys doing everything they asked us

James E. Neebling, Vol. 2                              03/14/2007

Page 169

1   to do.  Tom's life is spiraling out of control, and

2   they're having a conversation just what it will take

3   Tom to get out of harm's way, not capitalize on the

4   situation.

5                The promise was I will go back to Richard

6   and I will try to work something out.  That was always

7   the carrot, it was always dangling some security in

8   front of Tom.  I heard it on the tapes with Charlie

9   Moore with Tommy.  I talked to Richard after the

10  litigation.  It was a continued circle jerk of

11  promises for him and his family.  The word

12  "promise" -- I didn't hear the word "I promise," it

13  wasn't a boy scout.  These guys drink, I don't drink,

14  but I remember the math and the things that went on,

15  why it came about.

16               MR. GROSS:  I don't have anything

17         further.

18               MR. SHAPIRO:  One issue to clarify from

19         last time.

20  EXAMINATION BY

21  MR. SHAPIRO:

22          Q.    Do you remember, Jim, you testified about

23  a day in March '02 when there were a couple of

24  meetings, one a breakfast meeting -- before you look

25  at your chart -- a breakfast meeting and then at the



## CONTRACT FOR LOGISTICS MANAGEMENT SERVICES
## CONTRACT No. 2002111

**THIS CONTRACT,** made and entered into as of this 1st day of May 2003, by and between Iron Mountain Records Management, a division of Iron Mountain Information Management, Inc., with an address of 1000 Campus Drive, Collegeville, Pa. 19426 (hereinafter called "IMC") and, as used in this Contract, these terms shall include any present or future entity that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with IMC and Systrans Freight Systems, Inc.. with an address of 571 West Lake Avenue Suite 5, Bay Head, NJ 08742 (hereinafter called "Contractor")

**WITNESSETH,** that the Contractor, for and in consideration of the payments hereinafter specified and agreed to, hereby covenants and agrees to furnish and deliver all and manpower (possessing the particular training, ability, knowledge, and experience), materials and equipment to effectively provide the services for IMC as set forth in this "Contract".

IMC provides storage at its facilities of business, legal, medical and other records for its clients; and such clients frequently request delivery or pickup of containers or files of records, which IMC accomplishes either with its own fleet of vehicles and drivers, or by using third-party couriers.

### I.   TERM

The term of this Contract is as stated on the cover page. This Contract will automatically renew on a year-to-year basis, unless either party gives written notice of termination, such notice to be given at least 120 days in advance of the termination date. Notwithstanding the foregoing, IMC may terminate this Contract for convenience at any time during the first six (6) months of the term, upon sixty (60) days' notice.

### II.   SCOPE OF WORK

#### A.   General Duties

1.   Transportation Services – Contractor shall immediately upon execution of this Contract begin a study of IMC's courier network, identifying all locations, specific routes and all costs associated with the network. Contractor shall simultaneously begin negotiations with the current providers of courier services in order to reduce costs and manage the daily operations of the network. IMC's contractual provisions currently in force with any courier or delivery services shall be respected and managed to their proper conclusion, with the consent of the contractor if study and negotiations so indicate and only as approved in advance by IMC. Any correspondence regarding existing courier services will be issued by IMC to be enforceable. The Contractor may seek to modify any such provisions (with this Contract of the contract courier.

The Contractor will provide courier services to the IMC markets, facilities and sites in the continental United States. Contractor will provide courier services to operate to, from and between Iron Mountain customers and facilities where courier services are not covered by existing contracts, and on a District-by-District basis, as approved by IMC. Contractor shall comply with all applicable federal, state and local laws, rules and regulations relating to the performance of the Services, including without limitation, all federal, state and local taxes, and social security taxes, applicable federal, state and local laws pertaining to wages,

C:\Documents and Settings\Administrator\Local Settings\Temporary Internet Files\OLK87\AGREEMENTFORCOURIERSERVICES REVISED - clean.doc

EXH 2
FOR IDENT
IN EVD   DATE 2/27/07
DENISE L. DANIELS



hours and other terms and conditions of employment. Contractor will observe any customer-required rules and procedures while on premises of IMC customers.

Contractor will provide total coverage of all services on a 7-day, 24-hour basis. Services shall be provided on all IMC observed holidays as requested by IMC. It is also agreed that the Contractor's central dispatch operation will remain staffed until such time as the last scheduled delivery is received at IMC's customer/pickup facility.

Contractor will provide access to the following modes of courier and various transportation services to IMC.

- Ground courier services performed by car, van, or step van.
- Less than truckload services performed by 12'-24' straight truck with or without liftgate.
- Truckload services
- Air courier services – domestic and international – next flight/overnight 2nd day, as a supplement to other primary service contractors and only as specifically directed by IMC.

2.  Management Services – Contractor will provide the following management services to IMC.
- 7-day, 24-hour customer service courier response and 24x7 coverage with services and transactions.
- Selection of vendors to meet both scheduled and on-demand courier services requests.
- Re-negotiation of current vendor courier contracts affected by this Contract while preserving and respecting current terms contained within those Contracts.
- Direct contractual and day-to-day operational supervision of all vendors delivering the services required by the contract.
- Payment of all vendor invoices associated with vendors.
- Provide IMC courier network reporting including delivery times (based on interface with IMC mainframe) and management reporting in the format and within the time parameters requested by IMC.

3.  Technology/Systems Applications – Contractor will provide the following technology to IMC.
- Installation of Contractor's transportation management software at Iron Mountain locations.

4.  Compensation and Billing – IMC shall pay Contractor for the courier network services based on the pricing and conditions listed on Schedules "A", "B", "C", "D", "E". Contractor shall submit electronic invoices to IMC in such form and with such supporting documentation, affidavits, waivers, and releases, as IMC may reasonably request and at the times stipulated. IMC shall pay Contractor weekly following IMC's receipt of Contractor's weekly invoice. Invoice shall provide an attachment with a breakdown showing the activity of each business line services, the date services were performed and the charge for the work performed.

5.  Initial Payment – Upon execution of this Contract, IMC will pay contractor an initial amount of $105,000. This payment will be applied to startup expenses related to the project. Contractor will credit IMC $2,000 per week off the weekly invoice. In the event this contract is cancelled, IMC may offset the full amount outstanding, and



Contractor shall reimburse IMC for any portion of the initial amount not offset. Contractor hereby grants IMC a security interest in the equipment purchased by Contractor at the inception of this Agreement. Upon request, Contractor will execute UCC financing statement to perfect this security interest.

**B.     Contractor Employees and Subcontractors**

It is expected that Contractor's employees, and any subcontractors and their respective employees collectively known as "Personnel" assigned to this account will have frequent, personal contact with customers, employees, visitors and vendors of IMC. Accordingly, it is agreed that the Contractor's employees and subcontractors shall meet the highest standard of appearance and demeanor. Contractor's personnel shall, at all times, demonstrate a high degree of professionalism in their treatment of IMC's customers, employees, visitors and vendors of IMC as is appropriate to the environment, conduct and business of IMC. If any customer requests that any personnel cease servicing such customer, Contractor shall immediately cause such individual to stop servicing the requesting customer.

Contractor shall require all of its on-site personnel to meet the approval of IMC. All personnel shall be bonded. IMC shall receive a copy of the bonds covering personnel.

Contractor shall ensure that all personnel assigned to operate a motor vehicle, or other such equipment, meet all special licensing requirements. All drivers must possess and maintain a safe driving record.

Contractor shall ensure that all assigned personnel pass a comprehensive pre-employment background and reference check as is acceptable to IMC and comparable to that undertaken by IMC on its own employees, including but not limited to fingerprinting, credit checks, criminal background checks and pre-employment drug testing. Contractor shall periodically perform random updates and checks as deemed necessary to insure continued compliance.

IMC reserves the right to fingerprint and photograph all employees assigned under this Contract, or require that Contractor perform same, and subject Contractor personnel to any other security related pre-employment screening that is regularly required of IMC personnel.

Contractor will ensure that all in-house foot messengers and drivers wear appropriate business attire and carry proper identification issued and validated by Contractor. Further, personnel shall present any such additional identification necessary to confirm the validity of Contractor-supplied identification, such as a valid driver's license.

Contractor will recruit, employ, train, supervise, direct, discipline, and, if necessary, discharge Contractor's employees working at IMC facilities, or delivery to customers' sites.. Contractor's employees shall be able, qualified, and trained personnel who shall be responsible solely to Contractor. Contractor agrees to transfer or otherwise remove any Contractor personnel requested by IMC at IMC's sole discretion, with or without cause. Contractor will require the same of all subcontractors and their personnel.

Contractor and IMC acknowledge that Contractor is an independent contractor and that neither Contractor nor its personnel are employees of IMC. Further, it is agreed and assured that Contractor and its personnel will not participate in or be entitled to any benefits under IMC's benefit program now existing or hereafter created, including, without limitation, IMC's pension plan, profit sharing plan, medical, life or accidental death insurance plans. Personnel shall, at all times, remain employees or Contractor or its Subcontractors, which shall be solely responsible for the payment of



each employee's benefits and entire compensation, including employment taxes, workmen's compensation, and any similar taxes and requirements associated with employment.

Contractor's personnel will comply with all IMC's security regulations regarding entering IMC's facilities and while in the conduct of the services on the IMC premises. Any employee or contractor who disrupts IMC's normal operations shall be removed immediately by Contractor upon IMC's request.

Contractor warrants that all Contractor personnel provided to IMC are US citizens or are legally entitled to accept employment with Contractor or its subcontractors and to perform services under this Contract.

C.    Set-aside

Contractor agrees to utilize "8-A" minority owned vendor for services representing 15% of the total revenue received by Contractor under this contract. Contractor will bill IMC for difference between the vendor rate and the agreed rate for services. Contractor will process "8-A" vendor invoices for direct payment from IMC to vendor.

D.    Supervision

Contractor shall be solely responsible for the direction and supervision of all Contractor personnel assigned to the facilities. Contractor shall provide a sufficient number of line supervisory personnel to ensure Contractor's successful performance of its obligations under this Contract.

Contractor shall designate an Account Manager who shall be a member of the Contractor's management team and shall be accessible regarding any communication relevant to the Services.

Contractor's supervisors and the Account Manager shall meet regularly with IMC's designated representatives to monitor performance under this Contract, and to review performance as herein described. It is the Contractor's responsibility to initiate and facilitate these meetings. Contractor's supervisory personnel shall be available at reasonable times to consult with IMC's designated representatives.
IMC, as owner or lessee of its property and facilities, has the exclusive right to control and deny access to those premises for any reason to any individual including the personnel or agents of the Contractor.

Contractor shall insure that all vehicles provided in the performance of the services shall be less than five (5) years of age unless special exception has been granted by IMC, possess adequate two-way communication, and be maintained properly. Vehicles shall be inspected monthly by Contractor and service records reviewed. All vehicles must be secured at all times. Cargo areas will be equipped with proper security measures to protect the interests of IMC. These provisions apply not only to Contractor but to any subcontractors as well.

E.    Loss/Reconstruction of Documents

In the event there is a loss or discrepancy, contractor shall cooperate in conducting a full investigation. Contractor will be liable for up to a maximum of $100,000 in reconstruction costs, as defined below.



1.  Cost necessary to reconstruct and photocopy related documents and other items involved. IMC agrees to cooperate and reasonably aid Contractor in the reconstruction of the items lost.

2.  Reasonable costs of IMC in connection with the reproduction of documents involved.

3.  Such other necessary and reasonable costs and expenses as are directly related to the loss and reconstruction of destroyed and related documents.

## III.  GENERAL TERMS AND CONDITIONS

### A.  Warranty

The Contractor warrants that the services performed under this Contract will be done in a correct and acceptable industry standard manner and that all services performed will be free from omissions, errors and miscalculations. This warranty will be effective for a period of 30 days from the date the work completed, regardless of any termination. Subject to the limitations in Section II E above, the Contractor will remedy any services declared defective or incorrect by IMC and will perform again or rebate the cost of those services as appropriate provided IMC gives the Contractor notice promptly upon discovery.

### B.  Contractor Confidentiality

The Contractor and IMC acknowledge that in the negotiation and performance of this Contract, confidential and proprietary information of each has been and will be made available to the other. The parties agree to use reasonable efforts to maintain the confidentiality of such material and not to make external use of such material not required under this Contract. Neither party will disclose the information to any third party without prior written authorization from the disclosing party, and will not use the information received by it, except to those of its employees, agents and consultants whose duties justify the need for access to the information provided that such individuals are subject to obligations or secrecy and limited use commensurate in scope with this Contract. These obligations will apply to verbal information as well as specific portions of the information that are disclosed in writing or other tangible form even if not marked to indicate its confidential nature. These obligations will not apply to any of the information which:

1.  Was known to the receiving party prior to receipt under this Contract, as demonstrated by the receiving party's records; or
    Was publicly known or available prior to receipt under this Contract, or later becomes publicly known or available through no fault of the receiving party; or

2.  Is disclosed to the receiving party without restrictions on disclosure by a third party having the legal right to disclose the same; or

4.  Is disclosed to a third party by the disclosing party without an obligation of confidentiality; or

5.  Is independently developed by an employee, consultant, or agent of the receiving party without access to the information as received under this Contract; or



6.  The receiving party is obligated to produce as required by law, lawfully issued subpoena, or a court order, provided that the disclosing party has been given notice thereof and an opportunity to waive its rights or to seek a protective order or other appropriate remedy.

Upon written request of a disclosing party, the receiving party will return all information disclosed in written or tangible form, and the receiving party will destroy all of its copies, excerpts or notes, and files – computer, tape and paper, made by it which contain any portions of the information unless otherwise provided for by the parties

**C.    Governing Law**

This Contract shall be governed by the laws of the State of New Jersey.

**D.    Indemnity**

To the fullest extent permitted by law, and subject to any limitations expressly set forth in this Contract, Contractor, its agents, employees, servants and subcontractors (collectively "Indemnifiers") shall hold harmless and indemnify IMC, its affiliated companies (as their interest may appear), its officers, directors, employees, agents and servants (collectively "Indemnitees") from any liabilities, injury, death, penalties, losses, costs, damages, claims, expenses, attorney's fees, expenses of litigation, suits, judgments, liens and encumbrances, arising out of or resulting from the negligence or willful misconduct of Contractor and/or its employees, subcontractors, agents or servants in performing the services under this contract. In the event any legal proceeding is brought against an Indemnitee solely due to any of the above activities, the Indemnifier agrees to defend the interests of the Indemnitee at no cost to the Indemnitee, so long as the Indemnitee provides prompt notice to the Indemnifier of the legal proceeding and permits the Indemnifier sole control over the defense in such legal proceeding.

**E.    Insurance Requirements**

1.  All insurance policies of either party affecting this contract shall include a clause or endorsement denying the insurer any rights of subrogation against the other party to the extent rights have been waived by the insured before the occurrence of injury or loss. IMC and Contractor waive any and all rights of recovery against the other for injury or loss due to the hazards covered by policies of insurance required by this contract to the extent of the injury or loss covered thereby. To that end, neither party shall seek to recover under any indemnity hereunder to the extent the loss covered thereby is recovered or recoverable under any policy of insurance carried by such party.

2.  Contractor shall, at its own cost and expense, maintain commercial general liability (CGL) insurance written on a per occurrence basis, to include coverage for Personal Injury, Contractual, Contingent, Products/Completed Operations and Contractual Liability and Broad Form Property Damage, with limits in at least the following amounts:

    $1,000,000 per occurrence Combined Single Limit
    $5,000,000 Umbrella Policy
    $     50,000 per occurrence limit for Fire Legal Liability
    $       5,000 per person per occurrence limit for Medical expenses



3.  Contractor shall, at its own cost and expense, maintain commercial business auto liability insurance in an amount of not less than $1 million combined single limit. Such policy shall include coverage for all vehicles owned, hired, non-owned and borrowed by the Contractor or any of its subcontractors in the performance of the services covered by this contract.

4.  Contractor shall at its own cost and expense, maintain Workers' Compensation Insurance, unemployment compensation insurance and any other insurance that may be required by law with respect to Contractor's employees and in accordance with statutory requirements for all states in which services are to be performed under this contract. Minimum employer's liability limits are:

    $500,000 Bodily injury by accident, for each accident
    $500,000 Bodily injury by disease, for each employee
    $500,000 policy limits for bodily injury by disease

5.  All insurance policies or bonds required by this Contract shall be issued by insurance companies with a Best Rating or Standard and Poor's Claims-paying ability rating of not less than "A".

6.  Upon IMC's written request, Contractor shall provide IMC a certificate of insurance evidencing such required coverage. In addition, IMC shall be notified of any cancellation of such policies with at least ten (10) days' prior written notice.

7.  Contractor's liability insurance shall identify IMC as an additional insured.

8.  Contractor shall require that each subcontractor used by Contractor in providing the services hereunder must carry the same insurance as is required to be carried by Contractor.

9.  Contractor shall, at its own cost and expense provide cargo insurance coverage in the amount of $100,000. Cargo insurance to include "Reconstruction of Documents" endorsement

**F.    Contractor Employees**

Contractor shall recruit, hire, train, supervise, direct, and if necessary, discipline, transfer and discharge management and non-management employees of Contractor performing services hereunder. All personnel employed by Contractor shall at all times and for all purposes be solely in the employment of Contractor while performing the services described herein. Contractor agrees to comply with all federal, state and local laws and regulations applicable to Contractor as employer, including but not limited to those relating to employee withholding, unemployment taxes, workers compensation insurance and equal employment opportunity. It is understood and agreed that Contractor is an independent supplier, and is not an agent of IMC.

**G.    Amendments**

No amendment of this Contract will be effective unless it is reduced to writing and executed by both appropriate and authorized signatory parties of the Contract. In the event of the need to implement a change order IMC will discuss the scope of Contract with the Contractor and adjust the compensation relative to the increase or decrease of services required.



**H.    Termination**

*This Contract may be terminated upon written notice, upon the occurrence of the following conditions:*

    1.  IMC may terminate if:

        A.    Contractor fails to provide adequate service during the first 180 days of service.

        B.    Contractor breaches a material provision of this Contract, which breach remains unresolved for a period of 30 days from the receipt of written notice from IMC specifying the breach.

        C.    A petition is filed by or against Contractor under bankruptcy law or any other insolvency laws providing for the relief of debtors, termination shall be effective immediately upon receipt of written notice from IMC.

        D.    For convenience at any time during the first six (6) months of the term on thirty (30) days' notice.

    2  Contractor may terminate if:

        E.    IMC breaches a material provision of the Contract, which breach remains unresolved for a period of 30 days from the receipt of written notice from Contractor specifying the breach.

        F.    A petition is filed by or against IMC under bankruptcy law or any other insolvency laws providing for the relief of debtors; and

The merger or acquisition of IMC into or by another entity shall not constitute a breech which would enable Contractor to terminate this Contract, provided the surviving entity executes a substantially similar Contract with Contractor based upon substantially similar facts and circumstances.

Cancellation of the contract does not relieve the Contractor of the obligation to deliver and perform on outstanding work prior to the effective date of the cancellation. All sums due to Contractor up to the date of termination shall be paid in accordance with the terms of the Contract.

**I.    Limitation of Warranties and Liability**

THE LIMITED WARRANTIES SET FORTH IN THIS CONTRACT ARE IN LIEU OF ALL OTHER WARRANTIES, EXPRESSED OR IMPLIED, AND CONTRACTOR EXPRESSLY DISCLAIMS ANY IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE.

Each party's ("First Party") liability to the other party ("Other Party") arising out of this Contract or for any other reason relating to or arising from the products and services provided under this Contract, including claims for contribution or indemnity will be limited to the amounts the First Party has paid to or received from the Other Party under this Contract. IN NO EVENT WILL WITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES OR LOST PROFITS, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.



**L.    Assignment**

Contractor may not assign this Contract without the prior written consent of IMC. Subject to the foregoing, this Contract shall be binding upon, and shall inure to the benefit of the successors and assigns of IMC and the Contractor.

**M.    Severability**

If any term or provision of this Contract shall be held unenforceable by a court or competent jurisdiction, the remaining provisions of this Contract shall not be affected by such unenforceability and shall be valid and enforceable to the fullest extent permitted by law.

**N.    Modifications**

Any handwritten changes, to include but not limited to additions, rewordings, deletions, etc. made to the face of this document must be initialed and dated by both appropriate and authorized signatory parties of the Contract to indicate both parties' acceptance and Contract with the change (s) for it to be considered a valid and binding part of the signed Contract.

**O.    Mediation and Arbitration**

The parties agree that any disputes arising in connection with the interpretation of this Contract or the performance of any party under this Contract, or otherwise relating to this Contract, shall be treated in accordance with the procedures set forth in this paragraph. Such treatment shall occur prior to any party pursuing arbitration or litigation in connection with such disputes. The dispute shall be referred for resolution to Garry Watzke for IMC and James Neebling for the Contractor. Such procedure shall be invoked by either the Contractor or IMC presenting to the other a "Notice of Request for Resolution of Dispute ("a Notice") identifying the issues in dispute sought to be addressed hereunder. A telephone or personal conference of those executives will be held within 10 days after the delivery of the Notice.

**P.    Privacy Addendum**

Contractor shall execute the Privacy Addendum in the form annexed to this contract and shall cause each subcontractor to execute the Privacy Addendum as part of such subcontractor's Contract with Contractor, provided that IMC shall have the direct right to enforce the terms of the Privacy Addendum against any subcontractor.





Date: 5/01/03

# SCHEDULE "A"
# HALF DAY / RUSH DELIVERY NORTHEAST

- Rates to be established and inserted after 90 day test period

- Test period rates will not exceed current rates

- New rates to be inserted after test will reflect a minimum savings of 2%, or 98% of current rates





Date: 5/01/2003

# SCHEDULE "C"
# HALF DAY / RUSH DELIVERY
# MIDWEST

- Rates to be inserted upon startup of this region

- Inserted rates to reflect a 2% cost reduction (98% of current rates)





# SCHEDULE "D"

Date: 5/01/2003

# HALF DAY / RUSH DELIVERY SOUTHWEST

Rates to be inserted upon startup of this region

Inserted rates to reflect a 2% cost reduction (98% of current rates





Date: 5/01/2003

## SCHEDULE "E"
## HALF DAY / RUSH DELIVERY
## WEST

- Rates to be inserted upon startup of this region

- Inserted rates to reflect a 2% cost reduction (98% of current rates)



**CONTRACT FOR COURIER SERVICES**

**CONTRACT NUMBER:**        2002111                    *Confidential*

**CONTRACT TERM:**          **May 1, 2003 through April 30, 2006**

**CLIENT:**                                      **CONTRACTOR:**

Iron Mountain Records Management,                Systrans Freight Systems, Inc.
a division of Iron Mountain
Information Management, Inc.
1000 Campus Drive                                571 West Lake Avenue, Suite 5
Collegeville, Pa  19426                          Bay Head, NJ 08742

**SCOPE OF CONTRACT:**

Contractor shall furnish and deliver all the manpower, materials, and equipment to provide logistics/courier management services for specified Iron Mountain facilities, (the "Service Delivery Area").  Management services will be responsible for "Half-Day", "Rush" shipments from IMC facilities to IMC customer sites.

**IN WITNESS WHEREOF,** the parties have caused this Contract to be executed with the intent to be bound by its provisions.  Said Contract is indicated and evidenced by the signatures of their duly authorized officers affixed below.

Authorized Signatures:

**IRON MOUNTAIN RECORDS**                        SYSTRANS FREIGHT SYSTEMS, INC.
**MANAGEMENT, a division of Iron**
**Mountain Information Management, Inc..**

By:                                              By:
Print Name:                                      Print Name:
            Bob Miller                                       James Neebling

Title:      President                            Title:      President
Phone:      610-831-2315                         Phone:      732-295-9914

Date:       5/12/03                              Date:       4/29/03

## Franciosa, Cindy

**From:**    Jim Neebling [jimneebling@systransfreight.com]
**Sent:**    Monday, December 15, 2003 10:29 AM
**To:**      Varn, Larry
**Subject:** Jim Neebling

Larry

I spoke to Charlie on Friday and told him about my discussion with Tom. First, after I left the meeting I was beyond mad and phoned Tom.   His explanation was he thinks this was money owed to National Expedite from TC transport. I told him that 1. I never heard of Rogers trucking, 2. Any work we did for TC transport was minimal and was always paid back and forth, and 3. National never received $ 50,000 from Rogers trucking and or TC transport.  I was so mad I actually ended the call and phoned Lehmann.  John said that he thought Tommy had told me about this and that Tommy took a check from him to a check cashing place in Philadelphia that National had an account with for drivers to cash paychecks.  I said that the check cashing location would never cash a check for $ 50,000 and in fact I recall the limit was $ 5,000,   John stated that Tommy had left a check with them and waited for it to clear before returning for the cash.  I then called back Tom with no success (10 calls)  I finally caught up to Tom around 6pm after he met Charlie.  I had a long conversation on Friday regarding Tom and I'm concerned about his state of mind as well as my new issue with him.

Tom indicated to Charlie about additional time for the warehouse.  I feel Tom is not in touch with the issues and we can achieve the 22nd-24th deadline.  Tom's seems to make everyone around him a problem in his eyes and he is the victim.  I want to get Tom back his capital ASAP.  The fastest way for me to accomplish that, give Vinnie some business here, is to allow Systrans to handle the courier and freight business in the PA, NJ, and NY.  That would get our volume over the 50k per week and allow me to pay Tom Back personally.  If I can start paying Tom and maybe Art, I feel that will take the edge off of Tom's desperation.  I will do my best to calm him but my own emotions are very upset with him after this recent development.  I never know when I'm being told the truth or a story.   Please give me your thoughts.

Jim Neebling

President

Systrans Freight Systems Inc.

Phone:732-295-9914  Ext. 20

Fax: 732-295-9980

Cell: 732-684-4008

**http://www.systransfreight.com**

EXH 3
FOR IDENT
IN EVD    DATE 2/27/07
DENISE L. DANIELS

8/9/2005

# EXHIBIT H

# United States District Court
# District of Massachusetts

IRON MOUNTAIN INC.,
IRON MOUNTAIN INFORMATION
     MANAGEMENT, INC.,
C. RICHARD REESE,
JOHN F. KENNY, JR.,
GARRY B. WATZKE,
LARRY L. VARN,
CHARLES G. MOORE,
        Plaintiffs,

     V.                    CIVIL ACTION NO. 05-10890-RCL

THOMAS CARR,
        Defendant,

-------------------------------------------------------------------------------------------------------

THOMAS CARR,
        Counterclaim-Plaintiff,

     V.

IRON MOUNTAIN INC.,
IRON MOUNTAIN INFORMATION
     MANAGEMENT, INC.,
C. RICHARD REESE,
JOHN F. KENNY, JR.,
GARRY B. WATZKE,
LARRY L. VARN,
CHARLES G. MOORE,
        Counterclaim-Defendants.

# *REPORT AND RECOMMENDATION ON COUNTERCLAIM-DEFENDANTS' MOTION TO DISMISS COUNTERCLAIM-PLAINTIFF'S FRAUDULENT MISREPRESENTATION CLAIM (#13) AND MOTION TO DISMISS CONTRACT CLAIMS AGAINST PLAINTIFFS WATZKE, REESE, VARN, IRON MOUNTAIN AND IRON MOUNTAIN INFORMATION MANAGEMENT, INC. AS PRAYED FOR IN THE SUPPLEMENTAL FILING IN SUPPORT OF THEIR MOTION TO DISMISS SECOND* <u>*AMENDED COUNTERCLAIMS (#44)*</u>

COLLINGS, U.S.M.J.

## *I. INTRODUCTION*

On May 2, 2005, Plaintiffs and Counter-Defendants Iron Mountain Incorporated ("Iron Mountain"), Iron Mountain Information Management, Inc. ("IMIM"), C. Richard Reese ("Reese"), John F. Kenny, Jr. ("Kenny"), Garry B.

Watzke ("Watzke"), Larry L. Varn ("Varn") and Charles G. Moore ("Moore") (collectively, the "plaintiffs")[1] sued defendant Thomas Carr ("Carr" or the "defendant") for declaratory judgment and injunctive relief. Specifically, the plaintiffs are seeking a declaratory judgment that they have no agreements with or other legal obligations to Carr and an injunction against Carr to prevent him from prosecuting any actions against the plaintiffs. (*See generally* Complaint for Declaratory and Injunctive Relief #1)

On May 6, 2005, Carr filed an Answer to the Complaint and Counterclaims against the plaintiffs, in which he lodged claims for breach of contract and fraudulent misrepresentation. (Answer, Affirmative Defenses and Counterclaims #3) Carr then filed a First Amended Counterclaim ("FAC") on May 20, 2005.

On May 31, 2005, Moore and Kenny filed motions to dismiss with supporting memoranda on the grounds that the FAC failed to state a claim against them. (##9, 10, 11, 12) On June 13, 2005, Carr moved for leave to file a Second Amended Counterclaim ("SAC"). (#16) On June 27, 2005, the

---

[1]

For simplicity's sake, the plaintiffs/counter-defendants will be referred to herein simply as the "plaintiffs." All of the plaintiffs together, excluding Iron Mountain and IMIM, shall be referred to as the "individual plaintiffs."

3

plaintiffs opposed Carr's motion for leave to file the SAC. (#22) On October 12, 2005, this Court granted the motion for leave to file the SAC and ordered that "the motion to dismiss the First Amended Counterclaim be...deemed to seek dismissal of the Second Amended Counterclaim."[2]

On October 20, 2005, the plaintiffs filed a Supplemental Filing in Support of Their Motion to Dismiss Second Amended Counterclaims (the "Supplemental Filing"), the gist of which was that the SAC failed to state any claims against any of the plaintiffs. (#44) While not technically styled as a motion, the Supplemental Filing moves that the Court dismiss the SAC in its entirety as against all of the plaintiffs. On November 3, 2005, Carr filed an Opposition to Counter-Defendants' Motion to Dismiss the Second Amended Counterclaims. (#46) On March 10, 2006, this Court issued a Report and Recommendation in which it recommended that the breach of contract claims contained in the SAC be dismissed as against Moore and Kenny.

In this Report and Recommendation, the Court shall address the breach of contract claims against Iron Mountain, IMIM, Reese, Watzke and Varn and the fraudulent misrepresentation claims against the individual plaintiffs since

---

[2] The SAC was actually docketed on October 26, 2005. (#45)

the fraud claims have been lodged only against the individual plaintiffs. For the reasons discussed below, the Court shall recommend that the motion to dismiss the breach of contract claim against Watzke be allowed, that the motion to dismiss all of the other breach of contract claims be denied and that the motion to dismiss the fraudulent misrepresentation count be allowed pursuant to Fed. Rule Civ. P. 9(b).

## II. RELEVANT FACTS

Prior to January 2001, Iron Mountain and IMIM merged with and/or acquired a competitor known as Pierce Leahy, Inc., the resulting company being known as Iron Mountain. (#45, ¶ 1) Sometime in 2001, J. Peter Pierce ("Pierce") was elected to the Board of Directors of Iron Mountain and also was appointed president of the new company. (#45, ¶ 2) Sometime after the merger/acquisition, Pierce was fired as the company's president but remained on its Board of Directors. (#45, ¶ 3)

On or about January 15, 2001, Carr and Pierce entered into an agreement to form a transportation company known as Logisteq, LLC ("Logisteq"). (#45, ¶ 5)   A Pierce-controlled entity, Pioneer Capital LLP and a Carr-controlled entity, Transportation Concepts of New Jersey, Inc., owned Logisteq 51% and

49% respectively. (#45, ¶ 5) Subsequently, Pierce alone formed a company known as Sequedex which he may have used to compete with Iron Mountain and in doing so posted significant costs to operate Sequedex on the books of Logisteq. (#45, ¶ 6)

Iron Mountain filed suit against Pierce, according to Carr, for breach of a non-compete agreement. (#45, ¶ 7) Ultimately, an arbitrator found in favor of Pierce. (#45, ¶ 7)

One result of the Iron Mountain/Pierce Leahy merger[3] was that Logisteq became a tenant of Iron Mountain. (#45, ¶ 9) At some point, Iron Mountain sent a letter to Carr signed by Watzke that Logisteq and Carr as well as certain of Carr's businesses were being evicted from property now owned by Iron Mountain. (#45, ¶ 10) Carr protested in writing to Watzke. (#45, ¶ 11)

In August, 2001, at a meeting between senior management of Iron Mountain and Carr, Iron Mountain told Carr that if Carr would assist Iron Mountain in its action against Pierce for violation of the non-compete, then Iron Mountain would compensate Carr in various ways. (#45, ¶ 13) Thereafter, a series of meetings occurred with the plaintiffs and Carr and his counsel, Arthur

---

[3]

For simplicity's sake, the term "merger" is used since Carr is unclear whether the transaction was actually a merger or an acquisition.

6

Peslak ("Peslak"), and Carr's friend James Neebling ("Neebling"), principal of Systrans Freight, Inc. ("Systrans"); some of these meetings occurred on March 19, 2002, March 26, 2002, April 2, 2002, April 9, 2002, July 16, 2003 and September, 2003. (#45, ¶ 15)

In the Spring of 2002, Iron Mountain began encouraging Carr to file a lawsuit against Pierce regarding Logisteq to coincide with the action that Iron Mountain was planning to file against Pierce. (#45, ¶ 17) Iron Mountain drafted the complaint for Carr to file and agreed to fund Carr's lawsuit. (#45, ¶ 17) The draft of the complaint was delivered to Carr while he was on vacation in California; Carr signed the complaint and Iron Mountain coordinated the filing of the action. (#45, ¶ 24)

On March 26, 2002, Carr and Neebling met with Kenny, Reese and Watzke at Iron Mountain in Boston.  Reese offered $5 million to Carr so that Carr could buy out Pierce's share of Logisteq. (#45, ¶ 18) Reese also promised that Iron Mountain would hire Carr as a transportation consultant and provide $25 million in courier business to Systrans. (#45, ¶ 18) At this same meeting, Kenny "advised" that $45 million in business would be given to Systrans each year for five years in return for the cooperation of Carr and Systrans. (#45, ¶ 18)

7

On April 2, 2002, during a conference call, Watzke promised that Iron Mountain would pay for Carr's attorneys' fees in his suit against Pierce. (#45, ¶ 19) Watzke also promised that Iron Mountain would retain Carr in a consulting position. (#45, ¶ 19)

On April 9, 2002, at a private residence in New York City, Varn promised that Iron Mountain would wire a $50,000 retainer to Peslak. (#45, ¶ 20) That transaction was completed two days later. (#45, ¶ 20)

As consideration for Carr's involvement in Iron Mountain's lawsuit against Pierce, Kenny called Carr and promised that, in exchange for Carr's participation, Iron Mountain would fund Carr's lawsuit, including all legal fees and costs and that Iron Mountain would provide business to Systrans in excess of $45 million, hire Carr as a consultant with the same salary and benefits he was currently making, and repay any debt that Carr incurred in the process as guarantor of certain obligations. (#45, ¶ 22)

Kenny made these same promises to Carr's wife, Judy, in a separate telephone conversation that occurred in April, 2002 while the Carr family was in California on vacation. (#45, ¶ 23) Kenny also advised Judy that all negative financial fall out from her husband's filing of a complaint against Pierce and his other cooperation with Iron Mountain would "be taken care of" by Iron

Mountain. (#45, ¶ 23)

In reliance on the promises made by the plaintiffs, Carr cooperated with the plaintiffs as they had requested and, as a result of his reliance, Carr lost his businesses and was shackled with debt. (#45, ¶ 26) Several of the plaintiffs promised to allay such debt by providing sufficient income to Carr to allow him to handle the debt. (#45, ¶ 26)

During a July 16, 2003 telephone conference, Peslak asked Watzke why Iron Mountain and the other plaintiffs had not fulfilled their obligations and promises. (#45, ¶ 27) Watzke told Peslak that once the arbitration between Iron Mountain and Pierce was over, Reese would meet with Carr and Peslak to discuss the fulfillment of Iron Mountain's promises to Carr. (#45, ¶ 27) Moore subsequently made the same assurances to Carr that had been made by Watzke on July 16, 2003. (#45, ¶ 28)

In September, 2003, Carr and Neebling attended a meeting with Varn and Moore, during which Varn promised $2 million to Carr for Carr to use to pay off certain debts incurred in the previous year or two. (#45, ¶ 29) In addition, Varn called Paul Schwartz ("Schwartz")[4], a person to whom Carr owed money, to

---

[4] The name of this man is spelled different ways in the SAC–"Schwarz" and "Schwartz". Clearly, the references are to the same person and the Court shall use the latter spelling herein.

advise him that Iron Mountain was in the process of setting up a very lucrative business relationship with Carr and that Carr was therefore a good credit risk to whom Schwartz should lend additional money. (#45, ¶ 30)

All of the aforementioned promises were, according to Carr, made with no intention of fulfilling them. (#45, ¶¶ 31, 33) Moreover, the plaintiffs knew that statements regarding the promises were false when made. (#45, ¶ 33) As a direct result of Carr's cooperation with Iron Mountain, Pierce "wasted" Logisteq, and Carr was left shackled with debt and a loss of his source of income. (#45, ¶ 34)

From February to May of 2005, Carr had various communications with Watzke and Varn regarding the promises to Carr that remained unfulfilled. (#45, ¶¶ 37-42) The ultimate response was the lawsuit filed by the plaintiffs against Carr. (#45, ¶ 43)

### III. STANDARD

The Rule 12(b)(6) pleading standard is familiar: "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the [non-moving party] can prove no set of facts in support of his claims that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957)

10

(footnote omitted).  When addressing a motion to dismiss, it is incumbent upon the Court to accept "'the allegations in the complaint as true and mak[e] all reasonable inferences in favor of plaintiff'".  *Doran v. Mass. Turnpike Auth.*, 348 F.3d 315, 318 (1 Cir., 2003), *cert. denied,* 541 U.S. 1031 (2004) citing *Rockwell v. Cape Cod Hosp.,* 26 F.3d 254, 255 (1 Cir., 1994).  That general proposition notwithstanding, "bald assertions, . . . subjective characterizations, optimistic predications, or problematic suppositions" need not be credited.  *United States v. AVX Corp.*, 962 F.2d 108, 115 (1 Cir., 1992)  (internal quotations omitted); *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 224 (1 Cir.), *cert. denied,* 125 S.Ct. 59 (2004).

## IV.  ANALYSIS

### A.  Breach of Contract Claim

The plaintiffs[5] move to dismiss the breach of contract counterclaim against them on several grounds: (1) the alleged agreements in the SAC violate settled public policy; (2) the individual plaintiffs (as opposed to the corporate plaintiffs) were not parties to any contract; and (3) the Statute of Frauds bars Carr's claim of an oral five year contract between Iron Mountain and Systrans.

---

[5]

This excludes Moore and Kenny who, as explained above, filed separate motions to dismiss the contract counterclaims against them.

Carr in turn argues that: (1) the agreements are enforceable; (2) the individual plaintiffs made promises on behalf of themselves to Carr; and (3) the Statute of Frauds is inapplicable.

In order for a breach of contract claim to survive a motion to dismiss, a plaintiff must allege that "(1) an agreement was made between the plaintiffs and the defendant supported by valid consideration; (2) the plaintiffs have been ready, willing and able to perform; (3) the defendant's breach has prevented them from performing; and (4) the plaintiffs have suffered damage." *Singarella v. City of Boston*, 342 Mass. 385, 387, 173 N.E.2d 290, 291 (1961) (internal citations omitted). Clearly, Carr has alleged breach, damages and that he was ready, willing and able to perform his part of the bargain. *See, e.g.,* #45 at ¶¶ 24, 26, 32, 34, 36, 47, 48.

The gist of the plaintiffs' public policy argument is that "a contract that induces a corporate fiduciary to breach its fiduciary duties" is unenforceable and that as such the purported agreements between Carr and the plaintiffs cannot be enforced because they required Carr to breach his fiduciary duty to Logisteq. (#44 at 6-7) Specifically, say the plaintiffs, the agreements as set out by Carr in the SAC required that Carr disclose confidential and proprietary information

12

about Logisteq to Iron Mountain. (#44 at 7) Carr responds that there is no evidence at this point that he was an officer of Logisteq, a requirement if he were to owe Logisteq a fiduciary duty. Moreover, Carr explains that he had been terminated from Logisteq before most of the promises occurred and thus he did not owe any fiduciary duty to Logisteq given that he had already been fired. (#46 at 2) Finally, Carr contends that the plaintiffs' partial performance of the purported contract, in the form of a $50,000 payment to Carr's attorney, demonstrates that the "contract" is indeed enforceable. (#45 at 3-4)

The plaintiffs' public policy argument is premature. At this juncture, the Court is only to examine the SAC to determine whether a contract claim has been put forth. In order to decide whether the purported agreements between Carr and the plaintiffs violate public policy, some discovery would need to be completed. For example, from the face of the SAC it is impossible to ascertain whether Carr was employed by Logisteq when the promises were made by the plaintiffs, when Carr was fired from Logisteq, whether Carr was an officer of Logisteq and what kind of fiduciary duties (if any) Carr owed to Logisteq. Thus, at this point, the Court shall not recommend that the breach of contract counterclaim be dismissed on the grounds that the purported agreements between Carr and the plaintiffs violate public policy. This is an argument better

13

addressed at the summary judgment stage.

The plaintiffs' next argument is that the Statute of Frauds bars Carr's claim of an oral five-year contract between Iron Mountain and Systrans pursuant to which Iron Mountain would give Systrans courier business of $45 million each year for a period of five years. Carr's position is that such an agreement does not come within the Statute of Frauds because it is capable of being performed in one year.

The SAC is not explicit as to the terms of the purported $45 million agreement. In Paragraph 16.4 of the SAC, it is alleged that Systrans "would receive nearly $50 million per year in courier business"; in Paragraph 18, it is alleged that "business revenues of $45 million would be paid to Systrans, Inc. each year for a period of five years"; and, in Paragraph 22, it is alleged that "Iron Mountain would provide business to Systrans in excess of $45 million dollars...." Thus, it is not clear that this agreement was for a year or for five years or for some other time period and therefore, it is impossible to determine at this juncture whether such a "contract" would come within the parameters of the Statute of Frauds. "If the terms of the contract are such that it is *possible* for performance to be completed within the one-year period, even if this is not

14

very likely, the contract is not within the Statute of Frauds." 35 Mass. Prac., Consumer Law § 1:19 (2d ed., 2006)(emphasis in original).

Viewing the SAC in the most favorable light, the Court cannot dismiss this part of the breach of contract claim against Iron Mountain since it is not clear whether the Statute of Frauds is applicable or not. Such a determination would be better made at a later stage in the case. In sum, at this point, the breach of contract claims still stand against Iron Mountain and IMIM. The breach of contract claims against the individual plaintiffs (excluding Kenny and Moore) shall be addressed next.

The plaintiffs' position as to the breach of contract counterclaims against the individual plaintiffs is that the individual plaintiffs were acting as agents for Iron Mountain, a fully disclosed principal, and as such, the individual plaintiffs were not parties to any contract and cannot therefore be sued for breach of contract. Carr's stance is that the individual plaintiffs made the promises on behalf of themselves, as well as on behalf of Iron Mountain.

It is well-established that a person making a contract for a disclosed principal is not himself liable for breach of the contract. In other words, "[u]nless otherwise agreed, a person making or purporting to make a contract

15

for a disclosed principal does not become a party to the contract." *Bratcher v. Moriarty, Donoghue & Leja, P.C.,* 54 Mass. App. Ct. 111, 116, 763 N.E.2d 556, 560-61 (2002)(citing *Porshin v. Snider*, 349 Mass. 653, 655, 212 N.E.2d 216 (1965)), quoting from Restatement (Second) of Agency § 320, and comment a (1958)); *see also Cumberland Farms, Inc. v. Marchese*, 2000 WL 33171003, * 5 (Mass. Super., Mar. 14, 2000)(citations omitted)("one who deals with an agent of a fully disclosed principal may only seek recovery from the principal for any contract-based claims.").

The SAC must be examined closely to see if the allegations as to each individual plaintiff are that the individual plaintiff was acting only as an agent of Iron Mountain or also was acting individually. Turning to Reese first, the only promises he is alleged to have made to Carr are that he "offered $5 million to Carr to use to buy out Pierce's share of Logisteq" and that he "promised that Iron Mountain would hire Carr as a transportation consultant and provide $25 million in courier business to Systrans, Inc." (#45, ¶ 18) Carr in the SAC asserts that Reese was acting "[i]ndividually as well as acting as agent of Iron Mountain." (#45, ¶ 18) Viewing the allegations in the light most favorable to Carr, he has barely alleged the existence of a contract between Reese

16

individually and himself–i.e., the payment of $5 million for Carr to buy out Pierce's share of Logisteq. Although unlikely, it is possible that Reese could have been acting individually when he made such a promise. Thus, at this point, the breach of contract claim against Reese should not be dismissed.

Turning now to Watzke, the only allegations are that Watzke "promised that Iron Mountain would pay for Carr's attorneys' fees in his suit against Pierce" and that "Iron Mountain would retain Carr in a consulting position." (#45, ¶ 19) The only other allegation against Watzke is simply that he agreed that Reese would meet with Carr at a later date. (#45, ¶ 27) Thus, even though it is alleged that Watzke was acting individually and as an agent of Iron Mountain, it is obvious from the face of the SAC that the two purported promises he made were made only on behalf of Iron Mountain, a fully disclosed principal. Thus, Watzke was not a party to any contract and cannot be sued for breach thereof. As a result, the breach of contract claim should be dismissed against Watzke.

As for Varn, the allegations in the SAC are that he "promised that Iron Mountain would wire a $50,000 retainer to Arthur Peslak, Mr. Carr's counsel in disputes involving Pierce" and that he "promised $2 million dollars for Carr to use to pay off certain debts incurred during the preceding year or two."(#45,

17

¶¶ 20, 29) Carr contends that Varn was acting "individually, as a partner in the Boston firm of Sullivan and Worcester and acting as an agent of Iron Mountain...." (#45, ¶ 20) Like the claims against Reese, the latter claim against Varn is enough, when viewed in the most favorable light, to state a claim against him individually. It is possible, although unlikely, that Varn could have been making the promise of a $2 million payment on behalf of himself, rather than on behalf of Iron Mountain. Thus, at this juncture, the breach of contract claim should stand against Varn. Therefore, the Court shall recommend that Count I of the SAC be dismissed as against Watzke but not as against Reese and Varn.

## B. *Fraudulent Misrepresentation*

The plaintiffs argue that the fraudulent misrepresentation claim against the individual plaintiffs should be dismissed because: (1) Carr has not pleaded the required elements for a fraudulent misrepresentation claim; and (2) the SAC does not satisfy the particularity requirements of Fed. R. Civ. P. 9(b) ("Rule 9(b)"). Not surprisingly, Carr disagrees, asserting that he has successfully and specifically pleaded all of the required elements of fraudulent misrepresentation.

18

In order to state a claim for fraud[]..., the plaintiff must allege:

> (1) that the statement was knowingly false; (2) that [defendants] made the false statement with the intent to deceive; (3) that the statement was material to the plaintiffs' decision . . . ; (4) that the plaintiffs reasonably relied on the statement; and (5) that the plaintiffs were injured as a result of their reliance.

*Doyle v. Hasbro, Inc.*, 103 F.3d 186, 193 (1 Cir., 1996), quoting *Turner v. Johnson & Johnson*, 809 F.2d 90, 95 (1 Cir., 1986); *see also Johnson v. Brown & Williamson Tobacco Corp.*, 122 F. Supp. 2d 194, 207 (D. Mass., 2000).

The plaintiffs' first argument as to Carr's fraud claim is that Carr has failed adequately to plead reasonable reliance and that Carr has failed to detail any action he took as a result of the plaintiffs' purported promises. Notably, both cases that plaintiffs rely upon to support their argument are summary judgment cases, not motion to dismiss cases. Carr's response is that at the motion to dismiss stage, the Court's inquiry should be limited and that the SAC has satisfactorily alleged reliance, as well as the other elements of fraud.

Looking at the SAC, Carr has alleged reliance. *See* #45, ¶ 26 ("In direct and full reliance on the aforementioned promises of consideration, Carr continued to cooperate with the Counter-Defendants...."); #45, ¶ 36 ("As a direct result of his reliance on the false statements of Iron Mountain, Carr has lost his business...."); #45, ¶ 54 ("Carr did in fact rely on the aforementioned

19

false statements, not knowing them to be false, to his detriment....").  The issue is thus whether Carr's allegations of reliance are enough to withstand the motion to dismiss.

The plaintiffs argue that Carr does not allege that he took (or forewent) any action in reliance on the plaintiffs' promises.  However, Carr does purport that he "continued to cooperate" with the plaintiffs and as a result, he "lost his business and was shackled with debt." (#45, ¶ 26) While certainly this allegation is bare-bones, it is enough to withstand the motion to dismiss.  *See, e.g., Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.,* 577 F. Supp. 1281, 1287 (D. Mass., 1983)(allowing motion to dismiss misrepresentation claims because "plaintiff failed to plead adequately the reliance element...."); *Young v. Deloitte & Touche, LLP,* 2004 WL 2341344, *5 (Mass. Super., Sept. 20, 2004)(denying motion to dismiss misrepresentation claim because plaintiff "alleged that the shareholders....'justifiably relied upon Deloitte's false statements and misrepresentations' in taking certain action. This is enough at this stage of the case.").  Thus, the Court shall not recommend that the fraud claim be dismissed on the grounds that Carr failed sufficiently to plead reliance.

The plaintiffs next assert that the so-called representations made by the plaintiffs to Carr are not actionable because they were all promissory in nature. Carr responds that promises relating to future events can be actionable if, like in this case, they were made without intention of performance or if one party has superior knowledge concerning the matters to which the misrepresentations relate.

It is established law that, "only statements of fact, not statements of opinion, future conditions, or matters promissory in nature, are actionable as fraud....A statement that is promissory in nature, however, may be actionable where the defendant misrepresents his actual present intent to perform a future act." *Armstrong v. Rohm and Haas Co., Inc.*, 349 F. Supp.2d 71, 81 n. 4 (D. Mass., 2004)(citations omitted).  In the case at bar, Carr alleged that "Iron Mountain through the aforementioned officers, agent and outside counsel had absolutely no intention of following through on said considerations" (#45, ¶ 33) and that the "Counter-Defendants...knew that they had no intention of fulfilling said obligations and/or promises...." (#45, ¶ 52) Thus, it has adequately been alleged that the plaintiffs did not have the intent to perform their future acts, and thus representations that were promissory in nature could be actionable.

21

This allegation is enough to withstand the motion to dismiss.

Because the Court has determined that the representations, as pled by Carr, are actionable, it need not address Carr's argument regarding the plaintiffs having superior knowledge as to the subject matter of the representations. Consequently, the Court rules that the plaintiffs' are not entitled to dismissal of the fraud claim on the basis that all of the alleged statements were promissory in nature.

Last, the plaintiffs argue that the SAC does not satisfy the particularity requirements of Rule 9(b). In short, say the plaintiffs, Carr has not alleged "supporting facts showing that the statements were false when made, as an intention to perform in the future cannot be established merely by the promise's subsequent non-performance." (#44 at 18) The plaintiffs also argue that the SAC is faulty because it does not allege separate and specific facts of an intention to deceive or reliance against each of the plaintiffs. (#44 at 18-19) Carr asserts, in response, that "each and every promise by each and every [plaintiff] is set forth with particularity in paragraphs 18, 19, 20, 22, 23, 24, 27, 28, 29, and 30." (#46 at 13)

"The First Circuit strictly applies the particularity requirements of Rule 9(b)....Under the First Circuit test, Rule 9(b) requires specification of the time,

22

place and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent can be inferred." *Bio-Vita, Ltd. v. Rausch*, 759 F. Supp. 33, 37 (1 Cir., 1991)(citations and internal quotations omitted). Moreover, it is well-established that, "[i]n a case...where multiple defendants are named, it is incumbent upon the plaintiff to particularize, at least to some extent, the activities for which it attempts to hold each defendant accountable....Each individual defendant is entitled to notice of the particulars of the fraudulent acts it is alleged to have committed." *Prudential Ins. Co. of America v. Turner & Newall, PLC*, 1988 WL 150491, *8 (D. Mass., Dec. 12, 1988). *See also Goebel v. Schmid Bros., Inc.*, 871 F. Supp. 68, 73 (D. Mass., 1994)(citations omitted)("when multiple defendants are involved in cases arising in this circuit, Rule 9(b) requires that fraud be alleged particularly as to each defendant.").

Thus, it is clear that Carr, in order to withstand the motion to dismiss, must have alleged fraud with particularity as to each individual plaintiff.[6] If he did not do so, then the SAC must be dismissed as to that plaintiff for failure to comply with Rule 9(b). *See Goebel*, 871 F. Supp. at 73, 79 (allowing motion to

---

[6]    As mentioned above, Carr did not bring the fraudulent misrepresentation claims against Iron Mountain or IMIM, just against the individual plaintiffs.

23

dismiss because plaintiffs failed to attribute to defendant "with the requisite particularity, any allegedly fraudulent misrepresentations...."); *Prudential Ins.*, 1988 WL 150491 at *9 (plaintiff referred to defendants collectively and included "no detail as to who made which statement, where and when.").

In reviewing the SAC, it is apparent that Carr has satisfied Rule 9(b) because he has alleged the "time, place and content" of each purportedly fraudulent misrepresentation. *See* #45 at ¶ 18 (Reese), ¶¶ 18, 22 (Kenny), ¶¶ 19, 27 (Watzke), ¶ 28 (Moore), ¶ 29 (Varn)[7]. The plaintiffs argue that the fraud claim should be dismissed under Rule 9(b) because Carr failed to plead reliance and knowledge of falsity as to each plaintiff individually. However, Rule 9(b) does not require Carr to do so–that rule requires only that a pleading "specify the time, place and content of each alleged false representation." *Bio-Vita*, 759 F. Supp. at 37. "Malice, intent, knowledge, and other conditions of mind may be averred generally." *Suna v. Bailey Corp.*, 107 F.3d 64, 68 (1 Cir., 1997)(quoting Rule 9(b)). Carr has adequately set forth the time, place and content of each supposedly fraudulent misrepresentation.

As to the plaintiffs' last argument–that dismissal under Rule 9(b) is

---

[7]

This is not to suggest that such allegations could stand up at the summary judgment stage. Especially as to Moore, the allegations of fraud just barely survive Rule 9(b) at this motion to dismiss stage.

24

appropriate because Carr alleged the knowledge of the falsity of the promises "in the most conclusory fashion," the plaintiffs point out that Carr's only allegation as to knowledge of falsity is that "[i]n hindsight" the plaintiffs "knew that [their] statements....were false." (*See* #45, ¶ 33) The plaintiffs assert that such summary allegations are not enough under Rule 9(b).

Carr does indeed rely on conclusory allegations that the plaintiffs knew their promises were false when made.    And, the rule is that "[a]lthough a plaintiff need not specify the circumstances or the evidence from which fraudulent intent could be inferred, the complaint must provide some factual support for the allegations of fraud." *Reisman v. KPMG Peat Marwick LLP*, 965 F. Supp. 165, 172 (D. Mass., 1997).[8]    Although it is a close call, the Court finds that Carr simply does not offer enough in the way of factual support such that it could reasonably be inferred at the motion to dismiss stage that the plaintiffs knew their statements were false *when made*.

For example, Carr avers that Iron Mountain and its employees told Carr

---

[8]

In *Reisman*, the court found that complaint did set forth "specific factual allegations which, if proven, would permit a reasonable factfinder to conclude that [defendant] made false representations of material fact with knowledge of their falsity...." 965 F. Supp. at 172.    Thus, although *Reiman* talks in terms of providing factual support for the intent element of fraud, the court goes on to address the knowledge of the falsity of the statements.    Seemingly, the intent and knowledge element are somewhat intertwined.    Here, while Carr did sufficiently allege intent for purposes of surviving the 12(b)(6) motion, he did not, under the requirements of Rule 9(b),  adequately provide factual support for his one allegation that the plaintiffs knew their statements were false when made.

that he would be compensated if he assisted them in their lawsuit against Pierce (#45, ¶ 13), that Iron Mountain had already paid Carr's legal fees in the amount of $50,000 (#45, ¶ 16.1) and that Iron Mountain sought Carr's participation in the lawsuit against Pierce because Iron Mountain wanted Pierce to have to defend simultaneous lawsuits (#45, ¶ 17). All of this certainly suggests a potential "motive" for all of Iron Mountain's promises–it would promise Carr huge rewards if he, in turn, cooperated with Iron Mountain in its action against Pierce. However, these allegations are not enough, even viewed in the most favorable light, to support an inference that the promises were false when made. Perhaps the promises were true when made and it was only after Iron Mountain lost its arbitration with Pierce that Iron Mountain decided to back out of its promises to Carr. That is, Carr just does not include sufficient allegations in his SAC to support the conclusion or even the inference that the plaintiffs knew that their statements were false when made.

In short, all Carr puts forth is one statement that "in hindsight" it is apparent that the plaintiffs knew their statements were false when made. In *De Jesus v. Sears, Roebuck and Co.,* 1995 WL 122726, *4 (S.D.N.Y., Mar. 22, 1995), *aff'd,* 87 F.3d 65 (2 Cir., 1996), *cert. denied,* 519 U.S. 1007 (1996), the court

26

dismissed plaintiffs' fraud complaint which contained only one statement that defendant's "agents 'knew' that their statements to plaintiffs were false when made." The *De Jesus* court explained that "[s]uch conclusory allegations are insufficient under Rule 9(b) to convert what may possibly be contract claims into fraud claims." *De Jesus,* 1995 WL 122726, at *4 . Similarly, in the case at bar, Carr has not pled his fraud claim with sufficient particularity. Thus, this Court shall recommend that the fraud count against all of the individual plaintiffs be dismissed pursuant to Rule 9(b).

## V. CONCLUSION

For the aforementioned reasons, I RECOMMEND that the plaintiffs' motion to dismiss Count I (breach of contract) of Carr's Second Amended Counterclaim (as to all plaintiffs except Moore and Kenney as set forth in pleading #44) be ALLOWED as to plaintiff Watzke and DENIED as to plaintiffs Reese, Varn, Iron Mountain and IMIM. I further RECOMMEND that the Counterclaim-Defendants Motion to Dismiss Counterclaim-Plaintiff's Fraudulent Misrepresentation Claim (#13) contained in Count II of Carr's Second Amended Counterclaim be ALLOWED as to all plaintiffs pursuant to Fed. R. Civ. P. 9(b).

## VI. REVIEW BY THE DISTRICT JUDGE

27

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrate Judges in the United States District Court for the District of Massachusetts, any party who objects to this report and recommendation must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review. *See Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1 Cir., 1980); *United States v. Vega*, 678 F.2d 376, 378-79 (1 Cir., 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983). *See also Thomas v. Arn*, 474 U.S. 140 (1985).

*/s/ Robert B. Collings*

ROBERT B. COLLINGS
United States Magistrate Judge

March 13, 2006.

# EXHIBIT I

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; and CHARLES G. MOORE, <br><br> Plaintiffs and Counterclaim Defendants, <br><br> v. <br><br> THOMAS CARR, <br><br> Defendant and Counterclaim-Plaintiff. | ) ) ) ) ) ) ) ) ) CIVIL ACTION ) NO. 05 10890 RCL ) ) ) ) ) ) ) ) ) |

## DEFENDANT'S SUPPLEMENTAL RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendant Thomas Carr, by his attorneys, and with reference to the Plaintiffs' counsel's letter of December 7, 2006, supplements his answers to the Plaintiffs' First Set of Interrogatories as follows:

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:

We have produced or will produce by the close of discovery each and every document, tangible thing, and especially taped conversation that we intend to use at trial.

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:

Promises made directly to Tom Carr by one or more of the Plaintiffs/Counter-Defendants herein included $2MM to handle personal debts as well as a $5MM loan to buy his business back

4848714

from Pierce and employment as a consultant to IM with a salary and benefits commensurate with

his situation prior to Pierce's arrival. We would calculate wages and benefits for a five year

period -- whether "back at the wheel of his own ship" or as a consultant to IM to be worth at

least $2.5MM. In addition, promises were very clearly made to pay Carr's legal expenses in

pursuing Pierce and otherwise being involved in the Pierce litigation at the request of IM -- not

just $50K. This broken promise has a value of at least $200K. Various promises were made to

Mr. Carr and his wife to hold them harmless for any economic loss which befell them because of

fall-out from the actions of Mr. Pierce once Mr. Carr aligned himself with IM. In addition to

wages and benefits lost as previously covered, there are loan guarantees and losses of net profits

which we will estimate to be, over five years, $1MM. The moneys Colonial Bank demanded

from Carr alone (which Carr has paid over time at much personal sacrifice) as a result of his

personal guarantee of moneys to buy equipment for the Pierce/Carr business was nearly $400K.

And finally there is the extent to which business revenues promised to Systrans would benefit

Carr. Carr had no ownership interest in Systrans -- but was a creditor and was owed $600K

which he loaned to capitalize the start-up business being operated by his lifelong friend Jim

Neebling. While the $600K loan did not require the payment of interest, instead, the creditor

Carr would receive a percentage of the net profits earned by Systrans which is currently being

calculated and currently being discussed with an Economist whose identity and opinion will be

shared in due course if the parties are able to engage his services. All of the foregoing will total

no less than $6.8MM which will remain our total damages claim until modified prior to the close

of discovery.

SUPPLEMENTAL RESPONSE TO INTERROGATORIES NO. 8-10:

We object to these interrogatories in that they call for information that is neither relevant to this action nor calculated to lead to the discovery of admissible evidence. As for Mr. Carr's credibility, if he were to testify, then you would at that time be able to attempt to impeach it.

Without waiving that or any other objection, we respond as follows: The current status of Mr. Carr's problems with the law is simple: he has been cooperating with the Department of Justice and has not been sentenced. Moreover, you have produced to us many more documents and transcripts regarding these indictments than Mr. Carr or his counsel have ever seen.

Respectfully submitted,

December 19, 2006

Read K. McCaffrey (pro hac vice)
Ilya Shapiro (pro hac vice)
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-6000
rmccaffrey@pattonboggs.com
ishapiro@pattonboggs.com

<u>Certificate of Service</u>

I certify that on this 19 day of December, 2006, I caused to be served on the counsel

identified and in the manner indicated this **Defendant's Supplemental Response to Plaintiffs'**

**First Set of Interrogatories**.

> Ira K. Gross (BO #12720)
> Samuel A. Miller (BBO #648568)
> SULLIVAN & WORCESTER LLP
> One Post Office Square
> Boston, MA 02109
> (617) 338-2800

(by first class mail)

Ilya Shapiro

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED;<br>IRON MOUNTAIN INFORMATION<br>MANAGEMENT, INC.; C. RICHARD<br>REESE; JOHN F. KENNY, JR.;<br>GARRY B. WATZKE; LARRY L. VARN;<br>and CHARLES G. MOORE,<br><br>         Plaintiffs and<br>         Counterclaim Defendants,<br><br>         v.<br><br>THOMAS CARR,<br><br>         Defendant and<br>         Counterclaim-Plaintiff. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) CIVIL ACTION<br>) NO. 05 10890 RCL<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## DEFENDANT'S VERIFIED SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendant Thomas Carr, by his attorneys, and with reference to the Plaintiffs' counsel's letter of December 7, 2006 and his own Fourth Amended Initial Disclosures, supplements his answers to the Plaintiffs' First Set of Interrogatories as follows:

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:

We have produced or will produce by the close of discovery each and every document, tangible thing, and especially taped conversation that we intend to use at trial.

4877354

SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:

Please refer to the damages portion of Carr's Fourth Amended Initial Disclosures. We will supplement this response with calculations and documents as these are developed.


SUPPLEMENTAL RESPONSE TO INTERROGATORIES NO. 8-10:

We object to these interrogatories in that they call for information that is neither relevant to this action nor calculated to lead to the discovery of admissible evidence. As for Mr. Carr's credibility, if he were to testify, then you would at that time be able to attempt to impeach it.

Without waiving that or any other objection, we respond as follows: The current status of Mr. Carr's problems with the law is simple: he has been cooperating with the Department of Justice and has not been sentenced. Moreover, you have produced to us many more documents and transcripts regarding these indictments than Mr. Carr or his counsel have ever seen.


Respectfully submitted,

March 27, 2007

Read K. McCaffrey (pro hac vice)
Ilya Shapiro (pro hac vice)
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-6000
rmccaffrey@pattonboggs.com
ishapiro@pattonboggs.com

4877354                                      2

## VERIFICATION

I, Thomas Carr, have read the foregoing DEFENDANT'S VERIFIED SECOND SUPPLEMENTAL RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES, and verify under penalty of perjury that the factual matters stated in the Responses therein are true and correct to the best of my knowledge.

_____
Thomas Carr

Sworn and subscribed before me
by Thomas Carr this 25 day of ~~March~~, 2007.

_____
Notary Public

MARYANN TORRE
NOTARY PUBLIC OF NEW JERSEY
Commission Expires 3-19-08

4877354

<u>Certificate of Service</u>

I certify that on this 30th day of April, 2007, I caused to be served on the counsel

identified and in the manner indicated this **Defendant's Verified Second Supplemental**

**Response to Plaintiffs' First Set of Interrogatories.**

> Ira K. Gross (BO #12720)
> Samuel A. Miller (BBO #648568)
> SULLIVAN & WORCESTER LLP
> One Post Office Square
> Boston, MA 02109
> (617) 338-2800

(by first class mail)

_____
Ilya Shapiro