## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; and CHARLES G. MOORE, )))))))) | |
| Plaintiffs and Counterclaim-Defendants, )) | CIVIL ACTION NO. 05 10890 RCL |
| v. ) | |
| THOMAS CARR, )) | |
| Defendant and Counterclaim-Plaintiff. )) | |
| IRON MOUNTAIN INFORMATION MANAGEMENT, INC., ))) | |
| Plaintiff, )) | CIVIL ACTION NO. 05 10999 RCL |
| v. )) | |
| SYSTRANS FREIGHT SYSTEMS, INC., )) | |
| Defendant. )) | |

## MEMORANDUM OF LAW OF IRON MOUNTAIN AND
## IRON MOUNTAIN INFORMATION MANAGEMENT, INC.
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## Table of Contents

Page

I. INTRODUCTION ...................................................................................................1

II. STATEMENT OF FACTS ....................................................................................2

    A. Background ...................................................................................................2

        1. The Parties ...........................................................................................2

        2. Iron Mountain's Acquisition of Pierce Leahy Corporation ................3

        3. Formation of Logisteq, LLC and Sequedex LLC ...............................3

    B. Carr Initiates Contact with Iron Mountain ..................................................4

    C. Iron Mountain Sues Pierce, and Carr Sues Pierce........................................4

    D. The Alleged Promises Made to Carr .............................................................5

    E. The "Evidence" Concerning the Alleged Contracts ......................................7

    F. Plaintiffs File This Declaratory Judgment Action ......................................10

III. ARGUMENT ......................................................................................................10

    A. Standard ......................................................................................................10

    B. Plaintiffs Are Entitled To Summary Judgment On Carr's Claim For $2 Million Because There Was No Enforceable Contract To Give Carr $2 Million ...................11

    C. Plaintiffs Are Entitled To Summary Judgment Because Carr Has Repeatedly Admitted That Iron Mountain And Its Lawyers Made No Promises To Him ............12

    D. The Alleged Promise To Provide Revenue to Systrans and the Alleged Promise to Hire Carr as a Consultant are Unenforceable Under the Statute of Frauds ................14

        1. The alleged promise to provide revenue to Systrans "each year for a period of five years" is unenforceable under the Statute of Frauds. ...............................14

        2. The alleged promise to hire Carr as a consultant is unenforceable under the Statute of Frauds. ...........................................................................................15

i

**Table of Contents**
(continued)

Page

E.  The Counterclaim For Breach Of The Alleged Promise To Provide Business To
    Systrans Fails Because: (i) There Is No Evidence That Any Of The Plaintiffs Made
    This Promise, Let Alone To Carr; (ii) Carr Had No Interest In Systrans; and (iii)
    Carr's Alleged Damages Cannot Be Calculated With Reasonable Certainty..............16

IV.  CONCLUSION.....................................................................................................................19

## TABLE OF AUTHORITIES

### FEDERAL CASES

Armstrong v. Rohm & Haas Co., 349 F. Supp. 2d 71 (D. Mass. 2004) ........................5, 18

Bergin v. Dartmouth Pharm., Inc., 326 F. Supp. 2d 179 (D. Mass. 2004) ........................11

Camar Corp. v. Preston Trucking Co., 221 F.3d 271 (1st Cir. 2000)................................18

Colantuoni v. Alfred Calcagni & Sons, 44 F.3d 1 (1st Cir. 1994)....................................13

Davis v. Dawson, Inc., 15 F. Supp. 2d 64 (D. Mass. 1998).................................................5

DeNovellis v. Shalala, 124 F.3d 298 (1st Cir. 1997).....................................................10, 11

Doherty v. Doherty Insurance Agency, Inc., 878 F.2d 546 (1st Cir. 1989)......................15

Doyle v. Hasbro, Inc., 103 F.3d 186 (1st Cir. 1996) ...........................................................5

Giuliano v. Nations Title, 1998 U.S. App. LEXIS 1136 (1st Cir. Jan. 23, 1998) ..............5

Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49 (1st Cir. 2000) ...............13

Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp., 317 F.3d 16 (1st Cir. 2003)..........16

Hodgkins v. New Eng. Telegraph Co., 82 F.3d 1226 (1st Cir. 1992) ...............................12

Korpacz v. Women's Prof'l Football League,
    2006 U.S. Dist. LEXIS 3154 (D. Mass. Jan. 27, 2006) ..............................................18

Mauldin v. Shaffer, 1977 U.S. Dist. LEXIS 13585 (M.D.N.C. Oct. 7, 1997)...................12

Michelson v. Digital Finance Services, 167 F.3d 715 (1st Cir. 1999)...............................13

Murphy v. Ford Motor Co., 170 F.R.D. 82 (D. Mass. 1997)......................................13, 18

Powers v. Boston Cooper Corp., 926 F.2d 109 (1st Cir. 1991).........................................15

Smith v. Stratus Computer, Inc., 40 F.3d 11 (1st Cir. 1994) ............................................11

Stefanik v. Friendly Ice Cream Corp., 183 F.R.D. 52 (D. Mass. 1998) ...........................13

Thore v. Howe, 466 F.3d 173 (1st Cir. 2006)...................................................................13

Whelan v. Intergraph Corp., 889 F. Supp. 15 (D. Mass. 1995).........................................15

## STATE CASES

Beaver v. Raytheon Manufacturing Co., 299 Mass. 218 (1938) ................................14, 15

Bogash v. Studios, Inc., 303 Mass. 207 (1939) ................................................14

Broad Street National Bank of Trenton v. Collier, 169 A. 552 (N.J. 1933) ......................12

DiGaetano v. Lawrence Firefighters Federal Credit Union, No. 01-01373,
    2002 Mass. Super. LEXIS 447 (Mass. Super. Ct. Nov. 5, 2002) ................................15

Greater Boston Cable Corp. v. White Mountain Cable Construction Corp.,
    414 Mass. 76 (1992) ........................................................................12

Held v. Zamparelli, 13 Mass. App. Ct. 957 (1982) ............................................19

Henry W. Savage, Inc. v. Friedberg, 322 Mass. 321 (1948) ....................................12

Hill v. Hooper, 67 Mass. 131 (1854) .........................................................14

John Hetherington & Sons, Ltd. v. William Firth Co., 210 Mass. 8 (1911) .....................19

Kalker v. Bailen, 290 Mass. 202 (Mass. 1935)................................................14

Kuzmeskus v. Pickup Motor Co., 330 Mass. 490 (1953) ........................................11

Leisure Sports Investment Corp. v. Riverside Enterprise, Inc.,
    7 Mass. App. Ct. 489 (1979)................................................................17

McCauley v. Sons Pharmacy, Inc., 3 Mass. App. Ct. 774-75 (1975)..............................19

Nile v. Nile, 432 Mass. 390 (2000)..........................................................11

Phoenix Spring Beverage Co. v. Harvard Brewing Co., 312 Mass. 501 (1942) ....................11

Rhode Island Hospital Trust National Bank v. Varadian, 419 Mass. 841 (1995) .................11

Richard Tucker Associates, Inc. v. Smith, 395 Mass. 648 (1985)...........................14, 15

Rosenfield v. United States Trust Co., 290 Mass. 210 (1935).................................11

Sisters of Charity of the Incarnate Word v. Int'l Med. Equip. Collaborative,
    2004 Mass. Super. LEXIS 223 (Mass. Super. Ct. Apr. 20, 2004)..............................17

Smith v. Vose & Sons Piano Co., 194 Mass. 193 (1907).......................................17

Plaintiffs and Counterclaim-Defendants Iron Mountain Incorporated ("Iron Mountain") and Iron Mountain Information Management, Inc. ("IMIM") (together, "Plaintiffs") respectfully submit this memorandum in support of their motion for summary judgment.[1] Plaintiffs request that the Court: (a) enter a declaration that they have no contractual or other legal obligations to Defendant and Counterclaim-Plaintiff Thomas Carr ("Carr"); and (b) dismiss Carr's counterclaim for breach of contract against Iron Mountain and IMIM.

## I. INTRODUCTION

In response to the baseless claims of Carr, a twice-confessed federal felon, that Plaintiffs made promises to him worth millions of dollars, Plaintiffs filed this action for a declaration that they had no contractual or other legal obligations to Carr. In response, Carr filed a series of counterclaims, asserting that Plaintiffs had defrauded him and made a series of extravagant oral promises to him. None of the alleged promises was ever made, or even referenced, in a writing.

In March 2006, this Court dismissed Carr's counterclaims, except for one for breach of an oral contract against Iron Mountain, IMIM, Reese and Varn. The Court accepted Carr's allegations as true for purposes of the Plaintiffs' motion to dismiss, but observed that Carr's surviving claim was "barely alleged" and its chances of success were "unlikely." Now, after exhaustive discovery, the fecklessness of Carr's remaining allegations is fully revealed.

In two prior proceedings, Carr testified that Plaintiffs never promised him anything and affirmed his prior testimony in this case. In the face of these repeated admissions, Carr persists in maintaining that one or more of the Plaintiffs orally promised to: (1) hire Carr as a transportation consultant; (2) supply Systrans LLC ("Systrans"), a company owned by Carr's friend, James Neebling ("Neebling"), with either $25 million or $45 million in courier business

---

[1] The individual plaintiffs, C. Richard Reese ("Reese"), John F. Kenny, Jr. ("Kenny"), Garry B. Watzke ("Watzke"), Larry L. Varn ("Varn") and Charles G. Moore ("Moore") filed a separate motion for summary judgment.

per year for a period of five years; (3) pay for Carr's legal fees with respect to a lawsuit that Carr

had filed in New Jersey state court; and (4) pay Carr $2 million.

No reasonable fact finder could conclude on this record that Carr had an enforceable

contract with any of the Plaintiffs. It is abundantly clear that Carr's half-baked theories are

unsupported by the facts and plagued with legal deficiencies, including: (i) the alleged "promise"

to give Carr $2 million is unenforceable because, even according to Carr, this "promise" was

only a statement to "try" and "work something out " and is not supported by consideration; (ii)

the Statute of Frauds bars enforcement of the alleged promises to hire Carr as a transportation

consultant or to provide business to Systrans; and (iii) Carr lacks standing to sue for breach of

the alleged promise to provide Systrans with courier business because, even according to Carr

(and according to Neebling), this promise was never made to Carr. Thus, even viewed in the

light most favorable to Carr, the evidence irrefutably undercuts Carr's allegations, and summary

judgment should enter on the last vestige of Carr's counterclaim.

## II. STATEMENT OF FACTS

### A.    Background

#### 1.    The Parties

Iron Mountain, based in Boston, is the global leader for outsourced records and

information management services ("<u>RIMS</u>").  <u>See</u> Complaint for Declaratory and Injunctive

Relief (the "<u>Complaint</u>" or "<u>Compl.</u>")[2] ¶ 2.  IMIM is a wholly-owned subsidiary of Iron

Mountain.  Compl. ¶ 3.  Reese is the Chairman of the Board of Directors and CEO of Iron

Mountain, and CEO of IMIM.  Compl. ¶ 4.  Varn is a partner of Sullivan & Worcester LLP

---

[2] The Complaint is attached to the Declaration of Ira K. Gross, Esq. ("<u>Gross</u> <u>Declaration</u>" or "<u>Gross</u> <u>Decl.</u>"),
submitted herewith and incorporated herein by reference, as Exhibit A.

("S&W"), which regularly represents Iron Mountain and IMIM.[3]  Compl. ¶ 7.  Defendant Carr

resides in New Jersey.  Compl. ¶ 9.

### 2.    Iron Mountain's Acquisition of Pierce Leahy Corporation

This case has its genesis in a corporate transaction that occurred in 2000, when Iron

Mountain acquired Pierce Leahy Corp. ("PLC"), also a leader in the RIMS industry.  See

Defendant's and Counter-Plaintiff's Second Amended Counterclaim (the "SAC")[4] ¶ 1.

Following the acquisition, J. Peter Pierce ("Pierce"), the head of PLC, was elected to the Board

of Directors of Iron Mountain and was appointed President and Chief Operating Officer of

IMIM.  SAC ¶ 2.  In connection with the acquisition, Pierce and PLC entered into a written

employment agreement that prohibited Pierce from competing, with Iron Mountain.  SAC ¶ 4.

In June 2000, Pierce's employment was terminated.  SAC ¶ 3.  Pierce remained a member of

Iron Mountain's Board of Directors until his resignation on December 23, 2002.  Id.

### 3.    Formation of Logisteq, LLC and Sequedex LLC

In early 2001, Carr and Pierce agreed to form a transportation and coffee storage

company known as Logisteq, LLC ("Logisteq"), based in Freehold, New Jersey, that succeeded

two former businesses owned and operated by Carr.  SAC ¶ 5.  At the conclusion of the

transaction, entities controlled by Pierce and Carr owned 51% and 49%, respectively, of

Logisteq.  SAC ¶ 5.  Pierce paid Carr $3.8 million dollars for the majority interest.  See

Deposition of Thomas Carr, taken February 28, 2007 and March 15, 2007 ("Carr Deposition" or

---

[3] Kenny is senior officer of Iron Mountain and IMIM.  Compl. ¶ 5.  Watzke is a Vice President and the General Counsel of Iron Mountain and IMIM.  Compl. ¶ 6.  Moore is the principal of C.G.M. Private Detective Group, and is from time to time engaged by Varn and S&W, in their capacity as counsel to Iron Mountain and IMIM, to provide investigatory services.  Compl. ¶ 8.  On March 31, 2006, this Court adopted the reports and recommendations of Magistrate Judge Collings granting in part and denying in part certain motions to dismiss filed by Plaintiffs in this action.  As a result, Carr's counterclaims against Kenny, Watzke and Moore have been dismissed.

[4] The SAC is attached to the Gross Declaration as Exhibit B.

"Carr Depo.")[5] p. 252 and Exhibit 10; see also Deposition of Arthur Peslak, Esq., taken March 14, 2007 ("Peslak Deposition" or Peslak Depo.")[6] p. 5.

Pierce was also involved with Sequedex LLC ("Sequedex"), an IMIM competitor in the RIMS industry. SAC ¶ 6. Carr has alleged, and Iron Mountain believes, that Sequedex competed surreptitiously (in violation of Pierce's non-compete covenant) with Iron Mountain.

**B.      Carr Initiates Contact with Iron Mountain**

In or about October 2001, Carr telephoned Watzke and requested a meeting with Iron Mountain. Carr Depo. Exhibit 4 at pp. 114-17. Although he had received over $3.8 million from Pierce (Carr Depo p. 252), Carr was "unhappy" with their relationship and was "looking for financing" to buy back Pierce's 51% share of Logisteq. Carr Depo. Exhibit 4 at p. 120. Carr claimed to have evidence of Pierce's breaches of duty to Iron Mountain and, over the next several months, met with Plaintiffs on several occasions, regaling them with stories regarding this supposed evidence. SAC ¶¶ 6, 13, 26.

**C.      Iron Mountain Sues Pierce, and Carr Sues Pierce**

In late March 2002, Iron Mountain and IMIM filed a complaint against Pierce (the "Pierce Litigation") alleging, *inter alia*, that Pierce had violated his non-compete covenants with Iron Mountain and his fiduciary obligations to Iron Mountain and its stockholders. SAC ¶ 7. The Pierce Litigation was stayed pending arbitration (the "Pierce Arbitration").

In April 2002, shortly after the Pierce Litigation was filed, Carr also filed a complaint against Pierce in Monmouth County, New Jersey (the "Carr Litigation"), in which he alleged, *inter alia*, that Pierce "abused Logisteq" and "used Logisteq as part of a scheme to gain revenge against Iron Mountain." See Peslak Depo. Exhibit 2 at ¶ 74. Carr retained Arthur Peslak, Esq.

---

[5] Relevant pages and exhibits from the Carr Deposition are attached to the Gross Declaration as Exhibit C.

[6] Relevant pages and exhibits from the Peslak Deposition are attached to the Gross Declaration as Exhibit D.

("Peslak") to represent him in the Carr Litigation.  Peslak Depo. pp. 7-8.  No one at Iron

Mountain encouraged Carr to file the Carr Litigation.[7]  See Carr Depo. Exhibit 1 at p. 16.

**D.    The Alleged Promises Made to Carr**

Carr has alleged that, "in consideration for information being supplied by Mr. Carr and/or

confirmations being provided by Mr. Carr," Plaintiffs made a host of extravagant promises to

him.  SAC ¶¶ 16 – 24.  These alleged promises, evidenced by not so much as a scrap of paper

(Carr Depo. p. 5), are: [8]

- On March 26, 2002, during a meeting at Iron Mountain's headquarters, Iron

  Mountain allegedly promised to hire Carr as a transportation consultant.  SAC

  ¶¶ 16.3, 19, 23.  Carr alleges that this promise was repeated by Watzke during

  an April 2, 2002 conference call.  SAC ¶ 19.

- During the same meeting, Iron Mountain allegedly promised that it would

  supply Systrans LLC ("Systrans"), a transportation company owned by Carr's

---

[7] The Pierce Arbitration concluded in February 2004.  On February 4, 2004, the arbitrator issued a written opinion in which he denied Iron Mountain's claim for damages against Pierce, and made specific reference to Carr as "a con-man who, *inter alia*, took Iron Mountain for $50,000 in fees to support a separate lawsuit against Pierce [and] who bamboozled Iron Mountain with corrupt 'evidence' from corrupt witnesses...."  Carr Depo. pp. 227-28 and Exhibit 7 at p. 30.  Carr was likewise unsuccessful in the Carr Litigation, and his claims against Pierce were dismissed without prejudice.  Peslak Depo. p. 85-86.

[8] In addition to these alleged promises, Carr has also alleged that one or more of the Plaintiffs: (1) orally promised to provide a $5 million loan for Carr to buy back Pierce's share of Logisteq (SAC ¶¶ 16.2, 18); (2) made oral "assurances" to a man named Paul Schwartz (who loaned money from Carr from time to time) that Carr was a good candidate to whom money could be loaned (SAC ¶¶ 16.6, 30); and (3) made oral "assurances" that if any "negative financial effects" befell Carr, Iron Mountain would indemnify him (SAC ¶ 16.7).  Because Carr does not seek any damages based on these alleged promises and assurances, these claims must be deemed abandoned.  Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996) (damages are an essential element to a claim for breach of contract); Davis v. Dawson, Inc., 15 F. Supp. 2d 64, 128 (D. Mass. 1998) (same).  Even if Carr were claiming damages, these alleged promises are too vague and indefinite to be enforceable.  Armstrong v. Rohm & Haas Co., 349 F. Supp. 2d 71, 78 (D. Mass. 2004) ("lack of definiteness in an agreement might be based on a lack of specificity regarding the time of performance, price to be paid, work to be done, or property to be transferred"); Giuliano v. Nations Title, 1998 U.S. App. LEXIS 1136, at *16 (1st Cir. Jan. 23, 1998) ("vague language gives a court no way to interpret and enforce the intent of the parties, and thus is an unenforceable contract").  The record is bare as to the material terms of the alleged promises to loan Carr $5 million and/or to indemnify him, and there is no evidence in the record as to how the alleged "assurances" to Mr. Schwartz created an enforceable contract between any of the Plaintiffs and Carr.

friend, James Neebling ("Neebling"), with either $25 million or $45 million in courier business per year for a period of five years. SAC ¶¶ 16.4, 18, 23.

- On April 2, 2002, during a conference call among Carr, Peslak and Watzke, Watzke allegedly promised that Iron Mountain would pay for Carr's legal fees in the Carr Litigation. SAC ¶¶ 16.1, 19 and 23. Although Carr has claimed that his legal fees in the Carr Litigation were $250,000, Peslak testified that the "total fees billed" were only $75,000 to $80,000, and those fees have already been paid in full. See Carr's Fourth Amended Initial Disclosures (the "Disclosures")[9] p. 13; see also Peslak Depo. p. 68.

- In September 2003, Varn allegedly promised that he would pay $2 million in cash to Carr so that he could satisfy certain obligations. SAC ¶¶ 16.5, 23, 29.

On or about April 9, 2002, after three of the above "promises" had allegedly been made, Carr met with Varn. Carr Depo. p. 148. At this meeting, Carr admitted, for the first time, that he had been indicted in August 2001 in the Southern District of New York (the "SDNY Indictment") for conspiracy and bank fraud.[10] See Carr Depo. pp. 52, 213 and Exhibit 6.

Later that day, Carr, Neebling, Peslak, Kenny, Reese and Varn had dinner in New York City. Carr Depo. pp. 152-53. Just prior to that dinner, Reese learned about the SDNY Indictment. See Deposition of C. Richard Reese, taken November 30, 2006 ("Reese Deposition" or "Reese Depo.")[11] pp. 44-45. Reese agreed to advance $50,000 to Peslak to help defray Carr's

---

[9] The Disclosures are attached to the Gross Declaration as Exhibit E.

[10] In September 2002, Carr was indicted again, this time in the Eastern District of New York (the "EDNY Indictment"), wherein he was charged with conspiracy to commit bank and wire fraud and conspiracy to launder money. Carr Depo pp. 227-28 and Exhibit 8. On September 29, 2004, Carr pled guilty to the charges of conspiracy to launder money (as charged in the EDNY Indictment) and bank fraud (as charged in the SDNY Indictment). Carr Depo. pp. 53-54 and Exhibit 2.

[11] Relevant pages from the Reese Deposition are attached to the Gross Declaration as Exhibit F.

legal expenses in the Carr Litigation, so that Carr could develop useful evidence against Pierce that Iron Mountain would itself otherwise be unable to obtain in the Pierce Arbitration.  Reese Depo. pp. 28-30; Carr Depo. p. 153.

**E.    The "Evidence" Concerning the Alleged Contracts**

Plaintiffs have consistently denied the existence of any contracts with Carr.  Carr himself has admitted, on several occasions, that he was never promised anything.  For example, on May 30, 2002, after three of the four "promises" had allegedly been made, Carr was deposed by Pierce's counsel in the Carr Litigation and testified under oath that Iron Mountain had never offered him anything in return for the "information" he supposedly provided:

> Q.    Other than paying or offering to pay for the legal bills in this case, has Iron Mountain offered or – has Iron Mountain given you or offered to give you anything in return for providing information to them?
> A.    *They're too smart for that.  Absolutely not.*
> Q.    Okay.
> A.    *They did not offer me any perks, any money, anything.*
> Q.    Have they dangled in front of you future employment or a future business association?
> A.    *None whatsoever.  They just asked me to speak the truth….*

See Carr Depo. Exhibit 1 at p. 183 (emphasis added).

On July 31, 2003, during the Pierce Arbitration, Carr again testified under oath that neither Iron Mountain nor its lawyers had promised him anything:

> Q.    Now, what promises were given to you by Iron Mountain, if any, or their lawyers, for gathering information on their behalf for use in this lawsuit?
> A.    *There was no promises given.*
> …
> Q.    That – let me finish, please.  That a promise was made by Garry Watzke to you that they would fund a lawsuit?
> A.    *For the record, he didn't promise, he said he would help compensate me for my attorney fees*.

Carr Depo. Exhibit 5 at pp. 945-46 (emphasis added).

In his deposition in *this* case, Carr was presented with both transcripts of his prior testimony, and was given an opportunity to explain any reason why his testimony was not accurate. Carr confirmed his prior testimony and his admissions that he was promised nothing:

> Q.    This is testimony that you gave under oath [in the case you brought against Mr. Pierce] and that you're affirming as correct at this time, correct?
> A.    *Yes, correct*.
>       …
> Q.    Mr. Carr, did you, in fact, give testimony at the arbitration captioned Iron Mountain Incorporated against J. Peter Pierce?
> A.    Yes, I did.
>       …
> Q.    And is that document that's before you a transcript of that testimony?
> A.    Yes, it is.
> Q.    Did you give that testimony under oath?
> A.    *Yes*.
> Q.    And was your testimony that day accurate?
> A.    *Yes, it was*.
> Q.    You told the truth?
> A.    *Yes, I did*.

Carr Depo. pp. 18, 212-13 (emphasis added).[12]

In his deposition in this case, Carr was questioned extensively about the March 26, 2002 meeting, and did not mention Iron Mountain's purported promise to hire him as a transportation consultant. <u>See</u> Carr Depo pp. 133-146 and Exhibit 3 at p. 1 (Q. "So, we talked about everything that went on at the March 26th meeting, correct?" A. "Yes, we did."). Carr also testified that in June 2002 (three months after this "promise" was allegedly made), he contacted Kenny and *asked for* a job, and Kenny responded that "he would see what he can do and get back to me." Carr Depo. pp. 237-38.

---

[12] Peslak testified in this case that, as far as he knew, Carr's testimony in the Carr Litigation was truthful, the only exception being when Carr lied about knowing Reese. <u>See</u> Peslak Depo. pp. 86-87. Even so, in *this* case, Carr swore that his previous testimony was truthful and accurate, including his testimony that he had never even met Reese. Carr Depo. pp. 18, 212-13. It seems nobody knows when to believe Carr. <u>See also, e.g.</u>, Deposition of James Neebling, Exhibit 3 (attached to Gross Declaration as Exhibit G) (referring to Carr, "I never know when I'm being told the truth or a story").

As for the alleged contract to provide revenue to Systrans, Carr's testimony was that Iron Mountain had discussions with Neebling about potential courier business, but not with Carr. See Carr Depo. pp. 161, 164 ("Mr. Kenny told Jim [Neebling] ... it was not $25 million, it was $45 million in business .... *[t]hey told Mr. Neebling* we have $25 million of business that we would like you to look at ...") (emphasis added). The discussions did not involve Carr because, as Carr concedes, he had no interest in Systrans. See Carr Depo. pp. 254-55 and Exhibit 11; see also Deposition of James Neebling, taken February 27, 2007 and March 14, 2007 ("Neebling Deposition or Neebling Depo.")[13] p. 153. The discussions with Neebling resulted in a May 2003 written contract for logistics management services (the "Systrans Contract") between IMIM and Systrans, which contained no provision for how much business IMIM would provide to Systrans. See Neebling Depo. at Exhibit 2. Neebling himself testified that the "promise" alleged by Carr was actually "just a discussion" between Reese and Neebling (see Neebling Depo. p. 99), and Neebling was trying to "pin Reese down to a meeting" and "make my presentation" to Iron Mountain later on. Neebling Depo. pp. 101, 119-120.

Finally, with respect to the alleged promise to give Carr $2 million, Carr testified only that Varn made a series of statements indicating that he would "try" and "figure out" how to get Carr $2 million from Iron Mountain:

> I'm going to talk to [Mr.] Watzke, Tom, and I'm going to *figure out* a way how I can get you $2 million .... I'll talk to Art, I'll talk to Garry and *we'll try to work it out*.

Carr Depo. p. 201 (emphasis added). Carr's friend Neebling similarly testified that Varn did not promise Carr $2 million, but only agreed to take Carr's request back to Iron Mountain. See Neebling Depo. pp. 168-69 ("if you're going to ask me did [Varn] say 'I promise to give you $2

---

[13] Relevant pages and exhibits from the Neebling Deposition are attached to the Gross Declaration as Exhibit G.

million,' no …. The promise was [Varn] will go back to [Reese] and [Varn will] try to work something out …. I didn't hear the word 'I promise'").

**F.    Plaintiffs File This Declaratory Judgment Action**

Throughout 2004 and 2005, Carr accused Iron Mountain and the other Plaintiffs of making the alleged promises discussed above.  SAC ¶¶ 25-32.  Plaintiffs filed this action for a binding declaration that they have no contractual or other legal obligations to Carr.

On October 26, 2005, Carr filed the SAC and attempted to state two counterclaims against Plaintiffs for breach of contract and fraudulent misrepresentation.[14]  SAC ¶ 44-55.  On March 13, 2006, Magistrate Judge Collings filed a report and recommendation (the "Report"),[15] recommending that the Court dismiss Carr's fraudulent misrepresentation claim against all Plaintiffs and dismiss Carr's breach of contract claim except as to Iron Mountain, IMIM, Reese and Varn, although acknowledging that Carr had "barely alleged" the existence of a contract with Reese, and that Carr's alleged contracts with Reese and Varn were "unlikely."  See Report pp. 16-18.  On March 31, 2006, this Court adopted Magistrate Judge Collings' recommendations.  With discovery completed, summary judgment is now appropriate on the last of Carr's claims.

### III.  ARGUMENT

**A.    Standard**

"The very mission of the summary judgment procedure is to … assess the proof in order to see whether there is a genuine need for trial."  DeNovellis v. Shalala, 124 F.3d 298, 305-06 (1st Cir. 1997) (citation omitted).  Plaintiffs bear the initial burden of showing that there are no material facts genuinely in dispute (see Fed. R. Civ. P. 56(c)), and then Carr must "set forth specific facts showing that there is a genuine issue of material fact as to each issue upon which

---

[14] The SAC contains no jury claim, and no party has requested a jury trial.

[15] The Report is attached to the Gross Declaration as Exhibit H.

he would bear the ultimate burden of proof at trial." Id. at 306 (citations omitted). Carr may not

avoid summary judgment by resting on "conclusory allegations, improbable inferences, and

unsupported speculation." Smith v. Stratus Computer, Inc., 40 F.3d 11, 12 (1st Cir. 1994)

(internal quotations omitted). If Carr's evidence is merely "colorable" or is not "significantly

probative," summary judgment is appropriate. DeNovellis, 124 F.3d at 306 (citations omitted).

**B.    Plaintiffs Are Entitled To Summary Judgment On Carr's Claim For $2 Million Because There Was No Enforceable Contract To Give Carr $2 Million[16]**

Carr *alleges* that Varn's supposed statements to him in September 2003 resulted in a

contract between Carr and one or more of the Plaintiffs for the payment of $2 million. SAC ¶

29. As explained below, this allegation fails for several reasons.

First, Massachusetts courts have long adhered to the principle that "an agreement to reach

an agreement is a contradiction in terms and imposes no obligation on the parties thereto[.]"

Rosenfield v. United States Trust Co., 290 Mass. 210, 217 (1935). "A promise made with an

understood intention that it is not to be legally binding, but only expressive of a present intention,

is not a contract." Kuzmeskus v. Pickup Motor Co., 330 Mass. 490, 493 (1953); Rhode Island

Hosp. Trust Nat'l Bank v. Varadian, 419 Mass. 841, 850 (1995). Stated another way,

"[e]xpectations and negotiations fall far short of a binding agreement." Phoenix Spring

Beverage Co. v. Harvard Brewing Co., 312 Mass. 501, 506 (1942).

While Carr has *pleaded* that he was "promised" $2 million in cash (SAC ¶¶ 16.5, 29), his

*testimony* reveals that Varn only stated that he would "try" and "figure out" how to facilitate an

---

[16] Massachusetts law applies to Carr's counterclaim for breach of contract because it is the state with the "most significant relationship to the transaction." Nile v. Nile, 432 Mass. 390, 401 (2000); Bergin v. Dartmouth Pharm., Inc., 326 F. Supp. 2d 179, 181 (D. Mass. 2004). Iron Mountain and IMIM have their principal places of business in Massachusetts. Five of the six individual parties to this case are residents of Massachusetts. Three of the four "promises" claimed by Carr were allegedly made by one or more of the Plaintiffs while in Massachusetts (the fourth "promise" allegedly being made in New York). The parties submitted extensive briefing at the pleadings stage directed at Carr's counterclaims, and cited extensively to the Massachusetts law. Magistrate Judge Collings relied on Massachusetts law in his recommendation to dismiss the bulk of Carr's counterclaims.

agreement between Iron Mountain and Carr. Carr Depo. p. 201. The testimony of Carr's friend

Neebling supports the same conclusion, *i.e.*, that Varn did *not* make a promise to Carr for $2

million, but only said he would "try to work something out." See Neebling Depo. pp. 168-69.

    The facts here are similar to those in Mauldin v. Shaffer, 1977 U.S. Dist. LEXIS 13585

(M.D.N.C. Oct. 7, 1997), which rejected a similar claim for breach of contract:

> In the present case, the plaintiff has failed to establish that the defendant promised
> to do anything. The evidence establishes that the defendant *offered to arrange* for
> someone, either himself or another, to buy the plaintiff's stock. Implicit in the
> terminology used in the defendant's offer, is the conditional nature of the assumed
> obligation. *To arrange to do something is not to promise to do it*…. An attempt
> to form a contract is not a contract. Only an actual agreement can support a
> binding contract.

Id. at *29-30 (emphasis added); see also Broad Street Nat'l Bank of Trenton v. Collier, 169 A.

552, 554 (N.J. 1933) ("[a] declaration … which does not show that the party … promises to act

… or intends to incur a legal liability obliging him to act in such way, is not an offer which can

be accepted so as to make a contract"). Accordingly, no reasonable fact finder could conclude

that any of the Plaintiffs entered into an enforceable contract to give Carr $2 million.[17]

### C.    Plaintiffs Are Entitled To Summary Judgment Because Carr Has Repeatedly Admitted That Iron Mountain And Its Lawyers Made No Promises To Him

    Carr's credibility aside, his claim for breach of contract flies in the face of his *own*

repeated admissions that Iron Mountain and its lawyers *never* promised him *anything*. Where, as

here, a party has given clear testimony in response to unambiguous questions, that party may not

then create a material factual dispute by disavowing his testimony and taking an inconsistent

---

[17] Even if someone did "promise" to pay Carr $2 million in September 2003, an allegation belied by Carr's own testimony, such a promise would be unenforceable for lack of consideration. By that time, Carr had long ago provided his "consideration" to Plaintiffs. See SAC ¶¶ 12-13 (the alleged consideration was that Carr would "assist and support Iron Mountain against Pierce"). Carr had already shared his "evidence" with Plaintiffs concerning Pierce's conduct, and had already testified on Plaintiffs' behalf in the Pierce Arbitration. Carr's "past consideration," even if proven, is decidedly insufficient to form the basis for an enforceable contract. Hodgkins v. New Eng. Tel. Co., 82 F.3d 1226, 1231 (1st Cir. 1992); Greater Boston Cable Corp. v. White Mountain Cable Constr. Corp., 414 Mass. 76, 80 (1992); Henry W. Savage, Inc. v. Friedberg, 322 Mass. 321, 323 (1948).

position to avoid summary judgment. See Thore v. Howe, 466 F.3d 173, 185-86 (1st Cir. 2006); Colantuoni v. Alfred Calcagni & Sons, 44 F.3d 1, 4-5 (1st Cir. 1994). As the Court of Appeals for the First Circuit has held, allowing a litigant to contradict his own prior testimony would make summary judgment "almost impossible." See Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 54 (1st Cir. 2000).

In the Carr Litigation, Carr testified that Iron Mountain had not offered him anything in return for the "information" he had provided. Carr's responses were simple and straightforward: "[t]hey're too smart for that" ... "[a]bsolutely not" ... "[t]hey did not offer me any perks, any money, anything" ... "[n]one whatsoever" ... "[t]hey just asked me to speak the truth...." See Carr Depo. Exhibit 1 at p. 183 (emphasis added). Carr was asked the same question in the Pierce Arbitration, and he testified in the same way: "there was no promises given." Carr Depo. Exhibit 5 at pp. 945-46 (emphasis added). Moreover, in his deposition in *this* case, Carr had an opportunity to explain whether his prior testimony was inaccurate in any way, and he unequivocally affirmed his previous testimony as truthful. Carr Depo. pp. 18, 212-13.

Carr's own testimony calls for summary judgment in Plaintiffs' favor. See Michelson v. Digital Fin. Servs., 167 F.3d 715, 725 (1st Cir. 1999) ("the first alleged promise does not raise a genuine issue of material fact ... [because] Michelson admits that he was told his threshold would be between $10 million and $12 million"); Stefanik v. Friendly Ice Cream Corp., 183 F.R.D. 52, 53 (D. Mass. 1998) ("plaintiff is not permitted to kick over the chess board in the face of a checkmate"); Murphy v. Ford Motor Co., 170 F.R.D. 82, 85 (D. Mass. 1997) (a litigant may not defeat summary judgment by "contradict[ing] his own prior deposition testimony"). Carr should not be permitted to disavow his own admissions (and his affirmance of those admissions in this case) to defeat summary judgment.

- 13 -

**D.     The Alleged Promise To Provide Revenue to Systrans and the Alleged Promise to Hire Carr as a Consultant are Unenforceable Under the Statute of Frauds**

The Statute of Frauds provides that oral contracts are unenforceable unless they can be performed within one year of their making. M.G.L. ch. 259 § 1 (2007); Hill v. Hooper, 67 Mass. 131, 133 (1854). Having admitted that none of the alleged promises from Iron Mountain was made in writing (Carr Depo. p. 5), Carr may only avoid the statute by proving that the alleged promises could be performed by Iron Mountain within one year. See Bogash v. Studios, Inc., 303 Mass. 207, 207 (1939); Beaver v. Raytheon Mfg. Co., 299 Mass. 218, 220 (1938); Kalker v. Bailen, 290 Mass. 202, 205 (Mass. 1935). Carr simply cannot satisfy his burden on this record.

**1.     The alleged promise to provide revenue to Systrans "each year for a period of five years" is unenforceable under the Statute of Frauds.**

When examining whether a contract is capable of being performed within one year, courts look to the understanding of the parties to the alleged contract. See Richard Tucker Assocs., Inc. v. Smith, 395 Mass. 648, 650 (1985) ("[w]e look to the terms of the contract, as they reflect the understanding of the parties at the time they entered into the contract, to determine whether the agreement could have been performed within one year of its making") (citation omitted).

Plaintiffs dispute that they made *any* promises to Carr. Consequently, the only evidence in the record as to the "understanding of the parties" is Carr's own understanding, which was that revenue would be provided to Systrans for a term of years, i.e., "*each year* for a period of *five years.*" SAC ¶ 18 (emphasis added). The Statue of Frauds bars enforcement of an alleged oral

promise, like this one, for a term of years.  See Powers v. Boston Cooper Corp., 926 F.2d 109, 110 (1st Cir. 1991).[18]

### 2.    The alleged promise to hire Carr as a consultant is unenforceable under the Statute of Frauds.

An oral employment contract for more than one year is also barred by the Statute of Frauds.  Powers, 926 F.2d at 110; Doherty v. Doherty Ins. Agency, Inc., 878 F.2d 546, 552 (1st Cir. 1989); Richard Tucker Assocs., Inc., 395 Mass. at 650; Beaver, 229 Mass. at 220.  Although an oral contract for an "indefinite" duration may satisfy the Statute of Frauds, a party "cannot claim that he had an indefinite contract strictly for the purpose of avoiding the Statute of Frauds."  DiGaetano v. Lawrence Firefighters Fed. Credit Union, No. 01-01373, 2002 Mass. Super. LEXIS 447, at *11 (Mass. Super. Ct. Nov. 5, 2002).  In addition, under Massachusetts law, a party asserting that an employment contract was "indefinite" (to avoid the Statute of Frauds) must, "at a minimum … present evidence of a promise of *permanent* employment."  Id. (emphasis added); see also Whelan v. Intergraph Corp., 889 F. Supp. 15, 19 (D. Mass. 1995) (Statute of Frauds bars a claim for breach of employment contract where "all of the statements … are too indefinite to create a lifetime employment relationship").

There is no allegation, let alone evidence in the record, that Iron Mountain promised Carr permanent employment.  Accordingly, Carr's claim cannot survive.[19]  See DiGaetano, 2002 Mass. Super. LEXIS 447, at *11 (a party who is "not sure" about the duration of an employment may not claim indefiniteness to avoid the Statute of Frauds); Whelan, 889 F. Supp. at 18-19.

---

[18] The damages sought by Carr further solidify his understanding of the alleged promise.  Carr seeks damages in the amount of "$7.5 million over *five years*."  Disclosures pp. 13-14 (emphasis added).  Iron Mountain was simply incapable of fulfilling this alleged promise within one year.  The Statute of Frauds bars Carr's claim.

[19] In his claim for damages, Carr again reveals his understanding that Iron Mountain promised to employ him for a period of (at least) *five years*.  See Disclosures p. 13 (emphasis added).  An oral, five-year employment contract is decidedly unenforceable.  Powers, 926 F.2d at 110.  Carr's claim should be dismissed.

**E.** **The Counterclaim For Breach Of The Alleged Promise To Provide Business To Systrans Fails Because: (i) There Is No Evidence That Any Of The Plaintiffs Made This Promise, Let Alone To Carr; (ii) Carr Had No Interest In Systrans; and (iii) Carr's Alleged Damages Cannot Be Calculated With Reasonable Certainty**

Carr has *pleaded* that on March 26, 2002, one or more of the Plaintiffs promised to provide $25 million or $45 million in revenue to Systrans. SAC ¶¶ 16.4, 18, 23. The *record* clearly shows, however, that the alleged "promise" was actually just a "discussion" between certain of the Plaintiffs and Neebling. Carr has not even alleged (let alone show any evidence) that he has the right to recover on an alleged contract between any of the Plaintiffs and Neebling.

Only the parties to a contract have standing to sue for its breach. Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp., 317 F.3d 16, 23 (1st Cir. 2003). Carr has not testified that he was a party to the alleged March 26, 2002 "contract" to provide courier business to Systrans, but rather, that Iron Mountain talked *with Neebling* about it. See Carr Depo. p. 164 (*"[t]hey told Mr. Neebling* we have $25 million of business that we would like you to look at …"*) (emphasis added). The fact that Carr was present for those alleged conversations is of no moment.

Neebling testified that the "promise" alleged by Carr was actually *"just a discussion"* that he had with Reese (see Neebling Depo. p. 99) (emphasis added), and that he was trying to "pin Reese down to a meeting" and "make my presentation." Neebling Depo. pp. 101, 119-120.[20] The *discussion* between Reese and Neebling resulted in the Systrans Contract, a fully integrated written agreement between IMIM and Systrans which was executed in May 2003. See Neebling Depo. at Exhibit 2. In the Systrans Contract, IMIM was under *no* obligation to Systrans[21] (and

---

[20] Peslak testified that he has no firsthand knowledge of the alleged promise to provide courier business to Systrans, but had heard *from Neebling* that the Plaintiffs had "thrown around numbers of $25 million or $45 million in courier business" to Systrans. See Peslak Depo. p. 65 ("Jim [Neebling] told me that's part of what he discussed with Richard Reese…").

[21] In the other piece of this consolidated case, Systrans attempted to advance the same flawed claim as that advanced by Carr here, *i.e.*, that a promise was made to provide Systrans with $25 million or $45 million in courier

certainly no obligation to Carr) to provide a minimum amount of revenue to Systrans. The written agreement clearly represents the complete understanding of the parties, and therefore triggers a conclusive legal presumption that the parties did *not* agree to a minimum level of courier business. See Leisure Sports Inv. Corp. v. Riverside Enter., Inc., 7 Mass. App. Ct. 489, 493 (1979) ("written agreements are presumed to express the parties' final arrangements"); Sisters of Charity of the Incarnate Word v. Int'l Med. Equip. Collaborative, No. 03-00016, 2004 Mass. Super. LEXIS 223, at *6 (Mass. Super. Ct. April 20, 2004) (when there is a written contract, "there is a conclusive legal presumption, that it contains the entire agreement") (quoting Smith v. Vose & Sons Piano Co., 194 Mass. 193, 199 (1907)). That presumption cannot be rebutted on this record.

Even if it could somehow be concluded that Plaintiffs had a contract *with Carr* to provide revenue to Systrans, Carr could not possibly have been damaged because, by his own admission, he has "no interest in Systrans, ownership *or otherwise*." See Carr Depo. pp. 254-55 and Exhibit 11 (emphasis added). Carr's friend Neebling, the president of Systrans, also testified that Carr has no interest in the company. See Neebling Depo. p. 152 ("the only thing [Carr] had was an escrow agreement to secure his debt"). Nevertheless, Carr again tosses aside his previous testimony, and his signed affidavit (Carr Depo. Exhibit 11), and states that he *does* have an interest in Systrans, *i.e.*, an entitlement to a staggering 50% of the company's profits.[22] See Carr's Supplemental Responses to Plaintiffs' First Set of Interrogatories ("Carr's Supp. Interrog.

---

business. Systrans's claim was dismissed by this Court on June 28, 2006. Carr's claim should likewise be dismissed.

[22] Carr has produced no documents evidencing his supposed interest in the profits of Systrans, and the specifics of his supposed relationship with Systrans has been a moving target throughout this case. For example, although he testified that he was never an employee of Systrans (Carr Depo. pp. 245-46), he claims that he received health benefits from Systrans for about a year (id. at 253-54). Similarly, while he indicated in his interrogatory responses that he loaned $600k to Neebling to start Systrans (Carr's Supp. Interrog. Resp. No. 7), he testified at his deposition that he had "given" Neebling *almost $600,000*" (Carr Depo. p. 182) (emphasis added) and later testified that he only gave $450k to Neebling (Carr Depo. p. 183).

Resp.")[23] at Interrog. No. 7 (wherein Carr claims an entitlement to "a percentage of the net profits earned by Systrans"); see also Carr Depo. pp. 185-86. Carr's back-and-forth testimony cannot prevent summary judgment. Murphy, 170 F.R.D. at 85.

Carr's claim suffers from yet another defect – his alleged damages are far too speculative. Carr would be required to establish his damages with reasonable certainty, which would require him to demonstrate to a fact finder, at a minimum, that Systrans had "historic profitability" or the "actual existence of future contracts." Camar Corp. v. Preston Trucking Co., 221 F.3d 271, 279 (1st Cir. 2000); Korpacz v. Women's Prof'l Football League, 2006 U.S. Dist. LEXIS 3154, at *12-13 (D. Mass. Jan. 27, 2006) (affirming summary judgment); see also Armstrong, 349 F. Supp. 2d at 80 (D. Mass. 2004) ("the court would have to determine an estimated net profit (presumably, after determining estimated gross sales and estimated expenses) of a business that … is new and has no history of any kind … for an indefinite period of time"). Carr could not possibly make that showing on this record.

Carr has no expert to attempt to calculate whether and how much Systrans would have profited from Iron Mountain's business and, more specifically, Carr's share of those undetermined profits. Systrans was a startup business with *no* history of profitability, and had only one contract (the Systrans Contract) that did not require any minimum amount of business or revenue. Carr has made no attempt to explain his guess that his damages are either $4.3 million or $7.5 million (Disclosures p. 14). As one court has held, under similar facts:

> The described agreement is silent on essential terms of the contract, such as, but scarcely limited to: when the plaintiff's share of the profits was to be computed and to be paid to her; the duration of the agreement under which she claims the right to a share of the profits; what was to occur if the property were sold; or what would be the plaintiff's responsibility should there be a claim against the owners

---

[23] Carr's Supplemental Responses and Second Supplemental Responses to Plaintiffs' First Set of Interrogatories are attached to the Gross Declaration as Exhibit I.

> of the property. Construction and enforcement of the agreement without these
> essential terms would be futile, and we cannot supply these provisions without
> writing a contract for the parties which they themselves did not make.

Held v. Zamparelli, 13 Mass. App. Ct. 957, 958 (1982) (internal citations omitted); see also John

Hetherington & Sons, Ltd. v. William Firth Co., 210 Mass. 8, 22 (1911) (lost profits cannot be

awarded where "any essential element is left to conjecture, surmise or hypothesis"); McCauley v.

Sons Pharmacy, Inc., 3 Mass. App. Ct. 774-75 (1975) (refusing to award lost profits because "no

established earnings record existed upon which such an opinion could be based"). Carr's

counterclaim for breach of this alleged "contract" should be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court: (i) grant

Plaintiffs' motion for summary judgment in its entirety; (ii) enter a declaration that none of the

Plaintiffs has any contractual or other legal obligation to Carr; and (iii) dismiss Carr's

counterclaim for breach of contract against Iron Mountain and IMIM.

Dated:  June 21, 2007                     Respectfully submitted,

                                          **IRON MOUNTAIN INCORPORATED and
                                          IRON MOUNTAIN INFORMATION
                                          MANAGEMENT, INC.,**

                                          By their attorneys,


                                          /s/ Ira K. Gross
                                          Ira K. Gross (BBO #212720)
                                          *igross@sandw.com*
                                          Kevin M. Colmey (Admitted *Pro Hac Vice*)
                                          *kcolmey@sandw.com*
                                          SULLIVAN & WORCESTER LLP
                                          One Post Office Square
                                          Boston, Massachusetts  02109
                                          (617) 338-2800

- 19 -

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 21, 2007.

/s/ Kevin M. Colmey