## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; ) <br> IRON MOUNTAIN INFORMATION ) <br> MANAGEMENT, INC.; C. RICHARD ) <br> REESE; JOHN F. KENNY, JR.; ) <br> GARRY B. WATZKE; LARRY L. VARN; ) <br> and CHARLES G. MOORE, ) <br> ) <br>      Plaintiffs and ) <br>      Counterclaim-Defendants, ) <br> ) <br>      v. ) <br> ) <br> THOMAS CARR, ) <br> ) <br>      Defendant and ) <br>      Counterclaim-Plaintiff. ) | CIVIL ACTION <br> NO. 05 10890 RCL |
| IRON MOUNTAIN INFORMATION ) <br> MANAGEMENT, INC., ) <br> ) <br>      Plaintiff, ) <br> ) <br>      v. ) <br> ) <br> SYSTRANS FREIGHT SYSTEMS, INC., ) <br> ) <br>      Defendant. ) | CIVIL ACTION <br> NO. 05 10999 RCL |

## DECLARATION OF KEVIN M. COLMEY, ESQ. IN SUPPORT OF IRON MOUNTAIN INFORMATION MANAGEMENT, INC.'S MOTION FOR SUMMARY JUDGMENT AGAINST SYSTRANS FREIGHT SYSTEMS, INC.

KEVIN M. COLMEY hereby declares the following under penalties of perjury:

1.     I am an associate with the law firm of Sullivan & Worcester LLP, counsel to plaintiff Iron Mountain Information Management, Inc. ("IMIM").  I make this declaration from facts within my personal knowledge and I believe all matters set forth herein to be true.

2.       Annexed hereto as Exhibit A is a true and correct copy of the First Amended Complaint, which was filed by IMIM on May 20, 2005.

3.       Annexed hereto as Exhibit B is a true and correct copy of the relevant pages from the deposition of James Neebling, taken on February 27, 2007 and March 14, 2007.

4.       Annexed hereto as Exhibit C is a true and correct copy of the Answer and Counterclaims filed by defendant Systrans Freight Systems, Inc. ("Systrans") on June 17, 2005.

5.       Annexed hereto as Exhibit D is a true and correct copy of the docket sheet in this case, reflecting that on June 28, 2006, this Court entered an electronic Order dismissing the counterclaims asserted against IMIM by Systrans.

6.       Annexed hereto as Exhibit E is a true and correct copy of Systrans's Response to IMIM's First Set of Interrogatories.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on June 21, 2007.

_____ /s/ Kevin M. Colmey _____

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on June 21, 2007.

_____ /s/ Kevin M. Colmey _____

# EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IRON MOUNTAIN INFORMATION MANAGEMENT, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 05-10999-RCL |
| SYSTRANS FREIGHT SYSTEMS, INC., | ) ) | |
| Defendant. | ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiff Iron Mountain Information Management, Inc. ("Iron Mountain"), by its attorneys, Sullivan & Worcester LLP, as and for its first amended complaint against Defendant Systrans Freight Systems, Inc. ("Systrans"), alleges as follows:

### Nature of the Action

1.      Systrans breached a written agreement, which requires that Systrans provide or procure courier services on Iron Mountain's behalf in certain markets.  Among other things, Systrans failed to pay vendor invoices as required by the agreement.  Systrans has also failed to repay Iron Mountain, as required by the agreement, certain monies that Iron Mountain has advanced to Systrans.  Systrans has also refused to return, as requested by Iron Mountain pursuant to the agreement, certain of Iron Mountain's confidential and proprietary information.  Iron Mountain seeks to recover damages and secure other relief resulting from Systrans' breaches.

**Parties**

2.      Plaintiff Iron Mountain is a Delaware corporation with a principal place of business located at 1000 Campus Drive, Collegeville, Pennsylvania.  Iron Mountain is a wholly-owned subsidiary of Iron Mountain Incorporated (NYSE: IRM).

3.      Defendant Systrans is, upon information and belief, a Florida corporation with a principal place of business located at 571 West Lake Avenue, Suite 5, Bay Head, New Jersey.

**Jurisdiction and Venue**

4.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1) in that the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

5.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the dispute occurred in this judicial district.

**Background**

6.      By written agreement dated May 1, 2003 (the "Contract"), Iron Mountain and Systrans agreed, among other things, that Systrans would furnish and deliver all of the manpower (possessing appropriate training, ability, knowledge, and expertise), materials and equipment to effectively provide courier and related services for Iron Mountain.

7.      Prior to execution of the Contract, Systrans made a presentation to Iron Mountain executives regarding the courier and related services it could provide.  This presentation occurred at Iron Mountain Incorporated's corporate headquarters at 745 Atlantic Avenue, Boston, Massachusetts.  The Contract was negotiated, in part, in Boston, Massachusetts.

8.      The Contract requires, among other things, that Systrans provide courier services within certain Iron Mountain markets and to certain facilities and sites in the continental United States.  These services are to operate to, from, and between Iron Mountain customers and

-2-

{B0407794; 1}

facilities on a district-by-district basis as approved by Iron Mountain. Iron Mountain's Boston district is among the districts that Iron Mountain approved for provision of courier services by Systrans.

9.      The Contract requires that Systrans provide certain management services related to the courier services that Systrans agreed to provide. Among other management services, the Contract requires that Systrans pay vendor invoices from courier companies that Systrans is using for performance of the Contract.

10.      Systrans has not paid certain vendor invoices from courier companies that Systrans is using for performance of the Contract, despite Iron Mountain's having paid Systrans under the Contract sums intended to cover such invoices. Additionally, upon information and belief, a Systrans check to one vendor was returned by the bank due to insufficient funds.

11.      By letter dated April 26, 2005, Iron Mountain notified Systrans that its failure to pay vendor invoices constituted a material breach of the Contract. The April 26th letter demanded that Systrans remedy any breaches of the Contract and provide Iron Mountain with adequate assurance that all outstanding vendor invoices related to performance of the Contract are paid and will continue to be paid on a timely basis. Systrans has since informed Iron Mountain that it will not provide the requested assurances and has therefore repudiated its obligations under the Contract.

12.      Iron Mountain continues to be presented with unpaid invoices from vendors who refuse to deliver containers or records for Iron Mountain until their unpaid invoices are satisfied. Upon information and belief, the unpaid vendor invoices that Systrans has failed to pay currently total at least $389,000.

-3-

{B0407794; 1}

13.     In conjunction with and upon execution of the Contract, Iron Mountain agreed to advance Systrans an initial amount of $105,000 (the "Initial Advance").  The Initial Advance was to be applied to startup expenses related to the Contract.  Systrans agreed to repay the Initial Advance.

14.     To secure the Initial Advance, Systrans granted Iron Mountain a security interest in the equipment purchased by Systrans at the inception of the Contract and agreed that, upon request, Systrans would execute the necessary UCC financing statement to perfect Iron Mountain's security interest.

15.     By written agreement dated January 30, 2004 (the "First Amendment"), Iron Mountain agreed to advance an additional $50,000 (the "First Additional Advance") to Systrans. Iron Mountain provided the First Additional Advance to assist Systrans in expanding services to Iron Mountain.  Systrans agreed to repay the First Additional Advance.

16.     By written agreement dated January 19, 2005 (the "Second Amendment"), Iron Mountain agreed to advance an additional $40,500 (the "Second Additional Advance") to Systrans.  Iron Mountain provided the Second Additional Advance to assist Systrans in improving its services to Iron Mountain.  Systrans agreed to repay the Second Additional Advance with interest.

17.     During the term of the Contract, Systrans overcharged Iron Mountain.  As of January 19, 2005, Iron Mountain and Systrans agreed that the aggregate amount of the overcharges was in excess of $78,500 (the "Overcharges").  Systrans has failed to fully repay these overcharges or offset them from amounts invoiced to Iron Mountain.

18.     Of the Initial Advance ($105,000), First Additional Advance ($50,000), Second Additional Advance ($40,500), and the Overcharges (more than $78,500), Systrans has repaid or

-4-

offset only approximately $108,000, leaving approximately $166,000 due and owing from Systrans to Iron Mountain on those advances and overcharges.

19.     The Contract expressly acknowledges that Systrans will receive and maintain certain of Iron Mountain's confidential and proprietary information while performing the Contract. The confidential and proprietary information includes (i) Iron Mountain's customers' names, (ii) customer contact information (including name, address, phone numbers), (iii) charges for deliveries, and (iv) frequency of deliveries.

20.     Iron Mountain takes great care to maintain and protect the confidentiality of its confidential and proprietary information.

21.     The Contract restricts Systrans' disclosure of Iron Mountain's confidential and proprietary information except as necessary to perform the Contract.

22.     Systrans has overtly threatened Iron Mountain that, if Iron Mountain does not pay the invoices from it to Iron Mountain for the weeks of April 30 and May 6, 2005 (which, in view of Systrans' failure to pay its vendors, Systrans had previously acknowledged and agreed that Iron Mountain would not have to pay), Systrans will sell Iron Mountain's confidential and proprietary information. Systrans has also threatened to begin sending demand letters to, and pursuing collection activities against, Iron Mountain's customers with respect to these invoices.

23.     On May 17, 2005, Iron Mountain sent Systrans a letter explaining that Systrans' threats, if executed, would breach the Contract. Iron Mountain also demanded that "Systrans return all information that Iron Mountain has disclosed in written or tangible form, and that Systrans destroy all of its copies, excerpts or notes, and files (including, but not limited to, computer, tape, and paper), made by it that contain any portions of the information."

{B0407794; 1}

24.     On May 17, 2005, Systrans, through its President, Mr. Neebling, responded by email to Iron Mountain's May 17th letter and did not retract Systrans' threats. In fact, Mr. Neebling stated, with regard to returning and destroying data and information, that "I will pursue the sale of our technology [which contains Iron Mountain's data] if we don't resolve this matter to minimize the financial downside."

25.     On May 18, 2005, Systrans' counsel sent a letter to Iron Mountain, in part responding to Iron Mountain's May 17th letter, and stated that "<u>at this time</u> Systrans, either through Mr. Neebling or any other entity or individual, has no intention of breaching the confidentiality provisions of the Contract or contacting customers directly." (emphasis added). Nevertheless, the May 18th letter from Mr. Neebling's counsel did not state that Systrans would return Iron Mountain's confidential and proprietary information and Systrans has not, in fact, returned Iron Mountain's information as demanded.

## **Count I: Breach of Contract – (Failure to Pay Vendors)**

26.     Iron Mountain incorporates by reference herein the allegations in paragraphs 1 through and including 25 as if set forth herein.

27.     Iron Mountain and Systrans, for good and valuable consideration, entered into the Contract. The Contract, as amended, reflects valid and binding legal obligations of Iron Mountain and Systrans, enforceable in accordance with their terms.

28.     Systrans breached the Contract by, among other things, not paying vendor invoices from courier companies that Systrans is using for performance of the Contract.

29.     Iron Mountain has fully performed its duties and obligations under the Contract.

30.     As a direct and proximate result of Systrans' breaches, Iron Mountain has suffered damages.

-6-

### Count II:  Breach of Contract – (Failure to Pay Amounts Due and Owing)

31.     Iron Mountain incorporates by reference herein the allegations in paragraphs 1 through and including 30 as if set forth herein.

32.     Iron Mountain and Systrans, for good and valuable consideration, entered into the Contract.  The Contract, as amended, reflects valid and binding legal obligations of Iron Mountain and Systrans, enforceable in accordance with their terms.

33.     Systrans has breached the Contract, as amended, by failing to repay the full amount of the Overcharges or offset them from amounts invoiced to Iron Mountain.

34.     Systrans has also breached the Contract, as amended, by failing to fully repay the full amount of the Initial Advance, the First Additional Advance, and the Second Additional Advance or offset them from amounts invoiced to Iron Mountain.

35.     Iron Mountain has fully performed its duties and obligations under the Contract.

36.     As a direct and proximate result of Systrans' breaches, Iron Mountain has suffered damages.

### Count III:  Misappropriation – (Money Had and Received)

37.     Iron Mountain incorporates by reference herein the allegations in paragraphs 1 through and including 36 as if set forth herein.

38.     Iron Mountain has paid Systrans certain monies that Systrans had agreed and was bound to pay to courier companies making deliveries on Iron Mountain's behalf.

39.     Contrary to its agreement, Systrans has not paid vendor invoices from these courier companies making deliveries on behalf of Iron Mountain.

40.     Upon information and belief, Systrans has misappropriated certain of the monies that Iron Mountain paid to Systrans.

{B0407794; 1}

41.     The monies that Iron Mountain paid to Systrans for payment to courier companies, which monies have in fact not been paid to those courier companies, should be returned to Iron Mountain.

### Count IV:  Conversion – (Iron Mountain's Confidential and Proprietary Information)

42.     Iron Mountain incorporates by reference herein the allegations in paragraphs 1 through and including 41 as if set forth herein.

43.     Iron Mountain has a right to its confidential and proprietary information that is in Systrans' possession.

44.     Systrans has intentionally and wrongfully exercised control and dominion over Iron Mountain's confidential and proprietary information that is in Systrans' possession.

45.     Notwithstanding Iron Mountain's express demands, Systrans has failed to return Iron Mountain's confidential and proprietary information that is in Systrans' possession.

46.     By reason of Systrans' continued and unauthorized retention of Iron Mountain's confidential and proprietary information, Iron Mountain is suffering damage and detriment.

### Count V:  Preliminary and Permanent Injunction (Threatened Tortious Interference with Iron Mountain's Customers)

47.     Iron Mountain incorporates by reference herein the allegations in paragraphs 1 through and including 46 as if set forth herein.

48.     Iron Mountain has contractual and business relationships with customers and Systrans has arranged for transportation between Iron Mountain and certain of those customers.

49.     Systrans has knowledge of the identity of these Iron Mountain customers since Systrans has arranged for deliveries between those customers and Iron Mountain.

{B0407794; 1}

50.     Systrans has threatened, with an improper motive or means, to interfere with Iron Mountain's contractual and business relationship with its customers by making unwarranted demands for payments from those customers.

51.     Systrans' threats, if executed, would likely irreparably damage the contractual and business relationships between Iron Mountain and its customers, and Iron Mountain has no adequate remedy at law.

### Count VI:  Preliminary and Permanent Injunction (Threatened Disclosure of Iron Mountain's Confidential and Proprietary Information)

52.     Iron Mountain incorporates by reference herein the allegations in paragraphs 1 through and including 51 as if set forth herein.

53.     The Contract requires that Systrans maintain and protect any confidential and proprietary information that Iron Mountain provides to Systrans.

54.     The Contract restricts Systrans' disclosure of Iron Mountain's confidential and proprietary information.

55.     Systrans has threatened to disclose Iron Mountain's confidential and proprietary information in violation of the Contract.

56.     Iron Mountain would be irreparably damaged if Systrans unjustifiably disclosed Iron Mountain's confidential and proprietary information, and Iron Mountain has no adequate remedy at law.

**WHEREFORE**, Iron Mountain respectfully requests that this Court:

A.     Award Iron Mountain compensatory damages resulting from Systrans' breaches of the Contract;

-9-

{B0407794; 1}

B.     Order and direct Systrans to reimburse Iron Mountain for all monies paid that, by agreement, should have been paid by Systrans to courier companies making deliveries on Iron Mountain's behalf;

C.     Permanently enjoin Systrans, as well as its principals and agents and all others acting in concert with them who receive notice of the Court's order, from disclosing, selling, transferring or otherwise disposing of Iron Mountain's confidential and proprietary information in direct violation of a written agreement between Iron Mountain and Systrans;

D.     Permanently enjoin Systrans, as well as its principals and agents and all others acting in concert with them who receive notice of the Court's order, from contacting any Iron Mountain customers demanding payment for any deliveries that Systrans arranged pursuant to the Contract;

E.     Order and direct Systrans to provide Iron Mountain with a full, complete and detailed inventory or any and all confidential and proprietary information that is in Systrans' possession;

F.     Order and direct Systrans to return to Iron Mountain all information that Iron Mountain has disclosed in written or tangible form;

G.     Order and direct Systrans to destroy all of its copies, excerpts or notes, and files (including, but not limited to, computer, tape and paper), made by it that contain any portions of the information; and

{B0407794; 1}

H.    Award the Plaintiffs such further relief as the Court deems just, including without limitation reasonable attorneys' fees and disbursements.

**IRON MOUNTAIN INFORMATION MANAGEMENT, INC.**

By its attorneys,

May 20, 2005

/s/ Samual A. Miller
Ira K. Gross (BBO #212720)
*igross@sandw.com*
Samual A. Miller (BBO #648568)
*smiller@sandw.com*
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, Massachusetts  02109
(617) 338-2800

-11-

{B0407794; 1}

# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
----------------------------------------x
IRON MOUNTAIN INCORPORATED;
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.; C. RICHARD          **CERTIFIED ORIGINAL**
REESE; JOHN F. KENNY, JR.;            **LEGALINK BOSTON**
GARRY B. WATZKE; LARRY L. VARN;
and CHARLES G. MOORE,

          Plaintiffs and
          Counterclaim Defendants,

                    Civil Action
     v.          No. 05 10890 RCL

THOMAS CARR,

          Defendant and
          Counterclaim Plaintiff.
----------------------------------------x
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.

          Plaintiff,

                    Civil Action
     v.          No. 05 10999 RCL
SYSTRANS FREIGHT SYSTEMS, INC.,
          Defendant.
----------------------------------------x
                February 27, 2007
                10:15 a.m.
     Deposition of JAMES E. NEEBLING, taken by
Plaintiff, pursuant to Notice, at the offices of
Patton Boggs, LLP, One Riverfront Plaza, Newark, New
Jersey, before Denise L. Daniels, a Shorthand Reporter
and Notary Public.

James E. Neebling

02/27/2007

Page 2

1

2

A p p e a r a n c e s:

3

SULLIVAN & WORCESTER, LLP

4              Attorneys for Plaintiffs and
             Counterclaim Defendants

5              One Post Office Square
             Boston, Massachusetts 02109

6

BY:    IRA K. GROSS, ESQ.

7

8

9       PATTON BOGGS, LLP
             Attorneys for Defendant and

10             Counterclaim Plaintiff
             2550 M Street, NW

11             Washington, D.C. 20005

12       BY:    READ K. McCAFFREY, ESQ.
             ILYA SHAPIRO, ESQ.

13

14

15

16  Also Present:

17       THOMAS CARR
         LARRY L. VARN

18

                    oOo

19

20

21

22

23

24

25

James E. Neebling

02/27/2007

Page 3

1

2          J A M E S   E.   N E E B L I N G,

3                 residing at 20 Marigold Lane, Marlboro,

4                 New Jersey 07746, having been first duly

5                 sworn by the Notary Public (Denise L.

6                 Daniels), was examined and testified as

7                 follows:

8     EXAMINATION BY

9     MR. GROSS:

10                Q.     Good morning, Mr. Neebling.  Would you

11    state your name for the record, please?

12                A.     James E. Neebling.

13                Q.     Where do you live, Mr. Neebling?

14                A.     20 Marigold Lane, Marlboro, New Jersey

15    07746.

16                Q.     Are you employed currently?

17                A.     Yes.

18                Q.     By whom?

19                A.     I work with Land Star Freight Systems.

20                Q.     What's the business of Land Star Freight

21    Systems?

22                A.     Land Star is a truckload carrier.

23                Q.     Where is its headquarters?

24                A.     Jacksonville, Florida.

25                Q.     Do you work out of that headquarters or

Page 11

1

2          Q.    Mr. Neebling, you were involved with a

3    company called Systrans, correct?

4          A.    Yes.

5          Q.    All right.  What is Systrans?

6          A.    It's a -- Systrans is a company that did

7    not ever evolve into a corporation, into an entity.

8          Q.    It was never an entity?

9          A.    No, it was an LLC filed, and it never

10   became anything.

11         Q.    Did it ever do business?

12         A.    No.

13         Q.    What's the status of Systrans today?

14         MR. McCAFFREY:  Wait.

15         A.    See, I'm going to play the game.

16         Can we go off the record?

17         MR. GROSS:  No.

18         MR. McCAFFREY:  Leave it on the record.

19         I'm going to object because the term

20         "Systrans" is a bit vague.  If there's a

21         specific entity that you're going to ask him

22         about, then fine.

23         Q.    Did you understand what I meant by

24   Systrans?

25         A.    Exactly.

James E. Neebling

Page 12

1

2      Q.      What did I mean by Systrans?

3      A.      You meant the entity called Systrans.

4      Q.      Is there an entity called Systrans

5   Freight Systems, Inc.?

6      A.      Yes.

7      Q.      And what's that?

8      A.      Systrans Freight Systems, Inc. was the

9   company that engaged Iron Mountain to perform courier

10  services and consulting services.

11     Q.      You had a connection with Systrans

12  Freight Systems, Inc.?

13     A.      Yes.

14     Q.      What was that connection?

15     A.      I was the president of the company.

16     Q.      Will it confuse you if we refer to

17  Systrans Freight Systems, Inc. going forward in this

18  deposition as Systrans?

19     A.      That's fine with me.

20     Q.      Okay, I will do that.

21             So Systrans was actually a corporation

22  then, correct?

23     A.      Systrans was an LLC formed.  Correct.

24     Q.      And what is the status of Systrans today?

25             THE WITNESS:  Can I just answer this?

Page 109

```
 1
 2
 3                     C E R T I F I C A T E
                     - - - - - - - - - - -
 4
 5     STATE OF NEW YORK        )        CERTIFIED ORIGINAL
                                )  ss.:   LEGALINK BOSTON
 6     COUNTY OF NEW YORK       )
 7              I, DENISE L. DANIELS, a Shorthand
 8     Reporter and Notary Public within and for the
 9     State of New York, do hereby certify:
10              That I reported the proceedings in
11     the within entitled matter, and that the
12     within transcript is a true record of such
13     proceedings.
14              I further certify that I am not
15     related, by blood or marriage, to any of
16     the parties in this matter and that I am
17     in no way interested in the outcome of this
18     matter.
19              IN WITNESS WHEREOF, I have hereunto
20     set my hand this 6th day of March,
21     2007.
22
                        Denise L. Daniels
23                      DENISE L. DANIELS
24
25
```

**Merrill Legal Solutions**
**(617) 542-0039**

Page 110

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

------------------------------------------x

IRON MOUNTAIN INCORPORATED;

IRON MOUNTAIN INFORMATION

MANAGEMENT, INC.; C. RICHARD

REESE; JOHN F. KENNY, JR.;

GARRY B. WATZKE; LARRY L. VARN;

and CHARLES G. MOORE,

                Plaintiffs and
                Counterclaim Defendants,
                              Civil Action
        v.                    No. 05 10890 RCL

THOMAS CARR,

                Defendant and
                Counterclaim Plaintiff.
------------------------------------------x

IRON MOUNTAIN INFORMATION

MANAGEMENT, INC.

                Plaintiff,

                              Civil Action
        v.                    No. 05 10999 RCL

SYSTRANS FREIGHT SYSTEMS, INC.,
                Defendant.
------------------------------------------x

                    March 14, 2007
                    2:30 p.m.

        Continued deposition of JAMES E. NEEBLING,

taken by Plaintiff, pursuant to Adjournment, at the

offices of Patton Boggs, LLP, One Riverfront Plaza,

Newark, New Jersey, before Denise L. Daniels, a

Shorthand Reporter and Notary Public.

Page 111

1

A p p e a r a n c e s :

2

        SULLIVAN & WORCESTER, LLP
3                Attorneys for Plaintiffs and
                 Counterclaim Defendants
4                One Post Office Square
                 Boston, Massachusetts 02109
5

        BY:    IRA K. GROSS, ESQ.
6

7

8       PATTON BOGGS, LLP
                 Attorneys for Defendant and
9                Counterclaim Plaintiff
                 2550 M Street, NW
10               Washington, D.C. 20005
11      BY:    ILYA SHAPIRO, ESQ.
                 EDWARD D. GEHRES, III, ESQ.

12

13

14

15

16   Also Present:
17        LARRY L. VARN
          CHARLES G. MOORE
18        THOMAS CARR
19                      oOo
20

21

22

23

24

25

Page 112

1    J A M E S    E.    N E E B L I N G

2           having been previously sworn resumed and

3           testified further as follows:

4    EXAMINATION (Continued)

5    BY MR. GROSS:

6           Q.    Good afternoon, Mr. Neebling.  I'll just

7    start by going back to Exhibit 2 and I'll hand you

8    that.

9           A.    Okay.

10          Q.    We've established earlier in your

11   deposition that Exhibit 2 is the one and only contract

12   between Iron Mountain and Systrans Freight Systems,

13   Inc., correct?

14          A.    Yes, this is the only contract we had.

15          Q.    Who drafted that?

16          A.    I drafted the contract from a previous

17   contract I had.  I sent it to Garry Watzke.  He made

18   changes or revisions and then I believe sent it back

19   to me or might have sent it to Bob Miller first.

20          Q.    Would you characterize the changes and

21   revisions as substantial or insubstantial?

22          A.    I think they were some legalese, but this

23   came from a banking contract, current contract so it

24   was pretty well versed and tested through a lot of big

25   banking institutions.  So I don't recall the exact

Page 142

1   week in business.

2          According to your CFO, you spent

3   $800,000, we're the good guys, we're with you, how

4   about just letting us pay our bills.  At that point

5   Miller who couldn't handle me either, I said, "Look,

6   Bob, what's the deal?  I gave you an out, you don't

7   want the out.  I'm begging you for the business.  You

8   don't want to let me go.  You don't want to instruct

9   your people in the field to at least let us pay our

10  bills."  We're not talking about the entire walk which

11  we expect and was committed to get the business.

12  We're just talking about 50,000 a week in business.

13  They spend 800.

14          He's telling me, "No, enjoy your dinner,

15  listen, Dave Barlow will take care of it, we're going

16  to have a nice life and move forward."

17      Q.    Do you have a record of the advances that

18  were provided to Systrans?

19      A.    Someplace, but I only brought what I

20  brought last time.  I do have at this point, I do

21  have -- there's a running total of the loan balance.

22  So at that point, it was 94,000 July 31st, '04.

23      Q.    Before we go any further, I hate to

24  interrupt, but we're talking about a document that

25  hasn't been identified.

Page 143

1          A.    I had it last time with me.

2                MR. GROSS:  We didn't mark it.  Mark this

3          as Neebling Exhibit 6.

4                (Whereupon, document re loan balance from

5          Systrans to Iron Mountain marked Neebling

6          Exhibit 6 for identification, as of this date.)

7          Q.    Are you ready to go on?

8          A.    Yes, don't mind me.

9          Q.    I've got to.

10               So looking at Exhibit 6, I'll hand it

11    back to you in a second, it appears that the loan

12    balance from Systrans Freight Systems to Iron Mountain

13    was down to about $81,000 in February of '04 and then

14    it went to 131,000 which would have suggested an

15    advance of 50, right?

16         A.    There were multiple advances, yes.

17         Q.    I'm aware there was an advance of 105,000

18    at the outset?

19         A.    In the beginning, yes.

20         Q.    There was a subsequent advance of $50,000

21    in or about late January of 2004?

22         A.    It probably can be equated to this, yes.

23    This was like our running total.

24         Q.    I'm aware there was another advance of

25    $40,500 that manifested in an agreement that comes in

Page 144

1    January 2005.  Were there others besides those?

2          A.    There was an advance after our meeting.

3          Q.    In July 2004, sometime in the summer?

4          A.    Yes.  The problem was, you can see from

5    this exhibit that every week we had certain fixed

6    expenses.  And as every week went by, you know, the

7    deficit kept growing bigger and bigger.  Therefore,

8    our accounts receivable, our payables to our vendors

9    kept growing bigger and bigger.

10          I said, "I'm not arguing with you about

11    the entire business that we're supposed to get, I'm

12    talking about just paying our bills like you're

13    killing me here.  I need 50,000 a week in revenue.

14    You have it, just instruct your people to give it to

15    us."

16          I tried to show them, you illustrate it

17    this way because when you look at it this way, you can

18    kind of see the trend and understand it.  That's why I

19    came up with this because I'm like, look, it's not

20    working, you're not willing to force your people, what

21    do you want me to do here?

22          Q.    The "this" you just referred to is

23    Exhibit 5?

24          A.    That's correct.

25          Q.    So what happened after the Sparks dinner?

JAMES E. NEEBLING

1                        C E R T I F I C A T E
2
3
STATE OF NEW YORK        )
4                               )   ss.:
COUNTY OF NEW YORK       )
5
6            I, DENISE L. DANIELS, a Shorthand
7    Reporter and Notary Public within and for the
     State of New York, do hereby certify:
8
9            That I reported the proceedings in
     the within entitled matter, and that the
10
     within transcript is a true record of such
11
     proceedings.
12
13           I further certify that I am not
     related, by blood or marriage, to any of
14
     the parties in this matter and that I am
15   in no way interested in the outcome of this
16   matter.
17
             IN WITNESS WHEREOF, I have hereunto
18
     set my hand this 21st day of March,
19
     2007.
20
21                    _____
                         DENISE L. DANIELS
22
23                          CERTIFIED ORIGINAL
24                          LEGALINK BOSTON
25

# EXHIBIT C

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

|  |  |
|---|---|
| IRON MOUNTAIN INFORMATION MANAGEMENT INC. | ) ) ) ) |
| Plaintiff and Defendant-in-Counterclaim | ) ) ) ) ) ) |
| v. SYSTRANS FREIGHT SYSTEMS, INC | ) ) ) ) ) ) |
| Defendant and Plaintiff-in-Counterclaim | ) ) ) ) ) ) |

CIVIL ACTION NO. 05-10999-MLW

---

**DEFENDANT AND COUNTER-PLAINTIFF'S ANSWER TO PLAINTIFF'S AND
COUNTER-DEFENDANT'S FIRST AMENDED COMPLAINT,
AFFIRMATIVE DEFENSES AND COUNTER-CLAIMS**

Defendant and Counter-Plaintiff Systrans Freight Systems, Inc. ("Systrans") by its attorneys

Kathleen Stone of Looney, Cohen, Reagan & Aisenberg LLP and Read McCaffrey of Patton Boggs,

LLP, herewith Answers Plaintiff's First Amended Complaint and states:

### Nature of the Action

1.     Systrans DENIES the allegations in Paragraph 1.

### Parties

2.     Systrans ADMITS the allegations in Paragraph 2.

3.     Systrans ADMITS the allegations in Paragraph 3.

1

3869089v2

<u>Jurisdiction and Venue</u>

4.    Systrans ADMITS the allegations in Paragraph 4.

5.    Systrans ADMITS that venue is proper in this Court as alleged in Paragraph 5.

<u>Background</u>

6.    Systrans DENIES the allegations in Paragraph 6, and notes the contract speaks for itself.

7.    Systrans ADMITS the allegations in Paragraph 7.

8.    Systrans DENIES the allegations in Paragraph 8, and notes the contract speaks for itself.

9.    Systrans ADMITS only that the Contract states at II.A.2, "Contractor will provide the following management services to Iron Mountain . . . Payment of all vendor invoices associated with vendors."

10.   Systrans ADMITS that certain vendor invoices have not been paid from courier companies used for performance of the contract.  Systrans notes that the contract speaks for itself. Systrans DENIES the remaining allegations of Paragraph 10

11.   Systrans ADMITS that the first sentence of Paragraph 11 appears to summarize the contents of a May 2, 2005 letter from Plaintiff signed by Gary Watske, but Systrans denies received a letter of April 26, 2005.  Systrans DENIES the allegations in the second sentence of Paragraph 11.

12.   Systrans has insufficient information to either admit or deny the first sentence of Paragraph 12.  Systrans DENIES the allegation in the second sentence.

13.   Systrans ADMITS the allegations in Paragraph 13.

2

3869089v2

14.    Systrans has insufficient information to either admit or deny the allegations in Paragraph 14.

15.    Systrans ADMITS sentences one and two, but denies the remaining allegations in Paragraph 15.

16.    Systrans ADMITS sentences one and two, but denies the remaining allegations in Paragraph 16.

17.    Systrans DENIES the allegations in Paragraph 17. An error was discovered in the program by Systrans. Systrans disclosed this error to Iron Mountain and Systrans, at its own cost, retained an expert to calculate any excess charges that may have been applied. Their charges were expressly agreed to by Iron Mountain and Systrans and by further agreement were added to the loan balance.

18.    Systrans DENIES the addenda but admits that a balance of approximately $150,000 is owed.

19.    Systrans DENIES Plaintiffs' characterizations in Paragraph 19and admit only that the contract speaks for itself.

20.    Systrans lacks sufficient information to either admit or deny the allegations in Paragraph 20.

21.    Systrans admits only that the contract speaks for itself.

22.    Systrans DENIES the allegations in Paragraph 22.

23.    Systrans admits only that the May 17, 2005 letter speaks for itself.

24.    Systrans DENIES the allegations in Paragraph 24.

3869089v2

25.  Systrans ADMITS that a portion of the May 18, 2005 letter from counsel is accurately quoted.  The entire letter appears as Exhibit C to Iron Mountain's Motion for Preliminary Injunction, now being withdrawn.

## Count I

26.  Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-26 as is set forth fully herein.

27.  Systrans asserts that the contract speaks for itself, and the remaining allegations contain legal conclusions to which no responsive pleading is required.

28.  Systrans DENIES the allegations in Paragraph 28.

29.  Systrans DENIES the allegations in Paragraph 29.

30.  Systrans DENIES the allegations in Paragraph 28.  Further, Systrans contends the allegations state a legal conclusion for which no responsive pleading is required.

## Count II

31.  Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-30 as is set forth fully herein.

32.  Systrans contends that the contract speaks for itself.

33.  Systrans DENIES the allegations in Paragraph 33.

34.  Systrans DENIES the allegations in Paragraph 34.  Further, Systrans had agreed with Plaintiff to a payment plan for the monies allegedly owed and Systrans was current on this plan at the time Plaintiff sued Systrans.

4

35.     Systrans DENIES the allegations in Paragraph 35.

36.     Systrans DENIES the allegations in Paragraph 36.

### Count III

37.     Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-38 as is set forth fully herein.

38.     Systrans DENIES the characterizations of the contract in Paragraph 29 and admits only that the contract speaks for itself.

39.     Systrans DENIES the allegations in Paragraph 39.

40.     Systrans DENIES the allegations in Paragraph 40.

41.     Systrans DENIES the allegations in Paragraph 41.

### Count IV

42.     Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-41 as is set forth fully herein.

43.     Systrans DENIES the allegations in Paragraph 43.

44.     Systrans DENIES the allegations in Paragraph 44.

45.     Systrans DENIES the allegations in Paragraph 45.

46.     Systrans DENIES the allegations in Paragraph 46.

3869089v2

## Count V

47.    Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-46 as is set forth fully herein.

48.    Systrans DENIES the allegations in Paragraph 48.

49.    Systrans DENIES the allegations in Paragraph 49.

50.    Systrans DENIES the allegations in Paragraph 50.

51.    Systrans DENIES the allegations in Paragraph 51.

## Count VI

52.    Systrans incorporates herein by reference its answers to the allegations in paragraphs 1-52 as is set forth fully herein.

53.    Systrans DENIES the allegations in Paragraph 53.

54.    Systrans DENIES the allegations in Paragraph 54.

55.    Systrans DENIES the allegations in Paragraph 55.

56.    Systrans DENIES the allegations in Paragraph 56.

## DEFENDANT'S AND COUNTER-PLAINTIFFS'S AFFIRMATIVE DEFENSES

And for its Affirmative Defenses to Plaintiff's First Amended Complaint, Systrans avers:

1.    Plaintiff has failed to aver any basis for its implied contention that this Honorable Court, in these proceedings, would have personal jurisdiction over the Defendant.

2.    Plaintiff has failed to aver any basis for its implied contention that this Honorable Court, in these proceedings, would have subject jurisdiction over the dispute.

6

3869089v2

3.    The relief sought by the Plaintiff is barred by the doctrine of Unclean Hands.

4.    Plaintiff has failed to state a claim upon which relief can be granted.

5.    Plaintiff has failed to join parties indispensable pursuant to Rule 19.

6.    Plaintiff's claims are barred by estoppel.

7.    Plaintiff's Complaint is frivolous and otherwise violates Rule 11.

8.    Certain of Plaintiff's claims have been mooted by Court order.

9.    Defendant and Counter-Plaintiff reserve its right to assert additional defenses as discovery in these proceedings may support.


## COUNTER-CLAIMS

Defendant and Counter-Plaintiff Systrans, by its undersigned counsel, brings this action against the Plaintiff and Counter-Defendant Iron Mountain, and states:


### Nature of Action

1.    Prior to January 2001, Iron Mountain Incorporated merged with and/or acquired a competitor known as Pierce Leahy, Inc., the resulting company being known as Iron Mountain ("Iron Mountain"). At all times relevant to this Counter-Claim, Iron Mountain, as a result of its acquisition of Pierce Leahy, was one of the world's leading document retention and storage companies in the world worth almost $4 billion. Iron Mountain employs approximately 15,000 people. To be sure, no company in the United States comes close to being able to directly compete with Iron Mountain's dominance in this industry.

7

3869089v2

2.  Following the aforementioned transaction, J. Peter Pierce, ("Pierce") was elected to the Board of Directors of Iron Mountain and also was appointed president of the new company.

3.  Sometime following the aforementioned merger and/or acquisition, Pierce had a falling out with Iron Mountain and, upon information and belief, was fired as the new company's president, but remained on its Board of Directors.

4.  Upon information and belief, Pierce had signed a "non-compete" agreement as part of the aforementioned commercial transaction.

5.  On or about January 15, 2001, Thomas Carr, ("Carr") and Pierce entered into an agreement to form a transportation company known as Logisteq, LLC ("Logisteq"), at the conclusion of which transaction, a Pierce controlled entity, Pioneer Capital, L.P., and a Carr controlled entity, Transportation Concepts of New Jersey, Inc. owned Logisteq 51% and 49%, respectively.

6.  In the months following the formation of Logisteq, Pierce, on his own, formed a company known as Sequedex that, on information and belief, he used surreptitiously to compete with Iron Mountain and in so doing 'posted' significant costs including payroll, etc. expended to operate Sequedex on the books of Logisteq.

7.  At a time material to these proceedings, Iron Mountain filed suit against Pierce for, on information and belief, a breach of the merger/acquisition contract described in Paragraph 1 above, (a violation of Pierce's non-compete agreement), which action was placed before an arbiter who ultimately decided the action in favor of Pierce.

8

8. The proceedings described in Paragraph 7 are currently on appeal. However, it is believed that Iron Mountain has recently reimbursed Pierce between $1 million and $2 million for Pierce's counsel fees as a result of Pierce prevailing in the arbitration.

9. One result of the merger/acquisition discussed in Paragraph 1 above was that Logisteq, became a tenant of Iron Mountain at one of the many warehouses Iron Mountain acquired from Pierce Leahy.

10. On information and belief, because of the activities of Pierce and Sequedex, Iron Mountain sent a letter to Carr signed by Gary Watzke, Iron Mountain's General Counsel, that Logisteq and Carr as well as Carr businesses were being evicted from property now owned by Iron Mountain. Carr protested in writing to Watzke.

11. In August 2001 a senior 'entourage' from Iron Mountain, including its President (Bob Miller), General Counsel (Gary Watzke) and Chief Financial Officer (John Kenny), came to New Jersey and met with Carr and revealed at that time, for the first time, their true agenda: a discussion of what they believed were unlawful acts being committed by Pierce.

12. At the meeting in August 2001 described above, Iron Mountain, through its senior management and counsel, stated that if Carr would assist Iron Mountain in confirming what it already suspected about the activities of Pierce, and would otherwise assist and support Iron Mountain against Pierce for his violation of the non-compete agreement, that Iron Mountain would compensate Carr in various ways which they, Iron Mountain, were confident Carr would find acceptable.

3869089v2

13. On information and belief, if Iron Mountain were to succeed in its claim against Pierce alleging a breach of the non-compete agreement, Iron Mountain would stand to recoup some or all of the $1.2 billion Iron Mountain paid to acquire of Pierce's company.

14. Thereafter, a series of meetings transpired among Iron Mountain, its agents (see Paragraph 15) and Carr, his counsel Arthur Peslak, and Carr's friend James Neebling, principal of Counter-Plaintiff, Systrans Freight, Inc., (hereinafter "Systrans"). While literally scores of conversations occurred among these parties over a two and half year period the more notable meetings or conversations occurred on March 19, 2002 in New Jersey, March 26, 2002 in Boston, April 2, 2002 by telephone conference, April 9, 2002 in New York, July 16, 2003 by telephone conference and September 2003 in New York. To be clear, the meetings and conversations between the parties occurred with the active participation of Iron Mountain's Chairman and Chief Executive Officer (Richard Reece), President (Bob Miller), General Counsel (Gary Watzke) and Chief Financial Officer (John Kenny) as well as Iron Mountain's agents, as described in Paragraph 15.

15. Also involved in these meetings and negotiations on behalf of Iron Mountain were its outside counsel, the law firms of Sullivan and Worcester and Morgan Lewis. Attorneys Larry Varn, Samuel Miller, William Matlock, and Beth Jacobson, were all either partners or associates of Sullivan and Worcester, acting on behalf of Sullivan and Worcester, and had proffered, participated, or ratified, the promises made by Iron Mountain to Systrans. Attorney Doreen Davis, a partner of Morgan Lewis, acting on behalf of Morgan Lewis, had proffered, participated, or ratified, the promises made by Iron Mountain to Systrans. Iron Mountain and/or Sullivan and Worcester retained Charlie Moore to serve as the primary liaison with Carr and Systrans. (Collectively, the attorneys and law firms of Sullivan and

10

Worcester and Morgan Lewis and Charlie Moore are referred to as Iron Mountain's "agents".)

16. During one or more of the aforesaid meetings, both in person and by telephone, wherein the participants included Iron Mountain and its agents on the one hand, and Carr, Peslak and Systrans, on the other hand, Iron Mountain stated that in consideration for Carr and Neebling providing information and cooperation in the Pierce arbitration, Iron Mountain and one or more of its agents promised Carr and Systrans, *inter alia*, that Systrans would receive nearly $45 Million per year in transportation courier management business for five years.

17. In comparison with Iron Mountain's $4 billion value and nearly 15,000 employees, Systrans was a small business worth less than $1 million and employed less than 15 people. Iron Mountain's business model required it to rely heavily on vendors at an enormous expense and loss of efficiency. In reliance on Iron Mountain's promises, Systrans created software that was specifically designed to effectively to manage third party courier and transportation services for Iron Mountain. Neebling, on behalf of Systrans, purchased hundreds of thousands of dollars of computer software and hardware systems and devoted two and half years of work evaluating Iron Mountain's systems and creating software and technologies that have proven to save Iron Mountain millions in unnecessary expenses and efficiencies. Systrans' software and technology was therefore designed and capable of handling the $45 million in business that Iron Mountain repeatedly promised would be forth coming.

18. As part of Neebling's comprehensive analysis of Iron Mountain's transportation and courier systems he uncovered and disclosed to Iron Mountain massive problems with Iron Mountain's management of these systems. Neebling discovered and disclosed to Iron

3869089v2

Mountain: serious violations of Department of Transportation regulations, security clearance violations for courier drivers, incompetent and improperly trained courier drivers (both in-house and third party), incorrectly licensed motor vehicles, failure to comply with insurance regulations for commercial liability, failure to comply with Workers Compensations regulations, and failure to have comprehensive standard operating procedures for drivers that would preclude the chance for loss of theft of information being transported. Discovering and remedying these deficiencies were part of the scope of work that Systrans was to perform, but Iron Mountain refused to allow Systrans to fix these massive internal problems or create a mechanism for Iron Mountain to remedy these deficiencies.

19. During a meeting in 2002, Iron Mountain's CFO, Kenny, told Neebling that Iron Mountain annually incurs well over $125 million in expenses for courier and transportation services. At all times relevant to this Counter-Claim Iron Mountain's representations to Systrans regarding their contract were made based upon Iron Mountain's superior knowledge of its own courier needs and internal business strategies. Separately, Iron Mountain's representations to Systrans regarding its repeatedly stated promise to provide Systrans with $45 million in annual business for five years were made with Iron Mountains' recognition that its decision to honor its promises to Systrans were within Iron Mountain's sole discretion and/or exclusive control.

20. Concurrently in the spring of 2002, Iron Mountain began encouraging Carr to file a lawsuit against Pierce to coincide with the action that Iron Mountain was planning to also file against Pierce. With the intent of orchestrating simultaneous lawsuits against Pierce, Iron Mountain actively sought to coerce and facilitate Carr's participation by agreeing to fund Carr's lawsuit, including legal fees and costs, as well as drafting the complaint for Carr to file.

3869089v2

21. On March 26, 2002, Carr and Neebling met with Iron Mountain's Chairman and CEO (Reece), CFO (Kenny), and General Counsel (Watzke) at Iron Mountain's corporate headquarters in Boston, Massachusetts. Acting as an agent of Iron Mountain and with such authority, Reese offered $5 million to Carr to use to buy out Pierce's share of Logisteq. Also, at this meeting Reese further promised that Iron Mountain would hire Carr as a transportation consultant and promised Neebling to provide $25 million in courier business to Systrans. During that same conversation, Kenny revised the amount of courier business Iron Mountain would provide to Systrans. Kenny stated, in the presence of Reese and Watzke, that revenues of more than $45 Million would be paid to Systrans each year for a period of five years in return for the cooperation of Carr and Neebling (Systrans) as described above.

22. On April 9, 2002 in a private restaurant room in New York, New York, Carr, Neebling and Peslak met with Varn, Reese and Kenny. At this meeting, Varn, individually, as a partner in the Boston firm of Sullivan and Worcester and acting as an agent of Iron Mountain and within the scope of his authority as its attorney, promised that Iron Mountain would wire a $50,000 retainer to Arthur Peslak, Carr's counsel in disputes involving Pierce. That transaction was completed two days later.

23. Carr initially voiced reluctance in joining Iron Mountain's campaign against Pierce and expressed significant concerns about the negative effects of any such action on his business and family.

24. As consideration for Carr's involvement in Iron Mountain's coordinated efforts against Pierce, Kenny called Carr and promised that, in exchange for his participation, Iron Mountain would fund Carr's lawsuit, including paying all legal fees and costs. In addition,

3869089v2

Kenny reiterated that in exchange for Neebling and Carr's participation, Iron Mountain would provide business to Systrans in excess of $45 million dollars, hire Carr as a consultant with the same salary and benefits that he was currently making, and repay any debt that Carr incurred in the process as guarantor of certain obligations.

25. In addition to expressing these promises to Carr, Kenny also made the same promises to Carr's wife Judy in a separate telephone conversation with her, which occurred in April of 2002.  Kenny called Mrs. Carr while she and her family were on vacation in California.  In response to her concerns about the negative effects that Carr's involvement with Iron Mountain in its claims against Pierce would have on her family, Kenny specifically affirmed each of the foregoing promises to Mrs. Carr and advised her that any and all negative financial fall out resulting from her husband's filing a complaint against Pierce and/or his other cooperation with Iron Mountain would be taken care of by Iron Mountain.

26. Carr eventually acquiesced and agreed to participate in Iron Mountain's efforts against Pierce.  Upon receiving Carr's acceptance, Iron Mountain had a courier deliver a copy of the drafted complaint to Carr while he was on vacation with his family in California.  Carr signed the complaint and Iron Mountain coordinated the filing of the action.

27. During the ensuing months, Carr and Neebling on behalf of Systrans cooperated completely with the Counter-Defendant by meeting with witnesses, reviewing and investigating commercial transactions involving Pierce and Pierce-related companies, and turning over documents and other materials to the Counter-Defendant and/or its agents.  This cooperation involved extensive travel at the request of several of the Counter-Defendant and its agents.  Among those to whom Systrans provided the aforementioned information and cooperation were, in part, Varn, Miller, Davis, Watzke, and Moore.  Indeed, Varn, Miller,

14

Davis and Moore met with Neebling and reviewed key testimony and evidence regarding the Pierce arbitration. Varn and Miller, on behalf of Sullivan and Worcester, shared pleadings and depositions from the arbitration with Neebling and asked for Neebling's analysis of the pleadings and testimony.

28. In direct and full reliance on the aforementioned promises of consideration, Neebling continued to cooperate with the Counter-Defendant, as they had requested and, as a result of his reliance on behalf of Systrans, has virtually lost the entire Systrans businesses as a result of Iron Mountain's failure to provide Systrans with the nearly $45 million in revenue for five years as it had promised.

29. While Iron Mountain repeatedly promised Systrans that it would provide Systrans with $45 million in revenue for five years for its courier management technology services, Iron Mountain's statements to Systrans were false at the time they were made in that Iron Mountain never intended to give Systrans this level of business. Iron Mountain's representations were false at the time they were made and were designed merely to ensure Neebling and Carr's cooperation in Iron Mountain's prosecution of its arbitration action against Pierce. Once Iron Mountain decisively lost the arbitration and was forced to pay Pierce's cost to defend himself, Iron Mountain promptly turned on Systrans and Neebling and began to systematically strangle Systrans economically by not providing it with enough revenue to survive.

30. In approximately September 2003, Carr and Neebling attended a meeting with Varn and Moore in New York, New York. At this meeting, Varn, individually, as a partner at the Boston law firm Sullivan and Worcester and acting as an agent of Iron Mountain and within

15

the scope of his authority, promised $2 million dollars for Carr to use to pay off certain debts incurred during the preceding year or two.

31. All of the aforementioned contractual obligations and promises, which the Counter-Defendant presented to Neebling on behalf of Systrans, were made with absolutely no intention of fulfilling or otherwise satisfying said obligations.

32. Despite repeated requests from Carr, his New Jersey counsel Peslak as well as his Neebling, for the period beginning in the fall of 2003 through the early months of 2005 the Counter-Defendants refused to fulfill the aforementioned promises, continuing to use as an excuse the pendency of the Iron Mountain versus Pierce arbitration appeal.

## Count I

## Breach of Contract

33. Incorporated by reference are all allegations as set forth in Paragraphs 1 through 32 as if repeated herein.

34. The transactions as between Iron Mountain and Systrans do constitute a binding oral contract supported by adequate consideration.

35. Systrans has performed all of his obligations pursuant to the terms and conditions of the aforementioned oral contract.

36. Iron Mountain failed to perform its promises and obligations pursuant to the aforementioned oral contract as described above, which does constitute a material breach of said oral contract.

16

37. As the direct and proximate result of the aforementioned material breach of contract by the Counter-defendant, Systrans has been damaged.

38. WHEREFORE, the Counter-Plaintiff Systrans demands judgment against the Counter-Defendants in the amount of $20 Million plus interest, attorneys' fees and costs.

## Count II

## Negligent Misrepresentation

39. Incorporated by reference are all allegations as set forth in Paragraphs 1 through 38 as if repeated herein.

40. Iron Mountain repeatedly promised Systrans, through its owner, that it would direct to the company $45 million in revenue for five years, in exchange for Neebling's information and cooperation in prosecuting the Pierce arbitration, as more fully described in paragraph 21.

41. Iron Mountain received from Neebling critical information known to Neebling, which information was sought by the Counter-Defendant in the prosecution of its claims against Pierce.  Moreover, Iron Mountain gained Neebling's complete cooperation in assisting Iron Mountain in filing a separate action against Pierce.

42. At the time the representations set forth in Paragraph 40 were made to Neebling, the Counter-Defendant, had superior knowledge, recognized that the ability and decision to honor its contract with Systrans was in its sole discretion and/or its exclusive control, and/or that at the time the statements were made Iron Mountain did not intend to honor its promises, making the statements to Systrans false when they were made.

17

43. That, as more fully explained above, Systrans did in fact rely on the aforementioned false statements, not knowing them to be false, to its detriment in that Systrans invested money, and effort in developing technology specifically for Iron Mountain and Iron Mountain's false representations caused Systrans to suffer massive business losses and effectively, the business itself.

44. As the direct and proximate result of Iron Mountain's and the other Counter-Defendants' negligent misrepresentations, Systrans has been damaged.

WHEREFORE, Systrans demands judgment for compensatory damages against the Counter-Defendants in the amount of $20 Million, plus interest, attorneys' fees and costs.

SYSTRANS DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully submitted,

By its attorneys,

**/S/ Stone**

Kathleen C. Stone
BBO #481920
Looney, Cohen, Reagan & Aisenberg LLP
109 State Street
Boston, MA 02109
(617) 371-1050

Read K. McCaffrey
Christopher W. Hellmich
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-5243

# EXHIBIT E

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

IRON MOUNTAIN INCORPORATED;      )
IRON MOUNTAIN INFORMATION         )
MANAGEMENT, INC.; C. RICHARD      )
REESE; JOHN F. KENNY, JR.;        )
GARRY B. WATZKE; LARRY L. VARN;   )
and CHARLES G. MOORE,             )
                                  )
      Plaintiffs and              )    CIVIL ACTION
      Counterclaim Defendants,    )    NO. 05 10890 RCL
                                  )
      v.                          )
                                  )
THOMAS CARR,                      )
                                  )
      Defendant and               )
      Counterclaim-Plaintiff.     )

IRON MOUNTAIN INFORMATION         )
MANAGEMENT, INC.                  )
                                  )
      Plaintiff,                  )
                                  )
      v.                          )
                                  )
SYSTRANS FREIGHT SYSTEMS, INC.,   )    CIVIL ACTION
                                  )    NO. 05 10999 RCL
      Defendant                   )
                                  )

## DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

      Subject to the specific objections set forth below in response to particular Interrogatories,

Defendant Systrans Freight Systems, Inc., by its attorneys, answers the Plaintiffs' First Set of

Interrogatories as follows:

4841873

## INTERROGATORIES

INTERROGATORY NO. 1:

Identify each person who was consulted or who provided information used in connection with the responses to these Interrogatories.

RESPONSE NO. 1:

Mr. Jim Neebling provided assistance. The remainder of the information sought is protected by the attorney/client privilege.

INTERROGATORY NO. 2:

Identify each person who has or who you reasonably believe may have any knowledge of any information concerning any allegation in the Complaint and Answer, for each such person, set forth the knowledge held, or that you believe is held, by each such person.

RESPONSE NO. 2:

Systrans does not know who, among the Plaintiff's officers, directors, or employees—or any other individuals or entities—would be best informed to testify regarding the contentions stated in your Complaint. Systrans identifies the following entities and individuals likely to have discoverable information that Systrans may use to support its defenses relating to your claims.

1)    James Neebling
      571 West Lake Avenue; Suite 5
      Bayhead, NJ 08742
      (732) 295-9914

Neebling, the Defendant's founder and president will testify concerning the agreements he made with the Plaintiff on behalf of Systrans. Neebling will also testify to his and Systrans's fulfillment of their obligations under these agreements, and Systrans's provision of all services

requested of it. He will also testify to Systrans's compliance, as of the date this action was filed, with the payment plan it negotiated with the Plaintiff.

2)    Arthur Peslak
      80 Scenic Drive, Suite 5
      Freehold, NJ 07728
      (732) 761-1610

Peslak will testify concerning the contractual agreements Neebling made with the Plaintiff on behalf of Systrans. Neebling will also testify to Systrans's fulfillment of its obligations under these agreements, and Systrans's provision of all services requested of it.

3)    Thomas Carr
      152 Chestnut Way
      Manalapan, NJ 07726

Carr will testify concerning the contractual agreements Neebling made with the Plaintiff on behalf of Systrans. Carr will also testify to Systrans's fulfillment of its obligations under these agreements, and Systrans's provision of all services requested of it.

4)    Several third-party vendors, to be determined

The vendors will testify to agreements that they personally entered into with the Plaintiff, which were similar to those entered into by Systrans. They will also testify, to they extent they have personal knowledge, to Systrans's fulfillment of its obligations under its agreements with the Plaintiff.


INTERROGATORY NO. 3:

Identify each person whom you expect to call as a witness at any hearing or trial in these actions.

RESPONSE NO. 3:

Please see the above response to Interrogatory No. 2.


4841873

INTERROGATORY NO. 4:

Identify each document that you intend to introduce as an exhibit at any hearing or trial in these actions.

RESPONSE NO. 4:

We object to this interrogatory because a response would violate the attorney work product privilege. In the spirit of discovery, however, we make reference to Systrans's response to the Plaintiff's First Request for Production of Documents and Tangible Things.

INTERROGATORY NO. 5:

Identify each person whom you expect to call as an expert witness at any hearing or trial of these actions and, for each expert witness identified, provide the information and documents required by Fed. R. Civ. P. 26(a)(2)(B).

RESPONSE NO. 4:

We have not selected any experts at this time.

INTERROGATORY NO. 6:

If Carr currently has or ever had any ownership, shareholder or membership interest, or investment, in Systrans, describe the interest and state whether Carr still possesses or has any current rights with respect to that interest or investment and the nature and extent of such interest or investment.

RESPONSE NO. 6:

We object to this interrogatory in that it calls for information that is neither relevant to

4841873

this action nor calculated to lead to the discovery of admissible evidence.

INTERROGATORY NO. 7:

Does Systrans still possess any information regarding Iron Mountain's or IMIM's

customers or clients? If "yes," identify where the information is currently stored.

RESPONSE NO. 7:

No.

INTERROGATORY NO. 8:

Does Systrans still own, possess or have access to all or any of "the equipment purchased

by contractor at the inception of this Agreement" identified in section II.A.5. of the Contract? If

"yes," identify the current location of all such equipment.

RESPONSE NO. 8:

No.

INTERROGATORY NO. 9:

How much money does Systrans owe to Iron Mountain? State the basis for any amount

owed.

RESPONSE NO. 9:

Systrans owes Iron Mountain approximately $150,000, calculated from various payments

that Iron Mountain made to Systrans in an amount greater than the value of services Systrans

provided, minus those payments Systrans had made under the agreed payment plan before Iron

Mountain commenced this action.

4841873

Respectfully submitted,

November 30, 2006

Read K. McCaffrey (pro hac vice)
Ilya Shapiro (pro hac vice)
PATTON BOGGS, LLP
2550 M Street, NW
Washington, DC 20005
(202) 457-5243
rmccaffrey@pattonboggs.com
ishapiro@pattonboggs.com

4841873