## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; and CHARLES G. MOORE, | ) ) ) ) ) ) ) ) |
| Plaintiffs and Counterclaim Defendants, | ) CIVIL ACTION ) NO. 05 10890 RCL |
| v. | ) ) |
| THOMAS CARR, | ) ) |
| Defendant and Counterclaim-Plaintiff. | ) ) ) |

### DEFENDANT'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

Defendant Thomas Carr, by his attorneys, hereby opposes both the individual and corporate Plaintiffs' respective motions for summary judgment. The essence of this opposition is that despite the Plaintiffs' best efforts to demonstrate the absence of a material factual dispute many significant and material disputes remain, including the very heart of this case: the existence and nature of the oral contract between the parties.

### I. INTRODUCTION

The thrust of the Plaintiffs' prolix submissions is that they are entitled to summary judgment because they have produced allegedly undisputed evidence that no enforceable contract exists. The evidence supposedly proving this negative consists of the deposition testimony of one of the Plaintiffs, Richard Reese, and very selective quotes from the deposition

4896205

testimony of Mr. Carr and his business associate James Neebling. Plaintiffs choose to ignore the rest of the statements and discovery in these proceedings.

Not only do the parties differ in their respective views of the facts of this case, or even that triable issues of material fact remain at the close of discovery, but essentially *every* material fact remains in dispute:

1) Did any of the Plaintiffs make promises to compensate Carr in any way for his cooperation and assistance in their claims against Pierce?

2) Did Carr agree to the Plaintiffs' offer and fulfill his end of the bargain?

3) If he did, what do the Plaintiffs owe him?

The Plaintiffs' nearly 250 submitted pages (including two memoranda of law, and not including over 100 pages of submissions for the companion *Systrans* case) gloss over and otherwise ignore these very real disputes, inexplicably contending that the parties agree on all aspects of the case. And the Plaintiffs do not submit any sworn affidavits to support their arguments—not even as exhibits—relying instead on three lawyers' declarations.

The Plaintiffs also bizarrely attack Carr's credibility and attempt to impeach him with his own and Neebling's deposition testimony. This line of attack is, of course, not germane to a summary judgment motion but instead goes to the weight that Carr's evidence should be afforded by the fact-finder at trial.

Carr himself would prefer to dispose of this litigation at the summary judgment stage but cannot in good faith file his own motion because of the conflicting evidence the parties have presented about the existence, nature, and enforceability of the oral contract at issue. Under these contentions and disparate circumstances, Carr and his counsel are puzzled as to why the Plaintiffs are calling upon judicial resources to review disingenuous motions.

4896205

2

## II. STATEMENT OF FACTS

For purposes of this opposition, Carr accepts the material facts laid out in Section A of the Plaintiffs' Statement of Facts, "Background." Rather than parsing the remaining sections, Carr incorporates his Statement of Disputed Material Facts (which in turn incorporates the Declaration of Ilya Shapiro, Esq., the Affidavit of James Neebling, and their exhibits).

Carr's involvement with the Plaintiffs began when Iron Mountain became his landlord and engaged him in a dispute over certain rental property. That dispute was eventually settled amicably and in October 2001 a senior "entourage" from Iron Mountain, including the CFO and General Counsel (Plaintiffs John Kenny and Garry Watzke, respectively), came to New Jersey to meet with Carr and discuss what they believed were unlawful acts being committed by Peter Pierce—previously the owner and seller of an Iron Mountain competitor. At this meeting, the Plaintiffs stated that if Carr would assist them in confirming what they already suspected about Pierce's activities, and would otherwise assist and support them in litigation against Pierce, that they would compensate Carr in various ways.

Thereafter, the individual Plaintiffs, the top executive management of the corporate Plaintiffs and their counsel, engaged in a series of meetings with Carr, his counsel Arthur Peslak, and Neebling, including those admitted by the Plaintiffs in their Answer to Carr's Second Amended Counterclaim: March 19, 2002 in New Jersey, March 26, 2002 in Boston, April 2, 2002 by telephone conference, April 9, 2002 in New York, July 16, 2003 by telephone conference, and September 2003 in New York. During one or more of these and the many other meetings admitted by the Plaintiffs in various filings and deposition testimony in this case, both in person and by telephone, and in consideration for Carr's information and cooperation, the Plaintiffs promised: 1) To fund Carr's lawsuit against Pierce and related legal expenses; 2) to

loan him $ 5 million; 3) to hire him to as a transportation consultant on the same terms as he was then employed; 4) to ensure that Systrans would receive $45 million in courier business (through which Carr, as a principal investor, would see a large profit); 5) to pay him $2 million as an interim measure to allow him to satisfy certain obligations in the wake of Pierce's malfeasance; 6) the provision of assurances to Carr's creditor, Paul Schwarz, that Iron Mountain would provide sufficient funds and revenues to Carr to enable Schwartz to conclude that Carr was a good candidate for loans; and 7) that if any negative financial effects befell Carr or his family as a result of his cooperation with the Plaintiffs in their disputes with Pierce, the Plaintiffs would indemnify him.  These are the contracted-for promises for which Carr now seeks damages.

Concurrently, in the spring of 2002, the Plaintiffs began encouraging Carr to file his own suit against Pierce to strategically coincide with the action that Iron Mountain was planning to also file.  With the intent of orchestrating simultaneous lawsuits against Pierce, the Plaintiffs sought to facilitate Carr's participation by agreeing to fund his lawsuit and drafting a complaint for Carr to file.

Carr initially voiced reluctance in joining the Plaintiffs' campaign against Pierce and expressed significant concerns about the negative effects of any such action on his business and family.  In addition to the promises the Plaintiffs made to Carr, Kenny also called Carr's wife to reiterate and specifically affirm each of the foregoing promises and advise her that Iron Mountain would ensure the family's financial stability should Carr join the effort against Pierce. Carr eventually acquiesced and Iron Mountain had a courier deliver a copy of the drafted complaint for Carr to sign while he was on vacation with his family in California.

During the ensuing months, Carr cooperated completely with the Plaintiffs, met with witnesses, reviewed commercial transactions involving Pierce and Pierce-related companies, and

turned over documents and other materials to various of the Plaintiffs. This cooperation involved extensive travel at the Plaintiffs' request. It culminated in Carr's testimony at the Pierce arbitration in July 2003, which Varn coached to be technically accurate but factually misleading. Disputed Facts ¶¶ 3-6; Neebling Aff. ¶¶ 27-28.

Carr assisted the Plaintiffs in full reliance on the aforementioned promises and, as a direct result of this reliance, lost his businesses and was shackled with debt. In retaliation for Carr's cooperation with the Plaintiffs, including his filing of a complaint against Pierce, Pierce wasted the business of which Carr was a 49% owner, fired him, and left him without a source of income.

Carr believed that the Plaintiffs would make good on their oral contract for monetary compensation, employment, business, and other indemnification but when Carr demanded satisfaction he was met with silence, delay, and denial. At one point the Plaintiffs began to advise Carr that he would have to wait until after the Pierce arbitration to get compensated and then, after Iron Mountain lost the arbitration in February 2004, until final resolution of appeals.

Despite repeated requests from Carr, Peslak, and Neebling, the Plaintiffs remained incapable of or unwilling to fulfill the aforementioned promises, continuing to use as an excuse the pendency of the arbitration appeal. In early 2005, undersigned counsel became involved in an effort to amicably resolve Carr's claims relating to the Plaintiffs' obligations to him. After being put off for several months and being assured that a resolution of his Carr claims awaited the conclusion of appeals in the Pierce case, Carr received the Plaintiff's Complaint in this case.

Carr counterclaimed and now, after the close of discovery, the parties remain far apart in their view of the facts, with each side presenting evidence that tells vastly different stories.

## III. ARGUMENT

### A. Standard

Summary judgment is only warranted if, after reviewing the facts in the light most favorable to the non-moving party, no genuine issues of material fact remain and the moving party is entitled to judgment as matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine" issue of fact is one that a reasonable jury, on the record before the court, could resolve in favor of either party. *Anderson*, 477 U.S. at 248. A fact is material when it "might affect the outcome of the suit under the governing law." *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 90 (1st Cir.1993) (citing *Anderson*, 477 U.S. at 248). The opposing party can avoid summary judgment by providing evidence of disputed material facts that would require trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### B. Carr's Evidence Contradicts That of the Plaintiffs and Thus Creates a Dispute as to the Existence and Nature of the Oral Contract Between Him and the Plaintiffs

The Plaintiffs claim that they never agreed to pay Carr $2 million (one part of his damages calculation), and indeed argue that Carr himself admits that the Plaintiffs never promised him *anything*. Corp. Pl. Memo at 11-13; Indiv. Pl. Memo at 6-7. They cite a long string of cases for the proposition that vague promises, present intentions, expectations, and the like, are unenforceable. *Id*. Carr does not dispute these legal authorities, though he is puzzled by the Plaintiffs' heavy reliance on—and questions the persuasiveness of—an unpublished opinion from the Middle District of North Carolina and a case from the Supreme Court of New Jersey (from 1933 no less). Corp. Memo at 12 (block-quoting *Mauldin v. Shaffer*, 1977 U.S. Dist. LEXIS 13585 at *29-30 (M.D.N.C. Oct. 7, 1997) and citing *Broad Street Nat'l Bank of Trenton v. Collier*, 169 A. 552, 554 (N.J. 1933)). But they are beside the point; Carr's claims are not an attempt to enforce a promise to "work something out" or "an agreement to reach an agreement,"

or anything of the sort. Instead, he has presented clear evidence showing the existence of an enforceable oral contract.

For a contract to be enforceable, it must be of "sufficient explicitness so that a court can perceive … the respective obligations of the parties." *Soar v. National Football League Players' Ass'n*, 550 F.2d 1287, 1290 (1st Cir. 1977). The parties must agree on the material terms and have a present intention to be bound by that agreement. *McCarthy v. Tobin,* 706 N.E.2d 629, 631 (Mass. 1999). Not all terms of the agreement must be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract. *Lafayette Place Assoc. v. Boston Redevelopment Auth.*, 694 N.E.2d 820, 826 (Mass. 1998) (enforcing contract where certain terms, including purchase price, were unknown and unknowable at time of signing); *Shayeb v. Holland*, 73 N.E.2d 731, 732 (Mass. 1947) (enforcing agreement after finding contract embodying material factors not to be incomplete or indefinite when it fails to express certain matters necessary for its performance or satisfaction); *see also Soar*, 550 F.2d at 1291 (enforceable contract might be found even if one or more critical questions are left unanswered).

Fundamentally, a contract is not invalid because one of its material provisions is stated in general terms, if, when construing it "in light of attending circumstances," a court can determine the rights and obligations of the parties "with reasonable certainty." *Cygan v. Megathlin*, 96 N.E.2d 702, 703 (Mass. 1951). That determination necessarily varies according to the facts of each case. *Armstrong v. Rohm & Hass Co.*, 349 F.Supp.2d 71, 78 (D. Mass. 2004) (when lack of specificity regarding terms such as time of performance, price to be paid, or work to be done, courts ask whether parties intended to contract with one another and whether "reasonably certain basis" for providing appropriate remedy).

Moreover, a defendant cannot avoid its obligations under an alleged contract after having accepted its benefits. *See*, *e.g.*, *Hastings Associates, Inc. v. Local 369 Bldg. Fund, Inc.*, 675 N.E.2d 403, 410 (Mass. App. Ct. 1997) (citing, *inter alia*, *Cygan*, 96 N.E.2d 702) (enforcing ambiguous lease renewal where doing otherwise would benefit defendant at plaintiff's expense in a way not contemplated by contract). And if the parties specify "procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding." *Lafayette Place Assoc.*, 694 N.E.2d at 826. Respectfully, undersigned counsel find the foregoing Massachusetts authority persuasive.

Courts enforced the contracts in *Lafayette Place* and *Shayeb* despite vague or missing terms because they found material agreement between the parties. Here, this Court must interpret not a vague or ambiguous contract but a complete one that the Plaintiffs now disclaim—after having received the benefit of their bargain. As summarized above and cited in his Statement of Disputed Material Facts, Carr has presented copious evidence buttressing his claim that *all* essential terms of the contract were agreed, namely 1) the services he was to provide the Plaintiffs (assistance with their lawsuit against Pierce), and 2) how the Plaintiffs were to compensate him (the damages Carr claims). Eventually, the Plaintiffs even specified *when* they would provide this compensation (after the conclusion of the Pierce litigation). On more than one occasion, Varn reiterated the Plaintiffs' promises that Carr would be compensated in the way he now claims, which claims match the understanding of the parties' contract by numerous non-party witnesses who have given their testimony herein.

Finally, the Plaintiffs' catechistic recitation of Carr's "admissions" that the Plaintiffs made him no promises carries no weight because of evidence that Varn taught Carr to obfuscate in this manner. That is, Varn coached Carr to "split hairs and make statements that were both

technically accurate from a legal standpoint and completely misleading in what they meant." Neebling Aff. ¶ 27.  For example, "Varn instructed Carr that if he was asked 'did Iron Mountain offer you a job in exchange for your assistance' that Carr was to say 'no' because he was offered a consulting position and not a job."  Ex. C to Shapiro Decl. (Peslak Decl. at ¶ 14).  Carr is not "disavowing his testimony and taking an inconsistent position to avoid summary judgment," Corp. Pl. Memo at 12-13, but instead provides evidence from multiple sources explaining why it might seem that he is disclaiming his contract with the Plaintiffs.

### C. The Plaintiffs Cannot Use the Statute of Frauds as an Affirmative Defense Due to Waiver and Estoppel, and Because the Statute Does Not Govern the Contract At Issue

The Plaintiffs' eleventh-hour invocation of the Statute of Frauds is a desperate and untimely (and therefore unsuccessful) attempt to avoid their contractual obligations.  Moreover, having induced Carr to engage in a course of action that could be nothing but detrimental to him, the Plaintiffs are now estopped from disclaiming the certain payments and indefinite employment they promised him in return for this action.

#### 1. The Plaintiffs Have Waived the Statute of Frauds Defense Because They Are Only Now Raising It for the First Time

Affirmative defenses must be plead in the answer to give the opposing party notice of that defense and a chance to develop evidence and offer arguments to controvert it.  Fed. R. Civ. P. 8(c); *Wolf v. Reliance Standard Life Ins. Co.*, 71 F.3d 444, 449 (1st Cir. 1995); *Knapp Shoes, Inc., v. Sylvania Shoe Mfg. Corp.*, 15 F.3d 1222, 1226 (1st Cir. 1994); *Boston Hides & Furs, Ltd. v. Sumitomo Bank, Ltd.*, 870 F. Supp. 1153, 1161 n.6 (D. Mass. 1994); *see also McKinnon v. Kwong Wah Restaurant*, 83 F.3d 498, 505 (1st Cir. 1996) (to avoid waiver, defendant must assert all affirmative defenses in answer).

Here, after more than two years of litigation, the Plaintiffs raise the Statute of Frauds for the first time in their motion for summary judgment. It does not appear among the 12 affirmative defenses they raise in their answer to Carr's First Amended Counterclaim (filed May 31, 2005), nor among the 16 they raise in their answer to Carr's Second Amended Counterclaim (filed April 14, 2006). Nor did the Plaintiffs ever file or seek leave to file any amended answers, or even mention the Statute of Frauds obliquely during motion practice or in discovery responses.

Moreover, none of the limited exceptions to waiver for non-pleading apply here. *See*, *e.g.*, *Conjugal P'ship Comprised by Joseph Jones and Verneta G. Jones v. Conjugal P'Ship Comprised of Arthur Pineda and Toni Pineda*, 22 F.3d 391, 400 (1st Cir. 1994) (no waiver because affirmative defense was tried with other party's consent); *Doherty v. Doherty Ins. Agency, Inc.*, 878 F.2d 546, 551 n.4 (1st Cir. 1989) (no waiver because Statute of Frauds defense raised in *pre-answer* motion to dismiss or for summary judgment); *Agri-Mark, Inc. v. Niro, Inc.*, 214 F. Supp.2d 33, 43 (D. Mass. 2002) (no waiver because plaintiff received notice of affirmative defense by means other than pleading).

Put simply, while the Plaintiffs had ample opportunity to plead and put Carr on notice of their Statute of Frauds argument—as they did with their growing laundry list of affirmative defenses—they failed to do so until after the close of discovery. They have thus waived it.

**2. The Plaintiffs Are Estopped From Relying on the Statute of Frauds Defense Because Their Representations Induced Carr to Engage in a Course of Conduct That Proved Detrimental to Him**

Even if the Plaintiffs had not waived the Statute of Frauds defense, they are estopped from now raising it. Estoppel prevails against a Statute of Frauds defense where the party claiming estoppel proves: (1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2)

4896205                                    10

an act or omission resulting from the representation, whether actual or by conduct; and (3) detriment to such person as a consequence of the act or omission. *Maffei v. Roman Catholic Archbishop of Boston*, 867 N.E.2d 300, 318 (Mass. 2007).

      Here, the Plaintiffs promised Carr that, if he assisted them in their litigation against his then-business partner Pierce, he would receive certain compensation, including cash payments, employment, and return on investment. In providing this assistance—by acting as a liaison to potential witnesses and collecting other evidence—Carr necessarily damaged his relationship with Pierce, who fired him and gutted the value of his interest in their company as Carr and his family had feared. Thus, even if the Plaintiffs had not waived the Statute of Frauds defense, they are estopped from raising it because the oral contract they concluded with Carr induced him to take actions to his detriment. *See also*, *e.g.*, *Hastings Associates*, 675 N.E.2d at 410 (defendant estopped from denying existence of contract where it had already gotten benefit of the bargain).

### 3. The Plaintiffs Agreed to Pay Carr and to Hire Him for an Indefinite Period, Which Type of Agreement is Not Governed by the Statute of Frauds

      The Massachusetts Statute of Frauds "does not apply to contracts which may be performed within a year but may also extend beyond that year." *Kitaeff v. Johnson*, 914 F. Supp. 734, 738 (D. Mass. 1996) (citing *Doherty*, 878 F.2d at 552 (in turn quoting *Rowland v. Hackel*, 137 N.E. 265 (Mass. 1922)). An oral contract for permanent or indefinite employment is thus enforceable because it may theoretically be performed within a year. *Meng v. Trustees of Boston University*, 693 N.E.2d 183, 185 (Mass. 1998); *Sereni v. Star Sportswear Mfg. Corp.*, 509 N.E.2d 1203, 1207 (Mass. 1987). To ascertain if the parties intended "permanent employment," courts consider the circumstances surrounding the contract formation, its subject, the situation and relation of the parties, and the sense in which, taking these things into account, the words would be commonly understood. *Whelan v. Intergraph*, 889 F.Supp. 15, 18 (D.Mass. 1995)

(citing *Carnig v. Carr*, 46 N.E. 117 (Mass. 1897)). A party cannot maintain a claim strictly to avoid the Statute but must, at a minimum, present evidence of "a promise of permanent employment" from which a reasonable juror could "infer that he had an indefinite contract." *DiGaetano v. Lawrence Firefighters Fed. Credit Union*, No. 01-01373, 2002 Mass. Super. LEXIS 447, at *4 (Mass. Super Ct. Nov. 5, 2002).

Determinations regarding the existence of an offer for permanent employment are necessarily case-specific. Massachusetts courts have found the following statements insufficient to create a contract for permanent employment: a) that the employee had "secure and continuing employment," *Treadwell v. John Hancock Mut. Life Ins. Co.*, 666 F.Supp. 278, 286 (D.Mass. 1987); and b) that the employee had a "promising future" and "his experience with the division might be a nice way to end his business career," *Gregory v. Raytheon Service Co.*, 540 N.E.2d 694, 695 (Mass.App.Ct 1989). In contrast, the Massachusetts Supreme Court has found sufficient evidence to allow the jury to find a contract for permanent employment where the plaintiff had been induced to take the job after expressing concerns about job security. *Boothby v. Texon, Inc.*, 608 N.E.2d 1028, 1035-36 (Mass. 1993) (finding contract to be outside Statute of Frauds because "permanent employment" could end within one year due to employee's for-cause termination or death, or employer's going out of business).

Here, as in *Boothby*, the Plaintiffs offered to employ Carr after he expressed concerns about job security. Carr worried, understandably and correctly as it turned out, that his employment with Pierce would be in jeopardy once he started assisting the Plaintiffs' litigation against Pierce. This is why Kenny offered him a job "at the same benefits and the same salary" and said "we will continue to support you." Disputed Facts ¶ 16. Of course, such a position, while permanent, or indefinite, could have ended at any time as a result of Carr's death or

unsatisfactory performance, or a shift in Iron Mountain's business climate. Carr's job could thus have ended within one year, so even if the Plaintiffs had not waived the Statute of Frauds, this defense does not apply to the Plaintiffs' promise to employ Carr (let alone their promise to pay his legal fees and $2 million compensation).

**D. Carr's Counterclaim for Damages Relating to His Investment in Systrans Remains At Issue Because The Parties Dispute the Existence and Nature of This Part of Their Oral Contract and Carr Has Already Proffered a Valid Calculation of Those Damages**

The Plaintiffs raise three issues particular to the Systrans-related portion of Carr's damages claim: 1) that the Plaintiffs made no promises to provide Systrans with revenues through which Carr would profit as an investor; 2) that even if the Plaintiffs made such promises, Carr had no interest in Systrans such that he can claim to be damaged by the Plaintiffs' breach; and 3) that even if Carr can claim damages, those damages are too speculative to be compensated. These are all factual issues, and Carr has presented more than enough evidence to create a dispute about them such that summary judgment is inappropriate.

First, Carr, Neebling, Peslak, and Schwartz have all testified to the promises the Plaintiffs made that Iron Mountain would provide Systrans with business. *See* Disputed Facts ¶¶ 12, 14. The Systrans Contract did not incorporate these promises, but it is not Carr's contention that it does (nor that of Neebling, Systrans's president). Indeed, the Systrans Contract and generally the business relationship between Iron Mountain and Systrans—while relevant to this case by virtue of Carr's association with Neebling and the Plaintiffs' decision to use Systrans as a vehicle for compensating Carr (Disputed Facts ¶ 12; Neebling Aff. ¶ 42)—is the subject of the companion case, not this one. Thus the Plaintiffs' airtight authority for the proposition that "written agreements are presumed to express the parties' final arrangements," Corp. Pl. Memo at

4896205                                    13

17, is of no moment. The agreement to compensate Carr by providing revenues to Systrans was part of a separate oral contract.

Similarly, the Plaintiffs' contention that Carr has no "standing" to sue for the breach of Iron Mountain's contract with Systrans would be decisive if Carr were indeed bringing a claim that properly belonged to Systrans. Instead, Carr, who invested over $600,000 in Systrans, is claiming his share of the profits he would have received had the Plaintiffs not breached their promise *to him*. Disputed Facts ¶ 12-13; Neebling Aff. ¶¶ 41-42. And the Plaintiffs have always known of the nature of Carr's investment in Systrans, to the point that Varn had Carr and Neebling sign an affidavit artfully disclaiming Carr's "interest." Neebling Aff. ¶ 26, Exh. B. The Plaintiffs seemed to have been so enamored with the idea of using Systrans to compensate Carr that at one point they also wanted to funnel other money they owed him through Systrans. *See, e.g.*, Neebling Aff. ¶¶ 31-32 ("Varn told us that Watzke would work out some kind of arrangement to send Systrans the $2 million Iron Mountain had earlier promised Carr …. Varn asked me to be creative in thinking about how Iron Mountain would be able to pass this money onto Carr."). In short, not only was Carr expecting a return on his investment, but the Plaintiffs envisioned their provision of business to Systrans as an element of Carr's compensation package.

The last argument on which the Plaintiffs hang their motion is that Carr's damages with respect to Systrans profits are "far too speculative" and "cannot be calculated with reasonable certainty." Again, as in Section III.B *supra*, they claim that Carr is trying to enforce a vague contract with various essential terms missing. Yet Carr has presented sufficient evidence that he was to receive half of Systrans's profits, as well as evidence of what those profits would be. Disputed Facts ¶¶ 13; Neebling Aff. ¶ 41. Neebling, the company's president, who has over 20 years of experience in the industry, can state unequivocally that "Systrans's net profit margin

was 10-12%." Neebling Aff. ¶ 41. The Plaintiffs had the chance to ask Neebling about Systrans's history or profitability, and about Carr's Systrans-related damages claim but, as with their Statute of Frauds defense, did not avail themselves of the opportunity to raise this supposed weakness in Carr's case. And no expert is needed to calculate 10-12% (or 7%, as Carr very conservatively claims) of $45 million.

As stated earlier, if the parties to a contract specify "procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding." *Lafayette Place Assoc.*, 694 N.E.2d at 826. Here, for purposes of this summary judgment motion, Carr has clearly created a triable issue over how much the Plaintiffs owe him for having breached their promise to pay for his services through the mechanism of Systrans's profits.

**E. The Individual Plaintiffs Cannot Be Dismissed From This Case Because This Court Ruled That Carr Stated a Valid Counterclaim Against Richard Reese and Larry Varn and Genuine Issues of Material Fact Remain With Regard to That Counterclaim[1]**

In a transparent attempt to circumvent Local Rule 7.1(b)(4), which limits memoranda supporting motions to 20 pages, the Plaintiffs decided to file two separate motions for summary judgment, one for the corporate Plaintiffs and one for the individual Plaintiffs. Apparently the above-discussed arguments (absence of a promise to pay $2 million, Statute of Frauds, etc.) do not apply to Carr's counterclaim against Richard Reese and Larry Varn. Nevertheless, the Plaintiffs maintain that there is no evidence that Carr had an enforceable contract with either Reese or Varn, the former because all of Reese's promises were made on behalf of the corporate Plaintiffs, and the latter because Varn's promises were too vague. Indiv. Pl. Memo at 2.

---

[1] The body of the Individual Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment argues for summary judgment solely in favor of those Plaintiffs who are also Counter-Defendants, Reese and Varn. The only mention of the remaining Plaintiffs, John Kenny, Garry Watzke, and Charles Moore, is a reference to this Court's dismissal of Carr's counterclaims against them and a prayer for entry of declaratory relief in their favor. Indiv. Pl. Memo at 1-2, 8.

Reese is a party to this case because Reese sued Carr in his individual capacity; the Plaintiffs decided to include him in their original declaratory judgment action and Carr sufficiently pled a counterclaim that Reese breached an oral contract to fulfill certain promises. Since that time, Carr has presented evidence that Reese made these promises to him. Carr has no knowledge of whether Reese was making these promises on his own or Iron Mountain's behalf, but if Reese had not made them in an individual capacity, why was he included as a plaintiff in this case?

As for Varn, who also sued Carr in his individual capacity, please see section III.B *supra* for a discussion of his promises to Carr. *See also* Disputed Facts ¶¶ 3-7, 18, 23-24; Neebling Aff. ¶¶ 21-32.

Larry Varn, senior attorney of Boston's Sullivan and Worcester LLP, decided, curiously, to file a declaratory action against Carr, obviously concerned about what may be revealed if Carr prevailed. When confronted with questions about what he said to Carr's lender Schwartz (who has since confirmed the details of the Varn-Schwartz conversation under oath), Varn simply denied that the conversation as sworn to by Schwartz ever took place. *See* Disputed Facts ¶ 18. Obviously, one of these sworn declarants is "mistaken."

It is baffling why and how Plaintiff Varn represents to this Honorable Court that no material disputes exist as to his promises to and relationship with Carr.

## IV. CONCLUSION

For the foregoing reasons, Mr. Carr requests that the Court deny the Plaintiffs' respective motions for summary judgment and allow this case to proceed to trial. The Plaintiffs simply do not understand that an averment that no material facts exist "supported" by a huge pile of mostly irrelevant paper will never satisfy the requirements of Rule 56.

          Respectfully submitted,

July 10, 2007

          /s/  Read K. McCaffrey
          Read K. McCaffrey (admitted *pro hac vice*)
          Ilya Shapiro (admitted *pro hac vice*)
          PATTON BOGGS, LLP
          2550 M Street, NW
          Washington, DC 20005
          (202) 457-6000
          rmccaffrey@pattonboggs.com
          ishapiro@pattonboggs.com

Certificate of Service

I certify that on this 10th day of July, 2007, I caused to be served on the counsel identified by e-mail, first-class mail, and through the ECF system this **Defendant's Consolidated Opposition to Plaintiffs' Motions for Summary Judgment**.

> Ira K. Gross (BO #12720)
> Kevin M. Colmey (admitted *pro hac vice*)
> SULLIVAN & WORCESTER LLP
> One Post Office Square
> Boston, MA 02109
> (617) 338-2800
>
>
> /s/ Ilya Shapiro
> Ilya Shapiro

4896205