## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; and CHARLES G. MOORE, | ) ) ) ) ) ) ) ) |
| Plaintiffs and Counterclaim Defendants, | ) ) |
| v. | ) ) |
| THOMAS CARR, | ) ) |
| Defendant and Counterclaim-Plaintiff. | ) ) ) ) |
| IRON MOUNTAIN INFORMATION MANAGEMENT, INC. | ) ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| SYSTRANS FREIGHT SYSTEMS, INC., | ) ) |
| Defendant | ) ) ) |

CIVIL ACTION
NO. 05 10890 RCL

CIVIL ACTION
NO. 05 10999 RCL

## DECLARATION OF ILYA SHAPIRO, ESQ.

I, Ilya Shapiro, upon personal knowledge and observation, hereby affirm as follows:

1.      I am an associate with the law firm of Patton Boggs LLP, counsel to Thomas Carr and Systrans Freight Systems, Inc., the Defendants in the above-captioned consolidated cases. I make this declaration to support the Defendants' respective oppositions to the respective Plaintiffs' motions for summary judgment.

1

2.      Annexed hereto as Exhibit A is a true and correct copy of the relevant pages and exhibits from the deposition of Thomas Carr, taken February 28 and March 15, 2007.

3.      Annexed hereto as Exhibit B is a true and correct copy of the relevant pages and exhibits from the deposition of Arthur Peslak, taken March 14, 2007.

4.      Annexed hereto as Exhibit C is a true and correct copy of the Declaration of Arthur Peslak, which was filed by Carr on October 12, 2005.

5.      Annexed hereto as Exhibit D is a true and correct copy of the relevant pages and exhibits from the deposition of James Neebling, taken February 27 and March 14, 2007.

6.      Annexed hereto as Exhibit E is a true and correct copy of Defendant Thomas Carr's Fourth Amended Initial Disclosures.

7.      Annexed hereto as Exhibit F is a true and correct copy of the relevant pages and exhibits from the deposition of Paul Schwartz, taken March 8, 2007.

8.      Annexed hereto as Exhibit G is a true and correct copy of the relevant pages and exhibits from the deposition of Judith Carr, taken March 8, 2007.

9.      Annexed hereto as Exhibit H is a true and correct copy of the relevant pages and exhibits from the deposition of Larry Varn, taken September 19, 2006.

10.     Annexed hereto as Exhibit I is a true and correct copy of the chart I prepared to summarize the various meetings and telephone conversations among the parties, which has previously appeared in this case as Exhibit 1 to the Neebling Deposition and Exhibit 3 to the Varn Deposition.  In compiling this chart, I reviewed all the pleadings and other filings in this case, as well as deposition testimony and the documents produced by both sides in discovery.

I declare under the penalty of perjury that the foregoing information is true and correct.


Executed July 10, 2007                         /s/ Ilya Shapiro_____
                                               Ilya Shapiro

Certificate of Service

I certify that on this 10th day of July, 2007, I caused this document to be served on the

counsel identified by e-mail, first-class mail, and through the ECF system.

Ira K. Gross (BO #12720)
Kevin M. Colmey (admitted *pro hac vice*)
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2800


/s/ Ilya Shapiro
Ilya Shapiro

# EXHIBIT A

Thomas Carr                                          02/28/2007

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS
----------------------------------------x
IRON MOUNTAIN INCORPORATED;
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.; C. RICHARD
REESE; JOHN F. KENNY, JR.;
GARRY B. WATZKE; LARRY L. VARN;
and CHARLES G. MOORE,

        Plaintiffs and
        Counterclaim Defendants,

                        Civil Action
    v.                    No. 05 10890 RCL

THOMAS CARR,

        Defendant and
        Counterclaim Plaintiff.
----------------------------------------x
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.

        Plaintiff,

                        Civil Action
    v.                    No. 05 10999 RCL

SYSTRANS FREIGHT SYSTEMS, INC.,

        Defendant.
----------------------------------------x

                  February 28, 2007
                  10:05 a.m.
      Deposition of THOMAS CARR, taken by Plaintiff,

pursuant to Notice, at the offices of Patton Boggs,

LLP, One Riverfront Plaza, Newark, New Jersey, before

Denise L. Daniels, a Shorthand Reporter and Notary

Public.

Page 9

```
 1
 2      had told Charlie that I'm really disappointed, the
 3      numbers that Jim is telling me he's doing weekly are
 4      really not making the numbers that we expect.
 5             And Charlie responded by, well, you know,
 6      I'll give Larry a call and I'll see what we can do
 7      about that.
 8             And he then had told me that, you know, I
 9      spoke to Richard a week ago and Richard told me as
10      long as Systrans does a good job, they will continue
11      to get the business.  But as far as any cash being
12      laid out, we would have to wait until after the trial
13      or the arbitration because it can cross and redirect.
14      Q.    You are saying that Mr. Moore said that's
15      what Mr. Reese told him?
16      A.    Yes, sir.
17      Q.    Was there anything else to the
18      conversation?
19      A.    I have the tape here, if you would like
20      to hear it.
21             MR. GROSS:  Has that been produced?
22             MR. McCAFFREY:  No.
23             MR. GROSS:  Are you planning to produce
24      it?
25             MR. McCAFFREY:  Sure.
```

Thomas Carr                                          02/28/2007

                                                      Page 91

1

2      meeting or afterwards, I also told him I want all of

3      the involvement that we have put into this company,

4      the cancer that is bringing the profits of this

5      company down that affect Sequedex that are working for

6      Sequedex, I want it stopped.  I want it stopped.

7           Q.     Did he agree to that?

8           A.     He said, "We'll talk about it."

9           Q.     How long did you give him before you

10     realized he wasn't going to fulfill any of these

11     promises?

12          A.     Well, I gave him through March, and then

13     what happened is I had conversations with my wife and

14     I said, you know, "I have to make a major decision

15     here.  Do I join Iron Mountain or do I believe Peter

16     is going to make good on his promises?"

17                 And at that point, I received a -- a

18     vacation was very much needed.  I had a meeting on

19     March 26th in Iron Mountain's conference room.  I was

20     very delighted and very convinced by the people I

21     spoke to at that meeting.  I left there feeling

22     wonderful.

23                 Within days I had left for San Diego to

24     the La Costa spa resort with my wife and family to

25     digest what was happening.  Here I am running a $15

1

2      million company, becoming one of the leaders in the

3      coffee industry with people who are a complete cancer

4      in the company, and I had to make a decision.  Do I

5      sue Peter Pierce, do I go through with the lawsuit or

6      do I believe him that he's going to make everything

7      okay?

8                   It was a very difficult decision until

9      John Kenny called me on vacation.  And Mr. Kenny and

10     Mr. Watzke and Mr. Art Peslak with unexpected --

11     totally unexpected for me, called me in San Diego on a

12     conference, Garry and Kenny called Art.  They tied me

13     in on the conference call.  They explained to me that

14     what John Kenny had told me on March 13th, that Iron

15     Mountain was going to pursue a lawsuit against

16     Mr. Pierce for a noncompete, that they would like me

17     to also file my complaint and coincide the same week.

18                   I had told Mr. Kenny and Mr. Watzke with

19     Art Peslak as a witness, I said, "Guys, I like you, I

20     believe in you, I trust you, I have a problem."

21                   And Mr. Kenny said, "What is that?"

22                   "Well, my wife feels without a written

23     commitment, without anything in writing, that I have a

24     daughter who has a brain tumor, I have a son who has a

25     bone disease," which I didn't tell him at that time --

Page 93

1

2        Q.    Try to stick to what was said, please.

3        A.    I have three kids in college, I have a $3

4    million loan that I'm personally guaranteed on.  I

5    have a $500,000 loan I'm personally guaranteed on.  I

6    have character, I have a great income and benefits.

7    I'm going to chance giving this all to join a fight

8    between two billionaires, meaning Mr. Reese and

9    Mr. Pierce.

10                John Kenny's exact words, exact, and I

11    remember it because my very, very, very best friend

12    who lives next door just died in 9/11 says to me,

13    "Tom, we're not the Taliban, we're the U.S. Air Force,

14    we stand behind our promises."

15                I said, "Well, that's just great, will

16    you put it in writing?"

17                And they said, "We can't."

18                And I said, "Why can't you?"

19                "Because Pierce is dirty and will do

20    anything in his power to try to say that Iron Mountain

21    put Tom up to this.  Do you understand that?"

22                And I said, "Well, I understand that."

23                I said, "Art, what do you think?"

24                Art said, "Well, I'm on the phone, I'm

25    hearing the promises."

Thomas Carr                                                    02/28/2007

1

2                    I said, "Well, I have one more problem.

3    My wife is telling me not to do it, we have too much

4    too lose."

5                    MR. McCAFFREY:  The "it" being filing the

6           suit against Pierce?

7                    THE WITNESS:  Yes.

8         A.    So John Kenny, who I really, really

9    liked, I liked him out of the whole group, I think he

10   was a great sincere guy.  He talked about his church,

11   his boating.  Both Jimmy and I felt we're going to

12   have a lot of fun --

13                   MR. McCAFFREY:  You need to move on.

14        A.    Anyhow, John Kenny said, "Tom, let me

15   talk to your wife."  I gave John my wife's number, who

16   was with me and on vacation.

17        Q.    Her cell phone number?

18        A.    Yes.  John Kenny had called my wife, and

19   he said, "Mrs. Carr, this is John Kenny, CFO for Iron

20   Mountain.  Your husband told me you had concerns about

21   him moving forward and signing the complaint against

22   Peter."

23                   She said, "John, I know you guys have

24   told my husband that you will support him a hundred

25   percent and we'll suffer no economic harm, but I'm

Thomas Carr                                                          02/28/2007

Page 95

1

2   very nervous about this whole deal.  You know, I don't

3   want my husband stuck between two billionaire

4   companies and we're going to wind up losing

5   everything."

6            Unfortunately Jimmy Neebling was telling

7   her prior to that about his father being involved in

8   two major public companies, and he got completely

9   squeezed out and lost his earnings.

10           John Kenny promised my wife, "Mrs. Carr,

11  your children will go to college, you will suffer no

12  economic harm, and like I told your husband, we are

13  not the Taliban, we're the U.S. Air Force.  We will

14  support you 100 percent."

15           He also turned around and said, "With our

16  blessing from Vin Ryan and Mr. Reese, we will pay all

17  of your attorneys' fees, and we will help your husband

18  with his company, with the coffee roll-up."

19           After that, my wife looked at me and

20  said, "Well, if you think that's the right thing to

21  do, you got my blessing."

22       Q.   Let me stop you for one second.

23           On the call that you had that preceded

24  this call to your wife, it was Mr. Peslak, Mr. Watzke,

25  Mr. Kenny and you?

Page 113

1

2    to tell us about Mr. Pierce and the employees you have

3    in the company.

4              So I went into explaining the details of

5    the actions of Mr. Pierce with employees in the

6    company and the Logisteq payroll who basically did

7    work for Sequedex.  They had asked Tammy Phillips if

8    we could supply payroll records.  Tammy gave them the

9    information of the payroll company we used.

10             Larry took that information, and Tammy

11   and I agreed that we were very happy to move forward

12   with you people.  And again my concern was that I'm

13   very nervous about the fact that Pierce already

14   threatened to close my company and fire me if I

15   continued to talk with Iron Mountain.

16             And John Kenny immediately turned around

17   and said that if that was to happen, we would

18   immediately offer you a consultant position at the

19   same benefits and wage.  And as a matter of fact,

20   Tammy Kahn turned around and said, "Thanks, what about

21   me?"

22             And he said, "Fine, we would find you a

23   job too."

24             And they told us that, "Listen, Peter is

25   a bad guy, he believes his own lies.  You'll

Thomas Carr                                        02/28/2007

1

2    said, "It's a very expensive -- you're going to be up

3    against some big money guys and it's going to be very

4    costly to file a suit."  We wanted to make sure that

5    Iron Mountain or its companies, affiliates, Schooner

6    Capital, was going to support us a hundred percent.

7    And what that means is to give us the coffee

8    businesses, together, merge them, to back me a hundred

9    percent for attorneys' fees, to hold me harmless of

10   any economic fallout if Pierce decided to fire me.

11        Q.    Were those last three things that you

12   just mentioned discussed expressly at this meeting?

13        A.    Yes, they were.

14        Q.    That's what you said, "This is what it

15   means to me to be backed a hundred percent, I need all

16   these things"?

17        A.    I said, "I need to have your assurances

18   that you are going to back me a hundred percent."

19   Garry Watzke was somewhat on the quiet side and

20   Mr. Kenny said, "Tom, if Mr. Pierce fires you, we will

21   give you a consulting job at the same benefits and the

22   same salary and we will continue to support you."

23              And I said, "Thank you."  So that was a

24   very good comfort level for me.  Art Peslak seemed to

25   be fine with it, we thought we were in bed with a real

1

2     good group of guys, guys that were going to be honest

3     and not lie like they have been doing on their

4     affidavits.

5            Q.    Did either you or Mr. Peslak request that

6     any of these assurances be put into writing at that

7     point?

8            A.    Yes.

9            Q.    At this meeting?

10           A.    Yes.

11           Q.    Who, you or Mr. Peslak?

12           A.    Mr. Peslak.

13           Q.    Of whom did he make that request?

14           A.    Mr. Peslak asked Garry Watzke to -- we

15    need to have a meeting to coordinate to put something

16    in writing.

17           Q.    What did Mr. Watzke say?

18           A.    He didn't agree or disagree.  He said,

19    "We'll talk."

20           Q.    Can you think of anything else anybody

21    said at this meeting?

22           A.    That was pretty much it.

23           Q.    After March 13th, what was the next

24    occasion on which you had contact with Iron Mountain?

25           A.    Well, I have to tell you, I'm a little

Thomas Carr                                              02/28/2007

1

2    million to you so you would then own the company

3    outright?

4         A.    I don't know.  I don't know, Jim Neebling

5    said he said it as a loan.  All I know is on my

6    children's life, Mr. Reese in front of John Kenny and

7    in front of Garry Watzke, as clear as we're sitting

8    here today said, "Tom, I will give you $5 million to

9    buy Mr. Pierce out."  Period.

10        Q.    You understood him to be offering you $5

11   million, and then you would be the owner of Logisteq

12   outright?

13        A.    No, no.

14        Q.    What did you understand him to mean?

15        A.    What I understood by that is that

16   Schooner Capital would buy Logisteq's 51 percent from

17   Pierce and that they would consolidate along with the

18   Systrans and along with the coffee and merge all of

19   this together and have a very nice company.  And

20   continue to grow and make money.  That's how I took

21   it.

22        Q.    So just to make sure I got it, when

23   Mr. Reese said he would give you $5 million to buy out

24   Pierce, you understood that what you just said is what

25   he had in mind?  That is, Schooner would buy Pierce's

Page 138

```
 1
 2    share, and you would move forward with the coffee
 3    roll-up?
 4         A.    Yes.  I don't think Mr. Reese is going to
 5    say here, Mr. Carr, here's $5 million.  I think
 6    Mr. Reese was looking, as he previously told me, to
 7    the consolidation of the coffee companies, and
 8    Logisteq was obviously going to head this roll-up
 9    along with his people and Schooner's people and
10    affiliates.
11         Q.    Do you recall any mention of mezzanine
12    financing in this meeting?
13         A.    Yes, I do.  Mr. Kenny had told us at that
14    meeting that through his connections, and I don't even
15    know what that meant, but he said through his --
16    whether it was Bear Stearns or Goldman Sachs or hedge
17    funds he had told us that he has ways of getting
18    mezzanine, and I don't even know what that word means,
19    but getting mezzanine financing to do the roll-up of
20    these coffee companies.
21              MR. McCAFFREY:  You've sat in the
22         mezzanine, haven't you?  Just kidding.
23              THE WITNESS:  Yes, up on the nose bleed
24         section.
25         A.    I said these guys are looking to give us
```

Thomas Carr                                          02/28/2007

 1

 2     a get-together social meeting.  Dinner, drinks.

 3          Q.    What was discussed?

 4          A.    We were all very happy about the evidence

 5     that we had for the Iron Mountain/Pierce litigation.

 6     At that meeting Jim Neebling also spoke with Richard

 7     regarding the $25 -- $25,000 business that Jim was

 8     getting for his business, Systrans, and at that

 9     meeting, both Jim and I were very happily surprised

10     when John Kenny told us the good news, that he had an

11     oracle that showed that the business potential that

12     Systrans would receive was not 25,000, that it was

13     45 -- I'm sorry.  You know what, 25 million.  And that

14     the business that Jim's company could secure was $45

15     million a year in annual sales.

16          Q.    When you say could secure, you mean that

17     he was making a pitch for the business and if he got

18     the business, that was the volume of it?

19          A.    We were committed to business and there

20     really wasn't --

21               MR. McCAFFREY:   You were committed?

22          A.    We were committed from Mr. Reese and John

23     Kenny on the March 26th meeting in the conference

24     room.  It's not like we had to pitch the business.

25     They were really pitching the business to Jim because

Thomas Carr                                              02/28/2007

Page 161

 1

 2    they were so impressed with Jim's knowledge of the

 3    transportation sector that they needed help, meaning

 4    Iron Mountain.  So at that meeting --

 5            Q.    Which meeting?

 6            A.    On the 26th.  We were told we need help,

 7    we have $25 million in transportation business we can

 8    give you.  And don't get me wrong, it was not a

 9    meeting where Richard Reese turned around and said,

10    "By the way, here's 25 million, let's start, Tom."

11                As in any big company, you have to have

12    infrastructure, you have to have a business plan.  We

13    left there with John Kenny and Richard Reese saying

14    we'll gather, put the business plan together, let's

15    sit down and put our heads together and consummate the

16    deal and let's make it happen.

17                At the meeting that we had dinner at the

18    Waldorf Astoria, the great news of the night was that

19    Mr. Kenny told Jim that Mr. Reese made a mistake, it

20    was not 25 million, it was $45 million in business.

21    Now I'm like, Oh, my God, that's wonderful.

22            Q.    The 45 million, that was all of Iron

23    Mountain courier business?

24            A.    No, I believe he said there was 120,

25    maybe 140 million in business total, but Iron Mountain

Thomas Carr                                                    02/28/2007

Page 162

1

2      had their own transportation through their own

3      equipment.   Then the $45 million in business was the

4      business that they outsourced through outside couriers

5      and different transportation companies.   So --

6          Q.    So 45 million was all their outside

7      couriers?

8          A.    Yes.   And John Kenny had shown us at the

9      table an Oracle of the cycles and the different areas,

10     and the majority of that business was right here in

11     the New York and New Jersey metropolitan area.   Jim

12     and Richard Reese pretty much had a one-on-one because

13     Jim was really pitching this whole plan, how he's

14     going to be able to help Iron Mountain.

15              And Kenny was telling him that they have

16     somebody now working in Massachusetts on this and they

17     want to connect Jimmy with them.   And put it together

18     and would start this business, you know, in an off

19     area pretty much.

20              I believe Jim started in Massachusetts

21     and then went out to the West Coast, like Kansas or

22     Wyoming and started doing test runs on how this

23     business would operate before we actually came into

24     the New York/New Jersey market where the majority of

25     the business consisted of.

Page 163

1

2          Q.     Do you recall Mr. Reese soliciting a

3   business plan from Mr. Neebling at this June 10, 2002

4   meeting?

5          A.     Reese was not soliciting anything.

6          Q.     So the answer is no?

7          A.     No.

8          Q.     So I assume you don't recall Mr. Reese

9   suggesting to Mr. Neebling if Mr. Neebling gave him

10  such a plan that he would get it into the right hands

11  for consideration?  That's not something that happened

12  at this meeting either?

13         A.     It did happen at the meeting.

14         Q.     It did?

15         A.     Yes.

16         Q.     Mr. Reese said that?

17         A.     Yes, he did.  He said Jim -- that's what

18  I was telling you.  He was going to get him involved

19  with -- again it was their conversation, but I believe

20  the name was Dave Bartley, it might have been someone

21  else, but he was going to connect him to a person to

22  start getting this up and going.

23         Q.     It wasn't your understanding that they

24  had an agreement to give Mr. Neebling or Systrans the

25  business at this point, is it?

Page 164

1

2          A.     My understanding is we had an agreement

3    from the March 26th meeting.

4          Q.     That Mr. Neebling and Systrans would

5    actually get this business?

6          A.     Absolutely.  Mr. Reese and Mr. Kenny came

7    to us and said, "We need you to help us with our

8    transportation."

9          Q.     Did they tell Mr. Neebling that he had

10   the business on March 26th?

11         A.     They told Mr. Neebling we have $25

12   million of business that we would like you to look at

13   to operate and help us with the problem we're having.

14         Q.     Did anybody discuss a contract at that

15   point?

16         A.     I don't recall.

17         Q.     Do you know whether there was ever a

18   contract entered into between Iron Mountain and

19   Systrans for a courier business?

20         A.     Yes, I do know of a contract.

21         Q.     Anything else at the June 10, 2002

22   meetings?

23         A.     A great dinner, great restaurant, great

24   food, great drinks.  We all celebrated, we were very

25   happy, one big family.  Things were going the way that

Page 165

1    we all anticipated.

2

3         Q.    When was the next meeting involving Iron

4    Mountain?

5         A.    I believe the next meeting was on June

6    13, '02.

7         Q.    Who was in attendance?

8         A.    Who was in attendance.  It was Mr. Reese,

9    Mr. Kenny, Mr. Watzke, Mr. David Windell, Mr. Vin

10   Ryan, Mr. Neebling, Mr. Carr, Mr. Ray Masucci, Mr. Ray

11   Masucci's accountant, who I believe was his uncle.

12        Q.    And that occurred where?

13        A.    Dakota Steakhouse in Boston,

14   Massachusetts.

15        Q.    Who called that meeting?

16        A.    Mr. Kenny.

17        Q.    For what purpose?

18        A.    That was the meeting to sit down and get

19   introduced to the leader who was going to overlook the

20   merger and acquisition of the two coffee companies and

21   Logisteq, who is David Windell, who had experience in

22   the coffee industry and who was a personal friend or

23   past ex-president of Iron Mountain, who was going to

24   be in charge of the new entity which would be

25   Logisteq, RPM and Continental along with Systrans.

1

2       Q.    Go ahead.

3       A.    So what happened is Jimmy would

4    constantly come to me and ask me for funds to help him

5    fund Systrans based on the promise that we would have

6    $45 million in work and that if I fund the company, he

7    would give me half of the profits, the net profits on

8    the company.  And that's basically how it worked.  And

9    what I did is, approximately over time I had given Jim

10   between -- loans from Paul Schwartz and my own funds

11   in the sum of almost $600,000 to fund Systrans.

12      Q.    How much of it was from your funds as

13   opposed to Mr. Schwartz's funds?

14      A.    One moment.

15            MR. McCAFFREY:  Just do the subtraction.

16      A.    2002, November --

17            MR. McCAFFREY:  How much did Paul loan

18      you?

19      Q.    You want to give me what you lent?

20      A.    I have to add up all the checks I gave

21   him.

22            MR. McCAFFREY:  No, we know from the

23      other day when we did this together it's 600

24      total.  What was Paul's?

25            THE WITNESS:  I have 250 -- I have

Thomas Carr                                                    02/28/2007

Page 192

```
 1

 2   January 29, 2003.  Mr. Varn, Mr. Moore, Mr. Miller,

 3   you and Mr. Neebling were in attendance.  Is that

 4   accurate?

 5        A.    Yes.

 6        Q.    Do you recall what went on at that

 7   meeting?

 8        A.    I think that meeting I was getting a

 9   little antsy at the time, and I was getting a little

10   nervous that the promises that were made to me were

11   not being fulfilled.  My big concern was I was giving

12   Jim Neebling money as a loan to support him in

13   Systrans.

14             At this point I wasn't sure if Jim was

15   just telling me things to, you know, kind of pacify

16   me, I really didn't know if -- I wasn't sure why we

17   were not getting the business that was promised to us

18   from Iron Mountain.  I know that I went through a

19   considerable amount of money putting into Systrans,

20   based on this promise, and I had not really seen a

21   return, to the point where Jim Neebling was paying me

22   $1,000 a week, and he did pay my health benefits for a

23   while, but I was putting all this money into the

24   company and I started to hear negative complaints from

25   Jim that I'm doing everything I can.  I'm giving them
```

Thomas Carr                                                    02/28/2007

Page 193

```
 1

 2    the service.  I have nothing but good things to say

 3    about the business.  I'm saving Iron Mountain money.

 4              And Larry had told me that the reason

 5    Iron Mountain cannot give us the big piece of business

 6    in New York and New Jersey -- you know, I didn't know

 7    at the time Larry -- Larry would drink a lot at night,

 8    he would get really staggering with his words, and I

 9    don't know if he was just telling me things to shut me

10    up or pacify me or he was sincere, but at the point he

11    told me, "Hey, listen, you just got to hang in there,

12    stop calling people.  Don't bother with us.  When the

13    arbitration is done, you'll be taken care of and Jimmy

14    is going to get the business."

15              He pretty much went on to tell us that

16    the reason Iron Mountain is not giving Jim the New

17    Jersey and New York business is that that area is the

18    Pierce Lehigh area, this is the control of Pierce

19    Lehigh that Iron Mountain acquired and they had to

20    watch out for themselves.  Because Larry was afraid

21    that Pat O'Connor was trying to use this as leverage

22    to say this is how they're getting to Tom and Jim by

23    giving them the business.

24              And Larry said, you know, he's going to

25    go back and talk to Richard.  You know, Larry seemed
```

Thomas Carr                                                02/28/2007

Page 194

```
 1

 2    pretty sincere that he was really helping us get the

 3    business.  But I think Larry, too was kind of

 4    frustrated.  I think Larry said, "You know, Jim, I'm

 5    trying to do everything I can, but how much can I do?

 6    I go to Richard Reese, I tell him that Jim needs more

 7    business to survive and Larry's response would be that

 8    Richard is in agreement that he's going to get the

 9    business.  And as far as the New York/Jersey business,

10    we just have to be patient."  Of course you know Larry

11    Varn's number one priority was to win the lawsuit, and

12    he didn't want anything to interfere with it.

13         Q.    Did Mr. Varn tell you that at this

14    meeting in January of 2003?

15         A.    Yes, he did.

16         Q.    And do you remember your complaining to

17    Mr. Varn at that meeting about promises that Richard

18    Reese had made to you that weren't fulfilled that had

19    to do with a $4 million promise?

20         A.    It was a $5 million promise.

21         Q.    You raised that at this meeting?

22         A.    Yes, I did.

23         Q.    Did Mr. Varn say to you that that promise

24    had never been made?

25         A.    Mr. Varn said to me, "I was not there
```

Page 195

```
 1
 2    when that promise was made, and I don't believe
 3    Richard made that promise."  And now he really upset
 4    me.
 5              And I said, "Well, he did make that
 6    promise, and I was there for that promise."  And now I
 7    really started to get nervous, and I was like what are
 8    these guys trying to pull?  Jimmy was trying to
 9    convince me calm down, "You're getting these guys
10    upset, you're calling them, you're pushing them."
11              Larry told me, "Listen, you cannot call
12    up a management, you have to communicate with Charlie
13    Moore.  You know this is a big case for us, you're
14    going to start pissing guys off, be patient.  Richard
15    is going to take care of you after the arbitration and
16    until then, you have to be patient."
17        Q.    Isn't it true at that meeting when
18    Mr. Varn said that a promise had not been made by
19    Mr. Reese, that you agreed in front of others?
20        A.    I would never say that because that's
21    truly, truly false.
22        Q.    You're saying you didn't say it?
23        A.    We all know that promise was gone, the $5
24    million never came to the company and the company was
25    closed down.
```

 1

 2            So Larry said to me, "Well, how much do

 3    you do need?  How much would cover your liability?"

 4            And I said, "I'm out at least $2

 5    million."

 6            And he said to me, whether he knows if he

 7    said it or not, because half the meetings we had, I

 8    don't know if he's a functional alcoholic or a drunk,

 9    but he was smashed that night and said, "I'll get you

10    $2 million.  I'm going to talk to Garry Watzke, Tom,

11    and I'm going to figure out a way how I can get you $2

12    million if it's the last thing I do.  We'll have to

13    structure it to keep these bastards down in Philly out

14    of it.  We'll have to structure it through Jim

15    Neebling's company.  I'll talk to Art, I'll talk to

16    Garry and we'll try to work it out."

17            The next day, Garry Watzke called Art

18    Peslak, and Art Peslak's phone records, they had a

19    conversation on how Jim Neebling can structure a deal

20    where Iron Mountain can buy him out, give him the

21    money to get to me and have Jimmy run the company

22    basically as a consultant for Iron Mountain.

23        Q.    Mr. Watzke asked Mr. Peslak to

24    participate in structuring a deal like that?

25        A.    Mr. Watzke asked Art Peslak to figure out

1

2    wanted a personal guarantee.  When I personally

3    guaranteed the loan of approximately $500,000, I owe

4    Mr. Schwartz.  When Logisteq came and merged into my

5    company, they were going to pay that loan off as

6    Mr. Pierce had told me and just never got the chance

7    to do that.  And I never got the chance to remove my

8    personal guarantee from that note.  So when Mr. Pierce

9    tanked the company, I was personally liable for that

10   note on the equipment.

11        Q.    Is it your understanding that

12   Mr. Schwartz had a conversation with anybody from Iron

13   Mountain?

14        A.    He had multiple conversations with people

15   in Iron Mountain.

16        Q.    About this debt?

17        A.    At the point I was running out of funds,

18   and couldn't give Jim Neebling any more money for

19   Systrans.

20        Q.    About when was this?

21        A.    200 -- at the end of 2003.  I went to

22   Paul Schwartz and I said, "Paul," I said, "If you can

23   help us, I can help you get paid back for the

24   equipment that I have.  Because we have a promise from

25   Iron Mountain that we're going to have $45 million in

 1

 2    business and there will be plenty of profits there for

 3    Jimmy and I to make and to pay you back, but we're

 4    running tight on funds."

 5              And he said, "Okay, well, show me a

 6    little more about the business."  He asked if he could

 7    come down and visit the headquarters.  He actually

 8    came down, looked at the office.  Jim Neebling showed

 9    him the technology we purchased, he showed him all the

10    business and backed up our story, "Look at all the

11    work we're doing, now approximately 20 to 25,000 a

12    week."

13              He was impressed because he was in the

14    computer business.  I worked for IBM and he also sold

15    a division of IBM as a leasing company where he would

16    lease IBM computers, so he's very familiar with

17    technology.  He was very impressed with the system,

18    but he wanted to do his due diligence.

19              He said, "I would like to see a contract

20    with Iron Mountain."  I showed him the contract.  He

21    said, "Before I decide I want to invest or lend more

22    money, I would like to speak to someone in top

23    management from Iron Mountain."

24              I called Larry.  I said, "Larry, I need

25    help.  You guys told me I wouldn't suffer any economic

Thomas Carr                                                    02/28/2007

```
 1

 2    loss.  I'm suffering an economic loss.  I have this

 3    debt with Paul Schwartz I have to pay back and I'm

 4    asking him to lend us additional funds so we can

 5    continue to grow Systrans and get the work through

 6    Iron Mountain."

 7                I asked Larry would he call Paul Schwartz

 8    and let him know that we do have this business and

 9    there will be enough business in Systrans that Tom and

10    Jim would have plenty of profits to pay your debt

11    back.  So that's what I asked Larry.

12                And Larry said yes, he would do that.

13    But at the time Larry was on my team, he was a good

14    guy, he was helping us.  He was always telling us he

15    was talking to Richie and -- Larry Varn would also

16    give us the saying, "I'm trying to have Richard push

17    the pig through the python."  I don't know what that

18    means.  A lot of terms I don't know what Iron Mountain

19    means, but Larry would always show that he had

20    interest in Jim and I.

21                I don't think Larry ever liked me, but I

22    know he had a great relationship with Jim.  I think he

23    felt bad, but the bottom line is Larry Varn had a job

24    to do, and right now the job was working for Iron

25    Mountain and not Jim Neebling and Tom Carr.
```

1

2          MR. McCAFFREY:  Did he make the call?

3          THE WITNESS:  Yes, he did.

4     Q.    When was that?

5     A.    I don't know.

6     Q.    You have no idea?

7     A.    All I know is Paul Schwartz called me

8  from that phone call and said he spoke to Larry.

9     Q.    That's how you know that Mr. Varn made

10  the call, Paul Schwartz told you?

11    A.    Yes.

12    Q.    When did Paul Schwartz call you to tell

13  you that?

14    A.    The next day.

15    Q.    But you can't place that?  Relatively I

16  understand, but absolutely you don't know what year?

17  What year was it?

18    A.    I can look it up.  Okay, let's say '03,

19  March '03.

20    Q.    So Mr. Schwartz called you and said he

21  had spoken to Mr. Varn?

22    A.    He spoke to Mr. Varn.  Mr. Varn assured

23  him that Iron Mountain was giving Systrans the

24  business and made a commitment with them and Jim has a

25  contract.  And that they were behind Tom and Jim, and

Page 208

1

2    he believes that this would be a good investment for

3    Mr. Schwartz in a way that Mr. Schwartz could satisfy

4    his debt that he had with Tom Carr.  Period.  And it

5    must have worked because after that, Paul gave us the

6    money.

7        Q.    You said, "Paul gave us the money." What

8    exactly did Mr. Schwartz do?

9        A.    Paul Schwartz gave me money to give to

10   Systrans.  The first check he gave me was $50,000.

11       Q.    This wasn't a gift, I take it?

12       A.    Absolutely not.

13       Q.    So when you say he gave you money --

14       A.    It was a loan.

15       Q.    A loan to you personally?

16       A.    To Jim and I, to Systrans.  With of

17   course, my personal guarantee.  As a matter of fact,

18   let me go a little further.  I had a vehicle that I

19   owned that I had paid off after the sale, and I owned

20   the vehicle outright.  And one of the things I did, I

21   gave Mr. Schwartz the title of that vehicle as

22   collateral, and that was a Mercedes Benz, which he

23   still has the title.  Another $70,000 lost.  That's

24   pretty sick.

25       Q.    So he lent $50,000 to Systrans through

Thomas Carr

1

2    Give me the components that make up the $2 million?

3        A.    Well, considering that my company was

4    valued at about $8 million --

5        Q.    What I really want to know is how you

6    came to the number of 2 million.  I want to know

7    something else too, but let's go over this part first.

8            MR. McCAFFREY:  He didn't come to the

9            number 2 million.  His testimony is Mr. Varn

10            came to the number.

11            MR. GROSS:  No, no, he came to it

12            originally too, and it's in his disclosure.  So

13            he's claiming it's $2 million.  I want to know

14            where it comes from.

15        Q.    Go ahead, you can answer.

16            MR. McCAFFREY:  Answer, sure.

17        A.    The $2 million is what Larry Varn had

18    asked me, during the night at Gallagher's what would I

19    need to help with my financial problems.  And I had

20    told him $2 million.  The $2 million was that I had

21    lost my company, I had lost the debt due to

22    Mr. Schwartz, the debt from Commerce Bank.  The salary

23    and benefits that I was promised for a consultant job

24    from Mr. Kenny.

25        Q.    Any other components?

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS
----------------------------------------x
IRON MOUNTAIN INCORPORATED;
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.; C. RICHARD
REESE; JOHN F. KENNY, JR.;
GARRY B. WATZKE; LARRY L. VARN;
and CHARLES G. MOORE,

          Plaintiffs and
          Counterclaim Defendants,

                         Civil Action
     v.                No. 05 10890 RCL

THOMAS CARR,

          Defendant and
          Counterclaim Plaintiff.
----------------------------------------x
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.

          Plaintiff,

                         Civil Action
     v.                No. 05 10999 RCL

SYSTRANS FREIGHT SYSTEMS, INC.,

          Defendant.

----------------------------------------x
                 March 15, 2007
                 10:10 a.m.
      Continued deposition of THOMAS CARR, taken by

Plaintiff, pursuant to Adjournment, at the offices of

Patton Boggs, LLP, One Riverfront Plaza, Newark, New

Jersey, before Denise L. Daniels, a Shorthand Reporter

and Notary Public.

```
 1   T H O M A S    C A R R,

 2          having been previously sworn resumed and

 3          testified further as follows:

 4              MR. SHAPIRO:  Ira, before you start, I

 5          want to put on the record -- and I appreciate

 6          this morning you said barring Mr. Carr's

 7          filibustering, we'll be out on time -- I want

 8          to put on the record that last time you had

 9          over six hours, and it's now 10:10.  We

10          appreciate your argument about Mr. Carr's

11          loquaciousness, but we're going to be done

12          either way at noon, and I appreciate you said

13          that shouldn't be a problem.

14              MR. GROSS:  I don't expect it to be.

15          Let's hope for the best.

16   EXAMINATION BY

17   MR. GROSS:

18          Q.   Let me start, Mr. Carr, by handing you a

19   document that was marked as Exhibit 2 at Mr. Peslak's

20   deposition which you attended yesterday.

21              Can you tell me what that document is?

22          A.   Superior Court of New Jersey, Chancery

23   Division.  It's a complaint, Thomas Carr versus J.

24   Peter Pierce.

25          Q.   This is a complaint that Mr. Peslak filed
```

Page 224

1    on your behalf?

2           A.     Yes, he did.

3           Q.     Did you verify this complaint, do you

4    recall that?

5           A.     Yes, I did.

6           Q.     Would you turn to page 25, please.   Do

7    you have that before you?

8           A.     Yes, I do.

9           Q.     Is that your signature on page 25 under

10   the verification?

11          A.     Yes.

12          Q.     Did you verify that all allegations

13   contained in the complaint were true and correct?

14          A.     Yes, I did.

15          Q.     And were they true and correct?

16          A.     Yes, they were.

17          Q.     When did you sign it?

18          A.     April 3, 2002.

19          Q.     Do you recall that from memory or you're

20   just reading it from the page?

21          A.     I looked at it on the page.

22          Q.     Does that comport with your independent

23   memory of when you signed it?

24          A.     Yes, that's correct.

25          Q.     Where were you on April 3rd of 2002?

1          A.     I was at the LaCosta Resort and Spa in

2    San Diego, California.

3          Q.     Mr. Carr, do you recall by what means you

4    received Peslak Exhibit 2?

5          A.     I believe it was a messenger.

6          Q.     A messenger?

7          A.     Yes.

8          Q.     A private messenger service?

9          A.     I don't recall.  Gary Watzke and John

10   Kenny told me they were going to have a messenger

11   deliver it to me to sign, and that day I had a

12   messenger come to the door.  I reviewed it, signed it,

13   and then I believe it was sent back to Iron Mountain

14   San Diego.  From Iron Mountain San Diego, I believe

15   they sent it to Art Peslak's office.

16         Q.     A messenger came to your door at the

17   hotel?

18         A.     Yes.

19         Q.     And you signed it in the messenger's

20   presence?

21         A.     Yes.

22         Q.     And you gave it back?

23         A.     Yes.

24         Q.     Was the messenger identified in any way,

25   either by himself or by a uniform that he was wearing

1    as to who he worked for?

2           A.    No.  He had a uniform on, but I'm not

3    sure if it was -- I think it was just a local courier,

4    one of Iron Mountain's local couriers had brought it

5    to me, I believe.

6           Q.    Mr. Carr, you were here yesterday for

7    Mr. Peslak's testimony, correct?

8           A.    Yes.

9           Q.    You heard him testify about conversations

10   he had with you regarding this document, Peslak

11   Exhibit 2?

12          A.    Yes.

13          Q.    To your best recollection, did he testify

14   accurately about those conversations?

15          A.    Yes.

16          Q.    I'm handing you another document,

17   Mr. Carr, and I want to ask you whether you can tell

18   me what that is?

19              MR. SHAPIRO:  Do you have another copy of

20          that?

21              MR. GROSS:  Yes.

22          A.    It's the findings of facts for the

23   arbitration between Iron Mountain versus Peter Pierce.

24   The Arbitrator was Thomas B. Rutter, Esquire,

25   Arbitrator.

1          Q.    Okay, go ahead, please.

2          A.    Well, when John Kenny and Gary Watzke had

3    asked me to sign the complaint on April 2nd, they told

4    me I would suffer no economic harm.  And my suffering

5    of economic harm has been that my company was closed

6    down.

7          Q.    This is Logisteq?

8          A.    Logisteq.  We were becoming a leader in

9    the coffee industry with the potential of making many

10   millions of dollars in the future.  From that closing

11   of Logisteq, I suffered many personal guarantees that

12   I had signed with the company personally which I made

13   John Kenny and everyone at Iron Mountain aware of,

14   which was the Commerce Bank loan that I signed

15   personally on for, I believe, approximately $3

16   million.  I had vehicles that I was signed personally

17   on that came back to me.  I had a $100,000 bond,

18   coffee bond that was taken.  I had a salary and

19   benefits that I lost.

20                And the downfall effect from Iron

21   Mountain not supporting Systrans was a major stab in

22   the back because I was funding Systrans and getting

23   myself more into debt with a promise from Iron

24   Mountain that there would be enough money in there for

25   Jim and I to live off of.

Page 239

1       Q.    And you already talked about those?

2       A.    Yes.

3       Q.    Did you do work for Systrans?

4       A.    Did I do work for Systrans?  No.

5       Q.    What was your relationship to the

6    company?

7       A.    I was an investor.

8       Q.    And that's all?

9       A.    I went on meetings with Jim.  I met with

10   all the Iron Mountain management team at the Flatotel,

11   when we gave a presentation for the Veredex

12   technology.  Iron Mountain wanted to be able to see

13   that we would be able to handle the $45 million in

14   work to spread out the national contract.

15            So I was there during that time and that

16   was pretty much it, really.  I just helped Jim.  You

17   know, I had an interest as far as that's how I was

18   going to be paid back for my loss.  So I wanted to see

19   the company grow, and I wanted to make sure it was

20   successful and that everything was going forward.

21       Q.    What else did you do, if anything, in

22   that regard to help the company in its prospects for

23   growth?

24       A.    Basically just fund it.

25       Q.    Did you make any effort to generate

Page 240

1    sales, business?

2         A.    No.

3         Q.    When we were here last, Mr. Carr, we went

4    through a chronology and covered through a meeting of

5    September 9, 2003.  Is it your contention that Iron

6    Mountain or anybody representing Iron Mountain made

7    any promises to you after September 9, 2003?

8         A.    I would have -- I believe the last

9    conversation was with Charlie Moore.  I was concerned

10   that -- Jimmy would always call me in a panic telling

11   me that the business is just not coming, and we're

12   constantly in the negative.

13             And what I did is I called Charlie Moore,

14   because Charlie was my contact, and I was concerned

15   that Iron Mountain would not fulfill their commitments

16   to me and Systrans.  And I had asked Charlie, and

17   Charlie had told me that he spoke with Richard and

18   that Richard said as long as Jimmy continues to give

19   good service, he would secure more business.  That as

20   far as any cash being laid out to me, I would have to

21   wait until after the arbitration.  And I was somewhat

22   satisfied with that.  I was under a lot of pressure, I

23   had banks attacking me and personal commitments, and

24   it was a very difficult time I went through.

25             Q.    Let me interrupt you for a second because

# EXHIBIT B

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------------------x

IRON MOUNTAIN INCORPORATED;
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.; C. RICHARD
REESE; JOHN F. KENNY, JR.;
GARRY B. WATZKE; LARRY L. VARN;
and CHARLES G. MOORE,

        Plaintiffs and
        Counterclaim Defendants,

                    Civil Action
     v.            No. 05 10890 RCL

THOMAS CARR,

        Defendant and
        Counterclaim Plaintiff.

----------------------------------------x

IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.

        Plaintiff,

                    Civil Action
     v.            No. 05 10999 RCL

SYSTRANS FREIGHT SYSTEMS, INC.,

        Defendant.

----------------------------------------x

                 March 14, 2007
                 10:05 a.m.
       Deposition of ARTHUR M. PESLAK, taken by

Plaintiff, pursuant to Subpoena, at the offices of

Patton Boggs, LLP, One Riverfront Plaza, Newark, New

Jersey, before Denise L. Daniels, a Shorthand Reporter

and Notary Public.

Page 16

1    necessarily have a long-term financial record of

2    making money.  And this was a new business it was

3    getting into, coffee warehousing.

4         Q.    Mr. Carr signed this verified complaint

5    on the verification page, which is page 25, correct?

6         A.    Yes.

7         Q.    Can you tell me when he signed it?

8         A.    The date says April 3rd, but I wasn't

9    there when he signed it, so I can't verify that was

10   the actual date.

11        Q.    Can you tell me the circumstances of his

12   signing it?

13        A.    Yeah.  He was on vacation in San Diego

14   and somehow the people at Iron Mountain got a copy of

15   the complaint into his hands, he signed it, and it was

16   returned to my office.

17        Q.    What's the basis of your understanding

18   that somehow people at Iron Mountain got a copy of the

19   complaint into his hands?

20        A.    Because I e-mailed a copy to Garry Watzke

21   at Garry Watzke's request, and Garry said he would get

22   a courier to take it to Tommy and have him sign it.

23        Q.    You were representing Mr. Carr at the

24   time.  Why didn't you arrange to send it directly to

25   him?

Page 17

1          A.     I was going to.

2          Q.     You were going to, but why didn't you?

3          A.     There was a telephone conference with

4     John Kenny and Garry Watzke where Garry said, "Well,

5     we can facilitate this for you."  I didn't think it

6     was necessary, but they were trying to put on a show

7     for Tommy and I said okay.

8          Q.     Let's try to break this down a little

9     bit.

10               At what point did you e-mail a copy of

11    Peslak Exhibit 2 to Mr. Watzke?

12         A.     I believe it was April 2nd, 2002.

13         Q.     And what prompted you to do that?

14         A.     This telephone conference with Garry,

15    John Kenny and Tommy.

16         Q.     And that telephone conference with Garry,

17    John Kenny and Mr. Carr occurred on the 2nd of April

18    2002?

19         A.     I believe so.

20         Q.     How did that telephone conference get set

21    up mechanically?

22         A.     I assume someone at Iron Mountain set it

23    up.

24         Q.     Well, how did you get tied into it?

25         A.     Somebody called my office and tied me

Arthur M. Peslak                                              03/14/2007

Page 18

1    into the conversation.

2         Q.    Who?

3         A.    Someone at Iron Mountain.

4         Q.    You don't know who it was?

5         A.    I don't recall who it was.

6         Q.    When you came into the conversation, was

7    Mr. Carr already on the line?

8         A.    I don't recall.

9         Q.    Your testimony is that on April 2nd of

10   2002, you received a call from someone at Iron

11   Mountain, and you can't recall whom, correct?

12        A.    Right.

13        Q.    And had there been any prelude to that

14   call, any warning that you were going to get the call?

15        A.    I think there was a line of activity that

16   day and there were several calls back and forth.

17        Q.    Did you inform anybody at Iron Mountain

18   that you had completed drafting Peslak Exhibit 2?

19        A.    I think I told Larry that morning.

20        Q.    The morning of April 2nd?

21        A.    Yes.

22        Q.    By what means did you tell him?

23        A.    I called him up on the phone.

24        Q.    As best as you recall, what did you tell

25   him, and what did he say in response?

Arthur M. Peslak

```
 1          A.    I believe I had been working on the
 2   complaint for a couple days prior to that, and I
 3   received an e-mail from Peter Pierce early in the
 4   morning that they were firing Tom.  And that was the
 5   precipitating event I was waiting for to file the
 6   lawsuit.
 7          Q.    You say that was the precipitating event
 8   you were waiting for to file the lawsuit.
 9                When did your expectation that Mr. Carr
10   was going to be fired by Mr. Pierce arise?
11          A.    Probably the week or two before.
12          Q.    What caused you to have that expectation?
13          A.    There had been some negotiations back and
14   forth between Tommy, Peter, about Tommy potentially
15   buying Peter's interest back in the company.  And when
16   those negotiations didn't appear to be going
17   successfully, Peter was demanding that Tommy put, I
18   believe, $3 million into Logisteq as a capital
19   contribution or he was going to take action against
20   Tommy.  And I knew Tommy was not going to put $3
21   million into Logisteq.
22          Q.    And these conversations when Mr. Pierce
23   was making these demands had started several weeks
24   before April 2nd?
25          A.    Yeah, a week or two before.  The demands
```

Arthur M. Peslak                                        03/14/2007

Page 20

 1   may have started before then, for the money, but there

 2   had been some negotiations a week or two before about

 3   buying Pierce out.

 4          Q.    And when did they fail?

 5          A.    I think we continued -- Tommy continued

 6   to try to buy Peter out, even after the lawsuit was

 7   filed.  It was sometime after that in April.

 8          Q.    If you would turn, please, to Exhibit 1

 9   in Peslak 2.

10          A.    Sure.

11          Q.    This appears to be an e-mail from

12   Mr. Pierce to you dated April 2nd, 2002, 9:39 in the

13   morning, eastern time.

14          A.    Right.

15          Q.    Is this an e-mail you received from

16   Mr. Pierce at or about that time?

17          A.    Yes.

18          Q.    Is this the means by which you learned

19   that Mr. Carr was being -- his employment with

20   Logisteq was being terminated?

21          A.    Yes.

22          Q.    Did you take steps upon receiving this

23   e-mail to inform Mr. Carr of this development?

24          A.    I'm sure I spoke to Tommy about it, yes.

25          Q.    He was in San Diego at the time; is that

1    correct?

2          A.    That's correct.

3          Q.    Is it your recollection that you called

4    him to tell him this?

5          A.    No.  My recollection is that he had

6    called my office.

7          Q.    This was fairly significant news to

8    Mr. Carr in your judgment, wasn't it?

9          A.    Yes.

10          Q.    But you didn't call him, you waited for

11    him to give you a call to pass this on?

12          A.    Well, he was in San Diego, it was 6:39 in

13    the morning in San Diego.  So I was probably going to

14    wait an hour or two, and Tommy was regularly checking

15    in with me the first thing in the morning when he got

16    up, so I was waiting for him to call.

17          Q.    Was he checking in to ask about the

18    progress of the complaint you were drafting?

19          A.    No, he was basically checking in to find

20    out whether I had heard anything from Peter.

21          Q.    So you informed Mr. Carr of this news.

22    Did that conversation have any impact on your decision

23    to file the complaint?

24          A.    Well, yes, this is what we were waiting

25    for.  Tommy knew this is what we were waiting for.

Arthur M. Peslak

1    tape.  And him going on for quite a while.  I think I

2    left the room for a while.

3              And at the end of the meeting, there was

4    a discussion that Iron Mountain would like Tom to turn

5    over whatever tapes and evidence he had, and I

6    indicated, well, we need to have some kind of

7    agreement here going forward as to what's going to

8    happen.

9         Q.    Did you tell Iron Mountain what kind of

10   agreement you had in mind?

11        A.    Well, I mean I think we made it clear

12   that, you know, if Tommy was going to turn on his 50

13   percent partner here in which he invested his whole

14   life work history that Tommy was going to suffer --

15   there was potential for Tommy to suffer some economic

16   loss and that Iron Mountain, if they wanted his

17   cooperation, they were going to have to make sure he

18   didn't suffer that economic loss.  We didn't speak of

19   details, but we needed to know what their commitment

20   to Tom was going to be, and I wanted that in writing.

21        Q.    And you expressed that desire at this

22   meeting?

23        A.    Probably not in those exact words, but in

24   sum and substance I did.

25        Q.    And what was the response?

Page 60

```
 1          A.    I believe that's correct, yes.

 2          Q.    Forgive me for this if I already asked

 3     it.

 4                During those conversations on April 2nd,

 5     2002, did you raise the issue of putting an agreement

 6     between Iron Mountain and Mr. Carr into writing?

 7          A.    I believe I did.

 8          Q.    What was the reaction, if any, by anybody

 9     else on the call?

10          A.    I don't recall.

11          Q.    When you finished with the conversations

12     on April 2nd, did you understand that there was an

13     agreement between Mr. Carr and Iron Mountain?

14          A.    Yes.

15          Q.    What were the terms?

16          A.    I understood that they were going to fund

17     Tommy's legal fees in the case against Peter and that

18     they were going to find him a job at the same

19     compensation.

20          Q.    And what was Mr. Carr going to do in

21     return?

22          A.    He was going to go to work every day.

23          Q.    Go to work at Logisteq?

24          A.    Go to work where Iron Mountain found him

25     a job.
```

1   this business effort in Systrans.

2        Q.    Support him how, through the business

3   effort?  What was the proposal?

4        A.    These guys had thrown around numbers of

5   25 million or $45 million in courier business every

6   year, and from that, Tom would get some sort of

7   distribution, salary, whatever.

8        Q.    You said Mr. Neebling actually made a

9   proposal that included that component at this Waldorf

10  Astoria meeting?

11       A.    I don't know exactly what he discussed

12  with Richard Reese because they were sitting down at

13  one end of the table and I was sitting at the other

14  end with Larry and Kenny, but Jim told me that's part

15  of what he discussed with Richard Reese that night.

16       Q.    So you didn't hear that firsthand while

17  it was occurring?

18       A.    No.

19       Q.    And what we're talking about at the

20  Waldorf Astoria occurred on June 10, 2002?

21       A.    If that's what's on my -- it's on my

22  thing, yeah, June 10th.

23       Q.    Let's backtrack a little bit to the

24  chronology reflected in Exhibit 4.  We haven't

25  discussed yet the April 9, 2002 meeting.  Can you tell

Arthur M. Peslak

1           A.    I think the total amount was 75/$80,000,

2    something like that.

3           Q.    When you say the total, you mean

4    including the 50?

5           A.    Total fees billed on the case.

6           Q.    Is 75 to $80,000?

7           A.    Yes.

8           Q.    And how much of that remains unpaid?

9           A.    None of it.

10          Q.    Mr. Carr paid the balance after the

11   $50,000 was applied?

12          A.    The 50,000 was applied.  There was a

13   subsequent payment from Iron Mountain of a couple of

14   thousand dollars.  I don't have the numbers offhand on

15   top of my head.  I think Tommy paid another 15 to

16   $20,000 to our firm.  These are ballpark figures.

17          Q.    So, as far as what you say Mr. Varn told

18   you Iron Mountain would undertake in the way of

19   payment of your fees, those fees have all been paid at

20   this point?

21          A.    Someone paid them, right.

22          Q.    Yes, I understand, but they're all paid?

23          A.    Right.

24          Q.    Have you told me everything that you can

25   recall about the April 9th dinner meeting at

Arthur M. Peslak                                              03/14/2007

Page 90

1    agreement.  I don't know what it was called, but I

2    understand there was a written contract.

3         Q.    Were you involved in any way in the

4    negotiation or execution of that agreement?

5         A.    No.

6         Q.    Did you testify, Mr. Peslak, that you did

7    not place the interlineations on Exhibit 4?

8         A.    I don't recall doing it.

9         Q.    I would like you to turn your attention

10   to a telephone call that this document indicates you

11   had with Garry Watzke on July 16, 2003.  It's Item 32

12   on page 5.

13        A.    Correct.

14        Q.    Was that a conversation that was solely

15   between you and Mr. Watzke?

16        A.    Yes.

17        Q.    Can you tell me what transpired during

18   the conversation, what was said?

19        A.    Garry called me and said that Tom had

20   made phone calls to Iron Mountain and left a voicemail

21   for he and Richard Reese.  And Garry said he had

22   called Tom back and gave him a stern -- this is

23   Garry's words, "a stern response" telling him to stop

24   calling Iron Mountain.

25              And that after he had done that, he had

1    reported that to Richard Reese and Richard told him to

2    call me back and say, "Please have Tom stop calling."

3    That once the arbitration is over, that Richard would

4    sit down with Tom and I and discuss how Iron Mountain

5    would fulfill its obligations to Tom.

6         Q.    Are those Watzke's words, "fulfill its

7    obligations"?

8         A.    Yes.

9         Q.    Did Mr. Watzke say anything else in that

10   conversation?

11        A.    In sum and substance, that's it.

12        Q.    Did he refer specifically to your legal

13   fees?

14        A.    Yes.

15        Q.    What did he say about that?

16        A.    He said that my bills would be paid after

17   the arbitration.

18        Q.    Did he make any reference specifically to

19   what the so-called Iron Mountain obligations to

20   Mr. Carr were?

21        A.    No, they were his words, obligation.   I

22   didn't ask him to elaborate.

23        Q.    Other than as you've testified here

24   today, Mr. Peslak, did you ever personally observe,

25   see or hear any promise being made by anyone from Iron

# EXHIBIT C

Case 1:05-cv-10890-RCL    Document 43-3    Filed 10/12/2005    Page 2 of 11    ☒002

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| IRON MOUNTAIN INCORPORATED;<br>et al. | ) | |
| | ) | |
| Plaintiffs and,<br>Counterclaim Defendants | ) | Civil Action No.<br>05CV10890 RCL |
| | ) | |
| v. | ) | |
| | ) | |
| THOMAS CARR, | ) | Magistrate Judge Collings |
| | ) | |
| Defendant and<br>Counterclaim-Plaintiff | ) | |
| | ) | |

### DECLARATION OF ARTHUR M. PESLAK

I, Arthur M. Peslak, do hereby swear and affirm under the penalties of perjury that the following is based on my personal knowledge, that I am over the age of 18 and am competent to testify and that if I were called to testify I would do so substantially as follows:

1.  I am an attorney in good standing licensed to practice law in the states of New Jersey and New York.  I have represented Defendant and Counterclaim Plaintiff Thomas Carr on a number of matters in the past.

2.  I have no interest, monetary or otherwise, at stake in this case.

3.  In connection with my representation of Carr, on several occasions beginning in 2001 I met with attorneys from the firm of Sullivan & Worcester ("S&W") including Counter-Defendant Larry Varn ("Varn") as well as Iron Mountain's General Counsel Gary Watzke.

4.  During these meetings, these S&W attorneys as well as Watzke, on behalf of its client Iron Mountain, made several promises to Defendant and Counter-Plaintiff Thomas Carr ("Carr") and James Neebling ("Neebling"), owner of Systrans Freight Systems, Inc.

5. Among the promises made to Carr and Neebling was the promise that, in exchange for their agreement to assist S&W and its investigators prepare their case against Peter Pierce, all legal fees Carr would incur in this effort – my bills – would be paid by Iron Mountain.

6. I informed Varn and Watzke that I would not be able to initiate a lawsuit against Peter Pierce on behalf of Carr without assurance that my fees would be covered. Varn and Watzke assured me and Carr that all fees Carr incurred in pursuit of Carr's action against Pierce and Carr's support of Iron Mountain's case against Pierce would be paid. While I presumed they would be paid by Iron Mountain, the initial $50,000 wire transfer came from S&W.

7. In reliance on Varn's agreement with Carr and at Carr's direction, I began the task of preparing a case for Carr against Pierce in New Jersey state court. Varn had previously met with Carr on numerous occasions and had sent to me a draft affidavit that he prepared for Mr. Carr. I used that affidavit to begin my initial draft of Carr's Complaint against Pierce. I had also spoken with Varn regarding the contents of the suit and the various causes of action. I shared my thoughts, which were privileged attorney work product, with Varn because I understood that Varn and I were working toward a common goal on behalf of our clients, the defeat of Peter Pierce in actions filed by Carr and Iron Mountain.

8. I would never have shared with Varn any privileged attorney work product or confidential communications I had with Carr were it not for my understanding that Varn had agreed to keep this information confidential and not disclose it to any third party. I shared confidential information with Varn with the express understanding that Carr authorized these communications with Varn. Carr knew and approved of my frequent communications with Varn that included discussions of litigation strategy for both Carr's case and the development of Iron Mountain's case.

- 2 -

Case 1:05-cv-10890-RCL    Document 43-3    Filed 10/12/2005    Page 4 of 11 Ø004

9.  I had prepared a joint defense agreement and sent a draft to Varn.  However, Varn and I discussed the draft agreement and we both agreed there is no requirement in New Jersey for such joint prosecution agreements involving a common interest among parties to be written. Regardless, the law in New Jersey requires counsel to the parties in any such common interest or joint prosecution agreement to maintain the confidences shared by the parties as if they were confidential communications with one's own client.

10. I contacted Varn and asked him to review the draft complaint I wrote for filing on behalf of Carr.  As Varn's affidavit admits he made edits to the draft, which I accepted and used when I filed the lawsuit.  Although the timing of Mr. Carr's lawsuit was in part related to issues between Carr and Pierce, Varn was pleased that the filing coincided with actions he was taking against Pierce on behalf of Iron Mountain.

11. As a result of several conversations with me, Carr, Varn and Watzke, on April 12, 2002, S&W wired $50,000 to my firm as a retainer for my fees in representing Carr against Pierce.  I have no affirmative evidence to suggest whether Iron Mountain paid or reimbursed the $50,000 to S&W.  It was clear to me that the reason Varn and Watzke had agreed to fund the lawsuit against Pierce, for Carr's benefit, was because Varn and Watzke believed that I could develop information, strategies, or testimony that would assist their case against Pierce.  Another reason is that Varn relied on me to help him prepare for Iron Mountain, Inc's. arbitration against Pierce.

12. The Carr lawsuit against Pierce was on an expedited discovery track since we were seeking a preliminary injunction unlike the Iron Mountain case which was on a normal discovery track.  Varn indicated he was, indeed, interested in whatever facts or documents I could get in discovery from Pierce.

- 3 -

13. In furtherance of our common interest, Varn insisted on being involved in every phase of Carr's litigation from reviewing pleadings, to preparing Carr for his deposition testimony to weighing in on settlement of the case. In fact, Varn was insistent that I not begin to prepare Carr for his deposition in a case involving Iron Mountain and Sequedex without Varn being present. I also provided Varn with confidential and privileged documents and work product that I would not have produced to any other person were it not for our joint prosecution agreement, which presumed the maintaining of confidences of our respective clients.

14. In the preparation session for Carr's deposition in the Sequedex case, Varn coached Carr how to answer deposition questions so that Carr would remain strictly truthful to his answers, but would not unnecessarily volunteer information. For example, Varn instructed Carr that if he was asked "did Iron Mountain offer you a job in exchange for your assistance" that Carr was to say "no" because he was offered a consulting position and not a job. While I was uncomfortable with Varn's hair-splitting he was careful to advise Carr to always tell the truth and the advice that Varn was giving was for Carr to carefully listen to the question and answer the only the precise question asked in as narrow a manner as possible.

15. At one point during Carr's deposition in the Sequedex matter, Pierce's son, J. Peter Pierce Jr., approached Carr in the hallway outside of my office and inquired about initiating settlement discussions. I was in my private office and Varn overheard him and ran into my office and told me to get my client away from Pierce, Jr. After the deposition, Varn told Carr, that Carr was not to meet with anyone to discuss settling his dispute with Pierce without Varn being involved. It was agreed that I would write to Pierce's counsel about the incident to inquire whether Pierce had a settlement proposal to offer. Nothing came of my inquiry.

- 4 -

16. Shortly after I filed Carr's suit against Pierce, in early April 2002, Pierce's attorneys learned that Varn and I were working together on our common cases against Pierce. (Varn filed the arbitration action on behalf of Iron Mountain, Inc. on or about April 15, 2002, in Philadelphia. *See,* Varn Aff. p. 17, n.1.) In July 2002, Pierce's counsel sought leave for an out-of-state commission to depose Varn in Carr's New Jersey state court action as well as compel Varn to produce documents I shared with Varn.

17. On or about July 24, 2002, after consulting with Varn, I filed an opposition to Pierce's application with the Honorable Clarkson S. Fisher Jr., P. J. Ch., Superior Court of New Jersey, Monmouth County - Chancery Division, the presiding judge in Carr's action against Pierce. At that time I moved to quash Pierce's efforts to depose Varn. I argued to the court that Varn and I were engaged in a joint prosecution effort against Pierce and that our communications were privileged through the common interest privilege. New Jersey law expressly permits such common interest privileges and I cited the court to *Laporta v. Gloucester County Bd. of Chosen Freeholders,* 340 N.J. Super 254, 263 (App. Div. 2001) ("Generally, when such privileged information is turned over to a non-adversary who has a legitimate interest in the information, such as the GCPO here, there is no waiver unless it can be shown that there was a 'conscious disregard' of the possibility that an adversary would gain access to the material").

18. Judge Fisher did not issue a written opinion but believed that because Pierce's counsel wanted to depose Varn in Massachusetts that he would "issue" the out-of-state commission to a Massachusetts court and it would be for the court in Massachusetts to make any necessary factual findings regarding the application of the privilege to particular documents or questions. I did not appear in the court in Massachusetts regarding the commission to depose Varn but Varn and I did coordinate our defense of this effort and it is my understanding that

- 5 -

Varn and S&W opposed Pierce's efforts to depose Varn by, in part, citing the Massachusetts court to the common interest agreement between Carr and Iron Mountain. . I do know that the Massachusetts court did not execute the commission and Varn was never deposed as part of Carr's case as Pierce's counsel had sought in New Jersey.

19. Having fought and won that battle in July 2002, it is my view that both Varn and I were even more diligent in protecting the confidentiality of our communications from the aggressive discovery tactics of Pierce's attorneys. In fact, Pierce's counsel subpoenaed me in the Iron Mountain/Pierce arbitration in Philadelphia. I successfully had the subpoena quashed by the Superior Court of New Jersey at least in part based upon my argument of the applicability of the New Jersey common interest privilege that I cited to the court.

20. That Varn and others acting in their individual capacities are now suing Carr and are using these confidential communications against Carr is, in my view, a breach of the joint prosecution agreement and a violation of Carr's expectation that Varn would keep all such communications confidential.

21. The common interest privilege in my view continued through the 2003-2004 arbitration and did not cease until early 2005 when it became obvious that Carr and Iron Mountain, Inc. were at odds over Iron Mountain's promises. I have acted consistently with the intent of the Carr-Iron Mountain common interest agreement and have not disclosed or breached the confidences regarding Iron Mountain that I was privy to throughout the duration of the agreement.

22. Leading up to the Iron Mountain, Inc. arbitration, I met or spoke on the phone on several occasions with Varn, attorneys from S&W and Morgan Lewis. Iron Mountain, Inc. had retained Morgan Lewis as its counsel in Philadelphia to assist Varn in trying the arbitration. I

- 6 -

quickly understood and agreed, on behalf of Carr, that Morgan Lewis was part of the joint team and was a recipient of all confidential communications I had shared with Varn. The inclusion of Morgan Lewis as an additional member of the team was neither surprising nor objectionable to me. I freely communicated with attorneys or support staff from Morgan Lewis as I did with Varn. While I had a very minimal role, I was nevertheless privy to many confidential communications regarding the Iron Mountain arbitration strategy. In fact, I was present in Varn's hotel room when the Morgan Lewis attorneys were preparing Varn for his own testimony in the arbitration regarding a trailer of documents that the Pierce attorneys were hiding from Iron Mountain and Carr during discovery.

23. The purpose of my meetings with Varn, S&W and Morgan Lewis was to plan strategy for the case. No meeting with Varn was ever entirely social even if the primary purpose was to meet for dinner or lunch. At absolutely every meeting with Varn, S&W and or attorneys from Morgan Lewis, at some point at least one person would raise the case and discuss client confidential information or trial strategy. I understood that the information I learned was confidential and that I had an ethical obligation to not disclose the information to any person other than my client, Carr.

24. I also helped Varn prepare an affidavit from a third party, Tammi Phillips, which Varn submitted to the arbitrator in the Pierce/Iron Mountain arbitration.

25. Carr was scheduled to be deposed in the Iron Mountain Sequedex matter in May 2003. Prior to the deposition, I told Varn that I had earned the entire $50,000 retainer and had incurred substantially more fees in representing Carr. I told Varn that I could do no further work on behalf of Carr unless Iron Mountain, S&W, or Carr agreed to pay my outstanding fees and agree to pay those that were reasonably foreseeable involving the upcoming arbitration. Indeed,

I told Varn that I could not and would not provide any further assistance to Carr without such an understanding. Varn asked for a copy of all of my bills and I provided them to him and he unambiguously told me that he would get them all paid. A few days later Varn called me to confirm my prior understanding of the agreement between the counter-defendants and Carr, i.e., that Iron Mountain would pay the current outstanding fees and all of the remainder of the fees I incurred on behalf of Carr. Carr and I knew that Carr could not afford to pay the fees and Varn's reiteration of his earlier agreement to pay my fees on behalf of Carr was instrumental to my continuing to provide services to Carr. Varn had one condition, which was that he did not want another large transaction between S&W and me until after the Pierce arbitration which was scheduled to be completed in July 2003. I informed Carr of this conversation and Carr agreed with me that I would continue to represent Carr since Varn had promised that my fees would be paid by Iron Mountain.

26. Varn also asked me to travel to Philadelphia where the arbitration was to convene. Varn reserved a hotel room at the Four Seasons hotel and I expected that Iron Mountain would be paying the bill. Upon arriving in Philadelphia I expected that my time would be spent primarily in preparing Carr for his envisioned testimony. However, Varn had other plans.

27. The first night I arrived Varn instructed me to work with an S&W associate, Beth Jacobson and, I believe, a paralegal from Morgan Lewis on reviewing documents relating to Carr's dealings with Pierce to be used in the arbitration. The next day I continued to review the documents in the office of Morgan Lewis in the presence of Plaintiff Charlie Moore.

28. Carr's testimony that Iron Mountain, Inc. had fulfilled all of its promises is, in my view, correct. Varn had promised to pay all of my fees after the arbitration leading one to reasonably expect that my fees would be paid and that Iron Mountain had satisfied its

- 8 -

obligations. Moreover, a careful reading of the question asks if Iron Mountain, Inc. – the only claimant in the arbitration – had fulfilled all of its promises in the arbitration. The question was narrowly phrased and did not encompass any other Iron Mountain affiliated companies that may have been used by Varn to make promises to Carr and Neebling. While a narrow reading of the question, Carr answered it correctly and truthfully, as Varn had instructed.

29. The arbitration was scheduled to end in July 2003 but did not. More days of testimony were scheduled for November and December. In August 2003, I again inquired of Varn about paying my bills but he asked me to wait until after the completion of testimony later that year. I agreed, albeit reluctantly, because of a telephone conversation with Gary Watzke in July wherein Watzke indicated to me that Richard Reese would meet with Carr and me after the arbitration to discus how Iron Mountain would fulfill all its obligations to Carr.

30. On February 10, 2004, Varn had apparently met with his client to review the result of the arbitration. Late in the evening, Varn called and said that he would have Iron Mountain pay my fees if I could convince Carr to allow Varn to review certain audiotapes that Carr possessed. Varn then said that if Carr would pay $10,000 that he would ensure that Iron Mountain paid the remainder of my fees. Neither of these conditions were part of the original agreement and I objected to Varn's efforts to try to modify the agreement he and Iron Mountain made with Carr.

31. Varn and Iron Mountain breached their agreement to pay my fees by paying only an additional $8,177.50 on April 5, 2004, and refusing to pay the full balance. Varn apparently prevailed upon Iron Mountain to pay the part of my outstanding balance relating to my work, at Varn's request, in connection with the arbitration.

32. After the April 5, 2004 payment, a balance of $17,500 remained on Carr's account. Despite the breach by Varn and Iron Mountain, Carr kept his obligation to me by paying off the

09/27/2005 TUE 09:34 [TX/RX NO 7589] ☒010

entire balance. Therefore, I can testify that on multiple occasions Varn promised Carr directly, and through me, that Iron Mountain would pay <u>all</u> of my fees incurred in representing Carr in exchange for Carr's cooperation for helping Varn prepare Iron Mountain's cases against Pierce. Because Varn and Iron Mountain breached their agreement Carr has been damaged by having to pay nearly $17,500, or the remainder of my fees not paid for by Iron Mountain and Varn as they had promised.

I declare the forgoing to be true and correct under the penalty of perjury in accordance with 18 U.S.C. § 1746.

_____ September 27, 2005 _____
Date

_____
Arthur M. Peslak

- 10 -

# EXHIBIT D

James E. Neebling

02/27/2007

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

----------------------------------------x

IRON MOUNTAIN INCORPORATED;
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.; C. RICHARD
REESE; JOHN F. KENNY, JR.;
GARRY B. WATZKE; LARRY L. VARN;
and CHARLES G. MOORE,

        Plaintiffs and
        Counterclaim Defendants,

                          Civil Action
     v.               No. 05 10890 RCL

THOMAS CARR,

        Defendant and
        Counterclaim Plaintiff.

----------------------------------------x

IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.

        Plaintiff,

                          Civil Action
     v.               No. 05 10999 RCL

SYSTRANS FREIGHT SYSTEMS, INC.,

        Defendant.

----------------------------------------x

                February 27, 2007
                10:15 a.m.
      Deposition of JAMES E. NEEBLING, taken by

Plaintiff, pursuant to Notice, at the offices of

Patton Boggs, LLP, One Riverfront Plaza, Newark, New

Jersey, before Denise L. Daniels, a Shorthand Reporter

and Notary Public.

James E. Neebling                                            02/27/2007

Page 11

1

2          Q.    Mr. Neebling, you were involved with a

3     company called Systrans, correct?

4          A.    Yes.

5          Q.    All right.  What is Systrans?

6          A.    It's a -- Systrans is a company that did

7     not ever evolve into a corporation, into an entity.

8          Q.    It was never an entity?

9          A.    No, it was an LLC filed, and it never

10    became anything.

11         Q.    Did it ever do business?

12         A.    No.

13         Q.    What's the status of Systrans today?

14               MR. McCAFFREY:  Wait.

15         A.    See, I'm going to play the game.

16               Can we go off the record?

17               MR. GROSS:  No.

18               MR. McCAFFREY:  Leave it on the record.

19               I'm going to object because the term

20          "Systrans" is a bit vague.  If there's a

21          specific entity that you're going to ask him

22          about, then fine.

23         Q.    Did you understand what I meant by

24    Systrans?

25         A.    Exactly.

James E. Neebling

Page 12

```
 1
 2        Q.    What did I mean by Systrans?
 3        A.    You meant the entity called Systrans.
 4        Q.    Is there an entity called Systrans
 5   Freight Systems, Inc.?
 6        A.    Yes.
 7        Q.    And what's that?
 8        A.    Systrans Freight Systems, Inc. was the
 9   company that engaged Iron Mountain to perform courier
10   services and consulting services.
11        Q.    You had a connection with Systrans
12   Freight Systems, Inc.?
13        A.    Yes.
14        Q.    What was that connection?
15        A.    I was the president of the company.
16        Q.    Will it confuse you if we refer to
17   Systrans Freight Systems, Inc. going forward in this
18   deposition as Systrans?
19        A.    That's fine with me.
20        Q.    Okay, I will do that.
21              So Systrans was actually a corporation
22   then, correct?
23        A.    Systrans was an LLC formed.  Correct.
24        Q.    And what is the status of Systrans today?
25              THE WITNESS:  Can I just answer this?
```

James E. Neebling

Page 13

1

2              MR. McCAFFREY:  Yes.

3        A.     So you're not confused, Systrans, LLC was

4    formed originally when we were originally

5    contemplating doing business with Iron Mountain.

6              Systrans Freight Systems, Inc. was a

7    company I had already in Florida doing business.

8    During the arbitration -- we kind of forgot about

9    Systrans, LLC because we were going to take on an

10   investor to provide us with the technology.  During

11   the arbitration, when I came up to Advanced Options,

12   whatever the company was in Philadelphia, the elevator

13   opened and Garry Watzke was standing there saying we

14   have to talk.

15             He took me down the hall and said, "What

16   the hell is Systrans?"  I remembered when we were

17   going to do business, we set up something called

18   Systrans, LLC with Tom, myself and another guy in

19   Florida who was going to provide the technology.  It

20   never happened.  It was disbanded and dormant.  When I

21   left that meeting, O'Connor was going to drill me on

22   that, so I was prepared.  There were two Systrans

23   entities.

24             Are you clear?

25        Q.     Fine.  I'm asking about Freight Systems.

James E. Neebling

1

2          MR. McCAFFREY:  Counsel said to you

3     earlier when he used the word "Systrans," he

4     meant Systrans Freight Systems, Inc. And you

5     agreed.

6          A.    I understand.  Systrans Freight Systems

7   went -- basically stopped doing business when Iron

8   Mountain severed its ties with us.

9          Q.    And you placed that in May of 2005; is

10  that correct?

11         A.    About 2005, yes.

12         Q.    When you say it stopped doing business,

13  were there any formal steps taken to dissolve it or

14  otherwise, dissolve Systrans Freight Systems, Inc.?

15         A.    No, I was originally thrown into

16  bankruptcy, but you guys filed a motion that I

17  couldn't disclose anything or sell until -- or let it

18  dissolve with a Trustee.  I couldn't do anything with

19  it.  I had to wait for this matter to be resolved.

20              Had I done that, then the information of

21  Iron Mountain or any asset to the company would have

22  been vulnerable to violating that agreement that

23  either you or Garry Watzke sent me.  I respected that,

24  and I didn't do anything with that.

25         Q.    The answer is it's still a corporate

James E. Neebling

Page 15

1

2    entity?

3         A.    Yes.

4         Q.    But it's not doing business?

5         A.    No.

6         Q.    Did Systrans Freight Systems have any

7    contracts or agreements with Iron Mountain?

8         A.    Yes.

9         Q.    I'm going to hand you a document,

10   Mr. Neebling.  It's headed "Systrans."  It says

11   "Contract for logistics management services, contract

12   number 2002111."

13              I ask you to take a look at that and tell

14   me whether that's a contract between Systrans Freight

15   and Iron Mountain?

16        A.    Yes.

17              MR. GROSS:  I ask the reporter to mark

18        that as Neebling Exhibit 2, please.

19              (Whereupon, document re contract number

20        2002111 marked Neebling Exhibit 2 for

21        identification, as of this date.)

22        Q.    Mr. Neebling, you were the president of

23   Systrans Freight System, Inc. at the time this

24   contract was entered into?

25        A.    Yes.

James E. Neebling

 1

 2     It was just something that he wanted to make sure that

 3     we were legally correct in our ability to now take

 4     them from Logisteq.

 5          Q.    After May 9th, what was the next contact

 6     with Iron Mountain?

 7          A.    It would have been a dinner meeting at

 8     the Waldorf Astoria.  Right down the street from my

 9     house.  No, I'm only kidding.

10          Q.    That was in June?

11          A.    That was June 10th, '02.

12          Q.    Who was there?

13          A.    Reese, Kenny, Varn, Carr, Neebling,

14     Peslak.  And to just clarify something from the past,

15     that may be when they were going to CNBC.  That might

16     be the day when they had to meet with analysts.  We

17     met at the Bull and the Bear.  The CFO, CEO, Varn, two

18     guys from Freehold, and I had basically sat down and

19     wanted to solicit them to do business with Systrans or

20     contemplate a deal.

21               At that point Kenny had said to me, and I

22     specifically remember this, that, "Oh, I had checked

23     with the Oracle" -- I guess Oracle was our accounting

24     system -- "and it wasn't 25 million, it was 120

25     million, but 80 million on our Oracle accounting was

1

2     for internal trucks." So it netted out to be like a

3     40-plus million dollars opportunity.

4         Q.     Forty million for external couriers?

5         A.     External couriers, correct.

6         Q.     What else transpired?

7         A.     Well, I mean that meeting was a meeting

8     where we -- you know, it was very -- from 30,000 feet,

9     it was a very social, pretty impressive place to eat

10    dinner. We didn't have a proposal. Kenny was getting

11    back to me with the size of the opportunity. I went a

12    little further with Richard explaining what I thought

13    we could do, and then we were setting up a meeting to

14    be up in Boston at a future date for me to come in

15    with something formal.

16        Q.     Up to this point, insofar as Systrans and

17    you were concerned, you were discussing with Iron

18    Mountain the possibility you might do courier business

19    for them in the future?

20        A.     Up to this point, it was just a

21    discussion, correct.

22        Q.     Did you make any kind of pitch at this

23    meeting at all?

24        A.     The one thing we had at the meeting was

25    the fact that we had known Peter's intention not to

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS
-----------------------------------------x
IRON MOUNTAIN INCORPORATED;
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.; C. RICHARD
REESE; JOHN F. KENNY, JR.;
GARRY B. WATZKE; LARRY L. VARN;
and CHARLES G. MOORE,

        Plaintiffs and
        Counterclaim Defendants,

                     Civil Action
     v.              No. 05 10890 RCL

THOMAS CARR,

        Defendant and
        Counterclaim Plaintiff.
-----------------------------------------x
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.

        Plaintiff,

                     Civil Action
     v.              No. 05 10999 RCL

SYSTRANS FREIGHT SYSTEMS, INC.,

        Defendant.
-----------------------------------------x
                  March 14, 2007
                  2:30 p.m.
      Continued deposition of JAMES E. NEEBLING,

taken by Plaintiff, pursuant to Adjournment, at the

offices of Patton Boggs, LLP, One Riverfront Plaza,

Newark, New Jersey, before Denise L. Daniels, a

Shorthand Reporter and Notary Public.

James E. Neebling, Vol. 2

Page 116

1    past testimony, $5 million to help Tom buy Pierce out

2    of his portion.  Then the concept was, well, if he

3    doesn't sell it to you or we can't structure that

4    deal, we can give you our courier business.  We were

5    spending at one time -- the figures went back and

6    forth, it was 20, 25, 45 and then 120, but internally

7    it was 80.

8                And so we went on the premise that it was

9    going to be in excess of 25, and at times they told us

10   it was $45 million in total revenue.  I did the first

11   location for them as a test market that was directed,

12   you know, to me from Richard Reese.  It was amazing

13   what we found.  Drivers that had no licenses,

14   companies that had no authority, total noncompliance.

15   It was a liability nightmare.

16               When we delivered these results on the

17   first market back to them, they couldn't move fast

18   enough to give us the business, in the beginning

19   because they realized that they had a situation that

20   was -- they had drivers driving that were

21   subcontractors that had no tax ID numbers, that had no

22   corporations.

23               One guy had no license, one guy was a

24   convicted felon, one guy was a drunk driver and had no

25   license.  When I came back to them with the results,

Page 152

1    Let Bob feel that he's doing his thing.  But, you

2    know, I would respect that only to a certain point

3    and, you know this went up to Boston.

4                MR. SHAPIRO:  Can we take a five-minute

5         break?

6                MR. GROSS:  Absolutely.

7                (Recess taken at this point.)

8         Q.    Mr. Neebling, did Mr. Carr ever have any

9    equity interest in Systrans Freight Systems?

10        A.    The only thing he had was an escrow

11   agreement to secure his debt.  It was always the

12   intention of everyone at Iron Mountain, including

13   myself to make sure that Cozen & O'Connor and the

14   Pierce camp did not in any way feel that Tom was

15   involved.

16        Q.    So?

17        A.    He didn't have equity technically, but

18   everyone knew that he was involved with the company.

19   The company was put there to basically help him offset

20   his loss.  I mean they didn't know me from Adam.  I

21   didn't just walk down Atlantic and run into them.  I

22   was there because of Tom, Tom was their main guy, and

23   I set this thing up to service them but it was

24   basically to benefit myself and Tom.

25                MR. SHAPIRO:  Jim, you're giving sort of

Page 153

```
 1          a Tom Carr answer here.  Ira asked simply

 2          whether Tom had an equity interest in Systrans

 3          or not?

 4          A.    The answer is no.

 5          Q.    I'm going to hand you a document

 6    Mr. Neebling.  This appears to be an e-mail that you

 7    sent Garry Watzke with a copy to Larry Varn dated

 8    January 5, 2004.  Can you confirm that you actually

 9    did send that?

10          A.    Yes.

11                MR. GROSS:  I ask the reporter to mark

12          that as Exhibit 7.

13                (Whereupon, e-mail from Mr. Neebling to

14          Garry Watzke with copy to Larry Varn dated

15          January 5, 2004 marked Neebling Exhibit 7 for

16          identification, as of this date.)

17          Q.    What prompted you to send this?

18          A.    What prompted me to send this was the

19    fact that I continually wanted business in the New

20    Jersey, New York marketplace.  Mike Holland was the

21    man in charge of this region.  Mike Holland also had

22    the Freehold facility under his watch, his control.

23    What would happen was we were given warehouse space

24    there to use, rent, we paid rent, we didn't pay rent,

25    we were given time, there was no rent.
```

# EXHIBIT E

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; et al. | ) ) ) |
| Plaintiffs and, Counter-Defendants v. | ) ) ) ) ) |
| THOMAS CARR, | ) ) ) |
| Defendant and Counter-Plaintiff | ) ) ) ) |

Civil Action No.  05 10890 RCL

**DEFENDANT AND COUNTER-PLAINTIFF THOMAS CARR'S**
**FOURTH AMENDED INITIAL DISCLOSURES**

Defendant and Counter-Plaintiff Thomas Carr ("Carr"), by and through

undersigned counsel and pursuant to Rule 26(a) of the federal Rules of Civil Procedure

and Local Rule 26.2, hereby provides the following initial disclosures.  These disclosures

are made without waiving any rights and/or objections as to competency, relevancy,

materiality, privilege, confidentiality and/or admissibility as evidence in this or any

related proceeding.

**Rule 26(a)(1)(A) Disclosures**

Carr identifies the following entities and individuals likely to have discoverable

information that Carr may use to support his claim or defenses relating to, but not limited

to the contractual relationship between Carr and the Plaintiffs and Counterclaim

Defendants as well as the communications amongst the parties and various third parties.

1)      Iron Mountain Incorporated

4873985

Iron Mountain Incorporated, through its corporate representatives and/or one or more of the witnesses listed in paragraphs three through seven below, will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Iron Mountain Incorporated will testify to Carr's fulfillment of his obligations under the agreements and its own breach of the parties' oral agreement.

2)      Iron Mountain Information Management, Inc.

Iron Mountain Information Management, Inc., through its corporate representatives and/or one or more of the witnesses listed in the paragraphs three through seven below, will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Iron Mountain Information Management, Inc. will testify to Carr's fulfillment of his obligations under the agreements and its own breach of the parties' oral agreement.

3)      C. Richard Reese

As described more fully in paragraphs 18 and 20 of Counter-Plaintiff's Second Amended Counterclaim ("SAC"), C. Richard Reese will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Reese will testify to Carr's fulfillment of his obligations under the agreements and its own breach of the parties' oral agreement.

4)      John F. Kenny, Jr.

As described more fully in paragraphs 18, 20, 22, and 23 of the SAC, John F. Kenny Jr. will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Iron Mountain Incorporated will testify to Carr's fulfillment of his obligations under the agreements and its own breach of the parties' oral agreement.

5)    Gary Watzke

As described more fully in paragraphs 18, 19, and 27 of the SAC, Gary Watzke will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Watzke will testify to Carr's fulfillment of his obligations under the agreements and its own breach of the parties' oral agreement.

6)    Larry L. Varn

As described more fully in paragraphs 20, 29, and 30 of the SAC, Larry L. Varne will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Varn will testify to Carr's fulfillment of his obligations under the agreements and its own breach of the parties' oral agreement.

7)    Charles G. Moore

As described more fully in paragraphs 28 and 29 of the SAC, Charles Moore will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Moore will testify to Carr's fulfillment of his obligations under the agreements and its own breach of the parties' oral agreement.

4873985                                        3

8)    James Neebling
      571 West Lake Avenue; Suite 5
      Bayhead, NJ 08742
      (732) 295-9914

James Neebling will testify concerning the promises and contractual obligations made

to Carr in exchange for Carr's assistance with and participation in efforts against

Pierce. In particular, Neebling will testify concerning promises made to Carr

concerning Neebling's company, Systrans, Inc. In addition, Neebling will testify to

Carr's fulfillment of his obligations under the parties' oral agreements and Iron

Mountain's breach of those agreements. Specifically, he will testify how he and Carr

helped develop Iron Mountain's case against Pierce. Finally, as he stated at his

deposition in this case (started February 27, finished March 14, 2007), Neebling will

corroborate Carr's allegations, specifically with regard to contractual obligations the

Counter-Defendants undertook at particular meetings and the investments that Carr

made in Systrans (which Carr lost when Iron Mountain breached its agreements).

9)    Arthur Peslak
      80 Scenic Drive, Suite 5
      Freehold, NJ  07728
      (732) 761-1610

As described more fully in paragraphs 19, 20, and 27 of the SAC, Arthur Peslak will

testify concerning the promises and contractual obligations made to Carr in exchange

for Carr's assistance with and participation in efforts against Pierce. In particular,

Peslak will testify concerning Carr's lawsuit against Peter Pierce and the promises of

Counter-Defendants to fund that lawsuit. In addition, Peslak will testify to Carr's

fulfillment of his obligations under the agreements and its own breach of the parties'

oral agreement. He will also testify as to Varn's preparation of Carr to testify at the

Iron Mountain-Pierce arbitration. Finally, as he stated at his March 14, 2007

deposition in this case, Peslak will corroborate Carr's allegations with regard to contractual obligations the Counterclaim Defendants undertook at certain meetings and during certain telephone calls.

10)　　Judy Carr
　　　　152 Chestnut Way
　　　　Manalapan, NJ 07726
　　　　(732) 617-5925

Judy Carr will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In particular, Mrs. Carr will testify concerning the events described more fully in paragraph 23 of the SAC. Specifically—and as she testified at her March 8, 2007 deposition in this case—she will testify of phone calls made to her by Kenny and John Hayden (identified below) to assure her that Iron Mountain would compensate her husband financially for his efforts in their case against Pierce. In addition, Mrs. Carr will testify to Carr's fulfillment of his obligation under the agreements and the Counter-Defendants' breaches of the parties' oral agreements.

11)　　Paul Schwartz
　　　　976 Wateredge Place
　　　　Hewlett, NY 11557-2612
　　　　(516) 374-6530

Paul Schwartz will testify concerning Counterclaim Defendants' assurances that Carr was a good candidate to receive a financial loan from Schwartz because of money and revenue promised to Carr by the Counter-Defendants. More specifically—and as he stated at his March 8, 2007 deposition in this case—Schwartz will testify that, in March 2003, after Carr had requested a $500,000 loan to capitalize the Systrans venture with Neebling, Varn called Schwartz to confirm that Iron Mountain would

provide Systrans with tens of millions of dollars of business ($45 million per year).
This phone call followed on a previous negotiation with Carr about Carr's request for
an extension of time to repay an earlier $500,000 loan that Schwartz had made to
Logisteq on Carr's personal guarantee. Schwartz will testify that he agreed to this
extension only after performing due diligence on Carr's statement that Iron Mountain
would be hiring him as a consultant and had agreed to invest in certain coffee
distributorships with Carr. Schwartz will testify that he would never have made the
new loan—or extended the term of the older one—if he had not received assurances
from Iron Mountain. Finally, Schwartz will testify that he stopped receiving
assurances from the Counter-Defendants once Iron Mountain lost its arbitration
against Pierce.

12)    Michael Chazen
       4400 Route 9 South, Ste. 1000
       Freehold, NJ  07728
       (732) 303-0808

Michael Chazen will testify concerning the promises and contractual obligations
made to Carr in exchange for Carr's assistance with and participation in efforts
against Pierce. Chazen will testify about the arbitration against Pierce and Carr's
assistance to IM in that regard. In addition, Chazen will testify to Carr's fulfillment
of his obligations under the agreements and the Counter-Defendants' breaches of the
parties' oral agreements. He will also testify that he would not have agreed to
testify—without a subpoena—in the Pierce arbitration if Larry Varn had not made
certain assurances to him. Specifically, Chazen will testify that Varn, by e-mail and
over the phone, assured him that Carr would be "taken care of," and that Varn's

assurances only confirmed what Carr has been telling him about IM's agreement to pay off Carr's debts and hire Carr.

13)     Vincent Brana
        c/o Velocity Express
        80 Wesley St.
        So. Hackensack, NJ 07606
        (201) 487-7443

Vincent Brana will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Brana will testify to agreements that he personally entered into with the Counter-Defendants, which were similar to those entered into by Carr. Brana will also testify to Carr's fulfillment of his obligations under the agreements and the Counter-Defendants' breaches of the parties' oral agreements. More specifically, Brana will testify that he had many meetings, dinners, and phone conversations with Varn over a period of about six months in 2002. He will testify that Varn repeatedly and continually promised that Brana would be receiving up to $15 million of business per year from Iron Mountain (as a subcontractor for Carr and Neebling)—that Iron Mountain would specifically direct its business to Brana's company. Finally, Brana will testify that he stopped receiving entreaties and assurances from the Counter-Defendants once Iron Mountain lost its arbitration against Pierce.

14)     Tammy Phillips-Kahn
        12 Alden Terrace
        Howell, NJ 07731-1531
        (908) 692-5179

Tammy Phillips-Kahn will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in

efforts against Pierce. In particular Phillips-Kahn will testify concerning the February

2002 meeting at the Waldorf-Astoria hotel in New York between Carr and the

Counter-Defendants, which is described more fully in the SAC. She will testify that

Watzke, Kenny, and Varn assured her and Carr that they would have jobs if Pierce

closed Logisteq and fired them. She will also testify that, around the time of Varn's

preparation of her for testifying at the Pierce arbitration, Varn assured her that if she

and Carr helped IM in its case against Pierce, IM would help them. Finally, Phillips-

Kahn will testify to Carr's fulfillment of his obligations under the parties' oral

agreements and the Counter-Defendants' breaches of those oral agreements.

15)    Arturo Soto
       2 Charlestown Ct.
       Maulvin, S.C. 29662
       (732) 642-5190

Arturo Soto will testify concerning the promises and contractual obligations made to

Carr in exchange for Carr's assistance with and participation in efforts against Pierce.

In addition, Soto will testify about agreements that he entered into with Counter-

Defendants, which were similar to those entered into by Carr—assistance with the

Pierce case in exchange for financial and employment assistance—and that IM

similarly breached these agreements after the Pierce arbitration. Soto will also testify

to Carr's fulfillment of his obligations under the agreements and the Counter-

Defendants' breaches of the parties' oral agreements.

16)    John Hayden
       Address to be provided

John Hayden will testify concerning the promises and contractual obligations made to

Carr in exchange for Carr's assistance with and participation in efforts against Pierce.

In particular, Hayden will testify concerning certain meetings and communications described more fully in the SAC, as well as a telephone conversation about which Judy Carr testified at her deposition. In addition, Hayden will testify to Carr's fulfillment of his obligations under the agreements and the Counter-Defendants' breaches of the parties' oral agreements.

17)    Vincent Ryan
       Address to be provided

Vincent Ryan, Charman of Schooner Capital LLC, will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Ryan will testify to Carr's fulfillment of his obligations under the parties' agreements and the Counter-Defendants' breaches of those agreements.

18)    Samual Miller, Esq.
       Sullivan & Worcester LLP
       One Post Office Square
       Boston, MA  020109
       (617) 338-2800

Samuel Miller, Esq. will testify concerning the promises and contractual obligations made to Carr in exchange for Carr's assistance with and participation in efforts against Pierce. In particular, Miller will testify concerning certain meetings between Carr and the Counter-Defendants described more fully in the SAC, which he attended. In addition, Miller will testify to Carr's fulfillment of his obligations under the agreements and the Counter-Defendants' breaches of the parties oral agreements.

19)    Bob Miller

Bob Miller is the President of Counter-Defendant Iron Mountain Incorporated and will testify concerning the promises and contractual obligations made to Carr in

exchange for Carr's assistance with and participation in efforts against Pierce. In addition, Bob Miller will testify to Carr's fulfillment of his obligations under the agreements and its own breach of the parties' oral agreement.

20)    Patrick O'Hare
       Address to be provided

Patrick O'Hare will testify as to meetings between Carr, Larry Varn and Charles Moore in Miami concerning the business of Iron Mountain in Florida.

21)    Walter Hughes
       Address to be provided

Walter Hughes will testify concerning meetings between Carr, Varn and Charles Moore to discuss the business of Iron Mountain as it related to former employees of Logisteq.

22)    William Hettler
       Address to be provided

William Hettler will testify concerning meetings between himself, Carr, Varn and Charles Moore about Hettler's participation in Iron Mountain's efforts against Peter Pierce including an affidavit Hettler executed for Iron Mountain relating to Hettler's sale of property to Peter Pierce and Logisteq for record storage.

23)    Ron Shapss
       Address to be provided

Ron Shapss will testify about meetings between himself, Varn and Charles Moore that were arranged by Carr and James Neebling at the request of Iron Mountain to develop and perfect its claims against Peter Pierce.

24)    Jeff Stern
       Address to be provided

Jeff Stern will testify about meetings between himself, Varn and Charles Moore that were arranged by Carr and James Neebling at the request of Iron Mountain to develop and perfect its claims against Peter Pierce.

25)    Ron Lieberman
       Address to be provided

Ron Lieberman will testify about meetings between himself, Varn and Charles Moore that were arranged by Carr and Jim Neebling at the request of Iron Mountain to develop and perfect its claims against Peter Pierce.

**Rule 26(a)(1)(B) Disclosure:**

Carr will make available for inspection and/or copying all non-privileged or protected documents that are in its possession, custody or control and that Carr may use to support its claims or defenses. Documents and physical evidence categories include, but are not limited to the following:

1) Correspondence and communications between the parties;

2) Correspondence and communications between the parties and third-parties concerning matters pertaining to this action;

3) Correspondence between Counter-Defendant Larry Varn and James Neebling including, but not limited to, the following:

- email dated January 20, 2003
- email dated March 4, 2003
- email dated March 10, 2003
- email dated March 31, 2003
- email dated April 2, 2003
- emails dated April 14, 2003
- email dated May 4, 2003
- email dated May 19, 2003
- email dated June 10, 2003
- emails dated June 20, 2003

- emails dated June 24, 2003
- emails dated June 26, 2003
- email dated June 30, 2003
- emails dated July 1, 2003
- emails dated July 2, 2003
- email dated July 9, 2003
- emails dated July 11, 2003
- emails dated July 25, 2003
- emails dated July 29, 2003
- email dated August 14, 2003
- email dated September 8, 2003
- email dated September 10, 2003
- emails dated September 25, 2003
- email dated November 2, 2003
- email dated November 14, 2003
- email dated November 2, 2004
- email dated March 4, 2005
- email dated March 5, 2005
- email dated March 6, 2005

4) Correspondence between Arthur Peslak and Richard Reese, including but not

limited to, the following:

- letter from Peslak to Reese dated February 13, 2004

5) Documents concerning the parties' promises and oral agreements;

6) Documents concerning Carr's fulfillment of his obligations under the parties

agreement;

7) Documents concerning Peter Pierce and Logisteq, LLC.

8) Documents related to Iron Mountain's legal action against Pierce including

pleadings, drafts of pleadings, and depositions, including but not limited to the

following:

- Deposition of John F. Kenny in Iron Mountain v. Pierce, American Arbitration
  Association, No. 4 160 00671 02
- Deposition of C. Richard Reese in Iron Mountain v. Pierce, American Arbitration
  Association, No. 4 160 00671 02

9) Documents concerning Systrans, Inc.

10) Documents relating to Paul Schwartz;

11) Documents related to legal actions involving Iron Mountain, IMIM and Peter
Pierce; and

12) Documents related to legal actions involving Carr and Peter Pierce;

Carr's identification of documents, physical evidence and tangible things under
Rule 26(a)(1)(B) is preliminary in nature. In addition, relevant documents, physical
evidence and tangible things may be found in the custody and control of the defendants in
this proceeding, various third parties identified under Rule 26(a)(1)(A) and other persons
and/or organizations to be identified during discovery.

**Rule 26(a)(1)(C) Disclosure:**

Carr's preliminary computation of damages consists of the following:

1) $250,000 paid and remaining due in legal costs and fees to Arthur Peslak in
connection with Carr's lawsuit against Peter Pierce;

2) $2 million promised to Carr to alleviate personal debts and other financial
burdens;

3) $1,250,000 in lost wages and benefits Carr would have received as a consultant
for Iron Mountain and IMIM (calculated as yearly wages of $250,000 for 5
years);

4) Lost profits from the Counter-Defendants' breach of their oral contract with Carr
and Jim Neebling to provide business in the amount of $45 million gross revenues
to Systrans Freight Systems, Inc. (in which Carr invested and was due as return on
investment 50% of total expected net profits). Conservatively, net profits from the

Systrans transportation services brokerage business would equal 7% of gross

revenues or approximately $3MM per year, for five years equals $15MM one half

of which is $7.5MM. For the original promise of $25MM in gross revenues

annually for 5 years, the calculation would result in Carr receiving $4.3MM.

5) $600,000, the investment in Systrans Freight Systems, Inc. that Carr lost as a

result of the Counter-Defendants' breach. Obviously, this is duplicative partially

of #4 above and would be part of the damage claim only if #4 was not awarded.

**Rule 26(a)(1)(D) Disclosure:**

The disclosures required by this Rule are not applicable in this case.

Dated March 22 2007

Respectfully submitted,

Read K. McCaffrey (pro hac vice)
Ilya Shapiro (pro hac vice)
rmccaffrey@pattonboggs.com
ishapiro@pattonboggs.com
Patton Boggs LLP
2550 M Street, NW
Washington, DC 20037
Telephone: (202) 457-6000

Counsel for Defendant and
Counter-Plaintiff

4873985                                    14

<u>Certificate of Service</u>

I certify that on this 22nd day of March, 2007, I caused to be served on the counsel

identified by e-mail and first class mail this **Defendant and Counter-Plaintiff Thomas**

**Carr's Fourth Amended Initial Disclosures.**

>Ira K. Gross (BO #12720)
>Kevin Colmey (pro hac vice)
>SULLIVAN & WORCESTER LLP
>One Post Office Square
>Boston, MA 02109
>(617) 338-2800
>
>(by first class mail)
>
>_____
>Ilya Shapiro

4873985                              15

# EXHIBIT F

Paul Schwartz

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS
----------------------------------------x
IRON MOUNTAIN INCORPORATED;
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.; C. RICHARD
REESE; JOHN F. KENNY, JR.;
GARRY B. WATZKE; LARRY L. VARN;
and CHARLES G. MOORE,

        Plaintiffs and
        Counterclaim Defendants,

                Civil Action
    v.              No. 05 10890 RCL

THOMAS CARR,

        Defendant and
        Counterclaim Plaintiff.
----------------------------------------x
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.

        Plaintiff,

                Civil Action
    v.              No. 05 10999 RCL

SYSTRANS FREIGHT SYSTEMS, INC.,

        Defendant.
----------------------------------------x

               March 8, 2007
               10:05 a.m.

     Deposition of PAUL SCHWARTZ, taken by

Plaintiff, pursuant to Notice, at the offices of

Sullivan & Worcester, LLP, 1290 Avenue of the

Americas, New York, New York, before Denise L.

Daniels, a Shorthand Reporter and Notary Public.

Paul Schwartz

Page 26

1    a result of that, in particular after that

2    transaction, they bought out the leases.

3                   So I had developed a lot of confidence in

4    Tom, the way he did business and handled things and

5    was a straight shooter as far as, you know, what he

6    told me he was going to do, you know, that's what he

7    was doing.

8                   So I said to Tom at that time that, yes,

9    but I want to qualify it, do due diligence because

10   we're talking about a lot more money, you already owe

11   me a lot of money, and we're talking about a lot more.

12                  So from that, we visited the Systrans

13   facility, which I believe was in Bayhead.  And I saw

14   their layout, it was very well organized, it seemed to

15   be running very efficiently.  I looked at their

16   computer system.  It was very slick, having a computer

17   background myself, I could appreciate what I was

18   seeing.  And they also showed me a contract between

19   Iron Mountain and Systrans.

20                  So, we left, and then I called Tom the

21   next day and I said that -- you know, it might even be

22   that day that I discussed it, but the next day or two,

23   whatever and I said to him that I would like to speak

24   to somebody in Iron Mountain that is familiar with

25   this, that's in a position of authority and can verify

1    that this is the intent.

2              So he said, "Yeah, I'll speak to Larry

3    Varn and I'll have him call you," which he did.

4              And so I, not knowing what the amount is,

5    I wanted to find out what that amount is, and so I

6    guess you're aware that Tom wants to borrow, you know,

7    a line of credit or up to about 500,000, and so I want

8    to be certain that, you know, considering that I had

9    loaned all this money and I want to get it back and I

10   don't want to spend more money, loan more money

11   without an assurance that this is going to happen.

12             So he assured me that they were going to

13   generate income in the tens of millions that

14   eventually would be everything that was being done in

15   Iron Mountain, which was in the neighborhood of 40,

16   $45 million and that this was --

17             MR. SHAPIRO:  Just so we're clear, is

18        that per year, total?

19             THE WITNESS:  Per year.  40, 45 million

20        per year.  It would eventually grow to 40, 45

21        million per year.

22        A.    And he said that this would be an

23   excellent way of getting the loans back from -- that

24   you had loaned to Logisteq and TC Transport, et

25   cetera.

Page 28

1              So after that conversation, I spoke to

2     Tom, and I said, "I'll do it."  You know he gave me a

3     pretty good comfort level, and based on what I saw at

4     Systrans's headquarters, prepared to begin lending

5     additional money.  So that's what happened.

6              Q.    Okay.  I appreciate the description of

7     that, but I want to back up just a little bit because

8     it's very important that we understand exactly what

9     was said to the best of your recollection.

10             First you said that Mr. Varn contacted

11    you, correct?

12             A.    Yes.

13             Q.    You didn't contact him?

14             A.    I don't think so.

15             Q.    Did you --

16             A.    I think he was getting Varn to contact me

17    in order --

18             Q.    Who is "he"?

19             A.    Pardon me, Tom Carr, in order to give me

20    an assurance that the things that Tom was saying were

21    going to happen.  And after that meeting, I walked

22    away feeling assured.

23             Q.    So Mr. Carr had told you that he would

24    have Larry Varn contact you?

25             A.    Yes.

Paul Schwartz

1        Q.     And Larry Varn did, in fact, contact you?

2        A.     Uh-huh.

3               MR. SHAPIRO:  Is that a yes?

4               THE WITNESS:  Pardon me.  Yes.

5        Q.     To the best that you can remember, what

6    was the date of that conversation?

7        A.     I can't -- again, just in the terms of

8    the sequence of things, it's in -- what year did I

9    say?  It was 2002 or 2003.  It goes in the sequence

10   that I explained.  So giving you a specific date, I

11   really can't remember at this point.

12       Q.     As best as you can remember?

13       A.     2002, possibly 2003.

14              MR. SHAPIRO:  If I can represent to you,

15              and I apologize, this might help you clarify

16              the date issue.  Larry Varn's affidavit puts a

17              phone conversation between you and him as March

18              13, 2003.  Does that refresh your recollection?

19              Is that around the point in time?

20              THE WITNESS:  I can't say, but it's in

21              that time frame that I just mentioned.

22       Q.     Was that the only conversation you ever

23   had with Mr. Varn?

24       A.     Yes.

25       Q.     And, again, I just want to be clear, and

Paul Schwartz

1    I'm not sure I got a clear answer before.  Is it your

2    testimony today that he contacted you, that Mr. Varn

3    contacted you?

4         A.    I believe that was the case, yes.

5         Q.    Do you have any recollection that you

6    ever contacted Mr. Varn?

7         A.    No.

8         Q.    Where were you when you spoke to

9    Mr. Varn?

10        A.    In my office, which was the home address.

11        Q.    On your office phone?

12        A.    I believe so, yes.

13        Q.    What's your office phone number?

14        A.    (516) 374-6530.

15        Q.    Do you have a cell phone that you would

16   have had at the time that you spoke to Mr. Varn?

17        A.    At that time back, yeah, I believe.

18   (516) 902-9001.

19        Q.    For how long would you say that

20   conversation lasted?

21        A.    It was short.  I would say no more than a

22   few minutes.  He sort of seemed nervous, like he

23   shouldn't really be saying these things to me.

24        Q.    Would you say that the conversation

25   lasted less than ten minutes?

```
 1        A.    Yes.

 2        Q.    Definitely less than ten minutes?

 3        A.    I believe so.

 4        Q.    Less than five minutes?

 5        A.    I would say in the neighborhood of five

 6   minutes.

 7        Q.    Do you remember what time of day it was?

 8        A.    No.  It was during working hours,

 9   business hours.

10        Q.    But you can't recall whether it was in

11   the morning or afternoon?

12        A.    No.

13        Q.    And tell me again, as best you can,

14   exactly what it is that Mr. Varn said to you.  Rather

15   than a general description of the discussion, what can

16   you tell me?  If you don't remember everything, that's

17   fine, but exactly the words that he used?

18        A.    The words, to the best of my knowledge,

19   was that Systrans was going to grow into the tens of

20   millions of dollars and that this was an excellent way

21   for me to be able to get back the loan monies that I

22   made to Carr.

23        Q.    Did he explain to you how it was that

24   Systrans was going to grow?

25        A.    No.
```

Paul Schwartz                                        03/08/2007

Page 47

1        Q.    In or about 1996, when TC Transport was
2    sold to U.S. Delivery?
3        A.    Yes.  Just let me correct something.  It
4    gets difficult with all these different stages, but I
5    think at that time that was around 300,000, and that's
6    just a guess, I'm not really sure.  I believe I made
7    it in the neighborhood of about 300,000.
8        Q.    Could you repeat that again?  I didn't
9    understand what you said.
10       A.    I think at that time those loans were in
11   the neighborhood of $300,000.
12       Q.    Because some of them had been paid back?
13       A.    I'm confusing it against the later loans.
14   Not because they were paid back because I'm confusing
15   it with the loans that were made after he bought back
16   his company from U.S. Delivery.
17       Q.    So the original $500,000 loan or leases
18   that you provided to TC Transport, does any amount of
19   that remain due and owing to CAC Leasing today as we
20   sit here?
21       A.    No.
22       Q.    Your company has been paid completely for
23   that?
24       A.    The TC Transport leases, we were paid
25   completely by the company that acquired TC Transport,

Paul Schwartz                                                03/08/2007

Page 72

1    provide that revenue?

2         A.    He told me that there was a promise that

3    had been made that Iron Mountain would, over a period,

4    give them all of their courier business, which I

5    believe at the time was like 40 to $50 million per

6    annum.

7         Q.    So Larry Varn said to you that Iron

8    Mountain had made a promise to Mr. Carr?

9         A.    I can't remember the exact verbiage, but

10   he said to me that they were going to make tens of

11   millions of dollars, and this was an excellent way for

12   you to get back the money that's owed.  And then some.

13   And going on, he said something about they'll have a

14   very nice living, being derived from the growth of

15   Systrans.

16        Q.    I need to be clear, because it's

17   important.

18             If your testimony is that Mr. Varn had

19   indicated that Systrans would be successful or would

20   make money, there's a difference between that kind of

21   a statement and a statement that that business was

22   going to come from any particular source or by virtue

23   of any particular promise.

24             MR. SHAPIRO:  How many ways are you going

25        to ask this particular question?

Page 73

1         A.    The source was Iron Mountain.  The source

2    of the business that Systrans was getting was Iron

3    Mountain.

4         Q.    How do you know that?

5         A.    Systrans existed totally as a result of

6    Iron Mountain.

7         Q.    How do you know that the source of that

8    business was Iron Mountain?

9         A.    Well, I also was in the office, saw what

10   was going on, saw the contract, et cetera.  The

11   contract did not have the amount and that was one of

12   the reasons why I wanted to talk to Larry Varn.  Not

13   Larry Varn per se.  I wanted to talk to somebody that

14   was in a position of authority in Iron Mountain.

15        Q.    You said you reviewed a copy of the

16   contract between Systrans and Iron Mountain?

17        A.    Right.

18        Q.    And in that contract, did you see any

19   indication as to the amount of business that would be

20   provided to Systrans?

21        A.    No, I think I just answered that

22   question.  I did a cursory review.  I asked what's the

23   amount, and they explained because of circumstances,

24   that they could not put that in the agreement.  And

25   that's when I wanted to speak to somebody in

1     Iron Mountain make a promise to Tom Carr?

2          A.     Did I hear somebody in Iron Mountain, no.

3          Q.     Make a promise to Tom Carr?

4          A.     An employee or an attorney or something

5     along those lines make a promise to Tom Carr, is that

6     the question?

7          Q.     Yes.

8          A.     No.  My only interaction of substance

9     with Iron Mountain or a representative of Iron

10    Mountain, other than a few minor phone calls at the

11    beginning was with Larry Varn, and that was for the

12    purposes of assuring me that what Tom was telling me

13    was going to happen.  And if he didn't tell me it was

14    going to happen, I wouldn't have loaned him any more

15    money.  And as a result of that conversation, I agreed

16    to extend him that line.

17         Q.     And at that time, I believe you testified

18    that you were aware that there was a contract in place

19    between Iron Mountain and Systrans?

20         A.     I said there was a contract?  Say that

21    again, what was the question?

22         Q.     I believe you testified and I believe

23    it's true that a contract was in place at that time

24    between Iron Mountain and Systrans.

25         A.     Which became knowledgeable to me at the

# EXHIBIT G

Judith Carr

03/08/2007

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

-----------------------------------------x

IRON MOUNTAIN INCORPORATED;
IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.; C. RICHARD
REESE; JOHN F. KENNY, JR.;
GARRY B. WATZKE; LARRY L. VARN;
and CHARLES G. MOORE,

        Plaintiffs and
        Counterclaim Defendants,

                    Civil Action
     v.             No. 05 10890 RCL

THOMAS CARR,

        Defendant and
        Counterclaim Plaintiff.

-----------------------------------------x

IRON MOUNTAIN INFORMATION
MANAGEMENT, INC.

        Plaintiff,

                    Civil Action
     v.             No. 05 10999 RCL

SYSTRANS FREIGHT SYSTEMS, INC.,

        Defendant.

-----------------------------------------x

                March 8, 2007
                1:30 p.m.

     Deposition of JUDITH CARR, taken by Plaintiff,

pursuant to Notice, at the offices of Sullivan &

Worcester, LLP, 1290 Avenue of the Americas, New York,

New York, before Denise L. Daniels, a Shorthand

Reporter and Notary Public.

Judith Carr                                                    03/08/2007

Page 23

1     Between 9:30 and 11:00.

2          Q.     In the morning?

3          A.     Uh-huh.

4                 MR. SHAPIRO:  Is that a yes?

5          A.     Yes.

6          Q.     You testified that you have spoken to

7     John Kenny also; is that right?

8          A.     Yes.

9          Q.     And actually before we speak about

10    Mr. Kenny, did you ever speak to Mr. Hayden after

11    that?

12         A.     Never.

13         Q.     With respect to your conversation with

14    Mr. Kenny, when did that conversation take place?

15         A.     We were in San Diego, California on

16    vacation.

17         Q.     Do you remember what year?

18         A.     It was April of '02.

19         Q.     Did you know who Mr. Kenny was?

20         A.     I knew who Mr. Kenny was because my

21    husband was talking on the phone with Iron Mountain

22    our whole vacation, he was on his cell phone

23    constantly.  They were talking.  And my husband,

24    before Mr. Kenny called me said that Mr. Kenny from

25    Iron Mountain was going to call me because I did not

```
 1    want my husband to sign those papers that they were

 2    sending out to California.

 3         Q.    Why didn't you want your husband to sign?

 4               First of all, what was your understanding

 5    of the papers?

 6         A.    It was a lawsuit that they wanted us to

 7    initiate against Peter Pierce.

 8         Q.    Who is "us," when you say "us"?

 9         A.    We're a family, so I say us.  It was a

10    lawsuit they wanted my husband to sign.

11         Q.    When you say "they," who is "they"?

12         A.    Iron Mountain.

13         Q.    Anybody in particular at Iron Mountain?

14         A.    I have no idea.  My husband was talking

15    to everybody from Iron Mountain.  That wasn't my

16    concern.

17         Q.    So had your husband had conversations

18    with anyone at Iron Mountain on the day that you spoke

19    to Mr. Kenny?

20         A.    Yes.

21         Q.    How do you know that?

22         A.    Because I was in the room.  We were in a

23    hotel room with our children.  He was on the cell

24    phone with people from Iron Mountain.  And he told me,

25    "John Kenny is going to call you in a few minutes."
```

Judith Carr                                                    03/08/2007

1          Q.    And Mr. Kenny did call?

2          A.    Yes, he did.

3          Q.    He called your cell phone?

4          A.    Yes, he did.

5          Q.    Do you remember what your cell phone

6    number was at the time?

7          A.    I have no idea.  I've had 10 cell phone

8    numbers since then.

9          Q.    Do you remember who your cell phone

10   carrier was?

11         A.    I think it was Cingular at that point.

12         Q.    Do you remember your husband's cell phone

13   number at the time?

14         A.    No.

15         Q.    How long was your conversation with

16   Mr. Kenny?

17         A.    Another 15-minute conversation, I'd say,

18   quite a long time.

19         Q.    Aside from what you had heard from your

20   husband, you didn't know who John Kenny was?

21         A.    No.

22         Q.    What did Mr. Kenny say when he called

23   you?

24         A.    Mr. Kenny called and said, "Mrs. Carr, I

25   know that you were apprehensive again about your

Judith Carr                                                    03/08/2007

Page 26

1    husband signing these papers, but this is in your

2    family's best interest."  And he's the one who said,

3    "We're the U.S. Air Force.  We're not the Taliban,

4    that we're here to help you, that Peter is -- you know

5    what he's doing is wrong, and we're going to help your

6    family."

7           Q.    Did he say anything else?

8           A.    And I again reiterated I have a lot at

9    stake.  If my husband goes against Peter Pierce, Peter

10   will retaliate, and we could lose everything, and we

11   don't have the money for a battle, we need income

12   coming in.  We have loans through the company,

13   personally signed and, again, the coffee business is

14   what our goal is.  That's our goal.  We have nothing

15   to do.  I don't care if Peter -- I cared about Peter

16   with Sequedex because he was pulling money from our

17   company, but other than that, that's between you and

18   Peter, not me.

19          Q.    You told those things to Mr. Kenny?

20          A.    Uh-huh.

21                MR. SHAPIRO:  Is that a yes?

22          A.    Yes.

23          Q.    And what else, if anything, did Mr. Kenny

24   say?

25          A.    He told me that Peter would destroy my

Judith Carr                                                    03/08/2007

Page 27

```
 1   husband's company and we would have nothing anyway.

 2   And he promised that nothing in my life would change,

 3   that it could only get better if my husband joins this

 4   lawsuit.

 5          Q.    Did he make any other promises to you?

 6          A.    No, just his income, our benefits, the

 7   personal loans, the coffee company.

 8          Q.    What did he promise?  What else did he

 9   promise you?

10          A.    That's it.  Nothing in my life would

11   change, he said.  My life would only be better.

12               MR. SHAPIRO:  Were you asking about the

13          specifics of the items she listed?

14               MR. COLMEY:  No.

15          Q.    He promised you that nothing in your life

16   would change?

17          A.    He also asked me if I wanted them to rent

18   a Porsche for my husband and myself and they would pay

19   for the weekend.  I told them no thank you, we had our

20   four children and a babysitter with us, that it was a

21   family vacation.  I don't know, it was weird.

22          Q.    What else did he say to you?

23          A.    That was it, just the Porsche.  That was

24   really the odd thing.  He was promising, he was trying

25   to make me think he was our friend and I believed him.
```

Judith Carr                                          03/08/2007

 1    He was very, very nice.

 2            Q.    Did Mr. Kenny say anything else to you

 3    that you can remember in that conversation?

 4            A.    No, that was the basis of the whole

 5    conversation.

 6            Q.    Did you ever speak to Mr. Kenny again?

 7            A.    No.

 8            Q.    And you may have testified about this

 9    before, and I apologize if I'm asking again, but other

10    than Mr. Kenny and Mr. Hayden, do you recall ever

11    speaking with anybody else who purported to work at

12    Iron Mountain or who was connected to Iron Mountain in

13    any way?

14            A.    No.  If they called my house and I said,

15    hello and they asked for Tommy and I said, "He's not

16    home," they hung up and I didn't know who they were

17    maybe, but no conversations with anybody else.

18            Q.    Do you have any personal knowledge of any

19    promises that Iron Mountain or anyone acting on Iron

20    Mountain's behalf made to your husband?

21            A.    I have the knowledge of what they told

22    me, and if they spoke to me, who could not sign legal

23    documents that they wanted signed, of course they

24    spoke to my husband, I guess, and other people.  I

25    don't know.

Page 29

```
 1            Q.    Aside from your conversation that you had

 2     with Mr. Kenny and your conversation with Mr. Hayden,

 3     do you have direct personal knowledge that Iron

 4     Mountain ever promised to do anything for your

 5     husband?  I can clarify the question.

 6            A.    Clarify what you're trying to get at.

 7            Q.    I believe you testified that your husband

 8     has told you about certain meetings and things that

 9     were said to him by Iron Mountain, but I want to know

10     aside from things that you were told and that you

11     learned secondhand, do you have any personal knowledge

12     about any promises that were ever made to your husband

13     by Iron Mountain or anyone acting on behalf of Iron

14     Mountain?

15            A.    No.

16            Q.    Do you know whether any of the promises

17     that you learned of secondhand that were made to your

18     husband were in writing?

19            A.    Oh, you know what, nothing was in

20     writing.  That was my point with Mr. Kenny and

21     Mr. Hayden, too.  I wanted something in writing.  I

22     said there's nothing in writing, you can do whatever

23     you want.  That's my fear.  My husband said -- Tommy

24     had told me they won't put anything in writing, and

25     that's why I didn't want him to join the lawsuit.  I
```

Judith Carr

Page 39

1          they made to you?

2                    THE WITNESS:   Yes.

3          A.    When we were in California, he was on the

4    phone the whole weekend.  I heard my husband's side of

5    the conversation.

6          Q.    They made promises to you?

7          A.    Yes.

8          Q.    Are you a party to this lawsuit,

9    Mrs. Carr?

10         A.    No.

11         Q.    Do you remember whether, in fact, your

12   husband received any packages while you were on

13   vacation in California?

14         A.    Yes.

15         Q.    How many packages did he receive?

16         A.    It was one like FedEx size box with legal

17   documents in it.

18         Q.    Did you see what was in the package?

19         A.    Yes.

20         Q.    What was in the package?

21         A.    It was a letter that -- there was a cover

22   letter, and he had to sign, it said that he needed to

23   sign this and send it back, and it would be forwarded

24   to the attorneys and that it would go on to Art

25   Peslak.

Page 40

1          Q.    And you saw it?

2          A.    Yes, I did.

3          Q.    Did you read it?

4          A.    I didn't read the whole document, but I

5     looked at it quickly.

6          Q.    Do you remember what date that package

7     arrived?

8          A.    That was April 2nd.

9          Q.    Is that the same day that you had a

10    conversation with Mr. Kenny?

11         A.    Yes.

12         Q.    Has your husband or anyone else asked you

13    whether you would be willing to travel to Boston to

14    give testimony on Mr. Carr's behalf?

15         A.    No.

16         Q.    Would you be willing?

17         A.    Yes.

18         Q.    To come to Boston and give testimony?

19         A.    Yes.

20         Q.    Has all your testimony here today been

21    truthful?

22         A.    Yes.

23         Q.    Mrs. Carr, did you meet with anyone at

24    Patton Boggs in preparation for your deposition today?

25         A.    No.

# EXHIBIT H

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-10890 RCL

***************************************
IRON MOUNTAIN, INCORPORATED, et al.,  *
        Plaintiffs and                *
        Counter-Defendants,           *
                                      *
v.                                    *
                                      *
THOMAS CARR,                          *
        Defendant and                 *
        Counter-Plaintiff.            *
***************************************

                    DEPOSITION OF LARRY L. VARN, taken
pursuant to the applicable provisions of the Federal
Rules of Civil Procedure, before Michelle Kaczynski, a
Registered Professional Reporter and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of Block & Roos, LLP, 60 State Street, Suite
3800, Boston, Massachusetts, on Tuesday, September 19,
2006, at 9:43 a.m.

KACZYNSKI REPORTING
72 CHANDLER STREET, SUITE 3
BOSTON, MASSACHUSETTS  02116
(617) 426-6060

VARN-9/19/06

Page 55

1    remember, and that Carr had told him that Iron Mountain

2    had agreed with Carr to pay Carr's guaranty obligations

3    to Mr. Schwartz or his company, and I told him in no

4    uncertain terms that there were no agreements of that

5    type or any other agreements of which I was aware

6    between Carr and Iron Mountain, and he should look at

7    his own debtor/guarantor for whatever recovery he might

8    be looking for.  That was the one and only time I ever

9    heard from the guy.

10        Q.   Have you in the course of your involvement in

11   this case in which we are taking your deposition had an

12   opportunity to review an affidavit executed by

13   Mr. Schwartz?

14        A.   I think I saw it, I don't think I read it.

15        Q.   There is a version of a conversation between

16   you and Mr. Schwartz which describes the conversation

17   as one during which you advised Mr. Schwartz that Iron

18   Mountain is going to provide certain business

19   opportunities and income to Mr. Carr, and that

20   therefore Mr. Carr's creditworthiness, for want of a

21   better term, would be on the rise.  Now, my question

22   with that as background is this.  Is it your testimony

23   that no conversation resembling the description that

24   I've just given you occurred between you and

VARN-9/19/06

Page 56

1    Mr. Schwartz?

2        A.    That's correct.

3        Q.    Did you have a conversation at any time with

4    Mr. Peslak concerning your or Iron Mountain's or

5    Sullivan & Worcester's payment of more than fifty

6    thousand dollars of the fees and costs which Mr. Peslak

7    had incurred other than the subsequent conversation

8    you've already described?

9        A.    By subsequent conversation you're referring

10   to the one about his appearance in Philadelphia?

11       Q.    Yes.

12       A.    No, there was never any other, there was

13   never any other conversation in which that was

14   undertaken.  There was certainly a conversation or two

15   in which he was looking for more.

16       Q.    Have you had an opportunity to read

17   Mr. Peslak's affidavit as filed in these proceedings?

18       A.    I think I read it briefly some time back.

19       Q.    Do you recall how much money Mr. Peslak

20   discussed with you he was owed at or about the time of

21   the fifty thousand dollar payment which we've already

22   discussed?

23       A.    No.

24       Q.    Does it refresh your memory for me to tell

KACZYNSKI REPORTING

# EXHIBIT I

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

CARR MEETINGS

| Date | Admitted by Plaintiffs? | Type of Meeting | Location | City | Attendees | Subject of Discussion (Alleged by Carr) | Notes |
|---|---|---|---|---|---|---|---|
| 17-Oct-01 | Yes (in Rog response) | | Hilton | East Brunswick, NJ | Kenny, Watzke, Carr (Plaintiffs say Watzke, Miller, Varn, Carr, Peslak) | Carr's assistance with IM's claims against Pierce | confirmed in Peslak's records; Moore observed meeting from elsewhere at Hilton Hotel |
| 19-Oct-01 | No | telephone conf. | n/a | | Peslak, IM counsel | Pierce suit | from Peslak billing records |
| 24-Oct-01 | No | telephone conf. | n/a | | Peslak, IM counsel | Pierce suit | from Peslak billing records |
| Nov-01 | Yes (Watzke affidavit) | telephone conf. | n/a | | Watzke, Carr | Watzke: Carr wanted meeting with Reese and Vin Ryan | not alleged in FAC/SAC |
| 28-Nov-01 | Yes (Watzke affidavit) | telephone conf. | n/a | | Watzke, Carr | Watzke: Carr names A. Soto as having relevant info | not alleged in FAC/SAC |
| 10-Dec-01 | Yes (Varn affidavit; Reese testimony) | dinner meeting | Harvard Club | Boston | Reese, Watzke, Vincent Ryan, Carr | Carr's background, Pierce suit; coffee business investment | not alleged in FAC/SAC; Varn affidavit says "late December" |
| Jan-02 | Yes (Watzke affidavit) | telephone conf. | n/a | | Watzke, Carr | Watzke: set up meeting | not alleged in FAC/SAC |
| 31-Jan-02 | Yes (Varn affidavit) | | Peslak's office | Freehold, NJ | Watzke, Varn, Carr, Peslak | Varn: Carr's knowledge of Sequedex, Pierce's involvement with Sequedex, obtain documents | not alleged in FAC/SAC |
| Feb-02 | Yes (Reese testimony) | brief meeting | IM conference room | Boston | Reese, Kenny, Vin Ryan, Carr, Neebling | Pierce litigation; coffee business | not alleged in FAC/SAC |
| 7-Feb-02 | No | telephone conf. | n/a | | Watzke, Varn, Peslak | Pierce suit strategy | from Peslak billing records |
| 19/20-Feb-02 | Yes (Varn affidavit) | telephone conf. | n/a | | Varn, Peslak | Varn: Carr affidavit for Pierce action | not alleged in FAC/SAC |

4828750

CARR MEETINGS

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

| Date | Admitted by Plaintiffs? | Type of Meeting | Location | City | Attendees | Subject of Discussion (Alleged by Carr) | Notes |
|---|---|---|---|---|---|---|---|
| 25-Feb-02 | Yes (Varn affidavit) | | Waldorf-Astoria | NY | Kenny, Watzke, Varn, Carr, Tammi Phillips (Carr's bookkeeper) | Varn: Carr's knowledge of Sequedex, Pierce's involvement with Sequedex, other background, doing a "roll up" of companies in coffee warehousing industry; Carr asked Kenny about job at IM if Pierce fired Carr | not alleged in FAC/SAC |
| 13-Mar-02 | Yes (Watzke affidavit) | breakfast | Newark Airport Marriott | Newark, NJ | Kenny, Watzke, Carr, Neebling | Watzke: coffee warehousing business | not alleged in FAC/SAC |
| 13-Mar-02 | Yes (Watzke affidavit) | lunch | Casa Dante | Jersey City | Kenny, Watzke, Carr, Neebling, Doug Martocci (Continental Terminals), Ray Masucci (RPM) | Watzke: coffee warehousing business | not alleged in FAC/SAC |
| 19-Mar-02 | Yes | lunch | Casa Dante | Jersey City | Kenny, Watzke, Carr, Neebling, Peslak | funding of Carr's lawsuit, compensation | First Answer says March 13, Second Answer admits March 19 (confirmed by Peslak billing records) |
| 19-Mar-02 | Yes | | Newark Airport Hilton | Newark, NJ | Watzke, Varn, Carr, Neebling, Arturo Soto (former IM/TCT/Logisteq employee), John Lehmann (TCT/Logisteq dispatcher) | funding of Carr's lawsuit, compensation; (Varn: Carr's attempts to get Soto to make statements implicating Pierce with Sequedex) | details of meeting taken from Varn affidavit; Watzke affidavit says Newark Airport Marriott |

2

4828750

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

CARR MEETINGS

| Date | Admitted by Plaintiffs? | Type of Meeting | Location | City | Attendees | Subject of Discussion (Alleged by Carr) | Notes |
|---|---|---|---|---|---|---|---|
| 26-Mar-02 | Yes (Varn affidavit) | "brief unannounced stop" | S&W | Boston | Varn, William Matlack (S&W lawyer), Carr, Neebling | Varn: nothing of substance | not alleged in FAC/SAC |
| 26-Mar-02 | Yes | | IM HQ | Boston | Reese, Kenny, Watzke, Carr, Neebling | Carr's cooperation, buy-out of Pierce's share of Logisteq, hiring Carr as transportation consultant, guaranteed business revenues to Systrans; (Varn: coffee exchange warehousing) | |
| 28-Mar-02 | Yes (Varn affidavit) | telephone conf. | n/a | | Varn, Peslak | Varn: filing of IM's action against Pierce | not alleged in FAC/SAC |
| early Apr-02 | No | telephone conf. | n/a | | Kenny, Mrs. Carr | assurances of financial support | Carrs were on vacation in California at the time |
| 2-Apr-02 | Yes | telephone conf. | n/a | | Watzke, Carr, Peslak | Carr's firing by Pierce, IM hiring Carr as consultant, IM's payment of Carr's attorney fees | Second Answer mislabels this as 2-Apr-03; confirmed by Peslak's billing records |
| 4-Apr-02 | Yes (Varn affidavit) | telephone conf. | n/a | | Varn, Peslak | Varn: hearing on Carr's emergency motion for interim relief | not alleged in FAC/SAC; confirmed by Peslak's billing records |
| 8-Apr-02 | Yes (Varn affidavit) | telephone conf. | n/a | | Varn, Neebling | Varn: Pierce's disclosure of Carr's SDNY indictment | not alleged in FAC/SAC |

3

4828750

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

CARR MEETINGS

| Date | Admitted by Plaintiffs? | Type of Meeting | Location | City | Attendees | Subject of Discussion (Alleged by Carr) | Notes |
|---|---|---|---|---|---|---|---|
| 8-Apr-02 | Yes (Varn affidavit) | telephone conf. | n/a | | Varn, Peslak | Varn: Pierce's disclosure of Carr's SDNY indictment, Peslak's apology for not having told IM about this | not alleged in FAC/SAC; confirmed by Peslak billing records |
| 9-Apr-02 | Yes (Varn affidavit) | coffee | Corner Stone coffee shop | Freehold, NJ | Varn, Carr, Neebling, Peslak | Varn: upbraided Carr for not disclosing indictment, advised him not to tell Varn/IM anything further about it w/o counsel, Carr said "I only made one mistake" | not alleged in FAC/SAC; confirmed by Peslak billing records |
| 9-Apr-02 | Yes | dinner | Giambelli's | NY | Reese, Kenny, Varn, Carr, Neebling, Peslak | payment of Carr's legal expenses; (Varn: Reese scloded Carr about not disclosing indictment, Carr's protestations of innocence) | confirmed by Peslak billing records; SAC placed meeting at a private residence; Varn affidavit says April 10 |
| 10 or 11-Apr-02 | Yes (Varn affidavit) | | Peslak's office | Freehold, NJ | Varn, Moore, Carr, Peslak, Neebling | Varn: Carr played tapes with Pierce confirming Logisteq/Sequedex connection | Varn says day after Giambelli's dinner; not alleged in FAC/SAC; Varn/Moore not mentioned in Peslak billing records; Moore affidavit says April 11 |
| 22-23-Apr-02 | No | telephone conf. | n/a | | Varn, Peslak | Pierce settlement strategy | from Peslak billing records |
| 26-Apr-02 | No | telephone conf. | n/a | | Kenny, Watzke, Peslak | Continental deal | from Peslak billing records |

4

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

CARR MEETINGS

| Date | Admitted by Plaintiffs? | Type of Meeting | Location | City | Attendees | Subject of Discussion (Alleged by Carr) | Notes |
|------|------------------------|-----------------|----------|------|-----------|------------------------------------------|-------|
| 29-Apr-02 | No | telephone conf. | n/a | | Varn, Peslak | Pierce litigation | from Peslak billing records |
| 1-2-May-02 | No | telephone conf. | n/a | | Varn, Peslak | Pierce litigation | from Peslak billing records |
| 6-May-02 | No | telephone conf. | n/a | | Varn, Peslak | Pierce litigation | from Peslak billing records |
| 7/8-May-02 | Yes (Varn affidavit) | | Freehold Facility | Freehold, NJ | Varn, Carr, Neebling | Varn: repossession of truck trailers | not alleged in FAC/SAC |
| 9-May-02 | No | telephone conf. | n/a | | Varn, Neebling, Peslak | trailers | from Peslak billing records |
| 16-May-02 | Yes (Varn affidavit) | brief meeting | | Freehold, NJ | Varn, Carr | Varn: Carr concerned for family, wanted promise that Reese would take care of his family | not alleged in FAC/SAC |
| 21-May-02 | No | telephone conf. | n/a | | Watzke, Carr, Peslak | loan | from Peslak billing records |
| 22-May-02 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 29-May-02 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 31-May-02 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 10-Jun-02 | Yes (Varn affidavit) | drink/dinner meeting | Waldorf-Astoria | NY | Reese, Kenny, Varn, Carr, Neebling, Peslak | Varn: mostly social, Neebling's business proposals | not alleged in FAC/SAC; confirmed by Peslak billing records |
| 13-Jun-02 | No | telephone conf. | n/a | | Varn, Peslak | S&W subpoena | from Peslak billing records |

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

CARR MEETINGS

| Date | Admitted by Plaintiffs? | Type of Meeting | Location | City | Attendees | Subject of Discussion (Alleged by Carr) | Notes |
|---|---|---|---|---|---|---|---|
| Summer 2002 | Yes (Reese testimony) | dinner meeting | Dakota's | Boston | Reese, Kenny, Watzke, David Wendell (coffee investor), Vin Ryan, Neebling, Carr, Ray Massucci, Massucci's uncle (Joe Martocci) | coffee business | not alleged in FAC/SAC |
| 9-Jul-02 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 12-Jul-02 | No | telephone conf. | n/a | | Varn, Peslak | various issues | from Peslak billing records |
| 17-Jul-02 | Yes (Moore affidavit) | | Wilentz law firm | Woodbridge, NJ | Varn, Moore, Carr, Neebling, William Hetler; Carr telephoned in | Moore: Anchor Glass facility | not alleged in FAC/SAC |
| 18-Jul-02 | Yes (Moore affidavit) | | various | Suffern, NY and Freehold, NJ | Varn, Moore, Carr, Neebling, various individuals | assist Varn with evidence re Pierce case | not alleged in FAC/SAC |
| 19-Jul-02 | Yes (Varn affidavit) | lunch | Newark Airport Marriott | Newark, NJ | Varn, Moore, Samual Miller, Carr, Neebling | Varn: documents re interactions with Pierce | not alleged in FAC/SAC |
| 22-Jul-02 | No | telephone conf. | n/a | | Varn, Peslak, Carr | various issues | from Peslak billing records |
| 25-26-Jul-02 | No | telephone conf. | n/a | | Varn, Peslak | various issues | from Peslak billing records |
| 1-Aug-02 | Yes (Moore affidavit) | dinner | Filli Ponte | NY | Varn, Moore, Carr, Neebling, Vincent Brana | Moore: Brana's dealings with Pierce, Pierce's animosity toward IM | not alleged in FAC/SAC |
| 6-Aug-02 | Yes (Varn affidavit) | brief meeting | | Boston | Varn, Carr, Neebling | | not alleged in FAC/SAC |
| 7-Aug-02 | Yes (Varn affidavit) | | | Boston | IM officials, Ryan, others, Carr, Neebling | | not alleged in FAC/SAC |
| 27-Aug-02 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |

6

4828750

CARR MEETINGS

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

| Date | Admitted by Plaintiffs? | Type of Meeting | Location | City | Attendees | Subject of Discussion (Alleged by Carr) | Notes |
|---|---|---|---|---|---|---|---|
| 3-Sep-02 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 9-Sep-02 | Yes (Varn affidavit) | dinner | Casa Dante | Jersey City | Varn, S. Miller, Moore, Carr, Neebling, two Kansas City backers of Systrans | Varn: primarily social | not alleged in FAC/SAC |
| 1-Oct-02 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 14-Oct-02 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 18-Oct-02 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 25-Oct-02 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 30-Oct-02 | No | telephone conf. | n/a | | Varn, Peslak | Varn brief for arbitration | from Peslak billing records |
| 1-Nov-02 | No | telephone conf. | n/a | | Varn, Peslak | depo scheduling | from Peslak billing records |
| 13-Nov-02 | No | telephone conf. | n/a | | Varn, Peslak | Mike Gold depo | from Peslak billing records |
| 22-Nov-02 | No | telephone conf. | n/a | | Varn, Peslak | various issues | from Peslak billing records |
| 2-Dec-02 | No | telephone conf. | n/a | | Varn, Peslak | Logiteq bankruptcy petition | from Peslak billing records |
| 2-Dec-02 | Yes (Varn affidavit) | dinner | Chart House | Philadelphia | Varn, Moore, Beth Jacobson (S&W), Phil Paul (Moore associate), Carr, Neebling | Varn: primarily social, next day's depo in Pierce Pierce arbitration | not alleged in FAC/SAC |
| 20-Dec-02 | No | telephone conf. | n/a | | Varn, Peslak | document subpoena | from Peslak billing records |
| 30-Dec-02 | No | telephone conf. | n/a | | Varn, Peslak | depo scheduling | from Peslak billing records |
| 1/2-Jan-03 | Yes (Varn affidavit) | series of meetings | | New Jersey | Varn, Carr, several potential witnesses for Pierce arbitration | Varn: potential witness interviews | not alleged in FAC/SAC |

4828750

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

CARR MEETINGS

| Date | Admitted by Plaintiffs? | Type of Meeting | Location | City | Attendees | Subject of Discussion (Alleged by Carr) | Notes |
|---|---|---|---|---|---|---|---|
| 9-Jan-03 | No | telephone conf. | n/a | | Varn, Peslak, Carr | Pierce depo, other issues | from Peslak billing records |
| 22-Jan-03 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 29-Jan-03 | Yes (Varn affidavit) | dinner | Casa Dante | Jersey City | Varn, S. Miller, Moore, Carr, Neebling | Varn: potential witnesses, Carr made remark re Reese's promises, which Varn denied | not alleged in FAC/SAC |
| 5-Mar-03 | Yes (Varn affidavit) | dinner | Delmonico's | NY | Varn, S. Miller, Moore, Carr, Neebling, Peslak | Varn: primarily social | not alleged in FAC/SAC; not in Peslak billing records |
| 10-Mar-03 | Yes (Varn affidavit) | dinner | | New Jersey | Varn, Neebling | Varn: purely social | not alleged in FAC/SAC |
| 13-Mar-02 | Yes (Varn affidavit) | telephone conf. | n/a | | Varn, Paul Schwartz (CAC Leasing) | Varn: Schwartz said Carr told him to contact IM for payment, Varn refused | not alleged in FAC/SAC |
| 27-Mar-02 | No | telephone conf. | n/a | | Varn, Peslak | various issues | from Peslak billing records |
| 31-Mar-02 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 8-Apr-03 | Yes (Varn affidavit) | | Freehold Facility | Freehold, NJ | Varn, S. Miller, Moore, Neebling | Varn: inspection of abandoned trailer | not alleged in FAC/SAC |
| 10-Apr-03 | No | telephone conf. | n/a | | Varn, Peslak | document review | from Peslak billing records |
| 15-Apr-03 | Yes (Varn affidavit) | | Peslak's office | Freehold, NJ | Varn, Carr, Neebling, Peslak | Varn: review documents from abandoned trailer | not alleged in FAC/SAC; confirmed by Peslak billing records |
| 17-Apr-03 | Yes (Varn affidavit) | dinner | | Boston | Kenny, Varn, Neebling | | not alleged in FAC/SAC |
| 28-Apr-03 | No | meeting | Peslak's office | Freehold, NJ | Varn, S. Miller, Peslak | strategy | from Peslak billing records |

8

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

CARR MEETINGS

| Date | Admitted by Plaintiffs? | Type of Meeting | Location | City | Attendees | Subject of Discussion (Alleged by Carr) | Notes |
|---|---|---|---|---|---|---|---|
| April/May-03 | Yes (Varn affidavit) | series of meetings | | New Jersey | Varn, Neebling, Carr | | not alleged in FAC/SAC |
| 13-May-03 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 19-May-03 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 29-30-May-03 | No | telephone conf. | n/a | | Varn, Peslak | various issues | from Peslak billing records |
| 18-Jun-03 | No | telephone conf. | n/a | | Varn, Peslak | | from Peslak billing records |
| 26-Jun-03 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 30-Jun-03 | No | telephone conf. | n/a | | Varn, Peslak, Neebling, Gary Mason | case status | from Peslak billing records |
| 14-Jul-03 | No | telephone conf. | n/a | | Varn, Peslak, Neebling | | from Peslak billing records |
| 16-Jul-03 | Yes (not specific date) | telephone conf. | n/a | | Watzke, Peslak | payment of Peslak's invoices to Carr for litigation against Pierce | confirmed by Peslak billing records |
| Jul-03 | No | telephone conf. | n/a | | Moore, Carr | reiterating Watzke's assurances of payment | |
| 22-Jul-03 | No | telephone conf. | n/a | | Varn, Peslak, Doreen Davis | tape | from Peslak billing records |
| 23-Jul-03 | No | telephone conf. | n/a | | Varn, Peslak, Carr | tape issues | from Peslak billing records |
| 25-Jul-03 | No | telephone conf. | n/a | | Varn, Peslak | review of tapes | from Peslak billing records |
| 15-Aug-03 | No | telephone conf. | n/a | | Varn, Peslak | Tammi Phillips testimony at arbitration | from Peslak billing records |
| 26-Aug-03 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |

9

4828750

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

CARR MEETINGS

| Date | Admitted by Plaintiffs? | Type of Meeting | Location | City | Attendees | Subject of Discussion (Alleged by Carr) | Notes |
|---|---|---|---|---|---|---|---|
| 9-Sep-03 | Yes | dinner | Gallagher's | NY | Varn, Moore, Carr, Neebling | Varn promised Carr $2m to pay debts; (Varn: denies this) | Answers and Varn affidavit call this a "social dinner" |
| 25-Sep-03 | No | telephone conf. | n/a | | Varn, Peslak | Commerce Bank | from Peslak billing records |
| 2-Oct-03 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 7-Oct-03 | Yes (Moore affidavit) | telephone conf. | n/a | | Moore, Carr | Moore: Carr's concerns, willingness to help | not alleged in FAC/SAC |
| 27-Oct-03 | No | telephone conf. | n/a | | Varn, Peslak | case status | from Peslak billing records |
| 30-Oct-03 | Yes (Moore affidavit) | 3-hrs meeting | Metropolitan Café | Freehold, NJ | Moore, Carr, Bill Trump (PI) | Moore: Carr asking Moore to help him get money from IM | not alleged in FAC/SAC |
| 10-Dec-03 | Yes (Moore affidavit) | | Friday's restaurant | Marlboro, NJ | Moore, Carr | Moore: Carr's request for help from IM | not alleged in FAC/SAC |
| 9-Jan-04 | Yes (Moore affidavit) | telephone conf. | n/a | | Moore, Carr | Moore: told Carr not to come to closing argument of Pierce arbitration | not alleged in FAC/SAC |
| 5-Feb-04 | Yes (Varn affidavit) | | Seville Diner | New Brunswick, NJ | Varn, Moore, Neebling, Peslak | Varn: disappointing result in Pierce arbitration, finding that Carr was a "con man" | not alleged in FAC/SAC; confirmed by Peslak billing records |
| 6-Feb-04 | No | telephone conf. | n/a | | Varn, Peslak | arbitration decision | from Peslak billing records |
| 7-Feb-04 | Yes (Varn affidavit) | telephone conf. | n/a | | Varn, Carr | Varn: Carr's disappointment at result, offer to prove that TE-109 taped in NJ not PA | not alleged in FAC/SAC; Varn later told Moore about this meeting |

4828750

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

CARR MEETINGS

| Date | Admitted by Plaintiffs? | Type of Meeting | Location | City | Attendees | Subject of Discussion (Alleged by Carr) | Notes |
|---|---|---|---|---|---|---|---|
| 10-Feb-04 | No | telephone conf. | n/a | | Varn, Peslak | Peslak: Peslak should pressure Carr to allow Varn to listen to tape recording and to pay $10,000 if Carr wanted IM to pay remainder of legal fees | from Peslak letter to Reese of 2/13/04; confirmed by Peslak billing records |
| Feb-04 | Yes (Moore affidavit) | | Peslak's office | Freehold, NJ | Moore, Carr, Peslak | Moore: tape related to Pierce dispute | not alleged in FAC/SAC; not in Peslak billing records |
| 5-Apr-04 | Yes (Moore affidavit) | | Holiday Inn | Cranbury, NJ | Moore, Phil Paul, Carr | Moore: Carr's work with FBI | not alleged in FAC/SAC |
| 20-May-04 | Yes (Moore affidavit) | telephone conf. | n/a | | Moore, Carr | Moore: Carr's inquiry re IM's proposal re Systrans | not alleged in FAC/SAC |
| 21-Jul-04 | Yes (Moore affidavit) | meeting/lunch | Neebling's office | Bay Head, NJ | Moore, Varn, Neebling | Moore: Carr's pressure re loan to Systrans | not alleged in FAC/SAC |
| 17-Sep-04 | No | meeting | | | Moore, Peslak, Carr | | from Peslak billing records |
| 5-Oct-04 | Yes (Moore affidavit) | dinner | | New Brunswick, NJ | Moore, Varn, Neebling | Moore: Carr's interest in Systrans | not alleged in FAC/SAC; Moore says Neebling called Carr "delusional," "really crazy" |
| 6/7-Oct-04 | Yes (Moore affidavit) | telephone conf. | n/a | | Moore, Neebling | Moore: Neebling said Carr had switched banking to Wachovia to avoid creditors | not alleged in FAC/SAC |
| 31-Oct-04 | Yes (Varn affidavit) | telephone conf. | n/a | | Varn, Carr | Varn: "bizarre" call re claims against IM | not alleged in FAC/SAC |

4828750

PRIVILEGED AND CONFIDENTIAL
ATTORNEY WORK PRODUCT

CARR MEETINGS

| Date | Admitted by Plaintiffs? | Type of Meeting | Location | City | Attendees | Subject of Discussion (Alleged by Carr) | Notes |
|---|---|---|---|---|---|---|---|
| 2-Nov-04 | Yes (Moore affidavit) | dinner | Casa Dante | Jersey City | Moore, Varn, Neebling | Moore: Carr's further machinations | not alleged in FAC/SAC; Moore says Neebling called Carr "delusional," "crazy," "lives in his own world" |
| Fall 2004 | Yes (Moore affidavit) | telephone conf. | n/a | | Moore, Carr | Moore: Carr threatened Moore with tape | not alleged in FAC/SAC |
| 23-Feb-05 | Yes | | IM's HQ? | Boston | Varn, Watzke, Peslak | Carr's assistance in ongoing dispute with Pierce, Carr's claims | not in Peslak billing records |
| 19-Apr-05 | Yes | telephone conf. | n/a | | Watzke, Peslak | requesting meeting with Varn | not in Peslak billing records |
| Fall 2003 - Spring 2005 | Yes | various communications | n/a | | "certain Plaintiffs," Carr, Neebling, Peslak | Varn: Carr's erratic, inconsistent, disturbing, "at times threatening" phone calls and voice mails; Neebling saying "Tommy's crazy," "Tommy is delusional," Tommy lives in his own world" | |

12