# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED;<br>IRON MOUNTAIN INFORMATION<br>MANAGEMENT, INC.; C. RICHARD<br>REESE; JOHN F. KENNY, JR.;<br>GARRY B. WATZKE; LARRY L. VARN;<br>and CHARLES G. MOORE,<br><br>      Plaintiffs and<br>      Counterclaim Defendants,<br><br>      v.<br><br>THOMAS CARR,<br><br>      Defendant and<br>      Counterclaim-Plaintiff. | CIVIL ACTION<br>NO. 05 10890 RCL |
| IRON MOUNTAIN INFORMATION<br>MANAGEMENT, INC.<br><br>      Plaintiff,<br><br>      v.<br><br>SYSTRANS FREIGHT SYSTEMS, INC.,<br><br>      Defendant | CIVIL ACTION<br>NO. 05 10999 RCL |

## AFFIDAVIT OF JAMES NEEBLING

I, James Neebling, do hereby swear and affirm under the penalties of perjury that I am

over the age of 18 years, that the following information is based on my personal knowledge and

is both true and correct, and that I am competent to so testify.

1.    I am the principal owner of Systrans Freight Systems, Inc. ("Systrans"), the

Defendant in one of the above-captioned cases.

2.      I am also a friend and associate of Thomas Carr, the Defendant in the other above-captioned case.

3.      I reaffirm the truth of my previous declaration in these proceedings, filed October 26, 2005 (and a true and correct copy of which is attached hereto as Exhibit A).

**The Plaintiffs' Promises to Carr and to Systrans**

4.      The original promises made in my presence to Carr were made by John Kenny, Iron Mountain's CFO, and Garry Watzke, Iron Mountain's General Counsel, at the restaurant Casa Dante in Jersey City, NJ on March 19, 2002.  The Iron Mountain executives arranged this meeting to convince Carr to join the Iron Mountain effort against Pierce.  Watzke explained "how wrong Pierce was" while Kenny courted Carr.  Kenny made specific promises to Carr that Iron  Mountain would "make it worth [Carr's] while" by hiring him as a consultant, giving him warehouse space, helping him legally, and participating in a "roll-up" in the coffee storage business that would provide him with a nice profit.  Kenny went on to set up a meeting in Boston with Vin Ryan of Schooner Capital to formulate a financial strategy.  Kenny had numerous meetings, circulating documents and engaging in financial analysis with representatives of RPM and Continental Terminals (the two largest coffee storage companies).

5.      Watzke and Kenny also agreed to speak to Richard Reese, Iron Mountain's CEO, to assist Carr with the repurchase of 51% of Carr's company from Pierce.  Iron Mountain would back Tom in this venture in return for his cooperation and assistance with the Pierce litigation.

6.      I also accompanied Carr to a meeting at Iron Mountain's headquarters in Boston on March 26, 2002 with Kenny, Watzke, and Reese.  All three Iron Mountain officials wanted us

to join them in their case against Pierce. Reese and Kenny openly discussed how they could make Carr's cooperation "worth [his] assisting Iron Mountain." Reese specifically said he would loan Carr $5 million to buy his 51% back from Pierce. Reese also promised that Iron Mountain would provide Systrans with $45 million in annual business. Carr voiced his concerns that he could wind up in the middle between two powerful parties, Pierce and Iron Mountain. Kenny and Reese promised Carr employment, consulting fees, and legal fees to cover this possibility.

7.     Richard Reese learned about Carr's federal indictments before our April 9, 2002 meeting at Giambelli's restaurant in New York. At this dinner meeting, Reese told Carr how disappointed he was, but decided to expand his and Iron Mountain's relationship with Carr and Systrans by using the information and evidence Carr and I could provide. He also promised to pay Art Peslak $50,000 as an advance on Carr's legal expenses, which the Plaintiffs had promised to cover. Reese appeared to be willing to do anything to defeat Pierce.

8.     Reese and Kenny next assembled a meeting at the Dakota Steak House in Boston. This dinner included David Wendall (former Iron Mountain president), Ryan, and Watzke to further explain Iron Mountain's interest in backing Carr. All senior executives continued to assure Carr that they would assist him financially if he assisted them against Pierce.

9.     On June 10, 2002 at the Waldorf-Astoria, Carr and I met again with Kenny and Reese, as well as Varn, where the Iron Mountain representatives presented the opportunity for a "win-win" for Carr and myself. I had previously discussed the possibility of providing Iron Mountain with courier services. I remember that Reese asked Kenny, "How much do we spend on outside couriers?" and Kenny confirmed that Iron Mountain spent about $40-45 million per

year.  Reese explained that the company "preferred deliveries with company drivers and company vans" but spends "a lot of money on outside couriers," which was "the most uncontrolled area of our business."  He concluded that the opportunity for Carr and Systrans to service this business "will benefit Iron Mountain, and allow [me/Systrans] and Tom to make a substantial amount of money."

10.    After this meeting, most of the Plaintiffs' communications with Systrans and Carr came from Reese through Varn.  Varn told me on multiple occasions that we were not to contact Iron Mountain executives, and that he instructed the Iron Mountain executives not to speak directly to Carr or me.  Varn explained that this was to protect our relationship from the Pierce legal team, so they could not charge our testimony as biased.  Varn specifically reminded everyone that "all communications must be filtered."  For example, Varn handled my requests for cash advances for Systrans directly with Reese.

11.    Nevertheless, both Carr and I wrote letters to Reese to remind him of the promises made by him.  I sent my letter via Varn, while Carr sent his directly to Reese.  In response, Reese assigned a team to assist Systrans with undertaking Iron Mountain's business.  The team included Walter Caudill, Robert Reynolds, Chris Neefus, and Bob Miller.  Each of these individuals told me on various occasions that Systrans would handle Iron Mountain's entire nationwide outside courier business.

12.    This understanding was reinforced when the team had serious concerns about Systrans's technological capacity; Reynolds, Caudill, and Neefus outlined a yearly "order count" and determined that Systrans would need a technology that would handle a larger volume of

orders with adequate speed. Systrans then purchased a large technology system from a now-defunct Canadian company. Reese advanced Systrans $105,000 to acquire the system. Reese, Varn, and Watzke were all aware that Carr spent several hundred thousand dollars to set up the technology to service Iron Mountain's national program.

13.    Reese provided multiple rounds of "cash advances" to Systrans to assist with the business capitalization. The Plaintiffs carefully orchestrated this financing so to not alert the Pierce legal team to the extent of the relationship among Systrans, Carr, and the Plaintiffs.

14.    The Plaintiffs had over 120 meetings (counting phone calls) with Carr, me, or both of us, or with Peslak acting as Carr's representative, relating to the promises that are the heart of this lawsuit. Using the various pleadings, filings and evidence produced in discovery, Carr's and Systrans's counsel Ilya Shapiro compiled a chart summarizing many of these meetings (a true and correct copy of which is attached as Exhibit I to the Shapiro Declaration). I relied on this chart to refresh my memory in preparing for my deposition and continue to attest to its accuracy insofar as meetings I attended are concerned. This chart does not include the hundreds of emails the parties exchanged. Nor does it include the 46 meetings between Iron Mountain and Systrans that resulted in the "Systrans Contract" as defined by the Plaintiffs.

15.    From the beginning of our relationship, the Plaintiffs courted both Carr and me, making promises that influenced our decisions and financial security for over three years. Carr and I were the "go to guys" for contacts and information relating to the Pierce litigation. We attended many dinners, lunches, and business meetings all focusing on a mutually beneficial relationship among Iron Mountain, Carr, and Systrans.

16.    The Plaintiffs methodically collected and compiled information, affidavits, and evidence to be used against Pierce, including that which Carr and I provided and procured. Upon losing their arbitration, the Plaintiffs methodically turned on Carr. The same people who protected us, gave us legal representation, and financed our Systrans venture, now tried to squeeze Carr and Systrans out of our oral agreement with them.

17.    Moore, under instructions from Varn, researched Carr's vehicle registrations and marital issues, and even called the FBI to attempt to interfere with Carr's cooperation agreement. Varn and Moore on multiple occasions demanded to see Carr's "Proffer Agreement." Carr delayed and Varn had Moore call me and say that Reese "has been patient enough, and Larry wants to see the Proffer Agreement or this is not going to be favorable for the relationship." I pressured Carr until he gave the copy to Varn. Varn and Moore then contacted Commerce Bank and supplied information for the bank to collect on Carr's personal guarantee of a loan he signed the company Peirce had wasted.

18.    I can testify to other examples of how the Plaintiffs tried to destroy Carr financially and morally after they lost the Pierce arbitration.

19.    The relationship Carr and I had with the Reese, Kenny, and Varn was filled with continuous promises for business, funding, intermediate financing, consulting/employment, and legal representation until Iron Mountain had Carr and Systrans in a vulnerable position. The Plaintiffs were always accepting his evidence, quick to request additional information, and happy to call upon Carr and me to assist in the Pierce case. They always would advance Systrans money, and ask us to trust that they appreciate our efforts and would reward us with the business.

4897072                                              6

20.     After all of Carr's meetings, phone calls, and correspondence with various of the Plaintiffs, none of the Plaintiffs ever communicated to Carr that he was misunderstanding the agreement they had or that he did not have to assist them because they had no intention of honoring their commitments. The first negative response came when the arbitration was lost and the appeal strategy determined that Carr was of no further use to Iron Mountain.

**Larry Varn's Role**

21.     Larry Varn made many promises to Carr and me, both personally and as an agent of Iron Mountain or Reese. He used us to contact and interview potential witnesses, collect data and evidence, procure affidavits, and attempt to use tapes that Carr recorded of Pierce. Varn had Moore assist in investigations, surveillance, and interviews to prepare for the Pierce arbitration.

22.     Varn reported directly to Reese and bragged about his close relationship with Reese. He often commented that he was in control and wanted us to follow his direction. We were not to contact Iron Mountain executives but were to report daily on any Pierce-related correspondence or events. Varn gave us weekly instructions and would share his strategy and often the reasons behind this strategy.

23.     For most of the time I have known Varn I trusted him and thought he would protect me financially and try to preserve our mutually beneficial relationship. He consistently provided me with legal advice as it related to Pierce's case against Systrans. I wanted to settle that case but Varn told me not to do so because he wanted as much activity between the parties as possible—and explained to my attorneys in New Jersey and Florida these coordinated efforts. At his instruction, I coped and forwarded any documentation I received from Pierce.

24.    Varn also assisted me in communicating with Reese.  Varn had Reese approve Iron Mountain's payment of Carr's legal fees with Art Peslak.  Varn specifically told me that he was billing Iron Mountain and his firm was paying Peslak in order to "distance" Iron Mountain from Carr.  I heard Varn in multiple conversations with Art Peslak coordinate the filing of Carr's suit against Pierce.

25.    Varn always assisted me as I pushed to increase Systrans's business with Iron Mountain, though he always wanted to keep the relationship "under the radar" because of the Pierce litigation.

26.    Varn was aware that, while Carr had no equitable interest in Systrans, Carr and I had an escrow agreement as collateral against the money Carr invested in Systrans.  Varn was aware of Carr's investment, and at one point insisted that Carr and I sign an affidavit that he prepared, a true and correct copy of which is attached hereto as Exhibit B, stating that "Tom had no interest in Systrans."  He told me he carefully worded the document so it was not a false statement, but that Reese required the document to enable Iron Mountain to comply with Sarbanes-Oxley.

27.    This affidavit reminded me of how Varn coached Carr before he testified at the Pierce arbitration, telling him to split hairs and make statements that were both technically accurate from a legal standpoint and completely misleading in what they meant.  For example, when Carr testified that he had never been offered anything by Iron Mountain in exchange for his testimony and other services, he could say no because the promises technically could come from any number of Iron Mountain's affiliates, rather than the parent company.

28.     As another example of Varn's coaching, Carr could truthfully say that the Plaintiffs did not promise him a "job" because what they offered could plausibly be described as a "consulting" position. This was just a matter of labels; the Plaintiffs were always offering Carr at-will employment under the same terms as he had with Pierce when negotiations began.

29.     Varn constantly made promises to Carr about financial compensation for his efforts and what the value of eliminating Pierce's new company was to Iron Mountain. Carr was very nervous and constantly asked Varn for financial relief and assistance with his company's creditors. Varn would always advise Carr along the lines that "Richard is aware of your efforts, but we must wait until the litigation is over."

30.     Varn would be furious every time Carr tried to communicate with Reese, Kenny, or Watzke about their original commitments to him. I once received a call from an irate Varn telling me to control Carr. Varn wanted Carr's tapes to be admissible in the Pierce arbitration and would pacify Carr with new promises that Iron Mountain would honor those commitments if he allowed Varn to review the tapes.

31.     One of the last meetings Carr and I had with any of the Plaintiffs occurred on September 9, 2003, when we met with Varn and Charlie Moore at Gallagher's Steakhouse in New York. I was upset with Varn and Iron Mountain for not fulfilling their promises to Carr and me, and demanded some answers. Varn told us that Watzke would work out some kind of arrangement to send Systrans the $2 million Iron Mountain had earlier promised Carr, and I would pass that money to Carr, to cover the debt he incurred when Pierce wasted his company.

32.    Varn asked me to be creative in thinking about how Iron Mountain would be able to pass this money onto Carr, without Pierce and his legal team attacking. I suggested that Iron Mountain buy Systrans, allowing Carr to get his money and me to run the company. Varn liked the idea and then had Watzke call Peslak to see how Iron Mountain could structure the deal. Again the deal never happened and we were asked to be patient until after the arbitration.

## Systrans's Relationship with Iron Mountain

33.    Systrans began its relationship with Iron Mountain by investigating the Baltimore/Washington market. I discovered drivers with revoked drivers licenses and DUI convictions, owner operators without commercial insurance, and rates that were not in line with competitive rates for that market. I designed and implemented a program to eliminate these deficiencies and improve Iron Mountain's performance in this market. Iron Mountain was impressed and decided to roll out Systrans's program across the country.

34.    The Systrans program established competitive rates, eliminated local decision making, automated the manual process, increased insurance levels, established US DOT compliance, and increased security. I tailored the program to Iron Mountain's needs, and its key was Iron Mountain's promised large volume; Systrans required $50,000 weekly business to break even. I personally requested, pleaded, and begged for the promised volume.

35.    I corresponded with Iron Mountain on about 25 occasions, explaining Systrans's desperate need for volume. Every time I would ask, the Plaintiffs would say that the New York, New Jersey, Pennsylvania markets were "too close to the Pierce camp," so they could not do anything "until the litigation is over," and other such excuses. I sent Iron Mountain spreadsheets

with the sales data, the revenue shortfall, and requests for assistance with the program, but Miller could not increase revenues to Systrans because Reese and Varn did not approve.

36.    One of the consequences of Iron Mountain's foot-dragging was that the vendors were getting later payments. The vendors were behind because of the revenue deficiency of over $300,000. Systrans remained a solution to achieve the security, DOT compliance, rate reduction, and automation that the test market results showed. Nevertheless, at the end of our relationship, Iron Mountain blamed Systrans for poor service.

37.    After Iron Mountain lost the arbitration against Pierce, I presented a "buyout" offer to Varn, who presented it to Reese. Varn and Reese decided not to end their relationship with Systrans because the appeal was pending. I explained that Iron Mountain could recoup the money it had advanced Systrans by contracting with the couriers at a wholesale rate. Iron Mountain declined to take my offer, but summoned me to a dinner at Sparks Steak House in New York City. At the dinner, Miller delivered the message from Reese that Iron Mountain would loan Systrans additional money, assign a new senior manager to Systrans, and send out a communication to the field management relating to the company's commitment to Systrans.

38.    I only accepted this last advance to Systrans because Iron Mountain promised to give Systrans additional business. Unfortunately, the business never increased and, just as Systrans's payments to Iron Mountain were to resume, the amount of business declined further.

39.    Systrans began paying off its debt to Iron Mountain as soon as it began receiving Iron Mountain's business, meager as it was. That is, as both parties agreed, I deducted a portion of Iron Mountain's loan/advances to Systrans on each invoice Systrans sent to Iron Mountain.

Iron Mountain and Systrans agreed to waive payments the last four months of 2004, but weekly payments resumed in 2005 under the agreed plan. Systrans never stopped making payments on its debt until Iron Mountain ended the business relationship by filing this lawsuit. At that time, Iron Mountain's business represented almost all (about 98%) of Systrans's business. Systrans is no longer a going concern and has no assets other than accounts receivable from Iron Mountain.

40.    I always attempted to hold the Systrans-Iron Mountain relationship, including the Systrans Contract, separate from Iron Mountain's relationship with Carr (including the promises to compensate Carr by giving additional business to Systrans). I was disappointed that Iron Mountain decided to sue Systrans when it sued Carr. At the time Iron Mountain filed its suit against Systrans, Systrans owed Iron Mountain about $150,000 (the remainder of several advances and overcharges, minus the above-mentioned payments/deductions Systrans had made). At the same time, Iron Mountain owed Systrans $49,034 in delivery charges.

*          *          *

41.    I have been in the courier, delivery, and trucking business for over 20 years. Systrans is but one of the more recent companies in that field which I have owned, managed, or with which I have been involved otherwise. Based on Systrans's business model and financial history previous to its involvement with Iron Mountain—as well as presentations I made to the Plaintiffs, true and correct copies of which are attached hereto as Exhibits C and D[1]—Systrans's gross margin was 25%. As in all non-asset-based delivery/trucking companies, Systrans's net profit margin was 10-12%. (Asset-backed companies have a margin of 5-7%.) Systrans's

---

[1] Exhibit C, titled "Business Relationship Review: Iron Mountain," is also Neebling Depo Exhibit 5. Exhibit D, titled "Systrans Proposal for : Iron Mountain" is also (part of) Neebling Depo Exhibit 9.

annual profits from Iron Mountain's business would thus have been $2.5-3.0 million on revenues of $25 million and $4.5-5.4 million on revenues of $45 million.

42.    Carr loaned Systrans a total of $657,890, as the Plaintiffs are aware from my email correspondence with Iron Mountain executives, true and correct copies of which are attached as Exhibit E. Because of this investment, Carr and I had an understanding—which was never set in writing—that he would receive half of Systrans's profits, as well as an escrow agreement to secure his debt. In other words, I provided most of the management and operational expertise, and he provided most of the financing.

43.    Reese made the decision to do business with Systrans, as well as the decision to engage Carr to assist with the Pierce case. Varn supported and pushed both decisions. Reese and Varn instructed Watzke, Kenny, and Miller to provide Systrans and Carr with business and cash advances, and eventually decided that Carr was of no value to the Pierce litigation.

I declare under the penalty of perjury that the foregoing information is true and correct to the best of my recollection.

Executed July 7, 2007

James Neebling

Sworn and subscribed before me
by James Neebling this 7 day of
July, 2007.

Notary Public   # 352378

JOHN V. ESPINOSA
NOTARY PUBLIC
COMMISSION
EXPIRES
APRIL 30, 2008
COMMONWEALTH OF VIRGINIA

<u>Certificate of Service</u>

I certify that on this 10th day of July, 2007, I caused this document to be served on the

counsel identified by e-mail, first-class mail, and through the ECF system.

Ira K. Gross (BO #12720)
Kevin M. Colmey (admitted *pro hac vice*)
SULLIVAN & WORCESTER LLP
One Post Office Square
Boston, MA 02109
(617) 338-2800


/s/ Ilya Shapiro
Ilya Shapiro

# EXHIBIT A

# UNITED STATES DISTRICT COURT

## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; et al.<br><br>Plaintiffs,<br><br>v.<br><br>THOMAS CARR,<br><br>Defendant<br><br>And<br><br>THOMAS CARR,<br><br>Counter-Plaintiff<br><br>v.<br><br>IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; AND CHARLES G. MOORE,<br><br>Counter-Defendants | Civil Action No.<br><br>05 10890 RCL |

## DECLARATION OF JAMES NEEBLING

I, James Neebling, upon personal knowledge and observation, hereby affirm as follows:

1.    I am a resident of the State of New Jersey and am over the age of 18 and if called to testify I would be prepared to testify to the following information based upon my own personal knowledge.

1

3878832v1

2.     I am the principal owner of Systrans Freight Systems, Inc., which was sued by Iron Mountain on May 13, 2005, in this Court in an action styled: *Iron Mountain Information Management Inc. u Systrans Freight System, Inc.*, Civil Action # 05cv10999 MLW (the "Systrans case"). Like Mr. Carr in this Action, I filed counterclaims against Iron Mountain and I have joined Mr. Carr, both before Your Honor and before Judge Wolf, in moving the Court to consolidate the Systrans case with this matter.

3.     I was present at most if not all of the meetings that are set forth in Carr's counterclaim in this Action as well those counterclaims I filed against Iron Mountain in the Systrans case

4.     In addition, I personally was a party to several communications with the counter-Defendants in this Action pertaining to the promises at issue in this case as well as those same promises that are implicated in the Systrans case.

5.     Specifically, in connection with this case, the counter-defendants sought and received both Carr's and my cooperation in assisting Iron Mountain's litigation team prepare Iron Mountain's lawsuit against Peter Pierce ("Pierce") in exchange for the promises outlined in the respective counterclaims in this and the Systrans case.

6.     Larry Varn ("Varn"), a senior partner at the firm of Sullivan & Worcester, led the litigation efforts against Pierce including the litigation team staffed with lawyers from S&W and the law firm Morgan Lewis.

7.     Also part of Varn's litigation team was a private investigator hired by S&W, Charlie Moore ("Morre"). As explained to me by Varn, Moore was tasked primarily with "digging up as

much dirt on Pierce as possible" and Varn and Moore specifically sought my assistance in this regard.

8.    In connection with those efforts, Varn approached both Carr and myself soliciting our assistance to aid his litigation team prepare Iron Mountain's case against Pierce.

9.    Beginning in August 2001, Carr and I were first approached by senior executives at Iron Mountain to participate in a series of meetings to discuss what assistance Carr and I could provide Iron Mountain and its litigation team in its legal actions against Pierce. Those executives were: Gary Watzke, general counsel for Iron Mountain; John Kenny, chief financial officer for Iron Mountain; and Iron Mountain's CEO Richard Reese.

10.    As set forth in both Carr's and Systran's respective counterclaims, throughout these meetings the above-named counter-Defendants made a series of promises to both Carr and myself amounting to millions of dollars in cash and contracts for Carr and Systrans.

11.    In addition to the above-referenced meetings, S&W's litigation team initiated or participated in literally hundreds of communications (electronic mail, telephone, and in person meetings) with Carr and myself over the years to which Iron Mountain was not privy.

12.    In particular, Varn expressed to Carr and me that he was concerned that we were having too much direct contact with Gary Watzke and he further directed us instead to use Moore as conduit for communicating with Iron Mountain. Moore and Varn told me that Moore was hired by S&W and not by Iron Mountain.

13.    During these communications with Moore, Moore personally promised both Carr and me that funds would be paid to Carr and that Systrans would receive significant contracts in

3878832v1

3

exchange for our continued assistance in helping S&W's litigation team prepare Iron Mountain's case.

14.    In addition to the meetings described above, Varn also met separately with Carr and me on several occasions in which he reaffirmed that we would be compensated for our efforts in assisting with S&W's investigation of Pierce.

15.    Also present at many of these meetings was another S&W attorney, Samuel Miller ("Miller"). Miller was a key participant in S&W's preparation of Iron Mountain's case and would contact me regularly regarding my efforts to advance the investigation of Pierce. Miller's name appears on pleadings S&W filed in support of their representation of Iron Mountain against Pierce. Miller attended at least one dinner in New York that included, at least, Varn, Carr, and myself. It became my understanding over the years that Miller worked closely with Varn and seemed in my judgment to be fully apprised of the communications and promises that that Varn had with Carr and me.

16.    In one meeting at a restaurant in New York that included Varn, Carr, myself and Arthur Peslak ("Peslak"), an attorney for Carr, Varn promised to Carr and me that S&W would pay at least $50,000.00 of legal fees to Peslak for legal fees and expenses owed by Carr and me. Peslak, Carr, Varn, and Moore all told me that S&W did in fact pay Peslak $50,000 in partial fulfillment of Varn's promise.

17.    During the time in which Carr and I were assisting with S&W's investigation of Pierce, we had complete access to all aspects of the Pierce litigation, including confidential information, and we were routinely asked for our input and advice regarding this information. At no point did Varn, Miller, Moore, attorneys for Morgan Lewis, or anyone from S&W ask me to sign a

4

confidentiality or non-disclosure agreement. I believe that all of those people (Varn, Miller, Moore, attorneys for Morgan Lewis, and S&W) knew that I was being provided with confidential proprietary business information that I would otherwise not be able to access.

18.    For example, Varn sent me Pierce's motion for summary judgment to review. In a separate email, Varn later sent me Iron Mountain's draft opposition to Pierce's motion for summary judgment along with eight attachments. Varn specifically instructed me to review the attachments to Iron Mountain's opposition that included documents produced that were clearly marked confidential and provided by third parties to the dispute. Varn also provided to me other confidential information to which non-parties to the Pierce litigation were not supposed to be privy to. This information contained proprietary business information pertaining to a third party to the suit. Systrans is in the freight and trucking business and the confidential information that Varn told me to review pertained to the confidential financing of another trucking business called, Sequedex. There is no possible way that I would have been privy to Sequedex's efforts to raise capital, the identity of the people from who the company was seeking the capital, without Varn's provision of this information to me.

19.    As I understood it, the purpose in providing these documents to Carr and me was to educate us as to S&W's strategy and theories concerning the Pierce case in furtherance of our continued efforts to assist them in it.

20.    In addition, Varn and Miller contacted Peslak and me concerning a deposition of a significant witness in the Pierce case to ask us for assistance in preparing questions for that deposition. While this may seem strange for two lawyers to contact me, a non-layer and non-party, this was the type of communication that I routinely received from S&W.

3878832v1                                        5

I declare under the penalty of perjury 28 USC § 1746 that the foregoing information is true and correct to the best of my recollection.

7/15/05
Date

James Neebling

3578832v1

# EXHIBIT B

Mar-17-05  04:48pm    From-PATTON BOGGS LLP                    20245763154440        T-174  P.03/03  F-831

## AFFIDAVIT OF THOMAS CARR AND JAMES NEEBLING

We, Thomas Carr and James Neebling, hereby individually swear and affirm under the penalties of perjury that the following information is based on our individual personal knowledge, that we are each competent to so testify, and that the following information is both true and correct.

Each of us is over the age of eighteen years.

Systrans Freight Systems, Inc. was formed by the undersigned James Neebling in anticipation of a commercial relationship with Iron Mountain. Systrans Freight Systems, Inc. is owned one hundred percent (100%) by James Neebling.

The undersigned Thomas Carr has no interest in Systrans Freight Systems, Inc., ownership or otherwise, or any interest in any other entity, ownership or otherwise, which is in any way involved with Systrans Freight Systems, Inc.

The undersigned Thomas Carr has no involvement whatsoever in the administration and/or operations of Systrans Freight Systems, Inc.

DATE: 3-17-05

_____                    _____
Witness                                    Thomas Carr

DATE: _____

_____                    _____
Witness                                    James Neebling

03/17/2005 THU 15:10 [TX/RX NO 6986] @002

IMP04340

# EXHIBIT C

82

Systrans Freight Systems, Inc.

Business Relationship Review: Iron Mountain

<u>Highly Confidential</u>

The Systrans Courier program is in place in the following markets:
- Maine
- Boston
- New Hampshire
- Connecticut
- Baltimore/Washington, DC
- Virginia
- Dallas
- Houston
- Minneapolis
- Kansas City
- Tulsa

Systrans is being installed in Chicago as a "pass through" cost model per request of Bob Miller.

The current revenue is 45-50 k per week.

The current yearly revenue is about 2.5 million without Chicago.

Systrans applies a 25% markup. This markup falls 25% lower then original Iron Mountain pricing. The Systrans fees total 12-14,000 per week.

Systrans yearly fees at current sales levels without Chicago are
$ 650,000 to $728,000

\

**SYS0105**

<u>Systrans Added Value</u>:
- Insurance levels
- Pricing competition based on market
- Compliance
- Service level monitoring
- Risk and exposure

<u>Current Critical Issues</u>:

Based on a business review meeting on March 30th with Bob Miller, the following were a list of critical issues:

1. System reporting capabilities
2. Compliance/security features
3. System speed
4. System integration with vendors
5. System features for service levels, and operational issues
6. EDI capabilities
7. Systrans pricing model impact on Chicago
8. Communication

The solutions for items 1-6 were presented to Bob Miller with a complete re-write of the current technology. The roll-out for the new system is ahead of schedule with a "live" date of May 17, 2004. A preview will be presented to senior management in Collegeville on May 6, 2004. Over $ 75,000 were spent to complete this process.

Item 7 was completed with an agreement to run Chicago at a pure pass-through cost basis.

Item 8 was reviewed and a change in management structure has given more structured communications between both management teams.

The Iron Mountain transportation staff and couriers will receive online training May 12th.

SYS0106

The business relationship has been the most successful in Houston, Minneapolis, and Connecticut. These locations have management that utilizes the system per the corporate mandate, and as a tool to improve their business model and customer service.

The relationship in Boston/Maine, Baltimore and Dallas is in a continuous state of resistance, personal agenda's, and working outside of the programs parameters.

The current campaign to remove Systrans in these markets is 20% system complaints and 80% personal preference.

Systrans needs to expand the program in the NJ, PA, NY area. This is critical to the success of the program. We have a building perception that the program is optional, and not a corporate decision. Locations are deciding to stop using the system, go directly to vendors, or not cooperate. Systrans has proven that we can:

1. BUY THE TRANSPORTATION 25% CHEAPER
2. Add a level of insurance
3. Reduce liability exposure
4. Add the 12th man to the dispatch model
5. Customize a technology to handle Iron Mountain's needs

This proves that the business model works, but may operate better as an internal force rather then an external entity.

The lack of revenue volume, and commitment, is creating an atmosphere that is counter productive to both Iron Mountain and Systrans. Our capital commitment and technology investment were based on anticipated volume of 10-15 million.

The current situation is not related to the other current issues, but has an impact on the Systrans relationship, program acceptance, and potential conflicts. I would like to propose an "exit" to the current relationship to solve a variety of issues, and be in the best interest of Iron Mountain in the long term.

**SYS0107**

The Systrans objectives are:

1. Recoup startup capital
2. Payoff related assumed debt
3. Establish a new consulting relationship
4. Improve our current program

I feel the Iron Mountain objectives are:

1. Eliminate expectations and distractions
2. Implement a compliance program
3. Automate process with long term integration goals
4. Reduce cost
5. Limit liability
6. Standardize practices
7. Remove local conflicts with decision making

The current business under contract has a net cost $ 650,000 to $ 728,000 less then Iron Mountain is currently paying, based on 2.5 million in Systrans billing.

The program could be expanded to 10-15 million which would result in a net cost of 2.5 million less then current costs.

I would propose a deal with (2) components:

1. Transition of current business model, financial relationships with vendors, technology, and intellectual property for a "Buy-out" fee which would be recouped by Iron Mountain over 18-24 months.

2. Expand the project on a national level to all Iron Mountain locations to review, negotiate, and conduct a compliance review for a fee based on 50 percent of cost reduction for a period of 6 months. This would be no risk, no conflict, and allow Iron Mountain to capture hard dollars immediately after the local project is completed. After completion of a market the location would be setup on the automated courier system owned and operated by Iron Mountain. Price changes and courier payments would be secured via the technology.

**SYS0108**

Systrans would propose the following:

1.  Forgive current advance of $ 121,000
2.  Purchase of Systrans stock, or assets for cash payment of $ 900,000

Terms of the deal would be confidential, and subject to reps and warranty provisions.   The cash portion would be recouped within 12-14 months of current net costs.   The other costs of the transaction would be recouped with the program expansion net savings.   The program expansion would be funded completed from the cost reductions in each market.   The system would allow the courier costs to be maintained without employees having ability to renegotiate new deals that could eliminate savings.

The carrying costs for the system for national coverage to link all couriers with Iron Mountain would be $ 2100.00 from our automation vendor.

Please let me know what you think.

# EXHIBIT D

*137*

# Systrans
Courier Systems

# Proposal for:



IRON MOUNTAIN™

*Confidential*

August 2002

**SYS0163**

1 38

# Company Overview:

Systrans Courier Systems combines the talent of experienced courier, transportation, customer service and technology professionals. The senior management team was recruited from various public and private companies to establish a culture to become a leader in providing customers superior service, with cost effective solutions.

Systrans Courier Systems operates as a non-asset based third party logistics provider offering a menu of services which include routed distribution, same-day ground service and same-day air courier.

All operations rely on our technology to provide state of the art information management. The "Systrax" system allows our clients and resources "real-time" data, integration with our clients' customer service departments and courier network management.

Systrans customizes programs to provide value added solutions for our customers. We rely on data and benchmarks to gauge our performance. Each program is constructed to meet or exceed our clients' operational, financial and customer service needs.

*Systrans*

139

## Mission Statement:

"We will be the premier courier service provider by....

- ❑ Putting people first
- ❑ Providing competitive-superior value to our customers
- ❑ Continuously improving the performance of our business

Resulting in long-term customer relations, significant competitive advantages, fulfilling careers, and the achievement of our financial goals."

*Systrans*

# Project Objectives:

❑  Improve Service Levels

❑  Reduce Costs

❑  Standardize Services



❑  Total Responsibility by Systrans

❑  Minimize Paper and Administrative Cost with technology

❑  Execute a 120 day Test Project

❑  Document Results

❑  Evaluate Data



❑  Enter a multi-year National Contract

*Systrans*

|4|

# Program Features:

❏  Cost Reduction

❏  Vendor Evaluation

❏  Standardize Services

❏  Centralize Control and Information Management

❏  State of the Art Technology

❏  Experienced Management Team



Systrans

# Advantages to Iron Mountain :



- ☐ Total responsibility for program managed by Systrans

- ☐ Standard pricing by region

- ☐ Central control and contact

- ☐ Cost savings / and control

- ☐ Centralized electronic invoicing



*Systrans*

SYS0168

143

# Network Vendor Benefits:

## Advantages to local resources:

- ❏ Cash Flow

- ❏ Volume

- ❏ Information management, technology and customer service

- ❏ Centralized dispatch

- ❏ Other national accounts



*Systrans*

SYS0169

ea:



objectives:

information, Visitation,Development Phase 30 days

Operational Phase 90 Days

Reduce Costs

Standardize Services

Convert Process to Third Party Provider

Quantify Results

Evaluate Data

*Systrans*

SYS0170

## Phase – Reports and Benchmarks:

### orts:

- ❑ Savings Report
- ❑ Cost efficiency report   Old-vs.-new costs
- ❑ Transaction report
- ❑ Activity by location
- ❑ Activity by destination
- ❑ Activity by dispatch time



### nchmarks:

- ❑ Cost Savings
- ❑ On time pickups
- ❑ On time delivery
- ❑ Response times
- ❑ Customer complaints
- ❑ Management comments



Systrans

# National Network:

Systrans contracts with strategic resources in each market. Our national program utilizes technology to standardize operations, communications, and service levels.

Each resource is contracted to Systrans to act as our local service partner. Our program is designed to keep service levels and costs consistent with Iron Mountain's requirements.

All operations are coordinated, scheduled and dispatched via a central command center located in New York City. Our central dispatch is open 24 hours and provides operations and customer service staff familiar with each region of the United States.

Systrans contracts with one (1) primary and two (2) secondary resources in each market. We focus on strategic partnerships with our local vendors. Systrans employs a Manager of Nation Resources and various administration personnel to manage vendor compliance, and support.

*Systrans*

*147*

# Vendor Wholesale Program:

1. Vendors are designated as a primary or secondary resource

2. Each resource is linked electronically to the Systrax system

3. Systrans handles customer service, billing, insurance, supplies and dispatch management

4. Systrans will fax each vendor a reconciliation of the previous weeks' activity each Monday.  Vendors will acknowledge reconciliation

5. Systrans will pay resources electronically each Tuesday for previous week

6. Each resource will review electronic reports and benchmarks based on their results



*Systrans*

SYS0173

148

## :tional Network Quality Standards:

- ❏ Operational Capabilities

- ❏ References

- ❏ Financial Stability

- ❏ DOT Safety Rating

- ❏ DMV and Criminal Background Check

- ❏ Appearance, Uniforms and ID Cards

- ❏ Technology/Radio Dispatched

- ❏ On-Time Performance

- ❏ Customer Feedback

*Systrans*

SYS0174

149

# Order Flow:

1. Client request documents from Iron Mountain

2. Iron Mountain requests expedited shipment via phone, fax or on-line to Systrans



3. Systrans' staff dispatches shipment electronically to local vendor



4. Vendor acknowledges shipment, acknowledges dispatch, acknowledges pickup, acknowledges delivery via Nextel data entry interface with Systrax system



5. Systrans electronically sends shipment information back to Iron Mountain



SYS0175

## Pricing Methodology:

- ☐ Establish current rates and volume from each local vendor

- ☐ Establish a rate range for local rates

- ☐ Reduce costs by 3% - 10% for each market

- ☐ Establish dispatch protocol for service levels

- ☐ Systrans' rates to vendors will be established at a wholesale level. This is based on increase volume, electronic payments and reduced responsibility

- ☐ Systrans' gross margins range from 18% - 25%

*Systrans*

151

# Program Financial Model:



SYS0177

# Training and Driver Quality:

Every Systrans' resource operates under an Agent Contract which defines strict quality standards, training and operations requirements.

The Systrans' staff and resources will be trained on the following:

- Iron Mountain's service standards

- Customer Communication

- Appearance, ID, hygiene

- Problem resolution

- Quality measurement process

*Systrans*

# Automation:

The Systrax system was developed to integrated with the most common courier industry software. Systrax is is fully integrated with the handheld Nextel radios.

The system will organize and distribute shipment information from Iron Mountain to the national network. Each shipment will be monitored from our New York operations center. Upon completion of each delivery, drivers will key in all data via the Nextel radios, Systrax will send the information electronically back to Iron Mountain.

The Systrax system features:

- Scalable and Flexible
- Supports Common Platforms
- Handheld Integrated
- Quick Response Support
- Web-based Access
- Detailed Reports

*Systrans*

**SYS0179**

# Insurance:

Liability Insurance

1 Million

Cargo Insurance

$100,000 (includes reconstruction endorsement

Workman's Comp Insurance

State required limits

Umbrella

2 million

*Systrans*

# EXHIBIT E

## Jim Neebling

From:        Jim Neebling
Sent:        Friday, May 06, 2005 4:49 PM
To:          'Bob Miller (bob.miller@ironmountain.com)'; 'Jim Andrusko (jim.andrusko@imrm.com)'
Subject:     Systrans

Bob,

The following is the four dollar amounts:

1. Carr debt $ 657,890
2. Technology, equipment, lease cancellations  $ 244,013
3. Courier accounts payable $ 389,958 minus $ 25,550 due Systrans for week ending 4/30 and minus $ 25,617 due Systrans for week ending 5/6 4pm  totaling      $ 338,791
4. Loan Balance due Iron Mountain $ 162,069

Please let me know if we can send the communication Don drafted.

Thank you,

Jim Neebling
President
Systrans
Phone:732-295-9914
Fax: 732-295-9980
Cell: 732-684-7868

SYS0090

**Jim Neebling**

| | |
|---|---|
| **From:** | Jim Neebling |
| **Sent:** | Thursday, May 05, 2005 4:28 PM |
| **To:** | 'Bob Miller (bob.miller@ironmountain.com)' |
| **Cc:** | 'Larry Varn (lvarn@sandw.com)'; 'Richard Reese (rreese@ironmountain.com)'; 'Garry B. Watzke (garry_watzke@ironmountain.com)' |
| **Subject:** | Systrans Program |

Bob,

I realize we have our meeting scheduled for Friday, but I wanted to give you a scenario of our situation:

My position:

1. The program was originally setup to handle 25 million in courier spending by Iron Mountain
2. After the 90 day test project we were to expand the project across the US
3. Iron Mountain Agreed to move forward after the initial test was completed
4. Systrans has spent $ 385,000 on the technology to service and start the Iron Mountain project and $ 105,000 to re-write the system in April 2004
5. The break even revenue point was and still is $ 49,500 per week, with a margin of $ 10,800 to pay all overhead including original loan from Iron Mountain
6. The volume has always been a challenge to meet or exceed the break even point. We were removed from Maine, Tulsa, and reduced to minimum volume in other areas.
7. We saw a need for a freight program, developed a program with reduced rates, circulated it, and were then told "not to pursue" the freight business
8. We attempted to expand to our home area NJ, NY, PA, DE but were told to wait until the court case is over, and various other excuses as to why we can not expand. On one occasion I received a call from a friend in Philadelphia who said he was contacted from an Iron Mountain employee in Sharon Hill, PA who stated they were looking for other courier services, yet we could not expand.
9. During the litigation I personally went to dinner with Larry Varn and Vincent Brana on many occasions courting Vinnie to assure to work would come in the NY area. Mr. Brana testified against his own company's request not to testify, yet the business nor the ability to even evaluate the current business never materialized. The night before the Arbitrators decision, Tom Carr was panicked about Iron Mountain getting a verdict and forgetting about him, called the arbitrators office to request a private meeting with him. This happened while you and the rest of your senior management were meeting at the Four Seasons preparing for the decision in the morning. Who did Larry Varn and Charlie Moore call to calm the situation? Me and Vinnie Brana who contacted Carr to remind him that the situation will work out for everyone. All we wanted was the business opportunity to expand our program, reduce your costs and liability, and obviously make money from the relationship. Why would we be involved at this level unless we were motivated to expand our business?
10. In June 2004 after I asked for the NY/NJ market numerous times when our year to date sales were $ 189,000 under break even, and after spending $ 105,000 to re-write the system, I requested we work out a deal for I.M. to take back the business at my rates, so the margin we were earning would go to I.M. in order for the buyout to make sense to I.M. and for Systrans to payoff all financial obligations (including Carr). The deal basically had the reduced courier rates paying the buyout.
11. We had a meeting at Sparks Steak House in NY City, at that meeting you agreed to lend us additional money, defer the loan payment until 1/1/05, and commit to additional business. You stated "you were not interested in a buyout, and you would make this work". A company e-mail went out on August 23, 2004 to encourage the field to use Systrans.
12. The business continued well below the break even point and closed 2004 $ 346,000 below our break even point.
13. January 1, 2005 we started paying back the loan amount at a rate of 5% of our sales. We have paid back approximately $ 50k year to date
14. The sales continued to decrease during Q1, 2005 and have declined each week in addition to our loan repayment
15. Our vendor a/p continued to increase the number of days for payment, because of the decline in sales, and the renewal of our annual insurance and technology license.

The summary of the situation is that I feel Systrans provided value, and had a targeted break even revenue point that was clearly and continuously communicated. Even if the original expectation of 25 million in revenue never occurred, it is beyond all logic why we are at this position. I cooperated and spent numerous hours, days, travel, and research all in the spirit of cooperating to win the case against Pierce. Many people say the issues are unrelated, but I worked hard on this program, the court case, and the relationship, and clearly deserved more respect and commitment.

1

SYS0091

I also hear "problems in the field" as reasons why not to expand. The truth is that other then normal operational situations that we always encounter, the business runs well. An example of this is the Baltimore area where Chuck was not happy. After meeting each month with data, reports, and backup, we coordinated the I.M. staff and Systrans to work together to resolve issues. This resulted in future meetings being cancelled because of "no pending issues". In the past 45 days the vendors have made a lot of complaints relative to payment terms. Obviously if you ask your staff current day they would indicate problems relative to this issue. But that statement is broad and does not apply to our overall relationship.

I sit with the following financial situation: I owe Tom Carr $ 660,000 from capital loans for this project. I have Courier a/p of approximately $ 375,000. I have a balance due to Iron Mountain, technology leases of $ 240,000 and most of all my staff who assisted with the project, and the case. I found the arbitrators decision to as shocking as you did. Clearly I.M. should have won the case. But in evaluating the results I.M. was successful in closing Sequedex, which I feel I worked hard to assist the legal battle. I feel this entitles me to be treated fairly, and hope you can understand my position.

I need to understand your position when we meet on Friday. I need to know if Iron Mountain has any intentions of working out a global deal so we can all move forward and put this relationship behind us. I have vendors, employees, and business relationships that I need to advise of our ability to remedy.

I hope we can reach an amicable solution.

Thank you,


Jim Neebling
President
Systrans
Phone:732-295-9914
Fax: 732-295-9980
Cell: 732-684-7868

**SYS0092**