# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED, et al. <br><br> Plaintiffs and, <br> Counter-Defendants, <br><br> vs. <br><br> THOMAS CARR, <br><br> Defendant and <br> Counter-Plaintiff. | Civil Action No. 05-10890-RCL |
| IRON MOUNTAIN INFORMATION MANAGEMENT, INC., <br><br> Plaintiff, <br><br> vs. <br><br> SYSTRANS FREIGHT SYSTEMS, INC., <br><br> Defendant. | Civil Action No. 05-10999-RCL (Consolidated) |

## JOINT PRETRIAL MEMORANDUM

Pursuant to Local Rule 16.5(d) and the Court's Procedural Order dated February

5, 2008, Plaintiffs/Counterclaim-Defendants Iron Mountain Incorporated ("Iron

Mountain") and Iron Mountain Information Management, Inc. ("IMIM") (and together

with Iron Mountain, "Iron Mountain"),[1] Defendant/Counterclaim-Plaintiff Thomas Carr

---

[1] On February 4, 2008, this Court granted a motion for summary judgment filed by Plaintiffs/Counterclaim-Defendants C. Richard Reese, John F. Kenny, Jr, Garry B. Watzke, Larry L. Varn and Charles G. Moore and issued a judicial declaration that these individuals "have no agreements or other legal obligations to Carr...."

("Carr") and Defendant Systrans Freight Systems, Inc. ("Systrans"), respectfully submit this pretrial memorandum.

## I. Names, Addresses, and Telephone Numbers of Trial Counsel

### A. Counsel for Plaintiffs and Counter-Defendants Iron Mountain, *et al.*

Ira K. Gross (BBO# 212720)
igross@sandw.com
Sullivan & Worcester LLP
One Post Office Square
Boston, Massachusetts 02109
(617) 338-2800

### B. Counsel for Defendant and Counter-Plaintiff Carr and Defendant Systrans

Read K. McCaffrey (*Pro Hac Vice*)
rmccaffrey@pattonboggs.com
Patton Boggs LLP
2550 M Street NW
Washington, DC 20037
(202) 457-6000

## II. Summaries of Positions Asserted

### A. Iron Mountain's Positions

#### 1. Concise Summary of Iron Mountain's Position in *Iron Mountain, et al. v. Carr*, Civil Action No. 05 10890 RCL

In response to Carr's claim that Iron Mountain made promises to him worth millions of dollars, Iron Mountain filed this action for a declaration that it had no contractual or other legal obligations to Carr. In response, Carr filed a series of counterclaims asserting that Iron Mountain had defrauded him and made a series of extravagant oral promises to him. None of the alleged promises was ever made, or even referenced, in a writing. This Court dismissed several of Carr's claims, and later granted summary judgment in Iron Mountain's favor with respect to several other of Carr's

claims. Only two of Carr's claims for breach of contract remain pending against Iron Mountain, each of which is addressed in turn below.

Carr's first remaining claim for breach of contract is for $17,500. This claim arises from an alleged "promise" by Iron Mountain on April 2, 2002 to pay Carr's attorneys' fees in connection with a lawsuit that he commenced in New Jersey state court against his former business associate, J. Peter Pierce ("Pierce") (the "Pierce Litigation"). Carr testified under oath in the Pierce Litigation that Garry Watzke offered to "assist" him with his attorneys' fees, and that he did not have discussions with anyone else concerning this supposed offer.

Iron Mountain's position is that it never made this or any other promise to Carr. In addition, on July 31, 2003, over a year after the promise was supposedly made, Carr testified under oath (in an arbitration that Iron Mountain commenced against Pierce) that Garry Watzke "didn't promise" to pay his attorneys' fees, but instead only offered to "help." Carr further testified that "[t]here was no promises given" [sic]. There is no dispute that Iron Mountain "helped" by paying $50,000 to Carr's counsel in the Pierce Litigation. Carr's remaining claim for $17,500 is baseless.

Carr's other remaining claim for breach of contract is for $2 million. According to Carr, on September 9, 2003, he had dinner in New York City with his friend James Neebling ("Neebling"), Larry Varn ("Varn") and Charles Moore ("Moore"). Carr claims that, during this dinner, Varn told Carr that he was "going to figure out a way" to get Carr $2 million from Iron Mountain. Varn, Moore and Iron Mountain have consistently denied that Varn made any such statement or promise to Carr. Neebling similarly testified in this case that he never heard Varn "promise" to get Carr $2 million.

Iron Mountain's position is that: (1) Varn never made the statements alleged by Carr; (2) even if Varn made the alleged statements (and he did not), they did not create a binding agreement between Iron Mountain and Carr for the payment of $2 million; and (3) even if Varn made the alleged statements (and he did not), and even if those statements somehow resulted in an "agreement" between Iron Mountain and Carr for the payment of $2 million (and they did not), that "agreement" is unenforceable for lack of consideration.

Neither of the two alleged promises at issue in this case is evidenced by a single scrap of paper. As a result, this case turns almost entirely on Carr's credibility. Iron Mountain will introduce evidence showing Carr's repeated admissions that Iron Mountain made no promises to him, as well as Carr's felony convictions and convictions for crimes of dishonesty.

2.    **Concise Summary of Iron Mountain's Position in *Iron Mountain v. Systrans Freight Systems, Inc.,* Civil Action No. 05 10999 RCL (Consolidated)**

In May 2003, Iron Mountain and Systrans Freight Systems, Inc. ("Systrans") entered into a written contract (the "Systrans Contract"), under which Iron Mountain made a series of cash advances to Systrans totaling almost $200,000. Although Systrans agreed to repay these advances, it has only repaid a portion of them and still owes $166,000 to Iron Mountain.

On May 20, 2006, Iron Mountain filed a complaint against Systrans for, *inter alia*, breach of the Systrans Contract. On June 17, 2005, Systrans filed its answer and admitted that "approximately $150,000 is owed" to Iron Mountain. Systrans did not assert a counterclaim for any "setoffs," nor did Systrans list any "setoffs" as an

affirmative defense to Iron Mountain's claims. Systrans attempted to state two counterclaims against Iron Mountain for breach of contract and negligent misrepresentation. On June 28, 2006, however, both of Systrans's counterclaims were dismissed. Systrans has no pending claims in this case.

On June 21, 2007, Iron Mountain filed a motion for summary judgment against Systrans, and requested judgment in its favor in the amount of $150,000, the amount Systrans admitted owing to Iron Mountain. On July 10, 2007, Systrans filed its opposition to Iron Mountain's motion, and again admitted to owing Iron Mountain about $150,000, "but for certain setoffs" supposedly amounting to $49,000. Systrans provided no details concerning these supposed "setoffs." On November 8, 2007, the Court entered an electronic Order denying Iron Mountain's motion because "there is a disputed issue of fact as to the damages owed to [Iron Mountain.]"

It is Iron Mountain's position that Systrans is not entitled to any "setoffs" and, even if it were, such "setoffs" were not asserted by Systrans in *this* action and therefore should not delay entry of judgment in Iron Mountain's favor. Iron Mountain seeks a judgment in the amount of $166,000 plus accrued interest.

## B. Concise Summary of Carr and Systrans' Position in the Consolidated Matters of Iron Mountain, *et al.* v. Carr and Iron Mountain v. Systrans

Counter-Defendants have breached oral contracts with Carr promising to compensate him in consideration for his cooperation and information in supporting their claims against J. Peter Pierce ("Pierce"). Carr fully complied with his end of the bargain. Counter-Defendants must fulfill their promises. Counter-Defendants have had the "benefit of the bargain."

Counter-Defendants Iron Mountain and IMIM, through representations of the individual Plaintiffs in this matter, specifically requested and sought Carr's (and his friend, James Neebling's ("Neebling")) assistance in Iron Mountain and IMIM's efforts against a former officer and director of Iron Mountain, Pierce, who had at that time entered into an agreement with Carr to form a transportation company known as Logisteq, LLC ("Logisteq"). Specifically, Counter-Defendants sought Carr's assistance in the efforts to pursue legal action against Pierce for Pierce's alleged violations of a non-compete agreement he had signed with Iron Mountain. Concurrently, Counter-Defendants also induced Carr to file a separate lawsuit against Pierce concerning Logisteq to coincide with the action that Iron Mountain was planning to file against Pierce. In consideration for Carr's agreement to participate in these efforts (including, but not limited to, gathering documents, contacting witnesses, making introductions, and providing details concerning Pierce's allegedly competitive enterprise), Iron Mountain and the individual Plaintiffs, acting on behalf of Iron Mountain and IMIM, made numerous promises designed to convince Carr and his colleagues to perform as they had promised, of which we focus on the following:

a) assurances that in the event of any negative financial effects befell Carr, his family, or his businesses as a result of his cooperation with the Counter-Defendants' disputes with Pierce that the Counter-Defendants would, in essence, indemnify Carr, his family, and his businesses against any such negative effects;

b) assurances that Carr would be protected financially through business, amounting to $25-45 million in annual gross revenues, that Counter-

Defendants would provide to Systrans, a transportation company owned

by Neebling that Carr had provided with $600,000 in start-up capital;

c)  the payment of $2 million as a clear interim payment for the negative

financial effects that did in fact befall Carr, his family, and his businesses

as a result of his cooperation with the Counter-Defendants' disputes with

Pierce;

d)  the payment of legal fees and expenses in Carr's lawsuit against Pierce, of

which Carr has paid approximately $17,500 himself in reliance on

Counter-Defendants' promise to pay.

Despite Carr's complete performance of his obligations under the oral

agreements, the Counter-Defendants have failed to fulfill their promises are therefore in

breach of their respective contractual obligations.  In Mr. Peslak's sworn testimony, he

stated, ". . . Garry [Watzke] said he had called Tom [Carr] back and gave him . . . 'a stern

response' telling him to stop calling Iron Mountain. . . .  Richard [Reese] told [Watzke] to

call me back and say . . . [t]hat once the arbitration is over, that Richard [Reese] would sit

down with Tom and I and discuss how Iron Mountain would fulfill its obligations to Tom

[Carr]."  Arthur Peslak Dep. 90:19 – 91:5, March 14, 2007.  At the source of these delays

to discuss specific fulfillment of Iron Mountain's obligations until after arbitration is

Richard Reese, CEO of Iron Mountain.  In response to the Plaintiffs/Counter-Defendants'

abject denials and rejection of the existence of any supporting evidence, in addition to

Carr, many of the promises involved and/or were witnessed by Neebling, Judith Carr

(Carr's spouse), Arthur Peslak (Carr's attorney in the Pierce matter), and Paul Schwartz

(Carr's friend who loaned him funds for Systrans).

In the consolidated case of IMIM v. Systrans, it is Systrans' position that Systrans owes no monies to the corporate Plaintiff because of its debt of $49,034 in delivery charges and the larger setoff of the promise of annual gross business revenues in the amount of $25-45 million not yet fulfilled by the Plaintiff.

## III.    Claims or Defenses Waived or Not Pursued at Trial

### A. Iron Mountain

Iron Mountain has not waived, and does not waive, any of its claims or defenses in this case.

### B. Carr and Systrans

a)    Carr is not waiving any remaining counterclaims for trial.

b)    Carr is not waiving any defenses to the Complaint filed by the Corporate Plaintiffs and Counter-Defendants herein.  However, by virtue of the Court's rulings regarding the counterclaims against the individual Plaintiffs, the affirmative claims of the individual Plaintiffs for declaratory judgment may be moot.

c)    Systrans is not waiving any remaining counterclaims for trial.

d)    Systrans is not waiving any defenses to the Complaint filed by IMIM.

## IV.    Joint Statement of Stipulated Facts

The following statements present facts established by affirmative answers in the pleadings and/or by agreement.

1.    Iron Mountain is in the business of outsourced records and information management services, and has its principal place of business in Boston, Massachusetts.

2.    IMIM is a wholly-owned subsidiary of Iron Mountain.

3.    Varn is a partner of Sullivan & Worcester LLP ("S&W"), which regularly represents Iron Mountain and IMIM.

4.    Carr is an individual who resides in New Jersey.

5.    In early 2000, Iron Mountain acquired Pierce Leahy Corp. ("PLC"). Following the acquisition, J. Peter Pierce ("Pierce"), a principal of PLC, was elected to the Iron Mountain Board of Directors and was appointed as President of Iron Mountain and Chief Operating Officer of IMIM.

6.    In connection with the acquisition, Pierce and Iron Mountain entered into a written employment agreement that prohibited Pierce from competing with Iron Mountain.  In June 2000, Pierce's employment with Iron Mountain and IMIM was terminated, but Pierce remained a member of Iron Mountain's Board of Directors until his resignation on December 23, 2002.

7.    In early 2001, Carr and Pierce entered into an agreement to form a transportation company, Logisteq, at the conclusion of which transaction, a Pierce-controlled entity, Pioneer Capital, L.P., and a Carr-controlled entity, Transportation Concepts of New Jersey, Inc. ("T.C.") owned Logisteq 51% and 49% respectively.

8.    Pierce paid Carr $3.8 million for the majority investment in Logisteq.

9.    Carr has alleged, and Iron Mountain believes, that Pierce also directly and indirectly managed, engaged in, participated in, and provided advice to Sequedex LLC ("Sequedex"), a former Iron Mountain competitor, and that Sequedex competed with Iron Mountain.

10.    S&W and Varn represented Iron Mountain and IMIM in connection with an investigation of Pierce's conduct, and Moore provided investigatory services to S&W, in connection with the same investigation.

11.     On March 28, 2002, Iron Mountain filed a complaint against Pierce in the New Jersey Superior Court, Middlesex County, Chancery Division, alleging, inter alia, that Pierce had violated his written covenants with Iron Mountain and his fiduciary obligations to Iron Mountain and its shareholders.  The action was stayed pending completion of a pending arbitration proceeding against Pierce (the "Pierce Arbitration").

12.     Carr filed a Verified Complaint and Demand for Trial by Jury dated April 3, 2002 against Pierce in Monmouth County, New Jersey (the "Pierce Litigation").

13.     On or about April 9, 2002, Iron Mountain paid $50,000 to Arthur Peslak, Esq. ("Peslak"), Carr's counsel in the Pierce Litigation.  S&W caused the payment to be made to Peslak's trust account, and Peslak received that payment.

14.     No written contract or agreement exists between Carr and Iron Mountain.

15.     Iron Mountain never made any offer, promise or assurance to Carr in writing.

16.     On or about May 1, 2003, Iron Mountain and Systrans entered into the Systrans Contract.

17.     In the Systrans Contract, the parties agreed, among other things, that Systrans would furnish and provide courier and related services on behalf of Iron Mountain.

18.     In conjunction with the Systrans Contract, Iron Mountain advanced to Systrans an initial amount of $105,000 (the "Initial Advance"), which Systrans agreed to repay.

19.    By a written agreement dated January 30, 2004, Iron Mountain advanced an additional $50,000 to Systrans (the "First Additional Advance"), which Systrans agreed to repay.

20.    By a written agreement dated January 19, 2005, Iron Mountain advanced an additional $40,500 to Systrans (the "Second Additional Advance"), which Systrans agreed to repay.

21.    During the term of the Systrans Contract, Systrans overcharged IMIM. Iron Mountain and Systrans agreed that the aggregate amount of the overcharges was in excess of $78,500 (the "Overcharges").

22.    Of the Initial Advance ($105,000), First Additional Advance ($50,000), Second Additional Advance ($40,500), and the agreed Overcharges (more than $78,500), Systrans has repaid or offset only a portion of that amount, and admits to owing approximately $150,000 to IMIM. Systrans admits to this fact only in light of Systrans' claims that the amount is set off by Iron Mountain's debt of $49,034 in delivery charges and the promise of annual gross business revenues in the amount of $25-45 million.

23.    On March 17, 2005 Carr signed an affidavit in which he swore under oath that he had "no interest in [Systrans], ownership or otherwise, or any interest in any other entity, ownership or otherwise, which is in any way involved with [Systrans]." *See* Carr Depo. Exhibit 11.

24.    On June 28, 2006, this Court dismissed both of Systrans's counterclaims for breach of contract and negligent misrepresentation against Iron Mountain.

## V.    Contested Issues of Fact

### A. Iron Mountain

Iron Mountain submits the following "contested" issues of fact*:

1.      Whether, on April 2, 2002, Iron Mountain promised to pay Carr's attorneys' fees (of which only $17,500 remain at issue in this case);[2] and

2.      Whether, on September 9, 2003, Varn made any statement to Carr that was promissory in nature and, if so, what Varn said.

3.      From time to time, certain of the Plaintiffs met with or had telephone conversations with Carr, James Neebling ("Neebling"), the President of Systrans, and/or Arthur Peslak ("Peslak"). There were two meetings on March 19, 2002, in New Jersey, (ii) there was a meeting on March 26, 2002, in Boston, (iii) there was a telephone conference with Peslak on April 2, 2003, (iv) there was a meeting on April 9, 2002, in New York, New York, and (v) there was a dinner on September 9, 2003, in New York.

4.      On May 30, 2002, Carr was deposed in connection with the Pierce Litigation. Carr was asked whether "Mr. Varn or Mr. Wat[z]ke or anyone from Iron Mountain encouraged him to bring this lawsuit," and Carr responded, under oath, "No." *See* Carr Depo. Exhibit 1 at p. 16.*

5.      Also during Carr's deposition in the Pierce Litigation, counsel for Pierce asked Carr whether Iron Mountain had offered or given anything to him. Carr responded, under oath: "They're too smart for that. Absolutely not…. They did not offer me any perks, any money, anything." *See* Carr Depo. Exhibit 1 at p. 183.*

---

[*] The paragraphs designated with an asterisk in Sections V(A)-(B), to the extent that they quote accurately from existing documents, or state other facts, are not contested as to their content. There is, however, an objection as to whether they are relevant, admissible, and/or presented in context.

[2] This remains a "contested" issue of fact in this case even though Carr has admitted under oath, on more than one occasion, that Iron Mountain did not make this promise.

6.      Also during his deposition in the Pierce Litigation, Carr was asked "Has Iron Mountain either paid or offered to pay the legal expense of [the Pierce litigation]?" and Carr responded, "Yes . . . Larry Varn and Gary Wa[t]zke." When asked during his deposition, "Who did you strike the arrangement with to have Iron Mountain pay the legal bills in this case?" and Carr responded, under oath, "Gary Wa[t]zke." When Carr was asked the follow-up question of whether there was "[a]nyone else that you had a discussion with," Carr responded "No, sir." *See* Carr Depo. Exhibit 1 at pp. 15-16.*

7.      On July 31, 2003, when counsel for Pierce asked Carr what promises were made to him by Iron Mountain or its lawyers, and Carr responded, under oath: "There was no promises given." *See* Carr Depo. Exhibit 5 at pp. 945-46.*

8.      In his deposition in this case, Carr affirmed his previous testimony (in the Pierce Litigation and the Pierce Arbitration) as truthful and correct.*

9.      Neebling, who was present on September 9, 2003 when Varn allegedly "promised" to get Carr $2 million from Iron Mountain, testified in this case as follows: "if you're going to ask me did [Varn] say 'I promise to give you $2 million,' no .... The promise was [Varn] will go back to [Reese] and [Varn will] try to work something out .... I didn't hear the word 'I promise.'" *See* Neebling Depo. pp. 168-69. *

10.     Carr testified that in this case that, after September 9, 2003, there were no further meetings between Carr and anybody from Iron Mountain. *

11.     In August 2001, Carr was indicted in the Southern District of New York (the "SDNY Indictment") for conspiracy and bank fraud. In September 2002, Carr was indicted again, this time in the Eastern District of New York (the "EDNY Indictment"), wherein he was charged with conspiracy to commit bank and wire fraud and conspiracy

to launder money.  On September 29, 2004, Carr pled guilty to the charges of conspiracy to launder money (as charged in the EDNY Indictment) and bank fraud (as charged in the SDNY Indictment).  On June 18, 2007, Carr was sentenced to eight months incarceration and three years probation/supervised release, and was ordered to pay restitution of $305,000 and forfeiture of $25,000.*

12.    In March 2005, Carr filed a complaint against Pierce in the United States District Court for the District of New Jersey.*

### B. Carr and Systrans

Carr and Systrans submit the following contested issues of fact:

1.    Other than the meetings identified in Section IV.11 above, the parties dispute the occurrence of and/or the subject of discussion at the meetings listed and described in Exhibit I to the Declaration by Ilya Shapiro made in connection with Carr's Statement of Disputed Material Facts in support of his Consolidated Opposition to the Plaintiffs' Motions for Summary Judgment, which represents a list of some of the physical meetings and telephone conversations involving the parties.  Carr submits that these meetings occurred as described and are supported by party declarations and/or evidence from Peslak's billing records.

2.    During one of the many meetings admitted by the Plaintiffs in various filings and deposition testimony in this case, both in person and by telephone, and in consideration for Carr's information and cooperation, the Plaintiffs promised:

   a) to fund Carr's lawsuit against Pierce and related legal expenses;

   b) to loan him $5 million;

   c) to hire him as a transportation consultant on the same terms as he was then employed;

d) to ensure that Systrans would receive $25-45 million in courier business (through which Carr, as a principal investor, would see a large profit);

e) to pay Carr $2 million as an interim measure to allow him to satisfy certain obligations in the wake of Pierce's malfeasance;

f) assurances to Carr's creditor, Paul Schwartz, that Iron Mountain would provide sufficient funds and revenues to Carr to enable Schwartz to conclude that Carr was a good candidate for loans; and

g) that if any negative financial effects befell Carr or his family as a result of his cooperation with the Plaintiffs in their disputes with Pierce, the Plaintiffs would indemnify him.

3.      Carr, sometimes through his attorney, Peslak, requested on several occasions that the oral contract be set down in writing, but the Plaintiffs declined to do so out of a stated (but false) fear that evidence of their contract with Carr would lessen the effect of Carr's testimony in the litigation against Pierce.

4.      Carr has an invested interest in Systrans of at least $600,000, which he paid towards Systrans' capital expenses. Carr was entitled to a share of Systrans' profits.

5.      Systrans LLC was created to handle the business through which the Plaintiffs promised to compensate Carr for his services on their behalf. Systrans Freight Systems, Inc., meanwhile, which is the entity that signed the Systrans contract and which is the Defendant in the companion case to this one, was an established provider of courier and transportation consulting services.

6.      While it is the case that Systrans conceded it owes Plaintiff IMIM $150,000, this amount is offset by $49,034 in delivery charges owed to Systrans by

IMIM. Further setting off the amount owed by Systrans is the promise by IMIM that Systrans was to earn net profits of at least $4.5 million per year from the promised annual gross revenues of $25-45 million. Thus, Systrans owes no monies to IMIM.

7. The assurances Plaintiffs (specifically Varn) made to Carr's creditor Paul Schwartz have caused Carr damages. For example, part of the $600,000 Carr invested in Systrans was a loan from Schwartz, as was part of the $2 million personal debt the Plaintiffs promised to repay to Carr.

8. T.C. or an affiliated entity became a tenant of Iron Mountain at IMIM's Freehold, New Jersey records center.*

9. On or about February 20, 2001, Iron Mountain, over the signature of Garry B. Watzke, Esq., its General Counsel, sent a letter to Carr and TC advising that Iron Mountain was exercising its option under the lease to terminate TC's tenancy effective March 31, 2001.*

10. In the spring of 2002, the Plaintiffs began encouraging Carr to file his own suit against Pierce to strategically coincide with the action that Iron Mountain was planning to also file. With the intent of orchestrating simultaneous lawsuits against Pierce, the Plaintiffs sought to facilitate Carr's participation by agreeing to fund his lawsuit and drafting a complaint for Carr to file.

11. Varn promised Carr $2 million in return for his services, saying "I'll get you $2 million. I'm going to talk to Garry Watzke, Tom, and I'm going to figure out a way how I can get you $2 million if it's the last thing I do . . . ." Carr Depo., February 28, 2007 and March 15, 2007, p. 201.

12.     Plaintiffs promised to pay all of Peslak's fees, but Carr advanced around $17,500 of that total.

13.     Arthur Peslak testified under oath in his deposition taken March 14, 2007 and swore under penalties of perjury in his declaration filed by Carr on October 12, 2005 that both Watzke and Varn promised (1) payment of his legal fees and (2) fulfillment of Iron Mountain's obligations to Carr after the conclusion of arbitration (and the subsequent appeal). Peslak is a member in good standing of the New Jersey State Bar and is an active member of the Monmouth County, New Jersey State Bar Association (Chair, Intellectual Property Section 1997-1999).

14.     Carr initially voiced reluctance in joining the Plaintiffs' campaign against Pierce and expressed significant concerns about the negative effects of any such action on his business and family. In addition to the promises the Plaintiffs made to Carr, Kenny also called Carr's wife to reiterate and specifically affirm each of the foregoing promises and advise her that Iron Mountain would ensure the family's financial stability should Carr join the effort against Pierce. Carr eventually acquiesced, and Iron Mountain had a courier deliver a copy of the drafted complaint for Carr to sign while he was on vacation with his family in California.

15.     Carr cooperated completely with the Plaintiffs, met with witnesses, reviewed commercial transactions involving Pierce and Pierce-related companies, and turned over documents and other materials to several of the Plaintiffs. This cooperation involved extensive travel at the Plaintiffs' request. It culminated in Carr's testimony at the Pierce Arbitration in July 2003, which Varn coached to be technically accurate but factually misleading.

16.    Carr assisted the Plaintiffs in full reliance on the aforementioned promises and, as a direct result of this reliance, lost his businesses and was shackled with debt. In retaliation for Carr's cooperation with the Plaintiffs, including his filing of a complaint against Pierce, Pierce wasted the business of which Carr was a 49% owner, fired him, and left him without a source of income.

17.    The Plaintiffs continued to take an active role in the Carr-Pierce litigation; Varn acted as co-counsel to Peslak, "from reviewing pleadings, to preparing Carr for his deposition testimony to weighing in on settlement of the case." Declaration of Arthur Peslak, filed October 12, 2005 ¶ 13.

18.    Carr believed that the Plaintiffs would make good on their oral contract for monetary compensation, employment, business, and other indemnification but when Carr demanded satisfaction he was met with silence, delay, and denial. At one point the Plaintiffs began to advise Carr that he would have to wait until after the Pierce Arbitration and then, after Iron Mountain lost the arbitration in February 2004, until final resolution of appeals.

19.    Despite repeated requests from Carr, Peslak, and Neebling, the Plaintiffs remained incapable of or unwilling to fulfill the aforementioned promises, continuing to use as an excuse the pendency of the arbitration appeal. In early 2005, undersigned counsel became involved in an effort to amicably resolve Carr's claims relating to the Plaintiffs' obligations to him. After being put off for several months and being assured that a resolution of his Carr claims awaited the conclusion of appeals in the Pierce case, Carr received the Plaintiff's Complaint in this case.

20.     Plaintiff Charles Moore promised Carr and Neebling that funds would be paid to Carr and that Systrans would receive significant contracts in exchange for their continued assistance in the Pierce litigation.

21.     Carr has presented the only evidence in this case that does not come from an interested party, namely that of Peslak, whose legal fees have been paid and who has "no interest, monetary or otherwise, at stake in this case." Peslak Decl at ¶ 2.

22.     Peslak stated in his declaration dated September 27, 2005 that, "In furtherance of our [Iron Mountain and Carr's] common interest, Varn insisted on being involved in every phase of Carr's litigation from reviewing pleadings, to preparing Carr for his deposition testimony to weighing in on settlement of the case. In fact, Varn was insistent that I not begin to prepare Carr for his deposition in a case involving Iron Mountain and Sequedex without Varn being present. I also provided Varn with confidential and privileged documents and work product that I would not have produced to any other person were it not for our joint prosecution agreement, which presumed the maintaining of confidences of our respective clients." *See* Declaration of Arthur Peslak, September 27, 2005 ¶ 13.*

23.     In his sworn declaration, Peslak stated that, "In the preparation session for Carr's deposition in the Sequedex case, Varn coached Carr how to answer deposition questions so that Carr would remain strictly truthful to his answers but would not unnecessarily volunteer information. For example, Varn instructed Carr that if he was asked 'did Iron Mountain offer you a job in exchange for your assistance' that Carr was to say 'no' because he was offered a consulting position and not a job." *See* Declaration of Arthur Peslak, September 27, 2005 ¶ 14.*

24.    Carr testified under oath that at the September 9, 2003 meeting Varn promised Carr $2 million in return for his services, saying "I'll get you $2 million. I'm going to talk to Garry Watzke, Tom, and I'm going to figure out a way how I can get you $2 million if it's the last thing I do . . . ." *See* Deposition of Thomas Carr, taken February 28, 2007 and March 15, 2007 p. 201.*

25.    Neebling swore under oath that "Varn told us that Watzke would work out some kind of arrangement to send Systrans the $2 million Iron Mountain had earlier promised Carr, and I would pass that money to Carr, to cover the debt he incurred when Pierce wasted his company." Affidavit of James Neebling, July 9, 2007, ¶ 31.*

26.    Arthur Peslak testified under oath in his deposition that, "Larry [Varn] said, '. . . I can tell you Iron Mountain is going to pay you . . . Richard has decided he's going to take back Tommy and we're going to pay your fees in the case. So don't worry about it." Later, "[Watzke] said my bills would be paid after the arbitration." *See* Deposition by Arthur Peslak, March 14, 2007, pp. 67 & 91.*

## VI.    **Pending Motions**

Other than the motions in limine to be filed on even date herewith, there are no pending motions.

## VII.    **Issues of Law and Supporting Authority**

### A. Iron Mountain

Iron Mountain identifies the following three issues of law and supporting authority:

1.    Whether Varn's alleged statements, even if made, were sufficient to form a binding agreement between Iron Mountain and Carr for the payment of $2 million.

> Supporting Authority: *Broad Street Nat'l Bank of Trenton v. Collier*, 169 A. 552, 554 (N.J. 1933) ("[a] declaration … which does not show that the party … promises to act … or intends to incur a legal liability obliging him to act in such way, is not an offer which can be accepted so as to make a contract"); *Esslinger's, Inc. v. Alachnowicz*, 68 N.J. Super. 339, 344-51 (N.J. App. Div. 1961) ("friendly assurances" and "good intentions" insufficient to create an enforceable contract); *Spectrum Research Corp. v. Interscience, Inc.*, 242 A.D.2d 810, 811 (N.Y. 1997) ("[i]t is well settled that a contract must be definite in its material terms in order to be enforceable"); *Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482 (1989); *Marraccini v Bertelsmann Music Group*, 221 A.D.2d 95, 97 (N.Y. 1996). Thus, an "agreement to agree, in which a material term is left for future negotiations, is unenforceable." *See Martin Delicatessen v Schumacher*, 52 N.Y.2d 105, 109 (N.Y. 1981); *Bower v. Atlis Sys.*, 182 A.D.2d 951, 952-53 (N.Y. 1992).

2.    Even if Varn's alleged statements were made and would otherwise be sufficient to form an "agreement" between Iron Mountain and Carr for $2 million, whether that supposed "agreement" is supported by adequate consideration.

> Supporting Authority: *Pershall V. Elliot*, 163 N.E. 554, 556 (N.Y. 1928) ("past consideration is no consideration"); N.Y. Gen. Oblig. Law § 5-1105 (past consideration is not valid to support a contract unless there is a writing signed by the party to be bound); *Thermoid Co. v. Consol. Prods. Co., Inc.*, 81 A.2d 473, 475 (N.J. 1951) ("past consideration . . . [is] insufficient in law to support a binding promise"); *New Brunswick v. Milltown*, 191 N.J. Super. 467, 469 (Super. Ct. 1983) ("past consideration is insufficient to require … performance"); *Long v. Board of Chosen Freeholders*, 16 N.J. Super. 448, 456 (App. Div. 1951) ("merely agreeing to pay past due accruals" is unenforceable for lack of consideration).

3.    Whether Systrans is entitled to any "setoffs" of amounts it has admitted owing to Iron Mountain in this case, where all of Systrans' counterclaims have been dismissed, and where Systrans did not assert the supposed "setoffs" as an affirmative defense in this case.

Supporting Authority: Fed. R. Civ. P. 13; *United Structures of America, Inc. v. G.R.G. Engineering, S.E.*, 9F.3d 996, 998 (1st Cir. 1993) (a setoff is a "*counter-claim* demand which defendant holds against plaintiff, arising out of a transaction *extrinsic of plaintiff's cause of action*") (emphasis in original) (citation omitted); *Valley Disposal, Inc. v. Central Vermont Solid Waste Mgmt. Dist.*, 113 F.3d 357, 365 (2d Cir. 1997) ("Rule 13 plainly requires that a setoff claim, if it is to be asserted, be asserted in a pleading during the lawsuit"); *In re Scaife*, 825 F.2d 357, 362 (11th Cir. 1987) (rejecting defendant's request for "setoffs" based on defendant's failure to claim such setoffs in its pleadings); *United States v. American Packing & Provision Co.*, 122 F.2d 445, 449 (10th Cir. 1941) (equitable setoff may be asserted as a counterclaim to a breach of contract claim).

## B.    Carr and Systrans

Carr and Systrans identify the following three issues of law and supporting authority:

1.    Whether the promises by Iron Mountain through its representatives in exchange for Carr's cooperation in the Pierce Arbitration constitute an enforceable oral contract.

Supporting Authority: *Soar v. National Football League Players' Ass'n*, 550 F.2d 1287, 1290-91 (1st Cir. 1977) (for a contract to be enforceable, it must be of "sufficient explicitness so that a court can perceive ... the respective obligations of the parties" and an enforceable contract may be found even if one or more critical questions are left unanswered); *TLT Construction v. RI, Inc.*, 484 F.3d 130, 135-36 (1st Cir. 2007) (parties may orally agree to be bound by agreeing to the material terms of a contract); *Armstrong v. Rohm & Hass Co.*, 349 F.Supp.2d 71, 78 (D. Mass. 2004) (when lack of specificity regarding terms such as time of performance, price to be paid, or work to be done, courts ask whether parties intended to contract with one another and whether "reasonably certain basis" for providing appropriate remedy); *McCarthy v. Tobin*, 706 N.E.2d 629, 631 (Mass. 1999) (parties must agree on the material terms and have a present intention to be bound by that agreement); *Lafayette Place Assoc. v. Boston Redevelopment Auth.*, 694 N.E.2d 820, 826 (Mass. 1998) (enforcing a contract where certain terms, including purchase price, were unknown and unknowable at time of signing); *Shayeb v. Holland*, 73 N.E.2d 731, 732 (Mass. 1947) (enforcing an agreement after finding contract embodying material factors not to be incomplete or indefinite when it fails to express certain matters necessary for its performance or satisfaction); *Cygan v. Megathlin*, 96 N.E.2d 702, 703 (Mass. 1951) (a contract is not invalid

because one of its material provisions is stated in general terms, if, when construing it "in light of attending circumstances," a court can determine the rights and obligations of the parties "with reasonable certainty").

    2.        Whether Iron Mountain can avoid its obligations under the contract after

having accepted its benefits.

> Supporting Authority: *Lafayette Place Assoc. v. Boston Redevelopment Auth.*, 694 N.E.2d 820, 826 (Mass. 1998) (if the parties specify "procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding"); *Cygan v. Megathlin*, 96 N.E.2d 702, 703 (Mass. 1951); *Hastings Associates, Inc. v. Local 369 Bldg. Fund, Inc.*, 675 N.E.2d 403, 410 (Mass. App. Ct. 1997) (enforcing an ambiguous lease renewal where doing otherwise would benefit defendant at plaintiff's expense in a way not contemplated by contract).

    3.        Whether the amount owed by Systrans to IMIM can be set off or recouped

by the amounts IMIM owes and promised to Systrans.

> Supporting Authority: *F.D.I.C. v. Kooyomjian*, 220 F.3d 10 (1st Cir. 2000) (recoupment is a defense against a claim where a counter-claim arising out of the same transaction is subtracted from the damages owed on the original claim); *United Structures v. G.R.G. Eng'g*, 9 F.3d *996*, 998 (1st Cir. 1993) (both judgments must be final and the parties must be mutual; "'The distinctions between . . . recoupment and setoff are no longer of much importance. . .'") (citation omitted); *In re Grand Wireless Inc.*, No. 06-40150-RWZ, at *2-3 (D. Mass. May 29, 2007); *Sign-a-way, Inc. v. Mechtronics Corp.*, 12 F. Supp.2d 132, 160-61 (D. Mass. 1998); *Goldman v. Noxon Chemical Products Co.*, 174 N.E. 67 (Mass. 1931) (setoff is the difference between two judgments based upon separate judgments between mutual parties).

VIII.   **Requested Amendments to the Pleadings**

None.

IX.   **Additional Matters to Aid in the Disposition of the Action**

A.   **Iron Mountain**

Iron Mountain submits that Carr has waived his right, if any, to a jury trial. Carr has acknowledged this waiver.

B.   **Carr and Systrans**

Defendant and Counter-Plaintiff Carr notes that in light of the Court's Order of February 4, 2008 concerning the Plaintiffs and Counter-Defendants' Motion for Summary Judgment, the Plaintiffs' original complaint requesting declaratory judgment ruling that the individual Plaintiffs have no agreements or promises with Carr now appears moot. As stated in the Order, "The court declares on the basis of this ruling that individual plaintiffs have no agreements or other legal obligations to Carr with respect to any breach of contract claim raised in this case." Thus, Defendant wishes to clarify that the matter at trial will be limited to the corporate Plaintiffs and that for purposes of the trial, the individual Plaintiffs are no longer party to this matter.

X.   **Probable Length of Trial**

Carr and Systrans estimate the probable length of trial to be seven days. Iron Mountain believes that this trial can be finished in less time if the scope is appropriately limited.

## XI.    Names and Addresses of Testifying Witnesses

### A.    Iron Mountain

Iron Mountain expects to call the following fact witnesses at trial, other than impeachment witnesses.  Iron Mountain reserves the right to amend or supplement this list and to call rebuttal witnesses.

    1.    Larry L. Varn, Esq.
        Sullivan & Worcester LLP
        One Post Office Square
        Boston, MA 02116
        (617) 338-2800

    2.    Mr. Charles G. Moore
        Charles G. Moore Private Detectives
        P.O. Box 1201
        Plymouth, MA  02360
        (508) 747-7667

    3.    Garry B. Watzke, Esq.
        Iron Mountain Incorporated
        745 Atlantic Avenue
        Boston, MA  02111
        (617) 535-4702

    4.    Mr. John F. Kenny, Jr.
        Iron Mountain Incorporated
        745 Atlantic Avenue
        Boston, MA  02111
        (617) 535-4702

### B.    Carr and Systrans

Carr and Systrans expect to call the following fact witnesses at trial, other than impeachment witnesses.  Carr and Systrans reserve the right to amend or supplement this list and to call rebuttal witnesses.

1.     James Neebling
        571 West Lake Avenue; Suite 5
        Bayhead, NJ 08742
        (732) 295-9914

2.     Arthur Peslak
        80 Scenic Drive, Suite 5
        Freehold, NJ 07728
        (732) 761-1610

3.     Judith Carr
        152 Chestnut Way
        Manalapan, NJ 07726
        (732) 617-5925

4.     Paul Schwartz
        976 Wateredge Place
        Hewlett, NY  11557-2612
        (516) 374-6530

5.     Thomas Carr
        152 Chestnut Way
        Manalapan, NJ 07726
        (732) 617-5925

6.     C. Richard Reese
        Iron Mountain Inc.
        745 Atlantic Avenue
        Boston, MA 02111
        (617) 535-4702

7.     John F. Kenny, Jr.
        Iron Mountain Inc.
        745 Atlantic Avenue
        Boston, MA 02111
        (617) 535-4702

8.     Gary Watzke
        Iron Mountain Inc.
        745 Atlantic Avenue
        Boston, MA 02111
        (617) 535-4702

9.      Larry L. Varn
        Sullivan & Worcester LLP
        One Post Office Square
        Boston, MA 02109
        (617) 338-2800

10.     Charles G. Moore
        Charles G. Moore Private Detectives
        P.O. Box 1201
        Plymouth, MA 02360
        (508) 747-7667

11.     John Hayden
        Last known address:
        Iron Mountain, Inc.
        745 Atlantic Ave
        Boston, MA 02111

12.     Vincent Ryan
        Schooner Capital, LLC
        45 Atlantic Avenue, 11th Floor
        Boston, MA 02111
        (617) 357-9031

13.     Deb Matthews
        Controller of Accounting
        Sullivan & Worcester LLP
        One Post Office Square
        Boston, MA 02109
        (617) 338-2994

## XII.    **Proposed Exhibits**

### A. Iron Mountain

Iron Mountain expects to offer the following exhibits, in its case in chief or in rebuttal, and reserves the right to supplement this list:

1.      Verified Complaint and Demand for Trial by Jury filed by Thomas Carr on April 4, 2002 in *Thomas Carr, et al. v. J. Peter Pierce, et al.*, Docket No. MONC 95-02 (Chancery Division, Monmouth County, NJ);

2.      Relevant portions of May 30, 2002 Deposition of Thomas Carr in *Thomas Carr, et al. v. J. Peter Pierce, et al.*, Docket No. MONC 95-02 (Chancery Division, Monmouth County, NJ);

3.      Relevant portions of September 29, 2004 Transcript of Plea Before Honorable William D. Wall, United States Magistrate in *United States of America v. Barry Schwartz, et al.*, Case No. 02-cr-1112 (E.D.N.Y.);

4.      Judgment of conviction or other documents sufficient to show judgment of conviction of Thomas Carr in *United States of America v. Thomas Carr, et al.*, Case No. 2:02-cr-01112-ADS-2 (E.D.N.Y.) and *United States of America v. Peter G. Liounis, et al.*, Case No. 01-Crim. 784 (S.D.N.Y.);

5.      Relevant portions of a document (undated) titled "Responses to Meetings: Tom Carr, Jim Neebling";

6.      Relevant portions of the July 31, 2003 testimony of Thomas Carr in *Iron Mountain Incorporated v. J. Peter Pierce* (AAA);

7.      August 23, 2001 Indictment of Thomas Carr in *United States of America v. Peter G. Liounis, et al.*, Case No. 01-Crim. 784 (S.D.N.Y.);

8.      September 24, 2002 Indictment of Thomas Carr in *United States of America v. Barry Schwartz, et al.*, Case No. 02-cr-1112 (E.D.N.Y.);

9.      Affidavit of Thomas Carr and James Neebling, signed by Thomas Carr on March 17, 2005;

10.     Complaint dated March 25, 2005 filed by Thomas Carr in *Thomas Carr, et al. v. J. Peter Pierce, et al.*, Case No. 05-cv-1721 (D.N.J. 2005);

11.     December 15, 2003 e-mail from James Neebling to Larry Varn; and

12.     Contract for Logistics Management Services, Contract No. 2002111 between Iron Mountain Information Management, Inc. and Systrans Freight Systems, Inc. dated May 1, 2003 and related Schedules and Amendments.

**B.  Exhibits Proposed by Defendant and Counter-Plaintiff Carr and Defendant Systrans**

Defendant and Counter-Plaintiff Carr and Defendant Systrans may present the

following exhibits in addition to referencing exhibits already filed with the Court by the

parties.

1.  Letter from Arthur M. Peslak to Read McCaffrey attaching billing records for the Carr matters (7/17/06)

2. Asset Purchase Agreement by and among Transportation Concepts of NJ, Inc., TC Transport & Warehousing, Inc., TC Transport & Leasing, Inc., Thomas Carr and Logisteq, LLC (1/00/00)

3. Declaration of Arthur M. Peslak (9/26/05)

4. Email from Arthur Peslak to Larry Varn re: outstanding bill (2/12/04)

5. Letter from Arthur Peslak to Vincent Ryan re: legal fees (4/9/02)

6. Email from Larry Varn to Arthur Peslak and Garry Watzke re: proposed agreement re: fees (4/9/02)

7. Letter from Arthur Peslak to Richard Reese re: communications with Larry Varn (2/13/04)

8. Email from Larry Varn to Arthur Peslak re: wire transfer (4/12/02)

9. Limited Liability Company Operating Agreement of Logisteq, LLC (1/00/01)

10. Email from Larry Varn to Arthur Peslak re: Haslon deposition (3/4/03)

11. Email from Larry Varn to Arthur Peslak and Jim Neebling re: dinner on Wednesday night (5/19/03)

12. Email from Larry Varn to Doreen Davis, Charles Moore, Arthur Peslak, Jim Neebling, and Beth Jacobson re: hotel rooms (7/25/03)

13. Email from Larry Varn to Patrick O'Connor, Philip Kircher, Melanie Miller, John Barnoski, Doreen Davis, and Beth Jacobson re: Iron Mountain v. Pierce witnesses (7/25/03)

14. Emails from Larry Varn to Arthur Peslak and Jim Neebling re: travel itinerary (7/25/03)

15. Letter from Thomas Carr to Richard Reese re: issues with Iron Mountain and possible legal action (7/13/04)

16. Email from Jim Neebling to Bob Miller, Read McCaffrey and Garry Watzke re: legal matter (5/13/05)

17. Email from Jim Neebling to Garry Watzke and Read McCaffrey re: legal matter (5/17/05)

18. Chart recapping discussions (12/2001 – 10/2004)

19. Letter from Arthur Peslak to Richard Reese re: communications with Larry Varn (2/13/04)

20. Letter from Jim Neebling to Larry Varn re: Systrans (4/11/03)

21. Letter from Judith Carr to Vincent Ryan re: Thomas Carr (3/2/06)

22. Email from Paul Schwartz to Ilya Shapiro re: loan (10/6/06)

23. Declaration of Michael Chazen

24. Carr/Iron Mountain Chronology (12/8/06)

25. Email from Arthur Peslak to Ilya Shapiro re: meetings with Kenny or Moore (1/30/07)

26. Email from Larry Varn to Arthur Peslak and Jim Neebling re: Thomas Carr (2/12/04)

27. Email from Jim Neebling to Arthur Peslak and Kerry Potestivo re: shake down (2/12/04)

28. Email from Garry Watzke to Arthur Peslak re: 3/8/04 invoice (3/15/04)

29. Fax from Arthur Peslak to Garry Watzke attaching signed W-9 (3/26/04)

30. Fax from Garry Watzke to Arthur Peslak attaching unsigned W-9 and invoice (3/26/04)

31. Mutual Interest Agreement/Confidentiality Agreement

32. Email from Larry Varn to Arthur Peslak and William Matlack re: info for Price Waterhouse Coopers (4/11/02)

33. Email from Larry Varn to Arthur Peslak re: Logisteq (4/11/02)

34. Memo from Larry Varn to Arthur Peslak re: Carr's microcassettes (4/23/02)

35. Email from Larry Varn to Arthur Peslak and Garry Watzke re: Logisteq litigations (5/29/02)

36. Letter from Franklin Velie to Thomas Carr re: 7/13/04 letter to Reese (7/23/04)

37. The following correspondence between Counter-Defendant Larry Varn and James Neebling:

    a) email dated January 20, 2003
    b) email dated March 4, 2003
    c) email dated March 10, 2003
    d) email dated March 31, 2003
    e) email dated April 2, 2003

f)  emails dated April 14, 2003
g)  email dated May 4, 2003
h)  email dated May 19, 2003
i)  email dated June 10, 2003
j)  emails dated June 20, 2003
k)  emails dated June 24, 2003
l)  emails dated June 26, 2003
m)  email dated June 30, 2003
n)  emails dated July 1, 2003
o)  emails dated July 2, 2003
p)  email dated July 9, 2003
q)  emails dated July 11, 2003
r)  emails dated July 25, 2003
s)  emails dated July 29, 2003
t)  email dated August 14, 2003
u)  email dated September 8, 2003
v)  email dated September 10, 2003
w)  emails dated September 25, 2003
x)  email dated November 2, 2003
y)  email dated November 14, 2003
z)  email dated November 2, 2004
aa) email dated March 4, 2005
bb) email dated March 5, 2005
cc) email dated March 6, 2005

38. The following documents related to Iron Mountain's legal action against Pierce:

a)  deposition of John F. Kenny in Iron Mountain v. Pierce, American Arbitration Association, No. 4 160 00671 02

b)  deposition of C. Richard Reese in Iron Mountain v. Pierce, American Arbitration Association, No. 4 160 00671 02

39. The following documents concerning Systrans:

a)  Systrans Freight Systems, Inc. Business Relationship Review: Iron Mountain

b)  Systrans Proposal for Iron Mountain, August 2002

c)  email from James Neebling to Bob Miller dated May 6, 2005 regarding various debts owed by Systrans

d)  email from James Neebling to Bob Miller dated May 5, 2005 regarding the Systrans Program

40. Carr's complaint against Pierce in the Pierce Litigation.

31

### C. Exhibits to be Introduced without Objection

1.      Verified Complaint and Demand for Trial by Jury filed by Thomas Carr on April 4, 2002 in *Thomas Carr, et al. v. J. Peter Pierce, et al.*, Docket No. MONC 95-02 (Chancery Division, Monmouth County, NJ).

2.      Affidavit of Thomas Carr and James Neebling, signed by Thomas Carr on March 17, 2005.

## XIII.    **Appendix of Proposed Findings of Fact and Rulings of Law**

Please see attached appendices.

Dated: April 3, 2008.

Respectfully submitted,


/s/ Ira K. Gross                                     /s/ Read K. McCaffrey
Ira K. Gross (BBO# 212720)           Read K. McCaffrey (*Pro Hac Vice*)
igross@sandw.com                           rmccaffrey@pattonboggs.com
Sullivan & Worcester LLP                 Patton Boggs LLP
One Post Office Square                     2550 M Street, NW
Boston, Massachusetts 02109           Washington, DC 20037
(617) 338-2800                                 Telephone: (202) 457-6000

*Counsel for Iron Mountain*              *Counsel for Carr and Systrans*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IRON MOUNTAIN INCORPORATED; IRON MOUNTAIN INFORMATION MANAGEMENT, INC.; C. RICHARD REESE; JOHN F. KENNY, JR.; GARRY B. WATZKE; LARRY L. VARN; and CHARLES G. MOORE, <br><br> Plaintiffs, <br><br> v. <br><br> THOMAS CARR, <br><br> Defendants. | Civil Action No. 05 10890 RCL |
| IRON MOUNTAIN INFORMATION MANAGEMENT, INC., <br><br> Plaintiff, <br> v. <br><br> SYSTRANS FREIGHT SYSTEMS, INC., <br><br> Defendant. | Civil Action No. 05 10999 RCL (consolidated) |

**PLAINTIFFS' APPENDIX OF PROPOSED FINDINGS OF FACT
AND RULINGS OF LAW**

Pursuant to paragraph 2(m) of the Court's Procedural Order dated February 5, 2008,

Plaintiffs/Counterclaim-Defendants Iron Mountain Incorporated and Iron Mountain Information

Management, Inc. (together, "Iron Mountain"), respectfully submit this Appendix to their

Pretrial Memorandum and offer the following proposed findings of fact and rulings of law:

**Proposed Findings of Fact**

1.      Neither Iron Mountain nor anyone acting on Iron Mountain's behalf made any

enforceable promise to Defendant/Counterclaim-Plaintiff Thomas Carr ("Carr").

2.      Neither Iron Mountain nor anyone acting on Iron Mountain's behalf promised to pay Carr's attorneys' fees in connection with a lawsuit that Carr commenced in New Jersey state court against his former business associate, J. Peter Pierce.

3.      Neither Iron Mountain nor anyone acting on Iron Mountain's behalf promised to pay Carr $2 million or to get Carr $2 million.

4.      In connection with a written contract between Iron Mountain and Systrans Freight Systems, Inc. ("Systrans") entered into in May 2003 (the "Systrans Contract"), Iron Mountain made a series of cash advances to Systrans totaling $195,500 (the "Advances"), which Systrans agreed to repay.

5.      During the term of the Systrans Contract, Systrans overcharged Iron Mountain, in the amount of $78,500 (the "Overcharges").

6.      Systrans has repaid or offset $108,000 of the Advances and Overcharges, but has otherwise not repaid Iron Mountain for the Advances or the Overcharges.

**Proposed Rulings of Law**

1.      Larry Varn's alleged statements, even if made, were not sufficient to form a binding agreement between Iron Mountain and Carr for the payment of $2 million.

> Supporting Authority: *Broad Street Nat'l Bank of Trenton v. Collier*, 169 A. 552, 554 (N.J. 1933) ("[a] declaration … which does not show that the party … promises to act … or intends to incur a legal liability obliging him to act in such way, is not an offer which can be accepted so as to make a contract"); *Esslinger's, Inc. v. Alachnowicz*, 68 N.J. Super. 339, 344-51 (N.J. App. Div. 1961) ("friendly assurances" and "good intentions" insufficient to create an enforceable contract); *Spectrum Research Corp. v. Interscience, Inc.*, 242 A.D.2d 810, 811 (N.Y. 1997) ("[i]t is well settled that a contract must be definite in its material terms in order to be enforceable"); *Cobble Hill Nursing Home v. Henry & Warren Corp.*, 74 N.Y.2d 475, 482 (1989); *Marraccini v Bertelsmann Music Group*, 221 A.D.2d 95, 97 (N.Y. 1996). Thus, an "agreement to agree, in which a material term is left for future negotiations, is unenforceable." *See Martin Delicatessen v Schumacher*, 52 N.Y.2d 105, 109 (N.Y. 1981); *Bower v. Atlis Sys.*, 182 A.D.2d 951, 952-53 (N.Y. 1992).

2.      Even if Larry Varn's alleged statements were made and would otherwise be sufficient to form an "agreement" between Iron Mountain and Carr for $2 million, that supposed "agreement" is unenforceable for lack of consideration.

> <u>Supporting Authority</u>: *Pershall V. Elliot*, 163 N.E. 554, 556 (N.Y. 1928) ("past consideration is no consideration"); N.Y. Gen. Oblig. Law § 5-1105 (past consideration is not valid to support a contract unless there is a writing signed by the party to be bound); *Thermoid Co. v. Consol. Prods. Co., Inc.*, 81 A.2d 473, 475 (N.J. 1951) ("past consideration . . . [is] insufficient in law to support a binding promise"); *New Brunswick v. Milltown*, 191 N.J. Super. 467, 469 (Super. Ct. 1983) ("past consideration is insufficient to require ... performance"); *Long v. Board of Chosen Freeholders*, 16 N.J. Super. 448, 456 (App. Div. 1951) ("merely agreeing to pay past due accruals" is unenforceable for lack of consideration).

3.      Iron Mountain has no contractual or other legal obligations to Carr.

4.      Systrans breached the Systrans Contract by failing to repay Iron Mountain for the Advances and Overcharges, and is obligated to repay Iron Mountain a total of $166,000 plus accrued interest.


Dated: April 3, 2008                          Respectfully submitted,

                                              **IRON MOUNTAIN INCORPORATED
                                              and
                                              IRON MOUNTAIN INFORMATION
                                              MANAGEMENT, INC.,**

                                              By their attorneys,

                                              /s/ Ira K. Gross
                                              Ira K. Gross (BBO# 212720)
                                              *igross@sandw.com*
                                              Kevin Colmey (Admitted *Pro Hac Vice*)
                                              *kcolmey@sandw.com*
                                              SULLIVAN & WORCESTER LLP
                                              One Post Office Square
                                              Boston, Massachusetts  02109

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IRON MOUNTAIN INCORPORATED, et al. | ) | |
| | ) | |
| Plaintiffs and, | ) | |
| Counter-Defendants, | ) | Civil Action No. 05-10890-RCL |
| | ) | |
| vs. | ) | |
| | ) | |
| THOMAS CARR, | ) | |
| | ) | |
| Defendant and | ) | |
| Counter-Plaintiff. | ) | |
| IRON MOUNTAIN INFORMATION | ) | |
| MANAGEMENT, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 05-10999-RCL |
| vs. | ) | (Consolidated) |
| | ) | |
| SYSTRANS FREIGHT SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT / COUNTERCLAIM-PLAINTIFF THOMAS CARR AND DEFENDANT SYSTRANS FREIGNT SYSTEMS, INC.'S PROPOSED FINDINGS OF FACT AND RULINGS OF LAW

Defendant/Counterclaim-Plaintiff Thomas Carr ("Carr") and Defendant Systrans Freight

Systems, Inc. ("Systrans"), through counsel, respectfully submit these Proposed Findings of Fact

and Rulings of Law as an appendix to the Joint Pretrial Memorandum submitted pursuant to the

Court's Procedural Order dated February 5, 2008.

## Proposed Findings of Fact

1.      Iron Mountain Inc. is a Pennsylvania corporation with a principal place of business located at 745 Atlantic Avenue, Boston, Massachusetts, specializing in outsourced records and information management services.

2.      IMIM is a Delaware corporation with a principal place of business located at 1000 Campus Drive, Collegeville, Pennsylvania. IMIM is a wholly-owned subsidiary of Iron Mountain (together the entities are referenced as "Iron Mountain").

3.      Larry Varn ("Varn") is now, and was at all times material to the matters at issue, a partner of Sullivan & Worcester LLP ("S&W"), which regularly represents Iron Mountain and IMIM.

4.      Carr is an individual who resides at 152 Chestnut Way, Manalapan, New Jersey.

5.      Arthur Peslak is a member in good standing of the New Jersey State Bar and is an active member of the Monmouth County, New Jersey State Bar Association (Chair, Intellectual Property Section 1997-1999).

6.      On February 1, 2000, Iron Mountain was merged with and into Pierce Leahy Corp., a Pennsylvania corporation (the "Merger"), the remaining corporation being Iron Mountain. Peter Pierce ("Pierce") was elected to the Iron Mountain Board of Directors in connection with and as a result of the Merger, and Pierce was appointed as President of Iron Mountain and also as President, Chief Operating Officer, and the most senior officer of IMIM.

7.      On or about June 30, 2000, Pierce's employment with Iron Mountain and IMIM was terminated, and Pierce remained a member of Iron Mountain's Board of Directors until his

2

resignation on December 23, 2002. As a condition to the Merger, Pierce and Iron Mountain had entered into a written Employment Agreement containing certain non-compete covenants.

8.    On or about January 15, 2001, Carr and Pierce entered into an agreement to form a transportation company, Logisteq, at the conclusion of which transaction, a Pierce-controlled entity, Pioneer Capital, L.P., and a Carr-controlled entity, Transportation Concepts of New Jersey, Inc. ("T.C.") owned Logisteq 51% and 49% respectively. Prior to this time, sometime around mid-2000, Pierce directly and indirectly managed, engaged in, participated in, and provided advice to, Sequedex LLC ("Sequedex"), a former IMIM competitor.

9.    S&W and Varn represented Iron Mountain and IMIM in connection with an investigation of Pierce, and Moore provided investigatory services to S&W, in connection with the same investigation.

10.    On or about February 20, 2001, Iron Mountain, over the signature of Garry B. Watzke, Esq. ("Watzke"), its General Counsel, sent a letter to Carr and T.C. advising that Iron Mountain was exercising its option under the lease to terminate T.C.'s tenancy effective March 31, 2001.

11.    In the spring of 2002, the Plaintiffs began encouraging Carr to file his own suit against Pierce to strategically coincide with the action that Iron Mountain was planning to also file. With the intent of orchestrating simultaneous lawsuits against Pierce, the Plaintiffs sought to facilitate Carr's participation by agreeing to fund his lawsuit and drafting a complaint for Carr to file.

12.    From time to time, certain of the Plaintiffs met with or had telephone conversations with Carr, James Neebling ("Neebling"), the President of Systrans, and/or Arthur Peslak ("Peslak"). Included in these meetings were two meetings on March 19, 2002 in New Jersey, a meeting on March 26, 2002 in Boston, a telephone conference with Peslak on April 2, 2002, a meeting on April 9, 2002 in New York, New York, and a dinner on or about September 9, 2003 at Gallagher's Restaurant in New York, New York.

13.    The meetings listed and described in Exhibit I to the Declaration by Ilya Shapiro made in connection with Carr's Statement of Disputed Material Facts in support of his Consolidated Opposition to the Plaintiffs' Motions for Summary Judgment represents a list of some of the physical meetings and telephone conversations involving the parties. These meetings occurred as described.

14.    During one of the many meetings admitted by the Plaintiffs in various filings and deposition testimony in this case, both in person and by telephone, and in consideration for Carr's information and cooperation, the Plaintiffs promised:

a)    to fund Carr's lawsuit against Pierce and related legal expenses;

b)    to loan him $5 million;

c)    to hire him as a transportation consultant on the same terms as he was then employed;

d)    to ensure that Systrans would receive $25-45 million in courier business (through which Carr, as a principal investor, would see a large profit);

e)    to pay Carr $2 million as an interim measure to allow him to satisfy certain obligations in the wake of Pierce's malfeasance;

4

f)      assurances to Carr's creditor, Paul Schwartz, that Iron Mountain would provide

sufficient funds and revenues to Carr to enable Schwartz to conclude that Carr

was a good candidate for loans; and

g)      that if any negative financial effects befell Carr or his family as a result of his

cooperation with the Plaintiffs in their disputes with Pierce, the Plaintiffs would

indemnify him.

15.     The assurances Plaintiffs, specifically Varn, made to Carr's creditor Paul

Schwartz have caused Carr damages.  Part of the $600,000 Carr invested in Systrans was a loan

from Schwartz, as was part of the $2 million personal debt the Plaintiffs promised to repay to

Carr.

16.     Varn promised Carr $2 million in return for his services.  Carr Depo., February

28, 2007 and March 15, 2007, p. 201.

17.     Carr initially voiced reluctance in joining the Plaintiffs' campaign against Pierce

and expressed significant concerns about the negative effects of any such action on his business

and family.  In addition to the promises the Plaintiffs made to Carr, Kenny also called Carr's

wife to reiterate and specifically affirm each of the foregoing promises and advise her that Iron

Mountain would ensure the family's financial stability should Carr join the effort against Pierce.

Carr eventually acquiesced, and Iron Mountain had a courier deliver a copy of the drafted

complaint for Carr to sign while he was on vacation with his family in California.

18.     Carr cooperated completely with the Plaintiffs, met with witnesses, reviewed

commercial transactions involving Pierce and Pierce-related companies, and turned over

documents and other materials to several of the Plaintiffs.  This cooperation involved extensive

5

travel at the Plaintiffs' request.  It culminated in Carr's testimony at the Pierce Arbitration in July 2003, which Varn coached to be technically accurate but factually misleading.

19.    Carr assisted the Plaintiffs in full reliance on the aforementioned promises and, as a direct result of this reliance, lost his businesses and was shackled with debt.  In retaliation for Carr's cooperation with the Plaintiffs, including his filing of a complaint against Pierce, Pierce wasted the business of which Carr was a 49% owner, fired him, and left him without a source of income.

20.    The Plaintiffs continued to take an active role in the Carr-Pierce litigation; Varn acted as co-counsel to Peslak, "from reviewing pleadings, to preparing Carr for his deposition testimony to weighing in on settlement of the case."  Declaration of Arthur Peslak, filed October 12, 2005 ¶ 13.

21.    Carr believed that the Plaintiffs would fulfill their oral contract for monetary compensation, employment, business, and other indemnification but when Carr demanded satisfaction he was met with silence, delay, and denial.  At one point the Plaintiffs began to advise Carr that he would have to wait until after the Pierce Arbitration and then, after Iron Mountain lost the arbitration in February 2004, until final resolution of appeals.

22.    Despite repeated requests from Carr, Peslak, and Neebling, the Plaintiffs remained incapable of or unwilling to fulfill the aforementioned promises, continuing to use as an excuse the pendancy of the arbitration appeal.  In early 2005, undersigned counsel became involved in an effort to amicably resolve Carr's claims relating to the Plaintiffs' obligations to him.  After being put off for several months and being assured that a resolution of his Carr

claims awaited the conclusion of appeals in the Pierce case, Carr received the Plaintiffs' Complaint in this case.

23.     Carr has lost or been deprived millions of dollars as a result of Plaintiffs' failure to fulfill their promises.

24.     Carr, sometimes through his attorney, Peslak, requested on several occasions that the oral contract be set down in writing, but the Plaintiffs declined to do so out of a stated (but false) fear that evidence of their contract with Carr would lessen the effect of Carr's testimony in the litigation against Pierce.

25.     Larry Varn coached Carr to answer in a way that was legally accurate but nevertheless misleading with respect to his testimony in his litigation against Pierce over Logisteq.  For example, Varn instructed Carr that if he was asked "did Iron Mountain offer you a job in exchange for your assistance," Carr was to say "no" because he was offered a consulting position and not a job.

26.     On April 28, 2002, Iron Mountain filed a complaint against Pierce in the New Jersey Superior Court, Middlesex County, Chancery Division, alleging, inter alia, that Pierce violated his written covenants with Iron Mountain and his fiduciary obligations to Iron Mountain and its shareholders.  The action was stayed pending completion of a pending arbitration proceeding against Pierce (the "Pierce Arbitration"), and the arbitrator ruled that Iron Mountain did not introduce sufficient evidence that Pierce had violated his legal obligations to Iron Mountain and its stockholders.

27.    In or about April 2002, Iron Mountain paid to Peslak, Carr's counsel in proceedings against Pierce, the amount of $50,000 in partial fulfillment of their promise to pay Carr's legal expenses in connection with his suit against Pierce. Sullivan & Worcester LLP, upon Varn's instructions, caused the payment to be made to Peslak's trust account via wire shortly thereafter.

28.    Both Watzke and Varn promised Carr (1) payment of his legal fees and (2) fulfillment of Iron Mountain's obligations to Carr after the conclusion of arbitration (and the subsequent appeal). Carr advanced about $17,500 of the total legal fees.

29.    Carr has an invested interest in Systrans of at least $600,000, which he paid towards Systrans' capital expenses. Carr was entitled to a share of Systrans' profits.

30.    Systrans LLC was created to handle the business through which the Plaintiffs promised to compensate Carr for his services on their behalf. Systrans Freight Systems, Inc., meanwhile, which is the entity that signed the Systrans contract and which is the Defendant in the consolidated case, was an established provider of courier and transportation consulting services.

31.    The amount owed by Systrans to IMIM is offset by $49,034 in delivery charges owed to Systrans by IMIM. Further setting off the amount owed by Systrans is the promise by IMIM that Systrans was to earn net profits of at least $4.5 million per year from the promised annual gross revenues of $25-45 million. Thus, Systrans owes no monies to IMIM.

32.    Plaintiff Charles Moore promised Carr and Neebling that funds would be paid to Carr and that Systrans would receive significant contracts in exchange for their continued assistance in the Pierce litigation.

33.    Carr has presented the only evidence in this case that does not come from an interested party, namely that of Peslak, whose legal fees have been paid and who has "no interest, monetary or otherwise, at stake in this case." Peslak Decl. at ¶ 2.

## Proposed Rulings of Law

1.    Plaintiffs/Counterclaim-Defendants' promises to Defendant/Counterclaim-Plaintiff Carr in exchange for his cooperation in the Pierce Arbitration constitute enforceable oral contracts. *Soar v. National Football League Players' Ass'n*, 550 F.2d 1287, 1290-91 (1st Cir. 1977) (for a contract to be enforceable, it must be of "sufficient explicitness so that a court can perceive … the respective obligations of the parties" and an enforceable contract may be found even if one or more critical questions are left unanswered); *TLT Construction v. RI, Inc.*, 484 F.3d 130, 135-36 (1st Cir. 2007) (parties may orally agree to be bound by agreeing to the material terms of a contract); *Armstrong v. Rohm & Hass Co.*, 349 F.Supp.2d 71, 78 (D. Mass. 2004) (when lack of specificity regarding terms such as time of performance, price to be paid, or work to be done, courts ask whether parties intended to contract with one another and whether "reasonably certain basis" for providing appropriate remedy); *McCarthy v. Tobin,* 706 N.E.2d 629, 631 (Mass. 1999) (parties must agree on the material terms and have a present intention to be bound by that agreement); *Lafayette Place Assoc. v. Boston Redevelopment Auth.*, 694 N.E.2d 820, 826 (Mass. 1998) (enforcing a contract where certain terms, including purchase price, were unknown and unknowable at time of signing); *Shayeb v. Holland*, 73 N.E.2d 731, 732 (Mass.

9

1947) (enforcing an agreement after finding contract embodying material factors not to be incomplete or indefinite when it fails to express certain matters necessary for its performance or satisfaction); *Cygan v. Megathlin*, 96 N.E.2d 702, 703 (Mass. 1951) (a contract is not invalid because one of its material provisions is stated in general terms, if, when construing it "in light of attending circumstances," a court can determine the rights and obligations of the parties "with reasonable certainty").

      2.     Plaintiffs/Counterclaim-Defendants have accepted the benefit of the bargain and are thus liable for their obligations under the contracts. *Lafayette Place Assoc. v. Boston Redevelopment Auth.*, 694 N.E.2d 820, 826 (Mass. 1998) (if the parties specify "procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding"); *Cygan v. Megathlin*, 96 N.E.2d 702, 703 (Mass. 1951); *Hastings Associates, Inc. v. Local 369 Bldg. Fund, Inc.*, 675 N.E.2d 403, 410 (Mass. App. Ct. 1997) (enforcing an ambiguous lease renewal where doing otherwise would benefit defendant at plaintiff's expense in a way not contemplated by contract).

      3.     The amount owed by Systrans to IMIM is set off by the amounts IMIM owes and promised to Systrans, therefore Systrans is released from any claimed liability to IMIM with respect to the claims in this matter. *F.D.I.C. v. Kooyomjian*, 220 F.3d 10 (1st Cir. 2000) (recoupment is a defense against a claim where a counter-claim arising out of the same transaction is subtracted from the damages owed on the original claim); *United Structures v. G.R.G. Eng'g*, 9 F.3d *996*, 998 (1st Cir. 1993) (both judgments must be final and the parties must be mutual; "'The distinctions between . . . recoupment and setoff are no longer of much importance. . .'") (citation omitted); *In re Grand Wireless Inc.*, No. 06-40150-RWZ, at *2-3 (D. Mass. May 29, 2007); *Sign-a-way, Inc. v. Mechtronics Corp.*, 12 F. Supp.2d 132, 160-61 (D.

Mass. 1998); *Goldman v. Noxon Chemical Products Co.*, 174 N.E. 67 (Mass. 1931) (setoff is the difference between two judgments based upon separate judgments between mutual parties).

    4.       Defendant/Counterclaim Plaintiff Carr is entitled to monetary damages for breach of contract in the amount of $2,017,500.

    5.       It is for the Court to determine the total monetary damages, applying Massachusetts state law.  Under Massachusetts law, the Plaintiffs/Counterclaim Defendants owe the amount of their promises, plus prejudgment interest.  *Blue Hills Office Park v. J.P. Morgan Chase Bank*, 477 F. Supp. 2d 366, 385 (Mass. 2007); *Saint-Gobain Indus. Ceramics Inc. v. Wellons, Inc.*, 246 F.3d 64, 69 (1st Cir. 2001); *Perkins Sch. for the Blind v. Rate Setting Comm'n*, 383 Mass. 825, 835 (1981).

**Dated April 3, 2008**

**Respectfully submitted,**

*/s/ Read K. McCaffrey*
Read K. McCaffrey (pro hac vice)
rmccaffrey@pattonboggs.com
Patton Boggs LLP
2550 M Street, NW
Washington, DC  20037
Telephone: (202) 457-6000

Counsel for Defendant and
Counterclaim-Plaintiff Thomas Carr

and

Counsel for Defendant Systrans Freight
Systems, Inc.

**<u>Certificate of Service</u>**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on April 3, 2008.

/s/ Kevin M. Colmey